# 15 Cv. 819

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

### MARTIN HEIDGEN,

*Petitioner,*

### - against -

### HAROLD GRAHAM, SUPERINTENDENT AUBURN CORRECTIONAL FACILITY and NYS DOCCS,

*Respondent.*

---

# MEMORANDUM OF LAW IN SUPPORT OF MARTIN HEIDGEN'S PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254

---

JILLIAN S. HARRINGTON, ESQ.
Attorney at Law
P.O. Box 6006
Monroe Twp., New Jersey 08831
(718) 490-3235
JBHESQ@AOL.COM

## TABLE OF CONTENTS

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     THE PEOPLE'S CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    THE DEFENSE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    III.   THE VERDICT AND SENTENCING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    IV.   THE DIRECT APPEAL TO THE APPELLATE DIVISION, SECOND DEPARTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    V.    THE APPEAL TO THE NEW YORK STATE COURT OF APPEALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**POINT I.**

MR. HEIDGEN WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS AS A RESULT OF THE TRIAL COURT'S DECISION TO PERMIT DNA TESTING IN THE MIDDLE OF TRIAL AND REVERSE HIS OWN DECISION AND ADMIT THE PREVIOUSLY EXCLUDED BLOOD PURPORT-ED TO BE MR. HEIDGEN'S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    I.     PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    What Happened at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.    The Direct Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

## TABLE OF CONTENTS (cont'd)

II.     THE STANDARD OF REVIEW IN A HABEAS CORPUS
        PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.    ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.      Step One – It was Clearly Error to Admit the DNA and
                Blood Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                1.      The Court's Decision to Permit Scientific Testing
                        Mid-Trial Was Procedurally Erroneous . . . . . . . . . . . . . . . . . . . 31
                2.      No DNA Test Could Render Reliable a Piece of
                        Evidence the Trial Court Already Deemed Unreliable
                        and Excluded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        B.      Step Two – The Error to Admit the Blood Evidence Resulted
                in the Depravation of Mr. Heidgen's Constitutional Rights to
                a Fair Trial and Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        C.      The Erroneously Admitted Evidence Was Critical to the
                People's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38


***POINT II.***

THE PEOPLE FAILED AS A MATTER OF LAW TO PROVE MR.
HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED
INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE
DOUBT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.      PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 0

II.     APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        A.      Penal Law Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        B.      Standard of Review of Sufficiency of the Evidence Claims
                in Habeas Petitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**TABLE OF CONTENTS (cont'd)**

III.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    A.   Mr. Heidgen's Level of Intoxication. . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    B.   Mr. Heidgen Was Not Suicidal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    C.   Mr. Heidgen's Speed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    D.   Mr. Heidgen Did Not Ignore Signs That He Was Driving
       on the Wrong Side of the Road. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*POINT III.*

MR. HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND
IMPROPERLY ADMITTED INTO EVIDENCE AT TRIAL IN VIOL-
ATION OF HIS FOURTH AMENDMENT RIGHT TO BE FREE OF
UNREASONABLE, WARRANTLESS SEARCHES AND SEIZURES. . . . . . . . . . . . . 67

I.   THE PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

II.   THE APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . 71

III.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    A.   This Court Should Reach this Issue Despite the Court of
       Appeals' Finding That it Was Unpreserved. . . . . . . . . . . . . . . . . . . . . . . 73

        1.   This Issue Was Preserved for Appellate Review. . . . . . . . . . . . . 73
        2.   This Issue Is of Such Great Constitutional Magnitude
           That a Perceived State Procedural Bar to Review
           Should Not Prohibit Habeas Review in Light of the
           Supreme Court's Recent Decisions. . . . . . . . . . . . . . . . . . . . . . . 74

    B.   Mr. Heidgen Should Prevail on this Issue on the Merits. . . . . . . . . . . . . 76

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

iii

## TABLE OF CONTENTS (cont'd)

### *POINT IV.*

THE TRIAL COURT VIOLATED MR. HEIDGEN'S CONSTITU-
TIONAL RIGHTS TO A FAIR TRIAL AND TO PRESENT A
DEFENSE BY  PRECLUDING HIM FROM PRESENTING THE
EXPERT TESTIMONY OF A QUALIFIED POLICE ACCIDENT
RECONSTRUCTIONIST... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

I.      FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

II.     ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93


CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  94

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES:**</u>

<u>Agard v. Portuondo</u>, 117 F.3d 696 (2d Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

<u>Alvarez v. Scully</u>, 833 F. Supp. 1000 (SDNY 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Antoine v. Ercole</u>, 11-CV-00088 (EDNY Aug. 29, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 43

<u>Baker v. Reid</u>, 482 F.Supp. 470 (SDNY1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

<u>California v. Trombetta</u>, 467 U.S. 479 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

<u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

<u>Coleman v. Thompson</u>, 501 U.S. 722 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

<u>Collins v. Scully</u>, 755 F.2d 16 (2d Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 38

<u>Cotto v. Herbert</u>, 331 F.3d 217 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

<u>Daye v. Attorney Gen. of NYS</u>, 696 F.2d 186 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . 74

<u>Fernandez v. California</u>, 134 S.Ct. 1126 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

<u>Garvey v. Duncan</u>, 485 F.3d 709 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

<u>Green v. Travis</u>, 414 F.3d 288 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Gutierrez v. Smith</u>, 702 F. 3d 103 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

<u>Howard v. Walker</u>, 406 F. 3d 114 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 91

<u>In re Winship</u>, 397 U.S. 358 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

<u>Jones v. Stinson</u>, 229 F.3d 112 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 92

<u>Kozlowski v. Hulihan</u>, 511 F. Appx. 1 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Lee v. Kemna</u>, 534 U.S. 362 (2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

<u>Lewis v. Jeffers</u>, 497 U. S. 764 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Mannix v. Phillips</u>, 619 F.3d 187 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

<u>Mattot v. Ward</u>, 48 N.Y.2d 455 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

<u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Missouri v. McNeely</u>, 133 S.Ct. 1552 (2013) . . . . . . . . . . . . . . .   22, 70, 71, 72, 76, 80, 81, 83

<u>Mullings v. Laffin</u>, 13-cv-139 (EDNY Aug. 8. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

<u>Ospeh v. Rock</u>, 11-cv-00536 (NDNY March 31, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 63

<u>Piedra v. LaValley</u>, No. 12-cv-02711 (EDNY 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>People v. Alomar</u>, 55 A.D.3d 617 (2d Dept. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>People v. Contes</u>, 60 N.Y.2d 620 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

<u>People v. Coon</u>, 34 A.D.3d 869 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

<u>People v. Dingle</u>, 30 A.D.3d 1121 (1st Dept. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

<u>People v. Feingold</u>, 7 N.Y.3d 288 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

<u>People v. Heidgen</u>, 87 A.D.3d 1016 (2d Dept. 2011). . . . . . . . . 20, 21, 40, 41, 50, 58, 59, 62, 70

<u>People v. Heidgen</u>, 22 N.Y.3d 259 (2013). . . . . . . . . . . . . . . . . . . . . . 21, 22, 47, 48, 51, 71

<u>People v. Julian</u>, 41 N.Y.2d 340 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 34

<u>People v. Kates</u>, 53 N.Y.2d 591 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

<u>People v. Lazartes</u>, 23 A.D.3d 400 (2d Dept. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 93

<u>People v. McPherson</u>, 89 A.D.3d 752 (2d Dept. 2011).. . . . . . . . . . . . . . . . . . . . . . . . 45, 64

<u>People v. Negron</u>, 91 N.Y.2d 788 (1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**TABLE OF AUTHORITIES (cont'd)**

People v. Payne, 3 N.Y.3d 266 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

People v. Register, 60 N.Y.2d 270 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

People v. Rivera, 184 A.D.2d 153 (1ˢᵗ Dept 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

People v. Sanchez, 98 N.Y.2d 373 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

People v. Suarez, 6 N.Y.3d 202 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 44, 49, 50, 58

People v. Thacker, 166 A.D.2d 102 (1ˢᵗ Dept. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

People v. Valencia, 14 N.Y.3d 927 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

People v. Williams, 5 N.Y.3d 732 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

People v. Wimes, 49 A.D.3d 1286 (4ᵗʰ Dept. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Quartararo v. Hanslmaier, 186 F.3d 91(2d Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Schmerber v. California, 384 U.S. 757 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Taylor v. Curry, 708 F.2d 886 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Taylor v. Illinois, 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Underwood v. Kelly, 692 F.Supp. 146 (EDNY 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Garcia, 56 F.3d 418 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

United States v. Johnson, 457 U.S. 537 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

United States v. Mi Sun Cho, 713 F.3d 716 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 86

 United States v. Norman, 13-2840 (2d Cir. Jan. 9, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 90

United States v. Valenzuela-Bernal, 458 U.S. 858 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 88

Wade v. Mantello, 333 F.3d 51 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

## TABLE OF AUTHORITIES (cont'd)

Wainwright v. Sykes, 433 U.S. 72 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Washington v. Schriver, 255 F. 3d 45 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 87, 91, 92

Webb v. Texas, 409 U.S. 95 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Whitley v. Ercole, 642 F.3d 278 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Williams v. Taylor, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

## STATUTES:

28 U.S.C. §2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 27, 28, 42, 72, 92

C.P.L. §240.40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

C.P.L. §240.90. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.P.L. §330.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.P.L. §470.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

C.P.L. §690.36. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

N.Y. Const. Art. I §6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

P.L. §15.00. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

P.L.§15.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

P.L. §120.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41

P.L. §125.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 41, 42, 43

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

U.S. Const. Amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 84, 86, 93

U.S. Const. Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 42, 84, 86, 93

V.T.L.§1194. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 71, 76, 81

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
**MARTIN HEIDGEN,**

<em><strong>Petitioner,</strong></em>

      **v.**

**HAROLD GRAHAM, SUPERINTENDENT AUBURN**
**CORRECTIONAL FACILITY and NYS DOCCS,**

<em><strong>Respondent.</strong></em>

-----------------------------------------------------------------

## ISSUES PRESENTED FOR REVIEW

1.      Whether Mr. Heidgen was denied his constitutional rights to a fair trial and due process as a result of the trial court's decision to permit DNA testing in the middle of trial and reverse his own decision and admit the previously excluded blood purported to be Mr. Heidgen's?

2.      Whether the People failed as a matter of law to prove Mr. Heidgen's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt?

3.      Whether Mr. Heidgen's blood was illegally obtained and improperly admitted into evidence at trial in violation of his Fourth Amendment right to be free of unreasonable, warrantless searches and seizures?

4.      Whether the trial court violated Mr. Heidgen's constitutional rights to a fair trial and to present a defense by  precluding him from presenting the expert testimony of a qualified police accident reconstructionist?

## INTRODUCTION

Martin Heidgen respectfully submits this Memorandum of Law in support of his motion, made pursuant to 28 U.S.C. §2254, to vacate his conviction as unconstitutional and unjust. All of the issues included herein have been presented to the Appellate Division, Second Department and the New York State Court of Appeals and, therefore, have been exhausted for purposes of review.

## STATEMENT OF FACTS

### I.   THE PEOPLE'S CASE

At 2:10 a.m. on July 2, 2005, NYS TROOPER PATRICK SIEGLER responded to the southbound lanes of the Meadowbrook Parkway. Upon arriving, Siegler observed a limousine facing south in the center lane, a pick up truck in the left lane, and a Nissan Maxima facing north in the right lane. He saw Stanley Rabinowitz in the front seat of the limousine and Jennifer Flynn seated on the center median. Siegler then looked inside the limousine where he saw several injured passengers. In the pick up truck, he saw Mr. Heidgen sitting mostly upright with his eyes open. (Siegler: T.318-22)[1]

Mr. Heidgen was removed from the pick up and placed in an ambulance. Siegler got into the ambulance and observed that Mr. Heidgen's eyes were watery and bloodshot and there was a strong odor of alcohol on his breath. Siegler asked Mr. Heidgen his name but got no response. Siegler then exited the ambulance and, after the ambulance left at approximately 2:33 a.m., he went to Mr. Heidgen's pick up where he found a wallet on the floor and learned Mr. Heidgen's name from his

---

[1] Numbers in parentheses preceded by the letter "T" refer to the pages of the trial transcript. A full transcript of the trial will be furnished to the Court upon request.

Arkansas driver's license. Siegler gave that information to Inv. Harris and Tr. Stafford at the hospital. (Siegler: T.323-26, 344)

Siegler added that at 2:33 a.m., the decision was made to arrest Mr. Heidgen but no one told Mr. Heidgen. (Siegler: T.341-42)

CHRISTOPHER TANGNEY, Jennifer Flynn's father, is a retired Nassau County police officer. He recalled leaving his daughter's wedding at approximately 1:30 a.m. and getting into Stanley Rabinowitz's limousine. Mr. Tangney, who was not wearing his seatbelt, was seated in the rear of the limousine behind Mr. Rabinowitz and could see out the limousine's front window. (C.Tangney: T.408-410, 413-15)

As the limousine traveled in the left lane of the southbound Meadowbrook Parkway at approximately 60 MPH, Mr. Tangney noticed a bright light coming toward them at what he estimated to be approximately 65 MPH. He then realized it was a car and was about to say something when he heard Rabinowitz gasp and try to get to the right but a small car was next to them. They crashed and the impact threw him and his wife forward and decapitated his granddaughter Kate. When first responders arrived, they removed Neil and Grace Flynn and then cut the side of the limousine and removed Mr. and Mrs. Tangney and transported them to the hospital. His injuries included: lower right leg broken off between ankle and knee (was re-attached), left femur broken, bowel disconnected, torn lung, stomach, liver and spleen, damaged hip, and internal bleeding. (C.Tangney: T.421-33)

At approximately 2 a.m., NYS TROOPER DANIEL O'HARE responded to the scene with his partner Michael Stafford. Upon arriving, he saw two vehicles with heavy front-end damage. O'Hare was instructed by Tr. Knapp to go to the hospital with Mr. Heidgen to obtain a blood sample.

O'Hare retrieved a NYS Police blood kit from his patrol car and accompanied Mr. Heidgen to the hospital in the ambulance. (O'Hare: T.597-99, 601-05)

While in the ambulance, O'Hare remained near Mr. Heidgen's head and observed a strong odor of alcohol. He described Mr. Heidgen's eyes as bloodshot and watery. (O'Hare: T.609-10)

Five minutes after arriving at the hospital, Tr. O'Hare asked Nurse Busco to draw Mr. Heidgen's blood for evidence. He watched as she opened the blood kit and removed everything leaving the box empty. While reading the kit's instructions, he observed Busco clean the injection site with the kit's non-alcohol swab before drawing two tubes of blood using the needle she removed from the kit. After she drew the first tube, she gave it to O'Hare. While the second tube was being drawn, O'Hare inverted the first tube at least twenty times per the kit's instructions and then did the same for the second tube. He then placed the blood-filled tubes in the kit. When Busco was done, she discarded the kit's used vacutainer and needle. (O'Hare: T.613-14, 620, 643, 647-52, 679, 684)

Tr. O'Hare displayed a sample kit for the jury which he explained includes a plastic box inside another box. The plastic box includes: a Lab-1 form on which information is provided regarding the defendant and the incident, six integrity seals (four white and two red), instructions on taking blood specimens, a blood collection report; a consent form, a non-alcohol swab to clean injection site, a vacutainer and needle, a holder for the tubes, a biohazard sticker, and two glass tubes with gray tops containing anticoagulant. According to O'Hare, all of the items in the kit were used to draw Mr. Heidgen's blood. (O'Hare: T.615-17, 643-45)

Once the blood was drawn, Tr. O'Hare left the room and partially filled out the seals. He put his initials and the date and time the blood was drawn on the seals but said he could not complete them because he did not know Mr. Heidgen's name. He testified that he filled them out with the

information he had because he thought others would use them at a later time to seal the kit. He then put the partially completed white seals over the tops of the blood tubes and wrote his initials on the tubes themselves before placing them back in the kit. He said that he did not seal the kit at that time even though the instructions tell you to do so because he did not have all of the information. Once he was finished with the tubes, he moved on to the kit's paperwork. He asked Nurse Busco to sign the blood collection report but did not fill in the time and date. He also neglected to sign the form himself in the space designated for the signature of the officer who observed the blood draw. He admitted this was an oversight and acknowledged the importance of the verification. He also explained that he did not fill out the Lab I, although he acknowledged he was supposed to, because he did not have a lot of the information requested on the form despite the fact that the instructions state that the person who observed the blood draw should fill out the form. He further testified that someone else must have completed the seals and forms that he started although he did not know who. (O'Hare: T.620, 653-58, 661, 668, 674-76, 683, 689)

After Tr. O'Hare was finished with the paperwork, he handed the unsealed blood kit to Tr. Stafford who he claimed never told him Mr. Heidgen's name even though Stafford was there while O'Hare filled out the paperwork. When Tr. Stafford left with the blood kit, O'Hare remained with Mr. Heidgen until he was relieved later that morning. (O'Hare: T.622, 624, 645-47, 654)

At trial, Tr. O'Hare was shown People's Ex. #17 for identification which he claimed was the blood kit used to obtain and store Mr. Heidgen's blood on July 2, 2005. He testified he recognized the kit because of the white seals used to close it which contained his initials and Nurse Busco's name as the person who drew the blood. The white seals also had Mr. Heidgen's name which he admitted he did not write. (O'Hare: T.625, 661)

DOROTHY BUSCO, a registered nurse at Nassau University Medical Center, testified that Mr. Heidgen was placed in a trauma room upon arriving at the emergency room and eight to ten people worked on him. He responded to noxious and painful stimuli. Approximately ten minutes after he arrived, a trooper asked her to draw blood with a kit he provided her. (Busco: T.696-99)

Nurse Busco testified that she cleaned the area with a swab from the kit but used one of the hospital's sterile needles to draw Mr. Heidgen's blood. After drawing each of the two tubes of blood, she handed them to the trooper, who was standing almost next to her and he inverted the tubes. When asked about Tr. O'Hare's testimony that she used the needle from the kit, she explained she used the hospital's needle rather than the one included with the kit because, in addition to drawing blood for the police, she needed to establish an IV line to draw blood for medical purposes and the kit's needle could not be used to establish the IV. She also said that she told the DA that she used a different needle about ten days before she testified. (Busco: T.701-03, 752-56, 765-69)

NYS TROOPER MICHAEL STAFFORD went to the Nassau University Medical Center to obtain a blood kit from Tr. O'Hare. He claimed he did not know Mr. Heidgen's name when he went to the hospital. Upon arriving, he found Tr. O'Hare with the kit in hand filling out the seals. O'Hare gave Stafford the unsealed blood kit which Stafford passed along to Inv. Baez when he arrived at the hospital two hours later. Baez signed the Lab I form but did not look in the box or write on the kit or other forms. When it was pointed out to him on cross-examination that his name was on the box, he said it was not his handwriting. (Stafford: T.779-84, 787-89, 794-95)

NYS POLICE INV. CHRISTOPHER SWEENEY, of the Collision Reconstruction Unit, responded to the accident scene at approximately 2:45 a.m. Upon arriving, he examined the road for tire marks but found none which he explained does not mean the vehicles were not breaking or

slowing down. He observed scrape marks in the road between the left and center lanes indicative of the area of impact which he explained may not be the exact location of impact because the precise location is difficult to determine. After completing his survey, Sweeney used an electronic total work station to take measurements and angles and record them and then took photos. (Sweeney: T. 914-15, 918-26, 991-92)

On July 5, 2005, Inv. Sweeney removed a dash-mounted camera from the limousine and brought it to U.S. Limo where they downloaded the data from the camera onto a computer which they burned onto CD's (Sweeney: T.936-37).

