SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU : CRIMINAL PART 31
----------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK

         -against-
                                Indictment No.
                                1910N-2005

MARTIN ROBERT HEIDGEN,

                         Defendant.
----------------------------------------x

                                Mineola, New York
                                August 15, 2006

B E F O R E:   HON. ALAN L. HONOROF
                Acting Supreme Court Justice

A P P E A R A N C E S:

                HON. KATHLEEN RICE
                District Attorney, Nassau County
                BY:   ROBERT HAYDEN, ESQ.
                      MAUREEN MCCORMICK, ESQ.
                Assistant District Attorneys
                For the People

                STEPHEN LAMAGNA, ESQ.
                666 Old Country Road
                Garden City, New York  11530
                BY:   STEPHEN LAMAGNA, ESQ.
                      GREGORY MARTELLO, ESQ.
                Attorneys for the Defendant

                MINUTES OF JURY TRIAL
                    VOL I of V

Christa Flash, R.P.R.
Official Court Reporter

People v. Heidgen

1           THE CLERK:  Indictment number 1910N-2005,

2     People v. Martin Heidgen.

3           People's appearance, please?

4           MR. HAYDEN:  Robert Hayden and Maureen

5     McCormick for the People, your Honor.

6           THE CLERK:  Defense?

7           MR. LAMAGNA:  For the defendant, Stephen

8     LaMagna, 666 Old Country Road, Garden City, New

9     York.

10          Good afternoon, your Honor.

11          THE COURT:  Good afternoon.

12          THE CLERK:  The defendant is present, your

13    Honor.  This case is on for hearing.

14          THE COURT:  It's on for trial.

15          Would you call it for trial, please?

16          THE CLERK:  This case is on for trial.

17          People ready?

18          MR. HAYDEN:  People ready, your Honor.

19          THE CLERK:  Defendant ready?

20          MR. LAMAGNA:  Defendant ready, your Honor.

21          THE COURT:  Let's talk about Antommarchi

22    and Sandoval.  Is there a Sandoval issue?

23          MR. HAYDEN:  No, your Honor.

24          THE COURT:  That's the end of that.

25          Antommarchi?

People v. Heidgen

1               MR. LAMAGNA: Judge, I've had the

2         opportunity to explain the law in that area with my

3         client. We're going to be waiving that.

4               THE COURT: Do we have the written form,

5         Jean?

6               I'm going to provide you with a written

7         form. At the moment, Jean will be placing the

8         defendant under oath.

9         M A R T I N    H E I D G E N, after having

10    been first duly sworn by the Clerk of the Court, was

11    examined and testified as follows:

12              THE COURT: Mr. Heidgen, are you aware

13         that it is the law in the State of New York that

14         during jury selection you have the right to be

15         present here at the bench in the event there is a

16         conference between prospective jurors and the

17         lawyers? Are you aware of that?

18              THE DEFENDANT: I do, your Honor.

19              THE COURT: Are you aware your lawyer just

20         told me you intend to waive or give up that right

21         and, instead, the procedure would be if there is a

22         conference at the bench with a prospective juror,

23         your lawyer will attend that conference and report

24         back to you the contents of it. Do you understand

25         that?

People v. Heidgen

1      THE DEFENDANT:  I do, your Honor.

2      THE COURT:  Is that what you want to do

3  following the conference that you had with your

4  lawyer?

5      THE DEFENDANT:  Yes, your Honor.

6      THE COURT:  You understand this is

7  revocable.  By this I mean if you change your mind,

8  you can revoke the waiver and still have the

9  opportunity to come up to the bench.  Do you

10  understand that?

11      THE DEFENDANT:  I do, your Honor.

12      THE COURT:  The waiver is accepted.

13      Mr. LaMagna, if you fill out that

14  document, please, we'll have it marked as Court

15  Exhibit I.

16      This case is on trial.  It is adjourned

17  until September 5th for jury selection.

18      Now, Mr. Hayden should put on the record

19  the conference we had in chambers with respect to

20  the evidentiary issue.

21      MR. HAYDEN:  Yes, your Honor.

22      THE COURT:  Please do that.

23      MR. HAYDEN:  Yes, your Honor.

24      The People have no intention of

25  introducing into evidence photographs of the

People v. Heidgen

1    deceased in this case, Stanley Rabinowitz or

2    Kathleen Flynn.  There might be testimony about

3    observations made of Katie Flynn and Stanley

4    Rabinowitz at the scene of the collision, but we

5    have no intention of introducing photographic

6    evidence of their dead bodies.

7                    THE COURT:  Okay.

8                    MR. LAMAGNA:  Judge, I'm going to have an

9    application with respect to that issue.  From the

10    discovery material, from what I've received thus far

11    and pursuant to the testimony at the hearing, there

12    was some testimony elicited, number one, with

13    respect to an observation of the child's mother

14    cradling the child's head at the side of the road.

15    I would argue that that testimony must be precluded

16    as being too prejudicial, and the weighing of the

17    prejudicial value versus the probative value--

18    certainly the probative value is outweighed by the

19    prejudice that this jury would have towards my

20    client.

21                    With any evidence, whether it's

22    testimonial, whether it's objects, whether it's

23    photographs or demonstrative evidence, even if

24    relevant, and I don't even concede that that

25    particular testimony would be relevant to any

People v. Heidgen

1    material issue in this case whatsoever, but even if

2    it were to be relevant, the balancing test of

3    whether the probative value outweighs the

4    prejudicial effect of that testimony must be weighed

5    by the Court.  There will be an indelible thought,

6    an image in the minds of the jury with respect to

7    that testimony or that issue, that has no bearing

8    whatsoever on any issue presented in this case.

9         I would argue, and the case law is clear,

10   that the prejudicial value outweighs the probative

11   value, and that the Court, in its discretion, will

12   make rulings commensurate with that issue.  There is

13   nothing with respect to that image that goes to any

14   facts in this case, and the prejudice that would

15   endure to my client getting a fair trial and having

16   this jury get through that image will be

17   insurmountable.

18        THE COURT:  That was one of the reasons I

19   asked in chambers for a preview, if you will, of

20   what photographs the People intended to produce with

21   respect to the victims in this case, and Mr. Hayden

22   informed us he does not intend to use such

23   photographs, and let me go to Mr. Hayden and hear

24   what he has to say.

25        MR. HAYDEN:  I'd just like to start off,

People v. Heidgen

1    your Honor, by reading People v. Pobliner, 32 NY2d

2    356, pages 369 through 370:

3              "It is well-settled that where they are

4    otherwise properly admitted as having a tendency to

5    prove or disprove some material fact in issue,

6    photographs of a corpse are admissible even though

7    they 'portray a gruesome spectacle and may tend to

8    arouse passion and resentment against the defendant

9    in the minds of the jury.'"

10             The Court acknowledges they're talking

11   about photographs.  We don't even intend to offer

12   photographs in evidence.  We're talking about a

13   central fact of this case.  You cannot get around

14   this fact:  Katie Flynn was decapitated.  That's the

15   way she was killed.  That fact tends to establish

16   that she was killed in that head-on motor vehicle

17   collision.  That fact tends to establish that the

18   defendant behaved with a depraved state of mind.

19   The observations of Jennifer Flynn clutching Katie's

20   head in her arms, that's evidence of the fact that

21   Katie was decapitated.  That's the evidence we have.

22   To distort that evidence would be to distort reality

23   and to distort the truth.  We're not here to do

24   that, Judge.

25             THE COURT:  Let me go a little farther

People v. Heidgen

1    down that road and see if we can agree on different

2    points, although related.

3               As I understand the case, and I don't know

4    all the facts, but as I understand the case, the

5    mother of the child is supposed to have taken with

6    her to the hospital, the child's head.

7               MR. HAYDEN:  That's correct, your Honor.

8               THE COURT:  Would you agree with me that

9    that would be something that the jury doesn't need

10   to hear?

11              MR. HAYDEN:  Absolutely.

12              THE COURT:  All right.  And in that case,

13   as to your application--

14              MR. LAMAGNA:  Judge, may I just respond?

15              THE COURT:  Yes.

16              MR. LAMAGNA:  Sorry.  I agree with

17   Mr. Hayden's case that he cited, People v. Pobliner,

18   but the case stands for the proposition, as it is

19   articulated in the case, if the sole and only

20   purpose of the testimony or of the exhibit is to

21   arouse, in an undeniably inflammatory way, the

22   emotions of the jury without tending to prove or

23   disprove any material fact.  There is no dispute

24   that these two individuals died in this car

25   accident.  There is no dispute that these two

People v. Heidgen

1   individuals died as a result of a head-on collision.

2   There is no dispute this is how they died.  The

3   manner in which an individual may have perished in a

4   car accident does not bear upon the mental state of

5   an individual who was involved in that car accident.

6              THE COURT:  Let's approach it this way:

7   I'm going to ask you and the district attorney to

8   fashion a stipulation, if you can.  Until that time,

9   unless you cannot, decision is reserved.

10             MR. LAMAGNA:  A stipulation as to?

11             THE COURT:  As to what you agree or

12  disagree as to Mr. Hayden's intention to use

13  testimonial evidence that the mother cradled the

14  child's head.

15             MS. MCCORMICK:  Your Honor, if I might, I

16  know Mr. Hayden is making the argument, but I'd like

17  to add something to the Court's consideration and

18  just inform counsel of what would be necessary as

19  part of that stipulation.

20             The arrival of the first responding

21  emergency workers on that scene and their

22  observation of Mrs. Flynn cradling her daughter's

23  head is so inextricably woven into the fats of this

24  case and into the responses of those emergency

25  workers in what they did and didn't do and weren't

People v. Heidgen

1    able to do, and there would also be testimony from

2    the four adults inside the limousine as to

3    positioning, the movement of the bodies during the

4    crash, the location of people after the crash.  The

5    attempt to remove these facts from this case would

6    make it impossible for the witnesses to testify.

7            THE COURT:  It's something I'm going to

8    let the three of you wrestle with unless you require

9    me to make a decision.  Right now I'm reserving

10   decision in the hope you will be able to agree on

11   just what the jury should hear between the two

12   sides.  If you cannot, I will help you all out and

13   make a decision.  Between now and then the decision

14   is reserved.

15           MS. MCCORMICK:  Judge, earlier this

16   morning when we were first here we also had a

17   discussion with Howard that it would probably be in

18   the interest of the trial for both defense counsel

19   and the People to fashion a charge with the new

20   Feingold language with respect to depraved

21   indifference.

22           THE COURT:  If you can agree, that would

23   be great.  If you cannot agree, each of you give me

24   a proposed draft and I'll look it over.

25           Thank you.  September 5th.

People v. Heidgen

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    --------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4         -against-                          Indictment No.
                                              1910N-2005
 5

 6    MARTIN ROBERT HEIDGEN,

 7                          Defendant.
      --------------------------------------x
 8
                                        Mineola, New York
 9                                      September 5, 2006

10

11    B E F O R E:   HON. ALAN L. HONOROF
                     Acting Supreme Court Justice
12

13    A P P E A R A N C E S:

14              (Same as previously noted.)

15

16                    *    *    *    *

17

18              THE CLERK:  Case on trial, indictment

19       number 1910N-05, People v. Martin Heidgen.

20              Appearances, please?

21              MR. HAYDEN:  Robert T. Hayden and Maureen

22       McCormick for the People, your Honor.

23              People ready.

24              MR. LAMAGNA:  Steven LaMagna, 666 Old

25       Country Road, Garden City, New York.
```

People v. Heidgen

1      Defendant ready, your Honor.

2              THE CLERK:  The defendant is present.

3              THE COURT:  Just a couple of comments

4      before we bring the jury in.  As you know, this is

5      just a prescreening of jurors.  This is not voir

6      dire.  This is to find out who can devote this

7      amount of time, or what we would expect this amount

8      of time to be, and listen to the charges involving

9      the kind of injuries that are involved in this case.

10             I note that we have some family members in

11     the courtroom.  I feel for all of you.  However, I

12     must instruct you that at no time, please, ever

13     approach a juror in this case under any

14     circumstances.  Please don't do that.  I suggest

15     that you also refrain from contact from one family

16     to another.  I don't see what good can come of that.

17     So until this trial is over, please keep to

18     yourselves, if you can.

19             At this point please produce the jury.

20             MR. LAMAGNA:  Judge, before we do that--

21     I'm sorry-- I was just informed by my client that he

22     did not get access to his clothing that his mom

23     brought to the jail for the purposes of trial, and,

24     secondly, he requested to shave last night and this

25     morning, and that was denied.  Obviously, we know

People v. Heidgen

1   that's important, and he should be having access to

2   his clothes.

3               THE COURT:  I will see what I can do, but

4   at the moment we're going to--

5               MR. LAMAGNA:  I understand for today.

6               THE COURT:  I'll see what I can do to

7   help.

8               MR. LAMAGNA:  Thank you.

9               (Whereupon, the prospective jury panel

10  entered the courtroom.)

11              THE CLERK:  Case on trial, indictment

12  number 1910N-2005, People v. Martin Robert Heidgen.

13              People ready?

14              MR. HAYDEN:  People are ready, your Honor.

15              THE CLERK:  Defendant ready?

16              MR. LAMAGNA:  Defendant is ready, your

17  Honor.

18              THE COURT:  Good morning, ladies and

19  gentlemen.  I am going to tell you a little bit

20  about this case.  I'm going to give you the option

21  to serve in this trial or not.

22              This case involves the charge of murder in

23  the second degree.  In this case you will hear of

24  some terrible injuries.  However, there will be no

25  photographs.  You will hear about the

People v. Heidgen

1    alcohol-related drunk-driving deaths of a man by

2    blunt force trauma and a young child by

3    decapitation.  The case may last as long as five

4    weeks.  It's possible, although I have not yet

5    decided, that during deliberations the jury may be

6    sequestered in a hotel.

7              Due to the nature of the case and the time

8    commitment I've just discussed with you, we are

9    allowing the decision as to whether you choose to be

10   screened up to you.  If you choose not to be

11   screened, which is your right now, you will go back

12   to central jury.  You will be screened for other

13   juries.  None of them will involve a murder.  Some

14   of them might last longer.  If you choose to be

15   screened for this case, the Court staff will give

16   you further instructions.

17             This case has gotten and will continue to

18   receive media attention.  Please do not discuss the

19   case if you are approached by the media.

20             The Court staff will now give you further

21   instructions.

22             (Whereupon, a brief recess was taken.)

23             (Whereupon, the prospective jury panel

24   entered the courtroom.)

25             THE CLERK:  Case on trial, indictment

People v. Heidgen

1    number 1910N-05, People v. Martin Heidgen.

2             The People are present, the defendant is

3    present and defense counsel is present, your Honor.

4             THE COURT:  Thank you.

5             Good morning, ladies and gentlemen.  My

6    name is Alan Honorof.  I am a judge in the Supreme

7    Court part in relation to a criminal case which is

8    starting now.

9             This jury selection is going to be a

10   little bit off the beaten track in that I'm going to

11   give you your choice as to whether or not to be

12   screened for jury duty on this case.  In order to do

13   that, I have to tell you a little bit about this

14   case.

15            This case involves murder in the second

16   degree.  In this trial the jury will hear about

17   gruesome and terrible injuries, but there will be no

18   photographs.  You will hear-- the jury will hear

19   about the alcohol-related drunk-driving deaths of a

20   man by blunt force trauma and to a young child by

21   decapitation.

22            The case may last as long as five weeks.

23   It is possible, although I haven't yet decided, that

24   during the jury's deliberations they may be

25   sequestered at a hotel.  I'm not sure about that

People v. Heidgen

1     yet.

2           Due to the nature of the case and the time

3     commitment involved, we're allowing the decision as

4     to whether you choose to be screened to serve on

5     this jury up to you.  If you choose not to be

6     screened, you will go back to central jury and be

7     screened for other juries.  They will not involve

8     murder.  They might last longer.  If you choose to

9     be screened, my staff will give you further

10    instructions.

11          This case has gotten and will continue to

12    receive attention from the media.  If you are

13    approached by the media, please do not discuss any

14    aspect of this case with them.

15          My court staff will now take over.

16          (Whereupon, a luncheon recess was taken.)

17

18    *    *    *   A F T E R N O O N    S E S S I O N   *    *    *

19

20          THE CLERK:  Case on trial, indictment

21    number 1910-05, People v. Martin Heidgen.

22          People ready?

23          MR. HAYDEN:  Ready, your Honor.

24          THE CLERK:  Defendant ready?

25          MR. LAMAGNA:  Defendant ready, your Honor.

People v. Heidgen

1      THE CLERK:   The defendant is present, your

2   Honor.

3      THE COURT:   Thank you.

4      Would you produce the jury, please?

5      (Whereupon, the prospective jury panel

6   entered the courtroom.)

7      THE CLERK:   Case on trial, indictment

8   1910N-05, People v. Martin Heidgen.

9      People ready?

10      MR. HAYDEN:   People are ready, your Honor.

11      THE CLERK:   Defendant ready?

12      MR. LAMAGNA:   Defendant is ready, your

13   Honor.

14      THE CLERK:   The defendant is present, your

15   Honor.

16      THE COURT:   Thank you.

17      Good afternoon, ladies and gentlemen.

18   This is jury selection in a case that is a little

19   bit unusual in that I'm going to give you an option

20   to opt out of the trial.  You will not be excused

21   from jury duty.  If you opt out of the trial, you'll

22   be assigned to a different case.

23      This case involves a charge of murder in

24   the second degree.  In this case those people who

25   are selected as jurors will hear of some gruesome

People v. Heidgen

1    and terrible injures.  There will be no photographs

2    of those injuries.  This case is about an

3    alcohol-related drunk-driving death of a man by

4    blunt force trauma and a young child by

5    decapitation.

6         The case may last five weeks.  It's

7    possible, and I have not yet made this decision, but

8    it is possible that the jury who hears this case

9    will be sequestered during their deliberations at a

10   hotel.

11        Due to the nature of the case and the time

12   commitment, I'm allowing the decision as to whether

13   you choose to be screened to serve up to you.  If

14   you choose not to serve, you will be taken back to

15   central jury and screened there for another case.

16   It will not be a murder case.  It could last longer

17   than this.  If you choose to be screened, my court

18   staff will give you further instructions.

19        This case has gotten media attention.  It

20   will continue to get media attention.  If you are

21   approached by the media and are asked about this

22   case, please do not discuss it with them.

23        I am now going to turn the proceedings

24   over to my court staff.

25        (Whereupon, the Court stood in recess for

People v. Heidgen

1          the day.)

People v. Heidgen

1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
2   ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK

3

4       -against-                   Indictment No.
                                      1910N-2005

5

6   MARTIN ROBERT HEIDGEN,

7                      Defendant.
     ---------------------------------------x

8                            Mineola, New York
9                            September 6, 2006

10
     B E F O R E:   HON. ALAN L. HONOROF
11                  Acting Supreme Court Justice

12
     A P P E A R A N C E S:
13

14             (Same as previously noted.)

15

16              *   *   *   *

17

18           (Whereupon, the prospective jury panel

19      entered the courtroom.)

20           THE CLERK:  Case on trial, indictment

21      number 1910N-05, People v. Martin Heidgen.

22           People ready?

23           MR. HAYDEN:  People are ready, your Honor.

24           THE CLERK:  Defendant ready?

25           MR. LAMAGNA:  Defendant ready, your Honor.

People v. Heidgen

1           THE CLERK: The defendant is present, your

2   Honor.

3           THE COURT: Thank you. Good morning,

4   ladies and gentlemen. My name is Alan Honorof. I

5   am the judge here in the Supreme Court part in

6   relation to the criminal trial which is about to

7   commence.

8           This jury selection is going to be

9   different, at least this part, than in most jury

10   selections.

11           Can everybody hear me?

12           This case involves the charge of murder in

13   the second degree. In this case those people

14   selected as the jury will hear of gruesome and

15   terrible injuries. There will be no photographs of

16   those injuries. This case involves the alleged

17   alcohol-related drunk-driving deaths of a man by

18   blunt force trauma and a young girl by decapitation.

19           The case may last as long as five weeks.

20   It's possible, and there has not been a decision

21   made on this yet, but I am telling you now that it

22   is possible that during deliberations I may

23   sequester the jury at a hotel.

24           Due to the nature of the case and the time

25   commitment involved, I am allowing the decision as

People v. Heidgen

1        to whether or not you choose to be screened for this

2        case up to you.  If you choose not to be screened,

3        you'll simply go back to the Supreme Court where you

4        will be screened for another case.  The case could

5        last longer, but it will not be a murder case.  If

6        you choose to be screened, the Court staff will give

7        you further instructions.

8                This case has gotten media attention.  It

9        will continue to receive media attention.  If you

10       are approached by the media, please do not discuss

11       the case with them.

12               At this point I'm turning the proceedings

13       over to my staff.

14               (Whereupon, a recess was taken.)

15               (Whereupon, the jury panel entered the

16       courtroom.)

17               THE CLERK:  Case on trial, indictment

18       number 1910N-05, People v. Martin Heidgen.

19               People ready?

20               MR. HAYDEN:  People ready, your Honor.

21               THE CLERK:  Defendant ready?

22               MR. LAMAGNA:  Defendant is ready, your

23       Honor.

24               THE CLERK:  Defendant is present, your

25       Honor.

People v. Heidgen

1        THE COURT:   Thank you.

2            Good morning, ladies and gentlemen.   My

3    name is Alan Honorof.   This jury selection is going

4    to be commenced in a little bit of an unorthodox

5    manner in a sense that I am giving everyone an

6    option to leave the courtroom, to leave this jury

7    panel.

8            This case involves a charge of murder in

9    the second degree.   In this case the jury will hear

10   of gruesome and terrible injuries.   They will not

11   see any photographs.   The case involves the alleged

12   alcohol-related drunk-driving deaths of a man by

13   blunt force trauma and a young child by

14   decapitation.

15           The case may last as long as five weeks.

16   The jury might be sequestered during their

17   deliberations.   I haven't made that decision yet.

18   Due to the nature of the case and the time

19   commitment involved, I am allowing the decision as

20   to whether you choose to be screened to serve on

21   this jury panel up to you.   If you choose not to

22   serve on this panel, you will be taken back to

23   central jury, and you will be screened for another

24   case.   It will not be a murder case.   It could last

25   longer.   If you choose to be screened, the Court

People v. Heidgen

1    staff will give you further instructions.

2           This case has received media attention.

3    It will continue to receive media attention.  If you

4    are approached by members of the media, please do

5    not discuss the case with them.

6           I am turning the proceedings over to my

7    staff.

8           (Whereupon, a recess was taken.)

9           (Whereupon, the prospective jury panel

10   entered the courtroom.)

11          THE CLERK:  Case on trial, indictment

12   number 1910N-05, People v. Martin Heidgen.

13          People ready?

14          MR. HAYDEN:  The People are ready, your

15   Honor.

16          THE CLERK:  Defendant ready?

17          MR. LAMAGNA:  Defendant is ready, your

18   Honor.

19          THE CLERK:  The defendant is present, your

20   Honor.

21          THE COURT:  Thank you.

22          Good morning, ladies and gentlemen.  This

23   is supposed to be jury selection.  My name is Alan

24   Honorof.  We're going to start a criminal case;

25   however, this will be slightly different.  I am

People v. Heidgen

1   going to give everyone in the room the opportunity

2   to leave this jury panel.

3           This case involves the charge of murder in

4   the second degree.  The jury in this case will hear

5   of gruesome and terrible injuries.  They will not

6   see any photographs.  The jury will hear of the

7   alleged alcohol-related drunk-driving deaths of a

8   man by blunt force trauma and by a young child by

9   decapitation.

10          The case may last as long as five weeks.

11  It's possible, and I have not yet decided this,

12  during the deliberations the jury may be sequestered

13  in a hotel room.  Due to the nature of the case and

14  the time commitment involved, I am leaving the

15  decision as to whether you choose to be screened to

16  be on this jury up to you.  If you choose not to

17  serve on this panel, you will be taken back to

18  central jury, and you will be screened for another

19  case.  It will not be a murder case.  It could last

20  longer.  If you choose to stay and be screened, my

21  staff will give you further instructions.

22          This case has received media attention.

23  It will continue to receive media attention.  If the

24  media approaches you about this case, please do not

25  discuss the case with them.

People v. Heidgen

1    My staff will take over at this point.

2    (Whereupon, a recess was taken.)

3    (Whereupon, the prospective jury panel

4    entered the courtroom.)

5    THE CLERK:  Case on trial, indictment

6    number 1910N-05, People v. Martin Heidgen.

7    People ready?

8    MR. HAYDEN:  The People are ready, your

9    Honor.

10   THE CLERK:  Defendant ready?

11   MR. LAMAGNA:  Defendant ready, your Honor.

12   THE CLERK:  The defendant is present, your

13   Honor.

14   THE COURT:  Thank you.

15   Good afternoon, ladies and gentlemen.  My

16   name is Alan Honorof.

17   This is jury selection in the case you've

18   just heard called.  This jury selection is going to

19   be a little different than what would normally take

20   place.

21   This case involves the charge of murder in

22   the second degree.  In this case the jury will hear

23   of gruesome and terrible injuries.  They will not

24   see any photographs.  The jury in this case will

25   hear of the alleged alcohol-related drunk-driving

People v. Heidgen

1      deaths of a man by blunt force trauma and by a young

2      child by decapitation.

3                 The case may last five weeks. The jury

4      may be sequestered in a hotel during their

5      deliberations. Due to the nature of the case and

6      the time commitment involved, I am allowing the

7      decision as to whether or not you choose to be

8      screened in this case up to you. If you choose not

9      to serve on this case, you will be taken back to

10     central jury and you will be screened for another

11     case. It will not be a murder case. It might last

12     fewer or longer days or weeks than this case.

13                 This case has received media attention.

14     It will receive more media attention. If you are

15     approached by members of the media, please do not

16     discuss this case with them.

17                 I am now going to turn these proceedings

18     over to my staff.

19                 (Whereupon, a recess was taken.)

20                 (Whereupon, proceedings continued in the

21     Judge's chambers.)

22                 THE COURT: Mr. Hayden, Ms. McCormick,

23     explain to me what this is all about.

24                 MR. HAYDEN: Certainly, your Honor.

25                 We obtained copies of letters that the

People v. Heidgen

1   defendant sent to a friend, and in the course of

2   those letters he mentioned a particular letter that

3   was sent to Mr. Zigman in which he talked about

4   using certain movies to prepare a defense in this

5   case.  We prepared a subpoena for Mr. Zigman asking

6   for production of that letter.  In the course of the

7   previous letters he referred to another potential

8   witness in that letter in the possession of

9   Mr. Zigman.

10          We prepared a subpoena for Mr. Zigman.

11   That subpoena was prepared this morning.  It was

12   served on Mr. Zigman, and I've just been informed

13   Mr. Zigman tells us that he doesn't have that letter

14   any longer.

15          THE COURT:  Would you please put your name

16   and address on the record.

17          MR. ZIGMAN:  Joshua Zigman, Z-I-G-M-A-N,

18   225 Rector Place, New York, New York.

19          THE COURT:  Would you stand up,

20   Mr. Zigman?

21          Do you swear the evidence you are about to

22   give will be the truth so help you God?

23          MR. ZIGMAN:  I do.

24          THE COURT:  Sit down.

25          Do you know the letter the district

People v. Heidgen

1  attorney is referring to?

2              MR. ZIGMAN:  I do.

3              THE COURT:  Do you have it?

4              MR. ZIGMAN:  I don't.

5              THE COURT:  Do you know where it is?

6              MR. ZIGMAN:  It's gone.  I threw it out a

7  long time ago when I moved into my new apartment.

8              THE COURT:  All right.  I'm ordering you

9  to look for it.

10             MR. ZIGMAN:  Okay.

11             THE COURT:  If you locate it or know where

12 it is, it is to be produced or its whereabouts made

13 known to the Court.  If it turns out that you are

14 not being forthcoming and candid about what we are

15 now talking about, that will constitute grounds for

16 application by the District Attorney's Office to

17 hold you in contempt of Court.  I assure you, sir, I

18 will grant that application, which will result in

19 you being most likely incarcerated.

20             MR. ZIGMAN:  I understand.

21             THE COURT:  Okay.  Thank you.

22             MS. MCCORMICK:  Pardon me, your Honor.

23 The witness lives with another person, who was also

24 subpoenaed and has also made a claim that the letter

25 requested does not exist.

People v. Heidgen

1    THE COURT: Where is that person?

2        MS. MCCORMICK: That person is not here,

3    which is what I was verifying. We will bring him

4    before the Court. I should note for the record,

5    Judge, that the reference in this letter, and why

6    the People believed that Mr. Zigman would have the

7    letter, is that there was a specific reference made

8    that the defendant did not have a copy machine and

9    that he was requesting people, other associates,

10   other friends, to see Mr. Zigman to see this letter.

11   So we had every reason to believe that the letter

12   was still in existence and, frankly, still is in

13   existence.

14       THE COURT: Well, Mr. Zigman is going to

15   give it his best shot finding it, I assure you.

16       MR. ZIGMAN: I certainly will.

17       That's it?

18       THE COURT: That's it.

19       MR. ZIGMAN: Thank you.

20       (Whereupon, proceedings continued in open

21   court.)

22       (Whereupon, the prospective jury panel

23   entered the courtroom.)

24       THE CLERK: Case on trial, indictment

25   number 1910N-2005, People v. Martin Heidgen.

People v. Heidgen

1          People ready?

2          MR. HAYDEN:  Ready, your Honor.

3          THE CLERK:  Defense ready?

4          MR. LAMAGNA:  Defendant is ready, your

5    Honor.

6          THE CLERK:  The defendant is present, your

7    Honor.

8          THE COURT:  Thank you.

9          Good afternoon, ladies and gentlemen.  My

10   name is Alan Honorof.  Ordinarily, we would be

11   proceeding to give you certain instructions then

12   have you come up here in the box, but this case is a

13   little bit off the beaten track for that.  So if you

14   just pay attention to me, I'm going to give you some

15   information.

16          Can everybody hear me?

17          This case involves the charge of murder in

18   the second degree.  The jury who hears this case

19   will hear about gruesome and terrible injuries.  The

20   jury who hears this case will hear of the alleged

21   alcohol-related drunk-driving deaths of a man by

22   blunt force trauma and of a young child by

23   decapitation.

24          The case might last five weeks.  I have

25   not yet decided, but the jury might be sequestered

People v. Heidgen

1    in a hotel during their deliberations. Due to the

2    nature of the case and the time commitment involved,

3    I'm allowing the decision as to whether you choose

4    to be screened to serve in this case up to you. If

5    you choose not to serve on this panel, you'll be

6    taken back to the Central Jury. You will be

7    screened for another case. The case will not be a

8    murder case. The case might be shorter, it might be

9    longer. If you choose to be screened for this case,

10   my clerk will give you additional instructions.

11                This case has received attention from the

12   media. It will receive additional attention from

13   the media. If you are approached by the media about

14   this case, please do not speak with them.

15                My staff will now take over.

16                (Whereupon, a recess was taken.)

17                THE COURT: Are there any applications?

18                MR. LAMAGNA: Yes, Judge.

19                I received today some subpoenaed materials

20   in the nature of certain letters that allegedly were

21   made by Mr. Heidgen to, I believe, Amanda Goldman.

22   I do not know what the district attorney's intention

23   is with respect to those, however, but I would

24   object to their use on their direct case, certainly

25   in that I had again asked for those materials in my

People v. Heidgen

1    discovery demands dated September 20, 2005, and

2    Amanda Goldman is certainly not a witness, though

3    she is relevant to this case.  This was the actual

4    person whose home this party was at.

5              THE COURT:  What exactly did you request,

6    theoretically, from Amanda Goldman?

7              MR. LAMAGNA:  I didn't request anything

8    from Amanda Goldman.

9              THE COURT:  I'm saying in terms of your

10   request, what did you contemplate an Amanda Goldman

11   person to be producing?

12             MR. LAMAGNA:  I requested from the

13   District Attorney's Office in my discovery demands

14   any statements made by my client, number one, to any

15   law enforcement.  Number two--

16             THE COURT:  We agree she's not law

17   enforcement.

18             MR. LAMAGNA:  We do.

19             THE COURT:  And?

20             MR. LAMAGNA:  And, number two, to any

21   civilian witnesses, any statements that my client

22   may have made to any civilians, if they intend to

23   use those statements, and if they do intend to use

24   those statements, what were they, who were they made

25   to, and, furthermore, whether they were inculpatory

People v. Heidgen

1    or exculpatory.

2                THE COURT:   Please hold on.   You agree

3    those demands were made by Mr. LaMagna as he says,

4    either one of you?

5                MR. HAYDEN:   I haven't reviewed his demand

6    recently, your Honor.   I'm not certain that's what

7    he demanded.   I'm certain we didn't become aware of

8    these letters until just recently, I'm talking about

9    within days.

10               THE COURT:   I was going to get to that,

11   but I'm trying to get to Mr. LaMagna'S point that

12   the demand was made.   It's reasonable to agree, is

13   it not, Mr. Hayden, Miss McCormick, it's reasonable

14   he would have made such demand because it's a common

15   demand to make?

16               MR. HAYDEN:   Yes.   We're not at all

17   conceding he's entitled to everything in that

18   request.

19               THE COURT:   You are conceding it's more

20   than likely he made that demand, and it's reasonable

21   to assume he did?

22               MR. HAYDEN:   If Mr. LaMagna represents

23   that to the Court, we would accept his

24   representation.

25               MR. LAMAGNA:   I have the demand in my

People v. Heidgen

1    hand.

2                    THE COURT: I'm sure you do.

3                    MR. LAMAGNA: Now, there has been, over

4    the course of time in leading up to today, various

5    pieces of evidence that have come in, in my view,

6    inexcusably late to the defense by the prosecution,

7    whether they were statements precluded pursuant to

8    710.30, which Judge Donnino had actually dealt with,

9    whether they're search warrants, whether they're

10   tapes, all of these things that should have been

11   done for the last year pursuant to their

12   investigation of this case.

13                   The purpose of discovery and the time

14   limits for such discovery is to give the defendant

15   knowledge of what the evidence is against him so

16   that he can adequately and in a timely manner

17   prepare a defense for the case. We are now on

18   trial, we started jury selection, and now I have

19   letters written, or allegedly written, by my client

20   to this Amanda Goldman, who they have known all

21   these kids were interviewed, I believe, months ago

22   and they knew this.

23                   Now, my position is simply I don't know

24   when they plan on using them, but certainly on their

25   direct case, anything that's in their possession, it

People v. Heidgen

1     is just too late.  We have prepared our defense

2     based upon what we were given by the prosecution as

3     evidence that they will use in their direct case

4     against my client.  This case has been going on for

5     a year.

6               THE COURT:  Give me a moment, please.

7               (Whereupon, a brief recess was taken.)

8               THE COURT:  The same way, Mr. LaMagna, you

9     don't dispute or Mr. Hayden does not dispute the

10    fact that you made such a demand, do you dispute the

11    prosecutor's representations that these items have

12    only been recently, a day or so, received?

13              MR. LAMAGNA:  Yes, Judge.  I was actually

14    getting to that point.

15              The fact that the prosecution has now just

16    asked for those materials or if they just thought of

17    subpoenaing those materials is of no moment to the

18    prejudice that my client is going to enure.  We've

19    prepared our defense based upon the discovery we

20    received.

21              THE COURT:  Are you asking for an offer of

22    proof?

23              MR. LAMAGNA:  No.  What I'm saying is--

24              THE COURT:  Wouldn't you like one, though?

25    Good idea, since you don't know what they want to

People v. Heidgen

1    use it for?

2              MR. LAMAGNA:  That is true.

3              THE COURT:  I don't either.  Why don't we

4    find that out, then we'll know whether or not your

5    objection is necessary to address.

6              MR. LAMAGNA:  Okay.  I agree, Judge.

7              THE COURT:  Offer of proof?

8              MR. HAYDEN:  I'd just like to put some

9    facts on the record so they're there.

10             First of all, the Goldmans, Justin,

11   Amanda, their parents, refused to speak with

12   investigators or us for months and months.  It was

13   only after I spoke with their attorney, Marvin

14   Hirsch, that he made arrangements for us to speak

15   with Amanda Goldman.  It was only when we spoke with

16   Amanda Goldman just a week or so ago that we learned

17   of the existence of these letters.  We immediately

18   then went and prepared subpoenas for the Court's

19   signature to order production, not to us, but to the

20   Court.

21             We have no intention of using the contents

22   of the letters on our direct case, but we have every

23   intention of using the contents of the letters,

24   where appropriate, during cross-examination of the

25   defendant.

People v. Heidgen

1       THE COURT:  Well, to me, Mr. LaMagna, that

2   sounds like a reasonable position for the People to

3   take.

4       MR. LAMAGNA:  Judge, I'm glad we have

5   clarity, at least, on that issue.  However, Amanda

6   Goldman is such a central figure in the case in that

7   that is the home where this party was.

8       THE COURT:  If she refused to speak with

9   him until Marvin said it was okay--

10      MR. LAMAGNA:  My point is they spoke to

11  their attorney two weeks ago to do all this.  They

12  could have done this eleven months ago.

13      THE COURT:  Let me ask you this:

14  Certainly the fact that he wrote to Amanda was known

15  to your client.  Certainly Amanda was equally within

16  your capability to interview as well as the

17  prosecutor.  The witness is not necessarily, in

18  fact, not at all, under the People's dominion or

19  control.  The witness is equally available to both

20  of you, and you, Mr. LaMagna, in fact, is in the

21  superior position because the knowledge was unique

22  to your client that he had written letters to her

23  and certainly he knew what he wrote.

24      MR. LAMAGNA:  However, it is the

25  prosecution that has the burden of proof.

People v. Heidgen

1      THE COURT:  There's no question about

2    that.  I'm talking about the equal availability of

3    witnesses.

4      MR. LAMAGNA:  But I'm not planning on

5    using them.  What I'm saying--

6      THE COURT:  I didn't think so.

7      MR. LAMAGNA:  What I'm saying is that's

8    why there are statutes dealing with discovery and

9    timeliness, so that we, as the defendant who is

10   defending the charges, can have an idea of what they

11   are going to be using, whether it be on their direct

12   case--

13     THE COURT:  Let me do this:  Every time I

14   read these statutes, at the very bottom in little

15   fine print it always says at the discretion of the

16   Court.  It always says that.  When it says that, it

17   usually gives you an opportunity to avoid the

18   terrible surprise that has just occurred to have an

19   adjournment of these proceedings.  Do you want the

20   case adjourned for a day?

21     MR. LAMAGNA:  I don't want the case

22   adjourned.

23     THE COURT:  There you go.  Now, the

24   People's position being reasonable, what is your

25   request?

People v. Heidgen

1      MR. LAMAGNA: My request is for the Court,

2    based upon this late stage of these proceedings, to

3    exercise its discretion, given--

4      THE COURT: I view it the other way.

5      MR. LAMAGNA: --to exercise its discretion

6    in this particular case, given where we are, to

7    preclude any use of this. I understand on their

8    direct case it's a moot issue. They're not planning

9    on using it.

10     THE COURT: That's a good thing to know,

11   right?

12     MR. LAMAGNA: Yes. But even on their--

13   even on cross-examination, now we have to rethink at

14   this late stage of these proceedings, where we're on

15   trial, trial strategy with respect to my client.

16     THE COURT: The one thing I learned in

17   trying cases and in listening to cases now as a

18   judge over the last 32 years, these things are real

19   fluid. They change minute by minute, and as a trial

20   lawyer, the good ones react to these changes

21   instantly, and I know I'm dealing with good ones.

22   So that's why I'm denying your application.

23     MR. LAMAGNA: You know, Judge, that's the

24   opinion of the Court and that's your judgment.

25     THE COURT: Hold on one minute.

People v. Heidgen

1          (Whereupon, there was a pause in the

2     proceedings.)

3          THE COURT:  Incidentally, just so the

4     record is clear, I've read all of these letters.

5     Some of them were as recent as April.

6          MR. LAMAGNA:  I have not read through all

7     of them, I must say.

8          THE COURT:  My opinion earlier was to

9     provide them to both of you so you'll have them.

10          MR. LAMAGNA:  Judge, I received them this

11     morning.  I have not gotten through them all.

12     However, what I would ask the Court, then, if you're

13     going to allow some of the contents of those letters

14     to be used for cross-examination purposes of my

15     client--

16          THE COURT:  I presume for impeachment

17     purposes, otherwise, it's a nonissue.  Otherwise

18     it's just paper.

19          MR. LAMAGNA:  I would ask, then, for the

20     prosecution to articulate with specificity what

21     parts of those letters--

22          THE COURT:  He might deny his name is

23     Marty.  You've got to wait and see.

24          MR. LAMAGNA:  We can agree, then, however,

25     at least any articulations about anything that he

People v. Heidgen

1    was planning or going to do in the future when he

2    gets out or anything is not germane to this?

3                THE COURT:   I promise that when an

4    objection is made, I will sustain those that are

5    irrelevant, or I will sustain according to my

6    thinking at that time, and being that there's no

7    objection before me at present, it's difficult to

8    rule on it.

9                MR. LAMAGNA:   All right.   The ruling would

10   be--

11               THE COURT:   Wait and see.

12               MR. LAMAGNA:   In spite of the application.

13               THE COURT:   In spite of-- the ruling on

14   your application is denied.   The preruling on

15   objections is also denied.

16               MR. LAMAGNA:   Judge, also, if we can, just

17   so the record is complete, I know we've had various

18   discussions amongst the lawyers and the Court on the

19   issue of the testimony of the decapitation of the

20   child.

21               THE COURT:   I'm going to allow, within

22   limits, a description of the scene that the first

23   responders came upon and, to an extent, the

24   testimony of the mother regarding the first moments

25   following the incident until such time as first

People v. Heidgen

1     responders came to her assistance.

2              MR. LAMAGNA:  Judge, just with respect to

3     me understanding that, I've received a witness list

4     this morning.  There potentially could be over ten

5     witnesses on that list who could maybe articulate

6     those issues.

7              THE COURT:  I asked you earlier off the

8     record if all of you could agree to stipulate as to

9     the chain of custody and eliminate eight of these

10    witnesses.  Can you do that?

11             MR. LAMAGNA:  I've spoken to my client and

12    his family, and there will be no stipulation on

13    that.

14             THE COURT:  No stipulation.  Okay.

15             MR. LAMAGNA:  On the chain of custody and

16    police witnesses.

17             However, I did mention to Miss McCormick

18    earlier with respect to-- there's a list of doctors

19    or physicians or care providers that provided

20    subsequent care to the victims in this case.  I said

21    I would stipulate to the serious physical injury

22    they're going to testify to.

23             THE COURT:  Let me ask you this, because--

24    I'm asking the People this.  Out of the ten doctors

25    listed on the witness list, are any of those doctors

People v. Heidgen

1    the doctors who performed the autopsies of the child

2    and the older gentleman?

3              MS. MCCORMICK:  Yes, Judge.

4              THE COURT:  Can you stipulate those

5    results are not necessary?  Is that something you

6    want necessarily to have in front of this jury or

7    can we stipulate to what those doctors would say?

8              MR. LAMAGNA:  Judge, can I just--

9              THE COURT:  Or are the People not

10   willing--

11             MR. HAYDEN:  The People will call the

12   medical examiner.  The testimony will be relatively

13   brief.

14             THE COURT:  I guess that's that.

15             All right.  I will urge you to stipulate

16   to those things that are inescapable.  There's no

17   reason to prolong this trial.

18             MR. LAMAGNA:  That's why, with respect to

19   the doctors who treated the victims for the last

20   year or so, I would ask for that stipulation.

21             THE COURT:  You know what?  Maybe you've

22   got some horses to trade.

23             (Whereupon, a brief recess was taken.)

24             THE CLERK:  Case on trial, indictment

25   number 1910N-05, People v. Martin Heidgen.  People

People v. Heidgen

1    are present.  The defendant is present.  Defense

2    counsel is present, your Honor.

3              THE COURT:  Thank you.

4              Applications?

5              MS. MCCORMICK:  Yes, your Honor.

6              After the last on-the-record exchange, I

7    raised with your law secretary, Howard Sturim, in a

8    hope not to slow down the trial when it occurs-- the

9    Court has been very clear you don't want to deal

10   with objections until they occur, but the nature of

11   this testimony that I'm proposing I thought might be

12   something that the Court might want to consider

13   ahead of time.

14             THE COURT:  The expert witness on the

15   question of tolerance.

16             MS. MCCORMICK:  The People were intending

17   to call Dr. Closson, a toxicologist, to testify as

18   to the effects of alcohol and tolerance.

19             THE COURT:  First off, let's see if

20   there's an objection.

21             MR. LAMAGNA:  That's the issue.  With

22   respect to the issue of tolerance, I do have an

23   objection.

24             THE COURT:  All right.  The objection is

25   overruled.  The question of tolerance is one that I

People v. Heidgen

1    think the jury is entitled to know about and should

2    know about, so I'm going to allow it.

3               MR. LAMAGNA:  Judge, just for the record,

4    I want to make my objection.  From what I

5    understand, from talking with the prosecution, the

6    issue of tolerance is going to relate and infer to

7    this jury in this case that my client drinks a lot.

8               THE COURT:  I was afraid of the same thing

9    when I first heard the application, not just this

10   second, when I dealt with it earlier this afternoon.

11   I think that on the question of intoxication and the

12   effects of alcohol on people that it is relevant

13   testimony without necessarily referring your client

14   is either a regular drinker or an alcoholic.

15   Certainly were the testimony starting to head down

16   that road and cast that dispersion, I would not

17   permit that kind of testimony.

18               But in terms of education value for the

19   jury, so they understand the effects of alcohol with

20   someone who drinks on a regular basis as compared to

21   someone who drinks infrequently or never, I think

22   it's relevant testimony, and I think it's of value

23   to this jury to decide on those issues.

24               MR. LAMAGNA:  I suspect that, I could be

25   wrong, but I suspect that after that testimony we

People v. Heidgen

1    are going to hear on summation that based upon his

2    level, my client was a heavy drinker.

3               THE COURT: So we will agree--

4               MR. LAMAGNA: That is what I'm afraid of.

5    I believe that is going to happen in this case, and

6    that is prejudicial.

7               THE COURT: First of all, in the absence

8    of other testimony tending to link your client to

9    the use of alcohol, I would never allow it, and I

10   don't imagine that I know what the testimony is

11   going to be, but it's not unreasonable to believe

12   that since there was some kind of a party at which

13   the defendant was present-- I've heard through both

14   of your applications on these various points that

15   alcohol was being served at that party-- that the

16   defendant may have been drinking some of that

17   alcohol.

18               Certainly other people at that party were

19   drinking alcohol. Certainly some of these people

20   saw and heard and observed and participated in what

21   was going on. If that kind of testimony comes in,

22   then I will allow the district attorney appropriate

23   comment on it, but if there is no such testimony,

24   then the district attorney would not be able to

25   comment.

People v. Heidgen

1      MR. LAMAGNA:  For clarity, that I agree

2    with.  I believe that if that happens, comment can

3    be made with respect to the evidence that was

4    presented by the People who were able to observe and

5    saw and all of those things.

6          However, what my problem with the

7    tolerance issue is is if a toxicologist testifies

8    and indicates to the jury what the effects of

9    alcohol does to an individual and how it affects

10    their perception and coordination and dexterity and

11    all those things, that's one thing.  But to

12    articulate that in a situation like in this case, a

13    person who drinks a lot can have this reading and do

14    all these things, they are inferring, and I

15    guarantee you they're going to argue that on

16    summation and we're done, the issue of tolerance is

17    going to infer to this jury a propensity of prior

18    conduct by my client that he drinks a lot, and in

19    this case that is too prejudicial versus whatever

20    probative value there may be, and, again, I ask for

21    what their expert is going to say.

22          THE COURT:  If I was going to guess about

23    this stuff and imagine myself in the shoes of the

24    prosecution, I don't know that I would want to put

25    on or suggest to the jury that there was such heavy

People v. Heidgen

1    drinking going on that the defense of intoxication

2    could be more easily relied upon.  So you're both

3    walking a pretty fine line.

4              MR. LAMAGNA:  I think their argument is

5    just the opposite.  Their argument is going to be

6    that he is a heavy drinker, has been a heavy

7    drinker, is a consistently heavy drinker, that's why

8    they're putting that expert on for tolerance.

9    That's what this jury is going to hear.  That's

10   what's wrong.  That's what I object to.  If he wants

11   to testify how alcohol, especially a high level, can

12   affect a person mentally or physically, that I agree

13   with.

14             THE COURT:  We can agree on, all the

15   lawyers and I, that alcohol affects people in

16   different ways, and it affects people particularly

17   in different ways if they are light, casual, social

18   teetotalers or heavy drinkers.  That same amount of

19   alcohol would affect each one of those people in a

20   different way.

21             MR. LAMAGNA:  Then what would the effect

22   of that evidence be?  To suggest my client is a

23   heavy drinker.  That's exactly why I'm objecting to

24   that line of testimony.  If he wants to testify as

25   to what alcohol does to the system, I have no

People v. Heidgen

1    problem with that, but if it's exactly as you

2    articulated, which is what I believe is going to

3    happen, that is exactly my feeling, and that is why

4    we will not get a fair trial if that kind of

5    testimony comes out, because, again, they're going

6    to infer that propensity in this case, and that is

7    what the problem is.

8              MS. MCCORMICK:  Your Honor, excuse me.  If

9    I might, there is no criminality involved in

10   drinking alcohol when you are a person of age, as

11   this defendant was at the time.  There is no prior

12   bad act, there is no propensity to drive drunk,

13   which is part of this underlying charge, in

14   suggesting or presenting evidence that this

15   defendant does drink on a regular basis.

16             There are two separate issues, the ability

17   of the toxicologist to give the educational

18   information that the Court has described, but the

19   Court plainly articulated exactly the point.  Each

20   person can and does react to and is affected by

21   alcohol differently.  Evidence of this defendant's

22   drinking history, not to show his propensity to

23   drink and drive, but this defendant's social

24   drinking-- there is not going to be an allegation

25   he's a heavy drinker, but, rather, that he drinks on

People v. Heidgen

1    a regular basis with friends-- is appropriate for

2    the toxicologist to say that a person who would

3    drink on a weekly basis would be more likely to

4    hold--

5            THE COURT:  Now--

6            MR. LAMAGNA:  She just said it.

7            THE COURT:  Now you've raised a Molineux

8    issue which has not been brought forward nor

9    addressed by this Court, and I am disinclined, as I

10   sit here now, to permit testimony of his drinking on

11   previous occasions as he is not charged with that.

12   It is not a prior bad act, and I'm not going to have

13   the jury conclude that he's an alcoholic or a drunk

14   or someone who is prone to become intoxicated.

15           I will permit testimony as to what

16   happened that night, and I will permit testimony as

17   to what effect alcohol has on a person who drinks

18   not at all or to the other end of the spectrum, in

19   such a heavy manner so a .28 could leave him with a

20   normal functioning capability and simply violated

21   the statute saying he can't have more than .08.

22           MS. MCCORMICK:  Your Honor, I would take

23   issue with the concept being Molineux.

24           THE COURT:  Do you want to put in evidence

25   on prior occasions he has been known to drink?

People v. Heidgen

1         MS. MCCORMICK:  I would like to do that,

2   Judge, but not-- it is not a prior bad act.  That

3   was the reason I framed it in this context.

4         THE COURT:  Maybe he likes to brush his

5   teeth, too.

6         MS. MCCORMICK:  The difference being this

7   is relevant to his ability to be affected by alcohol

8   that evening.

9         THE COURT:  I'm not going to allow it.

10  That would be unfair.  What he did that night,

11  you're home free.  I've already given you the

12  capability of putting the expert on.  You are sort

13  of in the position of needing to quit while you're

14  ahead.  Now you raised an issue I didn't know about,

15  and, thank you, because now I'm not going to allow

16  you to do that.  It's not fair.

17        MS. MCCORMICK:  I wanted to make sure the

18  Court was aware of the dual issue of the

19  toxicologist testifying, on the one hand, but I

20  think that, with the Court's framing of the issue,

21  in terms of the effects on individuals being

22  different, that is clearly relevant evidence to this

23  jury about what the effects would be on this

24  defendant and his history.

25        THE COURT:  I'll tell you what I'm going

People v. Heidgen

1   to do, which I've been trying to do from the start

2   and so far both sides have been resisting to it.

3   You can together fashion a precharge as to what the

4   scope of this testimony will be insofar as I'll

5   explain to the jury why this witness is being heard

6   by them before he is heard, or a curative charge,

7   for want of a better word, following his testimony

8   as to what was intended by his production and

9   testimony, but I have to have you guys working

10   together.  The same as with the stipulation on the

11   chain of custody, the number of doctors, you guys

12   have got to work together, and I don't know what

13   else I can say.

14        MS. MCCORMICK:  Judge, I understand that.

15   I certainly agree that a charge to the jury is

16   appropriate under all of these circumstances, but a

17   charge to the jury does not, in and of itself, mean

18   the underlying testimony is inappropriate or the

19   background of this defendant is inappropriate.

20   We're not suggesting that he engaged in prior

21   criminal behavior.

22        THE COURT:  No.  No.  What you're

23   suggesting is he's an alcoholic, or well on the way,

24   or in some fashion or other a guy who does not mind

25   going to a party and kicking back a few, and that is

People v. Heidgen

1   not relevant to what he is charged with, which is

2   murder on that night.

3          Mr. Hayden?

4          MR. HAYDEN:  I have to speak, Judge.

5          This defendant's knowledge of the effects

6   of alcohol on him goes directly to whether or not he

7   was depraved when he went out and drove that night

8   anyway in spite of having consumed alcohol.  I would

9   ask the Court to please consider that when making

10  rulings in this area.

11         MR. LAMAGNA:  Judge--

12         THE COURT:  I absolutely believe that, but

13  at the same time, Mr. Hayden, your table is going to

14  have to prove these charges of what happened that

15  night.

16         MR. HAYDEN:  But, your Honor, we have to

17  get into his head.  As your Honor is aware, now

18  depraved mind is a state of mind.

19         THE COURT:  Are you claiming that this

20  depraved state of mind was the process of some type

21  of disease of alcoholism, which is progressive,

22  therefore he was sick?

23         MR. HAYDEN:  Absolutely not.  There is no

24  mention, no allegation, of alcoholism here.  There

25  is--

People v. Heidgen

1    THE COURT:  Then why try to prove it?

2    MR. HAYDEN:  We're not.  What we're trying

3    to--

4    THE COURT:  The conclusion is inescapable.

5    MR. HAYDEN:  We're talking about social

6    drinking and the knowledge of the effects of alcohol

7    on his senses, because if he's aware that alcohol

8    affects his senses, he should know enough not to go

9    out.  It takes depravity to go out and drive anyway

10   even knowing, as he would from prior experience,

11   that alcohol has profound effects upon his senses.

12   It has nothing to do with alcoholism, it

13   has nothing to do with falling down drunk, nothing

14   like that, but we have to establish he understands--

15   if this was a guy who was drinking for the first

16   time that night and was overwhelmed by alcohol, he

17   has no idea what the effects are going to be.  We

18   have to establish this man understands what those

19   effects are going to be to establish that he was

20   depraved when he went out that night and drove

21   anyway.

22   MR. LAMAGNA:  Judge, that is exactly--

23   again, the prosecution has just articulated what

24   I've been saying.  They want to use prior drinking

25   in the past, that has nothing to do with what

People v. Heidgen

1    happened that night, to prove that he has a

2    propensity to drink.

3                THE COURT:  I understand.

4                MR. LAMAGNA:  So everybody who ever drank

5    before, according to Mr. Hayden, not never or for

6    the first time ever, everybody who socially drank

7    before then would be in the position to know the

8    effects of alcohol.  That's nonsense.

9                MS. MCCORMICK:  Exactly.

10               MR. LAMAGNA:  If that's not the case, they

11   want to show that he drank a lot in the past to

12   prove it.

13               THE COURT:  Hold on.

14               (Whereupon there was a pause in the

15   proceedings.)

16               MS. MCCORMICK:  Your Honor, may I clarify

17   one point?  Out of the dozen or so interviews we

18   have done, there is no intention on the part of the

19   People, and we would not be attempting to present

20   evidence, that the defendant is an alcoholic.

21   Simply the testimony is that-- or what we propose is

22   that over the course of this man's time in New York

23   that he would drink once a week or so as a social

24   drinker.  There is testimony he never drank during

25   the week.

People v. Heidgen

1    THE COURT:  I find myself--  I have this

2    thought, and I just want to be able to get to it

3    while I'm still thinking about it.  I'm in a bit of

4    a unique situation, I think.  Since the defendant's

5    indictment, the standard of the charge with which he

6    is charged and the proof of that charge has changed.

7    Feingold makes his state of mind relevant.

8    Feingold, by the way, gives you the opportunity to

9    defend by the defense of intoxication, which was

10   previously unavailable.

11       Having said that, I don't want to prerule

12   while you both still have things to say, but I see

13   it a little more clearly right now.

14       Go ahead, Mr. LaMagna.

15       MR. LAMAGNA:  Thank you, Judge.

16       Feingold articulated a new standard by

17   which depraved indifference has to be judged by a

18   jury.  It is a state of mind.  The state of mind is

19   not intoxication.  The mere fact a person is

20   intoxicated is not, in and of itself, sufficient for

21   a depraved-mind murder.  It just isn't.  You need

22   more.  It's what he was doing, what he was saying,

23   how he was acting, what his demeanor was and all of

24   those things put together to infer a state of mind.

25       THE COURT:  The district attorney makes a

People v. Heidgen

1   good point.  The point made by the district

2   attorney, which has clarified this for me, is that a

3   person wholly unacquainted with the effects of

4   alcohol, to drink to a blood-alcohol content of .28,

5   would be wholly in another category to a person who

6   had taken drinks on previous occasions and was

7   consequently able to begin to judge the effects of

8   alcohol, forget about other people, but on himself.

9             MR. LAMAGNA:  But that's not the issue for

10   the depravity.

11             THE COURT:  No, I agree with you.

12             MR. LAMAGNA:  It's not necessarily

13   alcohol, it's what the individual's state of mind

14   was with respect to not having the regard for the

15   lives of others.

16             THE COURT:  That makes their point for

17   them, because if I preclude-- and I'm not saying

18   that I'm going to allow even if on 20 previous

19   occasions in the prior two weeks he become

20   falling-down drunk every night, but I think it is

21   relevant to the jury that he was at least, to some

22   degree, acquainted with the effects of alcohol on

23   himself because he has been known, on prior

24   occasions, to have had an alcoholic beverage.

25             MR. LAMAGNA:  Judge, I implore you that on

People v. Heidgen

1    this issue it is going to propensity, and this is

2    what this jury is going to infer with a DWI-related

3    homicide, especially where the top charge is murder

4    here, and I fear, and I implore you, Judge, they

5    will be more inclined to believe that he drinks a

6    lot rather than on occasion, and the fear is that

7    they will convict of murder rather than manslaughter

8    or any other lesser charge because of that.

9               To show his prior drinking habit is so

10   speculative on a depraved mind.  You could have a

11   depraved mind whether you're drunk, not drunk,

12   completely sober, have drank before or never drank a

13   single drink.  They are boot-strapping the alcohol

14   and drinking and propensity to drink to make a case.

15              THE COURT:  The never drank a single drink

16   is where your argument fails because--

17              MR. LAMAGNA:  It could go both ways.  They

18   want their cake and to eat it, too.

19              THE COURT:  If in this case, while the

20   defendant not having the burden, they chose to

21   introduce, even through the testimony of their own

22   witnesses, that the defendant had never before taken

23   a drink--

24              MR. LAMAGNA:  That's a different story.  I

25   can see where you're going.  That would be a

People v. Heidgen

1    different story.  If we said, well, hey, the defense

2    here of intoxication was--

3              (Whereupon there was a pause in the

4    proceedings.)

5              MR. LAMAGNA:  Judge, may I continue?

6              As I was saying, I see where you're going

7    with that intellectually.  I agree if the defendant

8    then proffered evidence saying he never drank before

9    and you could argue that somehow the intoxication

10   had something to do with the depraved mind, that is

11   one thing.  If he had five DWI convictions which

12   would show not just drinking, it's the drinking and

13   driving, you wouldn't allow that in.

14             This is a depraved-mind murder.  It's not,

15   it's not, whether he drank before or if he drank a

16   lot.  If it was completely somebody who knew the

17   effects of alcohol on their bodies, like most

18   people, probably the issue isn't whether or not he

19   decided to drive, because that's a reckless

20   manslaughter, what this is-- what this is is a

21   depraved-mind murder, an indifference to human life.

22   That's the state of mind.  They have to prove that,

23   not just by the alcohol.  That's the manslaughter.

24   If they just prove that, that's not murder.  I

25   implore you you cannot allow this prior drinking

People v. Heidgen

1    habit or his prior drinking history to come in.

2            THE COURT:  You're using a word which, of

3    course, is beneficial to your argument but somewhat

4    distorts my thinking.  It doesn't distort my

5    thinking, it distorts how I'm expressing my

6    thinking.

7            I think it's important that the jury know,

8    if it's true, that the defendant was not

9    unacquainted with the effects of alcohol insofar as

10   it affected his own capabilities.  I do not intend

11   to allow evidence of heavy drinking on many previous

12   occasions.  I do intend to allow that the defendant

13   was not unacquainted with drinking alcoholic

14   beverages on previous occasions, not a history, not

15   a history of heavy drinking, but an acquaintance

16   with drinking alcoholic beverages on previous

17   occasions.

18           Remember, he's up here from Arkansas.  So

19   the period of time with which these witnesses are

20   acquainted with his prior history is abbreviated.

21   I'm certainly not going to have them calling witness

22   from high school and Old Miss to come in to testify

23   as to what he did at his fraternity house.

24           What we're talking about is the

25   acquaintance of the witnesses who the People intend

People v. Heidgen

1    to bring in.  There are no secrets here.  I know

2    that some of these people are going to testify they

3    tried to stop him.  I've been made aware of that by

4    both of you.

5              MR. LAMAGNA:  I don't know if that's the

6    case.

7              THE COURT:  It's one of the theories I've

8    heard.  It's one of the scenarios that's been--

9              MR. LAMAGNA:  That's actually news to me.

10             THE COURT:  That's one of the things I've

11   heard.

12             MR. LAMAGNA:  I don't know.  Could I ask

13   the prosecution right now?  I don't believe there is

14   anybody that night that tried to stop him from

15   driving.

16             (Whereupon there was a pause in the

17   proceedings.)

18             MR. LAMAGNA:  Judge, I believe, just for

19   clarity of the record, I just had a quick

20   conversation, there is no testimony or evidence

21   that's going to be presented that anybody that night

22   tried to stop my client from driving.

23             THE COURT:  I stand corrected.  One of the

24   things that I recall from the volumes of information

25   that's been made of available to me was that--

People v. Heidgen

1      MR. LAMAGNA:  What I think it was is that

2    I think somebody in the past, prior to this

3    occasion, may have taken his keys, but that is not

4    coming in either.

5      THE COURT:  Here is the ruling of the

6    Court.  Thank you for your argument.  I've heard

7    enough to be able to make a decision.

8      Sorry, Bob.  I've heard enough to make a

9    decision.

10      I'm allowing the toxicologist in terms of

11    the ability by the People to educate this jury as to

12    what tolerance people have to alcohol and what

13    tolerance different classes of people, familiar and

14    unfamiliar with alcohol, have to alcohol and its

15    effects.

16      I will permit a limited inquiry by the

17    People into the fact that on prior occasions some of

18    the People's witnesses have seen the defendant

19    engage in social drinking, not to the extent that he

20    ever became intoxicated, not to the extent anyone

21    took his keys, but to the extent that on prior

22    occasions the defendant had been seen by some of

23    these witnesses to have been drinking alcoholic

24    beverages at social occasions, period.

25      That's not comfortable with either of you,

People v. Heidgen

1       therefore, it's correct.  If you both don't like it,

2       that's the way to do it.

3                   I know you're dying to talk, Bob.

4                   MR. HAYDEN:  Just briefly.

5                   It's our job to get into his head.  That's

6       the challenge now with depraved state of mind.  We

7       have to be able to establish what he knew.  We have

8       to be able to establish he understood the risks and

9       decided to take them anyway, to a degree, that it

10      was depraved.

11                  THE COURT:  That night.

12                  MR. HAYDEN:  Yes.  But, Judge, in order to

13      establish that what he did that night was depraved,

14      we have to be able to establish what was going on in

15      his mind.  We have to get in there--

16                  THE COURT:  That night.

17                  MR. HAYDEN:  --to see what he knew, but if

18      keys are taken from him on a prior occasion, then

19      the danger of drinking and driving has been made

20      very plain to him by other people showing concern.

21      The fact he's aware of that is extremely important

22      when he ignores it and goes out and drives anyway.

23                  THE COURT:  That application is denied.

24      I've given you more than I intended to.  I've given

25      them more than I intended to.  It's fair.  What I've

People v. Heidgen

1      done now, in my opinion, so I can sleep tonight, is

2      fair.

3                      MR. HAYDEN:  Certainly, should he take the

4      stand, what he knew that night--

5                      THE COURT:  If he takes the stand, we are

6      talking about a completely different horse race.

7                      MR. HAYDEN:  Thank you, your Honor.

8                      THE COURT:  That's a whole different

9      story.  I'm not going to prerule on an objection.

10     If he gets on the stand and places his credibility

11     at issue, whatever they decide to ask him about, if

12     there's an objection, I'll listen to it then.

13                     MR. LAMAGNA:  Judge, we did have a

14     Sandoval hearing though, and we did ask for prior

15     bad acts they want to cross-examine him about,

16     drinking and driving or driving while intoxicated.

17     We've passed that.

18                     THE COURT:  Gentlemen, or everybody, let's

19     not cross that bridge.

20                     MR. LAMAGNA:  We did cross it at the

21     Sandoval hearing.

22                     THE COURT:  We're now talking about--

23                     MR. LAMAGNA:  If he said I never did

24     something, that I understand.

25                     THE COURT:  If wishes were horses, beggars

People v. Heidgen

1    would ride.

2                    MR. LAMAGNA:  We did have a Sandoval.

3                    THE COURT:  Yes, we did, and I ruled on

4    it.

5                    (Whereupon the Court stood in recess for

6    the day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People v. Heidgen

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NASSAU : CRIMINAL PART 31
2   ---------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK

3

4        -against-                        Indictment No.
                                          1910N-2005
5

6   MARTIN ROBERT HEIDGEN,

7                          Defendant.
    ---------------------------------------x
8
                                   Mineola, New York
9                                  September 7, 2006

10

11  B E F O R E:   HON. ALAN L. HONOROF
                   Acting Supreme Court Justice
12

13  A P P E A R A N C E S:

14            (Same as previously noted.)

15

16                  *    *    *    *

17

18            (Whereupon, the jury panel entered the

19       courtroom.)

20                 THE CLERK:  Case on trial, indictment

21       number 1910-2005, People v. Martin Heidgen.

22                 People ready?

23                 MR. HAYDEN:  Ready, your Honor.

24                 THE CLERK:  Defense ready?

25                 MR. LAMAGNA:  Defendant ready, your Honor.

People v. Heidgen

1    THE CLERK:   The defendant is present, your

2    Honor.

3    THE COURT:   Thank you.

4    Good morning, ladies and gentlemen.   My

5    name is Alan Honorof.   This is a criminal trial here

6    in the Supreme Court which is about to commence.   I

7    am going to be doing jury selection a little bit out

8    of the ordinary in the following way:   I am letting

9    anyone who wants to be off this trial off this

10   trial.

11   This case involves the charge of murder in

12   the second degree.   In this case the jury will hear

13   of gruesome and terrible injuries.   They will not

14   see any photographs.   The jury will hear of the

15   alleged alcohol-related drunk-driving deaths of an

16   adult by blunt force trauma and a young child by

17   decapitation.

18   The case may last as long as five weeks.

19   I have not made this decision yet, but it's possible

20   the jury will be sequestered during their

21   deliberations at the end of the case.

22   Due to the nature of the case and the time

23   commitment involved, I'm allowing the decision as to

24   whether you choose to be screened for this trial up

25   to you.   If you choose not to serve and be screened

People v. Heidgen

1  for this trial, you will be taken back to central

2  jury and you will be screened for other cases.  They

3  will not be murder cases.  They may last longer than

4  this case.  If you choose to be screened, my staff

5  will give you additional instructions.

6          This case has received media attention and

7  it will continue to receive media attention.  If you

8  are approached by members of the press, please do

9  not discuss any aspect of this case with them.

10         At this time I am turning the proceedings

11  over to my staff.

12         (Whereupon, a recess was taken.)

13         (Whereupon, the prospective jury panel

14  entered the courtroom.)

15         THE CLERK:  Case on trial, indictment

16  number 1910N-05, People v. Martin Heidgen.

17         People ready?

18         MR. HAYDEN:  Ready, your Honor.

19         THE CLERK:  Defendant ready?

20         MR. LAMAGNA:  Defendant is ready, your

21  Honor.

22         THE CLERK:  The defendant is present, your

23  Honor.

24         THE COURT:  Would you please take over,

25  Jean?

People v. Heidgen

1    (Whereupon, the prospective jury panel was

2    sworn.)

3    THE COURT:  Fill the box, Jean.

4    THE CLERK:  Ladies and gentlemen, when you

5    hear your name, please follow the directions of the

6    officers.  Have your questionnaires out and

7    available.  Take all of your personal property with

8    you.  Thank you.

9    Seat number one, Linda Capoziello,

10   C-A-P-O-Z-I-E-L-L-O.

11   (No response.)

12   No response, your Honor.

13   THE COURT:  All right.

14   THE CLERK:  Seat number one, Aldasola

15   Okunboro, O-K-U-N-B-O-R-O.

16   (No response.)

17   THE CLERK:  Migdalia Tromp, seat number

18   one, M-I-G-D-A-L-I-A, T-R-O-M-P; seat number two,

19   Daniel Paul, P-A-U-L; seat number three, Alex

20   Gutierrez, G-U-T-I-E-R-R-E-Z; seat number four,

21   Kenneth Kircher, K-I-R-C-H-E-R; seat number five,

22   Zidnary Kinnard; K-I-N-N-A-R-D; seat number six,

23   James Essig; E-S-S-I-G; seat number seven, Loy

24   Malcolm, M-A-L-C-O-L-M; seat number eight, Bette

25   O'Hare, O-H-A-R-E; seat number nine, Dawn Connors,

People v. Heidgen

1    C-O-N-N-O-R-S; seat number ten, Angela Grasso,

2    G-R-A-S-S-O; seat number eleven, Triptarani Drugal.

3              (No response.)

4              THE CLERK:  Seat number eleven, Edward

5    Callaghan, C-A-L-L-A-G-H-A-N; seat number twelve,

6    Lea Kwartler, K-W-A-R-T-L-E-R; seat number thirteen,

7    Cara Aghabakian, A-G-H-A-B-A-K-I-A-N; seat number

8    fourteen, Rubin Coryat, C-O-R-Y-A-T.

9              THE COURT:  Welcome once again, ladies and

10   gentlemen.  To those of you standing, I apologize.

11   I have some remarks which I'd like you all to hear,

12   then those of you standing would be accompanied to a

13   room where you'll be able to sit until we need more

14   people than we will then have in the courtroom, but

15   I would like you to hear what I have to say at this

16   time.

17             Ladies and gentlemen, as you know, my name

18   is Alan Honorof.  I am the judge assigned in this

19   trial part here in the Supreme Court with relation

20   to the trial of the criminal case which is about to

21   commence.

22             First thing, can everybody hear me?

23             Thank you.

24             I am going to address myself to all

25   members of the jury panel, including those of you

People v. Heidgen

1    who may be seated or standing in the back of the

2    courtroom.  I would ask that you be kind enough to

3    give your attention to the various remarks and

4    instructions which I am about to give.  During the

5    course of my remarks I will explain briefly what

6    this trial involves, and I will explain to you the

7    separate functions that the judge and the jury

8    perform in a trial of this nature.

9            You have been selected to appear in this

10   Court as possible jurors in relation to the trial of

11   a case entitled the People of the State of New York

12   against Martin Heidgen, Defendant.

13           The People are represented by Robert

14   Hayden and Maureen McCormick, the assistant district

15   attorneys.  The defendant is represented by his

16   attorneys, Stephen LaMagna and Greg Martello.

17           May I caution you that simply because this

18   legal proceeding is brought in the name of the

19   People of State of New York, this does not in any

20   manner indicate the public desires a specific

21   verdict one way or the other.  The People of this

22   state will be served by whatever verdict is

23   justified by the evidence at this trial.

24           During this portion of the trial a

25   determination will be made as to who will actually

People v. Heidgen

1    sit as jurors in this case.  That determination is

2    made as a result of a series of questions which will

3    be put to prospective jurors whose names are drawn

4    at random from the selection drum who will, as a

5    result, be seated in the jury box.  In commencement

6    of this process we have already selected and seated

7    fourteen persons in this manner.

8         The purpose of questioning each

9    prospective juror in the jury box we'll be going

10   through in a moment is to elicit information

11   concerning each proposed juror in order to be able,

12   the Court and the attorneys, to select, so far as is

13   humanly possible, a jury free from disposition,

14   prejudice or bias.  That is to say, the objective we

15   all desire to accomplish is the selection of a jury

16   that is both impartial and qualified to hear and

17   determine the facts in this case.

18        The process of jury selection is an

19   important part in the trial procedure in a criminal

20   case.  The nature of the questioning may be somewhat

21   intensive.  This is a necessary procedure in order

22   that the objective of a fair and impartial trial

23   jury may be fulfilled.

24        However, the questions which will be put

25   to each of you either by myself or by either

People v. Heidgen

1   attorney are not intended to pry into your personal

2   life or to embarrass you in any way.  The purpose of

3   these questions is simply to permit the respective

4   attorneys to gain insight into the manner in which

5   you believe you would serve as a juror if selected

6   at this trial.  Therefore, I must request that you

7   answer all of the questions as candidly and as

8   completely as you are able.

9          If for any reason whatsoever any

10  prospective juror feels an answer will be sensitive

11  or embarrassing, please raise your hand and I will

12  have you approach the bench so that you can answer

13  the question more privately.

14          Under indictment number 1910N-05, the

15  defendant is charged with the crimes as follows:

16  Murder in the second degree, two counts, assault in

17  the first degree, three counts, reckless

18  endangerment in the first degree, two counts,

19  driving while intoxicated, two counts, as follows:

20          The Grand Jury of the County of Nassau by

21  this indictment accuses the defendant of the crime

22  of murder in the second degree, in violation of

23  Section 125.25(2) of the Penal Law of the State of

24  New York, committed as follows:

25          The defendant, Martin Heidgen, on or about

People v. Heidgen

1    the 2nd day of July, 2005, in the County of Nassau,

2    State of New York, under circumstances evincing a

3    depraved indifference to human life, recklessly

4    engaged in conduct that created a grave risk of

5    death to another person and thereby caused the death

6    of Stanley Rabinowitz.

7              Second count.

8              And the Grand Jury of the County of Nassau

9    by this indictment further accuses the defendant of

10   the crime of murder in the second degree, in

11   violation of Section 125.25(2) of the Penal Law of

12   the State of New York, committed as follows:

13             The defendant, Martin Heidgen, on or about

14   the 2nd day of July, 2005, in the County of Nassau,

15   State of New York, under circumstances evincing a

16   depraved indifference to human life, recklessly

17   engaged in conduct that created a grave risk of

18   death to another person and thereby caused the death

19   of Katherine Flynn.

20             Third count.

21             And the Grand Jury of the County of Nassau

22   by this indictment further accuses the defendant of

23   the crime of assault in the first degree, in

24   violation of Section 120.10(3) of the Penal Law of

25   the State of New York, committed as follows:

People v. Heidgen

1    The defendant Martin Heidgen, on or about

2    the 2nd day of July, 2005, in the County of Nassau,

3    State of New York, under circumstances evincing a

4    depraved indifference to human life, recklessly

5    engaged in conduct that created a grave risk of

6    death to another person and thereby caused serious

7    physical injury to Christopher Tangney.

8    The fourth count is identical with the

9    exception being the physical injury was caused to

10   Denise Tangney.

11   The fifth count is identical with the

12   exception being that the physical injury was caused

13   to Neil Flynn.

14   Sixth count.

15   And the Grand Jury of the County of Nassau

16   by this indictment further accuses the defendant of

17   the crime of reckless endangerment in the first

18   degree, in violation of Section 120.25 of the Penal

19   Law of State of New York, committed as follows:

20   The defendant, Martin Heidgen, on or about

21   the 2nd day of July, 2005, in the County of Nassau,

22   State of New York, under circumstances evincing a

23   depraved indifference to human life, recklessly

24   engaged in conduct that created a grave risk of

25   death to Elizabeth Serwin.

People v. Heidgen

1    Seventh count.

2         And the Grand Jury of the County of Nassau

3    by this indictment further accuses the defendant of

4    the crime of reckless endangerment in the first

5    degree, in violation of Section 120.25 of the Penal

6    Law of the State of New York, committed as follows:

7         The defendant, Martin Heidgen, on or about

8    the 2nd day of July, 2005, in the County of Nassau,

9    State of New York, under circumstance evincing a

10   depraved indifference to human life, recklessly

11   engaged in conduct that created a grave risk of

12   death to Joseph Caruso.

13        Eighth count.

14        And the Grand Jury of the County of Nassau

15   by this indictment further accuses the defendant of

16   the crime of operating a motor vehicle while under

17   the influence of alcohol, in violation of Section

18   1192.2 of the Vehicle and Traffic Law of the State

19   of New York, committed as follows:

20        The defendant, Martin Heidgen, on or about

21   the 2nd day of July, 2005, in the County of Nassau,

22   State of New York, operated a motor vehicle on a

23   public highway while he had .08 of one per centum or

24   more by weight of alcohol in his blood as shown by

25   chemical analysis of his blood pursuant to Section

People v. Heidgen

1      1194 of the Vehicle and Traffic Law, to wit: .28.

2              Ninth count.

3              And the Grand Jury of the County of Nassau

4      by this indictment further accuses the defendant of

5      the crime of operating a motor vehicle while under

6      the influence of alcohol in violation of Section

7      1192.3 of the Vehicle and Traffic Law of the State

8      of New York, committed as follows:

9              The defendant, Martin Heidgen, on or about

10     the 2nd day of July, 2005, in the County of Nassau,

11     State of New York, operated a motor vehicle on a

12     public highway while he was in an intoxicated

13     condition.

14             All of the acts and transactions alleged

15     in each of the several counts of this indictment are

16     connected together and form part of a common scheme

17     and plan.

18             Dated:  Mineola, New York, August 31,

19     2005, signed by Denis Dillon, who was the district

20     attorney at that time.

21             Now, before we go any further, members of

22     the panel, I wish to inform you that an indictment

23     is simply an accusation against the defendant.  It

24     creates no presumption of the defendant's guilt

25     since under our system of justice the defendant is

People v. Heidgen

1   presumed innocent, and this presumption of innocence

2   remains with the defendant all throughout the trial

3   and until proven otherwise by a verdict of a jury.

4   In a sense, the indictment is a medium which brings

5   us all together in this courtroom for the purpose of

6   hearing testimony concerning the charges.

7        This trial is the process by which we will

8   determine if the charges will be proven by

9   sufficient evidence.  In that process those of you

10   who are to be selected as jurors and I as the judge

11   perform separate and distinct functions.  As jurors,

12   you are going to be called upon to determine whether

13   or not the evidence which you will hear and possibly

14   see in this case establishes the defendant's guilt

15   beyond a reasonable doubt.

16        In order to do this you will have to

17   evaluate all the evidence at the end of the trial to

18   determine whether the testimony you have heard from

19   the witnesses and any exhibits you might see is, in

20   fact, true and what weight you will give to such

21   evidence.  This is called finding the facts.  That

22   will be your function alone.  I will find no facts

23   at this trial.  The jury alone will render a verdict

24   in this case.

25        In a criminal case the burden of proof is

People v. Heidgen

1   on the People to prove the guilt of the defendant

2   beyond a reasonable doubt.  This burden remains on

3   the People throughout the trial.  The defendant in a

4   criminal case is not required to prove or disprove

5   anything in relation to the charges made against

6   him.

7              Under our system of law the defendant is

8   not obligated to take the witness stand or call any

9   witnesses.  The law provides that you may not draw

10  any inference unfavorable to the defendant from the

11  fact that he does not take the stand.

12             At the appropriate time at the end of the

13  case I will define for you the term "reasonable

14  doubt."  Suffice it to say at this time, however,

15  you will be required to find the defendant not

16  guilty if, because of the evidence or lack of

17  evidence presented to you, you have a reasonable

18  doubt as to guilt.  On the other hand, the People

19  are not required to prove guilt beyond all doubt or

20  beyond an absolute certainty or to a mathematical

21  certainty.  If you find, therefore, that the People

22  have met the burden of proof which is required of

23  them, then it would be equally your responsibility

24  to return a verdict of guilty.

25             Your function as jurors will terminate

People v. Heidgen

1   when you make your determination as to whether the

2   defendant is found guilty or not.

3           Punishment of the defendant, if he should

4   be found guilty, is not the jury's concern.  Any

5   punishment required is the sole function of the

6   Court, nor may you permit sympathy or pity to

7   influence your deliberations.

8           As jurors, your ultimate decision as a

9   result of the trial process is called a verdict.

10   Your verdict will be either guilty or not guilty.

11   Whatever the verdict of the jury may be, it must be

12   by unanimous vote.

13           My role at the trial is to ensure that you

14   reach your verdict in accordance with the law, and

15   at the appropriate time I will explain to you what

16   the law is in relation to the issues at this trial.

17   In this respect you must bear in mind that you are

18   required to accept the law as I give it to you, even

19   if you should privately disagree with it.

20           Upon the conclusion of the questioning of

21   prospective jurors, particular persons may be

22   challenged by either or both of the attorneys.  You

23   must not be embarrassed or upset if this occurs.  It

24   is no reflection upon the ability, honesty or

25   integrity of any juror.  It simply means in the

People v. Heidgen

1    light of the experience and expertise of the

2    particular attorney, a prospective juror may not

3    fulfill all the desires the attorney may have with

4    regard to the duty that he or she must perform in

5    representing his or her client.

6            At this time, Jean, I think we can take

7    the People who are standing and make them more

8    comfortable, then we'll turn our attention to the

9    fourteen people up here.

10           (Whereupon, the standing jurors exit the

11   courtroom.)

12           THE COURT:  I am addressing myself to the

13   fourteen of you up here, although the rest of you

14   please pay attention.  I'm informed-- first of all,

15   I've introduced all of us.  Do any of you know any

16   of us?

17           PROSPECTIVE JUROR #14:  Yes.

18           THE COURT:  Who do you know?

19           PROSPECTIVE JUROR #14:  ADA McCormick.

20           THE COURT:  Okay.  In that case, sir,

21   thank you for that.  Would you please go back to

22   central jury.

23           (Whereupon, the prospective juror was

24   excused.)

25           THE CLERK:  Seat number fourteen, Qwing

People v. Heidgen

1    Wang.

2              THE COURT:  Do you know any of us, sir?

3    Do you know any of us?

4              PROSPECTIVE JUROR #14:  No.  Who?

5              THE COURT:  The People I've just

6    introduced, the lawyers, the defendant?

7              PROSPECTIVE JUROR #14:  I know, yeah.

8    Sorry.

9              THE COURT:  Sir, why don't you go back to

10   central jury, sir.

11             (Whereupon, the prospective juror was

12   excused.)

13             THE CLERK:  Seat number fourteen, Heather

14   Tolliner, T-O-L-L-I-N-E-R.

15             THE COURT:  Ma'am, do you know any of us?

16             PROSPECTIVE JUROR #14:  No.

17             THE COURT:  Okay.  I'm told by the lawyers

18   that the following people might be called as

19   witnesses.  It's a bit on the lengthy side, so stay

20   with me here.  If you know any of these people,

21   please raise your hand:

22             Michael Stafford, Sergeant Scott Crawford,

23   Linda Lindenthaler, John Whittall, Eric Baez,

24   Michael Harris, Daniel O'Hare, Michael Drake,

25   Maureen Roman, John Kwasnoski, Frank Lynch, John

People v. Heidgen

1    Ramos, Chris Sweeney, Laurence Hemmerich, Patrick

2    Siegler, Steed Davidson, Denise Tangney, Christopher

3    Tangney, Jennifer Flynn, Neil Flynn, Christopher

4    Pandolfo, Timothy Nolan, Del Lisk, Keith Rabinowitz,

5    Michael Ierardi, I-E-R-A-R-D-I, Dorothy Busco,

6    Michael Tangney, Matthew Sussingham, Greg Nizewitz,

7    Amy Hauck, Josh Sodikoff, Ilana Fromme, Tracey

8    Sodikoff, David Weiss, Mike Amato, Jamie Ormond,

9    Joshua Zigman, Justin Goldman, Brian Burkhart,

10   Amanda Goldman, Jane Gerner, Stephen Weber, James

11   Schiro, Elizabeth Serwin, Joseph Caruso, Joseph

12   Todaro, Wade Bartlett.

13             The following ten witnesses are all

14   doctors:

15             Gerard Catanese, Michael DeMartino,

16   William Closson, Alain Derzie, David Zarat.

17             All right.  How do you know him?

18             PROSPECTIVE JUROR #9:  I work with him.

19             THE COURT:  You know him personally?

20             PROSPECTIVE JUROR #9:  He's a doctor.

21             THE COURT:  Have you met and spoke with

22   him?

23             PROSPECTIVE JUROR #9:  Yes.

24             THE COURT:  Thank you, ma'am.  You go back

25   to Supreme Court.

People v. Heidgen

1              (Whereupon, the prospective juror was

2    excused.)

3              THE CLERK:  Filling seat number nine,

4    Diane Swenson, S-W-E-N-S-O-N.

5              THE COURT:  Ma'am, before you go down

6    there, do you know any of us?

7              PROSPECTIVE JUROR #9:  No.

8              THE COURT:  Did you know any of the names

9    I've read so far?

10             PROSPECTIVE JUROR #9:  No.

11             THE COURT:  Please have a seat.

12             Continuing, these are still doctors:

13   Andrew Pomerantz, Sean McCance, Peter Gelfand, Rosie

14   O'Regan, Christian Nahas, and this is not a doctor,

15   John Cunningham, Joe Foster, Dustin Pitonyak, Aire

16   Moreledge, Steven Schneider.

17             Now, this is in anticipation of what the

18   lawyers are probably also intending to ask you, do

19   any of you know anything about this case besides

20   what you've learned in this courtroom over the last

21   day or two?

22             PROSPECTIVE JUROR #13:  Yes.

23             THE COURT:  What do you know about it?

24             PROSPECTIVE JUROR #13:  I've been

25   following it.

People v. Heidgen

1   THE COURT:  You read about it in the

2   papers or heard about it on the radio?

3   PROSPECTIVE JUROR #13:  Yes.

4   THE COURT:  Anybody else?

5   Everybody heard about this case in some

6   way or another.  Those of you who have heard about

7   it, have any of you already made up your mind and

8   are consequently unable to be fair?

9   PROSPECTIVE JUROR #13:  Yeah.

10   THE COURT:  You feel you could be fair or

11   you cannot be?

12   PROSPECTIVE JUROR #14:  No.

13   PROSPECTIVE JUROR #13:  No.

14   THE COURT:  You say you can't be fair?

15   PROSPECTIVE JUROR #14:  No.  I know people

16   who know of the family.

17   THE COURT:  You say you can't be fair.

18   That's fine.  You're excused.  Go back to Supreme

19   Court.

20   (Whereupon, the prospective juror was

21   excused.)

22   Anybody else?

23   So far you've heard no evidence

24   whatsoever.  You know exactly nothing about this

25   case except whatever was written in the newspaper or

People v. Heidgen

1    magazine you might have read about it in.  You have

2    no evidence at all.

3                Is anybody else unable to be fair?

4                You are unable?

5                PROSPECTIVE JUROR #13:  Unable.  That's

6    what I said.

7                THE COURT:  I misunderstood you.  Go back

8    to Supreme Court.

9                (Whereupon, the prospective juror was

10   excused.)

11               THE COURT:  Before we fill the box, for

12   everybody, this case is going to be in the papers.

13   It's going to be on News 12 and probably some of the

14   major channels.  Also it's going to be on the radio.

15   As hard as it might be, don't listen, don't watch,

16   don't read.  You know what?  It's not fair.  If you

17   take an oath to be fair, you've got to be fair.  The

18   only people who are going to really know what's

19   going on in this case are you.  You're going to hear

20   the witnesses.  Newspapers, TV, radio, they don't

21   know what's going on.  They're not here.  There

22   might be a reporter here from time to time, but they

23   don't know.  You know.  And the only way it will be

24   fair to him is not to read the papers about this

25   case, not to listen to radio reports and not to

People v. Heidgen

1    watch TV reports.

2              Can you all do that?

3              Great.

4              Fill the box.

5              THE CLERK:  Seat number thirteen, Roberto

6    Espinosa.

7              (No response.)

8              THE COURT:  We're a little bit delayed,

9    obviously.  The person we just called is one of the

10   people who were standing and had to go to another

11   room.  Please bear with us.

12             Why don't you call the second one in the

13   meantime.

14             THE CLERK:  Seat number fourteen, John

15   Doyle, D-O-Y-L-E.

16             THE COURT:  Mr. Doyle, let me ask you at

17   the moment, first of all, do you know any of us?

18             PROSPECTIVE JUROR #14:  No.

19             THE COURT:  Did you know anybody on the

20   witness list?

21             PROSPECTIVE JUROR #14:  No.

22             THE COURT:  You've read or heard something

23   about this case before you got here today?

24             PROSPECTIVE JUROR #14:  Yes.

25             THE COURT:  By virtue of what you've read

People v. Heidgen

1   or heard or seen, do you feel that you could not be

2   fair or do you feel you can give this guy a fair

3   shot and listen to the evidence?

4           PROSPECTIVE JUROR #14:   I feel I could be

5   fair.

6           (Whereupon, Mr. Espinosa entered the

7   courtroom.)

8           THE COURT:   Mr. Espinosa, before you sit

9   down, I've briefly introduced all of us while you

10  were here earlier.   Do you know any of us?

11          PROSPECTIVE JUROR #13:   No.

12          THE COURT:   Have a seat.

13          I want to show you something.   I'm going

14  to bring to you, sir, a copy of the list of

15  witnesses I've already read.   Have a look at these

16  names, sir, and see if you know anybody on either of

17  those lists.

18          You don't know anybody?

19          PROSPECTIVE JUROR #13:   No.

20          THE COURT:   Now, some of the other

21  jurors-- in fact, most of the other jurors indicated

22  before they came to court, over the last year

23  they've heard or read or have seen something about

24  this case.   Have you?   Do you know anything about

25  this case?

People v. Heidgen

1          PROSPECTIVE JUROR #13:  No.

2          THE COURT:  Perfect.  Okay.

3          Who will conduct questioning on behalf of

4     the prosecution?

5          MS. MCCORMICK:  I will, your Honor.

6          THE COURT:  Go ahead.

7          MS. MCCORMICK:  I always had a really big

8     mouth.  I hope everybody back here can hear me.

9          Good morning, ladies and gentlemen.  I

10    want to thank you for hanging in there.  The judge

11    gave a recitation of some of the terrible facts in

12    this case, and right up front you could have

13    relieved yourself of this duty, of this opportunity,

14    if you see it that way, but I appreciate you didn't

15    do that.

16          The defendant, as you know, as the judge

17    has told you, is charged with murder.  It's the most

18    serious crime in our law, but there is some facts

19    about this case that are, themselves, unique and may

20    be too troubling for some people to be able to sit

21    on the jury, so I'm going to ask you some questions.

22    I think you probably saw me scribbling furiously

23    notes.  If I refer to my notes or butcher your name,

24    please forgive me.

25          Everyone in the room, my colleague, Bob

People v. Heidgen

1    Hayden from the District Attorney's Office,

2    Mr. LaMagna, Mr. Martello, the Judge, of course, are

3    hoping for a fair jury, and fair, of course, means

4    straight down the middle, not leaning one way or the

5    other, able to sit here in the courtroom and listen

6    only to the facts here in this courtroom, for you to

7    be the judge of those facts.

8         In this particular case the allegations

9    are that the defendant, Martin Heidgen, was driving

10   on July 1st, the overnight of a Friday night into a

11   Saturday morning, at about two o'clock in the

12   morning.  He had consumed enough alcohol that, we're

13   alleging, we're going to prove, that he had a .28

14   blood alcohol concentration.

15        He got onto, at some point, the

16   Meadowbrook Parkway going northbound but in the

17   southbound lanes of the Meadowbrook Parkway.  He

18   continued driving, we're going to allege, a few

19   miles.

20        MR. LAMAGNA:  Judge, I'm going to object

21   to the facts.

22        THE COURT:  It started out as foundation.

23        MS. MCCORMICK:  I'm just trying to--

24        THE COURT:  That's it, Miss McCormick.

25        MS. MCCORMICK:  Yes, your Honor.

People v. Heidgen

1           The point is that there was a horrific

2    crash, a head-on collision, and so that's why we are

3    here.  This is a crash case.  It is a case involving

4    two vehicles colliding on a roadway in Nassau

5    County.  People drive everywhere every day in Nassau

6    County.

7           Is the fact that this case involves a

8    crash of two vehicles, is that, itself, troubling to

9    any one of you, that a criminal charge could result

10   from a crash of two vehicles?

11          Mrs. Tromp, what are you thinking?  Do you

12   think a crime can derive out of a car crash or do

13   you think it should only be a civil suit and that no

14   crime should result from it?  What do you think?

15          PROSPECTIVE JUROR #1:  Yes, I think a

16   crime should result.

17          MS. MCCORMICK:  Of course you haven't

18   heard the facts.  You're going to have to hear what

19   those facts are from the evidence.  Do you think a

20   crime can result from from it?

21          PROSPECTIVE JUROR #2:  I think it can.

22          PROSPECTIVE JUROR #3:  Yes.

23          PROSPECTIVE JUROR #4:  Yeah.

24          PROSPECTIVE JUROR #5:  Yes.

25          PROSPECTIVE JUROR #6:  Yes.

People v. Heidgen

1                PROSPECTIVE JUROR #14:  Yes.

2                PROSPECTIVE JUROR #13:  Yes.

3                PROSPECTIVE JUROR #12:  Yes.

4                PROSPECTIVE JUROR #11:  Yes.

5                PROSPECTIVE JUROR #10:  Yes or no.

6                MS. MCCORMICK:  Okay.

7                PROSPECTIVE JUROR #9:  Yes.

8                PROSPECTIVE JUROR #8:  Yes.

9                PROSPECTIVE JUROR #7:  Yes.

10             MS. MCCORMICK:  Is there anyone who, by a

11  show of hands, has ever been involved in a crash?

12             THE COURT:  Excuse me, ladies and

13  gentlemen.  My court reporter is having a very hard

14  time hearing you.  If you wouldn't mind, please

15  speak up as loud as you can.

16             MS. MCCORMICK:  Before I get there, why

17  don't I ask who here drives a car?

18             Do you drive?

19             PROSPECTIVE JUROR #1:  I do.

20             MS. MCCORMICK:  By a show of hands.

21             Everybody in Nassau County.  Okay.

22             Has anyone in the course of driving their

23  car ever been involved in a scratch of any sort?

24             Okay.

25             Again, from a show of hands, has anybody

People v. Heidgen

1    been involved in a crash wherein there were criminal

2    charges brought after that crash against any of the

3    drivers?

4              No criminal charges.

5              So we're right back to where I started

6    from.  Is there any reason from your own experiences

7    in being involved in traffic crashes, anything that

8    happened there, that you thought criminal charges

9    should have been brought and weren't or that you

10   think will impact you on sitting on this case?

11             (No response.)

12             Is there anyone who raised their hand?

13             If you can raise it again, anybody having

14   been involved in a traffic crash who thinks that by

15   being involved in a crash, how the police responded,

16   whatever, will affect you in this case?  Anybody

17   think they'll be affected?

18             (No response.)

19             Silence.  Okay.  I'm going to take that as

20   a no, then.

21             Let me ask you my next question.  Part of

22   what you've already heard is that alcohol was

23   involved in this crash.  I presume, but I hope I'm

24   right, that since no one was charged in any of the

25   crashes in which you were involved, that alcohol was

People v. Heidgen

1   not involved in any of those cases.  Is that a

2   correct assumption?

3           Has anyone been involved in a traffic

4   crash where one of the drivers was accused of

5   driving while intoxicated?  No?

6           PROSPECTIVE JUROR #12:  I just want to

7   mention my car was totaled by a drunk driver who got

8   out and was belligerent with the police in front of

9   my house.  I wasn't involved in the crash, but my

10  car was totaled.

11          MS. MCCORMICK:  You were involved to the

12  extent your car-- you weren't in it at the time?

13          PROSPECTIVE JUROR #12:  I was not in it or

14  was my daughter.

15          MS. MCCORMICK:  Was the driver of that car

16  charged, do you know?

17          PROSPECTIVE JUROR #12:  She was.  She

18  served time.

19          MS. MCCORMICK:  Is there anything about

20  that fact, about your experiences with having been

21  the victim of a drunk driver, albeit your car was

22  the victim, that would affect you in this case?

23          PROSPECTIVE JUROR #12:  Well, just to be

24  honest, if I was in the car and my daughter was in

25  the car, we probably would have been dead as the car

People v. Heidgen

1    was completely totaled, smashed into a tree.  I do

2    think that that is a concern of mine.

3            MS. MCCORMICK:  As it would be with

4    anybody.  But now that you know-- you've had that

5    experience·and you were not in the car, but now that

6    you know this is a case where that exact accusation

7    is being made, that Martin Heidgen was driving drunk

8    and did cause the death of two people, do your own

9    experiences-- do you think your own experiences will

10   impact on your ability to be fair in this case?

11           PROSPECTIVE JUROR #12:  I don't think so.

12           MS. MCCORMICK:  Meaning you can be fair?

13           PROSPECTIVE JUROR #12:  Yes.

14           MS. MCCORMICK:  Do you think you can put

15   that aside and judge this case only on the facts?

16           PROSPECTIVE JUROR #12:  Yes.

17           MS. MCCORMICK:  Okay.  Thank you.

18           Does anyone along those lines know of

19   anyone who themselves have been accused of driving

20   while intoxicated?  A relative?  A friend?

21           Yes?  Okay.

22           And in terms of how those cases were

23   handled, can you tell me, sir, was there anything

24   about that person being--

25           PROSPECTIVE JUROR #2:  It's actually

People v. Heidgen

1   several people.

2           MS. MCCORMICK:  Several people.  Okay.

3           Is there anything about those facts-- do

4   you mind my asking what your relationship is to

5   those people?

6           PROSPECTIVE JUROR #2:  Just friends.

7           MS. MCCORMICK:  Friends.  Anything about

8   that-- do you think they were unfairly accused or is

9   there anything about those experiences that you

10  think would impact your ability to sit on this case?

11          PROSPECTIVE JUROR #2:  No.

12          MS. MCCORMICK:  How about the disposing of

13  their cases?  Do you think that they received too

14  harsh or too lenient treatment?

15          PROSPECTIVE JUROR #2:  I really couldn't

16  say.  I know they had been arrested.  I don't really

17  know.

18          I'm a bartender, so this has actually come

19  up quite a bit, but, no, I think it's not really my

20  place to say-- you know, I don't know the specifics

21  of their cases.

22          MS. MCCORMICK:  So in this case you'd be

23  able to only listen to what occurred in this case on

24  these facts and judge it not based on those outside

25  experiences?

People v. Heidgen

1                    PROSPECTIVE JUROR #2:  Yes.

2                    MS. MCCORMICK:  Who else knows someone who

3        has been arrested?

4                    You, sir?

5                    PROSPECTIVE JUROR #4:  Yes.

6                    MS. MCCORMICK:  Can I ask what your

7        relationship is to that person?

8                    PROSPECTIVE JUROR #4:  It was me.

9                    MS. MCCORMICK:  It was you.  Okay.

10                   Can I ask you, is there anything about

11       that-- it's not still pending, is it?

12                   PROSPECTIVE JUROR #4:  No.  It's long

13       gone.

14                   MS. MCCORMICK:  Okay.  About how long

15       gone?

16                   PROSPECTIVE JUROR #4:  Ten years.

17                   MS. MCCORMICK:  Okay.  Was that case

18       prosecuted here in Nassau County?

19                   PROSPECTIVE JUROR #4:  Absolutely.

20                   MS. MCCORMICK:  Is there anything about

21       that experience, either the way you were treated by

22       the police or the District Attorney's Office, that

23       would impact your ability in this case?

24                   PROSPECTIVE JUROR #4:  There were half

25       truths spoken.

People v. Heidgen

1        MS. MCCORMICK:   There was some false

2   accusations?

3        PROSPECTIVE JUROR #4:   Absolutely.

4        MS. MCCORMICK:   Do you think-- would you

5   apply your experiences, then, to listening to the

6   evidence in this case?

7        PROSPECTIVE JUROR #4:   I would hope not

8   but--

9        MS. MCCORMICK:   See, this is a critical

10  issue.   This is a hard thing to do.   We're in an

11  open place, but, everyone, the only way we're going

12  to get a fair jury here is by being completely

13  honest.

14        I really appreciate your honesty.   If you

15  have any hesitations that you think even

16  subliminally in your good conscience may affect your

17  ability to be fair, now would be the time to say so.

18        PROSPECTIVE JUROR #4:   It's hard to say,

19  you know, right at the moment, but probably.

20        MS. MCCORMICK:   Okay, sir.   Thank you.   I

21  really appreciate your honesty.   That was tough.

22        Anybody else?   Nobody?

23        PROSPECTIVE JUROR #6:   Yes.

24        MS. MCCORMICK:   Who was it, sir?

25        PROSPECTIVE JUROR #6:   A relative.

People v. Heidgen

1        MS. MCCORMICK:  Again, just like this

2    gentleman here, is there anything about that

3    experience that would impact on your ability to

4    listen fairly and openly to the facts in this case?

5        PROSPECTIVE JUROR #6:  No.

6        MS. MCCORMICK:  You're sure?

7        PROSPECTIVE JUROR #6:  Yes.

8        MS. MCCORMICK:  Who else?  I'm just going

9    to--

10        PROSPECTIVE JUROR #8:  My brother-in-law.

11        MS. MCCORMICK:  He was accused?

12        PROSPECTIVE JUROR #8:  We don't talk much.

13    I know he was in jail for a little bit.

14        MS. MCCORMICK:  Do you have any feelings,

15    any gut reactions, it was wrong, it was right,

16    anything like that?

17        PROSPECTIVE JUROR #8:  No.  We're not very

18    close.

19        MS. MCCORMICK:  Okay.  Is there anything

20    about your brother-in-law being arrested for DWI

21    that would impact on your ability to be fair in this

22    case?

23        PROSPECTIVE JUROR #8:  Not at all.

24        MS. MCCORMICK:  You, sir?

25        PROSPECTIVE JUROR #11:  I also have

People v. Heidgen

1    in-laws, both arrested, both served time, one turned

2    his life around, one didn't.

3              MS. MCCORMICK:  Okay.  Again--

4              PROSPECTIVE JUROR #11:  I know a lot of

5    people who have never been caught who have run into

6    parked cars and trees, things like that.

7              MS. MCCORMICK:  When you take the gamut of

8    all your experiences--

9              PROSPECTIVE JUROR #11:  Taking the whole

10   gamut of my experiences, when you say that the blood

11   alcohol was two-eight, it's starting to affect me.

12             MR. LAMAGNA:  Judge, I'm going to object.

13   This is why I didn't want to object before.  His

14   response was that-- what he said is that his

15   blood-alcohol level was a two-eight.  There's been

16   no evidence of that.  It's just an allegation.

17   That's why--

18             THE COURT:  Let me help you out there,

19   Mr. LaMagna.

20             At this moment in time you've heard no

21   evidence at all.  The fact that I read the

22   indictment, some piece of paper someplace-- there

23   has to be an accusatory instrument or we can't get

24   here.  They, the People, have to prove the

25   allegations in the indictment, each and every one,

People v. Heidgen

1   beyond a reasonable doubt.  At the moment they have

2   proven nothing.  If you had to vote right now, by

3   law the verdict would be not guilty on all counts.

4   You've heard no evidence.

5               MS. MCCORMICK:  We're clear on that,

6   right?

7               Let me get back to you, sir.  Let me see

8   if I can read my own chart.  Are you Mr. Callaghan?

9               PROSPECTIVE JUROR #11:  Correct.

10              MS. MCCORMICK:  Mr. Callaghan, with all of

11  your experiences, do you think that they will affect

12  your ability to be a fair and impartial juror in

13  this case?

14              PROSPECTIVE JUROR #11:  At this point,

15  yes.  Now that I've dwelled on that number and I'm

16  putting things together-- like I know highway

17  policemen, I know those tests are not inaccurate.

18              MS. MCCORMICK:  Okay.  Thank you.  Again,

19  I appreciate your honesty.

20              Is there anybody sitting here who has

21  stuff creeping in the corners of their brain that

22  you think you should bring to our attention?

23              (No response.)

24              Does anybody else know someone who has

25  been arrested for drunk driving?

People v. Heidgen

1          No?   Okay.

2          Well, still this involves a crash.   It

3    involves-- I guarantee you that somewhere along the

4    line in this case you will hear the word "accident"

5    used.

6          Mr. Doyle, could you tell me, sir, how

7    would you define the word "accident"?

8          PROSPECTIVE JUROR #14:   An unintentional

9    event.

10          MS. MCCORMICK:   An unintentional event is

11   a perfectly good definition.   You know, in this case

12   it might apply to the extent that-- you will not

13   hear from anyone in this courtroom that the

14   defendant went out with the intent in his mind to

15   murder Katie Flynn and Stanley Rabinowitz.   You're

16   not going to hear that in this courtroom.   So we're

17   going to start with a couple of things.   All right?

18          Accident.   Unintentional event.   That

19   covers a lot of ground, doesn't it, Miss Kinnard?

20   Supposing you have someone who decides they need to

21   paint a two-story house.   They buy a ladder, they

22   head up the ladder and they slip and they fall.

23   Would you call that an accident?

24          PROSPECTIVE JUROR #5:   Yes.

25          MS. MCCORMICK:   Now I have to look at my

People v. Heidgen

1   chart.  I'm sorry.

2           Mr. Gutierrez, supposing the same person

3   went to a store to buy a ladder then chose to take a

4   lawn chair, balance it on a picnic table-- I don't

5   know if you know people like this-- balance it on a

6   picnic table and reach up to paint and they also

7   fell.  Would you still call that an accident?

8           PROSPECTIVE JUROR #3:  Yes.

9           MS. MCCORMICK:  It is different than the

10  first accident, isn't it?

11          PROSPECTIVE JUROR #3:  Yes.

12          MS. MCCORMICK:  Taking it one more step,

13  Miss Swenson, if that same person balances that lawn

14  chair on the picnic table and does it knowing that

15  kids are playing underneath and fell and injured

16  them, would you still call that an accident?

17          PROSPECTIVE JUROR #9:  No.

18          MS. MCCORMICK:  Now, some people might

19  think-- it's an unintended result, right?

20          PROSPECTIVE JUROR #9:  Yes.

21          MS. MCCORMICK:  Yet all three of those

22  things are very different from one another, aren't

23  they?

24          PROSPECTIVE JUROR #9:  Yes.

25          MS. MCCORMICK:  Do you promise in

People v. Heidgen

1    listening to the evidence in this case that you'll

2    assess the choices made?  Whether this is

3    unintentional or whether it's unavoidable, there's a

4    difference in those two things.

5            Will you listen to the evidence, Miss

6    Malcolm?

7            PROSPECTIVE JUROR #7:  Yes.

8            MS. MCCORMICK:  Will you also listen to

9    the evidence and the distinction in this evidence in

10   addition to that?

11           The judge has already told you you are the

12   judges of the facts in this case.  You and you alone

13   will decide what happened that night based on the

14   evidence in this case.  The judge, of course, will

15   define the law for you, and you have to follow that

16   law.  That sounds really easy to do, but as the

17   judge told you, you have to follow the law.

18           Everyone raised their hand and said that

19   you are a driver, so let me ask you, Miss Tromp, how

20   do you feel-- this is not a case about wearing seat

21   belts.  What do you think about the law that

22   requires you to wear seat belts in your car?

23           PROSPECTIVE JUROR #1:  It's a good law.

24           MS. MCCORMICK:  It's a good law.  Do you

25   think so?

People v. Heidgen

1          PROSPECTIVE JUROR #2:  Yes.

2          MS. MCCORMICK:  Everybody thinks it's a

3     good law?

4          You're all better than my dad.  Okay?  My

5     dad happens to think that New York State has no

6     business telling him that he has to wear a seat belt

7     in his car.  You can imagine Thanksgiving dinner at

8     our house, but, nonetheless, if this were a case

9     about wearing a seat belt, it's not, but if it was a

10    case about that and he was sitting where you're

11    sitting, he would be swearing and taking an oath to

12    follow that law even though he's telling you right

13    up front I hate this law, I don't think they have

14    any business telling me what I should have to do.

15          It's not so easy, is it?  Do you think

16    that you can put aside how you feel about the law

17    and follow the law the way the judge gives it to

18    you?  This one is so big, I'm going to ask each one

19    of you.

20          PROSPECTIVE JUROR #1:  Yes.

21          PROSPECTIVE JUROR #2:  Yeah.

22          MS. MCCORMICK:  Can you do that?  I want

23    you to really think about this.

24          PROSPECTIVE JUROR #3:  Yes.

25          PROSPECTIVE JUROR #4:  Hopefully.

People v. Heidgen

```
 1              MS. MCCORMICK:  Okay.  You're honest.
 2      Okay.
 3              PROSPECTIVE JUROR #5:  Yes.
 4              PROSPECTIVE JUROR #6:  Yes.
 5              PROSPECTIVE JUROR #14:  Yes.
 6              PROSPECTIVE JUROR #13:  Yes.
 7              PROSPECTIVE JUROR #12:  Yes.
 8              PROSPECTIVE JUROR #11:  I think I can.
 9              PROSPECTIVE JUROR #10:  Yes.
10              PROSPECTIVE JUROR #9:  Yes.
11              PROSPECTIVE JUROR #8:  Yes.
12              PROSPECTIVE JUROR #7:  Yes.
13              MS. MCCORMICK:  Thank you.
14              I guarantee you that somewhere along the
15      line in this case, like I said, you heard the word
16      "accident," you're going to feel sympathy.  You're
17      going to feel it.  You're human beings.  The reason
18      you're here is to bring your life experiences into
19      this courtroom.  You would not be human if you did
20      not feel sympathy during this case.  You're likely
21      to feel sympathy for the victims, for the people
22      injured, but you may also feel sympathy for this
23      young man sitting here on trial for these very
24      serious charges.
25              I have to ask you specifically, Miss
```

People v. Heidgen

1    Swenson, you have a 25-year-old son.  This man is

2    about that age.  Does the fact that you have a son

3    that age, would that make you hesitate, even if you

4    believed the evidence beyond a reasonable doubt, of

5    convicting this man for murder?

6              PROSPECTIVE JUROR #9:  No.

7              MS. MCCORMICK:  No?  You're sure?

8              PROSPECTIVE JUROR #9:  Yes.

9              MS. MCCORMICK:  You know I'm coming to

10   you, Miss Tromp.  Miss Tromp, you're in the same

11   situation.  You have a 25-year-old son.  Has he ever

12   been involved in something where you said, what are

13   you crazy?  How could you do such a thing?  Has he

14   ever done something like that?

15             PROSPECTIVE JUROR #1:  Yes, of course.

16   Yes, of course.  Yes, I will probably hesitate

17   seeing him comparing him to my son.  I will feel

18   sympathy.

19             MS. MCCORMICK:  So you're going to--

20   thanks for your honesty.  Again, I appreciate that

21   more than you know.  It will be difficult for you to

22   convict him even if the evidence is there because of

23   the similarity to your own son's age?

24             PROSPECTIVE JUROR #1:  Exactly.

25             THE COURT:  In the final, analysis,

People v. Heidgen

1    however, could you do it?

2              PROSPECTIVE JUROR #1:  Can I say I will

3    try or do I have to say yes or no?

4              THE COURT:  You don't have to say

5    anything.  I'm asking you if you're selected as a

6    juror, despite the fact that you feel sympathy for

7    another person, that when you deliberate with your

8    fellow jurors and you all talk about the facts and

9    you come to a particular conclusion, whatever that

10   conclusion may be, can you come up with that

11   conclusion?

12             PROSPECTIVE JUROR #1:  I don't know.

13             MS. MCCORMICK:  Your Honor, if I might,

14   could you tell me how much time I have left?  I

15   don't want to--

16             THE COURT:  You have eight minutes.

17             MS. MCCORMICK:  Okay.  Thank you.

18             So then I've got to move along.

19             Miss O'Hare, you're in the same boat.  You

20   have a 21-year-old son.  Are you going to be able to

21   convict a person who is so like in age to your own

22   son?

23             PROSPECTIVE JUROR #8:  It depends on the

24   facts.

25             MS. MCCORMICK:  But you will be able to

People v. Heidgen

1      set aside the fact that you have a near-aged son and

2      listen to the evidence and make that decision?

3              PROSPECTIVE JUROR #8:  Yes.

4              MS. MCCORMICK:  I'm afraid, since I was

5      checking the time, I didn't hear your bottom-line

6      answer.  Can you be a fair juror?

7              PROSPECTIVE JUROR #1:  I said I don't

8      know.

9              MS. MCCORMICK:  Thank you.

10              Mr. Doyle, of course you've got a pile of

11     kids, 32, 30, 27, 25.  So what about you, sir?

12     Would you be able to set aside any empathy you feel

13     toward the defendant?

14              PROSPECTIVE JUROR #14:  I believe so, yes.

15              MS. MCCORMICK:  You do?  Yes?  Thank you.

16              You're going to hear from the judge that

17     the heart of this case-- that the charge is murder,

18     but it's something called depraved indifference.

19     He's going to define that for you.  You've said that

20     you can follow the law as the judge gives it to you.

21     Okay.  But, you know, depraved indifference, it's a

22     state of mind.  As judges of the facts of what

23     happened, you're going to have to come in and listen

24     to the evidence and decide what was going on in his

25     head at the time that this happened.  That's not an

People v. Heidgen

1    easy task.

2              I can assure you, like I have assured you,

3    you'll hear the word "accident" and that he did not

4    intend to kill those people.  You will not hear

5    evidence that as he drove down the road he shouted

6    out the window, I don't care what happens to

7    anybody.  You're not going to hear that.

8              So we put you in a position, as

9    prospective jurors in this case, of having to decide

10   what was in somebody's mind from the things they

11   were doing.  You probably do this every day.  You

12   know, you probably look at did my child mean to take

13   that thing or did they just inadvertently take it?

14   Did they get into that fight on purpose?

15             You assess credibility every day.  You

16   assess what people are thinking every day, but in a

17   murder charge where you have to decide it based on

18   what he did, the choices he made, is there anybody

19   here who, on that fact alone, that you'll have to

20   decide what's in somebody's head from what they were

21   doing, what they chose to do, things they said in

22   context, will you be able to do that?

23             PROSPECTIVE JUROR #6:  Yes.

24             MS. MCCORMICK:  Do you think so?

25             PROSPECTIVE JUROR #4:  Yes.

People v. Heidgen

1          PROSPECTIVE JUROR #3:  Yes.

2          PROSPECTIVE JUROR #2:  Yes.

3          PROSPECTIVE JUROR #1:  I think so.

4          PROSPECTIVE JUROR #7:  Yes.

5          PROSPECTIVE JUROR #8:  Yes.

6          PROSPECTIVE JUROR #9:  Yes.

7          PROSPECTIVE JUROR #10:  Yes.

8          PROSPECTIVE JUROR #11:  Yes.

9          PROSPECTIVE JUROR #12:  Yes.

10          PROSPECTIVE JUROR #13:  Yes.

11          PROSPECTIVE JUROR #14:  Yes.

12          MS. MCCORMICK:  You can do that?  Okay.

13     Thank you for thinking about it before you answered.

14          You realize, of course, what you find--

15     the decision you make at the end of the trial

16     doesn't have to be logical or reasonable or

17     sensible, you just have to find that's what it was.

18     Does the fact it doesn't have to make sense, that it

19     just is, does that trouble you on any level, that

20     you don't think you'll be able to do this?  Anybody?

21     Show of hands?

22          I have to move this along or I'll get in

23     trouble with the judge.  Thank you.

24          Is anybody sitting here so uncomfortable

25     with the notion of judging another person, you know,

People v. Heidgen

1    being a judge--

2            THE COURT:  Hold on.  Hold on.  Nobody

3    answer that question.

4            Nobody in this courtroom, myself included,

5    is going to judge another person.  If you are

6    selected as jurors, you are going to decide facts

7    which may or may not have happened.  That's all

8    you're doing.  You're not judging any human being

9    about anything.  You're deciding whether certain

10   facts happened or didn't happen.

11           MS. MCCORMICK:  Thank you, Judge.

12           Actually, he made the point I was trying

13   to get to.  You would not be making a declaration on

14   another person but on his acts and decisions and

15   choices just at that time.

16           Do you each understand that?  Does anybody

17   have a problem with that?

18           (No response.)

19           No?  Okay.

20           Alcohol is not on trial in this case.

21   Okay?  Do we all understand if you're over the age

22   of 21 that you're allowed to drink?  Does everybody

23   understand that?

24           Is there anybody here who does not consume

25   alcohol ever?

People v. Heidgen

1       PROSPECTIVE JUROR #7:  I don't.

2       MS. MCCORMICK:  Do you have any strong

3   feelings about people who do consume alcohol?

4       PROSPECTIVE JUROR #7:  No.

5       MS. MCCORMICK:  How about you?

6       PROSPECTIVE JUROR #5:  No.  If people

7   desire to drink, they drink.  It's their business.

8   I choose not to drink, personally.

9       MS. MCCORMICK:  Do we all also agree-- can

10  you agree with me that even a person of age, if they

11  choose to get drunk, falling down stumbling drunk,

12  it's not a crime unless and until you get in a car?

13  Would you agree with that?  Do we all agree?  Does

14  anybody have issues with that?

15       You're a bartender, so you probably have

16  had more experience with people drinking alcohol

17  than most.  How would you define somebody who is

18  intoxicated?

19       PROSPECTIVE JUROR #2:  It's tough.

20  There's obviously varying levels, but it starts

21  with-- the first one goes to-- you know, clear

22  intoxication starts early.  I don't know how to

23  define it but--

24       MS. MCCORMICK:  But you know it when you

25  see it.

People v. Heidgen

1          PROSPECTIVE JUROR #2:  Most times.

2          MS. MCCORMICK:  As a bartender have you

3  had experience with people who appear to be a good

4  drunk?

5          PROSPECTIVE JUROR #2:  Yeah.

6          MS. MCCORMICK:  A person from the outside

7  who looks like they can hold their liquor?

8          PROSPECTIVE JUROR #2:  Yes.

9          MS. MCCORMICK:  Have you had that

10  experience?

11          Has anybody here had the experience of

12  someone they know, a relative, maybe, who can really

13  drink a lot and just does not look that bad on the

14  outside?

15          So everybody knows somebody they call a

16  "good drunk"?

17          PROSPECTIVE JUROR #12:  I don't know any.

18          PROSPECTIVE JUROR #10:  I don't know

19  anybody like that.

20          THE COURT:  Two minutes, Miss McCormick.

21          MS. MCCORMICK:  Could we agree, all of us,

22  that alcohol affects each individual differently?

23  Would you agree with that?

24          PROSPECTIVE JUROR #4:  Absolutely.

25          MS. MCCORMICK:  Do we all agree with that?

People v. Heidgen

1    Do we agree someone's appearance on the

2    outside doesn't necessarily match up with what's

3    going on on the inside, depending upon how much

4    alcohol someone consumed?

5         PROSPECTIVE JUROR #2:  Yes.

6         MS. MCCORMICK:  Would you agree someone

7    who consumes a little bit can be stumbling and

8    falling down just like someone who drank ten beers

9    based on their tolerance, their personal tolerance?

10        PROSPECTIVE JUROR #2:  Yes.

11        MS. MCCORMICK:  Does everyone agree with

12   that?

13        Since I have two minutes, I have to go

14   quick.  Do we all agree you're going to listen

15   carefully to how alcohol affected Martin Heidgen on

16   July 1st into July 2nd?  Can you do that?

17        You're the experts in this case,

18   toxicology and crash reconstruction, math and

19   science.  Is there anybody so intimidated by the

20   prospect of scientific tests, some gas

21   chromatographs, anybody intimidated by that that

22   they can't endure listening to math formulas on this

23   trial and they couldn't be fair?  Do you all think

24   you can do that?

25        You're all shaking your head.  Thanks.

People v. Heidgen

1      I'm sorry I'm speeding right along here,

2  but also along those lines, this is not-- who

3  watches CSI?  Anybody?

4      Okay.  This is not CSI.  Could we all

5  agree on that?  This is real life.  We don't wrap it

6  up neat and clean in an hour.  Okay?

7      Do we all agree when you're judging-- when

8  you're assessing credibility of real people that

9  you'll take into consideration that people sometimes

10  have inconsistencies and mistakes that aren't in the

11  CSI script that don't necessarily affect outcomes?

12  Can you agree with that?

13      THE COURT:  That's time, Miss McCormick.

14      MS. MCCORMICK:  Thank you, your Honor.

15      THE COURT:  Mr. LaMagna?

16      MR. LAMAGNA:  Thank you, your Honor.

17      Good morning, ladies and gentlemen, your

18  Honor, Counsel, Mr. Martello, Mr. Heidgen, you heard

19  from the Court and we heard from Miss McCormick what

20  this endeavor is all about.  It's about picking a

21  fair and impartial jury.

22      Now, what I just want to pick up on is

23  what Miss McCormick was just saying.  This clearly

24  is not CSI.  In fact, this is real.  This is real

25  life.  This isn't television.  This isn't actors.

People v. Heidgen

1        You would agree?

2                PROSPECTIVE JUROR #6:  Yes.

3                MR. LAMAGNA:  This is about a person's

4        life, and would you agree that inconsistencies,

5        excuses and mistakes play no role here when a

6        person's life is at stake?  You would agree with

7        that, right?

8                PROSPECTIVE JUROR #1:  Yes.

9                MR. LAMAGNA:  Would anybody disagree that

10       in real life we're not looking for excuses or

11       mistakes?

12                Wouldn't that be correct?

13                PROSPECTIVE JUROR #10:  Correct.

14                MR. LAMAGNA:  In fact, what we're looking

15       for, ma'am, isn't it true, we want facts; is that

16       correct?

17                PROSPECTIVE JUROR #8:  Yes.

18                MR. LAMAGNA:  Sir, you would want to be

19       sure when the judge tells you about reasonable

20       doubt, you'd want to make sure you don't have a

21       reasonable doubt before you judge the facts against

22       another human being.  Don't you agree?

23                PROSPECTIVE JUROR #2:  Yes.

24                MR. LAMAGNA:  Does anybody disagree with

25       that?

People v. Heidgen

1        This is not CSI.  This most certainly is

2    not television or the movies.  This is real life.

3    As the assistant district attorney told you, my

4    client is charged with murder, murder for an

5    unintentional act, as she had told you, too.

6        Now, you're going to hear a lot of

7    evidence-- Miss O'Hare is it?  I'll put my glasses

8    back on.  And I think everybody pretty much, except

9    for a couple, have said, you know, I've heard about

10   this case.  You would agree, would you not, that

11   often times things in life aren't as simple as they

12   seem?  Has anybody heard that expression?

13        Mr. Essig?

14        PROSPECTIVE JUROR #6:  Yes.

15        MR. LAMAGNA:  Now, you knew I would be

16   starting with you.  You're a New York City police

17   officer, correct?

18        PROSPECTIVE JUROR #6:  Correct.

19        MR. LAMAGNA:  You do investigations all

20   the time in your career, correct?

21        PROSPECTIVE JUROR #6:  That's correct.

22        MR. LAMAGNA:  Isn't it a fact an

23   investigation leads to a conclusion?  In other

24   words, you gather facts before you make up your

25   mind?

People v. Heidgen

1      PROSPECTIVE JUROR #6:  That's correct.

2          MR. LAMAGNA:  You don't rush to judgment

3   certainly, correct?

4      PROSPECTIVE JUROR #6:  Correct.

5          MR. LAMAGNA:  That would be incorrect.

6   You'd want to know what actually happened based upon

7   the facts, correct?

8      PROSPECTIVE JUROR #6:  Yes.

9          MR. LAMAGNA:  And Mr. Gutierrez?

10      PROSPECTIVE JUROR #3:  Gutierrez.

11          MR. LAMAGNA:  Gutierrez.  I'm sorry.

12          I'm going to make a blanket apology to

13   anybody's name I mispronounce.  It happens to me all

14   the time.

15          What I was asking you, then, is did you

16   ever hear of an experience where a person who rushes

17   to judgment fails to see the truth?

18      PROSPECTIVE JUROR #3:  Absolutely.

19          MR. LAMAGNA:  That's very important.  You

20   know, a cliche is often said because there's some

21.  truth in it.

22          Mr. Doyle?

23      PROSPECTIVE JUROR #14:  Doyle.

24          MR. LAMAGNA:  Would you agree with that?

25      PROSPECTIVE JUROR #14:  Yes.

People v. Heidgen

1          MR. LAMAGNA:  You're an engineer, aren't

2     you?

3          PROSPECTIVE JUROR #14:  Yes.

4          MR. LAMAGNA:  You don't rush to judgment

5     on things, correct?

6          PROSPECTIVE JUROR #14:  Correct.

7          MR. LAMAGNA:  If you rush to judgment, you

8     may fail to see the truth, correct?

9          PROSPECTIVE JUROR #14:  You can make a

10    mistake.

11         MR. LAMAGNA:  You can make a mistake.

12         Now, you would agree, Miss Kwartler?

13         PROSPECTIVE JUROR #12:  Kwartler.

14         MR. LAMAGNA:  Kwartler.

15         Would you agree that in some endeavors in

16    life, you know what?  We make mistakes.  They may

17    not mean much.  Sometimes something is so serious,

18    you make a mistake, you can't afford to make a

19    mistake.  There's too much riding on it.

20         You would all agree that in a situation,

21    if you're picked as a juror, with a person on trial,

22    there's no room to make mistakes.

23         Would you agree, Miss Malcolm?

24         PROSPECTIVE JUROR #7:  Yes.

25         MR. LAMAGNA:  Would anybody disagree with

People v. Heidgen

1    that?  There's no room for mistakes in situations

2    like this, correct?

3             Now, the Judge has already articulated to

4    you it's the district attorney who has the burden of

5    proof in this case.  Now, we've all heard that term.

6             Mr. Paul, do you promise you'll follow the

7    directions by the Court when they say that the

8    burden of proof is on the district attorney, it

9    stays with the district attorney, and the defense

10   has no burden of proof at all in this case?

11            PROSPECTIVE JUROR #2:  Yes.

12            MR. LAMAGNA:  Would you agree with that?

13            PROSPECTIVE JUROR #2:  Yes.

14            MR. LAMAGNA:  Does anybody instinctually

15   or emotionally have a problem with that?  Would

16   anyone expect us, the defendant, to have to prove

17   anything?

18            Mr. Espinosa, do you understand that the

19   entire burden of proof is at that table and at that

20   table only?  You agree with that?

21            PROSPECTIVE JUROR #13:  Right.  Right.

22            MR. LAMAGNA:  Miss Grasso-- I'm sorry--

23   Mrs. Swenson?

24            PROSPECTIVE JUROR #9:  Yes.

25            MR. LAMAGNA:  Now, certainly I'm not going

People v. Heidgen

1    to sit here and do nothing during the trial.  I am

2    going to cross-examine witnesses.  We may even

3    produce witnesses.  Just because I do that doesn't

4    necessarily mean I now have a burden of proof,

5    right?

6              PROSPECTIVE JUROR #9:  Correct.

7              MR. LAMAGNA:  The burden always stays with

8    them, correct?

9              PROSPECTIVE JUROR #9:  Yes.

10             MR. LAMAGNA:  Now, there will be testimony

11   concerning alcohol use.  Is anybody familiar with

12   any organizations like S.A.D.D. or M.A.D.D. or any

13   of these other organizations?  Is anybody a member

14   or an affiliate or belongs to any of these

15   organizations?

16             You understand that this is about facts,

17   not about political agendas for any organization?

18             Mr. Gutierrez, do you agree with that?

19   This isn't politics, right?

20             PROSPECTIVE JUROR #3:  No.

21             MR. LAMAGNA:  Your decision is not based

22   upon what's popular or unpopular, correct?

23             PROSPECTIVE JUROR #3:  No.

24             MR. LAMAGNA:  Mr. Kircher?

25             PROSPECTIVE JUROR #4:  Kircher.

People v. Heidgen

1    MR. LAMAGNA:  You would agree that

2    whatever your decision is, it's going to be based

3    upon the facts and the evidence, not what is a

4    desirable result, not what's undesirable, popular or

5    otherwise?

6         PROSPECTIVE JUROR #4:  Correct.

7         MR. LAMAGNA:  It's justice.

8         PROSPECTIVE JUROR #4:  That's right.

9         MR. LAMAGNA:  It's whether they prove

10   their case beyond a reasonable doubt, correct?

11        PROSPECTIVE JUROR #4:  Absolutely.

12        MR. LAMAGNA:  And if they haven't,

13   Mr. Callaghan, what's your verdict?

14        PROSPECTIVE JUROR #11:  If they haven't

15   proved their case, it would have to be--

16        MR. LAMAGNA:  Every single element.

17        PROSPECTIVE JUROR #11:  Every single

18   element, it would have to be a not guilty,

19        MR. LAMAGNA:  Now, you're going to hear

20   witnesses testify, and you're going to have to all

21   judge the credibility of these witnesses.

22        Miss Kinnard?

23        PROSPECTIVE JUROR #5:  Um-hum.

24        MR. LAMAGNA:  You're going to have to

25   determine whether or not a particular witness or a

People v. Heidgen

1    piece of evidence is credible, is believable.  Do

2    you understand?

3              PROSPECTIVE JUROR #5:  Yes.

4              MR. LAMAGNA:  And you would agree we do

5    that all the time.  In our everyday lives we make

6    decisions on credibility all the time.

7              How many people have children?

8              You know, say there's a dispute between

9    kids, you don't know what happened, or between

10   friends or family or at work.  You've got to decide

11   who do I believe.  We make those decisions all the

12   time.  Here we're going to have professional

13   witnesses, we're going to have police witnesses,

14   we're going to have civilian witnesses.

15             Mr. Essig?

16             PROSPECTIVE JUROR #6:  Yes.

17             MR. LAMAGNA:  Now, you're going to have to

18   use all your life experiences, like everybody else,

19   in making a determination of what you believe and

20   whether or not a particular person is credible or

21   not.  You can do that, certainly, sir?

22             PROSPECTIVE JUROR #6:  Yes.

23             MR. LAMAGNA:  Can we all do that?

24             Now, again, as Miss McCormick said, this

25   is a murder case, the most serious charge in our

People v. Heidgen

1   society.

2           Would it be fair to say, Miss Tromp, that

3   in light of the serious nature of this case and the

4   gravity of it, you will use a critical eye in making

5   your determination of what you believe and whether

6   or not a particular witness is credible?  Would you

7   do that?

8           PROSPECTIVE JUROR #1:  Yes.

9           MR. LAMAGNA:  Do we all agree that that is

10  an important endeavor here?

11          Miss Grasso?

12          PROSPECTIVE JUROR #10:  Yes.

13          MR. LAMAGNA:  That because of the gravity

14  of this charge, you can't make mistakes here?

15          PROSPECTIVE JUROR #10:  Yes.

16          MR. LAMAGNA:  You have to be sure.  If

17  you're not sure, not guilty.

18          PROSPECTIVE JUROR #10:  Right.

19          MR. LAMAGNA:  Now, would you promise me

20  that you will look to witnesses to see whether or

21  not a particular witness may have a bias not to tell

22  the truth?

23          How about you, Mr. Doyle?  A witness may

24  all of a sudden change their testimony because it

25  suits the position that they're on.  Would that be

People v. Heidgen

1    something that would strike you as maybe this person

2    is not credible?

3                   PROSPECTIVE JUROR #14:  If I believed it.

4                   MR. LAMAGNA:  Assuming that they changed

5    their testimony to suit a particular side.

6                   PROSPECTIVE JUROR #14:  How would I know

7    that?

8                   MR. LAMAGNA:  I'm asking you if somebody

9    says A, and then all of a sudden now they come into

10   the courtroom and they change their story from A and

11   now they say B because it fits some other side,

12   wouldn't that be something you would consider?

13                  PROSPECTIVE JUROR #14:  I guess I would in

14   the context of everything else, yes.

15                  MR. LAMAGNA:  How about you?

16                  PROSPECTIVE JUROR #6:  Same, in the

17   context of what's going on.

18                  MR. LAMAGNA:  For example, if, for

19   example, if there's an expert and you have an

20   engineer or somebody says, well, the light was red,

21   and then the person who hired him needs the light to

22   be green, and that expert changes his testimony or

23   his report from red now to green, would that be

24   something you would consider on credibility?

25                  I'm asking you again.

People v. Heidgen

1     PROSPECTIVE JUROR #6:  Yes.

2     MR. LAMAGNA:  Mr. Doyle?

3     PROSPECTIVE JUROR #14:  I'd think about

4     it, yes.

5     MR. LAMAGNA:  If an expert all of a sudden

6     changes his report from one thing to another because

7     he's being paid for his opinion, Miss Malcolm,

8     wouldn't that be something you would consider?

9     PROSPECTIVE JUROR #7:  Yes.

10    MR. LAMAGNA:  How about you?

11    PROSPECTIVE JUROR #2:  Yes.

12    MR. LAMAGNA:  Mr. Gutierrez?

13    PROSPECTIVE JUROR #3:  Yes.

14    MR. LAMAGNA:  Would that be something that

15    would concern you?

16    PROSPECTIVE JUROR #3:  It would be

17    questionable.

18    MR. LAMAGNA:  All of a sudden testimony

19    changes to a particular theory of the case to make

20    the case sound better.  Would that be something you

21    would consider in judging the credibility of that

22    witness?

23    PROSPECTIVE JUROR #3:  Yes.

24    MR. LAMAGNA:  How about you, Mr. Kircher?

25    PROSPECTIVE JUROR #4:  Kircher.

People v. Heidgen

1            It sure would.

2            MR. LAMAGNA:  Right?  That shouldn't be

3    happening, right?

4            Now, somebody gave a definition of an

5    accident.  Who gave that definition?

6            You did.  Okay.

7            I'm not going to spend time on semantics

8    of words.  An accident, as you say, it's an

9    unintentional act.  Do we all agree with that?  I'm

10   not going to banter whether we call it a crash or an

11   accident, whichever sounds maybe worse.  We know

12   what it is.

13           The issue is going to be under what

14   circumstances, how this terrible tragedy occurred

15   and why.  And is it murder, to be held to the same

16   standard as somebody who intentionally kills

17   somebody in cold blood.  That's what the issue is

18   going to be here.

19           You will not hear from the defense this

20   did not happen.  This was a terrible tragedy of

21   immeasurable proportion, and we all feel for this.

22   This is terrible.  However, two people did die, and

23   we cannot change that, and four people were

24   seriously injured.

25           When the judge related to you yesterday or

People v. Heidgen

1    today some of the facts, we all agree, do we not,

2    Mr. Espinosa, that in a car accident, people could

3    get gruesomely injured because of the nature of

4    what's happening.  It doesn't always mean it's a

5    criminal case or it's not a criminal case.  The fact

6    is, people get hurt terribly in a car accident.

7              Would you agree, as an engineer?

8              PROSPECTIVE JUROR #14:  Yes.

9              MR. LAMAGNA:  We're not disputing these

10    people died.  We're certainly not disputing people

11    being injured.  I'm asking you the district attorney

12    is going to bring in a lot of witnesses and produce

13    a lot of evidence concerning the gruesomeness of how

14    these people died.  We are not disputing that.  But

15    yet you're going to end up having to sit through all

16    of this.

17              What I'm saying to you is, Miss O'Hare, we

18    would not be human if we didn't feel that sympathy,

19    but what I'm asking you to do is not be persuaded by

20    the use of sympathy and emotion, but look at the

21    facts of the case.  You're going to sit through all

22    of this.  We're not disputing it, but yet you're

23    going to have to end up listening to it.  And,

24    unfortunately, Mr. Paul, one of the issues of how

25    this young child died was she was decapitated.  You

People v. Heidgen

1   can't change that.  The judge told you that.

2           What I need to know from all of you is

3   based upon the terrible emotional feelings you'll

4   have, can you look at the evidence through this

5   filter of emotion and get beyond that point and

6   concentrate on how it happened, why it happened and

7   under under what circumstances it happened?

8           Miss Kinnard?

9           PROSPECTIVE JUROR #5:  Yes.

10          MR. LAMAGNA:  We can't change how it

11  happened.  Accidents happen.  Tragedies happen.  You

12  know, the issue here is going to be why, how, under

13  what circumstances.  Would you agree?

14          PROSPECTIVE JUROR #5:  Yes.

15          MR. LAMAGNA:  Does anybody-- and this is a

16  critical point because this was a tragedy of

17  immeasurable proportions, but you're going-- they're

18  going to bring in witnesses who are going to be

19  doctors, not photographs, but testimony concerning

20  this.  We know that.  You know this now.  What I'm

21  saying is can you get beyond that and listen to the

22  facts about what's germane here?

23          Miss Kinnard?

24          PROSPECTIVE JUROR #5:  Yes.

25          MR. LAMAGNA:  Now, the judge, Mr. Doyle,

People v. Heidgen

1    will give you the charge on what depraved

2    indifference to human life means.  Will you promise

3    to follow that law--

4              PROSPECTIVE JUROR #14:  Yes.

5              MR. LAMAGNA:  --as it relates to this?

6              Now, if the district attorney doesn't

7    prove the element of depraved indifference, the

8    state of mind of depraved indifference, even if you

9    feel my client is responsible for the accident but

10   they don't prove the depraved indifference state of

11   mind, that evil and wicked state, how would you

12   vote?  Not guilty.

13             PROSPECTIVE JUROR #14:  Not guilty.

14             MR. LAMAGNA:  Is there any hesitation by

15   anybody that if they can't prove his state of mind

16   as being depraved it's a not guilty?  Does anybody

17   have any question about that?

18             Mr. Callaghan?

19             PROSPECTIVE JUROR #11:  How could you

20   tell?  I had a question.

21             MR. LAMAGNA:  Well--

22             PROSPECTIVE JUROR #11:  We're sitting

23   through your dissertation about how you understand

24   everything is an accident.

25             MR. LAMAGNA:  I'm going to--

People v. Heidgen

1          PROSPECTIVE JUROR #11:  You're saying

2     there was a crash and two people passed away.

3          MR. LAMAGNA:  That is a fact.

4          PROSPECTIVE JUROR #11:  Then is the

5     difference if your client wasn't driving?

6          MR. LAMAGNA:  What I'm saying to you is--

7          PROSPECTIVE JUROR #11:  I have a problem

8     with the personal accountability.

9          MR. LAMAGNA:  How about this:  Let's say

10    the district attorney doesn't prove that and the

11    judge instructs you if you don't find that the

12    district attorney has proved every element of the

13    charges of murder, but I'm going to allow you to

14    consider lesser charges where you may think he's

15    guilty of that but not the murder, would you

16    consider those lesser charges if the judge tells you

17    to consider them?

18         PROSPECTIVE JUROR #11:  Yes.

19         MR. LAMAGNA:  You would agree,

20    Mrs. Grasso, you would agree that simply because

21    somebody may be accused of one crime, that person

22    may not be guilty of that crime but may be guilty of

23    some lesser crime?

24         PROSPECTIVE JUROR #10:  Right.

25         MR. LAMAGNA:  Until you hear the evidence

People v. Heidgen

1    you don't know.

2              PROSPECTIVE JUROR #10:  Right.

3              MR. LAMAGNA:  Now, Mr. Espinosa.

4              PROSPECTIVE JUROR #6:  Espinosa.

5              MR. LAMAGNA:  Would you agree with me that

6    a person may be charged with one thing and maybe not

7    guilty of that or maybe they don't prove that but

8    they may prove something lesser?  There's still

9    culpability but not to what they're charged with.

10   If the judge gives you those lessers, would you

11   consider them?

12             PROSPECTIVE JUROR #6:  Yes.

13             MR. LAMAGNA:  How about Mrs. Tromp?

14             PROSPECTIVE JUROR #1:  Yes, I would

15   consider them.

16             MR. LAMAGNA:  Right?  Because it's

17   possible somebody may not be guilty of this top

18   charge but maybe something in between.

19             Mr. Paul, have you ever heard the

20   expression there are shades of gray in life?

21             PROSPECTIVE JUROR #2:  Yes.

22             MR. LAMAGNA:  They may seek a charge of

23   murder, to be held to the same standard as somebody

24   who, essentially, kills somebody in cold blood.

25   That may not be what happened here.  It may have

People v. Heidgen

 1    been an accident but with liability.

 2              Would you agree that that's possible?

 3              PROSPECTIVE JUROR #2:  Yeah.

 4              MR. LAMAGNA:  Mr. Callaghan, is that

 5    possible?

 6              PROSPECTIVE JUROR #11:  I'm not sure how

 7    you interpret liability.  Is that the same as

 8    accountability?

 9              MR. LAMAGNA:  Yes.

10              PROSPECTIVE JUROR #11:  It's not a civil

11    case.

12              MR. LAMAGNA:  No.  No.  This is a criminal

13    case.  The judge will give you the charges which

14    they have to be able to prove.  If they haven't

15    proved one, is it possible maybe they proved

16    another?

17              PROSPECTIVE JUROR #11:  It's possible.

18              MR. LAMAGNA:  Okay.

19              PROSPECTIVE JUROR #11:  Depending on the--

20              MR. LAMAGNA:  Depending how you see the

21    facts.

22              PROSPECTIVE JUROR #11:  Or if the judge

23    were to give us alternate charges, how he would

24    interpret those to see if the burden was met.

25              MR. LAMAGNA:  If there's an element

People v. Heidgen

1   missing out of any of these charges, how would you

2   vote?

3          PROSPECTIVE JUROR #11:  If they haven't

4   proved their case, it would be not guilty.

5          MR. LAMAGNA:  Would you agree-- I want

6   everybody to hear this-- if there's, let's say, ten

7   elements and they prove nine, that's pretty good,

8   right?  In normal things, nine out of ten is a 90.

9   That's pretty good.  But in this scenario, with so

10  much on the line, and as the judge tells you, they

11  have to prove every element, each individually

12  beyond a reasonable doubt.

13          Now, what if they prove to your

14  satisfaction nine out of ten elements beyond a

15  reasonable doubt, but one element you're just not

16  quite sure of and you have a doubt.  How would you

17  vote?

18          PROSPECTIVE JUROR #11:  Depends on where

19  that doubt was from.

20          MR. LAMAGNA:  If there was a doubt, if

21  there is a doubt-- well, okay.

22          How about Miss Grasso?

23          PROSPECTIVE JUROR #10:  If there was

24  doubt, I would have to say not guilty.

25          MR. LAMAGNA:  Of course, if that's what

People v. Heidgen

1    the judge told you the law was.  If there's ten

2    elements and they only prove nine elements, then how

3    would you vote?

4              PROSPECTIVE JUROR #10:  What you are

5    saying?

6              MR. LAMAGNA:  I'm saying-- let's say for

7    one charge they have to prove ten things to prove

8    that one charge.

9              PROSPECTIVE JUROR #10:  Ten things equals

10   one and one equals no?  I'd have to say no.

11             MR. LAMAGNA:  You'd have to say no.  Not

12   guilty, right?

13             The judge will tell you as my client sits

14   here he's presumed innocent.  We don't have to prove

15   anything.  They have to prove it all to your

16   satisfaction beyond a reasonable doubt, correct?

17             PROSPECTIVE JUROR #10:  Yes.

18             MR. LAMAGNA:  If there's 100 elements and

19   they only prove 99 elements, how would you vote?

20   Not guilty?

21             PROSPECTIVE JUROR #10:  Yes.

22             MR. LAMAGNA:  Could we all agree with

23   that?  No hesitation?  Because if there's

24   hesitation, if that is what the judge tells you the

25   law is, we need to know that now.  You may not be

People v. Heidgen

```
 1    right to sit on this particular case.  If you were

 2    sitting there-- that's the important thing with this

 3    kind of job, if you will, as a juror.  I'm going to

 4    ask you to ask yourselves, you know, what if I was

 5    sitting there?

 6              MS. MCCORMICK:  Objection, Judge.

 7              MR. LAMAGNA:  Would you--

 8              THE COURT:  It's a fair question.  I heard

 9    that question before.  It's okay.

10              MR. LAMAGNA:  So what I'm asking is just--

11    we can't get into your heads, especially in these

12    few minutes, so you have to ask yourselves and be

13    honest with us, it's about fairness and justice and

14    a person's life.  If you were sitting there, would

15    you feel comfortable, with the law that the judge

16    just gave you, beyond a reasonable doubt, burden of

17    proof, would you feel comfortable being where he is

18    with you as a juror?

19              PROSPECTIVE JUROR #6:  Yes.

20              PROSPECTIVE JUROR #5:  Yes.

21              PROSPECTIVE JUROR #4:  Yes.

22              PROSPECTIVE JUROR #3:  Yes.

23              PROSPECTIVE JUROR #2:  Yes.

24              MR. LAMAGNA:  You're hesitating.  You

25    hesitated before.
```

People v. Heidgen

1      PROSPECTIVE JUROR #1:  No.

2      PROSPECTIVE JUROR #14:  Yes.

3      PROSPECTIVE JUROR #13:  Yes.

4      PROSPECTIVE JUROR #12:  I have a slight

5  hesitation.

6           MR. LAMAGNA:  That's okay.

7      PROSPECTIVE JUROR #12:  I'm just being

8  honest.

9           MR. LAMAGNA:  I think that's wonderful.  I

10  think, as the Court said, there's no right or wrong

11  answers here.  The right answers are the open and

12  honest answers, because you know what?  You don't

13  want to have to come to us in the middle of the

14  trial and say, you know what?  What I just heard,

15  Mr. LaMagna, I'm sorry, I can't do this now.  We

16  don't want that.

17           So, please, anything, right now, this is

18  the time.  If there is any reservation, we have all

19  these people here.  If anybody has even the

20  slightest reservation concerning the facts of this

21  case, the gravity of the charge and the

22  responsibility of doing what you're going to be

23  asked to do, if you have any reservations and think

24  you can't do it, please, now is the time.

25           Does anybody feel that after hearing this

People v. Heidgen

1    now, you know what?  I rather be on a different type

2    of case.  Everybody feels they can do it, other than

3    your reservation?

4                PROSPECTIVE JUROR #12:  I have a slight

5    reservation.

6                MR. LAMAGNA:  Would you rather not be on a

7    case like this because of your experiences and--

8                PROSPECTIVE JUROR #12:  To be honest, yes.

9    I have a lot of alcoholism in my family and a lot of

10   people who have been hurt by alcoholism.

11               MR. LAMAGNA:  You have a certain bias?

12               PROSPECTIVE JUROR #12:  I think I have a

13   bias towards there needs to be accountability, so

14   I'm just being honest.  When you drink, that should

15   be taken into account.

16               MR. LAMAGNA:  I understand.

17               Is there anybody else who feels the same

18   way?

19               THE COURT:  Two minutes, Mr. LaMagna.

20               MR. LAMAGNA:  Thank you, your Honor.

21               With respect to how this accident

22   occurred, do you realize that accidents can happen

23   for a lot of reasons?  Right?  We all are aware of

24   that.

25               Mr. Paul?

People v. Heidgen

1          PROSPECTIVE JUROR #2:  Yep.

2          MR. LAMAGNA:  There could be one reason

3    for an accident occurring or a myriad of reasons all

4    coming together causing an accident, correct?

5          PROSPECTIVE JUROR #2:  Yes.

6          MR. LAMAGNA:  Would you question whether

7    the individual slowed down to try to self-correct,

8    maybe too late?  Would you question whether or not

9    the street signs were okay or whether he's familiar

10   with an area?

11         Mr. Espinosa, did you ever drive your own

12   car in a place where you didn't know where you were

13   going?

14         PROSPECTIVE JUROR #6:  Yes.

15         MR. LAMAGNA:  Maybe somewhere out of the

16   State of New York or somewhere?

17         PROSPECTIVE JUROR #6:  Yes, I have.

18         MR. LAMAGNA:  Mr. Doyle, have you ever

19   gotten lost driving?

20         PROSPECTIVE JUROR #14:  Yes.

21         MR. LAMAGNA:  When you're driving and get

22   lost, what do you do?  You kind of slow down, right?

23   You try to get your bearings straight.

24         Have we all experienced that?  We slow

25   down and look for a sign, right?

People v. Heidgen

1    Miss Grasso, signs are for people who

2    don't know where they're going, not for people who

3    know where they're going.

4         PROSPECTIVE JUROR #10:  Correct.

5         MR. LAMAGNA:  Do you promise to consider

6    all these things and what was happening that caused

7    this accident, and if alcohol was involved, that's

8    one aspect.  The issue is going to be whether he

9    acted with an evil, depraved mind-- okay?  Do you

10   understand that?  --for murder.  The judge may give

11   you other lesser charges, that's one thing, but I'm

12   talking about the murder case.  Will you concentrate

13   on all those issues?

14        Now, I need as my last question here a

15   promise from all of you, and I think anybody who

16   will be sitting where this young man is would ask

17   the same question.  Do you promise to make the

18   prosecution fulfill its legal obligation to prove

19   each and every element of the charge regardless of

20   whether, under the circumstances, you think there's

21   accountability or not?  If their proof does not meet

22   its burden beyond a reasonable doubt, every element,

23   then it's not guilty.  Remember, maybe guilty,

24   possibly guilty, I think he's guilty is not enough.

25   You agree with that, everybody?  It's beyond a

People v. Heidgen

1   reasonable doubt.

2            THE COURT:  That's time, Mr. LaMagna.

3            MR. LAMAGNA:  Thank you, Judge.

4            Thank you, ladies and gentlemen.

5            THE COURT:  At this time I'm going to give

6   counsel a couple of minutes with their notes, then

7   I'd like to see counsel at the bench.

8            (Whereupon, a discussion was held at the

9   bench on the record.)

10           THE CLERK:  People, challenges for cause,

11  one through twelve?

12           MS. MCCORMICK:  Number one.

13           THE COURT:  Granted.

14           MS. MCCORMICK:  Number four.

15           THE COURT:  Denied.

16           MS. MCCORMICK:  Mr. Kircher--

17           THE COURT:  Denied.  He rehabilitated

18  himself.  Denied.

19           MS. MCCORMICK:  Exception noted, Judge.

20           THE COURT:  Yes.

21           MS. MCCORMICK:  He specifically said that

22  in his experience, he thought that a false statement

23  had been used against him.

24           THE COURT:  He said that in the beginning,

25  and he became fairer, fairer and fairer.  He started

People v. Heidgen

1   to answer the questions like a fair juror.

2                  Your challenge for cause is denied.

3                  MS. MCCORMICK:  Okay, your Honor.

4                  THE CLERK:  Anything else, People, one

5   through twelve?

6                  MS. MCCORMICK:  No other for cause, Judge.

7                  THE CLERK:  Defense, first twelve,

8   challenges for cause, one through twelve?

9                  MR. LAMAGNA:  One through twelve?  Yes,

10  number eleven.

11                 THE COURT:  Granted.

12                 MR. LAMAGNA:  And number twelve.

13                 THE COURT:  Granted.

14                 MR. LAMAGNA:  That's for cause.

15                 THE CLERK:  Any other challenges for

16  cause, one through twelve?

17                 MR. LAMAGNA:  No.

18                 THE CLERK:  People, peremptory challenges,

19  seats one through twelve?

20                 MS. MCCORMICK:  I'm sorry.  Two, three and

21  four, Judge.

22                 Excuse me.  Let me continue to look in the

23  next row.

24                 MR. LAMAGNA:  So two, three and four?

25                 MS. MCCORMICK:  Yes.

People v. Heidgen

1      No others, Judge.

2          THE CLERK:  Defense?

3          MR. LAMAGNA:  Judge, I have number five,

4      number six, number nine and number ten.

5          THE COURT:  Okay.  Let's do thirteen and

6      fourteen.

7          THE CLERK:  Seat number seven, which was

8      Loy Malcolm, is now going to become juror number

9      one.  Seat number eight, which was Bette O'Hare, now

10     becomes juror number two.

11         We're addressing thirteen and fourteen,

12     People, for cause?

13         MS. MCCORMICK:  None for cause.

14         THE CLERK:  Defense, addressing thirteen

15     and fourteen for cause?

16         MR. LAMAGNA:  Thirteen and fourteen for

17     cause?  No.

18         THE CLERK:  People, peremptory challenges

19     as to seats thirteen and fourteen?

20         MS. MCCORMICK:  I'm going to challenge

21     number thirteen.

22         MR. LAMAGNA:  Number thirteen?

23         MS. MCCORMICK:  Yes.

24         THE CLERK:  Nothing further from the

25     People?

People v. Heidgen

1      MS. MCCORMICK:  No, sorry.

2      THE CLERK:  Defense, peremptory challenge

3  on number fourteen?

4      MR. LAMAGNA:  Number fourteen, yes.

5      THE CLERK:  The People have used four and

6  the defense has used five.

7      THE COURT:  Okay.

8      (Whereupon, proceedings continue in open

9  court.)

10      THE CLERK:  If you hear your name called,

11  please remain seated in the box:

12      Miss Malcolm and Miss O'Hare.

13      The rest of the jurors in the box, the

14  Court would like to thank you for your service.

15  Please follow the directions of the court officers.

16      (Whereupon, the unselected jurors were

17  excused.)

18      (Whereupon, the jurors were duly sworn.)

19      THE COURT:  Please have seats.  What I'm

20  going to do now, ladies and gentlemen, is I'm going

21  to ask you to stay for this, even though you don't

22  need to be back here until Monday at 9:30 in the

23  morning.  I have certain instructions which, when we

24  break, I'm required by law to give you, but I don't

25  want to send you off now with the admonitions then

People v. Heidgen

1    fill the box and say the admonitions all over again.

2    I'd like the two of you to please sit down over

3    here.

4            We're going to fill the box, then we're

5    going to break for lunch.  Those of you who are in

6    the box at the time that we break, please remember

7    the seat that you're in at 2:15 when we resume.

8    When you come back in, please take those seats.

9            THE CLERK:  Ladies and gentlemen, please

10   have your questionnaires out and follow the

11   directions of the court officers.

12           Seat number one, Eddie Piazza,

13   P-I-A-Z-Z-A; seat number two, Henry Thom, T-H-O-M;

14   seat number three, Brian Straker, S-T-R-A-K-E-R;

15   seat number four, Lorissa Edom; E-D-O-M; seat number

16   five, Nina Lanci, L-A-N-C-I; seat number six,

17   William Donald, Jr., D-O-N-A-L-D; seat number seven,

18   Matthew Lander, L-A-N-D-E-R; seat number eight,

19   Thomas Mayernik, M-A-Y-E-R-N-I-K; seat number nine,

20   Anthony Macchiarulo, M-A-C-C-H-I-A-R-U-L-O; seat

21   number ten, Nina Ward, W-A-R-D; seat number eleven,

22   Lillian Puleo, P-U-L-E-O.

23           (No response.)

24           THE CLERK:  Seat number eleven, Michael

25   Orena, O-R-E-N-A; seat number twelve, Marla DeJesus,

People v. Heidgen

1    D-E-J-E-S-U-S; seat number thirteen, Albert

2    Giarretto, G-I-A-R-R-E-T-T-O; seat number fourteen,

3    Lindsay Hamme, H-A-M-M-E.

4              THE COURT:  Okay.  Welcome, ladies and

5    gentlemen, and ladies and gentlemen in the back, we

6    are now breaking until 2:15.  For your purposes, we

7    are breaking until 9:30 Monday morning.  Please be

8    prompt, otherwise we can't stay to the schedule I

9    told you about in the beginning.

10             For everybody in the room, all of you,

11   until 2:15, and ladies, until 9:30 Monday morning,

12   between now and then you must not discuss the case

13   among yourselves or with anybody else.  Do not form

14   or express any opinions until the entire case has

15   been completed and the Court has given you the

16   charge as to the law.  You must keep an open mind

17   until all of the evidence is presented and you are

18   charged as to the law.

19             You must not read or listen to any

20   accounts or discussions of this case in the event it

21   is reported by newspapers or other media.  You must

22   not visit or view the premises or place where the

23   offense or offenses charged were allegedly committed

24   or any other premises or place involved in the case.

25             You are not to permit any party to discuss

People v. Heidgen

1    the case with you or attempt to influence you.

2    Promptly report to the Court any incident within

3    your knowledge involving an attempt by any person

4    improperly to influence any member of the jury.

5            Prior to discharge you may not accept any

6    payment or benefit in consideration for supplying

7    any information concerning this trial.

8            I advise you if at any time any

9    participant of the trial should meet you outside the

10   building, you may not speak to or even acknowledge

11   them to avoid any appearance of impropriety.

12           Have a nice lunch.

13           Have a nice weekend.

14           (Whereupon, a luncheon recess was taken.)

15

16   *   *   *   A F T E R N O O N   S E S S I O N   *   *   *

17

18           (Whereupon, the prospective jury panel

19   entered the courtroom.)

20           THE CLERK: . Case on trial, indictment

21   number 1910N-05, People v. Martin Heidgen.

22           People ready?

23           MR. HAYDEN:  Ready, your Honor.

24           THE CLERK:  Defendant ready?

25           MR. LAMAGNA:  Defendant ready, your Honor.

People v. Heidgen

1      THE CLERK:   The defendant is present your

2  Honor.

3      THE COURT:   Thank you.

4      All right.   Standard introductory

5  questions.

6      Any of you know any of us?

7      (No response.)

8      Does anybody know any names on the witness

9  list I read off before?

10     (No response.)

11     Let me get to the issue I discussed with

12  the previous panel.   Many of you probably know

13  something about this case through the last year from

14  newspapers or TV or radio.   Would that be correct?

15     Does anybody, as you sit here now, since

16  you've heard no evidence yet, feel they are, as we

17  sit here, influenced to such an extent that they

18  could not give the defendant a fair trial?

19     You feel you could not, sir?

20     PROSPECTIVE JUROR #1:   No.

21     THE COURT:   All right.   Go back to central

22  jury, please.

23     (Whereupon, the prospective juror was

24  excused.)

25     THE COURT:   The rest of you are satisfied

People v. Heidgen

1    with the frames of mind that you have you are ready

2    to listen to evidence and come to conclusions?

3              All right.  Fill the box, please.

4              THE CLERK:  Seat number one, Nelson

5    Figueroa, F-I-G-U-E-R-O-A.

6              Please have your questionnaires out.

7              THE COURT:  Mr. Figueroa, do you know any

8    of us?

9              PROSPECTIVE JUROR #1:  No.

10             THE COURT:  Do you know anybody on that

11   witness list?

12             PROSPECTIVE JUROR #1:  No.

13             THE COURT:  You may have heard something

14   about this case before you got here.  Do you feel

15   like you're in a position to be fair to this man?

16             PROSPECTIVE JUROR #1:  I don't know if I

17   can be fair.

18             THE COURT:  Go back to Supreme Court, sir.

19             (Whereupon, the prospective juror was

20   excused.)

21             THE CLERK:  Seat number one, Stacey Haber,

22   H-A-B-E-R.

23             THE COURT:  Miss Haber, do you know any of

24   us?

25             PROSPECTIVE JUROR #1:  No.

People v. Heidgen

1      THE COURT:  Do you know anybody on that

2   list?

3      PROSPECTIVE JUROR #1:  No, I don't.

4      THE COURT:  You might have heard something

5   about this case already.  Are you in the right frame

6   of mind to be fair to this man?

7      PROSPECTIVE JUROR #1:  Yes.

8      THE COURT:  Please have a seat.

9      Mr. Hayden, go ahead, please.

10      MR. HAYDEN:  Good afternoon, ladies and

11   gentlemen.  Good afternoon.  I'm Assistant District

12   Attorney Bob Hayden.  I and Miss McCormick represent

13   Kathleen Rice, District Attorney of Nassau County.

14   We're trying this case on behalf of the People of

15   the State of New York.

16      I'm sure each of you has a mental picture

17   of an intoxicated person, a drunk.  Some of you may

18   have a picture of a falling down drunk.  When you

19   picture an intoxicated person, some of you may

20   picture a man so drunk he can't even walk.  Some of

21   you may picture a man so drunk he can't even talk.

22      Would each of you accept that when it

23   comes to driving a car, the standard for

24   intoxication may be different?  Can everyone accept

25   that?

People v. Heidgen

1    Would each of you accept that when it

2    comes to driving a car, the standard for

3    intoxication should be different?  True?

4    Would each of you accept that a falling

5    down drunk might not be able to find his car, much

6    less drive it?

7    Would each of you accept a falling down

8    drunk might not find his keys, much less use them to

9    get into his car behind a steering wheel?

10    Would each of you accept a falling down

11    drunk may not select an ignition key to use to drive

12    that car?

13    That's not what we're talking about here.

14    Can each of you assure us you'll look at the

15    defendant's driving in determining whether he's

16    intoxicated in this case?  Everyone?

17    Would each of you accept that

18    intoxication, social drinking, any kind of drinking

19    is not on trial here?  That's not what this is

20    about.  Can everyone accept that?

21    There's nothing wrong with social

22    drinking.  I'm sure all of us, or most of us, have

23    probably consumed alcohol during the course of life.

24    There's nothing wrong with that.  That has nothing

25    to do with it.  The charges in this case are much

People v. Heidgen

1    different than that.

2         Would each of you accept that drinking

3    affects people differently?  Everyone?

4         Some people are much more visibly affected

5    by alcohol than others.  Could everyone accept that?

6    Some people are much less visibly affected by

7    alcohol than others.  Can everyone accept that?

8         You've learned that the defendant is

9    charged with two counts of murder.  You've learned

10   that the defendant didn't intend to kill anyone.

11   You'll learn that the defendant is not accused of

12   intending to kill anyone.  We're not alleging he

13   intended to kill anyone.

14        You've learned that these murder charges

15   involved depravity, not an intent to kill.  These

16   murder charges involve the use of a motor vehicle, a

17   pick-up truck, not a gun or a knife or a club.

18        Do any of you feel you couldn't convict a

19   man of murder unless he intended to kill?  Anyone

20   feel that way?  It's not an unreasonable reaction.

21   Do any of you feel that way?  Anyone feel you can't

22   convict a man with murder without an intent to kill?

23             Yes, sir?

24             PROSPECTIVE JUROR #13:  I do.

25             MR. HAYDEN:  You feel that way.

People v. Heidgen

1    Does anyone else feel that way?

2    THE COURT:  Sir-- excuse me, Mr. Hayden.

3    Sir, I haven't instructed you yet on what

4    the law is.  Depraved indifference to human life in

5    the State of New York is a frame of mind or a state

6    of mind that could render a person guilty of the

7    charge of murder as it is written in the

8    legislature.  Do you think you could listen to my

9    explanation of the law and go along with what I have

10   to tell you constitutes depraved indifference to

11   human life?

12   PROSPECTIVE JUROR #13:  Yes.

13   THE COURT:  Okay.

14   MR. HAYDEN:  You'd be able to do that even

15   without an intent to kill; is that correct?

16   PROSPECTIVE JUROR #13:  Yes.

17   MR. HAYDEN:  Ma'am, how about you?

18   PROSPECTIVE JUROR #1:  I would have to

19   hear more specification.

20   MR. HAYDEN:  Can all of you assure us

21   you'll listen very carefully when Judge Honorof

22   explains these murder charges?  Everyone?

23   Can each of you assure us you'll listen

24   carefully when Judge Honorof explains the elements

25   of depraved murder?  Everyone?

People v. Heidgen

1      Can each of you assure us you're going to

2  accept the elements of depraved mind murder as Judge

3  Honorof explains them?  Everyone?  Even if they

4  don't include an intent to kill?

5      In the end, do each of you assure us you

6  won't force us to prove intent to kill if the law

7  doesn't require it?  Everyone?

8      Defense counsel talked a lot about the

9  state of mind.  It's a state of mind.  You've got to

10  get into his head.  You've learned that the

11  defendant did not announce his state of mind.  I'm

12  really depraved, that's why I'm doing what I'm

13  doing.

14      Can each of you assure us you're going to

15  concentrate on the evidence in trying to determine

16  the defendant's state of mind in spite of the fact

17  he didn't announce it?  Can everyone do that?

18      Can each of you assure us you're going to

19  consider the observations of the defendant before he

20  went out driving that night?  Everyone?  What he

21  said?  What he did?

22      Can each of you assure us you're going to

23  consider the observations of the defendant while he

24  was driving that night?  Everyone?

25      Can each of you assure us you're going to

People v. Heidgen

1    consider what the defendant had to say about his

2    state of mind after the collision that night?

3    Everyone?

4              And can each of you assure us you're going

5    to consider what he did?  If you happen to see a man

6    walk up to another man holding a gun to the side of

7    his head to his temple and fire a shot, if the man

8    goes down and he leans down and fires two more

9    shots, you say, what did you do, and the man says, I

10   didn't intend to kill him, would any of you accept

11   that having seen what you saw?  Anyone?

12             Can each of you assure us you're going to

13   concentrate and consider what he was doing that

14   night in determining his state of mind?  Everyone?

15             Okay.  Defense counsel talked about this

16   not being CSI.  Everyone accepts this isn't CSI,

17   right?  This is real.  Remember, defense counsel

18   told you this is real.  The People, Miss McCormick

19   and I, want to join with defense counsel and tell

20   you this is very, very, very real.  Make no mistake

21   about it.  And defense counsel told you this affects

22   a human life.  Yeah, it does.  We agree.  It affects

23   that young man's life.  Can everyone accept that?

24             Would each of you also accept this case

25   affects a lot of human lives?  Would you accept

People v. Heidgen

1    that?

2              Would all of you accept the fact this case

3    affects human lives that were lost that night?

4    Would you accept that?

5              Would all of you accept the fact this case

6    affects human lives of people that were badly

7    injured that night?  Everyone?

8              Defense counsel talked about the extent of

9    injuries and said we agree-- both sides agree the

10   injuries are horrific.  The deaths are horrific.

11   They're gruesome.  Everyone concedes that.

12             What I'm going to ask is can you assure me

13   you're going to consider the nature of these

14   injuries in determining whether the conduct that

15   produced these injuries was depraved?  You'll

16   consider the extent of the injury.  Will you all do

17   that?

18             Defense counsel asked the previous group

19   of jurors have you ever gotten lost.  Have you ever

20   driven in a car and have gotten lost.

21             I'll ask you, ma'am, how about you?

22             PROSPECTIVE JUROR #1:  Right.

23             MR. HAYDEN:  Of course.  Everyone?

24             Has any of you ever gotten lost and driven

25   the wrong way on a parkway for more than three miles

People v. Heidgen

1    against oncoming traffic?

2              MR. LAMAGNA:  Objection.

3              MR. HAYDEN:  Anyone?

4              THE COURT:  Sustained.

5              MR. HAYDEN:  You can see that the

6    defendant is a relatively young man who has been

7    accused of a very serious crime.  As has been

8    mentioned before, you may feel sympathy, especially

9    those of you who have 20, 25-year-old sons.  There's

10   nothing wrong with that.  You're going to feel

11   sympathy for the victims in this case, including the

12   seven-year-old child.

13             Would each of you assure us-- would each

14   of you accept that as jurors you're going to be fact

15   finders?  Everyone?

16             Would each of you accept as fact finders

17   sympathy for anyone should have nothing to do with

18   your finding of the facts?  Everybody?

19             Would each of you accept that as fact

20   finders sentencing considerations should have

21   nothing to do with your finding of the facts?

22   Everyone?

23             Would each of you accept as fact finders

24   punishment should have nothing to do with your

25   finding of facts?  Can everyone accept that?

People v. Heidgen

1        Can each of you assure us as fact finders

2   you're going to leave sentencing considerations

3   where they belong, in Judge Honorof's hands?  Can

4   everyone do that?

5        Can each of you assure us as fact finders

6   you're going to leave punishment where it belongs,

7   in Judge Honorof's hands?  Can you all agree and

8   assure us you'll be able to do that and not concern

9   yourselves with that?

10        Over the course of the presentation of

11   evidence in this trial you're going to hear from a

12   number of police officers.  Do any of you have

13   strong feelings about police officers, positive or

14   negative, based upon anything you may have seen or

15   heard or read?  Anybody?

16        Anyone have strong feelings about police

17   officers based on any personal experience?  Anyone?

18        I'm sure most of you have received traffic

19   tickets.  Has anyone received a traffic ticket and

20   felt unfairly about it?

21        How about you, sir?

22        PROSPECTIVE JUROR #6:  No, I deserved it.

23        MR. HAYDEN:  Does anyone feel you were

24   treated with disrespect?  Anybody at all?

25        Anything you heard so far which gives you

People v. Heidgen

1     any concern about your ability to be fair and

2     impartial to both sides?

3                PROSPECTIVE JUROR #1:  No.

4                MR. HAYDEN:  I know you mentioned, ma'am,

5     on your questionnaire that you know someone who has

6     been accused of a crime.

7                PROSPECTIVE JUROR #1:  Yes.

8                MR. HAYDEN:  Tell us just a bit about

9     that.

10               PROSPECTIVE JUROR #1:  I was accused of a

11     crime.

12               MR. HAYDEN:  Is there anything about that

13     experience that may affect you here?

14               PROSPECTIVE JUROR #1:  I was a minor, no,

15     so--

16               MR. HAYDEN:  How do you feel you were

17     treated?

18               PROSPECTIVE JUROR #1:  Very fairly.

19               MR. HAYDEN:  That wouldn't affect you at

20     all?

21               PROSPECTIVE JUROR #1:  No.

22               MR. HAYDEN:  Mr. Thom, I noticed on your

23     questionnaire you have the same thing checked off.

24     You or someone you know has been accused of a crime?

25               PROSPECTIVE JUROR #2:  Yes.

People v. Heidgen

1          MR. HAYDEN:  Could you tell us about that?

2          PROSPECTIVE JUROR #2:  It was me.  I was

3     accused of a crime.

4          MR. HAYDEN:  How do you feel you were

5     treated?

6          PROSPECTIVE JUROR #2:  I thought I was

7     treated fairly.

8          MR. HAYDEN:  Is there anything about that

9     experience that would affect you at all during the

10    course of the presentation of evidence at this

11    trial?

12         PROSPECTIVE JUROR #2:  No.

13         MR. HAYDEN:  Do you feel you can be fair

14    and impartial to both sides?

15         PROSPECTIVE JUROR #2:  Yes.

16         MR. HAYDEN:  Nothing you heard so far

17    gives you any concern?

18         PROSPECTIVE JUROR #2:  No.

19         MR. HAYDEN:  Mr. Straker, you mentioned on

20    your questionnaire you've been the victim of a

21    crime?

22         PROSPECTIVE JUROR #3:  Someone in my

23    family.

24         MR. HAYDEN:  Would you tell us a bit about

25    that?

People v. Heidgen

1        PROSPECTIVE JUROR #3:  Robbed.

2        MR. HAYDEN:  Is there anything about that

3    experience that would affect you here?

4        PROSPECTIVE JUROR #3:  No.

5        MR. HAYDEN:  You mentioned on your

6    questionnaire that you know members of law

7    enforcement?

8        PROSPECTIVE JUROR #3:  Yeah.

9        MR. HAYDEN:  Tell us a bit about the

10   people you know.

11       PROSPECTIVE JUROR #3:  A friend of mine is

12   a court officer.

13       MR. HAYDEN:  A court officer?  Is that in

14   the city or here in Nassau County?

15       PROSPECTIVE JUROR #3:  In the city.

16       MR. HAYDEN:  Do you discuss his work with

17   him?

18       PROSPECTIVE JUROR #3:  Occasionally.

19       MR. HAYDEN:  Anything about those

20   conversations that might affect you here?

21       PROSPECTIVE JUROR #3:  No.

22       MR. HAYDEN:  Anything you've heard so far

23   from anyone give you reason to think you might be

24   less than fair and impartial?

25       PROSPECTIVE JUROR #3:  No.

People v. Heidgen

1          MR. HAYDEN:  Miss Edom, ma'am, I noticed

2     you, too, had indicated on your questionnaire you or

3     someone you know has been accused and convicted of a

4     crime.

5          PROSPECTIVE JUROR #4:  It was a mistake.

6          MR. HAYDEN:  You crossed it out.

7          PROSPECTIVE JUROR #4:  I crossed it out.

8          MR. HAYDEN:  Anything you've heard so far

9     which would lead you to believe you couldn't be fair

10    and impartial, not only to the defendant, but to the

11    People?

12         PROSPECTIVE JUROR #4:  No.

13         MR. HAYDEN:  Miss Lanci-- is that

14    correctly pronounced?

15         PROSPECTIVE JUROR #5:  Yes.

16         MR. HAYDEN:  Anything you've heard, ma'am,

17    that gives you any concern?

18         PROSPECTIVE JUROR #5:  No.

19         MR. HAYDEN:  You can be fair and

20    impartial, not only to the People, but to the

21    defendant?

22         PROSPECTIVE JUROR #5:  Yes.

23         MR. HAYDEN:  Mr. Donald, you indicated on

24    your questionnaire that you or someone you know has

25    been the victim of a crime?

People v. Heidgen

1          PROSPECTIVE JUROR #6:  Yes.

2          MR. HAYDEN:  Tell us about that.

3          PROSPECTIVE JUROR #6:  Somebody stole my

4     car.

5          MR. HAYDEN:  Is there anything about that

6     experience that would affect you one way or another

7     here?

8          PROSPECTIVE JUROR #6:  No, I don't think

9     so.

10          MR. HAYDEN:  Mr. Lander, you indicated on

11     your questionnaire you or someone you know has been

12     accused of a crime; is that right?

13          PROSPECTIVE JUROR #7:  Yes.

14          MR. HAYDEN:  Could you tell us a bit about

15     that?

16          PROSPECTIVE JUROR #7:  It was my mother.

17     She was accused of a hit and run and leaving, and

18     also my car was broken into.

19          MR. HAYDEN:  Is there anything about your

20     mom's experience that would affect you here?

21          PROSPECTIVE JUROR #7:  No.

22          MR. HAYDEN:  Do you feel your mom was

23     treated fairly?

24          PROSPECTIVE JUROR #7:  As far as I know,

25     yes.

People v. Heidgen

1          MR. HAYDEN:  Does she feel she was treated

2     fairly?

3          PROSPECTIVE JUROR #7:  Yes.

4          MR. HAYDEN:  Anything about that

5     experience that would influence you at all in the

6     prosecution of this case?

7          PROSPECTIVE JUROR #7:  No.

8          MR. HAYDEN:  Mr. Mayernik-- correctly

9     pronounced?

10          PROSPECTIVE JUROR #8:  Yes.

11          MR. HAYDEN:  Mr. Mayernik, anything you've

12     heard from anyone, from Mr. LaMagna, from Miss

13     McCormick, from myself or from his Honor, that would

14     lead you to believe you couldn't be fair and

15     impartial?

16          PROSPECTIVE JUROR #8:  No.

17          MR. HAYDEN:  Mr. Macchiarulo?

18          PROSPECTIVE JUROR #9:  Macchiarulo.

19          MR. HAYDEN:  You indicated, sir, that you

20     served on a criminal jury?

21          PROSPECTIVE JUROR #9:  Yes.

22          MR. HAYDEN:  What type of case?

23          PROSPECTIVE JUROR #9:  Robbery.

24          MR. HAYDEN:  Anything about that

25     experience that would influence you in any way here?

People v. Heidgen

1       PROSPECTIVE JUROR #9:  No.

2       MR. HAYDEN:  Any reason why you wouldn't

3   want to serve?

4       PROSPECTIVE JUROR #9:  No.

5       MR. HAYDEN:  Miss Ward?

6       PROSPECTIVE JUROR #10:  Yes.

7       MR. HAYDEN:  Anything you've heard, Miss

8   Ward, that gives you pause about your ability to sit

9   fairly and impartially?

10      PROSPECTIVE JUROR #10:  No.

11      MR. HAYDEN:  Is there any reason why you

12  wouldn't want to sit?

13      PROSPECTIVE JUROR #10:  It's a lengthy

14  trial.  That's about it.

15      MR. HAYDEN:  Can you assure us, with the

16  understanding it could go as long as five weeks,

17  you'd be able to give us your full, undivided

18  attention?

19      PROSPECTIVE JUROR #10:  If I was chosen to

20  serve, yes, I would.

21      MR. HAYDEN:  Mr. Orena?

22      PROSPECTIVE JUROR #11:  Yes.

23      MR. HAYDEN:  Anything you heard that gives

24  you concern about your ability to be fair and

25  impartial, not only to the defense, but to the

People v. Heidgen

 1    prosecution, as well?

 2                PROSPECTIVE JUROR #11:  No.

 3                MR. HAYDEN:  Miss DeJesus, correctly

 4    pronounced, ma'am?

 5                PROSPECTIVE JUROR #12:  Yes.

 6                MR. HAYDEN:  Ma'am, you indicated on your

 7    questionnaire that you know people in law

 8    enforcement?

 9                PROSPECTIVE JUROR #12:  Yes.

10                MR. HAYDEN:  Could you tell us about those

11    people?

12                PROSPECTIVE JUROR #12:  My best friend's

13    husband.

14                MR. HAYDEN:  Where does he work?

15                PROSPECTIVE JUROR #12:  Suffolk County.

16                MR. HAYDEN:  What type of work does he do?

17                PROSPECTIVE JUROR #12:  He is a state

18    trooper.

19                MR. HAYDEN:  Have you discussed his work

20    with him?

21                PROSPECTIVE JUROR #12:  No.

22                MR. HAYDEN:  Anything about your

23    relationship with him that would affect you here?

24                PROSPECTIVE JUROR #12:  No.

25                MR. HAYDEN:  You can treat a police

People v. Heidgen

1    officer like anybody else?

2              PROSPECTIVE JUROR #12:  Yes.

3              MR. HAYDEN:  Mr. Giarretto, correctly

4    pronounced?

5              PROSPECTIVE JUROR #13:  Yes.

6              MR. HAYDEN:  Sir, you indicated you know

7    people in law enforcement?

8              PROSPECTIVE JUROR #13:  Yes.

9              MR. HAYDEN:  Who are they?

10             PROSPECTIVE JUROR #13:  My uncle.  He's a

11   retired New York City cop.

12             MR. HAYDEN:  What type of work did he do

13   for the NYPD?

14             PROSPECTIVE JUROR #13:  I'm not sure.

15             MR. HAYDEN:  Okay.  Ever discuss his work

16   with him?

17             PROSPECTIVE JUROR #13:  No.

18             MR. HAYDEN:  Anything about that

19   relationship that would affect you here?

20             PROSPECTIVE JUROR #13:  No.

21             MR. HAYDEN:  You would treat police

22   officers like anyone else?

23             PROSPECTIVE JUROR #13:  Yes.

24             THE COURT:  Two minutes.

25             MR. HAYDEN:  Yes, your Honor.

People v. Heidgen

1        Anything you've heard so far that would

2    lead you to believe you couldn't be fair and

3    impartial to either side?

4              PROSPECTIVE JUROR #13:  No.

5              MR. HAYDEN:  Miss Hamme, anything that

6    you've heard so far that gives you concern that you

7    couldn't be fair and impartial?

8              PROSPECTIVE JUROR #14:  No.

9              MR. HAYDEN:  Any reason why you wouldn't

10   want to serve?

11             PROSPECTIVE JUROR #14:  I'm getting

12   married in a month.  We'll be out of New York for

13   the majority of next month.

14             MR. HAYDEN:  Okay.  So the time

15   constraints would prevent you from serving?

16             PROSPECTIVE JUROR #14:  Exactly.

17             MR. HAYDEN:  Thank you all for your kind

18   attention.

19             THE COURT:  Mr. LaMagna?

20             MR. LAMAGNA:  Thank you.

21             Good afternoon, ladies and gentlemen.

22   Now, you have had the benefit of listening to the

23   first round and some of the questions and some of

24   the comments that both the district attorney and I

25   have made.  Does anything strike you other than what

People v. Heidgen

1    most people have answered that's unusual, whether

2    it's about the burden of proof or reasonable doubt

3    or any of those basic concepts that the Court

4    ultimately will be giving you?

5             We all accept it's the district attorney

6    that has the burden of proof.  As my client sits

7    here right now, he is presumed innocent.  Isn't that

8    right, Mr. Lander?

9             PROSPECTIVE JUROR #7:  Yes.

10            MR. LAMAGNA:  Miss Haber?

11            PROSPECTIVE JUROR #1:  Yes.

12            MR. LAMAGNA:  So if the judge, as I think

13   he might have asked the last panel, if you were to

14   vote right now, it's not guilty, correct?  We all

15   agree with that?

16            Now, most of us have read something about

17   this case, I think we've all said, most of us.  Now,

18   you understand anything you read in the paper may

19   not be the whole truth.  Would you all agree with

20   that?

21            There could be reasons, Mr. Macchiarulo--

22   did I get that right?

23            PROSPECTIVE JUROR #9:  Close enough.

24            MR. LAMAGNA:  Close.  I have the same

25   problem with my name.

People v. Heidgen

1          Not everything you read in the paper is

2   necessarily accurate.  You can agree with that?

3          PROSPECTIVE JUROR #9:  Of course.

4          MR. LAMAGNA:  Would you agree there may be

5   reasons, maybe to sell newspapers, they may

6   sensationalize a case?  We've all seen that, haven't

7   we?

8          So what's very important, Mr. Straker, is

9   that we need to know, all of us need to know,

10   whether or not it's possible to wipe out everything

11   that you may have heard, may have seen, may have

12   discussed concerning this case, and listen only to

13   the evidence that's presented in this case on that

14   witness stand.  Can you do that?

15          Can everybody do that?

16          It's not easy to wipe something out when

17   you think you know something.  Is that fair to say,

18   Mr. Donald?

19          PROSPECTIVE JUROR #6:  That's correct.

20          MR. LAMAGNA:  Can you do that?

21          PROSPECTIVE JUROR #6:  I'll try my best.

22          MR. LAMAGNA:  Let me ask you this:  Has

23   anybody formed an opinion about, well, based upon

24   what you read or maybe what you have heard in this

25   case, has anybody formed an opinion concerning this

People v. Heidgen

1    case?

2                    PROSPECTIVE JUROR #6:  I don't think so.

3                    MR. LAMAGNA:  This is the time to--

4                    PROSPECTIVE JUROR #6:  I know.  I know.  I

5    know.

6                    MR. LAMAGNA:  So you may have?

7                    PROSPECTIVE JUROR #6:  Yeah.

8                    MR. LAMAGNA:  Is that a yes or--

9                    THE COURT:  Can you form an opinion

10   without hearing what the law is?

11                   PROSPECTIVE JUROR #6:  No.

12                   THE COURT:  I haven't explained the law to

13   anybody.  None of you heard any evidence.

14                   MR. LAMAGNA:  So you'll keep an open mind

15   knowing the Court is going to give you the law of

16   exactly what depraved indifference to human life is?

17                   Now, if the judge were to tell you just by

18   merely a person being intoxicated and causing a

19   terrible accident like that, in and of itself, by

20   itself, does not constitute murder, would you follow

21   that law?

22                   PROSPECTIVE JUROR #6:  I'll wait to hear

23   what the judge says.

24                   MR. LAMAGNA:  But if he says that to you?

25                   PROSPECTIVE JUROR #6:  Yeah.

People v. Heidgen

1      MR. LAMAGNA:  Do we all understand that

2   there's another element to this, it's a depraved

3   indifference to human life, to be held to the same

4   accountability as one who intentionally, in cold

5   blood, killed somebody.  That's what they have to

6   prove, not just that he may have been drinking, not

7   that he may have been responsible for causing a

8   terrific accident, that's one thing.

9      THE COURT:  Excuse me, Mr. LaMagna.  I

10   don't want the lawyers to try to explain the law to

11   you.  They will inadvertently confuse you.  I will

12   give you the smallest of examples about what

13   depraved indifference is just so you can focus on it

14   as the lawyers might discuss it with you.

15      If you were to take a loaded gun and fire

16   it into a darkened theater, you may not

17   intentionally be trying to kill anyone, but the fact

18   that somebody does die, your state of mind at that

19   time when you fired that gun was depraved

20   indifference to human life.  You didn't necessarily

21   intend to kill anyone, but your state of mind at the

22   time renders you liable in the State of New York to

23   answer to the charge of murder.

24      MR. LAMAGNA:  Thanks.

25      Miss Edom?

People v. Heidgen

1           PROSPECTIVE JUROR #4:   Edom.

2           MR. LAMAGNA:   Do you believe that young

3  people may drink more than older people?   Does

4  anybody feel that way?

5           Mr. Donald?

6           PROSPECTIVE JUROR #6:   Yes.

7           MR. LAMAGNA:   Do you feel that way?

8           Would you agree that that's a result of

9  maturity, growing up, life experiences and things

10  like that?

11          Mr. Lander?

12          PROSPECTIVE JUROR #7:   Yeah.

13          MR. LAMAGNA:   Would you agree,

14  Mr. Mayernik, that sometimes young people do foolish

15  and irresponsible things not realizing the

16  consequences of their actions, and that's part of

17  maturity?

18          PROSPECTIVE JUROR #8:   Only minors or--

19          MR. LAMAGNA:   No.   I'm saying--

20          PROSPECTIVE JUROR #8:   Yeah.

21          MR. LAMAGNA:   Can we all accept that

22  concept, Mr. Giarretto, that sometimes young people

23  do foolish and irresponsible things which may cause

24  terrible tragedy, but that happens.   Would you

25  agree?

People v. Heidgen

1      PROSPECTIVE JUROR #13:  I would agree.  I

2  don't think it's just young people.  Older people do

3  also.

4      MR. LAMAGNA:  I agree with you.

5      Now, would you agree, Mr. Orena, that if

6  somebody acts in a terribly foolish or irresponsible

7  way and ultimately causes a tragedy, that doesn't

8  necessarily mean they have a depraved mind, being

9  held to the same standard as somebody who

10  intentionally killed somebody.  Would you agree with

11  that?

12      PROSPECTIVE JUROR #11:  Yes.

13      MR. LAMAGNA:  Mrs. DeJesus?

14      PROSPECTIVE JUROR #12:  Yes.

15      MR. LAMAGNA:  Would you agree with that?

16      PROSPECTIVE JUROR #12:  Yes.

17      MR. LAMAGNA:  Mrs. Ward, would you agree

18  with that?

19      PROSPECTIVE JUROR #10:  Yes.

20      MR. LAMAGNA:  Does anybody disagree with

21  that?

22      You will wait to hear actual evidence,

23  Mrs. Lanci, of whether this was a terrible tragedy

24  as a result-- we know what resulted.  The issue is

25  is it murder.  That's what we're going to be talking

People v. Heidgen

1      about, and I had asked the last panel if the judge

2      gives you the opportunity to consider lesser

3      charges, would you consider those if the judge gives

4      them to you?

5              PROSPECTIVE JUROR #5:  Yes.

6              MR. LAMAGNA:  Will we all consider those

7      if the judge gives them to you?

8              Now, Mr. Straker, you would agree, would

9      you not, that simply because somebody may be charged

10     with something, they can be overcharged, too?  Do we

11     all agree with that, too?

12             And somebody, Mr. Thom, could be charged

13     with something and be not guilty of that charge but

14     maybe they are guilty of something lesser.  Would

15     you agree with that?

16             PROSPECTIVE JUROR #2:  Yes.

17             MR. LAMAGNA:  Would we all agree with

18     that?

19             Now, accidents can occur for many reasons.

20             Miss Haber, would you agree?

21             PROSPECTIVE JUROR #1:  Yes.

22             MR. LAMAGNA:  It may be one reason, it

23     could be a confluence of many reasons.

24             PROSPECTIVE JUROR #1:  Yes.

25             MR. LAMAGNA:  Would you promise in judging

People v. Heidgen

1    this case, Mr. Orena, that you will consider the

2    road conditions, how much traffic was on the road,

3    whether the roadway was safely designated with

4    proper signage?

5              PROSPECTIVE JUROR #11:  Yes.

6              MR. LAMAGNA:  Would you promise that you

7    will look, Mr. Thom, to whether or not, in causing

8    the accident, that Mr. Heidgen attempted to try to

9    correct but it was just too late?  Would that be

10   something you would consider?

11             PROSPECTIVE JUROR #2:  I don't know.

12             MR. LAMAGNA:  You would not consider that?

13             PROSPECTIVE JUROR #2:  I don't know.

14             MR. LAMAGNA:  Does anybody feel they

15   wouldn't consider what he was doing while he was

16   driving, like Mr. Thom?

17             PROSPECTIVE JUROR #2:  Can you repeat the

18   question?

19             MR. LAMAGNA:  Would you consider the

20   manner in which he was driving to determine whether

21   he was depraved, if he was trying to self-correct,

22   to get safe, but it was just too late?

23             PROSPECTIVE JUROR #2:  I don't know.

24             MR. LAMAGNA:  Would anybody consider that?

25   Does anybody feel that's something that's not

People v. Heidgen

1  appropriate?

2            PROSPECTIVE JUROR #6:  Yes.

3            MR. LAMAGNA:  Of course you would consider

4  that to determine was he trying to avoid this.  That

5  would, would it not, negate whether or not he was

6  depraved at the time.

7            Mr. Mayernik?

8            PROSPECTIVE JUROR #8:  Mayernik.

9            MR. LAMAGNA:  Now, we know, Mr. Mayernik,

10  what happened here, but simply knowing the result of

11  what happened doesn't necessarily help us about how

12  it happened, why it happened and under what

13  circumstances, correct?

14            PROSPECTIVE JUROR #8:  Right.

15            MR. LAMAGNA:  Some people, we would agree,

16  would we not, Miss Lanci, are bad, evil people, and

17  they do bad and evil things.  Wouldn't you agree

18  with that?

19            PROSPECTIVE JUROR #5:  Yes.

20            MR. LAMAGNA:  Some people, would you

21  agree, Mr. Lander, are good people that may do a bad

22  thing?

23            PROSPECTIVE JUROR #7:  Yeah.

24            MR. LAMAGNA:  It's going to be your

25  determination to say although something tragic

People v. Heidgen

1    happened, it was a tragedy, it may very well be a

2    liability for but not murder.  Would you all

3    consider that?

4              For example, you drive on the road-- just

5    as an example, somebody drives.  Let's say they're

6    lost or they're not paying attention.  A squirrel

7    comes across the street.  We've all seen that.  He

8    hits the squirrel.  That person caused a tragedy.  I

9    mean, people love animals, but he wasn't depraved

10   from other people, even if he was drunk.  Other

11   people could be driving who are not even drunk at

12   all and sees a squirrel and speeds up trying to see

13   it run, and he ends up killing it because he didn't

14   care whether it died or it didn't die, he was just

15   trying to see it scurry.  See the difference between

16   those two people?  Do we all see that?

17             That's what you're going to be

18   determining, not just simply whether there was

19   alcohol involved, whether there was drinking

20   involved.  We all agree people do irresponsible

21   things, that's not murder.  What was in his mind?

22   Was he evincing that evil wickedness?

23             Now, you're going to base your decision,

24   are you not, Miss Hamme--

25             PROSPECTIVE JUROR #14:  Hamme.

People v. Heidgen

1        MR. LAMAGNA:  --based upon the quality of

2   evidence produced by the District Attorney's Office,

3   right?

4        PROSPECTIVE JUROR #14:  Um-hum.

5        MR. LAMAGNA:  Not the quantity of it.  Did

6   you ever hear it's quality, not quantity?

7        PROSPECTIVE JUROR #14:  Yes.

8        MR. LAMAGNA:  Now, if, for example, there

9   are inconsistencies with which an important witness

10  is testifying, we have to judge credibility.  Would

11  that be something you would consider in judging a

12  person's credibility?

13       PROSPECTIVE JUROR #14:  Yes.

14       MR. LAMAGNA:  Sir?

15       PROSPECTIVE JUROR #6:  (Indicating.)

16       MR. LAMAGNA:  For example, if somebody

17  gets hired as an expert to give their opinion for

18  one side or the other, and let's say he makes an

19  opinion and it doesn't fit their theory and all of a

20  sudden he changes it.  Would that be something you

21  would consider in judging the credibility of that

22  so-called expert?

23       PROSPECTIVE JUROR #6:  Of course.

24       MR. LAMAGNA:  Because people have motives,

25  whether it's for a particular party that's paying

People v. Heidgen

1      them.  Would you agree, Mr. Lander?

2                PROSPECTIVE JUROR #7:  Yes.

3                MR. LAMAGNA:  Would you determine this

4      expert is nothing more than a hired gun to testify

5      in any way that suits his employer?

6                PROSPECTIVE JUROR #7:  Um-hum.

7                MR. LAMAGNA:  Certainly, would we all

8      agree to do that?

9                Now, Mr. Straker, if mistakes are made,

10     critical mistakes, and then all of a sudden they're

11     fixed, paperwork is changed, would that be something

12     you would be a little suspicious of in judging the

13     credibility of a witness like that?

14               PROSPECTIVE JUROR #3:  Yes.

15               MR. LAMAGNA:  Especially in a case like

16     this?

17               PROSPECTIVE JUROR #3:  Yeah.

18               MR. LAMAGNA:  Where a person is charged

19     with murder?

20               PROSPECTIVE JUROR #3:  Um-hum.

21               MR. LAMAGNA:  This isn't going to be about

22     excuses or mistakes.  We want quality evidence,

23     don't we?  We want to be sure before we make a

24     decision concerning this man's life, don't we?

25               Mr. Straker?

People v. Heidgen

1    PROSPECTIVE JUROR #3:  Yes.

2         MR. LAMAGNA:  Now, we wouldn't be human if

3    we didn't feel pain, even anger, for what happened

4    in a terrible tragedy like this.  The problem is,

5    though, we have to be able to get beyond that, to

6    look at the facts.

7         Does anybody feel that simply because this

8    tragedy occurred, you know what, I've heard it all,

9    I can't think.  I can't do this.  Does anybody feel

10   like that?

11        (No response.)

12        I take the silence as a no?  You'll all be

13   able to do that?

14        Just remember, I was talking about that

15   filter of emotion.  This person is here on trial for

16   murder.  If you're a juror, if you're picked as a

17   juror, you're going to have to make that sober-- to

18   use that word-- decision about whether or not they

19   have proved their case beyond a reasonable doubt.

20        Mr. Donald, now let's say there's five

21   elements and they only proved four.  How would you

22   vote?

23        PROSPECTIVE JUROR #6:  If--

24        MR. LAMAGNA:  I'm sorry.  Did I catch you?

25   If I said they had to prove five elements to prove

People v. Heidgen

1    murder and they only proved four, how do you vote?

2                PROSPECTIVE JUROR #6:  Not guilty for

3    that.

4                MR. LAMAGNA:  Is there any hesitation by

5    anybody, sir, that if they don't prove all of the

6    elements of murder, that's a not guilty?

7                PROSPECTIVE JUROR #9:  According to what

8    you say.

9                MR. LAMAGNA:  If the judge tells you you

10   have to prove A, B, C and D and they only prove A,

11   B, and C, they don't prove D, how do you vote?

12               PROSPECTIVE JUROR #9:  Not guilty.

13               MR. LAMAGNA:  Even if they proved A, B and

14   C, then there's no doubt-- you have a doubt on D,

15   how do you vote?

16               PROSPECTIVE JUROR #9:  Beyond a reasonable

17   doubt.

18               MR. LAMAGNA:  Then it would be not guilty,

19   right?

20               PROSPECTIVE JUROR #9:  Correct.

21               MR. LAMAGNA:  Does everybody agree with

22   that?

23               Mr. Giarretto?

24               PROSPECTIVE JUROR #13:  Yes.

25               THE COURT:  Two minutes, Mr. LaMagna.

People v. Heidgen

1      MR. LAMAGNA:  Thank you, your Honor.

2          Now, alcohol affects everybody.  Would we

3  agree, Mr. Giarretto, that alcohol could also

4  diminish your response time to something?

5          PROSPECTIVE JUROR #13:  Yes.

6          MR. LAMAGNA:  That your perception may be

7  dulled, that you don't react fast enough as you

8  would, Mr. Orena, had you not been drinking?

9          PROSPECTIVE JUROR #11:  Yes.

10         MR. LAMAGNA:  The judge will tell you what

11  depraved indifference means.  So simply because a

12  tragedy occurred, if they don't prove a depraved-- a

13  state of mind of depravity, and the judge gives you

14  the opportunity for a lesser offense, would you

15  consider that?

16         PROSPECTIVE JUROR #11:  Yes.

17         MR. LAMAGNA:  I'm going to ask everybody

18  what I asked the last panel.  Given the gravity of

19  this charge against this young man, if you were

20  sitting where he is, would you want yourself to be a

21  juror on this case?

22         PROSPECTIVE JUROR #6:  I think so.

23         PROSPECTIVE JUROR #5:  Yes.

24         PROSPECTIVE JUROR #4:  Yes.

25         MR. LAMAGNA:  No hesitation?  This is the

People v. Heidgen

1    time to respond.  If you can't, that's okay.

2                   Is that how you feel?

3                   PROSPECTIVE JUROR #4:  Yes.

4                   MR. LAMAGNA:  You can do this?

5                   PROSPECTIVE JUROR #4:  Yes.

6                   MR. LAMAGNA:  Sir?

7                   PROSPECTIVE JUROR #3:  Yeah.

8                   PROSPECTIVE JUROR #2:  Yeah.

9                   PROSPECTIVE JUROR #1:  Yes.

10                  PROSPECTIVE JUROR #7:  Yes.

11                  PROSPECTIVE JUROR #8:  Yes.

12                  MR. LAMAGNA:  Could I ask you, you're

13   involved with the Bellmore School District?

14                  PROSPECTIVE JUROR #5:  Bellmore Central

15   High School.

16                  MR. LAMAGNA:  Do you know Michelle

17   LaMagna?

18                  PROSPECTIVE JUROR #5:  The central high

19   school has over 600 employees.

20                  MR. LAMAGNA:  I'm just trying to make sure

21   that you don't know me.

22                  THE COURT:  That's time, Mr. LaMagna.

23                  MR. LAMAGNA:  Thank you, your Honor.

24                  THE COURT:  At this time I'm going to give

25   everybody in the courtroom a five or ten-minute

People v. Heidgen

1    break.

2                    You're going to want to talk about the

3    case.  Please don't talk about the case.  It would

4    not be fair.  You have to be fair.  Don't talk about

5    the case.

6                    See you in five or ten minutes.

7                    (Whereupon, the jury panel exited the

8    courtroom.)

9                    (Whereupon, a brief recess was taken.)

10                   THE CLERK:  People, challenges for cause,

11   seats one through ten?

12                   MR. HAYDEN:  None for cause, your Honor.

13                   THE CLERK:  Defense, challenges for cause,

14   one through ten?

15                   MR. LAMAGNA:  Judge, six, Mr. Donald.

16                   THE COURT:  Denied.

17                   THE CLERK:  Anything further?

18                   MR. LAMAGNA:  That's it one through ten.

19                   THE CLERK:  Thank you.

20                   People, peremptory challenges, one through

21   ten?

22                   MR. HAYDEN:  Number one, number seven and

23   number ten, your Honor.

24                   THE CLERK:  Defense counsel, peremptory

25   challenges, seats one through ten?

People v. Heidgen

1    MR. LAMAGNA:  Number three, number four,

2    number five and number eight.

3    THE CLERK:  Juror number three will be

4    Mr. Thom, juror number four will be Mr. Donald,

5    juror number five will be Mr. Macchiarulo.

6    Seats eleven through fourteen, People,

7    challenges for cause?

8    MR. LAMAGNA:  Your Honor.  I'm sorry.  I'm

9    sorry.

10   THE COURT:  Hold on.

11   MR. LAMAGNA:  I had on my sheet for cause.

12   I had forgotten that you had denied the cause for

13   number six.

14   THE COURT:  Okay.  You would like to use a

15   peremptory challenge; is that correct?

16   MR. LAMAGNA:  Yes.

17   THE COURT:  So that makes juror number

18   nine juror number four.

19   THE CLERK:  That's Anthony Macchiarulo.

20   People, we're addressing seats eleven

21   through fourteen at this time.  Challenges for

22   cause?

23   MR. HAYDEN:  Miss Hamme, your Honor.

24   THE COURT:  Pardon?

25   MR. HAYDEN:  Miss Hamme?

People v. Heidgen

1          THE COURT:  Granted.

2          THE CLERK:  Any further applications for

3     cause, eleven through fourteen?

4          MR. HAYDEN:  No, your Honor.

5          THE CLERK:  Defense, challenges for cause,

6     seats eleven through fourteen?

7          MR. LAMAGNA:  No, thank you.

8          THE CLERK:  People, peremptory challenges,

9     seats eleven through fourteen?

10          MR. HAYDEN:  Eleven and thirteen, your

11     Honor.

12          THE CLERK:  Defense counsel, peremptory

13     challenges, seat number twelve?

14          MR. LAMAGNA:  Seat number twelve.

15          THE COURT:  Okay.  We've got two.  Round

16     three in two minutes.

17          (Whereupon, a brief recess was taken.)

18          (Whereupon, the prospective jury panel

19     entered the courtroom.)

20          THE CLERK:  Case on trial, indictment

21     number 1910N-05, People v. Martin Heidgen.

22          People ready?

23          MR. HAYDEN:  People ready, your Honor.

24          THE CLERK:  Defendant ready?

25          MR. LAMAGNA:  Defendant ready, your Honor.

People v. Heidgen

1        THE CLERK:  The defendant is present, your

2    Honor.

3        THE COURT:  Would you take over, please,

4    Jean?

5        THE CLERK:  The two names I call out,

6    please remain seated:  Henry Thom and Anthony

7    Macchiarulo, remain seated in the box.

8        Everyone else in the box, you're excused

9    with the thanks of the Court.  Please follow the

10   directions of the officers.

11       (Whereupon, the unselected prospective

12   jurors exit the courtroom.)

13       (Whereupon, the jurors were duly sworn.)

14       THE COURT:  As you know, it's my hope to

15   be able to start this trial in terms of opening

16   statements and testimony on Monday morning.

17   Sometimes I'm wrong, but I need you to be here

18   Monday morning at 9:30, no later.  Please bring a

19   book that morning to read.  You're way ahead of me.

20   You already know the admonitions. I gave to you right

21   before lunch.  Please observe them.

22       Have a nice weekend.  We'll see you

23   Monday.  Thank you.

24       (Whereupon, the jurors exit the

25   courtroom.)

People v. Heidgen

1          THE CLERK:  Ladies and gentlemen, have

2     your questionnaires out and available and follow the

3     instructions of the officers, please.

4          Seat number one, Mary Bastien,

5     B-A-S-T-I-E-N.

6          (No response.)

7          Seat number one, Diana Rodriguez,

8     R-O-D-R-I-G-U-E-Z; seat number two, Tiranda Griffin,

9     G-R-I-F-F-I-N; seat number three, Enandanie,

10    E-N-A-N-D-A-N-I-E, last name Bherwani,

11    B-H-E-R-W-A-N-I; seat number four, Russell Zucker,

12    Z-U-C-K-E-R; seat number five, Robert Pike, P-I-K-E;

13    seat number six, Lisa Cartegena, C-A-R-T-E-G-E-N-A;

14    seat number seven, Nicole Memnon, M-E-M-N-O-N; seat

15    number eight, Patrick Clark, C-L-A-R-K; seat number

16    nine, Michael Colantonio, C-O-L-A-N-T-O-N-I-O; seat

17    number ten, Craig Cavaco, C-A-V-A-C-O; seat number

18    eleven, Ronald Ricardo.

19         (No response.)

20         Seat number eleven, Kenneth Kim, K-I-M;

21    seat number twelve, Calvin Chung.

22         (No response.)

23         Seat number twelve, Patrick Nielsen,

24    N-I-E-L-S-E-N; seat number thirteen, Sylvia

25    Goldkranz, G-O-L-D-K-R-A-N-Z; seat number fourteen,

People v. Heidgen

1      Elvis Dacosta, D-A-C-O-S-T-A.

2              THE COURT:  Welcome.  Just to make sure we

3      have a full pack, do any of you know any of us?

4              (No response.)

5              Did any of you recognize any of the names

6      I read on the witness list?

7              Ma'am?

8              PROSPECTIVE JUROR #7:  I know the family,

9      the Flynn family.

10             THE COURT:  Go back to central jury,

11     ma'am.

12             (Whereupon, the prospective juror was

13     excused.)

14             THE CLERK:  Seat number seven, Joseph

15     Carola, C-A-R-O-L-A.

16             THE COURT:  Mr. Carola, before you go up

17     there, do you know any of us?

18             PROSPECTIVE JUROR #7:  No, sir.

19             I am an attorney.  I did have a deposition

20     with Mr. Flynn three or four years ago.

21             THE COURT:  Go back to central jury, sir.

22             THE CLERK:  Seat number seven, Laura

23     Montaniao, M-O-N-T-A-N-I-A-O.

24             THE COURT:  Go back and get your

25     questionnaire.  We'll call someone else.

People v. Heidgen

1          THE CLERK:  Seat number seven, Thomas

2     Augustine, A-U-G-U-S-T-I-N-E.

3          THE COURT:  Mr. Augustine, do you know any

4     of us?

5          PROSPECTIVE JUROR #7:  No.

6          THE COURT:  Do you know anybody on the

7     witness list?

8          PROSPECTIVE JUROR #7:  No.

9          THE COURT:  Have a seat.

10          Let's get back to the issue of how much

11     about this case did any of you know before you got

12     here?  Is it fair to say that many of you knew

13     something of this case before you got here for jury

14     selection?  Yes?  Fair to say?  Raise your hands if

15     you knew something about the case.

16          Despite whatever you may have heard of the

17     case or about the case, as jurors you have heard no

18     evidence at all.  Do any of you feel as you sit here

19     now that because of whatever it is you know or

20.     thought you knew about this case that you're not

21     inclined to sit fairly at the present time?

22          All of you can be fair as you sit here,

23     despite anything you might have heard of the case?

24          Great.

25          Miss McCormick?

People v. Heidgen

1           MS. MCCORMICK:  Thank you.

2           Good afternoon.  Good afternoon.  I can't

3      decide whether you're at an advantage or

4      disadvantage having sat through everything else

5      that's gone on before.  I guess you know what's

6      coming.  We'll start with that.

7           Let me ask first, who here drives a car?

8      Everyone almost?

9           Not you?

10          PROSPECTIVE JUROR #2:  Yes.

11          MS. MCCORMICK:  Do you drive a car?

12          PROSPECTIVE JUROR #1:  No.

13          MS. MCCORMICK:  Have you ever driven a

14     car?

15          PROSPECTIVE JUROR #1:  No.

16          MS. MCCORMICK:  You live in Nassau County?

17          PROSPECTIVE JUROR #1:  I take the train.

18          MS. MCCORMICK:  Okay.  Has anyone been

19     involved in a traffic crash of any sort?  Show of

20     hands?

21          Did any of those traffic crashes result in

22     serious injury or criminal charges being brought?

23          You had your hand up momentarily, sir?

24          PROSPECTIVE JUROR #5:  No.

25          MS. MCCORMICK:  Lawsuits.  Anybody

People v. Heidgen

1   involved in a lawsuit as a result of a traffic

2   crash?

3                    (No response.)

4                    No?  Okay.

5                    Then let me go onto the next question.

6   And I apologize if it seems intrusive in your lives,

7   but do you know of anyone or have you, yourselves,

8   ever been accused of driving while intoxicated?  I'm

9   going to go down the line.  I didn't spend too much

10  time on this before.

11                   Can you tell us a little bit about that?

12                   PROSPECTIVE JUROR #1:  Yes.  A friend of

13  mine was arrested for driving while impaired and he

14  pled guilty.

15                   MS. MCCORMICK:  Was there anything about

16  that or was your friend unfairly treated by the

17  police or anybody--

18                   PROSPECTIVE JUROR #1:  No.

19                   MS. MCCORMICK:  --in any way, shape or

20  form that would affect your ability to be a fair

21  juror in this case?

22                   PROSPECTIVE JUROR #1:  No.

23                   MS. MCCORMICK:  Nothing from you?

24                   PROSPECTIVE JUROR #3:  No.

25                   PROSPECTIVE JUROR #4:  No.

People v. Heidgen

1      MS. MCCORMICK:  Sir, do you know anyone?

2      PROSPECTIVE JUROR #5:  No.

3      Miss Cartegena?

4      PROSPECTIVE JUROR #6:  No.

5      PROSPECTIVE JUROR #7:  Yes, several of my

6      friends.  One in particular was a roommate.  He was

7      in a drunk driving accident.

8      MS. MCCORMICK:  Was anybody seriously

9      injured?

10     PROSPECTIVE JUROR #7:  He was injured.

11     MS. MCCORMICK:  He was accused of driving

12     drunk?

13     PROSPECTIVE JUROR #7:  Um-hum.

14     MS. MCCORMICK:  Okay.  When you say

15     several of your friends--

16     PROSPECTIVE JUROR #7:  Two others, but not

17     as close as he was.  They were just accused.

18     MS. MCCORMICK:  They're still pending?

19     PROSPECTIVE JUROR #7:  They're still

20     pending.

21     MS. MCCORMICK:  Are they pending here in

22     Nassau County?

23     PROSPECTIVE JUROR #7:  One.  I'm not sure

24     if one is in Suffolk.

25     MS. MCCORMICK:  Is there anything about

People v. Heidgen

1    that, your friends having been accused, is there

2    anything about that, your one friend had a crash,

3    that would impact on your ability to sit as a fair

4    juror in this case?

5              PROSPECTIVE JUROR #7:  No.

6              MS. MCCORMICK:  What about the issue

7    itself of driving while intoxicated and the driving

8    while intoxicated laws?  Do you have a gut reaction

9    of them being fair or unfair or anything like that?

10             PROSPECTIVE JUROR #7:  No, it's fair.  I

11   can be fair.

12             MS. MCCORMICK:  So the fact your friends

13   have been accused is not bothersome to you in

14   sitting in this case?

15             PROSPECTIVE JUROR #7:  No.

16             MS. MCCORMICK:  Okay.  I have to check the

17   time.

18             Do you know anybody, Mr. Clark?

19             PROSPECTIVE JUROR #8:  No.

20             MS. MCCORMICK:  Mr. Cavaco?

21             PROSPECTIVE JUROR #10:  I was convicted

22   eight years ago.

23             MS. MCCORMICK:  I appreciate your honesty,

24   sir.

25             Was that the only time you have ever been

People v. Heidgen

1   accused?

2                 PROSPECTIVE JUROR #10:  Yes.

3                 MS. MCCORMICK:  When you say you were

4   "convicted," did you take the case to trial?

5                 PROSPECTIVE JUROR #10:  No.

6                 MS. MCCORMICK:  You pled guilty?

7                 PROSPECTIVE JUROR #10:  I pled guilty.

8                 MS. MCCORMICK:  Is there anything about

9   that in your life which would prevent you from being

10  a fair juror in this case?

11                PROSPECTIVE JUROR #10:  No.

12                MS. MCCORMICK:  You believe-- you didn't

13  feel you were unfairly treated?

14                PROSPECTIVE JUROR #10:  I was not unfairly

15  treated.

16                MS. MCCORMICK:  Okay.  Is there anything

17  else that we should know about that would prevent

18  you from being a fair juror?  That's all.  I'm not

19  trying to pry about anything in your life.  Is there

20  anything about that that bothers you?  Since the

21  accusation is depraved indifference, certainly it's

22  not all about driving while intoxicated, but is

23  there anything about it that troubles you?

24                PROSPECTIVE JUROR #10:  No.

25                MS. MCCORMICK:  Okay, sir.

People v. Heidgen

1         Mr. Kim, do you know of anyone?

2         PROSPECTIVE JUROR #11:  A good friend of

3   mine died in an accident in Queens.

4         MS. MCCORMICK:  He suffered serious

5   injuries?

6         PROSPECTIVE JUROR #11:  His passenger

7   suffered serious injuries.

8         MS. MCCORMICK:  Was your friend the person

9   accused of driving drunk?

10        PROSPECTIVE JUROR #11:  Yes.

11        MS. MCCORMICK:  Were there charges that

12  stemmed from that?

13        PROSPECTIVE JUROR #11:  He hit into a

14  tree, so, yeah.  Not criminal, but he was

15  prosecuted.

16        MS. MCCORMICK:  He was prosecuted for DWI?

17        PROSPECTIVE JUROR #11:  Yes.

18        MS. MCCORMICK:  And with respect to your

19  friend, was there anything about that incident, the

20  way he was treated, the fact he was charged, that

21  hits too close to home for you to be on this

22  particular jury?

23        PROSPECTIVE JUROR #11:  No.

24        MS. MCCORMICK:  What about the fact he got

25  into a crash and this is about a DWI crash, at least

People v. Heidgen

1    on some level?  Does that bother you at all as a

2    juror?

3                PROSPECTIVE JUROR #11:  No.

4                MS. MCCORMICK:  You can be fair and

5    impartial?

6                PROSPECTIVE JUROR #11:  Yes.

7                MS. MCCORMICK:  How about you,

8    Mr. Nielsen?  Do you know anybody?

9                PROSPECTIVE JUROR #12:  No.

10               MS. MCCORMICK:  Ms. Goldkranz?

11               PROSPECTIVE JUROR #13:  No.

12               MS. MCCORMICK:  Mr. Dacosta?

13               PROSPECTIVE JUROR #14:  No.

14               MS. MCCORMICK:  Okay.  Thank you very much

15   for your honesty.  I appreciate that very much.

16               You all heard the earlier discussions

17   about following the law, my dad and the seat belt

18   thing?  I did that loud enough so you could all hear

19   that.

20               If you are going to sit as a juror on this

21   case, you're going to have to be able to swear to

22   follow the law as the judge gives it to you,

23   regardless of how you feel about it, even if after

24   you've been listening to it you say to yourself

25   that's crazy.  I don't have to be worried about

People v. Heidgen

1    that?  You can be like my dad?  Even though he

2    thinks the seat belt laws are intrusive, in his

3    words, if he was a sworn juror on a seat belt case,

4    he would swear to follow that law even though he

5    disagreed with it.

6              Are you able to do that, Miss Rodriguez?

7    Can you follow what the judge tells you and put your

8    own feelings aside?

9              Please think about this.  I'm going to ask

10   you all.  It's very important.

11             PROSPECTIVE JUROR #1:  Yes.

12             MS. MCCORMICK:  Miss Griffin?

13             PROSPECTIVE JUROR #2:  Yes.

14             MS. MCCORMICK:  You can do that, Miss

15   Bherwani?

16             PROSPECTIVE JUROR #3:  Yes.

17             MS. MCCORMICK:  Mr. Zucker?

18             PROSPECTIVE JUROR #4:  Yes.

19             MS. MCCORMICK:  Mr. Pike?

20             PROSPECTIVE JUROR #5:  Yes.

21             MS. MCCORMICK:  Miss Cartegena?

22             PROSPECTIVE JUROR #6:  Yes.

23             MS. MCCORMICK:  Mr. Augustine?

24             PROSPECTIVE JUROR #7:  Yes.

25             MS. MCCORMICK:  Mr. Clark?

People v. Heidgen

1          PROSPECTIVE JUROR #8:   Yes.

2          MS. MCCORMICK:   Mr. Colantonio?

3          PROSPECTIVE JUROR #9:   Yes.

4          MS. MCCORMICK:   If I mispronounce your

5      name, I apologize.

6          Mr. Cavaco?

7          PROSPECTIVE JUROR #10:   Yes.

8          MS. MCCORMICK:   Mr. Kim?

9          PROSPECTIVE JUROR #11:   Yes.

10          MS. MCCORMICK:   Mr. Nielsen?

11          PROSPECTIVE JUROR #12:   Yes.

12          MS. MCCORMICK:   Miss Goldkranz?

13          PROSPECTIVE JUROR #13:   Yes.

14          MS. MCCORMICK:   Mr. Dacosta?

15          You can all follow the judge's

16      instructions?

17          Going along those lines, you just heard

18      the defense attorney get up and in rather animated

19      terms keep saying this is depraved murder,

20      tantamount to cold-blooded murder.   Do you

21      understand that the instructions on a depraved mind

22      are going to come from the judge, and there's

23      nothing in those instructions about it being

24      cold-blooded murder.   It's not about an intentional

25      murder.

People v. Heidgen

1    Do we all agree that you're going to

2    listen to the judge for your instructions?  Do we

3    agree on the fact this is not about an intentional

4    murder?

5            You heard earlier that no one is going to

6    say that the defendant, Martin Heidgen,

7    intentionally got in a car that night with the idea,

8    with the intent, to go out and kill people.  That

9    fact-- and because this charge is called murder,

10   he's going to define it for you.  You're going to

11   apply the facts to his definition.

12           But are you able, do you think, to follow

13   the law and convict somebody of murder when it

14   wasn't their intent to kill somebody?  That's not

15   part of what we have to prove.  Do you think you can

16   do that, if we meet our burden of proof?

17           PROSPECTIVE JUROR #1:  Yes.

18           MS. MCCORMICK:  The burden of proof, of

19   course, is that we have to show that he had a

20   depraved mind, that he just didn't care about what

21   was going to happen to himself or anybody else that

22   night.  Can you find somebody guilty of murder if we

23   meet that burden of proof?  Can you do it?

24           PROSPECTIVE JUROR #2:  Yes.

25           MS. MCCORMICK:  Miss Bherwani?

People v. Heidgen

1          PROSPECTIVE JUROR #3:  Yes.

2          MS. MCCORMICK:  Mr. Zucker?

3          PROSPECTIVE JUROR #4:  Yes.

4          MS. MCCORMICK:  How about-- I'm going to

5   ask you all, is there anybody who is troubled that

6   the charge itself doesn't involve the defendant

7   intending to kill somebody but it's called murder?

8   Is there any gut reaction, any-- even a subliminal

9   or subconscious reaction to that?  Anybody?

10         Mr. LaMagna was just talking about how--

11   he asked the jury whether in their experience young

12   people maybe drink more than older people, and there

13   were some smiles, maybe a little laughter.  Of

14   course in human experience would it be fair to say

15   that all people drink according to their own social

16   wants, needs, or don't drink at all?

17         Is there anybody in the jury box who does

18   not-- has not consumed alcohol?  Is there anybody

19   who doesn't drink at all for any reason?  Nobody?

20         So like everybody else, then, do you

21   understand that alcohol is not on trial in this

22   case, that you're allowed to drink alcohol?  Do you

23   understand that you're allowed to get absolutely

24   obliterated as long as you don't drive a car?  Do

25   you understand that?

People v. Heidgen

1      PROSPECTIVE JUROR #5:  Yes.

2          MS. MCCORMICK:  Is there anybody who

3      thinks there's a dispersion cast on drinking at all

4      because of the facts of this case?

5          What do you think?

6          PROSPECTIVE JUROR #1:  Um-hum.

7          MS. MCCORMICK:  You think it looks badly--

8      people who drink are looked upon worse than people

9      who don't drink or do you think it's about driving a

10     car?

11         PROSPECTIVE JUROR #1:  I think it's about

12     driving a car.

13         MS. MCCORMICK:  What about you, sir, and

14     your friends?  Is there a distinction in your mind

15     about drinking or it's just driving a car after

16     you've been drinking is the problem?

17         PROSPECTIVE JUROR #7:  Yes.

18         MS. MCCORMICK:  Okay.  Mr. LaMagna also

19     talked in his last round of jury selection about

20     things you should consider, things that the jury

21     should consider in determining the state of mind of

22     the defendant.  You know, there are some things I'm

23     going to ask you whether or not you will take into

24     account.

25         You know, this is not a case about

People v. Heidgen

1    squirrels.  I understand he was trying to make an

2    analogy about squirrels and crossing the road and

3    aiming for squirrels and not aiming for squirrels,

4    but do you think there's something in between the

5    aiming for the squirrel and the not seeing the

6    squirrel and the not caring whether there's anything

7    in the way?

8              Would you all agree to consider, when you

9    listen to the judge's charge, when you're thinking

10   about state of mind, you'll think about the actions?

11   From the evidence that you're going to hear, you'll

12   consider whether the defendant's state of mind was

13   one of not caring?  Can you think about that as you

14   listen to the evidence?

15             Can you do that?

16             PROSPECTIVE JUROR #1:  Um-hum.

17             MS. MCCORMICK:  Can you do that?

18             PROSPECTIVE JUROR #2:  Yes.

19             PROSPECTIVE JUROR #5:  Yes.

20             MS. MCCORMICK:  Can you do that?

21             PROSPECTIVE JUROR #6:  Yes.

22             MS. MCCORMICK:  Everybody?

23             Do you think that because a person is

24   young and does foolish things, as the defense

25   attorney said, that that is an excuse for not

People v. Heidgen

1        thinking about consequences, not thinking about

2        things that are obvious and serious and dangerous?

3        Is that an excuse?  Do you think so?

4                PROSPECTIVE JUROR #6:  No.

5                MS. MCCORMICK:  Do you think it should be

6        allowed to be a defense?

7                PROSPECTIVE JUROR #5:  No.

8                MR. LAMAGNA:  Objection, Judge.

9                THE COURT:  Sustained.

10               MS. MCCORMICK:  Do you think it's an

11       excuse?

12               PROSPECTIVE JUROR #3:  No.

13               PROSPECTIVE JUROR #2:  No.

14               PROSPECTIVE JUROR #1:  No.

15               PROSPECTIVE JUROR #7:  No.

16               MS. MCCORMICK:  What about you, sir?

17               PROSPECTIVE JUROR #8:  Age?

18               MS. MCCORMICK:  That a person is young,

19       somehow that absolves responsibility for

20       consequences of their actions?  You don't think so?

21               PROSPECTIVE JUROR #8:  No.

22               MS. MCCORMICK:  They should be held

23       equally accountable for the obvious results and

24       choices they make.

25               Do you think so, Mr. Colantonio?

People v. Heidgen

1          PROSPECTIVE JUROR #9:  Yes.

2          MS. MCCORMICK:  How about you?

3          PROSPECTIVE JUROR #10:  No.

4          MS. MCCORMICK:  Would you consider, as

5     you're listening to the evidence and whether the

6     defendant had a depraved state of mind, a disregard

7     for human life, his own included?  Would you

8     consider-- the defense attorney talked about actions

9     to correct, to slow down, to avoid a crash.  I'm

10    going to ask you the opposite.  Will you consider

11    the failure to act, the failure to avoid the crash

12    or to get out of the way as something that might

13    show you the state of mind of the defendant at the

14    time of the crash?  Would you think about that, if

15    someone failed to take an opportunity to get out of

16    the way?

17          What do you think?

18          PROSPECTIVE JUROR #2:  Yes.

19          PROSPECTIVE JUROR #7:  Yes.

20          PROSPECTIVE JUROR #9:  Yes.

21          PROSPECTIVE JUROR #10:  Yes.

22          PROSPECTIVE JUROR #11:  Yes.

23          MS. MCCORMICK:  Does anybody think that's

24    not an important point?

25          How about would you consider as the

People v. Heidgen

1    roadway opens up, and you're going to see pictures

2    of the roadway and you're going to hear witnesses

3    testify, that if you hear there were places, wide

4    shoulders, where somebody could get off and stop,

5    would you take that into account, that they weren't

6    used, to show the defendant's state of mind?

7            What do you think?

8            PROSPECTIVE JUROR #10:  Yes.

9            MS. MCCORMICK:  Would you, sir?

10           PROSPECTIVE JUROR #11:  Yes.

11           MS. MCCORMICK:  How about if there's no

12   evidence that the defendant tried to stop at all?

13   Would you take that into your consideration of his

14   state of mind?

15           You, sir?

16           PROSPECTIVE JUROR #14:  Yes.

17           MS. MCCORMICK:  How about if he appeared

18   to completely ignore the warnings of other cars

19   oncoming or any other kind of warnings and just kept

20   driving straight?  Is that something you would

21   consider as an important fact in determining whether

22   the defendant had a depraved state of mind?

23           PROSPECTIVE JUROR #3:  Yes.

24           MS. MCCORMICK:  Does anybody think that's

25   not important, not relevant in this case?

People v. Heidgen

1   How about the idea-- just the general

2   notion that you're going to have to determine what

3   the state of mind of the defendant is from his

4   actions?  Once again, you know, we usually don't

5   have the benefit of somebody announcing what they're

6   thinking as they're doing something.

7   Would you say, Miss Griffin, in your

8   everyday life that you look at what people do and

9   from what they do you determine what they meant to

10   do and when they intended to do?  You do that on an

11   everyday basis.

12   PROSPECTIVE JUROR #2:  No.

13   THE COURT:  Two minutes.

14   MS. MCCORMICK:  Thank you.

15   Do you have children, ma'am?

16   PROSPECTIVE JUROR #2:  Yes.

17   MS. MCCORMICK:  So if your kids do

18   something, they do one thing but they tell you

19   something else, would you consider, along with what

20   they said, what they did in determining what they

21   actually meant to do?  Would you do that?

22   PROSPECTIVE JUROR #2:  To determine what

23   they did?

24   MS. MCCORMICK:  What they actually meant

25   to do.  They do one thing and they say something

People v. Heidgen

1    else. How are you going to decide what they meant

2    to do?

3              PROSPECTIVE JUROR #2: I would have to

4    think about it more. I would have to get more

5    information on exactly what they did in order to

6    determine whether or not to punish them for what

7    they did.

8              MS. MCCORMICK: Would you all agree that

9    taking into account what someone did and matching it

10   to what they said and whether the two things match

11   up is an important thing to consider?

12             This trial-- again, alcohol-- you heard

13   the defense attorney talk about the fact that

14   alcohol can dull perception and slow reaction time.

15   Is there anybody here who has the idea about alcohol

16   that it will make you blind? Do you think alcohol

17   makes you blind or do you think it could affect how

18   quickly you percept?

19             PROSPECTIVE JUROR #1: If you have enough

20   alcohol, I'm sure it's quite difficult to see.

21             MS. MCCORMICK: Do you think if you had

22   alcohol and it's difficult to see, you'd know it?

23             PROSPECTIVE JUROR #1: Yeah.

24             MS. MCCORMICK: Yes. Do you think that

25   each person reacts differently to alcohol in their

People v. Heidgen

1    system?  Does everybody agree that people are

2    affected by alcohol differently?

3            Will you promise to listen to what effects

4    of alcohol had on this defendant that night?  Can

5    you do that?

6            THE COURT:  Time, Miss McCormick.

7            MS. MCCORMICK:  Thank you, your Honor.

8            THE COURT: Mr. LaMagna, please.

9            MR. LAMAGNA:  Good afternoon, ladies and

10   gentlemen.  Much of what we have been trying to

11   articulate to the group you've heard over and over

12   again.  However, there's some things I'd like to

13   just go over again.

14           Miss Rodriguez, Miss McCormick was saying,

15   well, it's about the driving and it is about

16   drinking and driving.  You understand that the

17   charge is murder.  It's not just about drinking and

18   driving.  Otherwise, every DWI homicide would be a

19   murder, wouldn't it?  So we're not just talking

20   about that.

21           And, Miss Cartegena, if the Court would

22   give you lesser charges to consider after the

23   evidence is in, wouldn't you consider those?

24           PROSPECTIVE JUROR #6:  Yeah.

25           MR. LAMAGNA:  Would anybody feel they're

People v. Heidgen

1   not going to consider them, that I'm only going to

2   consider the murder charge?

3           Mr. Clark?

4           PROSPECTIVE JUROR #8:  No.

5           MR. LAMAGNA:  In fact, you would agree

6   that there's degrees of culpability, that somebody

7   may be charged with something, maybe they're not

8   guilty of that, maybe they're guilty of something

9   else?

10          Miss Bherwani?

11          PROSPECTIVE JUROR #3:  Yes.

12          MR. LAMAGNA:  Would you agree with that?

13          PROSPECTIVE JUROR #3:  Yes.

14          MR. LAMAGNA:  It's a matter of degree,

15  isn't it?

16          PROSPECTIVE JUROR #3:  Yes.

17          MR. LAMAGNA:  There's an extreme degree

18  and different degrees after that, correct?

19          PROSPECTIVE JUROR #3:  Yes.

20          MR. LAMAGNA:  And it's only going to be

21  based on what the evidence is, Mr. Zucker, before

22  you can feel comfortable making a decision with such

23  gravity of a murder charge.  Would you agree with

24  that?

25          PROSPECTIVE JUROR #4:  Yes.

People v. Heidgen

1      MR. LAMAGNA:  Mr. Colantonio, you would

2    agree it's the quality of the evidence.  We know the

3    end result here.  It is a tragedy, and we all know

4    that.  What I need to ask you, and all of you, is

5    tragedies unfortunately in life happen.  The issue

6    is going to be what, if anything, is the culpability

7    of somebody who caused that tragedy.  Would you

8    agree?

9      PROSPECTIVE JUROR #9:  (Indicating.)

10      MR. LAMAGNA:  Are you open-minded enough

11    to say I'm going to wait for the evidence before I

12    decide what I think, correct?

13      PROSPECTIVE JUROR #9:  Yes.

14      MR. LAMAGNA:  Mr. Cavaco?

15      PROSPECTIVE JUROR #10:  Cavaco.

16      MR. LAMAGNA:  Would you agree with that,

17    that that's reasonable?

18      PROSPECTIVE JUROR #10:  Yes.

19      MR. LAMAGNA:  Now, Miss Goldkranz, we were

20    talking about youth.  Well, youth, you would agree,

21    would be a consideration to determine was this just

22    a foolish, terrible, irresponsible act by a young

23    man or a depraved mind.  That would be a question

24    that you would want to ask yourself, wouldn't it?

25    It would be reasonable.

People v. Heidgen

1        PROSPECTIVE JUROR #13:  Sure.

2        MR. LAMAGNA:  Mr. Nielsen, would that be

3    something that you would want to make a decision on

4    after the evidence is in, was what happened here a

5    terrible, foolish act, an irresponsible act, that

6    may have criminal liability, but I still don't know

7    necessarily if it was a depraved mind that did this.

8    Would that be reasonable?

9        PROSPECTIVE JUROR #12:  I'm not quite

10   clear on your question.

11       MR. LAMAGNA:  Would you consider all the

12   factors of a person's age, that there may have been

13   other reasons that are reasonable as to why this

14   happened other than having a depraved mind, an evil

15   mind?

16       PROSPECTIVE JUROR #12:  I would consider a

17   lot of things.

18       MR. LAMAGNA:  Would we all agree to

19   consider them, Mr. Kim?

20       PROSPECTIVE JUROR #11:  Yes.

21       MR. LAMAGNA:  Now, Mr. Kim, if ten people

22   were with Mr. Heidgen before that the whole day and

23   that night and articulated he was in a perfect mood,

24   he was as happy and as excited as everybody else, he

25   was having a great time, he was laughing, he was

People v. Heidgen

1    singing, he was dancing, wouldn't that be something

2    that you would consider of whether or not all of a

3    sudden he turned into a depraved person--

4              PROSPECTIVE JUROR #11:  Yes.

5              MR. LAMAGNA:  --to determine his state of

6    mind?  Wouldn't that be relevant?

7              PROSPECTIVE JUROR #11:  Yes.

8              MR. LAMAGNA:  Mr. Zucker, would you

9    consider what everybody else who was with him said

10   and their perception of what this person-- how he

11   was acting and what his demeanor was?

12             PROSPECTIVE JUROR #4:  I think that would

13   have to be considered, yes.

14             MR. LAMAGNA:  Miss Rodriguez, you heard

15   what Mr. Zucker said.  Wouldn't that have to be

16   considered in determining what a person's state of

17   mind is?

18             PROSPECTIVE JUROR #1:  Yes.

19             MR. LAMAGNA:  Miss Cartegena, did you ever

20   go out with a whole group of people sitting in a

21   restaurant, a bunch of people, and if somebody is

22   sitting there, they're not talking, they're looking

23   down at their plate, they're not laughing, they're

24   not engaging with anybody, you would say what's

25   wrong, right?  Because you would perceive, because

People v. Heidgen

1      of all of your life experiences would tell,

2      something is wrong, right?

3              Mr. Augustine, let's say you're at that

4      same dinner party and the person you were talking

5      about is engaging people, is talking, is happy, is

6      telling jokes, everything is fine.  That, as

7      Mr. Zucker said, would be a reasonable thing to take

8      into consideration if you were to decide what a

9      person's state of mind is, how he was acting, what

10     he was doing?

11             PROSPECTIVE JUROR #7:  I guess so.

12             MR. LAMAGNA:  Well, does anybody feel that

13     wouldn't be relevant?

14             Miss Bherwani?

15             PROSPECTIVE JUROR #3:  I would think it's

16     relevant.

17             MR. LAMAGNA:  Anybody?

18             Mr. Cavaco?

19             PROSPECTIVE JUROR #10:  It's relevant.

20             MR. LAMAGNA:  Of course.  This is how he

21     was acting.

22             Now, Mr. Kim, we talked about the effects

23     of alcohol, and I don't want to spend so much time

24     on that because that's not all there is to this

25     charge.  We're talking about, on top of which, a

People v. Heidgen

1    depraved mind.  But you would agree that in

2    determining whether or not this was a horrific,

3    unintentional act without a depraved mind, you would

4    determine how alcohol may have affected somebody,

5    wouldn't you?

6             PROSPECTIVE JUROR #11:  Definitely.

7             MR. LAMAGNA:  As we know from life

8    experiences, your perception gets changed.  You

9    don't react fast enough.  Things that probably

10   should have attracted your attention may not as

11   fast.

12            You agree with that, don't you?

13            PROSPECTIVE JUROR #11:  Um-hum.

14            MR. LAMAGNA:  Can we all agree with that,

15   that those are things that happen?

16            The issue in this case-- this is a murder

17   case.  We have to determine whether the district

18   attorney has presented sufficient evidence, not only

19   to show that this tragedy occurred and somebody is

20   at fault and whether they were drinking or not, but

21   that he was of a depraved mind.

22            Miss Griffin, would you promise that you

23   will listen to all of the evidence coming from that

24   witness stand, and if they don't prove that aspect

25   of their case, how would you vote?  Not guilty,

People v. Heidgen

1   right?

2               PROSPECTIVE JUROR #2:  Yes.

3               MR. LAMAGNA:  Are we all in agreement with

4   that?

5               Mr. Cavaco?

6               PROSPECTIVE JUROR #10:  Yes.

7               MR. LAMAGNA:  If they don't prove to your

8   satisfaction beyond a reasonable doubt that this

9   young man was of a depraved mind, how do you vote?

10               PROSPECTIVE JUROR #10:  Not guilty.

11               MR. LAMAGNA:  Are we all in agreement with

12   that?

13               Mr. Augustine?

14               PROSPECTIVE JUROR #7:  Yes.

15               MR. LAMAGNA:  And if the judge were to

16   give you lesser charges to consider, would you?

17               PROSPECTIVE JUROR #7:  Yes.

18               MR. LAMAGNA:  Mr. Clark?

19               PROSPECTIVE JUROR #8:  Yes.

20               MR. LAMAGNA:  Mr. Nielsen, you would agree

21   that there's degrees of culpability.  Would you not

22   agree?

23               PROSPECTIVE JUROR #12:  I would agree.

24               MR. LAMAGNA:  For example, if somebody

25   gets charged with stealing a coat from a store-- by

People v. Heidgen

1    no means am I trying to equate these examples to

2    this case, I think we all understand that-- but if

3    somebody steals a coat and he's charged with grand

4    larceny because the law says it's over $1,000, what

5    you stole makes it a grand larceny, and it turns out

6    the coat was only worth $500 and it doesn't reach

7    the level of grand larceny but it means it's a petit

8    larceny, he's still guilty of something.  He still

9    stole, but would you agree then it's not grand

10   larceny, it's the lesser petit larceny?

11            PROSPECTIVE JUROR #12:  Yes.

12            MR. LAMAGNA:  Miss Bherwani, would you

13   agree with that, too?  There are degrees of

14   culpability?

15            PROSPECTIVE JUROR #3:  Yes.

16            MR. LAMAGNA:  Somebody may be charged with

17   something and may not be guilty of that charge but

18   guilty of something else?

19            PROSPECTIVE JUROR #3:  Yes.

20            MR. LAMAGNA:  Would you promise to

21   consider that when you're-- after you hear all the

22   evidence?

23            PROSPECTIVE JUROR #3:  Yes.

24            MR. LAMAGNA:  Miss Rodriguez, would you

25   consider that?

People v. Heidgen

1                    PROSPECTIVE JUROR #1:  Yes.

2                    MR. LAMAGNA:  Miss Griffin, would you

3          agree that just because you're charged with

4          something doesn't necessarily mean you're guilty of

5          that?

6                    PROSPECTIVE JUROR #2:  I agree.

7                    MR. LAMAGNA:  People can get overcharged,

8          right?

9                    PROSPECTIVE JUROR #2:  Yes.

10                   MR. LAMAGNA:  They can be overcharged for

11         other reasons, too.  You know that, right?

12                   PROSPECTIVE JUROR #2:  Yes.

13                   MR. LAMAGNA:  There could be a bias,

14         politics, a lot of things.  You would agree with

15         that?

16                   PROSPECTIVE JUROR #2:  Yes, I do.

17                   MR. LAMAGNA:  Mr. Zucker, you agree that's

18         not fair, is it?

19                   PROSPECTIVE JUROR #4:  Correct.

20                   MR. LAMAGNA:  If a person is guilty of

21         something, they should be guilty of what they did,

22         not because it may be popular or politically

23         expedient.

24                   You agree with that, don't you?

25                   PROSPECTIVE JUROR #4:  Yes.

People v. Heidgen

1    MR. LAMAGNA:  Especially when a person's

2    life is at stake.

3    PROSPECTIVE JUROR #4:  Yes.

4    MR. LAMAGNA:  How about you, Miss

5    Cartegena.  Would you agree with that?

6    PROSPECTIVE JUROR #6:  I do.

7    MR. LAMAGNA:  Mr. Dacosta, I almost forgot

8    you back there.  Do you agree with that?

9    PROSPECTIVE JUROR #14:  Yes.

10   MR. LAMAGNA:  That fairness and justice--

11   somebody should be held accountable for what it is

12   that they did, nothing more, especially when it

13   comes to a murder charge.  Would

14   You agree with that?

15   PROSPECTIVE JUROR #14:  Right.

16   MR. LAMAGNA:  Miss Goldkranz, would you

17   agree that it would be wrong to overly convict

18   somebody of such a serious charge for reasons other

19   than the evidence?

20   PROSPECTIVE JUROR #13:  Yes.

21   MR. LAMAGNA:  That no matter how terrible

22   this result was, Mr. Kim, your job is to determine

23   the facts, not to give a verdict that is popular or

24   unpopular.

25   You agree with that, right?

People v. Heidgen

1        PROSPECTIVE JUROR #11:  That's correct.

2        MR. LAMAGNA:  It's about his life, right?

3        PROSPECTIVE JUROR #11:  That's correct.

4        MR. LAMAGNA:  Mr. Cavaco, you would agree

5   with that, too, wouldn't you?

6        PROSPECTIVE JUROR #10:  Yes.

7        MR. LAMAGNA:  It's not about what's

8   popular or unpopular, what is politically expedient

9   or what other people may want, even the victims.

10  It's not about that either, is it?

11       PROSPECTIVE JUROR #10:  No.

12       MR. LAMAGNA:  It's not about meeding out

13  vengeance, is it?

14       PROSPECTIVE JUROR #10:  No.

15       MR. LAMAGNA:  Do we all agree,

16  Mr. Colantonio, this isn't about vengeance, this is

17  about justice.  If somebody is guilty of something,

18  they should be found guilty of what it is they're

19  guilty of.  Isn't that what makes our country better

20  than others, our justice system?

21       PROSPECTIVE JUROR #9:  Um-hum.

22       MR. LAMAGNA:  Okay?  It's fairness.

23  That's why we have a jury here.

24       Miss Griffin, just because the government

25  may say we're charging somebody with murder, that

People v. Heidgen

1    doesn't mean it's necessarily so, correct?  Just

2    because they're charging a charge of murder doesn't

3    mean it's necessarily so.

4              PROSPECTIVE JUROR #2:  If it is, they have

5    to prove it.

6              MR. LAMAGNA:  Exactly.  You haven't heard

7    any evidence, correct?

8              PROSPECTIVE JUROR #2:  Right.

9              THE COURT:  Two minutes, Mr. LaMagna.

10             MR. LAMAGNA:  Thank you, your Honor.

11             Now, you're going to hear a lot of

12   evidence.  You're going to have to determine the

13   credibility of the witnesses who testify, and if a

14   witness changes his testimony to fit a particular

15   theory, that would be wrong, wouldn't it, Miss

16   Cartegena?

17             PROSPECTIVE JUROR #6:  (Indicating.)

18             MR. LAMAGNA:  Mr. Dacosta?

19             PROSPECTIVE JUROR #14:  Right.

20             MR. LAMAGNA:  Miss Goldkranz?

21             PROSPECTIVE JUROR #13:  Um-hum.

22             MR. LAMAGNA:  If evidence is changed just

23   to make my employer happy, I'll get more business at

24   the expense of somebody's life.  That would be

25   wrong, wouldn't it, Mr. Colantonio?

People v. Heidgen

1          PROSPECTIVE JUROR #9:  Yes.

2          MR. LAMAGNA:  Mr. Cavaco?

3          PROSPECTIVE JUROR #10:  Yes.

4          MR. LAMAGNA:  Would you promise when you

5     listen to these witnesses you'll look at them

6     critically?  If there are mistakes, ask yourself

7     why.  If there are excuses, excuses aren't evidence.

8          You don't fill in the blanks here, right,

9     Mr. Pike?

10         PROSPECTIVE JUROR #5:  Yeah.

11         MR. LAMAGNA:  It's the evidence.  If the

12    evidence is not there, you're not going to fill it

13    in, right?

14         PROSPECTIVE JUROR #5:  Correct.

15         MR. LAMAGNA:  And if a person is not

16    guilty of what the charge is, despite a terrible

17    tragedy, you would agree that they may be guilty of

18    something else.  Would you agree?

19         PROSPECTIVE JUROR #7:  Yes.

20         MR. LAMAGNA:  If that's the case, you

21    would find Marty not guilty of that charge, wouldn't

22    you?

23         PROSPECTIVE JUROR #7:  (Indicating.)

24         MR. LAMAGNA:  You would consider the

25    lesser charges?

People v. Heidgen

1          PROSPECTIVE JUROR #7:  Yes.

2          MR. LAMAGNA:  Would we all agree with

3     that?

4          Miss Goldkranz?

5          PROSPECTIVE JUROR #13:  Yes.

6          MR. LAMAGNA:  That would be the right

7     thing to do.

8          THE COURT:  That's time, Mr. LaMagna.

9          MR. LAMAGNA:  Thank you.

10          THE COURT:  Ladies and gentlemen, I'm

11     going to give you all about a five-minute break.

12     I'm going to ask you all to leave the courtroom for

13     that five minutes.

14          Please don't talk about the case.

15          (Whereupon, the jury panel exited the

16     courtroom.)

17          (Whereupon, a brief recess was taken.)

18          THE COURT:  Counsel?

19          THE CLERK:  People, challenges for cause

20     as to seats one through eight at this time?

21          MS. MCCORMICK:  None nor cause.

22          THE CLERK:  Defense, seats one through

23     eight for cause?

24          MR. LAMAGNA:  Nothing, your Honor.

25          THE CLERK:  People, peremptory challenges,

People v. Heidgen

1    seats one through eight?

2              MS. MCCORMICK:  Number three, your Honor,

3    and also number seven.

4              THE CLERK:  Bherwani and Augustine?

5              MS. MCCORMICK:  Yes.

6              MR. LAMAGNA:  One through eight?

7              Two and six, Griffin and Cartegena.

8              THE CLERK:  That leaves us with seat

9    number one becomes juror number five, which is

10   Rodriguez.  Seat number four becomes juror number

11   six, which is Zucker.  Seat number five becomes

12   juror number seven, which is Pike.  Seat number

13   eight becomes juror number eight, which is Clark.

14             We'll address seats nine through twelve at

15   this time.

16             People, for cause, nine through twelve?

17             MS. MCCORMICK:  No one for cause, your

18   Honor.

19             THE CLERK:  Defense?

20             MR. LAMAGNA:  No, your Honor.

21             THE CLERK:  People, peremptory challenges,

22   nine through twelve at this time?

23             MS. MCCORMICK:  Number twelve.

24             THE CLERK:  Nielsen?

25             MS. MCCORMICK:  Yes.

People v. Heidgen

1       THE CLERK:  Defense, peremptory

2   challenges, nine through twelve at this time?

3       MR. LAMAGNA:  No, your Honor.

4       THE CLERK:  Seat number nine becomes juror

5   number nine, which is Colantonio.  Seat number ten

6   becomes juror number ten, which is Cavaco.  Seat

7   number eleven, becomes juror number eleven, which is

8   Kim.

9       And seat number thirteen, People, for

10  cause?

11      MS. MCCORMICK:  No.

12      THE CLERK:  Defense, for cause, seat

13  number thirteen?

14      MR. LAMAGNA:  No.

15      THE CLERK:  People, peremptory challenge,

16  seat number thirteen?

17      MS. MCCORMICK:  No.

18      THE CLERK:  Defense, peremptory challenge,

19  seat number thirteen?

20      MR. LAMAGNA:  Yes, your Honor, which is

21  Goldkranz.

22      THE CLERK:  People, for cause, this is

23  seat number fourteen?

24      MS. MCCORMICK:  None for cause.

25      THE CLERK:  Defense, for cause, seat

People v. Heidgen

1    number fourteen?

2                    MR. LAMAGNA:  No, your Honor.

3                    THE CLERK:  People, peremptory, seat

4    number fourteen?

5                    MS. MCCORMICK:  Give me one minute.

6                    I'm going to challenge number fourteen.

7                    THE CLERK:  We have seven jurors out of

8    that round, your Honor.

9                    THE COURT:  Please produce the jury.

10                   (Whereupon, a brief recess was taken.)

11                   (Whereupon, the jury panel entered the

12   courtroom.)

13                   THE COURT:  Welcome back, ladies and

14   gentlemen.

15                   MR. LAMAGNA:  Jean, take over, please.

16                   THE CLERK:  The following jurors remain

17   seated, please:

18                   Diana Rodriguez, Russell Zucker, Robert

19   Pike, Patrick Clark, Michael Colantonio, Craig

20   Cavaco and Kenneth Kim remain seated.

21                   The other jurors in the box, please step

22   out.  You're excused with the thanks of the Court.

23   Follow the directions of the court officers.

24                   (Whereupon, the unselected jurors were

25   excused.)

People v. Heidgen

1        (Whereupon, the jurors were duly sworn.)

2        THE COURT:  Ladies and gentlemen, I now

3    have a much more optimistic feeling that Monday

4    morning at 9:30 we'll be able to get to opening

5    statements and take testimony.  I was starting to

6    despair a little bit.  No longer.

7            Except for present juror number one, make

8    sure you bring in a good book.  Juror number one has

9    a good book.

10           You all know the admonitions I gave to you

11   before lunch.  Please observe them.

12           Have a nice weekend.  See you Monday

13   morning.

14           (Whereupon, the jurors exited the

15   courtroom.)

16       THE COURT:  As for the rest of you, ladies

17   and gentlemen, please don't panic.  We're going to

18   fill the box, and that's all.  We'll get fourteen of

19   you to go through questioning, and that will give

20   the lawyers an opportunity to review the

21   questionnaires overnight, which will be a refreshing

22   change for them.  We are going to fill the box at

23   this time.

24       THE CLERK:  Please have your

25   questionnaires out.

People v. Heidgen

1       Seat number one, Phyllis Cheng, C-H-E-N-G;

2   seat number two, Robert Tingwall, T-I-N-G-W-A-L-L;

3   seat number three, Joseph Larson, L-A-R-S-O-N; seat

4   number four, Michael Derita, D-E-R-I-T-A; seat

5   number five, Susan Gledhill, G-L-E-D-H-I-L-L; seat

6   number six, Tom Cassidy.

7       (No response.)

8       Seat number six, Stacey Baez, B-A-E-Z;

9   seat number seven, William Hopkins, H-O-P-K-I-N-S.

10      PROSPECTIVE JUROR #7:  I know one of the

11  names on the witness list.

12      THE COURT:  Go back to central jury.

13      THE CLERK:  Seat number seven, Charmen

14  Brown, B-R-O-W-N; seat number eight, Peter Frosos,

15  F-R-O-S-O-S; seat number nine, James Cosgrove.

16      (No response.)

17      Seat number nine, Susan Kaul, K-A-U-L;

18  seat number ten, Joseph Sheridan, S-H-E-R-I-D-A-N;

19  seat number eleven, Jill Tung, T-U-N-G; seat number

20  twelve, Christina Rivas, R-I-V-A-S; seat number

21  thirteen, Meryl Shields, S-H-I-E-L-D-S; seat number

22  fourteen, Shannon Yearwood, Y-E-A-R-W-O-O-D.

23      THE COURT:  Welcome, ladies and gentlemen.

24  Let's see if we have a full box.

25      Do any of you know any of us?

People v. Heidgen

1              (No response.)

2              Did anybody know any of the names on the

3        witness list?

4              Sir?

5              PROSPECTIVE JUROR #10:  I have a cousin

6        with a similar name.

7              THE COURT:  Would you tell us what your

8        cousin's name is?

9              PROSPECTIVE JUROR #10:  Chris Sweeney.

10             THE COURT:  Is he an investigator with the

11       police department?

12             PROSPECTIVE JUROR #10:  No, sir.

13             THE COURT:  Is that who that is,

14       Investigator Sweeney?

15             He's with the state police, sir.  He's not

16       your cousin?

17             PROSPECTIVE JUROR #10:  No.

18             THE COURT:  Third, and probably most

19       important, many of you, if not all of you, know

20       something about this case from reports you may have

21       heard on TV, the radio, the newspaper, perhaps.  Are

22       any of you in that category?

23             Does anybody feel that because you might

24       have heard something about this case since its

25       inception, instead of only learning about this case

People v. Heidgen

1    in the courtroom, that you may have come to some

2    conclusion which renders you incapable of being

3    fair?  Does anybody feel that way?

4              (No response.)

5              In that case, everybody, we're keeping to

6    the timetable I've given you.  I'm giving you a

7    responsibility one another.  Please be present at

8    9:30.  If you are, I promise you we will be-- I

9    promise you if we get things going in a timely

10   manner in the morning, we'll be able to start

11   opening statements and the calling of witnesses

12   Monday.

13             Everybody, have a nice night.  See you all

14   tomorrow morning at 9:30.

15             (Whereupon, the jury panel exited the

16   courtroom.)

17             (Whereupon, a brief recess was taken.)

18             THE COURT:  Sworn juror Rodriguez, juror

19   number five, I thought I was clear when I said that

20   the case was going to last upwards of five weeks and

21   anybody who wanted to leave could leave.  She forgot

22   that she was a full-time student and she's going to

23   lose the whole semester.  She's on this jury.  I

24   don't know why she stayed, but she did.

25             Do we have consent to release her as a

People v. Heidgen

1     sworn juror?

2                 MR. HAYDEN:  Yes, your Honor.

3                 MR. LAMAGNA:  Yes, your Honor.

4                 THE COURT:  We're now down to ten sworn

5     jurors.  We'll deal with it tomorrow.  We're going

6     to move everybody up one.

7                 (Whereupon, the Court stood in recess for

8     the day.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People v. Heidgen

```
1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
2    ------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4          -against-                        Indictment No.
                                            1910N-2005
5

6    MARTIN ROBERT HEIDGEN,

7                          Defendant.
     ------------------------------------x
8
                                        Mineola, New York
9                                       September 8, 2006

10

     B E F O R E:   HON. ALAN L. HONOROF
11                    Acting Supreme Court Justice

12

     A P P E A R A N C E S:
13

14             (Same as previously noted.)

15

16                  *     *     *     *

17

18             (Whereupon, the prospective jury panel

19        entered the courtroom.)

20             THE CLERK:  Case on trial, indictment

21        1910N-2005, People v. Martin Heidgen.

22             People ready?

23             MR. HAYDEN:  The People are ready, your

24        Honor.

25             THE CLERK:  Defendant ready?
```

People v. Heidgen

1          MR. LAMAGNA:  Defendant ready, your Honor.

2          THE CLERK:  The defendant is present, your

3     Honor.

4          THE COURT:  All right.  Would you fill the

5     box, please?

6          THE CLERK:  Seat number one-- please have

7     your questionnaires out-- James Cosgrove,

8     C-O-S-G-R-O-V-E.

9          (No response.)

10          Seat number one, Michelle Vargas,

11     V-A-R-G-A-S.

12          THE COURT:  Miss Vargas, before you go

13     down there, do you know any of us?

14          PROSPECTIVE JUROR #1:  No.

15          THE COURT:  Do you know anybody on that

16     witness list?

17          PROSPECTIVE JUROR #1:  No.

18          THE COURT:  Have a seat.

19          Mr. Hayden?

20          MR. HAYDEN:  May I proceed?

21          THE COURT:  Please.

22          MR. HAYDEN:  Good morning, ladies and

23     gentlemen.  Good morning.

24          You heard a lot of talk about evil, as

25     defense counsel was speaking yesterday, evil, evil

People v. Heidgen

1    man.  Was he an evil man?  Was he a murderer?

2             Would each of you accept that you can't

3    accept anything defense counsel told you about a

4    depraved mind?  That's for the judge to tell you.

5    Can all of you accept that?

6             You disregard anything defense counsel

7    told you about evil and depravity.  It's all going

8    to be coming from Judge Honorof.  Would each of you

9    accept that?

10            Can each of you assure us you'll listen

11   very carefully when Judge Honorof explains depraved

12   indifference to human life, which is what we're

13   talking about here?  You can all do that?

14            If Judge Honorof charges you that we're

15   talking about depraved indifference to human life at

16   the time of the crash to cause these gruesome

17   injuries and death, will you accept that?

18            When you're trying to determine whether

19   the defendant showed a feeling of depraved

20   indifference to human life, will you consider what

21   it was he was doing out on the Meadowbrook Parkway

22   that night?  Will all of you do that?  Will you all

23   consider it?

24            Will you consider whether what he was

25   doing made gruesome brutal injuries and death

People v. Heidgen

1    inevitable?  Will you consider that?

2                And will you consider whether or not that

3    establishes that at the time of the crash he was

4    feeling a depraved indifference to human life?  Can

5    all of you do that?

6                Miss Vargas, is there anything you've

7    heard so far that gives you concern about your

8    ability to be fair and impartial?

9                PROSPECTIVE JUROR #1:  No.

10               MR. HAYDEN:  Will you concentrate, during

11   the course of this trial, on observations of the

12   defendant before the crash?

13               PROSPECTIVE JUROR #1:  Yes.

14               MR. HAYDEN:  Will you concentrate on

15   whether he was aware of his surroundings that night?

16               PROSPECTIVE JUROR #1:  Yes.

17               MR. HAYDEN:  Will you concentrate on

18   whether he knew what was going on around him?

19               PROSPECTIVE JUROR #1:  Yes.

20               MR. HAYDEN:  Will you concentrate on

21   whether he was equally aware, in spite of

22   intoxication, of his surroundings as he drove the

23   way he did along the parkway?

24               PROSPECTIVE JUROR #1:  Yes.

25               MR. HAYDEN:  And will you consider whether

People v. Heidgen

1    or not that establishes that at the time of the

2    crash he was feeling a depraved indifference to

3    human life?

4              PROSPECTIVE JUROR #1:  Yes.

5              MR. HAYDEN:  Can you do that?

6              PROSPECTIVE JUROR #1:  Yes.

7              MR. HAYDEN:  Mr. Tingwall?

8              PROSPECTIVE JUROR #2:  Yes.

9              MR. HAYDEN:  Is that correctly pronounced?

10             PROSPECTIVE JUROR #2:  That's correct.

11             MR. HAYDEN:  Mr. Tingwall, do you have any

12   grandchildren?

13             PROSPECTIVE JUROR #2:  I have one.

14             MR. HAYDEN:  Boy or girl?

15             PROSPECTIVE JUROR #2:  Girl.

16             MR. HAYDEN:  You mentioned on your

17   questionnaire that you know someone in law

18   enforcement?

19             PROSPECTIVE JUROR #2:  Yes.

20             MR. HAYDEN:  Who is that?

21             PROSPECTIVE JUROR #2:  That's me.  I was

22   formerly a detective school supervisor in midtown

23   south precinct in Manhattan.

24             MR. HAYDEN:  Is there anything about your

25   experiences as an officer that would prevent you--

People v. Heidgen

1    PROSPECTIVE JUROR #2:  No, I don't think

2    so.  It wouldn't.

3    MR. HAYDEN:  --from being fair and

4    impartial to both sides?

5    PROSPECTIVE JUROR #2:  I've always been

6    fair and impartial.

7    MR. HAYDEN:  You indicated, sir, you've

8    been the victim of a crime.  Tell us a bit about

9    that.

10    PROSPECTIVE JUROR #2:  I had a burglary

11    many years ago in my house.  My daughter, my

12    youngest daughter, had a cell phone and purse

13    stolen.

14    MR. HAYDEN:  Is there anything about that

15    experience that would prevent you from being fair

16    and impartial?

17    PROSPECTIVE JUROR #2:  No.  I don't see

18    why it would.

19    MR. HAYDEN:  You testified in a courtroom?

20    PROSPECTIVE JUROR #2:  Yes, I have

21    testified.

22    MR. HAYDEN:  As an officer?

23    PROSPECTIVE JUROR #2:  Yes.

24    MR. HAYDEN:  Anything about those

25    experiences that would affect you here?

People v. Heidgen

1          PROSPECTIVE JUROR #2:  Not that I can

2     think of, no.

3          MR. HAYDEN:  Mr. Larson?

4          PROSPECTIVE JUROR #3:  Yes.

5          MR. HAYDEN:  You indicated, sir, you, too,

6     have testified in court?

7          PROSPECTIVE JUROR #3:  Yes.

8          MR. HAYDEN:  Tell us a bit about that

9     experience.

10         PROSPECTIVE JUROR #3:  It was an accident

11    between a police car and, you know, a regular car,

12    and I just, you know, was a witness.

13         MR. HAYDEN:  That was a civil trial?

14         PROSPECTIVE JUROR #3:  Yes.

15         MR. HAYDEN:  Anything about that

16    experience that would affect your ability to be fair

17    and impartial?

18         PROSPECTIVE JUROR #3:  No.

19         MR. HAYDEN:  Also you indicated you were

20    involved in a lawsuit?

21         PROSPECTIVE JUROR #3:  Oh, my daughter

22    fell a long time ago in a school district and broke

23    her arm.

24         MR. HAYDEN:  Nothing about that that would

25    affect you here?

People v. Heidgen

1      PROSPECTIVE JUROR #3:  No.

2          MR. HAYDEN:  You know someone in law

3      enforcement?

4          PROSPECTIVE JUROR #3:  Yeah, a lot of

5      police officers in Williston Park.

6          MR. HAYDEN:  You could still treat a

7      police officer as a witness the same way you treat

8      anyone else?

9          PROSPECTIVE JUROR #3:  Yeah.

10         MR. HAYDEN:  You also served on a civil

11     jury?

12         PROSPECTIVE JUROR #3:  Yeah.

13         MR. HAYDEN:  What type of case?

14         PROSPECTIVE JUROR #3:  It was an accident,

15     where someone fell down a flight of stairs and hurt

16     their knee.

17         MR. HAYDEN:  There was a verdict?

18         PROSPECTIVE JUROR #3:  They settled about

19     20 minutes after the trial started.

20         MR. HAYDEN:  Anything about that

21     experience that would affect you here?

22         PROSPECTIVE JUROR #3:  No.

23         MR. HAYDEN:  Mr. Derita?

24         PROSPECTIVE JUROR #4:  Yes.

25         MR. HAYDEN:  You, too, know someone in law

People v. Heidgen

1   enforcement, sir?

2            PROSPECTIVE JUROR #4:  No, I don't.

3            MR. HAYDEN:  You served on a civil jury?

4            PROSPECTIVE JUROR #4:  Yes, I did.

5            MR. HAYDEN:  Anything about that

6   experience that would affect you here?

7            PROSPECTIVE JUROR #4:  No.

8            MR. HAYDEN:  Did it go to verdict?

9            PROSPECTIVE JUROR #4:  Yes, it did.

10           MR. HAYDEN:  Do you feel you could be fair

11  and impartial to both sides?

12           PROSPECTIVE JUROR #4:  I sure can.

13           MR. HAYDEN:  You'll concentrate on what

14  the defendant did on the Meadowbrook Parkway in

15  determining whether he was feeling a depraved

16  indifference to human life at the time of that

17  collision?

18           PROSPECTIVE JUROR #4:  I can be fair.

19           MR. HAYDEN:  Miss Gledhill?

20           PROSPECTIVE JUROR #5:  Um-hum.

21           MR. HAYDEN:  You mentioned, ma'am, you

22  were involved in a lawsuit?

23           PROSPECTIVE JUROR #5:  I wasn't, a friend

24  of mine had-- his wife passed away.  It was a

25  malpractice lawsuit.

People v. Heidgen

1   MR. HAYDEN:  Thinking about that

2   experience, would that affect you here?

3   PROSPECTIVE JUROR #5:  No, I don't see

4   why.

5   MR. HAYDEN:  You can be fair and impartial

6   to both sides?

7   PROSPECTIVE JUROR #5:  Certainly.

8   MR. HAYDEN:  You can be fair to the

9   defendant and to the prosecution?

10  PROSPECTIVE JUROR #5:  Sure.

11  MR. HAYDEN:  And you're going to consider

12  everything in trying to get into the defendant's

13  head and determine his state of mind at the time of

14  the collision?

15  PROSPECTIVE JUROR #5:  I'll try, sure.

16  MR. HAYDEN:  To see whether he was feeling

17  depraved indifference to human life?

18  PROSPECTIVE JUROR #5:  Of course.

19  MR. HAYDEN:  Of course you're going to

20  concentrate hard on what it was he was doing out on

21  the parkway?

22  PROSPECTIVE JUROR #5:  Right.

23  MR. HAYDEN:  Miss Baez?

24  PROSPECTIVE JUROR #6:  Yes.

25  MR. HAYDEN:  Miss Baez, you indicated you

People v. Heidgen

1   were the victim of a crime?

2          PROSPECTIVE JUROR #6:  No.  My sister's

3   house was robbed in California four years ago.

4          MR. HAYDEN:  Anything about that

5   experience that would affect you here?

6          PROSPECTIVE JUROR #6:  No.  I wasn't even

7   there.  It's just something that--

8          MR. HAYDEN:  Sure.

9          PROSPECTIVE JUROR #6:  --she told me.

10          MR. HAYDEN:  You know someone in law

11   enforcement?

12          PROSPECTIVE JUROR #6:  My dad retired in

13   '78.

14          MR. HAYDEN:  Where did he work?

15          PROSPECTIVE JUROR #6:  In the city.

16          MR. HAYDEN:  He was a police officer?

17          PROSPECTIVE JUROR #6:  Yes.

18          MR. HAYDEN:  Did he discuss his work with

19   you?

20          PROSPECTIVE JUROR #6:  Not really.  I was

21   young, no.

22          MR. HAYDEN:  Okay.  You can assure us

23   you'll treat police witnesses just like anyone else?

24          PROSPECTIVE JUROR #6:  Yes.

25          MR. HAYDEN:  You'll give them no more

People v. Heidgen

1     credibility than another witness?

2               PROSPECTIVE JUROR #6:  No.

3               MR. HAYDEN:  And no less credibility?

4               PROSPECTIVE JUROR #6:  No.

5               MR. HAYDEN:  You, too, will consider what

6     the defendant was doing out on the Meadowbrook

7     Parkway at around two o'clock on Saturday morning in

8     determining whether at the time he was feeling a

9     depraved indifference to human life?

10              PROSPECTIVE JUROR #6:  Yes.

11              MR. HAYDEN:  Miss Brown?

12              PROSPECTIVE JUROR #7:  Yes.

13              MR. HAYDEN:  Miss Brown, you indicated you

14    served on a jury in 2002?

15              PROSPECTIVE JUROR #7:  Yes.

16              MR. HAYDEN:  What type of jury was that?

17              PROSPECTIVE JUROR #7:  Civil.

18              MR. HAYDEN:  No verdict?

19              PROSPECTIVE JUROR #7:  No verdict.

20              MR. HAYDEN:  Anything about that

21    experience that would affect you here?

22              PROSPECTIVE JUROR #7:  No.

23              MR. HAYDEN:  What type of case was it?

24              PROSPECTIVE JUROR #7:  I didn't hear

25    anything about the case.

People v. Heidgen

1    MR. HAYDEN:  Anything you've heard so far

2    make you feel you wouldn't be fair and impartial to

3    both sides?

4         PROSPECTIVE JUROR #7:  No.

5         MR. HAYDEN:  You're going to consider all

6    of the facts in trying to determine whether he was

7    feeling a depraved indifference to human life at the

8    time of the crash that caused those gruesome

9    injuries and death?

10        PROSPECTIVE JUROR #7:  Yes.

11        MR. HAYDEN:  Mr. Frosos-- correctly

12   pronounced, sir?

13        PROSPECTIVE JUROR #8:  Yes.

14        MR. HAYDEN:  You know someone in law

15   enforcement?

16        PROSPECTIVE JUROR #8:  I have a nephew who

17   works in New York City.

18        MR. HAYDEN:  As a police officer?

19        PROSPECTIVE JUROR #8:  Yes.

20        MR. HAYDEN:  Do you discuss your work with

21   him?

22        PROSPECTIVE JUROR #8:  No.

23        MR. HAYDEN:  You served on a criminal

24   jury?

25        PROSPECTIVE JUROR #8:  Um-hum.

People v. Heidgen

1      MR. HAYDEN:  What type of case was that?

2      PROSPECTIVE JUROR #8:  A fight in

3  Eisenhower Park.  It was a stabbing but no weapon

4  was found.

5      MR. HAYDEN:  Did it go to verdict?

6      PROSPECTIVE JUROR #8:  Yeah.

7      MR. HAYDEN:  You indicated you were

8  involved in a lawsuit?

9      PROSPECTIVE JUROR #8:  Out of state.  It

10  was in reference to an injury.

11      MR. HAYDEN:  You can be fair and impartial

12  to both sides?

13      PROSPECTIVE JUROR #8:  Yes.

14      MR. HAYDEN:  You can look at all the

15  evidence, the facts and circumstances, in

16  determining whether the defendant was feeling

17  depraved indifference to human life at the time of

18  this crash?

19      PROSPECTIVE JUROR #8:  Yes.

20      MR. HAYDEN:  Miss Kaul, you indicated on

21  your questionnaire you know someone who has been the

22  victim of a crime?

23      PROSPECTIVE JUROR #9:  Yes, a friend.  He

24  was driving a car.

25      MR. HAYDEN:  Driving?

People v. Heidgen

1          PROSPECTIVE JUROR #9:  A friend of mine,

2     he was drunk and driving and he hit a boy and

3     someone sitting next to him died.

4          MR. HAYDEN:  Did you discuss the matter

5     with him?

6          PROSPECTIVE JUROR #9:  No.

7          MR. HAYDEN:  Did his case go to trial?

8          PROSPECTIVE JUROR #9:  Yes.

9          MR. HAYDEN:  Were you involved in the

10    trial in any way?

11         PROSPECTIVE JUROR #9:  No.

12         MR. HAYDEN:  Anything about that

13    experience that would affect you here?

14         PROSPECTIVE JUROR #9:  No.

15         MR. HAYDEN:  You can be fair and impartial

16    to both sides?

17         PROSPECTIVE JUROR #9:  Yes.

18         MR. HAYDEN:  Mr. Sheridan?

19         PROSPECTIVE JUROR #10:  Yes, sir.

20         MR. HAYDEN:  You served on a criminal

21    case?

22         PROSPECTIVE JUROR #10:  Yes, sir.

23         MR. HAYDEN:  Did it go to verdict?

24         PROSPECTIVE JUROR #10:  Yes, sir.

25         MR. HAYDEN:  What type of crime?

People v. Heidgen

1    PROSPECTIVE JUROR #10:  It was a rape,

2    first degree assault, and he was convicted.

3    MR. HAYDEN:  Anything about that

4    experience that would affect you here?

5    PROSPECTIVE JUROR #10:  No, sir.

6    MR. HAYDEN:  You indicated that you know

7    someone accused of a crime?

8    PROSPECTIVE JUROR #10:  Yes, sir.

9    MR. HAYDEN:  Would you tell us a bit about

10   that?

11   PROSPECTIVE JUROR #10:  I was arrested for

12   possession of drugs and the case was dismissed.

13   MR. HAYDEN:  How do you feel you were

14   treated?

15   PROSPECTIVE JUROR #10:  Okay.

16   MR. HAYDEN:  You were treated well by the

17   police?

18   PROSPECTIVE JUROR #10:  Yes.  It was

19   difficult.

20   MR. HAYDEN:  Sure.  Anything about that

21   experience that would affect you here?

22   PROSPECTIVE JUROR #10:  No, sir.

23   MR. HAYDEN:  You can be fair and impartial

24   to both sides?

25   PROSPECTIVE JUROR #10:  Yes, sir.

People v. Heidgen

1          MR. HAYDEN:  You, too, will consider all

2     of the facts and circumstances which you're going to

3     hear from the witness stand, how he was driving and

4     what he was doing in determining whether he was

5     feeling a depraved indifference to human life when

6     he caused this crash?

7          PROSPECTIVE JUROR #10:  Yes, sir.

8          MR. HAYDEN:  Miss Tung?

9          PROSPECTIVE JUROR #11:  Yes.

10         MR. HAYDEN:  Is that correctly pronounced,

11    ma'am?

12         PROSPECTIVE JUROR #11:  Yes.

13         MR. HAYDEN:  You mentioned, ma'am, you

14    know someone in law enforcement?

15         PROSPECTIVE JUROR #11:  My father is a

16    retired bridge and tunnel officer.

17         MR. HAYDEN:  Did you discuss his work with

18    him?

19         PROSPECTIVE JUROR #11:  No.

20         MR. HAYDEN:  You can treat a police

21    officer like any other witness?

22         PROSPECTIVE JUROR #11:  Yes.

23         MR. HAYDEN:  You can be fair and impartial

24    to both sides?

25         PROSPECTIVE JUROR #11:  Yes.

People v. Heidgen

1      MR. HAYDEN:  Miss Rivas, you indicated on

2   your questionnaire that you know someone accused and

3   convicted of a crime?

4      PROSPECTIVE JUROR #12:  Yes.

5      MR. HAYDEN:  Tell us a bit about that,

6   please.

7      PROSPECTIVE JUROR #12:  It was a friend of

8   mine.  She was actually accused of two crimes.  One

9   was stealing from her former employer, one was

10  driving while intoxicated.

11     MR. HAYDEN:  Did you discuss those matters

12  with her?

13     PROSPECTIVE JUROR #12:  Um-hum.

14     MR. HAYDEN:  Does she feel she was treated

15  fairly?

16     PROSPECTIVE JUROR #12:  For the first

17  trial which was stealing, yes.  For the drunken

18  driving, no.

19     MR. HAYDEN:  How do you feel?

20     PROSPECTIVE JUROR #12:  I wasn't in the

21  courtroom but--

22     MR. HAYDEN:  Based upon what she told you,

23  how do you feel she was treated?

24     PROSPECTIVE JUROR #12:  Fairly.  She was

25  drunk.

People v. Heidgen

1             MR. HAYDEN:  Anything about her

2    experiences and your conversations about them that

3    would affect you here?

4             PROSPECTIVE JUROR #12:  I don't think so.

5             MR. HAYDEN:  When you say you don't think

6    so--

7             PROSPECTIVE JUROR #12:  No.

8             MR. HAYDEN:  Any concern at all?

9             PROSPECTIVE JUROR #12:  I think I can

10   remove myself, yes.

11            MR. HAYDEN:  You can concentrate on the

12   facts and circumstances of this case--

13            PROSPECTIVE JUROR #12:  Yes.

14            MR. HAYDEN:  --and determine for yourself

15   whether or not at the time of this crash the

16   defendant was feeling a depraved indifference to the

17   human lives around him?

18            PROSPECTIVE JUROR #12:  Yes.

19            MR. HAYDEN:  Miss Shields?

20            PROSPECTIVE JUROR #13:  Yes.

21            MR. HAYDEN:  Ma'am, you served on a

22   criminal jury?

23            PROSPECTIVE JUROR #13:  Yes.

24            MR. HAYDEN:  What type of crime?

25            PROSPECTIVE JUROR #13:  Arson.

People v. Heidgen

1    MR. HAYDEN:  Anything about that
2    experience that would affect you here?
3    PROSPECTIVE JUROR #13:  Not at all.
4    MR. HAYDEN:  You can be fair and
5    impartial, not only to the defense, but to the
6    prosecution, as well?
7    PROSPECTIVE JUROR #13:  Yes.
8    MR. HAYDEN:  You can concentrate on the
9    facts and circumstances and make your own
10   determination about whether or not at the time of
11   this crash the defendant was feeling a depraved
12   indifference to the human lives around him?
13   PROSPECTIVE JUROR #13:  Yes.
14   THE COURT:  Two minutes, Mr. Hayden.
15   MR. HAYDEN:  Yes, your Honor.
16   Miss Yearwood?
17   PROSPECTIVE JUROR #14:  Yes.
18   MR. HAYDEN:  Can you assure us you can be
19   fair and impartial to both sides?
20   PROSPECTIVE JUROR #14:  Yes.
21   MR. HAYDEN:  Any reason you think you'd be
22   less than fair and impartial?
23   PROSPECTIVE JUROR #14:  None.
24   MR. HAYDEN:  Thank you all for your kind
25   attention.

People v. Heidgen

1    THE COURT:  Mr. Martello?

2        MR. MARTELLO:  Good morning, your Honor,

3    good morning everyone.  Ladies and gentlemen, my

4    name is Greg Martello.  I am cocounsel with

5    Mr. LaMagna for Marty.  Mr. LaMagna needed a break.

6    He was talking too much.  We need to save his voice

7    for later.

8        I have the unenviable job of having to go

9    over a lot of these concepts and things we've been

10   talking about for the last two days with everyone

11   here.  You've already heard over and over again and

12   you might be asking yourself at this point what do

13   they think?  We're not getting it?  Why do they keep

14   going over it?

15       I do agree with Mr. Hayden.  It's not

16   about what I say or what Mr. Hayden says, it's about

17   what the judge says.  The judge is going to give you

18   the law.  What we're doing-- what we're attempting

19   to do is just go over concepts and get assurances

20   from you that you understand these concepts and

21   you're going to use these concepts as the fact

22   finders in this trial, because this is a murder

23   charge we're talking about.  This is the most

24   serious charge any citizen in America can be charged

25   with, and so your job as jurors is that important.

People v. Heidgen

1    That's why we're taking such lengths to go over

2    this, just so that we can be assured that we're

3    going to have a fair jury, a jury that knows its

4    responsibility and understands the issues in this

5    case.

6              Now, as I'm sure you concluded already,

7    the most important concept here is this concept of

8    the depraved mind, depravity, because after all,

9    this was a terrible, terrible tragedy that resulted

10   from a car accident, but yet our client, Marty, is

11   charged with murder.  The distinction here is-- what

12   makes this car accident different and why he's being

13   charged with murder is did he have a depraved mind

14   at the time of the accident.  At that time what was

15   in his mind?  That's really your job, your key job

16   here.

17             Mr. Tingwall?

18             PROSPECTIVE JUROR #2:  Yes.

19             MR. MARTELLO:  As a police officer, as a

20   former police officer, you very often had to-- when

21   you're investigating a case, you had to find out

22   what the person was thinking at the time of the

23   crime to know whether he had intent to do something,

24   right?

25             PROSPECTIVE JUROR #2:  We don't-- police

People v. Heidgen

1   don't figure out intent.  We identify who may have

2   done it and bring them before justice.

3              MR. MARTELLO:  Okay.  Then it's the jury

4   who has to determine that.

5              PROSPECTIVE JUROR #2:  Yeah.

6              MR. MARTELLO:  That's right.  And the way

7   the jury determines what's intended is to look at

8   the evidence and look at what was going on.  Would

9   that be fair to say?

10             PROSPECTIVE JUROR #2:  That's fair.

11             MR. MARTELLO:  Now, here, Mr. Larson, we

12  have to determine whether he had a depraved mind.

13  So basically we're asking you, Mr. Larson, Miss

14  Gledhill, you have to determine what was he

15  thinking?  What was in his head at the time of the

16  accident?  How do you do that?  I mean, it's easy to

17  determine what people are doing.  I just picked up a

18  pen.  That's what I just did right now.  You know,

19  if somebody asked what did Mr. Martello do, he

20  picked up a pen.

21             If I asked you what am I thinking right

22  now as we sit here in the courtroom today, Miss

23  Brown, would you know what I'm thinking right now?

24  No.  I'm just standing here.  You don't know what

25  I'm thinking.  But if you put things together, which

People v. Heidgen

1   is, Miss Brown, what we're going to ask you to do in

2   this trial, if you put things together, put the

3   evidence together, maybe you could find out what I'm

4   thinking right now.

5        For instance, in your everyday life

6   Mr. Frosos, when you try to determine someone's

7   intention, what they're thinking, one of the things

8   you listen for is what they're talking about.  Like

9   if I said to the court officer could you please open

10  up that door for me, you can probably figure out my

11  intention is I want to walk through the door, right,

12  just by what I said?  So talking is a technique for

13  you, as fact finders, to determine what someone is

14  thinking.  Another thing is surrounding

15  circumstances, watching as the person is doing the

16  thing, then observations of other people, what they

17  see that person doing.  Then you can all determine,

18  maybe, what's going on in a person's head.

19        Would that be fair?

20        PROSPECTIVE JUROR #8:  It could be, yeah.

21        MR. MARTELLO:  Now, Mr. Sheridan, I had

22  asked the jury before what am I thinking.  Well,

23  let's look at the evidence.  I'm standing here in a

24  courtroom picking a jury.  That is the circumstances

25  I find myself in.  My actions, every once in a while

People v. Heidgen

1    I look at these notes because, as I'm referring to

2    them, I'm trying-- I'm thinking of something else to

3    say, the next thing I'm going to say.  What's coming

4    out?  My words.  I'm asking questions of you.  I'm

5    explaining concepts that are important in this case.

6         If you put all those three things

7    together, what am I talking about?  The actions I'm

8    doing, looking at this paper, and the circumstances

9    we find ourselves in, you'd probably conclude what

10   I'm thinking right now.  It would be a fair guess to

11   say I'm probably thinking that the most important

12   concern in my head right now is that I pick a fair

13   jury for Marty.  I'm his lawyer, and I want him to

14   get a fair shot and justice, and for him to get that

15   fair shot, I have to know I have a jury that is

16   going to be open-minded and is going to really

17   carefully look at the facts in this case, because

18   he's charged with murder.  That's what's in my head

19   right now.

20        If you actually put all those three things

21   together, Miss Brown, it's actually not that hard to

22   find out what was going on in my head, even though

23   you don't know me, just putting together my words,

24   the circumstances, and what I'm talking about.  You

25   probably could say to yourself, you know what?  He's

People v. Heidgen

1    concerned about Marty.  He's concerned about making

2    a good jury.  You'd be right.  That's what I'm

3    thinking about.

4              I'm going to need, Mr. Derita, you to do

5    that and to employ those same techniques in the

6    trial.  It's critical.  Critical.  So if I told you,

7    Mr. Derita, that you might hear evidence of things

8    Marty said, you'll take that into account to

9    determine what was going on in his head at the time

10   of this accident?

11             PROSPECTIVE JUROR #4:  Sure.

12             MR. MARTELLO:  If you were to hear

13   evidence of witnesses that described what he was

14   talking about, what he was feeling, his mood, his

15   demeanor, whether he was happy, all that, those

16   observations of his actions, in other words, would

17   that be something you would put together in the

18   equation about what's going on in his head?

19             PROSPECTIVE JUROR #4:  I'd listen to

20   everything, sure.

21             MR. MARTELLO:  Now, what about the last

22   part, the circumstances?

23             PROSPECTIVE JUROR #4:  Sure.

24             MR. MARTELLO:  Right?  If you heard

25   evidence that his life was, whatever, going fine,

People v. Heidgen

1      all of the rest of that would be something you'd

2      throw in the pot to say, you know what?  I have a

3      clear picture of this young man, and I know what was

4      going on in his head.

5                  PROSPECTIVE JUROR #4:  Yeah.

6                  MR. MARTELLO:  Now, why am I so concerned

7      about what's going on in his head?  I'm concerned

8      about what's going on in his head because you have

9      to make that determination of whether he had a

10     depraved mind, a wicked mind, at the time of this

11     tragic accident.

12                 Now, not surprisingly, we heard a lot of

13     examples.  The lawyers have been trying their best

14     to come up with examples for you guys about what is

15     a depraved mind, and the reason why we come up with

16     examples is because it's the best way for someone to

17     understand it.

18                 Not surprisingly, the judge came up with

19     the best example-- that's why he's the judge-- and

20     I've got to tell you it's a great example.  What the

21     judge said yesterday was that, you know, if a guy is

22     in a crowded, dark movie theater and shoots a gun

23     and he doesn't care, he doesn't care, and he hits

24     somebody, he doesn't care if he doesn't hit

25     somebody, he doesn't care about life, he doesn't

People v. Heidgen

1  care about who he hurts.  The judge is right.

2  That's a depraved mind.  It's a wicked mind.  He

3  doesn't care.  He just takes that gun, bang, shoots

4  it in a crowded, dark movie theater and doesn't care

5  if he hits a chair and doesn't care if he hits a

6  person in the chair.

7          Miss Tung, by the judge's example, would

8  you say that if you have evidence of a person doing

9  that type of action, would that be a wicked mind, a

10 depraved mind, at the time of the shooting?

11         PROSPECTIVE JUROR #11:  Yes.

12         MR. MARTELLO:  Would everyone agree with

13 that?

14         Miss Kaul?

15         PROSPECTIVE JUROR #9:  Yes.

16         MR. MARTELLO:  Miss Yearwood?

17         PROSPECTIVE JUROR #14:  Yes.

18         MR. MARTELLO:  How about you, Miss Baez?

19         PROSPECTIVE JUROR #6:  Yes.

20         MR. MARTELLO:  Now, that's what a depraved

21 mind is.  What about the reverse of that?  Same set

22 of facts.  A guy goes into the movie theater, a

23 crowded movie theater, and shoots a gun.  Let me

24 change the facts around a little bit.

25         Miss Frosos, let's say the person shooting

People v. Heidgen

1    the gun this time, in the second example, he didn't

2    know anybody was in the theater.  He didn't even

3    know it was a movie theater.  He was unfamiliar with

4    the building.  He walked in there and he didn't know

5    anybody was there.  In fact, he thought nobody was

6    in the movie theater.  He shoots a gun and somebody

7    gets hurt.

8            Now, what he did was still stupid and

9    still negligent and he probably shouldn't have done

10   it and it was still a stupid thing to do, but what

11   was going on in that second shooter's head, in your

12   mind, was he an evil, wicked person or was he a

13   stupid, negligent person?  Do you see the

14   distinction?  Does everyone see that?  That's

15   critical.

16           But I'm in a quandary here.  In both

17   examples, with shooter number one with the judge, a

18   person died when the person shot in that crowded

19   movie theater, and a person died in example number

20   two with the person that wasn't wicked, who didn't

21   have a depraved mind and was just stupid and

22   negligent.  So you have the same result but the

23   mindset is different.

24           Do you see the distinction, Miss Shields?

25           PROSPECTIVE JUROR #13:  Yes.

People v. Heidgen

1          MR. MARTELLO:  Very much so.  That's the
2     critical thing here.
3          THE COURT:  Two minutes, Mr. Martello.
4          MR. MARTELLO:  All right.
5          So that goes to the extent of, Miss Brown,
6     what Mr. LaMagna was talking about before.  If you
7     determine that at the end of the case he did not
8     have that wicked mind, he was not depraved, even
9     though the tragic accident happened, you would not
10    be able to vote murder, right?  That's very
11    important.  Okay?
12         Would you trust the law as the judge gives
13    it to you?  To trust the law, there are different
14    degrees of accountability.  He may not be
15    accountable for murder, he's still accountable for
16    doing a terrible, negligent thing, but he's not
17    accountable for the charge that the district
18    attorney has placed on him.
19         Do you see that, Miss Brown?
20         Mr. Frosos?
21         And so if, Miss Kaul, if you determine
22    that the DA has overcharged him, would you not vote
23    that way?
24         Lastly, Mr. LaMagna had talked about
25    credibility of witnesses, and we talked about

People v. Heidgen

1    whether there were reports changed and how do you

2    determine if somebody is credible.  Let me give you

3    an example.  Let's say someone is working for a

4    pharmaceutical company and he changes his report so

5    medicine could be sold.

6         You wouldn't buy that medicine, would you,

7    Miss Vargas?

8         PROSPECTIVE JUROR #1:  No.

9         MR. MARTELLO:  You wouldn't buy it.  You

10   couldn't trust that scientist because he changed a

11   report, because his employer who pays him told him

12   to change the report.  That's bad medicine.  That's

13   life and death.  So you wouldn't take that medicine.

14        The same thing here.  We're dealing with a

15   young man's life.  If you hear witnesses on that

16   stand that aren't credible that change their

17   reports, are you going to use that evidence, that

18   witness' testimony that's not credible, to determine

19   his life?

20        PROSPECTIVE JUROR #1:  No.

21        MR. MARTELLO:  You wouldn't do that?

22        PROSPECTIVE JUROR #1:  No.

23        MR. MARTELLO:  None of us would want that

24   for ourselves.

25        THE COURT:  Time, Mr. Martello.

People v. Heidgen

1        MR. MARTELLO:  Thank you, Judge.

2        THE COURT:  At this time I'm going to give

3    everyone in the courtroom a five-minute break, so

4    please don't talk about the case.  See you in a

5    little bit.

6             (Whereupon, the jury panel exited the

7    courtroom.)

8             (Whereupon, a brief recess was taken.)

9        THE CLERK:  People, challenges for cause

10   as to seats one and two at this time?

11       MR. HAYDEN:  No, your Honor.

12       THE CLERK:  Defendant, challenges for

13   cause seats one and two?

14       MR. LAMAGNA:  No, your Honor.

15       THE CLERK:  People, peremptory challenges

16   as to seats one and two at this time?

17       MR. HAYDEN:  No, your Honor.

18       THE CLERK:  Defense, peremptory challenges

19   as to seats one and two at this time?

20       MR. LAMAGNA:  Number two, your Honor.

21       THE CLERK:  Seat number one has now become

22   juror number eleven.

23            People, challenge for cause seat number

24   three?

25       MR. HAYDEN:  No, your Honor.

People v. Heidgen

1          THE CLERK:  Defense, challenge for cause

2   seat number three?

3          MR. LAMAGNA:  No, your Honor.

4          THE CLERK:  People, peremptory challenge

5   seat number three?

6          MR. HAYDEN:  No, your Honor.

7          THE CLERK:  Defense, peremptory challenge

8   seat number three?

9          MR. LAMAGNA:  Yes, your Honor.

10          THE CLERK:  People, challenge for cause

11   seat number four?

12          MR. HAYDEN:  No, your Honor.

13          THE CLERK:  Defense, challenge for cause

14   seat number four?

15          MR. LAMAGNA:  No, your Honor.

16          THE CLERK:  People, peremptory challenge

17   seat number four?

18          MR. HAYDEN:  No, your Honor.

19          THE CLERK:  Defense, peremptory challenge

20   seat number four?

21          MR. LAMAGNA:  No, your Honor.

22          THE CLERK:  That's juror number twelve.

23          People, challenge for cause seat number

24   five?

25          MR. HAYDEN:  No, your Honor.

People v. Heidgen

1          THE CLERK:  Defense, challenge for cause

2     seat number five?

3          MR. LAMAGNA:  No, your Honor.

4          THE CLERK:  People, peremptory challenge

5     seat number five?

6          MR. HAYDEN:  No, your Honor.

7          THE CLERK:  Defense, peremptory challenge

8     seat number five?

9          MR. LAMAGNA:  Yes, your Honor.

10          THE CLERK:  People, challenge for cause

11     seat number six?

12          MR. HAYDEN:  No, your Honor.

13          THE CLERK:  Defense, challenge for cause

14     seat number six?

15          MR. LAMAGNA:  No, your Honor.

16          THE CLERK:  People, peremptory challenge

17     seat number six?

18          MR. HAYDEN:  No, your Honor.

19          THE CLERK:  Defense, peremptory challenge

20     seat number six?

21          MR. LAMAGNA:  Yes, your Honor.

22          THE CLERK:  People, challenge for cause

23     seat number seven?

24          MR. HAYDEN:  No, your Honor.

25          THE CLERK:  Defense, challenge for cause

People v. Heidgen

1    seat number seven?

2              MR. LAMAGNA:  No, your Honor.

3              THE CLERK:  People, peremptory challenge

4    seat number seven?

5              MR. HAYDEN:  No, your Honor.

6              THE COURT:  Juror number seven is

7    alternate number one.

8              MR. LAMAGNA:  That's our first alternate.

9              THE COURT:  Try to work together.  I want

10   to try to get five or six alternates.

11             THE CLERK:  People, challenge for cause

12   seat number eight?

13             MR. HAYDEN:  No, your Honor.

14             THE CLERK:  Defense, challenge for cause

15   seat number eight?

16             MR. LAMAGNA:  No.

17             THE CLERK:  People, peremptory challenge

18   seat number eight?

19             MR. HAYDEN:  No, your Honor.

20             THE CLERK:  Defense, peremptory challenge

21   seat number eight?

22             MR. LAMAGNA:  No, your Honor.

23             THE COURT:  That's alternate number two.

24             THE CLERK:  People, challenge for cause

25   seat number nine?

People v. Heidgen

1          MR. HAYDEN:  No, your Honor.

2          THE CLERK:  Defense, challenge for cause

3    seat number nine?

4          MR. LAMAGNA:  No, your Honor.

5          THE CLERK:  People, peremptory challenge

6    seat number nine?

7          MR. HAYDEN:  Yes, your Honor.

8          THE CLERK:  People, challenge for cause

9    seat number ten?

10          MR. HAYDEN:  No, your Honor.

11          THE CLERK:  Defense, challenge for cause

12    seat number ten?

13          MR. LAMAGNA:  No, your Honor.

14          THE CLERK:  People, peremptory challenge

15    seat number ten?

16          MR. HAYDEN:  No, your Honor.

17          THE CLERK:  Defense, peremptory challenge

18    seat number ten?

19          MR. LAMAGNA:  No, your Honor.

20          THE CLERK:  That's alternate number three,

21    which is Sheridan.

22          THE COURT:  You guys are doing good.  Keep

23    it up.

24          THE CLERK:  People, challenge for cause

25    seat number eleven?

People v. Heidgen

1    MR. HAYDEN:  No, your Honor.

2    THE CLERK:  Defense, challenge for cause

3    seat number eleven?

4    MR. LAMAGNA:  No, your Honor.

5    THE CLERK:  People, peremptory challenge

6    seat number eleven?

7    MR. HAYDEN:  No, your Honor.

8    THE CLERK:  Defense, peremptory challenge

9    seat number eleven?

10   MR. LAMAGNA:  Yes, your Honor.

11   THE CLERK:  People, challenge for cause

12   seat number twelve?

13   MR. HAYDEN:  No, your Honor.

14   THE CLERK:  Defense, challenge for cause

15   seat number twelve?

16   MR. LAMAGNA:  No, your Honor.

17   THE CLERK:  People, peremptory challenge

18   seat number twelve?

19   MR. HAYDEN:  Yes, your Honor.

20   THE CLERK:  People, challenge for cause

21   seat number thirteen?

22   MR. HAYDEN:  No, your Honor.

23   THE CLERK:  Defense, challenge for cause

24   seat number thirteen?

25   MR. LAMAGNA:  No, your Honor.

People v. Heidgen

1       THE CLERK:  People, peremptory challenge

2   seat number thirteen?

3       MR. HAYDEN:  No, your Honor.

4       THE CLERK:  Defense, peremptory challenge

5   seat number thirteen?

6       MR. LAMAGNA:  No, your Honor.

7       THE CLERK:  That's alternate number four,

8   Shields.

9       People, challenge for cause, seat number

10  fourteen?

11      MR. HAYDEN:  No, not for cause.

12      THE CLERK:  Defense for cause, seat number

13  fourteen?

14      MR. LAMAGNA:  No, your Honor.

15      THE CLERK:  People, peremptory challenge

16  seat number fourteen?

17      MR. HAYDEN:  No, your Honor.

18      THE CLERK:  Defendant, peremptory

19  challenge seat number fourteen?

20      MR. LAMAGNA:  Yes, your Honor.

21      THE COURT:  All right.  We're going to put

22  six people in the box.  You can have five minutes

23  for two more alternates.

24      Would you produce the jury, please?

25      (Whereupon, the prospective jury panel

People v. Heidgen

1    entered the courtroom.)

2              THE CLERK:  Case on trial, indictment

3    1910N-2005, People v. Martin Heidgen.

4              People ready?

5              MR. HAYDEN:  Ready, your Honor.

6              THE CLERK:  Defendant ready?

7              MR. LAMAGNA:  Ready, your Honor.

8              THE CLERK:  The defendant is present, your

9    Honor.

10             The following jurors please remain seated

11   in the box:

12             Michelle Vargas, Michael Derita, Charmen

13   Brown, Peter Frosos, Joseph Sheridan and Meryl

14   Shields.

15             All other jurors follow the directions of

16   the officers, please.

17             (Whereupon, the unselected jurors were

18   excused.)

19             (Whereupon, the jurors were duly sworn.)

20             THE COURT:  With the exception of two more

21   alternates, which we'll select in a few minutes from

22   the balance of people seated in the back of the

23   courtroom, we will have a jury.  We will be starting

24   9:30 Monday morning.

25             Between now and then, as you know, I'm

People v. Heidgen

1    going to let all of you know, the same for those of

2    you who will ultimately be selected as alternates,

3    you must not discuss the case among yourselves or

4    with anyone else until the entire case has been

5    completed and the Court has given you its charge as

6    to the law which applies to the counts of the

7    indictment which will be given to you for your

8    consideration.

9            You must keep an open mind until all of

10   the evidence has been presented and you are charged

11   as to the law.

12           You must not read or listen to any

13   accounts or discussions of the case in the event it

14   is reported by newspapers or other media.  That's

15   going to be a hard one.  It probably is going to be

16   reported.  Please don't read about it or don't

17   listen about it.

18           You must not visit or view the place or

19   premises where the offenses charged were allegedly

20   committed or any other premises or place involved in

21   the case.

22           You are not to permit any party to discuss

23   the case with you or attempt to influence you.  You

24   must promptly report to the Court any incident

25   within your knowledge involving an attempt by any

People v. Heidgen

1  person to improperly influence any member of the

2  jury.

3          Prior to discharge you may not accept any

4  payment or benefit in consideration for supplying

5  any information concerning this trial.

6          I also advise you if at any time any of

7  the participants in this trial should meet you in

8  the hallways or outside the building, they may not

9  speak to or even acknowledge you to avoid any

10  appearance of impropriety.

11          Have a nice weekend.  See you Monday

12  morning.

13          (Whereupon, the jurors exited the

14  courtroom.)

15          THE CLERK:  Seat number one, Kathy Kneher,

16  K-N-E-H-E-R; seat number two, Shari Dominianni,

17  D-O-M-I-N-I-A-N-N-I; seat number three, Nancy

18  Cannataro, C-A-N-N-A-T-A-R-O; seat number four,

19  Marie Bastien, B-A-S-T-I-E-N; seat number five,

20  Robert Winterton, W-I-N-T-E-R-T-O-N; seat number

21  six, Peter Didangi, D-I-D-A-N-G-I.

22          THE COURT:  Okay.  Welcome, ladies and

23  gentlemen.  My first question is do any of you know

24  any of us?

25          (No response.)

People v. Heidgen

1    Did any of you recognize any names I read

2    on the witness list?

3        PROSPECTIVE JUROR #6:  I never saw the

4    list.

5        THE COURT:  Sir, why don't you have a look

6    at this and see if you know any of these names.

7        PROSPECTIVE JUROR #6:  No.

8        THE COURT:  Now, would it be fair to

9    assume, as in the last several panels, many of you,

10   if not all of you, know something about this case

11   from what you've read or learned over the course of

12   time before you got here?

13       Some yes, some no.

14       Those of you who do know something about

15   this case, in your present frame of mind do you

16   think you could be fair to the defendant and listen

17   fairly and impartially to the evidence that will be

18   presented during this trial?

19       Everybody can give me a yes on that?

20       PROSPECTIVE JUROR #6:  I'm not sure.

21       THE COURT:  You are not sure?

22       PROSPECTIVE JUROR #6:  No.

23       THE COURT:  Go back to central jury, sir.

24   Fill the box.

25       (Whereupon, the prospective juror was

People v. Heidgen

1     excused.)

2              THE CLERK:  Seat number six, Diana Lituma,

3     L-I-T-U-M-A.

4              (No response.)

5              Mike Lomas, L-O-M-A-S.

6              (No response.)

7              Seat number six, Jeanne Kontje.

8              THE COURT:  How about you, ma'am?  Do you

9     know any of us?

10             PROSPECTIVE JUROR #6:  No.

11             THE COURT:  Do you know anybody on the

12    witness list?

13             PROSPECTIVE JUROR #6:  No.

14             THE COURT:  Despite anything you might

15    have learned about this case before you got here,

16    presently in your frame of mind do you think you can

17    be fair to the defendant and listen to the evidence?

18             PROSPECTIVE JUROR #6:  Yes.

19             THE COURT:  Okay.

20             MS. MCCORMICK:  Good afternoon.  I

21    appreciate that you've been listening to all of this

22    day after day.  Thinking about what you've heard,

23    about the effects of alcohol on people or on

24    someone's state of mind, or do you know anybody who

25    has been accused of driving while intoxicated that

People v. Heidgen

1    you think we should know about, is there anything

2    about what you've heard you want to bring to our

3    attention?

4           Then I have to talk about this example

5    that Mr. Martello just used, taken from the judge,

6    about shooting into a dark movie theater.  I have to

7    ask you if that same person who shot the gun into

8    the movie theater did so after he passed a huge sign

9    that said movie theater, after he passed a billboard

10   that had the movie times listed and it said movie

11   playing right now, that if he then took a gun and

12   shot into a darkened room in that theater but after

13   the fact said, gee, I didn't know, I didn't mean it,

14   would you consider those things, all of those

15   things, in determining whether he knew or should

16   have known what effect that would have and if he was

17   indifferent or depraved to other people and didn't

18   care?  Would you consider those things?

19           Would you, ma'am?

20           I'm going really fast.  I'm sorry.

21           Do we all agree that you cannot undue

22   something by saying sorry afterwards?  Would you

23   agree that you could be genuinely sorry afterwards,

24   but it's not going to undue what you've done?  Would

25   you agree?

People v. Heidgen

1    And also in your life experiences would

2    you also agree that people wear social masks?

3    Perhaps you don't know people as well as you think

4    you do.  Say you work with somebody and you work

5    with them every day but you don't see them outside

6    the office, do you think there could be another side

7    to that person?  Do you think that people have other

8    sides than what they show the public?  Do you agree?

9        Do you think it's possible that somebody

10   could be set off by something and at that moment,

11   though they are an entirely different person the

12   rest of their life, at that moment they behave in a

13   way unexpected to people who have dealt with them at

14   work or at school?

15       Have each of you seen news reports or

16   accounts where neighbors and friends, after some

17   horrific event, were interviewed and said, my God, I

18   never would have thought that.  I am really so

19   surprised.  Does everybody agree that how well you

20   know somebody is dependent on what they're willing

21   to show you?  Do you agree?

22       So the last thing, because you know that

23   we're looking for a fair jury, and there's going to

24   be a lot of testimony and there's going to be some

25   science and some math, and there's going to be,

People v. Heidgen

1  maybe, some distractions throughout this trial, can

2  I ask each one of you for your assurance that while

3  you are listening to the evidence in this case that

4  you will keep your eye on the ball, or, more

5  accurately, keep your eye on that pick-up truck and

6  how the defendant was driving it at the time?

7  Because you will be called upon, if you become a

8  juror in this case, to decide about his behavior at

9  that time and what that behavior says about whether

10  or not he was indifferent to other people around

11  him.  Would you keep your eye on that truck?

12           Thank you.

13           I have nothing further, Judge.

14           THE COURT:  Mr. LaMagna?

15           MR. LAMAGNA:  Thank you, your Honor.

16           Hello, ladies and gentlemen.  Put simply,

17  as we all know as adults, this is going to be about

18  fairness, about justice.  You all agree with that?

19           If a person is charged with a crime, if

20  you're a juror, it's about fairness.  It's about

21  whether the district attorney, the government,

22  proves their case beyond a reasonable doubt; isn't

23  that correct?

24           You would agree, would you not, that it's

25  not about vengeance, it's about justice?

People v. Heidgen

1          PROSPECTIVE JUROR #1:  Yes.

2          MR. LAMAGNA:  You would agree it's not

3     about sympathy or emotion, it's about justice, isn't

4     it?  It's not about politics, certainly.  You would

5     agree with that?

6          PROSPECTIVE JUROR #1:  Yes.

7          MR. LAMAGNA:  Would you agree with that?

8          PROSPECTIVE JUROR #2:  Yes.

9          MR. LAMAGNA:  Would you agree with that?

10          PROSPECTIVE JUROR #3:  Yes.

11          PROSPECTIVE JUROR #5:  Yes.

12          MR. LAMAGNA:  You would agree, would you

13     not, that it's not about a political agenda of a

14     district attorney to charge murder on a DWI case

15     when she ran on being hard on DWI.

16          MS. MCCORMICK:  Objection, Judge.

17          THE COURT:  Sustained.

18          MR. LAMAGNA:  You would agree that life

19     isn't always black and white.  There are shades of

20     gray.  Would you agree with that?

21          And no matter how terrible a result is,

22     there are degrees of culpability, the most extreme

23     being murder, as if somebody intentionally, in cold

24     blood, killed somebody.  There's never anything

25     between?  Would we agree that if the judge gives you

People v. Heidgen

1     lesser charges of murder, it's still criminal

2     charges, would you consider those?

3              In viewing the evidence can you all

4     promise that you're going to be fair, especially

5     with the gravity of the charge here and this

6     person's life in your hands?

7              You promise you will take that

8     responsibility with the same gravity of the charge

9     and view all the evidence critically?

10             Whether there's changes, mistakes,

11    excuses, that's not evidence.  Thank could be doubt

12    too, couldn't it?

13             You can all promise you can be fair and

14    impartial?

15             Thank you.

16             THE COURT:  All right, everybody.  I'm

17    going to give everybody a five-minute break.  Don't

18    go too far away.  Don't talk about the case.

19             (Whereupon, the jury panel exited the

20    courtroom.)

21             THE CLERK:  People, challenge for cause as

22    to seat number one?

23             MS. MCCORMICK:  No, your Honor.

24             THE CLERK:  Defense, challenge for cause,

25    seat number one?

People v. Heidgen

1          MR. LAMAGNA:  No, your Honor.

2          THE CLERK:  People, peremptory challenge

3   seat number one?

4          MS. MCCORMICK:  No, your Honor.

5          THE CLERK:  Defense, peremptory challenge

6   seat number one?

7          MR. LAMAGNA:  Yes, your Honor.

8          THE CLERK:  People, challenge for cause

9   seat number two?

10          MS. MCCORMICK:  No cause, your Honor.

11          THE CLERK:  Defense, challenge for cause

12   seat number two?

13          MR. LAMAGNA:  No, your Honor.

14          THE CLERK:  People, peremptory challenge

15   seat number two?

16          MS. MCCORMICK:  Yes, your Honor.

17          THE CLERK:  People, challenge for cause

18   seat number three?

19          MS. MCCORMICK:  No, your Honor.

20          THE CLERK:  Defense, challenge for cause

21   seat number three?

22          MR. LAMAGNA:  No, your Honor.

23          THE CLERK:  People, peremptory challenge

24   seat number three?

25          MS. MCCORMICK:  No, your Honor.

People v. Heidgen

1      THE CLERK:  So that's alternate number

2   five at this time.  Cannataro becomes alternate

3   number five.

4      People, challenge for cause, seat number

5   four?

6      MS. MCCORMICK:  No, your Honor.

7      THE CLERK:  Defense, challenge for cause,

8   seat number four?

9      MR. LAMAGNA:  No, your Honor.

10      THE CLERK:  People, peremptory challenge

11   seat number four?

12      MS. MCCORMICK:  Yes, your Honor.

13      THE CLERK:  People, challenge for cause

14   seat number five?

15      MS. MCCORMICK:  No, your Honor.

16      THE CLERK:  Defendant, challenge for cause

17   seat number five?

18      MR. LAMAGNA:  No, your Honor.

19      THE CLERK:  People, peremptory challenge

20   seat number five?

21      MS. MCCORMICK:  No, your Honor.

22      THE CLERK:  Defense, peremptory challenge

23   seat number five?

24      MR. LAMAGNA:  No, your Honor.

25      THE COURT:  We have a jury.

People v. Heidgen

1      Okay.  Would you produce the jury?

2          (Whereupon, the prospective jury panel

3      entered the courtroom.)

4          THE CLERK:  Case on trial, indictment

5      number 1910N-05, People v. Martin Heidgen.

6          People ready?

7          MR. HAYDEN:  Ready, your Honor.

8          THE CLERK:  Defendant ready?

9          MR. LAMAGNA:  Ready, your Honor.

10         THE CLERK:  The defendant is present, your

11     Honor.

12         THE CLERK:  Will Nancy Cannataro and

13     Robert Winterton remain seated.  The other jurors,

14     please step out.  Follow the directions of the

15     officers.

16         (Whereupon, the unselected jurors were

17     excused.)

18         (Whereupon, the jurors were duly sworn.)

19         THE COURT:  Please have a seat.  We now

20     have selected our jury.  We will begin this case, in

21     terms of opening statements and calling of

22     witnesses, on Monday morning.

23         My comments now are to the rest of you in

24     the room who may feel as though you have been

25     sitting here wasting your time and haven't had an

People v. Heidgen

1    opportunity to participate in the process.  Usually,

2    I simply tell people that is true.  I remind them by

3    their participation, they assure all of us a fair

4    trial, but you've gone even an extra mile.

5               I told you that the case involves terrible

6    injuries.  I told you it will be a very long ordeal,

7    lasting as much as five weeks.  I told you that you

8    might even be sequestered in a hotel during

9    deliberations.  I told you that the task of being a

10   juror in this case was likely and will probably be

11   onerous, and yet here you are.  You're each to be

12   congratulated in insuring all of us that we, in

13   Nassau County, no matter what the charges are

14   against us, have jurors willing to give us a fair

15   trial.

16               You now are all excused from jury duty.

17               Have a nice weekend.  See you Monday

18   morning.

19               (Whereupon, the jury panel exited the

20   courtroom.)

21               (Whereupon, the Court stood in recess for

22   the day.)

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    ---------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4            -against-

 5

      MARTIN HEIDGEN,
 6
                              DEFENDANT.
 7    ---------------------------------------x
      INDICTMENT #:  1910N-06
 8
                              Mineola, New York
                              September 11, 2006
 9                            VOLUME II

10    B E F O R E:   HONORABLE ALAN L. HONOROF
                        Acting Supreme Court Justice
11

12    A P P E A R A N C E S:

13                 HON. KATHLEEN M. RICE
                   District Attorney, Nassau County
14                     262 Old Country Road
                   Mineola, New York 11501
15                 BY:  ROBERT HAYDEN, ESQ.
                   Assistant District Attorney
16                       and
                   MAUREEN McCORMICK, ESQ.
17                 Assistant District Attorney

18

                   STEPHEN LaMAGNA, ESQ.
19                     Attorney for the Defendant
                       666 Old Country Road
20                     Garden City, New York
                   BY:  STEPHEN V. LaMAGNA, ESQ.
21                       and
                   GREGORY MARTELLO, ESQ.
22

                         o0o
23                       TRIAL
                         o0o
24                 Gigi Wright, R.P.R.
                   Official Court Reporter
25
```

Proceedings

1                    (In chambers.  Ex parte proceeding.)

2                    THE COURT:  Good morning.  Good morning.

3        Would you please explain what this is about?

4                    MS. McCORMICK:  A subpoena had been issued

5        for letters that were admitted to have been sent to

6        Ms. Gerner from the defendant from jail.  We had reason

7        to believe that those letters might contain admissions

8        or information relevant to this trial so we subpoenaed

9        those letters.

10                   Ms. Gerner produced only an empty envelope

11       from a letter that she says she has thrown out.  There

12       is nothing about the content of this particular letter

13       that would lead us to believe that it would have been

14       retained, unlike the last letter that we brought to the

15       Court's attention.

16                   So all things being said, although we

17       appreciate the Court asking her to search for the

18       letter, she has assured us that she has searched for

19       the letter, and I have no reason to believe that it is

20       being withheld at this time.

21                   THE COURT:  Would you stand up please.

22                   (Whereupon, Ms. Gerner, was duly sworn by

23              the Court.)

24                   THE COURT:  Please a seat.  Are you familiar

25       with the letter the district attorney has been telling

Proceedings

1       me about?

2                    MS. GERNER:  The letter from Josh, I'm

3       familiar.

4                    THE COURT:  Do you know where it is?

5                    MS. GERNER:  I gave it to them last week.  I

6       found it.

7                    THE COURT:  No.  That is not the letter we

8       are referring to.  I'm referring to the letter sent

9       directly to you.

10                   MS. GERNER:  No one specific letter.  He

11      never really discussed the case with me.  It was like

12      he said -- it was all small talk.

13                   THE COURT:  Did he send you a letter?

14                   MS. GERNER:  Yes.

15                   THE COURT:  Did he send you more than one

16      letter?

17                   MS. GERNER:  Yes.

18                   THE COURT:  Where are the letters?

19                   MS. GERNER:  I don't know.  I threw them out.

20                   THE COURT:  All right.  I'm ordering you to

21.     search for the letters.

22                   MS. GERNER:  Okay.

23                   THE COURT:  If you find them, or if you don't

24      find them, you are to contact the district attorney

25      immediately and let her know, yes or no, as to the

Proceedings

1      search and what it revealed.

2                  MS. GERNER:  okay.

3                  THE COURT:  Okay.  Thank you.

4                  (In open court.  Defendant present.)

5                  THE CLERK:  Case on trial.  This is

6      Indictment 1910N of 2005, People of the State of New

7      York versus Martin Heidgen.  All parties present.

8      Defendant is present; jurors are not present.

9                  Appearances for the record.

10                  MR. HAYDEN:  Robert Hayden for the People.

11                  MR. LaMAGNA:  Steven LaMagna for the

12      defendant.  Also present is Greg Martello for the

13      defendant.

14                  MS. McCORMICK:  Maureen McCormick for the

15      People.

16                  THE COURT:  Bring in the jury.

17                  COURT OFFICER:  Jury entering.

18                  (Whereupon, the jury entered the courtroom,

19      and upon taking their respective seats the following

20      occurred:)

21                  THE CLERK:  Case on trial, Indictment number

22      1910N of 2005, People versus Martin Heidgen.

23                  People ready?

24                  MR. HAYDEN:  Ready, Your Honor.

25                  THE CLERK:  Defendant ready?

Proceedings

1          MR. LaMAGNA:  Defendant is ready, your Honor.

2          THE CLERK:  The defendant is present, your

3     Honor; the jurors are seated.

4          THE COURT:  Thank you.  We have already had

5     one juror issue come up, which we resolved in chambers.

6     I found, based on a phone conversation we had with

7     juror number three, that juror number three was

8     unavailable under the C.P.L. and, consequently, I

9     exercised my authority, and replaced juror number three

10    with alternate number one.

11         Members of the jury, we are about to begin

12    the trial of this case.  The trial has commenced with

13    the selection of the jury.  At this point I am required

14    by law to instruct you generally concerning your basic

15    functions, duties and conduct, and to acquaint you in a

16    general way to trial procedure and the general rules

17    which apply to jury trials, so you can better

18    understand and help you reach a proper verdict.  It is

19    hoped that these remarks will be helpful, particularly

20    those of you serving as jurors for the first time.

21         The comments and instructions which follow

22    are designed to acquaint you with the separate

23    functions, duties and responsibilities of the Court,

24    attorneys and jury, and to give you a better

25    understanding as to how you, as jurors, should conduct

Proceedings

1        yourselves during the trial.

2                As you know, this is a criminal case.  And it

3        has been brought by the People upon an indictment

4        accusing the defendant, Martin Heidgen, of the crimes

5        of Murder in the Second Degree, two counts; Assault in

6        the First Degree, three counts; Reckless Endangerment

7        in the First Degree, two counts and; Driving While

8        Intoxicated, two counts.

9                Please keep in mind that an indictment is

10       simply an accusation and it is not in any way evidence

11       of the allegations that it contains.  It is merely the

12       device used in our law to bring the charges of the

13       accused to trial.  The defendant has pleaded not guilty

14       to the indictment.  According to the law, the People

15       have the burden of proving beyond a reasonable doubt

16       each and every element of each of the crimes charged in

17       the indictment.  The defendant does not have to prove

18       anything.  The defendant is presumed to be innocent.

19               The next step in the trial will be an opening

20       statement by the People, represented by the district

21       attorney, during which he is required by law to

22       indicate to you what he intends to prove by way of

23       evidence to support the charges set forth against the

24       defendant.

25               Subsequent to that defense counsel, if he

Proceedings

1    desires, may also make an opening statement.  The

2    opening statement will enable the Court and the jury to

3    better understand the testimony and the evidence that

4    will follow at the trial.

5         What counsel for either party says in an

6    opening statement is not evidence.  You may consider

7    the opening statement as a preview of what each side

8    intends to prove by way of evidence in the case.

9         After the opening statement or statements the

10   district attorney will present a witness or witnesses

11   who will be questioned by him.  This is called direct

12   examination.

13        After the district attorney completes his

14   questions defense counsel will be given an opportunity

15   to question the witness.  This is called

16   cross-examination.  After the People have concluded the

17   calling of their witnesses and have accomplished the

18   introduction of any exhibits admissible into evidence,

19   the defendant may offer evidence in his defense and,

20   also if he chooses, offer exhibits into evidence.

21        There may be legal motions at various times

22   during the trial and at those times you will be

23   excused.

24        After the defendant rests and the People have

25   rested, the defendant may make a closing argument or

Proceedings

1     summation, following which the People may make a

2     closing argument or summation, then I will charge you

3     on the law and you will retire to deliberate for the

4     purpose of reaching a verdict.

5          That is a general outline of the trial

6     procedure.  You, the members of the jury, are the sole

7     judges of the facts.  You, and you alone, will have the

8     responsibility to find and determine the facts.

9          On the other hand, when I instruct you on the

10    law during the course of or at the close of the trial

11    you must follow my instructions on the law exactly as I

12    give them to you, without any hesitation or

13    reservation, even though you may disagree with my

14    instructions.

15         Exhibits, such as photographs, documents or

16    other tangible objects presented by counsel during the

17    course of the trial will be first marked solely for

18    identification.  Such exhibits are not evidence unless

19    and until they are received in evidence by order of the

20    Court.  For the most part, evidence consists of

21    testimony of witnesses under oath and exhibits which

22    are introduced into evidence.

23         Questions in and of themselves are not

24    evidence.  Therefore, you cannot infer any fact from

25    the mere asking of a question.  It is the answer,

Proceedings

1      coupled with the question, that constitutes evidence.

2                    During the course of the trial either

3      attorney, the district attorney or defense counsel may

4      object to a question or an answer on the ground that

5      somehow it is legally improper or inadmissible.

6                    If I sustain the objection that means I

7      believe the question or the answer was in some manner

8      improper.  Therefore, in the first instance the

9      question may not be asked and; in the second instance,

10     if an answer has been given I will strike it out and

11     the answer is no longer evidence in the case, and you

12     are to disregard it.

13                   If I overrule the objection then it means

14     that the question is proper, and I will permit it to be

15     answered.  Or if already answered, I will permit the

16     answer to stand as evidence in the case.  Please do not

17     hold it against either attorney if I rule against them.

18                   As I have already explained, you must not

19     discuss this case amongst yourselves or with anyone

20     else until the entire case has been completed and the

21     Court has given you the charge on the law which applies

22     to the counts of the indictment, which will be given to

23     you for your consideration.

24                   You must keep an open mind until all of the

25     evidence is presented and you are charged as to the

Opening - People

1     law.

2             You must not read or listen to any accounts

3     or discussion of the case in the event it is reported

4     by any newspaper or other media.

5             You must not visit or view the premises or

6     place where the offense or offenses charged were

7     allegedly committed, or any other premises or place

8     involved in the case.

9             You are not to permit any party to discuss

10    this case with you or attempt to influence you.  You

11    must promptly report to the Court any incident within

12    your knowledge involving an attempt by any person to

13    improperly influence any member of the jury.

14            Prior to discharge you may not request,

15    accept or discuss any payment or benefit in

16    consideration for supplying any information concerning

17    this trial.

18            I also advise you that if at any time either

19    any of the participants in this trial shall meet you in

20    the hallways or outside of the building they may not

21    speak to you or even acknowledge you to avoid any

22    appearance of impropriety.

23            We will now proceed with the next step in the

24    trial which is the opening statement by the People.

25            MR. HAYDEN:  I'm going to take you back to

Opening – People

1    around 2 o'clock on the early morning of Saturday, July

2    2nd of 2005.  The air outside was warm and clear.

3    Christopher and Denise Tangney were sitting in the

4    comfort of a long, black limousine moving smoothly

5    along the southbound Meadowbrook Parkway approaching

6    the Babylon Turnpike overpass.  There were on their way

7    home to Long Beach.

8              Fifty-nine year old Stanley Rabinowitz was

9    driving the limousine about 60 miles an hour, and the

10   Tangneys had no care in the world.

11             Friday, July 1st, had provided a beautiful

12   evening for Christopher and Denise.  Their younger

13   daughter, Lisa, had been married on the beach in

14   Bayville.  The scene was picture perfect, the food was

15   good, the music was good.  But most important they

16   celebrated the day with loved ones, with Lisa and the

17   groom, David; with their 34 year old son, Thomas; with

18   their older daughter, Jennifer and her husband Neil and

19   their granddaughters, seven year old Katie and five yea

20   old Grace.

21             Christopher and Denise shared the passenger

22   compartment in the limousine with Jennifer, Neil, Katie

23   and Grace.  The girls were sound asleep after one of

24   the biggest days of their young lives.  It was like a

25   beautiful dream for the entire family.

Opening - People

1           Within seconds that beautiful dream shattered

2      with the explosive impact of crunching metal and

3      breaking glass.  Within seconds that beautiful dream

4      became a nightmare from which a tiny family were never

5      fully awakened.

6           About 2 o'clock, early in the morning, there

7      was another vehicle, a pickup truck, moving steadily

8      along the southbound Meadowbrook Parkway.  The only

9      problem was it was moving northbound, ignoring several

10     sets of oncoming headlights, ignoring cars with blaring

11     horns.  The defendant kept coming the wrong way with a

12     blood alcohol content more than three times the legal

13     limit.  The defendant drove rapidly northbound along

14     the southbound center lane of the parkway for miles

15     before entering a collision course with the limousine.

16     He never swerved, he never wavered, he just kept

17     coming.  The impact was horrific.

18           Denise suffered injuries, including a broken

19     hip, and a shattered knee.  Christopher suffered

20     injuries, including compound fractures of the hip and

21     leg, along with internal injuries.  Neil suffered

22     injuries, including a broken back and a collapsed lung.

23     They were the luck lucky ones.  Mr. Rabinowitz was

24     crushed inside the driver's compartment of the

25     limousine and died instantly.  Katie was decapitated

Opening - People

1    and died in a heartbeat.

2         Family members will testify.  They'll

3    describe their injuries and establish their severity.

4    Medical examiners will testify.  They'll establish the

5    blunt force trauma from the blunt force impact.

6         A young man named Greg Nizewicz will testify.

7    He will tell you he is a friend of the defendant.

8    He'll tell you how he met the defendant on the late

9    afternoon of Friday, July 1st.  They met at a bar,

10   House of Brews, he saw the defendant consume six beers

11   while together that late Friday afternoon.

12        A young woman named Tracy Sodikoff will

13   testify.  She will tell you she too was a friend of the

14   defendant; she too met the defendant that Friday.  She

15   met him that Friday night at a house party in Merrick,

16   not far from the Meadowbrook Parkway.  She too will

17   tell you she saw the defendant consume alcoholic

18   beverages that Friday.  She saw him consume Irish car

19   bombs.  These are drinks with a mixture of whiskey,

20   Bailey's Irish Cream and Guinness.  She never saw the

21   defendant leave the party that night.  She never saw

22   the defendant say good night to anyone.

23        A 28-year-old waitress named Elizabeth Serwin

24   will testify.  She will tell you she was on her way

25   home that early Saturday morning.  She had worked at a

Opening - People

1    restaurant in Syosset.  Yet she was on her way home to

2    Long Beach.  She was driving southbound along the

3    southbound center lane of the parkway, and had her

4    lights on, south of Merrick Road when she saw oncoming

5    headlights.  When she realized those headlights were

6    being driven right at her, she veered across the

7    parkway onto the shoulder to avoid an immediate

8    collision.  She hit her car horn three times to alert

9    the driver.  The vehicle, the pickup truck, kept coming

10   at a high rate of speed.  The driver never swerved,

11   never wavered, never reacted to Ms. Serwin's headlights

12   or horn in any way.  She will tell you she noticed two

13   other cars, headlights on, pulled off onto the shoulder

14   of the road behind hers.

15          A 38-year-old Verizon employee, Mr. Shields,

16   will testify.  He'll tell you he too was out on the

17   Meadowbrook Parkway at approximately 2 o'clock in the

18   morning.  He too was going southbound in the southbound

19   center lane of the parkway, headlights on, south of

20   Merrick Road, when he noticed oncoming headlights.

21   Those headlights were approaching northbound along the

22   southbound center lane.  Mr. Shields moved over into

23   the right-hand lane and began flashing his headlights

24   and blaring his car horn to alert the driver.  The

25   vehicle, the pickup truck, just kept coming, high rate

Opening - People

1    of speed.  The driver never swerved, the driver never

2    wavered, the driver never reacted to those headlights

3    or car horns in any way.

4              A 34-year-old film producer, Joseph Caruso

5    will testify.  He too was on his way home at 2 o'clock,

6    early Saturday morning.  He too was driving southbound

7    along the southbound center lane of the parkway,

8    headlights on, just south of Merrick Road, when he

9    noticed oncoming headlights.  His initial reaction was

10   to drift slightly to his left.  When Mr. Caruso drifted

11   slightly to his left, he noticed that the oncoming

12   headlights appeared to be slightly to Mr. Caruso's

13   left.  Mr. Caruso veered across the parkway on the

14   shoulder road to avoid an immediate collision.  The

15   vehicle, the pickup truck, just kept coming at a high

16   rate of speed.  The driver never swerved, never

17   wavered, the driver never reacted to Mr. Caruso's

18   headlights in any way.  Mr. Caruso will tell you he

19   noticed another car pulled off onto the shoulder of the

20   road.  That car was in front of his.

21             A 19 year old Villanova student named Matthew

22   Sussingham will testify.  He too was on his way home at

23   2 o'clock that early Saturday morning.  He was driving

24   southbound along the right southbound lane of the

25   parkway, headlights on, onto an exit ramp to Sunrise

Opening - People

1    Highway when he saw the pickup truck come up over

2    northbound along the southbound center lane.  The

3    driver never swerved, never wavered, never reacted to

4    Mr. Sussingham's headlights in any way; just kept

5    coming right past Mr. Sussingham at a high rate of

6    speed.

7    A 38-year-old pastor named Steed Davidson,

8    from a Freeport United Methodist Church, will testify

9    he too was on his way home at 2 o'clock that early

10   Saturday morning.  He was driving family members home

11   in a Nissan Maxima automobile.  He too was driving

12   southbound along the southbound center lane of the

13   parkway, headlights on, about 55 miles an hour,

14   approaching the Babylon Turnpike overpass, when he

15   noticed the headlights of a limousine coming up from

16   behind him along the left southbound lane.

17   The limousine proceeded to pass the Reverend

18   Davidson about 60 miles an hour.  It was then that the

19   Reverend noticed oncoming headlights northbound along

20   the southbound parkway.  The limousine began to move

21   over toward the right into the southbound center lane

22   where Reverend Davidson was.  The oncoming headlights,

23   the headlights of a pickup truck, moved slightly to the

24   right and engaged the limousine in a massive head-on

25   collision.  At some point the limousine made contact

Opening - People

1.   with the Reverend Davidson's Nissan Maxima, that spun

2    out 180 degrees, finally coming to a rest.

3        You are actually going to see what the

4    Reverend Davidson saw.  You are actually going to see

5    what Christopher Tangney saw inside the limousine,

6    you're going to actually see what Stanley Rabinowitz

7    saw in the last moments of his life.

8        You're going to learn there was a video

9    camera installed in the limousine recording.  You are

10   actually going to see the defendant's headlights just

11   as the Reverend Davidson saw it.  You are actually

12   going to see the defendant's pickup truck coming around

13   the bend along the Babylon Turnpike overpass, just as

14   Christopher Tangney saw.

15       You're going to actually receive the pickup

16   truck move slightly to the right and slam head on into

17   the limousine, just as Stanley Rabinowitz saw, the last

18   thing he ever saw.  You were going to see this

19   collision for yourselves.

20       Police officers, including New York State

21.  Trooper Patrick Siegler and Danny O'Hare will testify.

22   They will tell you how they responded to the scene of

23   the collision and the devastation that they found.

24   They'll describe massive front-end crush damage to both

25   the limousine and the pickup truck.  They'll describe

GIGI WRIGHT, RPR    (516) 571-2503

Opening - People

1      observations that they made of the occupants of the

2      limousine.

3              They'll tell you how they found the defendant

4      pinned behind the steering wheel of the pickup truck,

5      and the police were able to pry him lose and bound him

6      on a stretcher and got him over to a nearby ambulance.

7              Police Officer Tim Nolan of the Freeport

8      Police Department will tell you how he tried to speak

9      with the defendant then, how he kept asking the

10     defendant's name, leaning closer and closer to the

11     defendant to have him say Martin. How he kept asking

12     where the defendant was coming from, leaning closer and

13     closer to the defendant, until he finally understood

14     that he was saying Long Beach. How he detected a

15     powerful odor of an alcoholic beverage on the

16     defendant's breath.

17             Trooper O'Hare will tell you how the

18     defendant was rushed to the trauma room of the Nassau

19     County Medical Center, where doctors and nurses

20     surrounded him and cared for him.

21             At 2:45, early Saturday morning, a nurse drew

22     samples of the defendant's blood, which Trooper O'Hare

23     sealed in tubes, sealing the tubes in a blood kit,

24     which eventually was sent to the New York State Police

25     toxicology lab.

Opening - People

1     The toxicologist will tell you how she

2     received the sealed tubes of the defendant's blood,

3     unsealed those tubes, analyzed the blood and determined

4     that the defendant had a blood alcohol content of .28,

5     more than three times the legal limit, just after the

6     collision.

7     Investigator Mike Harris of the State Police

8     will testify, and he will describe a conversation with

9     the defendant at the medical center, about a half day

10     after the collision.  He'll tell you how the defendant

11     told him he had been driving the pickup truck at the

12     time the collision; he had consumed a fifth of Old Parr

13     Scotch whiskey before driving the pickup truck, and how

14     he had been in what he described as a self-destruct

15     mode on the night of the collision.

16     In short, the People will prove beyond a

17     reasonable doubt, any reasonable doubt, that the

18     defendant kept drinking that night until he was highly

19     intoxicated; how he went out and drove the pickup truck

20     anyway; he wound up driving it the wrong way against

21     oncoming traffic; and how he kept driving it the wrong

22     way; how he drove right at oncoming headlights, forcing

23     drivers to chicken out, forcing drivers to veer out of

24     his path to avoid deadly head-on collisions; until he

25     came around the bend, out from beneath the Babylon

Opening - LaMagna

1    Turnpike overpass, and adjusted slightly to the right

2    and engaged the limousine in the devastation head-on

3    collision, Mr. Rabinowitz simply could not avoid,

4    killing Mr. Rabinowitz and Katie, and in so doing

5    showing a depraved indifference and utter lack of care

6    for their precious human lives, and the human lives of

7    anyone else out on the southbound Meadowbrook Parkway

8    around the time of the collision.  He just didn't care

9    enough whether those people lived or died.

10           In short, the People will prove beyond any

11   reasonable doubt that the defendant is guilty as

12   charged of all of the counts of the indictment,

13   including Murder in the Second Degree, depraved mind

14   murder; Assault in the First Degree, depraved mind

15   assault and; Reckless Endangerment in the First Degree.

16           Thank you, again for your time and a

17   attention.

18           THE COURT:  Mr. LaMagna.

19           MR. LaMAGNA:  As reasonable people we all

20   know what murder is, and as reasonable people we all

21   know who murderers are.  The evidence will show that

22   this is not a case of murder, and that this young man

23   is not any murderer.

24           Good morning, ladies and gentlemen of the

25   jury.  Your Honor, counsel for the prosecution,

Opening - LaMagna

1          Mr. Martello and Mr. Heidgen.

2                  As you know, this portion of the trial is

3          called the opening statement.  And, of course, as the

4          Judge had just told you, it is not evidence.  And what

5          we just heard from the prosecution, again, is not

6          evidence.  The purpose of the opening statement really

7          is for the government, and the prosecutor, the

8          prosecution, to articulate to you what they hope to

9          prove and exactly how they intend or will attempt to

10         prove each and every charge that they brought against

11         Mr. Heidgen, and ask you to consider those charges.

12         This is because they, and only they, have the burden of

13         proof in this case.  Before you, the jury, can even

14         reach a verdict of guilty they must prove each and

15         every element of the charges they have brought beyond a

16         reasonable doubt.

17                 The defense, unlike the prosecution, doesn't

18         have to even give an opening statement, because we have

19         no burden of proof.  That burden falls squarely on the

20         shoulders of the prosecution, and shall remain there

21         for the course of the trial.

22                 However, as you will see, we are nevertheless

23         prepared to present evidence.  We will question and at

24         times aggressively cross-examine the government

25         witnesses.  We'll question their motives, we will

Opening - LaMagna

1    question their biases, we will question whether or not

2    any of these government witnesses have changed their

3    story, have changed their testimony to fit and to

4    conform to the prosecution's unusual theory in this

5    case of depraved indifference murder.  We will explore

6    inconsistencies about their evidence and about their

7    witnesses.  We will expose mistakes made during the

8    course of their investigation and we will question the

9    quality and sufficiency of their evidence.

10             And, most importantly, ladies and gentlemen,

11   we'll question their conclusions, especially as it

12   relates to the state of mind of Martin Heidgen on July

13   2nd 2005.

14             We'll make sure that this trial is about all

15   the evidence; not just the piece of evidence that the

16   prosecution wants you to hear, because it fits their

17   agenda.  We are going to make sure that this trial is

18   about the truth, the truth concerning the circumstances

19   leading up to this unintentional, yet tragic accident;

20   the truth as to how this tragic accident occurred; and,

21   most importantly, the truth about this young man's

22   state of mind on that night.  That is the critical

23   issue in this trial.

24             We will make sure that your determination, as

25   we discussed in jury selection, is about the evidence,

1      not about emotion; it is not about sympathy and

2      certainly not about vengeance.  This must be about

3      justice and an accountability and responsibility, but

4      accountability and responsibility for what it is that a

5      person may be accountable and responsible for, nothing

6      more.

7                This isn't about making examples of anybody

8      or scapegoating anybody to get a headline in the paper.

9      A person's life is on the line here.

10               Now, we heard Mr. Hayden state what he hopes

11     the evidence will prove.  Many of what -- much of what

12     Mr. Hayden said we have no quarrel with; we agree.  A

13     terrible tragedy of immeasurable proportions occurred

14     in this case:  Two people lost their lives, a seven

15     year old child, and many people were injured as a

16     result of a car crash.  We know and we would not be

17     human if we didn't feel for them, but this is a trial

18     about not what ultimately happened, we know that; this

19     is going to be a trial about how it happened, under

20     what circumstances it happened, and what was the state

21     of mind of Marty Heidgen at the time that this

22     occurred.  What we heard from the prosecution is a

23     theory.  And just like pounding a square peg into a

24     round hole that theory of depraved mind murder simply

25     will not fit.

Opening - LaMagna

```
 1              Put simply, ladies and gentlemen:   The
 2       evidence will prove that on July 22nd 2005, a
 3       convergence of tragic circumstances all came together
 4       and made this perfect storm of tragic events that
 5       collectively came together and caused this tragic
 6       accident.  Not as the prosecution so desperately wants
 7       you to believe, the sudden and remarkable
 8       transformation of a 24-year-old young man's mind from
 9       being happy, excited, in a pleasant mood that night,
10       into a depraved mind murderer.  That is what the
11       evidence will prove did not happen, because that is the
12       truth.
13              Every single person who was with Marty
14       Heidgen that day, that evening, that night, will tell
15       you that he was in a perfect mood, he was happy, he was
16       engaging; not depressed in the least bit.  And like all
17       of his other friends were excited about this upcoming
18       Fourth of July weekend that they had plans for.
19              The evidence will prove that the state of
20       mind of Mr. Heidgen was perfect that day.  He was
21       happy.  Anything but depraved.  And, again, that is
22       what the truth is, that is who he is, and that is who
23       he was that night, and that is why the extreme charge
24       of murder in this case should never have been charged
25       and cannot be proven in this case.
```

Opening - LaMagna

1        Remember, in order for the prosecution to

2    prove the case of murder in this unintentional

3    accident, in addition to proving, if they do, that

4    Mr. Heidgen was intoxicated, they have to prove that

5    his mind was that of a depraved person.

6        Pay close attention to the evidence as they

7    present it to you.  I want you to ask yourselves as

8    they present evidence, witness after witness, ask

9    yourselves are there inconsistencies between their own

10   witnesses?  Are there inconsistencies between their own

11   experts?  Did the government continue to hire expert

12   after expert until they finally got an expert willing

13   to give an opinion that fit their theory?  Ask

14   yourselves did their experts change their opinions to

15   fit this unusual theory of depraved mind murder.

16       For example, pay close attention to one of

17   their experts in particular, Wade Bartlett.  Ask

18   yourselves why he would change his original testimony

19   in the report and then changed his report to support

20   it.

21       Now, Mr. Hayden mentioned some oral

22   statements apparently made by Mr. Heidgen.  Again, ask

23   yourselves were these statements that you're going to

24   hear, are they accurate, are they factually correct,

25   was he lying, was he lied to by the police prior to

1       giving his statement, is his blood alcohol level

2       accurate.  Are there reasonable alternatives to the

3       main issue of his state of mind as to whether it was

4       depraved.  You'll ask yourselves is there a single

5       witness that they will bring you that will corroborate

6       that theory, and the answer is no.  Every single person

7       who was with him will tell you that that is absolutely

8       not the truth about his state of mind.

9               Ultimately, ladies and gentlemen, the

10      evidence will prove that many factors unintentionally

11      converged to cause this terrific and terrible accident,

12      none of which was a depraved mind.

13              You will hear that Marty moved to New York

14      just eight months before this occurred from Arkansas

15      after he graduated college.  That he moved in with his

16      parents, or his mother in Valley Stream, and he worked

17      in Manhattan.  He commuted.  He was unfamiliar with the

18.     roadways on Long Island.  And you will hear that this

19      group of friends that he had made had plans for that

20      weekend, beginning with a party at the Goldman

21      residence the night of this accident.

22              You will hear that the Goldman residence is

23      in North Merrick.  That is significant because where

24      their house is is off the Meadowbrook Parkway by the

25      Babylon Turnpike exit.

Opening - LaMagna

 1            You will hear that at 9:40 that night Amanda

 2    Goldman gave Marty Heidgen directions to her house off

 3    the Meadowbrook Parkway at Babylon Turnpike, because he

 4    didn't know his way around.

 5            You'll hear that on his way to that very

 6    party, after getting directions, he got lost getting to

 7    the house in that area.  He called Amanda Goldman.  She

 8    gave him further instructions and he got to the party.

 9            You will hear that when he arrived at the

10    party he was not drunk; he didn't drink an entire

11    bottle of scotch.  You will hear that he was in a

12    perfect mood, happy, excited about the weekend, like

13    everybody.  No more, no less.  You'll hear that at the

14    party they were laughing, they were joking, they were

15    even dancing to music and, yes, they were drinking.

16    There is no question about that.

17            But you will hear that at 1:30, or

18    approximately 1:30, Marty left to go home, back to

19    Valley Stream.  And you will hear, just like when he

20    was driving from Valley Stream to the Goldman residence

21    in Merrick, off of the Meadowbrook Parkway, off of the

22    Babylon Turnpike exit, as he was going back home he got

23    lost again.  And you will see evidence that Mr. Heidgen

24    again, just like he did before when he got lost going

25    to the Goldman residence, he called Amanda at 1:45

1     because he was lost again.  Fifteen minutes before this

2     accident occurred.

3               You will hear that Amanda, who threw the

4     party, didn't pick up the phone, and Marty had to

5     navigate his way home, and he got lost and he got

6     confused.

7               And you will hear from accident

8     reconstruction experts and highway safety experts that

9     the Meadowbrook Parkway is poorly constructed and

10    unsafe in that it allows cars to get on that parkway in

11    the wrong direction.  You will hear at that time of

12    night, at 2 o'clock in the morning on the south

13    Meadowbrook Parkway, it is dark, it is empty and there

14    is no exits.

15              Unfortunately, he did get on the wrong side

16    of the parkway.  It wasn't that it was for miles,

17    because the salient point that is going to be in this

18    case, is from the first time that a car passed him

19    until the time of the accident was approximately only

20    point eight miles, less than a minute.  All of this was

21    happening that fast.

22              And you will hear that Marty did take

23    self-corrective measures.  You will hear that he

24    reduced his speed when he was seeing a car pass him,

25    saying he didn't know if it was him that was wrong or

Opening - LaMagna

1      the other guy.  You will hear that he reduced his speed

2      from 70 miles an hour, 65 miles an hour to 30, all in

3      that short period of time.  And you will also hear that

4      point one mile from the accident the whole area is

5      point .08 miles.

6                    As he is driving, as he is slowing down, he

7      was looking for signs.  And you will see on the

8      Meadowbrook Parkway point one mile from where this

9      terrible accident occurred, there is a sign on the

10     Meadowbrook Parkway facing the wrong way.  So an errant

11     driver driving north on the southbound lanes would see

12     a sign facing them on the right-hand side, where you

13     would normally look for signs to get off, adding

14     further confusion to what was happening that night.

15                   You see, ladies and gentlemen, this was a

16     tragedy of immeasurable proportions.  And,

17     unfortunately, we can't change the result.  But we can

18     determine how it happened and why it happened, and

19     under what circumstances it happened.  The evidence

20     will prove that corrective measures were taken;

21     unfortunately, too late.

22                   Ladies and gentlemen of the jury, what the

23     evidence will show is that there are times when a

24     multitude of circumstances, unintentional and without

25     malice, are created by mistake and irresponsibility

Opening - LaMagna

1     that come together in such a way that they create an

2     atmosphere where a terrible tragedy occurred, and that

3     is what happened in this case.  But that does not

4     amount to murder, and it does not amount to a depraved

5     indifference to human life.

6              And that is why, ladies and gentlemen, at the

7     end of this case you will find the defendant not guilty

8     of murder or any related charge to show a depraved

9     indifference to human life.

10             Thank you.

11             THE COURT:  Mr. Hayden.

12             MR. HAYDEN:  The People call Trooper Patrick

13    Siegler.

14             COURT OFFICER:  Step up.  Remain standing,

15    raise your right hand and face the clerk.

16             P A T R I C K   S I E G L E R,        a

17    witness called on behalf of the People, having been

18    first duly sworn by the Clerk of the Court, was

19    examined and testified as follows:

20             THE CLERK:  Please be seated.

21             In a loud voice, state your name, spelling

22    your last name, shield and command for the record the

23    record.

24             THE WITNESS:  Trooper Patrick Siegler,

25    S-I-E-G-L-E-R, New York State Police, Brentwood, Shield

Trooper Siegler - Direct - Hayden

```
 1          349.

 2                    THE CLERK:   Thank you.   Please take a seat.

 3     DIRECT EXAMINATION

 4     BY MR. HAYDEN:

 5          Q     Good morning, Trooper.

 6          A     Good morning.

 7          Q     How long have you been a member of the New York

 8     State Police?

 9          A     Approximately six and one-half years.

10          Q     Have you covered the scenes of motor vehicle

11     crashes?

12          A     Yes, I have.

13          Q     How many crash scenes have you covered?

14          A     In six years, hundreds.

15          Q     Do you know a man named Martin Heidgen?

16          A     I do.

17          Q     Please briefly describe him.

18          A     White male, 20s, dark hair.

19          Q     Do you see Martin Heidgen in this courtroom

20     today?

21          A     I do.

22          Q     Please point him out to the jury, and describe

23     for the record what he is wearing today.

24          A     Seated at the table to my left, centered between

25     counsel.  He has a checked tie, white shirt.
```

Trooper Siegler - Direct - Hayden

1           MR. HAYDEN:  Let the record reflect, your

2       Honor, that the witness has indicated the defendant

3       Martin Heidgen.

4           THE COURT:  The record will so reflect.

5       Q    I'm directing your attention to the early morning

6   of Saturday, July 2nd of 2005.

7           Were you working then?

8       A    Yes, I was.

9       Q    What was your assignment that morning?

10      A    I was assigned to patrol Post 9812, which

11  includes the Meadowbrook Parkway.

12      Q    How were you dressed then?

13      A    In uniform.

14      Q    Using a motor vehicle?

15      A    Marked State Police vehicle.

16      Q    Were you working with a partner?

17      A    I was working with Trooper Brunz.

18      Q    How was Trooper Brunz dressed?

19      A    In uniform.

20      Q    Describe the weather that morning?

21      A    It was warm and humid.

22      Q    Did you respond that morning to the vicinity of

23  the southbound lanes of the Meadowbrook Parkway, just north

24  of the Babylon Turnpike overpass?

25      A    Yes, I did.

Trooper Siegler - Direct - Hayden

1      Q      Where is the Babylon Turnpike overpass with

2   relation to Sunrise Highway?

3      A      It is north of Sunday Highway.

4      Q      Where is the Babylon Turnpike overpass with

5   relation to Merrick Road?

6      A      It is north of Merrick Road.   Two exits north.

7      Q      When did you arrive along the southbound

8   Meadowbrook Parkway just north of the Babylon Turnpike

9   overpass?

10     A      Approximately 2:10 a.m.

11     Q      Describe the circumstances under which you

12  responded there?

13     A      Received a dispatch from S.P. Farmingdale

14  communications to check for an accident, Meadowbrook Parkway

15  northbound in the vicinity of Merrick Road.

16     Q      Did you see a limousine when you arrived there?

17     A      Yes, I did.

18     Q      Where was the limousine?

19     A      The limousine was facing southbound, center lane

20  of the Meadowbrook Parkway, just north of the Babylon

21  Turnpike overpass.

22     Q      Describe for the jury any observations you made

23  of the front of the limousine?

24     A      Front end of the limousine was completely

25  destroyed.   Heavy front-end impact.

GIGI WRIGHT, RPR    (516) 571-2503

Trooper Siegler - Direct - Hayden

1    Q    Did you see a man named Stanley Rabinowitz in the

2    driver's compartment of the limousine?

3    A    Yes.

4    Q    Describe any observations you made of Stanley

5    Rabinowitz?

6    A    The driver's compartment was completely crushed

7    around him.  All I could see of Mr. Rabinowitz was part of

8    his left arm and his left hand.

9    Q    Did you see a woman named Jennifer Flynn with

10   remains of her daughter in the vicinity of the limousine?

11   A    Yes, I did.

12   Q    Where was Jennifer Flynn?

13   A    She was in the center median, sitting against the

14   guide rail.

15   Q    Did you look inside the limousine?

16   A    Yes.

17   Q    Tell the jury what you saw when you looked inside

18   the limousine?

19   A    Inside there were several people, all with

20   various serious injuries, crying out in pain.

21   Q    Did you see a pickup truck in the vicinity of the

22   limousine?

23   A    Yes.

24   Q    Where was the pickup truck?

25   A    Pickup truck was also southbound Meadowbrook

Trooper Siegler - Direct - Hayden

1    Parkway, mostly in the left-hand lane, facing south.

2    Adjacent to the limousine more or less.

3         Q    Describe any observations you made of the front

4    of the pickup truck?

5         A    The front end of the pickup truck was also

6    heavily damaged.  The frame of the vehicle was bent.

7         Q    Did you see the defendant inside the pickup

8    truck?

9         A    Yes, I did.

10        Q    Where was the defendant?

11        A    He was behind the wheel of the pickup truck,

12   sitting mostly upright.

13        Q    Did you see anyone else inside the pickup truck?

14        A    No.

15        Q    Describe any observations you made of the

16   defendant when you first saw him behind the steering wheel

17   of the pickup truck?

18        A    He was sitting mostly upright, his eyes were

19   open.  He had a small cut under his chin that I could see.

20        Q    Where were you while you were making those ·

21   observations of the defendant?

22        A    To the left of the pickup truck, to the left of

23   the driver's side of the pickup truck.

24        Q    Did you see a man named Michael Ierardi when you

25   arrived at the scene of the collision?

GIGI WRIGHT, RPR   (516) 571-2503

Trooper Siegler - Direct - Hayden

```
 1      A    Yes.

 2      Q    Who is he?

 3      A    He is a New York City court officer who was on

 4    his way home from work when he came upon the accident scene

 5    just after it happened.

 6      Q    Did you speak to him?

 7      A    Yes.  He was standing in the roadway waving a

 8    flashlight.

 9      Q    When did you speak with Mr. Ierardi?

10      A    As soon as I arrived.

11      Q    Did you eventually speak with a man named Steed

12    Davidson at the scene of the collision?

13      A    Yes.

14      Q    Who is he?

15      A    Mr. Davidson was the operator of a Nissan Maxima,

16    which was the third vehicle involved in the collision.

17      Q    When did you speak with Steed Davidson?

18      A    Approximately twenty minutes after two.

19      Q    Did you see Reverend Davidson's Nissan Maxima?

20      A    Yes, I did.  The Maxima was facing northbound,

21    mostly in the right lane of the Meadowbrook Parkway south.

22    His vehicle had been struck at or about the same time that

23    the pickup and the limousine had collided.  His vehicle spun

24    and was facing northbound in the southbound, mostly right

25    lane.
```

Trooper Siegler - Direct - Hayden

1      Q      South of the Babylon overpass?

2      A      South of the overpass, correct.

3      Q      The other vehicles were north of the overpass?

4      A      Correct.

5      Q      Describe any observations you made of Reverend

6    Davidson's Maxima?

7      A      The Maxima had some damage to the left rear

8    quarter panel, left rear door.

9      Q      Was the defendant removed from the pickup truck?

10     A      Yes.

11     Q      Where were you while the defendant was being

12    removed from the pickup truck?

13     A      At the time I was finishing up speaking with

14    Mr. Davidson I believe.

15     Q      Where was the defendant placed after being

16    removed from the pickup truck?

17     A      Placed on a stretcher and loaded into a Nassau

18    County Police ambulance.

19     Q      Did you join him there?

20     A      Yes, I did.

21     Q      Describe any additional observations you made of

22    the defendant after you joined him in the ambulance?

23     A      I got in the ambulance.  He was lying on his

24    back, looking up at the ceiling.  I observed his eyes to be

25    glassy and blood shot.  He had a strong odor of alcohol on

GIGI WRIGHT, RPR    (516) 571-2503

Trooper Siegler - Direct - Hayden

1    his breath.

2        Q    Did you notice any injury to the defendant while

3    you were with him in the ambulance?

4        A    He had a small laceration under his chin, and he

5    was wearing a neck brace.

6        Q    Did you try to speak with the defendant?

7        A    I had asked him his name.

8        Q    What did he say?

9        A    He did not respond.  He did not look at me or

10   make any eye contact.

11       Q    Any further effort to speak with him?

12       A    I leaned in again and I asked him his name a

13   second time, to which he did not respond as well.

14       Q    Anything further?

15       A    No.

16       Q    Did the defendant respond to anything said to him

17   in your presence?

18       A    No.

19       Q    Did the defendant ever look at your direction

20   while you were with him?

21       A    No.

22       Q    Did you ever see the defendant look at anyone's

23   direction while you were with him?

24       A    No.

25       Q    Did the defendant utter an unintelligible sound

Trooper Siegler - Direct - Hayden

1    while you were with him?

2        A    No.

3        Q    Did you leave the ambulance?

4        A    Yes.

5        Q    Describe the circumstances under which you left

6    the ambulance?

7        A    I left the ambulance, was speaking to Trooper

8    Knapp, and decided that Trooper O'Hare was going to

9    accompany Mr. Heidgen to the hospital with a blood kit for

10   the purposes of securing a blood sample as he was under

11   arrest for DWI.

12       Q    Did Trooper O'Hare join the defendant in the

13   ambulance?

14       A    Yes.

15       Q    Was the ambulance driving away?

16       A    Yes.

17       Q    At approximately what time?

18       A    Two-thirty-three a.m.

19       Q    Did you recover the defendant's wallet that

20   night?

21       A    Yes.

22       Q    When did you recover the defendant's wallet?

23       A    After the ambulance departed for the hospital I

24   still did not know who this person was.  I returned to his

25   vehicle, tried to find some kind of document that belonged

Trooper Siegler - Direct - Hayden

1    to him in order to identify him.

2            I Went inside towards, to where the pickup was,

3    shined my flashlight inside. I was not able to get around

4    it because the inside of the pickup truck was heavily

5    damaged. I shined my light inside and saw a wallet on the

6    floor of the driver's floorboard, and found a broken piece

7    of a fishing pole.

8            I retrieved the wallet and opened it up and

9    inside was a photo license, an Arkansas photo license, which

10   appeared to be one in the same of the person who was taken

11   in the ambulance and on his way to the hospital under

12   arrest.

13       Q    How long were you at the scene at the crash that

14   Saturday?

15       A    I was at the scene probably until at least 8

16   o'clock in the morning. Six hours or so.

17       Q    Were photographs taken at the scene of the crash?

18       A    Yes.

19           MR. HAYDEN: Your Honor, may I have this

20       group of photographs, which have been marked 1A through

21       12A shown to the witness, please?

22           THE COURT: Yes.

23       Q    Please take a look at those.

24           Do you recognize those photographs?

25       A    Yes.

1       Q    Are those photographs taken at the scene of the

2   crash?

3       A    That's correct.

4       Q    Are those photographs fair and accurate

5   representations of the way that the crash scene appeared

6   while you were there that morning?

7       A    Yes.

8            MR. HAYDEN:  Your Honor, at this time may the

9       witness please step down and take a look at these

10      enlarged photographs marked for identification?

11           THE COURT:  Are they identical to these but

12      enlarged?

13           MR. HAYDEN:  That's correct, your Honor.

14           THE COURT:  Is it your intention to put them

15      in evidence?

16           MR. HAYDEN:  It is, your Honor.

17           THE COURT:  Perhaps we can show these to

18      counsel, and see if there is an objection to them

19      coming into evidence.

20           MR. HAYDEN:  Yes, your Honor.

21           MR. LaMAGNA:  Your Honor, it is my

22      understanding that they want to introduce all of them.

23           THE COURT:  That is what Mr. Hayden just

24      said, yes.

25           MR. HAYDEN:  That's correct, your Honor.

Trooper Siegler - Direct - Hayden

1              MR. LaMAGNA:  Judge, I would object to the

2      cumulative nature of them.  One in particular.  I don't

3      know if you want to hear the objection now.

4              THE COURT:  Actually we have been at this

5      about an hour now.  Why don't I give the jury a five or

6      ten-minute break.

7              Ladies and gentlemen, I gave you the

8      admonitions right before the opening statements.

9      Please don't talk about the case.  See you in a few

10     minutes.

11             (Whereupon, the jury exited the courtroom.)

12             MR. LaMAGNA:  Do you want the witness present

13     for the discussion?

14             MR. LaMAGNA:  I guess maybe it is better that

15     he is not.

16             THE COURT:  Officer, would you mind stepping

17     down.

18             (Whereupon, the witness exits the courtroom.)

19             THE COURT:  What is the objection?

20             MR. LaMAGNA:  Judge, there is cumulative

21     nature to some of these photographs showing pretty much

22     the same scene.  One photograph in particular, the

23     limousine shows the photograph of the extraction that

24     was either by the fire department or EMS, when they

25     ripped open the limousine.

Trooper Siegler - Direct - Hayden

1          THE COURT:  How is that marked?

2          MR. LaMAGNA:  This is 7A.

3          THE COURT:  So the specific objection is to

4    7A, and the general objection to the rest is it is

5    cumulative?  Can I see them, please?

6          MR. LaMAGNA:  That's correct.

7          THE COURT:  Your argument for the admission

8    of 7A, Mr. Hayden?

9          MR. HAYDEN:  Your Honor, for one thing it

10   shows the location of Katie Flynn's body inside of the

11   vehicle.  It is undercover.  It is not inflammatory.

12   This shows the location of the body.  In addition, it

13   helps establish the extensive nature of the injuries in

14   that police and emergency personnel had to rip away the

15   side of the vehicle just to get to these people, to get

16   them out without causing further damage to them.

17         THE COURT:  The objection is overruled.  I'm

18   allowing all of the photographs.  Gentlemen, we'll take

19   a five-minute break as well and resume in a few

20   minutes.  Mark them.

21         (Whereupon, the items referred to received

22   and marked People's Exhibits 1A through 12A in

23   evidence.)

24         THE COURT:  Put the witness back on the

25   stand.

Trooper Siegler - Direct - Hayden

1          THE CLERK:  Case on trial, Indictment 1910N

2     of 2005, People versus Martin Heidgen.

3          People ready?

4          MR. HAYDEN:  Ready, your Honor.

5          THE CLERK:  Defendant ready?

6          MR. LaMAGNA:  Defendant ready.

7          THE CLERK:  Defendant is present at this

8     time, your Honor.

9          THE COURT:  All right.  We'll await the jury

10    and we'll continue.

11         THE CLERK:  I remind you you are still under

12    oath.  You can take a seat.

13         COURT OFFICER:  Jurors entering.

14         (Whereupon, the jury entered the courtroom,

15    and upon taking their respective seats, the following

16    occurred:)

17         THE CLERK:  Jurors are present and seated,

18    your Honor.

19         THE COURT:  The objection was overruled.  The

20    photographs are in evidence.

21         MR. HAYDEN:  Your Honor, with the Court's

22    permission may Trooper Siegler step down, take a look

23    at these enlarged photographs, and confirm that they

24    are fair and accurate enlargements of 1A through 12A in

25    evidence?

Trooper Siegler - Direct - Hayden

1              THE COURT:  Yes.

2      Q      Please step down, Trooper.  Please take a look at

3    those enlargements.

4              Trooper, are those enlargements 1B through 12B

5    fair and accurate enlargements of the photographs you

6    already identified and that have been placed into evidence,

7    1A through 12A?

8      A      Yes, they are.

9              MR. HAYDEN:  Your Honor, with the Court's

10             permission I would like to display each of the large

11             enlargements of the photographs and at the same time

12             have Ms. McCormick display the smaller photographs 1A

13             through 12A, for the defense counsel, the defendant and

14             for your Honor.

15             THE COURT:  Any objection?

16             MR. LaMAGNA:  No, Judge.

17             THE COURT:  Yes.

18             MR. HAYDEN:  May I proceed?

19             THE COURT:  Yes.

20     Q      Trooper, please step down in front of the jury.

21   I am now displaying, your Honor, 1B in evidence.

22             Briefly describe what that is.

23     A      That is the scene Meadowbrook Parkway southbound

24   lanes.  Here is the pickup truck.  This is the limousine.

25     Q      I am now placing 2B before the jury.  What is

Trooper Siegler - Direct - Hayden

1    that?

2    A    Another photo of the collision scene taken from

3    the Babylon Turnpike overpass, taken in daylight.  And you

4    have the limousine and pickup truck southbound lanes of the

·5    Meadowbrook Parkway.

6    Q    I am now showing 3B in evidence.

7         What is that?

8    A    Once again, the collision scene, scene of the

9    accident.  Freeport Police personnel and Nassau County

10   Police personnel and State Police members also at the

11   collision scene.

12   Q    I am now displaying 4B.  What is that?

13   A    That is the limousine.  Front end is completely

14   destroyed.  You have the pickup and the front end is

15   completely destroyed.  And you can see the radiator.

16            MR. LaMAGNA:  Objection.

17            THE COURT:  Overruled.

18   Q    Can you see Mr. Rabinowitz in that photograph?

19   A    I cannot.

20   Q    Where was Mr. Rabinowitz with relation to that

21   photograph?

22   A    This area here.  It would be the driver's seat.

23   Q    I am now showing 5B.  What is that?

24   A    Photo of the driver's side of the limousine.  The

25   left rear door is open.  You can see slightly inside the

Trooper Siegler - Direct - Hayden

1    passenger cabin.

2         Q    This is 6B.  What is that?

3         A    The limousine.  You can see part of the engine in

4    this area.  You can see one of the shots of the front left

5    tire, and the Freeport fire truck in the background.

6         Q    Can you see Mr. Rabinowitz in that photograph?

7         A    You can see part of his shoulder and elbow.

8         Q    That's toward the middle of the photograph?

9         A    That is toward the middle of the photograph.

10        Q    This is 7B.  What is that?

11        A    That is a photograph of the passenger side of the

12   limousine.  Passenger cabin area of the stretch limousine

13   was cut away by the ESU officers in order to extricate the

14   injured inside.

15        Q    So the torn metal down the middle of the

16   photograph was done by emergency people?

17        A    Correct.

18        Q    To get to the victims inside?

19        A    Correct.

20        Q    This is 8B.  What is that?

21        A    Photograph of the pickup truck on the Meadowbrook

22   Parkway at the collision scene.

23        Q    Where were you with relation to that photograph

24   when you first made your observations of the defendant?

25        A    I was just behind the door, near the wooden guide

GIGI WRIGHT, RPR   (516) 571-2503

Trooper Siegler - Direct - Hayden

1    rail.

2         Q      This is 9B.  What is that?

3         A      Another photograph of the pickup truck.  You can

4    see that the frame is bent heavily on the driver's side.

5    The front end of the vehicle is facing mostly south and the

6    rear of the vehicle is bent on an angle, the frame.

7         Q      This is 10B.  What is that?

8         A      It is a photograph of the pickup truck.  You

9    could see mostly the right front end.  And the passenger

10   side is visible.  And also a fishing tackle box falling

11   outside of the pickup truck.

12        Q      This is 11B.  What is that?

13        A      Photograph of the pickup truck showing mostly the

14   driver's side of the pickup.  You can see some of the front

15   end.  You can see the battery of the pickup truck.  You can

16   also see the air bag.

17        Q      That is toward the middle of the photograph?

18        A      Toward the middle.

19        Q      This is 12B.  What is that?

20        A      Photograph of the Nissan Maxima operated by Steed

21   Davidson.  The vehicle is facing northbound in the

22   southbound lanes, because it had been spun around after the

23   collision with the limousine.  Damage on the left rear

24   quarter panel and driver's side door.

25        Q      Once again, that is south of the Babylon Turnpike

Trooper Siegler - Cross - LaMagna

1    overpass?

2         A    That's correct.  This is actually -- this is the

3    exit lane to Babylon Turnpike east.  That would be the M7

4    east lane.

5         Q    Once again, the other vehicles were north of the

6    Babylon Turnpike overpass?

7         A    Yes.

8         Q    Please retake the witness box.

9              MR. HAYDEN:  Nothing further, your Honor.

10   Thank you.

11             THE COURT:  Mr. LaMagna.

12             MR. LaMAGNA:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. LaMAGNA:

15        Q    Good morning, Trooper.

16        A    Good morning.

17        Q    Trooper, as you know, my name is Stephen LaMagna.

18   I'm going to ask you just a couple of questions here this

19   morning.  If you don't understand a question please ask me

20   to repeat it and I certainly will.

21             Trooper, you received a radio call to respond to

22   an accident scene on the Meadowbrook Parkway; is that

23   correct?

24        A    That's correct.

25        Q    And that was at approximately 2:06?

Trooper Siegler - Cross - LaMagna

1    A    Approximately.

2    Q    A.m.

3    A    Yes.

4    Q    That was on July 2nd 2005, correct?

5    A    Correct.

6    Q    And you had testified that as a trooper you have

7  had experience in accident investigations; is that correct?

8    A    Correct.

9    Q    And you said there were hundreds of them; is that

10  correct?

11    A    I don't have an exact number.

12    Q    I understand.

13    A    But several a month times six years.

14    Q    With respect to that experience have any of them

15  been related to head-on collisions as well?

16    A    Yes.

17    Q    And out of those how many would you say were

18  head-on collisions?  Numerous?

19    A    No, I would say a small percentage.

20    Q    Were any of them on a parkway?

21    A    Yes.

22    Q    Or was this the first one?

23    A    No.  Nothing that I recall on this parkway, no.

24    Q    Not on this parkway.  In general, just as your

25  experience.

Trooper Siegler - Cross - LaMagna

```
 1        A    Not on a parkway necessarily, but perhaps on an

 2   interstate or a state road.

 3        Q    Now, you arrived at the scene at what time,

 4   approximately?

 5        A    Two-ten a.m.

 6        Q    And you were with a partner, correct?

 7        A    Correct.

 8        Q    That was Eric Burns?

 9        A    Brunz.

10        Q    Brunz, I'm sorry.

11             You said it was a warm and humid night; is that

12   correct?

13        A    Yes.  It had rained earlier in the evening.

14        Q    You were the first state troopers on scene?

15        A    Correct.

16        Q    And when you arrived at the scene you observed

17   the two vehicles, correct?

18        A    Yes.

19        Q    Did you approach the Silverado first or did you

20   approach the limousine first?

21        A    The limousine.

22        Q    And then you went to the Silverado?

23        A    Yes.

24        Q    At that time the window of the Silverado on the

25   driver's side was open, correct?
```

Trooper Siegler - Cross - LaMagna

```
 1      A      On the driver's side, yes.

 2      Q      Did you speak to a Mr. Ierardi, if I'm

 3   pronouncing in right?

 4      A      Ierardi, I spoke to him prior to going to the

 5   vehicles.  He was the first person we encountered on the way

 6   to the accident scene.

 7      Q      Did he tell you that he unrolled the window or

 8   did anything with respect to the door of that car?

 9      A      I don't recall.

10      Q      At some point other troopers were coming to the

11   scene; is that correct?

12      A      Yes.

13      Q      One of which would be Trooper Knapp; is that

14   correct?

15      A      Yes.

16      Q      Trooper O'Hare, correct?

17      A      Yes.

18      Q      And you said at some point you observed

19   Mr. Heidgen being extracted from his car; is that correct?

20      A      Yes.

21      Q      And you didn't aid in any of that; is that

22   correct?

23      A      No, I did not aid in it.

24      Q      You did, however, help in getting Mr. Heidgen to

25   a stretcher; is that correct?
```

Trooper Siegler - Cross - LaMagna

```
 1      A      No.   I don't believe I participated in loading

 2   him onto a stretcher.

 3      Q      Did you participate in --

 4      A      No.

 5      Q      -- in anything?

 6      A      Of his extraction, no.

 7      Q      Nothing?   Getting him into the ambulance?

 8      A      No.   But I was present while he was being loaded

 9   into the ambulance.

10      Q      So you observed that; is that correct?

11      A      Yes.

12      Q      And you observed the EMS put a neck brace on

13   Mr. Heidgen; is that correct?

14      A      Yes.

15      Q      And then at some point you said you attempted to

16   get some information from Mr. Heidgen; is that correct?

17      A      Yes.

18      Q      And was that in the ambulance or outside?

19      A      Inside the ambulance.

20      Q      So he was on the stretcher?

21      A      Yes.

22      Q      Neck brace on?

23      A      Yes.

24      Q      So when you say he was staring straight up, he

25   was wearing a neck brace, correct?
```

Trooper Siegler - Cross - LaMagna

1      A      Correct.

2      Q      Now, at some point you testified that --

3   withdrawn.

4             At some point you were notified that Trooper

5   O'Hare was going to retrieve a blood kit from his car for

6   the purposes of going with Mr. Heidgen to get --

7      A      I was not notified that as someone telling me

8   what was going to happen, it was discussed between myself

9   and Trooper Knapp.  Initially I was going to go to the

10  hospital in the ambulance with the blood kit, but I chose to

11  remain at the scene.  Someone was needed to take my place in

12  the ambulance and Troop O'Hare was chosen by myself and

13  Trooper Knapp.

14     Q      You actually were having a conversation with

15  Trooper Knapp concerning who would be going with Mr. Heidgen

16  for the purpose of ascertaining a blood sample, correct?

17     A      Correct.

18     Q      And at some point it was decided that Trooper

19  O'Hare would be doing that, correct?

20     A      Yes.

21     Q      And were you present when Trooper Knapp told

22  Trooper O'Hare to go get the blood kit; that he is the guy

23  who is going?

24     A      I don't recall if Trooper Knapp went to Trooper

25  O'Hare.  I don't recall if he was standing right there with

Trooper Siegler - Cross - LaMagna

```
 1    us.

 2    Q    You were there when that as decided?

 3    A    I was at the ambulance while this was going on.

 4    Q    At some point Trooper O'Hare came to the

 5    ambulance where you were, correct?

 6    A    Yes.

 7    Q    And at that point he had a blood kit in his hand,

 8    correct?

 9    A    Yes.

10    Q    At that point it was discussed that you were

11    going to leave the ambulance, and Trooper O'Hare was going

12    to go get into the ambulance?

13    A    That was already decided, yes.

14    Q    That's exactly what happened, correct?

15    A    Yes.

16    Q    O'Hare went into the ambulance with the blood

17    kit, correct?

18    A    Correct?

19    Q    And he was going to go to the hospital with

20    Mr. Heidgen to get the blood sample, correct?

21    A    Correct.

22    Q    Now, at some point it was decided to place

23    Mr. Heidgen under arrest, correct?

24    A    Yes.

25    Q    And that was around 2:33; is that correct? .
```

Trooper Siegler - Cross - LaMagna

1      A      Correct.

2      Q      That was approximately the same time that they

3   left for the hospital, correct?

4      A      Yes.

5      Q      Nobody informed Mr. Heidgen that he was being

6   placed under arrest?

7      A      Nobody verbally communicated to him that he was

8   under arrest, correct.

9      Q      Now, after the ambulance had left to go to the

10  hospital you went back to the car; is that correct?

11     A      To the pickup truck.

12     Q      To the Silverado?

13     A      Correct.

14     Q      And you said at some point that you shined your

15  flashlight in there, and you saw a wallet, correct?

16     A      Correct.

17     Q      And, in fact, there was a broken fishing pole

18  that you used to retrieve that wallet; is that correct?

19     A      Yes.

20     Q      That was around 2:35, 2:40?

21     A      It was a couple minutes after the ambulance had

22  left, yes.

23     Q      So a few minutes from that you were able to

24  retrieve the wallet that was in the car, correct?

25     A      Yes.

Trooper Siegler - Cross - LaMagna

1     Q     And you opened the wallet?

2     A     Yes.

3     Q     And the wallet revealed a license, among other

4     things, correct?

5     A     Correct.

6     Q     And the license identified the driver of that

7     Silverado; is that correct?

8     A     That's correct.

9     Q     And you looked at the photograph?

10    A     Yes, I did.

11    Q     And it matched Mr. Heidgen, correct?

12    A     Yes.

13    Q     So, within a few minutes of the ambulance leaving

14    to go to the hospital you, at that point, knew the identity

15    of the driver of that car, correct?

16    A     Yes.

17    Q     Martin Heidgen, correct?

18    A     Yes.

19    Q     Date of birth, correct?

20    A     Yes.

21    Q     Address, correct?

22    A     Uh huh.

23    Q     And did you give that information to Trooper

24    Knapp as well?

25    A     At the point that that information was obtained

Trooper Siegler - Cross - LaMagna

1   by me Trooper O'Hare was already gone to the hospital.

2        Q    I'm not asking you about O'Hare.

3        A    Did I give that to that Trooper Knapp, I don't

4   believe I did.  I believe I gave that to Investigator

5   Harris.

6        Q    Was Harris already on the scene?

7        A    Within a few minutes after the ambulance had

8   left.

9        Q    Do you recall what time Investigator Harris

10  arrived?

11       A    No, I do not.

12       Q    When you retrieved this wallet and the identity

13  of the driver, is it your testimony that you held it to

14  yourself until Investigator Harris arrived, or did you

15  disseminate that information among the other troopers you

16  were working with?

17       A    The other troopers that I was working with,

18  either I had relayed to them by telephone the information

19  that I got from the license, as they were at the hospital,

20  and whether or not it was Trooper Knapp, I don't recall.

21       Q    Who did you notify at the hospital of that

22  information?

23       A    I believe it was Trooper Stafford.

24       Q    And what time was that about?

25       A    I don't recall.  Probably within a half-hour or

Trooper Siegler - Cross - LaMagna

1     so.

2          Q     Is it fair to say 2:40ish, 2:50ish; is that a

3     fair amount of time?

4          A     Again, I don't recall the exact time.  It was

5     within a short time after the ambulance had left.

6          Q     And it was Trooper Stafford?

7          A     He was one of my contact points at the hospital.

8          Q     And you notified him about the identity of the

9     driver of the Silverado, correct?

10         A     Correct.

11         Q     Now, it was shortly after the ambulance had left

12    your presence, correct?

13         A     Yes.

14               MR. LaMAGNA:  One moment, your Honor.

15               THE COURT:  Okay.

16               (Brief pause in proceedings.)

17         Q     When you were in the ambulance you had testified,

18    I don't know if it was today or previously, that the

19    defendant was moaning.  Is that correct?

20         A     That's correct.  He was making some light moaning

21    sounds.

22         Q     You noticed an injury to his chin, correct?

23         A     Yes.

24         Q     Did you notice any other injuries, any broken

25    wrist or anything like that?

1      A      No.  Just he was wearing a neck brace, and as far

2    as any internal injuries he may have had I did not know at

3    that time.

4      Q      I understand.  All you recall him doing was

5    laying on the stretcher with the neck brace and moaning,

6    correct.

7      A      Correct.

8                  MR. LaMAGNA:  Your Honor, I have no further

9            questions.  Thank you.

10                 THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MR. HAYDEN:

13     Q      Describe the injury to his chin.

14     A      Small laceration underneath his chin.

15     Q      When you say, "small" what are you talking about?

16     A      It was a minor cut.  He was not going to bleed to

17   death from it.

18     Q      About what size was it?

19     A      Inch and-a-half.

20     Q      Was he bleeding from that injury?

21     A      Yes.  He was bleeding.

22                 MR. HAYDEN: Nothing further, your Honor.

23           Thank you.

24                 MR. LaMAGNA:  Nothing further.  Thank you.

25                 THE COURT:  Mr. Hayden.

Trooper Siegler - Redirect - Hayden

1          MS. McCORMICK:  If you don't mind?

2          THE COURT:  Ms. McCormick.

3          MS. McCORMICK:  People call Ms. Jennifer

4     Flynn.

5          COURT OFFICER:  Step up, remain standing,

6     raise your right hand, face the.

7          THE CLERK:

8          J E N N I F E R   F L Y N N ,          a

9          witness called on behalf of the People,

10         having been first duly sworn by the Clerk of

11         the Court, was examined and testified as

12         follows:

13         THE CLERK:  Please be seated.

14         State your name, spelling your last name for

15    the record.

16         THE WITNESS:  Jennifer Flynn, F-L-Y-N-N.

17         THE CLERK:  Thank you.  Please take a seat.

18    You can put your hand down.

19    DIRECT EXAMINATION

20    BY MS. McCORMICK:

21    Q     Good morning, Mrs. Flynn.

22    A     Good morning.

23    Q     Could you tell the jury, please, how old are you,

24    ma'am?

25    A     Thirty-six -- 37.

Trooper Siegler - Redirect - Hayden

```
 1      Q    At the time of the crash how old were you then?

 2      A    Thirty-six.

 3      Q    Are you employed outside of the home Mrs. Flynn?

 4      A    No.  I am a stay-at-home mother.

 5      Q    How many kids do you have?

 6      A    Four.

 7      Q    Could you tell the jury, please, their names and

 8   ages?

 9      A    Collin is two; Ammon is four, Grace is six and

10   Kate is seven.

11      Q    Mrs. Flynn, I'm going to ask you to think back to

12   the events of Friday, July 1st 2005.

13           Do you remember that day?

14      A    Yes.

15      Q    Can you tell the jury what it is that was

16   occurring on July 1st?

17      A    We were at my sister's wedding.  At about 1

18   o'clock we all got in a limousine:  My mother and father,

19   myself, my husband, Kate and Grace and my cousin Heather, to

20   drive to the Harrison House, which was a hotel where my

21   sister was staying before the wedding.  We got changed

22   there.

23           And then just the girls and his party went to the

24   Arboretum, Oyster Bay Arboretum, to take pictures.  That was

25   about three.  At five we went to the Crescent Beach Club in
```

Trooper Siegler - Redirect - Hayden

1    Bayville, and took pictures on the beach and at the place.

2    And but at that time my parents had met us, my husband, and

3    my brother, and we took family photos of us and then her

4    husband's family was there taking pictures.

5           About 7-ish was the actual wedding.  They got

6    married there.  So my girls were the flower girls.  I was

7    the Maid of Honor.  And they got married outside on the

8    beach.

9       Q    How was the weather that day, Mrs. Flynn?

10      A    It was nice.  We were outside.  It was nice.  I

11   mean, the pictures, it was nice.

12      Q    No rain that you recall?

13      A    No.

14      Q    Warm?

15      A    It was hot, yes.

16      Q    And in all respects how was the afternoon and the

17   evening?

18      A    It was beautiful.  I mean, it was a wedding.  My

19   entire family was there.  All of my cousins were there.  It

20   was Fourth July weekend.  At from parts of the place you

21   could see from where we were fireworks that, you know, you

22   can overlook and see.  We danced.  We ate.  We hung out.  It

23   was great.  I mean, it was a great day.

24      Q    Did there come a time when the reception for the

25   wedding ended?

Trooper Siegler - Redirect - Hayden

1      A    Yes.

2      Q    Can you tell the jury about what time the

3   reception ended, if you remember?

4      A    It started winding down toward 12:30.  I took the

5   girls to get changed so they would be comfortable to go home

6   in sweats and a tee shirt.  We danced a little bit more, and

7   then the girls couldn't stay awake anymore.  We put chairs

8   together in the reception room, and they fell asleep at the

9   tables, and then as the adults said their goodbyes, my

10  father carried Kate and Neil, my husband, carried Grace, and

11  we went outside.

12           There was, like, a place you could sit in this

13  outside.  There was, like, a bench, and you watched the cars

14  roll up.  And on the bench my dad was sitting with Kate

15  sleeping, my mother.  Neil was standing with Grace and I was

16  standing, and we were waiting for our limo.

17     Q    Mrs. Flynn, could I interrupt you for just a

18  moment.  Could you tell the jury, please, what is the name

19  of your dad?

20     A    Chris Tangney.

21     Q    And your mom?

22     A    Denise Tangney.

23     Q    And your husband?

24     A    Neil Flynn.

25     Q    You were all together outside of the reception

Trooper Siegler - Redirect - Hayden

1    hall?

2         A    We were all together outside of the reception

3    hall waiting to go home.

4         Q    How were you supposed to leave from that

5    reception hall that night?

6         A    Lisa and David reserved a car for us to go home.

7    It was a limousine.  But there were a couple of limousines

8    that they also reserved for themselves, Dave's parents and

9    other people that were going back to the hotel.  We didn't

10   want to go back to the hotel; we just wanted to go home.

11   They had a limo reserved for us to take us back to town.

12        Q    Mrs. Flynn, had you been drinking at the wedding

13   that night?

14        A    Yes.

15        Q    You had a limousine reserved to take you and your

16   family?

17        A    Yes.

18        Q    Did there come a time when you actually got into

19   a limousine?

20        A    Yes.

21        Q    Could you describe for the jury how that

22   happened?

23        A    We waited.  There was confusion as we were

24   leaving, because they didn't know what limousine was for us,

25   and Mr. Rabinowitz, the driver of the limousine, said he

Trooper Siegler - Redirect - Hayden

1    would take us because it wasn't, they didn't have it all

2    straight how we were getting home.  We had to wait a little

3    bit outside before we got in.

4           Eventually Mr. Rabinowitz said he would take us.

5    He came over, he introduced himself, and I grabbed, like,

6    the table settings to put in the back of the limousine that

7    we were taking with us.

8           My father, carried Kate and Neil carried Grace

9    into the car.  My mother and I were putting the stuff in the

10   trunk of the car, like our bags we brought that day,

11   flowers, settings and then we -- then my mother and I got

12   in.

13          My husband was seated behind the driver, I was

14   seated next to him, we were both facing the compartment of

15   the limousine, Stanley, Neil, me.  Mr. Rabinowitz, Neil, me.

16   Q     Mrs. Flynn, if I could, would you be facing the

17   direction that the limousine is traveling or are you facing

18   backwards?

19   A     We are facing backwards.

20   Q     And your seat is running right behind the

21   driver's compartment?

22   A     Correct.

23   Q     Please continue.  I'm sorry.

24   A     Kate is lying on the bench.  So it is Neil, then

25   there is this bench; Kate is here, her head toward where my

Trooper Siegler - Redirect - Hayden

1    dad is now sitting here, her legs toward Neil and she is

2    asleep.  In front of her on this side of the limousine is

3    the bar.  So it is me, Neil, Kate, my dad, my mother, the

4    bar.

5         Q     Mrs. Flynn, if I could try to clarify a couple

6    more points with you on that.

7               Is there another bench that runs the same

8    direction as your bench in the limousine?

9         A     Yes.  It just -- it is facing forward.

10        Q     So the two benches face one another inside of the

11   limousine?

12        A     Correct.

13        Q     Those two?

14        A     Yes.

15        Q     And that bench, the second bench, is at the back

16   of the limousine and it would be between the passenger

17   compartment and the trunk; is that correct?

18        A  _  Yes.  Yes.

19        Q     And your mom and dad were back there?

20        A     My mother, my father, Kate, Neil.  And Grace is

21   sleeping on me.  I'm holding her this way and her legs are

22   kind of on Neil.

23        Q     The third bench in the limousine, does that bench

24   run alongside of the limousine, so it is actually

25   perpendicular to your bench and the bench that your parents

Trooper Siegler - Redirect - Hayden

```
 1    are on?

 2        A      Yes, it is.

 3        Q      Is that the bench where Katie was located?

 4        A      Yes.

 5        Q      And that bench was on the driver's side, inside

 6    the limousine; is that correct?

 7        A      Yes.

 8        Q      Across from Katie's bench, what is across from

 9    Katie's bench in the limousine?

10        A      A bar.

11        Q      And it is attached inside the limousine?

12        A      Yes, it is.

13        Q      So all four walls of the passenger compartment

14    have either a bench or the bar against them?

15        A      Yes.

16        Q      And if you would just one last time for the jury

17    please, where is everyone located within that limousine?

18        A      The driver is driving; Neil, my husband, is

19    directly behind him, looking out at the rest of the

20    limousine.  So it is the driver, Neil, me.  This is the

21    bench.  Like the driver is here, driving.  Then it is the

22    bench behind it, which is Neil and myself.  I'm holding

23    Grace.  Then here, is Kate and my dad and my mom.  It is my

24    dad, Kate, Neil and me and my mother.

25        Q      Who entered the limousine first, Mrs. Flynn?
```

Trooper Siegler - Redirect - Hayden

1      A      Neil and Grace.

2      Q      Neil was carrying Grace?

3      A      Neil was carrying Grace.  Grace was asleep.

4      Q      And then second?

5      A      My father and Kate.  And my dad handed Kate, who

6   was sleeping, off to Neil, and Neil put her in and seat

7   belted her in.  She was asleep.

8      Q      On that side bench?

9      A      Yes.  So she is lying down on the bench.

10      Q      Now, you and your mom get into the limousine?

11      A      Then my mom and I got into the limousine.

12      Q      Door closes?

13      A      Door closes.

14      Q      What happens?

15      A      And we drive toward home.

16      Q      Do you know what time you actually left the

17   reception hall?

18      A      About 1:30.

19      Q      Was there anything eventful about your driving

20   from the reception hall to the point of the parkway?

21      A      It was quiet.  The compartment between us and

22   Mr. Rabinowitz was open.  He wasn't really talking to us and

23   we weren't talking to him.  We were all talking amongst each

24   other now and then.  We were tired.  We would have our eyes

25   closed and someone would say something and we would open

1    them and comment, talk a little bit, and then we would close

2    them and someone else would say something, and it was kind

3    of that way as we were driving home.

4        Q    Mrs. Flynn, when you say that the compartment was

5    open, was there a separation between the driver's

6    compartment and the passenger compartment in the limousine?

7        A    Yes.

8        Q    Was that sort of a window or a piece of --

9        A    It was --

10       Q.   -- wood?

11       A    It was like a Plexiglas window, and it was open.

12   Had I wanted to ask Mr. Rabinowitz a question I would have

13   been able to do that.

14       Q    Was there anything about the manner in which the

15   car traveled down roadways, were you going fast, were you

16   going slow, was there anything about that that you could

17   tell the jury?

18       A    We were going -- it is like a windy road as you

19   are leaving the Crescent Beach Club.  That way was windy.

20   For a little bit it seemed to me like we took a wrong turn.

21   It was windy and we weren't going particularly fast, but it

22   was windy.

23            Then when you make it to the Northern State

24   Parkway it is just a straight-away, so then we increased

25   speed, and we just went straight until, you know, the

Trooper Siegler - Redirect - Hayden

1    Northern State hits the Meadowbrook.

2        Q    You said that the reception hall is in Bayville.

3    Is that right?

4        A    Yes.

5        Q    And do you know what path, what road, path you

6    were going to travel to go home that night?

7        A    No.  I know he eventually hit the Northern State

8    and the Meadowbrook.  I did not know the exit off from the

9    Northern State or the name the road that winds up to the

10   Crescent Beach Club.

11       Q    Could you tell the jury, generally, where does

12   your family live?  Where is that, your home?

13       A    We live in Long Beach, about an hour away from

14   where we were supposed to be going.

15       Q    So did there come a time that you were aware of

16   the limousine entering the Northern State Parkway?

17       A    Yes.  Because it wasn't windy any longer.  When

18   it was windy it was a slower ride.  And it was winding, and

19   then when you hit the Northern State we increased speed, and

20   it is just a straight road home.  So there is no lane

21   changing, there is just a straight path to our house.

22       Q    Mrs. Flynn, you said that you guys were talking

23   among yourselves in the limousine.  Is that right?

24       A    Yes.

25       Q    The girls are sleeping?

Trooper Siegler - Redirect - Hayden

1     A     The girls were sleeping.

2     Q     What happened next?

3     A     It was quiet.  And then the car exploded.  It was

4     loud.  It was -- it smelled.  There was an incredible

5     screeching stop.  It threw me forward where I was able to

6     use my foot to brace me against the bar to keep from losing

7     Grace and myself.  And my mother, who was sitting in front

8     of me, flew sideways, diagonally to Neil.  My father, who

9     was sitting in front of Neil, flew sideways to me.

10          And when we finally stopped screeching and

11    stopped moving, my father was suspended directly in front of

12    me.  He was in the air, wrapped just like where I am

13    sitting.  Here he is right here.  He is suspended.  His legs

14    were mangled in the bar.  And he just was up in the air.

15          And my mother had fallen onto Neil, where Neil

16    was seated, still in, you know, that same spot sort of.  My

17    mother was lying on her -- her head was by his lap.  Her

18    legs were sideways into that aisle that you need to walk to

19    to get to where my seat should be.  There is like an aisle

20    in between the bench and bar.  She is kind of lying between

21    him and the bar is kind of under my dad.

22          And then everything stopped.  And then it was

23    kind of sizzling, like a hissing sound, just a loud sound

24    and smoke, and we stopped.

25          And I got up and I put Grace down.  And I leaned

Trooper Siegler - Redirect - Hayden

1      toward my father, and I needed to push up to get out.  So I

2      leaned up toward him and stuck my hand where his legs should

3      have been, but his foot had been cut off.  And I got up.  I

4      moved around, because I had to now climb over my mom and my

5      husband and Grace.  I stepped on where Kate had been

6      sleeping.  And I said I'm going to get help.  We are going

7      to be a okay.  I am going to get help.

8               I opened the door and ran out into traffic.

9      People at that time were not coming right at me.  I was not

10     worried that I would be hit, because there was a whole line

11     of cars that had also seen the crash and stopped.  So as I

12     got out, I could see all of the oncoming traffic coming, but

13     they were too far away from me, because there was a line of

14     cars with people out staring at us.  I screamed for help.  I

15     screamed that we were hurt.  Call the police, and that they

16     needed to hurry.

17              Then I got back into the car and when I left I

18     had went out the side that I was sitting on, the passenger

19     side door that went toward where the traffic was, because my

20     car was on the left.  When I climbed out, I went out that

21     passenger door side, so then there would be three lanes of

22     traffic.  We were on the left lane of the parkway --

23          Q    I'm sorry, the doors are in the back of the

24     limousine?

25          A    Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Trooper Siegler - Redirect - Hayden

1    Q    You exited the back passenger side?

2    A    Correct.

3    Q    And started to scream for help?

4    A    To scream for help.

5    Q    Before you left, Mrs. Flynn, was anybody talking

6    in the limousine?  Was anybody able to speak, other than

7    you?

8    A    My father was speaking to me.  My mother and my

9    husband were moaning.  Grace was crying.  And I didn't hear

10   Kate.

11   Q    What happens next, Mrs. Flynn?

12   A    We -- I then got back into the car, and I said,

13   "Where's Kate," you know, "Where's Kate."  And I looked and

14   she wasn't on the seat, and then I looked and I saw her head

15   on the floor.  So I -- it was -- she was sideways, as if her

16   head was also looking out the passenger side and her hair

17   was over her face.  So I moved her thinking I would get all

18   of her to pick her up.  I thought she was unconscious, but

19   it was just her head that was there.  And I never saw her

20   body.  And I picked her up and I held her, and I placed my

21   hand under her neck to keep everything together and I held

22   her.  And I stated to my father, and to the car, that Kate

23   was dead.  More as a statement than as a scream or anything.

24   Kate's dead.  And I said it more than once.

25        My father started saying, "No, not Kate.  No, not

Trooper Siegler - Redirect - Hayden

1    Kate." My mother was still moaning and then saying, "This

2    can't be." And Neil was saying, Katie Angel, Katie Angel

3    and Katie Angel. And Grace was crying a murmur. Nothing

4    loud. It was a quite car. And it was just quiet. I asked

5    about the driver, and my father said, "The driver's dead,

6    Jen."

7                And then I waited and waited and waited, and I

8    held her and no one was coming. I put her down and got out

9    again and I ran out into traffic again, and I started to

10   scream for help, and it was all the same people so, you

11   know, I knew they were calling but no one was coming.

12               I got back into the car and I picked her up and I

13   held her. My dad and I talked some more and then I lifted

14   the door open. When I came back in on the passenger side, a

15   man and a woman came toward the door to see if we were okay.

16   The man definitely wanted to do something for us. The woman

17   told him to leave us alone we couldn't be moved. We

18   couldn't be touched. And my father told them, I need to be

19   cut out. Don't -- you can't touch us.

20               The guy was beside himself. He definitely wanted

21   to come in and take people out and the woman was that voice

22   of reason at that time, she said you can't, and my father

23   clearly told them you can't touch us. Just call for help.

24   Call for help.

25               And then we waited. And then a little bit later

Trooper Siegler - Redirect - Hayden

1    from behind me -- because now I'm watching this open door

2    with those two people, and they walked away a little bit --

3    from behind me, the other door opens so it would be the back

4    door on the driver's side, and I am holding Kate, and I

5    turned behind me and it was my uncle Michael.

6              He had been driving home from the wedding and

7    came upon our crash.  So he sees me and Kate and my father

8    from where he is, he could see from that door angle just

9    that.  And my dad says, you know, Michael we are badly hurt.

10   Michael takes me and Kate, and we walk over on the side

11   off -- now, we are on the left side of the car, not by where

12   all of the other people are, and I sit on the guardrail with

13   Kate and I hold her and I watch, and my uncle goes into the

14   limousine to try to help everybody.

15             From where I am sitting I could see the

16   limousine.  Because from where I am, I could see the door.

17   I could see my father suspended and I could see my mother's

18   legs, and my husband appears.  He climbed out.  And he is by

19   the door and he is screaming for Kate, like not knowing that

20   she had died.  Just screaming that I got to get to Kate.

21   And then he collapses.

22             So I am watching and then it seems that a couple

23   more people come.  A man, not a police officer, comes over

24   to see if I am okay, and then runs away.  And after that a

25   couple more police officers could around and come and check

Trooper Siegler - Redirect - Hayden

1    on me and leave.  There were not enough people at the site

2    at that time to stay with me.  They were attending to what

3    was going on.

4         Q    Mrs. Flynn, where were you physically located

5    now?  Were you at the side of the road on grass and by the

6    exit, or in the middle of the road by the guardrail?

7         A    I'm on the guardrail to the -- the limousine is

8    here.  I'm right here.  And I could see from where I am

9    sitting into the limousine.

10        Q    Did there come a time when people helped?

11        A    Yes.  Then more people would come onto the crash,

12   so they put an officer with me, and then another officer, so

13   there were two of us at that time.  There became more

14   people.  Someone got a blanket and covered us.

15             My uncle Michael would come back and forth to me

16   every so often just to tell me, you know, we got Grace out,

17   she is with your aunt Darlene.  She is going to the

18   hospital.  We got Neil.  They are going to take him to the

19   hospital.  Never like one large report, but every so often

20   when they did something, he would show up and let me know

21   what was going on.

22        Q    About how long were you at the crash scene,

23   Mrs. Flynn, after the crash?

24        A    It seemed like an hour.  And I watched -- I

25   watched the car.  I watched the lights, I watched the

Trooper Siegler - Redirect - Hayden

1   policemen, I watched the confusion, and then, and then they

2   told me that, you know, they wanted me to leave.

3           I said I wanted to wait until everybody left,

4   that I knew my family had gotten out okay, and everyone was

5   going to the hospital. They got the truck to cut my father

6   out. And then everybody was out. So that it was time for

7   them to go to the hospital, so they came to me and they

8   said, "It's time. Everybody is out. We got to go."

9       Q     Did you go to the hospital, Mrs. Flynn?

10      A     I started to cry, because I knew that I would

11  never hold her again, and I got up and I went by stretcher

12  to an ambulance to the hospital.

13      Q     Mrs. Flynn, was Grace injured in the crash?

14      A     Grace wasn't examined for a couple of hours when

15  we were at the ER. It wasn't until about seven that they

16  took her in for tests.

17          They determined that her spleen was torn and

18  bleeding; that they needed to evaluate it and watch her.

19  And we stayed -- I stayed with her in that pediatric

20  Intensive Care Unit at Nassau County Medical Center for

21  about four or five days, and then she was okay to go home.

22  She wasn't allowed to do anything for a month. She couldn't

23  do anything to jar her stomach, no jumping, no going up

24  stairs. We pretty much had to keep her, like, watching TV

25  or playing board games for at least a month.

Trooper Siegler - Redirect - Hayden

1     Q     How about you, Mrs. Flynn, were you physically

2    injured in the crash?

3     A     They didn't treat me for it at the crash, but

4    about six weeks later I had to go back and have my foot

5    operated on, because when I braced it I broke it.  So I had

6    to go in and have surgery.  And I wore a boot for, like, six

7    weeks.

8           Grace and I went to group therapy for about eight

9    months.  I go to an individual person since then, where I

10   was prescribed anti-anxiety and muscle relaxers, and I tried

11   acupuncture.

12    Q     Mrs. Flynn, how old was Grace -- excuse me, how

13   old was Katie --

14    A     Seven.

15    Q     -- at the time of the crash?

16    A     Seven.

17    Q     Thank you.

18           MS. McCORMICK:  I have nothing further.

19           THE COURT:  Mr. LaMagna.

20           MR. LaMAGNA:  No questions.

21           THE COURT:  Thank you.  You may step down.

22           (Whereupon, the witness exits the courtroom.)

23           THE COURT:  Due to the hour, ladies and

24   gentlemen, I think we will break until 2 o'clock.

25           Do not talk about the case.  You know all of

Trooper Siegler - Redirect - Hayden

1      the admonitions I gave you just a short time ago.

2             Please be promptly back at 2 o'clock.  See

3      you at 2 o'clock.

4             (Whereupon, the jury exited the courtroom.)

5             THE CLERK:  At this time the Court will take

6      its luncheon recess.

7             (Whereupon, a luncheon recess held.)

8                            o0o

9             (Continued on following page.)

10                           o0o

11          A F T E R N O O N   S E S S I O N

12                           o0o

13            THE CLERK:  Case on trial continues.

14            THE COURT:  Would you produce the jury,

15     please.

16            COURT OFFICER:  Jury entering.

17            (Whereupon, the jury entered the courtroom,

18     and upon taking their respective seats, the following

19     occurred:)

20            THE CLERK:  Case on trial continues.

21     Indictment 1910 of 2005 People versus Martin Heidgen,

22            People ready?

23            MR. HAYDEN:  People ready.

24            THE CLERK:  Defendant ready?

25            MR. LaMAGNA:  Defendant is ready.

N. Flynn - Direct - Hayden

```
 1              THE CLERK:  Defendant is present, your Honor,
 2         and the jurors are seated.
 3              THE COURT:  Thank you.  Welcome back, ladies
 4         and gentlemen.
 5              Next witness, please.
 6              MR. HAYDEN:  Neil Flynn.
 7              COURT OFFICER:  Step up.  Remain standing,
 8         raise your right hand and face the clerk.
 9              N E I L  F L Y N N,          a witness called
10              on behalf of the People, having been first
11              duly sworn by the Clerk of the Court, was
12              examined and testified as follows:
13              THE CLERK:  You may put your hand down.
14              Staple, spell your last name for the record.
15              THE WITNESS:  Neil Flynn, F-L-Y-N-N.
16              THE CLERK:  Thank you.  Please take a seat.
17    DIRECT EXAMINATION
18    BY MR. HAYDEN:
19         Q    Good afternoon, Mr. Flynn.
20         A    Good afternoon, sir.
21         Q    How old are you?
22         A    Thirty-seven.
23         Q    What is your occupation?
24         A    I'm a lawyer.
25         Q    What type of law do you practice?
```

GIGI WRIGHT, RPR    (516) 571-2503

N. Flynn - Direct - Hayden

1        A        Civil litigation.   Personal injury, contract

2    disputes, labor law.

3        Q        Do you know a woman named Jennifer Flynn?

4        A        My wife.

5        Q        Do you know a man named Christopher Tangney?

6        A        Jen's dad, my father-in-law.

7        Q        Do you know a woman named Denise Tangney?

8        A        My mother-in-law.

9        Q        Do you know a young girl named Grace Flynn?

10       A        My daughter.

11       Q        How old was Grace on July 2nd of 2005?

12       A        She just turned five in April.

13       Q        Did you know a young girl named Katherine Flynn?

14       A        Still do.

15       Q        Do you call her Katie?

16       A        My oldest daughter.

17       Q        Is Katie dead?

18       A        She is.

19       Q        How old was Katie when she died?

20       A        Seven and-a-half.

21       Q        I'm directing your attention to around 2 o'clock

22   on the early morning of Saturday, July 2nd of 2005.   Were

23   you have riding in a limousine being driven by Stanley

24   Rabinowitz then?

25       A        I was.

GIGI WRIGHT, RPR    (516) 571-2503

1      Q      Describe the limousine.

2      A      It was a black stretch, late model.  I think it

3   was a Lincoln.  There were two bench seats that ran

4   perpendicular to the length of the car:  One back-to-back

5   with the driver's seat; one at the back of the limo facing

6   the one that was back-to-back with the driver's seat.  There

7   was a bench seat that ran perpendicular the length of those

8   two seats, and the length of the limo on the driver's side.

9   And on the passenger side, on the side of the limo there

10  was, like, a bar, a dry bar, where you could put ice and

11  drinks, and I guess decanters and things.

12     Q      Where were you coming from then?

13     A      We were coming from up on the north shore.  My

14  sister-in-law had gotten married that day and the ceremony

15  and the reception were up, I believe, in Bayville.

16     Q      When had the ceremony taken place?

17     A      Early evening.  It was still light out, sunset.

18  It was beautiful.  It was really nice.  They got married

19  right on the beach at the reception hall.  They had the

20  altar built and it was an outdoor ceremony.  They set up

21  chairs and everything.  Jen was the Matron of Honor, and my

22  little girls were the flower girls.

23     Q      Was there a reception after the ceremony?

24     A      Before and after.  We had gone earlier in the

25  day.  I had to go out there early with them because my

N. Flynn - Direct - Hayden

1   daughters and wife had to be in pictures and things like

2   that during the day, so we left around lunch time from Long

3   Beach.

4           We were living with my in-laws at the time

5   because my house was being renovated.  We were building new

6   rooms for the girls and my sons.  And we all left from my

7   in-laws' house.  And we separated.  My wife and the girls

8   went to the reception hall to take photos, and things like

9   that, and then I met up with them later.  And I was there

10  for the tail end of the photographs.  And then there was a

11  ceremony and then the cocktail hour and reception.

12         Q    Where was the reception?

13         A    It was at the same place where the wedding took

14  place.  I don't know, I don't know the name of it, to tell

15  you the truth.  Boat club or marina, something like that.

16  Right on the water on the north shore.  I had been there a

17  year before actually for a friend's wedding, beautiful

18  place.  You could look out over the water on the inside, and

19  actually take your food and drinks out on the deck.  And

20  there was a little beach where the girls played, where they

21  were picking up shells and things like that during the day.

22         Q    Briefly describe your recollection of the

23  reception?

24         A    It was great.  My sister-in-law married into a

25  family that we had known since we are children.  I know my

N. Flynn - Direct - Hayden

1    wife, since we are about eight, and we all went to high

2    school together. And Dave, my sister-in-law's husband, is

3    first cousins to a family that lives in town with us, and we

4    have known them for forever. There were dozens, if not

5    more, friends, as well as all of our family there.

6              The food was great, plenty to eat and drink.

7    Whatever you wanted. The ceremony was beautiful. It was

8    right at sunset on the beach. My girls were gorgeous,

9    dressed in the little versions of the gowns that the wedding

10   party had, and they loved it.

11             I remember at one point I told them you can have

12   as much as you want to eat and drink. Whatever you want.

13   It is a party. Have fun. And then, you know, we danced

14   with them. I remember holding both of them and dancing

15   around. And they were playing with their older cousins.

16   They were out on the beach at times. It was really nice.

17   It was a great wedding.

18        Q    Did you have anything to drink that day?

19        A    Yeah. It was a wedding.

20        Q    What did you drink?

21        A    Beer.

22        Q    How much?

23        A    I don't know. Quite a bit. It was a long day.

24   I got there at lunch time. I don't know how many.

25        Q    Describe your tolerance for alcohol?

N. Flynn - Direct - Hayden

1       A       I like beer.  I could have quite a few and not be

2    bothered by it too much.  It was a long day so.  Plus I was,

3    I was with family, interacting, taking pictures, dancing.

4    It is not like I was sitting at the bar pounding beers

5    throughout the course of the day.  I probably had ten or

6    twelve, but it was over nine or ten hours.

7       Q       When did the limousine leave the reception?

8       A       It was -- it wound down about 1 o'clock.  My

9    recollection, I don't even think I knew what time it was

10   then, but from what I learned afterwards it was some time

11   between one and one-thirty.

12      Q       Describe the circumstances under which the

13   limousine left the reception?

14      A       Well, Kate and Grace, after we had danced for a

15   while, got real tired.  And I put them down on the chairs.

16   We shoved the chairs together at the tables and they fell

17   asleep.  And then we decided to go.

18              And Dave and Lisa had hired cars for us to get

19   back.  We have two sons also who didn't attend.  They were

20   young then.  They are young now.  They were one and three,

21   and we wanted to get home to them.  So, we decided not to

22   stay over, like a lot of the guests did, and we were going

23   home.  So Dave and Lisa had arranged for a limo to take us

24   back to Long Beach.

25              And we went outside.  There was a little area

N. Flynn - Direct - Hayden

1    where they have a valet parking stand, with a little portico

2    over the exit door and we sat there for a few minutes.  I

3    don't know if the car wasn't there or none of the drivers

4    had been informed they were going to Long Beach, they all

5    the thought they were going to the hotel.  There was a delay

6    when we were sitting out on the bench, and it got to be

7    where other people were leaving, and Jen's uncle Michael

8    drove by at one point and offered us a ride, which we turned

9    down, because it was too crowded.  He had his four kids and

10   wife in his truck, and it would have been uncomfortable, so

11   we said no.  And we waited.

12           And then at some point Stanley Rabinowitz, the

13   man I now know to be Stanley Rabinowitz, came up and between

14   him and the other limo drivers, decided he would take us

15   down to Long Beach.

16   Q    Where was the limousine going then?

17   A    We were going back to my in-laws' house.  We had

18   been staying there for a little while, and my house still

19   wasn't ready yet.  We were under construction.  We were

20   living with my in-laws at the time, which were going back to

21   Long Beach, West Walnut Street.

22   Q    Where were you sitting inside of the limousine?

23   A    Directly behind Mr. Rabinowitz.  I was

24   back-to-back, facing the rear of the vehicle.  I was on the

25   driver's side, next to my wife and my daughter Grace.

GIGI WRIGHT, RPR    (516) 571-2503

N. Flynn - Direct - Hayden

1     Q     Who else was in the limousine with you?

2     A     Kate and my in-laws.  Kate was on the bench seat,

3     asleep; and my in-laws were facing me and my wife and my

4     daughter.  Chris was directly in front of me, and Denise was

5     next to him, to my left, his right.

6     Q     Was your seat belt buckled?

7     A     I don't remember.  I thought it was.  Jen said it

8     wasn't.  I don't know.

9     Q     Describe Katie's position inside of the

10    limousine?

11    A     Chris had handed her in to me.  Kate and Grace

12    were both asleep when we got in.  I think I put Grace on the

13    same seat I was sitting when we first got in.  Chris handed

14    Kate in.  Grace was sort of awake.  She was sitting up, a

15    little groggy, doing that fake asleep thing kids do.  Kate

16    was out cold.  I laid her down on the bench.  I put seat

17    belts, I think I put both, on.  It may have been one.  I'm

18    not sure.

19    Q     Describe your state of mind as you were on your

20    way home then?

21    A     We were kind of floating.  It was a long,

22    beautiful day.  You know, like I said, I had a couple of

23    beers.  I had a great time.  I saw friends I hadn't seen in

24    a long time.  It was a beautiful ceremony.

25          I really -- I get along with my in-laws.  I like

N. Flynn - Direct - Hayden

1    seeing them.  Jen's cousin's, aunts and uncles.  Like I

2    said, my kids, it was probably the best day of their lives,

3    Katie said to me, this is the best day of my life when I

4    told her she could have all of the soda she wanted.  It was

5    great.  We were all coming down from, coming down from a

6    big, big celebration, relaxing and looking forward to

7    getting home and getting to bed.

8        Q     What were you doing as you were riding in the

9    limousine at around 2 o'clock that early Saturday morning?

10       A     Reflecting on the day a little bit, talking about

11   a few things that had happened, talking about the ceremony,

12   who we saw, you know, trading anecdotes about who we had

13   spoken to, things like that.

14             I was probably teasing Grace a little bit.  She

15   was still kind of awake, fooling around with her.  Then I

16   started to nod off.  We got lost.

17             This area on the north shore is very, like my

18   wife said, the roads are twisty and winding and overhung

19   with trees.  It is almost like being in the country.

20             At some point I think that the driver got lost.

21   It took longer than it should have to get where we were

22   going.  I started closing my eyes myself.  I was nodding

23   off.

24       Q     What happened as you were riding in the limousine

25   at around 2 o'clock that early Saturday morning?

N. Flynn - Direct - Hayden

1          A      My world exploded.  Came to an end.  I was -- I

2    believe I was asleep, and I believe I was knocked

3    unconscious when the defendant crashed into us.  I woke up

4    and the first thing I remember was smelling smoke, and I

5    tasted blood in my mouth.  And I heard my wife saying over

6    and over again, "Neil, Katie's dead.  Neil, Katie's dead."

7    And I said, "No, she is not dead.  She is just hurt real

8    bad.  We'll get help."  And she said, "No.  She is dead."

9          And then I don't know if I -- well, at that point

10   my in-laws were right on top of me.  My father-in-law was

11   suspended in the middle of the limousine.  His legs were

12   jammed up against the passenger side of the limousine, and

13   his head was against the roof, and his back was against the

14   driver's side in the middle of the car hanging above the

15   ground.

16         And my mother-in-law was right on top of me, sort

17   of underneath him.  And I thought my wife was still -- I was

18   in the car, I thought they she was next to me when she was

19   speaking to me.  I was still with Grace.  And I don't know

20   if I passed out again, or if things just merged together,

21   the next substantive thing I remember, besides hearing Jen

22   screaming and smelling the smoke and tasting the blood, was

23   Jen's uncle Michael, Chris' brother, coming into the car.

24   And I saw him, sort of over Chris, and he came in and Chris

25   said, "My legs are broken.  Michael, don't move me.  My legs

1    are broken."

2            And then Michael went away, and like Jen said, it

3    seemed to take a long time.  Nobody was coming.  Nothing

4    happened.  I don't know, again, if I passed out again, or if

5    I was awake the whole time.  I couldn't really see a lot.

6    It was dark and what lights I could see seemed really

7    bright.  And they were flashing in my eyes.  And it was

8    difficult to discern things.

9            So at -- and I decided I still, I guess I knew

10   Kate was dead, but I didn't want to believe it.  And nobody

11   was coming to help us.  So I had to get help for her.

12           So I crawled underneath my in-laws and I couldn't

13   move my legs, so I had to pull myself with my arms to the

14   back of the car, and as I was going Grace said, "Daddy,

15   where are you going?"  And, like I said, I thought Jen was

16   still in the car.  I said, "Grace, I'm going to get help.

17   Stay there with mommy."  But her mother wasn't in the car,

18   with her anymore.  She was kind of by herself.  And I pulled

19   myself towards the front of the car, and I knew Kate had

20   been on the bench seat, and when I got to the middle of the

21   car the bar was crushed in, it was bent down.  I thought

22   maybe she was stuck under it.  I tried to push it up but I

23   couldn't move it.  So then I reached under it, but I didn't

24   feel her.  I have kept crawling.  I was dragging myself to

25   the back of the car.  And I -- the door was open on the

N. Flynn - Direct - Hayden

1    passenger side of the back, and I hung out and I started

2    yelling, "Somebody please help my Katie.  Somebody please

3    help Katie."

4              And then at some point a cop or a fireman came

5    and they pulled me out, and I kept telling them, "Help

6    Katie.  Don't worry about me."  But they put me on a

7    stretcher and they put me in the ambulance and they took me

8    to South Nassau Hospital.

9         Q    Was your back injured as a result of this crash?

10        A    Yes.  The defendant broke two of my vertebrae

11   when he crashed into us, crushed my lumbar, number one and

12   two vertebrae; broke my nose; he collapsed one of my lungs;

13   he damaged my heart, so they had to put me in the cardiac

14   unit for about two weeks; broke a bunch of my ribs; split

15   in, my eye was torn open; my mouth is ripped open.  I still

16   have a scar.  Every time I move my tongue I feel a bump in

17   my mouth.  I had two compression fractures of the vertebrae.

18   He also ruptured two of my discs, two herniated discs in my

19   spine, and he damaged my -- did something to my liver, I

20   really don't know, lacerated it or bruised it or something

21   like that.

22        Q    How about your lungs?

23        A    One of them was collapsed.  They had to give me

24   breathing treatments.  I don't think it was punctured by the

25   broken rib, but it was collapsed.  I couldn't really breathe

N. Flynn - Direct - Hayden

1     on my own.  I to go through breathing therapy the first two

2     weeks I was in the hospital.  And I was bedridden because of

3     the broken back.  I couldn't walk or anything.  But the lung

4     reinflated after a period of time, and I was able to breathe

5     normally.

6          Q     Describe any treatment you received for the

7     injury to your back and discs?

8          A     Well, I was confined to South Nassau Hospital for

9     about two weeks, and I was stuck in the bed.  I didn't get

10    to see my wife for about a week.  She was in the hospital

11    with Grace, and my in-laws were at the another hospital.  So

12    I had friends that came in, and my relatives would shuttle

13    back and forth between the different hospitals.

14               I could move my legs, but it hurt to do it.  I

15    wasn't paralyzed, but it was just real painful.  And I had

16    extensive nerve damage because of the herniated discs that

17    prevented me from using my legs normally.

18               So I was confined there for about two weeks, and

19    they consulted with orthopedic surgeons, and things like

20    that, and they determined that I probably need surgery.

21               I was released from there to a rehabilitation

22    center in Long Beach, where I spent about a week.  The last

23    day I was at South Nassau Hospital I got up and walked

24    around the nurses station on a walker.  But when I left they

25    kept me in a wheelchair for a while and I went to an

N. Flynn - Direct - Hayden

1     intensive physical therapy rehabilitation center, where I

2     alternated between the wheelchair and crutches.

3              They helped me walk on crutches, and they were

4     able to get me up on crutches to go to my daughter's

5     funeral.  And after about a week there I went home, well, to

6     my in-laws' house, not home.

7              And I was in constant pain, intractable.  It

8     wasn't any better than the first day it happened.  I was on

9     all kinds of drugs when I was at South Nassau.  I was on

10    I.V. pain killers.  I was doped up the whole time.  Then

11    they took me off that when I was in the rehabilitation

12    center, and I got oral pain killers, and a bunch of medicine

13    for my heart, because of the damage he had done to it.

14             And things -- and a bunch of other drugs, I don't

15    know what they were.  My blood pressure sky rocketed after

16    the crash, and I'm on high blood pressure pills.

17             So then after I was, I was in Long Beach, and I

18    got got released and went home, they sent me to physical

19    therapists a couple times to the house.  I couldn't do

20    anything.  I was still on the crutches.  I had to take a

21    chair into the shower and wash with a brush.  I couldn't

22    avenue get dressed, couldn't sleep in a bed.  Ultimately I

23    went to see another doctor.  I went to see a spine surgeon

24    in the city, and he took one look -- the guy they sent me

25    from South Nassau was a little equivocal, he wasn't sure

N. Flynn - Direct - Hayden

1    what he wanted to do and I got a second opinion, and this

2    guy took one look at the x-rays or the MRI and he said, you

3    could get surgery now or go to physical therapy for a year

4    and then surgery. And I went for a third opinion and the

5    doctor said the same thing.

6         So I got surgery about the middle of August at

7    Lenox-Hill Hospital. I was in there for another week. I

8    had to wear a brace. They gave me increasingly bigger

9    bulkier braces, a plastic brace that went up to my neck,

10   down to my waist. I had to wear that for six months after

11   the surgery.

12        They did what is called a discectomy on the

13   herniated disc and they tried to fix the fractured

14   vertebrae, the crushed lumbar vertebrae, by injecting rubber

15   cement into the empty space. It didn't work. They couldn't

16   get it in there. I continued to treat with physical therapy

17   three times a week.

18        I go to psychotherapy once a week and see my

19   surgeon every few months. The last time was in June. He

20   referred me out for MRIs and more x-rays, and things I

21   haven't had the energy to do.

22        He have said once he reads the films we will be

23   able to determine if I need more surgery, or if they can

24   treat it with some other method. But I may need another

25   operation.

N. Flynn - Direct - Hayden

1           And now I take -- I'm getting by with the

2    physical therapy.  I take Vicodin for the pain, I'm on

3    anti-depressants, and I still take the high blood pressure

4    medication because of the stress, grief and anxiety.  It

5    keeps my blood pressure high.

6           Q     Describe any treatment you received for the

7    damage to your heart?

8           A     They just kept me under observation.  I was in

9    the Cardiac Care Unit for the entire time I was at South

10   Nassau.  And I heard different things.  They said I had a

11   heart attack, and then they said it was just arrhythmia.

12   They didn't do anything except give me medication.  I took

13   medication while in South Nassau.  I was on medication.  And

14   then for a period of time after I got released, that was one

15   of the pills when I got out of the hospital, I had maybe

16   half a dozen prescriptions that they gave me.  Now I'm down

17   to four.  There were probably six or seven when I was on it

18   originally, at least one I know was to treat my heart.

19          Q     Describe any treatment you received for your

20   broken nose?

21          A     They didn't do anything for the nose.  I could

22   get surgery I guess down the road.  But my physical injuries

23   are the least of my problems.  I don't really know what I'll

24   do.

25          Q     How about your broken ribs?

N. Flynn - Cross - Martello

1      A      Again, they heal on their own.  There is no

2      treatment for broken ribs.  They just hurt.

3      Q      Was Christopher hospitalized as a result of the

4      crash?

5      A      Yes, but not with me, until we were both

6      transferred to Long Beach together.

7      Q      Describe any observations you made of Christopher

8      while you were together in Long Beach Memorial?

9      A      He is ruined.  He is a shell of himself.  He

10     bursts into tears.  The first time I looked at him all he

11     said was, "We did everything right.  How did this happen?"

12     He was in a wheelchair for months.  He was hurt real bad.

13     Lost a ton of weight.  He is emotionally fragile.

14            He was the go-to guy in his family.  Always.  And

15     now he is just a different person.  He is completely shot.

16     Q      How about Denise?

17     A      She was hurt bad too.  She had a bunch of

18     surgeries.  She is in a ton of pain.  They both limp around.

19     They hobble around.  They are young people.  They both just

20     retire.  They hobble around.  They are both crippled.  She

21     is like him; she walks like a penguin.

22            MR. HAYDEN:  I have nothing further, your

23     Honor.  Thank you.

24            THE COURT:  Mr. Martello.

25     CROSS-EXAMINATION

N. Flynn - Cross - Martello

1    BY MR. MARTELLO:

2       Q    Good afternoon, Mr. Flynn.  I promise I will be

3    very brief.  Just a couple of questions.

4            Mr. Hayden had said that, had asked you that you

5    practice law.  You are an attorney.  Do you practice in

6    Nassau County?

7       A    Yes.

8       Q    How long have you practiced in Nassau County as

9    an attorney?

10      A    Five years.

11           MR. MARTELLO:  Nothing further, your Honor.

12           THE COURT:  Redirect?

13           Mr. HAYDEN:  No, your Honor.

14           THE COURT:  Thank you.

15           THE WITNESS:  Thank you, your Honor.

16           THE COURT:  You are welcome.

17           (Whereupon, the witness exits the witness

18      stand.)

19           THE COURT:  Mr. Hayden, your next witness.

20           MS. McCORMICK:  Your Honor, the People call

21      Denise Tangney.

22           COURT OFFICER:  Step up.  Remain standing,

23      face the clerk and raise your right hand.

24           D E N I S E   T A N G N E Y,         a

25           witness called on behalf of the People,

D. Tangney - Direct - McCormick

1          having been first duly sworn by the Clerk of

2          the Court, was examined and testified as

3          follows:

4               THE CLERK:  You can put your hand down.

5      State your name, spelling your last name for the

6      record.

7               THE WITNESS:  Denise Tangney, T-A-N-G-N-E-Y.

8               THE CLERK:  Thank you.  Please take a seat.

9               MS. McCORMICK:   May I inquire?

10              THE COURT:  Please.

11  DIRECT EXAMINATION

12  BY MS. McCORMICK:

13      Q    Good afternoon, Mrs. Tangney,

14      A    Good afternoon.

15      Q    Mrs. Tangney, can you tell the jury, please, how

16  old are you, ma'am?

17      A    Fifty-seven.

18      Q    Do you have kids?

19      A    Yes.  I have three.

20      Q    Can you tell us their names and their ages,

21  please?·

22      A    My youngest daughter is Lisa, she is 32; Thomas

23  is 36; and Jennifer is 37.

24      Q    Mrs. Tangney, I'm going to ask you to think back

25  to July 1st of 2005.  Could you please tell the jury what