D. Tangney - Direct - McCormick

1    that Friday afternoon was like.

2         A      Friday early afternoon was exciting.  We were

3    just -- we were on a high.  As Neil said, the kids were

4    living with us while their house was being renovated, which

5    was really great for my husband and I, because it was just

6    great having them living with us.

7              In the early afternoon the limo was taking us,

8    all of us, because we were all there up to the Harrison

9    House, we were preparing, we brought our clothes with us, we

10   were going to get dressed there.  And we got there early

11   afternoon.

12             And have you ever been in a wedding party?  My

13   oldest daughter Jennifer was married ten years earlier.  It

14   was a long time since I was in a wedding party.  It was

15   wonderful.  It was -- you know, the bride's maids were

16   there, the girls were getting dressed, and primped, and it

17   was fairytale-like.  It was a beautiful day.

18             The girls and en had gone off to take pictures

19   for the album, and we kind of just took our time, just

20   enjoying ourselves at the Harrison House.  We went to a -- a

21   little later on we met them at the Crescent Beach Club,

22   which is in Bayville.

23             Again, the Sunday was shining.  It was

24   fairytale-like, is my best description of it.  It is all

25   glass.  The place is all glass.  The wedding was both inside

D. Tangney - Direct - McCormick

1    and outside.  There was an egress there that made you feel

2    like you were part of the water.  And the ceremony -- there

3    was a platform and tables, and the ceremony was outside.  We

4    spent a lot of time outside.

5         The wedding ceremony was beautiful and the

6    prayers were great.  And family and friends were there.  And

7    it was just beautiful.  So we just partied.  We partied.

8    And the ceremony was about seven.  And then we -- and then

9    the celebration followed after that.

10        So the music was wonderful.  As I said, my

11   daughter Jen's wedding was ten years earlier, and her party

12   was one of the best parties I have ever been to, but I was

13   drinking at that party.  I really enjoyed myself and had a

14   great time.  I regretted not being able to go to the tables

15   and be with my family and friends.  At that time I made a

16   conscious decision for Lisa's wedding that I would just be

17   with everybody and just share this day with them.  I was

18   just so happy to share it with everybody.  I was on a high,

19   going here, there and everywhere.

20        Q    Mrs. Tangney, you didn't drink at your daughter's

21   wedding?

22        A    No alcohol.  I drank club soda with lemon.

23        Q    But you had transportation provided for you?

24        A    Yes.

25        Q    Mrs. Tangney, about how long did the wedding

D. Tangney - Direct - McCormick

1    reception last?

2        A    It started to end close to 12:30-ish. People

3    were leaving. And it was winding down. And the flowers

4    were beautiful. And I was preoccupied with don't leave the

5    flowers. I grabbed as many as I could. And we were

6    gathering the belongings, the cameras and clothes that we

7    had brought and whatnot.

8            So we left about a half -- we left the inside

9    about a half-hour later. I guess it was about 1-ish in the

10   morning. Chris was holding Kate and Neil was holding Grace,

11   and I was holding the stuff. And we went out expecting to

12   have the limousine take us home that my daughter Lisa was

13   very insistent on that, and we wanted to get back home for

14   the boys.

15           So when we got outside I was surprised that the

16   limo wasn't there yet. So we sat there. There was, like, a

17   concrete stanchion, so Chris and I and Kate sat on that, and

18   kind of waited. And we were -- I was on a high. I wasn't

19   -- I was tired, but excited. So I saw there was

20   conversation between the limo drivers, and I forget who came

21   back and said they weren't quite sure who was going to take

22   us home, which limo we were going in. I didn't care anyway.

23           Mr. Rabinowitz, I understand, volunteered because

24   he knew the way to Long Beach, from what I understand. So

25   he was our driver.

GIGI WRIGHT, RPR    (516) 571-2503

D. Tangney - Direct - McCormick

1    Q    Mrs. Tangney, did you know Mr. Rabinowitz before

2    that evening?

3    A    No.

4    Q    When did you find out his name was

5    Mr. Rabinowitz?

6    A    After the hospital -- when I was in the hospital.

7    Q    On that evening it was just a man volunteering to

8    drive --

9    A    Yes.  I didn't know who it was.

10   Q    -- to drive you?

11   A    Yes.

12   Q    He was taking you to Long Beach?

13   A    Yes.

14   Q    And you were sitting outside with your daughter

15   Jennifer?

16   A    Jennifer was -- I was really sitting with Chris,

17   my husband, who was holding Kate.  And Jen was kind of

18   standing, coming back and forth, and Neil.  And then David,

19   my new son-in-law, was trying to orchestrate who was going

20   to take us home.  And they figured that out and then we

21   left.  We got into the limo and we left.

22   Q    What were the girls doing at this point?

23   A    The girls were sleeping.  Kate, when she is out

24   she is out.  She was just an angel.  And Gracie was also

25   tired, and she was sleeping on and off in her father's arms.

D. Tangney - Direct - McCormick

1     Q     Once the limousine issue was resolved did the

2  limousine then pull up?

3     A     No, they were there.  The limousines were there.

4  They were talking about which one we were going to get into.

5  So we walked -- it wasn't far from where we were sitting --

6  to the limousine.

7     Q     What happened when you got to the limousine?

8     A     What happened; we went in.  Chris was -- Neil was

9  first, then Chris went in after.  Neil had Katie in his

10  arms.  And then after the kids were settled, then I went in,

11  Chris sat on the back bench, on the driver's side, facing

12  the front of the car, and Neil was sitting behind the

13  driver, Mr. Rabinowitz.  And Grace was in the middle,

14  leaning on Jen, who was sitting on the passenger side facing

15  me.  And I was on the passenger side facing the front of the

16  car.

17     Q     So Neil went in first and was followed by your

18  husband Chris?

19     A     Yes.

20     Q     And Neil Flynn is your son-in-law?

21     A     Neil is my son-in-law, yes.

22     Q     Chris Tangney is your husband?

23     A     Chris is my husband.  And Katie is my

24  granddaughter.

25     Q     And Grace?

D. Tangney - Direct - McCormick

1        A      And Grace.

2        Q      Mrs. Tangney, can you tell the jury about your

3    ride in the limousine from the wedding reception?

4        A      I thought it was uneventful.  It was windy and

5    treed.  It is a country road.  I didn't mind one bit that we

6    were there.  It was a slow ride.  It was very windy and

7    slow.  And he was trying to figure his way out of that area

8    there.  And I remember the straight-away once we got on the

9    parkways.  I am not too familiar with the Northern State in

10   terms of looking out and knowing, but I'm familiar with the

11   Meadowbrook.  So I did recognize when we were on the

12   Meadowbrook.  I knew we were getting close to home.

13              It was quiet in the car.  It was -- we were just

14   chit-chatting with one another, it was quiet, and somebody

15   would say something, and Grace was on and off sleeping, and

16   Katie was sleeping, and her head was toward my husband

17   Chris' knees.  She has long blond hair.  And I was just on a

18   high, just looking at all of my family.  Just happy.  Just

19   -- it was just an uneventful quiet loving anecdotal

20   conversation as we went home.

21       Q      Mrs. Tangney, the limousine itself does the

22   limousine have windows on either side of it?

23       A      Yes.

24       Q      Could you see out those windows or were they

25   entirely blacked out?

GIGI WRIGHT, RPR    (516) 571-2503

D. Tangney - Direct - McCormick

1      A     No.  You could see out the windows.

2      Q     As you are driving along you said that you

3  weren't familiar with the Northern State, but you were

4  familiar with the Meadowbrook?

5      A     Yes.

6      Q     What happened, Mrs. Tangney, on the Meadowbrook

7  Parkway?

8      A     Well, we were driving for a bit, and I knew we

9  were almost home, and Chris was awake, and he had his hand

10  on, his right hand on my left knee and just resting there.

11  I was awake, awake and watching, looking out the windows.

12  And as we were driving I saw a light coming, a light in

13  front of me, and I knew instinctively that that light

14  shouldn't be there.  I didn't know what it was, but there

15  was a light in front of me.

16      Q     Mrs. Tangney, let me stop you for one moment.

17  When you say in front of you, you mean within the passenger

18  compartment of the limousine?

19      A     No.  Out onto the road in front.  On the road, or

20  someplace in front of me, not in the car, but outside.

21      Q     From where you were seated, Mrs. Tangney, were

22  you able to see through the front windshield of that

23  vehicle?

24      A     Yes.

25      Q     Was the partition up or down in the limousine

D. Tangney - Direct - McCormick

1      between yourself and Mr. Rabinowitz, the driver?

2          A      It was down.

3          Q      And from your vantage point you would be looking

4      in the same direction as Mr. Rabinowitz?

5          A      Yes.

6          Q      And the light that you are referring to is

7      outside of the vehicle?

8          A      Yes.

9          Q      In front of the vehicle?

10         A      Yes.

11         Q      When you first --

12         A      In the distance.  In the distance in front of the

13     vehicle.

14         Q      Would you please continue for the jury what did

15     you see when you first noticed the light?

16         A      I saw a light, one light.  And I just almost --

17     just as I -- I was like thinking quickly that I knew it

18     wasn't supposed to be there.  I remember glancing to the

19     northbound traffic, and I thought I was seeing something

20     that maybe it was on the other side, and I knew it wasn't

21     the lights from, from the highway lights.

22             It just didn't belong there.  And it was in a

23     flash.  It was just immediate, just this shouldn't be there.

24     And then all of a sudden the one light turned into two

25     lights, and I said to myself, "Oh, my God, we are going to

D. Tangney - Direct - McCormick

1    get hit." And I didn't have time to just say hold on,

2    Chris. There was no time. I didn't have any time to warn

3    them to stop. I just can't say. There was no time. It was

4    a breath's instant of knowing, oh, my God we are going to

5    get hit. And that was the last -- I don't remember the

6    sounds. Thank God. I don't have a memory of the sound of

7    the crash. But I woke up. And it was eerily quiet. It was

8    just -- it was silence. And there was a smell. I do

9    remember the smell.

10          And I could hear Jennifer, I could hear Jennifer

11   as we realized that we were hit, she said, "I'm going to go

12   get help." I was in a position -- once I realized that we

13   were hit, I heard Chris speaking, and I remember saying

14   okay, he's okay, because he was speaking. He wasn't crying

15   or shouting or anything. He was speaking very cogently to

16   my daughter. In my mind I said, okay, he is okay. And I

17   was in a position like this. My head was up and my back was

18   arched, so my body was up like that.

19      Q    Where was your body located within the passenger

20   compartment of the limousine?

21      A    I was on the floor and my --

22      Q    Would that be the floor in between the bench and

23   the bar?

24      A    Yes.

25      Q    And your head is now arched upward on what?

D. Tangney - Direct - McCormick

1      A      I don't know.  It was on the bench or -- I did

2    feel Neil.  I was on Neil at that point too.  So my first

3    recollection is thinking, okay, Chris is okay; Jen's okay.

4    And then I heard Jen say, "Where's Katie?  I can't find

5    Katie."  And Chris said, "Jen, look underneath me.  Maybe --

6    she must be underneath me,"  So, she found Katie.  And I

7    remember just saying, oh, no, that, I guess Jen kept saying

8    "She's dead.  She's dead.  She's dead."  And I heard Grace.

9    I knew where grace was, because she was in front of me in

10   the middle.  And I heard Grace.

11            Jennifer was moving back and forth, and Chris was

12   talking to her.  In the meantime Grace was whimpering, and I

13   heard her whimpering.  And I knew she was in front of me

14   somewhere on the bench, because I could feel the bench and I

15   kind of knew where she was sitting.

16     Q      Could you see her, Mrs. Tangney?

17     A      No, it was dark.  I couldn't see her.

18     Q      So --

19     A      I could hear her.  And I knew where she was.  And

20   when I reached up I was able to reach her, and I grabbed her

21   hand and I kept saying, "Nanny's here.  Don't worry.  Nanny

22   here.  Don't worry.  Everything is going to be all right."

23   I was stroking her hand and she was holding my hand.

24            And there was -- it was, I just -- I can't

25   explain the quietness.  There were people talking but it was

D. Tangney - Direct - McCormick

1    not, there wasn't a commotion in my memory.  It was just a

2    lot of people talking.  And I remember -- the next thing I

3    remember is somebody came and took Grace out of the car.

4         Q    Mrs. Tangney, excuse me.  Could you tell the jury

5    were you able to move at this point?

6         A    No.  No, I couldn't move.  And I couldn't

7    breathe.  There was a heaviness on me.  And I thought it was

8    my dress.  I thought that my dress was too tight.  I could

9    not breathe.  And I kept saying to anybody, "You have to cut

10   my dress off.  I just can't breathe."

11             And there was something on top of me.  And I

12   didn't know what it was.  I was not able to move it, but

13   when I was able to push up so I could get a breath, there

14   was a movement to it, a soft movement.  So I knew it had to

15   either be Neil on top of me or Chris on top of me.  I was

16   under something that I couldn't breathe.

17        Q    Did you ever learn what the thing was that was on

18   top of you?

19        A    I later found out that it was Chris, the bar, and

20   then Neil also had fallen and was partly on top of me.  And

21   then Chris was caught.  His legs were all caught in the bar

22   part that had moved off.  So he was like arched and he was

23   over me, but on top of me.

24        Q    Mrs. Tangney, is it fair to say that everyone

25   within the passenger compartment of the limousine was now

D. Tangney - Direct - McCormick

1    thrown forward to right behind the driver's compartment?

2        A    Yes.

3        Q    And they were pushed to the front of the

4    passenger compartment?

5        A    Yes.  We wound up separate.  We both didn't go

6    separate.  We must have flown in the air, because Chris -- I

7    was more near Neil and Jen.  And Chris was, Chris was near

8    Jen.

9        Q    Would it be fair to say that you actually

10   criss-crossed somehow?

11       A    I would imagine so.

12       Q    So you have this sensation of not being able to

13   breathe.  What happens next?

14       A    I kept saying, "I can't breathe and can somebody

15   please cut my dress."  I thought it was my underwire in the

16   dress, and I just had this desire to breathe.  I couldn't

17   breathe.  And then I remember being -- I moved to my left

18   and that gave me a little bit of respite.

19            I later found out somebody had moved me over a

20   little bit, and I was able to breathe better.  I still

21   couldn't breathe.

22       Q    Were you aware at this time that Katie was dead?

23       A    Yes.  Yes.

24       Q    But you were still conscious?

25       A    Yes.

D. Tangney - Direct - McCormick

1     Q    What happens with you next, Mrs. Tangney?

2     A    As soon as somebody took Grace out of the car I

3  just -- I was just fighting. I was just fighting to breathe

4  and fighting to hold her hand, and trying to keep lucid.

5  And as soon as somebody took her out I felt a tremendous

6  relief that Grace was okay. Somebody was taking care of

7  Grace. So I let go of her and then I have no memory of what

8  happened in the car after that. I woke up and my next

9  memory is in the hospital.

10    Q    You have no recollection of the extrication?

11    A    No. Oh, well, I do. Again, I couldn't breathe,

12  and they were using machines, and I don't know what they

13  were using, but it was this steel sound, and sparks were all

14  over the place and somebody put something over my head, a

15  towel or something to protect my face. And I could remember

16  being very annoyed at that because I couldn't breathe. And

17  this was even more of a hinderance to my breathing.

18        I did realize I needed it because there was

19  sparks and smoke everywhere.

20    Q    At some point you were removed from that vehicle.

21  Do you remember being physically taken out of the vehicle?

22    A    No.

23    Q    What is your next memory?

24    A    My next memory was being -- I was, what I later

25  found out, was intubated, which I have no recollection of.

D. Tangney - Direct - McCormick

1    I was screaming in.  Pain, and they needed to quiet me down.

2    I couldn't breathe so they intubated me, and they needed to

3    sedate me so that I wouldn't move.

4           And I do remember them placing the tube down my

5    throat and somebody, one of my sister-in-laws was with me.

6    I couldn't move.  They gave me something where my body just

7    wasn't moving.  But I was aware and I was awake and I can

8    hear my relatives talking to the staff, and then the staff

9    saying, she can't hear anything, she can't feel anything,

10   she is okay.  I was screaming so much.  And then I wasn't --

11   so they thought I had died.  So I could hear the

12   conversation between my family and whoever the staff at the

13   hospital were, and they are telling them she's okay.  She

14   can't hear and she can't feeling anything.  I was struggling

15   to let somebody know I can hear you, but I couldn't speak or

16   move.

17          But I could hear everything that was going on.

18   Somebody asked me if I wanted to see Jen, and I said, no.  I

19   couldn't do that.  I just couldn't.  I just couldn't.  And I

20   was in the car.  I wasn't bleeding.  But when they moved me

21   I lost most of my blood from the time they removed me from

22   the car to the hospital.  So they couldn't work on me at all

23   because I was unstable.  They had to stabilize me.  I lost

24   most of my blood at that point.

25       Q    Mrs. Flynn -- excuse me, Mrs. Tangney, at the

D. Tangney - Direct - McCormick

1    hospital did they determine that you had received injuries

2    as a result of this crash?

3         A    Yes.

4         Q    Could you describe those injuries for the jury,

5    please?

6         A    Well, in the morning after, quite a few hours

7    after we got there, because they couldn't do anything on me

8    until I was stabilized, in the morning some time they worked

9    on my -- I had my both lower legs were degloved, they call

10   it; all of the skin and muscles were completely torn off of

11   my bones from my knees down.  And my right knee was

12   exploded.  It was just in a million pieces.  My hip was also

13   exploded.

14             So the first operation in the morning they worked

15   on my, putting the skin and veins and whatnot back together.

16   And they tried to put my knee back together with pins and

17   whatever.  They tried to reconstruct it to at least hold it

18   in place.

19             But a four-hour operation went into eight hours,

20   and they didn't want to continue operating on me because it

21   is too long to be under anesthesia.

22             So, the --

23        Q    That operation took place the very next morning

24   after this crash?

25        A    Yes.

D. Tangney - Direct - McCormick

1      Q      And this is on July 2nd?

2      A      Yes.

3      Q      The intubation memory that you have, do you

4    recall whether that occurred before or after your operation?

5      A      Before.

6      Q      You said that you had family members there and

7    that you were trying to let know them know that you were

8    awake.  Do you know how they got there, Mrs. Tangney?

9      A      How my relatives got there?

10     Q      Yes.

11     A      At that point, no, I had no idea.  I knew it was

12   my family, but I don't remember them in the car.  But I knew

13   it was my family.

14     Q      So after that time did there come a time when

15   they realized that you were aware of your surroundings in

16   the hospital when were you intubated?  Did you successfully

17   communicate that you were awake?

18     A      Yes.  One of my sister-in-laws was right next to

19   me and I was moving, I was struggling so hard to move

20   something to let them know that I could hear and I was

21   awake.  So I did that, and one of my sister-in-laws said,

22   she is awake.

23     Q      After that realization, at some point you had the

24   four-hour surgery that went into eight hours?

25     A      Yes.

GIGI WRIGHT, RPR    (516) 571-2503

1     Q     On both of your legs?

2     A     The -- both of my lower legs were degloved. And

3     then my right knee exploded so they worked on that, but that

4     was going to take too long.

5     Q     After the eight hours of surgery when you came

6     out what is the next treatment that you received?

7     A     They had to wait a day again for the effects of

8     the first operation to wear off before they can do a second

9     operation, which was the day after I got there. And they

10    worked -- the same thing, they tried to reconstruct what

11    they can manage to put back together with pins and plates

12    and screws and whatnot. So I had a hip reconstruction,

13    whatever they call that.

14    Q     Did they do that with artificial rods and pins

15    and --

16    A     Yes.

17    Q     And that was the second day after you arrived at

18    the hospital?

19    A     No. I believe it was the third day. They had to

20    wait a whole day for the effects of the anesthesia to wear

21    off.

22    Q     Did you receive any additional injuries than

23    those that you were describing that they were operating on?

24    A     It didn't work. They really knew it wasn't going

25    to work. My hip bone wound up imploding or falling apart

GIGI WRIGHT, RPR    (516) 571-2503

D. Tangney - Direct - McCormick

1    because the nerves, they were just crushed.  All of the

2    nerves were crushed.  And there wasn't enough nourishment

3    going to the bone, so the bone fell apart and fell into

4    itself.

5              So I had to have a new hip put in at that time.

6    And a couple of weeks later my knee also.  There was no more

7    room, the pins and the screws had nothing to hold onto, the

8    bone just fell apart.  So I needed to get both repaired

9    artificially with extra long posts, whatever, to go deep.

10   One goes to my knee and the other one goes to my ankle.

11        Q    Was there an additional surgery that you

12   received?

13        A    Two additional surgeries.

14        Q    After the first two?

15        A    Yes.  And then in between there was physical

16   therapy.

17        Q    Where did you receive your physical therapy,

18   Mrs. Tangney?

19        A    We were transferred -- I was in the medical

20   center for two weeks, and then I was transferred to an acute

21   rehabilitation center in Long Beach.  And I was there for a

22   month.  It took a long time.  I was there the longest.

23        Q    Where was your husband, Chris, during all of

24   this?

25        A    He too was -- because of his injuries they

D. Tangney - Direct - McCormick

1     couldn't help him in the medical center, so they took him to

2     Winthrop Hospital.  We were all in different places.  My

3     family had to go from place to place and orchestrate who was

4     going to be where.  It was a nightmare.

5              So I left the medical center to go to Long Beach

6     Hospital, Long Beach Acute Care; and he left Winthrop and we

7     were both, in fact Neil too, all three of us were in Long

8     Beach Medical Center for a month.

9     Q    Are you continuing to receive treatment for your

10    injuries, Mrs. Tangney?

11    A    I have therapy three days a week, and my physical

12    therapist got to the point where my leg just wasn't doing

13    anything more.  She couldn't do anything more with it.  So

14    they agreed to change therapies.  I had to go to a pain

15    management guy who, through medication, tricks my nerves so

16    that they can better work on my legs, so it will work

17    better.  So I had to change therapies a couple of times and

18    continue with physical therapy.  I have to continue physical

19    therapy.

20             I also go to a psychologist once a week and

21    probably will continue for a long time.

22    Q    Do you have any idea as you sit here how long

23    you're going to have to continue going to physical therapy

24    because of these injuries?

25    A    They have given me no inclination that it is

D. Tangney - Cross - Martello

1    going to stop.  I can't walk.  I could walk from here to

2    there, but I can't stand up for a very long time.  I can't

3    cook.  I can't garden.  I can't food shop.  I can't love my

4    husband.  I can't do anything like I used to.  I can't love

5    my grandchildren.  I can't get on the ground and play with

6    them.  Life is different.

7         Q     Thank you.

8                    MS. McCORMICK:  I have nothing further, your

9         Honor.

10                   THE COURT:  Mr. Martello.

11   CROSS-EXAMINATION

12   BY MR. MARTELLO:

13        Q     Good afternoon, Mrs. Tangney.  I know this is

14   very difficult, and my sympathies go to you and your whole

15   family.  I have a few questions I will be very brief.

16              Mrs. Tangney, what do you do for a living?

17        A     I'm a retired teacher.

18        Q     Are you also a councilwoman for the Long Beach

19   City Counsel?

20        A     Yes.

21        Q     And on that City Council you help legislate laws?

22        A     Yes.

23        Q     That is a political position; is that correct?

24        A     Yes.

25        Q     Mrs. Tangney, when did you -- how long have you

D. Tangney - Cross - Martello

1    served on the City Council?

2         A    Since November.

3         Q    Of 2005?

4         A    Of 2005.

5         Q    So you were just recently elected?

6         A    Yes.

7         Q    Had you run with District Attorney Kathleen Rice,

8    on the same ticket?

9                   MR. HAYDEN:  Objection.

10                  THE COURT:  Sustained.

11                  MR. LaMAGNA:  No further questions.

12                  MS. McCORMICK:  No redirect.

13                  THE COURT:  Thank you.

14                  (Whereupon, the witness exits the courtroom

15   the courtroom.)

16                  THE COURT:  Ladies and gentlemen, we are

17   going at it just about an hour.  I will give you ten

18   minutes.  Please don't talk about the case.

19                  (Whereupon, the jury exited the courtroom,

20   and a brief recess held.)

21                  THE COURT:  Please produce the jury.

22                  COURT OFFICER:  Jury entering.

23                  (Whereupon, the jury entered the courtroom,

24   and upon taking their respective seats, the following

25   occurred:)

C. Tangney - Direct - Hayden

1          THE CLERK:  Case on trial continues.

2     Indictment number 1910N of 2005, People versus Martin

3     Heidgen.

4             People ready:

5             MR. HAYDEN:  People ready, your Honor.

6             THE CLERK:  Defendant ready?

7             MR. LaMAGNA:  Defendant is ready, your Honor.

8             THE CLERK:  Defendant is present and the

9     jurors are seated.

10            THE COURT:  All right.  Next witness, please.

11            MR. HAYDEN:  Christopher Tangney.

12            COURT OFFICER:  Step up.  Remain standing,

13    raise your right hand and face the clerk.

14       C H R I S T O P H E R  T A N G N E Y,

15            a witness called on behalf of the People,

16            having been first duly sworn by the Clerk of

17            the Court, was examined and testified as

18            follows:

19            THE CLERK:  Thank you.  Please put your hand

20    down.  State your name.

21            THE WITNESS:  Christopher Tangney,

22    T-A-N-G-N-E-Y.

23            THE CLERK:  Thank you.

24    DIRECT EXAMINATION

25    BY MR. HAYDEN:

C. Tangney - Direct - Hayden

```
 1      Q    Good afternoon, Mr. Tangney.

 2      A    Good afternoon.

 3      Q    How old are you?

 4      A    Fifty-nine.

 5      Q    Are you a retired police officer?

 6      A    Yes, I am.

 7      Q    Where did you work as a police officer?

 8      A    Nassau County.

 9      Q    Are you licensed to drive?

10      A    Yes, I am.

11      Q    When did you receive your license?

12      A    1964 or `65, I guess.

13      Q    Were you licensed in New York State?

14      A    Yes, I was.

15      Q    Have you estimated the speed of motor vehicles?

16      A    Yes, I have.

17      Q    How long have you been doing that?

18      A    Approximately thirty-five years.

19      Q    You mean as a police officer.  Just as a driver?

20      A    Oh, I would say thirty-five years.

21      Q    How often do you do that each week?

22      A    A number of times as a police officer you do

23   that, that's how you practice and to keep your accuracy.

24      Q    Were you trained as a police officer to estimate

25   the speed of motor vehicles?
```

C. Tangney - Direct - Hayden

1      A      Yes, I was.

2      Q      When were you trained to do that?

3      A      I was trained in the Nassau County Police Academy

4    when I first became a policeman.  I also was trained a

5    number of times when I had in-service training.

6      Q      How often would that be?

7      A      There is no specific time, but they would do it

8    every couple of years, every five, six, seven years,

9    depending on how much money they had and they can do it.

10     Q      Describe your training for the jury.

11     A      For the estimating of speed what they do is, you

12   go on the street with a radar certified technician, and he

13   will clock a car with the radar and you estimate.  And what

14   happens is you estimate, and then you tell him what you got,

15   and he tells you how close or accurate you are, and then he

16   teaches you how to adjust to the speeds.

17     Q      How long did your training take?

18     A      In the police academy I believe they did it two

19   different times.  And in-service training they do it once,

20   once during your week of in-service training.

21     Q      How many hours?

22     A      I believe it was four-hour blocks.

23     Q      Did your training include estimating the speed of

24   a motor vehicle coming right at you while you were facing

25   the vehicle?

GIGI WRIGHT, RPR    (516) 571-2503

1      A     Yes, they taught -- the training was while you

2   were sitting still, while you were in motion, while vehicles

3   were coming at you, and also looking through the rear view

4   mirror.

5      Q     Your training included estimating the speed of a

6   motor vehicle coming right at you as you were moving toward

7   that vehicle?

8      A     Correct.

9      Q     Was your accuracy tested over the course of your

10  training?

11     A     Yes, it was.

12     Q     How?

13     A     They -- I would estimate it and then the radar

14  people would tell you how accurate you were.

15     Q     What was the result of the testing, your

16  accuracy?

17     A     I was accurate from zero to three miles an hour.

18     Q     Do you know a woman named Denise Tangney?

19     A     That's my wife.

20     Q     Do you know a woman named Jennifer Flynn?

21     A     That's my daughter.

22     Q     Do you know a man named Neil Flynn?

23     A     My son-in-law.

24     Q     Do you know a girl named Grace Flynn?

25     A     That's my granddaughter.

1    Q    And do you know a girl named Katherine Flynn?

2    A    That's my other granddaughter.

3    Q    Was she called Katie?

4    A    Yes, she was.

5    Q    Is she dead?

6    A    Yes, she is.

7    Q    How old was Katie when she died?

8    A    Seven and-a-half.

9    Q    I'm directing your attention to around 2 o'clock

10   on the early morning of Saturday, July 2nd of 2005.

11        Were you riding in a limousine being driven by

12   Stanley Rabinowitz?

13   A    Yes, I was.

14   Q    Where were you coming from?

15   A    We were coming from the Crescent Beach Club in

16   Bayville, my daughter's wedding.

17   Q    When had the wedding taken place?

18   A    The wedding took place at approximately 7 o'clock

19   that night at Crescent Beach Club.

20   Q    Describe the location where the wedding took

21   place?

22   A    The wedding took place at the Crescent Beach

23   Club, which is on the Long Island Sound.  It is a little --

24   Bayville is a little beach community.  It has a sandy beach.

25   And the ceremony was on a deck that they built on the sand,

C. Tangney - Direct - Hayden

1   and that is where the wedding took place.

2        Q    Was there a reception after the wedding?

3        A    Yes, there was.

4        Q    Describe that location?

5        A    The reception was adjacent to this deck where

6   there were many sliding glass doors that could completely

7   open the interior of the building to the deck area, and

8   that's where the cocktail hour took place.  And then there

9   was a dining hall where we also ate dinner.

10       Q    Briefly describe any recollections you have of

11  the reception?

12       A    It was a pretty typical cocktail hour.  There was

13  a lot to eat and plenty of good food and drinks for

14  everyone.  It was a festive atmosphere.  It was a wedding.

15       Q    Did you have anything to drink at the reception?

16       A    Iced tea.

17       Q    When did you leave the reception?

18       A    We left the reception at -- to go for dinner or

19  the whole entire?

20       Q    When did you leave the reception after the

21  festivities were over?

22       A    That was 1:30 at night.

23       Q    You had no alcoholic beverages?

24       A    No.  I don't drink.

25       Q    Describe the circumstances under which you left

C. Tangney - Direct - Hayden

1    the reception after it was over?

2         A    We all had a good time.  We were dancing all

3    night and everybody was getting tired, so approximately 12,

4    I guess, around 12:30 the band stopped, and then we started

5    to get ready to leave.

6         Jennifer changed the girls into like sleeping

7    attire, because we knew any time they get in the car they

8    fall asleep.  And then while everybody was getting ready to

9    leave we put a couple of chairs together.  Katie and Grace

10   were lying on the chairs and I sat with them while they were

11   lying on the chairs until we were all ready to go.

12        Q    Describe the circumstances under which you wound

13   up in the limousine being driven by Stanley Rabinowitz?

14        A    After -- when we got ready to leave I picked up

15   Katie, Neil picked up Grace, and we went outside.  There was

16   a little confusion on exactly who was going to drive us

17   home, which limousine.  There were three limousines there.

18   A couple were going back to the Harrison House and we were

19   going to Long Beach.

20        The limo drivers, I'm just assuming when they get

21   their assignments they don't know where there end

22   destination is, they just go to pick up the people, and they

23   decided among themselves that Mr. Rabinowitz would take us

24   home to Long Beach.

25        Q    Was that the first time that you had ever met

C. Tangney - Direct - Hayden

1    Stanley Rabinowitz?

2         A    Yes, it was.

3         Q    Where was the limousine going when Stanley

4    Rabinowitz drove away from the reception?

5         A    It was going to Long Beach, going to my house on

6    West Walnut Street.

7         Q    Describe the interior of the limousine.

8         A    It is a pretty typical limousine.  It has a bench

9    seat along the rear of the limo between the two rear-most

10   doors, one of the driver's side and one on the passenger

11   side.  It has a bench seat that runs the length of the limo

12   that goes from the rear bench seat to a front bench seat.

13   There is also a front bench seat that is parallel to the

14   driver and the passenger seat.  And then in the driver's

15   compartment is his driver's seat and a passenger seat.  And

16   on the passenger side of the vehicle is a wood bar and

17   entertainment center.  It had a TV in it, glasses, an ice

18   chest.

19        Q    Where were you sitting?

20        A    I was sitting in the rear driver's side,

21   rear-most driver's side seat.

22        Q    Facing the front of the limousine?

23        A    Facing the front of the limousine.

24        Q    You were able to see out through the windshield

25   of the limousine?

C. Tangney - Direct - Hayden

```
1     A     Correct.

2     Q     Was there any glass or other partition between

3   you and the driver's compartment of the limousine?

4     A     There is a window that goes in between if you

5   wanted to isolate the driver from you.  It was not up.  But

6   there is a window there.

7     Q     It was down then?

8     A     It was down or non-existing.  It was not there.

9   I don't know.

10    Q     You were able to see through into the driver's

11  compartment?

12    A     Yes.

13    Q     You were able to see out through the windshield

14  to the road ahead?

15    A     Yes, I was.

16    Q     Was your seat belt buckled?

17    A     No.

18    Q     Who else was in the limousine?

19    A     In the limousine was my wife, Denise; my two

20  grandchildren, my two granddaughters, Katie and Grace; and

21  Neil and Jen Flynn, my daughter and son-in-law.

22    Q     Where was Denise sitting?

23    A     Denise was sitting next to me.  And that would be

24  on the passenger side rear seat.

25    Q     Where was Jennifer sitting?
```

C. Tangney - Direct - Hayden

1    A    Jennifer was sitting in the front bench seat

2   behind the, on the passenger side; Neil was sitting in the

3   front bench seat facing me, on the driver's side; Grace was

4   from between Neil and Jen; Katie was lying down on the long

5   bench seat that runs from the front bench seat to the rear

6   bench seat.  She was laying with her feet toward Neil and

7   her head toward me.

8    Q    Describe the observations you made of Jennifer on

9   the drive home?

10    A    Jennifer was sitting in the seat and she would

11   occasionally close her eyes.  Denise and I were talking.

12   Occasionally Jennifer would come in and comment on what we

13   were talking about.

14    Q    Describe any observations you made of Denise?

15    A    Denise?

16    Q    Yes.

17    A    Denise was awake.  She was sitting next to me on

18   the passenger side of that rear bench seat.  She was awake

19   the whole time.  We didn't speak the whole time, but we were

20   talking back and forth on the way home.

21    Q    How about Neil?

22    A    Neil was on the driver's side bench seat, and he

23   was dozing, and he would also talk to us once in a while.

24   He was going in and out of sleep.

25    Q    How about Grace?

C. Tangney - Direct - Hayden

1      A      Grace was kind of awake, playing a little bit,

2  being coy, like she was making believe she was sleeping.

3      Q      How about Katie?

4      A      Katie was out cold sleeping.

5      Q      Describe Katie's location inside of the

6  limousine?

7      A      Katie was on the bench seat that runs along the

8  driver's side of the vehicle from the front bench seat to

9  the rear bench seat.  She was lying with her feet toward

10  Neil, her head toward me, and she was seat belted in.

11      Q      Describe how she was seat belted in?

12      A      The seat belt is, it appeared it was attached

13  somehow to the ceiling.  I don't remember how.  And it was

14  also attached down the side of the seat, in between the seat

15  and the outside of the limo, and then it came across her

16  body.  It was a two-position seat belt.

17      Q      She was lying down?

18      A      Yes, sir.

19      Q      How?

20      A      She was laying on her back.  Her feet, like I

21  said, were to the front of the limo and her head was toward

22  us.

23                  MR. HAYDEN:  May I just have 13 for

24            identification shown to the witness, your Honor.

25                  (Handing.)

GIGI WRIGHT, RPR    (516) 571-2503

C. Tangney - Direct - Hayden

1     Q     Do you recognize that?

2     A     Yes.

3     Q     Is that the basic floor plan for the limousine in

4     which you were riding that early Saturday morning?

5     A     Yes.

6     Q     Is it a fair and accurate representation of the

7     basic floor plan of that limousine?

8     A     Yes, it is.

9               MR. HAYDEN:  Your Honor, the People would ask

10    that that be introduced as People's Exhibit 13 in

11    evidence for a basic idea of the floor plan of the

12    limousine.  It is not to scale.

13              THE COURT:  Please show it to counsel.

14              MR. LaMAGNA:  Thank you, your Honor.

15              I have no objection.

16              THE COURT:  It is received.

17              (Whereupon, People's Exhibit 13 for

18    identification now received and marked People's Exhibit

19    13 in evidence.)

20              COURT OFFICER:  Exhibit 13 in evidence.

21              MR. HAYDEN:  Your Honor, with the Court's

22    permission, may Mr. Tangney please take a look at that

23    floor plan, and using this black marker indicate and

24    write on that diagram the location of each of the

25    passengers inside of the limousine then?

C. Tangney - Direct - Hayden

1      THE COURT:  Sure.

2          (Witness complies.)

3      Q    Have you finished, Mr. Tangney?

4      A    Yes, sir.

5          MR. HAYDEN:  With the Court's permission, may

6      I please display that diagram for the jurors and have

7      Mr. Tangney step down and just show the jurors where

8      each person was located inside of the limousine?

9          THE COURT:  Sure.

10         (Witness complies.)

11     A    This would be the driver Stanley Rabinowitz.

12  This would be my son-in-law Neil and granddaughter Gracie

13  and daughter Jen.  This is where the bar was and the bench

14  seat where Katie was.  And that is me and that is Denise.

15     Q    Thank you, Mr. Tangney.  Please return to the

16  witness box.

17         (Whereupon, the witness steps back into the

18     witness box.)

19     Q    Describe your state of mind as you were on the

20  way home that early Saturday morning?

21     A    We were -- I was, myself, I was very happy,

22  euphoric.  We had a nice -- I mean, it was a nice wedding.

23  My youngest daughter was married.  It was great.

24     Q    Do you know where the limousine was at

25  approximately 2 o'clock, early that Saturday morning?

1    A   Yes.  Meadowbrook Parkway just north of the

2   Babylon Turnpike exit.

3    Q   Describe your view of the road ahead through the

4   windshield of the limousine?

5    A   We were going southbound at that area,

6   Meadowbrook Parkway is a three-lane parkway going

7   southbound.  Off to my right was an exit ramp for the

8   Freeport exit, and then there was an overpass in front of

9   us.  Beyond that on the right was the exit ramp for the

10   Babylon Turnpike to Merrick.

11    Q   Did you notice something as Stanley Rabinowitz

12   was driving southbound along the Meadowbrook Parkway then?

13    A   Yes.  I noticed in front of us a bright light

14   coming toward us.

15    Q   Describe for the jurors what you saw as that

16   bright light came toward you?

17    A   I was looking out the windshield and there was

18   what I thought initially was a motor vehicle coming toward

19   us, because it was one light and it was on, south of us, on

20   the type of like a little incline.  As it came down the

21   incline the one light, because of the distance, drifted

22   apart, and I could tell it was a car or something coming at

23   us.

24    Q   What was the approximate speed of the limousine

25   when you first noticed the oncoming light?

1       A       The approximate speed of the limousine was around

2    60 miles an hour.

3       Q       Describe for the jurors what happened after you

4    first noticed that oncoming light moving closer and closer

5    to you?

6       A       I noticed the -- once they separated and I

7    realized it was a car coming at us, I was about to say

8    something to Stanley Rabinowitz, that something was coming

9    at us, except for he gasped. He knew it. He tried to get

10   to the right, but this small car was alongside of us, and

11   the time from when we saw the light to the time it struck us

12   was approximately two seconds, I would guess.

13      Q       Describe what happened then?

14      A       We were southbound in the left lane, and the car

15   that was coming at us was in the center lane. We started to

16   go to the center lane to get off onto the right, and then

17   the vehicle coming at us moved over into our, toward us.

18   And then Mr. Rabinowitz tried to move again. And then the

19   truck, the car, seemed to follow us, the headlights, and

20   then within a short time, like I said, under two seconds,

21   we -- I didn't even have time to yell a warning to Stanley,

22   he gasped. I don't know what he said. It was not audible.

23   Then the car, there was, the -- he crashed into us.

24              The impact threw my wife and myself forward. It

25   pushed Neil up into, I believe it pushed him into the

C. Tangney - Direct - Hayden

1    ceiling, and then back down to the floor.

2              My granddaughter tore off her head and -- (pause

3    in proceedings) -- and then eventually the car came to a

4    stop.

5              It was like I would hear the tremendous explosion

6    of the car when we crashed.  Unlike my family, I certainly

7    did not smell anything, I did not taste anything.  After the

8    cars came to rest I was, I knew that I was suspended

9    somehow.  I had my legs entangled in the bar.  And it was

10   kind of holding me into kind of a back bend position above

11   everybody kind of from the bar over onto my wife across the

12   aisle onto my son-in-law and wife.

13        Q    Describe any further observations you made then?

14        A    Then when the car stopped my daughter, Jennifer,

15   she kind of wiggled herself up.  And I could tell she

16   touched me somewhere on the legs.  Then she asked me, she

17   said, "Dad, what happened," and I said, "We were in a

18   terrible accident.  See if you are okay.  See if you can go

19   outside."  She said she thought she could.  She got up, and

20   left the car.

21             She was gone, I don't know, maybe thirty or forty

22   seconds.  She came back to the car and then she came into

23   the car and she said, "Dad, Daddy I have Katie's head."  I

24   told her, "Okay, Jen," I said, "Just sit there.  Someone

25   will come for us.  Don't worry."  I said, "Someone will get

1    help." And then Jennifer got up and left the limo again.

2              She was back very shortly. And she again picked

3    up Katie's head and she sat down. Then a couple came and

4    the man put his head inside the limo, and he came in a

5    little bit, and he said, "I'm going to try to help you

6    people." And I said, "Listen -- I said -- we are really

7    badly hurt. We are going" -- I said, "If you have a phone

8    we need professional help. Could you call somebody?" His

9    wife actually told him "Don't touch these people. Let's get

10   somebody," and I'm guessing he did. I really don't know.

11   He left the limo at that time.

12             Within a short time later my brother showed up

13   and he came in, in the car and he -- then he realized it was

14   us. He didn't know. He thought someone else was in the

15   accident. And when he saw us he came in right away. And he

16   asked me what happened. I said, "Mike, we have been in a

17   bad accident," and then he looked around and he said, "I

18   think that" -- I said, "Katie is dead." And he said, "I

19   think that Denise is dead too, because her legs are all

20   exposed. She is not bleeding." At this time my wife said,

21   "I'm not dead. I can't breathe." So I told my brother, I

22   said, "Michael, I'm partly on top of Denise. You're going

23   to have to move me."

24             Michael -- then he said, "I can't. I think that

25   your one leg is missing and your other one is wrapped in the

C. Tangney - Direct - Hayden

1    bar." And I said, "Denise can't breathe. You have to move

2    me." So, we had a conversation for a few seconds. He said,

3    all right, and then he untwisted my legs from the bar and

4    then he went behind me and lifted me up from underneath the

5    arms and he pulled me back and laid me on the floor of the

6    limo.

7        Q    Describe anything else that you saw and heard?

8        A    Then after that, right after -- I'm sorry, right

9    before he moved me, Neil somehow muscled himself to the back

10   of the limousine and collapsed. He was calling for Katie.

11   And as soon as the first emergency responders -- I don't

12   know if was it the fire department or police or whoever,

13   somebody -- they took Neil out of the limousine. And then

14   someone came in and got Grace.

15       And then I was talking to, I believe, a State

16   Trooper, or I think it was a State Trooper, or one of the

17   county police officers, and they said, "We have to cut you

18   out. We can't get you through the door. We are going to

19   have to cut the side of the limousine off to get you out of

20   the limousine."

21       At this time they put, I don't know, tarp or

22   blankets or something over Denise and myself, and they cut

23   away the side of the limo. And then they came in with

24   backboards and they removed Denise and then some time later

25   they removed me.

GIGI WRIGHT, RPR    (516) 571-2503

C. Tangney - Direct - Hayden

1     After that I was put -- actually, I was put on a

2     stretcher. They ran out of ambulances. And they, someone

3     told me that they have to get another ambulance. And

4     something happened, I don't know exactly what, and they

5     moved Grace out of one ambulance and they decided to put me

6     in that ambulance, and they took me to the Nassau County

7     Medical Center for the injuries to my legs.

8         Q   Was a video camera installed in the limousine as

9     Stanley Rabinowitz was driving southbound on the Meadowbrook

10    Parkway?

11        A   Yes, it was.

12        Q   Was a video recorded at the time of the

13    collision?

14        A   Yes, it was.

15        Q   Have you seen the copy of that video?

16        A   Yes, I have.

17        Q   Did you see that copy today?

18        A   Yes, I did.

19        Q   Did you mark it in any way?

20        A   Yes, I did.

21        Q   How?

22        A   I put my initials on it and the date.

23            MR. HAYDEN:  Your Honor, may I have this

24    videotape marked as People's Exhibit 14 for

25    identification and shown to the witness, please.

C. Tangney - Direct - Hayden

1              (Whereupon, the item referred to, videotape,

2         received and marked People's Exhibit 14 for

3         identification.)

4              COURT OFFICER:  People's 14 for

5         identification.

6         Q    Do you recognize that?

7         A    Yes, I do.

8         Q    Is that the copy of the limousine video that you

9    saw today?

10        A    Yes, it is.

11        Q    Do you recognize your markings on that video?

12        A    Yes.  My initials and the date.

13        Q    Is that video a fair and accurate representation

14   of the oncoming headlights and the collision and the

15   immediate aftermath as you remember them?

16        A    Yes, it is.

17             MR. HAYDEN:  People offer that into evidence,

18        your Honor.

19             THE COURT:  Please show it to counsel.

20             MR. LaMAGNA:  Judge, I have a copy of the

21        video.  Obviously, I haven't seen this copy.  So I have

22        no objection to the video going in, the copy that I

23        have seen.  I just don't know what is in this video.

24             THE COURT:  I will take Mr. Hayden's

25        representation that they are one in the same.

C. Tangney - Direct - Hayden

1           MR. HAYDEN:  Yes, your Honor, except certain

2      things have been cut off at the end of the video.

3           THE COURT:  In fact, Mr. LaMagna has another

4      than we have here?

5           MR. HAYDEN:  Yes, he does.

6           THE COURT:  Okay.

7           MR. LaMAGNA:  Judge, I have no objection.

8           THE COURT:  Received.

9           (Whereupon, People's Exhibit 14 for

10     identification now received and marked People's Exhibit

11     14 in evidence.)

12     Q    Based upon your training and experience and upon

13     your observations of the early morning of Saturday, July 2nd

14     2005, what was the approximate speed of the oncoming

15     headlights as you were observing them before the crash?

16     A    Approximately 65 miles an hour.

17          MR. LaMAGNA:  Judge, I'm going to object to

18     to his testimony concerning the speed of that car.

19          THE COURT:  Overruled.

20     Q    Did you notice any change in speed of the

21     oncoming headlights as they were approaching you just before

22     the collision?

23     A    There was no change.

24     Q    Up to the time of the collision?

25     A    No change.

C. Tangney - Direct - Hayden

1     Q    You were injured as a result of the collision?

2     A    Yes, I was.

3     Q    Describe for your injuries for the jury.

4     A    My lower right leg was, between the ankle and the

5     knee, was broken off.  I had a compound fracture, which they

6     have since put back on.  My left femur was broken.  I had

7     some steel plate put in there to stabilize that.

8          I had internal injuries.  My bowel was

9     disconnected, my duodenum was disconnected, my lungs were

10    torn, my spleen was torn, my stomach was torn, the membrane

11    that holds your intestines in was, had to be removed because

12    that was all shredded.  I don't remember any more than that.

13    Q    Describe the damage to your hip?

14    A    My left hip has -- had the broken femur and the

15    hip socket was damaged, and they put a metal plate in to

16    stabilize that when they fixed the break.

17    Q    Describe the damage to your femur?

18    A    My femur was broken in half, kind of just below

19    where the ball is that goes into your hip.  That was broken

20    in half.

21    Q    That was your left femur?

22    A    That was my left femur.

23    Q    Describe any damage to your lower right leg?

24    A    My lower right leg was -- had a compound

25    fracture.  It was actually knotted up in my pant leg, that

C. Tangney - Direct - Hayden

1    is why my brother didn't see it.  It was held on by that

2    back skin portion, I guess your Achilles tendon, or whatever

3    is back there, I don't know.

4        Q    Did you suffer damage to your liver?

5        A    Yes, I did.  I had a cut to the liver that they

6    repaired.

7        Q    Your spleen?

8        A    My spleen.

9        Q    Describe that.

10       A    That also had a tear in it.  Like I said, the

11   bowel got ripped off from wherever that is connected to, the

12   duodenum.  That was also ripped apart.  My stomach, spleen,

13   my lungs had tears in them.  That is about it.

14       Q    Was blood eventually pumped from your stomach?

15       A    Yes.  When I -- when I got to the medical center

16   I was bleeding internally, and I don't think that they

17   realized it until my blood pressure left me.  At that time

18   they decided to transfer me to Winthrop Hospital, because

19   they thought that my heart was damaged.  They thought I was

20   bleeding from the heart.  Apparently, the medical center

21   didn't pick up where the bleeding was from until I lost my

22   blood pressure.

23            At that time I was, when the blood pressure was

24   gone there was a lot of activity in the emergency room.  A

25   nurse there was talking to me and she said that they would

GIGI WRIGHT, RPR   (516) 571-2503

C. Tangney - Direct - Hayden

1    like to give me the last rights, because she was pretty sure

2    I wasn't going to make it.

3              MR. LaMAGNA:  Objection.

4              THE COURT:  Overruled.

5    Q    Please proceed.

6    A    And then I -- they were transferring me to

7    Winthrop.  I went to Winthrop where they, I guess, they

8    surveyed me.  They pumped approximately seven pints of blood

9    out of my stomach.  And during that day I received, I

10   believe, eleven pints of blood while I was in, being

11   operated on, and later on when I went to the intensive care

12   unit.

13   Q    You were originally taken to Nassau University

14   Medical Center?

15   A    Correct.

16   Q    When were you then taken to Winthrop?

17   A    I'm not sure.  I know I was removed from the

18   accident scene somewhere in between, like, 3:30 and four.  I

19   was -- when they took me to Winthrop it was -- day -- I know

20   when they took me in the ambulance I could see daylight.  So

21   I know it was daylight and the sun was up pretty high.  I'm

22   guessing it was maybe six o'clock in the morning.

23   Q    Were you taken to any other hospital?

24   A    Well, then I was treated in Winthrop.  I spent, I

25   think, eleven days at Winthrop.  The first day they operated

C. Tangney - Direct - Hayden

1   on me for eleven hours, they opened me up and however they

2   seal all these lacerations and cuts I had.  I know some of

3   them they cauterized and some they stitched.  I don't know

4   which ones.

5           And they also had an orthopedist, while that was

6   going on, reattach the lower leg with a steel rod and four

7   screws.  And then he sewed up that leg.  And then I was sent

8   to the intensive care unit.  I was there, I believe, two

9   days.  And then on Monday they took me back to the operating

10  room and I was operated on for eight hours.  That operation

11  they re -- they fixed my left femur and my hip and they put

12  in a metal plate.

13          And then on Wednesday, which was two days later,

14  they reoperated on me again, and they gave me some kind of

15  screens they put in so I wouldn't get clots.  I don't know

16  where they are.  But I think that one was in my groin and

17  one was by my heart.

18      Q   All of that work was done at Winthrop?

19      A   All of that work was done at Winthrop.

20      Q   All repair work to your inner organs was done at

21  Winthrop?

22      A   Yes.

23      Q   Completely at Winthrop?

24      A   Yes.

25      Q   All of the work done on your femur, your left

C. Tangney - Direct - Hayden

1    femur, was done at Winthrop?

2        A    Yes.

3        Q    And your hip?

4        A    Yes.

5        Q    All that work has been completed?

6        A    I don't know that.  I -- since that -- since

7    those operations, around November I started to lose mobility

8    in my left leg.  When they checked that out it ended up

9    being an infection and they operated on me again in

10   February, I believe it was -- I believe it was February 9th

11   or February 6th -- and at that time they opened the leg,

12   they found that it was badly infected, they took out the

13   metal piece that they put in to stabilize my femur, and they

14   cleaned out the infection and debrided the bone, and then

15   they closed me up and I was put on antibiotics for six

16   weeks.

17            At the end of the six weeks they waited a week or

18   two and then they did another blood test, and I have an

19   infection back.  And that's where I am at right now.

20       Q    All of the work you have just described was at

21   Winthrop?

22       A    No.  That second operation, I said with the

23   taking the metal out and the infection out, was done at

24   North Shore Communities Hospital.  North Shore -- whatever

25   it is -- University Hospital.

C. Tangney - Direct - Hayden

1     Q    Do you expect additional surgery?

2     A    I don't know. I go November 2nd.

3     Q    Where did you go from Winthrop the first time

4  that you were there?

5     A    From Winthrop I was sent to Long Beach Rehab

6  Center. It is an acute care facility, where they teach you

7  how to walk again and how to function with what you have.

8     Q    What was done there then?

9     A    They do therapies. They teach you how to walk,

10  they teach you how to make Jello. It was all different

11  things, all different things to function in society. It is

12  an acute care facility. They teach you how to walk, bend

13  over, stand up, take and a a bath with the condition you

14  have.

15        I was in there, maybe, I think I was in there

16  either three or four weeks, and then they sent me home. And

17  because the right leg still was not healed, which took time,

18  I had a, they sent a nurse once a day to clean out the scab

19  and the wound in the right leg. She came every day. That

20  lasted about, I don't know, maybe another month. And then

21  after that they started, they let me put pressure on the

22  right leg, and I started to do outpatient therapy for about,

23  um, I did that for about another month or two, until the

24  infection came, and I didn't continue therapy until they

25  decided what to do with that infection. I have not had

1    therapy since.

2         Q    Do you expect future therapy?

3         A    I don't know.

4         Q    Describe any pain you have experienced as a

5    result of the injuries you described.

6         A    I'm -- we are in constant pain, all of us.  It's

7    massive breaks.  We have a lot of injuries.  With the

8    infection now, my groin and buttock area hurts all the time.

9              The right leg that had a compound fracture, that

10   is completely healed.  That is actually pretty good.  That I

11   don't have any pain in, other than I have a little loss of

12   mobility.  You know, if I am not paying attention I tip

13   over.  I kind of watch it now.

14        Q    Are there things that you could no longer do

15   because of your injuries?

16        A    Yeah.  I can't do most things.  I mean, I used to

17   jog every day.  I was in pretty good shape.  I had a

18   contracting business.  I had to give that up.  I don't do

19   that anymore.  Like I said, I was in the process of doing

20   their house when the accident happened.  I don't do that

21   anymore.  I was a licensed contractor in Nassau County, and

22   I can't do the contracting anymore.  I can't jog.  I read

23   and I watch TV.

24        Q    Was Neil with you at Long Beach Memorial

25   Hospital?

C. Tangney - Direct - Hayden

1    A    Yes.  Neil was at the rehab center.

2    Q    Describe the observations you made of Neil.

3    A    Neil, right from the accident, until before the

4    surgery on his back, which was a couple months later, I

5    don't know exactly when, Neil could not sleep in a bed.  He

6    slept in a chair.

7              MR. LaMAGNA:  I'm going to object to his

8         opinion.  Neil testified.

9              THE COURT:  The testimony is relevant.

10        Overruled.

11             MR. LaMAGNA:  We heard from Neil.

12             THE COURT:  Yes, we did.

13             MR. LaMAGNA:  He testified to this.  It is

14        cumulative.

15             THE COURT:  Overruled.

16    A    Neil has not -- did not sleep in a bed for the

17    first three months after the accident.  He slept in a chair

18    because he could not get comfortable.

19             For the past year he could not pick up his

20    children, he could not play with them.  He just started

21    doing that, maybe, this summer, around July or August.  For

22    a whole year he couldn't do that.  He cannot bend down.  He

23    is -- he seems to be in pain all the time.  He was an

24    athletic guy.  He was a football player and he can't do any

25    of that any more.  He could hardly walk.

C. Tangney - Cross - Martello

1      Q      Was Denise with you at Long Beach Memorial?

2      A      Yes, she was.

3      Q      Describe the observations you made of Denise.

4             MR. LaMAGNA:  Objection, Judge.

5             THE COURT:  Overruled.

6      A      Denise also cannot -- she used to be very active.

7   She used to walk the boardwalk every day.  She can no

8   longer.  She can't even walk a block.

9             During the past year she had the, she had all of

10  the surgeries and the knees and everything, done in July of

11  last year, and in March of this year the necrosis set in and

12  the hip collapsed.  She had a new hip put in in March.  In

13  May the knee collapsed.  She had a new knee put in in May.

14            You saw her.  She walks like a penguin.  She

15  can't bend her knee.  When she comes up a stair she has to

16  do it one step at a time.  She cannot bend her right leg.

17  She wakes up at night in agonizing pain.  It sucks.

18      Q      Thank you.

19            MR. HAYDEN:  I have nothing further, your

20      Honor.

21            THE COURT:  Thank you.

22            Counsel.

23  CROSS-EXAMINATION

24  BY MR. MARTELLO:

25      Q      Good afternoon, Mr. Tangney.  Again, my

GIGI WRIGHT, RPR   (516) 571-2503

C. Tangney - Cross - Martello

1   sympathies to you.  And I know it is very difficult.  I'll

2   be as brief as I can.

3                Mr. Tangney, you had testified earlier that you

4   were a police officer before you retired; is that correct?

5        A    Correct.

6        Q    In what county were you a police officer?

7        A    Nassau County.

8        Q    How long were you a police officer in Nassau

9   County?

10       A    Thirty-five years, six days.

11       Q    And what type of police work did you do as a

12  Nassau County Police Officer?

13       A    I was, in the beginning of my career, I was, I

14  worked a sector car; and for five years of my career I was

15  in emergency service, heavy rescue; and for approximately

16  fifteen years I was in the marine bureau; and for

17  approximately two or three years I was in the records

18  bureau, the last two or three years.

19       Q    All in Nassau County?

20       A    All in Nassau County.

21       Q    Now, Mr. Tangney, you testified about your

22  training as a police officer in observing and evaluating

23  speeds; is that correct?

24       A    Correct.

25       Q    Now, in your training would it be fair to say

C. Tangney - Cross - Martello

1    that the better opportunity you have to see the moving

2    vehicle the better ability you have to make an accurate

3    estimation of speed?  Would that be fair so say?

4         A    Yes.

5         Q    And the more time you have to view that moving

6    vehicle you could make a more accurate estimation of that

7    speed; would that also be fair to say?

8         A    Yes.

9         Q    Now, on this night you were traveling home from

10   the wedding reception; is that correct?

11        A    Correct.

12        Q    And had you been drinking at all during that the

13   wedding reception?

14        A    No.  I don't drink.

15        Q    You were dancing, enjoyed a good night, the

16   wedding was great, I would imagine?

17        A    Absolutely.

18        Q    How long, how many hours would you say the

19   wedding reception was?

20        A    It was from approximately, I guess, we got there

21   around 6-ish, preparing for the wedding ceremony, and we

22   were in the car on the way home at 1:30.

23        Q    What was that?

24        A    We were in the car on the way home at 1:30, so

25   five and-a-half hours.

C. Tangney - Cross - Martello

1      Q      From the point that you entered the limousine

2   until the time of the accident how long would you say you

3   were traveling?

4      A      About thirty minutes.

5      Q      During those thirty minutes, I would imagine you

6   were talking with the other occupants of the vehicle,

7   relating the time you had spent during the evening?

8      A      Yes.

9      Q      In fact, your wife indicated that your hand was

10   on her knee and you were talking?

11      A      Yes.

12      Q      Were you tired?

13      A      No.

14      Q      Would it be fair to say that you were not

15   expecting to get into an accident on your way home?

16      A      No, I was not expecting that.

17      Q      And, in fact, the view you had was through a

18   small opening, a partition opening, that leads into the

19   driver's compartment; is that correct?

20      A      Through the windshield.

21      Q      The view you had through the windshield?

22      A      Through the windshield, yes.

23      Q      You were seated in the furthest part, the

24   furthest back part of the limousine in the back seat; is

25   that correct?

C. Tangney - Cross - Martello

1       A       Rear seat, correct.

2       Q       You had the long view going through the

3    windshield, correct?

4       A       Yes.

5       Q       The longest view of any occupant of the car?

6       A       Yes.

7       Q       In fact, at first you said when you first saw the

8    light you thought you mistook it for a motorcycle; is that

9    correct?

10      A       Correct.

11      Q       You had also indicated that from the time that

12   you saw the light until the accident it was under two

13   seconds; the accident happened in a split second?

14      A       Approximately two seconds, yes.

15      Q       Now, would it be fair to say that you were not

16   expecting at that time to be making any speed evaluations of

17   that vehicle because it happened under two seconds?  Would

18   that be fair to say?

19      A       Could you repeat that?

20      Q       When you were sitting in the limousine you were

21   not, you were not expecting to be making any speed

22   evaluations?

23      A       No, I was not.

24      Q       What was that?

25      A       No, I was not.

C. Tangney - Cross - Martello

1       Q       And the time that you first saw the light it was

2    under two seconds?

3       A       Correct.

4       Q       Now, would it be fair to say, with your training

5    as a police officer, those circumstances certainly did not

6    lend themselves to making an accurate estimation of that

7    speed of that vehicle while you were sitting in the

8    limousine?

9       A       No, I would not say that.

10      Q       Well, Mr. Tangney, would it be fair to say that

11   the greater opportunity you had to observe the vehicle would

12   give a better accurate estimation of that vehicle, as you

13   had testified earlier?

14      A       Yes.

15      Q       And the longer time you had to observe that

16   vehicle would also lend itself to giving you a greater

17   opportunity to give a more accurate estimation as you

18   testified earlier?

19      A       Yes.

20      Q       Now, you said that you saw a videotape later on;

21   is that correct?

22      A       Yes.

23      Q       Now, you don't own that videotape, that videotape

24   is in the custody of the district attorney's office; is that

25   correct?

C. Tangney - Cross - Martello

1        A       I would assume so, yes.

2        Q       And you don't have any firsthand knowledge as to

3    whether or not that videotape was speeded up or slowed down;

4    any firsthand knowledge yourself?

5        A       No, I don't know anything about the tape, other

6    than that I saw it.

7        Q       Before you saw that tape you spoke to the

8    district attorney's office concerning the contents of that

9    tape; is that correct?

10       A       Correct.

11       Q       And you spoke about the importance of that tape,

12   correct?

13       A       I would think so.  I don't remember.

14       Q       Now, Mr. Tangney, I would imagine when you see

15   that tape it is an emotional experience for you?

16       A       Yes, it is.

17       Q       And when you view that it is an emotional

18   experience; isn't that correct?

19       A       Yes, it is.

20       Q       Now, Mr. Tangney, you are not an accident

21   reconstruction expert, are you?

22       A       Yes, I am.

23       Q       And what training have you received in that?

24       A       Also from the police academy.  I also went later

25   on in my career to the Underwriters -- I forget the name of

C. Tangney - Redirect - Hayden

1    it -- in Suffolk County for accident reconstruction.

2        Q    Mr. Tangney, as I asked you before, when you see

3    that videotape, is it an emotional experience?

4        A    Yes, it is.

5        Q    And whenever -- as a police officer when you were

6    asked to view or make estimations of speed it never involved

7    your own family, did it?

8        A    No, it did not.

9        Q    So when you are viewing that tape you are viewing

10   the tape that involved your family?

11       A    Yes.

12       Q    Now, Mrs. Flynn had testified earlier and

13   referred to an uncle Michael.  Would that be Michael

14   Tangney?

15       A    Yes, it is.

16       Q    How is Michael Tangney related to you?

17       A    He is my brother.

18       Q    And is this the same Michael Tangney that is the

19   commanding officer in the Long Beach Police Department?

20       A    Yes, it is.

21            MR. LaMAGNA:  I have nothing further.

22   REDIRECT EXAMINATION

23   BY MR. HAYDEN:

24       Q    Were you wide awake when you first noticed the

25   oncoming light?

C. Tangney - Redirect - Hayden

1     A     Yes, I was.

2     Q     Were you wide awake when that oncoming light

3  split and became two lights?

4     A     Yes, I was.

5     Q     Were you wide awake just before those oncoming

6  headlights collided with the limousine?

7     A     Yes, I was.

8     Q     Did your view through the windshield provide you

9  with a full view of the road ahead?

10    A     Yes, it did.

11    Q     Was anything blocking or in any way obstructing

12 your view of the road ahead when you first noticed the

13 oncoming light?

14    A     No, nothing was blocking my view.

15    Q     When the oncoming light split and became two was

16 anything blocking your view?

17    A     No.

18    Q     Anything obstructing your view?

19    A     No.

20    Q     Any difficulty seeing?

21    A     No.

22    Q     Anything blocking or obstructing your view just

23 before those headlights collided with the limousine?

24    A     No.

25    Q     You testified you observed the videotape of the

C. Tangney - Recross - Martello

1    oncoming light, the oncoming headlights and the collision;

2    is that right?

3         A    Yes, I did.

4         Q    Did your watching that tape match your

5    recollection of what happened that night?

6         A    Yes it did.

7         Q    Did the speed of the oncoming lights in the

8    videotape match your recollection of the oncoming headlights

9    as you perceived them that early Saturday morning?

10        A    The -- yes, it did.  The film is a little grainy

11   and stuff, but it is a pretty fair depiction.

12        Q    Was the speed on the tape identical to the speed

13   as you recollected it?

14        A    Yes.

15             MR. HAYDEN:  Nothing further, your Honor.

16   RECROSS-EXAMINATION

17   BY MR. MARTELLO:

18        Q    Again, Mr. Tangney, you testified that there were

19   no obstructions, but it is that small partition opening that

20   you are referring to that you looked through, going into the

21   driver's compartment; is that correct?  When you first saw

22   the light, you are talking about that partition opening?

23        A    Yes.  Not that partition opening.  That partition

24   opening.

25        Q    I understand.  Mr. Tangney, you testified that

C. Tangney - Redirect - Hayden

1    when you looked through that partition opening it was just

2    under two seconds?

3         A       Correct.

4         Q       And you were not expecting to --

5         A       No, I was not.

6         Q       -- to see any vehicle or make any speed

7    evaluation?

8         A       No, I was not.

9         Q       Thank you, Mr. Tangney, for your testimony.

10   FURTHER REDIRECT EXAMINATION

11   BY MR. HAYDEN:

12        Q       Did you make your estimate of the speed of the

13   oncoming headlights long before you ever saw the videotape?

14        A       Yes, I did.

15        Q       Was your estimate of the speed of the oncoming

16   headlights based upon your personal observations of the

17   oncoming headlights?

18        A       Yes, it was.

19                MR. HAYDEN:  Nothing further, your Honor.

20                MR. LaMAGNA:  Nothing.

21                THE COURT:  Thank you, sir.

22                (Whereupon, the witness exits the witness

23        stand.)

24                THE COURT:  Ladies and gentlemen, at this

25        time we will break for the evening.  I gave you the

C. Tangney - Redirect - Hayden

1        admonitions right before the opening statements.  You

2        all know what they are:  Don't talk about the case,

3        don't go to the scene, don't let anybody talk to you

4        about the case.  You know all of those things.  Don't

5        do any of those things.

6                I need you here at 9:30 in the morning,

7        please.  Promptly.  Have a nice evening.

8                (Whereupon, the jury exited the courtroom and

9        the trial adjourned to Tuesday, September 12, 2006 at

10       9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C. Tangney - Redirect - Hayden

1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
2   ----------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4        -against-

5

     MARTIN HEIDGEN,
6

                          DEFENDANT.
7   ----------------------------------------x
     INDICTMENT #:  1910N-06
8                      Mineola, New York
                      September 12, 2006
9

10  B E F O R E:  HONORABLE ALAN L. HONOROF
                Acting Supreme Court Justice
11

12  A P P E A R A N C E S:

13          HON. KATHLEEN M. RICE
          District Attorney, Nassau County
14            262 Old Country Road
            Mineola, New York 11501
15         BY:  ROBERT HAYDEN, ESQ.
            Assistant District Attorney
16             and
            MAUREEN McCORMICK, ESQ.
17            Assistant District Attorney

18

          STEPHEN LaMAGNA, ESQ.
19            Attorney for the Defendant
            666 Old Country Road
20            Garden City, New York
         BY:  STEPHEN V. LaMAGNA, ESQ.
21             and
          GREGORY MARTELLO, ESQ.
22

               o0o
23              TRIAL
              o0o
24         Gigi Wright, R.P.R.
        Official Court Reporter
25

Proceedings

```
 1                    (In open court.  Defendant present.)
 2               THE COURT:  Produce the jury.
 3               COURT OFFICER:  Jury entering.
 4                    (Whereupon, the jury entered the courtroom,
 5          and upon taking their respective seats, the following
 6          occurred:)
 7               THE CLERK:  Case on trial, Indictment 1910N
 8          of 2005, People versus Martin Heidgen.
 9                    People ready?
10               MR. HAYDEN:  Ready, your Honor.
11               THE CLERK:  Defense ready?
12               MR. LaMAGNA:  Defendant is ready.
13               THE CLERK:  Defendant is present and jurors
14          are seated, your Honor.
15               THE COURT:  Welcome back, ladies and
16          gentlemen.  Once again, I must ask you to please be on
17          time when we adjourn this case so that we can get the
18          case resolved in a timely manner.
19                    People, your next witness.
20               MR. HAYDEN:  Dr. Gerard Catanese.
21               THE COURT:  May I see counsel, please?
22                    (Whereupon, a discussion was held at the
23          bench, off the record.)
24               THE CLERK:  Step up.  Remain standing, raise
25          your right hand and face the clerk, sir.
```

GIGI WRIGHT, RPR    (516) 571-2503

Dr. Catanese - Direct - Hayden

1          G E R A L D   C A T A N E S E,          a

2              witness called on behalf of the People,

3              having been first duly sworn by the Clerk of

4              the Court, was examined and testified as

5              follows:

6                  THE CLERK:  You can put your hand down.

7         State your name, spelling your last name for the

8         record.

9                  THE WITNESS:  My name is Gerard Catanese,

10        C-A-T-A-N-E-S-E.

11                 THE CLERK:  Thank you.

12   DIRECT EXAMINATION

13   BY MR. HAYDEN:

14        Q    Good morning, Doctor.

15        A    Good morning.

16        Q    Are you licensed to practice medicine in the

17   State of New York?

18        A    Yes, I am.

19        Q    How long have you been licensed to practice

20   medicine in the State of New York?

21        A    I'm -- since 1987.

22        Q    Do you specialize in forensic pathology?

23        A    Yes, I do.

24        Q    What do you mean by "pathology"?

25        A    A pathologist is a doctor who specializes in

1    making diagnoses by sampling body tissues and fluids.  And a

2    forensic pathologist is a specialist in the area of

3    pathology; he specializes in examining injuries and wound

4    patterns and drawing conclusions about them.

5         Q    Describe your educational and professional

6    background.

7         A    I have a B.S. in biology from St. John's

8    University in Queens; I have a Doctor of Medicine from SUNY

9    Health Science Center in Brooklyn; I have a two-year

10   residency in anatomic pathology from Kings County; a

11   one-year internship in Pediatrics from Winthrop Hospital in

12   Mineola; two-year residency in clinical pathology from Kings

13   County Hospital in Brooklyn and; one year of specialized

14   training in forensic pathology from the New York City

15   Medical Examiner's Office.

16        Q    What is your title in the Medical Examiner's

17   Office?

18        A    Deputy Medical Examiner.

19        Q    Describe the work you do.

20        A    Essentially I perform autopsies, and I certify

21   the cause and manners of individual's deaths.

22        Q    What do you mean by an autopsy?

23        A    An autopsy is a complete examination of a body.

24   It starts with an examination of the external surface of the

25   body, and involves opening the body cavities and examining

Dr. Catanese - Direct - Hayden

1    all of the organs from their normal anatomic position, and

2    involves removing each organ and examining them

3    individually.

4         Q    How many autopsies have you performed?

5         A    More than three thousand.

6         Q    How many have you assisted in?

7         A    Thousands of others.

8         Q    I'm directing your attention to Saturday, July

9    2nd of 2005.  Did you conduct an autopsy that day on the

10   body of a 59-year old man named Stanley Rabinowitz?

11        A    Yes, I did.

12        Q    Describe Stanley Rabinowitz?

13        A    Sure.  The deceased was a 59-year old white,

14   male.  He measured sixty-six inches and weighed 254 pounds.

15   He had gray hair and gray mustache and beard.

16        Q    Did you examine Stanley Rabinowitz externally?

17        A    Yes, I did.

18        Q    Did you examine him internally?

19        A    Yes, I did.

20        Q    Describe any injury to Stanley Rabinowitz's face

21   and head.

22        A    He had abrasions to his face and contusions to

23   his scalp.  By "an abrasion" I mean an injury produced by

24   blunt trauma, which traditionally removes the outer surface

25   of skin.

Dr. Catanese - Direct - Hayden

1           And by "contusion" I mean a bruise or blunt

2   trauma that disrupts blood vessels and causes hemorrhage

3   into the skin and subcutaneous tissues.

4       Q    Describe any external injury to Mr. Rabinowitz's

5   chest and abdomen.

6       A    Externally there were obvious rib fractures,

7   identifiable without even opening the body cavities.  There

8   were also abrasions present on his chest and abdomen.

9       Q    Describe any injury to Mr. Rabinowitz's ribs?

10      A    Certainly on opening the body cavities there were

11  fractures of all of his ribs, the twelve on the right side

12  and the twelve on the left side.

13      Q    Did you make observations of Stanley sternum?

14      A    Yes, I did.  The sternum is the chest plate, or

15  breast bone, and this was fractured in multiple locations.

16      Q    Did you make observations of Stanley Rabinowitz's

17  pelvis?

18      A    Yes, I did.  The pelvis is, it is the pelvic

19  bone.  It was fractured on the left side.

20      Q    Did you make observations of Stanley Rabinowitz's

21  pericardial sac?

22      A    The pericardial sac is a covering that surrounds

23  the heart.  And, yes, I did.  The pericardial sac was

24  lacerated, or torn, due to the trauma.

25      Q    Describe any injury to Stanley Rabinowitz's

Dr. Catanese - Direct - Hayden

1    heart?

2         A    Mr. Rabinowitz's heart was also lacerated or

3    traumatically torn.

4         Q    Did you make observations of Stanley Rabinowitz's

5    aorta?

6         A    The aorta is the large artery that takes blood

7    away from the heart into the body.   The aorta was lacerated.

8         Q    Describe any injury to Stanley Rabinowitz's

9    lungs.

10        A    There were also lacerations present in

11   Mr. Rabinowitz's lungs.

12        Q    How about Mr. Rabinowitz's liver?

13        A    His liver was also lacerated.

14        Q    Describe the location of the liver.

15        A    The liver is present in the right upper abdomen,

16   and this was traumatically torn.

17        Q    Did you make observations of Mr. Rabinowitz's

18   spleen?

19        A    Yes.   His spleen was also lacerated.

20        Q    Describe the location of the spleen?

21        A    The spleen is located in the left upper abdomen.

22        Q    Did you make observations of Mr. Rabinowitz's

23   mesenteries?

24        A    The mesenteries are the tissues that cover the

25   intestines and allow the blood vessels to go to the

Dr. Catanese - Direct - Hayden

1   intestines.  It is a covering type of material.  These were

2   also lacerated, or torn.

3       Q      Did you observe blood in Stanley Rabinowitz's

4   body cavities?

5       A      Yes.  There was blood in his chest cavity and his

6   abdominal cavity.

7       Q      Describe the injury to Stanley Rabinowitz's hands

8   and arms?

9       A      He had fractures of both his right and left

10  forearms, and a fracture of his left elbow.

11      Q      Describe any injury to his legs?

12      A      Sure.  He had fractures to his femurs, or his

13  right and left thigh bones; and then he had fractures to his

14  right and left legs, or tibia and fibula, as they are

15  called.

16      Q      Based upon your training and experience and upon

17  your examination of Stanley Rabinowitz did you form an

18  opinion within a reasonable degree of scientific certainty

19  about the cause of Mr. Rabinowitz's death?

20      A      Yes, I did.

21      Q      What is that opinion?

22      A      Multiple internal injuries and fractures due to

23  blunt impact.

24      Q      Describe the basis for that opinion?

25      A      The basis of the opinion were the autopsy

Dr. Catanese - Direct - Hayden

1   findings.

2       Q     Were the blunt force injuries suffered by Stanley

3   Rabinowitz consistent with a high-speed motor vehicle

4   collision?

5       A     Yes.

6       Q     Can you determine with any specificity the kind

7   of speed you are talking about?

8       A     Not with any specificity, no.

9       Q     Was there a toxicology examination involving

10  Stanley Rabinowitz?

11      A     Yes, there was.

12      Q     What do you mean by "toxicology"?

13      A     The toxicology study would be testing of his body

14  fluids and organs for drugs and alcohol.

15      Q     Were there any drugs in Stanley Rabinowitz'

16  blood?

17      A     There were no drugs; there was no alcohol

18  present.

19      Q     Doctor, can you see that "Thin Man" display

20  across the courtroom?

21      A     Yes, I do.

22      Q     Would that "Thin Man" display help you describe

23  the extent and location of Stanley Rabinowitz's injuries?

24      A     I could point it out there, yes, I could.

25              MR. HAYDEN:  Your Honor, with the Court's

GIGI WRIGHT, RPR   (516) 571-2503

Dr. Catanese - Direct - Hayden

1          permission may we please have that marked as 15 for

2          identification, and deemed as 15 in evidence for the

3          limited purpose of Dr. Catanese describing with more

4          detail the injuries to Mr. Rabinowitz?

5                    THE COURT:  Any objection.

6                    MR. LaMAGNA:  No objection.

7                    THE COURT:  Deemed in evidence.  Doctor, you

8          can step down.

9                    (Whereupon, the item referred, a "Thin Man"

10         diagram, received and deemed marked People's Exhibit 15

11         in evidence.)

12         Q      Please proceed, Doctor.

13         A      Certainly.  He had abrasions and contusion of the

14    scalp; he had hemorrhage surrounding his brain, subarachnoid

15    hemorrhage; he had abrasions of his chest and abdomen;

16    fractures of the sternum; fractures of all of the ribs.

17    This sac you see around the heart, that was lacerated, as

18    was the heart, as were the lungs, as was the liver, the

19    spleen, the mesenteries and, of course, the aorta was or the

20    blood vessel was lacerated.

21                   The skeletal system is on the back.

22         Q      Doctor, if you take all six of those overlays and

23    remove them and it will show the skeletal system?

24         A      This would be better shown.

25                   We talked about the chest plate being fractured;

GIGI WRIGHT, RPR    (516) 571-2503

Dr. Catanese - Cross - Martello

1    we talked about all of the ribs being fractured; we talked

2    about bones of the forearms and the left elbow; we talked

3    about the bones of the thighs, bones of the legs, all being

4    fractured.

5        Q    Describe the damage to Mr. Rabinowitz's ribs.

6    How many breaks were there?

7        A    All of the ribs were broken and some of them

8    broke in multiple locations.  There is twenty-four-plus

9    fractures.  Twelve ribs on each side.

10       Q    Anything further, Doctor?

11       A    No.

12       Q    Thank you.  Please retake the witness stand.

13            MR. HAYDEN:  Nothing further, your Honor.

14    Thank you.

15            THE COURT:  You are welcome.

16    CROSS-EXAMINATION

17    BY MR. MARTELLO:

18       Q    Good morning, Dr. Catanese.

19       A    Good morning.

20       Q    Doctor, as part of your duties as a medical

21    examiner it is your job, basically, to investigate and

22    certify causes of injury and death in certain circumstances;

23    would that be correct?

24       A    Certain amount.  Our office investigates deaths.

25    I have a team of investigators that do that work for me.

Dr. Catanese - Cross - Martello

1    Yes, certainly we investigate the circumstances surrounding

2    people's deaths.

3        Q    It is your job to basically answer how these

4    deaths occurred based upon your investigation?

5        A    To a certain extent.

6        Q    Can you rely on certain police investigators to

7    also help you provide evidence and information in coming to

8    that conclusion?

9        A    Many times we'll have a police report,

10   particularly to get the circumstances surrounding.  Yes,

11   definitely.

12       Q    And one of the more important methods uses, of

13   course, the procedure of the autopsy itself; would that be

14   fair to say?

15       A    Um, the autopsy is very important, sure, from my

16   point of view, yes.

17       Q    And as you stated in this case you did perform an

18   autopsy on Mr. Rabinowitz; is that correct?

19       A    Yes, this is correct.

20       Q    And you put those findings, after you performed

21   that autopsy, in a report?

22       A    Yes.  The autopsy.  I have a copy with me here.

23       Q    Great.

24            And not only did you prepare an autopsy, you also

25   prepared what is called a certificate of death; would that

Dr. Catanese - Cross - Martello

1    be correct.

2           A      Yes, that's correct.

3           Q      That certificate of death was finalized after you

4    made your findings in the autopsy?

5           A      Yes.  The normal procedure would be to produce

6    the death certificate after the autopsy, yes.

7           Q      And before these reports were made official, I'm

8    referring to both the autopsy report itself and the

9    certificate of death, you certainly reviewed it for its

10   accuracy before you signed it; would that be fair to say,

11   doctor?

12          A      Certainly, there is a drafting of this autopsy

13   report that I had reviewed and, yes, that's correct.  And

14   the death certificate, yes, I would look at it, yes.

15          Q      Both?

16          A      Yes.

17          Q      So, in order to ensure accuracy, first there was

18   a draft of these reports, which you reviewed, corrected,

19   made whatever changes you thought were appropriate and, then

20   was later formalized into an actual official report; would

21   that be fair to say?

22          A      Yes, a final.  Like the final autopsy, yes.  Yes,

23   certainly things were reviewed.

24          Q      The same as a certificate of death?

25          A      The death certificate was probably, I believe I

Dr. Catanese - Cross - Martello

1    signed it that day with the information that we had.  Is --

2    the autopsy report took a lot longer to finish.

3        Q    I would imagine.

4             Doctor, before coming here today you reviewed

5    both your autopsy and the certificate of death you prepared?

6        A    Certainly I have looked at the autopsy report.  I

7    don't have a copy of the death certificate with me.

8        Q    I do.

9             MR. MARTELLO:  Your Honor, could we mark this

10            Defendant's Exhibit A for identification?

11                 (Whereupon, the item referred, death

12            certificate, received and marked Defendant's Exhibit A

13            for identification.)

14                 COURT OFFICER:  Defendant's Exhibit A for

15            identification.

16                 MR. MARTELLO:  Please show it to the witness.

17       Q    Doctor, I show you what has been marked as

18   Defendant's Exhibit A for identification.  What do you

19   recognize that to be?

20       A    This is a copy of the death certificate that I

21   signed on the day of the autopsy.  I just have to look at

22   this.

23            Yes, that's my signature.  Yes.

24       Q    That is the death certificate concerning

25   Mr. Rabinowitz?

GIGI WRIGHT, RPR    (516) 571-2503

1        A       Yes.  This is the one that I signed, yes.  His
2    name is here, and the case number is on it and the cause of
3    death is here.

4        Q       Okay.  Doctor, I am going to refer you to in the
5    certificate of death that you have there, in Exhibit A, I am
6    going to refer you to section number 27.  You'll note that
7    there are six boxes that could be checked under section 27;
8    would that be fair to say?

9        A       The section 27 is the manner of death, yes.

10       Q       There are six boxes?

11       A       That's correct.

12       Q       In those six boxes, box number one indicates
13   natural cause; box number two indicates accident; box number
14   three indicates homicide; box number four, suicide; box
15   number five, undetermined circumstances and; finally, box
16   number six, pending investigation.  Would that be a fair
17   description of the six boxes in section 27 of the
18   certificate of death, Doctor?

19       A       Certainly, yes.

20       Q       And, Doctor, is it also true then that you did
21   not mark "homicide" nor did you mark "undetermined
22   circumstances" or even "pending investigation"; but you did
23   mark "accident" as the cause of death in the certificate of
24   death?  Is that true?

25       A       As the manner of death, accident.

Dr. Catanese - Redirect - Hayden

1      Q      Manner of death?

2      A      Yes.

3      Q      Doctor, would you say that based upon your

4    examination in the autopsy that the blunt force trauma, the

5    injuries caused from the blunt force trauma to

6    Mr. Rabinowitz, was consistent with a terrible accident?

7      A      Yes.  Yes, it is a terrible accident, a motor

8    vehicle accident.  Yes, definitely.

9               MR. MARTELLO:  Thank you, your Honor.

10              THE COURT:  Redirect?

11              MR. HAYDEN:   Thank you.

12   REDIRECT EXAMINATION

13   BY MR. HAYDEN:

14     Q      Describe for the jury what you meant when you

15   checked "accident"?

16     A      Well, certainly an accidental death is not a

17   death that is obviously a natural death; it is a death that

18   occurs because an accident occurred.

19              In the case of motor vehicle deaths, irrespective

20   of the circumstances, they are generally called accidents.

21   You know, unless, in fact you had the information that

22   someone intentionally rammed someone down, that would be the

23   only time that a motor vehicle death would be called a

24   homicide.

25              I think in my entire thirteen years as a medical

Dr. Catanese - Redirect - Hayden

1    examiner, I may have only certified one motor vehicle death

2    as a homicide, because the person was seen to have

3    intentionally ran the person down by several witnesses.

4    Without that actual information these deaths are all

5    certified as accidents, irrespective of what someone was

6    doing, whether they were crossing the street when they

7    shouldn't were been, whether there was alcohol involved,

8    that is the way these cases are certified.

9              MR. HAYDEN:  Nothing further, your Honor,

10       thank you.

11             MR. LaMAGNA:  Nothing further.

12             THE COURT:  Thank you, Doctor.

13             (Whereupon, the witness exits the courtroom.)

14             THE COURT:  Next witness.

15             MS. McCORMICK:  Dr. DeMartino.

16             COURT OFFICER:  Step up.  Remain standing,

17       raise your right hand and face the clerk.

18          M I C H A E L   D E M A R T I N O,        a

19             witness called on behalf of the People,

20             having been first duly sworn by the Clerk of

21             the Court, was examined and testified as

22             follows:

23             THE CLERK:  You can put your hand down.

24       State your name, spelling your last name for the

25       record.

GIGI WRIGHT, RPR    (516) 571-2503

Dr. DeMartino - Direct - McCormick

1              THE WITNESS:  Michael DeMartino,

2       D-E-M-A-R-T-I-N-O.

3              THE CLERK:  Thank you.

4              MS. McCORMICK: May I?

5    DIRECT EXAMINATION

6    BY MS. McCORMICK:

7       Q     Good morning, Doctor.

8       A     Good morning.

9       Q     Doctor, can you tell the jury, please, where are

10   you employed?

11      A     I'm employed at the Nassau County Medical

12   Examiner's Office.

13      Q     Can you tell them how you are employed?

14      A     I'm sorry, how?

15      Q     Yes.  What is your official title?

16      A     My title is a Deputy Chief Medical Examiner.

17      Q     How long have you been a Deputy Chief Medical

18   Examiner?

19      A     About four years.

20      Q     Dr. DeMartino, can you describe for the jury,

21   please, what your duties are at the Medical Examiner's

22   Office?

23      A     The medical examiner is involved with

24   investigating and certifying death when it occurs in the

25   county under certain conditions.

Dr. DeMartino - Direct - McCormick

1          And some examples of the deaths that we are

2     involved with are deaths are occur suddenly and

3     unexpectedly, any death that occurs as a result of an

4     injury, any death that occurs under suspicious

5     circumstances, any death where the decedent was not attended

6     by a physician.  These are all examples of the kinds of

7     deaths we are involved with, and it is our function to make

8     a determination of cause and manner of death in these cases.

9          Q    As a Deputy Chief Medical Examiner are you a

10    licensed physician in the State of New York?

11         A    Yes, I am.

12         Q    How long have you been a licensed a doctor?

13         A    Since 1985.

14         Q    Doctor, can you tell the jury, please, did you

15    have to obtain any particular educational background in

16    order to become a doctor and Deputy Chief Medical Examiner?

17         A    Yes.  After graduating from college I attended

18    medical school.  I went to the State University of New York,

19    Downstate Medical Center in Brooklyn.  I graduated there

20    with a medical degree in 1984.

21              Then after that I did an internship in

22    pediatrics, and then a residency in anatomic and clinical

23    pathology at North Shore University Hospital in Manhasset.

24              After that I did fellowship training in forensic

25    pathology at the Nassau County Medical Examiner's Office.

Dr. DeMartino - Direct - McCormick

1     Q     Is forensic pathology your field of specialty?

2     A     Yes, it is.

3     Q     Would you please define for the jury what

4     forensic pathology is?

5     A     Forensic pathology is a subspecialty of

6     pathology.  And pathology is involved with making diagnoses,

7     putting it very simply, by examining body tissues and body

8     fluids.  And forensic pathology is applying the practice of

9     pathology and medicine, in general, to legal issues,

10    particularly when it involves making a determination of the

11    cause and manner of death.

12    Q     In the course of your duties with the Medical

13    Examiner's Office do you perform autopsies, Doctor?

14    A     Yes, I do.

15    Q     Could you describe for the jury what is an

16    autopsy, please?

17    A     An autopsy is a medical examination of a dead

18    body.  And it involves doing an external examination of the

19    remains and also an internal examination of the remains, and

20    doing various tests and so forth as needed, on a case by

21    case basis.

22    Q     Doctor, did you have occasion to perform an

23    autopsy on a young girl by the name of Katherine Flynn on

24    July 2nd 2005?

25    A     Yes, I did.  Actually, I'm sorry, it was July

Dr. DeMartino - Direct - McCormick

1      3rd.

2            Q      July 3rd?

3            A      Yes.

4            Q      Doctor, could you describe for the jury, please,

5      the remains of Katherine Flynn?

6            A      She was a young girl, seven years old.  She was

7      fifteen -- fifty-one inches in length and she weighed

8      fifty-three pounds.  She had obvious injury.  And traumatic

9      injury.  She was decapitated.  Her head was completely

10     separated from the remainder of her body.

11                  Aside from the decapitation she had very small

12     bruising to her left knee, her left elbow, and some bruising

13     and small abrasions on her left hand.

14           Q      Doctor, could you describe for the jury, please,

15     how Katherine Flynn was identified as Katherine Flynn?

16           A      Usually in our office when a person is identified

17     the family or a designee of the family comes to the office

18     and does an identification.

19                  In this instance an exception was made, and the

20     reason for that was the mother of the decedent was at the

21     hospital, Nassau University Medical Center, with the head of

22     her child --

23                  MR. LaMAGNA:  Objection, your Honor.

24           A      -- and I allowed that.

25                  MR. LaMAGNA:  Objection, your Honor.

Dr. DeMartino - Direct - McCormick

1              THE COURT:  Let me see counsel.

2              (Whereupon, a discussion was held at the

3         sidebar, off the record.)

4              THE COURT:  We are going to take a

5         five-minute break.  Don't talk about the case.

6              (Whereupon, the jury exited the courtroom.)

7              THE CLERK:  Dr. DeMartino, would you please

8         step outside the door.

9              (Whereupon, the witness exits the courtroom.)

10             THE COURT:  Mr. LaMagna?

11             MR. LaMAGNA:  Judge, I have an objection to

12        the testimony that was elicited from this doctor.  We

13        had rulings on the very nature of that testimony, and I

14        am surprised that that witness testified in the manner

15        in which he just testified.  We had gone over this at

16        length.

17             It appears or appeared that we had an

18        agreement so far as how that issue was going to be

19        dealt with with the various witnesses and about

20        subsequent issues after the initial accident scene, how

21        that issue was going to be depicted, and you had ruled

22        that evidence or testimony concerning that would not be

23        allowed.  I object to that testimony.  I want a

24        curative instruction.

25             MS. McCORMICK:  Your Honor, in preparing

Dr. DeMartino - Direct - McCormick

1    Dr. DeMartino for his testimony today -- and I asked

2    because the autopsy and the death certificate indicate

3    that Mrs. Flynn identified her daughter -- I asked him

4    about her identification, and he simply stated that he

5    would state that there was an exception made because

6    she had been with her daughter at the collision scene

7    and was at the hospital.

8             I am afraid he went a little further than I

9    expected him to go in the testimony.  I did not know he

10   was going to say that she was with her daughter's head

11   in the hospital itself, rather that an exception was

12   made in that no separate or official separate

13   identification was required of Mrs. Flynn under the

14   circumstances.

15            THE COURT:  Exactly what kind of curative

16   instruction do you think that I could make?

17            MR. LaMAGNA:  I don't think that you could

18   make any curative instruction to that as a matter of

19   fact.  That is why we went over this before the witness

20   testified.

21            THE COURT:  In the absence of a curative

22   instruction, do you seek any other remedy?

23            MR. LaMAGNA:  Judge, I will reserve making a

24   decision on that right now while this witness is on the

25   witness stand.  I would just simply ask the jury to

Dr. DeMartino - Direct - McCormick

1     obviously disregard what he testified to.

2             THE COURT:  And the time within which you'll

3     make your decision?  You'll not have unlimited time on

4     this decision.

5             MR. LaMAGNA:  I understand that.

6             THE COURT:  By this morning.

7             MR. LaMAGNA:  Thank you.

8             MS. McCORMICK:  Your Honor, the request to

9     disregard the testimony is a functional curative

10    instruction.  Will that cure the situation?

11            THE COURT:  No.

12            MR. LaMAGNA:  No.

13            THE COURT:  Not in a million years.  But I

14    will give you the opportunity to speak to the witness.

15    There will be no repetition of that kind of testimony.

16            MS. McCORMICK:  Absolutely, Judge.

17            THE CLERK:  Remain seated as the Judge exits

18    the bench.

19            (Whereupon, a brief recess was held.)

20            THE CLERK:  Remain seated.  Come to order.

21    Will you please put the witness back on the stand.

22            (Whereupon, the witness steps back into the

23    witness box.)

24            THE CLERK:  Dr. DeMartino, I would like to

25    remind you you are still under oath.

GIGI WRIGHT, RPR    (516) 571-2503

Dr. DeMartino - Direct - McCormick

1                    Bring them in, please.

2                    COURT OFFICER:   Jurors entering.

3                    (Whereupon, the jury entered the courtroom,

4          and upon taking their respective seats, the following

5          occurred:)

6                    THE CLERK:   Case on trial.   Indictment number

7          1910N of 2005, People versus March Heidgen.

8                    People ready?

9                    MR. HAYDEN:   Ready, your Honor.

10                   THE CLERK:   Defense ready?

11                   MR. LaMAGNA:   Yes.   Ready.

12                   THE CLERK:   Defendant is present and jurors

13         are seated.

14                   THE COURT:   All right.   Ms. McCormick.

15         BY MS. McCORMICK:

16         Q     Dr. DeMartino, were you able to determine after

17         the examination of Katherine Flynn with a reasonable degree

18         of scientific certainty the cause of her death?

19         A     Yes.

20         Q     Could you please tell the jury what the cause of

21         Katherine Flynn's death was?

22         A     Blunt force injury with decapitation.

23         Q     In the course of making that determination were

24         you able to establish the mechanism of her injury?

25         A     My opinion about that was that she died from

GIGI WRIGHT, RPR    (516) 571-2503

1   blunt force injury.

2        Q    What does that mean in layman's terms?

3        A    Means there was an impact that the body

4   experienced that caused the injury, which in this case was

5   decapitation, and the impact was a result of a motor vehicle

6   collision.

7        Q    Doctor, was the injury that you observed on

8   Katherine Flynn consistent with a high-speed motor vehicle

9   crash?

10       A    Yes.

11       Q    And are you able to tell with any degree of

12  certainty the nature of that speed, how fast the impact was?

13       A    No, that is not within my expertise.

14       Q    Thank you, Doctor.  I have no further questions.

15            MR. MARTELLO:  May I, your Honor?

16  CROSS-EXAMINATION

17  BY MR. MARTELLO:

18       Q    Good morning, Doctor.

19       A    Good morning.

20       Q    Doctor, now as the medical examiner here on this

21  case, it is your job, it is part of your duty, to

22  investigate manner and cause of death in certain cases?

23       A    Yes.

24       Q    And it is basically your job to answer, based

25  upon after reviewing the scientific findings, that you

Dr. DeMartino - Cross - Martello

1   determined how the death actually occurred under certain

2   circumstances; would that be fair?

3       A     It is our function to determine the manner of

4   death which would incorporate the circumstances.

5       Q     Okay.  And as part of your investigation you rely

6   on police investigators in order to give you information,

7   relevant information, that would assist you in coming to

8   your determination as to the cause of death; would that be

9   fair?

10      A     Some of the information would be coming from the

11  police, yes.

12      Q     And some of those police investigators I'm

13  referring to might be first responders, people on the scene

14  of the accident, that could relate information of the

15  details of the accident to you that would assist you in

16  formulating an opinion as to the cause of death; would that

17  be fair to say?

18      A     That's correct.

19      Q     And, again, one of the most important methods you

20  use as a medical examiner, in order to determine cause of

21  death, would be the actual procedure of an autopsy; would

22  that be fair?

23      A     Yes.

24      Q     And in this case you had already testified that

25  you did perform an autopsy?

Dr. DeMartino - Cross - Martello

1      A      Correct.

2      Q      And the findings of your autopsy were

3    memorialized in an official report?

4      A      Yes.

5      Q      And you also prepared what is called a

6    certificate of death?

7      A      Correct.

8      Q      And did you prepare that certificate of death in

9    this case as well?

10     A      Yes.

11     Q      Now, these official reports that I am referring

12   to, both the autopsy itself and the certificate of death,

13   you made those reports after you performed the autopsy and

14   after you spoke with particular police investigators who

15   have relevant information to provide to you; would that be

16   fair to say?

17     A      Yes.

18     Q      And before you made the report you, of course,

19   checked it for accuracy, the autopsy report?

20     A      Yes.

21     Q      And the same for the certificate of death; that

22   would be fair to say, you certainly checked it for accuracy

23   before you signed it?

24     A      Correct.

25     Q      And, in fact, you went to great lengths to make

Dr. DeMartino - Cross - Martello

1    sure it was accurate.  You first prepared what is called a

2    draft before you actually turned it into an official report;

3    would that be fair to say?

4         A    Yes, it is.

5         Q    And after you reviewed that draft you made

6    whatever corrections you deemed appropriate, and then you

7    made an official autopsy report and certificate of death; is

8    that true?

9         A    That's our routine, yes.

10        Q    Did you sign a certificate of death in this case?

11        A    Yes, I did.

12        Q    Did you bring that?  Would that be here?

13        A    I brought a copy of it.

14        Q    Would it refresh your recollection, would it help

15   you testify, if you referred to it, if I am going to ask you

16   some questions concerning it, Doctor?

17        A    Yes.

18        Q    It would assist you?

19        A    Possibly.

20        Q    Doctor, I am going to refer you to section 27 of

21   the certificate of death.  In there you see there are six

22   boxes, one of which indicates natural cause; box number two,

23   accident; box number three, homicide; box number four,

24   suicide; box number five, undetermined circumstances; and

25   box number six, pending investigation?  Are those six boxes

Dr. DeMartino - Cross - Martello

1    that appear in section 27 of the certificate of death?

2        A    Yes.

3        Q    And is it not true, Doctor, that you did not mark

4    off "homicide," you did not mark off "undetermined

5    circumstances" or even "pending investigation"?  You did, in

6    fact, mark off the box "accident"; is that true?

7        A    That is correct.

8        Q    Now, Doctor, referring further into your report,

9    on the report of investigation in the autopsy report, page

10   number five, do you have that?

11       A    Yes, I do.

12       Q    Doctor, on that page does it, just to clarify,

13   Doctor, so we are clear, on the information that you relied

14   on in coming to your conclusions in your report, does it

15   indicate that the Katherine Flynn was an unrestrained

16   passenger in the rear seat?  Does it indicate that in your

17   report, Doctor?

18       A    My autopsy report, page five, discusses the

19   autopsy findings.  You are referring to a different page.

20       Q    I'm referring to the report of investigation that

21   has the heading of Office of Medical Examiner County of

22   Nassau.

23       A    Yes, I know what you are referring to.

24       Q    On the bottom of that page in your report of

25   investigation does it not indicate that Katherine Flynn was

Dr. DeMartino - Redirect - McCormick

1    a rear seated unrestrained passenger?  Does it not indicate

2    that on the bottom of that page?

3         A    After it says "preliminary information" then it

4    says, "rear seat unrestrained passenger," yes.

5         Q    As you stated before, you do receive your

6    information from police investigators on the scene; is that

7    correct?

8         A    I said some of the information could come from

9    police.

10        Q    Doctor, you described the cause of death here,

11   the manner of death.  Would you say that these injuries are

12   consistent with a terrible accident?

13        A    Yes.

14             MR. MARTELLO:  I have no further questions.

15   REDIRECT EXAMINATION

16   BY MS. McCORMICK:

17        Q    Doctor, can you explain to the jury why you

18   checked off the box "accident" with respect to this case?

19        A    Yes.  The medical examiner, of course, as was

20   already discussed, has a limited number of choices with

21   regard to the manner of death, accident being one of them

22   and homicide being another.  And the reason this was

23   certified by me as an accident was I had no information at

24   the time that I certified this death certificate that there

25   was any intention of any person to do harm or kill the

1    decedent.

2        Q    Would it be fair to say then, Doctor --

3    withdrawn.

4            Approximately how many autopsies have you

5    performed in the course of your career?

6        A    Personally I have done close to four thousand,

7    and have been present for many thousands more.

8        Q    During the course of all of those investigations

9    that you conducted, would you have any idea what the

10   percentage is of motor vehicle crash victims?

11       A    Of the total number of autopsies that I have done

12   or have been present for -- this is just a ball park -- but

13   I would say that it is maybe five, ten percent.  Probably

14   less than ten percent, more closer to five.

15       Q    And of those percentage how many of them were

16   designated to your recollection as accidents?

17           MR. LaMAGNA:  Objection.

18           THE COURT:  Overruled.

19       A    I personally have never certified a death as a

20   result of a motor vehicle incident as a homicide.

21       Q    Are you familiar, Doctor, whether any of those

22   other cases that you have been involved with have resulted

23   in homicide charges?

24           MR. LaMAGNA:  Objection.

25           THE COURT:  Sustained.

Dr. DeMartino - Redirect - McCormick

1    Q     Doctor, are you -- have you ever testified in
2    court on criminal charges with respect to any of those other
3    autopsies you performed?
4              MR. LaMAGNA:  Objection.
5              THE COURT:  Sustained.
6    Q     Dr. DeMartino, is the designation of a motor
7    vehicle crash as a homicide your determination to make?
8    A     Well, ultimately it is the certifying physician
9    who certifies the cause and manner of death.  But that
10   determination has to be made in light of information
11   provided by other sources.
12   Q     And the other sources to the Medical Examiner's
13   Office include police information at the time that Katherine
14   Flynn was delivered to the morgue; is that correct?
15   A     Yes.  Correct.
16   Q     Dr. DeMartino, the information -- do you know
17   specifically where the information came from referred to by
18   defense counsel that Katherine Flynn was unrestrained in
19   that vehicle?
20   A     Yes.  That was information given, first of all,
21   to one of our investigators, and it was reported by an AMT.
22   Q     And, Doctor, do you have any personal knowledge
23   as to whether or not Katherine Flynn had been seat belted in
24   the back of that limousine?
25   A     Personal knowledge, no.

Dr. DeMartino - Redirect - McCormick

1      Q      Doctor, would Katherine Flynn's injuries be

2      consistent with a child who had been lap belted and was

3      lying down on a bench seat and thrown forward during the

4      high-speed crash?

5      A      Yes.

6              MS. McCORMICK:   Nothing further.

7      RECROSS-EXAMINATION

8      BY MR. MARTELLO:

9      Q      Doctor, you just testified that the injuries were

10     consistent with a child lying on a back seat, possibly

11     restrained.   Similarly, Doctor, would these injuries also be

12     consistent with a child lying on the bench seat

13     unrestrained?

14     A      It might be consistent.   But --

15     Q      Thank you.

16     A      -- if that were the case, I would have expected

17     more injuries to her in other parts of her body.

18     Q      Doctor, suffice to say though, that you cannot

19     state, you have no personal knowledge whether or not she was

20     restrained or not; is that correct?

21     A      If "personal" was meant if I was there, obviously

22     I have no personal knowledge of whether she was restrained.

23     Q      You did receive information from investigators

24     that relayed to you that she was an unrestrained rear

25     passenger that drew?

Dr. DeMartino - Redirect - McCormick

1      A      Preliminary information which is often wrong.

2                  MR. MARTELLO:  Objection.

3                  THE COURT:  Sustained.

4                  MR. MARTELLO:  Thank you.  No further

5      questions.

6    FURTHER REDIRECT-EXAMINATION

7    BY MS. McCORMICK:

8      Q      Doctor, why would you have expected to see

9    additional injuries to Katherine Flynn if she had not been

10   seat belted in?

11     A      Because the decapitation by her striking

12   something at the time of the impact, I would have expected

13   that other parts of her body would also have impacted with

14   something causing more significant injury.

15           The -- if I can go further, the possibility of

16   her becoming decapitated while being restrained would

17   explain the head being decapitated, if the belt got caught

18   on her neck at the time of the impact, and it would also

19   explain why she has very insignificant injuries to the rest

20   of her body.

21                 MS. McCORMICK:  Nothing further.  Thank you.

22                 THE COURT:  Anything else, gentlemen?

23                 MR. MARTELLO:  No.

24                 THE COURT:  Thank you, Doctor.

25                 (Whereupon, the witness exits the courtroom.)

M. Tangney - Direct - Hayden

1              THE COURT:  Next witness.

2              MR. HAYDEN:  Michael Tangney.

3              COURT OFFICER:  Step up.  Remain standing,

4       raise your right hand and face the clerk.

5              THE CLERK:  Staple , spelling your last name

6       for the record.

7              M I C H A E L   T A N G E Y,   a witness

8       called on behalf of the People, having been first duly

9       sworn by the Clerk of the Court, was examined and

10      testified as follows:

11             COURT OFFICER:  You can be seated.  Please

12      state your name, spelling your last.

13             THE WITNESS:  Michael Tangney, T-A-N-G-N-E-Y.

14             THE CLERK:  Thank you.

15   DIRECT EXAMINATION

16   BY MR. HAYDEN:

17      Q     Good morning, Mr. Tangney.

18      A     Good morning, Mr. Hayden.

19      Q     How old are you?

20      A     Fifty years old.

21      Q     What is your occupation?

22      A     I'm a police officer with the Long Beach Police

23   Department, currently serving as a lieutenant, as the

24   commanding officer of the traffic division.

25      Q     Describe the work you do in the traffic division?

M. Tangney - Direct - Hayden

1      A      I'm responsible for regulating all of the traffic

2   flow in Long Beach; I regulate the taxi industry, the

3   trucking industry, limousines; I deal with school crossings;

4   parking enforcement; speed, DWI.  Anything that deals with

5   traffic, pedestrian or vehicular.

6      Q      Do you know a man named Chris Tangney?

7      A      Yes.  He is my brother.

8      Q      Do you know Denise Tangney?

9      A      Yes.  That's Chris' wife, my sister-in-law.

10      Q      Jennifer Flynn?

11      A      That is Chris' daughter, my niece.

12      Q      Neil Flynn?

13      A      That is my niece's husband, my nephew, Neil.

14      Q      Grace Flynn?

15      A      That is my great niece, Jenny Flynn's daughter.

16      Q      Katherine Flynn?

17      A      That's Jennifer and Neil's oldest daughter, my

18   other great niece.

19      Q      I am directing your attention to around 2 o'clock

20   on the early morning of Saturday, July 2nd, 2005.  Were you

21   on your way home then?

22      A      Yes, I was.

23      Q      On your way home to Long Beach?

24      A      Yes, sir.

25      Q      Were you moving southbound along the Meadowbrook

GIGI WRIGHT, RPR   (516) 571-2503

M. Tangney - Direct - Hayden

1    Parkway then?

2         A    Yes, sir.

3         Q    Describe the vehicle.

4         A    I was in a 2003 Toyota Sequoia, which is my

5    personal vehicle.  My wife was driving.  I was in the front

6    passenger seat.  My four children were in the back of the

7    vehicle, along with my son's girlfriend.

8         Q    Were you coming from a wedding?

9         A    Yes, we were.

10        Q    When had the wedding taken place?

11        A    Immediately prior to our ride home.

12        Q    Was there a reception?

13        A    Yes, there was.

14        Q    Describe the location of the wedding?

15        A    The wedding was in Bayville, at the Crescent

16   Beach Country Club or Yacht Club.  It was a beautiful night.

17   It was crystal clear.  There was a fireworks show right

18   around the corner from the reception that we could watch

19   while we were attending the reception.

20             The wedding took place on the beach that abutted

21   the reception hall.  And it was really a marvelous night.

22   The kids had a great time.  It was the first time my entire

23   immediate family had ever been to a wedding.  It was the

24   first time my younger children had ever been to a wedding.

25   They were with all of their cousins, immediate family,

M. Tangney - Direct - Hayden

1    extended family.  My niece Lisa was gracious enough to

2    invite my son's girlfriend.  It was the perfect night.

3        Q     Did you have anything to drink at the reception?

4        A     Yes, I did.

5        Q     What did you have?

6        A     I had two mixed drinks.

7        Q     When did you leave the reception?

8        A     Approximately 1:30.

9        Q     How did you leave the reception?

10       A     My family as a group walked out of the reception

11   hall and I saw my brother, my brother Christopher, and his

12   family waiting.  And he stopped me and said, Michael, don't

13   leave yet; there was no limo there.  He wasn't sure if he

14   was going to get a ride home.  It was an hour from Long

15   Beach.  I pulled out of the valet area and I rearranged my

16   car.

17            My sister Liz was following us.  She had a

18   minivan.  It was her and her daughter.  We would have enough

19   seats if in fact the limo didn't show up.  As we were doing

20   this rearrangement the limo did show up and then Chris

21   called over to me, "Michael, we have a limo.  You can go."

22   At that time we left the reception hall.

23       Q     Who was with you when you left the reception

24   then?

25       A     It was my my wife, my four children, my son's

GIGI WRIGHT, RPR   (516) 571-2503

M. Tangney - Direct - Hayden

1    girlfriend; and following us in her own car was my sister,

2    Liz, and her daughter Jenna.

3        Q     How old were your children?

4        A     My son Michael was 17, his girlfriend was 15, my

5    oldest daughter was 15, and my twin daughters were fourteen.

6        Q     Describe your state of mind as you left the

7    reception and were proceeding home?

8        A     We were so happy as a group.  We were talking

9    about the reception itself.  I come from a very big family,

10   and my twin daughters were a little upset at fourteen that

11   they got stuck at the young children's table; they wanted to

12   be at the big table.  They had such a great time playing

13   with their cousins, Kate and Grace, dancing.  And that type

14   of stuff.

15             I could remember everybody dancing.  There is

16   always that one person that doesn't get up on the dance

17   floor; that didn't happen at this wedding.  It was the

18   perfect wedding.

19       Q     Where were you traveling at around 2 o'clock that

20   early Saturday morning?

21       A     We were traveling in the center lane of the

22   southbound side of the Meadowbrook Parkway approaching

23   Babylon Turnpike.

24       Q     Where were you sitting inside of the van?

25       A     I was in the front passenger seat.

M. Tangney - Direct - Hayden

1      Q      Did you notice something as you were approaching

2   the Babylon Turnpike overpass?

3      A      Yes.   I noticed a number of cars veering to the

4   right.   I saw a black stretch limo in the middle lane and a

5   pickup truck in the extreme left lane.   The limo and pickup

6   truck were both facing southbound.

7      Q      Describe your initial observations you made of

8   the limousine?

9      A      The limousine was in normal condition from the

10   rear.   As we started to approach the limo closer, I noticed

11   tremendous front-end damage to both the limousine and the

12   pickup truck.

13      Q      Describe your initial observations you made of

14   the pickup truck from the rear?

15      A      The pickup truck was juxtaposed on the road.   It

16   wasn't perfectly in the left lane.   It was angled.   The road

17   is primarily a southbound road.   The pickup truck was

18   pointing in a southwest direction.

19      Q      Did you have any idea then that your family was

20   in that limousine?

21      A      No, I did not.   Because we had left the reception

22   ahead of them, and as was told earlier there are a lot of

23   windy roads up in Bayville, and we got lost too.

24      Q      Did you see anyone else in the vicinity of the

25   limousine?

M. Tangney - Direct - Hayden

1       A    Not at that time.

2       Q    How about the pickup truck?

3       A    Not at that time.

4       Q    Any police?

5       A    No, sir.

6       Q    Any emergency vehicles?

7       A    No, sir.

8       Q    Civilians?

9       A    Not at that time.

10      Q    Where did your wife park after you first noticed

11  the limousine and the pickup truck?

12      A    Well, as we were passing the limousine on the

13  east side, which would be the right -- west side, which

14  would be the right lane, I told my wife to stop.  I exited

15  the car right there.  I told her to call 911 and watch for

16  my brother.  My brother is a retired police officer, as you

17  know.  And I told her I need help.  When I got ·to the

18  limousine and I jumped out there, she proceeded further

19  south to a safe area under the Babylon Turnpike overpass

20  toward the left lane.

21      Q    She parked south of the crash scene?

22      A    Yes, sir.

23      Q    Describe what you did, what you saw and what you

24  heard, as you approached the limousine?

25      A    Well, I approached the limousine from the

M. Tangney - Direct - Hayden

1    passenger side.  I walked around the front of the limousine

2    to the driver's side.  I looked inside and I saw a man I

3    now know to be Stanley Rabinowitz, and the front portion of

4    the interior cabin was crushed against his stomach.  He

5    didn't appear to be breathing.  I reached in to check his

6    carotid artery, and there was no pulse.  I determined at

7    that time he was dead.

8              And I walked to the rear of the limo.  As I was

9    walking to the rear of the limousine, a black couple was

10   walking south.  I was walking north, they were walking

11   south, obviously very upset, as to what they had seen

12   inside.

13             I opened the rear door.  And I saw -- the first

14   person I saw was my brother Chris, his legs were wrapped

15   around the bar of the service bar of the limo.  The lower

16   half of his legs were actually spun around the wood that

17   ripped away from the passenger side wall.

18             Jennifer was standing in the rear of the

19   limousine, Grace was sitting on the back bench, eyes as wide

20   as saucers.  She wasn't making any noise.  Underneath my

21   brother was my sister-in-law with just her legs sticking up

22   toward the bench.  One of her legs was snapped in half.

23   There was no blood leading me to believe that she was dead

24   at the time.

25             Next on top, mixed in the mess of bodies, was my

GIGI WRIGHT, RPR    (516) 571-2503

M. Tangney - Direct - Hayden

1    nephew Neil who was moaning "Kate, Kate."

2         Q     What happened then?

3         A     At that point Chris and I had a discussion where

4    he was kind of suspended.  His legs, I guess, as he had

5    flown forward, his legs wrapped around the bar and were kind

6    of suspended about two feet, three feet off the bottom of

7    the limousine, and his shoulders and head were kind of

8    leaning back into the pile of bodies.

9         We discussed the fact that I would have to move

10   him.  I told him, "Are you ready"; he said "yes."  I

11   unwrapped his first leg and he let out a horrific scream,

12   which you could imagine.

13        I unwrapped his second leg and Jen picked

14   something up and left the him.  And I told Chris, "I think

15   that Denise is dead."  Denise said, "No, I can't breathe."

16   At that point I then moved Chris a second time to the east

17   side of the limo, the passenger side, to give Denise some

18   relief.  Neil had muzzled himself off of Denise, back toward

19   the seat and she said, "I can breathe, I can breathe."

20        At that point I exited the vehicle to find out

21   where Jennifer went.  I saw Jennifer sitting on the side of

22   the road holding Kate.  I then proceeded south again to

23   check on my family, and to tell my wife to stay with the

24   kids; that Kate was dead; that the kids had to be cared for.

25   Is everything okay?  She said "yes."

M. Tangney - Direct - Hayden

1          I walked north.  My sister Liz's car was parked

2   behind the site as a kind of barrier.  I went to that car.

3   I told them not to get out.  Jen went with my family and Liz

4   went to sit with Jennifer.  I went back toward the

5   limousine.  At this point Neil, in a Herculean method,

6   pulled himself --

7               MR. LaMAGNA:  Objection.

8               THE COURT:  Overruled.

9   A      -- in a very strong method pulled himself,

10  despite his injuries, to all the way to the rear of the

11  limousine where he collapsed by the front door.

12          At this time the first emergency responder pulled

13  up, which was an ambulance driver.  I went over to him, and

14  I said to him, "We need more ambulances.  There is a lot of

15  aideds."  He said he had to do triage.  I said, "You have to

16  call for help."  He seemed to be very disoriented or very

17  overwhelmed by the situation.

18          I finally said to him, "I'm Lieutenant Tangney

19  from the Long Beach Police Department.  I'm ordering you to

20  get ambulances."  His training kicked in and he responded to

21  that command and ordered four more ambulances.

22          At that point we started, they started to work on

23  getting Neil out of the vehicle.  They ex --

24  Q      Describe how they did that.

25  A      They extricated Neil from the vehicle, put him on

GIGI WRIGHT, RPR    (516) 571-2503

M. Tangney - Direct - Hayden

1    a stretcher, and then I heard he was going to South Nassau

2    Hospital.  Based upon my training and experience I knew this

3    was too many people for one hospital, and that they would be

4    sending all of these aideds, my family, to different

5    hospitals.

6              At that point I said to my wife, "Call family

7    members.  Call my sisters."  I have four sisters and three

8    brothers.  My other two brothers live in Florida.  It wasn't

9    practical to call them.

10             I said call my sisters and get people, someone to

11   South Nassau, and tell them that we'll be going to the

12   medical center.

13             At that point I walked back.  Neil was out of the

14   car.  The fire department was there.  There was a large

15   number of police personnel.  They decided at that point -- I

16   was in contact throughout the entire event with the first

17   responders -- they decided at that point that they could

18   only safely remove Chris and Denise through cutting the car

19   up.

20             In between this period of time there they were

21   able to lift Grace out of the rear of the vehicle, a first

22   responder, and put her into one of the ambulances.  At this

23   point I walked back to my wife again, and I put my son in

24   charge of the family.  And I told my wife to stay with Grace

25   in the ambulance.

GIGI WRIGHT, RPR    (516) 571-2503

M. Tangney - Direct - Hayden

1      Q      Did she do that?

2      A      Yes.

3      Q      Describe what happened then.

4      A      It seemed longer than normal.  In a crisis

5      situation time seems to move slow.  They finally cut the car

6      open, they extracted Denise and put her in an ambulance and

7      sent her to the medical center.

8             It took a little more time to get Chris out

9      because of the severe leg fractures that he had, and the

10     other injuries.  When they got him out we were out of

11     ambulances.  There were no ambulances left.  So I spoke to

12     the AMT at that point, and a decision was made that they

13     would take Grace, who had no visible injuries, was not in --

14     didn't appear to be in any real pain, that we would take her

15     by police car -- we had plenty of police cars there -- and

16     use that ambulance to transport Chris.

17            So Grace and my wife left, got into a Freeport

18     Police car, where they were transported to the medical

19     center.  And then Chris was put on the ambulance and taken

20     from the scene.

21     Q      Describe the observations you made of Denise as

22     she was being removed from the limousine?

23     A      My observation was that Denise was

24     semi-conscious.  She was answering responders' questions,

25     but she didn't appear to be completely lucid.  She had

GIGI WRIGHT, RPR    (516) 571-2503

M. Tangney - Direct - Hayden

1    tremendous leg injuries.  She was moaning at different times

2    from, I guess, the other injuries.

3        Q    Describe any observations you made of Chris as he

4    was being removed from the limousine.

5        A    Chris' legs, from the knees down, were completely

6    flat.  His feet, as normal feet, would sit like this; his

7    feet were completely flat down, based on the breaks that he

8    had suffered.  It almost looked like a ventriloquist's

9    dummy's feet, just hanging there on the stretcher.  He was

10   lucid.  I was talking to him, and I couldn't see any other

11   injuries other than those.

12       Q    What next happened?

13       A    At this point, once everyone was loaded, I went

14   over to Jennifer.  And I -- a police officer actually had

15   come over to me and said, "Your niece won't leave."  I went

16   over to Jennifer.  And I said, "Jennifer, it is time to go."

17   It was a hot night.  "You are on a cold, dirty ground.  Sit

18   on a stretcher.  I'm not leaving," calm, lucid, succinct.

19   And I said, "Jen, you have to -- we have to put you on the

20   stretcher."  She said, "You are going to put me on a

21   stretcher?  You're going to tie me down?  You are going to

22   take me away?"  I said, "How about we do it one step at a

23   time; you sit on a stretcher and we'll talk."  She sat on

24   the stretcher and waited a couple of minutes and she said,

25   "I want to go with Kate."  I said, "You can go with Kate."

M. Tangney - Cross - Martello

1          There were people taking pictures.  There were a

2     lot of cameras, cell phone cameras.  People were taking a

3     ton of pictures.  There was flashes all over.  I said,

4     "There are people taking your picture.  How about we put you

5     in an ambulance?"  And she said, "so long as you don't drive

6     away."

7          We put her in the ambulance.  She said, "What

8     happens now?"  I said, "You go to the medical center where

9     Grace is, where your parents are," and she said, "Okay."  I

10    said, "Do you want me to ride with you?"  She said, "no, I

11    want to be alone."  The police officer that was in the

12    ambulance with her, shifted to the front of the ambulance,

13    because he was conscious of her decision to try to be alone.

14         We closed the doors and they drove off and then

15    police officers drove my car with my family to the medical

16    center to meet up with the rest of my family.  And another

17    police officer drove my sister's car to meet up at the

18    medical center with our families.

19              MR. HAYDEN:  I have nothing further, your

20         Honor.  Thank you.

21              THE COURT:  Mr. Martello.

22    CROSS-EXAMINATION

23    BY MR. MARTELLO:

24    Q     Good morning, Mr. Tangney.  I will be very brief.

25          Mr. Tangney, you indicated that you are the

M. Tangney - Cross - Martello

1   lieutenant from the office of the Long Beach Police

2   Department.

3        A      Traffic division.

4        Q      And that's you secure your office from

5   department?

6        A      Yes, sir.

7        Q      And how long have you been a police officer in

8   the Long Beach Police Department?

9        A      Over 28 years.

10       Q      And your job is to perform law enforcement duties

11  within Long Beach, City of Long Beach, County of Nassau?

12       A      Yes.

13       Q      And you are, as you stated, you are related to

14  Christopher Tangney?

15       A      Yes.

16       Q      And Denise Tangney?

17       A      Yes.

18       Q      Thank you, very much.

19              MR. MARTELLO:  Nothing further, your Honor.

20              THE COURT:  Thank you.

21              (Whereupon, the witness exits the courtroom.)

22              THE COURT:  Your next witness.

23              MS. McCORMICK:  Your Honor, the People call

24  Michael Ierardi.

25              COURT OFFICER:  Step up.  Remain standing,

1          raise your right hand and face the clerk.

2                  M I C H A E L   I E R A R D I,          a

3                  witness called on behalf of the People,

4                  having been first duly sworn by the Clerk of

5                  the Court, was examined and testified as

6                  follows:

7                  THE CLERK:  Put your hand down.  State your

8          name, spelling your last.

9                  THE WITNESS:  Michael L. Ierardi.

10                 THE CLERK:  Spell your last name for the

11         record, please.

12                 THE WITNESS:  I-E-R-A-R-D-I.

13                 THE CLERK:  Shield number and command.

14                 THE WITNESS:  Shield 3967.  New York State

15         Courts, 120 Schermerhorn Street, Criminal Court.

16                 THE CLERK:  Thank you.  Take a seat.

17    DIRECT EXAMINATION

18    BY MS. McCORMICK:

19         Q    Mr. Ierardi, good morning.

20         A    Good morning.

21         Q    Could you tell the jury please how old are you,

22    sir?

23         A    I'm 41.

24         Q    How are you employed?

25         A    I'm a New York State Court Officer.

Ierardi - Direct - McCormick

1    Q    Where are you employed as a court officer?

2    A    At 120 Schermerhorn Street, Brooklyn Criminal

3    Court, night court.

4    Q    Night court?

5    A    Yes.

6    Q    How long have you been a court officer?

7    A    I have been a court officer 15 years, March 1991.

8    Q    Excuse me?

9    A    March 19991.

10   Q    I don't know whether I should call you Mr. or

11   Officer Ierardi.  Could you describe for the jury, please,

12   what your responsibilities are as a court officer?

13   A    Court security.  I do medical detectors, search

14   people going in and out of the courtroom, prisoners, judges,

15   first aid, C.P.R., jury, witnesses.  Mainly security.  I do

16   arrests.  All kinds of things.

17   Q    You have some emergency training for C.P.R. or

18   rendering emergency aid?

19   A    Yes, I do.

20   Q    Is that for events that might occur within the

21   courthouse?

22   A    Yes.

23   Q    Were you working at 120 Schermerhorn Street in

24   Brooklyn on the overnight between July 1st into July 2nd

25   2005?

1      A     Yes, I was.

2      Q     What were your hours that you were working that

3   night?

4      A     I believe they were five to 1:15 that day.

5      Q     And did there come a time that you left from

6   Brooklyn to come back to Nassau County?

7      A     Yes.

8      Q     About what time was that?

9      A     Approximately 1:15 in the morning.

10     Q     Where were you going to?

11     A     I was going to Cedar Beach Marina on Ocean

12  Parkway, to my family that were camping there.

13     Q     Could you tell the jury what route you chose to

14  take to get down to Cedar Beach Marina?

15     A     I came off the B.Q.E., to the L.I.E., to the

16  Northern State, down the Meadowbrook Parkway.

17     Q     And did there come a time -- let me back up for a

18  minute, Mr. Ierardi.  Were you in uniform at the time that

19  you were driving home?

20     A     Yes.  I commute back and forth to work in my

21  uniform all the time.

22     Q     Was the top portion of your uniform visible?

23     A     Not at the time I was driving, no.  I wear a

24  jersey outside on top of my uniform.

25     Q     Can you tell the jury what happened as you

Ierardi - Direct - McCormick

1    approached the Babylon Turnpike overpass on the Meadowbrook

2    Parkway at around 2 o'clock in the morning?

3         A    Yes.  I came around the bend, and there appeared

4    to be some vehicles stopped in the left lane of the highway,

5    they were actually almost in the middle lane also.  And I

6    didn't know what was happening.  I pulled over to the

7    shoulder of the road, in a safe area, on the grass on the

8    highway.

9         Q    That would be on the west side of the road?

10        A    I would --

11        Q    The right side?

12        A    It is the west -- north side of the Meadowbrook

13   Parkway at the Babylon exit.

14        Q    As you are heading southbound on the Meadowbrook

15   you pulled to the right on the grassy area?

16        A    Yes, ma'am.

17        Q    What did you observe as you came upon that

18   Babylon Turnpike overpass?

19        A    When I exited my vehicle, I exited my vehicle and

20   I saw a horrible accident had happened.

21             When I first viewed the vehicle, when I was

22   pulling up, I just thought that maybe the limousine was

23   stuck at the time and they needed a jump.  I thought people

24   were jumping the vehicle.  I thought maybe I could help.

25        Q    From where you first saw the limousine could you

Ierardi - Direct - McCormick

1    see the pickup truck?

2        A    When I first saw the limousine I don't recall

3    seeing the pickup truck.  I saw a vehicle, I didn't know it

4    was a pickup truck at the time.

5        Q    Is it fair to say that you pulled to the

6    passenger side of that limousine before you stopped?

7        A    Yes.

8        Q    As you looked at the limousine pulling up to that

9    location did you observe damage to the limousine?

10       A    Yes.

11       Q    What damage did you observe?

12       A    The whole front end of the limousine was

13   destroyed.  There was nothing there.  The engine, if there

14   was what they call an engine, was disintegrated.  There was

15   a tire separated from the vehicle.  If there was anything

16   else it was pushed inside of the limousine.

17       Q    Let me just back you up for a second,

18   Mr. Ierardi.

19            When you first approached from behind the

20   vehicles and you stopped were you aware that this was a

21   crash?

22       A    No, I was not.

23       Q    What is it that you could see from where you had

24   stopped your car?

25       A    The whole side of the limousine appeared to be in

Ierardi - Direct - McCormick

1    one piece when I saw it.

2        Q    Did it appear to be damaged to you?

3        A    Not when I first pulled up on the vehicle.

4        Q    This is the passenger side of the limousine?

5        A    Yes, the rear-end passenger side.

6        Q    Did the rear of the limousine appear to be

7    damaged to you?

8        A    I didn't see any damage to the rear of the

9    limousine from when -- no, I didn't see any damage.

10        Q    Mr. Ierardi, what did you do after you stopped

11    your vehicle?

12        A    I exited.  And there was two people standing

13    there:  A man and a woman.  And I said, "Did anybody call

14    911," because now I knew there was an accident when I exited

15    out of the vehicle.  And a woman responded she had called

16    911.  I walked around the front of the limousine.

17        Q    Can you tell the jury, before you move on, where

18    it is that you saw the two people who were standing there?

19        A    They were alongside the passenger side of the

20    limousine, the right side passenger side of the limousine.

21    It appeared that they were trying to get into the limousine

22    to help the people inside.

23        Q    The rear door of that limousine?

24        A    Yes -- no, I don't recall.  I don't recall.

25        Q    As you pulled up to the location had you seen

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Direct - McCormick

1    those people standing there?

2         A    Not when I pulled up I didn't see them.

3         Q    Is that the first place that you went toward them

4    when you got out of your vehicle?

5         A    I believe I went toward the front of the vehicle

6    first.

7         Q    And is it at that point that you observed the

8    damage to the vehicle?

9         A    Yes.

10        Q    You went to the front of the vehicle and you had

11   the conversation, as you already said.  What did you do

12   next?

13        A    Walked around the front of the limo to the

14   driver's side of the limousine.  And at first I didn't see

15   anybody in the driver's seat of the car.  And I took my

16   flashlight out, and I saw a gentleman crushed in the front

17   seat of the limo, air bag, everything was just on top of

18   him.  He just appeared --

19        Q    Did you check the person that you saw in the

20   limousine for any kind of vital signs?

21        A    No, I did not touch him.

22        Q    How did he appear to you, Mr. Ierardi?

23        A    Appeared grayish, like a whitish color.  He

24   didn't appear alive at all.  He was not alive.

25        Q    You said you took your flashlight out.  Is a

GIGI WRIGHT, RPR   (516) 571-2503

Ierardi - Direct - McCormick

1    flashlight a part of your court officer uniform?

2        A      Yes, ma'am.

3        Q      Is that the first thing you did; you pulled out

4    your flashlight?

5        A      Yes, I did.

6        Q      After you made those observations of --

7    withdrawn.

8               After you made those observations of the driver

9    of the limousine what did you do next?

10       A      I basically turned around and walked to the

11   truck, pickup truck, that was also facing southbound at the

12   time.  And I opened the passenger door of the pickup truck.

13       Q      You were able to open it?

14       A      Yes, I was.

15       Q      Do you recall whether the window on that pickup

16   truck was opened or closed?

17       A      The window was closed.

18       Q      And you opened the door.  And what did you

19   observe within the pickup truck?

20       A      First thing, I smelled alcohol as soon as I

21   opened the door.  And there was a gentleman wedged

22   underneath the steering wheel between the seat, the steering

23   wheel and the dashboard.  The steering wheel, I believe, was

24   approximately shoulder height, and his head was sticking up

25   like on the seat.  He was between the seat and the steering

Ierardi - Direct - McCormick

1    wheel.

2        Q    Was the seat of the pickup truck bent in any way

3    that you remember?

4        A    I didn't observe it.  It was pushed against the

5    back of his neck.

6        Q    Was the driver of the pickup truck seated at the

7    appropriate height in the pickup truck?

8        A    Appropriate height, no, ma'am.

9        Q    Was he lower than --

10       A    He was underneath the dashboard, ma'am.

11       Q    How high was his head relative to the dashboard?

12       A    His head to the dashboard?

13       Q    Yes.

14       A    I would say his head was in front of the

15   dashboard.

16       Q    At that same level?

17       A    Yes.

18       Q    What did you observe about that person in the

19   pickup truck?

20       A    He was muttering.  I didn't ask him any

21   questions.  I don't know if there was -- I observed a

22   gentleman outside of the pickup truck on the driver's side.

23   I don't know if he was communicating with this gentleman

24   that was driving the vehicle, that was behind the vehicle,

25   the steering wheel, or he was talking to me.  But I didn't

Ierardi - Direct - McCormick

1    ask him any questions.

2        Q     Could you hear what was being said to the driver

3    from the other person?

4        A     No, I did not.

5        Q     Do you know whether the other person was a

6    civilian or a police officer?

7        A     No, I do not.

8        Q     Were you able to understand anything that was

9    said to you by the driver of the pickup truck?

10       A     Nothing at all.  Nothing clear.  He didn't speak

11   a clear word.

12       Q     Were his eyes open or closed?

13       A     His eyes were open.

14       Q     Can you describe the person, in terms of their

15   physical appearance, that you observed behind the wheel of

16   the pickup truck?

17       A     From what I observed it appeared to be a male,

18   approximately 25 years old, Hispanic or Spanish heritage, or

19   whatever, or whatever terminology you use.

20       Q     Mr. Ierardi, I'm going to ask you, sir, do you

21   see the person that you saw behind the wheel of the pickup

22   truck on July 2nd 2005, in the courtroom today?

23       A     Yes, I do.

24       Q     Could you describe him for the jury, please.

25       A     He is wearing a blue suit with a white shirt and

1    a tie, it looks like a speckled tie from here.  I can't tell

2    you the color.  He has brown hair.

3                    MS. McCORMICK:  Your Honor, I would ask that

4          the record reflect that the witness has indicated the

5          defendant.

6                    THE COURT:  The record will so reflect.

7    Q      Did there come a time that you walked away from

8    the pickup truck?

9    A      Yes.

10   Q      About how long in terms of time do you think you

11   were standing at the side door of the pickup truck?

12   A      I would guess it is ten seconds or less.

13   Q      Where did you go from there?

14   A      Turned around and walked to the rear of the

15   limousine, on the driver's side.  It was all in the same

16   proximity, turned around and walked to the driver's side

17   rear of the limousine.

18   Q      What did you do when you got to the rear of the

19   limousine?

20   A      I opened the rear passenger door, the most rear

21   door.  There is only two doors on the limousine on that

22   side.  I opened the door.

23   Q      And that would be the driver's side?

24   A      That's correct.

25   Q      What did you observe when you opened the rear

Ierardi - Direct - McCormick

1    door of the limousine?

2        A    There was nobody on that seat.  There was nobody

3    sitting on the seat when I opened the door directly in front

4    of me.

5        Q    What did you -- did you look further into the

6    passenger compartment?

7        A    I took my flashlight and shined it inside of what

8    is the front of the passenger area, toward the partition, or

9    the front of the limousine.

10       Q    What did you see when you looked toward the front

11   of the passenger compartment?

12       A    There was a man like hanging upside-down

13   practically.  His feet were facing me and his head was

14   facing the front of the the limousine.

15       Q    Was there only one person in that compartment?

16       A    There was more than one person.  I am not sure

17   how many.  I knew there was more than one person.  I saw

18   some gowns and tuxedos and somebody was screaming "Get the

19   firemen.  Get the firemen."  And I backed out of the limo

20   and grabbed my cell phone to call 911.

21       Q    What happened after that?

22       A    I was on the phone, and the lady that I first

23   asked if anyone had called 911, who had responded yes, she

24   had, she was now on the driver's side rear door, at the door

25   where the door is open, and she was, she had her head in

1    toward the door.  And she screams "She's dead."  And I told

2    her to be quiet.  I didn't want anybody inside of the

3    limousine knowing there was any dead people.

4           And I turned around, and it was -- I was on the

5    phone trying to get through to 911, and a woman exits the

6    vehicle with something in her hands.  It was the remains of

7    a child.

8        Q    What did she say to you, if anything?

9        A    "Don't touch her."  And I got frightened.  I ran

10   to my car to close the highway.  I knew I was in too deep

11   for myself.  I'm not a trained E.M.T.  And these people were

12   seriously hurt.  I went to close the highway so nobody would

13   pile into the back of them and no one else would see what I

14   saw.

15       Q    When you said you went to close the highway, as

16   best you can remember, Mr. Ierardi, what did you literally

17   do to close the highway?

18       A    I ran to the shoulder of the road where my car

19   was parked.  I got in it and started backing down the

20   highway, probably a quarter of a mile back to the ramp, I'm

21   not sure.  And one vehicle at that time tried to go around

22   me, and I tried to stop him with my flashlight and my door

23   opened, and they went around me, and I drove all the way

24   back, and I let that car go, and I drove to the ramp of the

25   highway and turned my car say, like, my car is a small car,

Ierardi - Direct - McCormick

1   but to block it, on a little bit of an angle.

2            I got out and took my jersey off to expose my

3   full uniform, had my flashlight and started directing cars

4   off the highway.

5       Q    While you were standing there about how many cars

6   did you have to direct off the highway?

7       A    Eight to fifteen cars.  I can't give you an exact

8   answer.

9       Q    Did there come a time when police personnel

10  responded to this crash scene?

11      A    Yes.

12      Q    Do you remember who the first responders were?

13      A    First responders were State Trooper Brunz, who

14  pulled up on the scene, and I told him who I was, I

15  identified myself as a court officer.  I told him what was

16  going on up ahead, and I told him that there was a --

17      Q    What is it, Mr. Ierardi?

18      A    I told them what I saw.

19      Q    And how long were you standing there directing

20  traffic?

21      A    We closed the highway with flares and we walked

22  up to the scene.  I think that some other state troopers

23  pulled up maybe behind us, some vehicles passed us, and we

24  walked up to the scene.  And I said to them, "You guys are

25  going to need my help."  You know, I asked them if they

Ierardi - Direct - McCormick

1    needed my help.

2        Q    What did you do when you got back to the scene?

3        A    An ambulance had pulled up and they said whoever

4    has gloves get over here and help.

5        Q    Did you have gloves?

6        A    Yes.  I carry gloves on me as part of my uniform.

7    I put gloves on and I jumped in and helped out.

8        Q    What specifically did you do, Mr. Ierardi?

9        A    I removed the gentleman from the limousine on a

10   backboard, put the backboard on the limousine, turned the

11   man onto the board, pulled him out head first.

12            I had determined that this man was already head

13   first.  I just rolled him over and pulled him out head first

14   onto the board, tied him on the board, and put him on a

15   stretcher.

16       Q    Could you tell the jury, please, where did you

17   remove -- how did you remove him?  From what space in the

18   limousine?

19       A    I'm sorry?

20       Q    Did he come out a door?

21       A    He came out of the rear driver's side door we

22   removed him from.

23       Q    Was he outside of the vehicle on the ground or

24   was he still within the vehicle?

25       A    He was within the vehicle.  We pulled him from

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Direct - McCormick

1    inside of the vehicle onto a board.  We put the board into

2    the car, over the seat, onto the floor, and pulled him up

3    onto the board and pulled him out on the board.

4         Q    Did you ever learn the name of that person?

5         A    Yes, I did.

6         Q    What was his name?

7         A    His name was Neil.

8         Q    After you removed Neil onto the board what did

9    you do next?

10        A    We put him on a stretcher and we moved him over

11   to an ambulance that was waiting behind us, which was, I

12   guess, north of us.

13        Q    And what did you do next, Mr. Ierardi?

14        A    Loaded him into the ambulance, and was told by

15   one of the E.M.T.s that worked for Nassau County to stay

16   with him and make sure he was all right.

17        Q    Did you stay with him?

18        A    Yes, I did.

19        Q    About how long were you with him?

20        A    Quite some time.  Maybe ten, fifteen minutes.

21        Q    Did you observe anything from inside of the

22   ambulance?

23        A    Neil was inside of the ambulance screaming some

24   of -- should I say it?

25             MR. LaMAGNA:  Object to him screaming.

GIGI WRIGHT, RPR   (516) 571-2503

Ierardi - Direct - McCormick

1           THE COURT:  Sustained.

2      Q    Mr. Ierardi, did there come a time when you left

3    that ambulance?

4      A    When they transported him to the hospital I

5    walked away from the ambulance, yes.

6      Q    Where did you go from there?

7      A    I went back to the scene, walked up to the limo,

8    and to the left there was Nassau County Police Officers

9    looking for something.  I asked them what they were you

10   looking for, and they told me they were looking for --

11          MR. LaMAGNA:  Objection.

12          THE COURT:  Sustained.

13     Q    Did you participate in looking for something at

14   the side of the road?

15     A    Yes, I did.

16     Q    What were you looking for, Mr. Ierardi?

17          MR. LaMAGNA:  Objection.

18          THE COURT:  Overruled.

19     A    A body of a child.

20     Q    Did you locate the body of the child on the side

21   of the road?

22     A    No, ma'am.

23     Q    Would you tell the jury what happened next?

24     A    I was approached by a Nassau County E.S.U.

25   officer, and was told that the remains were found inside of

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Direct - McCormick

1    the limousine; that we didn't need to look any further.

2        Q      And did you participate in removing any of the

3    other persons from the limousine?

4        A      No, ma'am.

5        Q      What did you do next?

6        A      I went to look for the first officer, the state

7    trooper that appeared on the scene, to give him my name.

8    And I ran into a sergeant from my training academy who was

9    with, I think, the Oceanside Fire Department.  I had some

10   words with him and we spoke, and then I found Officer Brunz,

11   State Trooper Brunz, and I gave him my name.  I then -- I

12   then walked back to my car.

13       Q      Mr. Ierardi -- withdrawn.

14              MS. McCORMICK:  With the Court's permission I

15          would ask to be allowed to have Mr. Ierardi view some

16          of the photographs that were already in evidence for

17          him to help with his testimony?

18              THE COURT:  Sure.

19              Ms. McCORMICK:  Can Mr. Ierardi step down

20          from the witness stand?

21              THE COURT:  Yes.

22              (Whereupon, the witness steps down and enters

23          the well of the courtroom.)

24              THE COURT:  Ms. McCormick, if you're going to

25          use the presented turn it a little bit, because I can't

Ierardi - Direct - McCormick

1      see it.

2                MS. McCORMICK:  Certainly.  I'm going to ask

3      Mr. Hayden to display the photographs that I am showing

4      to the witness.

5                THE COURT:  Surely.

6      Q     Mr. Ierardi, I'm going to show you what has been

7      previously moved into evidence as People's Exhibits numbered

8      1A and B in evidence, sir.

9                Do you recognize that?

10     A     Yes, I do.

11     Q     What do you recognize that to be?

12     A     That's the accident scene that I had pulled up on

13     on my way home from work that evening, July 1st.

14     Q     I'm going to ask you, because you don't have a

15     microphone, to keep your voice up.

16               Okay, Mr. Ierardi, using that diagram, not the

17     diagram, could you tell the jury or demonstrate for them

18     about where you put your vehicle as you came to a stop.

19     A     Approximately over here on the grass.

20     Q     Indicating, for the record, the top left portion

21     just outside the view of the photograph.

22               And, Mr. Ierardi, where did you proceed to from

23     that point where you stopped your vehicle?

24     A     Exited my vehicle, came across the two people who

25     were standing approximately here, I believe.

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Direct - McCormick

1      Q      Indicating the passenger side, middle or so, of

2    the limousine?

3      A      Yes.  I believe they were right here, one and

4    one.

5             I further walked around the front of this

6    vehicle, where I saw this horrific accident.  And then I saw

7    the gentleman crushed in the driver's seat of this vehicle

8    right here.

9      Q      I'm going to put down People's number 1 for a

10   moment, sir.

11            I'm going to go to People's Exhibit number 5A and

12   B.  Mr. Ierardi, do you recognize what is depicted in

13   People's Exhibit number 5?

14     A      Yes.  This is the limousine and the driver's side

15   of the vehicle at the accident scene that I drove up on.

16     Q      Is the area of the driver's door, or where it

17   should be illustrated, in People's Exhibit number 5?

18     A      I'm sorry, is this 5 or is this 5?

19     Q      People's Exhibit number 5, can you see where the

20   limousine driver's door should be on that photograph?

21     A      Yes, I do.

22     Q      Is that -- can you indicate for the jury, please,

23   where did you walk up to after you came around the front of

24   the limousine?

25     A      Right here.

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Direct - McCormick

1     Q    Indicating, for the record, about a third of the

2    way up on the left side of the photograph, right at the

3    corner of the limousine?

4    A    If I could say -- could I explain it a little

5    further? I was physically standing here, with the

6    transmission fluid. I was definitely standing in this spot,

7    and I was observing the crushed gentleman in the driver's

8    seat.

9    Q    I'm going to go to People's Exhibit number 6 in

10    evidence. Mr. Ierardi, do you recognize People's Exhibit

11    number 6?

12    A    Yes, I do.

13    Q    Is that the same limousine that you had been

14    referring to?

15    A    Same limousine; same accident.

16    Q    Is the puddle of fluids that you were referring

17    to visible in that photograph?

18    A    Yes, they are. They are right here on the

19    bottom, in the middle of this picture.

20    Q    Indicating a brown spot toward the center of the

21    photograph.

22    Mr. Ierardi, can you -- is Mr. Rabinowitz visible

23    in this photograph?

24    A    I believe this is his -- this is the gentleman

25    right here.

1    Q    Mr. Ierardi, if you could tell me what it is that

2    you are pointing to?

3    A    Right here.

4         MS. McCORMICK:  Your Honor, indicating a

5    black object in the vicinity of an upside-down "V"

6    shape in the center of that photograph.

7    Q    When did you observe, Mr. Ierardi,

8    Mr. Rabinowitz, as you walked up to that vehicle?

9    A    As I walked up to him, there was, there was an

10   arm that appeared to be sitting straight up.  I didn't see a

11   hand.  The sleeve was all there.  I believe his arm was cut

12   off.  At first I think that that is why I couldn't check for

13   a pulse.

14   Q    His arm.  Was he wearing a black jacket on that

15   evening?

16   A    Yes.

17   Q    And the object that you pointed to is part of

18   that sleeve of his jacket?

19   A    I believe that is his arm, yes, ma'am.

20   Q    Now, Mr. Ierardi, referring back for a moment to

21   People's Exhibit number 1 in evidence.  From the point where

22   you made your observations of Mr. Rabinowitz, where did you

23   go next?

24   A    I -- practically all I did was really turn

25   around, basically, and went to this door of the pickup

Ierardi - Direct - McCormick

1   truck, passenger door of the pickup truck, and pulled it

2   open.

3       Q    And you were able to open the door?

4       A    Yes.

5       Q    From that pickup truck where did you next go?

6       A    Walked back to this door that is open on the

7   limousine, the rear door on the driver's side limousine, and

8   I opened that door.

9       Q    The door had been closed at the point that you

10  approached it?

11      A    Yes.

12      Q    Again, referring to People's Exhibit number 5, is

13  the door that you opened visible in the photograph, People's

14  Exhibit number 5 in evidence?

15      A    Yes.  This is the door right here.

16      Q    Indicating the door on the right-hand side of the

17  photograph.

18           As that door is open, what did you observe when

19  you opened that door?

20      A    Like I said, there was nobody on the seat when I

21  opened the door.  But there was people toward, in this area,

22  this compartment area of the limousine.

23           At the time I couldn't tell you how many people.

24  I knew there was more than one person.  Like I said, the guy

25  was upside-down, like hanging.  His legs were up in the air.

Ierardi - Direct - McCormick

1    I don't know what was supporting him from underneath.

2         Q    Indicating, for the record, that where you saw

3    the people is toward the middle, front portion of the

4    windows that are illustrated in the photograph on the

5    driver's side?

6         A    Yes.

7         Q    Those are the intact windows on the driver's

8    side?

9         A    Right.

10        Q    I want to take you back one moment, Mr. Ierardi,

11   to the pickup truck, People's Exhibit number 11B in

12   evidence.

13             This is the driver's side of that pickup truck;

14   is that correct?

15        A    That's correct.

16        Q    And it is your testimony that you were not there,

17   but another person was on this driver's side?

18        A    Yes.

19        Q    Did you ever walk to that side and observe

20   whether that door was open?

21        A    Never.

22        Q    Referring then to People's number 10 in evidence.

23   What does this photograph depict, sir?

24        A    That's the passenger side door of the pickup

25   truck.  That's the door that I opened, and I smelled the

Ierardi - Cross - LaMagna

1    alcohol, and observed the gentleman sitting over there as

2    squished, trapped inside.

3         Q    I think that we are going to leave it at that,

4    Mr. Ierardi.  Thank you.

5              MS. McCORMICK:  I have no further questions.

6              (Whereupon, the witness steps back into the

7         witness box the witness.)

8              MR. LaMAGNA:  May I, your Honor?

9    CROSS-EXAMINATION

10   BY MR. LaMAGNA:

11        Q    Good afternoon, Mr. Ierardi.

12        A    Sir.

13        Q    My name is Stephen LaMagna.  I'm an attorney.

14   I'm just going to ask you a couple of questions here this

15   morning, if you don't mind.

16             You said that you left Brooklyn around 1:15; is

17   that correct?

18        A    That's correct.

19        Q    And you ended up you were going south on the

20   Meadowbrook Parkway; is that correct?

21        A    That's correct.

22        Q    And would it be fair to say that you -- were you

23   the first car to arrive at the accident scene?

24        A    I was definitely the first car that pulled over

25   behind or alongside of this accident scene, yes.

Ierardi - Cross - LaMagna

```
 1        Q     It would be fair to say that the accident had

 2   occurred recently from when you arrived, correct?

 3        A     Definitely.

 4        Q     And all of the testimony that you had given today

 5   is based upon your observations of the scene after the

 6   accident occurred, correct?

 7        A     Yes.

 8        Q     And you didn't see the accident occur, did you?

 9        A     No.

10        Q     So it would be fair to say that anything that,

11   any observations that you made were subsequent to the

12   accident occurring, correct?

13        A     Yes.

14        Q     And you have no personal knowledge as to how the

15   accident occurred, correct?  You didn't see it?

16        A     I did not see the accident, no.

17        Q     You have no personal knowledge of the

18   circumstances that occurred prior to the accident occurring,

19   correct?

20        A     Correct.

21        Q     And you have no personal knowledge of the

22   circumstances occurring prior to the accident, why the

23   accident occurred, correct?

24        A     Why the accident occurred?

25        Q     Any personal knowledge of any of the
```

Ierardi - Cross - LaMagna

1    circumstances concerning why the accident occurred, right?

2        A    No.

3        Q    So it would be fair to say that all of your

4    observations are with respect to the accident after it

5    occurred, correct?

6        A    Yes.

7        Q    Now, you said that at one point you were at the

8    passenger side door of the pickup truck, correct?

9        A    Yes.

10       Q    And at that time you said that there was another

11   individual at the driver's side of the pickup truck?

12       A    Yes.

13       Q    And you don't recall whether that was a police

14   officer or a civilian, correct?

15       A    Correct.

16       Q    But it appeared that that person was talking to

17   the driver of that car, correct?

18       A    I don't know what that man was doing.

19       Q    Well, then I'm mistaken.  I thought that you said

20   that that person was talking?

21       A    He may have been, but I don't know what he was

22   talking about.

23       Q    You don't recall?

24       A    I don't have personal knowledge.  No, I didn't

25   hear anything.

GIGI WRIGHT, RPR    (516) 571-2503

Ierardi - Cross - LaMagna

1        Q      In fact, you said you were only in that spot by

2    the passenger door for less than ten seconds, correct?

3        A      Yes.  Approximately ten seconds.

4        Q      That's a very short period of time?

5        A      Yeah.

6        Q      And you heard some sounds coming from the driver,

7    correct?

8        A      Yes.

9        Q      Did you hear any moaning or groaning or anything

10   like that, or you can't be sure?

11       A      I heard muttering.  I don't know if he was

12   moaning, groaning.  I don't know.

13       Q      That is what I am saying:  You don't know for

14   sure what that was?

15       A      No.

16       Q      And you don't know what, if anything, the other

17   person may have been saying, correct?

18       A      Correct.

19       Q      Now, you also said that there were two other

20   people, if I am correct.  Did you know who they were?

21       A      No, I don't.

22       Q      Male or female?

23       A      No.

24       Q      Were there --

25       A      Could you ask the question again, please?

Ierardi - Cross - LaMagna

1     Q     Was there two other people that you said that you

2     saw on the side of the road?

3     A     Yes, I did.

4     Q     And there were other people that drove up on the

5     accident, or you assume that?

6     A     I don't know where they came from.  They were

7     standing there.  I know that for sure.  I know.  I have

8     personal knowledge.

9     Q     And you didn't ask any questions of the

10    individual in the car, Mr. Heidgen?

11    A     No.

12    Q     And that was about less than ten seconds,

13    correct?

14    A     I would say yes, ten seconds.

15    Q     I have nothing further, Judge.

16          MS. McCORMICK:  No redirect, your Honor.

17          THE COURT:  Thank you.

18          (Whereupon, the witness exits the courtroom.)

19          THE COURT:  Your next witness.

20          MS. McCORMICK:  Your Honor, the People call

21    Officer Christopher Pandolfo.

22          COURT OFFICER:  Step up.  Remain standing,

23    raise your right hand and face the clerk.

24    C H R I S T O P H E R   P A N D O L F O,

25          a witness called on behalf of the People,

GIGI WRIGHT, RPR   (516) 571-2503

P.O. Pandolfo - Direct - McCormick

1          having been first duly sworn by the Clerk of

2          the Court, was examined and testified as

3          follows:

4              THE CLERK:  Put your hand down.  State your

5          name, spelling your last, shield number and command for

6          the record.

7              THE WITNESS:  Police Officer Christopher

8          Pandolfo, P-A-N-D-O-L-F-O.  My command is Freeport

9          Police Department, shield number 132.

10             THE CLERK:  Thank you.

11  DIRECT EXAMINATION

12  BY MS. McCORMICK:

13     Q     Good afternoon, Officer Pandolfo.

14     A     Good afternoon.

15     Q     Officer, how long have you been employed as a

16  police officer?

17     A     Nine and-a-half years.

18     Q  -- Were you working as a Freeport Police Officer on

19  the overnight between July 1st 2005 and July 2nd 2005?

20     A     Yes, I was.

21     Q     Do you remember what tour of duty you were

22  working?

23     A     Seven p.m. to 7 a.m.

24     Q     Officer Pandolfo, did you have occasion to become

25  involved in an investigation of a collision that occurred on

P.O. Pandolfo - Direct - McCormick

1    the southbound Meadowbrook Parkway in the vicinity of

2    Babylon Turnpike overpass, around 2 o'clock in the morning?

3         A    Yes, I did.

4         Q    Can you tell the jury, please, how did you get

5    involved in the investigation of that crash?

6         A    I was on patrol at about 2:05 a.m., and a citizen

7    flagged me down on Sunrise Highway and said there was a bad

8    accident on the Meadowbrook Parkway, north of Merrick Road.

9    He said there were no police there yet and it looked pretty

10   bad.

11        Q    Did you get the name of the person who flagged

12   you down?

13        A    No, I did not.

14        Q    You have no idea what they witnessed?

15        A    No.

16        Q    What did you do in response to that information?

17        A    I notified my command that I was going to respond

18   to the Meadowbrook for a possible accident.

19        Q    How did you get there?

20        A    I made a U-turn on Sunrise Highway, and went down

21   south on Sunrise toward Merrick Road.  I didn't see

22   anything.  I made a U-turn on Merrick Road, southbound --

23   excuse me -- northbound on the Meadowbrook.  As I approached

24   Babylon Turnpike I noticed an accident on the other side of

25   the road, in the southbound lanes.  So I had to proceed up

P.O. Pandolfo - Direct - McCormick

1    the Meadowbrook to make a U-turn over the median.

2        Q    Officer Pandolfo, as you came up the northbound

3    side was there anything obstructing your view of the

4    southbound lanes?

5        A    There was some brush, some trees.

6        Q    So your first view of this crash, can you

7    describe your vantage point from the northbound lanes?

8        A    It was kind of behind me when I saw it.  I had to

9    kind of turn my head to the left to see it.

10        Q    Such as looking over your shoulder?

11        A    Yeah.

12        Q    And so what portions of the vehicles did you

13    first observe from the northbound lanes?

14        A    The rear portions of the vehicles.

15        Q    And could you tell -- did you see any of the

16    damage to the vehicles at that point?

17        A    Not at that point, no.  I just saw them stopped

18    in the roadway.

19        Q    What did -- what did you do after that?

20        A    I proceeded at a high rate of speed so I could

21.    make a U-turn on the parkway.

22        Q    And was there a location to make a U-turn?

23        A    There was.  It was maybe three-quarters of a mile

24    further north on the parkway where I found the grass open to

25    make a U-turn over the median.

P.O. Pandolfo - Direct - McCormick

1        Q    What did you do next?

2        A    I proceeded down the left-hand lane, the

3    southbound lanes, and stopped my vehicle.  I went past

4    another police car that was by the exit to the Babylon

5    Turnpike, and I proceeded toward the accident scene.

6        Q    Do you remember where it is that you came to stop

7    at the accident scene?

8        A    I was in the left lane, approximately a hundred

9    feet behind the limousine.

10       Q    And as you approached that crash scene from

11   behind what did you observe about the crash scene now from

12   this vantage point?

13       A    I observed the limousine in the right-hand lane,

14   a pickup truck on the left, and I observed a female sitting

15   against a guardrail of the parkway.

16       Q    What did you do when you got out of your police

17   car?

18       A    I started to approach the female.  A civilian in

19   a white shirt approached me and said, "This is my family.

20   I'm on the job."

21       Q    What does it mean "on the job"?

22       A    He is an officer, a police officer.

23            I approached the female, and as I approached her

24   I asked her if her and her child were okay.

25       Q    What next?

P.O. Pandolfo - Direct - McCormick

1     A     When I got closer I noticed that she was holding

2     her -- she was holding just her kid's head.

3     Q     Officer, did you -- what did you do after you

4     made that observation?

5     A     I radioed for help.  But I heard screaming coming

6     out of the limousine back door that was open.

7     Q     When you say you radioed for help, was that a

8     radio you had on you, or did you have to go back to your

9     car?

10    A     It was my hand-held radio.

11    Q     And you radioed for additional assistance?

12    A     That's correct.

13    Q     Did you proceed -- where did you proceed?

14    A     I went to the limousine and I looked in the back

15    of the limousine and I saw some bodies up toward the front

16    of the limousine with some pretty bad injuries to them.

17    Q     Were you able to observe the injuries from your

18    location?

19    A     I saw leg injuries, saw bad leg injuries.  A lot

20    of screaming.

21    Q     Was the door of the limousine open or closed as

22    you approached it?

23    A     It was open.

24    Q     Do you recall which door you approached, the

25    driver's side or the passenger side rear?

P.O. Pandolfo - Direct - McCormick

1    A    It was the driver's side rear door.  It was

2  opened up all the way.

3    Q    Did you actually physically enter the limousine

4  or did you just look in it?

5    A    I just looked in it.

6    Q    Did you have any conversation with any of the

7  parties in that limousine?

8    A    No.

9    Q    What did you do next, Officer?

10   A    I proceeded up toward the front of the limousine,

11  and I was checking for the driver.

12   Q    Did you arrive at the area of the driver's door?

13   A    Yes.

14   Q    And can you tell the jury, please, what did you

15  observe upon arriving at that location?

16   A    The front of the car was completely, completely

17  destroyed.  I haven't seen anything like that since Ground

18  Zero.  It was --

19            MR. LaMAGNA:  Objection.

20            THE COURT:  Overruled.

21   A    It was crushed so bad that the cabin of the car

22  was completely pushed in.  And I observed a part of an arm

23  sticking out of the limousine.  I could barely see a little

24  bit of the skin of the driver.

25   Q    When you say "the skin" you are referring to the

P.O. Pandolfo - Direct - McCormick

1    side of his face?

2         A     That's correct.

3         Q     Did you check for any signs of life of that

4    driver?

5         A     No, I did not.

6         Q     Why was that?

7         A     It was so bad.  There was no way.  He was gone.

8         Q     What did you do after after making those

9    observations, Officer?

10        A     I called again, because now I was standing in a

11   puddle of gasoline, to hurry the fire department up or get

12   more personnel here.

13        Q     What was your concern?

14        A     That the car is going to go on fire and these

15   people in the back are going to be trapped.

16        Q     So you radioed a second time?

17        A     I got on the radio again.  I said "gasoline

18   leaking," and I got out of the puddle and walked around to

19   the front of the pickup truck.

20        Q     When you approached the two vehicles on the scene

21   can you please describe for the jury how the pickup truck

22   appeared to you at that crash scene?

23        A     The pickup truck was right next to the limousine.

24   They were both facing the southbound lanes.  The pickup

25   truck had severe front-end damage.

P.O. Pandolfo - Direct - McCormick

1    Q    Officer, as you walked up on that crash scene did

2    you know what had happened there?

3    A    I didn't have a clue at that point.  I had no

4    idea.  I knew it was a head-on collision.  I didn't know how

5    it happened, no.

6    Q    Is it fair to say that both vehicles were facing

7    in what should have been the correct direction of travel at

8    that point?

9    A    Yes.

10   Q    When you left the limousine and you went to the

11   pickup truck can you tell the jury where it is that you

12   actually went to the pickup truck?

13   A    I jumped on the guardrail with the pickup, on the

14   parkway, and I was holding onto the driver's door of the

15   pickup truck.

16   Q    You were on the guide rail itself?

17   A    I was standing on the guardrail holding the door

18   frame.

19   Q    So you were at the, directly at the driver's

20   door?

21   A    That's correct.

22   Q    Do you recall, Officer, as you approached that

23   vehicle, making any observations about any sounds?

24   A    I don't recall any sounds at all, no.

25   Q    Any radio?

1        A        Just screams.  I heard my radio going off.

2    People were asking where I was, what do you got, you know.

3    But no sounds coming out of the truck besides the screaming.

4        Q        Was the window of the pickup truck on the

5    driver's side open or closed?

6        A        It was open.

7        Q        Do you know whether it was open from having been

8    broken open or whether it was just open?

9        A        It just appeared open.  I didn't see any glass on

10   the door frame.  I didn't see any glass in there at all.

11       Q        What was your purpose in holding onto the guide

12   rail and hanging onto the door frame at that point?

13       A        The way the pickup was the door was kind of bent

14   outwards.  It seemed to me to be the easiest way to get into

15   the truck.

16       Q        What did you observe as you looked into that

17   pickup truck?

18       A        I saw a male white.  The dashboard was completely

19   pushed way up.  I could see it was pushed up.  I looked at

20   him, his legs.  His legs were, I thought they were snapped

21   in half.  They were completely bent apart.

22       Q        It would be fair to describe them as in a split

23   position?

24       A        Yes.  They were way far apart.

25       Q        Were his legs extended or bend at the knees in

GIGI WRIGHT, RPR    (516) 571-2503

1    that position?

2        A    They were bent at the knees.

3        Q    Was he moving at all?

4        A    He was moving, but wasn't flailing about in the

5    truck or anything, no.

6        Q    Could you describe his movements?

7        A    Just head movements, minor movements.  Nothing

8    with his hands.

9        Q    Officer Pandolfo, do you recall whether there was

10   any other person on the other side of the vehicle while you

11   were standing there?

12       A    Not at that time.  There was still nobody that I

13   saw with a uniform yet at the scene.

14       Q    Officer, did you make any additional observations

15   of that driver of the pickup truck from the window of the

16   driver's side window?

17       A    His head was down.  He was really pushed up in

18   the vehicle.  His eyes were open.  He was just gazing

19   straight ahead.

20       Q    Did you try to converse with him?

21       A    Yes.

22       Q    Can you convey to the jury the nature of that

23   conversation?

24       A    I was asking him questions, "Are you okay?  What

25   happened?"  I was shouting because I wasn't getting a

P.O. Pandolfo - Direct - McCormick

1    response.  I reached in the truck and I grabbed him.  I put

2    my hand on his shoulder and I finally got somewhat of a

3    response from him.

4         Q    What did he respond to you?

5         A    It was a very low, slurred mumble, "I don't know

6    where am I.  What happened?"  Some moans and that was it.

7         Q    Did you make any observation of the smell from

8    inside of that vehicle?

9         A    When I was in the cab with him, he smelled like

10   liquor.  It was -- there was a smell of liquor coming out of

11   him.

12        Q    Any observations about his eyes?

13        A    Very glassy, very little movement, just glassed

14   over.

15        Q    Did you attempt to get the driver of that pickup

16   truck out of the pickup at that point?

17        A    No.  I just told him to hold on.  I have help

18   coming.  I believe at that point either my sergeant showed

19   up or another officer showed up, and I started telling him

20   what was going on.

21        Q    Officer Pandolfo, could you describe in terms of

22   not the person, the physical appearance of the person you

23   saw behind the wheel of the pickup truck on that night?

24        A    He had a small cut on his chin.  That was it.

25        Q    How old was he?  Male?  Female?

1     A     Male, mid-20s.  Male white, dark hair, thin.

2     Q     Officer, I would ask you to take a look around

3  the courtroom today.  I ask you:  Do you see the person in

4  this courtroom as you observed him behind the wheel of the

5  pickup truck on the overnight of July 1st to July 2nd 2005?

6     A     Yes.  He is wearing a blue Blazer with a tie,

7  white shirt.  He is in the middle over here.

8              MS. McCORMICK:  Your Honor, I ask that the

9         record indicate that the witness has identified the

10        defendant.

11             THE COURT:  The record will so indicate.

12             MS. McCORMICK:  Thank you.

13     Q     Did there come a time at which you left that

14  position next to the pickup truck?

15     A     Yes.  When Officer Nolan came by, I walked around

16  to the front.  He came up to the passenger side.  I told him

17  what we had with Mrs. Flynn, and in the limousine.  I said,

18  "We got to get some more people here."  At that point other

19  personnel, fire, rescue, started showing up.

20     Q     What did you do next?

21     A     At that point as the fire department was coming I

22  know other officers were approaching.  I was trying to give

23  them a heads up of what is going on here, and the severity

24  of it and to just be prepared.  You know, it is not good.

25     Q     Officer, when you came around the front of the

1   pickup truck did you make any observations about any of the

2   contents of the pickup truck?

3        A    There was a blue tackle box laying on the

4   highway.

5        Q    Next to the pickup truck?

6        A    Yes.

7        Q    Did you make any observations of anything

8   contained in the bed of the pickup truck?

9        A    There were fishing poles in the back of the

10  pickup truck.

11       Q    You were in contact with other emergency workers.

12  What did you physically do after you had that contact?

13       A    As they were approaching the limousine, the

14  D.O.A., they cut him out, meaning the driver of the

15  limousine.  At that point I don't know where I was.  I was

16  telling people what was going on as they were arriving.

17       Q    Did you participate in any additional way in this

18  scene?

19       A    I was doing what I could do, getting stretchers,

20  directing people.  The next thing I remember doing, I

21  remember Mr. Heidgen, he was laying in the roadway, and a

22  fire truck was coming right at him.  I was trying to back

23  him off.  I didn't know if he was going to run him over or

24  not.  It was chaos.

25       Q    The overall scene was chaotic?

P.O. Pandolfo - Direct - McCormick

1      A      Unbelievable chaos.

2                    MR. LaMAGNA:  Objection.

3                    THE COURT:  Overruled.

4                    In view of the hour, I think that we are

5      going to break at this time until 2 o'clock.

6                    Ladies and gentlemen, you know all of the

7      admonitions:  Don't talk about the case.  Don't go to

8      the scene.  Don't let anybody talk to you about the

9      case to avoid any appearance of impropriety.

10                   Have a nice lunch.  I ask you to be promptly

11     here at 2 o'clock.  Have a nice lunch.

12                   (Whereupon, the jury exited the courtroom and

13     a luncheon recess was held.)

14                              o0o

15                   A F T E R N O O N   S E S S I O N

16                              o0o

17                   (In open court.  Defendant present.)

18                   THE COURT:  Produce the jury, please.

19                   (Whereupon, the jury entered the courtroom,

20     and upon taking their respectives seats, the following

21     occurred:)

22                   THE CLERK:  Case on trial, Indictment 1910 of

23     2005, People versus Martin Heidgen.

24                   People ready?

25                   MR. HAYDEN:  Ready, your Honor.

P.O. Pandolfo - Direct - McCormick

1            THE CLERK:  Defense ready?

2            MR. LaMAGNA:  Defendant is ready, your Honor.

3            THE CLERK:  Defendant is present; and the

4       jurors are seated your Honor.

5            THE COURT:  Welcome back.  Could we get the

6       witness back on the stand.

7            THE CLERK:  You are reminded you are still

8       under oath.

9  BY MS. McCORMICK:

10      Q     Good afternoon, Officer.

11      A     Good afternoon.

12      Q     Officer, I believe when we left off you were at

13  the point where you had left the pickup truck.  Do you

14  recall that in your earlier testimony?

15      A     Yes.

16      Q     Can you tell the jury, please, did you

17  participate at all in the extrication of any of the victims

18  in this case?

19      A     Yes.  Mrs. Tangney.

20      Q     Can you describe how that was accomplished and

21  what your role was?

22      A     E.S.U. came with a cutting tool and they cut up

23  the side of the limousine.  A couple of fire department

24  personnel went into the limousine with a backboard, and got

25  her onto the backboard.  We pulled her out of the limousine

1    and placed her on the stretcher.

2        Q    From that point was she carried to an ambulance?

3        A    Yes.

4        Q    Were you part of that or you stayed with the

5    vehicle?

6        A    No, I stayed with the vehicle.

7        Q    When they cut open the side of the limousine,

8    Officer, could you describe for the jury, please, what you

9    saw as they folded down the side of that limousine?

10       A    Mrs. Tangney had very severe injuries to her

11   thighs.  There was bone hanging out and flesh was hanging

12   down.

13       Q    Her bones were protruding from her legs?

14       A    Yes.

15       Q    Both legs, Officer?

16       A    I don't recall both.  I remember the one leg, the

17   side I saw.

18       Q    What was she doing when you observed her?

19       A    She was in a lot of pain.

20       Q    After Mrs. Tangney was removed from the vehicle

21   what did you do next?

22       A    We placed her on a stretcher.  Some other

23   personnel took her away, and I stayed at the side of the

24   limousine.

25       Q    Did there come a time when you left from that

1  crash scene?

2       A     I looked inside of the limousine and I observed

3  Katie Flynn's remains.  And that was it for me.  I walked

4  away from the scene and went back to my car.

5       Q     Did you leave the scene at that point?

6       A     I was taken out of there.

7       Q     You were taken out of there?

8       A     My sergeant and another partner just got me out

9  of the scene.

10            MS. McCORMICK:  Again, your Honor, I would

11       ask permission to show the witness a series of

12       photographs to aid the witness in describing the events

13       of that evening for the jury.  May the witness step

14       down from the box?

15            THE COURT:  Sure.

16            MS. McCORMICK:  Thank you.

17            (Whereupon, the witness steps down into the

18       well of the courtroom.)

19       Q     I am going to show you what has been moved in

20  evidence as People's Exhibit 1 in evidence.  And I am going

21  to ask you, utilizing the photograph, Officer Pandolfo, can

22  you please show the jury where it is that you parked your

23  vehicle as you arrived at this crash scene?

24       A     My vehicle was in the left lane, about a hundred

25  feet behind the limousine, approximately.

1    Q    Indicating for the record about one-third from

2    the right-hand corner of the photograph, and behind a person

3    who is walking, wearing a blue shirt and white shorts.  So

4    outside of the view of the photograph, actually?

5    A    Yes.

6    Q    Can you show the jury, please, after you parked

7    your vehicle where did you proceed?

8    A    I went directly to Mrs. Flynn.

9    Q    Indicating for the record in the top right-hand

10   corner of the photograph.  There are a couple of police

11   officers huddled over a person at the side of the road?

12   A    Yes.

13   Q    And the officers were not there at the time that

14   you arrived; is that correct?

15   A    No.  I was there by myself.

16   Q    You had a conversation with Mrs. Flynn at that

17   point.  And from there where did you go?

18   A    I proceeded to the rear door of the limousine

19   here.

20   Q    Was the door open or closed?

21   A    It is like it is now.

22   Q    The back of this crash scene, as you approached

23   it, were you aware of the severity of the damage to these

24   vehicles from behind?

25   A    No, not at that point.

P.O. Pandolfo - Direct - McCormick

1    Q    Did there appear to be any damage at all from

2  behind?

3    A    The back of the car was pretty much intact.  I

4  noticed some damage to the pickup truck, the way it was

5  folded, the way the truck was folded in half.

6    Q    Do you recall, Officer, whether or not the

7  limousine had both of its passenger compartment doors still

8  attached to it as you approached that limousine?

9    A    I recall the passenger side of the door was still

10  closed.

11    Q    Still closed?

12    A    Still closed.

13    Q    As you walked up to the limousine, indicating in

14  the photograph the open door, I believe there is a fireman

15  standing at that open door in the photograph, can you tell

16  the jury what it is that you did as you approached the

17  closed door of the limousine?

18    A    The closed door?

19    Q    It was closed when you came up to it, correct?

20    A    This door here was open.

21    Q    It was open?

22    A    Open.

23    Q    Excuse me.  What did you do?

24    A    I looked inside of the limousine.

25    Q    At that point you observed that there were

P.O. Pandolfo - Direct - McCormick

1    additional victims inside of the limousine?

2        A    There were bodies tangled up in the front of the

3    limousine.

4        Q    And, Officer Pandolfo, where did you proceed from

5    that location?

6        A    I went around here, and I went to the driver's

7    compartment.

8        Q    And just for the purposes of, while I have this

9    photograph up, I will be showing you more photographs, can

10   you show the jury, using this photograph, where you went

11   from the area of the driver's door of the limousine, where

12   did you go next?

13       A    I came around the front of the pickup truck to

14   right here.

15       Q    Indicating on the right side of the photograph

16   there is a guide rail that continues outside of the view of

17   the photograph, but right next to the driver's door is it

18   fair to say that this guide rail is where you went to?

19       A    Yes.

20       Q    The one closest to the driver's door?

21       A    Yes.

22       Q    It is from that vantage point that you made your

23   observations of the defendant?

24       A    Yes.

25       Q    Were you able to see the defendant?

P.O. Pandolfo - Direct - McCormick

1     A     Yes.

2     Q     What were the lighting conditions at that

3    location at that time?

4     A     There was visibility.  You could see.  It wasn't

5    pitch black, from what I recall.

6     Q     Did you have a flashlight or you were just using

7    the lit roadway?

8     A     At that point it was the roadway.

9     Q     From the pickup truck where did you proceed from

10   there at this crash scene?

11    A     Other officers started arriving.  I believe I

12   went back on top of the guardrail yelling to two other guys

13   I saw, two other cops coming toward me, I was trying to tell

14   them what was going on.  And I believe my sergeant went back

15   to Mrs. Flynn, and another officer went to the side door

16   here.

17    Q     Could you explain to the jury, if you know, what

18   this object in the center of the photograph is next to the

19   limousine driver's door?  You don't know?

20    A     This here?

21    Q     Yes.

22    A     It looks like a stretcher.

23    Q     Was that object in place when you first arrived

24   on this crash scene?

25    A     No.  None of these people were here at all.

1    There was no stretcher there.

2        Q      Was the tire visible in this photograph, off and

3    lying flat, in the manner it is depicted in this photograph?

4        A      Yes.

5        Q      Was the damage to the front of this limousine, is

6    that accurately reflected as you recall it from that night?

7        A      Yes.

8        Q      And at the point that you observed the limousine

9    there had been no attempt to get Stanley Rabinowitz out of

10   the driver's seat; is that correct?

11       A      None.  No.

12       Q      Was there enough space to remove Mr. Rabinowitz

13   at the time that you came on the crash.  Was there enough --

14   withdrawn.

15              From the physical configuration of the vehicle

16   could he have been moved without altering the vehicle?

17       A      Not a chance.  He was totally crushed in there.

18   The only thing you could see was his arm.

19       Q      Referring to now to People's Exhibit number 5 in

20   evidence.  Do you recognize People's Exhibit number 5.

21       A      Yes.

22       Q      Does the width and shape of the driver's door of

23   the limousine depicted in that photograph accurately

24   represent what you viewed on July 2nd 2005?

25       A      Yes.

1        Q     And, again, to the rear of the limousine, on the

2     right side of the photograph, there is an open door into the

3     passenger compartment. Do you see that?

4        A     Yes.

5        Q     You will note that there is no one visible in

6     that photograph; is that correct?

7        A     Correct.

8        Q     Is that your first observation inside of that

9     limousine?

10       A     Yes.  It looks like the door is already open on

11    the other side.

12       Q     At the time that you saw it it was closed on the

13    other side?

14       A     Yes.

15       Q     Referring next to People's Exhibit 6 in evidence.

16    Again, what is that a photograph of?

17       A     This is Mr. Rabinowitz crushed in the car, his

18    shoulder sticking out of his elbow.

19       Q     Is that as you observed him on July 2nd 2005?

20       A     Yes.

21       Q     People's Exhibit 11 in evidence.  What is that a

22    photograph of, Officer?

23       A     The pickup truck that was involved in the

24    collision.

25       Q     Specifically, Officer, is the driver's side door

1    visible in this photograph?

2         A    Yes.

3         Q    Was that door in that condition at the time that

4    you approached it?

5         A    Yes.

6         Q    It was hanging off in that manner as is

7    illustrated in the photograph?

8         A    Yes.

9         Q    Visible in this photograph, Officer, is a guide

10   rail adjacent to the pickup truck.  Is that the guide rail

11   you stood on to reach into that vehicle?

12        A    Yes.

13        Q    Is the configuration of the seats visible in

14   front of this pickup truck as you observed them when the

15   defendant was still in the pickup truck?

16        A    Yes.

17        Q    And do you know how the defendant was removed out

18   of the pickup truck?

19        A    They slid him out the passenger side door.

20        Q    This side of the vehicle was untouched to your

21   knowledge at that time?

22        A    Yes.

23        Q    People's Exhibit 10 in evidence.  Is this your

24   observation?  I believe you testified that you came back

25   around the pickup truck.

P.O. Pandolfo - Direct - McCormick

1      A      At one point I came back around the pickup.

2      Q      And did you observe anything that is reflected in

3      this photograph?

4      A      The fishing tackle box.

5      Q      And you are referring to a blue box that is

6      located right behind the front of the wheel?

7      A      Yes, ma'am.

8      Q      People's Exhibit 3 in evidence.  Officer

9      Pandolfo, you said that you participated in the extrication

10     of Mrs. Tangney.  Is that what is depicted in this

11     photograph?

12     A      Yes.

13     Q      Are you actually present in this photograph?

14     A      I'm standing right here, where the side of the

15     car was cut off.

16     Q      Indicating for the record the person who is

17     framed within the lights of the rear of an ambulance in that

18     photograph.  Is that accurate?

19     A      Yes.

20     Q      And are you at this time working on getting

21     Mrs. Tangney out of this vehicle?

22     A      I believe the stretcher was in place or just

23     going for the stretcher.  I'm not sure exactly what was

24     going on at that point.

25     Q      Do you know what the fire personnel are doing on

GIGI WRIGHT, RPR    (516) 571-2503

P.O. Pandolfo - Direct - McCormick

1    the driver's side of the vehicle at this point?

2         A    It looks like they started to extricate

3    Mr. Rabinowitz, but I didn't witness any of that.

4         Q    You were on the other side of the car?

5         A    Other side of the car and I walked away after

6    that.

7         Q    And People's Exhibit 7 in evidence.  Officer

8    Pandolfo, why don't you tell the jury what this photograph

9    depicts?

10        A    After we removed Mrs. Tangney they took the

11   backboard.  Katie's body was over here and Mr. Rabinowitz.

12   You could see the other side of his face.

13        Q    Indicating for the record, Judge, pointing to an

14   area covered in the photograph with a white sheet, in front

15   of the bench seat that is behind the driver's compartment,

16   as the area where Katie's remains are located?

17        A    Yes.

18        Q    To your knowledge is she still in the car in this

19   photograph?

20        A    Yes.

21        Q    And indicating as to Mr. Rabinowitz, in the

22   driver's compartment, though I don't know what you call

23   that, the divider between the passenger compartment and the

24   driver's compartment, you can see Mr. Rabinowitz's head in

25   that area?

P.O. Pandolfo - Cross - LaMagna

1                MR. LaMAGNA:  Objection.

2        A    Yes.

3                MR. LaMAGNA:  Objection, Judge.

4        Q    With respect to this backboard.

5                MR. LaMAGNA:  She is testifying.  I would ask

6            for a question to be asked.

7                MS. McCORMICK:  I was trying to reflect it

8            for the record.  I apologize.

9        Q    With respect to the back door, was this back door

10    removed as part of the extrication?

11       A    Yes, it was.

12       Q    And this specific damage, referring in the

13    photograph to, I'm going to describe it as the peeled away

14    section, was this in this condition when you arrived at the

15    crash scene?

16       A    No.

17       Q    Was this specifically part of the extrication?

18       A    Yes.

19               MS. McCORMICK:  I have no further questions.

20            Thank you, Officer.

21               (Whereupon, the witness steps back into the

22            witness box.)

23               MR. LaMAGNA:  May I inquire, your Honor?

24               THE COURT:  Please.

25    CROSS-EXAMINATION

1    BY MR. LaMAGNA:

2        Q    Good afternoon, Officer Pandolfo.

3        A    Good afternoon.

4        Q    You know my name is Stephen LaMagna.  I represent

5    Mr. Heidgen.  I'm going to ask you a couple questions this

6    afternoon.  If you don't understand the question please ask

7    me to repeat it and I will, okay?

8        A    Okay.

9        Q    You are a member of the Freeport Police

10   Department; is that correct?

11       A    Yes.

12       Q    How long have you been a member of the Freeport

13   Police Department?

14       A    A little over nine and-a-half years.

15       Q    Prior to testifying here this morning did you

16   meet with any members of the district attorney's office to

17   go over your testimony?

18       A    This morning, no.

19       Q    Have you in the past?

20       A    Yes.

21       Q    When was that?

22       A    Yesterday afternoon.  A couple of times prior.

23       Q    Who did you meet with?

24       A    Ms. McCormick and Mr. Hayden.

25       Q    And how many times would you say you went over

P.O. Pandolfo - Cross - LaMagna

1       your testimony prior to testifying here in court?

2               A       For the trial once; I think for the hearing,

3       twice.

4               Q       Now prior to testifying here today did you speak

5       to any other members of the Freeport Police Department

6       concerning the events of July 2nd 2005?

7               A       No.

8               Q       Did you discuss anything with Police Officer

9       Nolan?

10              A       Just about the reporters outside and all of the

11      people that were watching.

12              Q       No discussions concerning the testimony of

13      yourself, correct?

14              A       No.

15              Q       Now, prior to testifying here today did you

16      review any paperwork, notes, memoranda that was created as a

17      result of this incident?

18              A       No, I did not.

19              Q       Did you review any prior testimony that you may

20.     have given under oath concerning the events of July 2nd 2005

21      that you have previously given?

22              A       Yes.

23              Q       Now, pursuant to the testimony that you gave

24      today it is clear that you did not see this accident occur,

25      correct?

P.O. Pandolfo - Cross - LaMagna

1     A     Correct.

2     Q     The accident had already occurred by the time

3     that you arrived at the accident scene, correct?

4     A     Yes.

5     Q     You can't testify with any degree of specificity,

6     from any personal knowledge, concerning the events that

7     preceded this accident, correct?

8     A     Correct.

9     Q     How the accident occurred or why it occurred,

10    correct?

11    A     Right.

12    Q     Your testimony is really related to what you

13    observed after this accident occurred, correct?

14    A     Correct.

15    Q     Now, directing your attention to July 2nd 2005.

16    You were working as a Freeport Police Officer at that time?

17    A     Yes.

18    Q     And what was your tour of duty that day?

19    A     It was 7 p.m. on the 1st until 7 a.m. on the 2nd.

20    Q     Were you alone or were you with a partner?

21    A     I was alone.

22    Q     Uniform patrol, marked car?

23    A     Yes.  Marked patrol car.

24    Q     At some point around 2:05 a.m. you were in the

25    vicinity of Sunrise Highway in Freeport, correct?

P.O. Pandolfo - Cross - LaMagna

```
 1        A     Yes.

 2        Q     By the Home Depot, I believe?

 3        A     Around there, yeah.

 4        Q     And at some point a civilian, a non-police

 5   officer, flagged you down, correct?

 6        A     Yes.  He was beeping his horn.

 7        Q     And told you there was an accident on the

 8   Meadowbrook Parkway, correct?

 9        A     Yes.

10        Q     Who was that person that articulated that to you?

11        A     A civilian.  A stranger.

12        Q     Did you take his name down or his number?

13        A     No, I did not.

14        Q     At some point you turned around and you got on

15   the Meadowbrook Parkway, correct?

16        A     Correct.

17        Q     And you arrived at the scene of the Meadowbrook

18   Parkway at the Babylon Turnpike exit, or around the Babylon

19   Turnpike exit?

20        A     Yes.

21        Q     Now, were you the first or one of the first

22   officers on the scene, if you recall?

23        A     Excuse me?

24        Q     If you recall?

25        A     There was a marked Nassau County unit by the exit
```

1    ramp.

2         Q    Which exit ramp?

3         A    On Babylon Turnpike going into Freeport.  I saw a

4    man in a blue uniform.  I didn't know if it was a county cop

5    or county court officer.  I saw a guy in a uniform waving

6    traffic off the parkway, because there was still a lot of

7    oncoming traffic.

8         Q    It would be fair to say that you were one of the

9    first police personnel at the scene?

10        A    One of the first, yes.

11        Q    That was around two, 2:10; would that be fair?

12        A    Within a minute or two of getting the call I was

13   there, yes.

14        Q    Did you get a call from the --

15        A    Well, getting notified and notifying my command

16   that I was headed there.

17        Q    After you received this statement by a civilian

18   that there is an accident you called your command; is that

19   correct?

20        A    That's correct.

21        Q    And notified them that you were going up to

22   investigate, correct?

23        A    Right.

24        Q    Now, when you arrived at the exit of Babylon

25   Turnpike and the Meadowbrook Parkway, you observed the black

P.O. Pandolfo - Cross - LaMagna

1    limousine and the Silverado, correct?

2        A    Yes.

3        Q    And you said that you approached the Silverado,

4    correct?

5        A    Yes, I did.

6        Q    And you approached the Silverado from the

7    driver's side, correct?

8        A    Yes.

9        Q    And that was by the guardrail, correct?

10       A    Yes.

11       Q    And you said you observed Marty in the driver's

12   seat, correct?

13       A    Yes.

14       Q    And at that time he was awake, correct?

15       A    He was conscious.  His eyes were open.

16       Q    He was conscious and his eyes were open, correct?

17       A    Correct.

18       Q    He was calm?  He was staring straight ahead,

19   correct?  Correct?

20       A    Yes.  There was no bodily movement.

21       Q    He wasn't yelling or screaming or anything like

22   that, correct?

23       A    No, no yelling or screaming.

24       Q    Would you describe him as being calm?

25       A    Yes.

 1      Q      Now, you say at some point you were asking him a

 2    question, correct?  Or questions, correct?

 3      A      Yes.

 4      Q      And at some point you said to him, "Are you all

 5    right," correct?

 6      A      Yes.

 7      Q      And at some point he looked up at you, correct --

 8      A      Yes.

 9      Q      -- in response to your question, correct?

10      A      Yes.

11      Q      And you asked him again, "Are you all right,"

12    correct?

13      A      Yes.

14      Q      "What happened," correct?

15      A      "Are you okay?  What happened?"

16      Q      Correct?

17      A      Yes.

18      Q      "Are you all right?  What happened"; is that

19    correct?

20      A      Yes.

21      Q      And he responded to you, correct?

22      A      Eventually, yes, he did.

23      Q      And his response to you was to, "are you all

24    right," "I don't know," correct?

25      A      "I don't know.  Where am I?"

1        Q    And "what happened?"

2        A    I don't think "what happened."  "I don't know,

3     where am I," and some groans going on.

4        Q    Do you remember testifying at a hearing back in

5     April?

6        A    Yes.

7        Q    Do you remember being asked this question:  "And

8     when you asked him if he was all right, did he respond to

9     you, `I don't know'?"

10            Your answer is, "I don't know what happened.

11     Where am I?"

12            Do you remember giving those answers?

13        A    If they are in there.  I can't exactly say --

14            MR. LaMAGNA:  Could I have it marked for

15         identification.

16        Q    I will ask you to read it and maybe it will

17     refresh your recollection.

18        A    Sure.

19            MR. LaMAGNA:  May I have this shown.

20        Q    Take a moment.  Look at the bottom of page 14

21     into page 15.

22        A    Okay.

23        Q    Did you read it?  I'll give you enough time to

24     read that.

25            Do you see the top of page 15?

P.O. Pandolfo - Cross - LaMagna

1      A     Yes, I do.

2      Q     So in response to your question -- well, does

3   that refresh your recollection as to your testimony that

4   day?

5      A     To the best of my recollection he answered back,

6   "I don't know.  Where am I?  What happened?"

7      Q     Let's just separate those three things for a

8   second.

9           So when you asked him first, "Are you all right,"

10  his response was "I don't know," correct?

11     A     Correct.

12     Q     And then he asked you two questions, correct:

13  "Where am I?" and "what happened," correct?

14     A     Yes.

15     Q     Now, when he asked you what did happen did you

16  tell him, since he didn't know what happened, what, in fact,

17  did happen?

18     A     I don't remember saying a word to him.

19     Q     You didn't respond to his question about what

20  happened?

21     A     To the best of my recollection, no.

22     Q     And when Marty asked you where am I, did you

23  articulate or answer that question?

24     A     No.

25     Q     Now, when you asked Marty those questions and he

1    asked you the questions in response was anybody else present

2    at that point?

3         A    I was still by myself.

4         Q    At that location, you were still by yourself and

5    that was at the guardrail, correct?

6         A    Correct.

7         Q    And did you ever ask any other questions after

8    you left Marty at that point?

9         A    The only thing I said to him was, "Hang in there.

10   I got help coming. I got help on the way." That was it.

11        Q    That was still at that same time that you were

12   having this conversation?

13        A    Right. Before I left though, right.

14        Q    You said, "Hang on, we are going to get some

15   help," correct?

16        A    Yes.

17        Q    So just for clarity sake, when he asked you what

18   had happened you didn't explain to him the circumstances of

19   what occurred; is that correct?

20        A    Correct.

21        Q    Now, at that point, obviously, he was clearly

22   conscious, correct?

23        A    Conscious, but very --

24        Q    He was answering your questions and asking you

25   questions?

1      A      Yes.

2      Q      Did you speak to any other police officers

3   concerning the question about what he asked you about what

4   had happened, for somebody to explain to him what happened?

5   Did you do any of that?

6      A      No.

7      Q      So -- withdrawn.

8               MR. LaMAGNA:  Nothing further, Judge.

9               MS. McCORMICK:  Just a couple.

10   REDIRECT EXAMINATION

11   BY MS. McCORMICK:

12      Q      Officer Pandolfo, I think that you described in

13   your testimony that you arrived on the scene with both

14   vehicles facing the correct way; is that right?

15      A      Correct.

16      Q      At the time that you walked over to the driver's

17   door of the pickup truck did you know what had happened?

18      A      I hadn't had a clue of what happened.  I knew it

19   was a serious head-on collision, but I didn't know how it

20   happened.

21      Q      With respect to how much time you spent at the

22   vehicle, was the defendant responsive to you?

23      A      He was responsive in a way that somebody

24   seriously hurt or intoxicated or both would respond to me, I

25   mean.

1          MR. LaMAGNA:  Objection.  Not a responsive

2     answer.

3          THE COURT:  I'll let it stand.

4     Q    Can you tell the jury what you mean by that?

5     A    I mean, from judging from the condition of his

6     body in that car, the seriousness of the accident, it was a

7     very slurred, very low, slow talking moans.  That's what I

8     mean.

9     Q    Was he wide awake?

10    A    He was awake.  He wasn't with it.  He was out of

11    it, but he was awake.

12    Q    Officer, on that scene, in terms of finding out

13    what happened to tell him, what was your first thought in

14    terms of what you had to do at that scene?

15    A    Why I didn't respond to his questions?

16    Q    Yes.

17    A    He was out of it.  He was completely out of it.

18    It was pointless.

19    Q    What was your first priority there, Officer?

20    A    To get help, to get these people out of this car.

21    I really thought that the gasoline might cause a big

22    problem.  It was very chaotic for me.  You know, it was to

23    get help for these people.  There was no one there.  At that

24    point there was nobody there.

25    Q    Thank you, very much.

GIGI WRIGHT, RPR   (516) 571-2503

1          MS. McCORMICK:   I have nothing further.

2     RECROSS-EXAMINATION

3     BY MR. LaMAGNA:

4          Q     Officer, you articulated a question to Marty,

5     correct?

6          A     Yes, I did.

7          Q     And Marty articulated a response to you, correct?

8          A     Correct.

9          Q     And his response, or at least the first response

10    to your question, "Are you all right," was "I don't know,"

11    correct?

12         A     Yes.  I understood I don't know, yes.

13         Q     Yes.  So, not only did Marty respond to your

14    question, but his answer was responsive to the question you

15    asked him; isn't that correct.

16         A     Yes.

17         Q     And then he asked you a question, correct?

18         A     Yes.

19         Q     He asked you two questions, correct?

20         A     Correct.

21         Q     He asked you "What happened?" He didn't know what

22    happened, correct?

23               MS. McCORMICK:   Objection.

24               THE COURT:   Sustained.

25         Q     He asked you what happened, correct?

1      A      Correct.

2      Q      That was a question?

3      A      Correct.

4      Q      And then he asked you "Where am I," correct?

5      A      Correct.

6      Q      So, those questions were in your -- withdrawn.

7             Were these questions, in your mind, responsive to

8    what you were asking him?

9      A      He was speaking to me.  He was alive.

10     Q      And they were responsive answers to your

11   questions, correct?

12     A      He responded to my question, correct.

13            MR. LaMAGNA:  Nothing further, Judge.

14            MS. McCORMICK:  Nothing further.

15            THE COURT:  Thank you.

16            (Whereupon, the witness exits the courtroom.)

17            THE COURT:  Next witness, please.

18            MR. HAYDEN:  Keith Rabinowitz.

19            COURT OFFICER:  Step up.  Remain standing,

20   raise your right hand and face the clerk.

21            K E I T H   R A B I N O W I T Z,          a

22   witness called on behalf of the People, having been

23   first duly sworn by the Clerk of the Court, was

24   examined and testified as follows:

25            THE CLERK:  Put your hand down.  State your

P.O. Pandolfo - Recross - LaMagna

1      name, spelling your last name for the record.

2                  THE WITNESS:  Keith Rabinowitz,

3      R-A-B-I-N-O-W-I-T-Z.

4                  THE CLERK:  Thank you, please take a seat.

5      DIRECT EXAMINATION

6      BY MR. HAYDEN:

7          Q     Good afternoon, Mr. Rabinowitz.

8                How old are you?

9          A     Thirty-two.

10         Q     What is your occupation?

11         A     Motorcycle mechanic.

12         Q     Did you know a man named Stanley Rabinowitz?

13         A     Yes.  My father.

14         Q     Is your dad dead?

15         A     Yes.

16         Q     When did he die?

17         A     He died July 2nd 2005.

18         Q     What was your father's occupation?

19         A     He was a limo driver at the time.

20         Q     How long had he been a limo driver?

21         A     Approximately seven years.

22         Q     What were his prior occupations?

23         A     He was a safety manager at Waldbaum's before

24     that, and before that he worked for Cablevision.

25         Q     What did he do for Cablevision?

1          A     He was a line technician.

2          Q     When did you last see your dad alive?

3          A     Last time I saw my father I gave him a big hug,

4     and I squeezed him and I said, "I Love you, dad," and he

5     said" I love you Keith."  It was a week before the accident,

6     and it was my engagement party.

7          Q     I'm directing your attention to around 12:49 on

8     the afternoon of Saturday, July 2nd of 2005.  Were you in

9     the medical examiner's office then?

10         A     Yes.

11         Q     Did you see your dad then?

12         A     Yes, I did.

13         Q     Describe the circumstances under which you saw

14    your father then?

15         A     I was there with my fiance, and some other family

16    members.  I told them to stay outside, everybody just stay

17    outside and I'll go in and make sure everything is all

18    right, you know.  So I could make sure that everybody would

19    be okay going in and viewing him.  And I went in and I saw

20    him lying there with the sheet up to his neck.  And there,

21    there he was.  Then I came back outside and said it was okay

22    for them to come in and view him.

23         Q     Did you identify him?

24         A     Yes.

25               MR. HAYDEN:  Nothing further, your Honor.

P.O. Nolan - Direct - Hayden

1                    MR. LaMAGNA:  Nothing, your Honor.

2                    THE COURT:  Thank you, sir.

3                    (Whereupon, the witness exits the witness

4          stand.)

5                    THE COURT:  Call your next witness.

6                    MR. HAYDEN:  Police Officer Timothy Nolan.

7                    COURT OFFICER:  Step up, remain standing,

8          raise your right hand and face the clerk.

9               T I M O T H Y   N O L A N,        a witness

10                   called on behalf of the People, having been

11                   first duly sworn by the Clerk of the Court,

12                   was examined and testified as follows:

13                   THE CLERK:  You can put your hand down.

14          State your name, spelling your last name, shield number

15          and command for the record.

16                   THE WITNESS:  My name is Police Officer

17          Timothy Nolan, N-O-L-A-N.  My shield number is 137.  I

18          work for the Freeport Police Department.

19                   THE CLERK:  Thank you.

20     DIRECT EXAMINATION

21     BY MR. HAYDEN:

22          Q    Good afternoon, Officer.

23          A    Good afternoon.

24          Q    How long have you been a member of the Freeport

25     Police Department?

P.O. Nolan - Direct - Hayden

```
 1      A      Approximately nine and-a-half years.

 2      Q      Do you know a man named Martin Heidgen?

 3      A      Yes, I do.

 4      Q      Briefly describe him.

 5      A      He is a male white, approximately 25 years old,

 6   he has dark hair.

 7      Q      Do you see Martin Heidgen in this courtroom

 8   today?

 9      A      Yes, I do.

10      Q      Please point him out and describe for the record

11   what he is wearing today.

12      A      He is sitting right there.  It looks like he has

13   a blue dress jacket on.

14                     (Witness indicating.)

15             MR. HAYDEN:  Let the record reflect that the

16        witness has indicated the defendant Martin Heidgen.

17             THE COURT:  The record will so reflect.

18      Q      I'm directing your attention to the early morning

19   of Saturday, July 2nd of 2005.  Were you working then?

20      A      Yes.

21      Q      What was your assignment that morning?

22      A      I was assigned to post number 11, within the

23   Village of Freeport.

24      Q      How were you dressed?

25      A      In full uniform.
```

1    Q    Were you using a motor vehicle?

2    A    Yes, I was.

3    Q    Describe it.

4    A    It is a marked white police car, with the decal

5    "Village of Freeport," and it has the numbers 929 on it.

6    Q    Were you working alone?

7    A    Yes.

8    Q    Describe the weather that morning?

9    A    It was hot and humid.

10   Q    Did you respond that morning to the vicinity of

11   the southbound lanes of the Meadowbrook Parkway, just north

12   of the Babylon Turnpike overpass?

13   A    Yes, I did.

14   Q    When did you arrive?

15   A    Approximately 2:05 in the morning.

16   Q    Describe the circumstances under which you

17   responded there?

18   A    I responded to the scene, because I heard a call

19   for assistance regarding a serious motor vehicle accident at

20   the location.

21   Q    Whose radio call was that?

22   A    Officer Christopher Pandolfo.

23   Q    Describe how you got to the crash scene?

24   A    I drove my police car eastbound on Sunrise

25   Highway.  There was some initial confusion regarding the

1    exact location of the accident.  I proceeded southbound on

2    the Meadowbrook Parkway and arrived at Merrick Road, where I

3    initially believed the accident was located.

4            I went over the radio, requested further

5    location.  I found out that it was closer to the Babylon

6    Turnpike exit of the Meadowbrook Parkway.  I proceeded

7    northbound, getting back onto the Meadowbrook Parkway, and

8    drove over Sunrise Highway and passed Sunrise Highway.

9    There is a grassy area.  I crossed over due to the fact that

10   I could see flashing lights just underneath the overpass of

11   the Babylon Turnpike exit at the Meadowbrook Parkway.

12       Q    You were now driving northbound along the

13   southbound parkway?

14       A    Yes.

15       Q    Where did you park when you arrived at the crash

16   scene?

17       A    I parked right underneath that Babylon Turnpike

18   overpass on the Meadowbrook Parkway.

19       Q    Where were you with relation to the crash scene?

20       A    The crash scene was approximately a hundred feet

21   in front of me.

22       Q    Did you walk toward the crash scene?

23       A    Yes, I did.

24       Q    Describe what you saw as you were walking toward

25   the crash scene?

1        A       As I walked toward the crash scene I saw two

2    vehicles:  One vehicle, a silver type pickup truck, was

3    facing directly toward me, southbound.  It had extensive

4    front-end damage.  It was stopped in the left lane, which

5    would be the lane closest to the center median.  There was

6    another vehicle that was stopped, also with severe front-end

7    damage, which was stopped in the middle lane.  Again, that

8    was facing, again, directly toward me as I was approaching

9    it.  That was a black limousine.

10       Q       Did you see a police officer in the vicinity of

11   the pickup truck?

12       A       Yes, I did.

13       Q       Who was that?

14       A       Officer Christopher Pandolfo.

15       Q       Did you see any other police officer around the

16   pickup truck then?

17       A       No.

18       Q    _  Any other person?

19       A       No.

20       Q       How about the limousine?

21       A       I saw some people passed the limousine.  I didn't

22   know who they were or with what department or affiliation

23   they had.  There definitely wasn't more than about a

24   handful, you know, two or three people that I observed.

25       Q       Describe Officer Pandolfo's location?

1    A    Officer Pandolfo, when I observed him, was

2    standing on the center median guardrail directly opposite

3    the Chevy pickup driver's side door.

4    Q    What was he doing?

5    A    He was standing right on the guardrail, and he

6    was speaking to me because I asked him what was going on and

7    what did he need me to do.

8    Q    Did you look inside of the pickup truck?

9    A    Yes, I did.

10   Q    How did you look inside of the pickup truck?

11   A    I was standing directly opposite, but I was on

12   the other side of the pickup truck, where the passenger side

13   door would be.  I looked through the passenger side window

14   directly into the cab of the pickup truck.

15   Q    Was the passenger side door open or closed?

16   A    It was closed at this point.

17   Q    Was the passenger side window up or down?

18   A    It was up.

19   Q    Did you see the defendant when you looked inside

20   of the pickup truck?

21   A    Yes, I did.

22   Q    Did you see anyone else inside of the pickup

23   truck?

24   A    Nobody else was inside.

25   Q    Describe what you saw when you looked at the

P.O. Nolan - Direct - Hayden

1    defendant?

2         A     The defendant was just sitting there.  The seat

3    on the Chevy pickup truck was countered forward.  He was

4    pushed between the dashboard and that seat.  He was

5    basically in a crouched position.  I would say kind of like

6    a baseball catcher's crouched position, with his legs spread

7    wide apart.

8         Q     Where was his head with relation to the level of

9    the dashboard?

10        A     He was, due to the fact that he was kind of

11   pushed forward and his seat was causing him to kind of get

12   really low down to the ground where the driver's feet would

13   generally be, he was probably right even with the dashboard.

14        Q     Where was his face with relation to the steering?

15        A     Due to the fact that the vehicle had sustained

16   such front-end damage, the steering wheel was just a little

17   bit off to the right, would probably be right about even

18   with that steering wheel, just to the left.

19        Q     Did you notice any injury to the defendant when

20   you saw him then?

21        A     The only injury I observed of the defendant is

22   that he had a small laceration on his chin.

23        Q     Did you look inside of the limousine?

24        A     Yes.

25        Q     Describe how you did that?

P.O. Nolan - Direct - Hayden

1      A      I walked away from the pickup truck, and walked

2      toward the limousine.  I looked through the rear passenger

3      door, which would be on the driver's side; and then I walked

4      around to look into the other rear passenger door, which

5      would be on the passenger side.

6      Q      Did you see a woman named Denise Tangney when you

7      looked inside of the limousine?

8      A      Yes.

9      Q      Had you ever seen her before?

10     A      No.

11     Q      Describe any observations you made of Denise

12     Tangney?

13     A      Mrs. Tangney was suffering what appeared to be

14     severe leg injury.  I could see a bone sticking out from one

15     of her legs.  She was screaming in obvious pain.

16     Q      Describe her location inside the limousine as

17     best you remember it?

18     A      Okay.  Her location was further up toward the

19     driver's compartment in the limousine.  There is a bench

20     seat just behind the driver, and she was on the floor in

21     front of that bench seat.

22     Q      Did you see a man named Neil Flynn when you

23     looked inside of the limousine?

24     A      Yes.

25     Q      Had you ever seen Neil before?

1      A      No.

2      Q      Describe the observations you made of Neil.

3      A      The first door that I looked in, when I left the

4      pickup truck, which was the driver's side rear passenger

5      door, he was lying on the bench seat back there, basically

6      on his left side.  He was also looking to be in obvious

7      severe pain, moaning and groaning a little bit.  Screaming

8      to his -- to someone off to the side of the road saying

9      everything will be all right.

10      Q      Did you see a man named Chris Tangney inside of

11      the limousine?

12      A      Yes.

13      Q      Had you ever seen Chris before?

14      A      No.

15      Q      Describe the observations you made of Chris?

16      A      Mr. Tangney was observed, when I went back over

17      to the passenger side door, and he was lying on the, toward

18      the rear of the vehicle, also moaning and groaning in severe

19      pain.  Looked like he also had some pretty serious leg

20      injuries.

21      Q      Did you see a woman named Jennifer Flynn with

22      remains of her daughter outside of the limousine?

23      A      Yes, I did.

24      Q      Where was Jennifer?

25      A      She was seated in the center median, leaning up

1    against the guardrail.  She was just north of the Chevy

2    pickup truck, which would be toward the rear of the Chevy

3    pickup truck.

4         Q    Did you help remove the defendant from the pickup

5    truck?

6         A    Yes.

7         Q    Describe how the defendant was removed from the

8    pickup truck?

·9         A    The defendant was, again, inside the pickup truck

10   in that catcher's-type position.  Myself and additional

11   officers secured a backboard, did some minor medical aid to

12   him, like stabilizing his neck.  We were able to slide the

13   backboard in through the passenger side door.  We slowly

14   placed him onto that backboard and, again, the officer's

15   slid him along and where I accepted him along with a couple

16   of other officers.

17        Q    When you say you stabilized his neck, did you use

18   a neck brace?

19        A    Neck brace was not used until, I believe, he got

20   put onto the backboard.  I did not put a·neck brace on him.

21   Another officer, or A.M.T., who was inside of the cab I

22   believe did.

23        Q    How did you initially try to stabilize his neck?

24        A    Well, one -- I observed one other officer get in

25   right behind, or attempt to get in behind, and hold his head

1    by his ears and his neck, just to make sure he doesn't move.

2         Q    Did you speak with the defendant after he was

3    removed from the pickup truck?

4         A    Yes.

5         Q    Describe where the defendant was when you spoke

6    with him then?

7         A    When he was slid out toward myself and other

8    officers, I was holding the backboard.  He was, again, on

9    that backboard.  We took him out of the pickup truck and

10   started moving him toward an ambulance.  We eventually got

11   to approximately ten to fifteen feet in front of the

12   limousine.

13        I was basically telling him not to move, to lie

14   down flat, because he kept on trying to lift his head up.  I

15   kept telling him to stay down.  I asked him if he was okay.

16   I asked him if anything was hurting.  He didn't respond to

17   any of my questions.  I asked if he was hurting.  There was

18   no response.

19        When I asked, are you okay, there was no

20   response.  When I placed him down onto the ground, along

21   with the other officers, I asked him what his name was.  He

22   was answering me, but his speech was severely slurred.  I

23   couldn't even understand what he was saying.  I repeated my

24   question, what his name was numerous times.  Finally, I was

25   able to get real close to him, and while I was down on my

1    knees and I could understand finally what he was saying

2    through the slurred speech, and he was saying his name was

3    Marty.

4              I then asked him, okay, Marty where are you

5    coming from and, again, with the same slurred speech,

6    difficult to hear him, I had to get really close to him,

7    kept on trying to say something.  Again I couldn't

8    understand because of his slurred, and finally I was able to

9    comprehend what he was saying, and he was saying "Long

10   Beach.  Long Beach."

11        Q    How close did you get?

12        A    I was on my knees and I had to get very close.  I

13   was at least less than a foot away.

14        Q    Your face to his?

15        A    Face-to-face, yes.

16        Q    Describe any observations you made of the

17   defendant while you were trying to speak with him at that

18   point?

19        A    Again, I didn't observe any visible injuries

20   other than a little laceration on his chin.  The smell of

21   alcoholic beverages that was coming from his mouth was

22   extremely strong.

23        Q    How about his eyes?

24        A    His eyes were glassy and bloodshot.

25        Q    Where was the defendant eventually placed after

1   being removed from the pickup truck?

2        A       An ambulance was brought from -- an ambulance was

3   brought and a stretcher was taken off that ambulance.   The

4   stretcher was taken toward him.  Myself and other officers

5   lifted the backboard up and placed him on that stretcher.

6   We then wheeled him over to the ambulance and placed him

7   inside of the ambulance.

8        Q       Did you have any further contact with the

9   defendant after he was placed in the ambulance?

10       A       No, I did not.

11               MR. HAYDEN:  Your Honor, with the Court's

12       permission, may I display four of these photographs to

13       help the officer describe what it is he is telling the

14       jury?

15               THE COURT:  Yes.

16               MR. HAYDEN:  Thank you, your Honor.

17       Q       Officer, would you please step down?

18       A       Yes.

19               (Whereupon, the witness steps down into the

20       well of the courtroom.)

21       Q       This first photograph is 10B Officer, using that

22   photograph show us where Officer Pandolfo was when you first

23   noticed him?

24       A       Officer Pandolfo would have been off this

25   guardrail that runs along here.  He would have been off

GIGI WRIGHT, RPR   (516) 571-2503

 1    directly, as I said, opposite this driver's door, standing

 2    on the guardrail.

 3         Q    Off the picture to the right as you are looking

 4    at it?

 5         A    Yes.  Right off this picture.  Right about here,

 6    standing up.

 7         Q    Describe your location using that photograph?

 8         A    Again, this door was closed.  So I was standing

 9    right outside of this door, looking directly in through that

10    passenger window.

11         Q    Describe the defendant's location?

12         A    The defendant, again, was basically crouching in

13    a baseball catcher's type position, right where the driver

14    would be.

15         Q    Where would the top of his head have been with

16    relation to this photograph?

17         A    Probably right about the very top of this area

18    right here.  It wasn't any higher.

19              MR. HAYDEN:  Let the record reflect that the

20         witness has indicated right down at the bottom of the

21         windshield.

22         Q    This is 11B.  Using that photograph please

23    describe Officer Pandolfo's location?

24         A    Officer Pandolfo was standing on this guardrail

25    right here.

P.O. Nolan - Direct - Hayden

1                    (Witness indicating.)

2        Q      Your location?

3        A      My location was on the opposite side of this

4   pickup truck.

5        Q      The defendant's location?

6        A      Again, he was right in here where the driver

7   would be.  As you see the seat is countered forward forcing

8   him into that position, the seat being forward.

9        Q      The top of his head?

10       A      Down around in this area right here.

11                   (Witness indicating.)

12       Q      This is 6B.  Using that photograph show us

13   Mr. Rabinowitz's location?

14       A      Mr. Rabinowitz was right in this area right here,

15   where the driver would be.

16       Q      Would that be his shoulder there?

17       A      That would be part of his shoulder, yes.

18                   MR. HAYDEN:  Let the record reflect, your

19       Honor, that the witness is indicating an area right in

20       the middle of the photograph.

21       Q      This is 7B.  Using 7B show us where Neil Flynn

22   was when you first noticed him?

23       A      All right.  When I first noticed Mr. Flynn I was

24   passing on the other side of this vehicle, looking in

25   through this window, this bench right here.  He was lying

1    down on it, on his left side looking out in a southerly

2    direction and yelling over to someone over to his left.

3        Q    His head was right where you were?

4        A    Actually he was halfway out of the vehicle, half

5    of his torso was basically hanging outside of that door.

6        Q    Looking toward the front of the vehicle?

7        A    Lying on his left side, with his face looking

8    toward the front, trying to yell back behind to someone.

9            MR. HAYDEN:    Let the record reflect that the

10           witness has indicated an area of the photograph to the

11           left of the photograph as you are looking at it, and

12           toward the middle of the photograph as you are looking

13           at it.

14       Q    Using that photograph, please, show us where you

15   remember Denise Tangney being when you first noticed her?

16       A    When I first noticed Mrs. Tangney I peeked in

17   through this door back here, looking forward observing part

18   of Mr. Rabinowitz's head in the front of the photo.    And

19   Mrs. Tangney was down in this area, lying on the floor,

20   again obstructing a body also on the floor.

21           MR. HAYDEN:    Let the record reflect that the

22           witness has indicated an area toward the middle of the

23           photograph and slightly toward the right of the

24           photograph as you are looking at it.

25       Q    How about Chris Tangney's location?

P.O. Nolan - Cross - LaMagna

1     A     Mr. Tangney, again, as I looked through here I

2 observed him lying in this area right here.

3     Q     And that would be on the driver's side or the

4 passenger side?

5     A     He was more toward the passenger side, up against

6 this back bench seat right here.

7     Q     What part of Mr. Tangney was closest to you?

8     A     He was basically, I guess his head and torso and

9 his feet were toward the center of the limo.

10     Q     That's the way you remember him when you first

11 looked in?

12     A     When I first looked in, yes.

13     Q     Please retake the witness stand.

14     A     Yes, sir.

15                (Whereupon, the witness steps back into the

16          witness box.)

17                MR. HAYDEN:   Nothing further, your Honor.

18          Thank you.

19 CROSS-EXAMINATION

20 BY MR. LaMAGNA:

21     Q     Good afternoon, Officer.

22     A     Good afternoon.

23     Q     As you know, my name is Stephen LaMagna.  I'm

24 going to ask you a couple of questions here today.  If you

25 don't understand the question please feel free to ask me and

P.O. Nolan - Cross - LaMagna

1    I will repeat it, okay?

2         A    Yes.

3         Q    Now, you are a member of the Freeport Police

4    Department, yes?

5         A    Yes, sir.

6         Q    How long have you been a member?

7         A    Approximately nine and-a-half years.

8         Q    And you are familiar with Officer Pandolfo?

9         A    Yes, I am.

10        Q    Do you guys work together or are you just in the

11   same department?

12        A    For every five days I work I see him once.

13        Q    So you both have separate duties, correct?

14        A    We both work a patrol function.  We are assigned

15   to separate squads of two persons each, but we do work the

16   same tour, which is 7 p.m. to 7 a.m.

17        Q    You were working that tour on July 2nd 2005?

18        A    Yes.

19        Q    Now, prior to testifying here today did you

20   review any notes or memoranda, police paperwork, concerning

21   the events of July 2nd 2005?

22        A    Yes.

23        Q    Did you review any of your prior testimony that

24   you had given in prior proceedings concerning the events of

25   July 2nd 2005?

P.O. Nolan - Cross - LaMagna

1       A    Yes, sir.

2       Q    And did you have those minutes of those

3   proceedings or did the district attorney give them to you to

4   review?

5       A    No.  I was provided those minutes from the

6·  district attorney's office.

7       Q    And you had reviewed them today or yesterday or

8   at a time before that?

9       A    Today -- yesterday.

10      Q    So would it be fair to say that you have

11  refreshed your recollection as to all of the events of that

12  day?

13      A    Yes.

14      Q    Now, you testified today concerning the

15  observations that you made upon arriving at this accident

16  scene, correct?

17      A    Yes, sir.

18      Q    _ What I want to ask you is:  Do you have any

19  personal knowledge of any events or anything that dealt with

20  the events of July 2nd that happened prior to the accident

21  occurring?

22      A    Do I know that now --

23      Q    No.

24      A    -- or did I know it then?

25      Q    Did you know it then?

1        A      Other than a motor vehicle accident occurring at

2    Meadowbrook Parkway and Babylon Turnpike, that was the only

3    thing I knew.

4        Q      It is fair to say you didn't see the accident

5    occur, correct?

6        A      No, sir.

7        Q      In fact, you arrived at the accident scene

8    subsequent to this occurrence, correct?

9        A      Yes, sir.

10       Q      You can't state with any personal knowledge any

11   facts as to how this accident occurred, correct?

12       A      Other than the two vehicles having extensive

13   front-end damage, I could surmise.

14       Q      I'm not asking you to surmise.

15       A      I'm --

16       Q      I'm asking you:  Do you have any personal

17   knowledge of how this accident occurred at all?

18       A      Two vehicles have front-end damage head-on

19   collision.

20       Q      Do you have any personal knowledge of the events

21   that occurred prior to the accident?

22       A      Prior to the accident, no.

23       Q      Now, at some point you said that you were looking

24   through the passenger side front window, correct?

25       A      Yes.

1    Q    And did you open the door of the Silverado, the

2    passenger side door?

3    A    No, sir.

4    Q    At the time that you were looking through the

5    passenger side window, Officer Pandolfo is at the driver's

6    side front door; is that correct?

7    A    Outside it, yes.

8    Q    How long had you been standing in front of the

9    passenger side window?

10    A    In regards to, like, what; time frame?  The

11    amount of time when I arrived and then left or --

12    Q    Yes.

13    A    -- or talking to Officer Pandolfo?

14    Q    Yes.  Exactly.

15    A    Approximately about a minute.

16    Q    Were you just observing what Pandolfo, Officer

17    Pandolfo, was doing at that time?

18    A    My first inclination was to get to officer

19    Pandolfo and ask him what he needed me to do at the scene.

20    Q    What I am asking you is:  You said that you were

21    on the passenger side front door window, correct?

22    A    Yes.

23    Q    The door was closed, correct?

24    A    The Chevy pickup door was closed.

25    Q    The window was up, correct?

1      A      Yes.

2      Q      And you were standing there, you just said, for

3   about a minute, correct?  For about sixty seconds?

4      A      Approximately.

5      Q      What I am asking you is:  You were looking

6   through the window across at Officer Pandolfo?

7      A      Officer Pandolfo was on the guardrail.  He was

8   above the vehicle, to my angle level.  I was both looking

9   through the vehicle at the defendant and also looking at

10  Officer Pandolfo.

11     Q      At Officer Pandolfo?

12     A      While I was speaking with him.

13     Q      And you came back around to where Officer

14  Pandolfo was?

15     A      I never went to where Officer Pandolfo was.

16     Q      So when you left that location you went to the

17  limousine?

18     A      I went directly toward the limousine.

19     Q      You were not present when Officer Pandolfo was

20 . speaking to Mr. Heidgen?

21     A  .   I never saw Officer Pandolfo speak to your

22  defendant -- the defendant.

23     Q      You didn't hear my client ask Officer Pandolfo

24  what had happened, correct?

25     A      No, sir.

P.O. Nolan - Cross - LaMagna

1        Q       Now, at some point Mr. Heidgen was removed from

2    the car, correct?

3        A       Yes, sir.

4        Q       You aided somewhat in that, correct?

5        A       The backboard where your client was placed onto

6    was passed out toward me, and I grabbed that backboard.

7        Q       And a neck brace was put on him, correct?

8        A       A neck brace was put on outside.

9        Q       He was awake, correct?

10       A       He was awake at that time.

11       Q       His eyes were open?

12       A       His eyes were open at that time.

13       Q       He was clearly conscious at that time?

14       A       At that time.

15       Q       At some point he was moving around and you told

16   him to relax?

17       A       While we were taking him toward the front of the

18   limousine to place him in the center median, he attempted

19   and kept on lifting up his head.

20       Q       He got off the backboard, I guess, correct?  Is

21   that what he was on at the time?

22               MR. HAYDEN:  Objection.

23               THE COURT:  Sustained.

24       Q       He was on a backboard at that time?

25       A       He was on a backboard.

GIGI WRIGHT, RPR    (516) 571-2503

P.O. Nolan - Cross - LaMagna

1    Q    He was lifting his head up?

2    A    Yes.

3    Q    You told him to lay flat, correct?

4    A    Yes.

5    Q    Ultimately he laid flat?

6    A    After numerous times telling him, yes.

7    Q    Is that a yes?

8    A    Yes.

9    Q    After he was on the backboard and now he was

10   laying flat, after you told him to do so, you asked him what

11   his name was, correct?

12   A    Yes.

13   Q    And he responded to you, correct?

14   A    He was trying, yes.

15   Q    He responded to you, correct?

16   A    I couldn't understand what he was saying.

17   Q    Ultimately you did, didn't you?

18   A    Yes.

19   Q    He responded to you, didn't he?

20   A    Yes, sir.

21   Q    And his response to you was a name, correct?

22   A    Yes, sir.

23   Q    He articulated a name to your question about

24   "What's your name," correct?

25   A    Yes.

P.O. Nolan - Redirect - Hayden

1    Q    And the name he gave you was Marty, correct?

2    A    Yes.

3    Q    And ultimately you learned that, in fact, his

4    name is Marty, correct?

5    A    Yes.

6    Q    And so he responded to your question and he

7    responded accurately to your question, correct?

8    A    Yes.

9    Q    And then you asked him "Where were you coming

10   from," correct?

11   A    Yes.

12   Q    And he said, "Long Beach," correct?

13   A    Yes.

14   Q    And Long Beach is south of where you were on the

15   Meadowbrook Parkway, correct?

16   A    Yes.

17        MR. LaMAGNA: I have nothing further, your

18   Honor.

19        MR. HAYDEN:   Briefly, your Honor.

20   REDIRECT EXAMINATION

21   BY MR. HAYDEN:

22   Q    Did the defendant respond at all to your initial

23   questions?

24   A    No.

25   Q    What were your initial questions?

P.O. Nolan - Redirect - Hayden

1      A      "Are you okay?"  "Are you hurting?"

2      Q      Did he say anything when you asked, "Are you

3   okay?"

4      A      No.

5      Q      Did he say anything when you asked, "Are you

6   hurting?"

7      A      No.

8      Q      How many times did you ask the defendant his name

9   before he you finally were able to understand him?

10      A      At least half a dozen, if not more.

11      Q      How many times did you ask the defendant where he

12   was coming from before you finally understood him saying

13   Long Beach?

14      A      At least the same amount of times I asked him

15   what's your name.

16           MR. HAYDEN:  Your Honor, may I briefly reopen

17       the direct examination?

18           THE COURT:  Any objection?

19           MR. LaMAGNA:  Yes.

20           THE COURT:  Let me see counsel at the bench.

21           (Whereupon, a discussion was held at the

22       sidebar, off the record.)

23           THE COURT:  The application is denied.

24           THE COURT:  Anything further of this witness?

25           MR. LaMAGNA:  Nothing further, your Honor.

P.O. Nolan - Redirect - Hayden

1          THE COURT:  Thank you, Officer.

2          THE WITNESS:  Thank you, sir.

3          (Whereupon, the witness exits the courtroom.)

4          THE COURT:  Ladies and gentlemen, at this

5     time we will take a ten or fifteen minute break.

6     Please don't talk about the case.

7          (Whereupon, the jury exited the courtroom and

8     a brief recess held.)

9          THE COURT:  Produce the jury.

10         COURT OFFICER:  Jury entering.

11         (Whereupon, the jury entered the courtroom,

12    and upon taking their respective seats, the following

13    occurred:)

14         THE CLERK:  Case on trial, Indictment 1910N

15    of 2005, People versus Martin Heidgen.

16         People ready?

17         MR. HAYDEN:  People ready, your Honor.

18         THE CLERK:  Defense ready?

19         MR. LaMAGNA:  Defendant ready, your Honor.

20         THE CLERK:  Defendant is present and the

21    jurors are seated, your Honor.

22         THE COURT:  Thank you.

23         Next witness.

24         MS. McCORMICK:  People call Trooper Daniel

25    O'Hare.

1           COURT OFFICER:  Step up.  Remain standing,

2      raise your right hand and face the clerk.

3           D A N I E L   O ' H A R E,       a witness

4               called on behalf of the People, having been

5               first duly sworn by the Clerk of the Court,

6               was examined and testified as follows:

7           THE CLERK:  State your name, spelling your

8      last name, rank, shield and command for the record.

9           THE WITNESS:  My name is Trooper Daniel

10      O'Hare, O ' H A R E.  I'm a trooper with the New York

11      State Police out of Farmingdale, New York.

12           THE CLERK:  Shield number.

13           THE WITNESS:  5012.

14           THE CLERK:  Take a seat.

15 DIRECT EXAMINATION

16 BY MS. McCORMICK:

17      Q    Good afternoon, Trooper.

18      A    Good afternoon.

19      Q    Would you please tell the jury how long you have

20 been a New York State Trooper?

21      A    Approximately four years.

22      Q    Can you describe for the jury what your duties

23 are as a State Police Trooper?

24      A    I'm a sworn police officer and I patrol New York

25 State parkways on Long Island.

1        Q        Trooper O'Hare, were you working on the night of,

2    the overnight between July 1st 2005 into July 2nd 2005?

3        A        Yes, ma'am.

4        Q    .  What was your assignment on that night?

5        A       .My assignment was from 7 p.m. to 7 a.m. as a

6    patrol unit on the New York State parkways, Long Island, New

7    York.

8        Q        Were you in uniform?

9        A        Yes, ma'am.

10       Q        Were you patrolling in a marked New York State

11   Police vehicle?

12       A        Yes, ma'am.

13       Q        Did you have occasion, Trooper O'Hare, to become

14   involved in an investigation of a crash that occurred in the

15   southbound lanes of the Meadowbrook Parkway just north of

16   the Babylon Turnpike overpass at approximately 2 a.m.?

17       A        Yes, ma'am.

18       Q    _  Could you tell the jury how you got involved in

19   the investigation of that crash?

20       A        We received a call over the radio, State Police

21   radio, that there was an accident and numerous cars were

22   involved.

23       Q        What did you do in response to that information?

24       A        We responded to that area.

25       Q        When you say "we" Trooper O'Hare, were you

Trooper O'Hare - Direct - McCormick

1    working alone or with a partner?

2         A     I was with a partner that night.

3         Q     Who was your partner?

4         A     Trooper Michael Stafford.

5         Q     Was Trooper Stafford also in uniform?

6         A     Yes, ma'am.

7         Q     You were sharing the same marked police vehicle?

8         A     Yes, ma'am.

9         Q     Do you know about what time you arrived at the

10   crash scene?

11        A     Approximately 2 a.m., ma'am.

12        Q     Can you tell the jury what did you do upon your

13   arrival there?

14        A     I got out of the vehicle and I observed two

15   vehicles with severe front-end damage.

16        Q     How did you approach the crash scene?   What

17   physical route did you take?

18        A     I got out of the trooper car and walked

19   southbound toward the scene.

20        Q     In terms of where you were when you received the

21   call, Trooper O'Hare.

22        A     I was on Hempstead Turnpike on the Meadowbrook

23   State Parkway.

24        Q     How did you get to the crash scene?

25        A     We drove there.

Trooper O'Hare - Direct - McCormick

1      Q      In what direction?

2      A      Southbound on the Meadowbrook State Parkway.

3      Q      And when you got out of your police vehicle where

4      did you physically place it in relation to the crash scene?

5      A      Just north of the crash scene on the southbound

6      lanes.

7      Q      If you could, could you describe for the jury

8      what you saw as you walked toward the vehicles?

9      A      I saw two vehicles, once again, with severe

10     front-end damage.

11     Q      And was that front-end damage visible from behind

12     as you approached?

13     A      When I first arrived it was tough to see, tough

14     to see.

15     Q      Could you describe for the jury where did you

16     proceed first?

17     A      I proceeded right up to the crash scene.

18     Q      And which of the vehicles did you proceed to,

19     Trooper?

20     A      First one I observed was the black Lincoln

21     limousine.

22     Q      What did you do when you saw that limousine?

23     A      I observed the severe front-end damage.

24     Q      Did you go into the limousine at all, Trooper?

25     A      No, ma'am.

GIGI WRIGHT, RPR    (516) 571-2503

1    Q    What did you do at the crash scene?

2    A    The first thing I did was went up to Trooper

3    Knapp, who let me know there was a serious accident and

4    there were fatalities involved; and that one of the drivers

5    possibly DWI, driving while intoxicated; and someone would

6    have to go with that subject to the hospital to get blood.

7    Q    When you say "to get blood," are you referring to

8    getting blood of the suspected driver?

9    A    That is correct.

10   Q    What did you do in response to that information?

11   A    I went back to my marked unit and got the New

12   York State Police blood kit out of the vehicle.

13   Q    Is a blood kit something that you carry with you

14   regularly?

15   A    It is in every State Police vehicle.

16   Q    The same blood kit, or are there multiple blood

17   kits in all different vehicles?

18   A    There is one blood kit in every State Police

19   vehicle.

20         MS. McCORMICK:  Your Honor, I ask to approach

21         the witness with what I ask to be marked People's

22         Exhibit 16 for identification, purposes.

23              (Whereupon, a blood kit was received and

24         marked People's Exhibit 16 for identification.)

25              COURT OFFICER:  People's Exhibit 16 marked

1      for identification.

2      Q     Trooper, do you recognize what that is?

3      A     Yes, ma'am.

4      Q     What is that?

5      A     It is a New York State Police blood kit.

6      Q     Again, there is not just one blood kit, there are

7      a whole lot of blood kits that are carried by troopers

8      throughout New York State, correct?

9      A     That is correct.

10     Q     And you had a blood kit in your vehicle on the

11     night of this crash?

12     A     Yes, ma'am.

13     Q     It is not that particular blood kit, is it?

14     A     No, ma'am, it is not.

15     Q     Is that a used blood kit or an unused blood kit?

16     A     May I open it?

17     Q     Yes.

18     A     It is an unused blood kit.

19     Q     Is that blood kit identical to the one that you

20     used on the night of July 2nd 2005 to obtain the blood of

21     the defendant?

22     A     Yes, ma'am.

23     Q     Speaking of the defendant, did you make

24     observations of a person in a pick-up truck at the scene of

25     this crash?

GIGI WRIGHT, RPR    (516) 571-2503

1       A       When I first got at the scene, ma'am?

2       Q       Yes.

3       A       I wasn't able to get close to him until after we

4    got into the ambulance.

5       Q       You did accompany somebody in the ambulance to

6    the hospital?

7       A       Yes, ma'am.  I accompanied the subject in the

8    ambulance?

9       Q       You learned his name to be what, Trooper?

10      A       Martin Heidgen.

11      Q       Do you see the person who you learned to be

12   Martin Heidgen in this courtroom today?

13      A       Yes, ma'am.

14      Q       Can you describe him and point to him before the

15   jury?

16      A       Yes, ma'am.  He is a male subject, dark hair,

17   dark eyes, suit, white shirt and beige tie.

18              MS. McCORMICK::  Indicating the defendant for

19          the record, your Honor.

20              THE COURT:  Yes.

21      Q       With respect to the blood kit, Trooper O'Hare, is

22   that blood kit identical to the one you used to accompany

23   this defendant to the hospital on the night of July 2nd?

24      A       Yes, ma'am.

25      Q       This is unused; is that correct?

Trooper O'Hare - Direct - McCormick

1          A        That is correct, ma'am.

2                   MS. McCORMICK:  Your Honor, at this point I

3          would ask to admit the blood kit into evidence as

4          People's Exhibit 16 for demonstrative purposes.

5                   THE COURT:  Please show it to counsel.

6                   MR. LaMAGNA:  Just briefly, voir dire?

7                   THE COURT:  Yes.

8     VOIR DIRE EXAMINATION

9     BY MR. LaMAGNA:

10         Q        Trooper O'Hare, did you have an opportunity to

11    review the contents in this blood kit, especially the inner

12    container?

13         A        In that blood kit, sir, no, sir, I did not.

14         Q        Well, why don't you take a look at it.  First,

15    just peruse it.  You can see through it to make sure that

16    all of the contents that appear in this blood kit were the

17    same that appeared in the blood kit that you used.

18                  MS. McCORMICK:  Without opening it.

19                  MR. LaMAGNA:  Yes.

20         A        Without opening it?

21         Q        Yes.

22                  (Witness complies.)

23         A        From what I could see it is identical, sir.

24         Q        You are familiar with the contents of a blood

25    kit, correct?

1      A      Yes, sir, I am.

2      Q      You have been trained in how to use a blood kit,

3   correct?

4      A      Yes, sir.

5      Q      You have done it on numerous occasions, correct?

6      A      Yes.

7             MR. LaMAGNA:  Judge, for demonstrative

8      purposes -- obviously we are clear that is not the

9      blood kit -- I have no objection.

10            THE COURT:  It is received.

11            (Whereupon, People's Exhibit 16 for

12     identification now received and marked People's Exhibit

13     16 in evidence.)

14            COURT OFFICER:  People's Exhibit 16 in

15     evidence.

16   BY MS. McCORMICK:

17     Q      Trooper O'Hare, where was that blood kit located

18   when you retrieved it?

19     A      It was in the trunk of the marked State Police

20   vehicle.

21     Q      Is there any kind of markings on the blood kit

22   that would distinguish it from any other blood kit?

23     A      Yes, ma'am.

24     Q      What would those markings be?

25     A      There is a lot number located right here on the

1     lip of the box.

2                 MS. McCORMICK:   Indicating for the record the

3         trooper is pointing to the cardboard flap of the box,

4         and a number stamped there.

5         Q     Is that accurate?

6         A     Yes.

7         Q     Is there any additional dates or stamps on the

8     blood kit that you need to check before using it?

9         A     Yes, ma'am.   There is an expiration date.

10        Q     Did you check the expiration date of the blood

11    kit used on Martin Heidgen before you took it to the

12    hospital?

13        A     Yes, ma'am.

14        Q     Was this date of incident, July 2nd, within the

15    date of expiration of the blood kit?

16        A     Yes, ma'am, it was.

17        Q     Trooper O'Hare, you obtained that blood kit and

18    you are physically holding it in your hand.  What do you do

19    next at the scene?

20        A     I'm waiting for them to extricate Mr. Heidgen

21    from the vehicle so he can be brought to the ambulance and

22    brought to the hospital.

23        Q     Did you extricate Mr. Heidgen?

24        A     No, ma'am, I did not.

25        Q     Were you present when he was extricated?

1       A       Yes, ma'am, I was.

2       Q       Did you ever approach him inside of the pick-up

3    truck?

4       A       No, ma'am, I did not.

5       Q       You had no conversation with him in the pick-up

6    truck?

7       A       No, ma'am, I did not.

8       Q       When is the first time that you were able to

9    actually see the defendant Martin Heidgen on that date?

10      A       In the back of the ambulance.

11      Q       Did you see him being removed from the truck?

12      A       Yes, ma'am.

13      Q       After the defendant was removed from his pick-up

14   truck was he brought over to the ambulance?

15      A       Yes, ma'am.

16      Q       And was he loaded into that ambulance --

17      A       Yes, ma'am.

18      Q       Excuse me.

19              -- in your presence?

20      A       Yes, ma'am.

21      Q       Can you describe the manner in which he was put

22   inside of the ambulance?

23      A       He was put in head first.  His head was closest

24   to the front of the ambulance.

25      Q       Was there any ambulance personnel within the

Trooper O'Hare - Direct - McCormick

1    ambulance at the time that he was placed into it?

2         A    There were several people helping load him into

3    the ambulance.

4         Q    Was he on a backboard or gurney of some sort?

5         A    Backboard on top of a gurney.

6         Q    At some point did the remainder of the people

7    leave the ambulance?

8         A    Yes, ma'am.

9         Q    Who was left in the ambulance at that time?

10        A    EMT Cook.

11        Q    And yourself?

12        A    Yes, ma'am.  That's when I got into the

13   ambulance.

14        Q    Can you describe for the jury, did you enter that

15   ambulance?

16        A    Yes, ma'am, I did.

17        Q    Where were you physically located within that

18   ambulance?

19        A    I was in the back of the ambulance, behind the

20   driver's side.

21        Q    Were you toward the head of the defendant or his

22   feet?

23        A    I was closer to the head.

24        Q    Where was EMT Cook in the ambulance?

25        A    On the other side, back in the ambulance, behind

Trooper O'Hare - Direct - McCormick

1    the passenger side.

2        Q    Did there come a time when the ambulance doors

3    closed and you left the scene of this crash?

4        A    Yes, ma'am.

5        Q    Do you know about what time that was?

6        A    It was shortly, approximately 2:25, I believe.

7        Q    And at this point is this the first first

8    opportunity that you had to make observations of the

9    defendant?

10       A    Yes, ma'am.

11       Q    And can you describe for the jury what did you

12   observe about the defendant at that time?

13       A    I observed a strong odor of an alcoholic

14   beverage.  I also noticed that he had bloodshot, watery

15   eyes.

16       Q    Did you try to converse with him?

17       A    Yes, ma'am, I did.

18       Q    What did you say to him and what were his

19   responses?

20       A    I asked for his name, but the only response I got

21   were moans and groans.

22       Q    Did you ask him anything else?

23       A    No, that was it.

24       Q    Did the EMT attempt to speak to the defendant?

25       A    Yes, he did.

1          MR. LaMAGNA:  Objection.

2          THE COURT:  Overruled.

3     Q    I'm sorry, your answer?

4     A    Yes.  He tried to speak to the defendant.

5     Q    Did the defendant respond to the EMT?

6          MR. LaMAGNA:  Objection.

7     A    No.

8          THE COURT:  Overruled.

9          THE WITNESS:  I'm sorry, your Honor.

10    A    No, ma'am.

11    Q    Did not respond?

12    A    Did not respond.

13    Q    Approximately how long did it take you to get

14    from the area of the crash to the hospital?

15    A    Approximately ten minutes.

16    Q    Which hospital did you go to?

17    A    Nassau County Medical Center.

18    Q    And during that ten-minute drive can you describe

19    for the jury what was the defendant doing?

20    A    He was flailing his arms around numerous times.

21    He had a neck brace on.  He was trying to remove it.  He

22    continued to have these moans and groans as we continued to

23    travel to the hospital.

24    Q    Did you or EMT Cook continue to speak to the

25    defendant throughout this ride?

1        A        Yes, ma'am.

2        Q        Did the defendant at any time respond in an

3    understandable way to any of those attempts to speak to him?

4        A        No, ma'am.

5                 MR. LaMAGNA:  Objection.

6                 THE COURT:  Overruled.

7        Q        Was the defendant's eyes open or closed in the

8    ambulance?

9        A        His eyes were open.

10       Q        And in response to the movement that you observed

11   what, if anything, was done with the defendant in the

12   ambulance?

13       A        To stop his arms from flailing so that EMT Cook

14   could continue his medical technician procedures on him we

15   strapped him down.  There were straps on the gurney that we

16   used.

17       Q        Those straps were used for medical purposes?

18                 MR. LaMAGNA:  Objection.

19                 THE COURT:  Sustained.  Form.

20                 MS. McCORMICK:  I'll withdraw that.

21       Q        Was he handcuffed at all in the back of the

22   ambulance?

23       A        No, ma'am, he was not.

24       Q        Was he restrained for criminal law purposes in

25   any way in the back of the ambulance?

Trooper O'Hare - Direct - McCormick

1      A      No, ma'am.

2      Q      He was secured to the gurney?

3      A      Yes, ma'am.

4      Q      Did there come a time when the defendant's

5    behavior changed over the course of that ten-minute ride to

6    the hospital?

7      A      Yes, ma'am.

8      Q      And how did it change?

9      A      The closer we got to the hospital he became less

10   and less moving his arms and trying to flail around and he

11   came to moan and groan a little less.

12     Q      When you arrived at the hospital what happened

13   next?

14     A      Myself and EMT Cook removed the subject from the

15   ambulance and brought him into the emergency room.

16     Q      Did he continue to remain on that same gurney?

17     A      Yes, ma'am.

18     Q      And who were you met with at the hospital?

19     A      Myself and EMT Cook brought the subject into the

20   emergency room.  We were met by several doctors, nurses and,

21   you know, emergency technicians.

22     Q      Physically within the emergency room were you in

23   a cubicle or a single room or wide open room?  Where were

24   you?

25     A      It was a very large room.

GIGI WRIGHT, RPR   (516) 571-2503

1      Q      Approximately how many people were assessing or

2   treating the defendant as you came into the emergency room?

3      A      Approximately five or six.

4      Q      Trooper O'Hare, during the course of that

5   treatment did you observe any of the doctors or nurses try

6   to speak to the defendant?

7      A      Yes, ma'am.

8                   MR. LaMAGNA:  Objection.

9                   THE COURT:  Overruled.

10     Q      Did you observe -- withdrawn.

11             Did the defendant respond in any understandable

12  way to any of the questions being asked of him?

13     A      No, ma'am.

14     Q      Did there come a time when you asked any of the

15  medical staff to draw blood for the purposes of evidence

16  with respect to this crash?

17     A      Yes, ma'am.

18     Q      Approximately how long were you in the emergency

19  room before you made that request?

20     A      Approximately several minutes.

21     Q      Several minutes?

22     A      Yeah.

23     Q      Do you recall to whom you made that request?

24     A      R.N. Busco, Registered Nurse Busco.

25     Q      What was her response?

1        A     She said yes.

2        Q     Trooper O'Hare, did you continue to have with you

3    the blood kit which you had taken from the back of your

4    trunk?

5        A     Yes, ma'am.

6        Q     And what, if anything, did you do with the blood

7    kit upon receiving Nurse Busco's response that she would

8    draw blood?

9        A     I opened up the blood kit, opened it up for her,

10   and she took out the necessary tools and drew blood.

11       Q     Trooper O'Hare, I ask you at this time to refer

12   to People's Exhibit number 16 in evidence.  Could you

13   demonstrate for the jury, using People's Exhibit number 16,

14   how and what it is that you did with that blood kit with

15   Nurse Busco?

16             MS. McCORMICK:  Would it be possible for him

17        to come a little closer to the jury box?

18             THE COURT:  Sure.  If you want you can put it

19        right on the jury box right there.

20             THE WITNESS:  Yes, sir.

21             MS. McCORMICK:  Thank you.

22             MR. LaMAGNA:  Your Honor, may I?

23             THE COURT:  Of course.

24       A     It is a plastic box.  It has an adhesive seal

25   across it.  All you have to do is break the seal, and I

1    broke it and opened it up.

2            MS. McCORMICK:  May I ask him questions as he

3        does this, Judge?

4            THE COURT:  Yes.

5    Q    Was the plastic box of the blood kit you used on

6    July 2nd sealed with the same adhesive as you have just

7    shown to the jury on the night of July 2nd?

8    A    Yes, ma'am.

9    Q    The outward cardboard box does not have a seal;

10   is that correct?

11   A    That is correct.

12   Q    Did the box that you used on July 2nd have an

13   outer seal?

14   A    No, ma'am, it did not.

15   Q    So you opened the cardboard box and removed the

16   plastic container?

17   A    No, I did not.  I removed it now to show you.  On

18   the night in question it was in -- I opened it up, it was

19   still in this cardboard container.  I just took it out to

20   show you for the benefit of you guys.

21   Q    Trooper O'Hare, would you please take out each of

22   the items within that previously sealed plastic container

23   and describe them for the jury one at a time?

24   A    First piece of paper is called Lab-1.  You fill

25   out all of the information regarding the subject and the

1      incident, and this goes along with the blood up to the blood

2      lab.

3          Q      Is that a New York State Police document?

4          A      Yes, ma'am.

5          Q      And it is sealed within the blood kit itself?

6          A      Yes, ma'am.

7                 This is the certificate by the manufacturer.   It

8      states every item that is inside of the blood kit.

9                 There are two red integrity seals.  This is the

10     New York State Police instructions on how to obtain a blood

11     specimen.   And this is instructions regarding the vacutainer

12     needle in getting blood.  This is a blood collection report.

13                And this is --

14         Q      Excuse me, Trooper.  The blood collection report,

15     what is the purpose of that document?

16         A      You are supposed to write down the subject's name

17     and the time the blood was drawn, and also any information

18     regarding who took the blood.

19                This is a consent form.  These are more seals,

20     adhesive seals, put them altogether.  This is the piece of

21     paper that goes inside when the blood is finished.   It is

22     adhesive.  This is the -- I'm probably going to be

23     pronouncing it wrong -- biohydroxide (ph.) that you put on

24     the subject.

25         Q      That is a non-alcohol swab?

Trooper O'Hare - Direct - McCormick

1    A    Yes, ma'am.

2    Q    That is required in the blood kit?

3    A    Yes.

4         This is the vacutainer needle used to take the

5    blood.  This is the part that goes inside when you draw the

6    blood.  This is a sticker "biohazard" that we put on the

7    outside of the box when it is all completed, so for those

8    handling it know it is a biohazard.

9         Two glass tubes, 20 milliliters altogether, that

10   the specimen goes into.

11   Q    Ten milliliters each?

12   A    Yes, ma'am.

13   Q    Are they specifically gray-topped tubes?

14   A    They are all gray topped.

15   Q    There appears to be a substance in the bottom of

16   each of those.  Do you know what those are?

17   A    Coagulant so the blood doesn't botch up, get

18   clumpy.

19   Q    Anticoagulant?

20   A    That's the word I was looking for.

21   Q    Are you aware if there is also a preservative in

22   that tube?

23   A    I'm not aware of that.

24   Q    Were all of the items that you just displayed in

25   the kit that you used to take the blood of Martin Heidgen on

GIGI WRIGHT, RPR    (516) 571-2503

1    that night?

2         A    Yes, ma'am.

3         Q    I saw you were removing the plastic box.  And
4    what were you going to show?

5         A    On the bottom there is a plastic bag.  When the
6    blood is completed it goes in this plastic bag.  This part
7    goes in the plastic bag and put back in here.

8         Q    Could you explain to the jury, with respect to
9    these integrity seals and these four seals, what is supposed
10   to be done with them?

11        A    These two seals, even though they are similar,
12   they are identical, two of them will be used when the blood
13   is taken.

14        Q    What is the purpose of that, Trooper?

15        A    Once again, it is an integrity seal to make sure
16   that the blood is not tainted.

17             The second set, which is identical, when it is
18   all completed you close the cardboard box and seal the
19   cardboard box.

20        Q    What happens with the red integrity seals?

21        A    When you close the plastic they are put over the
22   plastic to seal it up, to make sure it is not tampered with.

23        Q    They actually sort of stick the box closed?  It
24   would have to be torn to be reopened in the lab?

25        A    That's correct.  Both seals are used and used to

Trooper O'Hare - Direct - McCormick

1    close the plastic box.

2        Q    Is the same true for the outward seals in the

3    cardboard box; they have to be torn at the lab?

4        A    That's correct.

5        Q    Trooper, would you please gather up all of that

6    stuff and take it back up -- withdrawn.

7            Can you explain, while you have the blood kit

8    here, how it is that you actually -- what did you do with

9    Nurse Busco to get this blood?

10       A    I stood next to Nurse Busco and asked her if she

11   was ready and she said, yes. And I removed all of the paper

12   items and held them, and held the blood kit.  She held the

13   vacutainer tube and turned and went to his arm, and reached

14   back and came back for the iodine swipe -- I'm not

15   pronouncing that right again -- and then she asked me for

16   one tube; I handed her one tube.  She turned back and came

17   back with the tube.  At that point you have to invert them,

18   you don't shake them, you invert them twenty times.

19       Q    Do you know what the purpose of inverting the

20   tube is?

21       A    It is for the anticoagulant.  It is for the white

22   powder inside so it mixes with the blood.

23            After that was done I took the second tube and

24   gave it to Nurse Busco, she gave it back to me, and inverted

25   it twenty times, and put it back in.  These were discarded

1    by Nurse Busco.  You don't use them again.  After that I put

2    the piece of paper in and closed it like so.  And then I

3    went over --

4         Q    Indicating for the record the items that were

5    discarded by Nurse Busco was the vacutainer and the needle

6    for the vacutainer.

7         A    I then stepped aside to fill out the seals

8    properly.  Unfortunately, I didn't know the name of the

9    subject at this time.  I wasn't able to complete them.  So I

10   filled out as much as I can.  I put my initials, date and

11   time the blood was taken, and put them over the top of the

12   tube, closed it that way, and did that for both.

13        Q    Is it fair to say, Trooper, that the adhesive

14   goes from one side of the glass over the gray rubber top and

15   then to the other side of the glass, so if that tube had

16   been opened the seal itself would have to have been broken?

17        A    That's correct.

18        Q    And you did that with both tubes?

19        A    Both tubes got one seal each.

20        Q    Why didn't you put the name of the defendant on

21   those seals?

22        A    I did not know the defendant name at this time.

23        Q    And you had asked him his name?

24        A    Several times.

25        Q    At this point now you can gather up that stuff

1    and take the witness stand.  Thank you.

2                    (Whereupon, the witness steps back into the

3              witness box.)

4         Q    Trooper O'Hare, you stated that after the blood

5    was taken and you had inverted it and placed it back in the

6    plastic box you walked to a separate table?

7         A    Uh huh.

8         Q    Was that away from where the defendant was

9    receiving treatment?

10        A    It was approximately a foot or two away from the

11   defendant.

12        Q    Was the defendant in any way physically injured

13   that you could see?

14        A    Nothing that I could see physically visible.

15        Q    When you were off to the side and you have the

16   documentation that you have described for the jury, what is

17   it that you fill out while you are still in the emergency

18   room?

19        A    I'm filling out the date and time that the blood

20   specimen was taken.

21        Q    Do you fill out who it is that took the blood?

22        A    Yes, ma'am.

23        Q    That was Nurse Busco?

24        A    R.N. Busco.

25        Q    Do you initial each of the seals contained within

1      that kit?

2          A      Yes, ma'am, I do.

3          Q      Physically what becomes of -- let me withdraw

4      that.

5                 What is your assignment in the hospital at that

6      time?

7          A      My assignment was to get blood from the subject

8      and then stay with the subject the entire time.

9          Q      So you are now not leaving the hospital?

10         A      Correct.  I was staying with the subject.

11         Q      But what becomes of the blood if you are not

12     leaving the hospital?

13         A      I gave it to Trooper Stafford at the hospital.

14         Q      Was Trooper Stafford with you the entire time you

15     were at the emergency room?

16         A      No, ma'am.

17         Q      He did not come with you in the ambulance?

18         A      No, ma'am, he did not.

19         Q      Was he with you when you first arrived in the

20     emergency room?

21         A      No, ma'am.

22         Q      Where did you encounter Trooper Stafford?

23         A      While I was filling out the seals I observed him

24     behind me.  He arrived shortly after we arrived in the

25     emergency room.

1       Q       And after you completed that paperwork did you,

2   in fact, reseal the box in the manner that you have done

3   here in order to retake the witness stand?

4       A       Could you repeat that?

5       Q       I'm sorry.  Did you put all of the stuff back in

6   the box?

7       A       No, I did not.

8       Q       What did you do?

9       A       Most of the stuff was left outside of the box.

10  The seals were not sealed yet in respect to on the piece of

11  paper right here you have to put the subject's name.  Once

12  again, we did not have the subject's name.

13              MS. McCORMICK:  Indicating for the record,

14          your Honor, he is pointing to a label that is affixed

15          to the top of the plastic interior box of the blood

16          kit.

17      A       So we did not seal the cardboard yet because we

18  did not know who the subject's name was yet.

19      Q       With respect to the blood tubes, you had placed

20  the seals over the tops of the tubes without his name?

21      A       That is correct.

22      Q       And you placed those inside of the plastic box?

23      A       Inside of the plastic over the tubes.

24      Q       Let me rephrase that.

25              Did you place the tubes back inside of the

1    interior plastic box of the blood kit?

2         A    Yes, I did.

3         Q    Did you seal the plastic box of the blood kit at

4    that point?

5         A    No, I did not.

6         Q    Why didn't you?

7         A    Once again, we did not have the subject's name,

8    and you want the subject's name on the red tag of the seals.

9         Q    You have the blood kit.  What do you physically

10   do with it?

11        A    I hand it over to Trooper Stafford.

12        Q    Where does Trooper Stafford go?  Does he stay

13   with you?

14        A    Shortly after that we leave the emergency room

15   and go to the x-ray room and CAT scan room.  Trooper

16   Stafford does not follow me there.

17        Q    He goes off in some other direction?

18        A    I do not know where he goes.  I was supposed to

19   stay with the subject.

20        Q    Now, I ask to approach you with what I ask be

21   marked People's Exhibit number 17 for identification

22   purposes.

23             (Whereupon, a blood kit received and marked

24        People's Exhibit 17 for identification.)

25             COURT OFFICER:  People's Exhibit 17 for

Trooper O'Hare - Direct - McCormick

1          . identification.

2          Q     Do you have People's Exhibit number 17 for

3     identification purposes in front of you?

4          A     Yes.

5          Q     In a general way, what is it that you are

6     holding?

7          A     It is a New York State Police blood kit.

8          Q     As opposed to the last blood test kit is this a

9     used or unused blood kit?

10         A     This is a used blood kit.

11         Q     Do you recognize this blood kit in any way?

12         A     Yes, ma'am.

13         Q     What do you recognize it to be?

14         A     The blood kit used on the night in question.

15         Q     Is there any particular markings on this blood

16    kit that would lead you to believe it was the blood kit used

17    on Martin Heidgen?

18         A     _ Yes, ma'am.

19         Q     What were those markings?

20         A     The two seals that I showed earlier are on the

21    box.  The white seals with the red lettering that says

22    "seal," they have my initials and also date and time the

23    blood was taken, and R.N. Busco, the name of the person that

24    took the blood?

25                MS. McCORMICK:  Your Honor, at this time I

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Direct - McCormick

1    would ask that that blood kit be moved into evidence as

2    People's Exhibit 17 in evidence.

3                 THE COURT:  Show it to counsel.

4                 MR. LaMAGNA:  Judge, at this time I'm going

5    to object to the blood kit being moved into evidence at

6    this time with respect to Trooper O'Hare's testimony.

7                 THE COURT:  Sustained.

8                 MS. McCORMICK:  I have nothing further, your

9    Honor.

10                THE COURT:  All right.  Let me see counsel

11   for a minute.

12                (Whereupon, a discussion was held off the

13   record.)

14                THE COURT:  Ladies and gentlemen, we are

15   going to break until tomorrow morning.  You know all of

16   the admonitions.  Don't go to the scene.  Don't talk

17   about the case.  Don't let anybody talk to you about

18   the case.  Don't talk to anybody about receiving any

19   benefit for any information about this case.  You know

20   all of these things.  I have told you a few times now.

21                I need all of you here at 9:30 tomorrow

22   morning.  If one of you is missing we are not starting.

23   So I'm giving you an obligation one to another to be

24   here at 9:30.  In the meantime, have a nice night.

25                COURT OFFICER:  Please remain seated as the

Trooper O'Hare - Direct - McCormick

1     Judge and the jury exit the courtroom.

2               (Whereupon, the jury exited the courtroom.)

3               (Whereupon, the trial was adjourned to

4     Wednesday, the 13th day of September 2006, at 9:30

5     a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
 2   ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
            -against-
 4

 5   MARTIN HEIDGEN,
                           DEFENDANT.
 6   ---------------------------------------x
     INDICTMENT #:  1910N-06
 7
                               Mineola, New York
 8                             September 13, 2006

 9
     B E F O R E:   HONORABLE ALAN L. HONOROF
10                  Acting Supreme Court Justice

11
     A P P E A R A N C E S:
12
                     HON. KATHLEEN M. RICE
13                   District Attorney, Nassau County
                        262 Old Country Road
14                   Mineola, New York 11501
                     BY:  ROBERT HAYDEN, ESQ.
15                        Assistant District Attorney
                              and
16                        MAUREEN McCORMICK, ESQ.
                          Assistant District Attorney
17

18
                     STEPHEN LaMAGNA, ESQ.
19                       Attorney for the Defendant
                         666 Old Country Road
20                       Garden City, New York·
                     BY:  STEPHEN V. LaMAGNA, ESQ.
21                             and
                         GREGORY MARTELLO, ESQ.
22
                            o0o
23                       CONTINUED TRIAL
                            o0o
24
                       Gigi Wright, R.P.R.
25                     Official Court Reporter


            GIGI WRIGHT, RPR    (516) 571-2503
```

Trooper O'Hare - Cross - LaMagna

1                    (In open court.  Defendant present.)

2                    COURT OFFICER:  Jury entering.

3                    (Whereupon, the jury entered the courtroom,

4          and upon taking their respective seats, the following

5          occurred:)

6                    THE CLERK:  Case on trial continues, People

7          versus Martin Heidgen, Indictment 1910N of 2005.

8                    Let the record reflect that the defendant is

9          present and the jury is present.

10                    People ready?

11                    MR. HAYDEN:  Ready, your Honor.

12                    THE CLERK:  Defendant ready?

13                    MR. LaMAGNA:  Defendant is ready, your Honor.

14                    THE COURT:  Welcome back, ladies and

15          gentlemen, the delay is on our end this morning.  I

16          apologize to you for that.

17                    Would you please put the witness back on the

18          stand.

19                    (Whereupon, the witness, Trooper O'Hare,

20          resumes the witness stand.)

21                    THE CLERK:  Trooper, I remind you you are

22          still under oath.

23                    THE COURT:  Mr. LaMagna.

24                    MR. LaMAGNA:  May I inquire?

25                    THE COURT:  Yes.

Trooper O'Hare - Cross - LaMagna

1    CROSS-EXAMINATION

2    BY MR. LaMAGNA:

3        Q    Good morning, Trooper.  How are you?

4        A    Good morning, sir.

5        Q    Trooper, as you know, I'm Steve LaMagna.  I am

6    going to be asking you a few questions this morning.  Any

7    questions you don't understand or you didn't hear, ask me to

8    repeat them and I certainly will.

9        A    Yes, sir.

10       Q    Trooper, between your testimony yesterday and you

11   taking the stand today you didn't discuss this case with

12   anybody, correct?

13       A    No, sir.

14       Q    No other Trooper, no other law enforcement

15   people, members of the district attorney's office, anybody,

16   correct?

17       A    No, sir.

18       Q    Now, you said you have been a State Trooper for

19   how long?

20       A    Approximately four years.

21       Q    What has your assignment been over these past

22   four years?

23       A    Patrol here and also upstate New York.

24       Q    What do you mean by "patrol"?

25       A    Radio runs, patrols down here, specifically New

GIGI WRIGHT, RPR   (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1   York State Parkways on Long Island, highway safety, vehicle

2   and traffic enforcement, accident investigations.

3       Q    Now, prior to testifying here today and yesterday

4   you reviewed paperwork generated as a result of the events

5   that occurred on July 2nd 2005?

6       A    Yes, sir.

7       Q    And you reviewed any prior testimony that you had

8   previously given under oath prior to testifying here today;

9   is that correct?

10      A    Yes, sir.

11      Q    And you had met with members of the district

12  attorney's office to go over that testimony; is that

13  correct?

14      A    Yes, sir.

15      Q    Now, I would like to direct your attention to

16  July 2nd 2005.

17           You were at that time working as a New York State

18  Trooper, correct?

19      A    Yes, sir.

20      Q    And what was your tour of duty on that day?

21      A    It was from 7 p.m. to 7 a.m.

22      Q    And were you working with a partner at that time

23  or were you working alone?

24      A    From midnight to 5 a.m. we have a partner.

25      Q    And your partner was?

Trooper O'Hare - Cross - LaMagna

```
 1      A      Trooper Michael Stafford.

 2      Q      Was Trooper Stafford with you in your vehicle?

 3      A      Between midnight and 5 a.m., yes.

 4      Q      Between midnight and five?

 5      A      Yes, that's when we double up.

 6      Q      At some point around 2:05 you received a call to

 7   respond to an accident scene, correct?

 8      A      Yes, sir.

 9      Q      And were you driving the vehicle or was Trooper

10   Stafford driving the vehicle?

11      A      Trooper Stafford was driving the vehicle, sir.

12      Q      And the location of this accident site or scene

13   that you were asked to respond to was on the Meadowbrook

14   Parkway, correct?

15      A      Yes, sir.

16      Q      And, specifically, the Meadowbrook Parkway at the

17   Babylon Turnpike exit?

18      A      Yes, sir.

19      Q      And thereafter you and Trooper Stafford responded

20   to that location?

21      A      Yes, sir.

22      Q      And you arrived at that location at approximately

23   2:30, would that be fair to say?  In that ball park?

24      A      Maybe a little before that.

25      Q      Two-twenty?
```

Trooper O'Hare - Cross - LaMagna

1     A     Yes, approximately, sir.

2     Q     And when you arrived at that location at

3     approximately 2:20 there were other members of law

4     enforcement already present, correct?

5     A     Yes, sir.

6     Q     In fact, other members of the New York State

7     Police Department, correct?

8     A     Yes, sir.

9     Q     And when you arrived where would you say you

10    parked your vehicle?

11    A     We parked it southbound on the Meadowbrook State

12    Parkway, just north of the accident scene.

13    Q     Both you and Trooper Stafford exited the vehicle

14    together?

15    A     Yes, sir.

16    Q     And the first Trooper that you spoke to was a

17    Trooper Knapp, correct?

18    A     Yes, sir.

19    Q     Was Trooper Stafford with you when you engaged

20    Trooper Knapp?

21    A     I don't recall.

22    Q     When you spoke with Trooper Knapp, Trooper Knapp

23    informed you that there was a serious accident, certainly?

24    A     Yes, sir.

25    Q     Correct?

1     A     Yes.

2     Q     And you were able to see that yourself, correct?

3     A     Yes, sir.

4     Q     That there were fatalities involved, correct?

5     A     Yes, sir.

6     Q     And one of the drivers was a possible DWI,

7     correct?

8     A     Yes, sir.

9     Q     And then Trooper Knapp instructed you to go to

10    your trooper car to get a blood kit, correct?

11    A     Yes, sir.

12    Q     And were you informed at that point that you were

13    going to be going in the ambulance with Marty to the

14    hospital for the purposes of getting this blood sample or --

15    I'm sorry, go ahead.

16    A     Yes, sir.

17    Q     So, you were told those two things during that

18    conversation with Trooper Knapp, correct?

19    A     It was implied -- since I was getting the blood

20    kit it was implied that I would be going with the subject.

21    Q     Okay.  And that makes sense, correct?

22    A     Yes, sir.

23    Q     So you went to your vehicle to get the blood kit,

24    correct?

25    A     Correct.

1    Q    And where was the blood kit located?

2    A    In the trunk of the vehicle.

3    Q    And how long had that blood kit been in the trunk

4    of your car?

5    A    I don't know.

6    Q    Is there any log, paperwork to show how long this

7    blood kit was sitting in the trunk of your car?

8    A    There is an expiration date on the cardboard box.

9    Q    Other than the expiration date on the cardboard

10   box what I am asking you is:  Is there a log or any

11   paperwork that will show how long that blood kit box was

12   sitting in your trunk prior to July 2nd 2005?

13   A    No, sir.

14   Q    So it could have been sitting there for many

15   months, correct?

16   A    I don't know.  I am not sure.

17   Q    Well, is that conceivable?

18   A    Yes, sir.

19   Q    Could have been a year conceivably?

20   A    Yes, sir.

21   Q    Now, there is obviously no climate control in

22   your trunk, correct?

23   A    No, sir.

24   Q    Now, you said that you went to your car, you got

25   the blood kit, correct?

Trooper O'Hare - Cross - LaMagna

1    A    Yes, sir.

2    Q    And then you immediately returned to Trooper

3  Knapp, correct?

4    A    I didn't walk back to him.  I walked over to the

5  scene and waited for them to extract the suspect from the

6  pick-up truck.

7    Q    So you received your blood kit?

8    A    Uh huh.

9    Q    You walked to the Silverado pick-up, correct?

10   A    Yes, sir.

11   Q    And it is at that time that Marty was being

12 extracted from the vehicle, or was he already out of the

13 vehicle?

14   A    They were still trying to take him out of the

15 vehicle, sir.

16   Q    And then they put him on a backboard, correct?

17   A    Yes.

18   Q    Neck brace, correct?

19   A    I don't believe they put the neck brace on right

20 away.  I think that they put him on the backboard.

21   Q    At some point they put the neck brace on?

22   A    Yes, sir.

23   Q    And then to the ambulance, correct?

24   A    Yes, sir.

25   Q    Now, you went then to the ambulance, correct?

Trooper O'Hare - Cross - LaMagna

1    A    Yes, sir.

2    Q    With the blood kit in hand?

3    A    Yes, sir.

4    Q    Knowing that it is now going to be your job to go

5    in the ambulance with Marty to the hospital, correct?

6    A    Yes, sir.

7    Q    And once at the hospital it was your job to get a

8    blood sample, using the blood kit, from Marty, correct?

9    A    Yes, sir.

10    Q    That was your job, correct?

11    A    Yes, sir.

12    Q    Did Trooper Knapp give you any other instructions

13    with respect to when, if you are successful in getting this

14    blood sample, give us a call because we are going to be

15    here, let us know you have got it?

16    A    No, sir.  I did not speak to Trooper Knapp after

17    that first encounter.

18    Q    Were you given any instructions by anybody about

19    what to do if you were able to complete the job or task that

20    you were given?

21    A    No, sir.

22    Q    So nobody told you when you get the blood sample

23    call anybody?

24    A    No, they didn't have to.

25    Q    Call Trooper Harris?

Trooper O'Hare - Cross - LaMagna

1      A      No.

2      Q      Call Trooper Knapp?  Nobody?

3      A      No, sir.

4      Q      Did anybody give you any instructions, once you

5   get the blood kit hand it over to investigator Baez, or

6   Trooper Stafford?  Did anybody tell you that?

7      A      No, sir.

8      Q      So you received no instructions what to do with

9   the blood kit other than try and get a blood sample,

10   correct?

11      A      Yes, sir.

12      Q      Now, you enter the ambulance, correct?

13      A      Yes, sir.

14      Q      And in the ambulance was yourself, Marty and AMT

15   Cook; is that correct?

16      A      Yes, sir.

17      Q      Did you see Trooper Siegler in the ambulance

18   before you got there?

19      A      No, sir.

20      Q      He wasn't in the ambulance and you kind of

21   switched spots?

22      A      No, sir.

23      Q      Now, at some point -- withdrawn.

24            At that point Marty was clearly conscious,

25   correct?

Trooper O'Hare - Cross - LaMagna

1    A    His eyes were open, he was making moans and

2    groans and flailing his arms around.

3    Q    And you had testified previously that at that

4    point he was conscious, correct?

5    A    Yes, sir.

6    Q    So he was conscious, correct?

7    A    Yes, sir.

8    Q    Now, the hospital that you were going to was the

9    Nassau University Medical Center, correct?

10   A    Yes, sir.

11   Q    And the ride from the Meadowbrook Parkway and

12   Babylon Turnpike to the Nassau County -- Nassau University

13   Medical Center is not that far of a distance, correct?

14   A    Yes, sir.

15   Q    It took you about ten minutes, you would say?

16   A    Approximately, sir.

17   Q    And you arrived at the medical center, give or

18   take, around 2:40, 2:45?

19   A    Approximately, sir.

20   Q    Around there?

21   A    Yes.

22   Q    When you arrived at the medical center you and

23   AMT Cook took Marty out of the ambulance, correct?

24   A    Yes, sir.

25   Q    He was in, like, a gurney?

Trooper O'Hare - Cross - LaMagna

1     A     Yes, sir.

2     Q     And he was rolled into an ER room, an emergency

3  room, correct?

4     A     Yes, sir.

5     Q     And you had your blood kit with you, correct?

6     A     Yes, sir.

7     Q     And the blood kit is the exact same type of blood

8  kit -- may I -- as we have in evidence, which is People's

9  Exhibit 16 in evidence, correct?

10    A     Yes, sir.

11    Q     You are familiar with blood kits, correct?

12    A     Yes, sir.

13    Q     You have been trained in the use of the blood

14  kits, correct?

15    A     Yes, sir.

16    Q     You have had experience using blood kits,

17  correct?

18    A     Yes, sir.

19    Q     And you have been successful in being able to get

20  blood samples from individuals using that kit, correct?

21    A     Yes, sir.

22    Q     Familiar with all of the paperwork concerning,

23  related, to the blood kit, correct?

24    A     Yes, sir.

25    Q     And the procedures in how to use the blood kit,

Trooper O'Hare - Cross - LaMagna

```
1    correct?

2         A    Yes, sir.

3         Q    And it is always the same, correct?

4         A    Yes, sir.

5         Q    Now, you testified on direct concerning --

6    withdrawn.

7              You testified on direct examination concerning

8    the contents of this blood kit, correct?

9         A    Yes, sir.  Yesterday.

10        Q    They are all the same; isn't that correct?

11        A    Yes, sir.

12        Q    You testified that there are two vacutainer brand

13   test tubes, correct?

14        A    Yes, sir.

15        Q    Those test tubes are gray-topped test tubes,

16   correct?

17        A    Yes, sir.

18        Q    And they are sealed, correct?

19        A    Yes, sir.

20        Q    And they are sterile, correct?

21        A    Yes, sir.

22        Q    Of whatever is inside, correct?

23        A    Yes, sir.

24        Q    You didn't break that seal or do anything with

25   respect to those test tubes, correct?
```

Trooper O'Hare - Cross - LaMagna

1        A        No, sir.

2        Q        You also said that contained in the kit there is

3    one vacutainer holder, correct?

4        A        Yes, sir.

5        Q        And that is where the blood tube goes into as the

6    nurse or the medical technician is drawing the blood,

7    correct?

8        A        Yes, sir.

9        Q        And you also testified that there is one sterile

10   disposable vacutainer needle, correct?

11       A        Yes, sir.

12       Q        And that fits into the holder too, and also the

13   test tube goes into the needle as well, correct?

14       A        Yes, sir.

15       Q        And that needle is sterilized as well, correct?

16       A        Yes, sir.

17       Q        In fact, there is, like, a top, correct, a green

18   top to it?

19       A        Yes, sir.

20       Q        And there is a vacutainer seal around it,

21   correct?

22       A        Yes, sir.

23       Q        Just like the test tubes they are sealed,

24   correct?

25       A        Yes, sir.

Trooper O'Hare - Cross - LaMagna

```
 1      Q      And you have to crack open the seal to get to the
 2   needle, correct?
 3      A      Yes, sir.
 4      Q      And you didn't do that with the test tubes,
 5   right?
 6      A      I did not open the test tubes, no, sir.
 7      Q      And there is an antiseptic swab as part of that
 8   kit as well, correct?
 9      A      Yes, sir.
10      Q      That is a swab that you have to give the medical
11   personnel to use, specifically that swab when taking blood,
12   correct?
13      A      Yes, sir.
14      Q      And you testified that you recall the nurse
15   actually using that swab.  Are you sure about that?
16      A      From what I recall, yes.
17      Q      Does that mean you may not be correct?
18      A      No.
19      Q      Or do you recall that?
20      A      I recall it.
21      Q      And there is various seals, correct?
22      A      Yes, sir.
23      Q      There is, in fact, six seals, correct?
24      A      Yes, sir.
25      Q      There is four white ones and two red ones,
```

Trooper O'Hare - Cross - LaMagna

1     correct?

2         A     Yes, sir.

3         Q     There is an absorbent pad and various other

4     paperwork, correct?

5         A     Yes, sir.

6         Q     And there is the Lab-1, correct, which is a

7     police form, correct?

8         A     Yes, sir.

9         Q     And then there is a blood collection report,

10    correct?

11        A     Yes, sir.

12        Q     And those two reports are kept by the New York

13    State Police Department as a record, correct?

14        A     Yes, sir.

15        Q     And it is their business to keep such records,

16    correct?

17        A     Yes, sir.

18        Q     And it is made by a person with knowledge of what

19    is contained in that record, correct?

20        A     Yes, sir.

21        Q     Now, when you arrived at the hospital I suspect

22    there was a lot going on in the emergency room, considering

23    the gravity of this accident, correct?

24        A     Yes, sir.

25        Q     There came a point in time, however, when Marty

 1    was brought to an area in the emergency room, correct?

 2         A    Yes, sir.

 3         Q    And it was at that time that you saw a nurse; is

 4    that correct?

 5         A    Yes, sir.

 6         Q    And that nurse was named Dorothy Busco?

 7         A    Last name Busco, yes, sir.

 8         Q    You had never met Ms. Busco before, correct?

 9         A    No, sir.

10         Q    Did you know if she was a registered nurse or any

11    other type of nurse?

12         A    She had an I.D. tag, and on it it said she is an

13    R.N.

14         Q    And you recall that as you are sitting here

15    today?

16         A    Yes, sir.

17         Q    And you said, or you demonstrated for the jury,

18    that you opened up the outer box, correct?

19         A    Yes, sir.

20         Q    And within the outer box is an inner box,

21    correct?

22         A    Yes, sir.

23         Q    And the inner box is a plastic box, correct?

24         A    Yes, sir.

25         Q    As you had shown us yesterday.  Is this what you

1    are referring to?

2        A    Yes, sir.

3        Q    And this inner box is sealed, correct?

4        A    Yes, sir.

5        Q    With all of those instruments and tools inside,

6    correct?

7        A    Yes, sir.

8        Q    Safeguarding this sterile environment of each

9    one, and that they haven't been tampered with, correct?

10       A    Yes, sir.

11       Q    Now, you said that you opened up that seal of the

12   inner box and handed the tools or the materials to the nurse

13   to take the blood, correct?

14       A    Yes, sir.

15       Q    She took out the two tubes?

16       A    Yes, sir.

17       Q    Right?

18       A    Yes.

19       Q    She took out the swab, correct?

20       A    Yes, sir.

21       Q    And she took out the needle, correct?

22       A    Yes, sir.

23       Q    And she took out the holder, correct?

24       A    Yes, sir.  Yep.

25       Q    There was nothing left in the inner box at this

Trooper O'Hare - Cross - LaMagna

1    point, correct?

2         A    Yes, sir.  All of the paperwork I took out and

3    put underneath the cardboard, and I'm holding it.

4         Q    You are holding an empty plastic inner box,

5    correct?

6         A    Yes, sir.

7         Q    You testified that you actually observed the

8    nurse draw the blood, correct?

9         A    Yes.  I was behind her.

10        Q    And you saw the nurse put the swab, use the swab

11   on Marty?

12        A    Yes.

13        Q    You saw her put it on his arm?

14        A    I saw her put a swab on there, yes, sir.

15        Q    And then she threw out the swab after it was

16   done?

17        A    She discarded it.

18        Q    They have these biohazard material canisters in

19   hospitals, correct?

20        A    I didn't see exactly where she threw it out.

21        Q    You saw her throw it out?

22        A    It was discarded.  It was not returned to me.

23        Q    You then saw her take the vacutainer needle,

24   correct?

25        A    Uh huh.  Yes, sir.

Trooper O'Hare - Cross - LaMagna

1      Q      You saw her open up the needle, correct?

2      A      Yes, sir.

3      Q      You saw her put the needle in the holder,

4    correct?

5      A      Yes.

6      Q      You saw her actually stick Marty with the needle,

7    with the holder, correct?

8      A      Yes, sir.

9      Q      And then she took one of the vacutainer tubes,

10   correct?

11     A      Yes, sir.

12     Q      And placed it in the holder?

13     A      Yes, sir.

14     Q      And you observed this happening, correct?

15     A      Yes, sir.

16     Q      Now, when the tube was filled did she hold onto

17   that tube until the next tube was filled, or did she give

18   you the first tube?

19     A      She gave me back the first tube before she filled

20   the second tube.

21     Q      So the tube fills.  You watch this, correct?

22     A      Yes, sir.

23     Q      And she gives you just the one tube after being

24   filled, correct?

25     A      Yes, sir.

Trooper O'Hare - Cross - LaMagna

1    Q    And you take that tube?

2    A    Yes.

3    Q    And you --

4    A    Invert it.

5    Q    -- inverted it.

6         Now, how many times did you invert it?

7    A    You have to do it at least twenty times as per

8    the instructions.

9    Q    Had you testified previously that you only

10   inverted it a couple of times?

11   A    I believe I testified I inverted it several

12   times.

13   Q    You are saying now twenty times?

14   A    That's what it says on the instructions.

15   Q    I do know that.  What I'm asking you is:  Did

16   you previously testify that you had inverted it several

17   times?

18   A    I believe in previous testimony I said I inverted

19   it several times.

20   Q    You never said "twenty"?

21   A    Never put an approximate number.

22   Q    Today you are saying twenty times?

23   A    No.  I'm referring to the instructions.  It says

24   at least twenty times.

25   Q    You read the instructions as you are doing this,

Trooper O'Hare - Cross - LaMagna

1    correct?

2         A    Yes, sir.  I don't have it memorized, the

3    instructions.

4         Q    You read them, the instructions that were in the

5    kit?

6         A    I follow along as she is doing it, yes, sir.

7         Q    It is important to follow the instructions,

8    correct?

9         A    Yes, sir, it is.

10        Q    Especially in a situation like this where there

11   are in specific instructions for the purpose of taking

12   blood, correct?

13        A    Yes, sir.

14        Q    So, as she is doing what is she is doing you are

15   looking at the instructions to make sure that you follow

16   them correctly, correct?

17        A    Yes, sir.

18        Q    And, in fact, there are two instruction sheets:

19   There is a New York State instruction blood sample specimen

20   sheet?

21        A    Yes, sir.

22        Q    In fact, there is also instructions on the back

23   of the Lab-1, correct?

24        A    Yes, as best I can recall.

25        Q    They are pretty much the same, right?

Trooper O'Hare - Cross - LaMagna

```
 1        A      Yes, sir.

 2        Q      So, getting back to my other question, you get

 3   the first blood sample in the tube, correct?

 4        A      Yes, sir.

 5        Q      The seal was never broken, the top was never

 6   taken off?

 7        A      Yes, sir.

 8        Q      You inverted it.  What do you mean by "inverted

 9   it"?

10        A      Just turn it from side to side, like this.  You

11   don't shake it.

12               (Witness indicating.)

13        Q      And you did that, correct?

14        A      Yes, sir.

15        Q      And then while you are doing that that is when

16   the nurse is actually doing the second draw on the second

17   blood?

18        A      Yes, sir.

19        Q      And you are observing that too?

20        A      I'm inverting it.

21        Q      You are standing right there?

22        A      I'm right next to her, yes.

23        Q      You observed that?

24        A      Yes, sir.

25        Q      When you got the second tube did you repeat that,
```

1    inverting it back and forth?

2         A    Yes, sir.

3         Q    Twenty times?

4         A    Approximately.

5         Q    Just bear with me one second.

6         A    Take your time.

7         Q    It does say on the instruction sheet to invert

8    twenty times.  Is that where you got that from?

9         A    From what I recall, yes, sir.

10        Q    So, in reviewing this paperwork before court you

11   know you followed the instructions, because that's why you

12   are saying you did it twenty times?

13        A    Yes, sir.  Approximately.

14        Q    Now, when you received the second blood tube --

15   you had both now, correct?

16        A    Yes, sir.

17        Q    So, the nurse is done?

18        A    Yes, sir.

19        Q    She discards the needle, correct?

20        A    Yes.  As soon as I get the second tube I step

21   right over to the side and start inverting it, away from the

22   gurney, because the medical technicians were doing numerous

23   medical procedures.

24        Q    You get the blood tubes, the nurse is finished

25   with what she has to do, she discards the holder, correct?

Trooper O'Hare - Cross - LaMagna

```
 1       A     I didn't see her discard it, but I'm sure she

 2   did.

 3       Q     She discarded the needle?

 4       A     I'm sure she did.  I didn't see it.

 5       Q     Discarded all of the other materials, correct?

 6       A     I'm sure she did.

 7       Q     You didn't receive them back?

 8       A     I did not receive them back.

 9       Q     They were already used, correct?

10       A     Yes, sir.

11       Q     So you received the two tubes and you take those

12   two tubes and you place them back into the plastic

13   container, correct?

14       A     Yes, sir.

15       Q     And did you put the name of Mark Heidgen on the

16   actual tube?

17       A     No, sir, I did not.

18       Q     You are saying because you did not know his name

19   at that time, correct?

20       A     Yes, sir.

21       Q     Was Trooper Stafford present when this was all

22   happening?

23       A     I noticed Trooper Stafford was in the room after

24   the blood was drawn when I stepped to the side to fill out

25   the seals, as much as I could of the seals.
```

1      Q    So Trooper Stafford was present when you were

2    filling out the seals, I think that you testified yesterday,

3    correct?

4      A    Yes.

5      Q    Were you aware that Trooper Stafford was given

6    information by Trooper Siegler that the identity of the

7    individual you had was named Marty Heidgen?

8      A    Could you repeat that?  I'm sorry.

9      Q    Were you made aware by Trooper Stafford that

10   Trooper Siegler had called him and told him the identity of

11   the individual that you were taking the blood from as being

12   Marty Heidgen?

13     A    No, sir.

14     Q    Trooper Stafford never discussed that with you?

15     A    No, sir.

16     Q    Never told you this guy's name is Martin Heidgen;

17   Trooper Siegler called me and told me that?

18     A    No, sir.

19     Q    He was with you from 2:45 through the time that

20   you ended up leaving, correct?

21     A    Approximately.

22     Q    He was with you when you were doing the paperwork

23   on this blood kit, correct?

24     A    Yes, sir.

25     Q    And he never articulated to you the name of the

Trooper O'Hare - Cross - LaMagna

1    subject as being Martin Heidgen, correct?

2         A    Yes, sir.

3         Q    Now you then testified, pursuant to the

4    instructions, that you filled out all six seals, correct?

5         A    As best as I could, yes, sir.

6         Q    And on each tube you put a seal on top of it,

7    correct?

8         A    Yes, sir.

9         Q    And you demonstrated to us what you actually did,

10   correct?

11        A    Yes, sir.

12        Q    You took one of the white seals with the

13   information that you had and you laid it on the top of the

14   gray stopper, correct?

15        A    Yes, sir.

16        Q    And you took another white seal and you placed it

17   on the top of the gray stopper of the second tube, correct?

18        A    Yes, sir.

19        Q    And then you placed it into the plastic kit,

20   correct?

21        A    Yes, sir.

22        Q    And then you took two integrity seals, the red

23   ones, correct?

24        A    Yes, sir.

25        Q    And sealed up the inner box, correct?

Trooper O'Hare - Cross - LaMagna

1     A    Not at that time, sir.

2     Q    Okay.  You just filled out the integrity seals?

3     A    Yes, sir.

4     Q    So, all that was in.  Now you are almost

5   finished.  The completed interior box contains just the two

6   tubes, correct?

7     A    Yes, sir.

8     Q    But you didn't seal them, correct?

9     A    I seal the top of the tubes, but not the inside

10  plastic box.

11    Q    So, according to the instructions those were

12  supposed to be sealed, correct?

13    A    Yes, sir.

14    Q    And you didn't seal them?

15    A    No, sir, I did not.

16    Q    Now, did you personally ever seal the inner

17  plastic box?

18    A    No, sir, I did not.

19    Q    But you had completed seals, correct?

20    A    Yes.

21    Q    In your handwriting?

22    A    I -- the seals were completed to the best of my

23  ability.

24    Q    So what I'm asking you is:  There were seals

25  unused that you filled out, correct?

Trooper O'Hare - Cross - LaMagna

1        A      Yes, sir.

2        Q      That were to be used by somebody else to seal

3   this box, correct?

4        A      Correct.

5        Q      So, a person other than you would be using seals

6   you filled out to seal this box, correct?

7        A      Yes, sir.

8        Q      So you never seal the box?

9        A      That's correct.

10       Q      There is also a blood collection report that

11   needs to be filled out, correct?

12       A      Yes, sir.

13              MR. LaMAGNA:  Could I have this marked,

14         Defendant's Exhibit C.

15              (Whereupon, a blood collection kit is

16         received and marked Defendant's Exhibit C for

17         identification.)

18              COURT OFFICER:  Defendant's Exhibit C marked

19         for identification

20              MR. LaMAGNA:  I ask you to show that to the

21         Trooper, if you may, please.

22       Q      I'm showing you, Trooper, what has been marked as

23   Defendant's Exhibit C for identification.  I ask you to take

24   a look at that.  Do you recognize that?

25       A      Yes, sir.

Trooper O'Hare - Cross - LaMagna

```
 1        Q     And what do you recognize that to be?

 2        A     It is the blood collection report from the

 3   incident, from a New York State blood kit.

 4        Q     Is that your handwriting on it?  Did you fill

 5   that out?

 6        A     The top part?

 7        Q     Yes.

 8        A     No, I did not.

 9        Q     Did you fill out the time and date?

10        A     No, I did not.

11        Q     Did you fill out any of that?

12        A     No, sir, I did not.

13        Q     Is that the report that came with this kit in the

14   case?

15        A     Yes, sir.

16        Q     Did you have Dorothy Busco sign that?

17        A     Yes, sir, I did.

18        Q     Do you recall that?

19        A     Yes, sir, I did.

20        Q     Is that document, again as I said before, a

21   document, a New York State Police document?

22        A     Yes, sir, it is.

23        Q     It is the business of the New York State Police

24   to keep such documents?

25        A     Yes, sir.
```

1       Q       And the information on that is made by a person

2       from the New York State Police, and timed close in time to

3       when it was prepared?

4       A       Yes, sir.

5       Q       And it is the ordinary course of the New York

6       State Police to keep these documents?

7       A       Yes, sir.

8                       MR. LaMAGNA:  Judge, I ask that be marked

9               into evidence.

10                      THE COURT:  Please show it to counsel.

11                      MS. McCORMICK:  No objection.

12                      THE COURT:  It is received.

13                      (Whereupon, Defendant's Exhibit C for

14              identification now received and marked Defendant's

15              Exhibit C in evidence.)

16                      COURT OFFICER:  Defendant's Exhibit C

17              received in evidence.

18      Q       Now, with the blood collection report that you

19      had Nurse Busco sign --

20      A       Yes, sir.

21      Q       -- pursuant to the instructions, isn't it a fact

22      that underneath it, which is blank, it says, "I certify that

23      I have witnessed the actual withdrawal of blood from the

24      above-named subject by the person whose signature appears

25      above it"?

GIGI WRIGHT, RPR    (516) 571-2503

1      A    Yes, sir.

2      Q    Wasn't that supposed to be filled out by the

3   person who actually observed the blood being withdrawn?

4      A    Yes, sir.

5      Q    That being you?

6      A    Yes, sir.

7      Q    That is completely blank, correct?

8      A    Yes, sir, it is.

9      Q    You never filled that out; is that correct?

10      A    That's correct.

11      Q    Now, Trooper, after you -- withdrawn.

12           I'm going to show you what is People's Exhibit 17

13   for identification, which is -- well, let me show it to you.

14                (Handing.)

15      Q    Do you recognize that?

16      A    Yes, sir.

17      Q    And what do you recognize that to be?

18      A    It is a State Police blood kit involving the

19   incident.

20      Q    Can you tell us which seals you actually filled

21   in, or what portion of the seals you actually filled out?

22      A    Yes, sir.  The two white seals.

23      Q    Did you fill those out completely?

24      A    No, sir, I did not.

25      Q    So, you only filled out what portion of those two

Trooper O'Hare - Cross - LaMagna

1    seals?

2         A       I filled out "specimen collector," I put "R.N.

3    Busco"; "police officer initials," I put my initials; date,

4    I put the date of the incident; and I put the time of the

5    incident on both of them.  Both of them are identical.

6         Q       So the name "Martin Heidgen" was not put on by

7    you, correct?

8         A       That is correct, sir.

9         Q       That was put on subsequently by somebody else,

10   correct?

11        A       Yes, sir.

12        Q       Somebody else completed the seals that you had

13   already written on, correct?

14        A       Yes, sir.

15        Q       So, the seals that you prepared, the seals that

16   you put on there, were incomplete, correct?

17        A       Yes, sir.

18        Q       And it was subsequently somebody else who filled

19   in the rest of the blanks, correct?

20        A       Yes, sir.

21        Q       And the rest of the blanks was the name of the

22   person Martin Heidgen, correct?

23        A       Yes, sir.

24                MR. LaMAGNA:  I'm going to have this marked

25         for identification as Defendant's Exhibit D.

Trooper O'Hare - Cross - LaMagna

```
 1              (Whereupon, a label is received and marked

 2      Defendant's Exhibit D for identification.)

 3              COURT OFFICER:  Defendant's Exhibit D marked

 4      for identification.

 5              MR. LaMAGNA:  May I have that shown to the

 6      witness, please.

 7              (Handing.)

 8        Q    Trooper, I show you what has been marked

 9      Defendant's Exhibit D for identification.  I ask you to look

10      at it.  Do you recognize it?

11        A    Yes, sir.

12        Q    What do you recognize that to be?

13        A    It is the police officer's chain of possession on

14      the plastic.

15        Q    In fact, that is the cover, that is the cover

16      label on the blood kit, correct?

17        A    Yes, sir.

18        Q    And that is a copy of the blood kit, correct?

19        A    Yes, sir, it is.

20        Q    Can you look at that, can you look at that and

21      answer us with respect to any of the writing on that, what

22      writing did you actually put on there?

23        A    Okay.  Second line it says, "Name of offense:

24      DWI."  I wrote that.  "Date of incident.  Time," I wrote

25      that down as well.
```

Trooper O'Hare - Cross - LaMagna

 1              "Trooper O'Hare," my name.  I wrote that.  Date

 2      the blood was drawn and the time, I wrote that.  "Location

 3      of drawing," I put down "Nassau County Medical Center, NCMC,

 4      blood drawn by R.N. Busco," I wrote that as well.  And then

 5      below that in big letters it says "Chain of possession, it

 6      is from defendant," I wrote that, "to Busco," the R.N.'s

 7      last name; date and time of that.  Then below that that is

 8      the last I wrote.  The last thing I wrote was "from

 9      defendant to Busco," and the date and time.

10          Q     Great.  Could I have that back, please.

11          A     Yes, sir.

12          Q     Above where it has "offense," again it has "Name

13      of subject"?

14          A     Yes, sir.

15          Q     That you left blank, correct?

16          A     Yes, sir.

17          Q     That was blank to be filled out by somebody else,

18      correct?

19          A     Yes, sir.

20          Q     Somebody other than you, correct?

21          A     Yes, sir.

22          Q     And this was the kit that you were producing,

23      correct?

24          A     Yes, sir.

25          Q     And after received from defendant to Busco --

Trooper O'Hare - Cross - LaMagna

```
 1       A      Yes, sir.

 2       Q      -- the next chain would be from Busco to you?

 3       A      Yes, sir.

 4       Q      Correct?

 5       A      Yes, sir.

 6       Q      You didn't write that in here, did you?

 7       A      No, sir, I did not.

 8       Q      So this would be this chain, this chain would be,

 9    at least initially, incorrect, correct?

10       A      My name -- my name is on the top part though.

11       Q      That's not what I am asking you.

12       A      It --

13       Q      It says, "Chain of possession," correct?

14       A      Yes, sir.

15       Q      You wrote "Defendant to Busco," correct?

16       A      Yes, sir.

17       Q      Then it says "from Stafford to Baez," correct?

18       A      Yes, sir.

19       Q      You didn't write that,?

20       A      No.

21       Q      Somebody else wrote that?

22       A      Yes, sir.

23       Q      What I'm saying to you is:  The correct chain

24    would have been, according to your testimony, defendant to

25    Busco, Busco to you, right?
```

Trooper O'Hare - Cross - LaMagna

1      A     Yes, sir.

2      Q     So you would agree then that the chain of

3   possession as articulated this is not correct, correct?

4      A     Yes, sir.

5      Q     And, again, these were entries that you didn't

6   fill out, correct?

7      A     Yes, sir.

8      Q     These were entries that somebody else filled out

9   after you didn't have the box anymore, correct?

10     A     Yes, sir.

11     Q     And, in particular, the name of the subject was

12  left blank for somebody else in the future to put in,

13  correct?

14     A     Yes, sir.

15     Q     Now, another form, police form, that is contained

16  in the blood kit is a form called a Lab-1 correct?

17     A     Yes, sir.

18     Q     And a Lab-1 is a New York State Police Crime

19  Laboratory Submission form?

20     A     Yes, sir.

21     Q     That Lab-1 follows the piece of evidence, the

22  box, correct?

23     A     Yes, sir.

24     Q     And according to the police instruction sheets

25  that you had you were to fill out that Lab-1, correct?

Trooper O'Hare - Cross - LaMagna

1    A    To the best of my ability, yes, sir.

2            MR. LaMAGNA:  Could I have this marked for

3    identification.

4            (Whereupon, Laboratory-1 received and marked

5    Defendant's Exhibit E for identification.)

6            COURT OFFICER:  Defendant's Exhibit E marked

7    for identification.

8            MR. LaMAGNA:  May I have it shown to the

9    witness.

10   Q    Trooper O'Hare, I show you what has been marked

11   as Defendant's Exhibit E for identification.

12           I ask you to look at that.  Do you recognize

13   that?

14   A    Yes, sir.

15   Q    What do you recognize that to be?

16   A    It is a Laboratory-1, a New York State Police

17   crime report.

18   Q    And does that photocopy of the Lab-1 accurately

19   reflect the Lab-1 that was prepared in this case?

20   A    Yes, sir.

21           MR. LaMAGNA:  I would like to have that

22   introduced in evidence as well.

23           THE COURT:  Please show it to counsel.

24           (Handing.)

25           MS. McCORMICK:  No objection.

Trooper O'Hare - Cross - LaMagna

```
 1              THE COURT:  It is received.

 2              (Whereupon, Defendant's Exhibits D and E for

 3       identification now received and marked Defendant's

 4       Exhibits D and E in evidence.)

 5              COURT OFFICER:  Defendant's Exhibits D and E

 6       received in evidence.

 7       Q     There is a backside of that Lab-1, correct?

 8       A     Yes, sir.

 9       Q     And that is the guidelines and the instructions

10       that go along with the Lab-1, correct?

11       A     Yes, sir.

12       Q     Just to make sure that is complete, let me just

13       show you that --

14              MR. LaMAGNA:  Judge, it is the same document.

15       This is just the back of the document.  Should I give

16       it a different number?

17              THE COURT:  I think that the record will be

18       clear on that.

19              MR. LaMAGNA:  Thank you, Judge.

20       Q     Trooper, I ask you to take a look at that.  Is

21       that the other side of the Lab-1, the complete form?

22       A     Yes, sir.

23              MR. LaMAGNA:  I would ask that that be part

24       of that exhibit, since I failed to put them together.

25              THE COURT:  Any objection?
```

Trooper O'Hare - Cross - LaMagna

1          MS. McCORMICK:  Yes, your Honor.  Do you wish

2     to hear a reason?

3          THE COURT:  Yes.

4          MS. McCORMICK:  The reason, your Honor, is

5     while the front of the document is something filled out

6     by the Trooper, the back of the document is not

7     something filled out by him; therefore, it is not a

8     record kept in the ordinary course of business.  It is

9     just instructions.

10          MR. LaMAGNA:  Judge, it is the back page.  It

11     is the same sheet.

12          THE COURT:  Objection is overruled.  Mark it.

13          MR. LaMAGNA:  Just so the record is clear,

14     Defendant's Exhibit E is now these two documents, your

15     Honor.

16     Q    Now, looking at the that Lab-1 form, the front

17     page of that, what actually did you fill out on that Lab-1?

18     A    ~ I didn't fill out any of it.

19     Q    You didn't fill out anything?

20     A    Nothing.

21     Q    Nothing at all on the Lab-1?

22     A    Nothing at at all.

23     Q    Now, shouldn't this New York State Crime

24     Laboratory Submission form for this blood be filled out by

25     the person who was taking the blood?

GIGI WRIGHT, RPR   (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1    A    A lot of the information on there I didn't have:

2    Once again, defendant's name, defendant's address, current

3    charges.

4    Q    There is a lot more to that.  What I am asking

5    you is:  According to the instruction sheet it says the

6    person taking the blood sample, or observing it, or the

7    police officer, you, has to fill out this sheet that goes

8    with the kit to the lab, correct?

9    A    On the back of that sheet?

10   Q    Yes.

11   A    Okay.  If you say so.

12   Q    I'm asking you.

13   A    I --

14   Q    That's who is supposed to fill it out.

15   A    I haven't read the back of the Lab-1.  I just

16   follow the instructions on the --

17   Q    Okay, let me show it to you.

18        (Handing.)

19   A    Okay.

20   Q    And there is the New York State Police

21   instruction sheet that is already in evidence with the blood

22   kit that came with it.  And that says, that it is, that the

23   Lab-1 is to be completed, correct?  It says, "Complete

24   transfer of Lab-1 form."  That is the bottom portion.  Did

25   you fill that out?

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1     A     No, sir, I did not.

2     Q     Did you fill out -- and you filled out nothing on

3     this sheet?

4     A     No, sir, I did not.

5     Q     Could I have that back, please.

6           Did you know at the time the BCI -- what does BCI

7     case number mean?

8     A     It is just a case number assigned to every

9     individual case.

10    Q     That is Bureau of Criminal Investigation?

11    A     Yes, sir.

12    Q     And that is the State Trooper Division Bureau of

13    Criminal Investigations, correct?

14    A     Yes, sir.

15    Q     And each case gets an identifying case number,

16    correct?

17    A     Yes, sir.

18    Q     And that case number identifies the individual

19    associated with this case, correct?

20    A     Yes, sir.

21    Q     Much like a Social Security number, correct?

22    A     Yes, sir.

23    Q     And those case numbers go in sequential order,

24    correct?

25    A     To the best of my knowledge, yes, sir.

Trooper O'Hare - Cross - LaMagna

1      Q      Like 05-001 one would be the first case of the

2   year of 2005, correct?

3      A      Yes, sir.

4      Q      And the next case that comes along would be

5   05-002?

6      A      Yes, sir.

7      Q      And the next case would be 05-003 and so on?

8      A      Yes, sir.

9      Q      And the case number assigned, the BCI case number

10   assigned to this case, was 05-140, correct?

11      A      Yes, sir.

12      Q      And that was the identifying number relating to

13   Martin Heidgen's case, correct?

14      A      Yes, sir.

15      Q      And all of the paperwork that gets generated all

16   has that identifying number so you know that that paperwork

17   is associated with this case, correct?

18      A      Yes, sir.

19      Q      And all evidence collected has that identifying

20   number so you know that that evidence belongs to this case,

21   correct?

22      A      Yes, sir.

23      Q      And that's why on that Lab-1 the BCI number of

24   05-140 is on there, correct?

25      A      Yes, sir.

GIGI WRIGHT, RPR   (516) 571-2503

1          Q       So you know that this evidence, this blood kit,

2     belongs to the case of Martin Heidgen, correct?

3          A       Yes, sir.

4          Q       And not somebody else, correct?

5          A       Yes, sir.

6          Q       And that's why those numbers are very important

7     to put on this paperwork, correct?

8          A       Yes, sir.

9          Q       Because certain things are very fungible, like

10    blood; you can't tell whose blood somebody's is, correct?

11         A       Yes, sir.

12         Q       And you look at the case number to match it up

13    with the individual, correct?

14         A       Yes, sir.

15         Q       Now, may I have that back, please.

16                 So, on the transfer record, the transfer record

17    relates to the chain of custody, correct?

18         A       Yes, sir.

19         Q       And the chain of custody is to articulate with

20    specificity each person that touched a piece of evidence,

21    and articulate who has it, and who you give it to you,

22    correct?

23         A       Yes, sir.

24         Q       And, for example, as you started, the original

25    chain on the box, it went from the defendant, according to

Trooper O'Hare - Cross - LaMagna

1      you, to the nurse, correct?

2          A      Yes, sir.

3          Q      And you made a mistake by not putting you down

4      after the nurse, correct?

5          A      That's correct.

6          Q      And then you said you gave it to Stafford,

7      correct?

8          A      Yes, sir.

9          Q      And that's what you put down here, correct?

10         A      Yes, sir.

11         Q      So every person that receives it, when they give

12     it to somebody else, they have to articulate with

13     specificity to whom they are giving it to, correct?

14         A      Yes, sir.

15         Q      And the person to whom -- the person who gets

16     this specimen then signs their name verifying receipt of

17     this specimen, or the piece of evidence, correct?

18         A      Yes, sir.

19         Q      That's how a chain of custody works?

20         A      Yes, sir.

21         Q      To ensure the integrity of the evidence; is that

22     correct?

23         A      Yes, sir.

24         Q      To ensure there was no tampering with the

25     evidence, correct?

1       A     Yes.

2       Q     And to ensure it is the exact same piece of

3   evidence that originally started when it was taken, correct?

4       A     Yes, sir.

5       Q     Now, on this transfer record, on the Lab-1 -- and

6   this paperwork comes with the kit, correct?

7       A     Yes, sir.

8       Q     On this very paperwork it starts with blood kit

9   from Stafford to Baez, correct?

10      A     Yes, sir.

11      Q     Well, that is not accurate either, is it?

12      A     No, sir, it is not.

13      Q     This is the actual chain of custody report that

14  goes with the kit, correct?

15      A     Yes, sir.

16      Q     So, you didn't put on here that you had received

17  it first, or that Busco received it first, correct?

18      A     Correct.

19      Q     So, you would agree this transfer record of the

20  Lab-1 articulating the chain of custody is incorrect?

21      A     Yes, sir.

22      Q     Now, this Lab-1 travels with the blood kit,

23  correct?

24      A     Yes, sir.

25      Q     Now, do you know where the blood kit ultimately

1    went to be tested?

2        A    I believe it was the crime lab in Newburgh, New

3    York.

4        Q    That's upstate, New York?

5        A    Yes, sir.

6        Q    In fact, on the transfer record of the Lab-1

7    doesn't it state that Officer Harris did not bring it to

8    Newburgh, but instead brought it to the Medical Examiner's

9    Office, the toxicology department, in Mineola?

10       A    I can't tell.

11       Q    Take a look at it.

12       A    I can't tell from the print.

13       Q    Does it say, "ME's office toxicology"?

14       A    I can't tell with the print.  I see "ME" on the

15   front.

16       Q    After that does it say "office" and then

17   "toxicology"?

18       A    Yeah, it could be that.

19       Q    Do you see a date?  Does it say 7/12?

20       A    I believe so.

21       Q    Seven-twelve, July 12th.  Officer, Investigator

22   Harris is saying the very box that went to Newburgh actually

23   went to the Medical Examiner's Office?  Isn't that what it

24   says?

25       A    From what I could see, yes, sir.

1     Q     Could I have that back, please.

2           Obviously the same box could not have gone to two

3     different labs and got tested, correct?

4     A     Correct.

5     Q     Something is very wrong, right?

6           MS. McCORMICK:  Objection.

7           THE COURT:  Sustained.

8     Q     So after you gave it to Trooper Stafford you

9     never saw this box again, did you?

10    A     That's correct.

11    Q     You don't know who filled in the rest of your

12    seals, right?

13    A     That's correct.

14    Q     Somebody else did though, didn't they?

15    A     Yes, sir.

16    Q     Somebody else filled in the rest of the integrity

17    seals, correct?

18    A     Yes, sir.

19    Q     And somebody else put those integrity seals on

20    the inner box, correct?

21    A     Yes, sir.

22    Q     Not you?

23    A     No, sir.

24    Q     And you did not put any identifying

25    characteristic by name or initial on the actual tubes of the

Trooper O'Hare - Redirect - McCormack

```
 1    blood that was taken by Nurse Busco, correct?

 2        A    I put my initials on the test tubes.

 3        Q    Defendant's name?

 4        A    Oh, no, sir.

 5        Q    And you put your initials on the tubes, correct?

 6        A    Yes, sir.

 7        Q    And you did not fill out the collection report

 8    either, as it was supposed to be, correct?

 9        A    Yes, sir.

10        Q    Thank you, Trooper.

11             MR. LaMAGNA:  I have nothing further, your

12    Honor.

13             THE COURT:  Redirect?

14             MS. McCORMICK:  May I, your Honor?

15             THE COURT:  Yes.

16    REDIRECT EXAMINATION

17    BY MS. McCORMICK:

18        Q    Good morning, Trooper.

19        A    Good morning.

20        Q    Trooper, at the very beginning of your testimony

21    this morning you indicated that you didn't have to get

22    instructions from anybody.  What did you mean by that?

23        A    I have taken blood before so I did know the

24    procedure.  I am aware of it.

25        Q    I'm sorry?
```

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Redirect - McCormack

1     A     I am aware of the procedure.

2     Q     So you didn't need to get a specific instruction

3   from a particular person about how to proceed?

4     A     No.   Once I was told I have to get the blood, you

5   just get the blood kit, you go to the hospital and follow

6   the instructions on the blood kit, and secure the blood kit

7   as best you can.

8     Q     Trooper, you were also asked about how long that

9   blood kit could possibly have been inside the trunk of your

10  car.  Do you recall that?

11    A     Yes.

12    Q     Do you recall that you were asked, could it have

13  possibly been there a year?

14    A     Yes.

15    Q     Could it have possibly been there a day?

16    A     Yes.

17    Q     If you use a blood kit would you replace that

18  blood kit with another kit in the car?

19    A     Yes, ma'am.

20    Q     And have you done other blood kits?

21    A     Yes, ma'am.

22    Q     Do you use that same car all the time?

23    A     Pretty frequently.

24    Q     But other troopers also use that car?

25    A     Yes, ma'am.

Trooper O'Hare - Redirect - McCormack

1       Q       If other troopers require a blood kit they would

2    take the one in the trunk out of the car and replace it with

3    a new one; is that correct?

4       A       Yes, ma'am.

5       Q       Was the blood kit used to take the blood of

6    Martin Heidgen within the expiration of the blood kit?

7       A       Yes, ma'am, it was.

8       Q       Are there any restrictions, or any kind of

9    instructions about having to keep the blood kit

10   climate-controlled?

11      A       No, ma'am.

12      Q       Trooper, you say that you took out the

13   instructions and followed them; is that correct?

14      A       Yes, ma'am.

15      Q       And you were at the emergency room of the

16   hospital about ten minutes after you left the scene of the

17   crash?

18      A       Yes, ma'am.

19      Q       Do you recall, Trooper, about how much time

20   passed in the emergency room -- ten minutes to the hospital

21   -- how much time passed from the time you got to the

22   hospital to when that blood was actually drawn?

23      A       Approximately five minutes.

24      Q       Five minutes.

25              Total of fifteen minutes from the time you left

GIGI WRIGHT, RPR     (516) 571-2503

1    the crash so far?

2         A    Approximately.

3         Q    And I believe your prior testimony was that you

4    took the blood kit and walked over to a table, or area

5    within the emergency room, to start filling out paperwork;

6    is that correct?

7         A    Yes, ma'am.

8         Q    Trooper Stafford had not been with you at this

9    time; is that right?

10        A    Not that I recall.

11        Q    And did there come a time, as you stood at that

12   table, that he joined you there?

13        A    Yes, ma'am.

14        Q    And about how long were you standing at that

15   table filling out what little you could on the seals and the

16   paperwork?

17        A    Before I saw Trooper Stafford?

18        Q    Yes.

19        A    Approximately a minute.

20        Q    A minute?

21        A    Yes, ma'am.

22        Q    So, we are at about sixteen minutes; is that

23   right?  So far, approximately?

24        A    Yes, ma'am, approximately.

25        Q    From the time Trooper Stafford came into the

Trooper O'Hare - Redirect - McCormack

1    emergency room was he standing with you?

2        A    He was standing behind me after I noticed him.

3    He was standing behind me.

4        Q    How long did you stand there completing the

5    paperwork before you handed the blood kit to Trooper

6    Stafford?

7        A    Approximately a minute or two.

8        Q    And the time that you were there with Trooper

9    Stafford in the emergency room -- let me withdraw that.

10            He left you at that point; is that right?

11       A    I left.  After I gave him the blood kit I went

12   with the suspect, because he had to go get a CAT scan, and

13   had to be x-rayed and had to be moved to other rooms, and I

14   was assigned to stay with him.

15       Q    It was your job to stay with the defendant?

16       A    Yes, ma'am.

17       Q    And Trooper Stafford at this point separated from

18   you and you don't know to where?

19       A    Yes, ma'am.

20       Q    During the time that you were with Trooper

21   Stafford did his cell phone ring?

22       A    I don't recall.

23       Q    Did a radio go off from Trooper Siegler?

24       A    No, ma'am.

25       Q    To your knowledge did Trooper Stafford know the

Trooper O'Hare - Redirect - McCormack

1    name of the defendant at the last point you saw him before

2    you left the emergency room?

3         A    No, ma'am.

4              MR. LaMAGNA:   I'm going to object, your

5         Honor, to what he knew.

6              THE COURT:   Sustained.

7         Q    But no call was received in your presence?

8         A    No call was received in my presence, ma'am.

9         Q    And that was at about sixteen, seventeen minutes

10   from the time you left the crash scene?

11        A    Yes, ma'am.

12        Q    Can you tell the jury, please, Trooper, why

13   didn't you fill out that portion of the collection report, I

14   think that it is Defendant's Exhibit C?  Can you take a look

15   at that, again.

16             Actually, Trooper, before I leave that last

17   issue, did you or did you not know the name of the driver of

18   the pick-up truck at the time that you filled out the

19   paperwork in the emergency room?

20        A    I did not know his name.

21        Q    Had you known it would you have written it on the

22   seals?

23        A    Yes, ma'am.

24             MR. LaMAGNA:   Objection.

25             THE COURT:   Sustained.

Trooper O'Hare - Redirect - McCormack

1       Q       Taking a look at Defendant's Exhibit C in

2   evidence.  Do you see it there?

3       A       Yes, ma'am.

4       Q       That is the partially filled out collection

5   report?

6       A       Yes, ma'am.

7       Q       And it is your testimony that you specifically

8   recall having Nurse Busco sign that document?

9       A       Yes, ma'am.

10      Q       And that was directly in relation to taking the

11  defendant's blood?

12      A       Yes, ma'am.

13      Q       Why didn't you fill out the rest of the document?

14      A       It was an oversight.

15      Q       Trooper O'Hare, excuse me for one second.  What

16  is the purpose of that document?

17      A       Just to document the time and date that the blood

18  was drawn.

19      Q       Were you present when the blood was drawn?

20      A       Yes, ma'am.

21      Q       That is supposed to document what you saw?

22      A       Yes, ma'am.

23      Q       Did you see the blood actually drawn?

24      A       Yes, ma'am, I did.

25      Q       Is the fact that that blood report, collection

Trooper O'Hare - Redirect - McCormack

1    report, is not filled out, does that change the fact that

2    you saw it?

3         A    I saw it.

4         Q    And the time that that blood was drawn, do you

5    recall?

6         A    Yes, ma'am.

7         Q    What time?

8         A    Two-forty-five a.m.

9         Q    Trooper O'Hare, can you describe for the jury,

10   please -- I think that it was yesterday you said that the

11   emergency room was a big, wide-open room.  Is that right?

12        A    Yes, ma'am.

13        Q    Can you tell the jury where you were in

14   relationship to the defendant?  He is on a gurney; is that

15   correct?

16        A    Yes, ma'am.

17        Q    Are you by his face?  Where are you in

18   relationship to him?

19        A    I'm closer to his feet, on his right-hand side,

20   as he is laying down.

21        Q    His right-hand side?

22        A    Yes.

23        Q    Where is Nurse Busco in relationship to you?

24        A    She is in front of me, closer to his arm.

25        Q    And she is working on him?

Trooper O'Hare - Redirect - McCormack

```
 1      A     Yes, ma'am.

 2      Q     And I believe you testified that five or six

 3   people were around him at this point?

 4      A     Yes, ma'am.  There were numerous people in the ER

 5   working on him.

 6      Q     Big room, right?

 7      A     Yes, ma'am.

 8      Q     But is it fair to say that it was crowded around

 9   the defendant?

10      A     Yes, it was.

11      Q     So you are standing right behind or next to Nurse

12   Busco

13      A     Yes, ma'am.

14      Q     Is her back toward you or her side toward you as

15   she is working on the defendant?

16      A     More of her back.

17      Q     Are you standing, I believe you described

18   yesterday, with the open box with the contents of the blood

19   kit open and available for her to take?

20      A     Yes ma'am.

21      Q     She takes all of those contents?

22      A     Yes, ma'am.

23      Q     And you see her working on his arm?

24      A     Yes, ma'am.

25      Q     You see her inject him and take the blood?
```

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Redirect - McCormack

1       A       Yes, ma'am.

2       Q       So far as this case investigation is concerned,

3   Trooper, who is the investigator assigned to this

4   investigation, this crash?

5       A       Investigator Harris.

6       Q       Does Investigator Harris perform each and every

7   function required in the investigation of this crash?

8       A       No, ma'am.

9       Q       You were performing a function in the

10  investigation of this crash?

11      A       Yes, ma'am.

12      Q       Were there people sent out to the crash scene to

13  do measurements and photographs?

14      A       Yes, ma'am.

15      Q       Were there -- approximately how many troopers

16  were involved in the investigation of this crash?

17      A       Approximately a dozen.

18      Q       And do all of those troopers ultimately report

19  back to Investigator Harris?

20      A       Yes, ma'am.

21      Q       So that you are performing a function as part of

22  a team?

23      A       Yes, ma'am.

24      Q       With respect to the guidelines for taking blood

25  samples does it specifically require that you fill out the

Trooper O'Hare - Recross - LaMagna

1    documentation or that it be filled out as part of the

2    investigation?

3         A    I have to refer to it.

4         Q    I believe that is Defendant's Exhibit E, the back

5    of Defendant's Exhibit E in evidence.

6         A    It says down at the bottom here, "Complete

7    transfer record on Lab-1 form."

8         Q    You acknowledge, Trooper, that there were some

9    oversights in the paperwork that day; is that correct?

10        A    Yes, ma'am.

11        Q    But so far as other people filling out portions

12   of this document, they are part of the same investigative

13   effort?

14        A    Yes, ma'am.

15        Q    And, Trooper, at the time that you filled out the

16   documentation, one more time, you did not have the

17   defendant's name?

18        A    That is correct.

19             MS. McCORMICK:  I have nothing further.

20             MR. LaMAGNA:  Briefly, your Honor.

21   RECROSS-EXAMINATION

22   BY MR. LaMAGNA:

23        Q    Now, Trooper, your job was to go and get the

24   blood, correct?  From Marty, correct?

25        A    Yes, sir.

GIGI WRIGHT, RPR  (516) 571-2503

Trooper O'Hare - Recross - LaMagna

1      Q      And, in fact, you were specifically told by

2   Trooper Knapp to get your blood kit, correct?

3      A      Yes, sir.

4      Q      Didn't tell Trooper Stafford to do that, correct?

5      A      Yes, sir.

6      Q      He told you?

7      A      Yes, sir.

8      Q      Right?

9      A      Yes, sir.

10     Q      And you went and got the kit, correct?

11     A      Yes, sir.

12     Q      And then you were told you're going to go in the

13   ambulance with Marty to the hospital, correct?

14     A      Yes, sir.

15     Q      Not Trooper Stafford?

16     A      Yes, sir.

17     Q      And you followed those instructions and went to

18   the hospital in the ambulance with Marty with your blood

19   kit, correct?

20     A      Yes, sir.

21     Q      And you observed and participated with the nurse

22   in doing your job, correct?

23     A      Yes, sir.

24     Q      And your job was to get the blood, correct?

25     A      Yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Recross - LaMagna

1      Q      Not Trooper Stafford, correct?

2      A      Yes, sir.

3      Q      So in doing your job as it relates to getting the

4      blood sample it was your job to fill out this paperwork,

5      correct?

6      A      To the best of my ability, yes, sir.

7      Q      And, as you said, you made oversights in not

8      filling out the blood collection report, correct?

9      A      Yes, sir.

10     Q      This isn't an insignificant report, is it?

11     A      No, sir.

12     Q      In fact, this is a verification that the person

13     actually witnessed the blood being taken from a particular

14     person, correct?

15     A      Yes, sir.

16     Q      This is a very important verification, isn't it?

17     A      Yes, sir.

18     Q      You didn't fill that out, did you?

19     A      I did not fill it out, sir.

20     Q      So there is no official verification as is

21     supposed to be of the person who observed the blood being

22     taken, correct?

23     A      Yes, sir.

24     Q      So you would agree, it is more than just a little

25     oversight, isn't it?

Trooper O'Hare - Recross - LaMagna

1      A      It is an oversight, sir.

2      Q      Now, this was your job, correct?

3      A      Yes, sir.

4      Q      And once the blood was taken you said you

5   received no instruction whatsoever what to do after you

6   received the blood, correct?

7      A      Yes, sir.

8      Q      You weren't told by your superiors who sent you

9   on this task to begin with to call us when you get it,

10  correct?

11     A      Correct.

12     Q      Not any instruction about once you got it what to

13  do with it, correct?

14     A      Correct.

15     Q      It was your job, correct?

16     A      Correct.

17     Q      So right after you received the blood you just

18  give it to Trooper Stafford?

19     A      Correct.

20     Q      But it wasn't Stafford's job; it was your job,

21  wasn't it?

22     A      Yes, sir, it was.

23     Q      So you didn't retain possession of this very

24  important piece of evidence which was your job to get?

25     A      No, I did not hold onto it, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Recross - LaMagna

1       Q      So who told you, I'll just give it to Trooper

2    Stafford since he just got here?  Who told you that?

3       A      No one did, sir.

4       Q      You just decided on your own?  You were given

5    this important task to do, that I just barely completed, and

6    I'm just going to give it to Trooper Stafford; is that what

7    went through your mind?

8       A      No, sir.

9       Q      But you gave it to him.  You didn't retain it

10   yourself, did you?

11      A      No, I did not.

12      Q      In fact, when you received -- when you were

13   successful, or allegedly successful, in getting a blood

14   sample did you call Trooper Knapp and say, "Hey, I was

15   successful in the job you sent me to do"?  Did you do that?

16      A      No, sir.

17      Q      Did you call Investigator Harris and say, "Hey, I

18   was sent to the hospital to get blood.  I got it.  What do

19   you want me to do?"  Did you do that?

20      A      No, sir.

21      Q      Did you call any superior officer and say, "Hey,

22   I just got the blood.  What do you want me to do with it?"

23   Did you do any of that?

24      A      No, sir.

25      Q      So you took it on your own to give it to Stafford

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Redirect - McCormick

1    as soon as he showed up, correct?

2         A    Yes, sir.

3         Q    And you left it for others to complete your

4    paperwork; is that correct?

5         A    Yes.

6         Q    And you left it for others to complete the seals

7    that you had partially written on, correct?

8         A    Yes.  Because I didn't have the information.

9         Q    And you left it for others to seal this kit,

10   correct?

11        A    Yes.

12        Q    So you never sealed it?

13        A    Yes, sir.

14             MR. LaMAGNA:  Nothing further.

15   FURTHER REDIRECT EXAMINATION

16   BY MS. McCORMICK:

17        Q    Trooper O'Hare, do you officially verify here

18   today that you observed blood taken from the defendant on

19   the overnight of July 2nd 2005?

20        A    Yes, ma'am.

21        Q    Did you observe blood being drawn from that

22   defendant and handed directly to you?

23        A    Yes, ma'am.

24        Q    Was it not your assignment to stay with the

25   defendant in the hospital?

Trooper O'Hare - Redirect - McCormick

1      A     Yes, ma'am.

2      Q     Is Trooper Stafford just some stranger to you?

3      A     No, ma'am.

4      Q     Is he a New York State Police Trooper?

5      A     Yes, ma'am.

6      Q     Is he your partner?

7      A     Yes, ma'am.

8      Q     When the defendant was being removed from the

9   emergency room and you went with him did you give the blood

10   to Trooper Stafford, your partner, to safeguard?

11     A     Yes, ma'am.

12     Q     When you received the blood from Nurse Busco did

13   you take paper seals with adhesive and did you put your

14   initials on them, absent his name, and seal the blood

15   itself?  Did you seal the blood with a piece of tape that

16   goes from one side of the glass across the top and over to

17   the bottom so that it would be known whether or not anyone

18   had broken those seals when that blood got to the lab?

19     A     Yes, ma'am.

20           MS. McCORMICK:  I have nothing further.

21           MR. LaMAGNA:  One question.

22   FURTHER RECROSS-EXAMINATION

23   BY MR. LaMAGNA:

24     Q     Those white seals that you put over the top of

25   the blood tube were not completely filled out; is that

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Redirect - McCormick

1    correct?

2         A     That is correct, sir.

3                    MR. LaMAGNA:  I have nothing further.

4                    THE COURT:  Thank you, Trooper.

5                    THE WITNESS:  Thank you.

6                    (Whereupon, the witness exits the courtroom.)

7                    THE COURT:  Ladies and gentlemen, we'll take

8         five to ten minutes.  Please don't talk about the case.

9                    (Whereupon, the jury exited the courtroom,

10        and a brief recess was held.)

11                   THE COURT:  Bring in the jury.

12                   COURT OFFICER:  Jury entering.

13                   (Whereupon, the jury entered the courtroom,

14        and upon taking their respective seats, the following

15        occurred:)

16                   THE CLERK:  Case on trial continues, People

17        versus Martin Heidgen, Indictment 1910N of 2005.

18                   People ready?

19                   MR. HAYDEN:  Ready, your Honor.

20                   THE CLERK:  Defense ready?

21                   MR. LaMAGNA:  Defendant is ready, your Honor.

22                   THE CLERK:  Defendant is present and the

23        jurors are seated, your Honor.

24                   THE COURT:  Thank you.

25                   People.

GIGI WRIGHT, RPR    (516) 571-2503

Busco - Direct - McCormick

1          MS. McCORMICK:  People call Dorothy Busco.

2          COURT OFFICER:  Step up, remain standing;

3     raise your right hand and face the clerk.

4          D O R O T H Y   B U S C O,      a witness

5          called on behalf of the People, having been

6          first duly sworn by the Clerk of the Court,

7          was examined and testified as follows:

8          THE CLERK: You may put your hand down.

9          State your name, spelling your last name for

10    the record.

11         THE WITNESS:  Dorothy Busco, B-U-S-C-O.

12         THE CLERK:  Please take a seat.

13         MS. McCORMICK: May I?

14         THE COURT:  Yes

15    DIRECT EXAMINATION

16    BY MS. McCORMICK:

17    Q    Good morning, Ms. Busco.

18         Could you tell the jury, please, what is your

19    occupation.

20    A    I'm a registered nurse.

21    Q    How long have you been a registered nurse?

22    A    Seventeen years.

23    Q    Could you tell the jury where you are employed?

24    A    Nassau University Medical Center.

25    Q    Were you employed at the medical center on the

1    overnight between July 1st 2005 into July 2nd 2005?

2        A    Yes, I was.

3        Q    Where were you working in the hospital at that

4    time?

5        A    I was working in the emergency room, in the

6    surgical ER.

7        Q    Did there come a time when people began arriving

8    in the emergency room relating to a crash that had occurred

9    on the Meadowbrook Parkway at around 2 o'clock in the

10   morning?

11       A    Yes.

12       Q    Do you recall about what time the first people

13   started arriving in the emergency room?

14       A    Roughly around 2 o'clock.  I don't know,

15   somewhere around quarter to two and 2:15, something like

16   that.

17       Q    Something around two?

18       A    Something around 2 o'clock, yes.

19       Q    Do you recall the arrival of a patient by the

20   name of Martin Heidgen?

21       A    At the time, no.  I didn't know that was his

22   name, but yes.

23       Q    Now you know his name?

24       A    Yes.

25       Q    Do you recall that person arriving in the

1    emergency room relating to this crash?

2         A    Yes.

3         Q    Can you describe how it is that he entered the

4    hospital?  How did he get there?

5         A    He came by ambulance, by I believe Nassau County

6    ambulance, into the trauma room.

7         Q    Was he accompanied by anybody?

8         A    The EMTs and police officers.

9         Q    From their arrival at the hospital where was

10   Martin Heidgen taken?

11        A    Into the trauma room.

12        Q    Can you describe that room for the jury, please?

13        A    It is a separate room from any of the other

14   patients.  It is a room when people are involved in a severe

15   accident that we feel will need, like, more care, so there

16   is a bunch of people that come into the room.  It is a

17   two-bedded room, equipped with a respirator, multiple

18   supplies, a crash cart.

19        Q    Approximately how many medical personnel were

20   tending to Martin Heidgen at the time of his coming in and

21   getting situated in that ER?

22        A    Approximately eight to ten people.

23        Q    Is it fair to say that they are all encircling

24   the gurney, or the bed?

25        A    Yes.

1      Q    Could you tell the jury what was your role in the

2    ER at that time as it relates to Mr. Heidgen?

3      A    I was the nurse at the bedside.  And there was

4    another nurse to be a documenting nurse.  I'm there to hook

5    him up to the monitor, assess him, get his blood pressure,

6    start a line, draw blood.

7      Q    Can you describe the condition of Martin Heidgen

8    as he appeared to you coming into the ER that night?

9      A    His physical description or --

10     Q    Yes.

11     A    -- his medical condition?

12     Q    Medical condition by observation.

13     A    For me I felt that he was just arousable to

14   noxious or painful stimuli.  If we would do a sternal rub he

15   would moan or, like, say a word or two.  Nothing really

16   coherent.

17     Q    Were his eyes opened or closed?  Do you recall?

18     A    I recall that they were closed.  They might

19   occasionally respond to noxious stimuli.

20     Q    By noxious stimulus what do you mean?

21     A    A pin in the arm, a deep sternal rub, something

22   to arouse him with.

23     Q    Something that would hurt?

24     A    Yes.

25     Q    With that you got what kind of response?

 1      A     Like a moaning or movement, basically.  Nothing

 2  really coherent that we would be able to, you know, decipher

 3  what he was saying.

 4      Q     Were there people among the medical staff who

 5  were trying to talk to the defendant?

 6      A     Yes.

 7      Q     Was he responding to them in any kind of coherent

 8  way?

 9      A     No.

10      Q     Did there come a time when Trooper Daniel O'Hare

11  asked you to draw blood for the purposes of collecting

12  evidence?

13      A     A Trooper asked me to draw blood, yes.

14      Q     You don't know his name?

15      A     No.

16      Q     Okay.  And can you tell the jury, please,

17  approximately how long were you in the emergency room with

18  the defendant before you were asked to draw that blood?

19      A     Approximately ten minutes.

20      Q     Can you describe for the jury, please, the actual

21  procedure used to draw the blood at the request of the

22  trooper?

23      A     Okay, well, the trooper comes with their own box

24  for the blood kit; but as well, I need to draw blood for the

25  hospital, and I need to establish an I.V.  So the box is

Busco - Direct - McCormick

1    opened.  There is two gray tubes in the box, along with a

2    vacutainer.

3         Q    I'm going to stop you for one second, because I

4    have in evidence here People's Exhibit number 16.  It is a

5    sample blood kit.  It is unused.

6         A    Okay.

7         Q    Could you take a look at that blood kit, please.

8         A    Okay, this resembles the kit that we had.  So I

9    use my own needle.

10        Q    Specifically, Ms. Busco, do -- are you familiar

11   with the paperwork in that kit?

12        A    The paperwork, I haven't read the paperwork.

13        Q    You know that there is papers in there.  You

14   don't know what they are?

15        A    Right.

16        Q    Okay.  With respect to the test tubes and needle

17   and swab, is that the same contents as you had handed to you

18   on July 2nd 2005?

19        A    Yes.

20        Q    Now, if you would you please describe for the

21   jury how it is that you took -- let me with withdraw that.

22             You were requested to take blood from the

23   defendant Martin Heidgen?

24        A    Yes.

25        Q    Did you, in fact, take blood?

GIGI WRIGHT, RPR    (516) 571-2503

1      A      Yes.

2      Q      Would you now please describe for the jury how it
3      is that you accomplished taking that blood?

4      A      I put a tourniquet on his left arm, I cleaned the
5      area with the betadine swab that comes in this kit.  I used
6      the hospital needle, because I needed to establish an I.V.,
7      as well as draw blood.  That is our protocol for taking care
8      of the patient.

9              So I opened up an 18 gauge I.V.  It is a sterile
10     package.  I opened it up.  I pulled it out of its hub, which
11     it is kept in so nobody sticks themselves.  I already wiped
12     the skin.  We have a different hub.  It is a blue hub.  This
13     is actually a needle you would use on somebody who doesn't
14     need an I.V.  Our blue hub is a plastic hub.  This twists
15     off.  And it is inserted in here.  And as you can see it is
16     a needle.

17             Our blue hub is plastic where the needle would
18     be, so it would fit in the I.V. catheter.  This bottom -- I
19     don't know if you could see it -- it is actually a needle
20     covered in rubber so it will puncture the tube.  I have
21     inserted the I.V.  Our blue hub came off and it connects to
22     the I.V.  And these tubes are inserted into that needle and
23     they fill up with blood.

24             After the first one is filled, I probably placed
25     it down, picked up the second one, put it in, and picked up

1    the first one to be inverted, inverted it a couple of times

2    to put it back in the box.  This one was finished, and I

3    handed it to the State Trooper.  And then I proceeded to

4    draw my own blood and hookup the I.V.

5        Q    The blood itself?

6        A    Yes.

7        Q    Can you tell the jury where was the trooper

8    located with respect to you in the emergency room?

9        A    He was --

10       Q    While this was going done?

11       A    He was particularly almost next to me.  He was

12   more catty-corner to my right.  And the patient is here.

13       Q    Did he hand you the entire box, or did he hold

14   the box and you withdrew items from the box?

15       A    I don't necessarily recall if he was holding it

16   or if it was on the table right next to me.

17       Q    Did you have to turn and then actually administer

18   the placement of the needle into the defendant's arm?

19       A    I'm sorry, could you repeat that.

20       Q    Did you have to take the equipment and then turn

21   and complete actually sticking him with the needle in the

22   arm to draw blood?

23       A    I might have had to turn slightly.

24       Q    And there are about eight to ten people around

25   the defendant at this time?

1       A       Right.  But all around.  Right.

2       Q       You were in the process of sticking the defendant

3    with the needle for medical treatment; is that correct?

4       A       Correct.

5       Q       Did you, in the course of that procedure, take a

6    sterile needle?

7       A       Yes.

8       Q       And it is a needle provided by the hospital?

9       A       Yes.

10      Q       But it is in packaging?

11      A       Yes.

12      Q       Did you have to withdraw that needle from the

13   packaging, open up the packaging?

14      A       Yes.

15      Q       And the needle that you used was going to stay in

16   place to act as an I.V. for this defendant for his

17   treatment; is that correct?

18      A    .  Yes.  The hub of the needle stays in place.

19      Q       And so your purpose in using the hospital needle

20   is what, rather than using the needle in the kit?

21      A       To provide medical treatment for the patient.

22      Q       If you were to use the needle in the kit would

23   you have to stick him, inject him with a needle twice

24   instead of once?

25      A       Right.

Busco - Direct - McCormick

1     Q     Once you had inserted the needle, before you

2     administer any I.V. fluids, is that when you take the blood?

3     A     Yes.

4     Q     After you had taken this blood do you hand it

5     directly to the trooper?

6     A     Yes.

7     Q     Do you know what the trooper does with the blood

8     at that point?

9     A     No.

10    Q     Does he stay next to you after you take this

11    blood?

12    A     No, he gets out of the way of the treatment of

13    the patient.

14          MS. McCORMICK:  I have nothing further.

15    Thank you.

16          MR. LaMAGNA:  Judge, could we approach?

17          THE COURT:  Sure.

18          (Whereupon, a discussion was held off the

19    record.)

20          THE COURT:  We are going to take things a

21    little bit out of turn.  Ma'am, you'll be

22    cross-examined at 2 o'clock.  Between now and then

23    don't talk to anybody about your testimony.

24          THE WITNESS:  Okay.

25          THE COURT:  Thank you, your Honor.

1                    (Whereupon, the witness exits the courtroom.)

2                    THE COURT:  People.

3                    MS. McCORMICK:  Your Honor, at this time the

4          People will call Maureen Roman.

5                    COURT OFFICER:  Step up, remain standing,

6          raise your right hand and face the clerk.

7                    M A U R E E N   R O M A N,        a witness

8                    called on behalf of the People, having been

9                    first duly sworn by the Clerk of the Court,

10                   was examined and testified as follows:

11                   THE CLERK:  You may put your hand down.

12                   Please state your name, spelling your last

13         name for the record.

14                   THE WITNESS:  Maureen Roman, M-A-U-R-E-E-N

15         R-O-M-A-N.

16                   THE CLERK:  Thank you.  Take a seat.

17    DIRECT EXAMINATION

18    BY MS. McCORMICK:

19         Q    Good afternoon, Ms. Roman.

20         A    High.

21         Q    Can you tell the jury, please, by whom you are

22    employed?

23         A    I'm with the New York State Police in Mid Hudson

24    Regional Crime Laboratory in Newburgh, New York.

25         Q    How long have you worked with the New York State

1    Police?

2         A    Almost twenty-four years.

3         Q    Are you a Trooper or police personnel?

4         A    Civilian.

5         Q    Can you describe for the jury, please, what is

6    your job and your duties within the job?

7         A    I'm an evidence technician.  I receive the

8    evidence from different crimes within different police

9    agencies.

10        Q    You operate out of the Newburgh lab?

11        A    Yes.

12        Q    Ms. Roman, I direct your attention to July 5th

13   2005.  Do you recall that date?

14        A    Yes.

15        Q    Were you working on that date?

16        A    Yes, I was.

17        Q    Did there come a time when someone brought into

18   the Newburgh lab a blood kit, designated as belonging to a

19   defendant Martin Heidgen?

20        A    Yes.

21        Q    Do you recall about what time that blood kit was

22   brought into the lab?

23        A    I date stamped the evidence submission form at

24   8:37 a.m.

25        Q    Who brought that to the lab?

1      A      Investigator John Ramos from State Police

2   Newburgh.

3      Q      He works in Newburgh?

4      A      Newburgh barracks.

5      Q      Newburgh barracks?

6      A      Uh huh.

7      Q      Are they attached to the Newburgh Police lab?

8      A      No.

9      Q      Are they in close proximity?

10     A      About fifteen feet.

11     Q      Ms. Roman, had the lab been open over the July

12   4th weekend?

13     A      We are normally closed on Sunday, and July 4th

14   being a Monday, we were closed that day also.

15     Q      There was no one available to receive any kind of

16   evidence submission on July 2nd, 3rd or 4th; is that

17   correct?

18     A      Correct.

19     Q      Could you describe for the jury, please, what it

20   is that you received from Investigator Ramos?

21     A      I received a sealed blood kit with a General IIA

22   submission form.

23     Q      What is a General IIA submission form?

24     A      It is a State Police submission form that they

25   use to list all of the items of evidence being submitted to

1    the laboratory system.

2         Q    That was with the blood kit itself?

3         A    Yes, it was.

4         Q    I'm going to ask to approach you with what has

5    been marked as People's Exhibit 17 for identification

6    purposes.

7                   (Handing.)

8         A    Yes, this is the blood kit I received.

9         Q    You foretold my question.  Do you recognize that

10   blood kit?

11        A    Yes.

12        Q    And what do you recognize it to be?

13        A    It is a sealed blood kit that I had taken on July

14   5th 2005.  I also put a piece of tape around it and I dated

15   it and initialed it also when I received it.

16        Q    Is that tape still visible on that blood kit?

17        A    Yes.

18        Q    And your initials are on it?

19        A    Yes, they are.

20        Q    Are there additional seals and tape that have

21   been added to that since the time of your receipt of that

22   blood kit?

23        A    Yes.

24        Q    And I know that you have your own initials on it,

25   but what else on that blood kit would indicate to you that

Roman - Direct - McCormick

1    it is the same one that you received on July 5th 2005?

2         A       There are bar codes, bright yellow bar codes, on

3    it.  After we enter the case into a laboratory information

4    management system we have it print out bar codes for that

5    particular case, and those bar codes are placed on the

6    evidence.

7         Q       Who placed those bar codes on the evidence?

8         A       I did.

9         Q       Physically, in the Newburgh lab, could you

10   describe the setup in terms of your receiving evidence?  Are

11   you in a wide open room?

12        A       I'm in a room with one large window.  There is a

13   sealed door on the other side so nobody can get in through

14   that way without being buzzed in.  There is a sealed vault

15   to my right that only the evidence clerks and the director

16   and the assistant director of the lab have the combination

17   to.  And after we receive the evidence we scan the bar code

18   to put the evidence into that sealed vault, and it is not

19   touched again until the analyst comes to take it out.

20        Q       When Investigator Ramos enters the lab, since the

21   New York barracks are right next door, can he just walk

22   right in?

23        A       Yes.

24        Q       Does he have a key or does he have to be buzzed

25   in?

Roman - Direct - McCormick

1      A      Buzzed in.

2      Q      Buzzed in.

3             When he enters the lab is there a log he has to

4      sign?

5      A      Yes.   There is a logbook he has to sign when he

6      comes in.

7      Q      Does he physically enter the area of the lab

8      where you are seated?

9      A      No.   He comes to the window.

10     Q      At which point what transpired with respect to

11     that specific blood?

12     A      He handed me the submission form and the blood

13     kit, and in that case I compared the blood kit to the

14     submission form; I initialed the paperwork; wrote the word

15     "sealed" under it, which means I received it in a sealed

16     manner; I date stamped it; wrote Investigator Ramos' name

17     under the date stamp; gave him his copy of that, after the

18     lab number was placed on paperwork and; then he left the lab

19     and this went into the vault.

20     Q      When you say that it was sealed what do you mean

21     by that?  Did you physically look at the blood kit at that

22     time?

23     A      Yes.   I get it like this.   I have checked the

24     seal to make sure it is sealed; dated and initialed it,

25     which it was by these white labels that came in; and the

GIGI WRIGHT, RPR    (516) 571-2503

1    State Police also put their own tape on this, which is dated

2    and initialed.

3        Q    The State Police being separate from the lab?

4        A    The State Police have blue and clear; the lab

5    evidence receiving has red and clear tape; and the analysts

6    have white and red tape.

7        Q    And the reason for that is to distinguish who is

8    putting what seals on when?

9        A    Yes.

10       Q    You indicated that you observed that it was

11   physically sealed upon your receipt of that --

12       A    Yes.

13       Q    -- blood kit?

14       A    Yes.

15       Q    You said you compared it to --

16       A    Yes.

17       Q    What did you compare it to?

18       A    It says on the submission form the item one was a

19   sealed blood kit, and that is what I received.

20       Q    Was there any indication on the General II of the

21   name of the defendant associated with that blood kit?

22       A    Yes.

23       Q    Did you compare that the names matched as well?

24       A    Yes.

25       Q    Is there a name indicated on the exterior of the

Roman - Direct - McCormick

1    box?

2         A      Only the white labels.  That is done -- I guess,

3    the trooper at the hospital put that on.  I'm not sure who

4    puts that on.

5         Q      You received that blood kit and then proceeded to

6    enter the data into the computer system?

7         A      Yes.

8         Q      Did you, at any time from the time that you

9    received that blood kit until the time it went into the

10   vault, lose sight of that blood kit?

11        A      It is kept next to me at all times.

12        Q      Approximately how long did it take you to enter

13   the data into the computer?

14        A      A blood kit would probably take me less than five

15   minutes.

16        Q      On the completion of that data entry are those

17   yellow bar code seals generated?

18        A      When -- after all of the information is entered

19   into the system the bar codes are automatically printed out

20   from the computer.

21        Q      Are you the person who affixed the yellow seals

22   to that box?

23        A      Yes.

24        Q      You didn't affix both sets?  There are two sets;

25   am I correct?

Roman - Cross - LaMagna

1      A      No.  I just did the main item number, and then
2   this one, the one that was crossed out.

3      Q      And, physically, then what becomes of that blood
4   kit?

5      A      It goes into a refrigerator that is in the sealed
6   vault, and it sits in the refrigerator until the analyst
7   comes and requests that the case be given to them.  Then I
8   scan it to that analyst -- which she has her own bar code --
9   I scan it to her, she has to enter her password into the
10  computer, I give her this, and when she has completed the
11  analysis she turns it back over to me and bar codes it back
12  to the refrigerator to go into the agency.

13     Q      Thank you.

14            MS. McCORMICK:  I have no further questions.

15     A      Thank you.

16  CROSS-EXAMINATION

17  BY MR. LaMAGNA:

18     Q      Good morning.  Ms. Roman, is it?

19     A      Yes, it is.

20     Q      How are you?

21     A      Good morning.

22     Q      My name is Stephen LaMagna.  I represent
23  Mr. Heidgen.  I am going to ask you a couple of questions
24  here this morning concerning your procedure or procedures at
25  the lab.

1        A     Of course.

2        Q     First off, you mentioned the General II.

3        A     Yes.

4        Q     That is a form, correct?

5        A     Yes.

6        Q     That is an evidence submission form, correct?

7        A     Yes.

8              MR. LaMAGNA:  Could I have this marked as

9        Defendant's Exhibit F.

10             (Whereupon, a General IIA form received and

11       marked Defendant's Exhibit F for identification.)

12             COURT OFFICER:  Defendant's Exhibit F marked

13       for identification.

14       Q     What do you recognize that form to be?

15       A     That is the General IIA that a police member uses

16       to submit evidence into the laboratory system.

17       Q     Is that a form that you received?  Is that what

18       you are talking about?

19       A     Yes, it is.

20             MR. LaMAGNA:  Could I have that introduced

21       into evidence, please.

22             THE COURT:  Please show it to counsel.

23             MS. McCORMICK:  No objection, Judge.

24             THE COURT:  Received.

25             (Whereupon, Defendant's Exhibit F for

Roman - Cross - LaMagna

1         identification now received and marked Defendant's

2         Exhibit F in evidence.)

3              COURT OFFICER:  Defendant's Exhibit F

4         received in evidence.

5         Q    And that is submitted when a piece of evidence

6    comes into the lab, correct?

7         A    Yes.

8         Q    And you review -- you said you reviewed the

9    information on here?

10        A    Yes.

11        Q    To make sure that your information matches this,

12   correct?

13        A    Yes.  Correct.

14        Q    So that your records and the records of the piece

15   of evidence match?

16        A    The submission form matches the evidence itself.

17        Q    To make sure that what you are talking about is

18   actually the evidence for this particular case, correct?

19        A    Correct.

20        Q    And, for example, when you prepared your --

21   withdrawn.

22             You prepared your own bar code, correct?

23        A    Correct.

24        Q    And that bar code has an identifying number,

25   correct?

Roman - Cross - LaMagna

1      A     Yes.

2      Q     A lab number, your number, correct?

3      A     Chronological through the lab system.   The

4   computer automatically gives us the next number.

5      Q     So it goes in sequential order?

6      A     Yes.

7      Q     So, if 05 00001 would be the first case you get,

8   the next case that comes in would be 00002, and so forth and

9   so on, correct?

10     A     Yes.

11     Q     And it is very important to match your case

12   number, if you will, to the case number of the other

13   agencies to know that we are talking about the same case,

14   correct?

15     A     Yes.   Their agency case number is different than

16   the laboratory case number.

17     Q     Exactly.

18           You want to make sure they are both correlated

19   together.   You are talking about 02653; they were talking

20   about 05-140, correct?

21     A     Correct.

22     Q     So, when this came in you did what you do, you

23   reviewed the paperwork, correct?

24     A     Yes.

25     Q     Now, there is a spot on the General I or the

GIGI WRIGHT, RPR    (516) 571-2503

Roman - Cross - LaMagna

1    General II, actually, that has says on the top left-hand

2    corner, "Lab Use Only," correct?

3         A    Yes.

4         Q    And that evinces the fact that this came in that

5    day and the lab stamped it, correct?

6         A    Yes.

7         Q    And it was Investigator Ramos who brought it in,

8    or Trooper Ramos, correct?

9         A    Investigator, yes.

10        Q    When you prepared your lab code to match the case

11   number of the submitting agency, the submitting agency's

12   case number was 05-140, correct?

13        A    Correct.

14        Q    And you prepared, in relation to that, a lab

15   code, your number, 05ML-02653, correct?

16        A    The number is automatically printed out into the

17   computer after I entered all of the information that is on

18   the submission form.

19        Q    That's what came out?

20        A    The lab case number automatically comes out of

21   the bar code machine.

22        Q    My point is that would be your case number?

23        A    That would automatically become our case number

24   for that case.

25        Q    In fact, it has the date even under the bar code,

does it not, and the time, correct?

A Yes, it does.

Q And to the right of it, just so everything is consistent, so you know there is a consistency in what piece of evidence actually you have, they mention the submitting agency. It was the, it looks like, L114SP Valley Stream. State Police Valley Stream, right?

A Yes.

Q It has their case number 05-140, correct?

A Correct.

Q And when that is received you said then it was placed in an evidence locker; is that correct?

A Yes.

Q And it is a refrigerated evidence locker, correct?

A Yes.

Q And that came. And there is also a chain of custody report, correct, that is generated by your lab?

A Yes.

MR. LaMAGNA: Could I have this marked as G?

COURT OFFICER: Defendant's Exhibit G marked for identification.

(Whereupon, a chain of custody form item received and marked Defendant's Exhibit G for identification.)

1          MR. LaMAGNA:  I would like to have it shown

2      to the witness.

3      Q     I show you what has been marked as Defendant's

4   Exhibit G for identification.  Do you recognize that form?

5      A     Yes.

6      Q     That's a form that is generated by the lab,

7   correct?

8      A     When the case goes to court this is usually

9   printed out by the analyst to take to court.

10     Q     That is generated from your office?

11     A     Yes.

12     Q     That's the chain of custody?

13     A     Correct.

14          MR. LaMAGNA:  I ask that be admitted into

15      evidence as well.

16          THE COURT:  Please show it to counsel.

17          MS. McCORMICK:  No objection, Judge.

18          THE COURT:  Received.

19          (Whereupon, Defendant's Exhibit G for

20      identification now received and marked Defendant's

21      Exhibit G in evidence.)

22          COURT OFFICER:  Defendant's Exhibit G in

23      evidence.

24     Q     With that there is another form that is produced

25   by your office relative to the chain of custody.

1      A    Yes.

2                  MR. LaMAGNA:  I would like to have this

3            marked as a Defendant's Exhibit.

4                  (Whereupon, chain of custody document

5            received and marked Defendant's Exhibit H for

6            identification.)

7                  COURT OFFICER:  Defendant's Exhibit H marked

8            for identification.

9      Q    Ms. Roman, I ask you to take a look at that,

10     please.

11     A    Yes.

12     Q    Do you recognize that as well?

13     A    Yes.

14     Q    That also corresponds to the chain of custody and

15     where, and in what location the evidence traveled through?

16     A    Yes.

17                 MR. LaMAGNA:  I ask that also be admitted

18           into evidence.

19                 MS. McCORMICK:  No objection.

20                 THE COURT:  Received.

21                 (Whereupon, Defendant's Exhibit H for

22           identification now received and marked Defendant's

23           Exhibit H in evidence.)

24                 COURT OFFICER:  Defendant's Exhibit H in

25           evidence.

1    Q    Now, Ms. Roman, according to your documentation,

2    a blood kit bearing case number 05-140 by the Valley Stream

3    State Police was entered on 7/5 of 2005, correct?

4    A    Yes.

5    Q    That was brought in by an Investigator Ramos,

6    correct?

7    A    Correct.

8              MR. LaMAGNA:  Could I have this shown to the

9         witness.  May I have it marked Defendant's Exhibit I

10        for identification.

11             (Whereupon, crime lab receipt received and

12        marked Defendant's Exhibit I for identification.)

13             COURT OFFICER:  Defendant's I marked for

14        identification.

15   Q    Do you recognize that report?

16   A    Yes, I do.

17   Q    That's the crime laboratory case receipt record

18   evincing the fact that a piece of evidence came in by

19   Investigator Ramos on that day, received by you?

20   A    Yes.

21   Q    Correct.

22             And the case number associated with the piece of

23   evidence was 05-140, correct?

24   A    Correct.

25             MR. LaMAGNA:  I ask that be entered into

Roman - Cross - LaMagna

1     evidence.

2                    MS. McCORMICK:  No objection, Judge.

3                    THE COURT:  It is received.

4                    (Whereupon, Defendant's Exhibit I for

5          identification now received and marked Defendant's

6          Exhibit I in evidence.)

7                    COURT OFFICER:  Defendant's Exhibit I in

8          evidence.

9          Q     Now, Ms. Roman --

10         A     Yes.

11         Q     -- it looks like, according to the documentation

12    that is now in evidence, that was generated by your office,

13    it shows that at 8:41 the evidence was received.  And it

14    says, "ML."  I'm assuming that means Mid Hudson lab?"

15         A     Yes.

16         Q     It looks like at 8:42, it is just one second

17    later, it was placed into the evidence locker, refrigerated

18    one, correct?

19         A     Correct.

20         Q     And then it shows 8:48, six seconds later, it was

21    taken out and given to Lisa Lindenthaler, correct?

22         A     Yes.  But it wasn't seconds; it was minutes.

23         Q     I'm sorry.  Six minutes.

24         A     Exactly.

25         Q     Six minutes later the lab technician took it out,

GIGI WRIGHT, RPR   (516) 571-2503

1    correct?

2         A      Correct.

3         Q      So really it was really only in that refrigerator

4    for about six minutes?

5         A      Until she came into work.

6         Q      Until she came in.  And we'll hear from her and

7    what she did.

8         A      Right.

9         Q      You did not receive that piece of evidence that

10   is associated with case number 05-140 back until 7/15,

11   correct?

12        A      Yes.

13        Q      So for ten days can you tell us where it was?

14        A      It was in Lisa Lindenthaler's custody.

15        Q      Since she was the one who had it first, you

16   believe she is the one who had it during that period of

17   time, correct?

18        A      For those ten days, yes.

19        Q      On 7/15 you receive it, you receive it back, and

20   the notation is "ready to return"?

21        A.     Yes.

22        Q      Meaning you are done; you did your analysis,

23   correct?

24        A      And we are waiting for the evidence custodian to

25   get it picked up.

Roman - Cross - LaMagna

1     Q     By the agency that brought it to you?

2     A     Correct.

3     Q     In this case the Valley Stream State Police,

4     correct?

5     A     Correct.

6     Q     Now, at some point on August 26th, Investigator

7     Harris came up to the lab, didn't he?

8     A     I don't know.  I was not there.  I didn't handle

9     it from that point on.

10    Q     Well, on 8/26 there shows a return, that the

11    evidence was picked up, correct?

12    A     Lieutenant Dominic Schiammento handled it from

13    that point, not myself.

14    Q     You can't --

15    A     Not myself.

16    Q     Now, you handled the intake of this, correct?

17    A     Yes.

18    Q     In fact, on 8/26 didn't Investigator Harris

19    request that the lab change its case number from 05-140 and

20    changed it to 05-141?

21    A     I don't know.  I wasn't handing it.

22          MS. McCORMICK:  Objection.

23          THE COURT:  Objection sustained.

24          MR. LaMAGNA:  Could I have this marked for

25          identification.

GIGI WRIGHT, RPR   (516) 571-2503

Roman - Cross - LaMagna

1          THE COURT:  There was an objection to your

2     question which I sustained.

3          MR. LaMAGNA:  Could I have this marked as

4     Defendant's J.

5          (Whereupon, an evidence submission form

6     received and marked Defendant's Exhibit J for

7     identification.)

8          COURT OFFICER:  Defendant's Exhibit J marked

9     for identification.

10    Q     Ms. Roman, I show you what has been marked

11   Defendant's Exhibit J for identification.

12    A     Yes.

13    Q     Do you recognize that?

14    A     Yes.

15    Q     In fact, that is the same, a copy of the same

16   submission form, correct?

17    A     Yes.  With the correction made.

18    Q     Only this time there is a new bar code added to

19   it, correct?

20    A     Correct.

21    Q     And you recognize that form?

22    A     Yes, a copy of the original submission form with

23   the correction made.

24    Q     With the new bar code that you put on it, or that

25   was generated?

Roman - Cross - LaMagna

```
 1        A     It was generated, but not by myself.

 2        Q     It was generated by the Mid Hudson lab, correct?

 3        A     Yes.

 4              MR. LaMAGNA:  I ask that be admitted.

 5              MS. McCORMICK:  I object.  She has no

 6        personal knowledge of the items entered.

 7              THE COURT:  Sustained.

 8              MR. LaMAGNA:  I'm sorry, I didn't hear the

 9        objection.

10              MS. McCORMICK:  She has no personal knowledge

11        of the change to that form.

12              MR. LaMAGNA:  Well, could I lay a further

13        foundation?

14              THE COURT:  Sure.

15              MR. LaMAGNA:  Go ahead and show her the

16        document.

17        Q     Do you recognize that form?

18        A     Yes.  It is a copy of the original submission

19   form.

20        Q     That you recognize, correct?

21        A     Yes.  With corrections made to it.

22        Q     And there is a new bar code on that, correct?

23        A     Yes.

24        Q     A bar code that is made by Mid Hudson lab,

25   correct?
```

Roman - Cross - LaMagna

1        A      Yes.

2        Q      You recognize that bar code?

3        A      Yes.

4        Q      Is it the business of the Mid Hudson lab to make

5    such records?

6        A      If a correction has been made, yes.

7        Q      And is it the business of the Mid Hudson lab to

8    keep records such as this in the ordinary course of their

9    business?

10       A      Yes.

11       Q      And was what was added to that made by somebody

12   with knowledge of what they changed on that form?

13       A      Yes.

14              MS. McCORMICK:  Objection.  How would she

15          know?

16              MR. LaMAGNA:  It is part of their -- it is a

17          business record.

18              THE COURT:  Objection sustained.  Are you

19          offering it as a business record?

20              MR. LaMAGNA:  Yes, I am.

21              MS. McCORMICK:  I won't object.  So long as

22          the record is clear that she did not do this or has any

23          personal knowledge.

24              THE COURT:  That's what she said.  As a

25          business record it is received.

Roman - Cross - LaMagna

1          (Whereupon, Defendant's Exhibit J for

2     identification now received and marked Defendant's

3     Exhibit J in evidence.)

4          COURT OFFICER:  Defendant's Exhibit J

5     received in evidence.

6     Q     Okay.  Now, showing you J in evidence, what was

7     changed on that document -- withdrawn.

8          What was changed on that document was a new bar

9     code, because the original case number of 05-140 was changed

10    to 05-141, correct?

11    A     Correct.

12    Q     Are there initials on there?

13    A     Yes.

14    Q     Now, when the document -- different document,

15    when the paperwork comes back from the return to submitting

16    agency pick up, and it states "no items remain at the lab,"

17    that means whomever picks up something they have it; we

18    don't have it anymore, correct?

19    A     Correct.

20    Q     May I see those documents.

21         Now, it appears on the records that were

22    generated that on August 26th the evidence was picked up,

23    correct?

24    A     I don't know.  I wasn't there.

25    Q     I'm just -- on the records -- I'm sorry, I

1     thought you had them.

2            Looking at Exhibit H, on August 26th, 1331

3     evidence disposition it states, "return to agency pick up,"

4     correct?

5            A     Correct.

6            Q     Correct?

7            A     Yes.

8            Q     The evidence was no longer in the lab; is that

9     correct?  Whomever picked it up -- whoever the agency is

10    picked it up, correct?

11           A     I don't know.  I wasn't -- I would assume so

12    according to that.

13           Q     According to that document anyway?

14           A     Yes.  But ten minutes later it was back in our

15    system.

16           Q     Actually let me ask you about that.  It actually

17    looks almost inverted.  It says, "8/26, ready to return."

18    And then "1341, return picked up."

19                 Could you explain that?

20           A     I can't, because I was not there.  I do know

21    apparently what happened.  But I wasn't physically there.

22    My lieutenant was there.  He was handling this with

23    Investigator Harris, not myself.

24           Q     We need to speak to him is that what you are

25    saying?

Roman - Cross - LaMagna

1      A      He is the one who handled this.  This is his

2    initials on this, not mine.

3      Q      According to at least the paperwork it was picked

4    up, correct?

5      A      It physically did not leave the lab until

6    December 8th 2005, where it was picked up by Investigator

7    Sweeney.

8      Q      If there was a submitting.  --

9              MR. LaMAGNA:  Could I have this marked and

10            shown to the witness.

11              (Whereupon, lab document received and marked

12            Defendant's Exhibit K for identification.)

13              COURT OFFICER:  Defendant's Exhibit K marked

14            for identification.

15      Q      Ms. Roman, I ask you to look at that.  Is that

16    one of the forms that is generated from the New York State

17    Mid Hudson lab?

18      A      Yes.

19      Q      Is that a form that says when a piece of evidence

20    is returned?

21      A      Returned to the agency.

22      Q      And it is signed off by somebody who accepts --

23      A      By the investigator.

24      Q      -- who accepts possession?

25      A      Yes.

Roman - Cross - LaMagna

1          Q     Is that also a record that is kept in the normal

2    course of business of the Mid Hudson lab?

3          A     Yes.

4          Q     And it is their business to make such records?

5          A     Yes.

6          Q     And the information presented in those records is

7    made by somebody with knowledge of the events?

8          A     Yes.

9          Q     And it is their business to keep those records,

10   correct?

11         A     Correct.

12               MR. LaMAGNA:  Judge, again, I would ask that

13         that be introduced in evidence.

14               THE COURT:  Show it to counsel.

15               MS. McCORMICK:  No objection.

16               THE COURT:  Received.

17               (Whereupon, Defendant's Exhibit K for

18         identification now received and marked People's Exhibit

19         K in evidence.)

20               COURT OFFICER:  Defendant's Exhibit K

21         received in evidence.

22         Q     Ms. Roman, we actually kind of went over that in

23   me getting it into evidence.  That is what that document is,

24   correct?

25         A     Yes.

GIGI WRIGHT, RPR   (516) 571-2503

Roman - Redirect - McCormick

1      Q      And according to the paperwork -- withdrawn.

2             So far as the bar code number of the lab's

3      number, your number, even though the State Police changed

4      their case number, your case number remained the same,

5      correct?

6      A      Correct.

7      Q      And their number went from 140 to 141, correct?

8      A      Correct.

9      Q      That was done on August 26th --

10     A      Correct.

11     Q      -- 2005?

12     A      Correct.

13     Q      Correct?

14     A      Yes.

15             MR. LaMAGNA:  I have nothing further, Judge.

16     REDIRECT EXAMINATION

17     BY MS. McCORMICK:

18     Q      Ms. Roman, off the top I ask to approach you with

19     what I ask to be marked as People's Exhibit 18 for

20     identification purposes.

21             COURT OFFICER:  People's Exhibit 18 marked

22             for identification.

23             MS. McCORMICK:  Your Honor, I regret to ask,

24             but I ask that that be changed.  I submitted the wrong

25             piece of paper.  I ask this be marked as People's

Roman - Redirect - McCormick

1          Exhibit 18 for identification, purposes.  That document

2          is the same one you just had.

3                    (Whereupon, lab evidence transfer receipt

4          received and marked People's Exhibit 18 for

5          identification.)

6                    COURT OFFICER:  People's Exhibit 18 marked

7          for identification.

8          Q     Referring to the real People's Exhibit 18 for

9     identification purposes, can you tell the Court and jury

10    what is that that you are holding in your hand?

11         A     This is an evidence transfer receipt.  That was

12    made from ready to return on August 26th of 2005, and it was

13    transferred by our Lieutenant Dominic Schiammento and signed

14    by Investigator Harris.

15         Q     You didn't have anything to do with the August

16    26th release or return of this item, did you?

17         A     No.

18         Q     But there is a case that is associated with this

19    blood that had been 140, and for whatever reason, apparently

20    on August 26th it was changed to 141?

21         A     Correct.

22         Q     The lab number stayed the same; is that correct?

23         A     Correct.

24         Q     And is that because it is the same piece of

25    evidence?

1      A      Yes.   Correct.

2      Q      So, so far as the lab is concerned nothing

3   changed?

4      A      Correct.

5      Q      Somewhere else, for some other reason,

6   administratively they changed the B.C.I. case -- B.C.I. is?

7                  MR. LaMAGNA:   Objection to "administrative."

8                  THE COURT:   Sustained.

9      Q      For whatever reason they changed the B.C.I.

10  Number from 140 to 141?

11     A      Correct.

12     Q      But at no time did that blood sample get switched

13  or changed; is that correct?

14     A      No.   The item bar code is the same.

15     Q      The document that I just asked you to take a look

16  at as People's Exhibit number 18, is that a State Police

17  document?

18     A      Yes.

19     Q      Made in the ordinary course of business?

20     A      Yes.

21     Q      And is it the ordinary course of business of the

22  lab to create that document?

23     A      Yes.

24     Q      Would that be created at or about the time of the

25  return of the item that is reflected in that document?

1      A    Yes.

2                 MS. McCORMICK:  Your Honor, at this time I

3      ask that that be admitted into evidence as People's

4      Exhibit 18 into evidence.

5                 THE COURT:  Please show it to counsel.

6                 MR. LaMAGNA:  No objection, your Honor.

7                 THE COURT:  Received.

8                 (Whereupon, People's Exhibit 18 for

9      identification now received and marked People's Exhibit

10     18 in evidence.)

11                COURT OFFICER:  People's Exhibit 18 received

12     in evidence.

13                MS. McCORMICK:  Your Honor, I would ask that

14     the witness be provided with Defendant's Exhibit K at

15     the same time.

16     Q    Ms. Roman, you have before you Defendant's

17     Exhibit K.

18     A    Yes.

19     Q    And you are familiar with the documents you just

20     reviewed in terms of the evidence received in and out of the

21     lab?

22     A    Yes.

23     Q    Those are the documents put into evidence by the

24     defense; is that correct?

25     A    Yes.

1    Q    Defendant's Exhibit K indicates that the blood

2    kit referred to in this case was removed from the lab at

3    13:31, is that correct.  Or it doesn't state the time?

4         A    On the transfer receipt it gives the time of

5    13:41.

6         Q    The transfer receipt is People's Exhibit 18?

7         A    Yes.

8         Q    Let me ask you to take a look at Defendant's

9    Exhibit H in evidence.

10        Now that is the evidence receipt that indicates

11   the times in and the times out; is that correct?

12        A    Correct.

13        Q    The time that the blood kit in this case was

14   taken out on August 26th was what time?

15        A    Thirteen-thirty-one.

16        Q    Meaning in real people time, what time?

17        A    One-thirty-one.

18        Q    And then the time that that same blood kit was

19   returned back into the lab was what time?

20        A    One-forty-one.

21        Q    Ten minutes?

22        A    Yes.

23        Q    So so far as the blood kit leaving the lab, the

24   times reflected on that document indicate that that is the

25   time it was removed from the evidence locker?

Roman - Redirect - McCormick

```
 1        A    Yes.

 2        Q    And is the time of that ten minutes, the time

 3   that it went back into the evidence locker?

 4        A    Yes.

 5        Q    And you have no personal knowledge that it ever

 6   left the lab?

 7        A    No.

 8        Q    On these documents there are things referred to

 9   as return, ready for return.  Are those codes generated by

10   the computer?

11        A    Those are bar codes that we have to scan to

12   identify where the location is of the evidence at all times.

13        Q    Is there any code in the computer that would

14   reflect temporarily removed to change number?

15        A    No.

16        Q    So any time the blood is taken out of the vault

17   it says what on the code?

18        A    The lieutenant apparently scanned the pick up

19   instead.

20             MR. LaMAGNA:  Objection.

21             THE COURT:  Sustained.

22        Q    This one says picked up, meaning that someone

23   physically took it?

24        A    He handed it over to Investigator Harris.

25        Q    And when evidence is submitted to go into the
```

Roman - Recross - LaMagna

```
 1    vault how is it designated on that document?

 2        A    It was scanned "ready to return."

 3        Q    What does "ready to return" mean?

 4        A    It is ready to return to the agency.

 5        Q    Meaning that you are hanging onto it?

 6        A    Until the agency comes in to pick it up.

 7        Q    And physically remove it?

 8        A    To physically remove it from the lab system.

 9        Q    And on August 26th --

10        A    Yes.

11        Q    -- was that blood sample, the defendant's blood

12   sample?

13        A    Yes.

14             MR. LaMAGNA:  Objection.

15             THE COURT:  Sustained.

16        Q    Was the blood sample removed from the lab?

17        A    It never left the lab building.  It just left the

18   vault.

19        Q    Thank you.

20             MS. McCORMICK:  I have nothing further.

21   RECROSS-EXAMINATION

22   BY MR. LaMAGNA:

23        Q    So, Ms. Roman, on August 26th you didn't have,

24   you didn't deal with this; your boss did, correct?

25        A    Yes.
```

GIGI WRIGHT, RPR   (516) 571-2503

```
 1        Q      It was your boss, the lieutenant, who was dealing

 2    with Investigator Harris with respect to this on that date?

 3        A      Yes.

 4        Q      And it was Investigator Harris who took the

 5    blood, correct?

 6        A      Yes.

 7        Q      And it was Investigator Harris who took the

 8    blood, the piece of evidence, out of the evidence locker for

 9    ten minutes?

10        A      The lieutenant took it out of the evidence vault

11    and handed it to Investigator Harris apparently.

12        Q      And they dealt together?

13        A      Yes.

14        Q      Your boss and him, correct?

15        A      Yes.

16        Q      And that's when all of the numbers, the case

17    number of the State Police was changed, correct?

18        A      Correct.

19        Q      And all of your paperwork was changed to reflect

20    that, correct?

21        A      Correct.

22        Q      Now, certainly whatever evidence you have didn't

23    change, but the identity of the source of the evidence,

24    meaning, the case number changed from 140 to another case

25    number numbered 141; isn't that correct?
```

Roman - Recross - LaMagna

```
 1       A     The physical evidence did not change.

 2       Q     I agree with that.

 3       A     Just the one bar code.

 4       Q     The case number was no longer identified by 140

 5   anymore; it changed to 141?

 6       A     Our lab case number never changed, just the

 7   agency number.

 8       Q     I know yours didn't.  The agency case number

 9   changed?

10       A     That's their number, not mine.

11       Q     That's their problem, I understand.

12             But when the assistant district attorney said I

13   know yours didn't change --

14       A     Correct.

15       Q     But you were told to change the source of that

16   evidence, the case number related to the source of that

17   evidence?

18             MS. McCORMICK:  Objection.

19             THE COURT:  Sustained.

20       A     They made the --

21             THE COURT:  Sustained.

22             THE WITNESS:  I'm sorry.

23       Q     So you -- withdrawn.

24             Thank you.

25             THE COURT:  Anything further?
```

Roman - Recross - LaMagna

```
 1              MS. McCORMICK:  Briefly.

 2    REDIRECT EXAMINATION

 3    BY MS. McCORMICK:

 4         Q    Ms. Roman, did anything about the blood kit that

 5    reflected Martin Heidgen's name change other than the number

 6    associated with B.C.I.?

 7         A    Nothing else changed.

 8              MS. McCORMICK:  Nothing further, Judge.

 9              THE COURT:  Thank you, ma'am.

10              THE WITNESS:  Thank you.

11              (Whereupon, the witness exits the courtroom.)

12              THE COURT:  Ladies and gentlemen, we will

13    break until 2 o'clock.  I would like you to be back on

14    time, please.

15              Don't talk about the case, keep an open mind.

16    Don't read or listen to any accounts or discussions in

17    the newspaper, on the radio or television.  Try not to

18    look or read anything about this case.  Don't go to the

19    premises or places mentioned in this trial.  Don't talk

20    about the case with anybody.  And if any of us run into

21    any of you we can't acknowledge you to avoid any

22    appearance of impropriety.

23              Have a nice lunch.  See you at 2 o'clock.

24              (Whereupon, the jury exited the courtroom and

25    a luncheon recess was held.)
```

Roman - Recross - LaMagna

1                          o0o

2              A F T E R N O O N    S E S S I O N

3                          o0o

4              THE CLERK:  Case on trial, Indictment 1910N

5     of 2005, People versus Martin Heidgen.

6              People ready?

7              MR. HAYDEN:  Ready, your Honor.

8              THE CLERK:  Defendant ready?

9              MR. LaMAGNA:  Defendant is ready, your Honor.

10             THE CLERK:  Defendant is present, your Honor.

11             THE COURT:  Application?

12             MS. McCORMICK: Yes, your Honor.  The People

13    had filed with the Court a written application, but

14    essentially that written application requests this

15    Court to allow the jury to inspect the actual vehicles

16    that were involved in this collision, two of them.  The

17    third vehicle belonging to Mr. Davidson has been

18    released.

19             But the limousine and the pickup truck have

20    been maintained in the custody of the State Police at

21    the Farmingdale impound yard from the time of this

22    collision until the present.  It is our belief that the

23    three dimensional viewing of those vehicles and the

24    damage caused by the force of the impact in this case

25    is something valuable, and only can be afforded to the

                    GIGI WRIGHT, RPR   (516) 571-2503

Roman - Recross - LaMagna

1      jury through an in-person inspection of that three

2      dimensional damage.

3              There is certainly photographs at the scene,

4      but they cannot provide that three dimensional aspect

5      of the evidence itself.

6              The People had requested the possibility of

7      bringing the vehicles, or offered the possibility of

8      bringing the vehicles via flatbed truck to the

9      courthouse, but would request whatever worked for the

10     Court.  If it is more convenient for the Court to bring

11     the jury to the impound yard, we would certainly

12     request whatever means by which we can afford the jury

13     this opportunity to view this evidence.

14             MR. LaMAGNA:  May I, your Honor?

15             THE COURT:  Yes.

16             MR. LaMAGNA:  Judge , I'm going to oppose

17     that application.  Judge, the vehicles in question

18     right now are not in the same condition as they were

19     that night of the accident.  There are, I believe,

20     twelve photographs depicting those vehicles in various

21     different angles, we have witnesses after witness

22     describe the damage to those cars.  They have accident

23     reconstruction experts coming in to articulate those

24     reasons.

25             Furthermore, those cars are not in the same

Roman - Recross - LaMagna

1    condition they were that night.  Not only was there

2    police personnel taking apart those cars, especially

3    the sides of the cars to extract the victims from the

4    car, but subsequent, while the cars were in the

5    impound, various devices, whether they were cameras or

6    SDMs or anything like that, was taken from the car,

7    where the cars had to be dismantled.  The interiors,

8    part of the front engines of the cars were taken apart

9    to take out these materials.  The cars have been

10   sitting outdoors for the last fourteen months.

11        There is no probative value to have them look

12   at these cars, specifically because these cars are no

13   longer in the same condition as they were, and they

14   have been adulterated from the condition that they were

15   in at the time of the accident.

16        And I think that we even heard from some

17   witnesses, police personnel, what they did to get out

18   the recorders, the SDMs and the cameras.  So, there is

19   no way these cars are in the same condition.  So people

20   looking at the cars today after all of this was done to

21   the condition of the cars is useless.

22        And I would think it would be prejudicial to

23   my client to have them look at these cars in a much

24   worse condition as they were when the accident

25   occurred.  And we have the photographs to show the

Roman - Recross - LaMagna

1      condition of the cars.  I would oppose that.

2                  THE COURT:  Where are they?

3                  MS. McCORMICK:  They are at the State Police

4      Headquarters in Farmingdale at Republic Airport.

5                  THE COURT:  Can you get directions to that

6      impound?  I'm going to have to take a look at the cars

7      and I will make a decision after I see them.

8                  MS. McCORMICK:  Yes, Judge.

9                  THE COURT:  Any other applications?

10                 MR. LaMAGNA:  No, your Honor.

11                 MS. McCORMICK:  No, your Honor.

12                 THE COURT:  Please produce the jury.

13                 I'm going to go after this afternoon.  If any

14     of the lawyers would like to, if not accompany me, if

15     you want to go, if you folks feel like looking at the

16     cars, it is not an official proceeding, if you would

17     like to have a look at the cars you are welcome to.

18     I'm going to try to get there between 5:30 and 6

19     o'clock, depending on what time we break here.

20                 MS. McCORMICK:  Yes, your Honor.

21                 COURT OFFICER:  Jury entering.

22                 (Whereupon, the jury entered the courtroom,

23     and upon taking their respective seats, the following

24     occurred:)

25                 THE CLERK:  Jurors are present and seated at

Busco - Cross - LaMagna

```
 1        this time.

 2                    THE COURT:  Thank you.  Welcome back, ladies

 3        and gentlemen.

 4                    Next witness, please.

 5                    MS. McCORMICK:  Your Honor, I believe that

 6        there is Nurse Busco who is still on the stand.

 7                    THE COURT:  Yes.

 8                    (Whereupon, the witness takes the stand.)

 9                    THE COURT:  As she comes up here, let me see

10        counsel.  Step up.

11                    (Whereupon, a discussion was held at the

12        sidebar, off the record.)

13                    THE CLERK:  You are reminded you are still

14        under oath.

15                    THE WITNESS:  Yes.

16   CROSS-EXAMINATION

17   BY MR. LaMAGNA:

18        Q    Good afternoon.  As you know, my name is Stephen

19   LaMagna.  I represent Mr. Heidgen.  I am going to ask you

20   some questions here today.  If you don't understand the

21   question please ask me to rephrase it and I certainly will.

22   If you want me to repeat it, I certainly will.

23             Now, you will recall that I had interviewed you

24   concerning the facts of this case that occurred on July 2nd

25   2005, correct?
```

GIGI WRIGHT, RPR    (516) 571-2503

Busco - Cross - LaMagna

1        A        Correct.

2        Q        In fact, I spoke to you at the hospital on

3    January 31st 2006; is that correct?

4        A        I know I met with you January of 2006.

5        Q        In the hospital?

6        A        Yes.

7        Q        Correct?

8        A        Yes.

9        Q        And then I had an interview with you on March

10   17th 2006.  Do you recall that?

11       A        On the telephone?

12       Q        Yes.

13       A        At my home, yes.

14       Q        Yes.  I have a recording of that conversation.

15   If you need that to refresh your recollection as to what you

16   had told me on that conversation, that is okay.

17       A        Which conversation?

18       Q        March 17th of 2006.  Okay.

19               Now, prior to testifying here today you spoke

20   with other members of the New York State Police concerning

21   your duties as a nurse on July 2nd 2006, correct?

22       A        Correct.

23       Q        In particular, you spoke to an Investigator

24   Harris, correct?

25       A        Correct.

Busco - Cross - LaMagna

1     Q      And did you speak to any other members of law

2   enforcement concerning your duties as a nurse with respect

3   to this matter?

4     A      I don't believe so, no.

5     Q      And do you recall when you spoke to Investigator

6   Harris concerning your duties as a nurse as it relates to

7   this case?

8     A      No, I don't.

9     Q      Would you say that it was some time in October of

10  last year, some time ago?

11    A      He took a statement.  I don't know when it was.

12    Q      And prior to testifying here today did you speak

13  with any members of the district attorney's office

14  concerning your testimony today?

15    A      Yes.

16    Q      When were those conversations had?

17    A      One was when the grand jury was here, a couple

18  months ago; and one was about ten days ago.

19    Q      And you spoke to them today or yesterday?

20    A      And this morning --

21    Q      And you were -- I'm sorry.

22    A      Yesterday I just verified that I was coming today

23  with, I believe, a clerk from upstairs; and this morning I

24  went over that I was going to give testimony today.

25    Q      And when you spoke with Investigator Harris and

Busco - Cross - LaMagna

1   members of the district attorney's office you discussed the

2   issues of you withdrawing blood from Mr. Heidgen, correct?

3        A    Correct.

4        Q    And you went over the procedure that you used in

5   taking the blood --

6        A    Correct.

7        Q    -- from Mr. Heidgen?

8        A    Correct.

9        Q    Correct?

10       A    Correct.

11       Q    And that is the import of your testimony here

12  today, correct?

13       A    Correct.

14       Q    Now, would it be fair to say that your testimony

15  today is based upon your recollection of what occurred

16  approximately fourteen months ago?

17       A    Correct.

18       Q    And you are testifying based upon that

19  recollection; is that correct?

20       A    That's correct.

21       Q    Is it possible that your recollection of the

22  events of July 2nd, specifically the manner in which you

23  took blood from Mr. Heidgen, may be incorrect due to the

24  period of time that passed?

25       A    No.

Busco - Cross - LaMagna

1      Q      So you are sure about everything that you had

2  said --

3      A      I am --

4      Q      -- earlier?

5      A      As far as what?  How I took the blood?

6      Q      Yes.

7      A      Yes.

8      Q      Now, you are familiar with the manner in which

9  blood is withdrawn for law enforcement purposes; are you

10  not, as a R.N.?

11     A      It is not part of your training but, yes.  The

12  kit is sealed and everything that you need is in that kit

13  practically, except the tourniquet.

14     Q      Prior to July 2nd 2005, you had been, on

15  occasion, asked to draw blood at the request of law

16  enforcement, correct?

17     A      Correct.

18     Q      And you had done so, correct?

19     A      Correct.

20     Q      And you are familiar with the official police

21  blood kit, correct?

22     A      Correct.

23     Q      And you showed us what was in evidence, the blood

24  kit, correct?

25     A      Yes.

Busco - Cross - LaMagna

1    Q    And you recognize that blood kit, correct?

2    A    Correct.

3    Q    In the blood kit there are tools for the person

4    who is withdrawing the blood to use, correct?

5    A    Correct.

6    Q    And the use of this blood kit and the withdrawing

7    of blood for law enforcement purposes differs from the

8    manner in which for medical purposes you would be normally

9    drawing blood from a patient, correct?

10    A    Correct.

11    Q    This is for evidence purposes, correct?

12    A    That kit is for evidence purposes, correct.

13    Q    And there are specific instructions in the manner

14    in which it is to be used, correct, by the person taking the

15    blood, correct?

16    A    Yes.

17    Q    And you are, as you said, familiar with those --

18    A    Right.

19    Q    -- instructions, correct?

20    A    Correct.

21    Q    And the use of this blood kit ensures that the

22    blood that is being taken is done to ensure the integrity of

23    the sample, correct?

24    A    Correct.

25    Q    And the fact that there was no tampering with the

Busco - Cross - LaMagna

1    sample, correct?

2         A    Correct.

3         Q    That there is no contamination of the sample,

4    correct?

5         A    Correct.

6         Q    And that there is no adulteration to the sample,

7    correct?

8         A    Correct.

9         Q    That's why the blood kit includes various tools

10   for the person withdrawing the blood, a person like you, to

11   use, correct?

12        A    Correct.

13        Q    That is why the blood kit has its own specific

14   seal, sealed sterilized test tubes, correct?

15        A    Correct.

16        Q    That's why this kit has its own specific swab to

17   be used, correct?

18        A    Correct.

19        Q    And that is why this kit has its own specific

20   holder to use, correct?

21        A    Correct.

22        Q    And that is why this kit has its own specific

23   needle to use, correct?

24        A    We don't have to use that particular needle.

25        Q    I'm not asking you that.  Everything else is

Busco - Cross - LaMagna

1    correct, but the needle is not correct; is that what you are

2    saying?  There is a needle in that box, correct?

3        A    Yes, there is.

4        Q    You are supposed to use, as you testified before,

5    the materials in that box, correct?

6        A    Well, not all of the materials are provided in

7    that box, as I stated before.

8        Q    But the materials that I just articulated before,

9    that you articulated on direct examination, that is in that

10   box are to be used, correct?

11       A    I would gather so, yes.

12       Q    And you would agree that in situations such as

13   this for evidence, for law enforcement purposes, it is

14   important to be accurate and follow procedure, correct?

15       A    Correct.

16       Q    Now, isn't it a fact that on the two occasions

17   that I spoke to you, and you spoke to Investigator Harris,

18   that at no time did you ever tell anybody that you used your

19   own needle?  Is that a fact; you never said that to anybody?

20       A    I don't actually recall what I said, if I used my

21   own needle or not.

22       Q    Well, is there anything -- well, here is a

23   statement you made.  Did you review your statement?

24       A    No, I did not.

25            MR. LaMAGNA:  Could I have this marked for

1    identification.

2    (Whereupon, the item referred to received and

3    marked Defendant's Exhibit L for identification.)

4    COURT OFFICER:  Defendant's Exhibit L marked

5    for identification.

6    Q    I ask you to take a look at that and read that,

7    please.

8    A    I reviewed it.

9    Q    Excuse me?

10   A    I reviewed it.

11   Q    You testified on direct examination that a

12   trooper approached you and said, we need blood, correct?

13   A    Correct.

14   Q    That was Trooper O'Hare, correct?

15   A    If that is who you identify him as, yes.

16   Q    Are you aware, Ms. Busco, that Trooper O'Hare

17   testified that he observed you use the actual tools and

18   needle in this kit?  Are you aware of that?

19   MS. McCORMICK:  Objection.

20   A    No, I don't.

21   THE COURT:  I'll allow it.

22   A    No, I am not aware of that.

23   Q    Are you aware that Trooper O'Hare testified that

24   he actually observed you crack the seal of that needle and

25   use that needle to stick the defendant?

Busco - Cross - LaMagna

1       A      No, I'm not aware of his testimony.

2                   MS. McCORMICK:   Objection.

3                   THE COURT:   Overruled.

4       Q      Are you aware that Trooper O'Hare testified that

5    he actually observed you use the needle, the holder and the

6    test tube to draw the blood?  Are you aware of that?

7       A      No, I'm not aware of his testimony.

8       Q      Now, when I had a conversation with you on March

9    17th -- withdrawn.

10                  When I had a conversation with you on January

11   31st 2006, didn't you tell me that when the trooper

12   approached you you had not yet stuck, with your I.V.,

13   Mr. Heidgen?

14      A      Repeat that.

15      Q      Do you recall telling me back in January that

16   when the trooper asked you to withdraw blood from

17   Mr. Heidgen, that you had not yet done or stuck him with

18   your I.V.?

19      A      Correct.

20      Q      And do you recall in that conversation that you

21   told me that you used the materials provided in the official

22   blood kit?

23      A      I don't recall telling you that.

24      Q      Is it possible that you did and you don't recall

25   that?  Is that possible?

GIGI WRIGHT, RPR   (516) 571-2503

1       A       Is it possible what?

2       Q       That you did and you just don't recall.

3       A       It is possible.

4       Q       And do you recall in a conversation I had with

5   you on March 17th 2006, and I asked you specifically, "Did

6   you use a different needle?"  Do you remember me asking you

7   that?

8       A       No, I don't.

9       Q       Do you remember saying that you used what was

10  provided in that blood kit?

11      A       I don't remember that.

12      Q       Do you recall ever saying anywhere, whether to

13  the New York State Police, to me, to the district attorney,

14  prior to today that you used a separate needle, not the

15  needle provided in this kit?

16      A       Yes.  The district attorney.

17      Q       When did you tell the district attorney that?

18      A       Ten days ago.

19      Q       What about months ago?

20      A       I don't remember.

21      Q       And nowhere in that statement that you reviewed

22  did it say that you used a different needle, correct?

23      A       It doesn't say anything in that statement.

24      Q       It doesn't say that, correct?

25      A       It doesn't say what I used in that statement.

Busco - Cross - LaMagna

1      Q      It doesn't say that you used a separate needle,

2   does it?

3      A      No.

4      Q      It doesn't say that you didn't follow the

5   instructions and use the needle provided in the blood kit,

6   correct?

7      A      Correct.

8                 MS. McCORMICK:  Objection.

9                 THE COURT:  Sustained.

10     Q      You used the tubes, however, correct?

11     A      Correct.

12     Q      Do you remember me asking you a question, "Did

13  you use a different needle or did you just use the same

14  I.V." and your response was, "he approached me before I

15  actually even stuck the patient"?  Does that sounds

16  familiar?

17     A      Can you repeat that?

18     Q      Do you recall I asked you, "Did you use a

19  different needle or did you just use the same I.V. you were

20  using?"  Do you remember me asking you that?

21     A      No, I don't.

22     Q      Do you remember you responding that "he

23  approached me before I actually even stuck the patient"?

24     A      Correct.

25     Q      That's when you said to me, "and that's when I

GIGI WRIGHT, RPR    (516) 571-2503

Busco - Cross - LaMagna

1    used," as I was asking you a question?  Do you remember

2    that?

3         A    No.

4         Q    And I said, "and you used a needle," and you

5    said, "Correct.  And betadine."

6         A    I used a needle and betadine, correct.

7         Q    Referring to the needle here, nowhere in that

8    conversation did you say you used a separate needle when I

9    asked you if you used a different needle; isn't that

10   correct?

11        A    I don't remember you asking me if I used a

12   different needle.

13             MR. LaMAGNA:  Judge, may I approach the

14        witness?

15        Q    If I played you that conversation would that

16   maybe refresh your recollection as to what was said?

17        A    The taped conversation on the telephone?

18        Q    Yes.  That would certainly refresh your

19   recollection as to what was said, correct, if you heard your

20   own voice?

21        A    I would gather.

22             THE COURT:  The jury will be excused for five

23        minutes.  Please don't talk about the case.

24             (Whereupon, the jury exited the courtroom.)

25             MR. LaMAGNA:  Shall I approach?

Busco - Cross - LaMagna

1           (Whereupon, the tape was played.)

2                THE COURT:  All right.  Please get the jury

3      back.

4                COURT OFFICER:  Jury entering.

5                (Whereupon, the jury entered the courtroom,

6      and upon taking their respective seats, the following

7      occurred:)

8                THE CLERK:  Jurors are present and seated,

9      your Honor.

10               THE COURT:  Mr. LaMagna.

11     Q     Ms. Busco, do you recall me asking if you used a

12     different needle?  Do you recall me asking you that

13     question?

14     A     Yes.

15     Q     And nowhere in response to that question did you

16     ever say "yes"; is that correct?

17     A     Correct.  But --

18     Q     When I asked you the question did you use a

19     different needle you didn't say "Yes, I did"; is that

20     correct?

21     A     Correct.

22     Q     And then I said, "Oh, so you just used the

23     need -- and we got stopped -- and I said, "the betadine,"

24     and you said, "that's when I used," isn't that the gist of

25     the conversation?

Busco - Cross - LaMagna

1        A       Yes.   But we weren't referring to anything in

2    particular.

3        Q       That's exactly what I was referring to in that

4    conversation.

5        A       I can't read your mind that you are referring to

6    that.

7        Q       Nurse, Busco, were we not discussing the

8    materials that you used --

9        A       Yes.

10       Q       -- to withdraw the blood?

11       A       Yes.

12       Q       So there can't be any mistake about the subject

13   matter of what we were talking about.

14       A       We weren't talking about the box.   You were

15   talking about the materials I used to draw the blood.

16       Q       Exactly.

17               MS. McCORMICK:   Objection.

18               THE COURT:   Sustained.  Don't argue with her,

19   Mr. LaMagna.

20       Q       We were talking about the materials you used to

21   withdraw the blood, correct?

22       A       Correct.

23       Q       There was no confusion about that, correct?

24       A       Not on my part, no.

25       Q       And when I asked you, "Did you use a different

Busco - Cross - LaMagna

1    needle," you didn't say to me, "Yes, I did"; isn't that

2    correct?

3        A    You didn't ask me if I used the needle from the

4    box.  You asked me if I used a different needle to draw the

5    blood.

6        Q    I asked you, "Did you use a different needle to

7    draw the blood."

8        A    You did not ask specifically from the box.

9        Q    You did not understand my question; is that the

10    point?

11        A    I gather so.

12        Q    You didn't use the needle in the box as Trooper

13    O'Hare saw you use, right?

14        A    Right.

15        Q    And you didn't follow the procedure of the blood

16    kit by using the materials in it, correct?

17            MS. McCORMICK:  Objection, Judge.

18            THE COURT:  Sustained.

19        Q    Nurse Busco, didn't you tell me that there was a

20    lot happening in the ER at that time?  Is that correct?

21        A    Yes.  We were aware that there was multiple

22    casualties.

23        Q    Didn't you tell me that you feel a lot of

24    pressure on you on this case?

25        A    No.

1      Q     You didn't tell me that you are very

2   uncomfortable being involved in this case?

3      A     I don't believe so.

4      Q     Did you feel any pressure by anybody concerning

5   your testimony in this case, you didn't tell me that?

6      A     I told you I never testified before.

7      Q     That too! We'll get to that.  It's the first

8   time, I understand that.

9            Didn't you tell me that due to the nature of this

10   case you were very uncomfortable and you felt a lot of

11   pressure?

12     A     I don't recall that.

13     Q     Do you think it is possible that due to the

14   length of time that passed, the fact that you never

15   testified before, and the nature of this case, that maybe

16   your recollection today isn't as good as it may have been?

17   Is that possible?

18     A    _ My recollection as far as what?

19     Q     Whether or not you followed the instructions of

20   the blood kit and used the materials that were provided

21   specifically for the withdrawal of that blood?

22               MS. McCORMICK:  Objection.

23               THE COURT:  Sustained.

24     Q     Did you take it upon yourself not to use the

25   materials provided in the blood kit?

1          MS. McCORMICK:  Objection.

2          THE COURT:  Overruled.

3     A    Yes.

4     Q    And a needle is provided in the blood kit,

5   correct, as you testified before?

6     A    Correct.

7     Q    And it is to be used specifically and only for

8   the blood taken for the evidence of whomever you are taking

9   the blood from, correct?

10    A    Correct, I guess.

11    Q    And you didn't do that?

12    A    Right.

13    Q    Is it your practice in the past when using a

14  blood kit not to use the materials?

15    A    It depends on the patient.

16    Q    So sometimes you don't follow the directions of

17  that box?

18          MS. McCORMICK:  Objection.

19          THE COURT:  Sustained.

20    Q    Now, I have shown you a statement that you had

21  given to Investigator Harris in October of 2005; isn't that

22  correct?

23    A    Correct.

24    Q    And you reviewed that?

25    A    Yes, I did.

Busco - Cross - LaMagna

1       Q       And nowhere in that statement does it say that

2    you used a different needle, correct?

3                    MS. McCORMICK:  Objection.  Asked and

4           answered.

5       A       It doesn't say anything in the statement as far

6    as anything other than I drew the blood.

7       Q       It didn't say --

8                    THE COURT:  Hold on.  There is an objection.

9           Objection is overruled.  Go ahead.

10      A       Repeat the question.

11      Q       It doesn't say you used a different needle.  It

12   says you withdrew the blood?

13      A       It says I drew the blood.

14      Q       Pursuant to the blood kit?

15      A       It doesn't say that.

16      Q       But you did?

17      A       Did what?

18      Q       You took blood from a request by law enforcement

19   with the use of a blood kit, correct?

20      A       Correct.

21      Q       And it is your testimony that you didn't follow

22   those instructions --

23                   MS. McCORMICK:  Objection.

24      Q       -- or procedures of the blood kit?

25                   THE COURT:  Sustained.

Busco - Cross - LaMagna

1      Q      Nurse Busco, let me ask you one last time: You
2   are testifying here from a position of recollection.  Is it
3   possible, considering the length of time that passed, that
4   maybe you are not quite right about what you are saying?
5      A      No.
6                   MS. McCORMICK:  Objection.
7                   THE COURT:  Overruled.
8      Q      And at no time did you ever articulate to me or
9   to anybody, whether it be Harris or any other law
10  enforcement official, that you used a different needle;
11  isn't that correct?
12     A      Ten days ago.  To the district attorney.
13     Q      To law enforcement personnel when they took
14  statements and interviewed you?
15     A      Right.
16     Q      It is only ten days ago when the district
17  attorney spoke to you that you said, Oh, yeah, now I used a
18  different needle?
19                  MS. McCORMICK:  Objection.
20     A      I didn't think that the needle was a big deal.
21                  THE COURT:  Sustained.
22     Q      So it was only ten days ago for the first time,
23  when talking with the district attorney the and preparing
24  for your testimony in this trial, did you articulate that
25  you used a different needle; is that your testimony?

1          A      Correct.

2                 MR. LaMAGNA:   Nothing further, Judge.

3     REDIRECT EXAMINATION

4     BY MS. McCORMICK:

5          Q      Nurse Busco --

6          A      Yes.

7          Q      -- when you say a different needle, what do you

8     mean by that?

9          A      It is a needle that is also used for an I.V.   It

10    is a needle that can be used to draw blood, as well as then

11    hook up to I.V. fluid; where the needle in the box can only

12    draw blood.

13         Q      So you used a different needle?

14         A      Correct.

15         Q      And is a different needle also a new needle?

16         A      Yes.

17         Q      Would there be any time that you would use an

18    already used needle?

19         A      Never.

20         Q      In the course of having drawn blood for police

21    purposes, if you are drawing blood for diagnostic purposes,

22    or for an I.V., is it your practice to first draw blood for

23    the police officers and then proceed to the I.V.s?

24         A      Yes.

25         Q      Nurse Busco, if you had done it a different way

Busco - Redirect - McCormick

1  would you not have necessitated repeating having to inject

2  the defendant with a needle twice, instead of once?

3       A    Can you repeat that?

4       Q    If you had done it using both the I.V. needle

5  that you were setting up for medical purposes, and then a

6  separate needle for the evidence purposes, would you not

7  have had to inject him twice instead of once?

8       A    Correct.

9       Q    At the time that you gave a statement to

10  Investigator Harris, you reviewed that statement; is that

11  correct?

12      A    Correct.

13      Q    Were you ever asked whether you used the specific

14  needle in the blood kit?

15      A    No.

16      Q    Did the defense in that conversation that

17  refreshed your recollection ever ask you directly did you

18  use the needle provided in the blood kit?

19      A    No.

20      Q    When he referred to you using materials in the

21  blood kit, did you use the materials from the blood kit?

22      A    Yes.

23      Q    Is it just the needle that you did not use?

24      A    Yes.

25      Q    And when he asked you about what needle you used,

1    did you not tell him that I used a different needle?

2         A    Yes, I believe so, yes.

3         Q    Were you present today in the courtroom when

4    Trooper O'Hare was testifying?

5         A    No.

6         Q    Would you have any way of knowing what he said in

7    this courtroom?

8         A    No.

9         Q    Defense counsel on his cross-examination asked

10   you, isn't it different to take blood for evidentiary

11   purposes than for medical purposes?  Do you recall that

12   statement?

13        A    Yes.

14        Q    Is not both things injecting a patient and

15   removing blood?

16        A    Yes.

17        Q    So it is the same procedure; is it not?

18        A    Except for the betadine swab.

19        Q    And you used betadine swab from the blood kit?

20        A    Yes.

21        Q    What would you use for medical purposes in the

22   hospital?

23        A    An alcohol swab.

24        Q    So you specifically used a swab that contained no

25   alcohol, correct?

Busco - Redirect - McCormick

```
 1        A      Correct.

 2        Q      And you knew that that was the purpose of using

 3    that swab?

 4        A      Correct.

 5        Q      And the alcohol, of course, in the hospital swab

 6    is that ethyl alcohol?

 7        A      I believe so.

 8        Q      Nurse Busco, are you provided with instructions

 9    from the trooper as to how to take the blood?  Are you

10    handed a piece of paper?

11        A      No.

12        Q      You are familiar that there is paperwork within

13    that blood kit; is that correct?

14        A      Yes.

15        Q      And is that paperwork, to your knowledge, for the

16    trooper?

17        A      Honestly I don't know who it is for.

18        Q      When you went to use the needle, before you

19    started the I.V.s, did you break the seal on the hospital

20    provided needle that you used?  Is it in a sealed container?

21        A      It is in a paper and plastic, you know, like

22    paper.

23        Q      And it is sealed?

24        A      It is sealed.

25        Q      It is sterile?
```

Busco - Redirect - McCormick

```
 1        A     It is sterile.

 2        Q     And you would use it to treat a patient in a

 3   hospital?

 4        A     Correct.

 5        Q     And, therefore, it must be sealed and sterile; is

 6   that correct?

 7        A     Correct.

 8        Q     In the statement that you gave to Investigator

 9   Harris, again you reviewed that statement?

10        A     Yes.

11        Q     Do you recall making the statement, "I was

12   already preparing to stick him for labs"?

13        A     Correct.

14        Q     What did you mean by that?

15        A     That I was preparing -- I had my blood tubes and

16   my I.V. and the tourniquet ready that I was preparing when

17   the trooper asked me.  I put the tourniquet on, he had the

18   box open, I took his betadine swab, and basically I'm going

19   to do the same for myself if I was drawing labs and starting

20   the I.V., except I'm going to use the betadine swab and

21   their tubes.

22        Q     So you turned and you took the tubes, you took

23   the betadine swab, and you were going to stick him anyway

24   for medical purposes?

25        A     Correct.
```

Busco - Redirect - McCormick

1    Q    And you are in an ER, and he is receiving

2    treatment; is that correct?

3    A    Correct.

4    Q    Is there a time pressure involved in that?

5    A    You want to stabilize the patient. That's the

6    time pressure. It is still to treat the patient.

7    Q    So you, in response to the trooper, did his

8    quickly and first before you did your I.V.?

9    A    Well, the needle is the I.V., so right, I

10   obtained the access to draw his blood and gave it to him and

11   went about what I needed to do.

12   Q    When I say "before," the I.V. it was not injected

13   in any fluids?

14   A    No.

15   Q    You did the blood first and then continued to

16   treat your patient?

17   A    That's correct.

18   Q    Would it have taken longer to do it twice, inject

19   him with an I.V. and then also have to do it separately

20   using the needle in that kit?

21   A    Yes.

22   Q    When you say that you were uncomfortable

23   testifying in this case, what did you mean by that?

24   A    That it is a high-profile case. I thought that I

25   have never testified, and as far as uncomfortable, it is

GIGI WRIGHT, RPR    (516) 571-2503

1    uncomfortable being up here.

2         Q    Is that what you meant by that?

3         A    Yes, pretty much.

4         Q    Did anybody pressure you to say anything other

5    than --

6         A    No.

7         Q    -- other than your recollection?

8         A    No.

9         Q    Has your testimony here today been your honest

10   recollection?

11        A    Yes.

12        Q    Do you have any hesitation about anything that

13   you said here today as being an accurate recollection?

14        A    An accurate?

15        Q    An accurate recollection.

16        A    Yes, I believe it to be an accurate recollection.

17        Q    This is what happened to your knowledge?

18        A    Yes.

19        Q    Nurse Busco, when the defense attorney called you

20   in March of this year did he inform you that he was taping

21   your conversation?

22        A    No, I don't believe so.  I actually told him that

23   it was not a good time to be talking to me.  It is St.

24   Patrick's Day.  My kids were running around the house and I

25   wanted to spend time with him.  I did say that to him on the

Busco - Recross - LaMagna

1    tape; this was not a good time.

2        Q    And he continued asking you questions?

3        A    He said it would only take a couple minutes.  I

4    said, "I really don't have a couple minutes.  This is St.

5    Patrick's day and I'm Irish, I happen to celebrate the

6    holiday.  I would really prefer to do this at another time."

7        Q    You refreshed your recollection by listening to

8    that tape; is that correct?

9        A    Correct.

10       Q    Were you ever asked whether you used the needle

11   from the blood kit?

12       A    No.

13       Q    Did you ever say anything other than I used a

14   different needle?  Do you recall?

15       A    I don't recall.

16            MS. McCORMICK:  I have nothing further.

17   RECROSS-EXAMINATION

18   BY MR. LaMAGNA:

19       Q    Now, Nurse Busco, you just testified that you

20   used the materials provided in the kit, correct?

21       A    Correct.

22       Q    But you didn't use all of the materials, correct?

23       A    Correct.

24       Q    In fact, you used the betadine swab that was

25   provided in the kit, correct?

Busco - Recross - LaMagna

```
 1        A     Correct.

 2        Q     You didn't use your hospital swab that you could

 3   have used when you were about to do the I.V.s, correct?

 4        A     Correct.

 5        Q     You used what was provided in the kit, correct?

 6        A     Correct.

 7        Q     That was for a reason, correct?

 8        A     Yes.

 9        Q     Because it was provided, and that's the manner in

10   which blood is taken, correct, because it is not alcoholic,

11   correct?

12        A     Correct.

13        Q     You also used a tube, the test tubes that were

14   part of the kit, correct?

15        A     Correct.

16        Q     You said that you had your own test tubes that

17   you were about to fill with blood yourself, correct?

18        A     Correct.

19        Q     You didn't use those, did you?

20        A     They are different colors.

21        Q     You didn't use the hospital test tubes, correct?

22        A     I used them after I did the draw for the blood

23   test.

24        Q     It is a different tube, correct?

25        A     Correct.
```

Busco - Recross - LaMagna

1       Q       You used the blood tubes, the vacutainer tubes,

2    provided in the kit?

3       A       Right.  We don't carry those, correct.

4       Q       And you didn't use the vacutainer needle that was

5    provided in the kit, correct?

6       A       Correct.

7       Q       Now, you said that your recollection, you

8    believe, is accurate today, correct?

9       A       Correct.

10      Q       Well, obviously, somebody is not telling the

11   truth between you and --

12              MS. McCORMICK:  Objection.

13      Q       -- Officer O'Hare?

14              THE COURT:  Sustained.

15      Q       Somebody is wrong.

16              MS. McCORMICK:  Objection.

17      Q       You both can't be correct.

18              MS. McCORMICK:  Objection.

19              THE COURT:  Sustained.

20              MR. LaMAGNA:  Nothing further.

21.  FURTHER REDIRECT EXAMINATION

22   BY MS. McCORMICK:

23      Q       Nurse Busco --

24      A       Yes.

25      Q       -- that vacutainer tube, is there a difference --

1       A       Yes.

2       Q       -- than hospital tubes?

3       A       Yes.

4       Q       What is the difference?

5       A       As far as the color.  There is a purple topped

6    tubes used for hemoglobin and hematocrit; and gold caps for

7    amylase, cardiac enzymes; blue tubes for coagulation

8    studies; gray topped tubes for lactic acid; pink and red

9    tubes to use for typing and screening a patient as far as if

10   they need blood products.  We don't carry those tubes in the

11   hospital.

12      Q       And in those tubes is there a white powdery

13   coagulant in the tubes?

14      A       Yes, there is a white powder in the tubes.

15      Q       So there is a difference between those tubes and

16   the tubes you use in the hospital; is that right?

17      A       Correct.

18      Q       That's why you have to use those tubes; is that

19   correct?

20      A       Correct.

21      Q       And the alcohol swabs in the hospital are

22   different than the non-alcohol swabs in the kit; is that

23   correct?

24      A       Correct.

25      Q       Is there any difference between the needle that

Busco - Recross - LaMagna

1    will extract blood in the kit and the needle that will

2    extract blood in the I.V. in your hospital?

3         A    Only that the needle, our needle, can convert to

4    an I.V.

5         Q    Thank you.

6              MR. LaMAGNA:  I have nothing else.

7              THE COURT:  Thank you.

8              THE WITNESS:  Thank you.

9              (Whereupon, the witness exits the courtroom.)

10             THE COURT:  I'm going to give the jury a real

11    five-minute break.  The court officers will come and

12    get you.  Don't talk about the case.

13             (Whereupon, the jury exited the courtroom,

14    and a brief recess was held.)

15             COURT OFFICER:  Jury entering.

16             (Whereupon, the jury entered the courtroom,

17    and upon taking their respective seats, the following

18    occurred:)

19             THE CLERK:  Case on trial, Indictment 1910N

20    of 2005.  People versus Martin Heidgen.

21             People ready?

22             MR. HAYDEN:  People ready.

23             THE CLERK:  Defendant ready?

24             MR. LaMAGNA:  Defendant ready.

25             THE CLERK:  Defendant is present and jury is

Tpr. Stafford - Direct - McCormick

1     seated, your Honor.

2               THE COURT:  Next witness, please.

3               Your Honor, the People call Trooper Stafford.

4               COURT OFFICER:  Step up.  Remain standing,

5     raise your right hand and face clerk.

6          M I C H A E L   S T A F F O R D,          a

7               witness called on behalf of the People,  .

8               having been first duly sworn by the Clerk of

9               the Court, was examined and testified as

10              follows:

11              THE CLERK:  You can put your hand down.

12              State your name, spelling your last name for

13    the record, shield number and command.

14              THE WITNESS:  Trooper Michael Stafford,

15    S-T-A-F-F-O-R-D, shield number 503.  I work at S.P.

16    Farmingdale.

17              THE CLERK:  Thank you.  Take a seat.

18              MS. McCORMICK:  May I inquire?

19              THE COURT:  Yes.

20    DIRECT EXAMINATION

21    BY MS. McCORMICK:

22    Q     Afternoon good, Trooper.

23    A     Good afternoon.

24    Q     Trooper Stafford, could you tell the jury by whom

25    you are employed?

Tpr. Stafford - Direct - McCormick

1     A    New York State Police.

2     Q    How long have you been a State Police Trooper?

3     A    Just under four years.

4     Q    Could you describe for the jury, please, what are

5  your duties as a New York State Police Trooper?

6     A    I'm a patrolman.

7     Q    Patrol?

8     A    Patrol.

9     Q    What do you do on patrol?

10    A    Investigate accidents, arrests, investigate DWIs

11  and so forth.

12    Q    Trooper Stafford, did you have occasion to become

13  involved in the investigation of a crash which occurred on

14  the Meadowbrook Parkway at about 2 o'clock in the morning on

15  July 2nd 2005?

16    A    Yes, I did.

17    Q    Specifically, I'm going to direct your attention

18  to the handling of a blood kit.  Do you recall that?

19    A    Yes, I do.

20    Q    Could you please convey to the jury your role in

21  handling the blood kit associated with a defendant Martin

22  Heidgen?

23    A    Yes.  I was advised by my sergeant at the scene

24  to go to Nassau County University Medical Center, that

25  Trooper O'Hare was going to basically be with the defendant

GIGI WRIGHT, RPR   (516) 571-2503

Tpr. Stafford - Direct - McCormick

1    at the time, and I had to basically take the blood kit from

2    Trooper O'Hare and hand it off to the investigator when he

3    got to the scene.

4         Q    And you did not go with Trooper O'Hare to the

5    hospital in the ambulance with the defendant, did you?

6         A    No, I did not.

7         Q    Had you responded to this crash scene as part of

8    the initial investigation?

9         A    I did, with Trooper O'Hare, yes.

10        Q    You are Trooper O'Hare's partner?

11        A    Yes.

12        Q    You guys were in the same police vehicle on that

13   night?

14        A    Yes.

15        Q    And when Trooper O'Hare went to the hospital

16   where were you?

17        A    My sergeant told me to go back to my vehicle, to

18   head up to Nassau County University Medical Center, and

19   basically secure the blood, take it over to, or wait for the

20   investigator to get to the hospital to give it to him.

21        Q    You received those instructions from your

22   sergeant?

23        A    Yes, I did.

24        Q    Who is your sergeant?

25        A    Sergeant Rudolph.

1     Q    Is it fair to say then that you basically

2    followed the ambulance to the hospital, not literally, but

3    followed behind it?

4    A    I was probably a few minutes behind, yes.

5    Q    Did there come a time when you saw Trooper O'Hare

6    in the emergency room in the hospital?

7    A    When I came in he was basically at that point

8    already at the emergency room door as I walked in, and he

9    had the blood kit in his hand at that time.

10    Q    I apologize.  What was he doing?

11    A    He was filling out the tags to put on the actual

12    blood kit itself.

13    Q    I'm going to ask to approach you with what has

14    been deemed marked People's Exhibit 17 for identification

15    purposes.

16         Trooper Stafford, do you recognize that?

17    A    Yes, I do.

18    Q    What do you recognize that to be?

19    A    It is the blood kit from that night.

20    Q    How do you recognize it?  Is there any particular

21    markings or indications?

22    A    It is a standard blood kit that is used by the

23    State Police.  It has a seal on it, with the names on it,

24    but that I do recognize.

25    Q    And the name that you recognize is the name of

1     the defendant Martin Heidgen?

2          A     Yes, ma'am.

3          Q     Trooper Stafford, upon arriving at the emergency

4     room how long were you with Trooper O'Hare?

5          A     Upon arriving, I'm sorry?

6          Q     Let me rephrase that.

7                You arrived at the emergency room and met up with

8     Trooper O'Hare.

9          A     Yes.

10         Q     How long were you with him before the two of use

11    separated?

12         A     Just a few minutes.

13         Q     During that time, Trooper Stafford, did you know

14    the name of the defendant Martin Heidgen?

15         A     No, I did not.

16         Q     Did you at any point somewhere along the line

17    learn his name?

18         A     Later on.

19         Q     Over the course of the night?

20         A     Actually probably the next day when I returned.

21         Q     Trooper Stafford, when you left the emergency

22    room did you have that blood kit with you?

23         A     Yes, I did.

24         Q     Did you put that blood kit down anywhere?

25         A     No, I did not.

Tpr. Stafford - Direct - McCormick

1      Q     Did you open the blood kit yourself and do

2      anything with respect to sealing it or anything at all to

3      the internal portion of it?

4      A     No, I did not.

5      Q     Was that blood kit, that cardboard box, in a

6      closed position when you received it from Trooper O'Hare?

7      A     Yes.

8      Q     Where did you physically go after you received

9      that blood kit from Trooper O'Hare?

10     A     At that point I went to the hallway, waited for

11     the investigator to come to the hospital.

12     Q     Did there come a time when the investigator came?

13     A     Yes.

14     Q     Which investigator came to the hospital to

15     receive that blood kit?

16     A     I believe it was investigator Baez.

17     Q     Not Harris?

18     A     No.

19     Q     Was Investigator Baez part of the team

20     investigating this crash?

21     A     At that point I did not know.  Later on I

22     realized, yes, he is.

23     Q     Did you have any further dealings, anything

24     further to do with that blood kit?

25     A     No.  Just when I handed it over to Investigator

Tpr. Stafford - Cross - LaMagna

1    Baez he asked me to sign on the Lab-1 sheet.  I just signed

2    my name, basically stating that I gave it to him for chain

3    of custody, and gave him the blood kit.

4                MS. McCORMICK:  I have nothing further.

5                MR. LaMAGNA:  May I?

6                THE COURT:  Please.

7    CROSS-EXAMINATION

8    BY MR. LaMAGNA:

9        Q    Good afternoon, Trooper.

10       A    Good afternoon, sir.

11       Q    My name is Stephen LaMagna.  We never met, have

12   we?

13       A    No, we have not.

14       Q    I'm going to ask you a couple questions.

15       A    Okay.

16       Q    If you don't understand a question, or if you

17   want me to repeat it, I certainly will.

18       A    Okay.

19       Q    Now, you and Trooper O'Hare are partners; is that

20   correct?

21       A    Yes.

22       Q    And you both arrived at the accident scene at

23   around 2:20; is that correct?

24       A    Around that time.

25       Q    You are both in the same car; is that correct?

Tpr. Stafford - Cross - LaMagna

```
 1        A    Yes.

 2        Q    And you were notified that your partner, Trooper

 3   O'Hare, was going to be going with Marty to the hospital for

 4   the purposes of trying to get a blood sample, correct?

 5        A    Yes.  My sergeant notified me that my partner

 6   would be driving the ambulance to the hospital.

 7        Q    And then you were told to get in the car and get

 8   to the hospital, correct?

 9        A    I was told to go to the hospital, yes.

10        Q    What time was that, would you say, about?

11        A    Um, approximately around, maybe, 2:40.

12        Q    Now, do you know a Trooper Siegler?

13        A    Yes, I do.

14        Q    He was on the scene, correct?

15        A    I believe he was, yes.

16        Q    And were you guys in contact at all by radio or

17   cell phone or anything?

18        A    No.

19        Q    You were not?

20        A    No.

21        Q    Now, you said it was Sergeant Rudolph who sent

22   you to the hospital, correct?

23        A    Yes, sir.

24        Q    And you were given instructions, correct?

25        A    Yes.
```

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Stafford - Cross - LaMagna

1      Q      And your instructions were to retrieve the blood

2    kit if O'Hare was successful in getting the blood sample,

3    correct?

4      A      Yes.

5      Q      And when you arrived at the hospital O'Hare had,

6    Trooper O'Hare had, already gotten the sample; is that

7    correct?

8      A      Yes.

9      Q      And you said he was filling out seals?

10     A      Yes.

11     Q      That come in there, correct?

12     A      Yes.

13     Q      Now, did you -- let me just show you Defendant's

14   Exhibit D in evidence.  I ask you to take a look at that.

15            Did you write anything on that exhibit?

16     A      No, I did not.

17     Q      None of that is your handwriting?

18     A      No.

19     Q      Somebody put your name on there, correct?

20     A      Yes.

21     Q      So on the chain of custody or chain of possession

22   where it said defendant Busco and then it says Stafford,

23   received from Stafford by Baez, you didn't write your own

24   name in there?

25     A      No.

Tpr. Stafford - Cross - LaMagna

1      Q      You didn't fill out the chain of possession;

2   somebody else did?

3      A      Investigator Baez did.

4      Q      You recognize his handwriting?

5      A      He did it in front of me.

6      Q      So you saw this?

7      A      Yes.

8      Q      When Baez comes, you have the box and you give it

9   to him, and you saw him fill that out?

10      A      Yes.

11      Q      Now, were you aware that the inner box, you are

12   familiar with -- withdrawn.

13            You are familiar with the blood kit?

14      A      Generally familiar, yes.

15      Q      You understand that there is an inner box?

16      A      Yes.

17      Q      And that's where the, once the blood is taken,

18   that is where the test tubes are, the blood, correct?

19      A      Yes.

20      Q      You were aware that at the time that you received

21   it from Trooper O'Hare that hadn't been sealed yet?  Were

22   you aware of that?

23      A      Was I aware it hadn't been sealed yet?

24      Q      Yes.

25      A      Yes.

Tpr. Stafford - Cross - LaMagna

1    Q    In fact, you saw O'Hare filling out seals,

2    correct?

3    A    Correct.

4    Q    Seals to be used at a later day, correct?

5    A    No.  It would be sealed that night by whoever

6    sealed it.

7    Q    At a later time, I should say.

8    A    Okay.

9    Q    You didn't seal this box, correct?

10    A    No, I did not.

11    Q    You received the blood kit in an unsealed

12    condition from Trooper O'Hare; is that correct?

13    A    That is correct.

14    Q    And then you took the unsealed blood kit and gave

15    it to Investigator Baez; is that correct?

16    A    Correct.

17    Q    Is it your testimony that at the time you arrived

18    Trooper O'Hare -- withdrawn.

19         What time did you take the blood kit from Trooper

20    O'Hare?  It was taken, approximately according to this, at

21    2:45.

22    A    Probably around five or ten minutes after it was

23    taken.

24    Q    Two-fifty-five, three in the morning?

25    A    Yes.

Tpr. Stafford - Cross - LaMagna

1    Q    And you were with O'Hare for a period of time

2    before he went, I believe, to the trauma unit with --

3    A    Just a short period of time.

4    Q    At 3:15-ish; would that be fair?

5    A    I couldn't give you an estimated time.

6    Q    You had not spoken to Trooper Siegler; is that

7    correct?

8    A    That's correct.

9    Q    In fact, you said you hadn't found out the

10   identity of Martin Heidgen until the next day?

11   A    That would be correct.

12   Q    Now, what time did Investigator Baez arrive?

13   A    It was a good -- it was quite a long time.  I

14   would say it was about an hour and forty-five minutes, two

15   hours or so, from the time I arrived at the hospital.

16   Q    Around 5 o'clock?

17   A    Yes, about that.

18   Q    Could it have been a little later?

19   A    No.  It was probably earlier, actually.

20   Q    So around 5 a.m. would be a fair estimate?

21   A    Yes.

22   Q    What were you doing with this unsealed --

23   A    Basically.

24   Q    -- blood kit?

25   A    I had in my hands waiting.

GIGI WRIGHT, RPR    (516) 571-2503

1    Q    Where were you waiting?

2    A    At the emergency room right by the exit.

3    Q    In the waiting area?

4    A    No, by the exit or entrance to the emergency

5    room.

6    Q    A lot of things were going on in the emergency

7    room because of the terrible nature of the accident?

8    A    I am not aware of -- I was in the room that

9    didn't have anything going on, other than people coming in

10   and going.

11   Q    You didn't do anything other than wait those two

12   hours for Baez to arrive?

13   A    That is correct.

14   Q    Were you making any phone calls to anybody,

15   saying what time is he going to arrive; what else should I

16   do?

17   A    I received a phone call from my sergeant who just

18   told me that Investigator Baez was on his way.

19   Q    What time did you receive the phone call from

20   Sergeant Rudolph?

21              THE COURT:  Excuse me, one second.

22              (Brief because in proceedings.)

23              THE COURT:  I'm sorry, Mr. LaMagna.

24   Q    What time did you receive that phone call from

25   Sergeant Rudolph that Investigator Baez would be coming

1    down?

2          A     I do not recollect.

3          Q     It was certainly after three, correct?

4          A     It was all around about the same time.

5          Q     And Rudolph never told you the identity of

6    Mr. Heidgen?

7          A     No.

8          Q     Now, when Officer Baez arrived -- withdrawn.

9                For three hours you were just waiting in the

10   waiting area for Baez, correct?

11         A     No.  For about two hours I was waiting for Baez.

12         Q     Two hours.  In the interim between the phone call

13   from Rudolph around three to the arrival of Investigator

14   Baez you had no contact with any other member of the New

15   York State Police?

16         A     No.

17         Q     So you just waited until he got there?

18         A     Yes, sir.

19         Q     And did Rudolph tell you where to wait for him?

20         A     No, he did not.

21         Q     Now did you know where to go?

22         A     Generally that is where any police officers go

23   coming through that entrance.

24         Q     So police officers always come in from that

25   entrance?

Tpr. Stafford - Cross - LaMagna

1     A     Yes, sir.

2     Q     Which entrance was that?

3     A     Emergency room entrance.

4     Q     The ER entrance?

5     A     Yes, sir.

6     Q     And you were just waiting by the door?

7     A     Yes, sir.

8     Q     For the two hours?

9     A     Yes, sir.

10    Q     And what happened when Investigator Baez arrived?

11    You just handed him the unsealed --

12    A     Yes.

13    Q     -- box.

14    A     Yes.

15    Q     Did he fill out anything?

16    A     Nope.  He pulled out the Lab-1 sheet and, like I

17    said, I signed off chain of custody to him, handed him the

18    box, and he took it from me, and that was it.

19    Q     Sir, let me just show you the Lab-1 report.  Let

20    me show you Defendant's Exhibit E in evidence.

21          I'm showing you what has been previously marked

22    Defendant's Exhibit E in evidence.  I ask you to take a look

23    at it.  Do you recognize that document?

24    A     Yes, I do.

25    Q     That's the Lab-1; is that correct?

Tpr. Stafford - Cross - LaMagna

1    A    Yes, sir.

2    Q    And on the bottom where it says "transfer record"

3    as it relates to the chain of custody, do you see your name

4    present?

5    A    Yes, I do.

6    Q    Is that your handwriting?

7    A    Yes, it is.

8    Q    It says from you to Baez, correct?

9    A    Yes, sir.

10    Q    And whose signature appears there?

11    A    That is mine.

12    Q    Isn't it generally the person receiving the

13    evidence who signs the signature spot to acknowledge receipt

14    of that evidence?

15    A    No.

16    Q    So it is, according to you, the person from signs

17    it; not to the person to --

18    A    I filled out numerous ones of these. I have

19    always done it this way.

20    Q    And that's what you did. And that's your

21    signature and that's your handwriting?

22    A    Yes, sir.

23    Q    And after you gave it to Investigator Baez at

24    around 5 o'clock, other than you filling out that portion of

25    the chain of custody on the Lab-1, is that all you had to

Tpr. Stafford - Cross - LaMagna

1    deal with or do with respect to the blood kit?

2         A    Yes.

3         Q    Didn't fill out any other paperwork, any other

4    seals or anything like that?

5         A    No, I did not.

6         Q    Didn't sign the box?  Didn't do anything,

7    correct?

8         A    No, I did not.

9         Q    Nor would you have to, since it wasn't sealed at

10   this point, correct?

11        A    Correct.

12        Q    You didn't open it, correct?

13        A    Correct.

14        Q    Did you look into the box?

15        A    No.

16        Q    Never opened the cardboard outer box to look into

17   it?

18        A    No.

19        Q    And then after you gave Investigator Baez the box

20   what did you do?

21        A    I basically at that point just returned to the

22   station.

23        Q    So you just left.  Handed it to him and then

24   left?

25        A    I asked him if he needed me to do anything, and

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Stafford - Cross - LaMagna

1    he said, no; you are all set.  You can go back to the

2    station.

3         Q    Your encounter was for a very short period of

4    time, correct?

5         A    Yes, sir.

6         Q    The only two things that you wrote on was the

7    outer chain of custody on the box?

8         A    I did not write on that.

9         Q    That is not your name -- that's not your

10   handwriting?

11        A    It is my name; but not my handwriting.

12        Q    It is your name; not handwriting?

13        A    Correct.

14        Q    That is Officer Baez?

15        A    Yes.

16             MR. LaMAGNA:  Thank you.  Nothing further.

17             MS. McCORMICK:  No redirect.  Thank you.

18             THE COURT:  Thank you.

19             (Whereupon, the witness exits the courtroom.)

20             THE COURT:  Call your next witness.

21             MS. McCORMICK:  Your Honor, the People call

22        Investigator Ramos.

23             COURT OFFICER:  Step up, remain standing,

24        raise your right hand and face the clerk.

25             J O H N   R A M O S,        a witness

Inv. Ramos - Direct - McCormick

1              called on behalf of the People, having been

2              first duly sworn by the Clerk of the Court,

3              was examined and testified as follows:

4                   THE COURT:   Please be seated.  Give your

5         name, shield and command.

6                   THE WITNESS:   My name is John Ramos,

7         R-A-M-O-S.  My shield number is 162.  I am stationed at

8         S.P. Newburgh.

9    DIRECT EXAMINATION

10   BY MS. McCORMICK:

11        Q    Good afternoon, Investigator.

12        A    Good afternoon.

13        Q    S.P., meaning State Police?

14        A    Yes, State Police.  I'm sorry.

15        Q    Investigator Ramos, just for a point of

16   reference, is an investigator in the state police the

17   equivalent of a detective in the Nassau County Police

18   Department?

19        A    Yes, it is.

20        Q    Same kind of rank?

21        A    Yes.

22        Q    Same kind of responsibilities?

23        A    Yes, it is.

24        Q    How long have you been working with the New York

25   State Police?

Inv. Ramos - Direct - McCormick

1       A       For over twenty years.

2       Q       What are your duties at the state police?

3       A       I investigate homicides, rapes, investigate

4       thefts, grand larcenies.  All felonies within the County of

5       Orange where I am stationed at.

6       Q       In the County of Orange, the nature of the state

7       police is different than it is here on Long Island in terms

8       of patrol duties and that sort of things?

9       A       Yes, it is.

10      Q       Investigator Ramos, could you tell the jury,

11      please, did you have occasion to become involved in the

12      handling of a blood sample attributed to defendant Martin

13      Heidgen?

14      A       Yes, I did.

15      Q       And directing your attention to July 5th.  Were

16      you working that day?

17      A       Yes, I was.

18      Q       Can you tell the jury, please, what your

19      involvement in the handling of that blood sample was?

20      A       I was working a day shift, which is a one shift

21      that would be 8:30 to 4:30.  I arrived at the station

22      moderately early, about eight, 8:15.  I queues had discussed

23      the daily activities, or nightly activities, with the desk

24      officer and reviewed the blotter.

25              At this point in time I discovered, or I knew

Inv. Ramos - Direct - McCormick

1    that there was evidence in the vault which had to be

2    transferred to the State Police Laboratory, which is next

3    door to us.  And at that point in time I removed the blood

4    evidence and transferred it to the Mid Hudson Regional Crime

5    Lab which is, like I said, next door.

6         Q    I'm going to ask to approach you with what is

7    marked People's Exhibit 17 for identification purposes.

8              Take a look at that, Investigator.

9         A    Yes.

10        Q    Do you recognize that?

11        A    Yes, I do.

12        Q    What do you recognize that to be?

13        A    This was the blood package that I submitted to

14   the lab on July 5th.

15        Q    And how do you know that?  How do you know it is

16   that particular blood kit?

17        A    It had the name of the defendant on the seal

18   tabs.  And that was it.

19        Q    Investigator Ramos, you said a moment ago that

20   you knew that there was evidence in the vault or the locker

21   that needed to be transported to the lab.

22             First of all, where is the lab relative to the

23   Newburgh Barracks?

24        A    The lab is right next door to the S.P. Newburgh

25   Barracks.

GIGI WRIGHT, RPR    (516) 571-2503

1       Q       Is it connected in any way?

2       A       No, it is not.

3       Q       Do you have access to that lab by any means other

4    than the front door?

5       A       No, I do not.

6       Q       How do you get into the front door of the lab?

7       A       You appear before the front foyer, there is a

8    buzzer to the door entering the lab, and you have to be let

9    in by one of the lab technicians or lab clerk.

10      Q       You testified to having to know that there was

11   evidence to be transported there.  How did you know that?

12      A       I received a call from my colleague, Investigator

13   Michael Drake.

14      Q       When did you receive that call?

15      A       I believe that early morning on the 5th.

16      Q       And the nature of that conversation was what?

17      A       Because the lab was closed on Saturdays and

18   Sundays, and they do have the holiday off, which fell on

19   July 4th, I transferred the blood evidence to the lab on

20   July 5th, that morning.

21      Q       Where was that blood kit physically located in

22   the Newburgh Barracks when you arrived at work on July 5th?

23      A       It was located in the Newburgh B.C.I. evidence

24   vault.

25      Q       Could you just explain to the jury, please, what

1    you are talking about with the B.C.I. evidence vault?

2        A    The barracks was an old bank.  The bank had a

3    bank vault.  And that is where the B.C.I. maintains their

4    B.C.I. evidence.  Again, everything pertaining to any B.C.I.

5    cases that run through the state police at Newburgh.

6        Q    What does B.C.I. stand for?

7        A    Bureau of Criminal Investigations.

8        Q    That essentially is the detective division of the

9    state police?

10       A    Yes.

11       Q    Now, you say that it is an old bank vault.  Is

12   there a lock on the door of that vault area?

13       A    Yes.  It is a gate and then there is a lock on

14   it.

15       Q    And with respect to that lock is it a keyed lock

16   or is it a combination lock?

17       A    It is a combination lock.

18       Q    Do you have the combination of that lock?

19       A    Yes, I do.

20       Q    How many people in the Newburgh Barracks have the

21   combination of that evidence lock?

22       A    There are five investigators and one senior

23   investigator, which includes myself.  A total of six people.

24       Q    There are other people that work in the Newburgh

25   Barracks?

Inv. Ramos - Direct - McCormick

1    A    That's all of the Bureau of Investigation

2    members, yes.

3    Q    But there are also Troopers that operate out of

4    the Newburgh Barracks; is that correct?

5    A    Yes, there are.

6    Q    Do those troopers have access to that evidence

7    vault?

8    A    No, they do not.

9    Q    You and how many other people have that

10    combination?

11    A    There are four other investigators; I would be

12    five; and the senior investigator, which makes six.

13    Q    Are you aware whether any of those six persons

14    were working in the barracks from the time that Investigator

15    Drake received that blood kit until the time that you

16    delivered it to the lab?

17    A    No.  I was the only one on duty for that whole

18    weekend.

19    Q    Is there a refrigerated portion of the evidence

20    vault?

21    A    Yes, there is.

22    Q    Was that blood kit within the refrigerated

23    portion?

24    A    Yes, it was.

25    Q    When you removed that blood kit from the

1    refrigerated portion of the vault, did you physically take a

2    look at the condition of the blood kit?

3        A    Yes, I did.

4        Q    Was it in a sealed or unsealed condition?

5        A    It was a sealed condition.

6        Q    And by that you mean that the seals were intact;

7    they were not broken?

8        A    The two seals on there were not broken, correct.

9        Q    Having entered the vault and obtaining the blood

10   kit, what did you literally do next?

11       A    Well, I attached -- I reviewed the attached

12   General II, which is an evidence record, to ascertain

13   whether the names on both documents and/or on the one

14   document and the blood sample were the same.  I did that.

15       Q    And then what did you do with the General II,

16   that evidence chain of custody record, and the blood kit

17   itself?

18       A    I walked it over to the lab.

19       Q    Did you gain entry to the lab by being buzzed in?

20       A    I was allowed entry, yes, I was.

21       Q    What did you do once inside of the lab itself?

22       A    I signed through the blotter, which the lab

23   maintains to note personnel coming into the lab.  I made an

24   entry into their blotter.

25       Q    Is there a public area versus the private area in

Inv. Ramos - Direct - McCormick

1    that lab?

2        A    There is that counter area, yes.

3        Q    Are you allowed access to any other portion of

4    the lab other than that front entryway where the blotter is

5    located?

6        A    No, I am not.

7        Q    You signed in at the blotter?

8        A    Yes, I did.

9        Q    What did you do next?

10       A    After completing the blotter entry I walked over

11   to the counter, to the receptionist there.

12       Q    Who was that person?

13       A    That was Mrs. Maureen Roman.

14       Q    And did you speak to Ms. Roman at that point?

15       A    Yes, I did.

16       Q    Did you give to Ms. Roman that blood kit?

17       A    I handed her the General II and the blood kit.

18       Q    The General II is the chain of custody record,

19   correct?

20       A    The evidence record, yes.

21       Q    Once you did that did you observe what she did

22   with the blood kit?

23       A    She examined it for any type of perforations or

24   any damage.  At that point in time she signed the General II

25   and time stamped it for receiving that particular document

Inv. Ramos - Cross - LaMagna

1    and item into the lab.

2         Q    And then what did you do?

3         A    I received a copy of the General II.  And that

4    was the end of my involvement with the transfer.

5         Q    Did you leave the lab?

6         A    Yes, I did.

7              MS. McCORMICK:  I have no further questions.

8    CROSS-EXAMINATION

9    BY MR. LaMAGNA:

10        Q    Is it Investigator Ramos?

11        A    Yes, sir.

12        Q    We never met before, have we?

13        A    No, we have not.

14        Q    My name is Stephen LaMagna.  I'm going to ask you

15   a question couple of questions today.

16        A    Yes, sir.

17        Q    You mentioned the General II.  Is that the only

18   form that you filled out?

19        A    I only completed an entry on the General II.

20        Q    I ask you to look at that, I think that is,

21   Defendant's Exhibit F in evidence.

22             Can you take a look at that and see if that is

23   what you are referring to?

24        A    Yes, it is.

25        Q    And in the entry where you signed, is that your

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Ramos - Cross - LaMagna

1    handwriting?

2        A    It will be the fourth line on that transfer

3    record.

4        Q    And your handwriting is throughout that whole

5    line, correct?

6        A    Correct, sir.

7        Q    May I have that back.

8             So you filled in "January 5th, B.C.I. evidence to

9    the lab," correct and signed it?

10       A    I believe it was a different date on that.

11       Q    Seven-five?

12       A    You said "January," sir.

13       Q    I'm sorry, July 5th, 2005.

14       A    Yes, July 5th, 2005.

15       Q    It's late in the afternoon.

16       A    I'm sorry.

17       Q    Now, you received a call from Trooper Drake or

18    Investigator Drake?

19       A    Investigator Michael J. Drake, yes.

20       Q    Did you receive a call from Investigator Harris

21    as well?

22       A    No, I did not.

23       Q    And the call was:   There is evidence that was

24    there; could you get it over to the lab?  Is that the gist

25    of it?

1      A      No.   There is evidence from another station and I

2    should get it to the lab when the lab opens on its next

3    business day.

4      Q      And that's what you did, correct?

5      A      Yes, sir.

6      Q      And when evidence comes into the lab it gets

7    stamped in.   And that's when you signed off on the General

8    II, correct?

9      A      I signed off the General II the minute I left

10   with the evidence from the vault, and I walked it over to

11   the lab.

12     Q      Let's talk about the vault.

13            Now, you say that there is only -- it is a

14   combination lock?

15     A      Yes, it is.

16     Q      And how do you know only six people have that

17   combination?

18     A      Well, it is our responsibility to maintain the

19   integrity of the vault and only six of us maintain that

20   combination.

21     Q      How long has that building with the vault been

22   there?   You said it was a renovated bank?

23     A      Well, Stewart Airport was born in about 1948.

24   That building was built anywhere between 1955 and 1960.

25     Q      So that vault has been there a long time?

1       A       Yes, sir.

2       Q       Does the state police from time to time change

3   the combination on that, just to ensure the integrity; that

4   nobody else knows that combination?

5       A.      I believe when the senior and the various number

6   of investigators leave the office that that lock does get

7   changed.

8       Q       Do you know when it was the last time the lock

9   was changed?

10      A       I believe when Senior Investigator Buscato was

11  promoted.  I am going to say it was about a year and-a-half

12  ago.

13      Q       So this is pretty much of a new combination on

14  that lock?

15      A       It is a new lock, yes.

16      Q       And so six people have the access to that vault,

17  correct?

18      A   .   Correct.

19      Q       And that is an evidence vault, correct?

20      A       Yes, it is.

21      Q       And can you please describe it.  Once you walk in

22  what does it look like?

23      A       Well, it has the old safe-type door, that inner

24  door.  It is inoperable right now.  The gate that closes the

25  evidence vault is a typical bank gate.  That is where the

1    lock is affixed to it.

2            As you enter the vault, I'm going to say the room

3    is approximately 12-by-12 enclosed.  It has no windows.  And

4    it has overhead lighting.  And we have walls of shelves

5    where we store our evidence, along with a gun rack to the

6    rear of the wall.  It has two filing cabinets, and a

7    refrigerator alongside the filing cabinet.

8        Q    Now, is there a lock on the refrigerator as well?

9        A    No, there is not.

10       Q    Is it a standard refrigerator?

11       A    It is a studio-size apartment refrigerator.

12       Q    Do you have any idea of the temperature that the

13   refrigerator was at at that time?

14       A    No, I do not.

15       Q    Now, you said you recognized 17 for

16   identification.  You looked at that.  And you testified that

17   you recognize it by the name of the defendant; is that

18   correct.

19       A    That's correct.

20       Q    Could I have that back.

21            That's the only way you recognize that; by the

22   name of the case?

23       A    Well, the name is affixed also to the General II.

24   I checked the General II along with the names.

25       Q    And the name matches?

Inv. Ramos - Cross - LaMagna

```
1      A     Correct.

2      Q     So it is by the name that you are referring to;

3    is that correct?

4      A     Yes.

5      Q     And you submitted this piece of evidence to

6    Ms. Roman; is that correct?

7      A     Mrs. Roman.

8      Q     Mrs. Roman.  Is that correct?

9      A     Yes.

10     Q     That's all you had to deal with is this; is that

11   correct?

12     A     Correct, sir.

13     Q     It was already in a sealed condition when you

14   retrieved it on the morning of July 5th; is that correct?

15     A     Correct.

16     Q     You also said you were the only investigator

17   working from July 2nd to July 5th?

18     A     No.  I was the only investigator working the

19   holiday weekend, which is -- I come on at 8:30 Sunday, and

20   my partner and my colleague was on a surveillance wire, so I

21   am the only on-call investigator for that Sunday through

22   Thursday.

23     Q     According to the General II, however, the

24   evidence was brought to B.C.I. on July 2nd; isn't that

25   correct?
```

Inv. Ramos - Cross - LaMagna

1      A      That's correct.

2      Q      So you can't say who had access to that between

3    the 2nd and, I guess, the 4th; is that correct?

4      A      Investigator Drake signed it through.  He works

5    Tuesday through Saturday.  And then my squad comes on from

6    Sunday through Thursday.

7      Q      So, if it was brought by on Saturday you didn't

8    come on until Sunday, correct?

9      A      Correct.

10     Q      When you say you were the only worker, you meant

11   from that Sunday to the Monday?

12     A      Correct.

13     Q      You can't say who had access from that Saturday

14   until you came on, correct?

15     A      Correct.

16            MR. LaMAGNA:  I have nothing further, Judge.

17            MS. McCORMICK:  Just one.

18   REDIRECT EXAMINATION

19   BY MS. McCORMICK:

20     Q      Investigator Ramos, is it your sworn duty as an

21   investigator in the state police to maintain the integrity

22   of that combination lock of the evidence vault?

23     A      Yes.

24     Q      Is it the sworn duty of the other five persons

25   who have that combination?

Inv. Ramos - Cross - LaMagna

1       A       Absolutely.

2               MS. McCORMICK:  I have nothing further.

3               THE COURT:  Thank you.  You may step down.

4               (Whereupon, the witness exits the courtroom.)

5               THE COURT:  Let me see counsel, please.

6               (Whereupon, a discussion was held at the

7       sidebar off the record.)

8               THE COURT:  People, call your next witness.

9               MS. McCORMICK:  Your Honor, the People call

10      Trooper Larry Hemmerich.

11              COURT OFFICER:  Step up.  Remain standing,

12      raise your right hand and face the clerk.

13              L A W R E N C E   H E M M E R I C H,

14              a witness called on behalf of the People,

15              having been first duly sworn by the Clerk of

16              the Court, was examined and testified as

17              follows:

18              THE CLERK:  You can put your hand down.

19              State your name, spelling your last name.

20              THE WITNESS:  Investigator Hemmerich,

21      H-E-M-M-E-R-I-C-H.

22              THE CLERK:  Who are you employed by?

23              THE WITNESS:  New York State Police.

24              THE CLERK:  Thank you, please take a seat.

25              MS. McCORMICK:  May I inquire?

GIGI WRIGHT, RPR   (516) 571-2503

1                    THE COURT:   Please.

2    DIRECT EXAMINATION

3    BY MS. McCORMICK:

4         Q     Good Afternoon.   Could you tell the jury, please,

5    where you work?

6         A     Where I was?

7         Q     Where you work.

8         A     I'm sorry.   I work for the New York State Police.

9    I have been so employed since July 11th 2001.

10        Q     Since 2001?

11        A     Yes, 2001.

12        Q     So five years?

13        A     Yes, ma'am.

14        Q     Out of what barracks do you work?

15        A     Currently S.P. Valley Stream.

16        Q     S.P. meaning, State Police Valley Stream?

17        A     Yes, ma'am.

18        Q     -- Were you -- did you have occasion to become

19   involved in the transportation of a blood kit attributed to

20   the defendant Martin Heidgen as the result of a crash that

21   occurred on the Meadowbrook Parkway on July 2nd 2005, around

22   2 o'clock in the morning?

23        A     Yes.

24        Q     Could you tell the jury how you got -- let me

25   withdraw that.

Inv. Hemmerich - Direct - McCormick

1      What was your role in the transportation of this

2  blood kit.

3      A    I was contacted by Investigator Mike Harris, and

4  he asked me if I knew where S.P. Newburgh was, S.P. Newburgh

5  lab was.  I said, yes.  I had worked up there.

6           And he asked me to come on in and he needed me to

7  transport, physically transport the blood kit from S.P.

8  Valley Stream, State Police Barracks Valley Stream, and take

9  it up to S.P. Newburgh, and make contact and turn it over up

10  there.

11     Q    Do you know when he contacted you, Investigator

12  Hemmerich?

13     A    It could be some time the late morning of July

14  2nd.

15     Q    That's Saturday, July 2nd?

16     A    Yes, ma'am.

17     Q    Is that the date of the crash itself?

18     A    Yes, ma'am.

19     Q    I'm going to ask to approach you with what has

20  been marked People's Exhibit 17 for identification.  Could

21  you take a look at that, please.

22          Do you recognize that?

23     A    Yes, I do.

24     Q    What do you recognize that to be?

25     A    It's the blood kit that I transported, took

1    custody of, transported to S.P. Newburgh.

2         Q     How do you know that?

3         A     Based on the filled out to and from, as well as

4    the labels here with the defendant's name and the date of

5    July 2nd 2005.

6         Q     Investigator Hemmerich, about what time did you

7    receive that blood kit, and from whom did you receive it?

8         A     Approximately 2 p.m. from Investigator Harris.

9         Q     Where were you when you got that blood kit?

10        A     State Police Barracks in Valley Stream.

11        Q     When you received that blood kit from

12   Investigator Harris did you make a visual inspection of the

13   kit itself?

14        A     Yes, I did.

15        Q     Did you note anything about whether it was in a

16   sealed or unsealed condition?

17        A     It was in a sealed condition.

18        Q     And what did you then -- what did you then

19   literally do once you received it from Investigator Harris?

20        A     Literally took it into my custody, made a blotter

21   entry at the time I left S.P. Valley Stream, and kept it in

22   my custody the entire time.

23        Q     Entire time until when?

24        A     Until I arrived at S.P. Newburgh and signed in

25   there.  Then I awaited for Investigator Mike Drake, who I

Inv. Hemmerich - Direct - McCormick

1    then turned over the blood kit to.

2         Q    Now, you say that you kept it in your custody the

3    entire time.  Is that correct?

4         A    Yes, ma'am.

5         Q    Ever lose sight of that blood kit?

6         A    No.

7         Q    Did you ever put it down any place?

8         A    Next to me on the front seat of the trooper car.

9         Q    When you received the blood kit from Investigator

10   Harris did you get into the trooper car and drive to

11   Newburgh?

12        A    Yes, ma'am.

13        Q    Did you make any stops?

14        A    No, ma'am.

15        Q    Did you -- withdrawn.

16             You got to Newburgh and signed in on the blotter?

17        A    Yes, ma'am.

18        Q    And then did there come a time when you spoke to

19   Investigator Drake?

20        A    Yes.  When I did get to S.P. Newburgh

21   Investigator Drake happened to be out with another trooper

22   at the time.  I waited until he returned.  And when he did

23   return I then turned over the blood kit to him, because he

24   was awaiting my arrival, and he took the blood kit from me.

25        Q    Did you physically observe what he did with that

1    blood kit?

2         A     He signed the General II, the chain of custody

3    sheet, and then he took it in and secured it into the

4    evidence locker at S.P. Newburgh, B.C.I., into a

5    refrigerator that was in the evidence locker.

6         Q     Did you physically watch him do that?

7         A     Yes, I did.

8         Q     Do you have access to that evidence locker up in

9    Newburgh?

10        A     Me personally, no.

11        Q     You don't know the combination to that lock?

12        A     No, I do not.

13        Q     You watched him put it in the refrigerator?

14        A     Yes, I did.

15        Q     What did you do after that?

16        A     I spoke with Investigator Drake for a little bit

17   longer, and then I turned around and returned back to Long

18   Island to conclude my tour of duty.

19        Q     Thank you.

20              MS. McCORMICK:   I have nothing further.

21   CROSS-EXAMINATION

22   BY MR. LaMAGNA:

23        Q     Good afternoon, Trooper.  Is it Hemmerich?

24        A     Hemmerich, yes, sir.  Thank you.

25        Q     My name is Stephen LaMagna.  I just want to ask

Tpr. Hemmerich - Cross - LaMagna

1.      you a couple of questions.

2.              I just want to show you the General II that has

3.      already been marked into evidence, which is Defendant's

4.      Exhibit F, please.

5.      A       Okay.

6.      Q       I show you what has been marked previously

7.      Defendant's Exhibit F in evidence.  Could I ask you to take

8.      a look at that.

9.              Do you recognize that?

10.     A       Yes, I do.

11.     Q       Is that the General II you are referring to?

12.     A       Yes, it is.

13.     Q       There is a notation, second line, where there is

14.     a notation on the transfer record, the chain of custody?

15.     A       Yes.

16.     Q       Where it shows from Trooper Hemmerich to

17.     Investigator M.J. Drake, correct?

18.     A       Yes.

19.     Q       And Drake signed next to his name?

20.     A       Yes, sir.

21.     Q       Is that his signature?

22.     A       That is his signature.

23.     Q       Verifying that he received the evidence from you,

24.     correct?

25.     A       Yes.

Tpr. Hemmerich - Cross - LaMagna

1     Q     And then there -- withdrawn.

2           So you drove up to Newburgh, handed over the

3     evidence to him, correct?

4     A     Yes.

5     Q     Now, on these General IIs when they talk about

6     chain of custody transfer record, it goes from one person to

7     another person, correct?  And then from that person to

8     another person, correct?

9     A     Yes.

10    Q     So you can follow the actual chain of who handled

11    this piece of evidence, correct?

12    A     That is correct.

13    Q     It is the person, the "to," that is verifying

14    that they received it from the person before him, correct?

15    A     Yes.

16    Q     And that's why Drake signed the signature as from

17    you to him, correct?

18    A     That is correct.

19    Q     And you observed him fill this out?

20    A     I observed him sign it, yes.

21    Q     Above that it says, July 2nd, Investigator

22    Harris, from Investigator Harris, Harris to you, correct?

23    A     That's correct.

24    Q     Is that your handwriting, Hemmerich?

25    A     No, it is not.

Tpr. Hemmerich - Cross - LaMagna

1    Q    So he filled that out for you?

2    A    I believe that is his signature.

3    Q    Before we get to who signed it, from Investigator

4    Harris to Trooper Hemmerich.  Do you see where I am talking

5    about?

6    A    Yes.

7    Q    Whose handwriting is that?

8    A    That handwriting is mine.

9    Q    That's yours?

10   A    Yes.

11   Q    You wrote your name in?

12   A    Yes.

13   Q    Harris wrote his name in?

14   A    Yes.

15   Q    But Harris signed that he -- he signed it,

16   correct?

17   A    That is correct.

18   Q    Not you, even though it went to you, correct?

19   A    Correct.

20   Q    He signed for you?

21   A    That's his signature.

22   Q    He signed for himself.  You didn't sign

23   acknowledging receipt of that; he did?

24   A    Correct.

25   Q    Now, when you received this of piece of evidence

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Hemmerich - Cross - LaMagna

1    you recognized it based upon the name of the defendant,

2    correct?

3        A    Yes, sir.

4        Q    And you knew the name Martin Heidgen was

5    associated with this case?

6        A    That's correct, sir.

7        Q    Were you involved earlier in the day with this

8    investigation?

9        A    Just from the aspect of assisting to reopen the

10   roadway when I first came on tour.

11       Q    So, did Harris say, "I have a piece of evidence.

12   The guy's name is Martin Heidgen. I need you to bring it up

13   to Newburgh"?

14       A    Later in the day when he called me; not at the

15   time that I was at the scene.

16       Q    And then you received the evidence, correct?

17       A    Yes.

18       Q    And that's how you recognize it?

19       A    Yes.

20       Q    Simply by the name, correct?

21       A    Yes.

22       Q    I have -- did you fill out any of the seals on

23   that box?

24       A    No, sir.

25       Q    Did you put your initials anywhere on that box?

Tpr. Hemmerich - Redirect - McCormick

1      A     No, sir.

2      Q     So there is nothing on the actual box other

3    than -- withdrawn.

4            There is nothing on that actual box that you

5    signed that verifies that that actual box is the box that

6    you took up, correct?

7      A     No, sir.

8      Q     You didn't put your initials and the date or

9    anything on that box, correct?

10     A     No, I didn't have anything to do with sealing the

11   box.

12     Q     I understand that.  I'm asking you:  Did you put

13   your initials on that box?

14     A     No.  It is not practice.  It is on here.

15     Q     I understand what we have here.  I'm asking you:

16   There is nothing on that box?

17     A     No.

18     Q     The only thing you could identify regarding that

19   box is by the name, correct?

20     A     Correct.  Yes.

21            MR. LaMAGNA:  I have nothing further.

22   REDIRECT EXAMINATION

23   BY MS. McCORMICK:

24     Q     Investigator Hemmerich, is that the box that you

25   drove up to Newburgh?

Tpr. Hemmerich - Redirect - McCormick

1    A    Yes, it is.

2    Q    Was the box sealed when you drove it up to

3    Newburgh?

4    A    Yes, it was.

5    Q    Did you ever lose sight of that box between Long

6    Island and when you handed it to Investigator Drake in

7    Newburgh?

8    A    No, ma'am.

9              MS. McCORMICK:  Nothing further.

10             THE COURT:  Thank you, Investigator.

11             (Whereupon, the witness exits the courtroom.

12             THE COURT:  Ladies and gentlemen, we are

13        going to call it a day.  You know what the admonitions

14        are:  Don't go to the scene.  Don't talk to anybody.

15        Don't let anybody talk to you.  If we run into you we

16        can't talk to you.  You know all of those things.

17             I need you to be on time.  Nine-thirty.  Have

18        a nice night.

19                           o0o

20             (Whereupon, the jury exited the courtroom and

21        the trial was adjourned to Thursday, the 14th day of

22        September 2006, at 9:30 a.m.)

23

24

25