```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    ------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4              -against-

 5

      MARTIN HEIDGEN,
 6
                            DEFENDANT.
 7    ------------------------------------x
      INDICTMENT #:  1910N-06
 8
                                    Mineola, New York
 9                                  September 14, 2006
                                    VOLUME III
10
      B E F O R E:   HONORABLE ALAN L. HONOROF
11                         Acting Supreme Court Justice

12
      A P P E A R A N C E S:
13
                    HON. KATHLEEN M. RICE
14                  District Attorney, Nassau County
                         262 Old Country Road
15                       Mineola, New York 11501
                    BY:  ROBERT HAYDEN, ESQ.
16                       Assistant District Attorney
                              and
17                       MAUREEN McCORMICK, ESQ.
                         Assistant District Attorney
18

19                  STEPHEN LaMAGNA, ESQ.
                         Attorney for the Defendant
20                       666 Old Country Road
                         Garden City, New York
21                  BY:  STEPHEN V. LaMAGNA, ESQ.
                              and
22                       GREGORY MARTELLO, ESQ.

23                       o0o
                         CONTINUED TRIAL
24                       o0o
                    Gigi Wright, R.P.R.
25
```

Proceedings

```
 1                    (In closed court.  Defendant present.)
 2               THE CLERK:  Case on trial, Indictment 1910N
 3     of 2005, People versus Martin Heidgen.
 4               People ready?
 5               MR. HAYDEN:  People ready.
 6               THE CLERK:  Defendant ready?
 7               MR. LaMAGNA:  Defendant ready.
 8               THE CLERK:  Defendant is present, your Honor.
 9               THE COURT:  This is a closed and sealed
10     proceeding.  I have not particularly followed the press
11     reporting on this case other than "Newsday," which I
12     normally read everyday anyway.
13                    Yesterday while surfing between Jeopardy and
14     Seinfeld, as I do at 6 o'clock, other than channel
15     Twelve 12 where I watched Mr. Heidgen give an interview
16     to the press.  If this happens again, Mr. Heidgen will
17     have the choice, at my option, of coming to court with
18     a gag on or watching these proceedings by closed
19     circuit television.
20                    Please produce the jury.
21                    (In open court.  Defendant present.)
22               THE COURT:  While we are waiting, the case
23     has already been called, with respect to the
24     application by the People to produce or to have the
25     jury view the cars, I went to the impound yard last
```

Proceedings

1     evening, and based on my review of those cars, I am

2     going to have them brought here tomorrow.

3            They will be in the vicinity just immediately

4     outside of the courtroom here between the main building

5     and the west wing.  The jury will be able to look at

6     the cars.  No one will say anything while the jury

7     looks at the cars.  They'll be able to look at them so

8     long as they want.

9            I have asked, through the court public

10    relations office, that although the press will be able

11    to take as many photographs of the car as they care to,

12    please do not take photographs of the jurors.

13           This is an on your honor kind of thing.  One

14    of the reasons I'm bringing the cars here, in addition

15    to the least inconvenience to the jurors, would be also

16    to not exclude the press from that observation.  So I

17    am looking for mutual respect between the press and the

18    Court.  Please do not take photographs of the jurors.

19           Produce the jury, please.

20           MR. LaMAGNA:  Just, Judge, for the record,

21    please note my exception and opposition to that.

22           THE COURT:  Yes.

23           COURT OFFICER:  Ready, Judge?

24           THE COURT:  Bring them in.

25           (Whereupon, the jury entered the courtroom,

Proceedings

1    and upon taking their respective seats, the following

2    occurred:)

3            THE CLERK:   Jurors are present and seated,

4    your Honor.

5            THE COURT:   Thank you.  Welcome back ladies

6    and gentlemen.

7            Mr. Hayden.

8            MR. HAYDEN:   Your Honor, before I call the

9    next witness I would ask that these medical records

10   from South Nassau Communities Hospital, which had been

11   marked as 19A for identification; these medical records

12   from Long Beach Medical Center, which have been marked

13   19B for identification; and these medical records from

14   Lenox-Hill Hospital, which have been marked 19C for

15   identification be introduced in evidence.   These are

16   medical records for Neil Flynn, and they have all been

17   certified.

18           MR. LaMAGNA:  No opposition, your Honor.

19           THE COURT:   They are received.

20           (Whereupon, People's Exhibits 19A, B and C,

21   medical records of Neil Flynn for identification now

22   received and marked in evidence.)

23           COURT OFFICER:   People's Exhibits 19A, B and

24   C in evidence.

25           MR. HAYDEN:   The People call Dr. Peter

1      Gelfand.

2                   COURT OFFICER:  Step up.  Remain standing,

3          raise your right hand and face the clerk.

4                   P E T E R   G E L F A N D,        a witness

5                   called on behalf of the People, having been

6                   first duly sworn by the Clerk of the Court,

7                   was examined and testified as follows:

8                   THE CLERK:  You may put your hand down.

9          Please state your name, spelling your last name.

10                  THE WITNESS:  Peter Gelfand, G-E-L-F-A-N-D.

11                  THE CLERK:  Thank you.  Please take a seat.

12     Q      Good morning, Doctor.

13     A      Good morning.

14     Q      How old are you?

15     A      Forty-seven.

16     Q      Are you a doctor licensed to practice medicine in

17     the State of New York?

18     A      Yes.

19     Q      How many years have you been so licensed to

20     practice medicine?

21     A      I have been licensed since 1992.

22     Q      What kind of medicine do you practice?

23     A      Practice internal medicine.

24     Q      What do you mean by that?

25     A      Internal medicine is sometimes referred to as a

1   general practitioner.  I treat all aspects of patient care.

2        Q    Describe your educational background.

3        A    I went to and graduated from the New York College

4   of Osteopathic Medicine, graduating in 1992; I did an

5   internship at Winthrop University Hospital, where I also did

6   residency in internal medicine and; after a three-year

7   program I became board certified in internal medicine.

8        Q    Describe your professional background.

9        A    Professional background, I have been practicing

10  since graduating in Long Beach.  I am actively on staff at

11  Long Beach Medical Center, South Nassau Communities

12  Hospital, Winthrop University Hospital, and I have been

13  appointed teaching positions at Stony Brook University

14  Medical Center, and at New York College of Osteopathic

15  Medicine.

16       Q    Are you affiliated with South Nassau Communities

17  Hospital?

18       A    Yes.

19       Q    Describe your affiliation there?

20       A    I am an attending physician, which means at times

21  when patients are admitted I take care of them in the

22  hospital.  Sometimes patients are admitted there and have

23  other physicians, depending on the case.

24       Q    Were you affiliated there in July of 2005?

25       A    Yes, sir.

1      Q      Do you know a man named Neil Flynn?

2      A      Yes.

3      Q      Have you treated Neil Flynn for injuries suffered

4   on the early morning of Saturday, July 2nd 2005?

5      A      Yes, sir.

6      Q      Did you also examine Neil Flynn at Long Beach

7   Medical Center?

8      A      Yes, I did.

9      Q      Was he x-rayed there?

10     A      Yes, he was.  He was x-rayed?

11     Q      Was he given an MRI there?

12     A      Yes, sir.

13     Q      What is an MRI?

14     A      MRI stands for magnetic resonance imaging.  It

15   images parts of the body and can focus on soft tissue and

16   sometimes bone, a little better than conventional x-ray can.

17     Q      Was he given a CAT scan there?

18     A      Yes, sir.

19     Q      What is that?

20     A      Computer tomography, and that also is for better

21   visualization, usually of harder structures, like bone.  It

22   is better visualization than plain x-ray.

23     Q      Describe Neil Flynn's injuries when you saw him

24   at Long Beach Memorial?

25     A      When I saw him he was at the rehab unit at Long

1    Beach Medical Center.  And at that time he was really in

2    constant pain, as he had a fractured vertebral vertebrae;

3    one of the bones in his back was fractured, and it was

4    causing a lot of pain back there and, apparently, irritating

5    nerve roots going down to the leg.  So he had back and leg

6    pain when I examined him.

7         Q    Describe the damage to Neil Flynn's back in as

8.   much detail as you can.

9         A    Okay.  He had suffered a comminuted fracture of

10   the first lumbar vertebrae.  A comminuted fracture is a

11   fracture of the bone, and part of it was actually, I will

12   describe it as, sort of collapsed.  Comminuted has a lot of

13   fractures in it.  It is not broken in half per se, it is

14   fractured in a number of places, and it was a little shrunk

15   due to the fractures.

16        Q    Was there damage to Neil Flynn's heart?

17        A    Yes.  From the motor vehicle accident while he

18   was in South Nassau Hospital he had apparently gone into an

19   episode of paroxysmal atrial fibrillation, which is an

20   irregular heartbeat, which tends to go very fast, and in the

21   worst case could be lethal.  But it was addressed there and

22   treated there with beta blocker medication, which was

23   continued while at Long Beach Medical Center.

24        Q    Was there damage to other internal organs noted

25   in Neil Flynn's medical records?

1       A    Yes.  I believe he had contusion injuries,

2   possibly to one of the kidneys; and there was some

3   questionable contusion injury to the liver also, which was

4   ascribed to the impact.

5       Q    Was he given anything for pain?

6       A    At Long Beach he was given dilaudid, which is

7   hydromorphone, a morphine derivative.  When I saw him in the

8   rehab center he was on quite a high dosage, potent dosage,

9   and it wasn't really holding him.  Aside from myself seeing

10  him, he consulted a pain specialist also, and he was, when I

11  saw him, taking a muscle relaxant at the time, a duragesic

12  patch, which is really essentially anesthesia given

13  constantly.  Tylenol, et cetera.

14      Q    Were South Nassau Communities Hospital or Long

15  Beach Medical Center able to fix Neil Flynn's back?

16      A    Weren't able to fix his back, no.  When he was at

17  Long Beach he was undergoing intense physical and

18  occupational therapy.  Ultimately he went for surgery at

19  Lenox-Hill Hospital.

20      Q    You mentioned that he suffered paroxysmal atrial

21  fibrillation.  What do you mean by that?

22      A    Again, that is an abnormal rhythm of the heart.

23  You know most people's hearts beat regularly.  You take your

24  pulse, you can feel a regular heart rate.  Atrial

25  fibrillation is an erratic heartbeat, and in some cases it

1    can go very fast and, as I said, in the worst case scenario

2    it could be lethal.

3        Q      How was he treated for the injury to his heart?

4        A      For the injury to his heart he was constantly

5    monitored.  A cardiologist was called in.  He was started on

6    a medication, a beta blocker, and what that does is it slows

7    the conduction rate down of the heart, enabling it to pump

8    naturally.

9        Q      Was the damage to his heart a life-threatening

10   injury?

11       A      Well, it has the potential to be lethal.  His had

12   subsided and was taken care of with medications.

13              MR. HAYDEN:  Nothing further, your Honor.

14       Thank you.

15              MR. LaMAGNA:  Nothing, your Honor.

16              THE COURT:  Thank you, Doctor.

17              (Whereupon, the witness exits the courtroom.)

18              THE COURT:  Next witness.

19              MR. HAYDEN:  Your Honor, the People call

20       Investigator Drake.  As I entered the courtroom he was

21       still parking and coming into the courthouse.

22              THE COURT:  I'm going to give the jury a

23       five -- I'm sorry -- I'm going to give you a

24       five-minute break until the witness gets here.  Please

25       don't talk about the case.

Dr. Gelfand - Direct - Hayden

1          (Whereupon, the jury exited the courtroom and

2      a brief recess held.)

3          COURT OFFICER:  Jury entering.

4          (Whereupon, the jury entered the courtroom,

5      and upon taking their respective seats, the following

6      occurred:)

7          THE CLERK:  Case on trial, Indictment 1910N

8      of 2005, People versus March Heidgen.

9          People ready?

10         MR. HAYDEN:  Ready, your Honor.

11         THE CLERK:  Defense ready?

12         MR. LaMAGNA:  Defendant ready, your Honor.

13         THE CLERK:  Defendant is present, your Honor.

14     Jurors are seated.

15         THE COURT:  Call your next witness, please.

16         MR. HAYDEN:  Yes, your Honor.  We will again

17     call Investigator Drake.

18         COURT OFFICER:  Step up.  Remain standing,

19     raise your right hand and face the clerk.

20         M I C H A E L   J O H N   D R A K E,

21             a witness called on behalf of the People,

22             having been first duly sworn by the Clerk of

23             the Court, was examined and testified as

24             follows:

25         THE CLERK:  You may put your hand down.

1          State your name, spelling your last name, rank, shield

2          and command for the record.

3                         THE WITNESS:  Michael John Drake, D-R-A-K-E.

4                         THE CLERK:  Shield number.

5                         THE WITNESS:  3121.

6                         THE CLERK:  Command?

7                         THE WITNESS:  New York State Police, Troop F,

8          Newburgh.

9                         THE CLERK:  Thank you.  Please take a seat.

10                         MS. McCORMICK:  May I inquire, your Honor?

11                         THE COURT:  Please.

12     DIRECT EXAMINATION

13     BY MS. McCORMICK:

14          Q     Good morning.

15          A     Good morning.

16          Q     You say you work in the New York State Police

17     Newburgh Barracks?

18          A     Yes, that's correct.

19          Q     Did you just drive here from Newburgh?

20          A     Just north of there.  Actually I left my house

21     and had to drive past Newburgh to get here.

22          Q     Investigator Drake, how long have you been

23     working for the New York State Police?

24          A     I have been so employed since October of 1996.

25     About ten years.

1      Q      Can you describe for the jury, please, what are

2   your duties as an investigator in the Newburgh Barracks?

3      A      I'm a background investigator myself.  I have

4   three partners and a senior investigator who is an

5   administrative boss for us.  We handle any felony in the

6   Eastern Orange County area of New York State that comes into

7   our barracks, and we also assist the local agencies with any

8   kind of fell investigations.

9      Q      Investigator, did you have occasion to become

10   involved in the handling of a blood kit attributed to a

11   defendant by the name of Martin Heidgen?

12      A      Yes, I did.

13      Q      Do you recall what day that was, sir?

14      A      It was Saturday, July 2nd 2005.

15      Q      I gather that you were working on that date?

16      A      I was, ma'am.

17      Q      Can you tell the jury what was your tour of duty

18   on that date?

19      A      I worked a B tour of duty, which encompasses 8:30

20   a.m. to 4:30 p.m.

21      Q   .  And how did you become involved in transporting

22   or handling this blood kit?

23      A      I was working my normal duties.  I was at my

24   desk, and I received a phone call from Trooper Larry

25   Hemmerich, who was stationed out of Long Island, and he

1    asked me if I was going to be around this afternoon; that he

2    had to bring evidence up that needed to be secured in our

3    evidence vault for later transfer to the Mid Hudson Regional

4    Crime Laboratory, which is the building directly behind my

5    barracks.

6         Q    In response to that call what, if anything, did

7    you do?

8         A    I told him I would be there so long as he was

9    coming up.  He said he would leave and get up here as soon

10   as he could.  I told him I would stick around until he

11   arrived.

12        Q    Did there come a time when Trooper Hemmerich

13   arrived at the Newburgh Barracks?

14        A    Yes, he did.  I believe he arrived around 4:30,

15   I'm not a hundred percent sure.  Because they called me, I

16   was out assisting a trooper with a vehicle search.  So by

17   the time I got back to the station it was between five and

18   5:30, and that's when I have met Troop Hemmerich in the

19   Newburgh Barracks.

20        Q    You weren't in the barracks when he arrived?

21        A    That's correct.

22        Q    To your knowledge he waited for you there?

23        A    That's correct.

24        Q    Did there come a time when you came back to the

25   barracks --

1    A    Yes.

2    Q    -- from assisting the other officers?

3    A    Yes, I did.  As soon as I could break free.  I

4    left the trooper when everything was secure, and I returned

5    back to the station and met with Trooper Hemmerich.

6    Q    When you went to the barracks where was Trooper

7    Hemmerich?

8    A    He was standing right in our dispatch area which,

9    when you come in the front door, it is immediately right in

10   front of you.

11   Q    At any time did Trooper Hemmerich hand to you

12   what you recognized to be a blood kit?

13   A    Yes, he did.  When I came in I shook his hand,

14   and at that time Trooper Hemmerich then handed me the blood

15   kit.

16   Q    Investigator Drake, I ask to approach you with

17   what has been marked as People's Exhibit number 17 for

18   identification.

19        Do you recognize that, sir?

20   A    Yes, I do, ma'am.

21   Q    What do you recognize that to be?

22   A    This is a blood specimen collection kit.

23   Q    Is that the blood specimen collection kit that

24   you received from Trooper Hemmerich on July 2nd 2005?

25   A    Yes, it is.

Inv. Drake - Direct - McCormick

1      Q      How do you know that?

2      A      It is marked with the date, and it appears to be

3   the same exact one that he handed me that date.

4      Q      Is there any kind of markings on it, besides the

5   date, indicating the defendant's name?

6      A      Yes, it does.  Name of subject, and then it has

7   the defendant's name, Martin Heidgen.

8      Q      On the date that you received that blood kit did

9   you make a visual inspection of the kit itself?

10     A      Yes, I did.  When Trooper Hemmerich handed me the

11   kit, he also handed me a General II evidence record with it.

12   I inspected both to make sure that they matched in what I

13   was receiving and what he claimed I would be receiving.

14     Q      Did you make an inspection of that kit as to

15   whether or not it was in a sealed condition?

16     A      Yes, I did.  I inspected it to make sure that it

17   was sealed.  And both seals were on it, and the tape was on

18   it, and it was initialed so no entry could be made without

19   breaking the seals.

20     Q      There had been no entry into the box so far as

21   those seals were concerned at that time?

22     A      That's correct.  There was no entry when Trooper

23   Hemmerich had given me the box.

24     Q      What, if anything, did you do with that box after

25   he handed it to you?

GIGI WRIGHT, RPR    (516) 571-2503

1   A      After he handed it to me, I looked over the

2   General II evidence record, and then I proceeded to go into

3   the back where my office is, in my section of the building,

4   opened up our evidence vault, and went in to place it into

5   the refrigerator that is within our evidence vault.

6        Q    The General II evidence record, did that

7   accompany the blood kit itself?

8        A    Yes, it did.

9        Q    Did you make any markings on that evidence

10  record?

11       A    Yes, I did.  I made a couple of markings.  One,

12  the transfer section of the General II evidence record, I

13  marked it from Trooper Hemmerich to myself, since he handed

14  it to me and then I signed it.  Then he made a subsequent

15  entry after that saying that from myself to the B.C.I.

16  Evidence vault, and I also signed it.

17       Q    Investigator Drake, you said that you took that

18  kit and the evidence receipt.  What did you call it?

19       A    General II evidence record.

20       Q    Did you keep those two items together as you went

21  into the evidence vault?

22       A    Yes, ma'am.

23       Q    Were you accompanied to that vault by Trooper

24  Hemmerich?

25       A    Yes.  Trooper Hemmerich followed behind me as we

Inv. Drake - Direct - McCormick

1    were discussing other things, and I went into the evidence

2    vault, and he was behind me.

3        Q    Physically within the evidence vault where did

4    you place that blood kit?

5        A    When you walk into our evidence vault it is like

6    a wrought iron gate that is closed with a lock, combination

7    lock.  I put the combination entry lock sequence in, opened

8    it, went in.

9             When you go in, the room is probably

10   ten-by-twelve.  I went toward the back, and on top of our

11   filing cabinet, we have two filing cabinets in the back,

12   there is a refrigerator.  It is a small two-by-two-by-two,

13   almost like a college dorm refrigerator, opened it up, made

14   sure it was cool, placed the evidence kit in there with the

15   General II around it.  I then closed the evidence -- excuse

16   me, I closed the refrigerator door and Trooper Hemmerich and

17   I retreated out of the vault, closed the vault and secured

18   it again.

19       Q    When you say you secured it, you made sure that

20   the lock on the vault was closed?

21       A    Yes.  And turned the dial so the combination

22   doesn't show, so the next person doesn't see it.

23       Q    The vault that you are talking about has been

24   previously described as a former bank vault.  Is that

25   correct?

Inv. Drake - Cross - LaMagna

1     A     That's correct, it was.

2     Q     After you came out of the vault what is the next

3  thing that you did?

4     A     I went back over -- turned out the lights and

5  went back over to my desk, which is now -- there is a

6  hallway to the evidence vault.  I went out the hallway, back

7  into my office, and Trooper Hemmerich and I just had idle

8  chit-chat at my desk for a little while, and then he left.

9     Q     Did you make any calls with respect to this to

10  Investigator Ramos?

11     A     Yes, I did.  I called him, either Monday or

12  Tuesday morning to my best recollection, just to let him

13  know that the evidence that I had placed into the

14  refrigerator had to be brought over to the Mid Hudson

15  Regional Crime Lab, which is right behind us, as soon as

16  possible.  Since Monday was the holiday, I knew the lab was

17  closed, I knew he had to do it Tuesday morning.

18             MS. McCORMICK:  I have nothing further.

19         Thank you.

20  CROSS-EXAMINATION

21  BY MR. LaMAGNA:

22     Q     Good morning, Investigator.  How are you?

23     A     Good, sir.  Yourself?

24     Q     Long drive this morning?

25     A     Yes, it was.

Inv. Drake - Cross - LaMagna

1    Q    My name is Stephen LaMagna.  I'm Mr. Heidgen's

2    attorney.  I'm going to ask you a couple of questions this

3    morning, concerning your involvement in this matter.

4    A    Yes, sir.

5    Q    Now, you are stationed up in Newburgh, correct?

6    A    Yes, sir, that's correct.

7    Q    That's upstate?

8    A    Yes, sir.

9    Q    You said at some point you received a phone call

10   from another State Trooper down from Long Island, from down

11   here?

12   A    That's correct.

13   Q    And that was Trooper Hemmerich --

14   A    Yes, sir.

15   Q    -- is that correct?

16   A    Yes, sir.

17   Q    And he said, I have to bring up a piece of

18   evidence up there, can you guys hold it for me?

19   A    That's correct, sir.

20   Q    And you said that you would, correct?

21   A    That's correct, sir.

22   Q    Now prior to coming in here and testifying did

23   you have any discussions concerning your participation in

24   this matter with any other state trooper prior to

25   testifying?

Inv. Drake - Cross - LaMagna

1      A    I talked to Trooper Hemmerich -- I'm sorry, now

2    Investigator -- to get directions up here yesterday.

3      Q    You didn't go over with him your testimony as it

4    related to this matter?

5      A    No, sir.

6      Q    Didn't confirm any activity about when he called

7    you or any of that?

8      A    No, sir.

9      Q    Didn't discuss anything with vest Investigator

10    Ramos?  Is he in your office too?

11     A    Yes, sir.  He is in the same office as I am.

12     Q    Did you have any discussions with him concerning

13    this case?

14     A    I just told him I wouldn't be able to make it

15    yesterday.  My apologies.  I had college.  I couldn't make

16    it.  We were going to try and coordinate driving down

17    together.  Other than that, nothing further.

18     Q    You knew he was going to be testifying in this

19    case as well?

20     A    That's correct.  The subpoenaes came together.

21     Q    You work in the same office?

22     A    Yes, sir.

23     Q    And you didn't discuss the testimony of why you

24    are testifying and why he is testifying?

25     A    No, sir.  I knew I was testifying.

Inv. Drake - Cross - LaMagna

1     Q    Now, the Mid Hudson Regional Crime Lab, you said

2  that that is right behind the barracks at Newburgh; is that

3  correct?

4     A    That's correct, sir.

5     Q    And are you familiar with that facility?

6     A    Yes, sir.

7     Q    I am assuming, and maybe I am wrong, that you

8  have had the opportunity in the past to drop off evidence

9  for the purposes of analysis to that lab, correct?

10     A    That's correct, sir.

11     Q    That's who the State Police uses to do the

12  analyzing of these matters in these cases, correct, blood,

13  drugs, et cetera?

14     A    In this region of this state, yes.

15     Q    In that region where you are?

16     A    Yes.

17     Q    What county is that?

18     A    Orange County, sir.

19     Q    That's Orange County, New York?

20     A    Yes, sir.

21     Q    They do all of the analysis of all of the cases

22  that emanate from Orange County, New York, correct?

23     A    I would say a majority of them.  I don't know how

24  they divide them up.  There are two or three other labs that

25  we use throughout the state.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Drake - Cross - LaMagna

1    Q    Now, you said that at some point Trooper

2    Hemmerich arrived at your barracks, correct?

3    A    That's correct, sir.

4    Q    That was around 4 o'clock, give or take?

5    A    Yes, sir.

6    Q    And you testified that you weren't there at the

7    time, but you knew he was there, and you got back over there

8    some time thereafter, correct?

9    A    That's correct.  The desk trooper, I left

10   instructions with him that I was going to be out of the

11   office, and to expect Trooper Hemmerich to arrive and let me

12   know via cell phone or radio, and he did.  And I returned as

13   soon as I could.

14   Q    The purpose was for you to hold onto the evidence

15   that was from Long Island, correct?

16   A    Correct.  It was to secure this blood kit in our

17   evidence locker until the lab opened up at the next business

18   day, and to transfer it from us to the laboratory.

19   Q    The lab up in Orange County, correct?

20   A    The lab right behind my building, sir, yes.

21   Q    That's in Orange County?

22   A    Yes, sir.

23   Q    So, Officer Hemmerich brings a lab kit from

24   Nassau County up to Orange County for you to hold onto,

25   correct, B.C.I. to hold onto it?

Inv. Drake - Cross - LaMagna

1      A     To secure, yes, sir.

2      Q     So when Hemmerich arrives, or when you meet with

3    Hemmerich he presents you with a blood kit, correct?

4      A     That's correct, sir.

5      Q     And you are familiar with what blood kits look

6    like?

7      A     Yes, sir.

8      Q     In fact, they all pretty much look alike,

9    correct?

10     A     As far as I have seen, sir, yes.

11     Q     New York State Police gets these blood kits from

12   a manufacturer, correct?

13     A     I would assume so, correct.

14     Q     In fact, there was a sample one already placed

15   into evidence by the prosecution.  I ask you to take a look

16   at this.  It looks like number 16, People's Exhibit 16 in

17   evidence.  I ask you to take a look at that.

18           Same box, right?

19     A     Appears to be, sir, yes.

20     Q     The outside box.  You certainly didn't look

21   inside of the box, correct?

22     A     Correct.  It was sealed, sir.

23     Q     Just the outside box?

24     A     That's correct.

25     Q     They all look the same?

GIGI WRIGHT, RPR   (516) 571-2503

1      A      That's correct, sir.

2      Q      So, Trooper Hemmerich brings this blood kit up to

3    you.  It is the same box as you are always used to; is that

4    correct?

5      A      That's correct.

6      Q      And you said just before on direct examination

7    that you recognize that box to be the same box as Trooper

8    Hemmerich gave you, correct?

9      A      Yes, sir.

10      Q      And you say that because the date is the same,

11    July 2nd?

12      A      Yes, sir.

13      Q      And that there is a name Martin Heidgen, correct?

14      A      Yes, sir.

15      Q      Nothing else?  That's how you recognize it to be

16    the same?  You didn't place any of your initials on the box,

17    did you?

18      A      No, sir.

19      Q      You didn't put a signature on the box with a date

20    that you received it so you could recognize that that is the

21    exact same box that you received, correct?

22      A      Correct.  I did not mark the box at all.

23      Q      The only thing that you had recognized is the

24    date, is the date, because you know you were working that

25    day, and the name Martin Heidgen, correct?

1    A    That's correct, sir.

2    Q    And these boxes all look the same, correct?

3    A    Yes, they do, sir.

4    Q    Now, at some point you said that Trooper

5    Hemmerich gave you what is called the General II; is that

6    correct?

7    A    That's correct, sir.

8    Q    The General II is a form, an official form, by

9    the New York State Police, that has a section for the chain

10   of custody, correct?

11   A    Correct, sir.

12   Q    I show you Defendant's Exhibit F in evidence.

13        MR. LaMAGNA:  Could I have that shown to the

14   witness, please.

15   Q    I show you what has been marked Defendant's

16   Exhibit F in evidence.  I ask you to take a look at it.

17        Do you recognize that?

18   A    Yes, I do.

19   Q    That's a General II form, correct?

20   A    It is, sir.

21   Q    And there is -- withdrawn.

22        And you recognize this to be the same General II

23   form that was presented to you by Trooper Hemmerich?

24   A    Photostatic copy, sir, yes.

25   Q    Yes, photostatic copy of that.

Inv. Drake - Cross - LaMagna

1      A      Yes, sir.

2      Q      What was the case number on the General II,

3   referring to the piece of evidence that was given to you, is

4   it 05-140?

5      A      Yes, there is two.  The B.C.I. case number is

6   05-140?

7      Q      Thank you.  Could I have that back, please.

8             Now, case numbers are assigned to individual

9   cases, correct?

10     A      Yes, sir.

11     Q      And they go in sequential order as the year goes

12   by.  05 is the year, correct?

13     A      Yes, sir.

14     Q      And 05-001 would be the first case of that year,

15   and so forth and so on, correct?

16     A      Yes, sir.

17     Q      And a case number that is assigned is assigned to

18   a specific case, correct?

19     A      Yes, sir.

20     Q      And that is the identifying number to that case,

21   correct?

22     A      Yes, sir.

23     Q      And paperwork is generated with that number so

24   you know that that paperwork belongs to that case, correct?

25     A      Yes, sir.

Inv. Drake - Cross - LaMagna

1      Q      And evidence such as this, when it comes in, has

2    the case number too, correct?

3      A      It should, sir.

4      Q      And you had just reviewed the General II, the

5    evidence report, of the transfer record with respect to the

6    evidence in this case, correct?

7      A      Yes, sir.

8      Q      And that's associated with the case number

9    05-140, correct?

10     A      Yes, sir.

11     Q      That's how you know that that piece of evidence

12   belongs to this particular case, correct?

13     A      Yes, sir.

14     Q      That that piece of evidence is the case with

15   Martin Heidgen, correct?

16     A      Yes, sir.

17     Q      Now, when you received the blood kit, are there

18   any logs that get filled in at B.C.I., at your barracks, to

19   evince the fact that you are placing it into your evidence

20   locker?

21     A      Not at my station for this case, sir.  The

22   originating agency or station where the case is out of keeps

23   all of the paperwork.  We do not keep any records where it

24   would be logged in.

25     Q      So a trooper from Long Island, Nassau County,

Inv. Drake - Cross - LaMagna

1 comes up to Orange County, to where your barracks are, to

2 have you secure a piece of evidence and bring it to your lab

3 up in Orange County for analysis, and you don't log it in to

4 show that you have their piece of evidence?

5  A I fill out the General II I received from --

6  Q Other than the General II.

7  A Other than that, I don't fill out anything at my

8 station that records it entered into my station other than

9 that General II, sir.

10  Q So we are clear, there is no paperwork that was

11 generated in your barracks memorializing the fact that you

12 took this piece of evidence from Trooper Hemmerich to hold

13 until it was brought to the lab; is that what you are

14 saying?

15  A I did not make any entries in anything other than

16 that General II at my station, sir.

17  Q You are the one who placed it into evidence,

18 correct?

19  A That's correct.

20  Q So there wouldn't be --

21  A To my knowledge, sir, no.

22  Q Now, you said you described your evidence locker,

23 and you said that there is a combination that gives access

24 in and out of the evidence locker; is that correct?

25  A Yes, sir.

Inv. Drake - Cross - LaMagna

1      Q      How many people have that combination?

2      A      To my knowledge there is six of us that work in

3   Newburgh right now:  Myself, my three partners, my boss and

4   an investigator at the airport, which is on the same

5   compound.  His office is actually up the road.  He stores

6   his evidence with us.

7      Q      What is his name?

8      A      Its Hank Piastrowski.

9      Q      If you can can you list the names of the people

10  who you believe would have the combination to this?

11     A      Yes, sir.  My boss is Neil Muscati; myself;

12  Michael Drake; my three partners, John Ramos, Michael

13  Vasquez, Rudolph Simmons; and the airport investigator,

14  which would be Henry Piastrowski.

15     Q      So, when you brought the blood kit into the

16  evidence locker there is a refrigerator?

17     A      Yes, sir.

18     Q      A small one, like a compact one?

19     A      Yes, sir.

20     Q      And was there any other samples that were being

21  held at that time there?

22     A      Not to my recollection.  I believe the

23  refrigerator was empty.

24     Q      Are you sure or are you not?

25     A      I know where I put this.  I put this right in.

 1      There was nothing in this part on the door.  As I open it

 2      there is a rack, but I don't believe there was anything on

 3      there.  I don't recall, sir.

 4          Q      If there would have been there would be other

 5      blood kits?  That's what the refrigeration would have been

 6      for for blood kits?

 7          A      Bio-hazard evidence.  There could be other items

 8      in there.

 9          Q      You said you made sure that it was cool in there,

10      that the refrigerator was working.

11          A      Yes, sir.  I made sure it was plugged in.  I put

12      my hand in it to make sure it was cold in there, and the

13      dial was still set at what it was set at.

14          Q      Do you know how cold or what temperature the

15      refrigerator was set on to preserve this material, which in

16      this case would have been blood?

17          A      I don't know the exact temperature.  Our setting

18      has nine -- the dial has nine hash marks on it, and it is

19      one to nine.  Nine is the coldest.  It has always been, in

20      the three years I have been at Newburgh, it has always been

21      between seven and eight.

22          Q      Is that where it was, between seven and eight?

23          A      Yes, sir.  But I don't recall the temperature.

24      There is no indication for that.

25          Q      And once you locked it into your evidence locker

Inv. Drake - Redirect - McCormick

1   you left, you locked, relocked it, and talked with Trooper

2   Hemmerich for a few minutes and that was it, correct?

3        A     Yes, sir.

4        Q     That was on July 2nd; is that also correct?

5        A     Yes, sir.

6        Q     And you had signed the General II in the two

7   spots, one evincing the fact that you received a blood kit

8   designated under case 05-140 from Trooper Hemmerich,

9   correct?

10       A     That's correct, sir.

11       Q     And then you also signed where you put from you

12  to the B.C.I. evidence locker, correct?

13       A     That's correct.

14       Q     And then you signed it?

15       A     Yes, sir.

16       Q     And that's the only paperwork related to you

17  taking the blood kit from Trooper Hemmerich; is that

18  correct?

19       A     Yes, sir.

20             MR. LaMAGNA:  I have nothing further, your

21       Honor.

22             MS. McCORMICK:  Just two questions, Judge.

23  REDIRECT EXAMINATION

24  BY MS. McCORMICK:

25       Q     Investigator, is there a New York State Police

Inv. Drake - Redirect - McCormick

1    lab on Long Island?

2         A    Not to my knowledge, ma'am.

3         Q    Therefore, is the Newburgh lab -- the Long Island

4    part of the region, is that served by the Newburgh lab?

5         A    Yes, ma'am.

6         Q    And the General II, the evidence record, stays

7    with the piece of evidence so that anyone who touches it

8    marks that General II?

9         A    That's correct, ma'am.  I wrapped the General II

10   around the kit when I placed it into the refrigerator, and

11   it stays with it through its entire journey.

12              MS. McCORMICK:  Nothing further.  Thank you.

13              THE COURT:  Anything else, Mr. LaMagna?

14              MR. LaMAGNA:  Nothing further, your Honor.

15              THE COURT:  Thank you.

16              THE WITNESS:  Thank you.

17              (Whereupon, the witness exits the courtroom.)

18              THE COURT:  Call your next witness.

19              MS. McCORMICK:  People call Dr. Nahas.

20              COURT OFFICER:  Step up, remain standing,

21         raise your right hand and face the clerk.

22         C H R I S T I A N   N A H A S,          a

23              witness called on behalf of the People,

24              having been first duly sworn by the Clerk of

25              the Court, was examined and testified as

```
 1              follows:

 2                   THE CLERK:  You can put your hand down.

 3          State your name, spelling your last name for the

 4          record.

 5                   THE WITNESS:  Dr. Christian Nahas, N-A-H-A-S.

 6                   THE CLERK:  Thank you.

 7     DIRECT EXAMINATION

 8     BY MS. McCORMICK:

 9          Q    Good morning, Doctor.

10          A    Good morning.

11          Q    Are you a licensed physician in the State of New

12     York?

13          A    Yes, I am.

14          Q    How long have you been a licensed, Doctor?

15          A    Fourteen years.

16          Q    Do you have an area of specialty or expertise?

17          A    Family practice, pain management and addiction

18     medicine.

19          Q    Can you describe for the jury, please, did you

20     have to obtain any particular education or training to

21     become a medical doctor?

22          A    Yes.  I went to medical school in New Jersey,

23     School of Osteopathic Medicine, and did my residency and

24     internship at Long Beach Medical Center and became board

25     certified in family practice, as well as received additional
```

1    training in pain management and addiction medicine over the

2    next three years after residency.

3        Q    Doctor, can you describe for the jury, please,

4    what is the nature of your practice?

5        A    I am a family physician with a solo practice in

6    Island Park.

7        Q    And, Doctor, do you have any affiliations with

8    any hospitals?

9        A    Yes.  I belong to South Nassau Community Hospital

10   in Oceanside; and Long Beach Medical Center in Long Beach,

11   New York.

12       Q    Was that the nature of your practice in July of

13   2005?

14       A    Yes.

15       Q    Do you know a woman, Doctor, by the name of

16   Denise Tangney?

17       A    Yes, she is my patient.

18       Q    Doctor, did you treat Dennis Tangney for injuries

19   that she received as a result of a motor vehicle crash on

20   July 2nd 2005?

21       A    Yes, I did.

22       Q    Have you reviewed the medical records from the

23   hospitals and the other treatment that she received as her

24   overall treating physician?

25       A    Yes, I have.

Dr. Nahas - Direct - McCormick

```
 1      Q    Is it fair to say, Doctor, that you are
 2   Mrs. Tangney's primary care physician?
 3      A    Yes.
 4            MS. McCORMICK:  Your Honor, I ask to approach
 5      the witness with what I ask to be marked People's
 6      Exhibit 20A for identification, please.
 7            (Whereupon, the item referred to received and
 8      marked People's Exhibit 20A for identification.)
 9            COURT OFFICER:  20A for identification.
10      Q    Doctor, you have a stack of documents before you.
11   Do you recognize that stack of documents?
12      A    Yes, I do.
13      Q    What do you recognize them to be?
14      A    The record for hospitalization at North Shore
15   University Hospital; and, also, the record of her stay at
16   Long Beach Medical Center's rehabilitation unit; and her
17   admission at Nassau University Medical Center after her
18   accident.
19      Q    Doctor, are those medical records that you
20   reviewed in the course of preparation for your testimony
21   today and for your treatment of Denise Tangney?
22      A    Yes.
23      Q    Doctor, from what you reviewed are they certified
24   hospital records, certified in the ordinary course of
25   business?  Do they have certifications on them?
```

Dr. Nahas - Direct - McCormick

1      A      Yes, they do.

2                     MS. McCORMICK:  Your Honor, I would ask that

3      they be moved into evidence as People's Exhibit 20A in

4      evidence.

5                     THE COURT:  Show them to counsel.

6                     MR. LaMAGNA:  Judge, I have received medical

7      records.  Are these the ones?

8                     MS. McCORMICK:  Yes.

9                     MR. LaMAGNA:  These all relate to

10     Mrs. Tangney?

11                    MS. McCORMICK:  Yes.

12                    MR. LaMAGNA:  No objection.

13                    THE COURT:  They are received.

14                    (Whereupon, People's Exhibit 20A for

15     identification now received and marked People's Exhibit

16     20A in evidence.)

17                    COURT OFFICER:  People's Exhibit 20A in

18     evidence.

19     Q      Doctor, if you would, could you please tell the

20     jury about the injuries received to Denise Tangney as a

21     result of the crash on July 2nd 2005, and her treatment,

22     your observations.  Describe her condition.

23     A      Sure.  She had multiple trauma from the car

24     accident.  She was unrestrained in the limousine when the

25     accident occurred.  She broke her left Hip, her right lower

GIGI WRIGHT, RPR    (516) 571-2503

Dr. Nahas - Direct - McCormick

1   leg, and she received lacerations to her left lower leg, and
2   her right lower leg as well.  And she also injured her
3   wrist, without breaking it.

4            She went for a long period of rehabilitation
5   after her surgery, one-month period of rehabilitation at
6   Long Beach Medical Center, after having spent about ten days
7   at Nassau University Hospital, having a left hip surgery to
8   repair the broken left hip and to repair the right broken
9   lower leg.

10            She had sutures put in all of the areas that she
11   had lacerations.  She had multiple x-rays.  She had a CAT
12   scan of the head.  She had venous dopplars of the leg, which
13   is an ultra sound to make sure she didn't have blood clots.
14   She had abdominal sonograms and CAT scans of the abdomen.

15            She received multiple pain medicines, sleeping
16   pills, because she had trouble sleeping at night.  She was
17   having nightmares.  She received psychiatric and
18   psychological services while at the rehabilitation unit.

19            And it is my understanding that after being
20   admitted on 7/11/05 to Long Beach Rehabilitation she was
21   discharged one month later, on 8/11/05; after which she went
22   home.  And I'm not sure of the time frame, but she started
23   to worsen within the next six months.

24            She had developed an inability to walk up stairs,
25   an inability to bend down to do common chores around the

1   house.  She went and saw another orthopedist named

2   Dr. Siedemann at North Shore University Hospital and they

3   determined that the left hip repair had broken down, and it

4   needed to be revised, and all of the hardware that was in

5   there had to be taken out.

6          So on March, I don't remember the exact date, but

7   some time in March, I think the 6th of March, they did a

8   surgery at North Shore to remove all of the hardware and to

9   improve the surgery and make her hip whole again.

10         Let me backtrack a little bit.  During her stay

11   at Long Beach Medical Center's rehab, she developed a

12   urinary tract infection, some gallbladder problems.  And

13   during the course of her stay at North Shore University for

14   the revision of her hip she developed a possible wound

15   infection in the area.  She was treated with antibiotics.

16   And she actually received medical clearance in my office to

17   receive the second surgery.  She came to our office to make

18   sure that she was strong enough to have the surgery.  And

19   she has followed up periodically in our office on occasion.

20         I think that most of her follow-up is with her

21   orthopedist and her physical therapists and such.

22    Q    Are you treating Mrs. Tangney for pain

23   management, Doctor?

24    A    I don't believe that I am her pain management at

25   this time.

1      Q      But to your knowledge, and from the records, she

2   does receive pain medications?

3      A      I believe so.

4      Q      Doctor, are you familiar, from the records, with

5   the initial treatments that Mrs. Tangney any received right

6   after the collision?

7      A      Yes.   The initial treatments included

8   antibiotics; the surgery to fix the left hip; suturing of

9   all of the wounds and lacerations that she had; pain

10  medicine for the amount of pain that she was in; and she was

11  probably in traction for a while, in a knee immobilizer; and

12  then she was probably put in, a very standard treatment

13  would be to put her knee in some sort of machine and her hip

14  to increase range of motion and to keep her leg moving.  She

15  was unable to weight bear on her left leg and hip for quite

16  some time.  Up until the end of her rehabilitation she was

17  forbidden from putting any weight on it.  She had to use

18  crutches and sort of learn how to walk with crutches.

19     Q      Dr. Nahas, the initial surgery that you were

20  referring to was actually two surgeries in short succession;

21  is that correct?

22     A      Yes.

23     Q      Do you know why they had to do a second surgery?

24     A      I don't recall.

25     Q      Doctor, I ask to approach you with what I ask to

1    be marked as 20B in evidence.

2                    (Whereupon, the item referred to received and

3           marked People's Exhibit 20B for identification.)

4                    COURT OFFICER:   20B for identification.

5           Q    Dr. Nahas, I ask you to open that large envelope

6    and examine its content and see if you recognize it.

7                    (Witness complies.)

8           A    Yes.

9           Q    What do you recognize the items to be?  And how

10   many items are there?

11          A    It looks like there is a screw into the left hip

12   and hardware holding the hip together where the fracture is

13   at the head or the neck of the leg bone connected to the

14   pelvis here.

15          Q    Doctor, are those photographs derived from

16   x-rays?

17          A    Yes, these are x-rays.

18          Q    How many of those x-rays do you have before you

19   as People's Exhibit 20B?

20          A    I have four x-rays.

21          Q    Are they relating to Mrs. Tangney and her

22   condition as you described it?

23          A    Yes.

24          Q    Are those x-rays after one of the surgeries that

25   she received?

1        A     Yes.   This one is dated 2/8/06.

2              And this would have been much later in her

3        treatment.  This is dated 5/3/06.  This x-ray, it seems that

4        some of the hardware has been removed and that they actually

5        have put an artificial hip into this joint, the left hip.

6        Before it was her own joint that was involved.  This was her

7        own hip joint with screws to strengthen it.

8              In this one they removed her own bone and put a

9        synthetic graft, a titanium rod with a plastic sheath to act

10       as the joint.

11       Q     Doctor, before you continue speaking about the

12       x-rays, are they accurate reflections of Mrs. Tangney's

13       condition that she received as a result of the fracture on

14       July 2nd 2005?

15       A     Yes.

16             MS. McCORMICK:  At this time I move them into

17       evidence as People's Exhibit 20B in evidence.

18             THE COURT:  Show them to Mr. LaMagna.

19             MR. LaMAGNA:  Judge, we have not received

20       these in discovery.  But I have no objection.

21             THE COURT:  They are received.

22             (Whereupon, People's Exhibits 20B for

23       identification now received and marked People's

24       Exhibits 20B in evidence.)

25             COURT OFFICER:  People's Exhibit 20B in

1       evidence.

2       Q       Doctor, you have already described two of the

3   four x-rays.  Would you continue with the others, please.

4       A       Sure.

5               This is the right lower leg.  This is the ankle.

6   This is the knee part, and it appears that the tibia, the

7   larger of the two bones that comprise the lower leg, is

8   broken and is being supported by hardware, screws and a rod,

9   to keep it in place.  And there is some wire that is

10  attaching to the upper part of the leg, the humerus -- the

11  femur, excuse me.

12              In this one it appears this is later.  The one

13  that we just saw was from 5/3/06, May 3rd 2006.  This one

14  here is two months later.  And they have replaced the joint,

15  the knee joint, completely with an artificial knee joint,

16  where you receive the rod going into the bone, probably

17  titanium and plastic, to comprise the knee joint.  So she

18  has had a right total knee replacement and a left total hip

19  replacement by the time she finished all of her surgeries.

20      Q       On the basis of your observations of Mrs. Tangney

21  and the medical records that you have viewed and those

22  x-rays, does Mrs. Tangney have difficulty in walking?

23      A       I can't imagine that she wouldn't have difficulty

24  walking.  Most people who receive these kinds of multiple

25  traumas are left with arthritis in various parts of their

GIGI WRIGHT, RPR    (516) 571-2503

1   body for life.  Many of their joints, their back, their

2   wrists.  Even if the total knee replacement is successful

3   there isn't the same degree of mobility that one would have

4   with a natural joint.

5        Q    So would it be consistent with a person now

6   unable to kneel down on the floor or sit for long periods of

7   time?

8        A    That's correct.  She could not kneel on the floor

9   with this.

10       Q    Doctor, what is Mrs. Tangney's prognosis?

11       A    I think that she probably needs to remain on pain

12   medicine, unless she has a strong pain threshold.  I believe

13   she probably will have, for life, post-traumatic arthritis,

14   which is a type of arthritis after injuries, multiple

15   injuries.  And, basically, she is prematurely aged by 30

16   years, 20 or 30 years.

17                 MS. McCORMICK:  Nothing further.  Thank you.

18                 MR. LaMAGNA:  Nothing further.

19                 THE COURT:  Thank you, Doctor.  You are

20        excused.

21                 (Whereupon, the witness exits the courtroom.)

22                 THE COURT:  At this time we will give the

23        jury a ten-minute break.  Please don't talk about the

24        case.  See you in ten minutes.

25                 (Whereupon, the jury exited the courtroom.)

Dr. Nahas - Direct - McCormick

1          MS. McCORMICK:  Your Honor, may I ask what

2     time you would like the cars here tomorrow morning?  I

3     have Investigator Sweeney out in the hall.

4          THE COURT:  Eleven o'clock.

5          Bring in the jury.

6          MS. McCORMICK:  One moment.  Where would you

7     like them placed?

8          THE COURT:  Right outside.  Step up.

9          (Whereupon, a discussion was held at the

10    sidebar, off the record.)

11         COURT OFFICER:  Jury entering.

12         (Whereupon, the jury entered the courtroom,

13    and upon taking their respective seats, the following

14    occurred:)

15         THE CLERK:  Come to order, please.

16         Case on trial.  Indictment 1910N of 2005,

17    People versus Martin Heidgen.

18         People ready?

19         MR. HAYDEN:  Ready, your Honor.

20         THE CLERK:  Defense ready?

21         MR. LaMAGNA:  Defendant ready, your Honor.

22         THE CLERK:  Defendant is present, and the

23    jurors are seated, your Honor.

24         MS. McCORMICK:  Your Honor the People call

25    Investigator John Whittall.

Tpr. Whittall - Direct - McCormick

1              COURT OFFICER:  Step up.  Remain standing,

2        raise your right hand and face the clerk.

3              J O H N   W H I T T A L L,        a witness

4              called on behalf of the People, having been

5              first duly sworn by the Clerk of the Court,

6              was examined and testified as follows:

7              THE CLERK:  You may put your hand down.

8              State your name, spelling your last name,

9        rank, shield and command for the record.

10             THE WITNESS:  Trooper John Whittall,

11       W-H-I-T-T-A-L-L.  New York State Police, Troop L.

12       Headquarters, Farmingdale.

13             THE CLERK:  Shield number, please.

14             THE WITNESS:  It is 2128.

15             THE CLERK:  Thank you.  Please take a seat.

16             MS. McCORMICK:  Your Honor, may I inquire?

17             THE COURT:  Please.

18             MS. McCORMICK:  Thank you.

19  DIRECT EXAMINATION

20  BY MS. McCORMICK:

21       Q     Good morning.

22       A     Good morning.

23       Q     Troop or Investigator?

24       A     Trooper.

25       Q     Trooper, could you please tell the jury where you

Tpr. Whittall - Direct - McCormick

1   are assigned in the New York State Police?

2        A      New York State Troop L Headquarters, Farmingdale.

3        Q      Approximately how long have you been a New York

4   State Trooper?

5        A      Almost twenty years.

6        Q      Could you describe for the jury, please, what are

7   your responsibilities as a state trooper in Farmingdale?

8        A      I'm presently assigned to the Collision

9   Reconstruction Unit, assigned to the Forensic Investigation

10  Unit, Troop L Headquarters in Farmingdale.  I have been the

11  full-time person since January 2005.

12       Q      Trooper Whittall, did you have occasion to become

13  involved in the investigation of a crash that occurred on

14  July 2nd 2005, about 2 o'clock in the morning, at the area

15  of Babylon Turnpike overpass on the Meadowbrook Parkway?

16       A      Yes.  On July 2nd I was on vacation.  I got back

17  from vacation on July 5th, and I learned about the incident,

18  the collision, that had occurred on July 2nd.  I was asked

19  to perform some duties regarding the case.

20       Q      Could you describe for the jury what are the

21  duties you were asked to perform in the investigation?

22       A      I was asked to do vehicle examinations, safety

23  checks on the vehicles, the three vehicles that were

24  involved in the collision.  I was asked to assist with the

25  weighing of the vehicles.  I was asked also to assist with

1    the diagram and some other things that myself and the

2    investigator called for in the examination of the vehicles.

3         Q    Trooper Whittall, you said you were asked to

4    assist in inspecting the vehicles.  Is that correct?

5         A    Yes.

6         Q    What do you mean by inspecting the vehicles?

7         A    What I am doing is an inspection of the vehicles,

8    similar to a New York State safety inspection, which would

9    inspect the safety items, the same items that are performed

10   in a safety inspection, to see if possibly any mechanical

11   malfunction occurred prior to the collision.

12        Q    Trooper Whittall, could you describe the

13   inspection that you performed on the vehicles for the jury?

14        A    Yes.  On all three vehicles I did inspections of

15   the brake system, light system, seat belt system.  I

16   inspected the engine compartment of the front end, where

17   possible.  Those type of inspections.

18        Q    Could you explain to the jury, did you receive

19   any training in making vehicle inspections prior to this

20   event?

21        A  .  Yes.  For two years in the 1990s, from 1995 to

22   1997, I was an understudy or assistant to the sergeant who

23   had the job of inspector before me.  I worked with him for

24   two years observing what he did, and learning the reports

25   that he did.  And then in 1997 I took a test at the

1    Department of Motor Vehicles to be certified as a safety

2    inspector, and I passed that test.

3        Q    Are we talking about the same Department of Motor

4    Vehicle tests that allow a local garage to be a DMV

5    inspection center?

6        A    Yes.  I'm not doing that for those purposes.

7        Q    I realize that.  But you are certified by DMV as

8    an inspector?

9        A    Yes.

10       Q    Trooper Whittall, could you describe what it is

11   that you observed about each of the three vehicles during

12   your inspection.  What days did you do it, by the way?

13       A    On July 7th I performed the inspection on the

14   pickup truck.  I checked the -- first off, the vehicle was

15   so damaged, so badly damaged, that I really could not do a

16   real inspection, first off, because the damage would prevent

17   you from inspecting certain items.

18            I inspected the parts that I could inspect.

19   Specifically the brake system, I removed the two, myself and

20   an assistant mechanic, removed the right side wheels on the

21   pickup truck.  We observed the brake system.  It was all

22   wheel disk brakes on the vehicle; disk brakes on the front,

23   disk brakes on the rear.

24            We inspected, or I inspected, the pads; the

25   rotors, the brake lines.  The pads had proper pad left.

1    That passed inspection.  There was no grease or oil on the

2    system.  There was no cracking of the pads.  And in my

3    analysis it was that the brake system was functioning

4    properly before the impact.  The reservoir still had fluid

5    in it.  It was still full of fluid.

6         I then went on to looking at the lighting system.

7    However, that was not going to be able to be tested by

8    turning the lights on, because the battery was broken and

9    disconnected.

10        The front headlights were both torn from the

11   vehicle.  Obviously, could not be checked.  The rear lights

12   could not be checked because of the battery being damaged.

13        I would have to refer to my notes to look for

14   other things that I checked, and what the results of those

15   checks were.

16   Q    Do you have those notes?

17   A    Yes.

18        MS. McCORMICK:  Your Honor, may the witness

19        refresh his recollection with his notes?

20        THE COURT:  Yes.

21   A    I also checked the tires, checked the tread depth

22   on all of the tires on the vehicle.  The left front tire was

23   flat.  The rim was damaged.  And it was obviously not going

24   to turn or be able to be driven.

25        I wrote down the tread depth of all of the tires.

1    They were all within the passing range on a safety

2    inspection.

3              The driver's front door was damaged.  The glass

4    was missing.  The passenger front door was damaged.  This is

5    on the pickup truck, so there are no rear doors.  The

6    steering wheel was damaged, windshield completely broken.

7    Hood was bent up and mangled.

8              The battery was damaged.  I said that already.

9    The steering links and all of the steering mechanisms were

10   heavily damaged and not able to be checked.  Drive shift was

11   bent at a 45-degree angle in the middle of the vehicle,

12   approximately where the bed of the pickup truck and cab met.

13   It was bent up at a 45-degree angle.

14        Q    When you say it was bent up at 45 degrees, is it

15   normally flat?

16        A    Yes, it is normally straight; horizontal to the

17   ground.

18        Q    Is that the frame of the pickup truck itself?

19        A    The drive shaft is what turns the engine and

20   gives power to the tires to run the vehicle.

21        Q    Rather than being parallel to the ground it is

22   bent up behind the cab and to the bed?

23        A    Right where the bed and the cab meet, because

24   they are two separate pieces, right in that area underneath

25   them it was bent up right there.

1    Q    At 45 degrees?

2    A    Yes.

3    Q    Okay.  Would you continue, please.

4    A    I checked the seat belts in the front and they

5    were both operating properly.  And that basically covered

6    all of the items that I checked.

7    Q    That's on the pickup truck?

8    A    Yes.

9    Q    July 7th?

10   A    July 7th 2005.

11   Q    Where did you conduct that inspection?

12   A    In the rear parking lot of State Police

13   headquarters.

14   Q    Is there an impound yard at that facility?

15   A    Yes.

16   Q    Did you also inspect the limousine?

17   A    Yes, I did.

18   Q    What date did you do that?

19   A    July 14th, I believe.  Yes, July 14th.

20   Q    Would you please describe the results of your

21   inspection for the jury.

22   A    On the limousine the same items, same general

23   items were inspected.  The vehicle again had four-wheel disk

24   brakes.  Again, I pulled the right side tires.  The disks on

25   both right side tires were both passing; no oil, no brake

1    fluid on the brakes to indicate that there may have been a

2    leak beforehand.  No reason to believe that the brakes were

3    not functioning properly before the collision.

4         The battery was again cut by rescue.  I could not

5    energize the lighting system.  Again, the front headlights

6    were both missing.  The rear lighting I could not check

7    because of the condition of the battery.

8         Left front tire was ripped from the vehicle.

9    Tire rim and pull wheel assembly was torn off the vehicle.

10   The right front tire was, the tread depth and the air

11   pressure was proper.  However, the rim was damaged and the

12   tire obviously was not going to move.

13        The rear tires had proper tread depth, air

14   pressure in them.  They had air pressure in them.  I

15   checked -- I could not check -- well, I tried to check the

16   driver's and the front passenger seat belts but, however,

17   they were both locked in the up position against the

18   shoulder rest.

19        Q    What do you mean by that?

20        A    When I attempted to pull them out of the harness

21   to put them on and buckle them into the buckle, I couldn't

22   even pull them out.  They were locked in the up position.

23        Q    Was that as a result of the collision, or do you

24   not know?

25        A    I would say from my training and experience that

Tpr. Whittall - Direct - McCormick

1   that was as a result of the collision.

2        Q     Anything else?

3        A     I did check the belts in the rear of the

4   limousine where the passenger compartment is, and they were

5   all working properly.

6        Q     Upon your observation of those belts did you

7   observe whether any of them were still belted together?  Do

8   you recall?

9        A     No, I don't recall.  And there may have been

10  other investigators in there before me that could have, you

11  know, attempted to buckle them, so I can't say --

12       Q     Okay.

13       A     -- accurately.

14       Q     In all respects then, Trooper Whittall, was the

15  limousine functioning as far as you can tell properly on on

16  July 2nd 2005 before the crash?

17       A     Well, knowing that I observed a video also, I

18  know it was functioning, yes.

19       Q     From the safety inspection that you were able to

20  observe there was nothing indicating to you that it was not

21  functioning?

22       A     No.  There was heavy damage, but from the things

23  that I could observe and, in fact, I observed the video --

24       Q     Did you also --

25       A     -- it was functioning.

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Whittall - Direct - McCormick

1    Q    Did you also inspect a third vehicle involved in
2    this crash?

3    A    Yes.   There was a third vehicle involved, a 1999
4    Nissan Maxima.   This vehicle had less damage.

5         It had damage along the left rear passenger door
6    and the left rear wheel assembly.   The contact was less
7    severe to this vehicle.

8    Q    Do you know to whom that vehicle belongs?

9    A    No, not offhand.   I know that there was three
10   people in that vehicle and they were involved in the
11   collision.

12   Q    Are there notations to the type of vehicle rather
13   than the ownership?

14   A    Yes.

15   Q    Could you say what type of vehicle it was and
16   what the license plate was?

17   A    1999 Nissan Maxima with New York B, Boy; V,
18   Victor; A, Adam; 4516 registration.

19   Q    Did you perform a safety inspection on that
20   vehicle as well?

21   A    Yes, I did.   On July 14th also.

22   Q    Was everything functioning in that vehicle from a
23   safety inspection standpoint?

24   A    There was some damage to the vehicle that would
25   not allow it to pass inspection at that present time, but

Tpr. Whittall - Direct - McCormick

1    that damage occurred as a result the collision.

2        Q     What is the nature of the damage that would have

3    impacted a safety inspection?

4        A     In the rear left a control arm was ripped out,

5    and the tire was moving freely.  It had some play in it.

6    And, obviously, this vehicle could not be driven safely on

7    the roadway in it's present condition.

8        Q     What that as a result of the damage from the

9    collision?

10       A     Yes.

11       Q     Did you do anything with respect to weighing

12   these vehicles at any point in the investigation?

13       A     Yes.  On July 15th I assisted a Trooper George

14   Tension, who is a scale certified trooper, who does truck

15   inspections.  I assisted him in weighing two of the

16   vehicles.

17       Q     What does "scale certified" mean?

18       A     He has gone to training courses where they learn

19   to operate scales and weigh trucks and vehicles.

20       Q     So those weigh stations that you see at the side

21   of the road would that be the type of thing you are talking

22   about?

23       A     It is not at the actual station.  He carries the

24   scales around with him in the vehicle.

25       Q     Did you and Troop Tension actually weigh all

1      three or two of the vehicles involved in this crash?

2          A    Two of the vehicles.

3          Q    Which two?

4          A    Limousine and pickup truck.

5          Q    Do you recall what day that was done?

6          A    That was done on July 15th.

7          Q    And you did not weigh that Nissan?

8          A    No.

9          Q    On July 15th could you tell the jury, please,

10     what was the weight of the limousine as it existed on that

11     date?

12         A    I don't know the exact weight offhand.  It was in

13     the area of 5,600.  I don't know the exact weight.  I would

14     have to look.

15         Q    You don't have the notes from that day?

16         A    No, I don't.

17         Q    But you were there when George Tension weighed

18     those vehicles?

19         A    Yes, I was.

20         Q    And they were conveyed to Sergeant Crawford and

21     yourself?

22         A    Yes.  Via e-mail.

23         Q    Trooper Whittall, what, if anything, else did you

24     do in relationship to this investigation?

25         A    I did the scene diagram.

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Whittall - Direct - McCormick

1      Q     Before we get to that, Trooper, could you explain

2  to the jury were you involved at all in obtaining from the

3  vehicle something referred to as the black box?

4      A     I don't refer to them as black boxes.

5      Q     Explain to the jury what you mean.

6      A     It is an air bag module.  It is part of a

7  computer system that is in every vehicle today that the

8  vehicle has a computer system in.  And there are various

9  different items which monitor the vehicle, one of them is an

10  item that monitors the air bag, and that is called an air

11  bag control module, ACM or diagnostic module.

12      Q     Those modules, were there modules relating to air

13  bag control in each of the limousine and the pickup?

14      A     Yes, there was.

15      Q     And did you obtain each of those air bag control

16  modules from those vehicles?

17      A     Yes, I did.  On July 7th I did.

18      Q     Can you describe for the jury where those modules

19  were located and how they were obtained?

20      A     In the pickup truck the module is located under

21  the driver's seat.  Myself and Investigator Sweeney and a

22  mechanic worked on pulling the bottom part of the seat out,

23  and when we pulled the seat out we were able to expose the

24  module, and we removed the module from the pickup truck.

25      Q     And did you also obtain the module from the

1    limousine?

2         A    Yes.

3         Q    Where was that module located?

4         A    That was along the transmission housing in the

5    front passenger compartment.  We had to pull back some floor

6    material, carpet, and some plastic to expose it.  It was a

7    little easier to do than getting the one out of the pickup

8    truck.  And we were able to expose the module and remove it

9    from the limousine.

10        Q    When you removed both of these modules what

11   became of them?

12        A    We took them into evidence and brought them into

13   the building, and we gave them to Sergeant Frank Lynch while

14   I was there.  We didn't physically give it to him to take,

15   we were all together.  We gave it to him in the office,

16   where he was at, and he did an examination of the two

17   modules.

18        Q    Sergeant Lynch is with the New York State Police?

19        A    Yes.

20        Q    When you say he did an examination, what was

21   actually done to the modules?

22        A    I connected the modules to a computer, which then

23   was able to read the data that was recorded on the modules

24   as a result of the air bag.  Modules do not collect data

25   unless there is a deployment or near deployment of the air

Tpr. Whittall - Direct - McCormick

1   bag.

2      Q      Did each of these vehicles have air bag

3   deployments?

4      A      Yes.

5      Q      Meaning that the air bags actually blew up and

6   were in use at the time of this crash?

7      A      Yes.

8      Q      So each of these air bag control modules then

9   should have recorded data; is that correct?

10     A      Yes.  But they did not completely record the

11  data.

12     Q      What was learned by doing a crash data retrieval

13  download?

14     A      We learned that there was failure of the

15  electrical system at some point during this collision and

16  only partial data was recorded on the air bag modules.

17     Q      Did either of these air bag modules record the

18  speed of the vehicles at the time of impact or just prior

19  to?

20     A      No, they did not.  And neither one of them was

21  actually capable of recording speed?

22     Q      These were not?

23     A      They were not designed when they were made to be

24  able to record speed.  Today's date there are several

25  vehicles which are designed to record speed.

Tpr. Whittall - Direct - McCormick

1      Q      Now, Trooper Whittall, you said you were also

2    involved in the conversion of data into a scene diagram.  Is

3    that correct?

4      A      Yes.

5      Q      What data did you use to convert into a diagram?

6      A      I used data that Investigator Sweeney and

7    Sergeant Crawford obtained on the night of the collision.

8      Q      And how did -- do you know where the data

9    specifically comes from?

10     A      It comes from the total station unit, which we

11   use for scene diagram.

12     Q      And that total station unit actually records

13   measurements at various points chosen by the person

14   operating it at the scene?

15     A      Yes.

16     Q      And those points are coded in terms of a computer

17   code?

18     A      They are coded by the operators of the instrument

19   and a pole person, who has a reflector on a pole, which he

20   picks spots where there is evidence and where there are

21   items that we like to document, such as roadway lines, and

22   trees and things like that, and then it is recorded by the

23   instrument and downloaded into a computer file.

24     Q      From that computer file were you able to convert

25   that data into a physical drawing?

1      A      Yes.

2      Q      How is that done?

3      A      I -- the data that they download into the

4      computer is imported into a program called auto sketch.  I

5      then look at that data, and I look at some of the things

6      that come in that are not necessarily needed in a diagram,

7      such as numbers or point numbers.  Each of the points that

8      we take has a number on it.  You -- if you had all of those

9      points on a diagram it would just overwhelm the person

10     looking at it.  The points are still there, but I just erase

11     the numbers for the points.

12            I then add in things like important vehicles.

13     Because the -- because at the scene they make a box around

14     the vehicle.  Now, that is just a line around the vehicle in

15     the diagram.  I import, from a library of cars that we have,

16     something that looks like or is exactly the same as the

17     vehicle at that time.  I imported a vehicle that looked like

18     a limousine and one that looked like a pickup truck, and one

19     that looked like a Nissan Maxima.

20     Q      At the conclusion of this is what is created a

21     scale diagram of the crash scene itself?

22     A      Yes.

23     Q      It is drawn to scale?

24     A      Yes.

25     Q      And the points that are measured and reflected on

1    that diagram are the points that were measured at the scene

2    itself?

3        A    Yes.

4        Q    Visually where the vehicles are located on the

5    diagram are where they were measured to be on the evening of

6    July 2nd 2005?

7        A    Yes.

8             When I import the vehicles I place it right over

9    the box or the rectangular shape of the vehicle, and I scale

10   if to exactly the size of the rectangular shape and then,

11   and only then, will I eliminate that rectangular shape.

12       Q    What about the roadway itself; are the

13   measurements of the roadway scaled and accurate as to how

14   they were measured that night?

15       A    Yes.

16       Q    Including the line spacings?

17       A    Yes.

18            MS. McCORMICK:  I ask that the witness be

19       allowed to step down, Judge, and view what I ask to be

20       marked as People's Exhibit 21 for identification

21       purposes.

22            THE COURT:  Yes.

23            COURT OFFICER:  People's Exhibit 21 for

24       identification.

25            (Whereupon, a diagram received and marked

1       People's Exhibit 21 for identification.)

2       Q     Trooper Whittall, are you looking at that,

3    People's Exhibit 21?

4       A     Yes.

5       Q     Do you recognize it?

6       A     Yes.

7       Q     What do you recognize it to be?

8       A     This is the diagram that I converted from the

9    total station points.

10      Q     How do you recognize that as being your diagram?

11      A     It has my signature on it.

12      Q     That is obviously an enlarged copy of your

13   diagram; is that correct?

14      A     Yes.

15      Q     Trooper, is that diagram the same diagram that

16   you produced as a result of the data collected at the crash

17   scene from July 2nd 2005?

18      A     Yes.

19            MS. McCORMICK:  Your Honor, at this time I

20      would ask it be admitted into evidence as People's

21      Exhibit 21.

22            R. LaMAGNA:  Brief voir dire, Judge?

23            THE COURT:  Yes.

24            MS. McCORMICK:  Just before we get do that,

25      I'm going to also ask that 21A be allowed in as well so

Tpr. Whittall - Direct - McCormick

```
 1        it can be projected on the presenter.  It is just a

 2        smaller version of the same diagram.

 3                    THE COURT:  Okay.

 4                    (Whereupon, a diagram received and marked

 5        People's Exhibit 21A for identification.)

 6                    COURT OFFICER:  People's 21A for

 7        identification.

 8   VOIR DIRE EXAMINATION

 9   BY MR. LaMAGNA:

10        Q     Good morning, Trooper.

11        A     Good morning.

12        Q     How are you?

13        A     Fine.

14        Q     Is it my understanding that the data and the

15   measurements that you used to prepare this diagram you

16   didn't get yourself?

17        A     No, that was taken by --

18        Q     -- other people?

19        A     That was by Sergeant Crawford and Investigator

20   Sweeney.

21        Q     So the measurements that you used to prepare this

22   diagram are measurements that other people took?

23        A     Yes.

24        Q     And the measurements of the roadway that you used

25   to prepare this diagram were measurements that other people
```

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Whittall - Direct - McCormick

1    took?

2        A    Yes.

3        Q    And the total station points, you weren't even

4    there when they did this, correct?

5        A    No, I was not.

6        Q    You didn't choose those points, correct?

7        A    No, I did not.

8        Q    You didn't operate the total station?

9        A    No.

10       Q    All of this information that you used to prepare

11   this diagram are from other people?

12       A    Yes.

13            MR. LaMAGNA:  Judge, I would object to this

14       diagram at this time.

15            THE COURT:  Overruled.

16            (Whereupon, People's Exhibits 21 and 21A for

17       identification now received and marked People's

18       Exhibits 21 and 21A in evidence.)

19            MS. McCORMICK:  Your Honor, I would ask that

20       the witness be permitted to step down and approach the

21       jury box and explain some points on the diagram.

22            (Whereupon, the witness steps down from the

23       witness stand.)

24   BY MS. McCORMICK;

25       Q    Trooper Whittall, this diagram could you just

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Whittall - Direct - McCormick

1    refer to the jury and point to the items reflected and

2    explain what each of these items are.

3         A      This is vehicle one, the limousine.

4              MS. McCORMICK:   Indicating for the record,

5         Judge, in the center of the diagram, the longer of the

6         two vehicles which is over a couple of, I want to call

7         them, oval-shaped markings on the roadway.

8         A      This is an area of gouges and scrapes, several of

9    them which are actually underneath the limousine, that

10   occurred from the impact of the two vehicles.

11             MS. McCORMICK:   Again, your Honor, referring

12        to those oval markings and some other lines just behind

13        the vehicle designated as the limousine in the diagram.

14        A      The vehicle on the left side of the roadway, or

15   the east side, is the pickup truck.

16        Q      Is that designated by any kind of a symbol, V1 or

17   V2?

18        A      I have V2 pointing at the vehicle.

19        Q      V1 is the limousine?

20        A      Yes.

21        Q      V2 is the pickup truck?

22        A      Yes.

23        Q      What else is in the diagram?

24        A      V3 is further down, south of Babylon Turnpike.

25   That is the third vehicle, the Nissan.

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Whittall - Direct - McCormick

1    Q    That Nissan is from the diagram, Trooper

2    Whittall, you were not at the scene; is that right?

3    A    Not that day.

4    Q    But from the diagram is vehicle three located

5    south of the Babylon Turnpike overpass?

6    A    Yes, it is.  And it is facing in a northbound

7    direction.

8    Q    So vehicle number three turned completely around

9    and appears to be facing northbound?

10    A    Yes.

11    Q    Is the Babylon Turnpike overpass reflected on

12    your diagram?

13    A    Yes.

14    Q    Could you just --

15    A    I have Babylon Turnpike overpass written and

16    arrows pointing at the two edges of the bridge; the north

17    edge and the south edge of the bridge.

18    Q    It is marked on the diagram, and the two edges of

19    the bridge are like a barber pole crossing the driveway

20    roadway?

21    A    Yes.

22          The headlight of vehicle one ended up under the

23    bridge, almost at the southern end of the bridge on the west

24    side of the roadway, just off of the edge of the roadway.

25    And the a headlight of vehicle two ended up on the east side

1    of the roadway.

2         Q    So vehicle one is the limousine?

3         A    That's correct.

4         Q    And by the headlight assembly you mean if you

5    look at it it would look like a headlight, but off the car?

6         A    Yes.

7         Q    That is actually found underneath the Babylon

8    Turnpike overpass at the southwest point of the Babylon

9    Turnpike overpass?

10        A    That's correct.

11        Q    And also, again, the headlight assembly of the

12   pickup truck is found in what is this area where you have it

13   noted on the diagram?

14        A    That would be the median, just at the edge of the

15   guide rail.

16        Q    It is actually off the roadway and onto the

17   center median?

18        A    Yes.

19        Q    Thank you, Trooper.  I have no further questions.

20             (Whereupon, the witness steps back into the

21        witness box.)

22   CROSS-EXAMINATION

23   BY MR. LaMAGNA:

24        Q    Good afternoon, again, Trooper.

25        A    Good afternoon, again.

1        Q     My name is Stephen LaMagna.  I'm going to ask you

2   a couple of questions relative to your duties with respect

3   to this case.  You said that you are a member of the

4   collision reconstruction unit; is that how it is called?

5        A     Yes.

6        Q     And that is since January of 2005?

7        A     I have been a member of the collision

8   reconstruction unit since November of 2004.  In January of

9   2005 I was assigned the full-time duties of collision

10  reconstruction unit.

11       Q     And the collision reconstruction unit for the New

12  York State Police conducts accident reconstruction for

13  accidents that occur on all of the state highways, correct?

14       A     On the state parkways in Nassau County and

15  Suffolk County.

16       Q     Not you, but New York State Police collision

17  reconstruction units, depending on what their geography

18  is --

19       A     We would do it wherever it would be requested,

20  whether it is roadways we patrol or whether other police

21  departments would request our assistance.

22       Q     So it would be not just for New York State

23  highways, it could be other highways that are not part of

24  the state jurisdiction?

25       A     That's correct.

1    Q    But certainly your responsibilities would be to

2    do the accident reconstruction on accidents that occur on

3    state highways, correct?

4    A    On Long Island they are state parkways.

5    Q    State parkways?

6    A    There are other state highways that the police do

7    not patrol.

8    Q    Let's talk about Long Island.  So the collision

9    reconstruction unit would be responsible for doing the

10    accident reconstruction of the accidents that occur on the

11    state parkways, correct?

12    A    Yes.

13    Q    And that's, in fact, why your unit did the

14    accident reconstruction on this matter, correct?

15    A    That's correct.

16    Q    This was the Meadowbrook State Parkway, correct?

17    A    That's correct.

18    Q    That falls within the New York State Police

19    jurisdiction, correct?

20    A    Correct.

21    Q    And it is your obligation jurisdictionally to

22    deal with state parkways, correct?

23    A    That's correct.

24    Q    And that accident reconstruction was done of this

25    accident scene, correct?

Tpr. Whittall - Cross - LaMagna

1      A      Correct.

2      Q      And you were part of that team that did the

3   accident reconstruction of this accident, correct?

4      A      Not on the initial response but, yes, after.

5      Q      At some point you did something with it, correct?

6      A      Correct.

7      Q      And the -- and you aided Sergeant Scott Crawford

8   and Trooper Chris Sweeney in their duties in the accident

9   reconstruction of this matter?

10     A      Yes.

11     Q      Now, you testified earlier that certain devices

12  were taken out of each car, correct?  The air bag control

13  module?

14     A      Yes.

15     Q      You also testified that with respect to each car

16  you had to, I believe, in the Silverado, you had to lift

17  back the seat of the -- why don't you tell us.

18     A      I had to pull the seat cushion out and the frame.

19     Q      It was underneath the front seat of the driver's

20  seat?

21     A      Yes.

22     Q      So it would be fair to say that you had to move

23  around some objects in the interior of the car to get to

24  these modules, correct?

25     A      Correct.

GIGI WRIGHT, RPR    (516) 571-2503

1    Q    And with respect to the limousine you had to pull

2    back the floor, plastic and the carpeting, to get underneath

3    to get to that module, correct?

4    A    Yes.

5    Q    And you also said that it was difficult for you

6    to state, with any degree of certainty or specificity with

7    respect to the seat belts and such, because troopers were in

8    and out of the car a lot, and a lot of --

9    A    Not a lot.  I didn't say "a lot."  I said that

10   there were other people that were involved in the

11   investigation, and I didn't know whether they had gone in

12   the vehicle to see if the seat belts were functioning before

13   I did.

14   Q    And my point is less about the seat belt, what my

15   point is is that when these cars were sitting in the lot

16   work was being done on them, correct?

17   A    No.

18   Q    You weren't doing an analysis of these two cars?

19   A    Are you asking me what I was doing or other

20   people were doing.

21   Q    I'm saying they were in the lot, correct, you did

22   some analysis on both cars?

23   A    Yes.  I was doing vehicle inspections.  I was

24   helping to assist weigh the vehicles and --

25   Q    Vehicles were being moved and placed on weights,

Tpr. Whittall - Cross - LaMagna

```
 1    correct?

 2         A    Yes.

 3         Q    And you were looking and doing your safety

 4    inspections of the cars, correct?

 5         A    Yes.

 6         Q    And you were looking into the brakes, correct?

 7         A    Uh huh.

 8         Q    The brake pads?

 9         A    Yes.

10         Q    All of these other aspects, correct?

11         A    Well, the module was removed on the 7th.

12         Q    I'm not talking about the modules.  I'm asking

13    you right now about your safety inspection.

14         A    Yes.

15         Q    My point is that you were working on these cars

16    to do a safety inspection, correct?

17         A    Yes.

18         Q    And you also did that with the limousine ,

19    correct?

20         A    Yes.

21         Q    Checked the brakes, checked the lights, checked

22    the tires?

23         A    Yes.

24         Q    Correct?

25         A    Yes.
```

Tpr. Whittall - Redirect - McCormick

1     Q     The battery you said was disconnected, correct?

2     A     Correct.

3     Q     So you were looking into the remains of the car,

4     the engine, and all of that stuff, correct?

5     A     That's correct.

6     Q     And you had to get into that to get to these

7     areas to determine whether or not you were able to make a

8     determination of whether something was working or wasn't

9     working, or if there was anything left of it to even make

10    that determination; is that correct?

11    A     That's correct.

12    Q     And the diagram that is now in evidence, that was

13    based upon the measurements taken by, was it Trooper Sweeney

14    or Scott Crawford?

15    A     The both of them worked on it together.

16    Q     Was there anybody else involved in that?

17    A     I don't know.

18          MR. LaMAGNA:  Nothing further, Judge.

19    REDIRECT EXAMINATION

20    BY MS. McCORMICK:

21    Q     Trooper Whittall, vehicles had to be moved in

22    order to get from the crash scene to the Farmingdale yard;

23    did they not?

24    A     Yes.

25    Q     And the work that you did on these vehicles was a

GIGI WRIGHT, RPR    (516) 571-2503

1    portion of it a visual inspection?

2         A    Yes.

3         Q    The removal of the SDMs, excuse me, the air bag

4    control modules, you described what you had to do in order

5    to accomplish that; is that correct?

6         A    Repeat that?

7         Q    In order to remove the air bag control modules,

8    you already described what you had to physically do to do

9    that.  You had to move the seat of the pickup truck; is that

10   right?

11        A    Yes.  We tried to do it in the least, you know,

12   way of doing things, but because of the damage to the

13   vehicle we had to remove that seat.

14        Q    But you didn't have to do anything like that to

15   the limousine to get the air bag control module out?

16        A    No.  I don't recall doing anything substantial

17   with pulling things and taking things apart to get the air

18   bag module out of the limousine.

19        Q    With respect to the impact damage, the front-end

20   damage on both of these vehicles, did you do anything in

21   terms of altering that damage or repairing that damage?

22        A    No.  I removed tires from the right side of the

23   vehicle, which was away from the area of the damage.

24        Q    And were they put back on?

25        A    Yes.

1     Q     So from an appearance standpoint, even the right

2     side appears the way it did when those vehicles were brought

3     in to the impound yard; is that correct?

4     A     That's correct.

5     Q     And the impact damage on the front of both of

6     these vehicles, has that remained intact?  Nothing was

7     disrupted from the time of the crash to bringing it to the

8     impound yard?

9     A     Other than the emergency services doing the

10    extrication of Mr. Rabinowitz, no.

11    Q     From the scene to the impound yard, from the time

12    it is in the impound yard has anyone altered the impact

13    damage of those vehicles?

14    A     Absolutely not.

15              MS. McCORMICK:  I have nothing further.

16              MR. LaMAGNA:  Nothing further.

17              THE COURT:  Thank you, Trooper.

18              (Whereupon, the witness exits the courtroom.)

19              THE COURT:  All right, ladies and gentlemen,

20    at this time we will break until 2 o'clock.

21              Don't talk about the case.  Don't make up

22    your mind until you have heard all of the evidence.  Do

23    not read or listen to any of the accounts of the case

24    in the event it is reported in the media.  Don't visit

25    or view the premises.  Don't allow anybody to talk to

Tpr. Whittall - Redirect - McCormick

1   you about the case. And if we run into you we can't

2   talk to you to avoid any appearance of impropriety.

3           Have a nice lunch. See you promptly at 2

4   o'clock.

5           THE CLERK: Remain seated until the Judge and

6   jury have exited the courtroom.

7           (Whereupon, the jury exited the courtroom,

8   and a luncheon recess held.)

9                       o0o

10          A F T E R N O O N   S E S S I O N

11                      o0o

12          (In open court. Defendant present.)

13          COURT OFFICER: Jury entering.

14          (Whereupon, the jury entered the courtroom,

15  and upon taking their respective seats, the following

16  occurred:)

17          THE CLERK: Case on trial, Indictment 1910N

18  of 2005. People versus Martin Heidgen.

19          People ready?

20          MR. HAYDEN: Ready, Your Honor.

21          THE CLERK: Defense ready?

22          MR. LaMAGNA: Defendant is ready, your Honor.

23          THE CLERK: Defendant is present and the

24  jurors are seated, your Honor.

25          THE COURT: Welcome back, ladies and

GIGI WRIGHT, RPR   (516) 571-2503

1        gentlemen.

2                People.

3                MR. HAYDEN:  Your Honor, the People are

4        offering medical records from the Nassau University

5        Medical Center marked 22A; medical records from

6        Winthrop University Hospital marked 22B; medical

7        records from Long Beach Medical Center, marked 22C; and

8        a final set of records from Long Beach Medical Center

9        marked 22D in evidence, as certified documents.  These

10       are medical records for Christopher Tangney.

11               THE COURT:  Any objection?

12               MR. LaMAGNA:  No objection.

13               THE COURT:  They are received.

14               (Whereupon, People's Exhibits 22A, B, C and D

15       for identification now received and marked in

16       evidence.)

17               MR. HAYDEN:  May I proceed, your Honor?

18               THE COURT:  Please.

19               MR. HAYDEN:  People call Dr. Alain Derzie.

20               COURT OFFICER:  Step up, remain standing,

21       raise your right hand and face the clerk.

22        A L A I N   D E R Z I E,        a witness

23               called on behalf of the People, having been

24               first duly sworn by the Clerk of the Court,

25               was examined and testified as follows:

1             THE CLERK:  You may put your hand down.

2             State your name, spelling your last name for

3        the record.

4             THE WITNESS:  Alain Derzie, A-L-A-I-N

5        D-E-R-Z-I-E.

6             THE CLERK:  Thank you.

7    DIRECT EXAMINATION

8    BY MR. HAYDEN:

9        Q    Good afternoon, Doctor.

10       A    Good afternoon.

11       Q    How old are you?

12       A    Thirty-eight.

13       Q    Are you a doctor licensed to practice medicine in

14   the State of New York?

15       A    Yes, I am.

16       Q    How many years have you been licensed to practice

17   medicine?

18       A    Approximately ten, twelve years.

19       Q    What kind of medicine do you practice?

20       A    General surgery.

21       Q    What does general surgery encompass?

22       A    Well, I cover the trauma service several times a

23   month at Winthrop Hospital.  I'm certified for advanced

24   trauma life support, cardiac life support.  But general

25   surgery is mostly all abdominal surgery, head, neck and

Dr. Derzie - Direct - Hayden

1    breast.

2         Q     Describe your educational background.

3         A     Spent four years at Cornell for undergraduate,

4    and then the State University of New York at Stony Brook for

5    medical school.  I spent a year doing research.  I did my

6    residency, which was five years, at Mt. Sinai Hospital in

7    New York.

8         Q     Describe your professional background.

9         A     Let's see, I'm board certified by the American

10   Board of Surgery.  I have, like I said, certification and do

11   advanced trauma life support; certification in advanced

12   cardiac life support.  Currently I'm in private practice in

13   Nassau County.  I'm affiliated with Winthrop Hospital.

14        Q     Were you affiliated with Winthrop Hospital in

15   July of 2005?

16        A     Yes, I was.

17        Q     Do you know a man named Christopher Tangney?

18        A     Yes, I do.

19        Q     Have you treated Christopher Tangney for injuries

20   suffered on the early morning of Saturday July 2nd of 2005?

21        A     Yes, I did.

22        Q     When did you first meet Christopher Tangney?

23        A     He was originally, after the accident, was sent

24   to another hospital.  At that hospital they felt that he

25   possibly suffered a cardiac injury that they were not able

1    to manage, so he was transferred to my service at Winthrop.
2    I was the trauma surgeon on call that day.

3              When he came to the hospital it became apparent
4    that he did not, in fact, have a cardiac injury; but that he
5    had lost a lot of blood during the accident.  He received
6    four units or four pints of blood in the trauma room.  The
7    trauma room is the area of the emergency room where the
8    trauma patients come in.  Four units is a lot.  Five units
9    is almost your whole blood volume.  He received four units
10   in the trauma room, because his blood pressure was extremely
11   low at the time.

12             And then we were able to get a CAT scan of his
13   chest, abdomen and pelvis.  When we got the CAT scan of the
14   abdomen and pelvis it was clear that he had a significant
15   amount of blood in his abdomen, that is probably where most
16   of the bleeding was coming from.  He was taken emergently to
17   the operating room, where he was found to have a lot of
18   multiple intra abdominal injuries, several liters of blood
19   in his abdomen, and he required another four units.  He had
20   a total of eight units of packed red blood cells or eight
21   pints of blood to keep him alive during that time.

22        Q    That was a life-threatening situation?

23        A    Absolutely, yes.

24        Q    What was done in the operating room?

25        A    He had, as I recall, four major injuries.  He had

Dr. Derzie - Direct - Hayden

```
 1    an injury to his liver that was bleeding, that was repaired;

 2    he had an injury to his small intestine, where the intestine

 3    basically ruptured, and he had a hole in the intestine that

 4    was repaired; he had two other vascular injuries, injuries

 5    to the blood vessels, one is to the mesentery, which is the

 6    blood supply to the intestine, and that was just freely

 7    bleeding; and he had an injury to an organ called the

 8    omentum, which is sort of a covering over the intestine, and

 9    one of the blood vessels there was lacerated or cut, and

10    that was bleeding as well.  And he had at least two

11    and-a-half liters of blood in his abdomen when we were

12    there.

13         Q     Did you examine Christopher Tangney at Winthrop?

14         A     Yes.

15         Q     He was x-rayed there?

16         A     Yes, he was.

17         Q     CAT scanned?

18         A     Yes.

19         Q     What do you mean by a CAT scan?

20         A     A CAT scan is computer axial tomography.  It is a

21    fancy type of x-ray that takes horizontal slices through

22    your body and gives you a very detailed picture of what is

23    going on on the inside, without doing anything invasive.  He

24    had plain x-rays as well.

25         Q     Describe any injuries to Christopher Tangney's
```

1    legs when he arrived at Winthrop.

2         A    He had a fracture of his femur, which is the big

3    bone in your upper leg right near your pelvis; and he also

4    had two fractures of his lower leg, tibia and fibula

5    fracture as well.

6         Q    How about his hip?

7         A    Well, the femur fracture is basically the hip.

8    That is part of the hip bone.

9         Q    Describe any treatment Christopher Tangney has

10   received for his leg injuries?

11        A    This is not treatment that I personally did.  But

12   other orthopedic services, a couple days after the surgery

13   that I had performed, once we had got him more stable,

14   because of all of the bleeding, and he had been on a

15   ventilator after the surgery, so approximately two days

16   after then the orthopedic service was able to take him back

17   to the operating room and they placed -- they did what it is

18   called an open reduction internal fixation.  So they

19   actually had to set the bone by placing metal screws and

20   plates to hold it in place.

21        Q    They rebuilt his legs?

22        A    Yes.

23             MR. HAYDEN:  Your Honor, may I please have

24        these x-rays which are marked 23A through 23E shown to

25        the witness, please.

1      A     Okay, I'm familiar with them.

2      Q     Do you recognize those?

3      A     Yes.

4      Q     Those are x-rays of Christopher Tangney's legs?

5      A     Yes.  And his pelvis.

6      Q     Those x-rays are fair and accurate

7   representations of damage to his legs?

8      A     Yes.

9      Q     Repair work to his legs?

10     A     Yes.

11           MR. HAYDEN:  People offer those in evidence,

12   your Honor.

13           THE COURT:  Show them to counsel.

14           MR. LaMAGNA:  Judge, again, I never received

15   these in discovery, but I have no objection.

16           THE COURT:  All right.  They are received.

17           (Whereupon, People's Exhibits 23A through 23E

18   for identification now received and marked People's

19   Exhibits 23A through 23E in evidence.)

20           COURT OFFICER:  People's Exhibits 23A through

21   E in evidence.

22           MR. HAYDEN:  Your Honor, with the Court's

23   permission may Dr. Derzie please step down by the light

24   box, and using the light box display the x-rays for the

25   jury, and using the x-rays describe the damage to

Dr. Derzie - Direct - Hayden

1      Christopher Tangney' legs and the repair work done to

2      put them back together again.

3                    THE COURT:  Yes.

4                    (Whereupon, the witness steps down into the

5      well of the courtroom.)

6      Q      Doctor, if you would just mention the number that

7      has been assigned to each of those x-rays when you are

8      displaying them?

9      A      Sure.  This is Exhibit 23E.  This is part of the

10     original when he came into the hospital.  And this x-ray was

11     taken when he first came into the emergency room in

12     Winthrop.  And part of the standard trauma x-rays that we do

13     to take a look at the pelvis.

14            This is the left side.  This the right side.

15     This is what a normal right hip or femur looks like.  Here

16     is the ball joint.  On this side you can see it is

17     fractured.

18                    THE COURT:  Doctor, these folks are also on

19            the jury.  I can't see, so I know they can't.

20                    THE WITNESS:  Is that better?

21                    THE COURT:  Yes, that's a lot better.

22     A      You can see there is a fracture.  By "fracture" I

23     mean a complete break, straight across the femur.  Right

24     there.

25            Okay this x-ray was actually taken in the

1    operating room by the orthopedic surgeon at the time that

2    they repaired that fracture, and they repaired it with, it

3    is a type -- this really dark area is metal -- and that is a

4    type of screw that is screwed across the ball joint that was

5    broken in half to hold it together.  The number on that was

6    23A.

7                 These are pictures that were done after repair of

8    his right leg.  This is your tibia and your fibula.  This is

9    a side view, so you could see the foot sort of pointing to

10   the left.  And this dark metal thing is a rod that was

11   placed.  You can see screws that went across.  So the rod

12   goes across the fracture to stabilize the fracture.  The

13   side view is 23C, and 23B for the front view.

14                Okay the last picture I have here, this was also

15   after the repair, this shows you the whole tibia, fibula

16   with a break here and a break there.  The fibula is front

17   weight-bearing.  You don't need to fix that.  You could see

18   how the rod goes from the knee all the way down to the foot.

19   And that is Exhibit 23D.  Those are all of them.

20        Q     Please retake the witness stand, Doctor.

21                (Whereupon, the witness steps back into the

22        the witness box.)

23        Q     Doctor, do you have any involvement in

24   Christopher Tangney's orthopedic care?

25        A     No, I do not.

GIGI WRIGHT, RPR    (516) 571-2503

Dr. Derzie - Direct - Hayden

1     Q     Are you able to give a prognosis for him?

2     A     I am not.

3           MR. HAYDEN:  Nothing further, your Honor.

4     Thank you.

5           MR. LaMAGNA:  Nothing, Judge.

6           THE COURT:  Thank you, Doctor.  You are

7     excused.

8           (Whereupon, the witness exits the courtroom.)

9           THE COURT:  Next witness.

10          MS. McCORMICK:  Your Honor, the next witness

11    involves -- we need a break.

12          THE COURT:  I am going to give the jury a

13    ten-minute break.  Please don't talk about the case.

14          (Whereupon, the jury exited the courtroom,

15    and a brief recess was held.)

16          THE COURT:  Bring in the jury.

17          COURT OFFICER:  Jury entering.

18          (Whereupon, the jury entered the courtroom,

19    and upon taking their respective seats, the following

20    occurred:)

21          THE CLERK:  Case on trial, Indictment 1910N

22    of 2005, People versus Martin Heidgen.

23          People ready?

24          MR. HAYDEN:  People ready.

25          THE CLERK:  Defendant ready?

GIGI WRIGHT, RPR    (516) 571-2503

1              MR. LaMAGNA:  Defendant is ready.

2              THE CLERK:  Defendant is present.  The jury

3         is present.

4              THE COURT:  Call your next witness.

5              MS. McCORMICK:  Your Honor, the People call

6         Investigator Chris Sweeney.

7              COURT OFFICER:  Step up.  Remain standing,

8         face the clerk and raise your right hand.

9              C H R I S T O P H E R   S W E E N E Y,

10             a witness called on behalf of the People,

11             having been first duly sworn by the Clerk of

12             the Court, was examined and testified as

13             follows:

14             THE CLERK:  You can put your hand down.

15        State your name, shield and command for the record.

16             THE WITNESS:  Christopher Sweeney.

17             THE CLERK:  Spell the last name.

18             THE WITNESS:  S-W-E-E-N-E-Y.

19             THE CLERK:  Your shield and command.

20             THE WITNESS:  Yes.  Shield 2002, my command

21        is New York State Police, Farmingdale.

22             THE CLERK:  Thank you, take a seat.

23   DIRECT EXAMINATION

24   BY MS. McCORMICK:

25        Q    Good afternoon, Investigator.

Inv. Sweeney - Direct - McCormick

1    A    Good afternoon.

2    Q    Investigator Sweeney, can you tell the jury,

3    please, how long have you been employed by the New York

4    State Police?

5    A    Been employed by the New York State Police since

6    October of '96.

7    Q    Can you describe for the jury, please, what your

8    duties are at Farmingdale?

9    A    My current title is the Troop L evidence

10   custodian.  I'm also a member of the FIU, Forensic

11   Identification Unit, as a Crime Scene technician and; also,

12   a member of the CRU, Collision Reconstruction Unit.

13   Q    Now, Investigator Sweeney, were you working on

14   the date of July 2nd 2005?

15   A    No, I was not.

16   Q    Did you become involved in the investigation of a

17   crash that occurred at about 2 o'clock in the morning on the

18   southbound Meadowbrook Parkway in the area of Babylon

19   Turnpike?

20   A    Yes, I did.

21   Q    Can you tell the jury how you became involved in

22   the investigation of that crash?

23   A    I was contacted at my residence from S.P.

24   Farmingdale communications, which is in our headquarters,

25   advising me as a member of the FIU and CIU, to respond to a

Inv. Sweeney - Direct - McCormick

1     scene of a double fatality located on the Meadowbrook

2     Parkway southbound, in the vicinity of M7, or Babylon

3     Turnpike.

4          Q     Investigator Sweeney, could you describe for the

5     jury, please, about what time did you arrive at that scene?

6          A     I believe -- I received the call at approximately

7     2:15, and I probably arrived on the scene approximately

8     2:45, 2:50, somewhere around there.

9          Q     Can you describe for the jury what was your role

10    at the scene?  What did you do?

11         A     My initial role on the scene was to document the

12    scene as initially observed using photography.  And I was

13    also there to assist the primary reconstructionist with

14    mapping the scene to create a scale diagram using the total

15    station.

16         Q     When you say, "the primary reconstructionist,"

17    what was your role?  What were you designated as if there

18    was a primary?

19         A     We try to send two reconstructionists to each

20    fatal scene:  one would be designated as the primary,

21    meaning he'll be doing the actual report; I'll be there as a

22    secondary, to assist with the investigation, taking the

23    measurements and whatever else he might need.  He will do

24    the actual report as the primary.

25         Q     Did you assist the primary reconstructionist at

1    that scene?

2         A    Yes, I did.

3         Q    How did you do that?  What did you do to assist?

4         A    As far as the reconstruction I assisted, I shot

5    the scene using the electronic total work station.

6         Q    Can you describe for the jury what is an

7    electronic total work station?

8         A    Quick example would be, of an electronic total

9    work station is, surveying instruments.  It is like what you

10   see people use to plot lots of land.  Basically it consists

11   of the work station head, which is on a tripod, which is

12   where I would shoot from; and the other individual would be

13   holding a metal prism pole which has a mirror.

14              What happens is from ahead it shoots a

15   monochromatic light out to the prism pole, which he has

16   placed on a point which he would like measured and plotted

17   for a diagram.  The light reflects off and takes three "T"

18   measurements, horizontal and vertical angles, and stores

19   that on the card for a total.

20        Q    Before you do the total measurements do you do a

21   visual survey of the scene?

22        A    Yes, ma'am.

23        Q    Did you do that in this instance?

24        A    Yes, I did, ma'am.

25        Q    What did you observe?  If you would please

Inv. Sweeney - Direct - McCormick

1    describe the crash scene as you observed it when you

2    arrived.

3        A    When I first arrived there were still numerous

4    State Police personnel, Nassau County Police Department,

5    Freeport P.D.  There was numerous police departments.

6    Nassau County ambulances and volunteer fire departments,

7    emergency workers still on the scene.  When I first got

8    there they were still removing some of the last injured

9    victims.

10            And then I was first approached by one of the

11   State Police supervisors, who gave me a brief synopsis, a

12   quick synopsis, of what happened and what information he had

13   at that time.  And then at that point I started to do my

14   walk around or walk through of the scene.

15       Q    Did you observe damage to the vehicles that were

16   located at that scene?

17       A    Yes, ma'am.

18       Q    Would you please describe that damage for the

19   jury?

20       A    We had three cars on the scene: we had the

21   limousine, pickup truck and there was also a third car

22   located south of Babylon Turnpike.

23            There was extensive damage to the front end of

24   both the limousine and the pickup truck.  Both of them on --

25   with the extensive damage on each vehicle concentrated on

 1    the driver's side front of both of them.

 2              The third vehicle, which was located south of

 3    Babylon Turnpike, had minor, what appeared to be a glancing

 4    strike to the rear.   I believe it was the rear driver's

 5    side, rear wheel well.   The main focus, or the most damage,

 6    was obviously on the limousine and pickup truck.

 7         Q    Were there headlight assemblies that had been

 8    removed -- wrong word -- from the vehicles at the location?

 9         A    Yes, ma'am.

10         Q    Did you observe them?

11         A    Yes, ma'am.

12         Q    Could you tell the jury where they were located,

13    please?

14         A    We documented one headlight assembly, which

15    appeared to be from the Chevy pickup truck, that was located

16    just north and in the center, grassy, center median, which

17    is located just north of Babylon Turnpike and just north of

18    the final rest position.   And then the second headlight is

19    actually located south of the scene, and should be reflected

20    on the diagram, it is south of the scene, just on the south

21    corner of the overpass for Babylon Turnpike.

22         Q    Looking --

23         A    As you're going south it would be on your

24    right-hand side.

25         Q    When you were looking for -- when you are doing a

GIGI WRIGHT, RPR   (516) 571-2503

1    visual inspection of the scene what is it that you are

2    specifically looking for?

3        A    We are looking at the scene to try and collect as

4    much physical evidence as we can from the scene, whether it

5    be tire marks; gouge marks; vehicle parts; debris; fluid

6    splatter patterns; in the event of possible ejections, the

7    path a victim may have taken.  We would be looking for torn

8    clothing.  Whatever physical evidence we can find on the

9    scene to help explain what happened, what took place.

10       Q    When you are talking about debris, those

11   headlight assemblies would be a piece of debris from the

12   crash?

13       A    Correct.

14       Q    When you arrived at the crash scene,

15   Investigator, what was the roadway condition; wet or dry?

16       A    When I arrived it was just starting to get a

17   light mist.

18       Q    Did you have any information as to what the

19   roadway condition was at the time of the accident?

20       A    At the time of the crash I was told it was still

21   dry.

22       Q    I'm going to ask to have the witness take a look

23   at People's Exhibit 12A in evidence.

24            Investigator Sweeney, do you recognize that?

25       A    Yes, ma'am.

Inv. Sweeney - Direct - McCormick

1    Q    What do you recognize that to be?

2    A    This is the third vehicle involved.

3    Q    What about the roadway condition can you tell the

4    jury basing on that photograph?

5    A    Like I said, this is showing where underneath the

6    vehicle is showing dry pavement.  This is at its final rest

7    position.  This hasn't been moved since the time of the

8    accident.  It shows I have a dry pavement underneath, but

9    there is light mist around, it is wet around the vehicle.

10   It is consistent with the condition at the time I arrived.

11   Q    The fact that the roadway is dry underneath this

12   vehicle that was not moved from the time it came to rest

13   after the crash, does that confirm that the roadway was dry

14   at the time of the crash for you?

15   A    It would, yes.

16   Q    Now, Investigator Sweeney, as you are examining

17   the roadway what else are you looking for besides debris?

18   A    To see if there are any sort of tire marks, gouge

19   marks, scrape marks, anything that would give me a

20   definitive explanation or clearer explanation of the path of

21   the vehicles, both into the accident scene, and as they

22   depart or post-impact travel.

23   Q    Can you define for the jury, please, what are the

24   various kinds of tire marks you might be looking for?

25   A    I would be looking for skid marks.  There is

1    regular standard skid marks and there is ABS. Where the

2    standard is a solid black line that you see when someone

3    looks at them in cars without ABS. They leave that dark

4    black solid line. ABS is called an ABS scuff, whereas the

5    brakes come on and off, and instead of seeing one solid

6    black line you'll see a little here and you will see the

7    actual spacing that results from the ABS.

8              Your marks will show where the vehicle lost

9    control sideways, you will see striations, angular lines in

10   the black tire mark to show the tire is still going. That

11   is probably the most common ones you'll see.

12        Q    Did you do an examination of this roadway on July

13   2nd 2005 for any evidence of tire marks relating to this

14   crash?

15        A    Yes, ma'am, I did.

16        Q    Specifically, Investigator Sweeney, with respect

17   to the pickup truck, did you do an examination of the

18   roadway looking for any evidence of either skid marks or

19   anti-lock brake scuff marks?

20        A    Yes, I did.

21        Q    Did you observe any tire marks relating to the

22   pickup truck as it entered the crash scene?

23        A    No, I did not see any tire marks prior to impact

24   or prior to the area of impact, and or post-impact.

25        Q    Did you see any tire marks relating to the

1    limousine?

2         A    No.

3         Q    From the roadway evidence -- let me withdraw
4    that.

5              Did you observe any other kind of markings in the
6    road that you would consider to be roadway evidence in
7    relation to this crash?

8         A    Yes.  There were scrape marks in the roadway
9    between lanes two and three, which would be as you are
10   heading south, left and center lane.  We call them two and
11   three.  There were obvious scrape marks which were
12   indicative of the area of impact.  I can't say it is the
13   exact point.  It would be considered the area of impact
14   where the vehicles have moved together pressing down in, and
15   items on either vehicle that are hanging down or being
16   compressed down will now gouge or scrape the roadway.  It is
17   one way of trying to determine what is your possible area of
18   impact in a collision such as this.

19        Q    Investigator Sweeney, I'm going to ask you, with
20   the Court's permission, to step down from the witness stand
21   and take a look at a very large People's Exhibit 21 in
22   evidence.  Can you take a step down.

23             This diagram that was created from the
24   measurements that you and Sergeant Crawford took at the
25   scene that night; is that correct?

 1        A        That is correct.

 2        Q        Can you indicate for the jury, please, where the

 3    scraping marks are that you are referring to as the area of

 4    impact?

 5        A        First indication, these marks here.

 6                 MS. McCORMICK:  Indicating for the record,

 7            Judge, toward the rear of vehicle one designated,

 8            actually underneath vehicle one as well.  Kidney

 9            shaped.

10        A        There were circular where there would have been

11    patches of scrape marks, instead of doing ten straight

12    lines, because some were close together.  The circle marks

13    underneath the vehicle also indicate areas of scrape marks

14    and/or gouging.

15        Q        I note from the diagram that there are some large

16    oval type marks, and then you have to the rear of vehicle

17    one there are a couple of small almost dash lines.  Is that

18    an accurate description?

19        A        Yes, ma'am.

20        Q        Can you describe for the jury what the difference

21    is between those two sets of markings as you reflected on

22    the diagram?

23        A        These first, the first ones behind the vehicle

24    would probably be more indicative of your area of impact.

25    These here are going to be more of a result of post-impact

1    travel of the vehicle.  In other words, those first marks

2    are probably, most likely, created on the roadway as a

3    result of the collision, the two vehicles' momentum forcing

4    them down, and the metal on pavement scrapings from one or

5    both vehicles entering the scene.  And then you have

6    post-impact, leaving the scene, scrape marks also, which are

7    indicated by these circles.

8         Q    Now, Investigator Sweeney, you told the jury that

9    this indicates an area of impact, not necessarily the point

10   of impact, but an area of impact; is that correct?

11        A    That is correct.

12        Q    That's because the damage will then dig down into

13   the roadway?

14        A    Yes, ma'am.

15        Q    Is it possible for the actual point of impact to

16   be at some point past, meaning further south from the first

17   gouge marks into the roadway?

18        A    It is possible.  That is why I will claim it is

19   an area of impact.  I cannot give you an exact point.  It is

20   very tough to find an exact point where I could say, unless

21   it is a real obvious gouge, in other words, I could look at

22   the bottom of the car and say this piece of the frame

23   obviously created this based on the dimensions of this gouge

24   matched very clearly to the piece of metal.  In a case like

25   this I didn't have that.  So I would only say it is an area

Inv. Sweeney - Direct - McCormick

1    of impact, because there is nothing definitive.

2        Q    North is indicated this way; is that correct?

3        A    Yes, ma'am.

4        Q    So the impact can occur before the damage or

5    could the impact have been further south in the roadway?  Do

6    you follow me?

7        A    I'm not sure I understand the question.

8        Q    Let me rephrase it.

9             There is damage located, the first point of

10   damage or gouging, is indicated by the first of these arrows

11   behind the limousine, be it the line in the diagram?

12       A    Vehicle one in the diagram, yes.

13       Q    Since that is damage to the roadway, could the

14   impact have occurred further down from the damage or further

15   before the damage, which is the area that you can't tell

16   because --

17       A    It could have occurred either way.  There is a

18   possibility it could have occurred a couple feet in either

19   direction.  That is why I am going to say it is an area.  I

20   don't have definitives to say this is where it happened.

21   That is just the first visible physical evidence on the

22   roadway that I saw.

23       Q    You can't say what specifically about either

24   vehicle caused the markings that you observed in the roadway

25   on that night?

1      A      No, ma'am.

2      Q      You can retake the witness stand.  Thank you,

3  Investigator.

4             Investigator Sweeney, in terms of roadway

5  evidence did you observe any roadway evidence that from

6  which you could determine the approach angles of these two

7  vehicles?

8      A      Based strictly on roadway evidence?

9      Q      Yes.

10     A      No, ma'am.

11     Q      Now, could you define for the jury what "approach

12  angles" mean?

13     A      Approach angles and departure angles are going to

14  be used in reconstruction formula, momentum formula, to try

15  to determine speed in a collision.  They are usually going

16  to be based off of the scale diagram that is taken from the

17  scene.

18     Q      But there is nothing in the roadway that would

19  have indicated a specific, I don't know, 30-degree angle,

20  20-degree angle of an impact as they came together?

21     A      Not that I observed, no.

22     Q      Anything in the roadway that would have, again,

23  indicated a ten-degree, 90-degree angle, as they came apart?

24     A      Nothing definitive, no.

25     Q      Investigator Sweeney, the photograph that I have

Inv. Sweeney - Direct - McCormick

1    showed you of the third vehicle, People's Exhibit 12 in

2    evidence, did you take that photograph?

3         A    Yes, ma'am.

4         Q    Did you take the majority of the photographs at

5    that crash scene that night?

6         A    Yes, ma'am.

7         Q    Did you take them all?

8         A    As far as the State Police photos, I took all of

9    the photos on that scene.

10        Q    Was that part of your responsibilities at that

11   scene?

12        A    That's my responsibility as a crime scene

13   technician to document the scene with photographs.

14        Q    Who makes the decision as to what gets

15   photographed?

16        A    Combination.  I'm looking for the evidence.  I

17   need to take overalls.  I want to take the scene as it is

18   first observed.  I take overalls, and while I'm taking my

19   overalls I'm also making mental notes and discussing with

20   the lead investigator handing the case, or in this case the

21   reconstructionist, if they have specific points that they

22   want documented with photos.  I'll also take them along with

23   overalls of the scenes, vehicles and roadway evidence.

24        Q    You said you took photographs of the scene as it

25   appeared when you first got there?

1      A      Yes, ma'am.

2      Q      When you first got there could you tell the jury

3   what was the status of the extrication of people from those

4   vehicles?

5      A      When I first got there, I pulled up, and I

6   believe they were wheeling the last of the injured into the

7   ambulance.  I think -- that was the last thing I observed

8   was one person, one female, being wheeled into the back of

9   the ambulance.  That is when I was approached by the

10   sergeant and started talking to him about what was going and

11   and what he had so far, and started taking my notes and

12   doing my walk through.

13      Q      By this time the side of the limousine had been

14   cut open by emergency workers?

15      A      Yes, ma'am.  When I started my walk through all

16   injured had been removed from both vehicles.

17      Q      The defendant was out of his vehicle and gone

18   from the scene at that point?

19      A      Yes, ma'am.

20      Q      What about Mr. Rabinowitz; was Mr. Rabinowitz

21   still on the scene?

22      A      Yes, ma'am.

23      Q      So you are the person who took the photographs of

24   the damage to his driver's compartment?

25      A      That's correct.

1        Q      And at the time that you took those photographs

2    that driver's compartment had been unaltered by emergency

3    attempts to extricate Mr. Rabinowitz's body?

4        A      Correct.

5        Q      Likewise, you took the photographs from inside

6    the limousine compartment of Mr. Rabinowitz and Katie Flynn,

7    her remains in that limousine?

8        A      Yes, ma'am.

9        Q      Katie was underneath a sheet in that photograph?

10       A      That's correct.

11       Q      Could you describe for the jury, please, the

12   manner in which you took photographs?  How did you do it?

13       A      I took both digital and 35.  I have both cameras.

14   As I was going through the scene I would shoot a photo

15   digitally, and then I took a 35 also, just in case one or

16   the other didn't come out.  I wanted to make sure the scene

17   was documented.  That's pretty much it.

18              As I walked through the scene, doing my walk

19   through, whatever I took a picture of digitally, I took one

20   35 millimeter.

21       Q      They would be very similar to one another?

22       A      They should be, yes.

23       Q      Did there come a time when you were going to

24   measure the scene with Sergeant Crawford to depict

25   everything that you saw there?

1       A      Yes, there was.

2       Q      And you already indicated that you used a total
3    station; is that right?

4       A      I did.

5       Q      Once again, who made the decision as to what
6    points should be measured for the collection of the
7    distances?

8       A      It would be a combination, but Sergeant Crawford
9    was holding the prism poll.  I was shooting to the points he
10   was marking.

11      Q      Could you give examples of what you mean by the
12   points he is marking?

13      A      I guess like the diagram shows, he'll walk along
14   like the fog line, the edge of the roadway, each line and
15   he'll give me a point at one end on both ends.  The road
16   around the cars, we'll take five points around each car to
17   give an outline of what we consider the final rest point of
18   that cars.  And, again, with the debris, same thing; you
19   pick points in those debris fields, and he stands with the
20   prism pole.  I shoot the measurement and it is stored on a
21   card and gets downloaded.

22      Q      It gets downloaded on a computer and converted to
23   a diagram?

24      A      Correct.

25      Q      Did there come a time, Investigator Sweeney, when

1    you left that crash scene?

2         A    Yes, ma'am.

3         Q    About how long were you on the scene performing

4    your duties?

5         A    Probably cleared there a little, just before, 9

6    o'clock.

7         Q    I think that you said your primary responsibility

8    at Farmingdale is to be the evidence --

9         A    Evidence custodian is the title.

10        Q    Evidence custodian.

11             Was any evidence taken into custody from the

12   scene of this crash?

13        A    The only direct evidence that I observed was the

14   two vehicles.  I ensured that prior to leaving the scene

15   that we had collected all of the visible pieces that we

16   could find for each of the respective vehicles, and put them

17   in the respective vehicles; observed them hooking up the

18   tows and then make sure that I had a marked patrol unit

19   escort the tows back to the Farmingdale barracks where we

20   secured the two vehicles.

21        Q    Have those vehicles remained secured at the

22   Farmingdale barracks since the time of July 2nd 2005?

23        A    Yes, they have.

24        Q    Has there been any alterations to the vehicles in

25   terms of the impact damage to the front of both of those

1    vehicles since that time?

2        A    Since the time of the accident?

3        Q    Yes.

4        A    Obviously there was extrication done.

5        Q    Actually, since the time that you removed the

6    vehicles from the scene and brought them back to

7    Farmingdale.

8        A    From the scene, no.

9        Q    There had been things done to the vehicles for

10   extrication?

11       A    Yes.  On the scene they did an extrication.

12   Actually, I'll stand corrected, we did remove the seat to

13   secure an SDM and we did secure lamp bulbs, brake light

14   lamps from the pickup truck so, yes, they have been.  In

15   that respect that is the only other things done to them that

16   I can recall.

17       Q    Were you a part of the removal of what you just

18   referred to as SDMs?

19       A    Yes, ma'am, I was.

20       Q    Do you recall what day that was?

21       A    The SDMs were July 7th.

22       Q    And SDMs in this context are also known as air

23   bag control modules?

24       A    Safety data module.  Depending on the

25   manufacturer, it will change initials, SDM, CDR.

Inv. Sweeney - Direct - McCormick

1   Q      What you are referring to is what took place in

2   terms of alterations that took place within the driver's

3   compartment of both of the vehicles?

4   A      That's correct.

5   Q      And in the pickup truck what had to be done?

6   A      In the pickup truck I had to actually,

7   physically, remove the bottom of the seat part of the

8   driver's side front seat, because it is located underneath

9   there.  So we actually moved the seat cushion of that to get

10  it, to access the SDM in the pickup truck.

11         But the limousine it is located on the center

12  tunnel.  We only had to remove some carpeting and padding to

13  access the module and remove that.

14  Q      Investigator Sweeney -- withdrawn.

15         Did you have occasion to learn the weights of the

16  two vehicles that you took into custody as the evidence

17  custodian?

18  A      Yes, ma'am.

19  Q      Do you know what the weights are of those

20  vehicles?

21  A      I believe there was an e-mail sent by Trooper

22  George Tension, he is with the truck unit.  He weighed them

23  with the portable scales.

24  Q      Is there something that would refresh your

25  recollection?

1     A      If you have a copy of that e-mail it would be

2     great, so I don't misquote the weight.  I have a ball park.

3     I don't want to misquote it.

4     Q      Yes.

5     A      Thank you.  Yes, ma'am.

6     Q      Can you tell the jury, please, what was the

7     weight of the limousine?

8     A      Weight of the limousine is 5,450 pounds.

9     Q  .   That was empty, no passengers, in the condition

10    it came back from the crash; is that correct?

11    A      No passengers, yes.  But all of the debris or

12    whatever contents of the vehicle were still inside.

13    Q      And what about the pickup truck?

14    A      Weight of the pickup truck was 4,200 pounds.

15    Q      Thank you, Investigator.  When you left the crash

16    scene you had said you had been there until 9 in the

17    morning?

18    A      That's correct.

19    Q      The vehicles were on their way to Farmingdale?

20    A      Correct.

21    Q      Where did you go?

22    A      Myself and Sergeant Crawford responded to the

23    Nassau County Medical Examiner's Office.

24    Q      What was the purpose of that visit?

25    A      We were going to the M.E.'s office to look at the

1    victims, to check injury patterns, to possibly compare to

2    occupant kinematics.

3        Q    What do you mean by occupant kinematics?

4        A    In other words, what happens to you in the car;

5    what physically happens to your body in the car we can

6    determine path of people inside of vehicles, a lot of times

7    based on the injury patterns as a result of the crash.

8        Q    Were you able to determine with any degree of

9    certainty the mechanism of injury for Katie Flynn?

10       A    No, ma'am.

11       Q    Did you have occasion, Investigator Sweeney, to

12   review the interior of the limousine?

13       A    Yes, ma'am.

14       Q    When did that occur?

15       A    While I was removing the victim from the rear of

16   the limo I made a note of the seat that I was advised she

17   was on, which was the bench seat along the driver's side of

18   the vehicle.  I did make a physical note on that bench seat

19   are two lap belts, one was in the locked position, the one

20   to the rear of the vehicle was in the locked position; the

21   one to the front of the vehicle was in the unlocked

22   position.

23            We did make a cursory search on the scene while I

24   was in the vehicle to see if there was any indications

25   within the interior, or what may have been the mechanism of

Inv. Sweeney - Direct - McCormick

1    injury to the victim.  I was unable to find anything

2    definitive inside of the passenger compartment that may have

3    caused or may have been the mechanism of the injury.

4        Q    Investigator Sweeney --

5             MS. McCORMICK:  Once again, your Honor, with

6        your permission, I ask that the investigator be allowed

7        to step down and approach the easel.

8             THE COURT:  Yes.

9        Q    I ask you to step down and take a look at

10   People's Exhibit 13 in evidence.

11            (Witness complies.)

12       Q    Do you recognize that, Investigator?

13       A    It is the first time I'm seeing it.

14       Q    Do you recognize it?

15       A    It looks like --

16            MR. LaMAGNA:  Objection.

17            THE COURT:  I'll take a yes or no:  Do you

18       recognize it or not?

19            THE WITNESS:  No.

20       Q    From the diagram itself, do you recognize what

21   this diagram represents?

22       A    Yes.

23            MR. LaMAGNA:  Objection.  He hasn't seen it.

24            THE COURT:  Let me see it, please.  It is in

25       evidence.  That's okay.  He can refer to it.

1    Q    Okay, do you recognize what this represents?

2    A    I do.

3    Q    What does it represent?

4    A    It appears to be the interior of the limousine.

5    Q    Just a basic layout?

6    A    Yes.

7    Q    I'm going to hand you a red marker, Investigator

8    Sweeney.  Could you put an "X" where you observed the closed

9    seat belt as you made an examination of the interior of this

10   limousine?

11   A    The closed one?

12   Q    The closed one.  The one that was buckled.

13   A    The buckled one was in this location.

14        (Witness indicating.)

15   A    And with that simulating the buckle.

16   Q    Thank you, Investigator.  You can retake the

17   stand.

18        Investigator Sweeney, what is the next thing that

19   you recall doing in relationship to this case in terms of

20   the investigation?

21   A    From the scene I went to the M.E.'s Office, came

22   back to work on the 5th.

23   Q    Did you do anything on July 5th relating to this

24   crash?

25   A    The next thing I did on July 5th, I was advised

1    by the case investigator, Investigator Harris, that the

2    limousine may contain a dash mounted or a dash camera or

3    video camera, and he asked me to check the limo, and if

4    there was one to secure the camera, which is what I did that

5    day.

6         Q    How did you actually secure the camera?  What did

7    you do have to do?

8         A    I physically went out.  I located it.  It was up

9    underneath the crushed windshield.  I was able to get it.  I

10   took photos of it, after I took it off the windshield, took

11   photos of it in its wired position to the vehicle.  And then

12   cut the wires and secured it as a piece of evidence.

13        Q    What basically became of the drive cam unit, the

14   video unit?  Where did you take it?

15        A    I called Investigator Harris and advised him I

16   secured it.  He told me that the manager, Ray Townsend at

17   U.S. Limo, had the capability to download the information.

18   So I called Mr. Townsend and I made arrangements to report

19   to U.S. Limo with the actual camera that I had secured, and

20   I went there that afternoon and we did a download of the

21   information that was on that camera.

22        Q    That was on the 5th?

23        A    Yes.

24        Q    Physically downloaded, you mean into the

25   computer?

Inv. Sweeney - Direct - McCormick

1       A       Correct.

2       Q       And then what became of the data that was
3    downloaded?

4       A       It goes into their system, that's in their
5    memory, or whatever.

6       Q       Did you obtain a copy?

7       A       Yes, I did.  I -- we -- when I went there I met
8    Mr. Townsend, Mr. Townsend said he can't do a download, but
9    he has his mechanic that will do the download for me.  We
10   went to the garage.  They have a regular hookup, like a USB
11   cable, took the camera, put the cable into the back of the
12   camera, it downloads, but it downloads to the computer in
13   the office.  We then unhooked the camera, went back to the
14   office, and Mr. Townsend asked everybody in the office to
15   please leave so that they would not have to observe the
16   contents, and he proceeded to take the download and burn
17   three copies to a disk, or a CD, for me from the information
18   that was taken out of the camera.

19      Q       And what became of the three disks?

20      A       I secured the three disks, along with the camera.
21   One copy was maintained with me at Trooper headquarters in
22.  my file; and gave the case investigator, Investigator
23   Harris, two copies, one for himself and one for the D.A's
24   Office.

25      Q       What became of the camera?

GIGI WRIGHT, RPR   (516) 571-2503

1          A       It was secured in my vault at S.P. Farmingdale at

2    Republic Airport.

3          Q       Had that camera been taken out of the vault at

4    S.P. Farmingdale?

5          A       Yes, it did.

6          Q       For what purpose?

7          A       It was forwarded up to our film or video section

8    in our academy in Albany.  Somebody wanted to -- they were

9    trying to enhance the quality for still photos and/or for

10   furthering the investigation.  They were trying to see if

11   they could get better clarity on the video for parts of the

12   reconstruction and for still photos.

13         Q       Where is that camera now as we speak?

14         A       Camera has since been returned, and it is again

15   secured in my vault at S.P. Farmingdale.

16         Q       Also on July 5th, I think, Investigator Sweeney,

17   did you do anything with respect to the execution of a

18   warrant?

19         A       Yes, ma'am.  In the afternoon on the 5th I was

20   contacted by Senior Investigator Steven Lauder out of S.P.

21   Valley Stream, he was requesting that FIU, Forensic

22   Identification Unit, assist in the execution of a search

23   warrant at 14 Oceanview Avenue, Valley Stream.

24         Q       Do you know what that location is?

25         A       It was described to me it was the residence of

1    the operator of the pickup involved in the collision.

2         Q    Can you describe how it is that you executed the

3    warrant, and what you actually did, what you observed?

4         A    I went there as a member of the FIU unit, again

5    similar to the collision scene I was there to document the

6    residence, the location, with photographs, prior to the

7    search, and then any items of evidence that we secured as a

8    result of the search warrant, prior to securing them I would

9    photograph each item and then package them and seal the

10   packages and to return the evidence.

11        Q    You are the person who took those photographs

12   again, Investigator Sweeney?

13        A    Yes, ma'am.

14        Q    I ask to approach you with what has been

15   previously marked as People's Exhibit number 24 in evidence.

16             MS. McCORMICK:   I would ask that two

17        additional photographs be marked as 24A and B.

18             (Whereupon, two photographs received and

19        marked People's Exhibits 24A and 24B for

20        identification.)

21             COURT OFFICER:   People's Exhibits 24A and B

22        marked for identification.

23        Q    Before I ask you to identify those photographs,

24   Investigator, could you describe the location that you went

25   into?  Was it a single-family home?

GIGI WRIGHT, RPR   (516) 571-2503

1         A     Single-family, two-story home.

2         Q     How --

3         A     Small apartment in the back.

4         Q     How did you enter the building?

5         A     I entered the building through the back where the

6     apartment was located.  We were told that was the residence

7     of the operator.

8         Q     Did that residence appear to be occupied?

9.        A     Yes, ma'am.

10        Q     What did you observe within the area of that

11    apartment?

12        A     In the apartment there was a small bathroom,

13    closet, small kitchenette, TV, dresser, it was a very small,

14    like, one bedroom.

15        Q     Did you make any observations with respect to

16    bottles that were contained on the top of the refrigerator

17    in that apartment?

18        A     We did secure some alcohol bottles that were

19    located on --

20              MR. LaMAGNA:  Objection.

21        A     -- the top of the refrigerator.

22              THE COURT:  Overruled.

23        Q     I ask you at this time, Investigator Sweeney, to

24    take a look at the photograph that is marked just as 24.

25    Take a look at that.

Inv. Sweeney - Direct - McCormick

1    A    Yes, ma'am.

2    Q    Do you recognize that?

3    A    Yes, ma'am.

4    Q    What do you recognize it to be?

5    A    Photo of the microwave which is on top of, by the

6    refrigerator, which was contained inside of that apartment.

7    Q    And does that photograph accurately reflect the

8    bottles that you were describing on top of the refrigerator?

9    A    Yes, ma'am, it does.

10        MS. McCORMICK:  At this time I ask to have it

11   published to the jury.  We have previously agreed to

12   have it admitted into evidence.

13        THE COURT:  All right.

14        (Whereupon, People's Exhibit 24 for

15   identification now received and marked People's Exhibit

16   24 in evidence.)

17        (Whereupon, People's Exhibit 24 displayed to

18   the jury.)

19   Q    Now, we still have 24A and B.  I ask to approach

20   you with what has previously been marked as People's Exhibit

21   25 in evidence.

22   Q    Can you take a look at that for me, please?

23   A    Yes, ma'am.

24   Q    Do you recognize it?

25   A    Yes, ma'am.

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Sweeney - Direct - McCormick

1    Q    What do you recognize it to be?

2    A    It is a bottle of Grand Old Parr Deluxe Scotch

3    Whiskey, that was secured from the residence, the apartment.

4    Q    What is the condition of that bottle; empty or

5    full?

6    A    It is empty.

7    Q    Was it empty on the night that you acquired it

8    from the defendant's apartment?

9    A    Yes, ma'am, it was.

10   Q    Now, I ask you to take a look at People's

11   Exhibits 24A and B for identification.  The other bottles on

12   top of that refrigerator, do you recall what they were?

13   A    Yes.

14   Q    What type of alcohol was in the bottles?

15   A    One was a Bacardi bottle, but I don't believe --

16   I think there was only a very little bit left on the bottom.

17   And there was a couple other ones, but not that I recall

18   directly on top of the refrigerator.  There might have been

19   some in the cabinets.

20   Q    Investigator, taking a look at those two

21   photographs before you, do you recognize them?

22   A    Yes.

23   Q    First referring to People's Exhibit 24A, if you

24   don't mind?

25   A    Okay.

Inv. Sweeney - Direct - McCormick

1      Q      What do you recognize it to be?

2      A      It appears to be a shot of the upstairs closet

3   located in the front of that residence.

4      Q      And 24B?

5      A      This looks like what would have been the dining

6   room in the front of the house.

7      Q      Investigator Sweeney, after you completed your

8   search of the defendant's apartment portion of the building

9   did you proceed into the main area of the house?

10     A      Yes, ma'am, I did.

11     Q      What did you observe in the main area of the

12   house?

13     A      Went into the main area of the house also to

14   document that with photographs.  It appeared that it was, it

15   wasn't being lived in, or somebody was moving out or just

16   moving in.  There was very, very few pieces of furniture; no

17   real clothing or bedding or anything to that effect.  There

18   were some computer desks.  Very sparsely populated.

19     Q      Do those photographs, 24A and B, accurately

20   reflect that empty sort of condition of the main portion of

21   the house?

22     A      Yes, ma'am, it does.

23            MS. McCORMICK:  Your Honor, I would ask that

24        they be introduced into evidence as People's Exhibit

25        24A and B in evidence.  Counsel has not agreed to those

1     those as yet.

2               THE COURT:  Please show those to counsel.

3               MR. LaMAGNA:  Judge, I am going to object to

4     these photographs.  That doesn't have anything to do

5     with anything.

6               THE COURT:  Let me see.

7               Do you have an offer of proof?

8               MS. McCORMICK:  Your Honor, the People

9     present those photographs as an indication of the

10    living conditions of the defendant at the time in the

11    absence of his mother from that household.  It goes to

12    his state of mind on the evening of July 2nd 2005.

13              MR. LaMAGNA:  Judge, objection.  That is the

14    mother's part of the house.  It has nothing to do with

15    the offer of proof that the assistant district attorney

16    just articulated.  A picture of a closet, coat closet?

17    There is nothing there.

18              THE COURT:  Instead of letting the jury

19    wonder about it, what you are all talking about,

20    objection overruled.  Objection overruled.

21              (Whereupon, People's Exhibits 24A and 24B for

22    identification now received and marked People's

23    Exhibits 24A and 24B in evidence.)

24              COURT OFFICER:  People's Exhibits 24A and B

25    in evidence.

1          And People's Exhibits 25 through 52 have been

2     previously marked in evidence on consent.

3          (Whereupon, People's Exhibits 25 through 52,

4     a series of photographs, so marked and in received

5     evidence.)

6          MS. McCORMICK:  Could you step down and

7     approach this easel one more time.

8     Q    Investigator Sweeney, as part of your

9     investigation in this case were you asked to go back to the

10    roadway within the last week and take photographs and

11    measurements?

12    A    Yes, I was.

13    Q    I am going to present a series of photographs

14    that have already been admitted into evidence, and I would

15    ask you to describe the contents of those photographs to the

16    jury as they are presented.  Bearing in mind, that they are

17    daytime photographs and only for the purposes of the roadway

18    curvature.

19          This is People's Exhibit number 26.  Can you tell

20    the jury, please, what is reflected in People's Exhibit 26?

21    A    This is an aerial photo of the Meadowbrook State

22    Parkway, south of M9, M9 being the first visible exit that

23    you see here, from the south looking north.

24    Q    You said that you were asked to do photographs of

25    the roadway within the last week.  This aerial photograph

1    was not one of those photographs; is that correct?

2         A    No, ma'am.

3         Q    When was this photograph taken?

4         A    I did aerial photos at the scene on July 26th.

5         Q    Of 2005?

6         A    Of 2005.

7         Q    This one, on the other hand, People's Exhibit

8    number 27 in evidence, this also is one of those aerial

9    photographs that you took in July of 2005?

10        A    Yes, ma'am.

11        Q    And what is reflected in that photograph?

12        A    Aerial photograph of the area where the collision

13   took place of the Meadowbrook State Parkway southbound, just

14   north of M7.

15        Q    People's Exhibit 28 in evidence.  Can you let the

16   jury know when it is that you took this photograph,

17   Investigator, and what it reflects?

18        A    One of the photos I just took this Sunday.  This

19   is depicting -- this is the Meadowbrook State Parkway

20   southbound.  This fourth lane here is the ramp from

21   eastbound Merrick Road to southbound Meadowbrook State

22   Parkway.  That is the end of that ramp right there.  And

23   these are the three southbound lanes of the Meadowbrook

24   State Parkway.

25        Q    Back to the aerial photographs.  People's Exhibit

1    number 29 in evidence.  What does that reflect,

2    Investigator?

3         A    This is aerial view of Exhibit M9, Merrick Road,

4    encompassing all four cloverleaves.

5         Q    And is that a view going southbound toward the

6    top left of the photograph heading toward the Loop Parkway?

7         A    That would be correct.

8         Q    Again, Investigator, what does this photograph

9    reflect?  This is People's Exhibit 30 in evidence.  What

10   does it reflect, and when was it taken?

11        A    This is one of the photographs I just took on

12   Sunday.  This is in the left lane of the Meadowbrook

13   Parkway, southbound, north of M7.  The left lane view

14   approaching the area of the collision or where the collision

15   took place.

16        Q    Is the Babylon Turnpike overpass reflected in

17   this photograph, Investigator Sweeney?

18        A    Yes, ma'am, it is.

19        Q    From the area that this photograph is taken you

20   said the left lane approaching Babylon Turnpike?

21        A    Correct.

22        Q    Are the southbound, the continuing southbound

23   lanes, visible in this photograph from that left lane?

24        A    Just barely.  You could see some of what would be

25   the left lane, but it is faint because it goes around the

1    bend.

2        Q    There is a bend underneath the Babylon Turnpike

3    overpass?

4        A    From this view, yes.

5        Q    Also from this view can you see some of the

6    northbound lanes coming toward the Babylon Turnpike

7    overpass?

8        A    As you are looking through the overpass, this

9    patch of gray to the left, that would be the northbound

10   lanes of the Meadowbrook.

11       Q    People's Exhibit number 31 in evidence, what is

12   it, and when it did you take it, Investigator Sweeney?

13       A    This is an overall aerial shot.  This photo is

14   being taken from the north, with Babylon Turnpike being the

15   first overpass.  Sunrise Highway is the next overpass, and

16   Merrick Road would be the last, with the roadway showing the

17   path of the roadway down toward the Loop Parkway.  It is

18   being shot from the north, facing south.  It is an aerial

19   view.

20       Q    People's Exhibit 32 in evidence, what is it and

21   when did you take it, Investigator Sweeney?

22       A    This is an aerial view of the Meadowbrook Parkway

23   in the vicinity of, I believe this is Sunrise Highway,

24   encompassing all of the on and off ramps.

25       Q    Is the Babylon Turnpike overpass visible in that

1    photograph?

2         A    Yes, ma'am, it is.

3         Q    Could you indicate where it is?  Can you point to

4    it?

5         A    Babylon Turnpike is located here.

6         Q    Top left portion of the photograph?

7         A    Correct.

8         Q    And People's Exhibit number 33 in evidence.

9         A    Another photo I took on Sunday.  This is

10   depicting, 1030 mile marker.  This is the three southbound

11   lanes of the Meadowbrook State Parkway, south of M9.

12        Q    Investigator Sweeney, there is a series of

13   additional photographs taken from particular vantage points

14   at the scene.  I would ask you to identify each of these

15   photographs as photographs you have taken, and represent

16   that they are accurate conditions of the roadway during

17   daylight hours along the Meadowbrook Parkway.

18        A    Do you want me --

19        Q    Look at them for the moment to identify them, and

20   make sure that they are fair and accurate.

21        A    Yes, ma'am.

22        Q    Are those photographs that you have recently

23   taken?  With the exception of the aerials.  You have a

24   couple of aerials in there as well?

25        A    Yes, ma'am.

Inv. Sweeney - Direct - McCormick

1    Q    Those are from the same package of July of 2005?

2    A    Correct.

3    Q    The aerials?

4    A    Correct.

5    Q    Anything on the ground was recently taken?

6    A    Ground photographs were taken on the 10th, this

7    past Sunday.  The aerials photographs would have been taken

8    July 26th of last year.

9         MS. McCORMICK:  Your Honor, subject to the

10        conversation held at the bench with counsel before the

11        jury came in, I would ask that all of these pictures be

12        admitted into evidence at this time, and just be marked

13        by the court reporter.

14        MR. LaMAGNA:  Judge, obviously, I have no

15        objection.  We agreed to that.  However, I would like

16        the instruction that these photographs are for the

17        geography only; they do not depict the lighting

18        conditions at the time, or the roadway conditions at

19        the time that this incident occurred.

20        THE COURT:  All of those things are correct.

21        Simply for your information then, education, it is not

22        designed to show the roadway as it was at the time of

23        the accident.

24        MS. McCORMICK:  Your Honor, there are 24

25        photographs that need to be marked by the court

1    reporter.  May we approach momentarily?

2            THE COURT:  We will take a five or ten-minute

3    break.  We will get you back in a while.  Don't talk

4    about the case.

5            (Whereupon, the jury exited the courtroom and

6    a brief recess held.)

7            COURT OFFICER:  Jury entering.

8            (Whereupon, the jury entered the courtroom,

9    and upon taking their respective seats, the following

10   occurred:)

11           THE CLERK:  Case on trial indictment number

12   1910 N of 2005, People versus Martin Heidgen.

13           People ready?

14           MR. HAYDEN: Ready, your Honor.

15           THE CLERK:  Defense ready?

16           MR. LaMAGNA:  Defendant is ready.

17           THE CLERK:  Defendant is present and the

18   jurors are seated, your Honor.

19           MS. McCORMICK:  May I continue?

20           THE COURT:  Yes.

21   CONTINUED DIRECT EXAMINATION

22   BY MS. McCORMICK:

23   Q    Investigator, between when you were out taking

24   those most recent photographs, did you also take

25   measurements of various points on that roadway?

Inv. Sweeney - Direct - McCormick

1        A      Yes, ma'am, I did.

2        Q      Would you convey those measurements as best you

3    can describe them to the jury at this time?

4        A      First measurement I took was the width of the

5    center divider on the Sunrise or M8 overpass.  I took a

6    measurement with an actual tape measure, center of fog line

7    to center of fog line.  Approximately ten feet was the

8    measurement on that.

9             Next was using the odometer on my vehicle.  It

10   was from the Babylon Turnpike overpass, southbound, to the

11   end of the guide rail in the center median, which is just

12   north of the turnaround, or what we call the old gas

13   station, as you head to the beach just before the tolls.  In

14   the center median is the turnaround.  There is a guide rail

15   end.  That measurement was approximately 2.6 miles.

16       Q      How far to the turnaround itself, the official

17   turnaround?

18       A      From the end of that guide rail to the first

19   turnaround that a vehicle can go through was approximately

20   another two tenths of a mile.

21       Q      So, total of 2.8 miles from the turnaround to the

22   Babylon Turnpike overpass?

23       A      Approximately, yes.

24       Q      Next measurement.

25       A      Next measurement was from the turnaround to the

GIGI WRIGHT, RPR    (516) 571-2503

1    Loop Parkway, westbound, or the first ramp onto the Loop.

2    That was approximately eight-tenths of a mile from the

3    turnaround to the Loop.

4           Then I took a measurement from the jersey

5    barrier, which is that concrete barrier in the center median

6    on the first water bridge, and I took that north of the

7    turnaround to the 1030 mile marker that was depicted in the

8    photo, the green mile marker on the center divider.  That

9    distance there was about three-tenths of a mile.

10          And then there was a wood sign south of M9, or

11   south of Merrick Road, to the center lane opposite the

12   eastbound to southbound ramp, and that was approximately

13   four-tenths of a mile.

14   Q      The wooden sign you are talking about, as you are

15   heading southbound from Merrick Road onto the Meadowbrook

16   Parkway, is a brown wooden sign on the side of the road, the

17   west side of the road?

18   A      It was on the west shoulder of the roadway.  It

19   is the first wooden sign south of the exit.

20   Q      Next measurement.

21   A      Next measurement I took was from under the

22   Merrick Road overpass southbound to the 1039 marker, mile

23   marker, which is in the center median, and that was

24   approximately four-tenths of a mile.

25   Q      And any other measurements, Investigator Sweeney?

Inv. Sweeney - Direct - McCormick

1       A       One other measurement I took was from the Babylon

2    Turnpike overpass, southbound, to where the wooden guide

3    rail meets the jersey barrier on the first water bridge, and

4    that distance was 2.4 miles, approximately.

5       Q       Investigator Sweeney, as part of this case were

6    you requested to remove the -- I don't know what they call

7    it -- brake lamps of the pickup truck?

8       A       Yes, ma'am, I was.

9       Q       I ask that you be approached with People's

10   Exhibits 53 and 54 for identification purposes.

11                   (Whereupon, People's Exhibits 53 and 54,

12           brake lights, so marked for identification.)

13      Q       Do you recognize them?

14      A       Yes, ma'am.

15      Q       What do you recognize them to be?

16      A       These are the brake lamp bulbs from the rear tail

17   lamp assembly of the '99 Chevy pickup.

18      Q       I know it is difficult through the plastic, could

19   you distinguish which is from the driver's side and which

20   one is from the passenger side?

21      A       Exhibit 53 would be considered the driver's side

22   brake light bulb, and Exhibit 54 is going to be the

23   passenger side brake light bulb.

24      Q       When did you remove those brake lights?

25      A       Excuse me, ma'am?

1      Q      When did you take them?

2      A      I secured these this morning.

3      Q      Are they in the same condition as you observed

4    them affixed into the pickup truck this morning?

5      A      Yes, ma'am.

6             MS. McCORMICK:  Your Honor, at this time I

7       would ask that they be introduced into evidence as

8       People's Exhibits 53 and 54 into evidence.

9             THE COURT:  Show them to counsel.

10            MR. LaMAGNA:  Just a brief voir dire.

11   VOIR DIRE EXAMINATION

12   BY MR. LaMAGNA:

13     Q      Trooper Sweeney or Investigator Sweeney --

14     A      Investigator Sweeney, now.

15     Q      -- these brake lamps, you took these out when?

16     A      I secured them this morning, sir.

17     Q      This morning?

18     A      Yes, sir.

19     Q      By looking at these brake lamps you can't tell

20   whether they were on, off or anything, on the night of July

21   2nd, right?

22     A      Actually the one bulb does show some shock to the

23   filament.

24     Q      Can that say -- so that would show that the brake

25   lamp was on?

1        A      Observing the filaments inside of those bulbs

2    will give you an indication whether or not that lamp was on

3    at the time of the collision.  It can.

4        Q      Meaning somebody was braking at that time; is

5    that what you mean?  The brake lamp was engaged?

6        A      It could.

7                    MR. LaMAGNA:  I have no objection.

8                    THE COURT:  Received.

9                    (Whereupon, People's Exhibits 53 and 54 for

10        identification now received and marked People's

11        Exhibits 53 and 54 in evidence.)

12    BY MS. McCORMICK:

13        Q      Finally, Investigator Sweeney, I ask you to take

14    a look at People's Exhibits 55 and 56 marked for

15    identification.

16                    (Whereupon, People's Exhibits 55 and 56,

17        photographs, so marked for identification.)

18        Q      And I ask you, sir -- they are maps -- do they

19    fairly and accurately represent the geographic area that is

20    being discussed in this case from the -- what road was that

21    the search warrant executed at, the defendant's house?

22        A      Fourteen Oceanview Avenue in Valley Stream.

23        Q      From there, and then the area of the Meadowbrook

24    Parkway, is this a fair and accurate representation of those

25    areas?

1    A    Yes, ma'am, it is.

2    Q    Same thing for, People's Exhibit 56, except that

3    in this one it just has the Meadowbrook Parkway from the

4    area of the Southern State Parkway all the way down to the

5    Loop; is that a fair and accurate representation of that

6    geographic area?

7    A    Yes, ma'am.

8         MR. McCORMICK:  At this time I ask these be

9         moved into evidence as People's Exhibits 55 and 56 in

10        evidence.

11        MR. LaMAGNA:  No objection.

12        THE COURT:  They are both received.

13        (Whereupon, People's Exhibits 55 and 56 for

14        identification now received and marked People's

15        Exhibits 55 and 56 in evidence.)

16        MS. McCORMICK:  Nothing further, your Honor.

17        THE COURT:  All right, Mr. LaMagna.

18        MS. McCORMICK:  May I ask one final question?

19        THE COURT:  Yes.

20    Q    The total station measurements you did,

21    Investigator Sweeney, and I'm going to go back to the

22    testimony, you also measured the lines and the spacing

23    between the lines at the crash scene?  I'm talking about the

24    travel lane lines.

25    A    Not on the scene.  They were documented.  They

1    were measured, the points were measured on the scene, yes.

2         Q    That's what I mean.

3         A    Okay.

4         Q    And that data was downloaded to the computer as

5    part of this crash investigation?

6         A    Yes, those were.  Those points were included in

7    all of the other points that were shot the morning of the

8    scene.

9         Q    Thank you.

10             THE COURT:  Cross-examination will take place

11   tomorrow.  However, it may be somewhat out of order.

12   I'm not sure if we are going to take it first thing or

13   we are going to do something else first thing.

14             You know all of the admonitions.  See you

15   here at 9:30.  We are doing pretty well so far, and I

16   would like to keep that up.  So keep all of the

17   admonitions in mind.  Have a nice night.  See you

18   tomorrow morning.

19             (Whereupon, the jury exited the courtroom.)

20             THE COURT:  Investigator, you can step down.

21             MS. McCORMICK:  Tomorrow morning is it in the

22   interest of the Court to have those cars here early

23   rather than late?

24             THE COURT:  With all of the gymnastics we are

25   going through with these cars, let's do it with what

1    all of the security people and police worked out.

2    Leave everything the way it is. Change nothing. 11

3    o'clock the jury will look at those cars.

4              THE WITNESS: On the ground, not on the

5         trucks.

6              THE COURT: Counsel, do we care if they are

7         left on the trucks or do we need them on the ground?

8              MR. LaMAGNA: Well, Judge --

9              THE COURT: I think you don't want them at

10        all. That objection is overruled. On a flatbed or on

11        the ground?

12             MS. McCORMICK: I would rather them be on the

13        ground.

14             THE COURT: On the ground.

15             THE WITNESS: Thank you.

16             MR. LaMAGNA: Judge, I was just going to,

17        based upon the testimony that we heard today from

18        Trooper Whittal and Investigator Sweeney, considering

19        all of the things that have been done to the interior

20        of these vehicles, and quite frankly to the exterior of

21        taking out certain SDMs out, et cetera, and doing a

22        complete safety check of the brakes and all of these

23        other things, in addition to my original opposition to

24        the viewing, I add that and again oppose the viewing of

25        of these vehicles. They do not depict the cars as they

Inv. Sweeney - Direct - McCormick

1    appeared at the time that this happened.

2              THE COURT:  As you know, based upon your

3    objection, based on the People's application, I went

4    and looked at those cars myself yesterday.  I am quite

5    satisfied, following my review of those cars, that it

6    is important and relevant evidence to this jury.  The

7    objection is overruled.  See you tomorrow morning.

8    Nine-thirty tomorrow morning.

9                             o0o

10             (Whereupon, the trial was adjourned to

11   Friday, the 15th day of September of 2005, at 9:30

12   a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    ----------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4             -against-

 5

 6    MARTIN HEIDGEN,

 7                              DEFENDANT.
      ----------------------------------------x
 8    INDICTMENT #:  1910N-06

 9                              Mineola, New York
                                September 15, 2006
10

11    B E F O R E:   HONORABLE ALAN L. HONOROF
                         Acting Supreme Court Justice
12

13    A P P E A R A N C E S:

14                   HON. KATHLEEN M. RICE
                     District Attorney, Nassau County
15                       262 Old Country Road
                         Mineola, New York 11501
16                   BY:  ROBERT HAYDEN, ESQ.
                         Assistant District Attorney
17                         and
                     MAUREEN McCORMICK, ESQ.
18                       Assistant District Attorney

19
                     STEPHEN LaMAGNA, ESQ.
20                       Attorney for the Defendant
                         666 Old Country Road
21                       Garden City, New York
                     BY:  STEPHEN V. LaMAGNA, ESQ.
22                         and
                     GREGORY MARTELLO, ESQ.
23
                            o0o
24                     CONTINUED TRIAL
                            o0o
25                     Gigi Wright, R.P.R.
                     Official Court Reporter

           GIGI WRIGHT, RPR    (516) 571-2503
```

Proceedings

```
 1              (In open court.  Defendant present.)
 2              THE CLERK:  Case on trial.  Indictment 1910N
 3      of 2005, People verses Martin Heidgen.
 4              People ready?
 5              MR. HAYDEN:  Ready, your Honor.
 6              THE CLERK:  Defendant ready?
 7              MR. LaMAGNA:  Defendant is ready.
 8              THE CLERK:  Defendant is present, your Honor.
 9              THE COURT:  All right.  Is there an
10      application?
11              MS. McCORMICK:   Yes, your Honor.  The People
12      are making an application this morning to have this
13      introduced into evidence, after the proper foundation
14      that it is a fair and accurate representation of the
15      path of the northbound -- excuse me, withdrawn -- it is
16      the southbound Meadowbrook Parkway from the point of
17      the turnaround up to and including the area of impact
18      of this collision.  It is the southbound lanes, but the
19      video specifically depicts traveling that in a
20      northbound direction.  The road was closed in order to
21      accomplish taking this video.  It is in daylight hours.
22              We understand that that is not reflecting the
23      specific viewpoint of the defendant on that night, but
24      it is introduced, much like the photographs yesterday,
25      to depict the configuration of the roadway and the
```

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1    turns, hills, and that sort of geographic nature of the

2    documentation.

3              THE COURT:  Mr. LaMagna.

4              MR. LaMAGNA:  Judge, I just received a copy

5    of that video five minutes ago.  And we had an

6    opportunity to view it one time just now.  I need time

7    to review it, review it with our experts that we

8    already have retained based upon the discovery that we

9    received pre-trial.

10             Secondly, at this particular point the actual

11   route that is depicted in that video, the proper

12   foundation hasn't been laid that that particular route

13   is relevant.  We haven't heard one witness that

14   articulated with any degree of specificity that that is

15   a route relevant to the route that anybody took.  So, I

16   don't know what I am going to ultimately do until I

17   have a chance to review the video myself with my

18   experts.

19             However, at least at this point there has

20   been no foundation laid that that route that is

21   depicted in that video is at all relevant in this case.

22   It could be any route.  At this point a foundation has

23   to be laid that that is a relevant route to show the

24   jury for demonstrative purposes.

25             MS. McCORMICK:  Your Honor, if I might just

Proceedings

1       add that as an offer of prove it is the expected

2       testimony of the witnesses that this is the route that

3       they observed the defendant take.  The witnesses have

4       been extensively questioned and prepared.  We have

5       taken them out to the scene of this roadway, and it is

6       on that basis that this route is being introduced into

7       evidence.

8               MR. LaMAGNA:  Judge, whether it is expected

9       or not hasn't been articulated.  The People haven't

10      been cross-examined, so.

11              THE COURT:  All right, well let's put the

12      witness on and see what the witness has to say.  If

13      there is an objection I will take it at that time.

14              MS. McCORMICK:  Your Honor, this witness is

15      not going to be the person through whom I will

16      introduce it.  I'm going to introduce it through

17      Detective Investigator Bill Walsh, who shot the video.

18      I'll make an application at that point.

19              As you know, when we came to the end of the

20      day yesterday I concluded rather abruptly the direct

21      testimony of Investigator Sweeney.  I have a couple of

22      things to introduce through him.  He is here.  He is

23      the one who has to be cross-examined.  I will ask to

24      reopen my direct before the witness begins.

25              MR. LaMAGNA:  I object to that.

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1        THE COURT:  Why?

2        MR. LaMAGNA:  She finished her direct

3   examination.  The examination is finished.  And I would

4   object to reopening the direct.

5        THE COURT:  I gave you some latitude

6   yesterday.  You said you preferred to cross today, and

7   we were in a bit of rush.  I have no problem with this

8   application at all.  The People can reopen the case.

9        MS. McCORMICK:  People call --

10       THE COURT:  Would you like the jury?

11       MS. McCORMICK:  Maybe.  I didn't know if you

12   want him on the stand before the jury comes in.

13            (Whereupon, the witness, Investigator

14   Sweeney, retakes the witness stand.)

15       THE CLERK:  Investigator, you are reminded

16   you are still under oath.

17       THE COURT:  Good morning.

18       THE WITNESS:  Good morning, your Honor.

19       COURT OFFICER:  Jury entering.

20            (Whereupon, the jury entered the courtroom,

21   and upon taking their respective seats, the following

22   occurred:)

23       THE CLERK:  Jurors are present and seated,

24   your Honor.

25       THE COURT:  Thank you.  Welcome back, ladies

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Sweeney - Direct - McCormick

1      and gentlemen.

2                    MS. McCORMICK:   Your Honor, at this time may

3      I continue my direct?

4                    THE COURT:   Yes.

5      CONTINUED DIRECT EXAMINATION

6      BY MS. McCORMICK:

7      Q      Good morning, Investigator Sweeney.

8      A      Good morning, ma'am.

9      Q      We pretty much concluded yesterday afternoon, but

10     I ask to approach you with what I am going to ask to deem

11     mark People's Exhibits 57 and 58 for identification

12     purposes.

13                    COURT OFFICER:   People's Exhibits 57 and 58

14     marked for identification.

15                    (Whereupon, the photographs received and

16     marked People's Exhibits 57 and 58 for identification.)

17                    MS. McCORMICK:   Would you hand them to the

18     witness, please.

19     Q      Investigator Sweeney, would you take a look at

20     what is 57 and what is 58.   And I ask you first:   Do you

21     recognize those two enlarged photographs?

22     A      Yes, I do.

23     Q      What do you recognize them to be?

24     A      These are photographs of the drive cam camera

25     unit that I removed from the limousine.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Direct - McCormick

1    Q    Did you take those photographs?

2    A    Yes, I did.

3    Q    Do they fairly and accurately represent the

4    condition of the drive cam unit as you removed it from the

5    vehicle that day?

6    A    Yes, it does.

7            MS. McCORMICK:  Your Honor, at this time I

8    would introduce those into evidence as People's

9    Exhibits 57 and 58 in evidence.

10           THE COURT:  Please show them to counsel.

11           MR. LaMAGNA:  No objection.

12           THE COURT:  They are received.

13           (Whereupon, People's Exhibits 57 and 58 for

14    identification now received and marked People's

15    Exhibits 57 and 58 in evidence.)

16           COURT OFFICER:  People's Exhibits 57 and 58

17    received in evidence.

18    Q    Would you just hold them up and show the jury.

19    Okay.  The court officer will do it.

20           (Whereupon, People's Exhibits 57 and 58

21    displayed to the jury.)

22           MS. McCORMICK:  Thank you, your Honor.  At

23    this time I would now ask to approach the witness with

24    what should be marked People's Exhibit number 59 for

25    identification purposes.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Direct - McCormick

1           (Whereupon, a diagram so received and marked

2       People's Exhibit 59 for identification.)

3           COURT OFFICER:  People's Exhibit 59 marked

4       for identification.

5       Q    Investigator Sweeney, do you recognize People's

6   Exhibit number 59?

7       A    Yes, ma'am.

8       Q    What do you recognize it to be?

9       A    This is a copy of the diagram, the scene diagram,

10  that was completed with measurements depicting the distances

11  between the lane lines and the distances of the lane lines

12  in the area of the collision.

13      Q    Did you create that diagram from measurements

14  taken on the night of the crash?

15      A    Yes, ma'am, I did.

16          MS. McCORMICK:  Your Honor, at this time,

17      because it is so small, I ask that that first be

18      introduced into evidence and published to the jury so

19      they can hand it around.

20          THE COURT:  Please show it to counsel.

21          MR. LaMAGNA:  Brief voir dire, Judge.

22  VOIR DIRE EXAMINATION

23  BY MR. LaMAGNA:

24      Q    Investigator Sweeney, you are saying that the

25  measurement distances that appear on this document were made

Inv. Sweeney - Direct - McCormick

1    when you arrived at the scene on the night of the incident?

2        A    No, sir.

3        Q    When were these measurements taken?

4        A    Those measurements -- points on the diagram are

5    plotted the day of the scene.  Those measurements that you

6    are seeing on the diagram were measured from the scale

7    diagram, which was already -- which was a result of the

8    measurements I took that day of the scene.

9        Q    So these aren't measurements that you actually

10    made at the scene, measuring the distances individually on

11    the road; is that correct?

12        A    Correct.

13        Q    So these were based upon plots that got a number

14    and then it extrapolated into this?

15        A    Yes, that's correct.  They were based on the

16    plotted points taken from the scene, but those measurements

17    are based from the diagram.

18        Q    None of these measurements of the lane lines and

19    the distances between the lane lines have been, if you will,

20    confirmed by going actually to the scene and actually

21    measuring this out?

22        A    Correct.  That was based on the scale diagram.

23    Those measurements are based on the scale diagram itself.

24        Q    So not from the actual measurements from one end

25    to the other?

Inv. Sweeney - Direct - McCormick

1      A      Correct.  Physically on the scene?

2      Q      Yes.

3      A      Correct.

4             MR. LaMAGNA:  Objection.

5             THE COURT:  Sustained.

6             MS. McCORMICK:  Your Honor, may I continue

7      asking the witness questions about the measurements?

8             THE COURT:  Yes.

9      BY MS. McCORMICK:

10     Q      Just to clarify, Investigator Sweeney, the

11     measurements that are reflected in that diagram, the spaces

12     are taken from the scale diagram, did you measure from the

13     total station to the beginning of each lane line from the

14     total station?

15     A      Yes, ma'am.

16     Q      Did you measure as to each of those lane markings

17     to the end of the lane marking?

18     A      Yes, ma'am.

19     Q      Was then the next measurement taken at the

20     beginning of the next lane marking?

21     A      Yes, it was.

22     Q      And the end of the next lane marking?

23     A      Correct.

24     Q      So each of those distances were, in fact,

25     measured on the night of July 2nd 2005; is that correct?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Direct - McCormick

1          A       That is correct.

2          Q       They were not, however, converted into a visual

3   diagram until this past weekend; is that also correct?

4          A       That's correct.

5          Q       But the measurements themselves were, in fact,

6   done at the time of the crash, after the crash, as part of

7   your investigation?

8          A       That's correct.

9                  MS. McCORMICK:  Your Honor, I again move this

10                 document into evidence as People's Exhibit number 59 in

11                 evidence.

12                 THE COURT:  All right.  Once again, please

13                 show it to counsel.

14                 MR. LaMAGNA:  If I may, Judge.

15                 THE COURT:  Yes.

16  VOIR DIRE EXAMINATION

17  BY MR. LaMAGNA:

18         Q       What I'm asking you, Investigator Sweeney, these

19  distances that you put together to extrapolate this diagram

20  were based upon data that you received from the total

21  station, correct?

22         A       Yes, correct.

23         Q       So what I am asking you is:  These actual lines

24  on the actual pavement were not measured physically by you,

25  correct?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Direct - McCormick

1        A        They were measured the day at the scene.

2        Q        With the total station?

3        A        With the total station.

4        Q        What I'm saying is:  Were these distances

5     actually at the scene, on the pavement, actually physically

6     measured by you using a tape measure or any type of measure

7     on the ground?

8        A        No.

9        Q        These are just based upon data that you piece

10    together to make this, correct?

11        A        They are based on the data that came from the

12    total station.

13        Q        I understand that.  Right.  Nobody actually

14    physically went to one line and actually measured out the

15    distances between the lines and the lane lines, correct?

16        A        Correct.

17                 MR. LaMAGNA:  Judge, I object.

18                 THE COURT:  Let me see it.

19                 Objection is overruled.  Document is

20    received.

21                 (Whereupon, People's Exhibit 59 for

22    identification now received and marked People's Exhibit

23    59 in evidence.)

24                 COURT OFFICER:  People's Exhibit 59 received

25    in evidence.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Direct - McCormick

1          MS. McCORMICK:  At this time may I ask that

2     the document be handed to the jury, passed one to

3     another so they can take a look at it?

4          THE COURT:  Yes.

5          (Whereupon, Exhibit 59 displayed to the

6     jury.)

7          MS. McCORMICK:  May I ask the witness a

8     couple more questions while they are looking at the

9     diagram?

10         THE COURT:  I don't want their attention

11    distracted.  After they are finished.

12  BY MS. McCORMICK:

13    Q     Investigator Sweeney, for the purposes of

14  clarification, can you tell the jury that just looked at the

15  diagram what the difference is in the colors of the numbers

16  that are on that diagram?

17    A     The distances that were indicated or printed in

18  black indicate the distance that was actually between the

19  lane lines.  The lane line measurements themselves are the

20  numbers indicated in the red ink on the top.

21    Q     Investigator Sweeney, wasn't the entire crash

22  scene measured and documented using the total station?

23    A     Yes, ma'am, it was.

24    Q     So, all of the measurements taken are taken with

25  the total station; are they not?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1      A      Correct.

2      Q      And is not the total station the functional

3   equivalent of taking a tape measure and rolling it on the

4   ground?

5      A      That is what we use to measure the scenes,

6   correct.

7              MS. McCORMICK: I have nothing further.

8              THE COURT:  Mr. LaMagna.

9   CROSS-EXAMINATION

10  BY MR. LaMAGNA:

11     Q      Now, Investigator Sweeney, I just want to finish

12  up with the last question that the assistant district

13  attorney asked you.  She said, isn't it the same using the

14  measurements from the total station as actually physically

15  measuring it.  That is not necessarily true, is it?

16     A      Not necessarily.

17     Q      Because when you physically measure something by

18  taking a measurement and measuring it, it is a little

19  different than a machine with software plotting out things

20  and coming up with a number that you rely on, isn't it a

21  little different?  Isn't it?

22     A      That's correct.  The total station is more

23  accurate.

24     Q      The software could be wrong, can't it?

25     A      It's possible.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1      Q      That was funny.  But the software could be wrong,

2   couldn't it?

3      A      Possible.

4      Q      And computers can be wrong sometimes, couldn't

5   they?

6      A      It is possible.

7      Q      This isn't something that we should be joking

8   about.

9               MS. McCORMICK:  Objection.

10              THE COURT:  Sustained.

11     Q      Now, relying on a computer or relying on software

12  to retrieve information is not generally, as you just said,

13  as accurate as actually physically doing it?  There could be

14  computer glitches or things wrong with the software; isn't

15  that correct?

16              MS. McCORMICK:  Objection.

17              THE COURT:  Sustained.

18     Q      Is it possible that software could be wrong?

19     A      It is possible.

20     Q      Was this particular software, prior to being

21  used, calibrated to make sure that it was measuring

22  accurately before it was used on this night?

23     A      Yes, sir.

24     Q      Do you have that paperwork to show that it was

25  calibrated correctly?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    A    No, I do not.

2    Q    Is there paperwork that was generated to show it

3 was calibrated prior to being used that night?

4    A    There are records, yes.

5         MR. LaMAGNA:  I have not been presented with

6    those, Judge.  Could I have those.

7         MS. McCORMICK:  I don't have them.  I will

8    inquire.

9         THE COURT:  They'll be provided to you.

10        MR. LaMAGNA:  Then I may need to ultimately

11   bring Investigator Sweeney back until I receive that.

12        THE COURT:  Okay.

13   Q    Now, the measurements were taken, and after the

14 measurements were taken was the total station recalibrated

15 again to ensure that the measurements that it was taking

16 were accurate?

17   A    No, it does not get calibrated after each scene.

18   Q    So, is it standard procedure to calibrate before

19 doing a measurement?

20   A    The instrument is calibrated once a year using

21 U.S. geological data points.

22   Q    So it wasn't calibrated that night?

23   A    No.

24   Q    Oh, that's what I was asking you.  So what I am

25 saying to you is:  When you used it that night is there any

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    mechanism that you do when you set it up to make sure that

2    it is measuring correctly that particular night, that the

3    machine is working?

4         A    We use a standard setup procedure where we'll use

5    a reference point that we shoot to, which will be the first

6    point, and it is usually the last point on the scene to show

7    that the measurements are correct.

8         Q    What was that point that you used?

9         A    I don't recall.

10        Q    What was the measurement of that point that you

11   used?

12        A    I don't recall the measurement.

13        Q    So you don't recall how much -- you don't recall

14   the distance of what it was?

15        A    No, I do not recall.

16        Q    Or where it was?

17        A    I know the reference point was established, set

18   up north of --

19        Q    Is that in any paperwork?

20        A    That is on the download from the total station.

21        Q    Do we have that?

22             MS. McCORMICK:  You received it.

23        Q    Now, once the measurements were taken, once the

24   measurements were taken, after the measurements were taken

25   was the machine again checked out that it is operating

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    correctly?

2         A     I'm not sure I understand your question, sir.

3         Q     In other words, when you use a machine you want

4    to make sure that it is accurately measuring, correct?

5         A     Correct.

6         Q     That's important, correct?

7         A     Correct.

8         Q     And that is why we calibrate machines, correct?

9         A     Correct.

10        Q     And you are saying that this machine is

11   calibrated once a year, correct?

12        A     Correct.

13        Q     That very night before you used it you said that

14   you picked a reference point, correct?

15        A     Correct.

16        Q     And the purpose of picking a reference point is

17   to make sure that the machine is measuring accurately,

18   correct?

19        A     Correct.

20        Q     You want to make sure that the measurements that

21   the machine is taking, that you are not taking physically

22   yourself, are going to be accurate for you to rely on,

23   correct?

24        A     Correct.

25        Q     You are going to be relying upon what a machine

Inv. Sweeney - Cross - LaMagna

1    gives you, correct?

2        A    Correct.

3        Q    The measurements the machine is giving you,

4    correct?

5        A    The data provided by the instrument, correct.

6        Q    And then you're going to rely upon that

7    information to make sure assumptions and certain opinions,

8    correct?

9        A    Conclusions, yes.

10       Q    Based upon what the machine gave you, correct?

11       A    Based on measurements.

12       Q    That the machine gave you, correct?

13            MS. McCORMICK:   Judge, I'm going to object to

14       "gave you."

15            THE COURT:   Sustained.

16       Q    That the machine printed out, correct?

17       A    That the machine calculated.

18       Q    Yes.  That the machine calculated, not you.

19    That's all I am saying.

20       A    Correct.

21       Q    You're going to rely on that, correct?  And you

22    want to make sure that that is reliable; is that correct?

23       A    Correct.

24       Q    What I'm saying to you is:  After the machine did

25    these measurements for you, after the measurements were

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    done, did you check the machine with the reference point

2    again to make sure that it is working right?

3         A    The first and last shot are both to the reference

4    point.

5         Q    And you don't know what that reference point was,

6    do you?

7         A    I don't recall the exact distance.  The reference

8    point is considered RP1.

9         Q    And it has a distance?

10        A    There will be a distance.

11        Q    A known distance that you knew before?

12        A    No.

13        Q    So if it goes to a reference point that, let's

14   just say for argument sake, it shows that it is 25 feet

15   away, let's just say, okay?

16        A    Okay.

17        Q    Can we assume that?  And you pointed at it and it

18   shows 25 feet, what I am asking you is:  As a known

19   reference, in order to ascertain whether the machine is

20   working, you need to know for sure empirically that that

21   position is 25 feet away, correct?

22        A    Correct.

23        Q    That is how you check to make sure the machine is

24   working correctly, correct?

25        A    Correct.

Inv. Sweeney - Cross - LaMagna

1      Q      So what I am asking you is:  The reference point

2  that you picked that you physically measured?

3      A      No, I did not.

4      Q      So, when you picked up a reference point and you

5  got that example 25 feet, how do you know at that time that

6  the measurement was accurate?

7      A      Because, like I said, we'll refer it to the last

8  shot.  It will have to be the same distance to show that it

9  is accurate.  On the scene I did not take the physical

10  measurement.

11      Q      So, the machine that you are using you get a

12  reference point, correct?

13      A      Correct.

14      Q      You don't premeasure it to determine whether the

15  machine is measuring it correctly, correct?

16      A      Correct.

17      Q      So you point it at a reference point, the machine

18  comes up with, let's say, that 25 feet, correct?

19      A      Correct.

20      Q      Then you do all of your measurements that you are

21  doing, correct?

22      A      Correct.

23      Q      After that you point it at that same reference

24  point again, correct?

25      A      Correct.

Inv. Sweeney - Cross - LaMagna

1    Q    And it is your testimony that if it shows 25 feet

2    again you know the machine is working correctly?

3    A    That's correct.

4    Q    My point to you is:  If you didn't know the

5    distance empirically that that reference point is 25 feet,

6    the machine theoretically could be measuring wrong, and that

7    glitch could be going through on every measurement

8    throughout, correct?  That's possible, correct?

9    A    Possible.

10   Q    And the mere fact that the machine that measures

11   the reference point is 25 feet in the beginning and measures

12   it again 25 feet could still be taking into consideration

13   the fact that the machine is not accurate, correct?

14   Whatever is wrong is following through, correct?

15   A    I suppose it is possible.

16   Q    For example, if the machine is off five feet,

17   let's just say that it measures wrong five feet, if you

18   point it at a reference point in the beginning and it

19   measures 25 feet, but in reality it is really 20 feet,

20   everything that it measures will include that wrong five

21   feet?  That is theoretically possible?

22   A    It is possible.

23   Q    The mere fact that you measured that at the end

24   that same point and it comes back 25 feet it still could

25   have that same five-foot glitch theoretically, right?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1      A      I'm not sure I'm following you.

2      Q      If you didn't measure it yourself, you are still

3   only relying on what the machine is saying it is, that's my

4   point.

5      A      I'm relying on the accuracy of a calibrated

6   instrument, yes.

7      Q      Right.  And nothing has been checked to determine

8   whether or not the machine is actually measuring it

9   correctly?  Nobody did a physical examination?

10     A      I did not do a physical check.

11     Q      Now, you said you made personal measurements by

12  yourself of distances along the Meadowbrook Parkway; is that

13  correct?

14     A      Correct.

15     Q      And you used your odometer in your car?

16     A      Correct.

17     Q      And did you do a distance from the Merrick Road

18  exit, going north, to the Babylon Turnpike exit?

19            MS. McCORMICK:  Objection, Judge.  Which

20       exit?

21            THE COURT:  Sustained.

22     Q      From the Merrick Road exit going north to the

23  Babylon Turnpike exit.

24            MS. McCORMICK:  Going which way?

25     Q      North.  From the Merrick Road exit going north to

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    the Babylon Turnpike exit.

2         A     May I refer to my notes?

3         Q     Sure.

4         A     What was that measurement again, sir.

5         Q     The Merrick Road exit going north to the Babylon

6    Turnpike exit.

7              MS. McCORMICK:  Excuse me, for clarification

8         the Babylon Turnpike exit going east or west?  Which

9         exit?

10        Q     The overpass.  Do you have point .08 miles?

11        A     I do not see a measurement.

12        Q     So you did not measure that measurement from

13   Merrick Road to the Babylon Turnpike overpass?

14        A     No, I did not, sir.

15        Q     Now, you are familiar with that area, correct?

16        A     Yes, sir.

17        Q     You have driven it back and forth and you have

18   made measurements, correct?

19        A     Yes, sir.

20        Q     Just south of the Babylon Turnpike overpass,

21   approximately point .01 miles south of that Babylon Turnpike

22   overpass, do you recall if there is a green and white sign

23   facing the south on the Southern Parkway?  It says "Norman

24   J. Levy Memorial Parkway"?

25        A     Yes, sir.

Inv. Sweeney - Cross - LaMagna

1     Q    Did you take a measurement of the distance

2  between that sign and the Babylon Turnpike overpass?

3     A    No, I did not, sir.

4     Q    And that sign is actually facing south on the

5  right-hand side if you are driving north on the southern

6  side of the parkway, correct?

7     A    Correct.  It is a two-sided sign.

8     Q    One side is facing south as you're going up the

9  north parkway, correct, on the right-hand side?  If you are

10  driving north in the southbound lanes?

11     A    North and southbound lanes it would be on the

12  right-hand side in the center median, correct.

13     Q    Facing?

14     A    Facing south you would see it.

15     Q    So, if you were driving north in the southbound

16  lanes the wrong way you would be able to read that sign on

17  your right-hand side, correct?

18     A    Yes, sir.

19     Q    And that is -- well, you didn't take the

20  measurements, correct?  I think that you just testified that

21  you did not take a measurement between that sign and the

22  overpass of Babylon Turnpike; is that correct?

23     A    That's correct, sir.

24     Q    It is a very short distance, however, correct?

25     A    Correct.

Inv. Sweeney - Cross - LaMagna

1      Q      Would it be consistent if I said .01 miles?

2   Would that sound about right to you?

3               MS. McCORMICK:  Objection.

4               THE COURT:  If he can answer it I will let

5      him.

6      A      I would prefer to measure it.  But it is a short

7   distance, I will agree with that.

8      Q      Now, you took various photographs at the home of

9   Mr. Heidgen and where his mother lived, correct?

10     A      Correct.

11     Q      That was in Valley Stream, correct?

12     A      That's correct.

13     Q      I believe you took ninety-something photos.  Do

14   you have that with you?  Do you have it with you?

15   I have it.

16              MR. LaMAGNA:  Could I have this marked as a

17     Defendant's Exhibit.

18              THE COURT:  You have it in your notes?

19              THE WITNESS:  Yes, this is mine.

20              MR. LaMAGNA:  Then I don't need to mark it.

21     Q      How many photographs did you take?  Ninety-three?

22     A      Correct.  Approximately.

23     Q      Now, when you were taking the photographs at the

24   home you took each room, the outside, the inside, closets

25   and such, correct?

Inv. Sweeney - Cross - LaMagna

1       A       That is correct.

2       Q       Now, you observed various hunting types of things

3    on the walls, antlers and a deer head or a moose head or

4    something like that; is that correct?

5       A       I'm not recalling at this time.  I would have to

6    refer to photos.

7       Q       Can you look at them?

8       A       I don't have the photos themselves.

9       Q       Do you recall seeing in one of the areas of the

10   house a hunting shotgun or a hunting rifle?  If I show you a

11   photo?

12      A       Okay.

13              MR. LaMAGNA:  Mark this Defendant's Exhibit

14   M.

15              (Whereupon, a photo received and marked

16   Defendant's Exhibit M for identification.) .

17              COURT OFFICER:  Defendant's Exhibit M marked

18   for identification.

19      Q       This isn't on your list, Investigator.  Do you

20   remember seeing that in the house, a hunting shotgun or

21   rifle?

22      A       I don't recall, no.

23      Q       You don't recall?

24      A       I may have taken a photo.  I don't know.

25      Q       You did not take a photo, that is my point?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1      A      No, I do not recall seeing that.

2      Q      Could I have that back.  Now, you are part of the

3   accident reconstruction unit at the New York State Police.

4   Is that Valley Stream or Farmingdale barracks?

5      A      I work in the Farmingdale barracks.

6      Q      You are part of that accident reconstruction

7   unit, correct?

8      A      Correct.

9      Q      And the responsibility of that unit is to perform

10   accident reconstruction on state highways, correct?

11     A      Correct.

12     Q      State parkways, correct?

13     A      Correct.

14     Q      And Farmingdale would encompass Nassau and

15   Suffolk Counties, correct?

16     A      Correct.

17     Q      And the Meadowbrook Parkway would certainly fall

18   within your jurisdiction, correct?

19     A      Yes, it does.

20     Q      And it is the responsibility of the New York

21   State Police in fatal accidents and other serious accidents

22   to perform these accident reconstructions, correct?

23     A      That is correct.

24     Q      Pursuant to that you take all of your

25   measurements, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

```
 1        A      That is correct.

 2        Q      And do all of your analyses, correct, to provide

 3    a report, correct?

 4        A      That is correct.

 5        Q      And then a report is ultimately generated,

 6    correct?

 7        A      Correct.

 8        Q      Determining the cause of the accident, if you can

 9    determine that, correct?

10        A      That's correct.

11        Q      And all of the pertinent factors based upon your

12    analyses, correct?

13        A      That's correct.

14        Q      And within that report, if it is possible, the

15    speed of the individual cars, correct?

16        A      That is correct.

17        Q      The manner in which a car was operated in,

18    correct?

19        A      That's correct.

20        Q      And all of these things, correct?

21        A      Yes, sir.

22        Q      And did you aid in the preparation of the report

23    in this case?

24        A      I assisted with the investigation.

25        Q      And that was Sergeant Crawford, I believe?
```

Inv. Sweeney - Cross - LaMagna

1        A     Yes sir.

2        Q     And as a law enforcement official with the

3   accident -- with the accident reconstruction unit that is

4   your job, correct?

5        A     Yes, sir.

6        Q     To do these reports, correct?

7        A     Yes, sir.

8        Q     To do all of these analyses, correct?

9        A     Yes, sir.

10       Q     Now, you testified that the roadway in your

11  opinion was dry at the time of the accident; is that

12  correct?

13       A     Yes, sir.

14       Q     You used that photograph where the Maxima was

15  situated, correct?

16       A     Yes, sir.

17       Q     So, that is really more of an assumption that you

18  are making based upon the fact that the roadway was dry

19  underneath the car, underneath the Maxima, after it started

20  to drizzle a little; is that correct?

21       A     No, sir.  I was advised.

22       Q     By who?

23       A     By the first members on the scene that the

24  roadway was dry.

25       Q     That's where you got that from not, necessarily

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    the photograph?

2         A    Yes.

3         Q    You testified based upon the photograph that is

4    why you believe it was dry.  You were told that; is that

5    correct?

6         A    Yes, sir.

7         Q    In your analysis of the roadway it was apparent

8    to you that neither the limousine nor the Silverado left any

9    tire marks, correct?

10        A    That's correct.

11        Q    Brake tire marks?

12        A    I did not observe any tire marks from the

13   vehicles, no.

14        Q    That doesn't necessarily mean that either one of

15   the cars were braking, correct?  Slowing down, correct?

16   Tire marks would be if it was locked up, right?  If the car

17   locked up?

18        A    I'm not sure I understand the question, sir.

19        Q    If you are driving and you put on your brakes to

20   slow down from 50 to, say, 30 miles per hour, you may not

21   have a tire mark on the road because of that, correct?

22        A    Correct.

23        Q    When you said that there were no tire marks by

24   either the limousine or the Silverado, that doesn't

25   necessarily mean that either car was not in the process of

Inv. Sweeney - Cross - LaMagna

```
 1    slowing down either, correct?

 2         A     That is correct.

 3         Q     And you would consider, based upon your

 4    experience in the reconstruction unit, that this was a

 5    pretty much in line head-on collision, correct?

 6         A     I don't know if it is a direct in line, no, sir.

 7         Q     But it was an in line collision; it is a head-on

 8    collision, correct?

 9         A     It is a head-on collision, yes.

10         Q     Now, when you took the photographs, I believe one

11    of the photographs are in evidence, of the kitchen, there

12    was a bottle that was just put into evidence, correct, an

13    empty bottle, correct, of Old Parr Scotch?

14         A     Yes, sir.

15         Q     Is that correct?

16         A     Yes, sir.

17         Q     And the empty condition that it is in today is in

18    the same condition as it was when you took it off the shelf;

19    is that correct?

20         A     That's correct, sir.

21         Q     Nothing has changed between the time that you

22    took this empty bottle off of the refrigerator or the

23    microwave, I believe it was, to the time it is here?

24    Nothing has changed about that condition, correct?

25         A     That's correct sir.
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Cross - LaMagna

1    Q    It was empty then; it is empty today, correct?

2    A    Correct, sir.

3    Q    In fact, there was another bottle on that

4    refrigerator that was empty too, correct?

5    A    I believe so, sir, yes.

6    Q    Well, there -- you have photographs.  I mean if

7    you looked at the photographs would that refresh your

8    recollection that it was empty?

9    A    I believe it was empty, sir.

10   Q    So it was empty?

11   A    I believe it was.

12   Q    Do you have that photograph?

13   A    I'm going to refer to that photo log.

14   Q    Investigator Harris was with you when you

15   executed that warrant, correct?

16   A    Yes, he was, sir.

17   Q    So, it is your recollection that the bottles on

18   the top of the microwave were empty, correct?

19   A    Yes.

20   Q    Or refrigerator?

21   A    Yes, sir.

22   Q    And the measurements between the wood sign south

23   to the Merrick Road exit you calculated was .4 miles; is

24   that correct?  Is that what you testified to?

25   A    Let me check.  What was that measurement again,

Inv. Sweeney - Cross - LaMagna

1    sir?

2           Q       The .4 miles.

3           A       The wood sign measurement?

4           Q       South from the guardrail, the wood to the Merrick

5    Road exit, the wood sign south, going to Merrick Road I have

6    .4 miles; is that correct?

7           A       Yes.   The wood sign south of M9 to the center

8    lane opposite the ramp was .4 miles, correct.

9           Q       Now, People's Exhibit -- I just want to show you

10   the photograph that was placed into evidence by the district

11   attorney yesterday.   Let me show you People's Exhibit 24 in

12   evidence.

13          That is when you went in and photographed.   That

14   depicts the kitchen area where the empty bottle of the Old

15   Parr Scotch was, correct?

16          A       That's correct, sir.

17          Q       And the other bottles in there, as you recall,

18   behind were empty as well, correct?

19          A       I believe so, sir, yes.

20          MR. LaMAGNA:   Judge, I don't know if this was

21          published to the jury.   I would ask -- I'm finished

22          with Investigator Sweeney, I just ask that this be

23          published to the jury.

24          THE COURT:   Okay.

25          (Whereupon, People's Exhibit 24 displayed to

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Redirect - McCormick

1    the jury.)

2                    MR. LaMAGNA:  I have nothing further, Judge.

3                    MS. McCORMICK:  With the Court's permission

4    can Investigator Sweeney come down from the witness

5    stand, please?

6                    THE COURT:  Sure.

7                    MS. McCORMICK:  I'm going to be showing to

8    the jury People's Exhibit 2B.  I can't project it

9    because I unplugged it.

10                   Could you come down, Investigator

11                   (Whereupon, the witness steps down.)

12   REDIRECT EXAMINATION

13   BY MS. McCORMICK:

14       Q     Investigator Sweeney, do you see People's Exhibit

15   2B in evidence on the easel before you?

16       A     Yes, I do.

17       Q     I am going to talk to you about this photograph.

18   First I would like you to describe for the jury what is an

19   in line collision?

20       A     In line collision would be considered either a

21   direct head-on or a direct rear-end in line.  Basically very

22   minimal movement from either vehicle.

23       Q     Would it be fair to describe on a head-on first,

24   nose-to-nose, straight across, both ends pretty much line

25   up; headlight to headlight on both sides for an in line

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Redirect - McCormick

1   head-on collision?

2        A     That would be correct.

3        Q     In this case, using People's Exhibit number 2B,

4   is it apparent from this photograph that the driver's side

5   of the pick-up truck is more greatly impacted on that

6   pick-up truck than its passenger side?

7        A     That's correct.

8        Q     And is that also true for the limousine, the

9   driver's side is more greatly impacted than its passenger

10  side?

11       A     Correct.

12       Q     Is it fair to say then, Investigator Sweeney,

13  from the physical evidence that these vehicles did not line

14  up nose-to-nose, but were, in fact, offset?

15       A     Correct.

16       Q     Thank you.  Can you retake the witness stand.

17             (Whereupon, the witness resumes the stand.)

18       Q     As to the roadway, Investigator Sweeney, you

19  received information but you weren't on the scene first; is

20  that correct?

21       A     That's correct.

22       Q     So you confirmed with your colleagues while at

23  the investigation scene what the condition of the roadway

24  was as they arrived?

25       A     That's correct.

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Sweeney - Redirect - McCormick

1     Q     The photograph that you viewed, is that just a

2     confirmation of that information?

3     A     Yes, ma'am.

4     Q     Were you subpoenaed to provide the calibration

5     records of the total station by the defense?

6     A     No, I was not.

7           MR. LaMAGNA:  Objection.

8           THE COURT:  Sustained.

9     Q     Can you tell the jury who set the calibration

10    standard of once a year on that total station?

11    A     The director of the collision reconstruction

12    unit.  All total stations are brought to Albany to be

13    calibrated once a year based on U.S. geological surveys,

14    data points in Albany.

15    Q     And, also, with respect to that -- well, you know

16    what, let me leave that for a moment and come back to it,

17          The sign that is on the center median, is that

18    where it is located, on the center median of the Meadowbrook

19    Parkway, the Norman J. Levy sign?

20    A     Correct.  Center median.

21    Q     You said that is a double-sided sign.  What does

22    that mean?

23    A     In other words what you see on the southbound

24    side you also see on the northbound side.

25    Q     So that sign is visible from both directions?  If

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Redirect - McCormick

1    you are traveling northbound in the correct northbound lanes

2    you would see that sign; is that correct?

3         A    Correct.

4         Q    And if you are traveling southbound in the

5    correct southbound lanes you would see that sign; is that

6    correct?

7         A    That is correct.

8         Q    And it is located on a wide, grassy, center

9    median between the northbound and southbound lanes just

10   south of the Babylon Turnpike overpass?

11        A    That's correct.

12        Q    Investigator Sweeney, with respect, again, now to

13   the total station can people, people without total stations,

14   people with measuring tapes could they be inaccurate in

15   their measurements?

16             MR. LaMAGNA:  Objection.

17             THE COURT:  Overruled.

18        A    Yes.

19        Q    Is it based on the individual person's decision

20   where to set the measuring tape?

21        A    Yes.

22        Q    And can you tell this jury, please, what the

23   accuracy is of the total station?

24        A    Accuracy of the total station that we use is

25   accurate to within one one-hundredth of a foot.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

```
 1        Q      One one-hundredth of a foot?

 2        A      Yes.

 3        Q      And, finally, Investigator Sweeney, can you

 4   recall how many red "wrong way" signs there are between the

 5   turnaround on the Meadowbrook Parkway going northbound up to

 6   the Babylon Turnpike overpass?

 7        A      Approximately three or four.  I know that there

 8   is one at each one of the exits, you will see a wrong way.

 9        Q      And they face, they would face a person who was

10   traveling northbound in the southbound lanes; is that

11   correct?

12        A      Correct.  They would be visible to somebody on

13   their left-hand side.

14        Q      Nothing further.

15   RECROSS-EXAMINATION

16   BY MR. LaMAGNA:

17        Q      Now, you said that the total station would be

18   accurate within one one-hundredth of a foot, correct?

19        A      Yes, sir.

20        Q      If it is operating properly, correct?

21        A      Correct, sir.

22        Q      And the reason we calibrate machines is to make

23   sure that they are operating properly, correct?

24        A      Correct, sir.

25        Q      Because machines can break down, correct?
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

1    A    Correct, sir.

2    Q    And you were just talking about human error,

3  correct?

4    A    Yes, sir.

5    Q    Machine error occurs, too, quite often, doesn't

6  it?

7              MS. McCORMICK:  Objection.

8              THE COURT:  Sustained.

9    Q    It is possible machines can break down?  That is

10  why you calibrate, correct?

11    A    It is possible.

12    Q    When was the last time that this total station

13  was calibrated?

14    A    I don't remember the exact date, sir.

15    Q    So you don't know?

16    A    I do not have it off the top of my head, no.

17    Q    Now, when we were talking about the sign on the

18  Meadowbrook Parkway, the Norman J. Levy green and white

19  sign, do you recall that?

20    A    Yes, sir.

21    Q    Exit signs on parkways are green and white; are

22  they not?

23    A    Yes, sir, they are.

24    Q    And this Norman J. Levy sign is a green and white

25  sign, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

1     A     Yes, sir.

2     Q     Similar color to the exit signs, correct?

3     A     Yes, sir.

4     Q     And if a car is mistakenly driving north in the

5     southbound lane this sign would be on that driver's

6     right-hand side, correct?

7     A     Correct, sir.

8     Q     Where exits would be, correct?

9     A     Correct, sir.

10    Q     So, this sign, if you are driving on the correct

11    northbound side, would also be visible, correct?

12    A     Yes, sir.

13    Q     But that would be on your left-hand side,

14    correct?

15    A     Yes, sir.

16    Q     Not where exits would be, correct?

17    A     Yes, sir.

18    Q     So, if a driver is driving erroneously in the

19    southbound lane, in the southbound lanes, but driving north

20    he would see this green and white sign on his right side,

21    correct?

22    A     Yes, sir.

23    Q     And this is in very close proximity to where the

24    accident occurred; is it not?

25    A     Yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

1              MR. LaMAGNA: I have nothing further.

2              MS. McCORMICK:  Just a couple, Judge.

3      FURTHER REDIRECT EXAMINATION

4      BY MS. McCORMICK:

5        Q     Are there occasionally left side exits off of a

6      parkway?

7        A     Yes, there is.

8        Q     And the Norman J. Levy sign that is in the

9      center, is that a narrow, rectangular sign or a wide

10     rectangular sign as an exit sign would be?

11       A     It is a smaller rectangle sign.

12       Q     Does it say "Exit" on it anywhere or a number or

13     anything indicating an exit?

14       A     No, ma'am.

15             MS. McCORMICK:  I have Nothing further.

16             MR. LaMAGNA:  Nothing, further.

17             THE COURT:  Thank you, Investigator.

18             (Whereupon, the witness exits the courtroom.)

19             THE COURT:  Ladies and gentlemen, at this

20     time I'm going to give you a short break, and then the

21     court officers will instruct you where to proceed and

22     when.  Don't talk about the case.

23             (Whereupon, the jury exited the courtroom.)

24             COURT OFFICER:  Remain seated as the judge

25     exits the bench.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

1              (Whereupon, a brief recess was held.)

2              THE CLERK:  Case on trial, Indictment 1910N

3      of 2005, People versus Martin Heidgen.  All parties

4      present.  Defendant is present.

5              THE COURT:  On the application of the People

6      to view the cars involved, or the main cars involved in

7      the accident, the Court has granted that request.

8              The cars have been delivered to the north end

9      of the West Wing, which is a secure area.  All counsel

10     and the defendant will remain together.  No one will

11     say anything.  This is for the sole purpose of the

12     viewing by the jury of the cars.  Counsel are present,

13     as is the defendant, to simply observe the jury's

14     viewing of those cars.  No one is to say anything to

15     the jury.

16              (Whereupon, the Court, counsel, the defendant

17     and the jury proceeded outside to view the evidence.)

18              THE CLERK:  Case on trial.  Indictment 1910N

19     of 2005, People versus Martin Heidgen.

20              People ready?

21              MR. HAYDEN:  Ready, your Honor.

22              THE CLERK:  Defense ready?

23              MR. LaMAGNA:  Defense is ready.

24              THE CLERK:  Defendant is present, your Honor.

25              THE COURT:  We have a note.  I'm going to

Inv. Sweeney - Recross - LaMagna

1    have it marked as a Court exhibit.  It reads, date and

2    time, "Juror Number Four will be attending an event at

3    the Jones Beach Theater on Sunday, September 17th.  In

4    order for me to attend this event it would be more

5    convenient for me to take the Meadowbrook Parkway.  Am

6    I permitted to take this route or should I take a

7    different route?"

8                 I can't really prevent a juror from traveling

9    main thoroughfares in Nassau County.  I'm going to say

10   it is okay to take the route.  Don't slow down; doesn't

11   stop.  It is the evidence will be that which he sees

12   and hears in court.

13                MR. LaMAGNA:  Judge, if I may, Wantagh

14   Parkway goes to Jones Beach, which is right next to the

15   theater.

16                THE COURT:  I can suggest that.  I cannot

17   prevent anybody from driving on the Meadowbrook

18   Parkway.

19                MR. LaMAGNA:  I understand.

20                THE COURT:  I will suggest that, but at the

21   same time I'm not going to stop anybody from using the

22   Meadowbrook Parkway.

23                THE COURT:  Bring in the jury.

24                COURT OFFICER:  Jury entering.

25                (Whereupon, the jury entered the courtroom,

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Sweeney - Recross - LaMagna

1    and upon taking their respective seats, the following

2    occurred:)

3              THE CLERK:   Jurors are present and seated,

4    your Honor.

5              THE COURT:   Thank you.

6              Just so the record stays clear, we have just

7    returned from the jury's viewing of the two major

8    automobiles involved in the incident.  At that time,

9    pursuant to instructions of the court officers, before

10   we went on that viewing nobody said a word either

11   within the jury or to the jury, just so the record is

12   clear on that.

13             I have a note from the jury dated today's

14   date:  "Juror Number Four be will be attending an event

15   at Jones Beach Theater on Sunday, September 17th.   In

16   order for me to attend this event it would be more

17   convenient for me to take the Meadowbrook Parkway.  Am

18   I permitted to take this route or should I take a

19   different route?"

20             The Wantagh Parkway goes there.  If it is

21   possible to go there, please do that.  I am not going

22   to tell the members of the Long Island community that

23   they can't go on the Meadowbrook Parkway.  Obviously,

24   any evidence that you use in coming to your conclusions

25   in this case will be those items in evidence, that you

Inv. Walsh - Direct - McCormick

1    see or hear described by witnesses; not anything that

2    you, yourself, might see.  To look at something on your

3    own, that isn't fair.  Your sworn obligation is to be

4    fair, and the only way to do that is by evaluating the

5    evidence in this case.  Please be guided accordingly.

6              Call your next witness.

7              MR. HAYDEN:  People call Investigator Bill

8    Walsh.

9              COURT OFFICER:  Step up.  Remain standing,

10   raise your right hand and face the clerk.

11        W I L L I A M   W A L S H,        a witness

12             called on behalf of the People, having been

13             first duly sworn by the Clerk of the Court,

14             was examined and testified as follows:

15             THE CLERK:  Put your hand down.  State your

16   name, spelling your last name, shield and command for

17   the record.

18             THE WITNESS:  Special Investigator William

19   Walsh, W-A-L-S-H, shield number 327.  I'm an

20   investigator with the Nassau D.A.'s Office.

21             THE CLERK:  Thank you.

22   DIRECT EXAMINATION

23   BY MS. McCORMICK:

24   Q    Good morning, Investigator Walsh.

25             Just a couple of questions.  You said you are an

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Direct - McCormick

1    investigator with the Nassau County D.A.'s Office.  Is that

2    correct?

3        A    That's correct.

4        Q    Approximately how many years have you held this

5    position?

6        A    Approximately two years.

7        Q    Describe your background prior to holding this

8    position?

9        A    Twenty years New York City Police Department as a

10   police officer, detective and sergeant.

11       Q    Investigator Walsh, with respect to a crash that

12   occurred on the Meadowbrook Parkway, July 2nd 2005, did you

13   have occasion to go to the scene of the Meadowbrook Parkway

14   on this past Sunday, the date of it being --

15       A    Yes, September 10th.

16       Q    And at that time did you participate in the

17   roadway being closed from the area of the Southern State

18   Parkway down to the Loop Parkway?

19       A    Yes, I did.

20       Q    As part of your participation did you, in fact,

21   videotape a section of that roadway traveling northbound in

22   the southbound lanes from the area of the turnaround, just

23   before the Loop Parkway exit, up to and including north of

24   the Babylon Turnpike overpass?

25       A    Yes, I did.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Direct - McCormick

1      Q      Investigator Walsh, did you have occasion to

2    review -- actually, let me approach the witness with what I

3    ask be marked People's Exhibit 60 for identification.

4                (Whereupon, a DVD, so marked People's Exhibit

5          60 for identification.)

6                COURT OFFICER:  People's Exhibit 60 marked

7          for identification.

8      Q      Investigator Walsh, can you take a look at that,

9    please?

10               Do you recognize that?

11     A      Yes, I do.

12     Q      What do you recognize to be?

13     A      This is a copy of the tape I just reviewed, I put

14   my initials on it, and dated it today.

15     Q      You reviewed that DVD today?

16     A      Yes.

17     Q      That is, in fact, a fair and accurate copy of

18   that which you, yourself, took on September 10th 2006?

19     A      Yes, that's correct.

20     Q      Does it fairly and accurately represent the

21   roadway in daylight hours in terms of its geographic

22   location?

23     A      Yes, it does.

24               MS. McCORMICK:  Your Honor, at this time the

25          People move People's Exhibit 60 into evidence.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Direct - McCormick

1          THE COURT:  Please show it to counsel.

2          MR. LaMAGNA:  Judge, considering I just got

3     this this morning, I don't know if I have an objection

4     necessarily to this at this time, but I would just ask

5     that I have an opportunity to review this in a timely

6     fashion so I could make that objection.

7          THE COURT:  Well, earlier today all counsel,

8     including myself, reviewed that contents of that DVD.

9     I find no prejudice to the defendant in its admission.

10    It will be illustrative to the jury to see from a point

11    of view of a northbound car in the southbound lanes of

12    the Meadowbrook Parkway, those things that one can see

13    in daylight; not necessarily reflecting the view had by

14    any particular person on the night of the incident.

15    The jury may view this DVD.

16          We have to dim the lights in the courtroom,

17    please.

18          It is now in evidence.

19          (Whereupon, People's Exhibit 60 for

20    identification now received and marked People's Exhibit

21    60 in evidence.)

22          (Whereupon, People's Exhibit 60, a DVD,

23    displayed to the jury.)

24          MS. McCORMICK:   If your Honor indulges me

25    just to turn this off.  Excuse me.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Cross - LaMagna

1          THE COURT:  Sure.

2     Q     Investigator Walsh, could you describe for the

3  jury, please, first of all, who was driving the vehicle in

4  which you were traveling?

5     A     Investigator Mike Harris, New York State Police.

6     Q     Do you know, Investigator Walsh, whether a

7  constant speed was maintained from the point that you began

8  that tape until its end?

9     A     Yes.  Sixty miles an hour.

10     Q     Investigator Walsh, the final overpass that is

11  passed underneath in the view from the camera, which

12  overpass was that?

13     A     Excuse me.  I am forgetting what the roadway is

14  there.

15     Q     Was the final --

16     A     It was the final overpass where the accident

17  occurred.

18     Q     Excuse me.  That was where the crash occurred,

19  Babylon Turnpike?

20     A     Yes, Babylon Turnpike.

21          MS. McCORMICK:  Thank you.  I have nothing

22     further.

23          THE COURT:  Mr. LaMagna.

24  CROSS-EXAMINATION

25  BY MR. LaMAGNA:

Inv. Walsh - Cross - LaMagna

```
1    Q    Is it Investigator Walsh?

2    A    Special Investigator is the actual title.

3    Q    I'm sorry.

4         Sir, you were asked to film a portion of the

5    Meadowbrook Parkway, correct?

6    A    That is correct.

7    Q    That was at the direction of the district

8    attorney's office, correct?

9    A    That's correct.

10   Q    That was just this past Sunday?

11   A    Yes.

12   Q    And you said that you were driving 60 miles an

13   hour; is that correct?

14   A    That's correct.

15   Q    Is that a constant 60 miles per hour?

16   A    Yes, approximately.

17   Q    I understand from what we were looking at it

18   looked like you were driving in te right-hand lane.  Was

19   that for any reason, or that was the lane Investigator

20   Harris happened to be driving in rather than the middle?

21   A    I guess from previous information we wanted to

22   depict --

23   Q    Well, were you told to drive in the right lane?

24   A    Yes, we deliberately drove in the right-hand

25   lane.
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Cross - LaMagna

1    Q    You were told to drive in the right lane?

2    A    Yes.

3         MS. McCORMICK:  Your Honor, he was not

4    driving.

5    Q    Well --

6    A    I was not told to drive in the right lane.  We

7    were driving in the right lane.

8    Q    You don't know then why Investigator Harris chose

9    to drive in the right lane?  That's all I am asking.

10   A    That's true.

11   Q    And this was what time in the morning?

12   A    Approximately 8:30, 9 o'clock.

13   Q    And you were given instructions by the district

14   attorney which portion of the parkway to film; is that

15   correct?

16   A    That's correct.

17   Q    In view of the video, it looks like the video

18   kept going for some distance past the Babylon Turnpike

19   overpass; is that correct?

20   A    That's correct.

21   Q    Thank you.

22        MR. LaMAGNA: Nothing further.

23        Ms. McCORMICK:  Nothing further, Judge.

24        THE COURT:  Okay, ladies and gentlemen, we

25   are going to break for the day.  We are going into a

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Cross - LaMagna

1    weekend.  I know you know these things, but between now

2    and 9:30 Monday morning, be prompt all of you.  They'll

3    be here.  I'll be here.

4           Between now and then you must not discuss the

5    case amongst yourselves until the entire case has been

6    presented to you and the Court has given you the charge

7    as to the law to all of the counts in the indictment

8    which shall be given to you for your consideration.

9    You must keep an open mind until all of the evidence is

10   presented and you are charged as to the law.

11          This is important:  You must not read or

12   listen to any accounts or discussions of the case in

13   the event it is reported by newspapers or other media.

14          You must not visit or view the premises or

15   place where the offense or offenses charged were

16   allegedly committed, or any other premises or places

17   involved in the case.  That, of course, is an

18   intentional visit other than passing by.

19          You are not to permit any party to discuss

20   the case with you or attempt to influence you.  You

21   must promptly report to the Court any incident within

22   your knowledge of any person who improperly tries to

23   influence you or any member of the jury.

24          Prior to discharge you may not accept any

25   payment or benefit in consideration for supplying any

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Cross - LaMagna

1    information concerning this trial.

2             I also advise you, if at any time any of the

3    participants in this trial shall meet you in the

4    hallways or outside we will not speak to you to avoid

5    any appearance of impropriety.

6             Have a nice weekend.  See you Monday.

7                       o0o

8             (Whereupon, the jury exited the courtroom,

9    and the trial adjourned to Monday, the 18th day of

10   September 2006, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GIGI WRIGHT, RPR    (516) 571-2503

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    ---------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3

 4              -against-

 5
      MARTIN HEIDGEN,
 6
                               DEFENDANT.
 7    ---------------------------------------x
      INDICTMENT #:  1910N-06
 8    ..                          Mineola, New York
                                  September 18, 2006
 9

10    B E F O R E:   HONORABLE ALAN L. HONOROF
                        Acting Supreme Court Justice
11

12    A P P E A R A N C E S:

13                   HON. KATHLEEN M. RICE
                     District Attorney, Nassau County
14                      262 Old Country Road
                        Mineola, New York 11501
15                   BY:  ROBERT HAYDEN, ESQ.
                        Assistant District Attorney
16                        and
                        MAUREEN McCORMICK, ESQ.
17                      Assistant District Attorney

18
                     STEPHEN LaMAGNA, ESQ.
19                      Attorney for the Defendant
                        666 Old Country Road
20                      Garden City, New York
                     BY:  STEPHEN V. LaMAGNA, ESQ.
21                            and
                        GREGORY MARTELLO, ESQ.
22
                             o0o
23                      CONTINUED TRIAL
                             o0o
24                   Gigi Wright, R.P.R.
                     Official Court Reporter
25


                GIGI WRIGHT, RPR    (516) 571-2503
```

Proceedings

1          (In open court. Defendant present.)

2          THE CLERK:  Case on trial continues,

3     Indictment number 1910N of 2005, People versus Martin

4     Heidgen.

5          People ready?

6          MR. HAYDEN:  Ready, your Honor.

7          THE CLERK:  Defendant ready?

8          MR. LaMAGNA:  Defendant is ready, your Honor.

9          THE CLERK:  Defendant is present, Your Honor.

10          THE COURT:  I understand there is an

11     application.

12          MR. LaMAGNA:  Yes, your Honor.  Judge, the

13     district attorney is planning on calling a witness this

14     morning a Mr. --  I don't know how if I'm pronouncing

15     his name correctly -- K-W-A-S-N-O-S-K-I.  I understand,

16     Judge, that he is an expert, an accident reconstruction

17     expert.

18          Judge, we had, as I articulated before, in

19     similar situations where we were presented with late

20     notice of a witness or evidence in this case, we have

21     asked for all experts.  We had asked for all reports in

22     our original demands that were submitted in October of

23     last year.  This is not just any witness; this is an

24     expert witness, a accident reconstruction expert

25     witness.

Proceedings

```
 1              The district attorney's office provided us

 2       with a report from the New York State Police of an

 3       accident reconstruction report in January of this year,

 4       nine months ago, and in that report there was a

 5       conclusion that the speed of the Chevrolet was going no

 6       more than 45 miles an hour.  The district attorney made

 7       an application that they wanted a second accident

 8       reconstruction expert in this case, and I believe at

 9       some point we were before Judge Donnino, over my

10       initial objection, and he gave them extra time to have

11       a new expert, Wade Bartlett, prepare a report.  This

12       was going on for months, until at such point Judge

13       Donnino said to the prosecution if the report is not in

14       in a certain time, I'm precluding it, the second

15       report, because you have your original report.  I

16       should not have allowed you to have this much time for

17       a second report.

18              We finally get that report in May, and then

19       we get a third report by that same accident

20       reconstructionist on May 30th.

21              THE COURT:  Mr. Bartlett?

22              MR. LaMAGNA:  Yes.

23              THE COURT:  You have one State Police report

24       and two Bartlett reports?

25              MR. LaMAGNA:  Correct.
```

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

```
1              THE COURT:  All properly noticed, at least so

2     far as Judge Donnino is concerned?

3              MR. LaMAGNA:  Yes.  Late, of course, with the

4     second report, but --

5              THE COURT:  Judge Donnino --

6              MR. LaMAGNA:  He allowed them to do that,

7     yes, that is correct, Judge.

8              MR. LaMAGNA:  Then I have to turn over all of

9     this for my expert to review, to prepare my defense in

10    this case.  We were on a very tight leash to get this

11    case going, and my expert received those reports in a

12    timely fashion.  Our report was finished and that was

13    turned over, and we were ready for trial.

14             I might add during the course of the summer

15    we were talking about scheduling.  Since it was summer,

16    and I had received various witness lists from the

17    district attorney's office in July and August, with

18    this person never even mentioned on those lists.  It

19    was only at the time of jury selection where I got this

20    new final list that this new witness appears.  And some

21    time during that period I said, "Who is this person,"

22    because I didn't recognize the name.

23             Well, it is an accident reconstructionist.

24    We already have that.  You can't use that.  We will see

25    as we get closer to the time we call him.  I was under
```

Proceedings

1    the impression, and may be wrong, that this witness was

2    only going to testify as to general principles of

3    accident reconstruction, in spite of the fact that they

4    have two already.  Not one; they have two.  And they

5    have three reports.

6              Now, we are in the middle of trial.  This

7    expert didn't even prepare a report, which I find very

8    suspicious, to be turned over to me, and as a criminal

9    defendant after having two accident reconstructionists,

10   having three reports, I, as a defendant, or my client,

11   has to hear for the first time what this accident

12   reconstruction expert is going to say when he takes the

13   witness stand at this trial.  So we have no way to

14   prepare for this.  It can't happen.  That is what

15   discovery is about; that there is no surprise for a

16   criminal defendant.

17             It is not like the district attorney didn't

18   have ample opportunity.  As I said, they don't just

19   have one, they have two experts for the same thing.

20   Now I received, just today, photographs, I assume

21   related to what they want this expert to testify, that

22   were taken yesterday, in the middle of this trial.  New

23   stuff.  We -- we can't defend that which we hear for

24   the first time what this witness is going to testify at

25   a criminal trial in a murder case.

Proceedings

1          Judge, there has to be a stop to this.  They

2     can't keep coming in with this egregiously late

3     application for more and more evidence that they are

4     just getting around to doing.  This case is a year and

5     three months old.  This should have been done months

6     ago if they wanted to do it.

7          There should be a report.  I should have

8     gotten a report where I would have ample opportunity to

9     review that report and my expert review that report so

10    I know what evidence is there.  They just can't come

11    in.  They have their reports.  They have their experts.

12    We are ready.  We opened on this case and our experts

13    are ready to go.  Our expert is --

14         THE COURT:  Let me hear from the People.

15         People.

16         MS. McCORMICK:  Your Honor, the New York

17    State Police created a report in January, with results

18    that, in light of the evidence, the other evidence that

19    the People had available to them, seemed contrary to

20    that evidence, and so an outside expert was hired to

21    review their findings and create their own

22    investigation.  That was Wade Bartlett.  Mr. Bartlett

23    came up with a, or rather concluded using

24    methodologies, specific accident reconstruction

25    methodologies, with a huge discrepancy from the New

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1    York State Police report, first in his preliminary

2    report, and then a discrepancy from himself in the

3    final report.

4          The People are very concerned about

5    presenting to this jury evidence that is not

6    scientifically reliable.  We reached out, after we

7    received Mr. Bartlett's first preliminary report, to

8    John Kwasnoski, a professional in the field of physics

9    for 31 years, a teacher of accident reconstruction in

10   thirty states, to review the methodologies employed by

11   both the State Police and Wade Bartlett.

12         THE COURT:  When did you do that?

13         MS. McCORMICK:  That was in May, after the

14   first report from Mr. Bartlett was received.  I think

15   it is dated may 4th.

16         THE COURT:  Did you notify defense counsel?

17         MS. McCORMICK:  That he was asked to review

18   it?

19         THE COURT:  Yes.

20         MS. McCORMICK:  Not at that time.  Not at

21   that time, Judge.

22         THE COURT:  He reviews it.  And does he

23   prepare a report?

24         MS. McCORMICK:  He does not.  He is not

25   requested to do a separate analysis.  He is simply

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

```
1        reviewing those methodologies employed by the State

2        Police and by Wade Bartlett for whether or not any of

3        the information provided could be considered

4        scientifically reliable.

5                In the final -- there was no decision made

6        for Mr. Kwasnoski to testify in this case.

7        Mr. Schneider did a report in July using another

8        methodology that was not used by either of the first

9        two.  Again, that information was sent to Mr. Kwasnoski

10       at the end of July for his review.

11               THE COURT:  Well, Mr. Schneider, I take it,

12       is the defense expert?

13               MS. McCORMICK:  Yes.  I apologize.

14               THE COURT:  Schneider's report is timely

15       served on the People in accordance with the C.P.L.?

16               MS. McCORMICK:  That was done after.

17               THE COURT:  Do you concede it was served in a

18       timely manner in accordance with the law?

19               MS. McCORMICK:  It was served in a timely

20       fashion, but by Judge Donnino.

21               THE COURT:  By an order of this Court?

22               MS. McCORMICK:  Yes.

23               THE COURT:  An expert in reviewing findings

24       must generate a report.

25               MS. McCORMICK:  There is nothing in the
```

GIGI WRIGHT, RPR     (516) 571-2503

Proceedings

1    Criminal Procedure Law that requires it.  If he is not

2    conducting a crash analysis to the extent that he is

3    concluding a speed, but rather reviewing the

4    methodologies employed, no report would be forthcoming

5    on that issue.

6         The notes that he took or the calculations

7    that he did in reviewing Mr. Bartlett's calculations,

8    the State Police calculations, and Mr. Schneider's have

9    been turned over to defense counsel at the beginning of

10   September.  He was on the witness list as we approached

11   trial, because that is when it was determined that he

12   would be required to testify to explain to this jury,

13   to educate this jury, about the methodologies used and .

14   what would constitute scientifically acceptable

15   evidence.

16        Mr. Kwasnoski comes out of Massachusetts.  He

17   came here as of yesterday on the ferry, and at that

18   point was asked to then continue his review BY visiting

19   the scene, by visiting the vehicles themselves in the

20   impound yard, and making certain inspections consistent

21   with the methodologies that should be employed in this

22   case.

23        Photographs were taken of the sight line

24   analysis that was available to the defense expert as

25   well.  There is no surprise here.  This is the crash.

Proceedings

1       These are the vehicles.  That was the damage.  He had

2       available to him all of the things that Mr. Kwasnoski

3       did.  There seems to be a belief on the part of

4       counsel, as he gets more and more involved and

5       animated, that he is somehow entitled to have

6       telescoped for him everything that the People are

7       doing.  And whether or not this investigator is at the

8       scene yesterday and doing what, he is looking at

9       things, he is measuring a sight line distance off the

10      of the limousine.  I'll say it again:  This was

11      available to the defense, had they chosen to do it.

12      The defense reconstruction expert is capable of and

13      certainly could be in the courtroom today to listen to

14      Mr. Kwasnoski's testimony to incorporate it into his

15      own when he takes the stand.

16              THE COURT:  Let me understand.  First, you

17      intend to call a witness.  Do you intend to call the

18      witness before the experts' reports were exchanged?

19              MS. McCORMICK:  I intend to call the witness

20      to review the methodologies employed in this type of

21      crash.

22              THE COURT:  This would happen before the jury

23      heard any expert report properly exchanged pursuant to

24      law or order of the Court?

25              MS. McCORMICK:  This would be a comment on

Proceedings

1    the type of collision that it is, and the type of

2    methodologies that ought to have been employed.

3            Additionally -- excuse me, Judge -- with

4    additional affirmative actions taken by Mr. Kwasnoski

5    in terms of three things:  A sight line analysis, as I

6    just described about the limousine yesterday; analyses

7    of the tires, he did a tire inspection at the pound

8    yesterday; and also a brake lamp analysis.

9            There is, in addition to methodology

10   testimony here, affirmative testimony, and very

11   importantly, Judge, and not subject to the

12   methodologies used by other experts, a review of the

13   debris fields and debris patterns reflected in

14   photographs taken of this collision at the scene, and

15   what it says about the area of impact.  It is critical

16   to an accident reconstruction.

17           MR. LaMAGNA:  Judge, if I may?

18           THE COURT:  Yes.

19           MR. LaMAGNA:  What I just heard from the

20   assistant district attorney is that they are hiring a

21   third expert to impeach their first two experts.

22   That's exactly what she just said.  The correct

23   methodology.  Nobody told the State Police who to use

24   and what methodologies to use.  They just did it.  They

25   had their report.  That is their report.

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1    They also then hired, because they didn't

2    like that report, they hired Wade Bartlett.  He gives a

3    report where the speed of the Chevrolet actually

4    dropped down to 23 to 30 miles an hour.  They didn't

5    like that.  He gives a third report, where he totally

6    changes his opinion, and now it is at 60.  Now they

7    want to bring in a third one, and we just heard it from

8    Ms. McCormick, to basically impeach their own witnesses

9    and say that what they did was wrong; not the

10   methodologies that should have been used.  That is

11   completely improper.

12        And, another, thing we don't have the burden

13   of proof in this case; they do.  Whether any of this

14   was available or not is of no moment.  The point is we

15   need to know what their experts are going to say and

16   what evidence they are going to present against us so

17   that we can put together a defense.

18        We have done everything by the book so far as

19   what Judge Donnino asked for; the time lines, getting

20   the expert reports in.  This guy has done stuff

21   yesterday.  She just said that they actually want him

22   to testify of a material nature.  This is the third

23   expert.  I have never seen anything like this.

24        MS. McCORMICK:  Your Honor, with respect to

25   impeaching my own witnesses, I can't impeach people who

Proceedings

1    haven't been on the stand.

2            THE COURT:  That was part of my point.

3            MS. McCORMICK:  I would not be impeaching

4    them.  The expert is prepared to testify, and I would

5    make clear to him that it is the Court's directive not

6    to refer to any of the prior reports, and simply

7    explain what methodologies should or should not be used

8    under these circumstances and why.

9            THE COURT:  One moment.

10           (Brief pause in proceedings.)

11           MS. McCORMICK:  May I bring one other thing

12   to the Court's attention before your Honor leaves;

13   which is, that in the course of that testimony, I just

14   have to make clear for the record that the People have

15   followed the Court's directives.  There was no breach

16   in terms of when the reports were generated.  It is

17   true that Judge Donnino waited for Mr. Bartlett's

18   report for a very long time, but this animated request

19   or demand that a report must be generated for the

20   defense is simply not what the Criminal Procedure Law

21   says.

22           THE COURT:  Let me see what the Criminal

23   Procedure Law requires, and see where we are going to

24   go with this.

25           MR. HAYDEN:  Thank you, your Honor.

Proceedings

1          (Brief pause in proceedings.)

2          THE COURT:  It seems to me that if this

3     witness was to be able to provide relevant information,

4     if the witness were to be able to do that -- and I am

5     reserving decision on the application by the defendant

6     -- it would be rebuttal following presentation of

7     reports which were properly drawn and exchanged

8     pursuant to both Criminal Procedure Law and by order of

9     Judge Donnino.  So I am going to reserve decision until

10    the jury has had the opportunity to hear all three of

11    these reports that were properly exchanged, and then

12    we'll see.

13          Please produce the jury.

14          THE CLERK:  Case on trial continues.

15          COURT OFFICER:  Jury entering.

16          (Whereupon, the jury entered the courtroom,

17    and upon taking their respective seats, the following

18    occurred:)

19          THE CLERK:  Case on trial, Indictment number

20    1910N of 2005, People versus Martin Heidgen.

21          People ready?

22          MR. HAYDEN:  Ready, your Honor.

23          THE CLERK:  Defendant ready?

24          MR. LaMAGNA:  Defendant is ready, your Honor.

25          THE CLERK:  Defendant is present, Your Honor,

Inv. Baez - Direct - Hayden

1        and the jurors are present and seated, your Honor.

2                    THE COURT:  Thank you.  Good morning, ladies

3        and gentlemen.  Sorry to have delayed you.  We were

4        working on matters germane to the case.  We were not

5        simply wasting your time.  We had to get things out of

6        the way that require conversations between ourselves.

7                    In the meantime, People.

8                    MR. HAYDEN:  Investigator Eric Baez.

9                    COURT OFFICER:  Step up, remain standing,

10       raise your right hand and face the clerk.

11           E R I C   B A E Z,        a witness called

12           on behalf of the People, having been first

13           duly sworn by the Clerk of the Court, was

14           examined and testified as follows:

15                   THE CLERK:  Please be seated.  State your

16       name, spelling your last name, shield and command for

17       the record.

18                   THE WITNESS:  Investigator Eric Baez,

19       B-A-E-Z, 386, State Police Barracks, Brentwood, New

20       York.

21                   THE CLERK:  You can take a seat.

22       DIRECT EXAMINATION

23       BY MR. HAYDEN:

24       Q     Good morning, Investigator.

25       A     Good morning.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1      Q      How long have you been a member of the New York

2   State Police?

3      A      Eighteen and-a-half years.

4      Q      How long have you been an investigator?

5      A      Four and-a-half years.

6      Q      Do you know a man named Martin Heidgen?

7      A      I do.

8      Q      Would briefly describe him.

9      A      White male, mid-20s, dark hair, dark eyes.

10      Q      Do you see Martin Heidgen in this courtroom

11   today?

12      A      I do.

13      Q      Please point him out and describe for the record

14   what he is wearing today.

15      A      He is sitting in the middle, blue jacket, gray

16   shirt, looks like a polka dot tie.

17             MR. HAYDEN:   Let the record reflect that the

18         witness has indicated the defendant Martin Heidgen,

19         your Honor.

20             THE COURT:   Record will so reflect.

21      Q      I'm directing your attention to the early morning

22   of Saturday, July 2nd 2005.

23             Did you become involved that morning with

24   investigating the deaths of a 59-year-old man named Stanley

25   Rabinowitz, and a seven year old girl named Katherine Flynn?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1      A      I did.

2      Q      Describe the circumstances under which you became

3   involved in that investigation.

4      A      At approximately 3:15 a.m. on July 2nd 2005, I

5   was contacted by the New York State Police Communications

6   Headquarters, and advised me that there is a motor vehicle,

7   fatal accident, on the Meadowbrook State Parkway,

8   southbound, south of the Southern State Parkway, and that my

9   assistance was needed.

10      Q      Did you go there?

11      A      I did.

12      Q      When did you get there?

13      A      Approximately 4:20 a.m.

14      Q      What happened then?

15      A      I sought after the case agent, case investigator,

16   Investigator Michael Harris.

17      Q      Did you find him?

18      A      I did.

19      Q      What happened when you found him?

20      A      When I approached Investigator Harris I said,

21   "Mike, what do you need me to do?"

22      Q      What did he say?

23      A      He advised me that there was a defendant at

24   Nassau County Medical Center, that blood was drawn and he

25   asked that I go to the hospital to secure the blood kit and

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    bring it back to him at the crime scene.

2        Q    Did you go to Nassau University Medical Center?

3        A    I did.

4        Q    Where did you go when you arrived there?

5        A    I went to the emergency room.

6        Q    Ground level?

7        A    Yes, sir.

8        Q    Back of the building?

9        A    Yes, sir.

10       Q    Did you see a blood kit when you arrived in that

11   area?

12       A    I did.

13       Q    When?

14       A    At approximately 4:50 a.m.

15       Q    Who gave it to you?

16       A    Trooper Stafford.

17       Q    Was the blood kit Trooper Stafford gave you

18   closed when he gave it to you?

19       A    Yes.

20       Q    Was it sealed?

21       A    No.

22       Q    Did you walk away then and open the closed blood

23   kit Trooper Stafford gave you?

24       A    I did.

25       Q    Did you examine the contents?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    A    I did.

2              MR. HAYDEN:  Your Honor, I am going to hold

3    up this clear plastic container from People's Exhibit

4    16 in evidence.

5    Q    Did the outer box of the blood kit contain a

6    clear plastic container, just like this one?

7    A    It did.

8    Q    Was the clear plastic container closed when you

9    opened the outer box of the blood kit?

10   A    Yes.

11   Q    Was it sealed?

12   A    No.

13   Q    Were there two tubes with gray stoppers inside

14   the closed clear plastic container when you opened the outer

15   box of the blood kit?

16   A    Yes.

17   Q    Was there anything inside those tubes you found

18   inside the closed clear plastic container?

19   A    Yes.

20   Q    What?

21   A    They were filled with blood.

22   Q    Were the gray stoppers in place over the two

23   tubes filled with blood?

24   A    Yes.

25   Q    Were the tubes sealed in any way?

Inv. Baez - Direct - Hayden

1      A      They were.

2      Q      How were they sealed?

3      A      With an orange, red integrity seal, initialed

4   D.P.O. and the date 7/2/05, across the rubber stopper and

5   affixed to the glass tubing.

6      Q      Was there a label attached to the clear plastic

7   container you found when you opened the outer box of the

8   blood kit?

9      A      Yes.

10     Q      Just like this one?

11     A      Yes.

12            MR. HAYDEN:  Would you please step down with

13     the Court's permission?

14            THE COURT:  Sure.

15            (Witness complies.)

16     Q      Would you stand over by that screen?

17            MS. McCORMICK:  Your Honor, may I sit so the

18     jury could see?

19            THE COURT:  Yes.

20     Q      Do you see "name of subject" on that label?

21     A      I do.

22     Q      Was there anything written next to "name of

23     subject" when you opened the outer box and removed the

24     closed clear plastic container?

25     A      No.

Inv. Baez - Direct - Hayden

```
 1    Q    You see "offense" below "name of subject"?

 2    A    I do.

 3    Q    Was there anything written alongside "offense"?

 4    A    Yes.

 5    Q    What was written there?

 6    A    "DWI."

 7    Q    Was there anything written next to "date of

 8  incident"?

 9    A    Yes.

10    Q    What was written there?

11    A    "7/2/05."

12    Q    Was there anything written next to time?

13    A    Yes.

14    Q    What was written there?

15    A    "2:06 a.m."

16    Q    Was there anything written next to "police

17  officer"?

18    A    Yes.

19    Q    What was written there?

20    A    "Trooper O'Hare."

21    Q    Was there anything written next to "date blood

22  drawn"?

23    A    Yes.

24    Q    What was written there?

25    A    "7/2/05."
```

Inv. Baez - Direct - Hayden

```
1    Q    Anything written next to "time"?

2    A    Yes.

3    Q    What?

4    A    "2:45 a.m."

5    Q    Anything next to location of drawing?

6    A    Yes.

7    Q    What was written there?

8    A    "NCMC."

9    Q    Anything next to "blood drawn by"?

10   A    Yes.

11   Q    What was written there?

12   A    "R.N. Busco."

13   Q    That's the way you found it?

14   A    Yes, sir.

15   Q    You see "received from" beneath "chain of

16   possession"?

17   A    Yes.

18   Q    Was there anything written next to that first

19   designation of received from?

20   A    Yes.

21   Q    What was written there?

22   A    "DEFT," defendant.

23   Q    Was there anything written next to "by"?

24   A    Yes.

25   Q    What was written there?
```

Inv. Baez - Direct - Hayden

```
 1      A      "Busco."

 2      Q      Was there anything written next to "date"?

 3      A      Yes.

 4      Q      What was there written there?

 5      A      "7/2/05."

 6      Q      Anything written next to "time"?

 7      A      Yes.

 8      Q      What was written there?

 9      A      "2:45 a.m."

10      Q      Go down to the second line "received from."  Was

11   there anything written there when you opened the outer box

12   of the blood kit and removed the closed plastic container?

13      A      No.

14      Q      Did you write anything next to "received from"?

15      A      I did.

16      Q      What did you write?

17      A      "Stafford."

18      Q      Did you write anything next to "by"?

19      A      Yes.

20      Q      What did you write?

21      A      "Investigator Baez."

22      Q      Did you write anything next to "date"?

23      A      I did.

24      Q      What did you write?

25      A      "7/2/05."
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    Q    Did you write anything next to "time"?

2    A    I did.

3    Q    What did you write?

4    A    "4:50 a.m."

5    Q    Was there anything written beneath your writing?

6    A    No.

7    Q    Did you leave that blank?

8    A    I did.

9    Q    Describe what you did after you examined the

10   contents of the closed sealed plastic container?

11   A    When I opened the box I removed the various

12   paperwork, observed that the tubes of blood were sealed by

13   Trooper O'Hare, and using the seals that Trooper O'Hare had

14   filled out, I sealed the clear plastic container containing

15   the tubes of blood that were sealed by Trooper O'Hare.

16   Q    Was the defendant unconscious at that time?

17   A    He was.

18   Q    Had he ever confirmed that he was Martin Heidgen?

19   A    No.

20   Q    Had anyone confirmed that he was Martin Heidgen?

21   A    No.

22        MR. HAYDEN:  Your Honor, now may I display

23   these seals, which are also part of 16 in evidence?

24        THE COURT:  All right.

25   Q    Were there two seals just like that one inside

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

```
 1    the box, the outer box of the blood kit?

 2         A    Yes.

 3         Q    Was each of the two seals filled out?

 4         A    Yes.

 5         Q    Identically?

 6         A    Yes.

 7         Q    Was there anything written next to "name of

 8    subject"?

 9         A    No.

10         Q    Was there anything written next to "specimen

11    collector's initials"?

12         A    Yes.

13         Q    Could you read those initials?

14         A    I could not.

15         Q    Was there anything written next to "police

16    officer's initials"?

17         A    Yes.

18         Q    What was written there?

19         A    "D.P.O."

20         Q    Was there anything written next to "supervisor's

21    initials"?

22         A    No.

23         Q    Was there anything written next to "date"?

24         A    Yes.

25         Q    What was written there?
```

Inv. Baez - Direct - Hayden

1    A    "7/2/05."

2    Q    Was there anything written next to "time"?

3    A    Yes.

4    Q    What was written there?

5    A    "2:45 a.m."

6    Q    Was there anything written next to "number"?

7    A    No.

8    Q    Do you know what that refers to?

9    A    That could be case number or laboratory number.

10   Q    You are not sure?

11   A    I am not sure.

12   Q    Did you use each of those two seals to seal the

13   closed clear plastic container from the outer box of the

14   blood kit?

15   A    I did.

16   Q    Show the jury where you placed the seals to seal

17   the closed clear plastic container from the blood kit?

18   A    I removed the seal, the integrity seal, filled

19   out by Trooper O'Hare, and I placed it on the location seal

20   here, on the clear plastic container which contained the

21   sealed blood tubes.

22   Q    Both ends of the clear plastic container?

23   A    Yes, sir.

24   Q    There, as well as below?

25   A    Yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    Q    Please retake the witness stand.

2         Describe what you did after you sealed both ends

3    of the closed clear plastic container?

4    A    I took the clear plastic container that contained

5    the sealed blood tubes, and I placed it in a cardboard box,

6    I closed the box with the tabs, and I placed all of the

7    related paperwork inside of that box as well.

8    Q    That's the outer box of the blood kit?

9    A    Yes.

10   Q    10478?

11   A    That is correct.

12        MR. HAYDEN:  May I please have 17 for

13   identification shown to the witness, your Honor?

14        THE COURT:  Sure.

15   Q    Do you recognize that box?

16   A    I do.

17   Q    Is that the box Trooper Stafford gave you?

18   A    This is the New York State Police blood kit that

19   was handed to me from Trooper Stafford.

20   Q    Was that box opened in your presence yesterday?

21   A    It was.

22   Q    Was I present then too?

23   A    You were.

24   Q    Did you examine the contents of the box you have

25   in front of you and determine they were as you remember

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    them?

2         A    Yes, sir.

3         Q    Was the box eventually closed in your presence?

4         A    Yes, sir.

5         Q    You can testify that that is the box Trooper

6    Stafford gave you back on July 2nd 2005?

7         A    This is the blood kit that was handed to me by

8    trooper Stafford on July 2nd 2005 at 4:50 a.m.

9         Q    And you confirm the contents by observing them

10   and examining them yesterday?

11        A    Yes, sir.

12        Q    In my presence?

13        A    Yes, sir.

14        Q    In the presence of Investigator Harris?

15        A    Yes, sir.

16        Q    Describe for the jury what you did with the

17   closed blood kit after you sealed the clear plastic

18   container and placed it inside?

19        A    I kept it in my possession.

20        Q    What did you eventually do with it?

21        A    I eventually go back to the crime scene and hand

22   this personal to Investigator Michael Harris.

23        Q    Did you ever lose custody of that blood kit from

24   the time Trooper Stafford gave it to you until the time you

25   personally handed it to Investigator Harris?

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Baez - Direct - Hayden

1      A      No.

2      Q      Did you ever lose possession of that blood kit

3   from the time Trooper Stafford gave it to you until the time

4   you personally handed it to Investigator Harris?

5      A      I did not.

6      Q      Did you take part in a conversation with the

7   defendant?

8      A      I did.

9      Q      When was that?

10      A      At approximately 12:30 p.m. on July 2nd 2005.

11      Q      Where was that?

12      A      Intensive Care Unit of Nassau County Medical

13   center on the second floor.

14      Q      Describe the defendant's location at the

15   Intensive Care Unit?

16      A      It was an open bay intensive care unit, part of

17   the wing of the Intensive Care Unit, at Nassau County

18   Medical Center.

19      Q      Were there four beds in the open bay?

20      A      There was.

21      Q      Was the defendant in bed one?

22      A      He was.

23      Q      Who was present during the conversation with the

24   defendant?

25      A      Myself and Investigator Harris.

Inv. Baez - Direct - Hayden

```
 1        Q      Was a curtain drawn around the defendant's bed

 2    while you and Investigator Harris were speaking with him?

 3        A      Yes.

 4        Q      Was the defendant restrained in any way while you

 5    and Investigator Harris were speaking with him?

 6        A      Yes.

 7        Q      How?

 8        A      He had medical --

 9               MR. LaMAGNA:  Objection.

10               THE COURT:  Sustained.

11        Q      Describe what you saw.

12        A      The defendant had medical restraints around --

13               MR. LaMAGNA:  Objection.

14               THE COURT:  Sustained.

15        Q      Did you see gauze at that time?

16        A      There was gauze wrapped around his wrist with

17    string attached to the bed frame on each hand.

18        Q      Were I.V. Units attached to the defendant then?

19        A      Yes.

20        Q      Did you have anything to do with placing those

21    restraints on the defendant's wrists?

22        A      No.

23        Q      Did Investigator Harris?

24        A      No.

25        Q      Did any other State Police officer?
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    A    No.

2    Q    Any other member of law enforcement?

3    A    No.

4    Q    Were doctors and nurses in the area of the open

5    bay of the Intensive Care Unit while you and Investigator

6    Harris were speaking with the defendant?

7    A    Yes.

8    Q    Did you notice any other trooper in the vicinity

9    of the area where you were speaking with the defendant?

10   A    Yes.

11   Q    Who did you notice?

12   A    Trooper Sewell.

13   Q    All of those people were outside of the area

14   where you and Investigator Harris were speaking with the

15   defendant?

16   A    Yes.

17   Q    Who conducted the conversation with the

18   defendant?

19   A    Myself and Investigator Harris.

20   Q    Was Investigator Harris the investigating

21   detective in this case?

22   A    Yes.

23   Q    It was his case?

24   A    Yes.

25   Q    He was the carrying investigator?

Inv. Baez - Direct - Hayden

1      A     Yes.

2      Q     Did you take notes of the conversation with the

3   defendant?

4      A     Yes, I did.

5      Q     Describe how you did that.

6      A     Question and answer, sum and substance.

7      Q     How many pages of notes did you take?

8      A     Six.

9            MR. HAYDEN:   Your Honor, may we please have

10   these six pages marked as People's Exhibits 61A through

11   F, and shown to the witness.

12            THE COURT:   Sure.

13            (Whereupon, six pages of notes received and

14   marked People's Exhibits 61A through F for

15   identification.)

16            COURT OFFICER:   People's 61A through F so

17   marked for identification.

18      Q     Please take a look at those pages.

19            Do you recognize those?

20      A     I do.

21      Q     Are those the pages of notes that you took of the

22   conversation Investigator Harris conducted with the

23   defendant?

24      A     They are.

25      Q     Are those notes a fair and accurate

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1    representation of the conversation that Investigator Harris

2    had with the defendant?

3        A    Yes.

4        Q    Did Investigator Harris inform the defendant of

5    his constitutional rights before speaking with him?

6        A    Yes.

7        Q    How did he do that?

8        A    He removed his Miranda warning card from his I.D.

9    case and read it to the defendant.

10       Q    Was the defendant asked if he understood?

11       A    Yes.

12       Q    What did he say?

13       A    He nodded, yes, and he answered yes.

14       Q    Was he asked whether he was willing to speak with

15   you?

16       A    Yes.

17       Q    What did he say?

18       A    Yes.

19       Q    Did the conversation Investigator Harris was

20   having with the defendant come to an end?

21       A    Yes.

22       Q    Describe the circumstances under which it came to

23   an end?

24       A    The defendant requested the advice of an

25   attorney.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

1      Q      Were you finished speaking with the defendant

2    when he asked for a lawyer?

3      A      No.

4      Q      What did you do when the defendant asked for a

5    lawyer?

6      A      We stopped asking him questions.

7      Q      Did you ask him anything further?

8      A      No.

9      Q      Did Investigator Harris ask him anything further?

10      A      No.

11      Q      Had you spoken with a doctor or a nurse about the

12    defendant's condition before you spoke with him?

13      A      Yes.

14      Q      You did that personally?

15      A      Yes.

16      Q      You were given an okay?

17      A      Yes.

18      Q      Describe the defendant's physical condition while

19    you were with him?

20      A      He had bumps and bruising and a laceration to his

21    chin.

22      Q      Did you notice any other injury?

23      A      I did not.

24      Q      Did he complain of any injury?

25      A      He did not.

Inv. Baez - Direct - Hayden

1    Q    Did you ever have difficulty understanding the

2    defendant?

3    A    No.

4    Q    Did the defendant ever say he had difficulty

5    understanding you?

6    A    No.

7    Q    Describe the defendant's demeanor while you were

8    speaking with him?

9    A    Pleasant.

10        MR. HAYDEN:  With the Court's permission may

11   the investigator step down by the screen again, your

12   Honor?

13        THE COURT:  Sure.

14        MR. HAYDEN:  Your Honor, I'm now going to

15   display Defendant's Exhibit E in evidence.

16   Q    Do you recognize that document?

17   A    I do.

18   Q    What is that?

19   A    This is a New York State police Lab-1.  It is

20   contained inside of the New York State Police blood kit.

21   Q    Did you find a Lab-1 inside of the outer box of

22   the blood kit that Trooper Stafford gave you?

23   A    I did.

24   Q    Was there any writing at all on the Lab-1 when

25   you removed it from the outer box of the blood kit?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Direct - Hayden

```
 1        A     There was.

 2        Q     Do you see that writing on the portion of the

 3   Lab-1 that is in front of you now?

 4        A     I do.

 5        Q     Would you please point it out to the members of

 6   the jury?

 7        A     "Secured by, Busco, RN."

 8        Q     Was there any other writing on the Lab-1 when you

 9   removed it from the outer box of the blood kit?

10        A     No.

11        Q     Did you write anything on the Lab-1?

12        A     I did.

13        Q     On that portion that we are just seeing?

14        A     No.

15        Q     On that portion?

16        A     Yes.

17        Q     Please point out to the jury what you wrote on

18   the Lab-1?

19        A     You can't see it:  "Date, items involved, from

20   Trooper Stafford to Investigator Baez," and I had Trooper

21   Stafford sign.

22        Q     So you filled out the first three areas along the

23   top line; is that right?

24        A     Yes, sir.

25        Q     Trooper Stafford signed?
```

GIGI WRIGHT, RPR     (516) 571-2503

Inv. Baez - Cross - LaMagna

1    A    Yes, sir.

2    Q    Is that it?

3    A    Yes.

4    Q    Anything else?

5    A    No, sir.

6          MR. HAYDEN: This is Defendant's F in

7    evidence, your Honor.

8    Q    Do you recognize that document?

9    A    I do.

10   Q    What is that?

11   A    That is a New York State Police General IIA

12   continuation sheet for evidence.

13   Q    Did you write anything at all on the top portion

14   of that document?

15   A    I did not.

16   Q    Did you write anything at all on the bottom

17   portion of that document?

18   A    I did not.

19   Q    Anything at all?

20   A    No, sir.

21         MR. HAYDEN:  Nothing further, your Honor.

22   Thank you.

23         THE COURT:  Mr. LaMagna.

24   CROSS-EXAMINATION

25   BY MR. LaMAGNA:

Inv. Baez - Cross - LaMagna

1      Q     Good morning, Investigator Baez.  How are you

2   today?

3      A     Good, sir.  How are you?

4      Q     I'm going to ask you some questions here today.

5   If you don't understand a question please ask me to repeat

6   it and I will; or if you want me to repeat it, if you don't

7   hear it or anything, then I will.  Okay?

8      A     Yes, sir.

9      Q     Now, just to begin, just yesterday prior to you

10   testifying you met with the members of the district

11   attorney's office, correct?

12      A     Yes, sir.

13      Q     And you met with them in their office, correct?

14      A     Yes, sir.

15      Q     And that was in this building, correct?

16      A     Yes, sir.

17      Q     And it was you, Investigator Harris, correct?

18      A     Yes, sir.

19      Q     Mr. Hayden, correct?

20      A     Yes.

21      Q     Ms. McCormick?

22      A     No.

23      Q     Anybody else present?

24      A     No.

25      Q     While you were in the district attorney's office

Inv. Baez - Cross - LaMagna

```
 1    you testified that -- withdrawn.

 2              While you were meeting with the district attorney

 3    as well as Investigator Harris you discussed the subject of

 4    your testimony today, correct?

 5         A    Yes.

 6         Q    Went over it, prepped for your testimony here

 7    today, correct?

 8         A    Yes.

 9         Q    And, in fact, what I just heard you testify on

10    direct was that the sealed blood kit was actually opened for

11    you; is that correct?

12         A    Yesterday.  Yes, sir.

13         Q    Yesterday?

14         A    Yes, sir.

15         Q    Prior to you testifying here today, correct?

16         A    Yes.

17         Q    And you have had an opportunity to look inside of

18    that sealed blood kit, correct?

19         A    Yes.

20         Q    And that was yesterday, correct?

21         A    Yes.

22         Q    Prior to your testimony today, correct?

23         A    Yes.

24         Q    And you reviewed and looked inside that box,

25    correct?
```

Inv. Baez - Cross - LaMagna

1    A    Yes.

2    Q    In anticipation of your testimony here today,

3    correct?

4    A    Yes.

5    Q    That was the purpose of looking inside that

6    sealed box, correct?

7    A    Yes.

8    Q    That was the purpose you had the box open,

9    correct?

10    A    Yes.

11    Q    To prepare for your testimony here today,

12    correct?

13    A    Yes.

14    Q    Now you hadn't looked inside that box, or maybe

15    you have, I don't know, prior to yesterday from July 2nd,

16    had you?

17    A    From July 2nd?

18    Q    Until yesterday.

19    A    2005 to yesterday, no, sir.

20    Q    Because it was sealed, correct?

21    A    That's correct.

22    Q    Now, you have been a State Trooper for how long?

23    A    Eighteen and-a-half years.

24    Q    And how long have you been an investigator?

25    A    Four and-a-half years.

Inv. Baez - Cross - LaMagna

1    Q    And where are you assigned?

2    A    State Police Brentwood, New York.

3    Q    Now, as an investigator you understand the

4    importance of the proper procedure in collecting evidence,

5    correct?

6    A    Yes, sir.

7    Q    As an investigator you are aware of the proper

8    procedure of making sure that all of the paperwork is done

9    correctly, correct?

10    A    Correct.

11    Q    And that all of the instructions with respect to

12    the proper collection of evidence is done correctly,

13    correct?

14    A    Yes, sir.

15    Q    Because some day, like today, you may be going to

16    court and testifying about a piece of evidence related to a

17    particular case, correct?

18    A    Yes, sir.

19    Q    And it is important that all of the paperwork

20    surrounding that piece of evidence is done accurately,

21    correct?

22    A    Yes, sir.

23    Q    Because these cases may have been or this

24    evidence may have been collected over a year ago, correct?

25    A    Correct.

1    Q    And you have been involved in many, many cases in

2    the period of time between the time that the evidence was

3    collected and your testimony in court, correct?

4    A    That's correct.

5    Q    And you want to make sure when you testify that

6    you are testifying accurately, right?

7    A    That is correct.

8    Q    That's why paperwork must be done correctly,

9    correct?

10   A    Correct.

11   Q    Because you will refresh your recollection as to

12   the events that happened a year ago by reviewing that

13   paperwork, correct?

14   A    Yes, sir.

15   Q    And you did that here, correct?

16   A    Yesterday, yes, sir.

17   Q    And it is very important when it comes to a piece

18   of evidence, such as Blood which is, you would agree,

19   fungible, correct?

20   A    Yes, sir.

21   Q    You can't distinguish somebody's blood from

22   another unless the paperwork follows that blood, correct?

23   A    That's correct.

24   Q    So the chain of custody of a piece of evidence

25   like that is very important, correct?

1      A    Yes, sir.

2      Q    The chain of custody accounts forever person who

3   handled that piece of evidence, correct?

4      A    Yes, sir.

5      Q    And that piece of evidence must be accounted for

6   so that when you come to court there is no question that the

7   evidence taken on a particular day is identical to the

8   ..evidence that is presented in court, correct?

9      A    Yes, sir.

10     Q    That there is no chance for mistake between the

11   evidence presented in court and that which was taken on the

12   date in question, correct?

13     A    Correct.

14     Q    That that piece of evidence was not mistaken for

15   somebody else's, for example, correct?

16     A    Correct.

17     Q    And all cases are assigned a case number,

18   corrects?

19     A    Yes, sir.

20     Q    And B.C.I. stands for the Bureau of Criminal

21   Investigations, correct?

22     A    Yes.

23     Q    And B.C.I. assigns case numbers to cases,

24   correct?

25     A    Yes.

1      Q      And that case number follows that case

2    throughout, correct?

3      A      Yes.

4      Q      And that case number is like a Social Security

5    number; it identifies the case, correct?

6      A      That particular case, correct.

7      Q      Yes.  And what would happen is all paperwork

8    generated has that case number associated with it, correct?

9      A      Not necessarily.

10     Q      Well, in this case you reviewed -- let me show

11   you the Lab-1.  This is Defendant's Exhibit E in evidence.

12            I show you what is marked Defendant's Exhibit E

13   in evidence.  I ask you to take a look at that.

14            Do you recognize that document?

15     A      I recognize this having the signature of Busco,

16   R.N. and the writing I did with "Trooper Stafford to

17   myself," and Trooper Stafford's signature.

18     Q      Do you recognize that document?

19     A      I do.

20     Q      That is the Lab-1, correct?

21     A      That is correct.

22     Q      That is the Lab-1 you just testified to on direct

23   examination, correct?

24     A      That's correct.

25     Q      And that's the same document that you recognized

Inv. Baez - Cross - LaMagna

1    five minutes ago you recognize now, don't you?

2        A    Yes, sir.

3        Q    That's the Lab-1 that is associated with this

4    case, correct?

5        A    That's correct.

6        Q    And that's the Lab-1 that is associated with the

7    blood kit, correct?

8        A    Yes, sir.

9        Q    And the blood kit that you testified to, correct?

10       A    Yes, sir.

11       Q    What is the B.C.I. case number assigned on that

12   document?

13       A    It states here 05-140.

14       Q    05-140 is the case number assigned on that Lab-1,

15   correct?

16       A    I would have to assume so, sir.

17       Q    You are looking at it.  You just said you

18   recognized that form?

19       A    I didn't write that number.

20       Q    I know you didn't.  You recognize that form.

21   That's the Lab-1, correct?

22       A    It is, sir.

23       Q    That's the case number that is on there, correct?

24       A    05-140, correct.

25       Q    Could I have that back, please.

Inv. Baez - Cross - LaMagna

1          MR. LaMAGNA:  Could I have this shown to the

2    witness too, Defendant's Exhibit F in evidence.

3     Q     I show you what has been marked Defendant's

4    Exhibit F in evidence.  Do you recognize that document?

5     A     It is a General IIA, New York State Police

6    continuation sheet for evidence.

7     Q     Same document five minutes ago that you

8    recognized, correct?

9     A     Yes, sir.

10     Q     What is the B.C.I. case number assigned --

11    withdrawn.  That General II is also a document related to

12    this piece of evidence, correct?

13     A     Yes, sir.

14     Q     And that is also -- that document has a chain of

15    custody with respect to the chain related to this blood kit,

16    correct?

17     A     Yes, sir.  There is a transfer record.

18     Q     And what is, again, the case number assigned to

19    that document?

20     A     In the section for B.C.I. case number 05-140.

21     Q     Same as the Lab-1, correct?

22     A     Yes, sir.

23     Q     I want to direct your attention to July 2nd 2005.

24    Now, you testified that you received a phone call at

25    approximately -- was it a phone call?

Inv. Baez - Cross - LaMagna

```
 1      A      Yes, sir.

 2      Q      Phone call at approximately 3:15 a.m., correct?

 3      A      Yes, sir.

 4      Q      And you were off duty at that time?

 5      A      Yes, sir.

 6      Q      You were called in for assistance, right?

 7      A      Yes, sir.

 8      Q      And you were called in that there was an accident

 9   on the Meadowbrook Parkway and Babylon Turnpike, correct?

10      A      Yes, sir.  A fatal motor vehicle accident.

11      Q      And you responded, did you not?

12      A      I did.

13      Q      And what time did you -- you say you responded

14   around 4:20; is that correct?

15      A      Yes, sir.  Approximately.

16      Q      And when you arrived you sought out Investigator

17   Harris, correct?

18      A      That's correct.

19      Q      He was the case agent on this case, correct?

20      A      Correct.

21      Q      He is responsible for everything, correct?

22      A      Yes, sir.

23      Q      He is the one who is responsible for making sure

24   all of the law enforcement personnel are doing what they are

25   supposed to be doing, correct?
```

Inv. Baez - Cross - LaMagna

1      A      Correct.

2      Q      He is coordinating with other law enforcement

3   agents what they need to be doing in the future, correct?

4      A      To the best of his ability, yes.

5      Q      Of course to the best of his ability.

6             And he is responsible for making sure that all of

7   the evidence is collected properly, correct?

8      A      Yes, sir.

9      Q      And as a case agent responsible for this case,

10  that all of the paperwork and everything is properly done,

11  correct?

12     A      Yes, sir.

13     Q      That is his responsibility, correct?

14     A      Yes, sir.

15     Q      And he of in meting out that responsibility gave

16  you an assignment, correct?

17     A      Yes, sir.

18     Q      He told you to go to the hospital to get a blood

19  kit that is waiting for you, or did he say is about to

20  get --

21     A      Actually, to go to Nassau County Medical Center.

22  There was a defendant and blood was drawn, to secure the

23  blood kit and bring it back to him at the crime scene.

24     Q      This was around 4:20?

25     A      Approximately.

1    Q    So at 4:30, Investigator Harris already knew that

2    blood had been secured, and told you to go pick it up; is

3    that correct?

4    A    He asked me to go to the Nassau County Medical

5    Center to secure a blood kit from the defendant.

6    Q    What I am asking you is, what you just said, and

7    I want to be clear on this:  You said that Investigator

8    Harris told you that blood had been taken from the

9    defendant, I want you to go to the hospital and pick it up;

10   isn't that what you just today said?

11   A    Those were not his words.  He stated --

12   Q    That's what you just said.  I want to be clear.

13   A    Yes, sir.  He stated that there was a defendant

14   at Nassau County Medical Center, and that there was a blood

15   kit there, secure it and bring it back to him at the crime

16   scene.

17   Q    So did you -- how did you take that; that blood

18   had already been taken?

19               MR. HAYDEN:  Objection.

20               THE COURT:  Sustained.

21   Q    Was it told to you that the blood had already

22   been secured?

23   A    He just asked me to go to Nassau County Medical

24   Center and secure the blood kit.

25   Q    So --

1     A     And bring it back to him.

2     Q     Are you testifying right now that you didn't know

3     if blood was taken or not?

4                 MR. HAYDEN:  Objection.

5                 THE COURT:  Sustained.

6     Q     Did you know when you left the scene to go to the

7     hospital whether or not blood had been taken or not?

8     A     No.

9     Q     You did not know that?

10    A     No, I did not.

11    Q     Did you ask him?

12    A     At that time, no.

13    Q     So you went to the hospital to pick up a blood

14    kit not knowing if it was actually done or not?

15    A     Not knowing if the actual blood had been drawn

16    from the defendant, no.

17    Q     You went there without even knowing if the blood

18    had been drawn?

19    A     That's correct.

20    Q     When you got to the hospital you said you went to

21    the emergency room, correct?

22    A     Yes, sir.

23    Q     Did anybody tell you to meet somebody at the

24    emergency room?

25    A     That would be the logical place.

1    Q    I didn't ask you that.

2         Did anybody tell you to go to the emergency room?

3    A    No, sir.

4    Q    Did anybody tell you, Investigator Harris or

5    anybody else, I want you to meet Trooper Stafford and pick

6    up the blood kit?

7    A    No, sir.

8    Q    So you went to the hospital not knowing whether

9    blood was drawn or not drawn, and you didn't even know who

10   you were supposed to meet there?

11   A    That's correct.

12   Q    So you went to the hospital not even knowing

13   which trooper to even look for?

14   A    That's correct.

15   Q    Not knowing if the blood was even secured or not?

16   A    At that time, no, I did not.

17   Q    You didn't ask Harris when he sent you to the

18   hospital, well, where should I go?  You didn't ask him that?

19   A    I did not.

20   Q    You didn't ask Harris, well, if I'm going there,

21   who is the trooper I should look for who has the blood kit?

22   You didn't ask that either?

23   A    No, sir.

24   Q    Just went there?

25   A    Yes, sir.

1    Q    Now, when you arrived at the emergency room what

2    did you do?

3    A    I located Trooper Stafford -- I -- or I went --

4    Q    Let's stop there.

5    A    Okay.  I went --

6    Q    You located Trooper Stafford, but you weren't

7    looking specifically for Stafford, correct?

8    A    That is correct.

9    Q    You didn't even know Stafford was there, did you?

10   A    I did not.

11   Q    In fact, you did not know who was there?

12   A    That's correct.

13   Q    There was a lot happening there, wasn't there?

14   A    Yes, sir.

15   Q    When you arrived, not only were there Troopers

16   present, there were Nassau County Police, correct?

17   A    I don't recall.

18   Q    Do you recall any other members of other law

19   enforcement agencies there?

20   A    I do not.

21   Q    You arrived at the emergency room, at the doors,

22   correct?

23   A    Yes, sir.

24   Q    You walk through the doors, correct?

25   A    Yes, sir.

Inv. Baez - Cross - LaMagna

1    Q    And there is a lot going on, right?

2    A    Yes, sir.

3    Q    Do you ask anybody anything, or do you just walk

4    right up to Trooper Stafford?

5    A    I see a New York State Police Trooper in uniform

6    and I approached him.

7    Q    But there were a lot of State Troopers there;

8    were there not?

9    A    No, sir.

10   Q    He was the only one?

11   A    The first one and only one I saw.

12   Q    You didn't see any other State Troopers in the

13   entire emergency room that night other than Trooper

14   Stafford?

15   A    No, sir.

16   Q    Is that no; or no, you didn't see them?

17   A    No, I eventually saw other members of the State

18   Police after.

19   Q    There were other members of the State Police

20   there.   Just Trooper Stafford was the first one you saw; is

21   that what you are saying?

22   A    Yes.

23   Q    When you saw it was Trooper Stafford did you

24   approach him and say, hey, are you the guy who has the blood

25   kit?

Inv. Baez - Cross - LaMagna

1    A    He was holding a New York State Police blood kit

2    in his hand.

3    Q    You just assumed he was the guy?

4    A    I approached him, and I questioned him regarding

5    that, yes.

6    Q    You said I was sent here by Investigator Harris

7    to take this kit from you?

8    A    Yes, sir.

9    Q    Was he expecting you?

10    A    He was expecting someone, I would assume, from

11    the State Police B.C.I.

12    Q    Did he say, "I was waiting for you," or was he

13    standing right by the door?

14    A    He was expecting me.

15    Q    He was expecting you?

16    A    Someone.

17    Q    Okay.  I understand.  He was expecting someone?

18    A    Correct.

19    Q    He knew somebody was on the way and it turned out

20    to be you, correct?

21    A    Yes, sir.

22    Q    Now, when he gave you this blood kit, the blood

23    kit was unsealed, correct?

24    A    Yes, sir.

25    Q    The outer box was unsealed, correct?

1      A      Yes, sir.

2      Q      The inner box was unsealed, correct?

3      A      Yes, sir.

4      Q      Now, you said that you looked inside.  You opened

5   up the -- withdrawn.

6             When he gave you the box, the inner box was

7   closed but not sealed -- the outer box was closed, but not

8   sealed, correct?

9      A      Yes, sir.

10     Q      Demonstrating like as it is now, closed, but not

11   sealed?

12     A      Yes, sir.

13     Q      So when you took the blood kit, the unsealed

14   blood kit, from Stafford did you bring it anywhere in

15   particular?  Did you bring it straight back to Investigator

16   Harris?

17     A      I did not.

18     Q      Where did you go with it?

19     A      I located a bench that I could place the box on

20   to open it up.

21     Q      So this is in the waiting room?

22     A      It is the hallway of the emergency room.

23     Q      So you are in a hallway of an emergency room and

24   you have this piece of evidence that is in an unsealed

25   condition and you find a bench?

Inv. Baez - Cross - LaMagna

1    MR. HAYDEN: Objection.

2    THE COURT: Sustained.

3    Q    You said you located a bench, correct?

4    A    I located a bench that was waist high that I

5    could use. I wouldn't say it was a bench, it was a --

6    Q    You did --

7    A    Correction. It was furniture that was waist

8    high, that I could set the blood kit onto to open it to

9    examine it.

10    Q    Was that part of your instructions from

11    Investigator Harris, to examine the blood kit and make sure

12    that it has been properly secured?

13    A    No.

14    Q    So you took that upon yourself, correct?

15    A    Yes, sir.

16    Q    That's because you saw that the outer box was not

17    sealed?

18    A    No.

19    Q    Was it curiosity; you wanted to make sure that it

20    was properly handled?

21    A    I knew that there was a chain of custody

22    documentation that I would have to sign before I left the

23    emergency room.

24    Q    Did Stafford give you a copy of the Lab-1 for you

25    to sign off on?

Inv. Baez - Cross - LaMagna

1     A    The Lab-1 was located inside the box.

2     Q    Not outside of the box?

3     A    No, sir.

4     Q    Did he hand you -- so, he didn't open the box --

5     A    No, sir.

6     Q    -- for you, and said, "Here's the Lab-1. I need

7    you to verify you're receiving it from me"?

8     A    No, sir.

9     Q    So, when he gives you the box you find a table,

10   or some sort of furniture to put it onto to open it up,

11   correct?

12     A    Yes, sir.

13     Q    And where did Trooper Stafford go?

14     A    He stays by my side.

15     Q    He is with you at this time, correct?

16     A    Yes, sir.

17     Q    You open up the box and take out the Lab-1; is

18   that correct?

19     A    And the other paperwork, correct.

20     Q    And all of the other paperwork, correct?

21     A    Yes, sir.

22     Q    And when you open the box you look inside the box

23   and you realized the inner box isn't sealed; is that

24   correct?

25     A    It was closed, but not sealed.

Inv. Baez - Cross - LaMagna

1        Q       That's what I just said.  It was not sealed,

2    correct?

3        A       Yes, sir.

4        Q       And you know as an investigator that once blood

5    is taken and put into the container by the officer observing

6    the blood draw, it is supposed to be sealed, correct?

7        A       Yes, sir.

8        Q       That is what the instructions say?

9        A       Yes, sir.

10       Q       That's proper police procedure, correct?

11       A       Yes, sir.

12       Q       That was not done here, was it?

13       A       It was not.

14       Q       So when you see the blood kit you see that it is

15   in an unsealed condition, correct?

16       A       Yes, sir.

17       Q       And, again, just yesterday prior to testifying

18   that blood kit was opened up for you to review the contents

19   of it, correct?

20       A       Yes, sir.

21       Q       Now, you said that there was various paperwork,

22   the standard paperwork that comes with the New York State

23   blood kit in the kit, correct?

24       A       Yes, sir.

25       Q       And you testified that there were seals,

1    integrity seals, that were filled out, not by you, but by

2    some other trooper, correct?

3        A    Trooper O'Hare, correct.

4        Q    Did you know that he had filled those out or you

5    just saw seals filled out by somebody else?

6        A    I observed initials "D.P.O."

7            THE COURT:  Mr. LaMagna, before you ask your

8        next question, the jury has been down here an hour,

9        I'll give the jury a ten-minute break.  Please do not

10       talk about the case.

11           (Whereupon, the jury exits the courtroom, and

12       a brief recess was held.)

13           THE CLERK:  Case on trial, Indictment 1910N

14       of 2005, People versus Martin Heidgen.

15           People ready?

16           MR. HAYDEN:  Ready, your Honor.

17           MR. LaMAGNA:  Defendant ready, your Honor.

18           THE CLERK:  Defendant is present, your Honor.

19           THE COURT:  Produce the jury.  Get the

20       witness back on the stand.

21           THE CLERK:  I would like to remind you you

22       are still under oath.

23           COURT OFFICER:  Jury entering.

24           (Whereupon, the jury entered the courtroom,

25       and upon taking their respective seats, the following

1      occurred:)

2                    THE CLERK:   Jurors are present and seated,

3         your Honor.

4                    THE COURT:   Thank you.   Mr. LaMagna.

5      BY MR. LaMAGNA:

6         Q     Investigator Baez, we were just talking about, I

7      believe, when you opened up the blood kit.   Correct?

8         A     Yes, sir.

9         Q     And you said when you opened the kit you saw

10     seals.   You said, seals filled out by somebody else,

11     correct?

12        A     Trooper O'Hare, correct.

13        Q     I think that that is actually where we were.   And

14     you recognized the initials of that being of Trooper O'Hare,

15     correct?

16        A     Yes, sir.

17        Q     Had you known that it was Trooper O'Hare that

18     actually witnessed the withdrawal of the blood from

19     Mr. Heidgen?

20        A     I inquired of Trooper Stafford.

21        Q     When was that?  Before you saw the seals

22     previously filled out by him or after it?

23        A     When I opened the box.

24        Q     When you opened the box you saw the seals or

25     paperwork filled out and saw D.P.O., and that's when you in

Inv. Baez - Cross - LaMagna

1    inquired of Stafford?

2         A    That's correct.

3         Q    And he confirmed to you that that was, in fact,

4    O'Hare?

5         A    Correct.

6         Q    Did you fill out any of those two seals that you

7    used?

8         A    No, sir.

9         Q    Put no initials on them?

10        A    No, sir.

11        Q    So there is nothing on those seals that verifies

12   that you actually used those seals, correct?

13        A    Not on the seals, correct.

14        Q    You said you opened up the box, you saw various

15   paperwork, and you saw two seals filled out by Trooper

16   O'Hare, correct?

17        A    Yes, sir.

18        Q    And you also said that you put integrity seals

19   around the inner box, correct?

20        A    Clear plastic container.

21        Q    You put the integrity seals which sealed that

22   inner container, correct?

23        A    Yes, sir, which contained the two sealed tubes of

24   blood.

25        Q    Now, you just testified on direct examination

Inv. Baez - Cross - LaMagna

1    that there were no supervisor initials on those seals

2    either; is that correct?

3         A    That's correct.

4         Q    Those were blank?

5         A    Yes, sir.

6         Q    And that should have been filled out, correct?

7         A    By a supervisor, correct.

8         Q    And that did not happen?

9         A    I was not the supervisor.

10        Q    You did not fill those out, but yet you used

11   them, correct?

12        A    Yes, sir.

13        Q    Now, there is a difference between the seals --

14   this is part of the exhibit that is already in evidence,

15   Defendant's Exhibit 16, which is a sample box.  Now there is

16   a difference between the white seals and the integrity

17   seals, correct?

18        A    Yes, sir.

19        Q    The white ones just say "seal," right?

20        A    That's correct.

21        Q    The red one says "integrity seal," correct?

22        A    That's correct.

23        Q    And you are familiar with the instructions that

24   come along with the blood kit, correct?

25        A    I'm familiar.  But I do not have them memorized,

Inv. Baez - Cross - LaMagna

1    correct.

2         Q    They are in evidence, correct.  I'll show it to

3    you.

4              MR. LaMAGNA:  Could I show Investigator Baez

5         Defendant's Exhibit E.

6         Q    As an investigator you are familiar with the

7    manner in which the blood kit is to be used, aren't you?

8         A    That's correct.

9         Q    I ask you to look at the back of the Lab-1, the

10   instruction sheet.  And you had previously testified on

11   direct examination that you used the integrity seals, and

12   two minutes ago you said you used the integrity seals to

13   close the inner box, correct?

14        A    I used the seals, that's correct.

15        Q    You said "integrity seals"; did you not?

16             MR. HAYDEN:  Objection.

17             THE COURT:  Sustained.

18        Q    Did you not testify previously on direct

19   examination and just now on cross-examination that you used

20   the integrity seals to seal the box?

21        A    I used the seals --

22        Q    Did you?

23        A    I --

24        Q    Please answer my question.

25        A    Okay.

Inv. Baez - Cross - LaMagna

1      Q     Did you testify on direct examination and just

2   now on cross-examination that you used the integrity seals

3   to seal that inner box?

4      A     I did.

5      Q     The integrity seals are the red seals; are they

6   not?

7      A     That's correct.

8      Q     And would it surprise you to know that, or do you

9   know that, or are you aware that Trooper O'Hare, who

10  witnessed the withdrawal of the blood and who sealed the

11  tubes, testified that he used the white seals to cover the

12  vials?  Are you aware of that?

13                 MR. HAYDEN:  Objection.

14                 THE COURT:  Objection sustained.

15     Q     But yet you testified on direct examination,

16  after reviewing the box yesterday, that there are red seals

17  on the top, correct?

18     A     There were red seals that were placed on the

19  tubes of the blood, correct?

20     Q     There is only two integrity seals that come in

21  this kit; isn't that correct?

22     A     That's correct.

23     Q     According to the instructions it is the red

24  integrity seals that seal the box, not that they go over the

25  top of the vials; isn't that correct?

Inv. Baez - Cross - LaMagna

1      A      That is correct.

2      Q      Correct procedure, according to the instructions,

3   is that a white seal goes over the vial stopper, correct?

4      A      That is correct.

5      Q      It is the white seal that is to be used to seal

6   the vials after the blood is put in the vials; isn't that

7   correct?

8      A      That is correct.

9      Q      And it is the integrity of seals, the red ones,

10   the only two red ones, that seal the inner box with the

11   tubes; isn't that correct?

12      A      That's correct.

13      Q      And you, as you just testified previously, you

14   testified that you used the integrity seals to seal the box,

15   which is what the instructions say to do, correct?

16      A      That is correct.

17      Q      Now, it is important, you would agree, that for

18   the chain of custody on a fungible item, like blood, that

19   these procedures be used to prove the identical nature of

20   evidence taken, evidence submitted for evidence, submitted

21   in court, correct?

22      A      Yes, sir.

23      Q      That is why we have these procedures, correct?

24      A      That's correct.

25      Q      That is why you need to follow these procedures,

Inv. Baez - Cross - LaMagna

1    correct?

2        A    Yes, sir.

3        Q    You agree then that mistakes were made in the

4    collection of this blood, correct?

5        A    I would not agree with that.

6        Q    Well, you just testified before that it should

7    have been sealed by the person who observed the withdrawal

8    of the blood, Trooper O'Hare, correct?

9        A    That's correct.

10       Q    He did not do that, correct?

11       A    No, he did not.

12       Q    That would constitute a mistake; would it not?

13       A    Yes.

14       Q    So I ask you again:  Mistakes were made; were

15    they not?

16       A    Yes.

17       Q    With respect to the collection and security of

18    that blood sample, correct?

19       A    No, sir.  I would not agree as to the collection.

20    I would agree as to the wrong seals were placed.

21       Q    I would -- then I withdraw that question.

22            You would agree then, would you not, that with

23    respect to the unsealed nature of that box going from one

24    person to another, that is a mistake, correct?

25       A    Yes, sir.

Inv. Baez - Cross - LaMagna

```
 1        Q      And the purpose of sealing the inner box

 2   immediately after withdrawal is to preserve the integrity of

 3   that blood sample, correct?

 4        A      Yes, sir.

 5        Q      So when you come to court there is no question

 6   that it is identical to that of the blood taken that night,

 7   correct?

 8        A      Yes, sir.

 9        Q      That there is no chance that it could have gotten

10   mixed up with anybody else's blood, correct?

11        A      That's correct.

12        Q      That there is no chance that it was either

13   tampered with or lost, correct?

14        A      Yes, sir.

15        Q      That was not done here, correct?

16        A      Correct.

17        Q      Now, when Trooper -- Investigator Harris sent you

18   to the hospital is it your testimony that he didn't tell you

19   the name of the individual whose blood was going to be

20   taken?

21        A      He did.

22        Q      He did tell you the name?

23        A      Yes, sir.

24        Q      And you knew the name to be Martin Heidgen,

25   correct?
```

Inv. Baez - Cross - LaMagna

1      A      No, sir.  He just -- he just used "Heidgen."

2      Q      "Heidgen"?

3      A      Yes, sir.

4      Q      Did you put "Heidgen" on any of the paperwork

5    when you went to that desk to go through it?

6      A      No, sir.

7      Q      So, if you sealed this kit with the integrity

8    seals you didn't write "Heidgen" on it?

9      A      I did not.

10      Q      How about on -- let me show you Exhibit D,

11    Defendant's Exhibit D in evidence.  Do you recognize that?

12      A      Yes, sir.

13      Q      That's the cover of the blood kit, right, 16 in

14    evidence, correct?

15      A      Yes, sir.

16      Q      The cover.

17              Now, you said you filled out a portion of that,

18    correct?

19      A      Yes, sir.

20      Q      You filled out a portion where you put your name

21    that you received this kit from Stafford, correct?

22      A      Yes, sir.

23      Q      So, you took it upon yourself to fill in some of

24    these blanks in the form, correct?

25      A      Yes, sir.

1    Q    There is a spot that had "name".  You knew the

2    name, correct, of the individual whose blood it was,

3    correct?

4    A    Yes.  The name was known, but not confirmed.

5    Q    So you didn't put it down?

6    A    I did not.

7    Q    When you say, "not confirmed" did Investigator

8    Harris say, "I'm sending you to the hospital.  The name is

9    Heidgen.  Don't write anything because it is not confirmed"?

10   A    No, sir, he did not.

11   Q    So what I'm asking you is:  When you took it upon

12   yourself to fill out some of that paperwork, specifically

13   the cover of the kit, you didn't put down the defendant's

14   name, even though you knew it, correct?

15   A    That's correct.

16   Q    And this was around 5 o'clock, 4:50?

17   A    Correct.

18   Q    Is that the same time that you sealed it?

19   A    Yes, sir.

20   A    Approximately.

21   Q    The box had been unsealed from about 2:40, 2:45

22   until 5 o'clock, correct?

23   A    That's correct.

24   Q    Now, whatever happened with Stafford?  Did he

25   leave?  Did you tell him to leave?

Inv. Baez - Cross - LaMagna

```
 1        A     At what point, sir?

 2        Q     After you received the box back from him.

 3        A     After I looked through the box, sealed it,

 4   completed the paperwork, had him sign the Lab-1, we remained

 5   in the emergency room for a short period of time so I could

 6   gather more information on the victims that were being

 7   treated at Nassau County Medical Center.

 8        Q     So did he leave?

 9        A     I left, sir.

10        Q     You left.  You left with the kit?

11        A     With the New York State Police blood kit, yes,

12   sir.

13        Q     Where did you go?

14        A     I went -- attempted to locate, to find, the

15   defendant who was taken away for a procedure.

16        Q     Say that one more time.  I didn't get that?

17        A     I left the emergency room.

18        Q     Right.

19        A     In an attempt to locate where the defendant was

20   because he had been taken away for a medical procedure.

21        Q     Did you locate him?

22        A     I did not.

23        Q     Did you see Troop O'Hare?

24        A     I did not.

25        Q     Did you see Trooper Stafford again?
```

Inv. Baez - Cross - LaMagna

1     A     I did not.

2     Q     After you couldn't find Trooper Stafford or you

3   couldn't find the defendant, did you leave?

4     A     I went back to the emergency room.

5     Q     And then where did you go?

6     A     Back to the crime scene.

7     Q     With the blood kit?

8     A     Yes, sir.

9     Q     It was at that time that you gave it to

10   Investigator Harris?

11    A     At approximately 6:50 a.m., yes.

12    Q     And did Investigator Harris make any inquiries to

13   you concerning the nature of the blood kit?

14    A     He did.

15    Q     What did he ask you?

16    A     He asked me: Do you have the blood kit, and what

17   is the status of the defendant.

18    Q     And you gave him the blood kit, correct?

19    A     I did.

20    Q     And do you know what he did with that?

21    A     I do not.

22    Q     Now, could I have those documents.

23          You testified on direct examination concerning

24   the fact that you filled in a chain of custody, a transfer

25   record, correct?

Inv. Baez - Cross - LaMagna

1    A    I filled out two forms:  Chain of possession,

2    which was on the --

3    Q    Lab-1?

4    A    No.  Chain of possession is located on the white

5    plastic clear container containing the sealed tubes, and on

6    the Lab-1.

7    Q    And you did not fill out anything on the General

8    II; is that correct?

9    A    That's correct.

10   Q    On the Lab-1, on the Lab-1 you testified that you

11   had Stafford fill that out to memorialize the fact that he

12   gave it to you, correct?

13   A    That's my handwriting.  I had him sign it.

14   Q    Now, the handwriting for -- there is three lines,

15   correct:  One is, what is the item.  Blood kit, correct?

16   A    There are three lines filled out, correct.

17   Q    Right.  Does that look like they are all in the

18   same handing, or is that all in your writing?

19   A    My handwriting is "From Trooper Stafford to

20   Investigator Baez," and Trooper Stafford's signature.

21   Q    Isn't it procedure that the person who is

22   receiving the item sign the transfer log to verify they

23   received it from you; rather than the person who is giving

24   it to somebody to sign it?

25   A    That varies.

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Baez - Cross - LaMagna

1      Q      Well, it varies.  What is the procedure?  Isn't

2      there a procedure?

3      A      That's the normal procedure.

4      Q      That is the normal procedure, that the person --

5      A      Yes.

6      Q      That the person who receives it signs it

7      acknowledging I received this from you, correct?

8      A      That's correct.

9      Q      Now that procedure wasn't followed here, correct?

10     A      Not in this particular case, no.

11     Q      You did not sign it verifying that you received

12     that blood kit from Stafford, correct?

13     A      That's correct.

14     Q      In fact, it is Stafford's signature; is that

15     correct?

16     A      That's correct.

17     Q      Do you recognize Stafford's signature?

18     A      I do not.

19     Q      So how do you know that that is his signature; by

20     remembering it?

21     A      I observed him signing it.

22     Q      Now, there is a chain -- on the General II,

23     Exhibit F, Defendant's Exhibit F, there is also a transfer

24     record, correct?

25     A      Yes, sir.

Inv. Baez - Cross - LaMagna

1     Q     That is also a chain of custody, correct?

2     A     Yes, sir.

3     Q     And it shows the blood kit going from one person

4     to another person, from that person to another person, and

5     so forth and so on, correct?

6     A     That's correct.

7     Q     The same as the Lab-1, correct?

8     A     Yes, sir.

9     Q     Both associated, as you testified earlier, with

10    case number B.C.I. Case number 05-140, correct?

11    A     Yes, sir.

12    Q     Case number number 05-140 relates to this case,

13    correct?

14    A     Yes, sir.

15    Q     Now, if you look at the two chains of custody

16    they are different; are they not?

17    A     Yes, sir.

18    Q     In fact, the Lab-1 chain of custody says it goes

19    from Stafford to you, correct?

20    A     Yes, sir.

21    Q     And then it says -- and that's on July 2nd,

22    correct?

23    A     Yes, sir.

24    Q     And then the next line says July 2nd, it goes

25    from Baez to Harris, correct?

Inv. Baez - Cross - LaMagna

1    A    Correct.

2    Q    And then what does the next line say?

3    A    "Investigator Harris to Medical Examiner's

4    Office."

5    Q    Medical Examiner's --

6    A    "M.E.'s Office."

7    Q    Medical Examiner's Office?

8    A    Yes, sir.

9    Q    That's here in Nassau County?

10   A    Yes, sir.

11   Q    And it says, "toxicology department," correct?

12   A    I can't read it on this copy.

13   Q    Take a look at it.  It says, "M.E.'s Office."

14   Right next to it does that say "toxicology"?

15   A    It appears to be.

16   Q    And what date does that say?

17   A    July -- again, I can't read it off of this copy.

18   Q    Does it look like 7/12 or 7/2?

19   A    I can't make it out.

20   Q    But in any event the chain of custody on the

21   Lab-1 says that this blood kit was transferred from

22   Investigator Harris to the Medical Examiner's Office in

23   Mineola, correct?

24   A    M.E.'s Office toxicology.

25   Q    Yes.  And that's here in Mineola?

Inv. Baez - Cross - LaMagna

1    A    Yes.

2    Q    And there is a signature next to it, correct?

3    A    I see a signature, yes.

4    Q    And you work with Investigator Harris, don't you?

5    A    I have on occasion.

6    Q    Do you recognize that as being Investigator

7    Harris' signature?

8    A    I do not.

9    Q    Now, let's go to the General II.  That is also in

10   an evidence form, correct?

11   A    Yes.

12   Q    It is an evidence form for the same piece of

13   evidence, the blood kit, yes, sir?

14   A    Yes, sir.

15   Q    It says, "Item.  Blood kit," correct?

16   A    Yes.

17   Q    Case number 05-140, correct?

18   A    Yes, sir.

19   Q    It is talking about the very same blood kit,

20   correct?

21   A    Yes, sir.

22   Q    And there is a chain of custody there, correct?

23   A    Yes, sir.

24   Q    And the chain of custody is very different than

25   the chain of custody that appears on the Lab-1; isn't that

Inv. Baez - Cross - LaMagna

1    correct?

2        A    Yes, sir.

3        Q    And the chain of custody on this form dealing

4    with the exact same piece of evidence says it went from

5    Investigator Harris on 7/2 to Trooper Hemmerich; isn't that

6    correct?

7        A    That's what is written down, yes, sir.

8        Q    And it is signed, correct?

9        A    Yes, sir.

10       Q    Not from Investigator Harris to the M.E.'s

11   Office; correct?

12       A    Correct.

13       Q    Then it says from Hemmerich to Drake, correct?

14       A    Correct.

15       Q    And then there is a signature, correct?

16       A    Yes, sir.

17       Q    And then it says, "from Drake to Newburgh B.C.I.

18   evidence," correct?

19       A    Yes, sir.

20       Q    That's upstate, New York, correct?

21       A    Yes, sir, it is.

22       Q    And then it says on 7/5 the same piece of

23   evidence went from the B.C.I. evidence to the Mid Hudson

24   Crime Lab, correct?

25       A    That's what is written down, yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Cross - LaMagna

1    Q    And it is signed, correct?

2    A    Yes.

3    Q    Not the M.E.'s office in Mineola, correct?

4    A    No, sir.

5    Q    So when you look at these two evidence forms for

6    the same piece of evidence they are saying this piece of

7    evidence went to two different places, doesn't it?

8    A    Yes, sir.

9    Q    That's a problem, right?  It can't go to both,

10   right?

11            MR. HAYDEN:  Objection.

12            THE COURT:  Sustained.

13   Q    You have no personal knowledge where this piece

14   of evidence or a piece of evidence, let's say, associated

15   with this case ultimately went, do you?

16   A    I do not.

17   Q    When you are at this bench, you are filling out

18   the integrity seals, you seal up the box with the two tubes

19   in the plastic container, correct?

20   A    No, sir.  I did not fill out the integrity seals.

21   They were already filled out.

22   Q    I'm sorry, that was my mistake.

23        When you took the two integrity seals filled out

24   by Trooper O'Hare you sealed up the inner plastic box with

25   the two tubes in them, correct?

1     A     Yes, sir.

2     Q     And then you placed that into the outer box,

3     correct?

4     A     Yes, sir.

5     Q     Closed up the box, but did not seal the outer

6     box, correct?

7     A     Correct.

8         Q     And then at some point you left the hospital and

9     went back to the scene of the accident, correct?

10    A     Yes, sir.

11    Q     And then handed the unsealed outer box, but the

12    sealed inner box with the integrity seals that you placed on

13    the inner box, to Investigator Harris, correct?

14    A     That's correct.

15    Q     And you did not place the name "Heidgen" or

16    "Martin Heidgen" or any other identifying characteristics on

17    any paperwork, any seal, any box, any vial, anything,

18    correct?

19    A     That's correct.

20    Q     Now, did you put your initials on the outer box

21    to evince the fact that you had this box?

22    A     No, sir.

23    Q     So when you are shown this sealed box, although

24    we know it was unsealed yesterday, this sealed box today,

25    when you say you recognize it you don't recognize that being

Inv. Baez - Cross - LaMagna

```
1    the exact same box that you had 14 or 15 months ago other
2    than by what; the name?
3         A    The number that is written in front of the box.
4         Q    Which number?
5         A    Could I see it?
6         Q    Excuse me.  That is 17 marked for identification.
7    That's the box?  You said you recognized that box as being
8    ·the same by the numbers.  What numbers?
9         A    There is two numbers 4992 and 10478.
10        Q    Were those -- I'm sorry, let me just see that
11   again.
12             That's how you recognize the box, the 4992; is
13   that what you just said?
14        A    That's correct, sir.
15        Q    And which other one was it?
16        A    10478.
17        Q    That's the lot and the number box of the blood
18   kit, correct?
19        A    Yes, sir.
20        Q    Do you -- and that's how you recognize that box,
21   correct?
22        A    Yes, sir.
23        Q    Now, when you went back to the scene of the
24   accident this was at what time?
25        A    Approximately 6:50 a.m.
```

Inv. Baez - Cross - LaMagna

1     Q     And did you get any further instructions from

2    Investigator Harris?

3     A     I handed him the box, the New York State blood

4    kit, that New York State Police blood kit, and he advised me

5    to go back to the hospital and just wait for the status of

6    the other victims to make sure no one else expired.

7     Q     So you went to that -- you went back to the

8    accident scene and then back to the hospital?

9     A     That's correct.

10    Q     What time did you arrive back at the hospital?

11    A     Approximately 7:15 a.m.

12    Q     And were you in the emergency room area?  Were

13   you going back and forth checking the status of --

14    A     I stayed in the emergency room.

15    Q     And then at some point what happened?  What did

16   you do next?

17    A     Then I contacted, or was made aware of the

18   location of the defendant, and I spoke, I went to that

19   location and I spoke to Trooper Sewell.

20    Q     And then did you call Investigator Harris?

21    A     I did not.

22    Q     At some point you and Investigator Harris arrived

23   at Mr. Heidgen's bedside in the hospital, correct?

24    A     Later on that afternoon, yes, sir.

25    Q     And that was around 12:30, correct?

1          A        That's correct.

2          Q        At some point, what I want to know is, did you

3    ever leave the hospital again before that interview?

4          A        Yes, sir.  At 7:45 a.m. I spoke to Trooper

5    Sewell, who stated that the defendant was still unconscious.

6          Q        And you left?

7          A        At approximately, I would say, 9 o'clock a.m. I

8    left and went to the State Police Barracks at Valley Stream.

9                   THE COURT:  Mr. LaMagna, based on the time I

10        think that we should break for lunch at this point.  Be

11        back promptly at 2 o'clock, ladies and gentlemen.

12                  You remember all of the admonitions:  Don't

13        talk about the case.  Don't let anybody talk to you.

14        Don't let anybody approach you.  Don't visit the scene.

15        Have a nice lunch, see you at 2 o'clock.

16                  (Whereupon, the jury exited the courtroom and

17        a luncheon recess was held.)

18                            o0o

19                  (Continued on following page.)

20

21

22

23

24

25

1                              o0o

2                  A F T E R N O O N   S E S S I O N

3                              o0o

4              (In open court.  Defendant present.)

5              THE COURT:  Could we put the witness back on

6         the stand, please?

7              (Whereupon, the witness steps back into the

8         witness box.)

9              COURT OFFICER:  Jury entering.

10             (Whereupon, the jury entered the courtroom,

11        and upon taking their respective seats, the following

12        occurred:)

13             THE CLERK:  Case on trial, Indictment number

14        1910N of 2005, People versus Martin Heidgen.

15             People ready?

16             MR. HAYDEN:  People ready.

17             THE CLERK:  Defendant ready?

18             MR. LaMAGNA:  Defendant ready.

19             THE CLERK:  Defendant is present and jurors

20        are seated, your Honor.

21             THE COURT:  Welcome back, ladies and

22        gentlemen.  Mr. LaMagna.

23             MR. LaMAGNA:  Thank you, Judge.

24   CONTINUED CROSS-EXAMINATION

25   BY MR. LaMAGNA:

Inv. Baez - Cross - LaMagna

1    Q    Good afternoon, Investigator.  How are you?

2    A    Afternoon, sir.

3    Q    Investigator, part of the procedure when you take

4    the blood is to fill out a blood collection report; isn't

5    that correct?

6    A    Yes, sir.

7    Q    I would like to have you look at Defendant's

8    Exhibit C in evidence, please.  I ask you to take a look at

9    that.  Do you recognize that?

10   A    I do.

11   Q    That is the blood collection report?

12   A    It is.

13   Q    That's the blood collection report associated

14   with that case?

15   A    Correct.

16   Q    That blood collection report is not filled out by

17   the trooper who witnessed the withdrawal of the blood by the

18   nurse; isn't that correct?

19   A    It is blank, correct.

20   Q    That should have been verified and acknowledged

21   by the trooper verifying that he observed the blood being

22   taken, correct?

23   A    Yes.

24   Q    That was not done in this case either was it?

25   A    No.

1      Q     May I have that back, please.

2            Now, lastly as you testified on cross-examination

3      that the two chain of custody reports, the Lab-1 and the

4      General II, do you remember testifying about those two

5      items?

6      A     Yes, sir.

7      Q     And you remember testifying that both of those

8      chains of custody show that the same blood kit went to two

9      different slabs, one went to mid Hudson and one report said

10     it went to the M.E.'s Office toxicology department in

11     Mineola, correct?

12     A     Correct.

13     Q     Now, the toxicology department in Mineola, the

14     Medical Examiner's Office, they test blood too, don't they?

15     A     They do.

16     Q     They have a department that, among other things,

17     that they test, they routinely test vials of blood, correct?

18     A     Correct.

19     Q     And there is vials of blood that are stored

20     there, correct?

21     A     Yes.

22     Q     And also in the Mid Hudson lab, the Mid Hudson

23     lab also tests blood, correct?

24     A     Yes, sir.

25     Q     And they also have facilities where blood from

Inv. Baez - Cross - LaMagna

```
 1    other cases are stored, correct?

 2         A    Yes.

 3         Q    Now, you testified that after, you went back,

 4    after receiving the blood kit, to the accident scene,

 5    correct?

 6         A    To the crime scene, yes.

 7         Q    And you remained there for how long?

 8         A    Approximately 15 or 20 minutes.

 9         Q    And then you went back to the hospital; is that

10    correct?

11         A    Correct.

12         Q    And then at the hospital how long did you remain

13    there?

14         A    I can't recall.

15         Q    Was it an hour, two hours, three hours?

16         A    Between two and three hours.

17         Q    And then at some point you went back to the

18    barracks; is that correct?

19         A    In Valley Stream, correct.

20         Q    What time did you arrive at the barracks in

21    Valley Stream?

22         A    Approximately 10:30.

23         Q    In the morning of the 2nd; is that correct?

24         A    That's correct.

25         Q    And, obviously, you didn't have possession of the
```

Inv. Baez - Cross - LaMagna

1    blood kit, correct?

2         A    That's correct.

3         Q    You had given that to Harris the first time you

4    went back to the accident scene, correct?

5         A    Correct.

6         Q    At some point after 10:30 on your arrival at the

7    barracks did you meet up with Investigator Harris again?

8         A    I did.

9         Q    And that was at the barracks?

10        A    That's correct.

11        Q    You guys are partners or just both investigators?

12        A    We work at two completely different stations.   He

13   is not my partner.

14        Q    You were just asked to help out on this

15   investigation for this day, I guess?

16        A    Yes, sir.

17        Q    So, what time do you recall meeting with

18   Investigator Harris at the barracks after 10:30?

19        A    I don't recall.

20        Q    Could it be 11, 11:30, 12, 12:30?

21        A    I would say between 10:30 and eleven.

22        Q    Ten-thirty and eleven.

23             And at some point, you testified on direct

24   examination, that you actually went back to the hospital; is

25   that correct?

Inv. Baez - Cross - LaMagna

```
 1        A      That's correct.

 2        Q      And you went back to the hospital with

 3     Investigator Harris, correct?

 4        A      In separate vehicles.

 5        Q      But you went with him to assist him, correct?

 6        A      That's correct.

 7        Q      And there was a discussion that the two of you

 8     had prior to leaving the barracks, correct?

 9        A      Could you repeat that, please?

10        Q      There there was discussion that the two of you

11     had prior to leaving the barracks to go to the hospital,

12     correct?

13        A      That's correct.

14        Q      And that discussion concerned what he wanted you

15     to assist him with, correct?

16        A      Correct.

17        Q      And one of the things was to conduct an

18     interrogation, if you could, of Mr. Heidgen, correct?

19        A      An interview, correct.

20        Q      An interview.  He was in custody; was he not?

21        A      He was.

22        Q      So it would be an interrogation; would it not?

23        A      I believe the term he said was "We'll interview

24     the defendant at the hospital together."

25        Q      He asked you to go along with him to do this
```

1     interview, correct?

2          A     Yes, sir.

3          Q     And that was one of the purposes in going to the

4     hospital with him, correct?

5          A     Yes.

6          Q     Now, prior to going to the hospital to conduct

7     this interview did either of you take a tape recording

8     device to tape record the actual interview?

9          A     No, sir.

10         Q     Did anybody take a video camera to tape and

11    memorialize exactly what was being said, if this interview

12    took place?

13         A     No, sir.

14         Q     Did anybody take even a micro cassette recorder

15    to record the conversation so that the conversation would be

16    recorded in its entirety?

17         A     No.

18         Q     The New York State Police has access to these

19    types of devices, don't they?

20         A     They do.

21         Q     And given the nature of this case, you didn't

22    take any of those, correct?

23         A     I did not have any in my possession, no.

24         Q     Investigator Harris also didn't have a tape

25    recorder or any type of recording device either, correct?

Inv. Baez - Cross - LaMagna

1    A    During the interview, no.

2    Q    Did he bring it to the interview?

3    A    No, he did not.

4    Q    Didn't bring a video recording device?

5    A    Not to my knowledge.

6    Q    That would be something you would have

7  remembered, correct?

8    A    Yes, sir.

9    Q    So no recording device whatsoever?

10    A    That I am aware of, no.

11    Q    Prior to going to interview Mr. Heidgen in the

12  hospital did either you or Investigator Harris take with you

13  any pre-printed New York State forms that list the

14  constitutional Miranda warnings on them?

15    A    No, I did not.

16    Q    There is a General 19, correct?

17    A    That is a General 19 statement, correct.

18    Q    And a General 19 is a pre-printed form prepared

19  by the New York State Police Department, correct?

20    A    That's correct.

21    Q    On the General 19 it articulates, with

22  specificity, exactly what the constitutional rights that you

23  must give to anybody in custody prior to interviewing them,

24  correct?

25    A    That's correct.

```
 1        Q    And on the bottom after the constitutional rights

 2   there is two questions, correct?

 3        A    Yes.

 4        Q    One question is directed to the individual to

 5   whom you're going to interview:  Do you understand these

 6   rights, correct?

 7        A    Yes.

 8        Q    And there is a space for that person to sign,

 9   yes, and put his initials that he verifies that he was given

10   these rights, correct?

11        A    Yes.

12        Q    And then there is another question after that on

13   this pre-printed New York State form that says, Do you wish

14   to waive these constitutional rights and speak to you

15   without an attorney present, right?

16        A    Yes.

17        Q    And there is a spot underneath that for the

18   individual to whom you are interviewing to sign "yes," and

19   with his initials verify that he is actually waiving these

20   constitutional rights and willing to talk to you, correct?

21        A    Yes.

22        Q    And you don't recall whether or not -- withdrawn.

23             You don't know -- you know you didn't take them,

24   correct.

25        A    That's correct.
```

Inv. Baez - Cross - LaMagna

```
 1        Q      Even though you know you were interviewing a

 2   person in custody, correct?

 3        A      That's correct.

 4        Q      Do you know if Investigator Harris took one of

 5   those with him?

 6        A      I can't recall.

 7        Q      Certainly you don't recall it being presented to

 8   Mr. Heidgen at the time of the interview, do you?

 9        A      It was not.

10        Q      It was not?

11        A      No.

12        Q      Now, at some point I think, if I recall

13   correctly, you testified that you arrived at Mr. Heidgen's

14   hospital bed at around 12:30; is that fair?

15        A      That's correct.

16        Q      And this was about ten hours or so after

17   Mr. Heidgen arrived in the hospital, correct?

18        A      Correct.

19        Q      And he was in a hospital bed, correct?

20        A      Correct.

21        Q      Now, you testified, I believe on direct

22   examination, that you actually had a conversation with a

23   doctor; is that correct?

24        A      Medical personnel, yes.

25        Q      What type of medical personnel?
```

Inv. Baez - Cross - LaMagna

1       A       I can't recall.

2       Q       Did you review your notes prior to testifying

3    here today?

4       A       I did.

5       Q       Nowhere in your notes does it articulate that you

6    spoke to any medical personnel concerning whether or not

7    Mr. Heidgen was physically able to talk to you at that time;

8    isn't that correct?

9       A       In my notes, no.

10      Q       And you reviewed your notes before you testified

11   today to refresh your recollection; isn't that correct?

12      A       That's correct.

13      Q       Would it be fair to say that if you did speak to

14   a doctor you would have noted that in your notes?  It would

15   have been something that would have been important, don't

16   you think?

17      A       Not necessarily that I would record it on my

18   notes.

19      Q       But it was not recorded, right?

20      A       It was not recorded, but I do recall.

21      Q       Do you recall when you spoke to medical

22   personnel, and you don't recall whether it was a doctor,

23   nurse, attendant or anybody; is that correct?

24      A       That's correct.

25      Q       Do you recall asking whether or not Mr. Heidgen

Inv. Baez - Cross - LaMagna

1   was under sedation; whether he was medicated due to his

2   injuries?

3       A    I recall asking would the patient be able to

4   speak to us.

5       Q    Did you take the name down of the person to whom

6   you asked this to?

7       A    I did not.

8       Q    Now, you testified on direct examination that you

9   noticed certain injuries to Mr. Heidgen, correct?

10      A    Correct.

11      Q    He also had a broken arm, I believe.  Did he have

12  a cast on or anything like that at that time?

13      A    I don't recall.

14      Q    Now, you also testified that when you were

15  speaking to Mr. Heidgen at 12:30 that he was pleasant,

16  correct?

17      A    Yes.

18      Q    He was calm, correct?

19      A    Yes.

20      Q    Courteous, correct?

21      A    Courteous.

22      Q    Cooperative, correct?

23      A    Pleasant and courteous.

24      Q    Polite?  Would that be another word you would

25  use?

Inv. Baez - Cross - LaMagna

1        A        Polite.

2        Q        Respectful to you?

3        A        Yes, sir.

4        Q        He referred to you as sir, and yes, sir, that

5   type of thing, right?

6        A        Yes.

7        Q        Now, prior to the issue of the Miranda warnings,

8   the constitutional rights, you had informed Mr. Heidgen that

9   he was under arrest for a DWI, I believe you testified,

10   correct?

11        A        I did.

12        Q        So at that point you did not articulate to

13   Mr. Heidgen the true consequences of this accident, correct?

14        A        He was advised that he was under arrest for

15   driving while intoxicated.

16        Q        What I am asking you is:  You did not articulate

17   with any degree of specificity the true nature of the result

18   of this accident; that two people had died, did you?

19        A        He was not informed at that time, no.

20        Q        You were not informed, -- you did not inform him

21   that there was even an accident with another vehicle,

22   correct?

23        A        That's correct.

24        Q        So at the time that you are questioning him he

25   was unaware of that nature, at least at that point, correct?

Inv. Baez - Cross - LaMagna

1        MR. HAYDEN:  Objection, your Honor.

2        THE COURT:  Sustained.

3    Q    So during the course of that interview, through

4    the whole interview, as you testified on direct, neither you

5    nor Investigator Harris articulated with specificity the

6    consequences of what happened that night, correct?

7    A    Correct.

8    Q    You just told him he was arrested for a DWI,

9    correct?

10   A    Yes, sir.

11   Q    And you testified that Mr. Heidgen was given his

12   constitutional Miranda warnings, correct?

13   A    Yes, sir.

14   Q    You didn't do that; Investigator Harris did that?

15   Or did you?

16   A    Investigator Harris.

17   Q    And you said that he read it off of a card that

18   he had in his wallet or on his person?

19   A    His identification case.

20   Q    Now, the New York State Police also has Miranda

21   cards, don't they?

22   A    Yes.

23   Q    And they are pre-printed also by the State

24   Police, correct?

25   A    Correct.

Inv. Baez - Cross - LaMagna

1    Q    And in these cards an individual who is given his

2    Miranda warnings can initial or sign those cards too,

3    correct?

4    A    Correct.

5    Q    And those cards, by signing, will verify and

6    corroborate the fact that this individual did get his

7    constitutional rights, correct?

8    A    Correct.

9    Q    And also on these cards, these pre-printed cards,

10   there is also those two questions, correct, as we discussed

11   on the other form?  Correct?

12   A    Correct.

13   Q    Namely, do you understand the rights that I have

14   given you, correct?

15   A    Yes.

16   Q    And there is a spot that the person can say "yes"

17   to evince the fact that these were given, correct?

18   A    Yes.

19   Q    And then there is that other question:  Having

20   been given these rights, do you wish to waive these rights

21   and talk to you without an attorney, correct?

22   A    Yes.

23   Q    There is a spot on that card where the person can

24   sign evincing the fact that those rights were given,

25   correct?

Inv. Baez - Cross - LaMagna

```
 1        A     Correct.

 2        Q     In this case you didn't use one of those cards

 3   either, did you?

 4        A     No, sir.

 5        Q     Did you have any of those cards with you?

 6        A     I did not.

 7        Q     Now, you said that -- withdrawn.

 8              Well, you said that you had been the one who was

 9   taking the notes of this interview process, correct?

10        A     Correct.

11        Q     In fact, I believe it was Investigator Harris who

12   was asking some questions, correct?

13        A     Correct.

14        Q     You were asking some questions, correct?

15        A     Yes, sir.

16        Q     And Mr. Heidgen was answering questions from the

17   two of you, correct?

18        A     Correct.

19        Q     Investigator Harris didn't take any notes,

20   correct?

21        A     No, he did not.

22        Q     You were taking the notes, correct?

23        A     Yes.

24        Q     And now, you aren't taking literal dictation,

25   were you?
```

1        A        It was --

2        Q        Sum and substance?

3        A        Sum and substance stance, correct.

4        Q        Forgive me.  You haven't taken any courses in

5    stenography or taken literal dictation, did you?

6        A        No.

7        Q        Three people are basically talking:  You, Harris

8    and Mr. Heidgen, correct?

9        A        Yes, sir.

10        Q        And these notes you were taking were

11    cotemporaneous with the questions being asked by both you

12    and Investigator Harris, correct?

13        A        Yes.

14        Q        And these notes were cotemporaneously made at the

15    time that Mr. Heidgen was answering these questions,

16    correct?

17        A        Yes.

18        Q        And it was in a normal parlance; people were just

19    talking as they normally do, correct?

20        A        Yes.

21        Q        You were trying to jot down as much as you can to

22    be as accurate as you could, right?

23        A        Correct.

24        Q        And it is important to take meticulous notes with

25    respect to an interview of an individual who was in custody;

Inv. Baez - Cross - LaMagna

1      isn't that true?

2          A      Yes.

3          Q      You want to be as accurate as you can, correct?

4          A      Correct.

5          Q      Because some day, as today, many, many months

6      later, fourteen months later, you may be asked to articulate

7      what was said, and you need to refresh your recollection,

8      correct?

9          A      Correct.

10         Q      It would be, and you would agree, would you not,

11     very difficult fourteen months later to remember exactly

12     what was said by everybody without refreshing your

13     recollection; isn't that correct?

14         A      That's correct.

15         Q      You would need these notes to refer to in

16     remembering what was said, correct?

17         A      Correct.

18         Q      Now, before any interview can even take place, as

19     you said, Mr. Heidgen's constitutional Miranda warnings were

20     given, correct?

21         A      Yes.

22         Q      That's a very important stage before you

23     interview somebody, correct?

24         A      Yes.

25         Q      You know by law you have to give these Miranda

1    warnings, right?

2         A    Yes, sir.

3         Q    And it is important to make sure that a person in

4    custody gets these warnings before they talk to law

5    enforcement, correct?

6         A    Yes.

7         Q    Those are our constitutional rights, right?

8         A    Yes, sir.

9         Q    And you testified that you took notes of this

10   interview, correct?

11        A    Yes.

12        Q    In fact, nowhere in any of your notes does it

13   articulate with any specificity that Mr. Heidgen was given

14   his Miranda warnings, and that he waived his Miranda

15   warnings; isn't that correct?

16        A    That's correct.

17        Q    So this very important part of an interview

18   process of somebody in custody was not memorialized anywhere

19   in your notes that this was actually given, correct?

20        A    At approximately when Investigator Harris read

21   him his rights I wrote down the time.

22        Q    You wrote down the time of the interview.  I

23   understand that.

24        A    Okay.

25        Q    Is there anywhere in your notes that articulates

1   with specificity that at a certain time Miranda or

2   constitutional rights was given to Mr. Heidgen?  It doesn't

3   appear there, right?

4        A    No, sir.

5        Q    Nowhere in those notes that you took of this

6   interview does it ever state with specificity that

7   Mr. Heidgen acknowledged receiving these constitutional

8   Miranda warnings, correct?

9        A    Correct.

10       Q    Nowhere in these notes does it articulate with

11   any specificity that Mr. Heidgen on hearing and

12   understanding these warnings waived those warnings, correct?

13       A    Correct.

14       Q    Now, as you testified earlier the notes that you

15   took are the sum and substance of what was being said by all

16   three of you, correct?

17       A    Correct.

18       Q    Certainly not word-for-word, correct?

19       A    Correct.

20       Q    And you would agree, would you not, that a word

21   missing here or there could have significant meaning in the

22   context of what a statement is, correct?

23       A    Correct.

24       Q    And you would agree that it is important to be as

25   detailed as you can because memories do fade, correct?

Inv. Baez - Redirect - Hayden

1      A      Yes, sir.

2      Q      Now, in relying on the notes that you have taken,

3   in reviewing them, if those notes are wrong that could

4   influence how you remember an event; isn't that correct?

5      A      It's possible.

6      Q      And it's possible, since the notes aren't literal

7   dictation, correct?

8      A      Correct.

9      Q      And it is possible because the conversation

10   wasn't recorded, correct?

11     A      It was not.

12     Q      So we don't have an actual recording, either

13   written or electronically recorded, of that actual interview

14   process, correct?

15     A      Just my notes, correct.

16     Q      Again, just for clarity sake, there is no

17   notation in these notes concerning with specificity that the

18   Miranda warnings were given; is that correct?

19     A      Correct.

20            MR. LaMAGNA:  I have nothing further, your

21   Honor.

22            THE COURT:  Mr. Hayden.

23   REDIRECT EXAMINATION

24   BY MR. HAYDEN:

25     Q      What is a B.C.I. number?

1    A    Bureau of Criminal Investigation case number.

2    Q    Are B.C.I. numbers assigned exclusively to blood

3    kits?

4    A    No, sir.

5    Q    Are B.C.I. numbers assigned exclusively to cases

6    involving blood kits?

7    A    No, sir.

8    Q    Are B.C.I. numbers assigned to all kinds of

9    cases?

10    A    Yes, sir.

11    Q    Rapes?

12    A    Yes.

13    Q    Murders?

14    A    Yes.

15    Q    Robberies?

16    A    Yes.

17    Q    Grand larcenies?

18    A    Yes.

19    Q    Gun possession?

20    A    Yes.

21    Q    You name it?

22    A    Yes.

23    Q    B.C.I. numbers are assigned to cases that have

24    nothing to do with blood kits?

25    A    Correct.

1      Q      Were you involved with any other blood kit,

2   except for this one, on Saturday, July 2nd of 2005?

3      A      I was not.

4      Q      Had you been involved with any other blood kit,

5   other than this one, in the week before Saturday, July 2nd

6   2005?

7      A      No, sir, I was not.

8      Q      Had you been involved with any other blood kit in

9   the week after Saturday, July 2nd of 2005?

10     A      I was not.

11     Q      To the best of your knowledge was the New York

12  State Police in Nassau County involved with any other blood

13  kit on Saturday, July 2nd of 2005?

14     A      No.

15            MR. LaMAGNA:  Objection.

16            THE COURT:  Overruled.

17     A      No.

18     Q      To the best of your knowledge had the New York

19  State Police in Nassau County been involved with any other

20  blood kit in the week before Saturday, July 2nd 2005?

21     A      No.

22     Q      To the best of your knowledge was the New York

23  State Police in Nassau County involved with any other blood

24  kit in the week after Saturday, July 2nd 2005?

25     A      No.

Inv. Baez - Redirect - Hayden

1        Q        You testified during cross-examination that you

2    made no markings on the seals you used to secure the clear

3    plastic container?

4        A        Correct.

5        Q        Did you recognize the seals you used when you

6    opened the blood kit yesterday afternoon?

7        A        I did.

8        Q        You recognized them as the same seals you had

9    used back on July 2nd 2005?

10       A        I did.

11       Q        No doubt in your mind?

12       A        None.

13       Q        You recognize the names on them?

14       A        I do.

15       Q        The date?

16       A        Yes.

17       Q        The time?

18       A        Yes.

19       Q        Everything?

20       A        Yes.

21       Q        You testified on cross-examination that you

22    didn't fill out anything next to "supervisor's initials"?

23       A        Correct.

24       Q        Were you the supervisor of this case?

25       A        No.

1    Q    Who was the supervisor in this case?

2    A    Investigator Harris.

3    Q    Where was Investigator Harris?

4    A    At the crime scene.

5    Q    Was he busy there?

6    A    He was.

7    Q    Had there been seriously injured people at the

8    scene of the collision?

9    A    Yes.

10   Q    Were they Investigator Harris' responsibility?

11   A    Yes.

12   Q    Were there dead people found at the scene of the

13   collision?

14   A    Yes.

15   Q    Were they Investigator Harris' responsibilities?

16   A    Yes.

17   Q    Was it Investigator Harris' responsibility to try

18   to determine what happened out there?

19   A    Yes.

20   Q    To sort out the destroyed automobiles, the

21   witnesses, was that his responsibility?

22   A    Yes.

23   Q    Was it his responsibility to locate witnesses at

24   the scene?

25   A    Yes.

Inv. Baez - Redirect - Hayden

```
 1        Q     To make certain they were spoken to?

 2        A     Correct.

 3        Q     To speak to some of them himself?

 4        A     Yes.

 5        Q     Was all of that Investigator Harris'

 6    responsibility?

 7        A     Yes.

 8        Q     You testified during cross-examination that

 9    Trooper O'Hare used the red integrity seals to secure the

10    two samples of blood.

11               MR. LaMAGNA:  Objection as to what the other

12          officer did.  Only what he saw.

13               THE COURT:  Objection sustained for different

14          reasons.

15        Q     You testified during cross-examination that red

16    integrity seals had been used to seal the blood in the tubes

17    you found inside the closed clear plastic container; is that

18    right?

19        A     That's correct.

20        Q     You testified that was a mistake?

21        A     It was.

22        Q     Not according to procedure?

23        A     Correct.

24        Q     Not according to the instructions?

25        A     Correct.
```

1      Q      Do those red integrity seals work so far as

2    securing the sealed blood tubes is concerned?

3      A      Yes.

4      Q      To do the job?

5      A      Yes.

6      Q      Were were they initialed?

7      A      Yes.

8      Q      Dated?

9      A      Yes.

10     Q      You testified during cross-examination that you

11   too made a mistake, didn't you?

12     A      Yes.

13     Q      You used the white seals to secure the closed

14   clear plastic container?

15     A      Yes.

16     Q      Did you do that?

17     A      Yes, I did.

18     Q      Did you make that mistake?

19     A      Yes, I did.

20     Q      Did it work?

21     A      Yes.

22     Q      Did those white seals serve their purpose?

23     A      They did.

24     Q      Did they secure the sealed blood tubes inside of

25   that closed clear plastic container?

Inv. Baez - Redirect - Hayden

1       A       They did.

2       Q       Any problem?

3       A       None.

4       Q       You testified during cross-examination about a

5    series of mistakes; is that right?

6       A       Yes.

7       Q       You testified during direct that alongside

8    "offense" on the label attached to the clear plastic

9    container was written "DWI"; is that right?

10      A       Correct.

11      Q       Do you have any evidence that was a mistake?

12      A       No.

13      Q       Do you have any reason to believe that was a

14   mistake?

15      A       No.

16      Q       You testified that alongside "date of incident"

17   was written "July 2nd 2005"; is that right?

18      A       Correct.

19      Q       Do you have any evidence that was a mistake?

20      A       None.

21      Q       Any reason to believe that that was a mistake?

22      A       None.

23      Q       Time of incident, 2:06 in the morning, do you

24   have any reason to believe that was a mistake?

25      A       No.

Inv. Baez - Redirect - Hayden

1     Q     Any evidence that that was a mistake?

2     A     None.

3     Q     "Trooper O'Hare," any reason to believe that that

4  was a mistake?

5     A     No.

6     Q     Any evidence that that was a mistake?

7     A     None.

8     Q     Date blood drawn, "July 2nd 2005," any evidence

9  that is a mistake?

10    A     None.

11    Q     Any reason to believe it is a mistake?

12    A     No.

13    Q     "Time blood drawn, 2:45" in the morning, any

14  reason to believe that is wrong?

15    A     No.

16    Q     That's a mistake?

17    A     No.   None.

18    Q     "Location of drawing, Nassau County Medical

19  Center," do you have any reason to believe that that is

20  incorrect?

21    A     No.

22    Q     Any reason to believe that is a mistake?

23    A     No.

24    Q     "Blood drawn by Registered Nurse Busco," do you

25  have any evidence that is a mistake?

Inv. Baez - Redirect - Hayden

1        A        No.

2        Q        Do you have any reason to believe that is a

3    mistake?

4        A        No.

5        Q        "Chain of possession, received from defendant,"

6    do you have any evidence that's not so?

7        A        No.

8                       MR. LaMAGNA:  Objection.

9                       THE COURT:  Overruled.

10        Q        Do you have any reason to believe, as you sit

11    here now, that is a mistake?

12        A        No.

13        Q        "Received by Busco," do you have any reason

14    whatsoever to believe, as you sit here now, that that is a

15    mistake?

16                       MR. LaMAGNA:  Objection.

17                       THE COURT:  Overruled.

18        A        No.

19        Q        "Date, July 2nd 2005.  Time, 2:45," do you have

20    any evidence that is a mistake?

21        A        No.

22        Q        Any reason to believe, as you sit here now, that

23    is a mistake?

24        A        No.

25        Q        "Received from Stafford," you wrote that,

Inv. Baez - Redirect - Hayden

1    correct?

2       A    I did.

3       Q    Is that a mistake?

4       A    No.

5       Q    "Received by Investigator Baez."  Is that a

6    mistake?

7       A    No.

8       Q    "July 2nd 2005, 4:50," that Saturday morning, is

9    that a mistake?

10      A    No.

11      Q    You testified during cross-examination you did

12   not put Martin Heidgen's name on the blood tubes or the

13   plastic container; is that right?

14      A    Correct.

15      Q    Martin Heidgen was conscious then?

16      A    He was.

17      Q    Unable to confirm his identity?

18           MR. LaMAGNA:  Objection.

19           THE COURT:  Sustained.

20      Q    Was he able to confirm his identity?

21           MR. LaMAGNA:  Objection.

22           THE COURT:  Overruled.

23      A    He was not.

24      Q    Did you come in contact with anyone then who was

25   able to confirm Martin Heidgen's identity?

1        A        No.

2        Q        Did you know for certain at that time that the

3   name of the person whose blood was in those sealed tubes was

4   Martin Heidgen?

5        A        No, it could not be confirmed.

6        Q        The name?

7        A        Yes.

8        Q        Did a family member confirm it?

9        A        No.

10        Q        Did a friend confirm it?

11        A        No.

12        Q        You were asked during cross-examination about

13   your ability to identify this as the blood kit we are

14   talking about.  Do you remember that?

15        A        Yes.

16        Q        You said there was a number on it?

17        A        Yes.

18        Q        10478?

19        A        Correct.

20        Q        Did you also open it yesterday?

21        A        I did.

22        Q        Did you recognize the contents inside it?

23        A        I did.

24        Q        Were they the very same contents that were in it

25   when you closed it and gave it to Investigator Harris?

Inv. Baez - Redirect - Hayden

```
 1        A     They were.

 2        Q     You recognized them yesterday?

 3        A     I did.

 4        Q     Just like you recognized them then?

 5        A     Yes, sir.

 6        Q     What is a General 19 form?

 7        A     It is a New York State Police statement form.

 8        Q     What is the purpose of it?

 9        A     To obtain a written confession from a defendant.

10        Q     Did you obtain a written statement from the

11   defendant?

12        A     I did not.

13        Q     Did you ask the defendant to give you a written

14   statement?

15        A     I did not.

16        Q     Why not?

17        A     Because his hands were restrained.

18        Q     Did you finish your conversation with the

19   defendant?

20        A     No, I did not.

21        Q     Why not?

22        A     He requested the advice of an attorney.

23        Q     Did you write down on your notes, as best you

24   could, what you and Investigator Harris were asking the

25   defendant?
```

Inv. Baez - Redirect - Hayden

1     A     I did.

2     Q     Did you write down, as best you could, the

3     defendant's responses to your questions and Investigator

4     Harris' questions?

5     A     I did.

6     Q     Is that all you wrote on your notes, except for

7     the time 12:30, at which time the conversation began?

8     A     Correct.

9     Q     You didn't write down that Miranda warnings had

10    been given?

11    A     Correct.

12    Q     Did you listen to Investigator Harris as he read

13    those rights to the defendant?

14    A     I did.

15    Q     Did you hear what Investigator Harris was saying

16    as he read those rights to the defendant?

17    A     I did.

18    Q     Had you heard those rights before?

19    A     I have.

20    Q     Had you read those rights before?

21    A     I have.

22    Q     Off the same kind of card Investigator Harris was

23    using?

24    A     I did.

25    Q     Did you recognize the words Investigator Harris

.GIGI WRIGHT, RPR    (516) 571-2503

 1    was reading to the defendant?

 2         A    I did.

 3         Q    Did you recognize those words as the same words

 4    that you had read on prior occasions?

 5         A    Yes.

 6         Q    Did you listen to Investigator Harris when he

 7    asked if the defendant understood?

 8         A    Yes.

 9         Q    Did he read that question right off the card?

10         A    He did.

11         Q    Did the defendant answer the question?

12         A    He did.

13         Q    Did you hear the defendant answer that question?

14         A    I did.

15         Q    What did he say?

16         A    Yes.

17         Q    Did you hear Investigator Harris ask the

18    defendant if he was willing to speak with you both?

19         A    Yes.

20         Q    You heard that?

21         A    I did.

22         Q    And you listened to it?

23         A    Yes.

24         Q    Did he read that question off of the card just

25    like the rights themselves?

1       A       He did.

2·      Q       You heard that?

3       A       Yes.

4       Q       What did the defendant say?

5       A       Yes.

6       Q       Defense counsel asked you about writing down the

7   sum and substance of the conversation with the defendant.

8   Did you ever write anything on those sheets of paper that

9   the defendant did not say?

10      A       No.

11      Q       Did you leave out any key word the defendant said

12  over the course of that conversation?

13      A       No.

14      Q       When you say you took down the sum and substance

15  of the conversation what do you mean?

16      A       I copied down, as the defendant spoke, the words.

17  I wrote them down on my note pad in question and answer

18  form.

19      Q       Are those notes a fair and accurate

20  representation of the give and take of that conversation?

21      A       Yes.

22              MR. HAYDEN:  Nothing further, your Honor.

23          Thank you.

24  RECROSS-EXAMINATION

25  BY MR. LaMAGNA:

1       Q       Investigator, B.C.I. is Bureau of Criminal

2  Investigations, correct?

3       A       Yes, sir.

4       Q       Now, they handle all types of criminal charges,

5  correct?

6       A       Correct.

7       Q       The whole gamut, correct?

8       A       Correct.

9       Q       Salient point is each case that comes in is

10  assigned a number, correct?

11      A       Eventually, yes.

12      Q       Yes.  And they go in sequential order, that is

13  why 05 stands for the year, correct?

14      A       Correct.

15      Q       And 001 would have been the first case that a

16  number was assigned that year, correct?

17      A       Correct.

18      Q       And then the next case that comes in would be

19  002, correct, and so on and so forth?

20      A       Correct.

21      Q       So the B.C.I. number is not necessarily

22  designated for the type of crime.  A B.C.I. number is an

23  identifying characteristic, correct?

24      A       Yes.

25      Q       Then when a case is assigned a number, no matter

Inv. Baez - Recross - LaMagna

1    what type of case it is, that is the number assigned, and

2    the evidence and the paperwork all carry that number with

3    it, correct?

4         A    Correct.

5         Q    And that is how you know a piece of evidence or a

6    form belongs to that case, correct?

7         A    Yes.

8         Q    It follows with it, correct?

9         A    Yes.

10        Q    It identifies it, correct?

11        A    Yes.

12        Q    And the numbers on this paperwork reflecting that

13   box was 05-140, as you testified to earlier, correct?

14        A    05-140, correct.

15        Q    Yes.

16        A    Yes.

17        Q    You can't testify from any personal knowledge

18   what happened with respect to the blood, the tubes or any of

19   its contents prior to you getting it, correct?

20        A    Prior to or after?

21        Q    Prior to you getting it you weren't present, were

22   you?

23        A    No, I was not.

24        Q    You only know what you received, correct?

25        A    Correct.

Inv. Baez - Recross - LaMagna

1    Q    And you don't know what happened after you left

2   possession of it, correct?

3    A    Correct.

4    Q    You only know what you got, correct?

5    A    Correct.

6    Q    So you can't say with any degree of specificity

7   what happened, how the blood was taken, and by whom, because

8   you weren't there?  You have no personal knowledge, correct?

9    A    Correct.

10    Q    Now let me ask you this:  You testified that you

11   looked into this box that morning, correct?

12    A    Correct.

13    Q    It had gone from the defendant, according to some

14   of your paperwork, the defendant to Busco, from Busco to

15   O'Hare, O'Hare to Stafford, and Stafford to you, correct?

16    A    Yes.

17    Q    At the time you got it it was still unsealed,

18   correct?

19    A    Unsealed, correct.

20    Q    So all of these people had this box in an

21   unsealed condition prior to you getting it, right?

22    A    The box itself was unsealed.

23    Q    Yes.

24    A    The red tubes --

25    Q    The tubes, I'm going to get there.

Inv. Baez - Recross - LaMagna

1           The tubes you looked at just yesterday, didn't

2      you?

3           A      Yes.

4           Q      That box, which was in a sealed condition, was

5      opened for you yesterday, correct?

6           A      Correct.

7           Q      And you looked into it yesterday, correct?

8           A      Correct.

9           Q      Prior to you testifying here today, correct?

10          A      Yes, sir.

11          Q      And it refreshed your recollection, as you

12     testified before, as to what was in that box, correct?

13          A      Correct.

14          Q      Now, let me ask you something:  If hypothetically

15     a police officer says that these tubes had a white label on

16     top of the stopper, and you get a tube with a red label on

17     the top of the stopper, it is not the same tubes, is it?

18                 MR. HAYDEN:  Objection.

19                 THE COURT:  Sustained.

20          Q      You cannot say that what you received was in the

21     same condition or in fact the actual same tubes that

22     contained the blood from Martin Heidgen because you were not

23     present during that process; isn't that true?

24          A      No.

25          Q      And you can't --

Inv. Baez - Recross - LaMagna

1      A      No, it is not true.

2      Q      You can't say with personal knowledge that the

3   condition of the tubes that you received is exactly the

4   same, identical tubes as the tubes that were were taken from

5   Martin Heidgen, observed by Trooper O'Hare, because you

6   weren't there?

7      A      I could tell by the red integrity tape that

8   Trooper O'Hare placed on the tubes.  It was the wrong --

9      Q      You didn't see him place them there, correct?

10     A      I did not.

11     Q      If he placed white ones on that tubes, these are

12   not the same tubes, right?

13                  MR. HAYDEN:  Objection.

14                  THE COURT:  Sustained.

15     Q      You didn't see any tampering when you looked at

16   the tubes that you received from Trooper Stafford, did you?

17     A      I did not.

18     Q      It didn't look like the tubes were ripped off and

19   new seals were put on it, did it?

20     A      No, sir.

21     Q      There was no tampering whatsoever with the tubes

22   that you received from Stafford, correct?

23     A      Correct.

24     Q      And according to you you said that the seals on

25   the tops of the tubes were red, right?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Baez - Recross - LaMagna

1    A    Yes, sir.

2    Q    And you just looked at these last night, correct?

3    A    Correct.

4    Q    And that is what you are testifying to today,

5    that they were red, correct?

6    A    Correct.

7    Q    If Trooper O'Hare said I didn't put red ones on,

8    I put white ones on, they would be different tubes, right?

9              MR. HAYDEN:  Objection.

10             THE COURT:  Sustained.

11   Q    Isn't it true that in this blood kit there are

12   six seals, correct?

13   A    Correct.

14   Q    There are four white ones, correct?

15   A    Yes, sir.

16   Q    And only two red integrity seals, correct?

17   A    Correct.  That is correct.

18   Q    Those two red integrity seals are not supposed to

19   be used for the tops of the tubes, correct?

20   A    That is correct.

21   Q    Those red integrity seals are supposed to be used

22   to seal the inner box, correct?

23   A    Correct.

24   Q    And if somebody was doing the proper procedure

25   that is exactly the way it should be, correct?

Inv. Baez - Recross - LaMagna

1        A       Correct.

2        Q       Now, as Mr. Hayden said you have no reason to

3   think that O'Hare didn't follow instructions, did you?

4                MR. HAYDEN:  Objection.

5                THE COURT:  Sustained.

6        Q       Now, you said on redirect that you are not the

7   case agent on this case; is that correct?  Right?

8        A       Yes, sir.

9        Q       It is Investigator Harris that has that

10  responsibility, correct?

11       A       Correct.

12       Q       There would be no need for you to write anything

13  on these labels about the name of the defendant, correct?

14       A       Could you repeat that?

15       Q       So there would be no reason for you, since you

16  are not the case agent, to write the name of the defendant

17  on this kit, correct?

18       A       If the name of the defendant was confirmed at

19  that point I would have filled in that information.

20       Q       But you had no reason to believe that it wasn't

21  his true identity.  You testified that nobody told you,

22  well, we don't know if it is really his name.  You testified

23  to that, correct?

24       A       I was told at the crime scene by Investigator

25  Harris.

Inv. Baez - Recross - LaMagna

1    Q    That his name was Heidgen?

2    A    Yes.

3    Q    That was it?  That is what you testified to this

4    morning, right?

5    A    Yes, sir.

6    Q    You had no reason to believe that the accuracy of

7    that name was not his name?

8    A    That's correct.

9    Q    That's correct.  So if you felt that there was no

10   reason to believe that that in fact wasn't his name, you

11   still didn't put it on that form; isn't that correct?

12   A    His identity was was not confirmed.

13   Q    To you?

14   A    Correct.

15   Q    But you just said you have no reason to believe

16   that was not accurate.

17   A    He advised me the last name of the defendant was

18   Heidgen, that is all I knew.

19   Q    Mr. Hayden asked you that since you are not the

20   case agent, implying that there would be no reason for you

21   to be writing any of this stuff?

22            MR. HAYDEN:  Objection.

23            THE COURT:  Sustained.

24   Q    Let's put it this way, Investigator, you did take

25   it upon yourself, even though you weren't the case agent, to

1    take seals that were pre-written by somebody else and use

2    them, didn't you?

3        A    Yes.

4        Q    These are seals that were filled out by somebody

5    else other than you, correct?

6        A    Correct.

7        Q    And you used those seals to seal this box,

8    correct?

9        A    Correct.

10       Q    And it is your testimony that you only used the

11   white seals, correct?

12       A    That is correct.

13       Q    And when you testified that you used the

14   integrity seals you misspoke then, I guess, correct?

15       A    They are -- all six are integrity seals.

16       Q    I'll show you these again.  We kind of went

17   through this already, but I'll show you these again.  You

18   recognize those seals, don't you?

19       A    I do.

20       Q    The white ones, do they say "integrity seal"?

21       A    No, sir.  It just says "seal."

22       Q    It just says "seal"?

23       A    Correct.

24       Q    And there are four in these kits, correct?

25       A    Of the white ones, correct.

Inv. Baez - Recross - LaMagna

1    Q    And there is red seals, correct?

2    A    Correct.

3    Q    And there is only two red seals in these kits,

4    correct?

5    A    That is correct.

6    Q    And those red seals are the only seals that say

7    "integrity seal," correct?

8    A    That's correct.

9    Q    When you said you used the integrity seals to

10   close up that box did you misspeak?

11   A    In my opinion, no.  These are all seals.  These

12   specifically say "integrity seals."

13        MR. HAYDEN:  Objection.

14   Q    And you --

15        MR. HAYDEN:  Objection let him finish.

16        THE COURT:  Sustained.

17   Q    You testified earlier today on direct examination

18   and on redirect examination that you used the integrity

19   seals.  That's the word you used, words you used, to seal

20   that box.  Do you recall that?

21   A    I do.

22   Q    And the only labels in that box that are called,

23   in bright letters, "integrity seals" are the red ones,

24   correct?

25        MR. HAYDEN:  Objection.  For the fourteenth

Inv. Baez - Recross - LaMagna

1      time.

2                      MR. LaMAGNA:   They are in evidence.

3                      THE COURT:   It is true.   But that is well

4      taken.   Sustained.

5        Q      When you said you used the integrity seals you

6      really meant that you only used the white seals?

7        A      The seals.

8        Q      Not the integrity seal?

9        A      Correct.   Which is also used for integrity of the

10     item.

11       Q      When you received those tubes you are sure that

12     the tubes that you received from O'Hare had red integrity

13     seals on the tops of those tubes?

14       A      Yes, sir.

15       Q      Is that because you refreshed your recollection

16     last night by looking at those tubes?

17       A      No, sir.

18       Q      You have a distinct recollection from fourteen

19     months ago that the wrong seals were used to seal those

20     vials?   Is that what you are saying?

21       A      The wrong seals were placed on the blood tubes,

22     correct.

23       Q      On the vials?

24       A      On the blood tubes, correct.

25       Q      You have a recollection of that; not that it was

1    refreshed by looking at it last night?

2        A    Prior to July 2nd 2005, I had an opportunity to

3    use a New York State Police blood kit and --

4        Q    I'm not asking you that.

5        A    And I'm --

6        Q    Listen to my question:  Are you saying that your

7    memory was not refreshed by looking at this blood kit that

8    was unsealed for you last night?  Is that what you are

9    saying?

10       A    No.

11       Q    So your memory was refreshed by looking at that

12   kit last night, correct?

13       A    My memory was refreshed on certain items, yes.

14       Q    And that is the purpose for them opening that box

15   for you last night, that was for the purpose of refreshing

16   your recollection for your testimony here today; isn't that

17   true?

18       A    That's correct.

19       Q    And what I am asking you is:  Is it possible that

20   you are wrong when you received those tubes from Stafford

21   that, in fact, they had white seals that Trooper O'Hare said

22   he put on them?

23                  MR. HAYDEN:  Objection.

24                  THE COURT:  Sustained.

25       Q    Now, you testified that you recognized the seals.

Inv. Baez - Recross - LaMagna

1    That's how you recognize them, right?  Didn't you testify to

2    that on redirect that you recognized the seals?

3         A    Yes, sir.

4         Q    All of these seals are the same, aren't they?

5         A    In terms of?

6         Q    What they looks like; the white seals and the

7    integrity seals?

8         A    Yes, sir.

9         Q    They all look the same, correct, from box to box

10   to box, correct?

11        A    Yes, sir.

12        Q    And the only difference is what is filled in in

13   those seals, correct?

14        A    That's correct.

15        Q    Now, there is no name on those seals, correct, of

16   the defendant?  Correct?

17        A    There was not.

18        Q    In fact, those seals were made out by somebody

19   other than you, correct?

20        A    Correct.

21        Q    Another officer, correct?

22        A    Correct.

23        Q    And you used those seals and you recognized

24   those?

25        A    I do.

Inv. Baez - Recross - LaMagna

1        Q      Now, when Mr. Hayden was asking you that you had
2    no reason to believe Officer O'Hare or Stafford did anything
3    wrong?  You said there was no reason, but there was no
4    mistake, correct?

5                    MR. HAYDEN:  Objection.

6                    THE COURT:  Sustained.

7        Q      Didn't you testify on redirect when Mr. Hayden
8    was asking you about certain notations put on by other
9    people on that blood kit, that you had no reason to believe
10   that it wasn't accurate?

11       A      Correct.

12       Q      But if those things were done outside of your
13   presence and you have no personal knowledge of what happened
14   you really can't say that, can you?

15       A      Yes, I can.

16       Q      You can because you believe it, correct?

17       A      No, sir.

18       Q      But you have no personal knowledge.  You didn't
19   observe what Trooper O'Hare did, did you?

20       A      I did not.

21       Q      Now, you have been a police officer for how many
22   years?

23       A      Eighteen and-a-half.

24       Q      Eighteen and and-a-half years.  Certainly you
25   know what the Miranda warnings are, as Mr. Hayden asked you,

GIGI WRIGHT, RPR    (516) 571-2503

1   because you recognize them, correct?

2        A    Yes, sir.

3        Q    But your job was to take down everything humanly

4   possible that was said during this interview, correct?

5        A    Correct.

6        Q    That was what you were there for, correct?

7        A    Yes, sir.

8        Q    And you took down what you said, correct?

9        A    Yes.

10       Q    You took down what Trooper Harris said?

11       A    Correct, Investigator Harris.

12       Q    And you took down what Mr. Heidgen said, correct?

13       A    Yes, sir.

14       Q    And you took it all down as accurately as you

15   can?

16       A    As accurately as I could, yes.

17       Q    The only thing you didn't put down was these

18   important constitutional rights.  You didn't put that in

19   your notes?

20       A    I did.  At 12:30 when Investigator Harris read

21   him --

22       Q    There is a date on that?

23       A    -- his rights I wrote them down.

24       Q    Did you state in specificity that you just went

25   over that -- withdrawn.

Inv. Baez - Recross - LaMagna

1        You said it was a Q and A type of writing that

2    you did, correct.

3        A    Yes, sir.

4        Q    Meaning when a question was asked you wrote down

5    the question?

6        A    Q and A.

7        Q    Q meaning for question, correct?

8        A    Yes, sir.

9        Q    You wrote down the question asked by either you

10   or Harris, correct?

11       A    Correct.

12       Q    And A stood for answer, correct?

13       A    Yes, sir.

14       Q    And that was the answer given by Mr. Heidgen,

15   correct?

16       A    Correct.

17       Q    But you didn't write down Q, the question, you

18   have the right to remain silent and so forth on the Miranda

19   warnings?  You didn't do that?  You didn't write those

20   questions down, did you?

21            MR. HAYDEN:  Objection.

22            THE COURT:  Sustained.

23       Q    Did you write those questions down --

24            MR. HAYDEN:  Objection.

25            THE COURT:  Sustained.

Inv. Baez - Recross - LaMagna

1    Q    -- in a question and A form?

2              THE COURT:  Sustained.

3    Q    Did you write any answers --

4    A    From the defendant.

5    Q    -- down concerning the questions that

6    Investigator Harris gave him concerning the Miranda

7    warnings?

8    A    I did not.

9    Q    But you took down everything else, correct?

10   A    Yes, sir.

11   Q    And you reviewed those notes, correct?

12   A    I did.

13   Q    Now, if you missed a sentence or a word you

14   wouldn't remember today that you missed a word, correct?

15   Because you didn't write it down, correct?

16   A    Correct.

17   Q    It would be obvious, correct?

18   A    Yes.

19   Q    When you say that everything in the statement is

20   accurate, it is as accurate as what is depicted on there,

21   according to you, correct?

22   A    Correct.

23   Q    If you missed something or you got something

24   wrong, you wouldn't know that because that is what you

25   wrote, correct?

Inv. Baez - Recross - LaMagna

1    A     Other than my recollection.

2              MR. LaMAGNA:  Nothing further, Judge.

3              MR. HAYDEN:  Nothing further.

4              THE COURT:  Thank you.

5              THE WITNESS:  Thank you.

6              (Whereupon, the witness exits the courtroom.)

7              THE COURT:  Ladies and gentlemen, we are

8    taking a five-minute break.  Don't talk about the case.

9              (Whereupon, the jury exited the courtroom,

10   and a brief recess held.)

11             THE COURT:  Bring in the jury.

12             COURT OFFICER:  Jury entering.

13             (Whereupon, the jury entered the courtroom,

14   and upon taking their respective seats, the following

15   occurred:)

16             THE CLERK:  Case on trial continues.

17   Defendant is present.  Jury is present.  Indictment

18   number 1910N of 2005, People versus Martin Heidgen,

19             People ready?

20             MR. HAYDEN:  Ready, your Honor.

21             THE CLERK:  Defendant ready?

22             MR. LaMAGNA:  Defendant is ready, your Honor.

23             THE CLERK:  Defendant is present and jurors

24   are seated, your Honor.

25             THE COURT:  Thank you.  People.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Direct - Hayden

1              MR. HAYDEN:  Investigator Michael Harris.

2              COURT OFFICER:  Step up, remain standing,

3      raise your right hand and face the clerk.

4              M I C H A E L   H A R R I S,         a

5              witness called on behalf of the People,

6              having been first duly sworn by the Clerk of

7              the Court, was examined and testified as

8              follows:

9              THE CLERK:  You can put your hand down.

10             State your name, spelling your last name,

11     shield number and command.

12             THE WITNESS:  Michael W. Harris, H-A-R-R-I-S,

13     shield number 1156.

14             THE CLERK:   Command?

15             THE WITNESS:  New York State Police.

16             THE CLERK:  Thank you.  Please take a seat.

17   DIRECT EXAMINATION

18   BY MR. HAYDEN:

19     Q     Good afternoon, Investigator.

20     A     Good afternoon.

21     Q     How long have you been a member of the New York

22   State Police?

23     A     Next month will be 23 years.

24     Q     How long have you been an investigator?

25     A     Thirteen and-a-half years.

1       Q       Do you live in Suffolk County with your wife and

2    family?

3       A       Yes, sir.

4       Q       Do you know a man named Martin Heidgen?

5       A       Yes, sir.

6       Q       Briefly describe him.

7       A       Approximately six feet, 175 to 180 pounds, black

8    hair.

9       Q       Do you see Martin Heidgen in this courtroom

10   today?

11      A       Yes, sir.

12      Q       Please point him out and describe for the record

13   what he is wearing today?

14      A       That gentleman there, sitting between the two

15   attorneys, wearing a dark-colored suit and, I believe, a

16   light gray shirt.

17              MR. HAYDEN:  Let the record reflect, your

18         Honor, that the witness has indicated the defendant

19         Martin Heidgen.

20              THE COURT:  Record will so reflect.

21      Q       I'm directing your attention to the early morning

22   of Saturday, July 2nd of 2005.

23              Did you respond that morning to the vicinity of a

24   crash scene along the Meadowbrook Parkway?

25      A       Yes, sir.

Inv. Harris - Direct - Hayden

1    Q    When did you arrive at the crash scene?

2    A    At 2:35 a.m.

3    Q    Describe the circumstances under which you

4    responded to the crash scene?

5    A    I got off of work at approximately 1:30 a.m.   On

6    the way from work I stopped at Pathmark in Massapequa.

7    About 2:20 a.m. I received a telephone call from S.P.

8    Farmingdale, Troop L, advising me to respond a multi-car

9    fatal car accident that occurred t the Meadowbrook Parkway

10   southbound in the vicinity of M7, which is a Babylon

11   Turnpike.

12   Q    What were you doing at Pathmark?

13   A    I was picking up some groceries en route to my

14   house.

15   Q    Describe how you got to the crash scene?

16   A    After I received the call, I shut down my trunk,

17   I entered my vehicle, put on my lights and sirens, entered

18   Rita Avenue headed east, continued onto Route 110 heading

19   northbound to the Southern State Parkway westbound,

20   continued to Exit 22, which is the Meadowbrook State Parkway

21   southbound, and I continued on and I stopped approximately

22   250 feet north of the accident scene on a grass shoulder.

23   Q    Did you get out of your vehicle then?

24   A    Yes, sir.

25   Q    Did you approach the crash scene on foot?

Inv. Harris - Direct - Hayden

1      A      Yes, sir.

2      Q      Describe what you saw as you were approaching the

3   crash scene on foot?

4      A      As I arrived at the crash seen, I observed

5   multiple vehicles from various police agencies, New York

6   State Police, Nassau County Police, Freeport Police.  I saw

7   fire truck apparatus from Freeport Fire Department, I.  Seen

8   multiple police personnel.  I saw a volunteer fireman.  I

9   saw civilians on the side of the road.

10      Q      Did you see a limousine?

11      A      Yes, sir.

12      Q      Where was that?

13      A      That was -- the limousine was facing the

14   southwest direction in the middle lane, just north of a

15   overpass of Babylon Turnpike.

16      Q      Describe any observations you eventually made of

17   the front of the limousine?

18      A      I walked toward the front of the limousine.  I

19   observed extensive, extensive front-end damage to the

20   limousine.

21      Q      Did you see a pickup truck?

22      A      Yes, sir.

23      Q      Describe the observations you eventually made of

24   the front of the pickup truck?

25      A      Pickup truck had front-end, had extensive

Inv. Harris - Direct - Hayden

1    front-end damage also to that vehicle.  It was positioned in

2    lane number one, left lane in a southwest direction.

3       Q    Did you smell anything as you were walking up to

4    the crash scene?

5       A    Yes, sir.

6       Q    What did you smell?

7       A    I recall smelling roadway flares, motor oil,

8    antifreeze and and a mixture with gasoline, as I walked up

9    to the scene.

10      Q    Did you hear anything as you were walking up to

11   the crash scene on foot?

12      A    Yes, sir.

13      Q    What did you hear?

14      A    Walking up to the limousine I heard moans and

15   groans from the vehicle, of victims that were injured.

16      Q    How many police and emergency people would you

17   estimate were at the crash scene when you arrived?

18      A    Over 20.

19      Q    How many civilians would you estimate were at the

20   crash scene when you arrived?

21      A    Over 20.

22      Q    Did you speak with people after arriving at the

23   crash scene?

24      A    Yes, sir.

25      Q    And how many people did you speak with?

Inv. Harris - Direct - Hayden

1       A       About 20.

2       Q       What else did you do after arriving at the crash

3   scene?

4       A       I arrived at the crash scene.  I first spoke to

5   the first responders, the first officer that came to the

6   scene.  I tried to locate them so they can give me

7   information about what they found out about the accident.

8               Also at the crash scene I monitored medical

9   personnel to make sure that the victims and the limousine

10  were being taken care of, and being extracted out of the

11  vehicle, so they can get to the hospital as quick as

12  possible.

13      Q       Did you try to determine how many witnesses there

14  were?

15      A       Yes, I did.  I canvassed the whole area and

16  interviewed about 20, 25 people to canvass for witnesses.

17      Q       Were all of those things your responsibility?

18      A       Yes, sir.

19              MR. HAYDEN:  Your Honor, with the Court's

20          permission may I display 1B in evidence for the jury

21          and 1A on the presenter?

22              THE COURT:  Yes, sir.

23      Q       Investigator, with the Court's permission please

24  step down in front of this photograph.

25              Investigator, is that a fair and accurate

Inv. Harris - Direct - Hayden

1    representation of the way the vehicles appeared, the

2    limousine and the pickup truck?

3            THE COURT:  Investigator, you are blocking

4        the view of the jurors.

5        Q    Yes, sir.

6        Q    Is that a fair and accurate representation of the

7    kind of police officials and emergency services personnel

8    you saw at the scene?

9        A    Yes, sir.

10       Q    Do you see yourself in that photograph?

11       A    Yes, sir.

12       Q    Would you point yourself out for the members of

13   the jury, please?

14           (Witness indicating.)

15           MR. HAYDEN:  Let the record reflect, your

16       Honor, that the witness is indicating himself up in the

17       upper left quadrant of the photograph as you are

18       looking at it, right up toward the upper left corner.

19       Q    Please retake the witness stand.

20           Did you receive a blood kit after arriving at the

21   crash scene?

22       A    Yes, sir.

23       Q    When did you receive the blood kit?

24       A    Approximately 6:50 a.m.

25       Q    Who gave you the blood kit?

1       A       Investigator Eric Baez.

2       Q       Was the outer box of the blood kit closed when

3    Investigator Baez gave it to you?

4       A       Yes, sir.

5       Q       Was the lot number on that box 10478?

6       A       Yes, sir.

7       Q       Describe the circumstances under which

8    Investigator Baez gave you that closed blood kit?

9       A       During the preliminary investigation that I was

10   conducting at the scene, Sergeant Timothy Heinz, advised we

11   have a subject under arrest en route to the hospital.  Also

12   that Trooper Daniel O'Hare was with him in the ambulance,

13   and went to the hospital with the blood kit.

14              Some time later Sergeant Heinz advised me that

15   subject was unconscious and they took blood.  They said they

16   took blood around 2:45 a.m., and due to the fact that I

17   couldn't avenue be at two places, I was at the crime scene,

18   I couldn't be at the hospital, and there was multiple aided

19   at different hospitals, I decided to call my supervisor and

20   have Eric Baez, Investigator Eric Baez come to the scene to

21   assist me..

22      Q       Did he come?

23      A       Yes, he did.

24      Q       What happened when he arrived?

25      A       He arrived at approximately 4:20 a.m.  He arrived

1     to the scene.  I wrote down the particulars, the

2     circumstances of the investigation, and the accident at the

3     scene.  I advised him to respond to Nassau County Medical

4     Center, we had multiple aided there, and also advised him

5     that we have taken blood from a subject at the hospital, and

6     I want him to go to the hospital and obtain that blood kit

7     and bring it to me.

8          Q     Did he leave then?

9          A     Yes, sir.

10         Q     Did he return?

11         A     Yes, he did.

12         Q     What happened when he returned?

13         A     He returned around 6:50 a.m. with a blood kit,

14    white cardboard box.  It was unsealed, with lot number

15    10478.  I took the blood kit from him.  I walked over to my

16    vehicle, unlocked my vehicle.  I placed the blood kit under

17    the driver's seat, and then locked the vehicle and continued

18    my investigation.

19         Q     Did you return to your car?

20         A     Yes, I did.

21         Q     When?

22         A     At 8:55, approximately 8:55 a.m.  When we shut

23    down, we opened up the roadway, we cleared the scene, I went

24    back to my vehicle, unlocked the vehicle, I looked under the

25    seat, I saw the white cardboard box, same position, same

1    condition where I left it, right under the driver's seat.  I

2    took it out and I placed it on the passenger seat.

3        Q    Was there any other blood kit in your vehicle

4    then?

5        A    No, sir.

6        Q    Were you involved with any other blood kit on

7    Saturday, July 2nd of 2005?

8        A    No, sir.

9        Q    Had you been involved with any other blood kit

10   during the week before Saturday, July 2nd 2005?

11       A    No, sir.

12       Q    Were you involved with any other blood kit during

13   the week after Saturday, July 2nd 2005?

14       A    No, sir.

15       Q    Describe for the jury what you did after you

16   retrieved the closed blood kit from where you left it in

17   your locked car?  What did you do with it then?

18       A    As I said, I took it, put it on the passenger

19   seat, and I drove the vehicle, my vehicle, to the Nassau

20   County Medical Examiner's Office to the toxicologist.  I

21   wanted to submit the blood there for analysis.

22            When I arrived there at around 9:03 a.m., I took

23   the blood kit, it was unsealed, white cardboard box, went

24   into the Nassau County Medical Examiner's Office, went to

25   the investigator's office, and I requested that I would like

1    to have a toxicologist come and take this blood.

2          He advised me there was none on duty; he would

3    have to call one in. And he started trying to make

4    notifications to have someone come in to take the blood.

5          During that time I opened up the blood kit, and I

6    looked at the contents. I observed it had a Lab-1, which is

7    a submission form, a lab submission form, a New York State

8    Police lab submission form for blood and urine. And also

9    they had the plastic container. Also the plastic container

10   on top of that they had different papers, like consent

11   forms, miscellaneous paperwork, and some plastic bags. I

12   took those out. I took out the plastic container and I

13   observed the plastic container. The plastic container had

14   two seals on it, white seals on it, on each side.

15         On the seals didn't have the defendant's name,

16   didn't have a supervisor's initials on it. Also I observed

17   the plastic container, I turned it over and looked on the

18   back, to observe the tubes. Both tubes were filled with

19   blood and both were sealed with red integrity seals. And I

20   observed the date on it and the initials is of DPO on both

21   integrity seals on the blood kit.

22         MR. HAYDEN: Your Honor, I'm now going to

23         display 16 in evidence.

24   Q     When you opened the outer box of the blood kit,

25   did you find a clear plastic container just like this one?

GIGI WRIGHT, RPR    (516) 571-2503

1     A     Yes, sir.

2     Q     With a label on it just like that one?

3     A     Yes, sir.

4     Q     With blood tubes capped in gray just like these?

5     A     Yes, sir.

6     Q     Was there writing on the label that you found?

7     A     Yes, sir.

8     Q     Attached to the clear plastic sealed container?

9     A     Yes, sir.

10    Q     Were there white seals securing the clear plastic

11    container you found inside the outer box of the blood kit?

12    A     Yes, sir.

13          MR. HAYDEN:  With the Court's permission may

14    the witness please step down by that presenter screen?

15          THE COURT:  Sure.

16    Q     You see "name of subject" beneath "police

17    officer's report"?

18    A     Yes, sir.

19    Q     Was there anything next to "name of subject" when

20    you removed that sealed clear plastic container from the

21    outer box of the blood kit?

22    A     No, sir.

23    Q     Did you eventually write something along "name of

24    subject"?

25    A     Yes, sir.

Inv. Harris - Direct - Hayden

```
1      Q    What did you write?

2      A    "Martin Heidgen."

3      Q    When did you do that?

4      A    At the lab at the M.E.'s office.

5      Q    That was at the M.E.'s office in Nassau County?

6      A    Yes, sir.

7      Q    While you were in the investigator's office

8    there?

9      A    Yes, sir.

10     Q    Do you see "offense" beneath "name of subject"?

11     A    Yes, sir.

12     Q    Was anything written alongside "offense"?

13     A    Yes, sir.

14     Q    What was written?

15     A    "DWI."

16     Q    Anything written along "date of incident"

17     A    Yes, sir.

18     Q    What was written?

19     A    "07/02/05"

20     Q    Anything written alongside "time of incident"?

21     A    Yes.

22     Q    What?

23     A    "2:06 a.m."

24     Q    Anything written next to police officer?

25     A    Yes.
```

1    Q    What?

2    A    "Trooper O'Hare."

3    Q    Anything next to "date blood drawn"?

4    A    Yes.

5    Q    What?

6    A    "07/02/05."

7    Q    Anything next to "time blood drawn"?

8    A    Yes.

9    Q    What?

10   A    "2:45 a.m."

11   Q    Anything next to "location of drawing"?

12   A    Yes.

13   Q    What was that?

14   A    "NCMC."

15   Q    Anything next to "blood drawn by"?

16   A    Yes.

17   Q    What was there?

18   A    "R.N. Busco"

19   Q    Was anything written alongside "received from,"

20   below chain of possession?

21   A    Yes.

22   Q    What was written there?

23   A    "DEFT."

24   Q    Defendant?

25   A    Yes, sir.

1    Q    Was there anything written next to "by"?

2    A    Yes.

3    Q    What was written there?

4    A    "Busco"

5    Q    Anything next to "date"?

6    A    Yes.

7    Q    What?

8    A    "07/02/05."

9    Q    Anything next to "time"?

10   A    Yes.

11   Q    What?  What was there?

12   A    "2:45 a.m."

13   Q    Let's go to the next line, "received from."

14   Anything written there?

15   A    Yes.

16   Q    What was written there?

17   A    "Trooper Stafford."

18   Q    "By"?

19   A    "Investigator Baez," sir.

20   Q    Date?

21   A    "07/02/05"

22   Q    Time?

23   A    "4:15 a.m."

24   Q    Anything written below that?

25   A    Yes.

Inv. Harris - Direct - Hayden

1    Q    What was written below that?

2    A    "Investigator Baez."

3    Q    Let's go to the next line.  Anything written next

4    to "received from," below the section that Investigator Baez

5    filled out?

6    A    "Received from Investigator Baez to Investigator

7    M.W. Harris."

8    Q    Who wrote that?

9    A    I did.

10   Q    When did you write that?

11   A    At the lab at the M.E.'s office.

12   Q    Investigator's office?

13   A    Yes.

14   Q    Date?

15   A    Yes.  "07/02/05."

16   Q    You wrote that?

17   A    Yes, I did.

18   Q    Time?

19   A    No.

20   Q    Did you neglect to fill in the time?

21   A    Yes.

22   Q    Should you have filled in the time?

23   A    Yes.

24   Q    Was that an oversight?

25   A    Yes, it was.

Inv. Harris - Direct - Hayden

1      Q      These are white seals from 16 in evidence.

2             You recognize these, Investigator?

3      A      Yes, sir.

4      Q      Did you find the clear plastic container inside

5      the outer box of the blood kit, did you find seals like

6      these securing that clear plastic container?

7      A      Yes, sir.

8      Q      Were the seals filled out?

9      A      Yes.

10     Q      Each one filled out identically?

11     A      Yes.

12     Q      Did you see anything next to "name of subject" on

13     each of the seals that you used to secure the clear plastic

14     container?

15     A      No, sir.

16     Q      Did you write something on each of those seals?

17     A      Yes, sir.

18     Q      What did you write?

19     A      "Defendant's name, Martin Heidgen."

20     Q      When did you do that?

21     A      At the M.E.'s office.

22     Q      Investigator's room?

23     A      Yes.

24     Q      Was anything written alongside "specimen

25     collector's initials" on each of those seals that was used

1   to secure the clear plastic container?

2       A       Yes.

3       Q       Could you read those initials?

4       A       No, I couldn't read them.

5       Q       Was there anything written alongside of "police

6   officer's initials"?

7       A       Yes.

8       Q       What was written alongside "police officer's

9   initials"?

10      A       "D.P.O."

11      Q       When you first looked at those seals used to

12  secure the clear plastic container was there anything

13  written alongside "supervisor's initials"?

14      A       No, sir.

15      Q       Did you eventually write something along

16  "supervisor's initials"?

17      A       Yes, sir.

18      Q       On each of those seals?

19      A       Yes, sir.

20      Q       What did you write?

21      A       I put my initials, "M.W.H."

22      Q       Anything written alongside "date"?

23      A       Yes, sir.

24      Q       Each of those seals?

25      A       Yes, sir.

Inv. Harris - Direct - Hayden

1    Q    What was written alongside "date"?

2    A    "07/02/05."

3    Q    Anything written alongside "time"?

4    A    Yes.

5    Q    Each seal?

6    A    Yes, sir.

7    Q    What was written alongside "time"?

8    A    "2:45 a.m."

9    Q    Anything written alongside "number"?

10   A    No, sir.

11   Q    Do you know what that refers to?

12   A    No, sir.

13   Q    Did you write anything alongside "number"?

14   A    No, sir.

15   Q    Did you find a Lab-1 form inside of the outer box

16   of the blood kit?

17   A    Yes, sir.

18   Q    Tell the jury what a Lab-1 is?

19   A    Lab-1 is a New York State Police laboratory

20   submission form for blood and urine kits.

21   Q    This is E in evidence, Defendant's E.  I'm going

22   to now display it for the jury.

23        Do you recognize the writing in the middle of

24   that Lab-1 form?

25   A    Here?

1        Q        Yes.

2        A        Yes.

3        Q        Was that writing on the Lab-1 form when you

4    retrieved it from the outer box of the blood kit?

5        A        Yes.

6        Q        What does it say?

7        A        "D. Busco."

8        Q        "R.N."?

9        A        "R.N."

10        Q        That was on the Lab-1 when you retrieved it?

11        A        Yes, sir.

12        Q        Was anything else written on the Lab-1 when you

13    retrieved it from the outer box of the blood kit?

14        A        Yes.

15        Q        What else was written on it?

16        A        Chain of custody.

17        Q        With the understanding that that is very

18    difficult to read, would you please show the jury where

19    there was writing in the chain of custody portion of the

20    Lab-1?

21        A        Top line.  Right here.

22        Q        What was written there?

23        A        07/02/05, blood kit from Trooper Stafford to

24    Investigator Baez, and the signature of Trooper Stafford.

25        Q        Was that all of the writing on the Lab-1 form in

Inv. Harris - Direct - Hayden

1    the chain of custody portion when you retrieved it from the

2    outer box of the blood kit?

3         A    Yes, sir.

4         Q    Did you fill out anything on the Lab-1?

5         A    Yes, sir.

6         Q    Show the jury the portion of the Lab-1 you filled

7    out?

8         A    Troop L.  Case number 123149.  BCI case number

9    05140.  Submitted by Michael W. Harris.  Date, here.  Title,

10   my title, Investigator.  Date here secured:  07/02/05.  Time

11   secured, 2:45 a.m.  Defendant's name:  Martin R. Heidgen.

12   His address:  5015 North Lakewood, Little Rock, Arkansas.

13   Subject arrest:  DWI.  Town:  Hempstead.  County:  Nassau.

14   Date of occurrence:  07/02/05.  Accident involved:  Yes.

15   Subject is alive.  Checked "fatal".  Number of vehicles

16   involved:  Three.  Examination requested:  Test for blood

17   alcohol concentrate.

18        Q    Did you write anything along the chain of custody

19   portion?

20        A    Yes, sir.

21        Q    Describe for the jurors what you wrote along the

22   chain of custody portion?

23        A    The date, 07/02/05.  Blood kit from Investigator

24   Baez to Investigator M.W. Harris, and I signed it.

25             Date, 07/02/05, blood kit, Investigator M.W.

Inv. Harris - Direct - Hayden

1   Harris to M.E.'s Office toxicology.

2       Q    After you had filled out the information you

3   filled out did you then seal the outer box of the blood kit?

4       A    Yes.

5       Q    Did you seal the Lab-1 inside the outer box of

6   the blood kit?

7       A    Yes, I did.

8       Q    Along with the sealed clear plastic container

9   enclosing the sealed blood tubes?

10      A    Yes, sir.

11      Q    Describe for the jury how you sealed the outer

12  box of the blood kit?

13      A    I closed the white cardboard box with the flaps

14  and appropriate holes.  I took the two seals and I placed

15  them in two locations on the box.

16      Q    Did you learn that there was no toxicologist

17  available at the Medical Examiner's Office on the Fourth of

18  July weekend?

19      A    Yes, sir.

20      Q    When did you learn that?

21      A    After the M.E. investigator made numerous

22  attempts to get someone to come in to take the blood, he

23  said no one is going to come in due to the fact that it was

24  Fourth of July weekend.

25      Q    Was the Lab-1 that you filled out indicating that

1       the blood was going from you to the toxicologist at the

2       M.E.'s Office, did you learn that there was no toxicologist

3       available after you had already sealed the outer box of the

4       blood kit?

5       A      Yes, sir.

6       Q      Did you decide not to open that and correct the

7       Lab-1?

8       A      Absolutely.

9       Q      Please retake the witness stand.

10              Describe for the jury what you did with the

11      sealed blood kit after you had enclosed the sealed plastic

12      container with the sealed blood tubes inside of it?

13      A      After learning there was no toxicologist coming

14      in to take the blood, I contacted my senior Investigator and

15      advised him of the circumstances. We decided that we were

16      going to have the blood transported to S.P. Newburgh, State

17      Police lab in Newburgh.

18              I took the sealed blood kit, the white box with

19      the defendant's name on it, I took it to my car, I placed

20      it -- unlocked my car, placed it in the passenger seat. I

21      continued to S.P. Valley Stream. I drove my route. If you

22      want to know my route, I took Hempstead Turnpike to the

23      Meadowbrook State Parkway, Meadowbrook State Parkway

24      southbound to the Southern State Parkway west, and took that

25      to the State Police barracks, which is located on the

1    westbound side between Exits 14 and 13.

2            As we got to the barracks we made arrangements

3    with Trooper Lawrence Hemmerich to come to the station.  He

4    was going to be the one to transport the blood to S.P.

5    Newburgh.

6            During that time, it was between 11:30, 11:40

7    a.m., we received a phone call stating that the defendant

8    was conscious and alert and talking.

9            I asked Trooper Hemmerich to make arrangements to

10   make a contact person up in Newburgh that he is going to

11   transport the blood to while we go to the hospital.

12           We go to the hospital, we conduct an interview

13   with the defendant, and returned to the station.

14           When I returned to the station Trooper Hemmerich

15   was still there.  He was waiting for me to return so I could

16   sign the General IIA for the chain of custody purposes.

17   After I signed the General IIA, Trooper Hemmerich

18   immediately went straight to Newburgh.

19       Q    Had you written anything at all on the outer box

20   of the blood kit itself?

21       A    Yes, sir.

22       Q    What had you written on the outer box of the

23   blood kit itself?

24       A    My name:  Investigator Harris.

25       Q    Where did you write that?

Inv. Harris - Direct - Hayden

1      A      Under Troop L.

2      Q      Did you write anything on the seals you used to

3   secure the outer box of the blood kit?

4      A      Yes, sir.

5      Q      What did you write on the seals?

6      A      The defendant's name, and I wrote down "MWH" as

7   the supervisor.

8      Q      Did you ever lose custody of the blood kit, the

9   closed blood kit, from the time that Investigator Baez gave

10  it to you until the time that you gave it to Trooper

11  Hemmerich?

12     A      No, I did not lose custody.  It was with me all

13  the time.

14     Q      Did you ever lose possession of it from the time

15  Investigator Baez gave it to you until the time you gave it

16  to Troop Hemmerich?

17     A      No, I did not lose possession.

18     Q      Tell the jurors what you are talking about when

19  you say a General II form?

20     A      A General IIA, it is a continuation of evidence,

21  of an evidence sheet.  I used it as a chain of custody, a

22  continued chain of custody of the blood, so everyone who

23  touched the blood could sign off on it, until it reached the

24  destination of the lab.

25            MR. HAYDEN:  Your Honor, with the Court's

1       permission may Investigator Harris please step down

2       again and approach that presenter?

3              THE COURT:   Sure.

4       Q      Do you recognize that?

5       A      Yes, I do.

6       Q      Is that the top of the General II form?

7       A      General IIA, yes, sir.

8       Q      Did you fill out the top of that General IIA

9       form?

10      A      Yes, sir.

11      Q      Describe how you filled it out?

12      A      Filled out the top, uniform side of the box.

13      NYSP Valley Stream.   TZS.   Case number I1123149.   Filled out

14      the BCI side, NYSP, Valley Stream, LI.   Case 05140.   Date of

15      occurrence:   07/02/05.   County of Nassau.   Investigator

16      Harris.   Submitted by Investigator Harris.   Name of

17      defendant, Heidgen, Martin R.   911 blood kit.   Test blood

18      alcohol concentrate to lab.

19             THE COURT:   Before you go on, Mr. Hayden.   It

20             is 4:30.   I think that we will break at this time until

21             tomorrow.   I'm giving you a bit of a break.

22             I have a matter that I must attend to at

23             9:30.   It should take an hour.   I'll ask you to be

24             present at 10:30, knowing that I will be here with a

25             proceeding that I have to take care of that might drag

Inv. Harris - Direct - Hayden

1          a little past that. If you are here at 10:30, if my

2          proceeding is concluded we can start promptly at 10:30

3          I might keep you waiting a little bit. I apologize in

4          advance for that.

5                    You know all the admonitions: Don't let

6          anybody talk about the case. This is hard. Don't read

7          anything about the case. Don't listen to anything

8          about the case. I know it is every place. Please

9          don't do it. It is not fair if you do. Don't go the

10         scene on purpose. All of those things.

11                   Have a nice night. See you 10:30 tomorrow

12         morning.

13                              o0o

14                   (Whereupon, the jury exited the courtroom,

15         and the trial was adjourned to Tuesday, the 19th day of

16         September 2006, at 10:30 a.m.)

17                              o0o

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NASSAU : CRIMINAL PART 31

2    ---------------------------------------x
       THE PEOPLE OF THE STATE OF NEW YORK

3

4         -against-

5

6    MARTIN HEIDGEN,

                      DEFENDANT.

7    ---------------------------------------x
       INDICTMENT #:  1910N-06

8

                             Mineola, New York

9                           September 19, 2006
                           VOLUME IV

10

11

    B E F O R E:   HONORABLE ALAN L. HONOROF

12                 Acting Supreme Court Justice

13

    A P P E A R A N C E S:

14

               HON. KATHLEEN M. RICE

15             District Attorney, Nassau County
                262 Old Country Road

16             Mineola, New York 11501
           BY:   ROBERT HAYDEN, ESQ.

17             Assistant District Attorney
                  and

18             MAUREEN McCORMICK, ESQ.
             Assistant District Attorney

19

20             STEPHEN LaMAGNA, ESQ.
                Attorney for the Defendant

21             666 Old Country Road
             Garden City, New York

22           BY:   STEPHEN V. LaMAGNA, ESQ.
                  and

23             GREGORY MARTELLO, ESQ.

24                o0o
              CONTINUED TRIAL

25                o0o
            Gigi Wright, R.P.R.

1                     Official Court Reporter

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1          (In open court.  Defendant present.)

2          THE CLERK:  People versus Martin Heidgen.

3     Case on trial continued, Indictment 1910N of 2005.

4          People ready?

5          MR. HAYDEN:  People ready.

6          THE CLERK:  Defendant ready?

7          MR. LaMAGNA:  Defendant is ready, your Honor.

8          THE CLERK:  Defendant is present.

9          THE COURT:  Let's take these things one a

10    time.  I got a note from one of jurors, marked Court

11    Exhibit III.  I have shown it to the lawyers.

12          It reads:  "Good morning, I am the next

13    alternate juror to be used on the jury.  Unfortunately,

14    my jury allowance service from my employer MTA Bus is

15    ending as of today.

16          "I called my union office for an extension of

17    my jury service, and I was told that our contract with

18    the company only allows ten paid days.  Remaining on

19    the jury will be very difficult for me financially.  I

20    am requesting your permission to be excused.  Thanks."

21    And it is signed by that juror.

22          Now, before I ask for your comments, I think

23    that the record should be abundantly clear that before

24    we began selecting this jury -- and we went through, as

25    memory serves, 480 jurors -- I told each prospective

1    panel that this case was likely to last five weeks, and

2    that it involves the charges it involves, and I was

3    fairly descriptive of those charges.  I said anyone who

4    wants to be excused from this panel will be excused

5    with no questions asked.  I thought I had been clear.

6            I will now take comment and suggestions from

7    the lawyers.

8            MR. LaMAGNA:  Judge, I think that in light of

9    the -- I think that we lost one juror, and alternate

10   one was placed, and we have now alternate two.  At

11   least from our perspective, look, if at this stage we

12   are winding down I guess I would have no objection to

13   relieve him at this point.  If that is what the

14   prosecution and Court permits.

15           MS. McCORMICK:  Your Honor, the People as

16   well as, I'm sure, the Court are always concerned when

17   a juror is expressing a desire to no longer be here in

18   terms of their ability to focus on the evidence in the

19   case.

20           The Court could not have been more clear

21   about how long the case was potentially going to last

22   or to give the juror the opportunity to leave.  That

23   being said, however, Judge, we would be very concerned

24   about a juror who remained and will be distracted by a

25   financial hardship, that he should have known should

Proceedings

1      have occurred, but did not factor into his decision to

2      serve.

3                    There are four remaining alternates and with

4      that in mind we would not object to his being released

5      at this point.

6                    THE COURT:  Then on consent of both sides the

7      juror will be excused from service.

8                    We could get the witness back on the stand.

9                    MR. LaMAGNA:  Judge, I think that there is

10     one outstanding issue.

11                   THE COURT:  Yes.

12                   MR. LaMAGNA:  The prosecution and I have

13     discussed the redaction of certain issues with respect

14     to the statement, and we agreed on what to redact,

15     except for there was one passage in the alleged

16     statement.  I believe the witness will testify to this,

17     or it is anticipated he will testify to this, there was

18     a question:  "Have you ever drank and blacked out?"

19     The answer allegedly was, "Yes in college, but not as a

20     professional."  That goes to the issue we discussed two

21     weeks or so ago, with respect to that type of issue.

22     So I would ask that that be redacted as well.

23                   MR. HAYDEN:  The People oppose that.  Your

24     Honor, we have to establish that the defendant was

25     acting with a depraved state of mind.  We have to

Proceedings

1        establish that he had familiarity with consumption of

2        alcohol.  He understood that consuming alcohol in his

3        case in the past led to blacking out.  We are not

4        talking about prior criminal activity.   There is

5        nothing criminal about that.  In a college context, it

6        is understandable.  But it certainly helps establish

7        that he knew when he started drinking on Friday, July

8        1st, that he would get so far to a point where he could

9        actually blackout.

10               This is important for us to establish, to

11       establish his experience, to establish that he knew

12       exactly what he was doing when he drank the way he did;

13       that when he did what he did he shows depraved

14       indifference to human life, and knowing he had his car

15       keys and had every intention of driving his pickup

16       truck that night, in spite of the fact that he blacked

17       out in the past from overconsumption of alcohol, and

18       kept on consuming alcohol and went out and drove the

19       pickup truck anyway.

20               MR. LaMAGNA:  Judge, that's exactly the

21       point.  We had this discussion two weeks ago, or

22       whenever it was, about the issue of the prior habits

23       with drinking or excessive drinking.  Any of those

24       issues that we discussed you were very clear in your

25       decision on that issue, and you articulated what your

GIGI WRIGHT, RPR   (516) 571-2503

Proceedings

1    reservations would have been.

2              And in giving that decision you said, look,

3    I'm going to allow them, discussion to talk about the

4    fact that in the past he is familiar with drinking,

5    been a social drinker, but anything about excessive

6    drinking or a propensity or any of those issues, or

7    that he was even drunk in the past, is not coming in.

8    It is exactly the same issue and we have already gone

9    over that.

10             Could I have a minute -- I have the minutes

11   to that proceeding.

12             THE COURT:  I am aware of the discussion that

13   we had.  I'm also aware of the context in which that

14   discussion was held.  I am also more and more aware of

15   the meaning of the case decided by the Court of Appeals

16   in the Feingold matter and how it affects this

17   prosecution, as compared to the prosecutions in the

18   past when depraved indifference was not considered to

19   be a state of mind.

20             I think that the People's point is well-taken

21   on this point, and I will allow that testimony to come

22   in.

23             Could we please produce the jury with the

24   exception of the excused juror.

25             MR. LaMAGNA:  Are we going to do that with

Proceedings

1    the juror, or is he going --

2              THE COURT:  He is gone.

3              COURT OFFICER:  Jury entering.

4              (Whereupon, the jury entered the courtroom,

5    and upon taking their respective seats, the following

6    occurred:)

7              THE COURT:  Could we get the witness back on

8    the stand.

9              THE CLERK:  Jurors are present and seated,

10   your Honor.

11             THE COURT:  Thank you.  Welcome back, ladies

12   and gentlemen.  Sorry for the delay.  I tried to warn

13   you.  We had some other matters related to the case,

14   and we had actually been working on the case.  With any

15   luck we have shortened it for you.  If this case is

16   still continuing on into next week, we are not going to

17   work Thursday, September 28th; Friday, the 29th; the

18   weekend, of course; or the Monday that follows, which

19   is Yom Kippur.  If this case lasts until the 28th,

20   you'll have those days off in any event.

21             THE CLERK:  Investigator, please take the

22   stand.

23             THE COURT:  I think that he was over at the

24   monitor.

25             THE CLERK:  Investigator, you are reminded

GIGI WRIGHT, RPR    (516) 571-2503

1        you are still under oath.

2                MR. HAYDEN:  Your Honor, I'm now up putting

3        Defendant's F in evidence on the presenter.

4    CONTINUED DIRECT EXAMINATION

5    BY MR. HAYDEN:

6        Q    Investigator, please describe for the jury

7    anything you wrote at the bottom of that General IIA form?

8        A    Date, 07/02/05.  Items involved, one;

9    Investigator M. Harris; Trooper L.L. Hemmerich; and my

10   signature, Investigator Michael W. Harris.

11       Q    That's it for the bottom part of the page?

12       A    Yes, sir.

13       Q    Please retake the witness stand.

14               (Whereupon, the witness resumes the witness

15       stand.)

16               MR. HAYDEN:  May I please have 17 for

17       identification shown to the witness, your Honor.

18               THE COURT:  Sure.

19       Q    Do you recognize that?

20       A    Yes, sir.

21       Q    Is that the blood kit you received from

22   Investigator Baez?

23       A    Yes, sir.  This is the blood kit I received from

24   Investigator Baez.

25       Q    Is that the blood kit you sealed?

Inv. Harris - Direct - Hayden

1        A        Yes, sir.

2        Q        Is that the blood kit you gave in a sealed

3    condition to Trooper Hemmerich?

4        A        Yes, sir.

5        Q        Tell the jurors how you know that is the blood

6    kit you received from Investigator Baez?

7        A        On the seals -- here is the seals -- I put on the

8    two other areas here with my initials.  I'm the supervisor.

9    And I wrote the name of the defendant, Martin Heidgen; and

10   also over here my name, Investigator Harris on the top.

11       Q        And it has that number 10478?

12       A        Yes, sir.

13       Q        Lot number?

14       A        4992.

15       Q        May I have that back, please.

16                Did you open that blood kit, break the seal last

17   Sunday?

18       A        Yes, I did.

19       Q        Two days ago?

20       A        Yes, I did.

21       Q        The 17th?

22       A        Yes, sir.

23       Q        Did you examine the contents when you opened the

24   blood kit then?

25       A        Yes, I did.

1    Q    Did you find the clear plastic container inside

2    that blood kit?

3    A    Yes, sir.

4    Q    Had the seals been broken?

5    A    Yes, sir.

6    Q    Did you find the two tubes of blood inside the

7    blood kit when you opened it?

8    A    Yes, sir.

9    Q    With gray stoppers?

10   A    Yes, sir.

11   Q    With the red sealing tape over each of the tubes?

12   A    Yes, sir.

13   Q    Was the seal on one of those two tubes broken?

14   A    Yes, sir.

15   Q    How about the other tube?

16   A    It was intact.

17   Q    Did you find an original Lab-1 form inside the

18   blood kit?

19   A    Yes, sir.

20   Q    Were the contents of the blood kit the same when

21   you opened it on Sunday as they were when you closed and

22   sealed it back on July 2nd of 2005?

23   A    Yes, sir.

24   Q    After you finished examining the contents of the

25   blood kit you then resealed the blood kit?

Inv. Harris - Direct - Hayden

 1      A      Yes, I did.

 2      Q      And it is resealed today?

 3      A      Yes, sir.

 4      Q      What is a B.C.I. Number?

 5      A      B.C.I. case number is a case generated by us,

 6   investigators, identifying a case that we adopt.

 7      Q      Does each New York State Police barracks issue

 8   its own B.C.I. numbers?

 9      A      Yes, sir.

10      Q      You work out of Valley Stream?

11      A      Yes, I do.

12      Q      Valley Stream barracks?

13      A      Yes, I do.

14      Q      You work with Valley Stream B.C.I. numbers?

15      A      Yes, sir.

16      Q      An B.C.I. number is assigned to each charge of a

17   felony case?

18      A      Yes, sir.

19      Q      B.C.I. numbers aren't assigned exclusively to

20   blood kits, are they?

21      A      No, sir.

22      Q      They are not assigned exclusively to cases

23   involving blood kits, are they?

24      A      No, sir.

25      Q      They are assigned to all kinds of cases?

1       A       Yes, sir.

2       Q       Rapes?

3       A       Yes, sir.

4       Q       Robberies?

5       A       Yes, sir.

6       Q       Murders?

7       A       Yes, sir.

8       Q       Gun cases?

9       A       Yes, sir.

10      Q       Drug cases?

11      A       Yes, sir.

12      Q       They are assigned to cases that have nothing to

13   do with blood kits?

14      A       Yes, sir.

15      Q       You assigned a B.C.I. number to this case, the

16   case involving Martin Heidgen?

17      A       Yes, I did.

18      Q    When did you assign a B.C.I. number to Martin

19   Heidgen's case?

20      A       At the -- at the M.E.'s Office, in the

21   investigator's office.

22      Q       What number did you assign?

23      A       05-140.

24      Q       Did you place that number anywhere on the outer

25   box of the blood kit?

1      A      No, sir.

2      Q      Did you place that number anywhere on the inside

3   of the outer box of the blood kit?

4      A      No, sir.

5      Q      Did you place that number on any of the contents

6   of the blood kit?

7      A      No, sir.

8      Q      Does the number 05-140 appear on the outside of

9   the blood kit?

10     A      Yes, sir.

11     Q      Where?

12     A      On the yellow label there.

13     Q      Has that yellow label been crossed out?

14     A      Yes, sir.

15     Q      Has a new number been assigned to the case and

16   replaced on the outside of the blood kit?

17     A      Yes, sir.

18     Q      What number is that?

19     A      05-141.

20     Q      Describe for the jurors why you wound up

21   replacing 05-140 with 05-141?

22     A      Earlier on July 1st at approximately 5:11 p.m. a

23   trooper from Valley Stream made an arrest in reference to a

24   subject possessing a firearm and possessing marijuana.

25   During the course of that I processed him, did the

Inv. Harris - Direct - Hayden

1    paperwork, had him arraigned into the court system.  The gun

2    charge was 05-139.  We had an underlying charge 05-140,

3    which was the marijuana.

4         I recalled that evening 05-139 being the main

5    case, since it was a felony, and the next number stuck in my

6    head was 05-140.  That is what I put on the Lab-1 in

7    reference to the B.C.I. case in reference to this case here.

8    That's how I made that error.

9         Q    The case involving that earlier arrest involved

10   two charges?

11        A    Yes, sir.

12        Q    The gun charge, the charge for a loaded handgun,

13   received a number 05-139?

14        A    Yes, sir.

15        Q    The marijuana charge received B.C.I. number

16   05-140?

17        A    Yes, sir.

18        Q    So when you assigned 05-140 to Martin Heidgen's

19   case that was a mistake?

20        A    Yes, sir.

21        Q    And you corrected that mistake?

22        A    Absolutely.

23        Q    Did that earlier case involve a blood kit?

24        A    No, sir.

25        Q    Did that earlier case involve any kind of blood

Inv. Harris - Direct - Hayden

```
 1    sample?

 2        A    No, sir.

 3        Q    To the best of your knowledge was there any other

 4    New York State Police case in Nassau County involving a

 5    blood kit on Saturday, July 2nd of 2005?

 6        A    No, sir.

 7        Q    To the best of your knowledge was there any other

 8    New York State Police, Nassau County case, involving a blood

 9    kit for the week before Saturday, July 2nd 2005?

10        A    No, sir.

11        Q    How about for the week after July 2nd 2005?

12        A    No, sir.

13        Q    No?

14        A    No.

15        Q    Is this it?

16        A    Yes, sir.

17        Q    The only blood kit?

18        A    That's the blood kit.

19        Q    For the week before?

20        A    That's the only blood kit, sir.

21        Q    For the week after?

22        A    That's the only blood kit.

23        Q    When did you correct the B.C.I. number?

24        A    August 26th 2005.

25        Q    How did you do that?
```

Inv. Harris - Direct - Hayden

1    A    I went up to S.P. Newburgh and made the

2    corrections there at the lab.

3    Q    Did you write the incorrect B.C.I. number on any

4    piece of paperwork on July 2nd of 2005?

5    A    I don't recall, sir.

6    Q    Lab-1?

7    A    Lab-1, yes, sir.

8    Q    How about the General IIA?

9    A    Yes, sir.

10   Q    Did you speak with the defendant during the

11   course of the investigation?

12   A    Yes, sir.

13   Q    When did you speak with him?

14   A    On July 2nd 2005, approximately 12:30 a.m.

15   Q    Where was that?

16   A    At N.C.M.C. I.C.U. unit on the second floor.

17   Q    Describe the location within the I.C.U. unit

18   where you spoke with the defendant?

19   A    It was an area with a four-bed bay area, and he

20   was in bed number one.

21   Q    Were there nurses and doctors in the area?

22   A    Yes, sir.

23   Q    Was there a curtain drawn around the defendant's

24   bed while you were speaking with him?

25   A    Yes, sir.

1     Q     Did you draw that curtain?

2     A     Yes, sir, I did.

3     Q     Was the defendant restrained in any way while you

4     were speaking with him?

5     A     Yes, sir.

6     Q     Describe how he was restrained.

7     A     Restrained with gauze or Ace bandage type tied,

8     both wrists tied to his bed rail.

9     Q     Were there I.V. units attached to the defendant?

10    A     Yes, sir.

11    Q     Did you have anything to do with restraining the

12    defendant?

13    A     No, sir.

14    Q     Did any other police officer have anything to do

15    with restraining the defendant?

16    A     No, sir.

17    Q     Who was present while you were speaking with the

18    defendant?

19    A     Investigator Eric Baez.

20    Q     Were there any other State Police officers in the

21    vicinity?

22    A     There was a Trooper Sewell, Trooper Grasso

23    outside the curtain.

24    Q     Did you and Investigator Baez introduce

25    yourselves to the defendant?

Inv. Harris - Direct - Hayden

1    A    Yes, sir.

2    Q    Did you inform the defendant of his

3    constitutional rights?

4    A    Yes, sir.

5    Q    How?

6    A    From my Miranda card.

7         MR. HAYDEN:  May I have this marked as 62 for

8         identification.

9         THE COURT:  Let's deem it.

10        (Whereupon, the item referred to, Miranda

11        card, deemed marked People's Exhibit 62 for

12        identification.)

13        COURT OFFICER:  Deemed marked 62 for

14        identification.

15   Q    Do you recognize that card?

16   A    Yes, I do.

17   Q    Is that the card that you use to inform

18   defendants of their constitutional rights?

19   A    Yes, sir.

20   Q    How long have you had it?

21   A    Ever since I was in the New York State Police

22   Academy, approximately 23 years ago.

23   Q    Do you recognize that as the card that you used

24   to inform the defendant of his constitutional rights?

25   A    Yes, sir.

1        MR. HAYDEN:  People offer that, your Honor,

2    as 62 in evidence.

3        THE COURT:  Please show it to counsel.

4        MR. LaMAGNA:  No objection.

5        THE COURT:  Received deemed.

6        (Whereupon, People's Exhibit 62 deemed for

7    identification now received and marked People's Exhibit

8    62 in evidence.)

9    Q    Investigator Harris, using that card in evidence

10   please read the constitutional rights for the jurors the

11   same way you read them for the defendant, and please include

12   any responses he made?

13   A    "You have a right to remain silent.  Anything you

14   say can and will be used against you in a court of law.

15        "You have a right to talk to a lawyer and have

16   him present with you while you are being questioned.

17        "If you cannot afford to hire a lawyer one will

18   be appointed to represent you free of charge before any

19   questioning, if you wish.

20        "You may decide at any time to exercise these

21   rights, and not answer any questions or make any

22   statements."

23        Then I asked him, "Do you understand each of

24   these rights I have explained to you?"  He answered "Yes,"

25   and nodded his head.

Inv. Harris - Direct - Hayden

1        "Having these rights in mind do you wish to talk

2    to us now?"  He answered "Yes," and nodded his head.

3        Q    Did you have a conversation with the defendant

4    after informing him of his constitutional rights?

5        A    Yes, sir.

6        Q    Investigator Baez was present?

7        A    Yes, sir.

8        Q    You led the conversation?

9        A    Yes, I did.

10        Q    Investigator Baez took part in the conversation?

11        A    Yes, sir.

12        Q    Were notes taken of your conversation with the

13    defendant?

14        A    Yes, sir.

15        Q    Who took those notes?

16        A    Investigator Eric Baez.

17        Q    How many pages of notes did Investigator Baez

18    take?

19        A    Six pages.

20             MR. HAYDEN:  Your Honor, may I have 61A

21    through 61F shown to the witness, please?

22             THE COURT:  Yes.

23        Q    Please take a look at those.

24        A    Yes.

25        Q    Do you recognize those notes?

1     A     Yes, sir.

2     Q     What are they?

3     A     Those are the notes that Eric Baez took while we

4     was questioning the defendant.

5     Q     Are those notes a fair and accurate

6     representation of the give and take of your conversation

7     with the defendant?

8     A     Yes, sir.

9     Q     Describe for the jurors any conversation you had

10    with the defendant after informing him of his constitutional

11    rights?

12          THE WITNESS:  Sir, may I refer to refresh my

13          recollection?

14          THE COURT:  To refresh your recollection,

15          yes.

16          THE WITNESS:  Thank you.

17    A     We asked him what happened.  He answered he had

18    an argument with his ex-girlfriend on the phone in Arkansas.

19    His boss owed him a thousand dollars.  He works on 40th and

20    Broadway in Manhattan since the end of January.  He moved to

21    New York from Arkansas in October.  He got into a

22    "self-destruct" mode.  He was very upset and depressed and

23    he drank a lot of alcohol.

24          Then we asked him what kind of alcohol.  He said,

25    "Old Parr Scotch."  Then we asked him, "How much?"  He

Inv. Harris - Direct - Hayden

1    answered, "A fifth of scotch."

2          He continued to say ever since he moved to New

3    York everything was going wrong.  He had financial problems,

4    and everything he seems to do is never enough.

5          Then we asked him, "What road were you on, what

6    road did you take?"  He said, "From Sunrise Highway to the

7    Southern State."  Then we asked him, "How do you feel about

8    yourself?"  He answered he was disgusted and embarrassed.

9          Then we asked him, "Did you try to hurt

10   yourself?"  He answered, "No.  Never before."  Then he said,

11   "I have disrespected my parents."

12          We asked him if he had any problems with alcohol.

13   He said, "No, nothing."  We asked him, "What route did you

14   take?"  He said he was just driving around.  He had to get

15   out of the house.  He got a moment of clarity.  He decided

16   he had to go home.  All he wants to do is work and make a

17   living.  He went to school for four years.  Now he is in

18   such a hole.  He is very humiliated.

19          Then we asked him, "Where is your family?"  He

20   said his mother and his stepfather were vacationing in

21   Niagara Falls.  He said his mother's name is Margat Aponte

22   and she lives in Islip, New York.  His father was named Kurt

23   Heidgen, he is a tractor-trailer driver.  He lived in a

24   trailer, and he provided a cell phone number for him.

25          We asked him, "What roads were you on and where

1    answered, "A fifth of scotch."

2            He continued to say ever since he moved to New

3    York everything was going wrong. He had financial problems,

4    and everything he seems to do is never enough.

5            Then we asked him, "What road were you on, what

6    road did you take?" He said, "From Sunrise Highway to the

7    Southern State." Then we asked him, "How do you feel about

8    yourself?" He answered he was disgusted and embarrassed.

9            Then we asked him, "Did you try to hurt

10   yourself?" He answered, "No. Never before." Then he said,

11   "I have disrespected my parents."

12           We asked him if he had any problems with alcohol.

13   He said, "No, nothing." We asked him, "What route did you

14   take?" He said he was just driving around. He had to get

15   out of the house. He got a moment of clarity. He decided

16   he had to go home. All he wants to do is work and make a

17   living. He went to school for four years. Now he is in

18   such a hole. He is very humiliated.

19           Then we asked him, "Where is your family?" He

20   said his mother and his stepfather were vacationing in

21   Niagara Falls. He said his mother's name is Margat Aponte

22   and she lives in Islip, New York. His father was named Kurt

23   Heidgen, he is a tractor-trailer driver. He lived in a

24   trailer, and he provided a cell phone number for him.

25           We asked him, "What roads were you on and where

1    were you going?"  He said he was on Sunrise Highway trying

2    to get home.  We asked him, "What did you hit?"  He said he

3    hit a tree or a median.  After he hit he is basically

4    knocked out.  He knew he was hurt and the next thing he knew

5    he was here.

6         We asked him about his ex-girlfriend; "What was

7    her name."  He said her name was Lindsay Long.  She lived on

8    Denning Road in Little Rock, Arkansas.  We asked him, "Does

9    she have a telephone?"  He said, no, she didn't have a

10   telephone.  She usually calls him using a calling card.  We

11   asked him how old she was.  He said, "24."  We asked him,

12   "What is her date of birth?"  He said, "12/6 1980."

13        We then asked him, "Did you go to work on

14   Friday?"  He said he went to work for two hours; he went by

15   way of Long Island Rail Road.  He left from the Valley

16   Stream station.  He got there at 3 p.m.  At about 5 p.m. he

17   met a couple of friends at a bar in New York City on

18   Restaurant Row, on 46th between 8th and 9th.  One of the

19   friends he met there was named Greg Nizewicz.  He was 24

20   years of age and he lives in Plainview, New York.

21        We asked him, "Where do you work?"  He said, "At

22   Key 2 Health Care, 1431 Broadway, New York City, near

23   Seventh Avenue."  We asked him, "Who is your supervisor or

24   the owner of the company?"  He said, "a man named Craig."

25   Then he said he was there until 8 p.m., he had about four

1    Bohemian beers.  He left the city at 8 p.m. after four

2    Bohemian beers.  He got to Valley Stream around 8:30, 8:40

3    p.m., and he walked straight home.

4           Then we asked him what happened after that.  He

5    said, "Around 9 o'clock he received a phone call from

6    Lindsay, his ex-girlfriend; they had an argument on the

7    phone."  He explained that they were having an off and on

8    relationship for the past five years, and they spoke for ten

9    to twelve minutes.  Then we asked him, "What is

10   'self-destruct mode'?"  He said, "Something to alleviate

11   stress and hardship."  We asked him if he ever drank and

12   blacked out before.  He said, "Yes, while in college, but

13   not as a professional."

14          We asked him what time did he leave the house?

15   He said, about 1 o'clock.  He was watching <u>Fear Factor</u>.

16   Then <u>Blind Date</u> came on.  He left after <u>Blind Date</u> was over.

17          We asked him what time was that about?  He said,

18   "It was around 2 a.m.  He was just driving around, but he

19   didn't stop anywhere."

20          We asked him, "Where did the accident occur?"  He

21   said, "the Meadowbrook State Parkway, or the Southern State

22   Parkway," because that were most of the roads he drives on.

23          We asked him if he was down to the beach?  Was he

24   fishing?  He said, "No."

25                 MR. LaMAGNA:  Judge, I'm going to object.  He

1       is reading.

2                   THE WITNESS:  No, I'm not.

3                   The COURT:  Overruled.

4                   MR. HAYDEN:  Absolutely not.

5                   THE COURT:  Objection overruled.  Just use it

6       to refresh your recollection.

7                   THE WITNESS:  Yes, sir.

8       A       We asked him, "How did he get on the Meadowbrook

9       State Parkway."  He said, take the Southern State Parkway to

10      Exit 22 or 23.  He believed he was going south on the

11      Meadowbrook State Parkway.  We asked him, "What do you

12      remember?"  He said he wasn't paying that much attention.

13      He doesn't remember -- he doesn't recall exiting the parkway

14      or making any U-turns.  Then he said, "My truck is all my

15      life -- is all I have in my life."

16                  We asked him about his address in Valley Stream;

17      "Where is it"?  He said it was 14 Oceanview Avenue in Valley

18      Stream, 11581.  We asked him "do you have a telephone number

19      for the house," he said, "No."  He provided his cell phone

20      number.  We asked him what he did for a living, he said

21      "sales."  We asked him if the vehicle was registered to him;

22      he said, yes, and to his grandmother.  He also advised us

23      that she had recently passed away.  We asked him, "Did that

24      bother you?"  He said, yes, they were close.  He also said

25      she was 98 years of age, and her funeral was more of a

1    celebration.

2        We asked him if he was the only child.  He said,

3    "yes."  We asked him, "What else can you tell us about

4    yourself?"  He said he had a B.S. in history and minor in

5    Spanish.  We asked him what is his salary; how much rent are

6    you paying a month?  He said he made 25 grand a year and he

7    paid $300 a month.

8        Then he went on saying that he was embarrassed

9    and humiliated for what had happened today.  All he wanted

10    to do was pay the price and penance for what he has done.

11        We asked him in the case of emergency who could

12    we contact.  He said his uncle, Roy Francisco Rodriguez, he

13    lives on Far Rockaway Boulevard, in South Ozone Park.  He

14    works for Escope Realty.  He lives with Ester, Betty,

15    Rodriguez.  He didn't have his telephone number.  He said

16    all of that information was in his cell phone.

17        We asked him if he had insurance for the vehicle.

18    He said, yes, U.S.A.A. Insurance.  It is a national

19    insurance company for veterans.  His father was in Vietnam;

20    he was entitled to it. .

21        We asked him did you hurt yourself -- "did you

22    try to hurt yourself?"  He says, "No, not under any

23    circumstances."  He thought about it, like everybody else,

24    but he never applied it or actually thought about doing it.

25        Then we asked him, again, "you weren't trying to

Inv. Harris - Direct - Hayden

1    hurt yourself today?"  He said, "No, sir.  I wouldn't cash

2    out like this.  I would wait for another hand to be dealt."

3    And then he said he didn't want to say anything else.  He

4    wanted a lawyer.

5         Q    Was the defendant pleasant while he was speaking

6    with you?

7         A    Yes, sir.

8         Q    Was the defendant making eye contact with you

9    when he said he had got into a "self-destruct mode" the

10   night of the crash?

11        A    Yes, sir.

12        Q    Describe the defendant's demeanor when he told

13   you he had gotten into a "self-destruct mode" on the night

14   of the accident.

15        A    He appeared upset.

16             MR. LaMAGNA:  Objection to what he appeared.

17             THE COURT:  Overruled.

18        Q    Was the defendant making eye contact with you

19   when he said he had been upset and depressed the night of

20   the crash?

21        A    Yes, sir.

22        Q    Describe the defendant's demeanor when he told

23   you he had been upset and depressed on the night of the

24   crash?

25        A    He appeared upset.

1    Q    Was the defendant making eye contact with you

2    when he told you that ever since he had come to New York

3    everything was going wrong?

4    A    Yes, sir.

5    Q    Describe the defendant's demeanor when he told

6    you that ever since he had come to New York everything was

7    going wrong?

8    A    He appeared upset.

9    Q    Was the defendant making eye contact with you

10   when he told you he had financial problems, and everything

11   he seemed to do was never enough?

12   A    Yes, sir.

13   Q    Describe the defendant's demeanor when he told

14   you that he had financial problems and everything he seemed

15   to do was never enough?

16   A    He appeared upset.

17   Q    Were you making eye contact with the defendant

18   when you asked if he meant to kill himself the night of the

19   crash?

20   A    Yes, sir.

21        MR. LaMAGNA:  Objection.  That is not what he

22        asked him.

23        THE COURT:  Sustained.

24   Q    What did you ask him at that point?

25   A    Did he try to hurt himself.

1        Q      Were you making eye contact him when you asked

2    him that question?

3        A      Yes, sir.

4        Q      Was he making eye contact with you when he said,

5    "No, never before"?

6        A      Yes, sir.

7        Q      Describe the defendant's demeanor when he told

8    you, "No, never before"?

9        A      He appeared upset.

10       Q      Was the defendant making eye contact with you

11   when he told you that "self-destruct mode" was a way of

12   relieving stress and hardship?

13       A      Yes, sir.

14       Q      Describe his demeanor when he told you that

15   "self-destruct mode" was a way of relieving stress and

16   hardship?

17       A      He appeared upset.

18       Q      Do you recall observing any injury to the

19   defendant?

20       A      Yes, sir.

21       Q      What did you see?

22       A      He he had a laceration on the chin and I believe

23   he sustained a broken ankle.

24       Q      Did the defendant complain of any injury while

25   you were speaking with him?

Inv. Harris - Direct - Hayden

```
 1        A      No, sir.

 2        Q      Did you have difficulty understanding the

 3   defendant?

 4        A      No, sir.

 5        Q      Did the defendant ever say he had difficulty

 6   understanding you?

 7        A      No, sir.

 8        Q      Describe for the jurors how the conversation with

 9   the defendant ended?

10        A      We weren't done.  We were just beginning to get

11   into the questioning and he said he didn't want to say

12   anything anymore; he wanted a lawyer, so we had to stop

13   questioning him.

14        Q      Did you ask any other questions after the

15   defendant said he wanted a lawyer?

16        A      No, sir.

17        Q      Did Investigator Baez ask any other question

18   after the defendant said he wanted a lawyer?

19        A      No, sir.

20        Q      Where did the defendant tell you he worked?

21        A      Key 2 Health Care, 1431 Broadway, New York City.

22        Q      Did you go there during the course of your

23   investigation?

24        A      Yes, sir.

25        Q      When was that?
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Direct - Hayden

1        A       August 26th 2005.

2        Q       Describe any observations you made at Key 2

3    Health Care?

4        A       You come into the front of the building, you go

5    into an elevator, you go into the elevator, and you take the

6    elevator and go straight up to the floor.  Key 2 Health Care

7    is on -- and when it opens up the elevator you are right to

8    the business.

9                And you walk through, you see a reception area.

10   To the left you see like a long desk with cubicles, work

11   stations.  When I was there it was dark.  It was empty.

12   There was nobody there.

13               I walked and checked the bathroom, because I

14   said, "Hello.  Hello."  Nobody was there.  I checked the

15   bathroom.  No one was there.

16               I walked toward the cubicles.  I saw a couple of

17   phones which were not plugged into the wall.  I walked

18   further back into the office area, and they had like two

19   separate offices to the left, and to the right it was empty.

20   There was nobody there.

21               On the work stations of the cubicles they have

22   papers, loose papers in reference to buzz quotes.  They have

23   sheets, like they give you dialogue when you answer the

24   phone; they tell you what to say.  I saw a couple of those

25   sheets.  And that was it.  It seemed like it was a

1   non-functional business at that point in time.

2       Q    You testified you saw a reception area.

3       A    Yes, sir.

4       Q    Was there a reception desk?

5       A    I don't recall that.

6       Q    Did you see anyone in the reception area?

7       A    No, sir.

8       Q    Did you see anyone at all inside the offices of

9   Key 2 Health Care?

10      A    No, sir.

11      Q    Did you see any computer?

12      A    No, sir.

13      Q    Did you see any business equipment?

14      A    No, sir.

15      Q    Calculators?

16      A    No, sir.

17      Q    Office equipment?

18      A    No, sir.

19      Q    Business documents?

20      A    Only those papers I saw on the work stations.

21      Q    You testified two telephones?

22      A    Two telephones not connected to the wall.

23      Q    The papers you observed were these papers with

24  handwriting?

25      A    Handwriting, yes.

Inv. Harris - Direct - Hayden

1       Q      Of scripts for cold calls?

2       A      Yes, sir.

3       Q      Scripts for cold calls?

4       A      Yes, sir.

5       Q      Where was the defendant living on July 2nd of

6    2005?

7       A      14 Oceanview Avenue.

8       Q      Where at that location?

9       A      Toward the back, a separate apartment, separated

10   from the rest of the house.

11      Q      Describe the building in its entirety.

12      A      It is a two-story, single-family residence with

13   an apartment in the back.  It is white.  It has three

14   entrances:  You have the front entrance, you have the side

15   entrance and you have the rear entrance, which is leading to

16   his apartment.

17      Q      Is there any direct connection between the

18   defendant's apartment at the rear of the building and the

19   remainder of the living quarters of the house?

20      A      No, sir.

21      Q      You went to that house --

22      A      Yes, sir.

23      Q      -- with a search warrant?

24      A      Yes, sir.

25      Q      When was that?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Direct - Hayden

1    A    July 5th 2005.

2    Q    Who signed the warrant?

3    A    Judge Meryl Berkowitz.

4    Q    Did you make any observations on the first floor

5    of the main living quarters of the house?

6    A    Yes.

7    Q    What did you see?

8    A    Basically there was hardly any furniture, a

9    couple of book shelves, computer, miscellaneous papers.

10    Doesn't appear to be lived in.

11    Q    Any couch?

12    A    No, sir.

13    Q    Any easy chairs?

14    A    No, sir.

15    Q    Any dining room table?

16    A    No, sir.

17    Q    Dining room chairs?

18    A    No, sir.

19    Q    Televisions?

20    A    No, sir.

21    Q    Stereo equipment?

22    A    No, sir.

23    Q    Did you enter the defendant's apartment?

24    A    Yes, sir.

25    Q    Describe any observations you made to the

1   defendant's apartment?

2       A      As soon as you walk into the apartment you walk

3   down a little corridor to the right.  To the right there is

4   a bathroom, and you go straight and you make an elbow left

5   and you go to the bedroom of the defendant.  As soon as you

6   walk in he has a closet to the right, he has a chair.  I

7   recall seeing a deer head with antler on the wall, a couple

8   of pictures.  You have his bed.

9            To the left you have a little kitchen area.

10  There was a refrigerator, a microwave, liquor bottles there.

11  He had flasks, clothes all over the place, books, we have

12  papers.

13      Q      How many flasks did you see?

14              MR. LaMAGNA:  Judge, objection.

15              THE COURT:  Overruled.

16      A      Two.

17      Q      Describe each of them?

18      A      One flask was in a box, leather flask that was

19  near the bed area.  And the other flask was on top of the

20  microwave near the liquor bottles.  It was a metal one with

21  an MRH on it, the initials MRH.

22      Q      Were the flasks empty?

23      A      Yes, sir.

24      Q      Describe the liquor bottles you found on top of

25  the microwave which was sitting on top of the refrigerator.

Inv. Harris - Direct - Hayden

1     A     I recall Bacardi, a vodka bottle, and an Old Parr

2   Scotch bottle.

3     Q     Describe the condition of each of those bottles?

4     A     Empty.

5           MR. HAYDEN:  May I have a moment, your Honor.

6           THE COURT:  Yes, sure.

7           (Brief pause in proceedings.)

8     Q     Did you recover a train ticket among the

9   defendant's belongings?

10    A     Yes, sir.

11    Q     Describe that ticket?

12    A     Train ticket, Long Island Rail Road train ticket.

13  It was in his wallet.

14    Q     Was it a monthly ticket?

15    A     I think I recall it as a monthly ticket.

16          MR. HAYDEN:  Nothing further, your Honor.

17        Thank you.

18          THE COURT:  Given the hour, we'll probably

19        start cross-examination after lunch.  You know all of

20        the admonitions.  Don't read anything about the case.

21        Don't talk to anybody.  Don't let anybody talk to you.

22          Please be prompt, be back at 2 o'clock.  Have

23        a nice lunch.

24          (Whereupon, the jury exited the courtroom and

25        a luncheon recess was held.)

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Harris - Cross - LaMagna

1                              oOo

2              A F T E R N O O N   S E S S I O N

3                              oOo

4              (In open Court.  Defendant present.)

5              THE CLERK:  Case on trial continues.

6              THE COURT:  Bring in the jury.

7              COURT OFFICER:  Jury entering.

8              (Whereupon, the jury entered the courtroom,

9         and upon taking their respective seats, the following

10        occurred:)

11             THE CLERK:  Case on trial, Indictment 1910N

12        of 2005, People versus Martin Heidgen.

13             People ready?

14             MR. HAYDEN:  Ready, your Honor.

15             THE CLERK:  Defendant ready?

16             MR. LaMAGNA:  Defendant is ready, your Honor.

17             THE CLERK:  Defendant is present, your Honor

18        and the jurors are seated.

19             THE COURT:  Thank you.  Mr. LaMagna.

20   CROSS-EXAMINATION

21   BY MR. LaMAGNA:

22        Q    Good afternoon, Investigator Harris.  How are

23   you?

24        A    Good afternoon, sir.

25        Q    As you know, my name is Stephen LaMagna.  I am

Inv. Harris - Cross - LaMagna

1    going to ask you some questions here today concerning your

2    testimony earlier.  If you have any questions, or if you

3    want me to repeat a question, I will.  If you don't

4    understand a question, please ask me and I will repeat it,

5    okay?

6         A    Yes, sir.

7         Q    You are the lead investigator on this case,

8    correct?

9         A    Yes, sir.

10        Q    As the lead investigator you are responsible for

11   the dynamics of this case, correct?

12        A    Yes, sir.

13        Q    Making sure that all of the paperwork is prepared

14   correctly, correct?

15        A    Yes, sir.

16        Q    Making sure that all of the individuals you

17   assign tasks to do are done correctly, correct?

18        A    -- Yes, sir.

19        Q    Making sure that all of the evidence is

20   accurately received, correct?

21        A    Yes, sir.

22        Q    And making sure that all of the evidence is

23   properly vouchered, correct?

24        A    Yes, sir.

25        Q    Making sure that all of the paperwork concerning

Inv. Harris - Cross - LaMagna

1    pieces of evidence are done in a proper way, correct?

2         A    Yes, sir.

3         Q    It's important that this paperwork be done in an

4    accurate and and meticulous fashion, correct?

5         A    Yes, sir.

6         Q    Of course, as today, there may come a time that

7    you may be going to court and having to articulate facts

8    that happened many months before, correct?

9         A    Yes, sir.

10        Q    So you want to make sure that the evidence that

11   is presented in a case is the actual evidence that was taken

12   many months ago and belongs to this particular case,

13   correct?

14        A    Yes, sir.

15        Q    And pieces of evidence are fungible?  Pieces of

16   evidence, like blood, have to be handled in a very precise

17   way, correct?

18        A    Yes, sir.

19        Q    And there are certain procedures that are

20   promulgated in the handling of these pieces of evidence,

21   this blood evidence, correct?

22        A    Yes, sir.

23        Q    Instructions, correct?

24        A    Yes, sir.

25        Q    Diagram, correct?

1    A    Yes.

2    Q    Those are to ensure the integrity of the identity

3    of that evidence, correct?

4    A    Yes.

5    Q    Make sure that that evidence is identical to the

6    evidence that is presented in court, correct?

7    A    Yes, sir.

8    Q    And that is called a chain, one of the things it

9    is called is a chain of custody, correct?

10    A    Yes, sir.

11    Q    You also make sure that all witnesses are

12    interviewed, correct?

13    A    Yes, sir.

14    Q    And when they are interviewed statements are

15    taken, correct?

16    A    Yes, sir.

17    Q    Now, as a lead investigator your job is to

18    communicate with the district attorney's office as well,

19    correct?

20    A    Yes, sir.

21    Q    And you discuss the dynamics of the case with the

22    district attorney's office, correct?

23    A    Yes, sir.

24    Q    You go over strategies, correct?

25    A    Yes.

Inv. Harris - Cross - LaMagna

1    Q    How a case will be presented, correct?

2    A    Yes.

3    Q    What witnesses to talk to, correct?

4    A    Yes.

5    Q    What evidence needs to be collected, correct?

6    A    Yes.

7    Q    All of those things you work hand-in-hand with

8    the district attorney's office, correct?

9    A    Yes.

10   Q    Now, directing your attention to July 2nd 2005.

11   You said you received a phone call on your cell phone,

12   correct?

13   A    Yes, sir.

14   Q    Who did that phone call come from?

15   A    S.P. Farmingdale communications.

16   Q    That is State Police Farmingdale?

17   A    Yes, sir.

18   Q    And you were notified at that time that you were

19   to go to an accident site, correct?

20   A    Yes, sir.

21   Q    And that accident site was on the Meadowbrook

22   Parkway, correct?

23   A    Yes, sir.

24   Q    And that was at the intersection of Babylon

25   Turnpike, or approximately about Babylon Turnpike, correct?

1        A    Yes, sir.

2        Q    And you arrived there at approximately 2:35; is

3    that correct?

4        A    Yes, sir.

5        Q    And when you arrived you testified that you were

6    aware that Trooper O'Hare had gone with the defendant to the

7    hospital, correct?

8        A    Yes, sir.

9        Q    And when you arrived Mr. Heidgen had already gone

10   to the hospital, correct?

11       A    Yes, sir.

12       Q    Were you notified that Trooper O'Hare had gone

13   with Mr. Heidgen to the hospital by Trooper Knapp?

14       A    Did Trooper Knapp -- repeat that question.

15       Q    Were you notified that Trooper O'Hare went to the

16   hospital with Mr. Heidgen by Trooper Knapp?

17       A    No, sir.

18       Q    Did you speak with Trooper Knapp?

19       A    No, sir.

20       Q    Who notified you that Trooper O'Hare had gone to

21   the hospital with Mr. Heidgen to get a blood sample?

22       A    Zone Sergeant Timothy Heinz.

23       Q    But you were nevertheless made aware that it was

24   Trooper O'Hare who had gone to the hospital; is that

25   correct?

Inv. Harris - Cross - LaMagna

```
1      A      Yes, sir.

2      Q      Now, you were informed of this when you arrived

3  at around 2:35; is that also correct?

4      A      No, sir.

5      Q      What time was that that you were notified?

6      A      Some time after that.  I don't have an exact time

7  when I was notified.

8      Q      Was it two minutes?  Five minutes?  Two hours?

9  Three hours?

10     A      It could have been within ten, fifteen minutes.

11     Q      So within a short period of time when you arrived

12  you knew that Mr. Heidgen was on his way to the hospital and

13  Trooper O'Hare was with him to get a blood sample, correct?

14     A      Correct.

15     Q      That was a very important job that Trooper O'Hare

16  was about to perform, correct?

17     A      Yes, sir.

18     Q      Now, you testified at some point you were made

19  aware that a blood sample was obtained, correct?

20     A      Yes, sir.

21     Q      And you had sent Investigator Baez to go pick up

22  that sample, correct?

23     A      Yes, sir.

24     Q      Now prior to that wasn't Trooper Stafford sent to

25  the hospital, as well?
```

1       A    He went with his partner to pick up his partner,

2    yes, sir.

3       Q    Who went to pick up his partner?

4       A    Trooper Stafford.

5       Q    Who is his partner?

6       A    Trooper O'Hare.

7       Q    So Trooper Stafford went to the hospital,

8    correct?

9       A    Yes, sir.

10      Q    After.  And his instructions were to just pick up

11   Trooper O'Hare?

12      A    I didn't giver him instructions.  Only Sergeant

13   Heinz gave him instructions.

14      Q    What did Sergeant Heinz tell you were the

15   instructions begin to Stafford?

16      A    I was never notified of his instructions.

17      Q    Did you ask him?

18      A  ~ No, sir.

19      Q    You were the lead investigator, right?

20      A    Yes, sir.

21      Q    You didn't know why Trooper Stafford was sent to

22   the hospital?

23                 MR. HAYDEN:  Objection.

24                 THE COURT:  Sustained.

25      Q    You were made aware that he had left the accident

Inv. Harris - Cross - LaMagna

1    scene to go to the hospital, correct, Trooper Stafford?

2        A    No, sir.

3        Q    You were not?

4        A    I was told that he was at the hospital.

5        Q    To pick up, I think you said, Trooper O'Hare?

6        A    He went with his partner, sir.

7        Q    Oh, so you are under the impression that Trooper

8    Stafford went with Trooper O'Hare?

9        A    Or followed thereafter.

10       Q    And he followed him thereafter.  You don't know

11   of any specific instructions that Trooper Stafford may have

12   been given, correct?

13       A    Correct, sir.

14       Q    When you arrived did you see Trooper Siegler?

15       A    Yes, sir.

16       Q    And Trooper Siegler at approximately 2:30, 2:35

17   had retrieved a wallet from the '99 Silverado, correct?

18       A    No, sir.

19       Q    What time was that?

20       A    Approximately hour, hour and-a-half after.

21       Q    An hour and-a-half after Trooper Siegler got the

22   wallet out of the car?

23       A    Absolutely.

24       Q    Absolutely.  Okay.

25            So if Trooper Siegler testified within five

 1    minutes he got the wallet that would be wrong?

 2                    MR. HAYDEN:  Objection.

 3                    THE COURT:  Sustained.

 4        Q       Did you review your paperwork prior to testifying

 5    here today?

 6        A       No, sir.

 7        Q       You didn't review any paperwork?

 8        A       Today.

 9        Q       In anticipation of your testimony.

10        A       Right here today?

11        Q       No.  Did you review your paperwork in

12    anticipation of your testimony today?

13        A       Yes, sir.

14        Q       And you reviewed all of that paperwork, correct?

15        A       Yes, sir.

16        Q       Was there anything in the paperwork articulating

17    when Trooper Siegler actually retrieved the wallet and the

18    identity of Mr. Heidgen?  Was there anything in there?

19        A       No, sir.

20        Q       Nothing?

21        A       No, sir.

22        Q       Did you talk to any of your officers under your

23    command about the circumstances of this case prior to you

24    testifying here today?

25                    Do you want me to repeat that?

GIGI WRIGHT, RPR    (516) 571-2503

1      A    Yes, sir.

2      Q    Did you speak to any of your troopers that were

3  under your command concerning the events of July 2nd before

4  you came and testified here today?

5      A    Yes, sir.

6      Q    Was Trooper Siegler one of them?

7      A    Yes, sir.

8      Q    You did not discuss with Trooper Siegler when he

9  retrieved the wallet and knew the identity of the driver of

10  the '99 Silverado?

11      A    Yes, I did, sir.

12      Q    And he told you an hour and-a-half after he

13  arrived at the scene the wallet was retrieved?

14              MR. HAYDEN:  Objection.

15              THE COURT:  Sustained.

16      Q    What did he tell you?

17              MR. HAYDEN:  Objection.

18              THE COURT:  Overruled.

19      A    Some time after, sir.

20      Q    Can you recall how much time after?

21      A    No, sir.

22      Q    When you testified about an hour and-a-half, is

23  that something that you just thought of?

24      A    No.  My recollection, sir.

25      Q    So at some point you knew the identify of the

GIGI WRIGHT, RPR    (516) 571-2503

1    driver of that Silverado, correct?

2         A    Yes, sir.

3         Q    That was Martin Heidgen; is that correct?

4         A    Yes, sir.

5         Q    Was Trooper O'Hare notified by you or anybody

6    else at the hospital of the identity of the individual to

7    whom he was with?

8         A    No, sir.

9         Q    Was Trooper O'Hare ever notified that the name

10   Martin Heidgen is associated with this case?

11        A    No, sir.

12        Q    But it was Trooper O'Hare who was sent to

13   retrieve the blood sample, correct?

14        A    Yes, sir.

15        Q    So nobody told him who the person was that he was

16   with?

17        A    No, sir.

18        Q    At some point you sent Trooper Baez to the

19   hospital, correct?

20        A    Investigator Baez, sir.

21        Q    Investigator, sir, I'm sorry.  Investigator Baez,

22   correct?

23        A    Yes, sir.

24        Q    At that time you knew the identity of the driver

25   of that car being Martin Heidgen, correct?

1    A    Tentative identity.

2    Q    Excuse me?

3    A    Tentative identity.

4    Q    Pursuant to the wallet, correct?

5    A    Pursuant to his registration plate.

6    Q    What time was Trooper Baez sent to the hospital?

7    A    Four-twenty.

8    Q    So you are saying at that time you didn't have

9    Martin Heidgen's wallet?  At that time?

10    A    We didn't have his physical license at the time.

11    Q    License wasn't in the wallet?

12    A    It was in the wallet.

13    Q    So what I am asking you is:  Did you look in the

14    wallet for a license?

15    A    Not originally, no.

16    Q    You didn't?

17    A    Not originally, no.

18    Q    Didn't you think that would have been important

19    to find out whose wallet this is; who's driving this car?

20    A    Very important.

21    Q    So you didn't open the wallet looking for a

22    driver's license; is that your testimony?

23    A    At the point in time I was doing interviews with

24    witnesses.

25    Q    It wasn't as important to know the identity of

Inv. Harris - Cross - LaMagna

1      the driver at that point in time?

2          A     At that point in time, no, sir.

3          Q     At some point you retrieved a cell phone from the

4      car, correct?

5          A     Yes, sir.

6          Q     And you vouchered that cell phone into evidence,

7      correct?

8          A     Yes, sir.

9          Q     And you have that cell phone still today?

10         A     Yes, sir.

11         Q     And at some point you downloaded the information

12     in that cell phone, correct?

13         A     Yes, sir.

14         Q     And, in fact, one of the outgoing calls on that

15     cell phone was made on July 2nd, the date of the incident,

16     2005, at 1:45 a.m.; isn't that correct?

17         A     Yes, sir.

18               MR. LaMAGNA:  Could I have this marked.

19               (Whereupon, an item received and marked

20         Defendant's Exhibit N for identification.)

21               COURT OFFICER:  Defendant's Exhibit N for

22         identification.

23         Q     Investigator Harris, I ask you to look at that.

24     Is that the information provided to me by your office or the

25     district attorney's office?

Inv. Harris - Cross - LaMagna

1    A    Yes, sir.

2    Q    Do you recognize that as the information you

3    retrieved from the cell phone?

4    A    Yes, sir.

5              MR. LaMAGNA:  At this time, your Honor, I

6         would like to have that introduced in evidence.

7              THE COURT:  Please show it to counsel.

8              MR. HAYDEN:  No objection.

9              THE COURT:  It is received.

10             (Whereupon, Defendant's Exhibit N for

11        identification now received and marked Defendant's

12        Exhibit N in evidence.)

13             COURT OFFICER:  Defendant's N in evidence.

14             MR. LaMAGNA: Show that to the witness,

15        please.

16   Q    Investigator Harris, pursuant to your

17   investigation do you recognize the number that Marty Heidgen

18   called at 1:45 a.m.?

19   A    Yes, sir.

20   Q    That number belongs to an Amanda Goldman,

21   correct?

22   A    Yes, sir.

23   Q    And Amanda Goldman was the individual who was

24   having a party that night, correct?

25   A    Yes, sir.

1    Q    And pursuant to your investigation you know that

2    Marty Heidgen was at that party, correct?

3    A    Yes, sir.

4    Q    And pursuant to your investigation you know that

5    Marty Heidgen arrived at that party at approximately 11:30,

6    correct?

7                    MR. HAYDEN:  Objection.

8                    MR. LaMAGNA:  It goes to his investigation,

9           your Honor.  If he knows.

10                   THE COURT:  Sustained.

11   Q    Did you learn that that is where the party was?

12                   MR. HAYDEN:  Objection.

13                   THE COURT:  Sustained.

14   Q    Did you speak with an Amanda Goldman?  Did you

15   speak to Amanda Goldman?

16   A    Yes, sir.

17   Q    Did you interview her?

18   A    -  No, sir.

19   Q    You spoke to her?

20   A    Yes, sir.

21   Q    Did she tell you that she was having a party?

22                   MR. HAYDEN:  Objection.

23                   THE COURT:  Sustained.

24   Q    That phone call went to Amanda Goldman's house at

25   1:45 a.m., correct?

Inv. Harris - Cross - LaMagna

1    A    This cell phone, sir?

2    Q    That one, yes.

3    A    This is her cell phone; not her house.

4    Q    Yes, her cell phone.

5    A    Yes, sir.

6    Q    At 1:45 a.m.; Correct?

7    A    Yes, sir.

8    Q    I'm sorry, her cell phone?

9    A    Yes, sir.

10   Q    At 1:45 a.m., correct?

11   A    Yes.

12   Q    Now you also, pursuant to your investigation in

13   conjunction with the district attorney's office, retrieved

14   all of the phone calls made and received by Marty Heidgen

15   from July 1st to July 2nd; isn't that correct?

16   A    Yes, sir.

17            MR. LaMAGNA:  Could I have this marked for

18   identification.

19            (Whereupon, the item referred to received and

20   marked Defendant's Exhibit O for identification.)

21            COURT OFFICER:  Defendant's Exhibit O for

22   identification.

23   Q    I show you what has been marked as Defendant's

24   Exhibit O for identification.  I ask you to look at it.

25            Do you recognize that to be the printout for the

Inv. Harris - Cross - LaMagna

```
 1   telephone calls made to and from Marty Heidgen's cell phone

 2   that was given to me by either your office or the district

 3   attorney's office in discovery?

 4        A    Yes, sir.

 5        Q    And do you recognize that to be that document?

 6        A    Yes, sir.

 7             MR. LaMAGNA:  I would like to have that

 8        marked into evidence as well.

 9             MR. HAYDEN:  Objection.

10             THE COURT:  Basis?

11             MR. HAYDEN:  May I look at it.  They are

12        telephone records.  They go through the telephone

13        companies, not this investigator.

14             MR. LaMAGNA:  Judge, I received them from

15        them --

16             MR. HAYDEN:  So.

17             MR. LaMAGNA:  -- pursuant to a subpoena.

18             THE COURT:  Let me just see that.  Give me a

19        minute.  Give the jury a five-minute break and we will

20        talk about this, counsel.  Don't talk about the case,

21        please.

22             (Whereupon, the jury exited the courtroom.)

23             THE COURT:  Would you read back the last few

24        questions.

25             (Whereupon, the record was read.)
```

Inv. Harris - Cross - LaMagna

1            THE COURT:  I'll hear your arguments.

2            MR. LaMAGNA:  Judge, that was subpoenaed by

3      the district attorney's office.  They gave me a copy of

4      that information that they subpoenaed.  I was under the

5      impression from months ago that they were not going to

6      object to that going in since they subpoenaed it and

7      they gave it to me.  I had -- that was my impression

8      all along.  That's why they gave them to me.  They

9      subpoenaed them.

10           MR. HAYDEN:  So.  That's my response.  What

11     difference does that make?  Everything we subpoenaed

12     and gave to defense counsel is now fair game; we can

13     put anything into evidence?  That is ridiculous.  These

14     are phone records.  Only someone from the phone company

15     can legitimize them, lay a foundation for them, and

16     then comment on what they mean.

17           There are a lot of questions raised by those

18     phone records.  We can't have them going in through the

19     investigator simply because he obtained them over the

20     course of an investigation, and gave them to me.  We

21     passed them along to defense counsel.  That doesn't lay

22     a foundation into the introduction of evidence.

23           If that is so, we have a lot of things we

24     would like to put into evidence here, things we

25     obtained by subpoena, things that were given to defense

1     counsel.

2              MR. LaMAGNA:  They are relevant and material.

3     I didn't subpoena them, because I received the

4     subpoenaed material from them.

5              I could lay a business foundation then with

6     this detective.  It is part of their file.  They keep

7     it in the ordinary course of business.

8              THE COURT:  Because it is part of their file

9     it doesn't make it a business record.

10             Objection is sustained.  Give the jury five

11    minutes and we will get them back.

12             (Whereupon, a brief recess was held.)

13             COURT OFFICER:  Jury entering.

14             (Whereupon, the jury entered the courtroom,

15    and upon taking their respective seats, the following

16    occurred:)

17             THE CLERK:  Case on trial, Indictment 1910N

18    of 2005, People versus Martin Heidgen.

19             People ready?

20             MR. HAYDEN:  People ready.

21             THE CLERK:  Defendant ready?

22             MR. LaMAGNA:  Defendant ready.

23             THE CLERK:  Defendant present and the jury is

24    seated, your Honor.

25             THE COURT:  Okay.  Objection sustained.

Inv. Harris - Cross - LaMagna

1        Mr. LaMagna.

2        MR. LaMAGNA:  May I continue?

3        THE COURT:  Yes.

4    BY MR. LaMAGNA:

5        Q    To finish off with the Exhibit N in evidence, the

6    time of that phone call was 1:45 a.m.; is that correct, on

7    July 2nd 2005?

8        A    Yes, sir.

9        Q    May I have that back.

10       And the accident occurred at approximately 2:06

11   a.m. that same day, correct?

12       A    Yes, sir.

13       Q    Now, you testified that you had sent Investigator

14   Baez to the hospital to retrieve a blood kit, correct?

15       A    Yes, sir.

16       Q    Do you remember what time that was?

17       A    Approximately 4:20 a.m.

18       Q    And the instructions for him was to do what?

19       A    Go to the hospital, be my eyes and ears at the

20   hospital; find out who is at hospital injured, their names,

21   all information possible, and to obtain that blood kit and

22   to bring it to me.

23       Q    Did you tell him who to meet there?  Did you tell

24   him Trooper O'Hare or Trooper Stafford?

25       A    I told him Trooper O'Hare was at the hospital.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Cross - LaMagna

1    Q    So that is who he was told to locate?

2    A    Find and locate.

3    Q    And then you told him those other things,

4    correct?

5    A    Absolutely.

6    Q    So he knew when he was going there that, number

7    one, the blood kit had been secured and to go and get it

8    from Trooper O'Hare; is that correct?

9    A    That's correct.

10   Q    Now, you said that at approximately 12:35 p.m. on

11   July 2nd you, as well as Investigator Baez, went to the

12   hospital, correct?

13   A    No, sir.

14   Q    How much earlier than 12: 35?

15   A    Eleven-forty-five.

16   Q    So you left at 11:45. And the beginning of the

17   interview with Marty was at 12:30, correct?

18   A    Yes, sir.

19   Q    Now, you went to the hospital to get a statement

20   or to interview Marty, correct?

21   A.   Yes, sir.

22   Q    That was one of the things that you said you were

23   going to do, correct?

24   A    Yes, sir.

25   Q    Now you testified on direct examination that you

1    received a call that Marty was up and talking, correct?

2        A    Yes, sir.

3        Q    Now, do you recall testifying at a prior

4    proceeding under oath concerning that issue?

5        A    I recall testifying.

6        Q    Directing your attention to page 147 and 148. Do

7    you remember being asked this question: "Were you notified

8    by anybody, Officer Sewell or otherwise, prior to you going

9    to the hospital at that particular time that he was already

10   up and talking," and your your response was, "I don't

11   recall." Do you remember being asked that --

12       A    Yes, sir.

13       Q    -- and giving that answer?

14       A    Yes, sir.

15       Q    Do you remember being asked the question at 148,

16   line 6: "Well, so you don't recall whether or not you

17   received a call or not? Could have been, but you don't

18   know? Is that a fair statement?

19            "ANSWER: I don't recall receiving -- I don't

20   recall receiving any phone calls." .

21            Do you remember giving that answer?

22       A    Yes, sir.

23       Q    So, between the time that you testified at that

24   hearing and the time that you testified today have you now

25   remembered that you did, in fact, get a phone call that he

Inv. Harris - Cross - LaMagna

1    was up and talking?

2         A    I didn't receive a phone call, sir.

3         Q    I thought you just said you received a phone call

4    that the defendant was up and talking?

5         A    My partner Investigator Baez received a phone

6    call.

7         Q    That's why you answered it that you don't recall

8    if anybody called?

9         A    Yes, sir.

10        Q    Okay.  That's is what it says.  Okay.

11             Now, knowing that you were going to interview

12   Mr. Heidgen for this case did you take with you, or

13   Investigator Baez, any recording devices?

14        A    No, sir.

15        Q    Take any tape recording devices?

16        A    No, sir.

17        Q    Micro cassette players?  Anything?

18        A    No, sir.

19        Q    You knew you were going there to try and

20   interview the defendant in this case, correct?

21        A    Yes, sir.

22        Q    Now, the New York State Police does have these

23   items, correct?

24        A    Yes, they do.

25        Q    You chose not to take them, correct?

Inv. Harris - Cross - LaMagna

1       A       Yes, sir.

2       Q       Now, you also had with you a pre-printed form

3   articulating Miranda warnings, correct?

4       A       Yes, sir.

5       Q       And those are forms that you actually took with

6   you?

7       A       Yes, sir.

8       Q       And you had them in your possession?

9       A       Yes, sir.

10      Q       And on those forms it lists exactly the

11  constitutional rights that a defendant has to be given when

12  he is in custody, correct?

13      A       Yes, sir.

14      Q       And Mr. Heidgen was clearly in custody at that

15  time, correct?

16      A       Yes, sir.

17      Q       And underneath where it articulates the Miranda

18  warnings there is two questions, correct?    "Do you

19  understand these rights," correct?

20      A       Yes.

21      Q       And there is a space for the individual who is

22  being questioned to answer and sign, "Yes, I received these

23  warnings," correct?

24      A       Yes, sir.

25      Q       And he initials it, correct?

1      A      Yes, sir.

2      Q      Verifying and corroborating that, in fact, this

3    person did get these very important constitutional rights,

4    correct?

5      A      Yes, sir.

6      Q      And there is another question on the form that

7    you had in in your possession, correct, that said, "I waive

8    these rights and I'm willing to talk to you without an

9    attorney," correct?

10     A      Yes, sir.

11     Q      And there is another spot right there for a

12   person in custody to sign with his initials, correct?

13     A      Yes, sir.

14     Q      Acknowledging that he, in fact, knows these

15   rights and he is waiving these rights and is willing to talk

16   to you, correct?

17     A      Yes, sir.

18     Q      And that's very important; is it not?

19     A      Yes, it is.

20     Q      Now, you also have, do you not, pre-printed

21   Miranda cards, correct?

22     A      Yes, sir.

23     Q      And those pre-printed Miranda cards have, again,

24   the constitutional rights that you read to a person in

25   custody, correct?

Inv. Harris - Cross - LaMagna

1    A    Yes, sir.

2    Q    And those pre-printed cards also have the same

3    two questions at the end of those rights, correct?

4    A    Yes, sir.

5    Q    For a person who is read these rights to

6    acknowledge and verify, corroborate, that they were given

7    these rights, correct?

8    A    Yes, sir.

9    Q    And then there is another question for the waiver

10   of those rights, correct?

11   A    Yes, sir.

12   Q    For that person to acknowledge that he is waving

13   his rights, that he was allegedly given, correct?

14   A    Yes, sir.

15   Q    And you did not use one of those cards either,

16   correct?

17   A    No, sir.

18   Q    -- In fact, you testified -- may I -- in fact, you

19   testified that, People's Exhibit 62 in evidence, you used

20   that card?

21   A    Yes, sir.

22   Q    How long have you had that card?

23   A    Twenty-three years.

24   Q    And that's the card that you used to give the

25   rights?

Inv. Harris - Cross - LaMagna

1      A     Yes, sir.

2            MR. LaMAGNA:  Judge, may I publish to this

3      the jury?

4            THE COURT:  Sure.

5            (Whereupon, People's Exhibit 62 displayed to

6      the jury.)

7      Q     That card is 23 years old?

8      A     In another three weeks it will be.

9      Q     It is not in such good shape, is it?  It is a

10     little tattered, isn't it?

11     A     It is worn.

12     Q     Nowhere on that card is there any place for an

13     individual to sign to acknowledge his rights, is there?

14     A     No, sir.

15     Q     So in spite of having a rights card, pre-printed

16     rights card with that ability, and a pre-printed form where

17     a person can acknowledge that, you chose to use this 23 year

18     old tattered card; is that correct?

19     A     Yes, sir.

20     Q     And, in fact, nowhere in any notes that you made

21     does it articulate with specificity that Miranda warnings,

22     constitutional rights, were given to Marty; isn't that

23     correct?

24     A     Yes, sir.

25     Q     And nowhere in any notes made by Investigator

1    Baez does it articulate with any degree of specificity that

2    Miranda, constitutional rights, were given to Marty,

3    correct?

4         A    He recorded the time.

5         Q    I know you recorded the time of the interview.

6    I'm asking you whether or not it articulates with any

7    specificity his Miranda warnings, his constitutional rights,

8    were given to him?  Nowhere it says that, does it?  Correct?

9         A    It doesn't say "Miranda rights."  But we recorded

10   the time.

11        Q    I know you recorded the time of the interview I'm

12   asking you --

13        A    Uh huh.

14        Q    -- does anywhere on any notes whatsoever taken by

15   you or Investigator Baez does it articulate with specificity

16   that his constitutional Miranda warnings were given?

17        A    Doesn't state that, sir.

18        Q    And nowhere on any notes does it say that he

19   waived these rights, correct?

20        A    Doesn't state that, sir.

21        Q    Now, directing your attention to approximately

22   12:30.  You arrive at the bedside of Marty Heidgen, correct?

23        A    Yes, sir.

24        Q    And who was present at that time?

25        A    Myself, Investigator Baez, Trooper Grasso and

Inv. Harris - Cross - LaMagna

1    Trooper Sewell.

2        Q      At some point you and Investigator Baez began

3    your interview with Mr. Heidgen; is that correct?

4        A      Yes, sir.

5        Q      And you introduced yourselves; is that correct?

6        A      Yes, sir.

7        Q      And you said Mr. Heidgen was in the hospital bed;

8    is that correct?

9        A      Yes, sir.

10       Q      Did he have an oxygen mask on his face at that

11   time?

12       A      No, sir.

13       Q      Now, you didn't speak to any doctors or nurses

14   concerning whether or not Mr. Heidgen was physically able or

15   under medication or still sedated, that he was in a

16   condition to answer questions, did you?

17       A      I recall speaking to a doctor and a nurse about

18   his condition.  But didn't ask them permission in reference

19   to interview him.

20       Q      You remember speaking to a doctor?

21       A      Doctor or a nurse.

22       Q      Can you be sure?

23       A      That's what I recall.

24       Q      It was a doctor or a nurse.  Do you recall

25   testifying at a prior proceeding concerning that issue?

Inv. Harris - Cross - LaMagna

1      A      Yes, sir.

2      Q      Do you remember answering the question, my

3   question:  You don't recall -- page 164.

4             So my question is:  "You don't recall whether you

5   spoke to any doctor prior to interviewing Mr. Heidgen," and

6   my question is to you:  "If you reviewed your notes would

7   that refresh your recollection as to whether or not you did

8   or you didn't?"

9             "ANSWER:  I don't recall speaking to any doctors,

10   and my notes don't reflect that."

11            Do you remember being that asked that question?

12     A      Yes, sir.

13     Q      Do you remember answering that?

14     A      Yes, sir.

15     Q      Again, is your recollection refreshed today that

16   you may have talked to a doctor, or you don't know?

17     A      Yes, sir.  I recall speaking to a doctor and a

18   nurse about his condition.

19     Q      So, now you remember that, correct?

20     A      Yes, sir.

21     Q      Now, the interview, you introduced yourself,

22   correct?

23     A      Yes, I did.

24     Q      Investigator Baez introduced himself; is that

25   correct?

Inv. Harris - Cross - LaMagna

```
 1        A     Yes, sir.

 2        Q     And at some point Investigator Baez told him he

 3   was under arrest for DWI; is that correct?

 4        A     Yes, sir.

 5        Q     You didn't tell him the true consequences of what

 6   happened at that time, correct?

 7        A     No, I didn't.

 8        Q     Well, all you told him he was arrested for DWI;

 9   is that correct?

10        A     Yes, sir.

11        Q     And Investigator Baez was taking notes?

12        A     Yes, sir.

13        Q     You didn't take any notes?

14        A     No, sir.

15        Q     You were asking questions, correct?

16        A     Yes, sir.

17        Q     Investigator Baez was asking questions, correct?

18        A     Yes, sir.

19        Q     Mr. Heidgen was answering the questions, correct?

20        A     Yes, sir.

21        Q     And Investigator Baez was taking these notes

22   cotemporaneously with people talking, correct?

23        A     Yes, sir.

24        Q     Three people were talking:  you, Investigator

25   Baez and the defendant, correct?
```

Inv. Harris - Cross - LaMagna

1       A       Yes, sir.

2       Q       And it was important to take these notes of the

3   interview, correct?

4       A       Yes, sir.

5       Q       Because some time you will be coming to court,

6   like today, and you would have to articulate what was said

7   by you and what was said by the person you were

8   interviewing; isn't that correct?

9       A       Yes, sir.

10      Q       And those notes you would use to refresh your

11  recollection; isn't that correct?

12      A       Yes, sir.

13      Q       Because sometimes, like today, you are referring

14  to a conversation that you may have had many months ago,

15  correct?

16      A       Yes, sir.

17      Q       In fact, in this case it was fourteen months ago,

18  correct?

19      A       Yes, sir.

20      Q       And you worked on a lot of cases between then and

21  today, correct?

22      A       Yes, sir.

23      Q       So you would need to refresh your recollection,

24  as you did on the witness stand on direct examination, to

25  recall the contents of those discussions; isn't that

1    correct?

2         A     Yes, sir.

3         Q     And yet you didn't use a tape recording device or

4    any other type of device to know exactly what was said so

5    there would be no question as to what was said by you and

6    what was said by the defendant; isn't that correct?

7         A     Yes, sir.

8         Q     You are relying just on the notes, not of you,

9    but you are relying on the notes of somebody else, correct?

10        A     Yes, sir.

11        Q     And you used those notes in anticipation of

12   testifying today to refresh your recollection?

13        A     Yes, sir.

14        Q     And you used them during your direct examination;

15   isn't that true?

16        A     The sequential order of the questions, yes, sir.

17        Q     Now, you testified on direct examination that

18   Marty was pleasant; isn't that correct?

19        A     Yes, sir.

20        Q     He was polite, correct?

21        A     Yes, sir.

22        Q     He was cooperative with you, correct?

23        A     He was pleasant.

24        Q     He was cooperative with you?

25        A     He was pleasant.

Inv. Harris - Cross - LaMagna

```
 1      Q      So he was not cooperative?

 2      A      He was pleasant, sir.

 3      Q      Did he answer your questions?

 4      A      He answered my questions.

 5      Q      Was he courteous to you?

 6      A      He was courteous.

 7      Q      Was he calm?

 8      A      He was calm.

 9      Q      Was he respectful to you?

10      A      He was respectful.

11      Q      Called you "sir"; is that correct?

12      A      On occasion.

13      Q      You would consider him well-mannered?

14      A      He was pleasant.

15      Q      Now, are you familiar with the New York State
```
16   Police manual?
```
17      A      I'm familiar with the manual.

18      Q      And isn't it a fact that the New York State
```
19   Police manual, in Article 32, says it is advisable to make
20   detailed notes concerning the advising of rights and
21   warnings of rights to individuals in custody, including the
22   time it was done.  Doesn't it say that?
```
23      A      I would have to refer to the manual, like I
```
24   always do.
```
25              MR. HAYDEN:  Objection.
```

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Cross - LaMagna

1           THE COURT:  Objection sustained.

2       Q    You do --

3           THE COURT:  Objection is sustained.

4       Q    Now, you testified concerning an interview that

5   you had with Marty this morning.  Do you recall that?

6       A    Yes, sir.

7       Q    Do you recall at one point you said that Marty

8   received a phone call at 9 p.m. from a Lindsay Long,

9   correct?

10      A    Yes, sir.

11      Q    His ex-girlfriend, I believe you said; is that

12  correct?

13      A    Yes, sir.

14      Q    Now, pursuant to your investigation and review of

15  all of the documents that you have obtained in this

16  investigation, you know that that is not true, that is

17  inaccurate; isn't that correct?

18      A    No, I don't, sir.

19      Q    Didn't you review the phone records that were

20  subpoenaed in this case?

21      A    Yes, sir.

22      Q    And there is no such call from a Lindsay Long on

23  those phone records; isn't that true?

24      A    I don't know that, sir.

25      Q    Didn't you review those records?

Inv. Harris - Cross - LaMagna

1      A      I reviewed them.

2      Q      Didn't you review whose numbers were on that

3    phone record from July 1st to July 2nd?

4      A      Yes, sir.

5      Q      And there is no such phone call from a Lindsay

6    Long, with a phone number that was given to you, at 9:00;

7    isn't that true?

8      A      I don't know that, sir.

9      Q      Doesn't that indicate that on the phone records?

10     A      No, it doesn't, sir.

11     Q      You didn't review them?

12     A      I reviewed them.  There are calls with Arkansas

13   numbers up there.

14     Q      You didn't check those out to see who those

15   individuals are?

16     A      At this point in time I don't know, sir.

17     Q      You are the lead investigator in this case; is

18   that correct?

19     A      Yes, sir.

20     Q      You you said, you testified, you testified you

21   asked him what he was drinking, and he said Old Parr Scotch;

22   is that correct?

23     A      Say that again.

24     Q      You said he said he was drinking Old Parr Scotch?

25     A      Old Parr Scotch, that's correct.

1    Q    Again, you reviewed your notes, correct,

2    concerning those statements?

3    A    Yes, sir.

4    Q    And that was to refresh your recollection,

5    correct?

6    A    Yes, sir.

7    Q    So it would be fair to say that your memory of

8    exactly what was stated in that conversation needed to be

9    refreshed; is that correct?

10   A    Yes, sir.

11   Q    Do you recall testifying at a prior hearing, at

12   page 133, where you testified in answer to a question:

13   "Did you ask him anything?"

14        "ANSWER:  Yes, ma'am.  I asked him what kind of

15   alcohol, and he told us John Parr Scotch."

16        Do you remember that?

17   A    No, sir.

18   Q    That's in the record?

19   A    I didn't say that, sir.

20   Q    So the reporter got it wrong?

21   A    Strong possibility.

22   Q    Not that you were wrong?

23   A    Excuse me?

24   Q    Not that you were wrong?

25   A    I was not wrong.

Inv. Harris - Cross - LaMagna

1        Q      Not that your memory was wrong?

2        A      No, sir.

3        Q      Wouldn't you agree that a word here or there

4    concerning a statement could have significant effect on the

5    meaning of a statement, correct?

6        A      Yes, sir.

7        Q      Now, you testified also that you asked him how

8    much were you drinking of this scotch, and he said a fifth

9    of a bottle.

10                    MR. HAYDEN:  Objection.

11                    THE COURT:  Sustained.

12       Q      You testified he drank a fifth, correct?

13       A      A fifth of?

14       Q      Scotch.

15       A      That's affirmative.

16       Q      Excuse me?

17       A      That's yes.

18       Q      Do you remember testifying in the grand jury in

19    this case?

20       A      Yes, sir.

21       Q      Do you remember being asked, or do you remember

22    giving the answer:  "I then asked him what kind of alcohol

23    he drank, and he called it Old Parr."  "Then I asked him how

24    much -- at page 72, I'm sorry -- and he told me, like, a

25    fifth of a bottle of scotch," not a fifth of scotch.  Do you

Inv. Harris - Cross - LaMagna

1    remember giving that testimony?

2         A    Yes, sir.  But after reviewing Investigator Baez'

3    notes I should have said, "a fifth of scotch."

4         Q    So you were wrong because the notes didn't

5    reflect that, correct?

6              MR. HAYDEN:  Objection.

7              THE COURT:  Sustained.

8         Q    So, you did testify "a fifth of a bottle" in the

9    grand jury, correct?

10        A    As I just said, yes, sir.

11        Q    And you testified here that he said to you that

12   he drank an entire fifth, meaning the whole bottle, correct?

13        A    I said "a fifth of scotch," sir.

14        Q    There is a distinction between the two

15   testimonies that you gave.  Do you have a recollection as

16   you sit here now, other than what notes may have said by

17   somebody else, what he actually said?

18        A    .. A fifth of scotch.

19        Q    You understand that one word here or there could

20   make a significant difference in what was said, correct?

21        A    Correct.

22        Q    Now, you testified that he had told you that he

23   had financial problems, correct?

24        A    Yes, sir.

25        Q    And you asked him about living in New York,

1    correct?  He said he just moved here from Arkansas eight

2    months ago?

3         A    He just told me that.

4         Q    Didn't he say he finds it very expensive living

5    in New York?

6         A    He didn't say that to me, sir.

7         Q    Are you sure?

8         A    I'm positive.

9         Q    Is that only because Investigator Baez' notes say

10   that or because you remember that?

11        A    I remember.

12        Q    You are sure?

13        A    Yes.

14        Q    You are sure about that?

15        A    Yes.

16        Q    Were you aware that pursuant to your

17   investigation that Marty, three months before this incident,

18   received an inheritance of over $20,000?

19             MR. HAYDEN:  Objection.

20             THE COURT:  Sustained.

21        Q    You didn't --

22             MR. LaMAGNA:  Judge, whether it is true or

23        not, I'm asking if he knew about it.

24             MR. HAYDEN:  Objection.  There is nothing to

25        to know.

Inv. Harris - Cross - LaMagna

1          THE COURT:  Sustained.

2     Q     You didn't know that?

3          THE COURT:  Sustained.

4     Q     Now, you testified that Marty said that he left

5     his house around 2 a.m.; isn't that correct?

6     A     Yes, sir.

7     Q     Well, you know that that is not true too,

8     pursuant to your investigation, correct?  You knew he was at

9     the Amanda Goldman's party, correct?

10         MR. HAYDEN:  Objection.

11         MR. LaMAGNA:  Judge, it is his investigation.

12         THE COURT:  Overruled.

13    Q     Now, you know that that is not true, correct?

14    That is an inaccurate statement?

15    A     Yes, he attended a party at the Goldmans.

16    Q     So you know he didn't leave his house at 2

17    o'clock; he was at the Goldmans' house from 11:30 to

18    approximately 1:30, correct?

19         MR. HAYDEN:  Objection.

20         THE COURT:  Sustained.

21    Q     Pursuant to your interview and your investigation

22    you were made aware that Amanda Goldman had a party,

23    correct?

24         MR. HAYDEN:  Objection.

25         THE COURT:  Sustained.

Inv. Harris - Cross - LaMagna

```
 1        Q     Now you testified that he said that he was

 2   driving on Sunrise Highway to Southern State Parkway,

 3   correct?

 4        A     Yes, sir.

 5        Q     Now, are you familiar with Meadowbrook Parkway?

 6        A     Yes, sir.

 7        Q     Familiar with Sunrise Highway?

 8        A     Yes, sir.

 9        Q     You are familiar with the Southern State Parkway?

10        A     Yes, sir.

11        Q     Now, you would agree that that would be

12   impossible to get from Sunrise Highway to the Southern State

13   Parkway, correct?  They both go east and west?

14        A     Yes, sir.

15        Q     You asked him how he felt; isn't that correct?

16        A     Yes, sir.

17        Q     And the word he used was "embarrassed"; isn't

18   that correct?

19        A     No, sir.

20        Q     He used the word "embarrassed"?

21        A     He said he was "disgusted and embarrassed."

22        Q     Disgusted and embarrassed, as if he has to tell

23   his parents he got arrested for a DWI and smashed his car?

24             MR. HAYDEN:  Objection.

25             THE COURT:  Sustained.
```

Inv. Harris - Cross - LaMagna

1    Q    The word "embarrassed" was the word he used, one

2    of the words, correct?

3    A    Yes, sir.

4    Q    And this was after you told him he was arrested

5    for a DWI, correct?

6    A    Yes, sir.

7    Q    And he told you and you asked -- withdrawn.

8         You asked him, "What did you hit," correct?

9    A    Yes, sir.

10   Q    And he said he thought he hit a tree or a median,

11   correct?

12   A    That's what he said.

13   Q    And then he was worried about the condition of

14   his car, correct?

15   A    That's what he said.

16   Q    He was worried?  He said that his car is all he

17   has, right?

18   A    -- That's what he said.

19   Q    He is worried about the condition of his car and

20   he was embarrassed, that's the words he used to you,

21   correct?

22   A    That's what he said.

23   Q    And he said to you he just wants to make a living

24   and work?  He wants to work and make a living, correct?

25   A    That's what he said.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Cross - LaMagna

1    Q    He told you he graduated with a bachelors degree

2    in history, correct?

3    A    Yes that's what he said.

4    Q    With a minor in Spanish, correct?

5    A    That's what he said.

6    Q    Did he tell you anything else about his college

7    concerning any fraternities he was in?

8    A    No, sir.

9    Q    He didn't tell you that he was the chaplain of

10   his fraternity?

11   A    No.

12   Q    Did he tell you he was the captain of the soccer

13   team? Did he tell you that?

14   A    No, sir.

15   Q    Did he tell you he was in the R.O.T.C. for four

16   years?

17   A    No, sir.

18   Q    Did he tell you he was the captain of the rival

19   team on the R.O.T.C.? Did he tell you that?

20   A    No.

21   Q    Did he tell you he was the philanthropic chairman

22   of his fraternity?

23   A    No, sir.

24   Q    He didn't tell you he ran fund raisers for

25   underprivileged kids when he was in the fraternity? Did he

1    tell you that?

2        A    No, sir.

3        Q    Did he tell you he volunteered at the YMCA for

4    underprivileged kids who didn't have dad for a soccer coach?

5        A    No.

6        Q    If he did you would have had that in your notes?

7        A    Yes, sir.

8        Q    You asked him where he was going twice, correct?

9        A    Yes, sir.

10       Q    Both times he said, "I was trying to go home"?

11   Didn't he tell you that?

12       A    No, sir.

13       Q    He didn't tell you he was trying to go home?  You

14   didn't testify to that this morning?

15       A    One time he said that, sir.

16       Q    And you asked him where he was going and he said,

17   I was trying to go home, correct?

18       A    Yes, sir.

19       Q    And you testified he mentioned that he was in a

20   "self-destruct mode," correct?

21       A    Yes, sir.

22       Q    He didn't tell you he was drinking and it was

23   self-destructive?

24       A    Excuse me?

25       Q    He didn't say he was drinking and he drank too

Inv. Harris - Cross - LaMagna

1    much; he was self-destructive?

2        A    He didn't put it that way, sir.

3        Q    You remember that, or it was because of the notes

4    you were reading to refresh your recollection?

5        A    I remember that, sir.

6        Q    And as a result of him saying that you took it

7    upon yourself to interpret that, and you asked him, were you

8    trying to hurt yourself?  Didn't you ask him that?

9        A    Yes, I did.

10       Q    In fact, you didn't ask him that once, you asked

11   him that three times.  You asked him that three times,

12   correct?

13       A    Yes, sir.

14       Q    And three times he answered you, no; isn't that

15   correct?

16       A    Not fully, sir.  He said, no, never before.

17       Q    I understand that.  But three times he answered

18   in the negative, no; isn't that true?

19       A    He said no.

20       Q    So you asked him the first time are you trying --

21   were you trying to hurt yourself tonight, correct?

22       A    Yes, sir.

23       Q    That was a question that came to your mind,

24   correct?

25       A    Yes, sir.

Inv. Harris - Cross - LaMagna

1    Q    That was a question you asked; isn't that

2    correct?

3    A    Yes, sir.

4    Q    And he said, "No, never before," correct?

5    A    "No, never before."

6    Q    Correct?

7    A    Yes, sir.

8    Q    You didn't ask him, have you ever tried to hurt

9    yourself, and he said, "No"?  Did you ask him that?

10   A    No, sir.

11   Q    Did you ask him, have you ever before tried to

12   hurt yourself, and he said "No"?

13   A    Didn't ask him that, sir.

14   Q    You asked him:  Did you try to hurt yourself, and

15   he said, "No, never before," correct?

16   A    Yes, sir.

17   Q    And then again you asked him a second time; isn't

18   that correct?

19   A    Yes, sir.

20   Q    And you asked him, did you try and hurt your

21   yourself tonight, and again he answered no; isn't that true?

22   A    Not fully.

23   Q    But didn't he say, "No"?

24   A    He said, "No, not under these circumstances."

25   Q    And that was "No," correct?

Inv. Harris - Cross - LaMagna

1     A     No.

2     Q     So a second time you asked him during the course

3     of this interview, and a second time he said, "No," correct?

4     A     Not fully, sir.

5     Q     "No, not under these circumstances," but he said

6     "no," correct?

7     A     He said, "No."

8     Q     And then, a third time you asked him, a third

9     time, "You weren't trying to hurt yourself tonight," and he

10    said "No, sir," correct?

11    A     Not correct, sir.

12    Q     There is a period. You made a period. We'll,

13    get to the rest of it. He said, "No"?

14    A     He said "No, sir." Continue.

15    Q     "I would not cash out like this. I would wait

16    for another card to be dealt," he said?

17    A     Yes, sir.

18    Q     .. Didn't you say to him, "What if things were going

19    wrong, wouldn't you try, if your were depressed or anything,

20    wouldn't you try to hurt yourself," and he said, "No"?

21    A     Didn't come out that way. Repeat that question.

22    Q     You didn't ask him by the third time, after twice

23    answering "No," you didn't say to him, "Well, if you were

24    depressed or sad you wouldn't try to hurt yourself?"

25    A     I probably would have asked him a fourth time,

Inv. Harris - Cross - LaMagna

1    but he wanted a lawyer, and I stopped questioning him.

2        Q       We'll get to that too.  He answered "No,"

3    correct?

4        A       Yes, sir.

5        Q       So the three times you asked him, three times he

6    said, "No," correct?

7        A       Yes, sir.

8        Q       And this interview lasted how long; fifteen

9    minutes?

10       A       No.  More than that.

11       Q       An hour?

12       A       Close to it.

13       Q       And during that whole time, three times you asked

14   him "Were you trying to hurt yourself," and three times he

15   said "No"?

16                       MR. HAYDEN:  Objection, your Honor.

17                       THE COURT:  Sustained.

18       Q    -- Correct?

19                       THE COURT:  Sustained.

20                       MR. LaMAGNA:  I didn't hear that, Judge.

21       Q       Now, you were talking about your case numbers.

22   Let's talk about that.  Well, let's back up.

23               You said at some point it was Mr. Heidgen who

24   ended that interview by saying, "I want a lawyer," correct?

25       A       Yes, sir.

Inv. Harris - Cross - LaMagna

1    Q    Nowhere in any of the notes that you took, or

2    Trooper Baez took, does it ever say "Defendant requested an

3    attorney," does it?

4    A    Doesn't say that, sir.

5    Q    Never noted anywhere, correct?

6    A    Doesn't say it, sir.

7    Q    And in the detailed notes that were taken by

8    Investigator Baez nowhere does it say "Miranda warnings were

9    given," correct?

10   A    Yes, sir.

11              MR. HAYDEN:  Objection.

12              THE COURT:  Sustained.

13   Q    Nowhere does it say --

14              MR. HAYDEN:  Objection.

15              THE COURT:  Sustained.

16   Q    Nowhere does it say that he requested an

17   attorney, does it?

18   A    It doesn't say it.

19   Q    That would be an important fact to note down,

20   wouldn't it?  Hello?

21   A    Depends on what Investigator Baez felt was

22   important to put down.

23   Q    I'm asking you:  That wouldn't have been an

24   important thing?

25   A    I wasn't taking the notes.

1      Q      You could have taken notes, nothing stopped you.

2   You were the lead investigator.

3      A      I was asking the questions.  He was taking the

4   notes.

5      Q      It was because Baez should have taken it,

6   correct; is that what you are saying?

7                    MR. HAYDEN:  Objection.

8                    THE COURT:  Sustained.

9      Q      Now you testified that every case is assigned a

10  B.C.I. number; isn't that correct?

11     A      Every case that  --

12     Q      Has a case number, correct?

13     A      That's correct.

14     Q      A case number is to identify that particular

15  case; is it not?

16     A      Yes, sir.

17     Q      These numbers go in sequential order, don't they?

18     A      Yes, they do.

19     Q      05 stands for the year, correct?

20     A      True.

21     Q      And it goes in order; 001 would be the first case

22  of the year, and so forth and so on, correct?

23     A      True.

24     Q      And that that number identifies that case,

25  correct?

Inv. Harris - Cross - LaMagna

1       A       Yes, sir.

2       Q       And all paperwork, evidence, goes along and is

3   identified by that number, the B.C.I. number, correct?

4       A       Yes.

5       Q       Now, you testified earlier that you gave this

6   case the B.C.I. number of 05-140, correct?

7       A       Yes.

8       Q       Now, that was the number assigned to this case to

9   articulate what belongs to this case, correct?

10      A       Tentatively assigned to the case, yes.   Correct.

11      Q       What evidence is assigned to this case, correct?

12      A       Yes.

13      Q       And what paperwork goes with this case by that

14  number, correct?

15      A       Yes.

16      Q       Now you testified earlier today that some other

17  guy was arrested earlier, and you used that number; is that

18  correct?

19      A       Yes, sir.

20      Q       You said that number stuck in your head, correct?

21      A       05-139 stuck in my head, yes, sir.

22      Q       But this case was given 140?

23      A       Yes, sir.

24      Q       And do you recall filling in the paperwork on

25  this particular case with the case number of 05-140?

1     A     05-140, yes, sir.

2     Q     And that was assigned to this case, right?

3     A     Yes, sir.

4     Q     Now, you testified before the grand jury,

5     correct?

6     A     Yes, sir.

7     Q     And you testified before the grand jury on August

8     29th of 2005, correct?

9     A     Yes, sir.

10    Q     And you were notified by the district attorney's

11    office, obviously prior to that date, that you will be

12    testifying before the grand jury; isn't that correct?

13    A     Yes, sir.

14    Q     And you were notified that all of the evidence

15    and the witnesses, and you worked with them to have it

16    prepared for the grand jury; isn't that correct?

17    A     Yes, sir.

18    Q     And isn't it a fact that three days before you

19    testified for the grand jury you took a trip up to Newburgh;

20    isn't that correct?

21    A     Yes, sir.

22    Q     And you went up to Newburgh and you went to the

23    Mid Hudson Lab, correct?

24    A     Yes, sir.

25    Q     And when you went up to the Mid Hudson lab you

Inv. Harris - Cross - LaMagna

1    met with Lieutenant Schiamento up there, correct?

2         A    Yes, sir.

3         Q    And when you went up to the lab three days before

4    the grand jury in August, you took that evidence out of the

5    evidence locker, correct?

6         A    Incorrect.

7         Q    You did not take that out?

8         A    Lieutenant Schiamento took it out.

9         Q    Didn't you open this up?

10        A    Yes, I did, sir.

11        Q    So you unsealed the box three days before the

12   grand jury; is that correct?

13        A    Yes, sir.

14        Q    That was in Lieutenant Schiamento's office?

15        A    Yes, I did.

16        Q    It was just you and Lieutenant Schiamento in the

17   office?

18        A    Yes, sir.

19        Q    And the evidence, correct?

20        A    Yes, sir.

21        Q    Three days before the grand jury; is that

22   correct?

23        A    Yes, sir.

24        Q    And it was at that time that you instructed

25   Lieutenant Schiamento to change all of the case numbers that

1  was previously assigned to this case from 05-140 to 05-141;

2  isn't that correct?

3      A    Yes, sir.

4      Q    And you told Lieutenant Schiamento to order all

5  of his people, his technicians, chemists, to change all of

6  their previously prepared paperwork that articulated 05-140

7  designating the identity of this evidence to 141; isn't that

8  correct?

9      A    Yes, sir.

10      Q    Now, you said on direct examination that that

11  this number was actually incorrect; isn't that correct?

12      A    Yes, sir.

13      Q    Now you didn't change any other numbers, did you,

14  on any other cases?  Did you?

15      A    No, sir.

16      Q    Just on this case, correct?

17      A    Yes, sir.

18      Q    .. Three days before the grand jury in August,

19  correct?

20      A    Yes, sir.

21      Q    And is it your position that actually 140 was

22  assigned to that marijuana case from the other guy's case?

23      A    Yes, sir.

24      Q    So this really should have been 141; is that

25  correct?

Inv. Harris - Cross - LaMagna

```
 1      A      This case here, yes, sir.

 2      Q      So you changed these numbers August 26th,

 3  correct?

 4      A      The numbers to the blood kit, yes.

 5      Q      August 26th.  Now, between -- you -- withdrawn.

 6             You didn't change any of the numbers on July 3rd,

 7  did you?

 8      A      No, sir.

 9      Q      You didn't change the case number on July 4th,

10  did you?

11      A.     No, sir.

12      Q      You didn't change the case number on July 5th,

13  did you?

14      A      No, sir.

15      Q      Or the entire month of July, correct?

16      A      Correct, sir.

17      Q      It was August 26th, correct?

18      A      Yes, sir.

19      Q      So, if this case should have really been 141

20  every other case that was assigned in a sequential order

21  after this case, but before August 26th, was wrong too?  Did

22  you change all of those numbers?  The people who got case

23  number 141, 142, 143, did you change all of those numbers?

24  Yes or no?  Did you?

25      A      The way you are explaining it it would not do it
```

1      justice.  You adopt a case officially --

2           Q    Let me ask you a question:  You said that 140 was

3      previously assigned to another case, correct?

4           A    That's affirmative.

5           Q    The night before, correct?

6           A    Yes.

7           Q    These cases go in sequential order, correct?

8           A    Yes, they do.

9           Q    05-140, next case is 05-141, and the next case is

10     05-142; isn't that correct?

11          A    Yes.

12          Q    If this case was given a number 140 that was

13     previously given, the next case that came out from B.C.I.

14     would have been assigned case number 141, the next case

15     after?

16          A    True.

17          Q    True?

18          A    Yes.

19          Q    Next case would have been 142, correct?

20          A    True.

21          Q    Next case is 143, correct?

22          A    True.

23          Q    If six, seven weeks later you changed this case

24     from 140 back to 141, all of the other cases that came after

25     would have been wrong.  You didn't change those cases, did

Inv. Harris - Cross - LaMagna

1    you?

2         A     Didn't have to.

3         Q     Didn't have to.

4               You testified that you went to the Medical

5    Examiner's Office, correct?

6         A     Yes, sir.

7         Q     And you said that you went to the Medical

8    Examiner's Office on July 2nd at 9:03; is that correct?

9         A     I arrived at 9:03 a.m.

10        Q     Nowhere in your notes that I have received does

11   it say that you went to the Medical Examiner's Office other

12   than on the Lab-1; is that correct?

13        A     Should be on the C.C. cards.

14        Q     Do you have that with you?

15        A     No, I don't.

16        Q     And you said that you filled out the Lab-1 there,

17   correct?

18        A     Yes, sir.

19        Q     Now the Lab-1 states that you delivered the

20   evidence to the M.E.'s Office, the toxicology department?

21   Doesn't it say that?

22        A     Yes, it does.

23        Q     Let me show it to you, Defendant's Exhibit E.   I

24   show you what has been marked Defendant's Exhibit E in

25   evidence.  Do you recognize that?

Inv. Harris - Cross - LaMagna

```
 1      A      Yes, sir.

 2      Q      That's the Lab-1 form that goes with the blood

 3   kit, correct?

 4      A      Yes, sir.

 5      Q      And it has case number 05-140, correct?

 6      A      Yes, sir.

 7      Q      It has your signature next to Medical Examiner's

 8   Office Toxicology, correct?

 9      A      On this one, yes.

10      Q      That's the Lab-1, correct?

11      A      It's a copy of the Lab-1.

12      Q      It has your signature on it, right?

13      A      This one does, yes.

14      Q      Are you saying there are other Lab-1s floating

15   around without your signature?

16      A      The original Lab-1 doesn't have my signature.

17      Q      You signed that one?

18      A      Yes.

19      Q      And that's the Lab-1?

20      A      That's a copy of the Lab-1.

21      Q      You signed it?

22      A      Yes.

23      Q      That's your signature?

24      A      Yes.

25      Q      And it said it went from who to who?
```

Inv. Harris - Cross - LaMagna

1      A      From Investigator Michael W. Harris, M.W. Harris,

2   to the toxicology office.

3      Q      To the toxicology department, correct?

4      A      Right.

5      Q      Medical Examiner's Office here in Mineola,

6   correct?

7      A      Yes.

8      Q      And you signed that form evincing the fact that

9   you dropped that evidence off, correct?  Isn't that what the

10   signature is supposed to be for?

11      A      Yes.

12      Q      But you said you actually didn't drop it off at

13   the toxicology department, because there was no toxicologist

14   available; is that correct?

15      A      Yes, sir.

16      Q      But you said you found that out after you put the

17   Lab-1 in the box that was sealed, correct?

18      A      . Yes, sir.

19      Q      So you knew that the Lab-1 was incorrect,

20   correct?  You knew you were not dropping it off at the

21   toxicology department, correct?

22      A      Rephrase that question.

23      Q      You knew you weren't leaving the evidence in the

24   toxicology department at the Medical Examiner's Office?

25      A      After I sealed the kit?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Cross - LaMagna

```
 1      Q      Correct.

 2      A      After I sealed the kit, yes.

 3      Q      And the reason you gave that you didn't change

 4    the Lab-1 is because you didn't want to open up the kit,

 5    correct?

 6      A      Yes, sir.

 7      Q      That was already sealed, correct?

 8      A      Yes, sir.

 9      Q      You had an incorrect Lab-1 sealed into this kit,

10    correct?

11      A      That's not incorrect, sir.

12      Q      You didn't have the toxicology lab do the test,

13    did you?

14      A      It went to the lab.

15      Q      You vouchered it into the lab?

16      A      It went to the lab.  It didn't end up there.

17      Q      I thought that you said you went there and you

18    were told there were no toxicologists and decided to send it

19    Newburgh.

20      A      They told us they were not coming in to receive

21    the blood kit and do the samples, so, yes, I made other

22    arrangements to have it brought up to Newburgh.

23      Q      It was never submitted to the Medical Examiner's

24    Office, correct?

25      A      That's true.
```

1     Q     If you read that document that document would be

2   incorrect; it actually went to newburgh, correct?

3     A     After the fact, yes.

4     Q     Doesn't say on the Lab-1 it went to Newburgh,

5   does it?

6     A     I sealed it in the kit.  I didn't open it.

7     Q     I'm not asking you that.  Does that document say

8   it went to Newburgh?

9     A     No, it doesn't.

10    Q     That's an incorrect document, correct?

11    A     It is not incorrect.

12    Q     You said you didn't want to change it because you

13  didn't want to open the box, correct?

14    A     Yes, sir.

15    Q     You opened that box quite a few times since it

16  was sealed to today, haven't you?

17    A     That's after the fact.

18    Q     Didn't you unseal it on the 26th?

19    A     26th of when?

20    Q     Of August?

21    A     Yes, sir.

22    Q     Didn't you unseal it two days ago, on Sunday?

23    A     Yes, sir.

24    Q     So if you unsealed it all you had to do was put a

25  new seal on it, correct?

1      A      That's the truth, sir.

2      Q      You could have easily corrected that form and

3    resealed the box, correct?

4      A      No, sir.

5      Q      You couldn't?

6      A      No, sir.

7      Q      Physically couldn't do that?

8      A      No, sir.  I wouldn't do that.

9      Q      You wouldn't.

10            You would agree that the two chain of custodies,

11   the Lab-1 and the General II, don't reflect the same thing,

12   correct?

13     A      Two different types, sir.  A general IIA.

14     Q      They don't reflect the same chain of custody, do

15   they?

16     A      No, they don't, sir.

17     Q      They both have 05-140 as their number, correct?

18     A      Yes, sir.

19     Q      Now, when you went -- Exhibit J -- when you went

20   to the lab on the 26th you physically changed the case

21   number on the General II from 140 to 141; is that correct?

22     A      Yes, sir.

23     Q      That's your handwriting across 140?

24     A      Up top here?

25     Q      Yes.

1      A    With the 141, with my signature M.W.H.?

2      Q    Yes.

3      A    Yes, sir.

4      Q    That's what you physically changed, correct?

5      A    Yes.

6      Q    When you opened up the box you physically changed

7      the file number, the B.C.I. number, from 140 to 141?

8      A    Yes, sir.

9      Q    And you physically changed or had changed every

10     other document by the lab reflecting the analysis of the

11     blood kit changed from case number 140 to 141?

12     A    To the best of my recollection.

13     Q    That's what you did, didn't you?

14     A    From the best of my recollection I changed every

15     form that had 05-140.

16     Q    Now, you found out, did you not, that the

17     toxicology lab in Mid Hudson was also closed for the

18     weekend, didn't you?

19     A    After the fact.

20     Q    You had Trooper Hemmerich go up to Newburgh to

21     drop it off to Trooper Drake, correct?

22     A    Yes, sir.

23     Q    To have it held there until after the weekend,

24     correct?

25     A    Yes, sir.

1    Q    So the same thing with Newburgh was the same as

2    the Medical Examiner's Office here, correct?

3    A    Yes, sir.

4    Q    So they had the same problem that nobody was

5    working?

6    A    No, sir.

7    Q    Yes, sir; or no, sir?

8    A    Repeat that question?

9    Q    They were both --

10   A    They were both closed.

11   Q    They were both unable to do the analysis?

12   A    Yes, sir.

13   Q    When you found that out you still had the blood

14   sent up to the State Police Lab upstate, correct?

15   A    Yes, sir.

16   Q    Rather than leave it here in Nassau County,

17   correct?

18   A    They wouldn't take it, sir.

19   Q    They wouldn't take it.

20        Now, when you opened up the kit you remember --

21   withdrawn.

22        When you received the kit from Investigator Baez,

23   you said that you recall seeing in the plastic inner box two

24   tubes, correct?

25   A    When I opened the kit at the M.E.'s Office,

Inv. Harris - Cross - LaMagna

```
 1   investigator's office?

 2       Q    Yes.  There were two tubes of blood, correct?

 3       A    Correct.

 4       Q    That was in the inner box, correct?

 5       A    It was in the plastic container.

 6       Q    In the plastic container, with these two tubes.

 7   There were seals over the top of those tubes, correct?

 8       A    Yes, sir.

 9       Q    Integrity seals, correct?

10       A    Red integrity seals.

11       Q    Red integrity seals?

12       A    Yes.

13       Q    You are familiar with the process of obtaining

14   blood, correct?

15       A    Yes, sir.

16       Q    And the instructions for taking blood is there is

17   supposed to be the white seals over the top, correct?

18       A    Yes, sir.

19       Q    Not the integrity seals, correct?

20       A    Yes, sir.

21       Q    Integrity seals are supposed to seal the inner

22   container, correct?

23       A    Yes, sir.

24       Q    So, what you received from Investigator Baez did

25   not have white seals over the tops of the vials, correct?
```

Inv. Harris - Cross - LaMagna

```
 1    A    Did not have white seals.

 2    Q    They had red seals?

 3    A    That's right.

 4    Q    That's what you received?

 5    A    Yes, sir.

 6    Q    And there is no question in your mind that what

 7   you had received had the red seals over the top, correct?

 8    A    Yes, sir.

 9    Q    And --

10              THE COURT:  Counsel, I will give the jury

11         five or ten minutes, and then we'll continue the cross.

12              Please don't talk about the case.

13              (Whereupon, the jury exits the courtroom and

14         a brief recess was held.)

15              COURT OFFICER:  Jury entering.

16              (Whereupon, the jury entered the courtroom,

17         and upon taking their respective seats, the following

18         occurred:)

19              THE COURT:  Put the witness back on the

20         stance.

21              THE CLERK:  Case on trial, Indictment 1910N

22         of 2005, People versus Martin Heidgen.

23              People ready?

24              MR. HAYDEN:  Ready, your Honor.

25              THE COURT:  Defendant ready?
```

Inv. Harris - Cross - LaMagna

1          MR. LaMAGNA:  Defendant ready.

2          THE CLERK:  Defendant is present and the

3     jurors are seated, your Honor.

4          THE COURT:  Thank you.  Mr. LaMagna.

5  CONTINUED CROSS-EXAMINATION

6  BY MR. LaMAGNA:

7     Q     Investigator, just finishing up, when you

8  received the kit, the kit had already, the inner box had

9  already been sealed, correct?

10    A     Yes, sir.

11    Q     And that was signed by Investigator Baez,

12  correct?

13    A     Yes, sir.

14    Q     And as you sit here today what you received that

15  day, the vials had red labels, correct?

16    A     Yes.  Yes, sir.

17    Q     And that was in the inner box, correct?

18    A     In the plastic container sealed.

19    Q     Sealed?

20    A     Sealed plastic container.

21    Q     You executed a search warrant, correct?

22    A     Yes, sir.

23    Q     And I show you prosecution 24 in evidence.  Now,

24  that photograph was taken during the execution of the

25  warrant, correct?

Inv. Harris - Cross - LaMagna

1      A      Yes, sir.

2      Q      And that was at the residence of Mr. Heidgen,

3   correct?

4      A      Yes, sir.

5      Q      And where Mr. Heidgen lived was a one-family

6   house, correct?

7      A      Yes, sir.

8      Q      And he had an apartment in the back of the house,

9   correct?

10     A      Yes, sir.

11     Q      When you took that photograph that photograph

12   depicts the kitchen of the apartment, correct?

13     A      His apartment.

14     Q      And that is a fair and accurate description of

15   what the kitchen looked like, or at least that area of the

16   kitchen, correct?

17     A      Yes, sir.

18     Q      -- You testified that there were, there was a --

19   there were three bottles, correct?

20     A      Yes.

21     Q      Up on the, is that the refrigerator or --

22     A      On top of the microwave.

23     Q      Correct?

24     A      Yes, sir.

25     Q      And all three bottles were empty, correct?

Inv. Harris - Cross - LaMagna

1    A    Yes, sir.

2    Q    Now, you said you had seen a deer head with

3    antlers?

4    A    Yes, sir.

5    Q    And did you also notice a hunting rifle or

6    shotgun in the house by the wall?  If I show you the

7    photograph would that refresh your recollection, Exhibit M

8    for identification.

9    A    Yes.

10    Q    Does that refresh your recollection?

11    A    Yes, sir.

12    Q    You remember seeing that there that night?

13    A    Yes, sir.

14    Q    Is that a fair and accurate description, or does

15    it fairly and accurately portray what was there?

16    A    Yes, sir.

17         MR. LaMAGNA:  Judge, at this time I would

18    like to have that admitted into evidence.

19         THE COURT:  Please show it to counsel.

20         MR. HAYDEN:  No objection.

21         THE COURT:  Received.

22         (Whereupon, Defendant's Exhibit M for

23    identification now received and marked Defendant's

24    Exhibit M in evidence.)

25         COURT OFFICER:  Defendant's Exhibit M in

Inv. Harris - Cross - LaMagna

1    evidence.

2        Q    Now, Trooper Sweeney was with you when you

3    executed the warrant; is that correct?

4        A    He was one of the members with me.

5        Q    He was taking the photographs, correct?

6        A    That's affirmative.  Yes, sir.

7        Q    The photograph, if you recall, was not taken of

8    that rifle, correct?

9        A    Excuse me?

10       Q    A photograph was not taken by Trooper Sweeney of

11   that shotgun, correct?  Or do you recall if it was?

12       A    I don't recall.

13       Q    Directing your attention to Sunday, July 3rd,

14   2005 in the hospital.

15       A    Okay.

16       Q    Do you recall meeting with Mr. Heidgen's family

17   that day before the arraignment?

18       A    ~ I recall.

19       Q    You do recall?

20       A    Yes.

21       Q    Do you recall walking into the hospital room with

22   Mr. Heidgen and his family, where Marty was prior to the

23   arraignment?

24       A    Yes, sir.

25       Q    Do you remember saying to Marty, in front of his

Inv. Harris - Redirect - Hayden

1  parents, "Son, do you remember me," and Marty saying, "No, I

2  don't, but I assume you are a police officer"?  Do you

3  remember having that conversation with Marty?

4       A     I don't recall.

5       Q     Do you remember prior to the arraignment you did

6  articulate to Mr. Heidgen the true results of what occurred

7  on July 2nd?

8       A     In the recovery room, because they moved him from

9  I.C.U. and they brought him to the recovery room.

10      Q     On July 3rd?

11      A     On July 3rd.

12      Q     Do you remember that?

13      A     I remember, yes.

14      Q     And his parents were present, correct?

15      A     I remember his father was there.

16      Q     And you don't remember saying, "Son, do you

17  remember me," and he said, "No, but I assume you are a

18  police officer"?

19      A     No, I don't recall.

20      Q     It's possible that that is what was said?

21           MR. HAYDEN:  Objection.

22           THE COURT:  Sustained.

23           MR. LaMAGNA:  Nothing further, Judge.

24           THE COURT:  Redirect.

25           MR. HAYDEN:  Yes, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. HAYDEN:

3                    MR. HAYDEN:  Is that small phone record with

4         the 1:45 notation on it, available?

5                    May I have this given to the detective.  If I

6         may have the investigator step down by the presenter?

7                    THE COURT:  Sure.

8         Q    Would you read that through for the members of

9    the jury?

10        A    Outgoing calls:  Caller, Amanda G; phone number,

11   516-458-5537; Date, 07/02 2005; Time, 1:45 a.m.

12        Q    Can you say, based upon that record, whether or

13   not that call was actually received by the person to whom it

14   was made?

15        A    Not by this.

16        Q    Have you seen any other evidence of that call on

17   any other telephone record?

18        A    ~ No, sir.

19        Q    Nothing further on that.  Please retake the

20   stand.

21                   You testified during cross-examination that one

22   of your responsibilities that night was to make sure that

23   blood was drawn in a proper way; is that right?

24        A    Yes, sir.

25        Q    One of your responsibilities was to make certain

Inv. Harris - Redirect - Hayden

1    that all of the proper procedures were used in securing a

2    blood sample?

3         A    Yes, sir.

4         Q    Was that your only responsibility?

5         A    No, sir.

6         Q    Did you have many other responsibilities?

7         A    Yes, sir.

8         Q    Did you decide that night, after arriving at the

9    scene of the crash, to remain at the scene of the crash?

10        A    Yes, sir.

11        Q    Was that a decision that you made?

12        A    Yes, sir.

13        Q    Not a mistake; a decision?

14        A    Yes, sir.

15        Q    Did you decide to send Investigator Baez over to

16   the hospital to do what he could to make certain that the

17   blood was drawn properly?

18        A    Yes, sir.

19        Q    Was that a decision you made?

20        A    Yes, sir.

21        Q    Not a mistake; a decision?

22        A    Yes, sir.

23        Q    Did you decide to take the blood kit with the

24   sealed clear plastic container and the sealed tubes of the

25   defendant's blood, did you decide to take that over to the

1    Medical Examiner's Office to try to have a toxicologist

2    analyze it there?

3         A    Yes, sir.

4         Q    Was that a decision you made?

5         A    Yes, sir.

6         Q    One of many decisions that night?

7         A    Yes, sir.

8         Q    Not a mistake; a decision?

9              MR. LaMAGNA:   Objection.

10             THE COURT:   Sustained.

11        Q    Was that a mistake?

12        A    No, sir.

13        Q    Did you decide to seal the outer box of the blood

14   kit there in the investigator's room at the Medical

15   Examiner's Office?

16        A    Yes, sir.

17        Q    Was that a decision you made?

18        A    Yes, sir.

19        Q    Was it a mistake?

20        A    No, sir.

21        .Q   Once you learned that there would be no

22   toxicologist available that weekend to analyze the blood

23   there in the Medical Examiner's Office did you decide to

24   leave the kit sealed with the Lab-1 inside it?

25        A    Yes, sir.

Inv. Harris - Redirect - Hayden

1    Q    Was that a decision you made?

2    A    Yes, sir.

3    Q    Was that a mistake?

4    A    No, sir.

5    Q    Defense counsel asked you whether or not you had

6    opened the blood kit a number of times since it was

7    analyzed.  Do you remember that?

8    A    Yes, sir.

9    Q    You opened it August 26th?

10   A    Yes, sir.

11   Q    And you opened it last Sunday?

12   A    Yes, sir.

13   Q    It was also opened so Mr. LaMagna could examine

14   the contents, wasn't it?

15   A    Yes, sir.

16   Q    He didn't object to that, did he?

17   A    No, he didn't.

18   Q    Every one of those times that the blood kit was

19   opened, the seal was broken, that was after the blood had

20   been analyzed; is that right?

21   A    Yes, sir.

22   Q    It was your decision at the Medical Examiner's

23   Office not to break the seal and open it before an analyst

24   had gotten to it; is that right?

25   A    That's right.

1    Q    That was a decision you made?

2    A    Yes, sir.

3    Q    Was it a mistake?

4    A    No, sir.

5    Q    Do you remember specifically when Trooper Siegler

6    told you that he had recovered the defendant's wallet from

7    inside of the defendant's Silverado pick-up?

8    A    Approximately hour, hour and-a-half after I got

9    there.

10    Q    Do you remember a specific time?

11    A    No, I don't.

12    Q    Did you note a specific time?

13    A    No, I didn't.

14    Q    Were you busy then?

15    A    Extremely.

16    Q    What were you doing?

17    A    I was taking -- making sure that the victims got

18    out, making sure that they got medical attention, making

19    sure they went to the hospital was my first main concern.

20         I had to gather and canvass everybody there and

21    ask them if they witnessed anything, speak to the first

22    responding officers and get their information, preserve the

23    crime scene, examine the vehicles, try to preserve the

24    victims' property, make sure I had enough personnel to come

25    help me to reconstruct the accident and conduct a thorough

```
 1   investigation.

 2        Q    Did you know when you arrived at the scene how

 3   this crash had happened?

 4        A    Not when I arrived at the scene.

 5        Q    Was it one of your jobs to find out?

 6        A    Yes, sir.

 7        Q    As best you could?

 8        A    Yes, sir.

 9        Q    You testified during cross-examination that you

10   had tentatively identified the defendant as Martin Heidgen;

11   is that right?

12        A    Yes, sir.

13        Q    How did you first learn the name Martin Heidgen?

14        A    His registration plate was registered to him and

15   a female.

16        Q    Was it later on that Trooper Siegler informed you

17   about finding the license in the wallet?

18        A    Yes, sir.

19        Q    Had the defendant himself confirmed his identity

20   as Martin Heidgen?

21        A    No, sir.

22        Q    Was he unconscious then?

23        A    No, sir.

24        Q    Had any family member of the defendant's

25   confirmed his identity?
```

1    A    No, sir.

2    Q    Any friend?

3    A    No, sir.

4    Q    Any person?

5    A    No person.

6    Q    What is the General 19 form?

7    A    General 19 form is a form with Miranda rights,

8    and you use that when you take a written statement.

9    Q    Did you take a written statement from the

10   defendant?

11   A    No, sir.

12   Q    Why not?

13   A    Because he wouldn't take a written statement.   He

14   asked for a lawyer.

15   Q    Defense counsel asked you during

16   cross-examination whether or not you used a rights card and

17   had the defendant write his responses to your questions on

18   the card.  Do you remember that?

19   A    Yes, sir.

20   Q    Were the defendant's wrists bound to the sides of

21   his bed while you were speaking with him?

22   A    Yes, sir.

23   Q    Was he restrained the entire time?

24   A    Yes, sir.

25   Q    Were his hands ever free to sign anything?

Inv. Harris - Redirect - Hayden

1     A     No, sir.

2     Q     Defense counsel asked you about the notes

3  Investigator Baez took.  Do you remember?

4     A     Yes, sir.

5     Q     Defense counsel said, well, the three of you were

6  talking, and that's when Investigator Baez was writing down

7  notes.  Do you remember that?

8     A     Yes, sir.

9     Q     Were the three of you talking at the same time?

10    A     No, sir.

11    Q     Were you talking when Investigator Baez asked a

12  question?

13    A     No, sir.

14    Q     Were you talking when the defendant was answering

15  a question Investigator Baez asked?

16    A     No, sir.

17    Q     Was Investigator Baez talking while you were

18  asking questions?

19    A     No, sir.

20    Q     Was he talking while the defendant was answering

21  those questions?

22    A     No, sir.

23    Q     Did you ever have difficulty understanding what

24  the defendant was saying because of anything Investigator

25  Baez was doing?

Inv. Harris - Redirect - Hayden

1        A       No, sir.

2        Q       You were asked whether or not you testified based

3    upon Investigator Baez' notes.  Do you remember?

4        A       Yes, sir.

5        Q       Did you use those notes to refresh your

6    recollection?

7        A       Yes, sir.

8        Q       Were you testifying based primarily on your

9    recollection?

10       A       Yes, sir.

11       Q       Defense counsel asked you during

12   cross-examination about the existence on telephone records

13   of calls between the defendant and Lindsay Long.  Do you

14   remember that?

15       A       Yes, sir.

16       Q       Did the defendant tell you during the course of

17   your conversation how Lindsay Long communicated with him by

18   telephone?

19       A       No, sir.

20       Q       Did he tell you that she used a calling card?

21       A       Yes, he did.

22       Q       What did he tell you about that?

23       A       That she didn't have a phone; that she usually

24   calls him by calling card.

25       Q       Defense counsel asked you whether the defendant

1    told you that he just wanted to work and make a living.  Do

2    you remember that?

3         A    Yes, sir.

4         Q    Did he tell you that?

5         A    Yes, he did.

6         Q    Did he also tell you he had gone to school for

7    four years and now he was in such a hole?

8         A    Yes, sir.

9         Q    Is that what he said right after telling you he

10   just wanted to work and make a living?

11        A    Yes, sir.

12        Q    Defense counsel asked you a series of questions

13   about what the defendant told you.  He asked you, did the

14   defendant tell you he had been a chaplain, did the defendant

15   tell you that he had been a soccer coach, did the defendant

16   tell you he had been a philanthropist.  Did the defendant

17   tell you he drove right at oncoming headlights that night

18   forcing drivers to veer out of his path to avoid deadly

19   head-on collisions?  Did he tell you that?

20        A    No, sir.

21        Q    You testified during cross-examination that you

22   didn't have to change numbers that succeeded the number

23   05-141.  Do you remember that?

24        A    Yes, sir.

25        Q    Tell the jury what you said that?

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Redirect - Hayden

1    A       When I officially adopted the case of 05-139 and

2    05-140 for Albany sending a teletype that you adopt the

3    cases, I didn't have to change anything because I sent that

4    on and 05-141 was the next case, which was this case.  When

5    I sent that case it was right there.  I didn't have to

6    change no other cases.  There was no other cases after,

7    that's why.

8    Q       That previous case involved two separate charges;

9    is that right?

10   A       Yes.

11   Q       That previous case actually wound up with two

12   separate numbers?

13   A       Yes.

14   Q       Was that where the confusion came?

15   A       Yes.

16   Q       Was the incorrect number 05-140 placed on either

17   of the sealed tubes you saw inside of the blood kit?

18   A       No, sir.

19   Q       Was it placed on the clear plastic container you

20   found inside of the blood kit?

21   A       No, sir.

22   Q       Was it placed on the outer box of the blood kit

23   you received from Investigator Baez?

24   A       No, sir.

25            MR. HAYDEN:  Nothing further, your Honor.

GIGI WRIGHT, RPR     (516) 571-2503

Inv. Harris - Recross - LaMagna

1          Thank you.

2                    THE COURT:  Recross.

3     RECROSS-EXAMINATION

4     BY MR. LaMAGNA:

5          Q    Now, Investigator, you said that you placed the

6     Lab-1 into the outer container, correct, the inside box,

7     correct?

8          A    No.

9          Q    Not the inner box, but over the inner box,

10    correct?

11         A    On top of the plastic container.

12         Q    The plastic container was sealed?

13         A    Within the cardboard box.

14         Q    The plastic container was sealed, correct?

15         A    Correct.

16         Q    The Lab-1 wasn't in the sealed plastic container,

17    correct?

18         A    No, sir.

19         Q    Just the vials?

20         A    Yes, sir.

21         Q    And that was sealed, correct?

22         A    Yes, sir.

23         Q    So by opening up the outer box you would not

24    disturb the tubes that were sealed in the inner box,

25    correct?

Inv. Harris - Recross - LaMagna

1      A      What I -- what outer box are you talking about,

2    sir?

3      Q      The cardboard outer box.

4      A      It was already open, sir.

5      Q      You said you sealed the outer box with the Lab-1,

6    that's why you didn't change it from the Medical Examiner's

7    Office and fix it, correct?

8      A      Correct.

9      Q      Are you following me?

10      A      I got you now.

11      Q      Inside the cardboard box was the sealed container

12   with the tubes, correct?

13      A      Yes, sir.

14      Q      It was already sealed, correct?

15      A      Yes, sir.

16      Q      The Lab-1 wasn't inside of the inner container

17   with the two tubes, correct?

18      A      Correct.

19      Q      So by you fixing it at the time that you knew

20   there was a mistake in the Lab-1 wouldn't have affected the

21   two tubes and the seal on the inner box, correct?

22      A      It would if I opened up those integrity seals.  I

23   was not going to do that.

24      Q      So you chose not to do that?

25      A      It was my decision not to do that.

Inv. Harris - Recross - LaMagna

1    Q    Now, at some point Trooper Siegler gave you or

2    showed you or articulated to you that we have Mr. Heidgen's

3    wallet, correct?

4    A    Yes, sir.

5    Q    And you said that his identity wasn't confirmed,

6    correct?

7    A    At the time that they sealed the tubes, yes, sir.

8    Q    I'm asking you:  You said when you were at the

9    scene his identity wasn't confirmed, correct?

10   A    Correct.

11   Q    You had a photo I.D. license in that wallet,

12   didn't you?

13   A    Yes, sir.

14   Q    A photo I.D. with a photograph of an individual,

15   correct?

16   A    Of an individual, yes, sir.

17   Q    A photograph that other officers identified as

18   being the same guy that was in the car that was taken to the

19   hospital.  Didn't they tell you that when they gave you the

20   license?

21   A    No, sir.

22   Q    Trooper Siegler never said that?

23   A    He said this is his wallet.

24   Q    He didn't say, "Here is his identity?  Here is

25   his photo identification, and I recognize this guy to be the

1    one who was driving"?  Didn't say any of that to you?

2    A    No, sir.

3              MR. LaMAGNA:  Could I have these marked?

4              THE COURT:  Let me see counsel.

5              MR. LaMAGNA:  I just want to put these two

6    in.

7              (Whereupon, a discussion was held at the

8         sidebar, off the record.)

9              THE COURT:  Ladies and gentlemen, I don't

10    think that we are going to be able to finish this

11    witness today.  Nine-thirty tomorrow morning.  I have

12    nothing in the way of this case.  I'm prepared to do

13    this case at 9:30.  Please be prompt.

14              You know all of the admonitions:  Don't read

15    anything.  I know it is hard.  Don't watch TV.  Don't

16    listen to this on the radio.  Don't talk to anybody.

17    Don't let anybody talk to you.  Don't go to the scene

18    on purpose.  You know all of of those things.  Have a

19    nice night.  See you at 9:30.

20                             o0o

21              (Whereupon, the jury exited the courtroom and

22    the trial was adjourned to Wednesday, the 20th day of

23    September 2006, at 9:30 a.m.)

24

25