Later that day, Inv. Sweeney participated in the execution of a search warrant at 14 Oceanview Avenue in Valley Stream. He took photographs of the two-story residence and then entered through Mr. Heidgen's apartment in the back of the building. During the search, Sweeney photographed an empty bottle of Grande Old Parr Scotch on top of the refrigerator. After they searched the apartment, they searched the main part of the house which appeared to be unoccupied. (Sweeney: T.938-43)

Inv. Sweeney further testified that along the Meadowbrook Parkway, south of the Babylon Turnpike, in close proximity to the accident scene, there is a two-sided, green and white sign facing south that says "Norman J. Levy Memorial Parkway" so that if you were driving the wrong way, you could still read it. (Sweeney: T.985-86, 999)

At approximately 4:50 a.m. on July 2nd, NYS POLICE INV. ERIC BAEZ went to Nassau University Medical Center and retrieved an unsealed blood kit from Tr. Stafford. Because he knew he had to sign the Lab I chain of custody report, he examined the contents of the kit which included two blood tubes with gray stoppers sealed with red integrity seals which had the initials "DPO" and

the date, "7/2/05". When he opened the box, he removed the paperwork and filled in the Lab I but not the General II. (Baez: T.1032-1035, 1069, 1086-87)

On cross-examination, Inv. Baez acknowledged that the General II and Lab I showed two different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the Medical Examiner's toxicology department. The General II indicated the blood went from Harris to Hemmerich (not from Harris to Medical Examiner as the Lab I indicated) and then from Hemmerich to Drake to Newburgh BCI evidence to Mid Hudson Crime lab (not the Medical Examiner). In other words, the two chain of custody reports showed the blood going to two different places – one to Mid Hudson Lab and the other to the Medical Examiner. (Baez:T.1088-92, 1099)

Inv. Baez further testified that he used two seals Tr. O'Hare filled out (with his initials, date and time, but no name included for subject) to seal the plastic container containing the blood tubes which had red seals with initials and the date but no name for the subject. And, although he learned Mr. Heidgen's name at the accident scene, he did not put it on the seals, paperwork or kit because he could not confirm it. On cross-examination, Baez admitted the red seals were supposed to be used to seal the box – not the tubes – and the white seals were to be placed on the tubes. He further admitted that the kit should have been sealed by the person who witnessed the blood draw to preserve the sample's integrity but O'Hare did not do that. (Baez: T.1034, 1038, 1078-82, 1128)

Inv. Baez placed the sealed plastic container in the cardboard box with the paperwork. After leaving the hospital, he returned to the accident scene and turned the blood kit over to Inv. Harris. (Baez: T.1041-42)

Later that afternoon, Inv. Baez returned to the hospital with Det. Harris and obtained permission from a doctor (whose name he could not recall) to speak with Mr. Heidgen. At

approximately 12:30 p.m., they found Mr. Heidgen in the ICU tied to the bed with gauze. They informed him that he was under arrest for DWI but did not tell him that two people had died in the accident. Harris advised Mr. Heidgen of his <u>Miranda</u> rights and he nodded that he understood the rights and agreed to speak with them but they did not ask him to sign a form. Baez had no problem understanding Mr. Heidgen who he described as pleasant, courteous, polite and respectful. The conversation ended when he requested an attorney. They did not ask him for a written statement because his hands were restrained. (Baez: T.1043-44, 1047-49, 1102, 1106-1110, 1129)

Finally, Inv. Baez testified that the blood evidence kit had been opened in his presence the day before he testified at which time he examined the contents which he recalled were the same as when he had sealed it. (Baez: T.1141-42)

At approximately 4:20 a.m., NYS POLICE INV. MICHAEL HARRIS sent Inv. Baez to Nassau County Medical Center to pick up a blood kit. Since Tr. Siegler had already found his wallet in his pick up, they had a tentative identification of Mr. Heidgen at that time. Baez returned at approximately 6:50 a.m. and gave Harris the closed blood kit which he placed under the driver's seat of his car and locked the door. At approximately 8:55 a.m., after the scene was cleared, Harris returned to his car and drove to the Nassau County Medical Examiner's Office to submit the kit for toxicology analysis but no one was there. While they made some calls to find where to bring the kit, Harris opened the outer box and examined its contents. He removed the paperwork and looked at the plastic container with two white seals on it which did not have Mr. Heidgen's name or a supervisor's initials. He saw two tubes of blood sealed with red seals with the date and initials "DPO". He then wrote Mr. Heidgen's name on the seals on the plastic container and put his initials in the spot for a supervisor's initials. He also filled in information on the Lab I and put it in the outer

9

box which he sealed with two seals. (Harris: T.1157-63, 1172-73, 1223, 1226-27)

When it was discovered that the Medical Examiner's office was closed for the holiday weekend, the decision was made to transport the blood kit to the NYS Police Newburgh Lab. Harris drove the kit to the Valley Stream barracks and NYS TROOPER LAWRENCE HEMMERICH picked it up from Harris in Valley Stream and brought it to Newburgh and gave it to INV. MICHAEL DRAKE who signed the General II and placed the kit in the vault and locked it. (Harris: T.1173-74; Hemmerich: T.814-16; Drake: T.837-40).

At approximately 11:30 a.m. on July 2nd, Inv. Harris received a call from the hospital informing him that Mr. Heidgen was conscious and alert. Invs. Harris and Baez drove to the hospital where they found Mr. Heidgen in the ICU with his hands restrained. After they introduced themselves, Harris read Mr. Heidgen his <u>Miranda</u> warnings after which he agreed to speak with them. Harris then asked Mr. Heidgen what happened. He replied that he had a fight on the phone with his ex-girlfriend Lindsay in Arkansas, his boss owes him $1000, he moved to New York from Arkansas and he got into a self-destructive mode. He added that he was very upset and drank a fifth of Old Parr Scotch. Harris then asked Mr. Heidgen how he felt about himself to which he replied that he was disgusted and embarrassed. When they asked if he was trying to hurt himself, Mr. Heidgen responded: "No, never before". Mr. Heidgen added that he was driving around and then got a moment of clarity and decided to go home. When the officers asked Mr. Heidgen what he hit with his truck, Mr. Heidgen said he thought he hit a tree or a median. The officers did not tell him what actually happened and questioned him about where he had been earlier that day. He said he met his friend Greg Nizewitz at a bar in NYC at about 5 p.m. and drank four Bohemian beers. He left the city about 8 p.m. and got a call from Lindsay about an hour later and they spoke for about ten

minutes. He said he left his house about 2 a.m. and drove around. When the officers again asked if he was trying to hurt himself, he replied: "No, not under any circumstances". And when asked the question a third time, he reiterated "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." Mr. Heidgen then asked for an attorney and the interrogation ended. (Harris: T.1174, 1194-1204, 1246)

Inv. Harris described Mr. Heidgen as pleasant and said he made eye contact during the interrogation. He added that he had no problem understanding him. (Harris: T.1205, 1208)

On July 5, 2005, Inv. Harris was present during the execution of a search warrant at Mr. Heidgen's apartment where he observed a hunting rifle. (Harris: T.1213-14, 1285)

LISA LINDENTHALER, a forensic scientist at the Mid-Hudson regional laboratory, was declared an expert in forensic toxicology. Lindenthaler testified that on July 5, 2005, she analyzed a sample of blood from a sealed kit [People's Ex. #17] marked with Mr. Heidgen's name. The kit contained two blood tubes, the tops of which were sealed with red seals with no initials written on the tubes. (Lindenthaler: T.1317-25, 1331-35) At that point, Lindenthaler's testimony was interrupted by a defense objection to the admission of the blood and a hearing was conducted out of the jury's presence at which Tr. O'Hare testified. Following that testimony, the court ruled that the People were precluded from introducing the blood evidence. (T.1369-1416) That hearing is detailed *infra* at Point I.

At approximately 4:30 p.m. on July 1, 2005, GREG NIZEWITZ met up with Mr. Heidgen at the House of Brews in Manhattan. He testified that he had met Mr. Heidgen about a year earlier through a mutual friend, Josh Zigman. They each drank about six Bohemian beers and talked about fantasy baseball. Nizewitz described Mr. Heidgen as happy, in a good mood and excited for the

11

holiday weekend including a party at their friend Amanda Goldamn's house that evening. Nizewitz left the bar at about 7:30 and Mr. Heidgen, who he noted was not effected by the alcohol, stayed at the bar to continue flirting with the bartender whose phone number he was trying to get. He also noted that Mr. Heidgen was not at all depressed. (Nizewitz: T.1422-29)

TRACY SODIKOFF met Mr. Heidgen through Josh Zigman and he became a member of their social group. Sodikoff recalled that before Mr. Heidgen arrived at the party at Amanda Goldman's house a little before midnight on July 1, 2005, she heard Amanda give him directions on the telephone twice. When he arrived, he was in a good mood, "pretty normal" and happy. And while at the party, she saw him drink a few beers and two Irish car bomb shots and found him to be perfectly happy, laughing and enjoying himself. They talked at the party and she told him a lot of girls thought he was the cutest guy there and would like to be with him which he seemed to take in stride. (Sodikoff: T.1456, 1460-64, 1468, 1472, 1476-77)

On July 2, 2005, ELIZABETH SERWIN was driving on the southbound Meadowbrook Parkway on the way home from work where she drank 1½ beers. In the distance, about two football field lengths away, she saw headlights in the center lane of her side of the road. She pulled onto the right shoulder and beeped her horn as a pick up truck, not veering or swerving, passed her going about 70-75 MPH. She called 911 and told police she was at Exit M7 but she was actually at Exit M9. (Serwin: T.1487-94, 1511)

At about 2 a.m. on July 2, 2005, JOSEPH CARUSO was driving on the southbound Meadowbrook Parkway headed home after a party where he had two drinks. When he was near an overpass, he saw headlights in the center lane about a quarter of a mile away. He was driving about 65-70 MPH and moved into the right lane and a pick up passed him going 70-80 MPH. He then

pulled off the road and called 911. (Caruso: T.1538-45, 1559-60)

STEPHEN WEBER testified that he called Newsday on Labor Day 2006, more than a year after this accident and a few days before trial began, after seeing a photo of the accident in the newspaper. He then called police and told them that on July 2nd, he was driving his motorcycle in the Meadowbrook Parkway's northbound left lane when he noticed a pick up driving northbound in the southbound lanes (on the other side of the road). Weber said he did not look at his speedometer but estimated they were both going about 70 MPH and said the pick up did not slow down and was not drifting. He could see the driver looking forward with both hands on the wheel. He stayed next to the pick up for five to seven seconds until the guardrail ended, and then moved to the center lane. He tried to warn the driver who he realized may not know he was on the wrong side of the road but lost sight of the truck just before the Babylon Turnpike overpass because of bushes on the center median. Two seconds later, he heard a loud screech and bang. (Weber: T.1571-77, 1581-83, 1588-89, 1593-95, 1599, 1673)

STEED DAVIDSON was driving in the center lane of the Meadowbrook Parkway at 2 a.m. on July 2, 2005, when a limousine passed him in the left lane. He was traveling 50-55 MPH and the limousine was going 55-60. Soon after, he saw headlights 50-75 feet ahead in the left lane coming in his direction. The oncoming car hit the limousine in the left lane, sending the limousine into the center lane striking Davidson's car and causing him to spin around. (Davidson: T.1719-23, 1726-28, 1750-51)

JOSHUA ZIGMAN became friends with Mr. Heidgen after they met while attending a training class at New York Life Insurance in November 2004. He described himself as Mr. Heidgen's closest friend in New York and said that he had never seen him in a bad mood, describing

him as an "upbeat, happy person". (Zigman: T.1762-63, 1780, 1795)

On July 1, 2005, Zigman attended a party at the Goldmans' house. Mr. Heidgen called at about 11:15 p.m. for directions from the Meadowbrook Parkway because he was lost and had never been there before and then arrived fifteen minutes later in a happy, upbeat, good mood. They spoke at the party and Mr. Heidgen, who drank three beers, was happy because he had been flirting with a bartender at the House of Brews for a couple of weeks and she gave him her phone number earlier that day. They also discussed their plans for the upcoming holiday weekend including a July 4th barbeque which Mr. Heidgen was excited about. (Zigman: T.1772, 1784-86, 1789, 1825-28)

While in jail awaiting trial, Mr. Heidgen wrote Zigman a letter in which he said that he had not spoken with Lindsay on July 1st and lied to police because he thought he had hit a tree or the median and he wanted to protect their friends Amanda and Justin Goldman at whose house he had been drinking. He said the bottle of Old Parr Scotch on top of his refrigerator had been empty for months which Zigman testified he recalled seeing. He also said he had no bills except student loans and that his grandmother had left him money when she died which she wanted him to use to buy real estate. Finally, he said he used lines from the movies Ocean's Eleven and Pulp Fiction during his conversation with police which they were now using against him even though he told them three times he was not trying to hurt himself. In particular, he quoted the line "I was upset. I fell into a self-destructive pattern." Zigman added that Mr. Heidgen often quoted movies. (Zigman: T.1801-11, 1815)

DANIEL ARANA, declared an expert in forensic genetics, testified that on September 20, 2006, he received a sealed blood kit from Inv. Harris containing two blood tubes. The seal of one of the tubes was intact and the other had been broken and had clear tape to reseal it. He took a

sample from each tube and submitted it for DNA typing and then re-sealed the tubes and returned them to the kit which he re-sealed when he was done. (Arana: T.2014, 2018-19, 2022, 2024)

On September 22, 2006, Arana received another blood kit containing two blood tubes. He took samples from each tube which he submitted for DNA typing. He then resealed the tubes and gave them to another analyst to perform tests to verify the results. He compared the DNA profiles of blood taken from Mr. Heidgen on September 22nd with the blood in the kit he was given on September 20th and determined they were identical. (Arana: T.2025, 2028, 2035)

Forensic toxicologist LISA LINDENTHALER was then re-called and testified that on July 5, 2005, she tested the blood in the kit she was given in connection with this case and determined the blood alcohol content was .28% ethyl alcohol by weight. (Lindenthaler: T.2060-62, 2068)

DR. WILLIAM CLOSSON, the director of toxicology at Bendiner and Schlesinger Laboratories, was declared an expert in forensic toxicology. Dr. Closson, who was paid by the DA, testified that he was given documents about blood testing performed by Lindenthaler and determined that she performed the tests in a scientifically valid manner. (Closson: T.2122-25)

Dr. Closson then explained how alcohol is absorbed into the blood and described alcohol as a central nervous system depressant that acts like an anaesthetic. He also described how alcohol effects the brain's ability to process information and its effect on a person's psychomotor skills. (Closson: T.2127-28) When asked a hypothetical question about the effects on a man with a .28 BAC, Dr. Closson responded that he would likely have difficulty processing stimuli, thinking, vision, ability to track an object across a field of vision (described as "tunnel vision" which makes a person stare straight ahead), peripheral vision, divided attention activity (ability to perform multiple tasks simultaneously) and reaction time. Dr. Closson added that an intoxicated person may have a reduced

inhibition and disregard risks which can cause their judgment to be clouded which can lead them to drink even more and have difficulty processing directions especially in an unfamiliar environment. (Closson: T.2131-33, 2165, 2168)

Finally, Dr. Closson estimated that based on studies of average people, a .28 BAC means that a person had fourteen drinks in his system. (Closson: T.2145-47)

## II.   THE DEFENSE CASE

JOSEPH FOSTER, a friend of Mr. Heidgen's for twenty years, testified that they met while attending Catholic school in Little Rock, Arkansas. Foster, who still lives in Arkansas, testified that after Mr. Heidgen moved to New York, they spoke about once a week and that Mr. Heidgen often quoted movies. Finally, Foster recalled that he and his fiancé came to New York on December 31, 2004 and stayed in Mr. Heidgen's apartment. While there, he took some photos, one of which depicted an empty Scotch bottle. (Foster: T.1885-91, 1997-98)

BURKE MORLEDGE testified that he became close friends with Mr. Heidgen while they were high school seniors in Little Rock. After Mr. Heidgen moved to New York, they kept in touch and spoke a couple of times a month. Mr. Heidgen called him on July 1, 2005 at about 5:30 p.m. from a bar to tell him that he ran into someone from Little Rock and asked if he knew the person. He described Mr. Heidgen, who was planning a trip to Arkansas in a few weeks, as jovial and happy during their conversation. (Morledge: T.1909-10)

Mr. Heidgen's mother, MARGOT APONTE, testified that her son moved to New York in October 2004, shortly after graduating from the University of Mississippi. Mrs. Aponte married Victor Aponte in April 2005 in a small civil ceremony that her son was unable to attend because he had plans to go on a pre-paid fishing trip with a friend who was getting married. Although the People

made much of her son missing the wedding, Mrs. Aponte explained that he never expressed any concern about her marriage and when he returned from his fishing trip, he made them a dinner to celebrate. She added that he was very happy for them and spent time with her new husband. (Aponte: T.2197-2200, 2227)

When asked about her son's attitude toward money and his career, Mrs. Aponte explained that he was never worried about making money and being successful. She described him as a very optimistic, smart, young man who felt successful. She also testified that he liked his job and the people he was working with and was generally having a good time and enjoying life in New York. With respect to his finances, Mrs. Aponte explained that she did not charge him rent to live in her house and that his father paid his bills including his car payment, insurance and student loans and he had inherited $20,000 when his grandmother recently passed away. (Aponte: T.2203, 2213, 2221-26)

SGT. SCOTT CRAWFORD, of the NYS Police accident reconstructionist unit, testified that on July 2, 2005, he was assigned to perform an accident reconstruction on the Meadowbrook Parkway. He arrived at the scene at approximately 2:52 a.m. and walked around to observe any evidence before documenting his findings with a total work station using an electronic laser to measure distances and angles which were used to create a forensic mapping of the scene. (Crawford: T.2240-46)

After recording the measurements, Sgt. Crawford analyzed the actual collision by performing a reconstruction of the accident. As a result, he reached conclusions which he memorialized in a report dated January 13, 2006 which was turned over to the DA. (Crawford: T.2247-48)

Sgt. Crawford was then asked by defense counsel to outline his training and experience.

17

Following his detailed questioning regarding Sgt. Crawford's experience and training, defense counsel asked the court to declare Crawford an expert in accident reconstruction. This was followed by *voir dire* examination by the People during which Crawford said "technically" he is not an expert in angular momentum (the type of analysis he used in this case) or comfortable with it because "There is usually too many variables in it". (Crawford: T.2248-49, 2253-56)

Following her *voir dire,* the prosecutor objected to the declaration of Sgt. Crawford as an expert. The court then asked Crawford if he had ever been qualified as an expert. He replied he had not. After, oral argument, the court sustained the People's objection, effectively precluding Sgt. Crawford's testimony regarding his scientific conclusions about the accident. (T.2256, 2264)

STEVEN SCHNEIDER, an expert in professional engineering specializing in accident reconstruction and highway safety design, was retained by the defense to perform an accident reconstruction and review the highway's design. In order to do so, he reviewed the drive cam, videos and police reports and made several visits to the accident scene. (Schneider: T.2274)

Schneider performed an analysis of the speeds the vehicles were traveling at the time of the accident. Using the GPS report and drive cam video, Schneider determined, to a reasonable degree of scientific certainty, that the limousine was going 62 MPH eight seconds before the crash and 49 MPH at the time of impact. He then determined the speed of Mr. Heidgen's pick up truck using two different types of analysis, linear momentum and the time-distance formula. Using the linear momentum formula, Schneider determined the pick up was traveling at 33 MPH at the time of impact. Using the time-distance formula, he determined that the pick up was going 38 MPH at impact. (Schneider: T.2304-05, 2312, 2323-24)

## III.   THE VERDICT AND SENTENCING

On October 17, 2006, the jury convicted Mr. Heidgen of two counts of Murder in the Second Degree; three counts of Assault in the First Degree; and two counts of Operating a Vehicle While Under the Influence of Alcohol. On February 28, 2007, Mr. Heidgen was sentenced to an indeterminate term of imprisonment of 18 years to life.

## IV.   DIRECT APPEAL TO THE APPELLATE DIVISION, SECOND DEPARTMENT

On direct appeal, Mr. Heidgen presented five issues for review: (1) whether the People failed, as a matter if law, to prove Martin Heidgen's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt; (2) whether Mr. Heidgen was denied his right to a fair trial as a result of the trial court's decision to permit a DNA test in the middle of trial and reverse his own decision and admit the previously excluded  blood sample purported to be Mr. Heidgen's; (3) whether Mr. Heidgen's blood was illegally seized by police and improperly admitted into evidence at trial (4) whether the trial court erred in precluding the defense from presenting testimony of a police accident reconstructionist; and (5) whether Mr. Heidgen's right to a fair trial was violated by the trial court's failure to address certain instances of juror misconduct and his erroneous finding that others were unsubstantiated.

The Appellate Division affirmed finding that, viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient to support the defendant's convictions of depraved indifference murder and assault in the first degree. In so holding, the majority pointed to the following facts which they claimed support a finding of depraved indifference: (1) 15-30 minutes before the collision, Mr. Heidgen, although intoxicated, remained steady on his feet and held conversations with friends at a party without slurring his speech; (2)

drivers on the Meadowbrook parkway testified Mr. Heidgen maintained a steady speed, successfully negotiated curves, and stayed in his lane of travel except when he "apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the pickup truck"; (3) for the approximately 2.5 miles Mr. Heidgen was traveling the wrong way, he passed "wrong way" signs, the back side of highway signs, and at least five sets of headlights shining directly at him; (4)  Mr. Heidgen was confronted with a horn blaring three times and the noise of a loud motorcycle on the other side of the median keeping pace with him in the same direction; and (5) Mr. Heidgen's statement to police while at the hospital that he was in self-destructive mode. People v. Heidgen, 87 A.D.3d 1016, 1021-22 (2d Dept. 2011).

Justice Cohen dissented, finding that "there is scant, if any, evidence from which a jury could reasonably infer that the defendant possessed the *mens rea* required to convict the defendant of a depraved indifference crime". Id. at 1034.

The only other issue addressed by the Appellate Division was the issue with regard to the jury's misconduct. The court held that the evidence adduced at the post-trial C.P.L. §330.30 hearing failed to establish Mr. Heidgen's claim of juror misconduct because one of the jurors testified at the hearing that

> another of the jurors stated during deliberation that the defendant has 'a prior DWI' when he was in college. However, upon hearing that information, that juror did not immediately change her vote from a conviction for manslaughter to a conviction for murder. She stated that the information had an influence on her, but that it was not the only influence, even though in a statement she provided to the prosecution, she denied that the information had any influence on her vote.

People v. Heidgen, 87 A.D.3d at 1026. Mr. Heidgen did not have a prior conviction for DWI.

The Appellate Division majority further held that the trial court did not err in limiting the

scope of the post-trial hearing and refusing to address the issue regarding the jury's consideration of the jail time Mr. Heidgen faced if convicted of manslaughter as opposed to murder "because the evidence submitted with the motion did not demonstrate that the jury's determination of guilt or innocence was affected by any such consideration." Id. at 1026-27.

The Court held that the remaining issues were without merit. Id. at 1027.

## V.      THE APPEAL TO THE NEW YORK STATE COURT OF APPEALS

After receiving leave to appeal from Appellate Division Justice Cohen, Mr. Heidgen presented the same five issues to the NYS Court of Appeals as he had unsuccessfully presented to the Second Department. Like the Appellate Division, the Court of Appeals refused to step in and find that no reasonable juror could have convicted Mr. Heidgen on this evidence instead finding that "[t]he jury could have determined that defendant was unhappy and self-destructive" and "concluded that defendant drove, knowing that he was on the wrong side of the road and with an appreciation of the grave risks involved in that behavior" because (1) his friends at the party thought he was intoxicated but not incoherent, unsteady on his feet or slurring his speech; (2) he drove the wrong way for over two miles without reacting to other drivers coming at him, car horns, or wrong way signage; (3) one witness testified he appeared to track the headlights of oncoming vehicles; and (4) his blood alcohol level would have caused delayed reaction time, but would not have rendered him incapable of reacting at all. People v. Heidgen, 22 N.Y.3d 259, 277 (2013).

Judges Smith and Read filed separate, strongly worded dissents to the majority's opinion both finding that the evidence was insufficient to support Mr. Heidgen's conviction. Id. at 281-86.

The only additional claim that the NYS Court of Appeals bothered to address was the issue regarding the propriety of the seizure of Mr. Heidgen's blood without his consent or a search

warrant. While his case was pending in the Court of Appeals (before oral argument), the Supreme Court decided <u>Missouri v. McNeely</u>, 133 S.Ct. 1552 (2013) which addressed this issue. As a result, counsel submitted a letter to the Court dated April 23, 2013 to bring <u>McNeely</u> to the Court's attention. However, the majority incorrectly held that, even after the Supreme Court's decision in <u>Missouri v. McNeely</u> wherein the Court ruled that in drunk driving investigations, the "natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant" [<u>Id</u>. at 1568], reversal was not warranted here because Mr. Heidgen did not preserve this claim as he failed to argue against the admission of his blood on Fourth Amendment grounds. <u>People v. Heidgen</u>, 22 N.Y.3d at 280. This was incorrect as defense counsel, while presenting a multi-faceted argument after a pre-trial hearing that the blood evidence should be suppressed, explained that rather than instructing a nurse to draw his blood without his consent, the police "should have called the district attorney's office, or certainly secured a warrant, and they didn't." Although counsel did not specifically mention the applicable constitutional provision, that was clearly a Fourth Amendment argument against the warrantless seizure of his blood. This argument was sufficient to preserve this claim for review on this constitutional ground.

## POINT I.

### MR. HEIDGEN WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS AS A RESULT OF THE TRIAL COURT'S DECISION TO PERMIT DNA TESTING IN THE MIDDLE OF TRIAL AND REVERSE HIS OWN DECISION AND ADMIT THE PREVIOUSLY EXCLUDED BLOOD PURPORTED TO BE MR. HEIDGEN'S.

Mr. Heidgen's constitutional rights to a fair trial and due process of law were violated by the trial court's decision to permit a DNA test in the middle of trial and then reverse his decision to preclude the admission of the unreliable blood evidence. U.S. Const. Amends. VI and XIV. This decision to permit DNA testing and then admit the unreliable blood was erroneous because: (1) it violated New York's discovery statutes; (2) it violated Mr. Heidgen's rights to a fair trial and due process of law as he had already formed and presented his defense based on the information that no DNA testing had been performed; and (3) no DNA test could render reliable this evidence which the court had already deemed unreliable and excluded because it was materially different than the evidence obtained at the hospital on July 2, 2005 and because the chain of custody reports were fatally flawed rendering it impossible to ensure that the evidence had not been tampered with. As a result, Mr. Heidgen's request for a writ of habeas corpus should be granted and a new trial ordered.

## I.     PROCEDURAL BACKGROUND

### A.     *What Happened at Trial*

Following the testimony of several of the People's witnesses including Tr. O'Hare (the NYS Trooper responsible for the collection of Mr. Heidgen's blood at the hospital) and Lisa Lindenthaler (the forensic scientist who tested the blood the People claimed to be Mr. Heidgen's), defense counsel objected to the admission of the blood kit offered by the People in accordance with People v. Julian,

41 N.Y.2d 340 (1977) (T.1341). Counsel argued that, because blood is a fungible item, the People were required to prove the evidence (1) is identical to and in the same condition as that involved in the crime; and (2) has not been tampered with (T.1342). Counsel further argued that the blood should be excluded as a result of Tr. O'Hare's trial testimony that he (a) observed the taking of the blood; (b) placed partially filled out white seals over the tops of the blood tubes; (c) initialed the blood tubes themselves; (d) partially filled out information on the red seals which would later be placed on the kit by someone else; (e) did not write Mr. Heidgen's name on the seals, tubes or kit because he did not know it; (e) watched Nurse Busco use the blood kit needle to draw Mr. Heidgen's blood and then discard it; and (f) neglected to complete the forms which are included with the blood kit to ensure the integrity and proper handling of the evidence. That testimony was materially different than that of Lindenthaler who testified that she received blood tubes with red seals over the tops, not white seals as Tr. O'Hare claimed he used, and no initials printed on the tubes themselves, which O'Hare testified he had done (T.1324, 1342-45). It was also refuted by the testimony of Inv. Harris who said that when he sent Inv. Baez to the hospital to get the blood, they had already found Mr. Heidgen's wallet in his truck so they knew his name (T.1226). These discrepancies became blatantly obvious when the blood kit was opened in court and the kit's unopened, unused needle was inside. Finally, as a further attack on the trustworthiness of the blood evidence, counsel added that according to the troopers' testimony, the *unsealed* kit containing the blood tubes was passed from Tr. O'Hare to Tr. Stafford to Inv. Baez thus leaving no assurances that it had not been tampered with (T.1346).

Prior to ruling on the motion, the court ordered the People to re-call Tr. O'Hare for a hearing outside of the presence of the jury "to determine whether or not those are the seals he used and whether or not those are his initials. If they are not, the objection is sustained; if they are, the

objection is overruled." (T.1350).

Later that day, Tr. O'Hare testified outside of the jury's presence and over defense objection, that he recognized his initials on the white and red seals (T.1370-71, 1376). He also testified that he put white seals on the tubes but acknowledged that the blood tubes the People were seeking to put in evidence [People's Ex. #17] had red seals. He also testified that he wrote his initials on the seals before placing them on the tubes and on other seals he did not use which he believed other officers would use later to seal the box. He claimed he did not seal the box before he handed it off because the defendant's name, which he did not know, needed to be placed on the tubes (T.1372-73, 1378).

On cross-examination, Tr. O'Hare further testified that, despite writing his initials on the blood tubes themselves, upon looking at the tubes presented by the People in court, his initials were not there. Finally, O'Hare testified that he observed Nurse Busco use the needle from the blood kit to draw Mr. Heidgen's blood and discard it when she was done and that when he gave the box to Tr. Stafford, all that it contained  was the blood tubes. However, when asked to look inside the blood evidence kit the People were attempting to offer into evidence at trial [People's Ex. #17], he discovered the kit's unopened, unused needle and the blood tube holder. (T.1382-1385)

Immediately following Tr. O'Hare's testimony, the trial court ruled that the defense "objection to further testimony by Lisa Lindenthaler is sustained" which precluded admission of the blood into evidence (T.713).

At the end of that trial day, the People asked the court for an order pursuant to C.P.L. §240.40(2)(b)(v) to require Mr. Heidgen to provide a DNA sample. The People argued that the DNA test was necessary because of "testimony that we were not aware of, that has caused the Court to rule to exclude extremely crucial evidence in this case; that being the blood evidence and the result of

25

the blood alcohol content from the defendant." (T.1431-32) The defense strenuously objected arguing that: (1) the blood kit offered by the People at trial was absolutely not in the same condition as it was at the time it was drawn from Mr. Heidgen – at the time the blood was drawn, Tr. O'Hare placed white seals on the blood tubes and the blood evidence the People tried to introduce at trial had red seals; at the time the blood was collected, O'Hare put his initials on the filled blood tubes and the blood tubes the People tried to introduce at trial had no initials; when O'Hare gave the blood kit to Tr. Stafford at the hospital all that was in it were the filled blood tubes, but the kit the People tried to introduce at trial contained an unopened, unused needle; (2) there were two different chain of custody reports for the evidence which had the blood, in an *unsealed* box, going to different places and being handled by different people; (3) the People's claim that the testimony just developed was false since the testimony at issue was from their own witnesses and thus was not newly discovered evidence not available before trial; (4) this request should have been made during the statutorily mandated discovery period; (5) the People had every opportunity during the fourteen months between the accident and trial to test the blood in their custody; (6) during discovery, the defense requested results of all scientific tests and was told there were none and formed the theory of their defense, planned their case, and questioned the People's witnesses based on that declaration; and, (7) the People cannot just shift gears and try a different way to get a piece of evidence admitted which had been precluded based on its obvious unreliability. (T.1433-39)

The trial court found that the DNA test was "a means with relative certainty to determine that it is not Mr. Heidgen's blood or that it is Mr. Heidgen's blood" [T.1439] and then immediately, without an adjournment to permit the defense to conduct any legal research (even though the request was made at the end of the trial day), granted the People's request noting "The last thing in the world

I'm going to worry about is reversal." (T.1448)

The next morning, defense counsel attempted to re-open discussion of the issue and articulate his position. The court refused and denied his request to stay the execution of the order to give the defense time to seek a writ of prohibition from the Appellate Division. (T.1453-54).

B.    *The Direct Appeal*

This issue was presented for review to both the Appellate Division and NYS Court of Appeals. Despite the obvious error that resulted in completely unreliable evidence being presented to the jury, shockingly both of these Courts failed to even mention the issue in their decisions.

## II.    THE STANDARD OF REVIEW IN A HABEAS CORPUS PETITION

To determine whether a writ of habeas corpus should be granted, a federal court must apply the standard of review set forth in 28 U.S.C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). "Clearly established Federal law" includes holdings "...of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) *quoting* Williams v. Taylor, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state

court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a State court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413. And, a state court's "determination of a factual issue" is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *accord* Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (A federal habeas court must "presume the [State court's] factual findings to be sound unless [the habeas petitioner] rebuts the presumption of correctness by clear and convincing evidence.").

## III.   ANALYSIS

While it is true that generally "federal habeas corpus relief does not lie for errors of state law" [Lewis v. Jeffers, 497 U. S. 764, 780 (1990)], the issue presented here is not one of State law. The question here is not whether this type of evidence is admissible because NYS law does permit the presentation of such evidence. The issue here is whether the admission of this evidence in the manner in which it was presented and at the time when it was admitted, virtually sandbagging the defense causing irreparable harm, resulted in the blatant violation of Mr. Heidgen's constitutional rights to due process and a fair trial. In order to preserve the sanctity of the criminal trial and preserve the appearance of fairness, the answer to that question must be a resounding yes. See Underwood v. Kelly, 692 F.Supp. 146, 150 (EDNY 1988) (Discretionary state court evidentiary rulings normally do not rise to a constitutional level so as to be cognizable in a federal habeas corpus proceeding unless there is a showing that the challenged rulings violated a specific constitutional right).

Moreover, even an erroneous evidentiary ruling by a State court could rise to the level of a

constitutional claim which would be cognizable in a habeas petition if it were shown that the error so infected the proceedings as to have rendered a petitioner's trial fundamentally unfair. See Collins v. Scully, 755 F.2d 16 (2d Cir.1985); Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983); Baker v. Reid, 482 F.Supp. 470, 471 n. 2 (SDNY1979). In other words, although "[d]iscretionary state court evidentiary rulings normally do not rise to a constitutional level so as to be cognizable in a federal habeas corpus proceeding," they are cognizable where there is "a showing that the challenged rulings violated a specific constitutional right." Alvarez v. Scully, 833 F. Supp. 1000, 1005 (SDNY 1993). Accordingly, since Mr. Heidgen can "elevate his claim to constitutional dimensions by demonstrating that the evidentiary error was 'so pervasive as to have denied him a fundamentally fair trial'" [Piedra v. LaValley, No. 12-cv-02711 (EDNY 2014) *quoting* Collins v. Scully, 755 F.2d at 18] and denied him his due process and fair trial rights, this issue can be raised in this petition.

In order to prevail on this issue, Mr. Heidgen must be able to demonstrate that (1) it was error for the trial court to admit the unreliable evidence, and (2) the error resulted in the depravation of a constitutional right. Piedra v. LaValley, No. 12-cv-02711 (EDNY 2014). This test requires that the admitted evidence be "sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it." Collins v. Scully, 755 F.2d at 18-19 (Holding that the evidence at issue must have been "crucial, critical, highly significant"). Mr. Heidgen can easily meet this test as the trial court's decision to order a DNA test in the middle of trial and then admit the unreliable evidence which he previously excluded because it may have been tampered with, clearly violated Mr. Heidgen's constitutional rights to due process and a fair trial.

A.    *Step One – It was Clear Error to Admit the DNA and Blood Evidence*

Here there can be no doubt that it was error to admit the unreliable blood evidence. And, not

only was it an error, it was an error that was of such great constitutional magnitude that it resulted in Mr. Heidgen's conviction of multiple murder and assault charges. First, it should be acknowledged that the trial court initially got it right when he precluded the blood after Tr. O'Hare's testimony out of the jury's presence which revealed material differences in what he recalled he had done on the night of the accident and the blood kit the People sought to enter into evidence at trial and gross errors in the chain of custody reports. In doing so, the court was clearly making a statement about the unreliability of the evidence. If the judge had stopped there, there would be no issue here. The constitutional violations arose in the next step when the trial court, in the middle of trial, allowed the People to violate New York's very specific discovery statutes and obtain a DNA sample from Mr. Heidgen and then reverse his decision to preclude the blood evidence and allow it to be admitted once it was confirmed that Mr. Heidgen's DNA was in the blood tubes. The problem was that although a test could confirm that Mr. Heidgen's blood was in the tubes, no test could possibly confirm that the blood had not been tampered with and the integrity of the sample compromised. This dramatic reversal altered the course of the entire trial (and subsequent appeals), caused irreparable harm to Mr. Heidgen as it forced him to completely re-formulate his defense in the middle of trial destroying his credibility in front of the jury, and resulted in the trampling of his constitutional rights to a fair trial and due process of law.

On direct appeal, Mr. Heidgen argued that the decision to permit the People to conduct a DNA test mid-trial and admit the results of that test and the blood, which was no more reliable after the DNA test than it was before, was erroneous for three reasons. The first reason, based on State statutory procedure, was that the request was made too late. That is not the basis of Mr. Heidgen's claim here. The second reason was that no DNA test could render reliable blood evidence which the

30

court had already deemed unreliable and excluded because it was materially different than the evidence obtained after the accident and because the chain of custody reports were fatally flawed. This argument was based on the fact that no DNA test could guarantee the integrity of the sample which had been so incredibly carelessly handled by police. And the final reason was because the admission of the DNA test results violated Mr. Heidgen's rights to a fair trial and due process as he had already formed and presented his defense based on the prosecution's averment that no such testing had been done. The second and third arguments are the focus of this request for habeas relief.

1.   The Court's Decision to Permit Scientific Testing Mid-Trial Was Procedurally Erroneous

While NY's discovery statute empowers trial courts to order defendants to provide "non-testimonial evidence" including DNA at the People's request [C.P.L. §240.40(2)(b)(v)], C.P.L. §240.90(1) requires that such request be made within 45 days after arraignment or, where "good cause" shown, up to the commencement of trial. Id. That limitation – before the commencement of trial – was a clear statement by the legislature that it did not want this type of discovery motion to be made during trial and for very good reason.

In the case at bar, we are faced with a situation where the discovery motion was made and granted smack in the middle of trial. This was a blatant violation of C.P.L. §240.90(1) which requires such a motion to be made *before* trial starts. While this claim is not based on this blatant procedural error, it is included here to alert this Court to the manner in which the trial court and prosecutor flouted the law to tip the scales in the People's favor. The People argued on direct appeal that this was not an issue of statutory violation but, rather, an issue of statutory enforcement: "the decision not to strictly enforce the discovery statute was a permissible exercise of the court's discretion in

light of the compelling circumstances." Resp. Br. at 60.[2] The People were wrong and the trial court was wrong to buy into that argument. Not only was this motion made fourteen months after arraignment, it was made in the middle of trial and after the court had taken the very bold step to suppress the evidence because it was unreliable as its integrity had been completely compromised by the manner in which it was handled by police. Thus, this is not an issue of "strict" enforcement or judicial discretion. This was a flagrant violation of a statute which was not a suggestion but a rule of procedure which must be followed all the time – not just when it is convenient for the DA. The statute could have been drafted to permit this motion at any time and could have included a provision giving trial courts discretion to enlarge the time but they did not. And the legislature clearly had no intention of having trial courts exercise such discretion in the middle of a double homicide trial.

Furthermore, this is not, as the People argued, a situation where "compelling circumstances" justified ignoring the statute. These "compelling circumstances", according to the People, were the result of unexpected testimony from their own witnesses and they argued that "if [they] had had any reason to expect that the testimony would establish anything other than a complete chain of custody, [they] would have requested a blood sample for DNA testing within the statutorily established time-frame... Trooper O'Hare's testimony was wholly unanticipated and took the People by surprise." Resp. Br. at 61. That argument is absurd given that this so-called "unexpected testimony" came from their own police witness who testified that he reviewed his paperwork and met with the prosecution team who reviewed his testimony with him (T.1374-75). It is also ridiculous given that the evidence, including the blood and chain of custody reports, were in the People's possession for more than fourteen months so they had more than ample time to run these tests. Thus, this is not an issue of

---

[2] "Resp. Br." refers to the pages of the brief submitted by the People to the Appellate Division Second Department.

forseeability but rather one caused by the People's failure to properly investigate and prepare their case. Had they adequately examined the blood kit and chain of custody reports, they would have discovered, as defense counsel did, that there were major discrepancies that seriously called into question the reliability and integrity of this critical piece of evidence. And had they discovered these problems, they could have requested the DNA test *before* trial which the statute clearly would have allowed. Instead, they sat back and watched as defense counsel successfully attacked their witnesses and succeeded in having the blood evidence discredited and suppressed and then, left scrambling to save their case, asked the judge to allow them to break the rules and conduct a DNA test in the middle of trial to confirm Mr. Heidgen's blood was in the tubes. And, instead of telling the People that they had their chance to make such a motion before trial and continuing to preclude the blood evidence, the judge rewarded the People for their poor preparation and granted their untimely motion and gave them the order to take more blood from Mr. Heidgen. A successful cross-examination of a prosecution witness during which a serious flaw in the People's case is exposed should not open the door to the re-investigation of their case in the middle of trial, especially not when that re-investigation involves the blatant violation of a law of procedure.

Indeed, it is more than noteworthy that the trial court himself admitted that he was not interested in the soundness or propriety of this decision, but only with the appearance of the proceedings: "The last thing in the world I'm going to worry about is reversal." (T.1448). However, the court's duty was to ensure that Mr. Heidgen received a fair trial which means following the laws and the failure to do so should result in the reversal about which the judge claimed to lack concern.

> 2. No DNA Test Could Render Reliable a Piece of Evidence that the Trial Court Already Deemed Unreliable and Excluded

Another reason given by the defense against the mid-trial DNA testing was that it was

nothing more than an attempt by the People to try a different way to get a piece of evidence admitted which had been deemed unreliable and precluded. Any alleged confirmation the People obtained through a DNA test could not render the blood evidence reliable because, although the DNA test may arguably have established that Mr. Heidgen's blood was in the tubes, no test could prove that the blood had not been tampered with. Thus, all of the reasons the court had for precluding the blood – the material differences between Tr. O'Hare's description of the blood tubes he passed to Tr. Stafford in an unsealed box and those described by Lindenthaler and presented at trial and the material differences in the chain of custody reports – remained even after the DNA test. In other words, the blood evidence was just as unreliable after the DNA test as it was before and should have remained excluded as its integrity had been severely and irreparably compromised.

In addition, the vital importance of the striking errors in the chain of custody reports cannot be underestimated when viewed in conjunction with the obvious differences in the condition of the evidence presented by the prosecution at trial. While it is true that NY's courts have held that an "incomplete" chain of custody may be excused where there are reasonable assurances of the identity and unchanged condition of the evidence [People v. Julian, 41 N.Y.2d at 343], "where the circumstances fail to provide such assurances... a gap in the chain of custody affects the admissibility of the evidence, not just its weight". People v. Rivera, 184 A.D.2d 153, 156 (1st Dept 1993); People v. Alomar, 55 A.D.3d 617 (2d Dept. 2008).

Here, we have significantly more than an incomplete chain of custody. What we have here is two chain of custody reports that show the blood kit going to completely different people and different places which clearly impacts the integrity and trustworthiness of the evidence. The People's own witnesses admitted that the chain of custody report showed Mr. Heidgen's blood being given

to different people and being taken to two different places for analysis. Inv. Baez testified that the General II and Lab I forms showed two different chains of custody: The Lab I form showed the blood went from Stafford to Baez to Harris to the Medical Examiner's toxicology department. In contrast, the General II form indicated that the blood went from Harris to Hemmerich (not from Harris to the Medical Examiner as the Lab I indicated) and then from Hemmerich to Drake to the Newburgh BCI evidence to Mid-Hudson Crime lab (not the Medical Examiner). In other words, the two reports showed the blood going to two different places – one to Mid-Hudson Lab and the other to the Medical Examiner's toxicology department. (Baez: T.1088-92, 1099). And Tr. O'Hare admitted that the Lab I, which he acknowledged travels with the blood kit to ensure its integrity, was wrong as it should have said Mr. Heidgen to Busco to O'Hare but he left himself out. He further testified that the form (filled in by another officer) indicated the blood was passed from Stafford to Baez which was also wrong. (O'Hare: T.664-65, 673-74) This testimony by the People's witnesses clearly demonstrates that the chain of custody reports could not be relied upon to establish the legitimacy and reliability of the blood as it could not provide assurances that it was identical to that drawn from Mr. Heidgen. What we have here is not an incomplete chain of custody. It is a completely defective one which destroyed the reliability and integrity of the evidence and should have – and did for a few hours – resulted in its preclusion.

Moreover, there were no "reasonable assurances" of the identity and unchanged condition of the evidence as described by the Julian Court to cure the defective chain of custody. The *unsealed* blood kit was passed from person to person without Mr. Heidgen's name even being written on the box or the tubes inside leaving it vulnerable to tampering. And the testimony of the People's witnesses demonstrated that the blood evidence Tr. O'Hare described was not even remotely the

35

same, let alone identical to, what the People presented for admission at trial.

In sum, given that the blood offered by the People at trial was materially different than that described by their witnesses and the chain of custody reports were defective which led the court to exclude the blood in the first place, any alleged proof that Mr. Heidgen's DNA was in the blood tubes did not bar the real possibility that the blood had been tampered with. The court was obviously deeply concerned about the integrity and reliability of the evidence as demonstrated by his decision to preclude it in the first place and that should have been the end of the discussion about the blood. Its resurrection based on a DNA test that proved only that his DNA was in the blood tubes and could not ensure that the blood had not been tampered with, resulted in a fundamentally unfair trial.

B.      *Step Two – The Error to Admit the Blood Evidence Resulted in the Depravation of Mr. Heidgen's Federal Constitutional Rights to a Fair Trial and Due Process*

The error to permit DNA testing mid-trial and then admit the unreliable blood evidence was not only a procedural error, it was also an error of constitutional magnitude as it resulted in a violation of Mr. Heidgen's fundamental rights to a fair trial and due process. U.S. Const. Amends. VI and XIV. In accordance with NY's Rules of Criminal Procedure, defendants have the statutory right to be provided with written reports of scientific tests conducted by law enforcement. C.P.L. §240.20. As counsel vigorously argued at trial, by the time the People sought to obtain and present this DNA evidence, the defense had already formed the defense theory, planned their case, and questioned the People's witnesses based on the DA's response to their pre-trial discovery demands that no DNA testing had been done. That defense included a vigorous attack on the blood evidence which was clearly a successful strategy given that the trial court initially took the bold step to preclude it. It is clear from the record that the strategy of attacking the blood evidence was directly related to the People's discovery responses. Had the defense known pre-trial, when it would have

36

been appropriate, that such DNA testing would be performed, they likely would have had a very different trial strategy. And, once the court reversed himself and let the blood in, the defense was left scrambling to totally re-formulate their defense in the middle of trial, something a criminal defendant who successfully attacks the prosecution's key piece of evidence should never be forced to do.

Moreover, the trial court's decision to preclude the blood evidence only to later admit it actually placed Mr. Heidgen in a significantly worse position than he would have been in if the court had denied his motion to preclude the blood in the first place. This is so because, once the People were permitted to admit into evidence the blood along with the DNA test results confirming that Mr. Heidgen's blood was in the tubes, the defense was left clambering to recover from the tremendous prejudice suffered by what the People claimed to be a verification that the tubes contained his blood. The defense was left damaged beyond repair. Without the DNA testing, the defense was in a better position to attack the reliability of the blood which was clearly in a completely different condition than when it was drawn. The court's decision to change his mind was significantly more than an evidentiary ruling. It had a devastating effect on the defense that continued throughout the trial and appellate process and severely discredited the credibility of defense counsel who prepared his case and presented it up to that point with the understanding that no such testing had been performed. If he had known about the DNA test, his presentation to the jury, as well the arguments made on appeal, would have been much different. As a result, Mr. Heidgen was denied his constitutional rights to a fair trial and due process.

C.    *The Erroneously Admitted Evidence Was Critical to the People's Case*

The final part of this analysis requires Mr. Heidgen to establish that the erroneously admitted piece of evidence is "sufficiently material to provide the basis for conviction or to remove reasonable

doubt that would have existed on the record without it." <u>Collins v. Scully</u>, 755 F.2d at 18-19. That is a simple task here as the integral part of a DWI-related homicide case is the defendant's blood alcohol content. A BAC of .28 in a DWI homicide case is very difficult to overcome. Once the jury was permitted to hear about this extremely high level of intoxication, the trial was, for all intents and purposes, over. Thus, once the court reversed himself and admitted the unreliable blood evidence, it became the centerpiece of the People's case and the basis of Mr. Heidgen's conviction.

## IV.   <u>CONCLUSION</u>

In short, Mr. Heidgen's constitutional rights to a fair trial and due process were violated by the trial court's decision to permit the People to violate the discovery statutes and then permit the admission of unreliable blood evidence. What happened here was a desperate attempt by the People to resurrect a piece of evidence which had been correctly precluded by the trial court due to the grossly negligent manner in which it was handled by police and the fact that its integrity had been irreparably compromised as a result and because the People were unprepared for the attack the defense mounted against it. The egregious errors in the handling of the blood, the different chain of custody reports, and the material differences in the blood evidence described by the People's own witnesses exposed by the defense clearly could have been discovered by the People with the proper examination of their own evidence and competent trial preparation. In truth, this request for DNA testing was made because of poor police work and incompetent trial preparation by the DA which was uncovered by the defense. And, despite all of this, the Appellate Division and NYS Court of Appeals declined to even address this issue. As a result, Mr. Heidgen's request for a writ of habeas corpus should be granted and his conviction vacated with an order for a new trial without the blood evidence.

## POINT II.

### THE PEOPLE FAILED AS A MATTER OF LAW TO PROVE MR. HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE DOUBT.

Mr. Heidgen contends that, as a matter of law, the People's evidence was legally insufficient to establish beyond a reasonable doubt that he acted with the *mens rea* of depraved indifference to human life and, therefore, insufficient to establish his guilt of the crimes including a *mens rea* of depraved indifference beyond a reasonable doubt. Following a jury trial, Mr. Heidgen was convicted of two counts of Murder in the Second Degree [P.L. §125.25(2)], and three counts of Assault in the First Degree [P.L.§120.10(3)], both of which require proof that he acted with a depraved indifference to human life. However, even viewing the evidence in the light most favorable to the People, and contrary to the decisions of the Appellate Division and NYS Court of Appeals, the evidence that Mr. Heidgen acted with a culpable mental state of depraved indifference when his blood alcohol level was, according to the People, a .28, and there was no evidence that he consciously drove on the wrong side of the road after realizing his error, simply did not rise to the level of proof beyond a reasonable doubt and no reasonable juror could have found as such. The evidence did not show that he acted with a mental state that was "at least as morally reprehensible as intentional murder [People v. Suarez, 6 N.Y.3d 202 (2005)], or "so wanton, so deficient in a moral sense of concern, so devoid of regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another." People v. Payne, 3 N.Y.3d 266, 271 (2004). As a result, a writ of habeas corpus should issue.

## I.       PROCEDURAL BACKGROUND

On direct appeal, the Appellate Division majority held that, viewing the evidence in the light most favorable to the People, it was legally sufficient to support Mr. Heidgen's convictions of depraved indifference murder and assault based on the following: (1) shortly before the collision, he, although obviously intoxicated (a .28 BAC), remained steady on his feet and held conversations with friends without slurring his speech; (2) drivers on the parkway testified that he maintained a steady speed, successfully negotiated curves and stayed in his lane of travel; (3) for the approximately 2.5 miles he was traveling the wrong way he passed "wrong way" signs, the back side of highway signs and at least five sets of headlights shining directly at him; (4) he was confronted with a blaring horn and loud motorcycle on the other side of the median keeping pace with him in the same direction; and (5) his statement to police while at the hospital that he was in a self-destructive mode. People v. Heidgen, 87 A.D.3d at 1021-22.

Justice Jeffrey A. Cohen dissented, finding that "there is scant, if any, evidence from which a jury could reasonably infer that the defendant possessed the *mens rea* required to convict the defendant of a depraved indifference crime". Id. at 1034.

After Justice Cohen granted leave to appeal, the NYS Court of Appeals, in a 5-2 decision, also declined to step in and right this wrong finding that

> [w]hen viewed in the light most favorable to the People, there was legally sufficient evidence to support Heidgen's convictions for depraved indifference murder. The jury could have determined that defendant was unhappy and self-destructive. Defendant's friends who observed him at the party thought that he was intoxicated but not so intoxicated that he was incoherent, unsteady on his feet or slurring his speech. Heidgen drove the wrong way on the highway for over two miles without reacting to other drivers coming at him, car horns, or wrong way signage. Perhaps most significantly, more than one witness testified that defendant appeared to follow, or track, the

headlights of oncoming vehicles. In addition, the toxicologist testified that defendant's blood alcohol level would have caused delayed reaction time, but that it would not have rendered him incapable of reacting at all. Based on this evidence, the jury could have found that, despite defendant's intoxication, he perceived his surroundings. The jury could have reasonably concluded that defendant drove, knowing that he was on the wrong side of the road and with an appreciation of the grave risks involved in that behavior. One who engages in what amounts to a high speed game of chicken, with complete disregard for the value of the lives that are thereby endangered, is undoubtedly an individual whose culpability is the equivalent of an intentional murderer.

Id. at 277. Two strongly worded dissents were also filed by Judges Robert S. Smith and Susan P. Read, both of whom completely disagreed with the majority's finding that the People had proven Mr. Heidgen's *mens rea* of depraved indifference beyond a reasonable doubt.

## II.   **APPLICABLE LEGAL PRINCIPLES**

### A.   *Penal Law Statutes*

Murder in the Second Degree, depraved indifference murder, requires the People to prove that "under the circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person". P.L. §125.25(2).[3]

### B.   *Standard of Review of Sufficiency of the Evidence Claims in Habeas Petitions*

The standard for reviewing the legal sufficiency of evidence in a criminal case is the same under both NY State and Federal law. It is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'." People v. Contes, 60 N.Y.2d 620, 621 (1983) *quoting* Jackson

---

[3] Although these arguments are focused on the two depraved indifference murder charges [P.L. §125.25(2)], the arguments made herein are also meant to apply to the three depraved indifference assault charges [P.L. §120.10(3)].

v. Virginia, 443 U.S. 307 (1979). And, the Supreme Court has held that "in a challenge to a state criminal conviction brought under 28 U.S.C. §2254... the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 324. The Supreme Court further held that the reviewing court must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor. Id. at 319.

## III.   ANALYSIS

The due process clauses of both the NYS and Federal constitutions require the People to establish each and every element of an offense charged beyond a reasonable doubt. U.S. Const. Amend XIV; N.Y. Const. Art. I §6; In re Winship, 397 U.S. 358, 364 (1970). And, when it considers the sufficiency of the evidence of a state conviction, "[a] federal [habeas] court must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir.1999); Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002).

In order to prove Mr. Heidgen's guilt of depraved indifference murder, the People were required to establish the following elements beyond a reasonable doubt: (1) that he caused the deaths of two people; (2) by recklessly engaging in conduct which created a grave risk of death; and (3) engaged in such conduct under circumstances evincing a *mens rea* of depraved indifference.[4] See P.L. §125.25(2). Although two people tragically died in this accident, the People failed to prove Mr. Heidgen's conduct in driving drunk and accidentally getting on the parkway going the wrong way

---

[4] It is more than noteworthy that "depraved indifference" was not included by the legislature in the Penal Law statute defining "culpable mental states". P.L. §15.00(6) defines a "culpable mental state" as committing a crime intentionally, knowingly recklessly, or with criminal negligence. The NYS Court of Appeals in People v. Feingold , 7 N.Y.3d (2006) took it upon itself to usurp the power of the legislature and rule that depraved indifference is a mental state. As a result, the depraved indifference murder statute as written is constitutionally vague.

and then slowing down when he realized it, evinced a depraved indifference which the NYS Court of Appeals has recognized to be "a culpable mental state". <u>People v. Feingold</u>, 7 N.Y.3d 288, 294 (2006)[5]; <u>Mannix v. Phillips</u>, 619 F.3d 187 (2d Cir. 2010). Mr. Heidgen's conviction of crimes alleging a mental state of depraved indifference, absent proof beyond a reasonable doubt that he possessed this *mens rea,* resulted in a constitutional violation requiring dismissal of the charges.

Up until <u>Feingold</u>, NY's courts were following the formulation developed in <u>People v. Sanchez</u>, 98 N.Y.2d 373 (2002) and <u>People v. Register</u>, 60 N.Y.2d 270 (1983), wherein the Court held that depraved indifference referred to the "factual setting in which the risk creating conduct must occur" and advocated an objective analysis of the conduct. <u>Id.</u> at 278. That test was no longer applicable once the Court ruled in <u>Feingold</u> that "depraved indifference to human life is a culpable mental state" requiring juries to look into defendants' minds to determine whether, at the time of the alleged crime, they had the *mens rea* of depraved indifference. In doing so, the Court replaced <u>Register</u>'s objective standard with a subjective one. <u>Gutierrez v. Smith</u>, 702 F. 3d 103, 110 (2d Cir. 2012) (Second Circuit recognized that in <u>Feingold</u>, the NYS Court of Appeals expressly overruled <u>Register</u> and <u>Sanchez</u> and held that depraved indifference referred to a mental state.); <u>Antoine v. Ercole</u>, 11-CV-00088 (EDNY Aug. 29, 2013).

Even before <u>Feingold</u>, in <u>Suarez</u> the NYS Court of Appeals ruled that a finding of depraved indifference should be limited to "a small, finite or rare category" of "unusual" cases and made it clear that

---

[5] While the charge in <u>Feingold</u> was Reckless Endangerment [P.L. §120.25], the NYS Court of Appeals ruled "the term 'depraved indifference' has the same meaning in both the depraved indifference murder statute and the reckless endangerment statute." <u>People v. Feingold</u>, 7 N.Y.3d at 294.

> depraved indifference is best understood as an utter disregard for the value of human life – a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy" as to render the actor as culpable as one whose conscious objective is to kill.

People v. Suarez, 6 N.Y.3d at 214-15. The Suarez Court also provided "quintessential examples" of conduct which would appropriately be charged as depraved indifference murder including: firing into a crowd, driving an automobile along a crowded sidewalk at a high speed, opening the lion's cage at the zoo, placing a time bomb in a public place, poisoning a well from which people draw water, opening a drawbridge as a train is about to pass over it, and dropping stones from an overpass onto a busy highway. Id. Conspicuously absent from this list is any case involving a highly intoxicated defendant and, even more notably, no case is cited involving intoxicated driving. Up until Mr. Heidgen's case, it was clear that that omission was the result of the Court of Appeals' intention to exclude driving while intoxicated from the list of "rare" and "unusual" cases it wished to hold up as examples of depraved indifference crimes even where they resulted in a tragic loss of life. The list of "quintessential examples" included only sober acts committed by defendants who acted intentionally and consciously disregarded the risks presented by their conduct. However, following the decision in Mr. Heidgen's case, prosecutors are now free to transform intoxicated driving cases into depraved indifference murder cases. The Court of Appeals got it wrong.

A deeper examination of Suarez's quintessential examples reveals that they involve intentional acts designed to create a great danger of injury or death even though the perpetrator may not have had the specific intent to cause such injury or death. As Justice Belen noted in his dissent

in People v. McPherson, 89 A.D.3d 752, 765 (2d Dept. 2011), "in general, a defendant who possesses the *mens rea* of depraved indifference intends to commit the act that results in the death or injury of another person, but is depravedly indifferent to the grave risk of death or injury to others as a consequence of his or her conduct..." There was no evidence whatsoever that Mr. Heidgen intended to drive on the wrong side of the road or to create danger of injury or death. Absent proof that he was suicidal and intended to drive on the wrong side of the road, there is no way the People could have proved beyond a reasonable doubt that he acted with depraved indifference.

There is no dispute that tragically two people died and others were injured as a result of this accident as this was conceded at trial. However, the error of the trial court in admitting the blood evidence (as discussed *supra* at Point I) forced Mr. Heidgen to change his defense and argue at trial (and then extended to his arguments on appeal), that the People's claim that his actions were committed with a depraved mind was incorrect as the People's unreliable blood evidence overwhelmingly pointed to his conduct being committed not with depravity equivalent to intentional murder, but during a state of intoxication that negated the formation of a *mens rea* of depraved indifference. See People v. Coon, 34 A.D.3d 869 (2006).

In this case, the State courts were presented with the question of whether the *mens rea* of depraved indifference can be negated by intoxication. While NY's Penal Law states that intoxication does not negate recklessness where the "person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication" [P.L. §15.05(3)], the same cannot be said for depraved indifference. After the decision in Heidgen and its companion cases, it is clear that the NYS Court of Appeals does not believe that it does. However, this is not a question for the NYS Court of Appeals to decide. It is a question that must be addressed by the legislature.

45

Indeed, other Appellate Divisions and the NYS Court of Appeals itself in People v. Valencia, 14 N.Y.3d 927 (2010), which was not overruled by Heidgen, have held that intoxication can prevent the formation of the *mens rea* of depraved indifference. In Valencia, the Court of Appeals held that the defendant, whose BAC was a .21, could not form the *mens rea* of depraved indifference because his level of intoxication rendered him oblivious as demonstrated by his statements after his accident that he "didn't know" what had happened and "didn't care" after he was told about the accident. Id. at 932. The Third Department, in People v. Coon, 34 A.D.3d 869, held that since the appellant, who while suffering from cocaine intoxication brought on by his voluntary use of crack cocaine, used a butcher knife to cut his victim's throat, "was too intoxicated to form a specific criminal intent, he also would be incapable of possessing the culpable mental state necessary to prove depraved indifference." And, the Fourth Department, in People v. Wimes, 49 A.D.3d 1286 (4th Dept. 2008), held that intoxication may negate depraved indifference. In addressing a challenge to the factual sufficiency of a plea allocution, that Court noted that "Although there had been testimony at trial that defendant was intoxicated at the time of the incident, there was no mention of intoxication during the plea allocution, despite the fact that intoxication could have negated the element of depraved indifference in the crime to which defendant pleaded guilty". Id. at 1287.

At trial, the People repeatedly argued (not conceded by the defense) that Mr. Heidgen was "deliberately drunk, a point 28 blood alcohol concentration; three and-a-half times the legal limit." (T.2513, 2516). And the People's own expert witness, Dr. Closson testified that a person with a .28 BAC has about fourteen drinks in his body and made a conservative estimate that Mr. Heidgen had consumed at least twenty drinks (T.1245). That begs the question, if he was as drunk as the People claim – a .28 BAC – could he form the *mens rea* of depraved indifference? Some NY courts have

46

said that he could not and Mr. Heidgen encouraged the Appellate Division and NYS Court of Appeals to do the same in his case but they declined to do so.

Judge Smith, in his NYS Court of Appeals dissent, found that the facts of Mr. Heidgen's case made it indistinguishable from <u>Valencia</u> where the Court found that the defendant was "oblivious" to the dangers he was creating. <u>People v. Valencia</u>, 14 N.Y.3d at 928. Judge Smith was correct. According to the People, Mr. Heidgen's BAC was .28 which was significantly higher than Valencia's BAC of .21. <u>Id.</u> at 932. Valencia traveled significantly longer than Mr. Heidgen – 3.9 miles – with many indicators that he was traveling in the wrong direction including five wrong-way signs, seven large overhead exit signs that could not be read because he was approaching them from the opposite direction, and 61 other signs that he could not read because they were backwards for the defendant's direction of travel and, when told about the accident, even said he "didn't know" what happened and "didn't care". <u>Id.</u>

Moreover, we cannot overlook Judge Smith's startling explanation for why he believes his Court was willing to act in <u>Valencia</u>, but refused to do so here. Judge Smith strongly hinted that the reason the Court was willing to dismiss Valencia's depraved indifference charge was because there was no homicide charge involved in that case: "There is, of course, one conspicuous difference between [Heidgen's case] and <u>Valencia</u>: Valencia did not kill anyone. The conviction we reversed in <u>Valencia</u> was for depraved indifference assault." <u>People v. Heidgen</u>, 22 N.Y.3d at 283-84. Judge Smith even went so far as to declare that the jury's verdict cannot stand in this case because

> ...juries, especially in cases with inflammatory facts, will often find depraved indifference where the evidence does not support it, and as a result we have reversed many convictions in recent years because the proof of this *mens rea* was insufficient. Cases in which intoxicated drivers kill innocent people are among the most inflammatory, and thus among the most likely to generate depraved

> indifference murder convictions where a conviction of a lesser (but
> still serious) crime is all that is warranted.

Id. at 281. This declaration by Judge Smith is a very astute observation about human nature. What Judge Smith is trying to say is that it is very difficult for juries (as well as appellate judges apparently), when faced with the very difficult task of assessing responsibility for the tragic loss of life and charges involving depraved indifference, have a very difficult time getting past the fact that innocent people have died and vote to convict simply because someone needs to pay the price for that loss of life. That is precisely what happened in this case. Tragically, in this case, two people including a young child died which Judge Smith clearly believed weighed heavily on the jury and his colleagues in making their decisions to affirm and led the Court to refuse to dismiss or even reduce Mr. Heidgen's conviction despite the fact that he believed this case to be "indistinguishable" from Valencia where the Court did just that and dismissed a charge it did not believe was supported by the evidence. Upholding a conviction which is not supported by insufficient evidence because of the heartbreaking result of the defendant's actions cannot be tolerated and blatantly violates the Constitution.

Even putting aside the fact that he was intoxicated, a review of the record reveals that, as a matter of law, the People's evidence was insufficient to establish that Mr. Heidgen acted with a *mens rea* of depraved indifference. While the consequences of his actions were tragic, and any argument made herein is not meant to minimize that tragedy, his *mens rea* at the time of the accident was not depraved indifference. In Suarez, this Court characterized conduct that evinced depraved indifference as "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life and lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" and added that such conduct will reflect "wickedness, evil or inhumanity, as manifested by

48

brutal, heinous and despicable acts". <u>People v. Suarez</u>, 6 N.Y.3d at 214. Despite this very tragic outcome, to use those terms to describe Mr. Heidgen, who got lost while trying to drive himself home from an area with which he was not familiar, albeit in an intoxicated state, would be a gross exaggeration.

The NYS Court of Appeals has held that even where death results, you need something *more* than recklessness to establish depraved indifference and that something more just is not present here. And, the fact that there was a chance of death resulting from his actions, does not suffice to raise the charge from manslaughter to depraved indifference murder:

> Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been. Otherwise, manslaughter in the second degree would routinely and automatically become depraved indifference murder in as much as the victim (who was, after all, killed) was necessarily exposed to a grave or substantial risk of death. The critical statutory language that separates second-degree manslaughter from depraved indifference murder is the defendant's underlying depraved indifference. Circumstances evincing a depraved indifference to human life' are not established by recklessness coupled only with actions that carry even an inevitable risk of death.

<u>People v. Suarez</u>, 6 N.Y.3d at 213.

Moreover, if the *mens rea* of depraved indifference was meant to include those who drive while intoxicated, then it would need to be charged in every DWI case and that is clearly not what the NYS legislature intended as demonstrated by the creation of a new statute to address precisely this type of case. As Justice Cohen noted in his Appellate Division dissent:

> two years after this incident – only months following the defendant's conviction in 2007 – and, as indicated in the relevant bill jacket, at least partially in response to this matter, the Legislature defined the new crime of aggravated vehicular homicide, a class B felony punishable by an indeterminate prison sentence ranging from 8⅓ to

> 25 years. In enacting this new legislation, the Legislature, as justification, stressed the need to provide law enforcement officials and prosecutors with the 'tools' necessary to charge and convict criminals who commit an offense involving driving while intoxicated that results in injury or death (internal citations omitted).

People v. Heidgen, 87 A.D.3d at 1034. Judge Read echoed this sentiment in her Court of Appeals dissent wherein she, citing this new law, explained that, not only was the majority's decision "contrary []to our precedent, but also to legislative intent." People v. Heidgen, 22 N.Y.3d at 285-86. Thus, the enactment of this new aggravated vehicular homicide statute was a signal from the legislature that conduct such as Mr. Heidgen's of driving while intoxicated, even when there is a fatality, is not the unique, rare or unusual case for which the *mens rea* of depraved indifference was meant to be reserved. People v. Suarez, 6 N.Y.3d at 214. Thus, by upholding Mr. Heidgen's conviction, the State courts were clearly defying the intention of the legislature.

According to the People, Mr. Heidgen was not depraved simply because he was drunk. They claimed that the something *more* that established Mr. Heidgen's depraved mind was the fact that he was suicidal – that he was so depressed about his life and angry with himself that he ignored warnings he must have observed and deliberately continued to drive approximately 2.5 miles on the wrong side of the road after realizing his error, not caring about the danger he posed to the others on the road. On appeal, they even added a claim that he was tracking a vehicle coming at him, an unsupported, completely speculative assertion adopted by the Appellate Division and NYS Court of Appeals majorities. The People were wrong and, despite their efforts to contort the evidence into what they wanted it to be, they could not transform this accident into depraved indifference murder.

In his NYS Court of Appeals dissent, Judge Smith plainly stated that the inferences drawn by his colleagues were wrong and that no reasonable juror could have found that Mr. Heidgen was

tracking other vehicles in an effort to have a head-on collision. Smith boldly stated that the so-called "tracking" evidence could mean that "Heidgen was deliberately aiming his car at the others, but I do not see how a reasonable juror could infer, with the confidence necessary to support a criminal conviction, that that is what he was doing. It is an extremely unusual thing to do." People v. Heidgen, 22 N.Y.3d at 283. Judge Smith further noted, as Mr. Heidgen has argued all along, that

> the very fact that [he] did drive the wrong way for miles, ignoring many signs and other events that should have alerted [him that he was driving the wrong way]... supports more strongly the inference that – as blood tests proved – [he was] very drunk. Ignoring warnings that would alert a sober person is what drunk people do. I do not doubt that, as the majority says, a drunk person is not biologically incapable of perceiving and reacting to his surroundings, but anyone who has ever met one knows that they often fail to do so.

Id. This explanation based in logic and real-world experience is an example of a judge using his common sense. And common sense tells us that no rational juror could have found that getting on the wrong side of the Meadowbrook Parkway and continuing to drive for 2.5 miles and then slowing down dramatically when he realized something was wrong is depraved indifference murder.

Judge Smith also recognized, and we ask this Court to do the same, that although Mr. Heidgen was at fault for these deaths, he is "not – or at least, [was] not proved to be – a murderer[]. [He] did not kill [his] victims intentionally, and – drawing all reasonable inferences in favor of the People – there is no more than a possibility that [he] did so with depraved indifference to human life." Id. at 284. And we know that "a possibility" is not enough to convict a man of any crime, let alone depraved indifference murder. Without proof beyond a reasonable doubt, this conviction cannot stand.

It is also necessary here to address the specific details of the People's case upon which both the Appellate Division and NYS Court of Appeals majorities relied to support their decisions to

affirm Mr. Heidgen's conviction. The problem for the People is that they took these details and then, using conjecture and speculation, twisted them to support their theory of what happened here. The result of this exercise in creative story-telling is a conviction based on evidence that was insufficient to establish each element of the crimes beyond a reasonable doubt.

Those details cited by the State courts to support their finding that his conduct evinced a depraved indifference included the facts (as the Appellate Division and Court of Appeals determined them to be) that he: (1) was at a party where, although intoxicated, he was steady on his feet and not slurring his speech 15-30 minutes before the accident; (2) told police he was in a self-destructive mode; (3) maintained a steady speed and stayed in one lane of travel except when he tracked the headlights of an oncoming vehicle as it attempted to avoid him; and (4) for the approximately 2.5 miles he traveled, passed "wrong way" signs, the back side of highway signs, and headlights and tail lights on the other side of the road and disregarded a horn blaring and the noise from a motorcycle on the other side of the median keeping pace with him and traveling in the same direction. They claim that those factors established depraved indifference as a matter of law. However, in coming to this conclusion, both of the State courts conspicuously omitted the most powerful pieces of evidence and twisted others to attempt to transform a horribly tragic accident into depraved indifference murder. In reality, a review of the record reveals that there was no evidence that he (1) was suicidal or even unhappy; (2) intentionally got onto the Meadowbrook Parkway going the wrong way; or (3) continued to drive in the wrong direction once he realized his error. Therefore, his conviction for depraved indifference murder and assault cannot stand.

A.    *Mr. Heidgen's Level of Intoxication*

Both the Appellate Division and NYS Court of Appeals majorities cite the fact that fifteen

to thirty minutes before the collision – a significant amount of time – "the defendant, although intoxicated, remained steady on his feet and held conversations without slurring his speech". According to the People, Mr. Heidgen's BAC was a .28. Despite the State courts' efforts to argue that this level of intoxication is not relevant because he was steady on his feet and able to coherently speak with friends approximately twenty minutes earlier, the effect of such a high level of intoxication upon the ability to drive cannot be dismissed. As the People's own expert Dr. Closson testified, a person with a .28 BAC would likely have difficulty processing stimuli, thinking, vision, ability to track an object across a field of vision (described as "tunnel vision" which makes a person stare straight ahead), peripheral vision, divided attention activity (ability to perform multiple tasks simultaneously) and reaction time. Dr. Closson added that an intoxicated person may have a reduced inhibition and disregard risks which can cause clouded judgment leading him to drink even more and have difficulty processing directions, especially in an unfamiliar environment. (T.2131-33, 2165, 2168) Finally, Dr. Closson estimated based on studies of average people, a .28 BAC means a person had fourteen drinks in his system at that moment and made a conservative estimate that Mr. Heidgen had consumed at least twenty drinks. (T.2145-47) That is a tremendous amount of alcohol, the effect of which cannot be so easily dismissed by a rational juror just because Mr. Heidgen did not fall down or slur his words the last time he was seen, which was quite a while before the accident.

B.    *Mr. Heidgen Was Not Suicidal*

In their quest to transform this tragic accident into depraved indifference murder, the prosecution and State courts also claimed, with no evidence to back it up, that this accident was the result of Mr. Heidgen being suicidal. However, although the People produced a large number of witnesses, only a very few of them gave any testimony that bore on the critical element of Mr.

Heidgen's state of mind at the time of the accident, and none of whom said he was anything but happy that night and not even close to being suicidal. According to the People's witnesses, Mr. Heidgen began drinking at approximately 4:30 p.m. the day before the accident (which occurred at about 2 a.m.) at the House of Brews in Manhattan with his friend Greg Nizewitz who testified that while at the bar, they talked about sports and plans for the upcoming holiday weekend including a party at their friend Amanda Goldman's house (T.1422-23, 1429). Nizewitz described Mr. Heidgen as being in a good mood, happy, and excited about the weekend (T.1423). When asked whether he would describe Mr. Heidgen as depressed, he replied "not depressed" (T.1426). Nizewitz also testified that, as further evidence of the fact that he was looking forward to and making plans for the future, Mr. Heidgen asked for and got the telephone number of a bartender he had been flirting with (T.1429). And, while they were at that bar, Mr. Heidgen also called another friend Burt Morledge in Arkansas and discussed coming there for a visit in a few weeks. Morledge described Mr. Heidgen as "jovial, happy" during their conversation. (T.1910) Those are the actions of a young man looking forward to having fun with his friends that night and in the future. Those are not the actions of a man with any intention of hurting himself and/or others. And those are certainly not the actions of a depraved mind murderer.

Later that evening, Mr. Heidgen attended a party at the Goldman home, arriving at approximately 11-11:30 p.m. after calling twice for directions. Partygoers described him as being in an upbeat, good mood, "pretty normal", perfectly happy, giggling and laughing and enjoying himself – hardly words you would use to describe someone about to attempt suicide in such a horrific way. (T.1461-63, 1472, 1783) Joshua Zigman testified that, while at the party, they discussed plans for a July 4th barbeque, and Mr. Heidgen was bragging about getting a bartender's phone

number earlier that day (T.1785, 1827-28). Zigman even went so far as to say he was surprised that Mr. Heidgen would have told police that he was depressed because he knew him to be an "upbeat, happy person" who liked his job and had no problems with his apartment or finances (T.1695, 1832-37). In fact, none of the party guests testified that Mr. Heidgen was anything but happy and nothing they said about him even remotely alluded to him being suicidal, in a depraved state of mind, or even despondent in any way at all.

Witnesses recalled that Mr. Heidgen left the party at about 1:30 a.m. and, although the prosecution made much of the fact that he did not make long goodbyes to the friends he planned to see the next day, nothing at all indicated he left depressed, sad or angry, much less that he was suicidal. But, in their attempt to retrofit this case into a depraved indifference murder, and knowing that they needed to make him look suicidal in order to justify their theory that he purposely continued to drive on the wrong side of the road after realizing his error, the People tried to portray Mr. Heidgen as a depressed young man who did not like his job, was upset that his mother remarried and moved to Central Islip, had financial problems, and was upset about an ex-girlfriend in Arkansas. And, in order to contradict their own witnesses who said he was happy that night because it did not jive with their theory that he was suicidal and didn't care about anyone around him, they fabricated a story that he was fooling his friends with a mask of happiness: "Whatever rage or depression the defendant was in that night, and that rage and depression that he was studiously hiding from his friends, behind one of those social masks..." (T.2515). The problem with that story is that it was just that – a story, pure fantasy. There was not an iota of evidence to support it. If Mr. Heidgen had been holed up in his apartment, not speaking with anyone and drinking dangerous amounts of alcohol by himself and not in a social setting, then maybe a rational juror could have bought into that fantasy

because that would be the picture of a man about whom a valid claim of depression and self-destruction could be made. However, that is not the happy, hopeful young man all of the witnesses described. And any attempt by the People to draw their own picture of him is based purely on speculation and the fictional tale they have spun in a desperate attempt to transform this accident into depraved indifference murder. Unfortunately for Mr. Heidgen, the jury, the Appellate Division and the NYS Court of Appeals majorities believed the People's fictional tale and affirmed Mr. Heidgen's conviction. We ask this Court not to do the same.

Despite his obviously happy demeanor, the Appellate Division majority latched onto Mr. Heidgen's statement to police made ten hours after the accident that he was home until 2 a.m., had a fight with his ex-girlfriend, got into a self-destructive mode, drank a fifth of scotch and had financial problems (T.1199). They treated this as a declaration by Mr. Heidgen that he was suicidal and did not care what happened to him or anyone else. However, each of those statements was refuted by the People's own witnesses and evidence. For example, we know he was not drinking alone at home – he was drinking at a bar in NYC in the afternoon and then at a party later that night. As for his ex-girlfriend, there was no evidence in the phone records that he even spoke with her that day, much less fought with her.[6] In fact, he was obviously not sitting around pining over his ex-girlfriend who lived more than 1,200 miles away in Arkansas. Quite to the contrary, he was out at bars, having fun, going to parties with his new friends and getting phone numbers from women including a bartender that day. As for the financial problems, while it is true that he was not making

---

[6] It is noteworthy that when defense counsel offered the phone records as evidence, the People objected to their admission (T.1232-34). This is further evidence of the People's attempt to keep up their portrayal of Mr. Heidgen as depressed and diminish the defense theory that he was trying to get home.

a fortune, he was only 23 years old and had a good, steady job in NYC which his friend/co-worker and mother testified he liked (T.1834, 2226). His mother further testified that he was not paying rent to live in her house and his father was paying his car loan, car insurance, student loan and cell phone bills. Thus, with no bills to pay, his salary was essentially discretionary income. And, in addition, he had recently inherited $20,000 from his grandmother (T.2203, 2235). With regard to the empty scotch bottle found on top of his refrigerator during the search of his apartment, there was testimony that it had been there for months.[7] In short, all of the reasons the People gave for Mr. Heidgen being suicidal and not caring about his actions or their consequences were refuted by the evidence. It is also worth noting that when Mr. Heidgen's apartment was searched, a hunting rifle was found [T.1285]. Thus, if Mr. Heidgen truly wanted to kill himself, he had access to a weapon that could have done the job.

The error in relying on this self-destructive mode statement to police to establish that Mr. Heidgen was suicidal is also evident when the statement is viewed in conjunction with a letter he wrote to his friend ten months after the accident while he was in jail awaiting trial. In that letter, which the People entered into evidence, Mr. Heidgen explained that: (1) in his statement to police after the accident, his objective was to protect his friends whose house he had been drinking at that night because loyalty is very important to him; (2) the scotch bottle on top of his refrigerator had been empty for months; (3) he never spoke with his ex-girlfriend on July 1st so he did not argue with her; (4) he had no financial problems; and (5) in his statement to police, he quoted lines from the

---

[7]  Two witnesses supported Mr. Heidgen's explanation that the bottle had been on top of the refrigerator for months. Zigman testified he was in the apartment and recalled Mr. Heidgen had pointed it out to him and said he liked the old bottle. And, Foster recalled seeing the bottle on December 31st during a visit from Arkansas. The bottle, which appeared empty, was in a photograph Foster had taken during that visit. (T.1844, 1890)

movies Ocean's Eleven and Pulp Fiction – the lines from Ocean's Eleven being: "I was upset I fell into a self-destructive pattern" – which police were now trying to use against him even though he told them he was not trying to hurt himself. At trial, Zigman and Foster both testified that quoting movies is something that Mr. Heidgen is notorious for doing (T.1810-11, 1815, 1844, 1891).

The Appellate Division majority discounted this letter claiming that, because Mr. Heidgen admitted in the letter that he had lied to police, that the letter should not be believed. They claimed that the letter just "confirmed the accuracy of the police officers' testimony concerning the statements that he made to them." People v. Heidgen, 87 A.D.3d at 1023. However, in drawing this unsupported conclusion, the majority conspicuously neglected to mention a critical part of that police interrogation which is that *three times* the police asked Mr. Heidgen if he was trying to hurt himself and each time he unequivocally replied that he was not, once emphatically stating "No. Not under any circumstances" and the other two times replying: "No, never before" and "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." (T.1199-1200, 1204, 1261). Those are not the answers of a despondent man who wanted to kill himself. Those are the definitive answers of a man who got lost while headed home, which is where he told police he was going when the accident occurred (T.1200-01, 1260); See e.g. People v. Dingle, 30 A.D.3d 1121 (1st Dept. 2006). Thus, if there was any ambiguity in his statements to police including his statement that he was in a self-destructive mode, that ambiguity was cleared up by his three unambiguous statements that he absolutely was not trying to hurt himself and his truthful explanation that he was just trying to get home. Simply stated, there is nothing whatsoever in Mr. Heidgen's statement to police that demonstrates the "uncommon brutality and inhumane cruelty required for depraved indifference murder". People v. Suarez, 6 N.Y.3d at 215. All of the evidence points to the conclusion that he was

a happy, young man who had been out having fun, trying to get himself home at the end of the night. Although he clearly made an error in judgment by driving while he was drunk, there was not a shred of evidence to establish beyond a reasonable doubt that he was trying to kill himself and, therefore, no rational juror could have found that he had the *mens rea* of depraved indifference to human life.

It is also worth noting that, at the time he was interrogated by police, Mr. Heidgen did not know that two people had died in the accident. When the officers asked him what he hit, Mr. Heidgen said he thought he hit a tree or a median and asked about his pickup truck, an odd question for someone who was allegedly playing chicken with or tracking the other drivers on the road. The officers did not bother to tell him what had really happened and even went so far as to tell his mother not to tell him the truth (T.1201-02, 1246, 2213). Had the officers been forthcoming about what had happened, the interrogation likely would have been much different and may never have happened at all.

C.     *Mr. Heidgen's Speed*

Another factor cited by the State courts as evidence of depraved indifference is that Mr. Heidgen "maintained a steady speed, successfully negotiated the curves of the parkway stayed within one lane of travel, except in those instances where the defendant apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the pickup truck." People v. Heidgen, 87 A.D.3d at 1021. This reliance is sorely misplaced as it is based purely on the testimony of lay witnesses and, in order to accept this theory as true, one also has to completely discount the unrefuted testimony of the only expert witness to testify about speed, Stephen Schneider, who testified that he determined to a reasonable degree of engineering certainty that Mr. Heidgen was going 33 MPH at the time of impact under one calculation and 38 MPH using another type of analysis (T.2305-06, 2312, 2319,

2323-26). When taken together with the testimony of prosecution witness Caruso, the only driver to testify that Mr. Heidgen passed him on the road, that when he passed Mr. Heidgen about .8 of a mile before the accident, he was going about 70 MPH, not an uncommon highway speed, that would mean that, in that .8 of a mile between when Mr. Heidgen passed Caruso and the accident, Mr. Heidgen slowed from 70 MPH to between 33 and 38 MPH. That is the only speed determination that should count because that drastic reduction in speed would indicate a person trying to fix his mistake, which is the antithesis of someone who does not care what happens to himself or others, and is certainly not a person with a depraved mind looking to hurt himself and/or others. Thus, the theory advocated by the People and the State courts – that Mr. Heidgen was speeding down the parkway, passing cars and signs warning him he was on the wrong side of the road, not caring what damage he caused – is belied by the record which clearly indicates that he was slowing down when the crash occurred. That fact alone negates a claim of depraved indifference and even recklessness. As defense counsel explained in summation, in slowing down Mr. Heidgen was "trying to self correct. He slowed down. What do you do when you are lost; you slow down and you look for signs." (T.2482). In fact, we know that he had been lost earlier on the way to the party and had called for directions and then called again at 1:45 a.m., shortly after leaving the party, likely for the same reason (T.1228-29, 1825-26). Those are the indications of a man who is lost, not a depraved mind murderer.[8] In other words, if Mr. Heidgen was truly tracking other vehicles as the State courts

---

[8] The Second Department has held that evidence that a driver was slowing down where conditions warranted "is the antithesis of a depraved, as opposed to a reckless, state of mind." People v. Lazartes, 23 A.D.3d 400, 405 (2d Dept. 2005) (Reversed depraved indifference murder conviction where defendant's speeding occurred on roadway designed to accommodate greater rates of speed than residential roads, at an hour where traffic conditions were lighter, the possibility of damage to pedestrians or residences was virtually non-existent, no contact occurred between defendant's vehicle and other vehicles prior to the accident and defendant slowed when traffic warranted.);

claimed or was attempting to cause a head-on collision, then why would he slow down so drastically? The short answer has to be that he would not which means that the People did not, because they could not, prove that he was acting with a depraved mind.

It is also more than noteworthy that Schneider was not the only expert to reconstruct this accident. It was revealed that the People had several reports prepared by other experts who came up with speed calculations some of which were in line with Crawford and Schneider's – at least one of which was initially even lower than theirs (approximately 23 MPH) – but chose not to call any of the people who prepared those reports. And, although they admitted Crawford performed an accident reconstruction and speed analysis in which he determined Mr. Heidgen was going approximately 45 MPH at the time of impact as discussed in greater detail *infra* at Point IV, the People mysteriously chose not to put him on the stand and blocked Mr. Heidgen from doing so by objecting to the request to declare him an expert. It is obvious that they made the strategic decision not to call Crawford and then to block the defense from doing so in an attempt to keep out his conclusions because they knew that his findings would decimate their case and give more credibility to the defense expert.

Another delusional claim regarding speed made by the Appellate Division and NYS Court of Appeals majorities is that Mr. Heidgen was tracking another vehicle on the road. That is not what happened and is certainly not what the evidence proved. What actually happened is that Mr. Heidgen, in his state of intoxication, had tunnel vision. That is what the People's own expert witness Dr. Closson explained happens when a person drives after consuming the extremely large amount of alcohol the People contended Mr. Heidgen drank before attempting to drive home:

---

People v. Thacker, 166 A.D.2d 102, 108 (1st Dept. 1991) (Conviction for depraved indifference murder reversed where "although it was undoubtedly reckless for defendant to have consumed alcohol and to have neglected to apply his brake... these actions do not rise to the level of 'unmitigated wickedness' or 'extreme inhumanity' which characterizes depraved indifference").

A:      ...A person who is under the influence of alcohol cannot perform those various activities [involved in driving a car] simultaneously, and those individuals tend to focus on one of those activities.

If they are driving a car it may be focused on the steering wheel, or it may be focused on an object directly in front of them, or it may be focused on the accelerator pedal, but they can't effectively focus on all of those activities at the same time.

Q:      Doctor, with respect to what you described as tunnel vision would it be fair to say that tunnel vision enables a person to see only the things directly in front of them?

A:      Yes. They ignore everything to the sides.

(T.2132-33). Thus, the People's own expert rebuts the claim that, because he was observed by their witnesses staring straight ahead and changing lanes in response to seeing headlights, he was tracking the vehicles. Instead, it explains that what happened here was a reaction that resulted from intoxication. Indeed, Justice Cohen in his Appellate Division dissent noted that he

reject[ed] the majority's argument that he was 'tracking' headlights because he was suicidal, and conclude that such an interpretation arises from a misapprehension of the expert's testimony. Given the defendant's probable tunnel vision, his lane change to the limousine's was more likely a reaction to his observation of the headlights of Davidson's vehicle. Such an action in my opinion militates against the conclusion that the defendant acted with depraved indifference.

People v. Heidgen, 87 A.D.3d at 1033.

Furthermore, there is no evidence that Mr. Heidgen tracked any vehicles. Any lane change he may have made was not to track the other vehicles but, rather, was a reaction to the headlights coming at him and his level of intoxication and, thus, was not blameworthy. In other words, although it was the wrong reaction to move into the lane of the oncoming headlights as they changed lanes, it was the reaction of a highly intoxicated man driving in an unfamiliar area. Just because it was the

wrong reaction or a delayed reaction, does not mean that he was tracking the other vehicles. And if he was not tracking the other vehicles, then the People's case disintegrates as this was the only so-called evidence they had to justify a finding of depraved indifference. After reviewing the record, one is left with the question – if Mr. Heidgen was trying to kill himself by driving into oncoming traffic, then why would he have slowed down? The answer to that question has to be that he would not have slowed down if his intent was to track the vehicles. This leaves the only conclusion which was that he was not trying to kill himself or harm anyone else. He made a mistake by getting on the highway going the wrong way and was trying to fix it when he slowed down.

Moreover, it seems that if, for the sake of argument, the State courts were correct and Mr. Heidgen was tracking the other vehicles, then doing so would have been an intentional act, not a depraved one. In other words, if he was tracking other vehicles, knowing that a head-on collision would kill himself and passengers of any vehicle he crashed into, then he was intending to cause death or injury which would be an example of an intentional murder, not a depraved one. See Ospeh v. Rock, 11-cv-00536 (NDNY March 31, 2014) ("The post-Feingold interpretation of 'depraved indifference' prevents convictions in cases where the defendant intended to cause a particular person's death because those intentional acts do not demonstrate an 'indifference' towards that individual's life.").

Finally, it is more than noteworthy that when imposing a sentence of eighteen years to life, the trial court declared "I know that it is true that you didn't intend to take the lives of Stanley Rabinowitz and Katie Flynn" (S.136).[9] This remark taken together with the sentence he imposed demonstrates the trial court's belief that this was a tragic accident. It is doubtful that a judge would

_____

[9] Numbers in parentheses preceded by the letter "S" refer to the pages of the sentencing proceeding.

sentence a man to eighteen years to life rather than the statutory maximum twenty-five years to life if he had believed the People's theory that Mr. Heidgen was playing a game of chicken and intending to cause harm to himself and others.

    D.    *Mr. Heidgen Did Not Ignore Signs That He Was Driving on the Wrong Side of the Road*

On direct appeal, the People argued that Mr. Heidgen must have known he was driving the wrong way because there were "wrong way" signs on the road. However, while Mr. Heidgen does not contest that those signs were there, near the accident scene there is also a two-sided sign facing south that says "Norman J. Levy Memorial Parkway" so if you were driving the wrong way, you could read it. (T.985-86, 999, 1001). Therefore, if he was able to read that sign, he would not have known he was going the wrong way.

Another major flaw in this theory is that they failed to prove he "consciously" drove in the wrong direction into oncoming traffic after becoming aware of his error. In fact, there was not a scintilla of evidence to prove that he knew he was driving the wrong way or that he continued to do so. The evidence at trial actually refuted that claim. If the People's theory that consciously driving on the wrong side of the road and taking no action to avert the oncoming traffic demonstrates depraved indifference is true, then the converse must also be true. That is, it must also be true that a driver who does not know he is driving on the wrong side of the road and slows down cannot be acting with depraved indifference. As Justice Belen noted in his dissent in People v. McPherson, 89 A.D.3d at 762:

> although several oncoming drivers swerved out of the defendant's path over the course of several miles, the People produced no evidence at trial which demonstrated, beyond a reasonable doubt, that the defendant understood that he was driving the wrong way down the parkway prior to the head-on collision, with utter disregard for the

> consequences, as might be evidenced with, for example, evidence that the defendant's vehicle continued on its course after colliding with an object or other vehicle.

Thus, given the evidence presented here, the People's theory that this was depraved indifference murder must fail as a matter of law.

## IV.    <u>CONCLUSION</u>

This entire argument can be summed up with one simple question – was Mr. Heidgen on the road that night looking for victims or consciously indifferent to the fact that his conduct could cause grave harm to those in his path? The clear answer must be no, he was not, he was just trying to get home and stated such to police. That answer precludes a finding that he had the *mens rea* of depraved indifference. All the People proved was that he was intoxicated, lost, and trying to get home from a party. Although the People presented the testimony of witnesses who observed Mr. Heidgen driving on the night of the accident, none could say that he was aware that he was driving on the wrong side of the road or that, once he realized it, he consciously continued to do so not caring about the potential danger he was creating. Witnesses testified that they honked their horns to alert Mr. Heidgen that he was on the wrong side of the road but none could say that he heard them. And, none of the witnesses gave any testimony that even remotely indicated that he was suicidal. Indeed all accounts of his behavior and attitude that night were that he was in a good mood looking forward to his future in the long and short terms. In other words, none of the witnesses gave any testimony which could establish beyond a reasonable doubt that Mr. Heidgen had a *mens rea* of depraved indifference to human life at the time of the accident. A review of the record reveals that the People's theory that Mr. Heidgen was suicidal or playing chicken with the other drivers simply makes no sense. Everyone who saw him that night and knew him personally unwaveringly testified

that he was a happy young man doing what young men do, hanging out with his friends and having fun. There was no reason whatsoever, and no proof to support the theory, for such a happy young man to suddenly transform into a depraved mind murderer while driving himself home on the Meadowbrook Parkway.

Thus, given the fact that, even when viewed in the light most favorable to the People, it is clear that they failed to prove each element of these crimes beyond a reasonable doubt, the only explanation for the appellate courts' failure to act is the tragic result of this accident. It is clear that because two people, including a young child, died during this accident, the appellate court judges could not bring themselves to do the right thing and were unwilling to right an obvious wrong that was presented to them in the form of a conviction based on insufficient evidence and dismiss or even reduce Mr. Heidgen's conviction of the crimes involving the mental state of depraved indifference. Upholding a conviction which is not supported by sufficient evidence just because of a tragic result blatantly violates the Constitution and requires that a writ of habeas corpus be granted and that the depraved indifference murder and assault charges be dismissed.

## POINT III.

## MR. HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND IMPROPERLY ADMITTED INTO EVIDENCE AT TRIAL IN VIOLATION OF HIS FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE, WARRANTLESS SEARCHES AND SEIZURES.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Mr. Heidgen contends that his Fourth Amendment right was violated when his blood was illegally seized by police and improperly admitted into evidence at trial. As a result, his petition for a writ of habeas corpus should be granted and his conviction vacated with an order for a new trial excluding the blood evidence.

## I.       THE PROCEDURAL BACKGROUND

A pre-trial hearing was conducted to address the admissibility of a blood sample taken from Mr. Heidgen by hospital personnel at the direction of police after the accident without his consent or a warrant. There, PO Christopher Pandolfo testified that shortly after arriving at the accident scene, he approached Mr. Heidgen who was alone, seated behind the wheel of his pick up truck. When Pandolfo approached Mr. Heidgen, who he described as conscious with his eyes open, Mr. Heidgen inquired: "What happened? Where am I?" (Pandolfo: H.3-5, 8, 14-15)[10].

PO Timothy Nolan also responded to the accident scene and testified that Mr. Heidgen was conscious and that, although his speech was low and slurred, he accurately answered questions and followed his commands. (Nolan: H.24-26, 29-30, 36-39)

---

[10] Numbers preceded by the letter "H" refer to the transcript of the pre-trial suppression hearing. The transcript of this proceeding will be furnished to the Court upon request.

Tr. Siegler spoke in the ambulance with Mr. Heidgen who he described as moaning and conscious. According to his paperwork, Tr. Siegler arrested Mr. Heidgen at 2:33 a.m., which would have been while in the ambulance en route to the hospital, but admitted that he did not tell him he was under arrest. (Siegler: H.40-51, 56-60)

At approximately 2:30 a.m., Tr. O'Hare entered the ambulance with a blood kit and escorted Mr. Heidgen to the hospital. During the ten-minute ride to the hospital, Mr. Heidgen's eyes were open, and he was moaning and moving. EMT Cook, who was tending to Mr. Heidgen, told him to calm down and relax so they could help him. O'Hare and Cook placed gurney straps on Mr. Heidgen to allow Cook to perform medical procedures. Tr. O'Hare, a certified first responder, reluctantly admitted Mr. Heidgen was, by the trooper's own definition, conscious with his eyes open and able to answer questions.(O'Hare: H.64-66, 69-73, 85-87, 96-102)

Tr. O'Hare further testified that, shortly after arriving at the hospital, Mr. Heidgen became unconscious at which time he asked Nurse Busco to draw two tubes of blood. He stayed with Mr. Heidgen in the emergency room and accompanied him to the ICU. Throughout the time he was with Mr. Heidgen, O'Hare never told him he was under arrest and never sought his consent to draw his blood. He also did not request a search warrant for his blood. (O'Hare: H.74-78, 87-93, 96-102)

Tr. Zawol was sent to the hospital to relieve Tr. O'Hare. When Mr. Heidgen awoke, he thanked the trooper for being there and helping him. Zawol informed Mr. Heidgen that investigators were coming to speak with him and said "Just wait right here and I'll be here with you." Although he admitted he would not have let Mr. Heidgen leave, at no time did Zawol inform him that he was under arrest or advise him of his Miranda rights. In fact he was not formally arrested and given Miranda until Invs. Harris and Baez arrived at the hospital that afternoon. (Zawol: H.104-118;

Harris: H.123-131, 167)

The defense called Raffi Zohrabian, M.D., attending emergency room doctor at Nassau County University Medical Center. Dr. Zohrabian testified that he has been a doctor for more than thirty years and an emergency room attending surgeon since 1993. Dr. Zohrabian testified that he treated Mr. Heidgen for fifteen minutes and administered neurological and physical examinations during which he calculated Mr. Heidgen's Glascow coma score to measure his level of consciousness using eye movement, verbal and motor response. Mr. Heidgen received top scores in the eye movement and motor response portions of the exam and scored slightly lower – three out of five – on the verbal portion. The full score was a thirteen out of fifteen which the doctor described as "a little below normal, but reasonable". Dr. Zohrabian explained that, despite Mr. Heidgen's answers to questions being inappropriate and not always understandable, he was able to answer "yes" or "no" questions and was reasonably conscious. Overall, Dr. Zohrabian's tests revealed Mr. Heidgen was alert, able to comprehend and obey commands, and had eye spontaneity. There was no question in Dr. Zohrabian's mind, based on a reasonable degree of medical certainty, that he was definitely capable of consenting to medical procedures, including giving a blood sample, and that he was able to appreciate the implications of doing so. (Zohrabian: H.193-215, 219-30, 234-39)

During oral argument on the motion, defense counsel argued, *inter alia*, that troopers failed to formally arrest Mr. Heidgen for purposes of drawing blood pursuant to V.T.L.§1194(2)(a)(1) and that they failed to seek his consent or a warrant before drawing his blood. Mr. Heidgen was not formally arrested until Invs. Harris and Baez arrived at the hospital approximately ten hours after his blood was drawn and well outside the statute's two-hour window. Despite Dr. Zohrabian's testimony that Mr. Heidgen was conscious and capable of giving consent, the police never asked him for it.

69

The People countered by arguing that Mr. Heidgen was not able to understand he was being arrested so the troopers were under no obligation to tell him he was. They further argued that, despite Dr. Zohrabian's testimony that he was conscious and able to understand, Mr. Heidgen could not consent to the blood draw because he was non-responsive at the scene and in the ambulance and unconscious at the hospital. The People claimed Mr. Heidgen therefore impliedly consented to his blood being drawn.

The hearing court determined that Mr. Heidgen's blood was properly drawn and admissible because he was arrested at the accident scene and, finding a distinction between the medical definitions of consciousness and responsiveness and those used in law, he was unable to consent to his blood being drawn and, therefore, there was no need to request it. In other words, the trial court inexplicably took the word of a police officer on the job for approximately four years over that of a man who had been a doctor for more than thirty years and an emergency room attending surgeon since 1993. (H.62, 245-51, 230-264, 272-73).

On direct appeal Mr. Heidgen argued that the trial court erred in admitting his blood which was illegally seized by police. The Appellate Division affirmed Mr. Heidgen's conviction without discussing this issue. People v. Heidgen, 87 A.D.3d 1016 (2d Dept. 2011).

The same claim was also raised on appeal to the NYS Court of Appeals. While his case was pending in that Court (before oral argument), the Supreme Court decided Missouri v. McNeely, 133 S.Ct. 1552 (2013) which addressed this issue and now requires that a warrant be sought before a suspect's blood can be drawn. Counsel submitted a letter dated April 23, 2013 to alert the Court of

Appeals to the Court's attention.[11]

In its decision affirming the Appellate Division's decision, the Court of Appeals majority addressed this claim erroneously holding that the issue was unpreserved for review because trial counsel failed to make the precise argument that his blood had been drawn in violation of his Fourth Amendment right to be free of unreasonable searches and seizures. People v. Heidgen, 22 N.Y.3d at 280.

## II.   THE APPLICABLE LEGAL PRINCIPLES

Section 1194(2)(a)(1) of NY's Vehicle and Traffic Law states that a police officer may direct the administration of a chemical test to determine the alcoholic content of blood upon:

> having reasonable grounds to believe such person to have been operating in violation of any subdivision of section eleven  hundred ninety-two of this article and within two hours after such person has been placed under arrest for any such violation...

The Supreme Court has held that the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State" and the taking of a suspect's blood is considered a search and seizure which must comply with the Fourth Amendment. Schmerber v. California, 384 U.S. 757, 767 (1966). And, in a recent case, the Supreme Court held that in drunk driving investigations, the "natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." Missouri v. McNeely, 133 S.Ct. at 1568. The Court found that a case-by-case analysis of the totality of the circumstances must be conducted to determine whether a warrant is necessary in

---

[11] This issue was available for review at that time because, under United States v. Johnson, 457 U.S. 537, 562 (1982), decisions of the Supreme Court construing the Fourth Amendment (such as McNeely) apply retroactively to cases that are pending on direct appeal when the Supreme Court decision is announced.

a particular case based on the facts of that case. Id. at 1556.

## III.   ANALYSIS

Mr. Heidgen's writ of habeas corpus should be granted because a review of this case reveals that the State court's refusal to reverse his conviction based on the illegal seizure of his blood with his consent or a search warrant despite the fact that he was capable of giving such consent, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; and (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d). The precedent to which we refer is Missouri v. McNeely, 133 S.Ct. 1552.

While it is true that federal courts typically do not review a State habeas petitioner's federal claim when the state court has determined that he failed to meet a State procedural requirement such as NY's contemporaneous objection rule [Whitley v. Ercole, 642 F.3d 278, 285 (2d Cir. 2011) citing Coleman v. Thompson, 501 U.S. 722, 729 (1991); Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977) (A state court's ruling that a claim is unpreserved for appellate review is an independent and adequate state law ground that results in a procedural bar to federal habeas review)], here this Court should reach this issue for two reasons. The first is that the NYS Court of Appeals was incorrect in its finding that the issue was not preserved for review. The second reason is that, even if this Court agrees that the issue was not preserved, this error was of such great constitutional magnitude that any perceived failure to object should be overlook and the issue should be addressed on the merits in order to preserve and protect the fundamental fairness of the criminal justice process.

    A.    *This Court Should Reach this Issue Despite the Court of Appeals' Finding That it Was Unpreserved*

        1.    This Issue Was Preserved for Appellate Review

NY's preservation law requires that "For purposes of appeal, a question of law... is presented when a protest thereto was registered, by the party claiming error... Such protest need not be in the form of an 'exception' but is sufficient if the party made his position with respect to the ruling or instruction known to the court..." C.P.L. §470.05(2).

While presenting a multi-faceted argument after a pre-trial hearing that the blood evidence should be suppressed, defense counsel explained that, rather than instructing a nurse to draw his blood without his consent, the police "should have called the district attorney's office, or certainly secured a warrant, and they didn't." Although it is true that counsel did not specifically mention the applicable constitutional provision, that was clearly a Fourth Amendment argument against the warrantless seizure of his client's blood. The fact that it was made in conjunction with other arguments should not detract from the fact that the hearing court was alerted to his claim that this was a case where a warrant should and easily could have been obtained by police before Mr. Heidgen's blood was taken at the hospital without his consent.

Furthermore, any argument based on a warrantless search and seizure by police is, by definition, a Fourth Amendment argument. Although defense counsel may not have directly referred to the Fourth Amendment in his argument for suppression, one of the main focuses of his argument was the failure of police to request Mr. Heidgen's consent to seize his blood and whether he was medically capable of giving such consent. Consent is one of the few exceptions to the warrant requirement. <u>See</u> <u>United States v. Garcia</u>, 56 F.3d 418, 422 (2d Cir. 1995) ("It is by now well established that while a warrantless search... is generally unreasonable and therefore violates the

Fourth Amendment, which proscribes 'unreasonable searches,' an individual may consent to a search, thereby rendering it reasonable."). If a person gives consent to search, then police do not need a warrant to conduct the search and the search would not run afoul of the Fourth Amendment. Thus, any argument that relies upon the failure to obtain or even request consent, implies that conducting the search without consent or a warrant violates the Fourth Amendment.

Indeed, for the purpose of determining whether a claim has been exhausted for habeas purposes, it is sufficient that a petitioner "assert[ed] the claim in particular terms that call to mind a specific constitutional right". Daye v. Attorney Gen. of NYS, 696 F.2d 186, 194 (2d Cir. 1982). And, by arguing that the police could have secured a search warrant before seizing a conscious Mr. Heidgen's blood, defense counsel was clearly making an argument that called to mind the Fourth Amendment which specifically bans warrantless seizures of property.

Moreover, what is important here is that the trial court was on notice that the defense was contending that the police were required to obtain a warrant before seizing Mr. Heidgen's blood without his consent. The statement by counsel that police "should have called the district attorney's office, or certainly secured a warrant, and they didn't" clearly alerted the court to his Fourth Amendment claim which, after all, is the primary purpose underlying the preservation requirement. See generally People v. Williams, 5 N.Y.3d 732 (2005).

      2.    This Issue Is of Such Great Constitutional Magnitude That any Perceived State Procedural Bar to Review Should Not Prohibit Habeas Review in Light of the Supreme Court's Recent Decision

Should this Court find that the NYS Court of Appeals was correct in finding that this claim was not preserved because a specific argument regarding the Fourth Amendment was not made to the trial court thus barring habeas review, it is respectfully requested that this Court find that the facts

of this case present the type of "exceptional case in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." <u>Kozlowski v. Hulihan</u>, 511 F. Appx. 1, 25-26 (2d Cir. 2013) *citing* <u>Cotto v. Herbert</u>, 331 F.3d 217, 240 (2d Cir. 2003); <u>Garvey v. Duncan</u>, 485 F.3d 709, 713-14 (2d Cir. 2007) *citing* <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002). In other words, "a claim that is barred by the independent and adequate state law doctrine may be reviewed if a petitioner can show... that a fundamental miscarriage of justice will occur in the absence of review." <u>Mullings v. Laffin</u>, 13-cv-139 (EDNY Aug. 8. 2014)

The Second Circuit has set forth the following "guideposts" for evaluating the adequacy of a state procedural bar in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances":

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest (internal quotation marks omitted).

<u>Cotto v. Herbert</u>, 331 F.3d at 240 *quoting* <u>Lee v. Kemna</u>, 534 U.S. at 381-85. This test can be met here as defense counsel did alert the court to his Fourth Amendment claim by mentioning that the police had the option to get a warrant but failed to do so.

Moreover, a gross miscarriage of justice would result if this Court, like the State courts to which this claim was presented, refuses to address this issue which lays out what can only be described as a blatant violation of Mr. Heidgen's Fourth Amendment right to be free of

unreasonable, warrantless searches and seizures. Thus, as it would be a gross miscarriage of justice if this claim is not reviewed, Mr. Heidgen respectfully requests that this Court look past any perceived lack of preservation and address this claim.

      B.    *Mr. Heidgen Should Prevail on this Issue on the Merits*

Blood draws ordered by police officers qualify as "searches" under the Fourth Amendment, which means they may occur only with consent, a search warrant or probable cause and exigent circumstances. Missouri v. McNeely, 133 S. Ct. at 1563. The expert testimony of a very experienced emergency room physician at the pre-trial suppression hearing clearly demonstrated that Mr. Heidgen was conscious and able to consent to having his blood drawn yet police never requested his consent. While NY's Vehicle and Traffic Law provides for implied consent for a blood sample, that provision only applies when a driver is unconscious or so disoriented that he cannot consent. See V.T.L. §1194(2)(a)(1). The Court of Appeals, in People v. Kates, 53 N.Y.2d 591 (1981), discussed the distinction between the unconscious and severely disoriented driver and the conscious driver and held that drawing blood from an unconscious driver or one that is so disoriented that police are unable to get consent, is not improper. Id. That was not the case here.

It is undisputed that, despite his high level of intoxication, when police arrived at the accident scene, Mr. Heidgen was conscious, his eyes were open, he answered questions and followed commands. (Nolan: A1672-A1674, A1677-A1678, A1684-A1687) While in the ambulance, he remained conscious. (O'Hare: A1717-A1723, A1733-A1734, A1744-A1748). And, if you believe Tr. O'Hare, he did not lose consciousness until after arriving at the hospital. Although O'Hare, who was at the hospital with orders from his supervisor to get a blood sample, spent approximately forty minutes with a conscious Mr. Heidgen, he never bothered to ask for consent. In fact, there was no

testimony that Tr. O'Hare even bothered to speak with doctors to see if Mr. Heidgen was medically capable of consenting. Instead he just followed his supervisor's order to get the blood without any consideration of Mr. Heidgen's constitutional rights.

In support of their findings that there was sufficient evidence to sustain his conviction, both the Appellate Division and NYS Court of Appeals majorities cited the fact that, although he was intoxicated [a .28 BAC], while at the party drinking with his friends Mr. Heidgen remained steady on his feet and held conversations with friends without slurring his speech. Such evidence would surely weigh in favor of an argument that, if he was coherent enough to make the decision to continue driving after realizing that he was on the wrong side of the road, that he was also coherent enough to consent to having his blood drawn.

The most compelling evidence that police should have sought Mr. Heidgen's consent was the testimony of experienced emergency room surgeon Dr. Zohrabian who performed neurological and physical examinations which proved Mr. Heidgen was conscious and capable of giving consent and understanding the legal consequences of having his blood drawn:

> Q:     Now, Dr. Zohrabian, based upon your medical examination of Mr. Heidgen on that night at that time, do you have an opinion based upon a reasonable degree of medical certainty whether Mr. Heidgen was capable of giving his informed consent or request made of him to perform medical procedures, including that of submitting a sample of blood for the purpose of ascertaining a blood alcohol level?...
>
> A:     That opinion is that he definitely understood what the test is all about and what his responsibility was in terms of responding to the officer's request, and therefore he knew quite well that the blood that was taken from him had some implications.
>
> Q:     Is there any question in your mind?
>
> A:     No, there is no question in my mind.

> Q:    And does that opinion encompass the entire period of time from the beginning of your examination?
>
> A:    It did.
>
> Q:    To the end of the examination?
>
> A:    To the end of the examination.
>
> Q:    Including the time that the blood was drawn?
>
> A:    Yes.

(Zohrabian: H.205-06). That testimony was *unrefuted* as it was the defense who called the doctor as a witness which is very telling. The People did not present testimony from any doctors or medical personnel regarding Mr. Heidgen's condition. They relied on the testimony of their police officers to support their unconstitutional seizure of Mr. Heidgen's blood even though he was conscious and able to consent. Dr. Zohrabian's unequivocal, unrefuted expert medical testimony should have been dispositive of this issue but inexplicably it was not.

At the pre-trial hearing, the People, with no medical support for their assertions, argued that Mr. Heidgen was unable to understand that he was under arrest and that his physical condition rendered him incapable of consenting so that it was unnecessary to tell him he was under arrest. They further argued that, as a result, the troopers were not obligated to seek his consent before requesting hospital personnel to draw his blood. (H.259-60) That theory was belied by the hearing record which clearly demonstrates that, despite his state of intoxication, Mr. Heidgen was conscious and able to consent (or decline) to have his blood drawn. The very experienced emergency room doctor who performed physical and neurological examinations of Mr. Heidgen testified he was capable of understanding the implications of having his blood drawn and the People's own witness, Tr. O'Hare, a trained first responder, admitted Mr. Heidgen was conscious in the ambulance (O'Hare: H.99).

However, this testimony was ignored by the hearing court in favor of the People's unsupported argument that consent was not necessary because of his medical condition.

To substantiate his decision to deny suppression, the court concocted a new distinction between the medical definition of consciousness and that used in the law:

> While the doctor testified in his opinion that the defendant was conscious and responsive, those conclusions were made in his estimation, given his task of surgically assessing the needs of the defendant. And the ability of the defendant to tolerate medical procedures or comprehend medical procedures is a different and completely distinct standard from that what we use in the law when making a decision whether a defendant is conscious or so disoriented as to make the acquisition of consent unnecessary, which the Court does find in this case.

(H.273). The court was wrong and neither he nor the People could cite any precedents to support this theory because none exist. Dr. Zohrabian could not have been more certain in his conclusion that Mr. Heidgen "definitely understood what the [blood] test is all about and what his responsibility was in terms of responding to the officer's request." (H.205-06). It cannot possibly be the case that we want courts to take the lay opinion of a police officer on the job for approximately four years over the medical evaluation of a man who has been a doctor for more than thirty years when determining consciousness and ability to respond to a simple question such as "do you consent to have your blood drawn?" This is especially true when the doctor who examined the defendant definitively testified that Mr. Heidgen was capable of responding to and understanding the consequences of the question. Leaving this decision to a police officer rather than a very experienced emergency room surgeon, as the trial court says we should, gives entirely too much authority to police who are not qualified to make such decisions.

Thus, given the fact that Mr. Heidgen was obviously conscious and capable of giving

consent, the police had two options. They could ask for his consent to take his blood or they could ask a judge to issue a warrant to do so. They did not explore either of these options even though they could have done so with minimal effort. Instead, they exceeded their authority and just instructed an emergency room nurse to take Mr. Heidgen's blood with no legal authority to do so. There can be no doubt that the police could easily have obtained a warrant. All they would have had to do was contact a judge over the telephone and ask for it and they surely would have gotten it. But they chose not to.

In Missouri v. McNeely, issued by the Supreme Court while Mr. Heidgen was awaiting oral argument in the NYS Court of Appeals, the defendant was arrested for drunk driving and, after he refused to consent to breathalyzer and blood tests, police, acting without a warrant, directed hospital personnel to draw his blood to obtain his BAC level. McNeely asserted that this action violated his Fourth Amendment right to be free from unreasonable searches and seizures and the Supreme Court (in a 5-4 decision) agreed. Missouri v. McNeely, 133 S. Ct. at 1557-58. The majority, in an opinion written by Justice Sotomayor, held that in drunk driving investigations, the "natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." Id. at 1568. The majority's opinion makes it clear that the Court was not willing to make an exception to the warrant requirement for the drawing of blood and was applying standard Fourth Amendment jurisprudence to the seizure of blood. In so doing, the Court found that its Fourth Amendment precedents simply did not support a blanket rule that blood could be drawn by police without ever having to seek a warrant from a judge.

No different result should obtain in the case at bar as the failure of police to request Mr. Heidgen's consent when, according to an experienced emergency room doctor, he was capable of

giving it, should compel the same result as <u>McNeely</u> where the defendant refused to give consent and police had his blood drawn anyway. In both cases, the defendants did not give consent – one refused and the other was never given the opportunity to refuse/consent – and in both cases the blood should have been suppressed.

As the <u>McNeely</u> majority recognized, courts should not be willing to make an exception to the warrant requirement for the drawing of blood especially since technology "allow[s] for the more expeditious processing of warrant applications." <u>Id.</u> at 1561-1562. Indeed, NY has provisions to allow for a warrant to be obtained in ways that are very convenient to police officers "by telephone, radio or other means of electronic communication". C.P.L. §690.36. In so holding, the Supreme Court found that its precedents regarding the Fourth Amendment simply did not support a blanket rule that blood could be drawn by law enforcement without ever having to seek a warrant from a judge first. "With these [technological] developments in view, dilution of the warrant requirement should be vigilantly resisted". <u>Fernandez v. California</u>, 134 S.Ct. 1126, 1142 (in dissent) (2014) (Justice Ginsburg in her dissent notes that when considering the propriety of a warrantless search, a reviewing court should keep in mind "the ease and speed with which search warrants nowadays can be obtained").

Moreover, this case does not even fall into the category of cases where state law would excuse the Fourth Amendment violation. V.T.L. §1194(2)(a)(1) mandates that a chemical blood test is permissible when an officer has a reasonable basis to believe a person was driving while under the influence of alcohol. However, that power is not limitless. The statute specifically states that the blood must be drawn within two hours of arrest. Mr. Heidgen's blood was drawn approximately ten hours before he was arrested and, thus, improperly obtained.

When police arrived at the accident scene at about 2 a.m., Mr. Heidgen was conscious and seated behind the wheel of his pickup truck. Believing they had probable cause to arrest and with the opportunity to do so, Tr. O'Hare accompanied Mr. Heidgen to the hospital with orders to get his blood without first placing him under arrest. Although the time of arrest was noted on police paperwork as 2:33 a.m. (when they were in the ambulance en route to the hospital), no one bothered to tell Mr. Heidgen that he was under arrest even though during the trip he remained conscious, his eyes were open, he was moaning and moving. He was also still conscious while receiving medical treatment in the emergency room, including an evaluation of his consciousness on which he scored very high but police still did not arrest him. At about 2:45 a.m., while Mr. Heidgen was still conscious, Tr. O'Hare asked a nurse to draw his blood. And the testimony revealed that Mr. Heidgen was not told that he was under arrest until approximately 12:30 p.m. when Inv. Baez and Det. Harris spoke with him and Mirandized him but did not bother to tell him that two people had tragically died during the accident. That means police were with a conscious Mr. Heidgen for about forty minutes but did not bother to (1) tell him he was under arrest, (2) read him his rights, and (3) ask for his consent to draw his blood. It was not until approximately ten hours after his blood was drawn that police took the time to formally arrest him – clearly outside the two-hour limit proscribed by statute.

Viewing the totality of the circumstances, Mr. Heidgen was not formally arrested until more than ten hours after the accident. Given the hearing testimony by police and the experienced emergency room doctor, the police paperwork indicating the time of arrest as 2:33 a.m., does not cure this infirmity. Thus, Mr. Heidgen's blood was improperly drawn in violation of the V.T.L. and should have been suppressed.

IV.     **CONCLUSION**

In sum, Mr. Heidgen's blood was taken in violation of NY's statute and his Fourth Amendment right protecting against unreasonable searches and seizures and should therefore have been precluded at trial. As noted by Justice Roberts in his concurrence, "the ultimate touchstone of the Fourth Amendment is reasonableness." Missouri v. McNeely, 133 S.Ct. at 1569; Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). What the police did in this case – by not requesting his consent to draw his blood and/or failing to obtain a warrant – clearly cannot be described as reasonable under the circumstances of this case. Accordingly, the petition for a writ if habeas corpus should be granted and his conviction vacated with an order for a new trial excluding the blood evidence.

<u>POINT IV.</u>

**THE TRIAL COURT VIOLATED MR. HEIDGEN'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO PRESENT A DEFENSE BY PRECLUDING HIM FROM PRESENTING THE EXPERT TESTIMONY OF A QUALIFIED POLICE ACCIDENT RECONSTRUCTIONIST.**

Mr. Heidgen was denied his constitutional rights to a fair trial and to present a defense as a result of the trial court's decision to preclude him from presenting the expert testimony of NYS Police Sgt. Scott Crawford who performed an accident reconstruction in this case and prepared a report given to the People indicating that Mr. Heidgen was traveling at 45 MPH at the tine of impact. U.S. Const. Amends. XIV and VI. As a result, Mr. Heidgen's request for a writ of habeas corpus should be granted and a new trial ordered.

I.      <u>FACTUAL BACKGROUND</u>

At trial, the defense called NYS Police Sgt. Scott Crawford who testified that on July 2, 2005, he performed an accident reconstruction on the Meadowbrook Parkway. Upon arriving, he walked the scene to observe any evidence before documenting his findings with a total work station used to measure distances and angles. Those measurements were used to create a forensic map of the scene. In addition, at a later date, Sgt. Crawford returned to the scene and used a roll wheel to measure the parkway's lane lines. (T.2240-46) After recording the measurements, Crawford analyzed the collision by performing a reconstruction. As a result of his investigation, he reached conclusions which he memorialized in a report dated January 13, 2006 which was given to the DA. (T.2247-48)

After describing his investigation, defense counsel asked Sgt. Crawford to outline his training and experience. He testified that he was qualified as an accident reconstructionist after completing three two-week courses amounting to 248 hours of training after which he received certificates from

the Institute of Police Technology and Management at the University of Florida. Sgt. Crawford

explained that those courses covered topics including, *inter alia*, identifying evidence at an accident

scene, speed estimates, drawing collision diagrams, momentum formula calculations, and time

distance evaluations. He further testified that since completing those courses, he has participated in

40 to 50 accident reconstructions. (T.2248-49, 2253)

Following his detailed questioning regarding Sgt. Crawford's experience and training in

accident reconstruction, defense counsel asked the court to declare him an expert in accident

reconstruction (T.2253). The prosecutor conducted *voir dire* examination during which Crawford

stated that he had been the primary reconstructionist on ten to twelve of the reconstructions he had

participated in and noted that he is "technically" not an expert in angular momentum or comfortable

with it because "There is usually too many variables in it". (T.2253-56)

Following the DA's *voir dire,* after which she objected to the declaration of Sgt. Crawford

as an expert, the court asked Crawford if he had ever been qualified as an expert to which he replied

that he had not. (T.2256)

The court then heard oral argument during which the defense argued that Sgt. Crawford

> is a New York State Trooper, a sergeant, who took the requisite
> courses in accident reconstruction, and who was assigned to do an
> accident reconstruction in this case. He has done fifty. He has been
> the primary on twelve. He prepared a report. Defense certainly didn't
> ask him to do a report; the New York State Police did, and submitted
> a report to the district attorney's office, that was turned over to us and
> to the Court by affirmation in January. He made certain conclusions.
> Whether the district attorney likes those conclusions or not, or
> whether the district attorney thinks this State Trooper is competent...
> They are opinions based on his expertise.

(T.2257-58). Counsel added that Crawford's credibility is ultimately an issue for cross-examination.

Id. When the court noted that Crawford had never been declared an expert, counsel stated that the

witness told him he was never declared an expert because this was the first case on which he was the primary accident reconstructionist that went to trial – not because he was not qualified to be declared an expert – and that his qualifications should be more important than his lack of experience testifying in court. Counsel further noted that Sgt. Crawford was on the People's witness list and that it was not until the middle of trial that they made the decision not to call him as a witness (T.2258-61).

The court sustained the People's objection and refused to declare Sgt. Crawford and expert. The jury returned to the courtroom and never heard from Sgt. Crawford again. (T.2264)

This issue was presented for review to the Appellate Division and the NYS Court of Appeals. Neither of the State appellate courts addressed the issue.

## II.    <u>ANALYSIS</u>

The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Sixth Amendment's Compulsory Process Clause and the Fourteenth Amendment's Due Process Clause. U.S. Const. Amends. VI, XIV; <u>Taylor v. Illinois</u>, 484 U.S. 400, 408-09 (1988); <u>California v. Trombetta</u>, 467 U.S. 479, 486 n. 6 (1984); <u>United States v. Mi Sun Cho</u>, 713 F.3d 716, 721 (2d Cir. 2013) (A defendant has "a fundamental due process right to present a defense."). The Supreme Court has recognized that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973) *citing, inter alia*, <u>Webb v. Texas</u>, 409 U.S. 95 (1972).

Like the courts of NY, there is no doubt that Federal courts permit expert testimony such as the testimony Sgt. Crawford had to offer here. Rule 702 of the Federal Rules of Evidence provides that "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or otherwise." And, there is also no doubt that the trial court erred in refusing to declare Crawford an expert. However, even an error by a State court will not automatically trigger a constitutional violation. The Second Circuit has held that "[e]rroneous evidentiary rulings rarely rise to the level of harm to this fundamental constitutional right to present a meaningful defense". Agard v. Portuondo, 117 F.3d 696, 705 (2d Cir.1997), *rev'd on other grounds*, 529 U.S. 61 (2000). However, the Second Circuit has also held that "state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness". Washington v. Schriver, 255 F. 3d 45, 56 (2d Cir. 2001). As a result, the Court created a test for determining whether a limitation on the right to present witnesses rises to the level of a constitutional violation: "When considering whether a trial court's exclusion of expert witness testimony violated a criminal defendant's right to Compulsory Process, a two-step analysis is appropriate. First, we consider the trial court's reasons for excluding the evidence. Second, we consider the strength of the prosecution's case as a whole." Howard v. Walker, 406 F. 3d 114, 132 (2d Cir. 2005); Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003) (In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, we start with "the propriety of the trial court's evidentiary ruling".). After conducting this analysis, it is clear that the trial court's error in precluding Sgt. Crawford's testimony by refusing to declare him an expert despite his obvious qualifications rises to the level of a constitutional violation.

The first step of the Howard v. Walker analysis – evaluation of the trial court's reasons for excluding the evidence – is simple in this case but must begin with a review of the proffered witness and the testimony he had to offer. An examination of the record clearly demonstrates that Crawford would have provided expert testimony that was "both material and favorable to his defense" and,

thus, the decision not to declare him an expert which effectively precluded his testimony resulted in a Sixth Amendment violation. See United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982) (To establish a Sixth Amendment violation, a defendant must demonstrate that he was deprived of the opportunity to present a witness who would have given testimony that was "both material and favorable to his defense.").

The defense called a witness who was a NYS Police Sergeant and who was on the People's witness list. This witness was a trained, qualified, certified, accident reconstructionist whose supervisors thought enough of his expertise to assign him to be the primary accident reconstructionist in this accident involving two fatalities and other serious injuries. However, it appears that when the DA did not like the sergeant's findings which included an estimation that Mr. Heidgen was "driving 45 MPH" at impact [Resp. Br. at 67] which is in line with the determinations reached by the defense expert Schneider and completely contradicts the People's theory that Mr. Heidgen was speeding along at approximately 70 MPH without slowing down, they decided to try to sweep Crawford's findings under the rug by not calling him as a witness and then blocked the defense from doing so by objecting to his declaration as an expert thereby precluding him from offering his opinions about speed. There can be no doubt that this is precisely what the DA was doing. They did not like what Sgt. Crawford was going to say and they were going to do everything in their power to keep his findings – which were clearly favorable to the defense – from getting in front of the jury. Much like the tactics they used to seize Mr. Heidgen's blood without his consent or a warrant and their efforts to seize his blood again using a mid-trial order in violation of the discovery statutes, their efforts to block Sgt. Crawford from testifying by discrediting him and his ability to do his job was yet another example of the DA's "win at all costs" modus operandi.

NY law requires that a witness who testifies as an expert, "should be possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the information imparted or the opinion rendered is reliable". Mattot v. Ward, 48 N.Y.2d 455, 459 (1979). That Sgt. Crawford possessed that skill, training, education, knowledge and experience was clearly demonstrated by defense counsel who established that he had attended the courses necessary to qualify him as an accident reconstructionist. And, the NYS Police was obviously satisfied with those qualifications because they assigned him to participate in forty to fifty reconstructions, on ten to twelve of which he was the primary reconstructionist (T.2254-56). Moreover, they assigned him to be the primary in this case which involved two fatalities and several serious injuries thus demonstrating his supervisors' confidence in his ability to do his job. To now say that he was not qualified to be declared an expert because he is not "comfortable" with the calculation necessary to conduct the reconstruction in this case seems all too convenient. If the NYS Police believed Crawford was qualified to perform this reconstruction and the forty to fifty others he had already been involved in, the trial court should have been satisfied as well. He is a trained, certified accident reconstructionist. He is the officer the NYS Police sent to conduct this investigation and when they did not like what his investigation revealed, they claimed a lack of confidence in his work. That is fundamentally unfair.

In arguing against the declaration of Sgt. Crawford as an expert, the People claimed that

> in preparing the witness, in speaking to him, in reviewing the foundations that he used in his report, it cannot meet the threshold foundation requirement of reliability... In this case, this momentum equation, it is the most difficult, the most sensitive in all of accident reconstruction, and he can't do it.

(T.2261). This statement by the prosecution makes it clear that the People did not want Crawford

to testify because his speed findings did not support their theory. If his speed calculations were what they wanted them to be, that is, if they supported their theory that he was speeding at a consistent rate and not slowing down at the time of the accident, they would have been thrilled to put him on the stand themselves and certainly would not have blocked the defense from calling him. Instead, they desperately tried to stop his expert opinions regarding speed from getting before the jury by attacking his credentials. To say that "he can't do it", referring to the speed calculations, when his bosses believed that he could do it because he was trained to do it and had prepared a report based on it, was an obvious attempt to stop the jury from hearing their own witness' opinions because they did not like what those opinions were. As defense counsel argued, despite Crawford's claim that he is not comfortable with angular momentum, "He wrote the report based upon these exact properties, the momentum analysis. If he felt at the time in January that he should not have been doing it, he didn't say anything about it. It is only now, months later, after these reports were turned over to the DA's Office that he is saying, well, I don't- I'm not so comfortable anymore, because the speed here is not what they like." (T.2260-61). This attempt by the People to block evidence that supported the defense theory of what happened and destroyed their own goes against what the Second Circuit has determined to be "the function of a trial [which] is to seek the truth". United States v. Norman, 13-2840 (2d Cir. Jan. 9, 2015). If we allow prosecutors to manipulate the process in this manner, then we are destroying the sanctity of the criminal justice process.

We now get to the reason that the trial court precluded this critical testimony. Following oral arguments, the trial court refused to declare Crawford an expert because he had never before testified as an expert. "In analyzing the reasonableness of a trial court's exclusion of evidence, we must examine the stated reasons for the exclusion and inquire into possible state evidentiary law errors

that may have deprived the petitioner of a fair trial (internal quotation marks omitted).” Washington v. Schriver, 255 F.3d at 57 *citing* Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000). In applying that premise, the Court in Washington v. Schriver found that the trial court's preclusion of an expert's testimony “because he has 'never been [previously] qualified as an expert in this state'... appears to us to be illogical because it would preclude any new expert from testifying in New York, no matter what his qualifications and no matter what relevance his testimony has”. Washington v. Schriver, 255 F. 3d at 57. This Court should find the same as the trial court's reliance on the fact that Sgt. Crawford had never before been declared an expert was ridiculous in light of defense counsel's explanation that he had never been declared an expert because none of the cases on which he had been the primary reconstructionist had gone to trial so he simply had never had the opportunity to be declared an expert. This explanation should have satisfied the court and not been the basis for denying the request. This was not a situation where a court had previously refused to declare him an expert based on a lack of qualifications. This was just the first time anyone had tried to declare him an expert. Every expert has to have a first time and there was no good reason that this could not have been Sgt. Crawford's.

Furthermore, since Sgt. Crawford's credentials and experience clearly qualified him as an expert, the credibility and reliability of his opinions should have been a matter for the People to test on cross-examination and the jury would then have been free to accept or reject his expert testimony. People v. Negron, 91 N.Y.2d 788, 892 (1998).

In short, it is clear that the People cannot make it past the first step of this analysis as the reasoning underlying the trial court's decision – that Sgt. Crawford had never before been declared an expert – was insufficient to survive appellate scrutiny.

The second prong of this analysis requires a review of the People's case as a whole. <u>Howard v. Walker</u>, 406 F.3d at 132. "In addition to analyzing the soundness of the state courts' reasons for excluding the evidence,... the strength of the prosecution's case must also be analyzed because [i]n a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt and raise the exclusion of the evidence to an error of constitutional proportions (internal quotation marks omitted)." <u>Washington v. Schriver</u>, 255 F. 3d at 59 *citing* <u>Jones v. Stinson</u>, 229 F.3d at 120. As outlined in greater detail *supra* at Point II, it is clear that this was a very close case and with the testimony of Sgt. Crawford to corroborate the testimony of the defense expert Schneider regarding the fact that Mr. Heidgen was slowing down dramatically at the time of the accident (from approximately 70-75 MPH to approximately 38 MPH) thus negating any theory that he had a *mens rea* of depraved indifference to human life, Mr. Heidgen stood a much better chance of acquittal of the depraved indifference charges. Therefore, it is clear that Mr. Heidgen can satisfy the second prong of this analysis to support a finding of constitutional violation as the trial court's decision was "contrary to" clearly established federal law and based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §2254(d)(1) and (2).

Finally, this error cannot be deemed harmless. In fact, not only was it not harmless, the preclusion of Sgt. Crawford's testimony severely damaged, if not crippled, Mr. Heidgen's defense. Had this expert been permitted to testify, his findings would have had a formidable effect upon the defense as his report would have contradicted the People's theory that Mr. Heidgen did not slow down when he realized he was traveling on the wrong side of the road and corroborated the testimony of Mr. Heidgen's expert Schneider who testified he calculated Mr. Heidgen's speed using

two types of analysis and found that the truck was going between 33 and 38 MPH at impact. (T.2304-05, 2312, 2323-24) That determination was in line with Sgt. Crawford's estimate that Mr. Heidgen was "driving 45 MPH" at impact which the jury never got to hear and totally destroyed the People's theory that he did not slow down. That is precisely why the People sought to block Crawford's testimony.

This error can also not be rendered harmless just because Mr. Heidgen presented his own expert testimony. The issue is not whether Mr. Heidgen was prevented from calling *any* expert witness. The constitutional issue presented here is whether he was erroneously prevented from calling *this particular* witness. The fact that he called his own expert should not excuse the trial court's error in blocking Sgt. Crawford's expert testimony. In addition, the significance of a police witness' expert testimony should not be underestimated. The testimony of this sergeant who is viewed by jurors as part of the prosecution team would have gone a long way to proving Mr. Heidgen's defense that he was slowing down at the time of the impact which was a crucial issue for the defense since, as discussed in greater detail *supra* at Point II, slowing down negates depraved indifference. People v. Lazartes, 23 A.D.3d at 405 (Second Department held that evidence that a driver was slowing down where conditions warranted "is the antithesis of a depraved, as opposed to a reckless, state of mind.").

III.   **CONCLUSION**

In sum, the court's decision to deny a request to declare Sgt. Crawford an expert in accident reconstruction which precluded Mr. Heidgen from presenting his expert testimony, resulted in the denial of his constitutional rights to a fair trial and to present a defense. U.S. Const. Amends. XIV and VI. As a result, his request for a writ of habeas corpus should be granted and a new trial ordered.

## **CONCLUSION**

For the foregoing reasons Mr. Heidgen's request for a writ of habeas corpus should be granted, his conviction should be reversed and a new trial ordered.

Respectfully Submitted,


_____/s/ Jillian S. Harrington_____
Jillian S. Harrington, Esq.
*Attorney for Petitioner Martin Heidgen*
P.O. Box 6006
Monroe Twp., New Jersey 08831
(718) 490-3235
jbhesq@aol.com