1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
2    ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3

4           -against-

5

     MARTIN HEIDGEN,
6
                         DEFENDANT.
7    ---------------------------------------x
     INDICTMENT #:  1910N-06
8
                                    Mineola, New York
9                                   September 20, 2006

10

     B E F O R E:   HONORABLE ALAN L. HONOROF
11                      Acting Supreme Court Justice

12
     A P P E A R A N C E S:
13
                    HON. KATHLEEN M. RICE
14                  District Attorney, Nassau County
                       262 Old Country Road
15                     Mineola, New York 11501
                    BY:  ROBERT HAYDEN, ESQ.
16                       Assistant District Attorney
                            and
17                       MAUREEN McCORMICK, ESQ.
                         Assistant District Attorney
18

19                  STEPHEN LaMAGNA, ESQ.
                       Attorney for the Defendant
20                     666 Old Country Road
                       Garden City, New York
21                  BY:  STEPHEN V. LaMAGNA, ESQ.
                            and
22                       GREGORY MARTELLO, ESQ.

23                         o0o
                        CONTINUED TRIAL
24                         o0o
                       Gigi Wright, R.P.R.
25                  Official Court Reporter


              GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Recross - LaMagna

1          (In open court.  Defendant present.)

2                THE CLERK:  Case on trial continues.

3                COURT OFFICER:  Jury entering.

4                (Whereupon, the jury entered the courtroom,

5          and upon taking their respective seats, the following

6          occurred:)

7                THE CLERK:  Case on trial, Indictment 1910N

8          of 2005, People versus Martin Heidgen.

9                People ready?

10                MR. HAYDEN:  Ready, your Honor.

11                THE CLERK:  Defense ready?

12                MR. LaMAGNA:  Defendant is ready, your Honor.

13                THE CLERK:  Defendant is present.  Jurors are

14          seated, your Honor.  Investigator Harris, you are

15          reminded you are still under oath.

16                THE COURT:  Thank you.

17    CONTINUED RECROSS-EXAMINATION

18    BY MR. LaMAGNA:

19          Q    Good morning, Investigator Harris.  How are you?

20          A    Good morning, sir.

21          Q    Investigator Harris, you said at some point that

22     you received Mr. Heidgen's wallet, correct?

23          A    Yes, sir.

24          Q    That was vouchered in evidence, correct?

25          A    Yes, sir.

1      MR. LaMAGNA:  I would like to have these

2   marked.

3      (Whereupon, the wallet items received and

4   marked Defendant's Exhibits R and S for

5   identification.)

6      COURT OFFICER:  Defendant's Exhibit R and S

7   for identification.

8   Q      Investigator, I show you what has been marked

9   Defendant's Exhibits R and S for identification.  I ask you

10  to take a look at those two items.  Do you recognize them?

11  A      Yes, sir.

12  Q      You recognize that those are two items that were

13  found in the wallet or contained in the wallet that you

14  retrieved belonging to Martin Heidgen on July 2nd 2005?

15  A      Yes.

16  Q      Are do they fairly and accurately represent those

17  items?

18  A      Yes, sir.

19  Q      They are in the same condition as they were when

20  you retrieved them?

21  A      Yes.

22      MR. LaMAGNA:  Judge, at this time I would

23   like to have those entered into evidence as Defendant's

24   Exhibits R and S.

25      MR. HAYDEN:  No objection.

Inv. Harris - Recross - LaMagna

1          THE COUR:  They are received.

2          (Whereupon, Defendant's Exhibits R and S for

3     identification now received and marked Defendant's

4     Exhibits R and S in evidence.)

5          COURT OFFICER:  Defendant's Exhibits R and S

6     in evidence.

7     Q     Now, Investigator Harris, you said you were

8     present during the execution of the search warrant at the

9     home of Mr. Heidgen, correct?

10    A     Yes, sir.

11    Q     I show you People's Exhibit 24 in evidence.  I

12    ask you to take a look at that.  Forgive, me if I already

13    asked you that, I'm not quite sure.  That's the photograph

14    that was taken at the time of the warrant of the kitchen; is

15    that correct?

16    A     Yes, sir.

17    Q     And that depicts the bottles where they were when

18    you arrived into the house, correct?

19    A     Yes, sir.

20    Q     And that fairly and accurately represents what

21    you observed, correct?

22    A     Yes, sir.

23    Q     And those bottles were empty, correct?

24    A     Yes, sir.

25    Q     Thank you.

Inv. Harris - Redirect - Hayden

1              MR. LaMAGNA:  Judge, I have no further

2       questions.

3    FURTHER REDIRECT EXAMINATION

4    BY MR. HAYDEN:

5              MR. HAYDEN:  Your Honor, may I please have

6       these eight items marked as 63A through H for

7       identification, please.

8              (Whereupon, wallet items received and marked

9       People's Exhibits 63A through H for identification.)

10             COURT OFFICER:  People's Exhibits 63A through

11      63H for identification.

12   A      Yes, sir.

13   Q      Do you recognize those items?

14   A      Yes, sir.

15   Q      Were those items also found in the defendant's

16   wallet when you received it?

17   A      Yes, sir.

18   Q      Those are the items that you found in the wallet?

19   A      Yes, sir.

20   Q      Do you recognize it as such?

21   A      Yes, sir.

22             MR. HAYDEN:  People offer those items in

23      evidence, sir.

24             MR. LaMAGNA:  Could we approach?

25             THE COURT:  All right.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Harris - Redirect - Hayden

 1            (Whereupon, a discussion was held at the

 2       sidebar, off the record.)

 3            THE COURT:  This is going to take a little

 4       bit more time than a bench conference.  I will give you

 5       five or ten minutes.  Please don't talk about the case.

 6            (Whereupon, the jury exited the courtroom.)

 7            THE COURT:  Before we go into the actual

 8       argument as to these eight items, I understand there is

 9       an agreement as to People's Exhibit 63A, the face only

10       of the train ticket, that will go into evidence.

11            MR. LaMAGNA:  Yes, your Honor.  No objection.

12            THE COURT:  All right.  Then 63A will be in

13       evidence.  As to the balance of the documents I will

14       take argument from the person objecting to them.  I'll

15       hear your objection.

16            MR. LaMAGNA:  Judge, my argument is twofold:

17       The first argument being that those items suggest or

18       infer that an individual may be a habitual drinker or

19       somebody who belongs to drinking clubs or

20       establishments.  The problem with that is the meaning

21       of those cards in Arkansas may have a very different

22       meaning in New York.  The laws in -- Arkansas has blue

23       laws that we don't have in New York.  And living in

24       Arkansas it may be common knowledge to everybody that

25       in order to go to a bar or club or restaurant, that

1    some of those stay open after 12 o'clock, that they

2    have to be converted under the law to being a club, and

3    that everybody who wants to remain there has to pay two

4    dollars to get these type of cards to these bars and

5    grills, or whatever it is.  That is a completely

6    different meaning than it would have in New York.  And

7    the inference would be very different here in New York.

8             To have those go in here the inference would

9    be that these are drinking clubs; that you go there

10   just to drink, and that is exactly what it is not.  And

11   the inference would be wrong to do that.  And if that

12   is the inference, going back to the original arguments

13   that we had made at the beginning of the trial about

14   what is at issue and what you will allow, that is

15   absolutely against what we had argued previously.

16            The issue is what happened that night.  And

17   although the prosecution must prove beyond a reasonable

18   doubt the defendant's state of mind that night, you

19   allowed, over our objection certainly, but that is how

20   you ruled, that they'll be allowed to bring in certain

21   evidence that the defendant was not unfamiliar with

22   alcohol; that he was seen previously on social

23   occasions just to socially drink, I think is what the

24   decision was.  I have the minutes to that decision.

25   This is completely out of that decision.

Inv. Harris - Redirect - Hayden

1           Here we have cards to suggest that we know

2       what they are going to suggest, and they have a

3       different meaning in Arkansas, which is where these

4       were from, and they were from years ago.  And there is

5       eight of them or seven of them.  The number is too

6       many.  The purpose for which it is being brought in is

7       in contravention of what you decided they can use.

8           The meaning is different here.  The inference

9       will be different to people who don't understand why

10      those cards and those memberships are in counties that

11      are dry counties or blue law for that purpose.

12          THE COURT:  Before I take argument by the

13      People I think that the record should be crystal clear

14      that I did not know of the existence of these items

15      unless by hearsay yesterday, and seeing them now for

16      the first time.

17          Had the argument been expanded enough so that

18      I had been made aware that it was the intention of the

19      People to offer these documents, my ruling might well

20      have been different.  My ruling did not contemplate the

21      admission or lack of admission of documents of this

22      nature seized from the defendant's person on the night

23      of the incident.  So that I am not intending to be

24      bound by a previous ruling which discussed the state of

25      mind of the defendant insofar as he was aware of the

1    effect of alcohol, because on previous occasions in New

2    York he had been known to be at social functions where

3    alcohol was served, and indeed served, and drunk by

4    him.  That was that ruling.  That ruling cannot bind me

5    on this application.

6          MR. LaMAGNA:  Judge, I ought to bring that up

7    just to articulate that to almost make the same

8    intellectual argument that --

9          THE COURT:  I understand the argument.. But I

10   cannot let the record put me into a corner on a ruling

11   which --

12         MR. LaMAGNA:  I understand.

13         THE COURT:  -- on a ruling which did not

14   contemplate this offer of evidence.

15         MR. LaMAGNA:  I understand.

16         THE COURT:  Mr. Hayden.

17         MR. HAYDEN:  Yes, your Honor.  First of all,

18   as the Court is aware after Feingold we have a

19   tremendous burden in establishing the defendant's

20   depraved mind on the night of these crimes.

21         We have to consider whether these items have

22   more probative value than prejudice to the defendant.

23   So far as prejudice is concerned, we argue to the Court

24   there is no prejudice.  There is nothing wrong with

25   being a member of any of these clubs.  It is not a

Inv. Harris - Redirect - Hayden

1    crime.  It doesn't mean that a member has ever become

2    intoxicated.  It doesn't mean he has a propensity to

3    drink to excess.  It means nothing of the kind.  It

4    certainly doesn't mean he drinks and drives.  It says

5    nothing at all so far as those things are concerned.

6            The probative value is that he is a member of

7    these establishments; these establishments are drinking

8    establishments where people get together and drink

9    socially; and each one of these cards establishes that

10   the defendant was very familiar with the effects of

11   alcohol on his system, on his senses, on his reflexes,

12   on his sight, on his hearing, long before the night of

13   the crash.

14           The further back we go with these cards the

15   more we establish that the defendant has been long

16   familiar with the effects of alcohol.  The more cards

17   we provide, the more clear it becomes that the

18   defendant is very familiar with the effects of alcohol.

19   Not that he is a drunk, not that he is a lush, not that

20   he has ever consumed alcohol to excess, but that he is

21   very familiar with the effects of alcohol on his senses

22   before he went out and drove that night, enabling us to

23   argue that he knew the risks when he went out, he knew

24   the danger long before he went out and, therefore,

25   those, cards have tremendous probative value.

1          They are circumstantial evidence of the

2     defendant's familiarity with the effects of alcohol and

3     they have absolutely no prejudice to the defendant,

4     because there is nothing wrong with any of it.  There

5     is nothing wrong with belonging to the clubs.  They say

6     nothing of the kind.  So there is a tremendous

7     probative value, given our high burden of establishing

8     a depraved mind, and there is absolutely no prejudice

9     to the defendant.  And we urge the Court to permit us .

10     to introduce these through Investigator Harris.

11          MR. LaMAGNA:  Judge, just briefly.  Whether

12     something is illegal or not doesn't determine whether

13     it is prejudicial to a defendant.  That is number one.

14          I think that what Mr. Hayden just

15     articulated, why it is prejudicial to have seven of

16     these cards going back years.  He just said it.  He

17     wants to infer how long he has been there, how many

18     cards he has, and he just said that.  That will go

19     exactly to propensity.  They are old in time from the

20     time that this incident occurred.  There is seven of

21     them.  And there is reasons why, we live in a different

22     state, why you would have that, which is not in New

23     York.  So the inference will clearly be prejudicial.

24     It will be prejudicial because it will infer

25     propensity.

Inv. Harris - Redirect - Hayden

```
 1                THE COURT:  All right.  I think pursuant to
 2       Feingold the law compels me to rule in favor of the
 3       prosecution on this application.
 4                MR. LaMAGNA:  On all?  On all seven?
 5                THE COURT:  All seven.  One is the train
 6       ticket.  Yes, on all seven.
 7                MR. LaMAGNA:  The fact that you're going to
 8       allow that, I ask you to curtail the amount and age of
 9       of some of them.
10                THE COURT:  Then take two minutes and see if
11       you can agree with the prosecutor as to which ones to
12       take.
13                MR. HAYDEN:  Absolutely, it has always been
14       our position that Mr. LaMagna has not countered that
15       argument in anyway.  The further back these cards go
16       the longer he has been familiar with the effects of
17       alcohol, and the number of cards establish the extent
18       of his familiarity with alcohol.
19                THE COURT:  First of all, I also think that
20       the state of mind of someone involved in the accident
21       that night, just the state of mind for someone who
22       would carry these cards on his person while living in
23       New York, it has an effect on his state of mind.  The
24       objection is overruled.  These cards will be marked
25       into evidence.
```

Inv. Harris - Recross - LaMagna

1   (Whereupon, People's Exhibits 63A through 63H

2   for identification now received and marked People's

3   Exhibits 63A through 63H in evidence.)

4   THE COURT:  Please produce the jury.

5   COURT OFFICER:  Jury entering.

6   (Whereupon, the jury entered the courtroom,

7   and upon taking their respective seats, the following

8   occurred:)

9   THE CLERK:  Jurors are present.

10   THE COURT:  The objection is overruled.  The

11   cards are admitted into evidence.

12   MR. HAYDEN:  Your Honor, with the Court's

13   permission may I have all of the contents of the

14   defendant's wallet which have been admitted into

15   evidence, including defense counsel's, passed among the

16   jury.

17   THE COURT:  Yes.

18   (Whereupon, the jury views the exhibits.)

19   THE COURT:  Anybody have any other questions?

20   MR. HAYDEN:  Nothing further, your Honor.

21   Thank you.

22   THE COURT:  Mr. LaMagna.

23   FURTHER RECROSS-EXAMINATION

24   BY MR. LaMAGNA:

25   Q   Investigator Harris, do you know who Jessica is?

GIGI WRIGHT, RPR   (516) 571-2503

1      A      Yes, sir.

2      Q      Who is she?

3      A      She is a barmaid at the House of Brews.

4      Q      The bar that Mr. Heidgen was at the afternoon of

5      this incident, correct?

6      A      Yes, sir.

7      Q      And that's her telephone number?

8      A      Yes, sir.

9             MR. LaMAGNA: Nothing further, Judge.

10            THE COURT:  Thank you, Investigator.  You may

11     step down.

12            (Whereupon, the witness exits the courtroom.)

13            THE COURT:  People.

14            MS. McCORMICK:  Your Honor, the People call

15     Lisa Lindenthaler.

16            COURT OFFICER:  Step up, remaining standing,

17     raise your right hand and face the clerk.

18      ~ L I S A  K.  L I N D E N T H A L E R,

19            a witness called on behalf of the People,

20            having been first duly sworn by the Clerk of

21            the Court, was examined and testified as

22            follows:

23            THE CLERK:  You may put your hand down.

24     State your name, spelling your last name.

25            THE WITNESS:  Lisa K. Lindenthaler,

GIGI WRIGHT, RPR    (516) 571-2503

Lindenthaler - Direct - McCormick

1        L-I-N-D-E-N-T-H-A-L-E-R.

2                    THE CLERK:   Thank you.   Please take a seat.

3    DIRECT EXAMINATION

4    BY MS. McCORMICK:

5        Q       Good morning, Ms. Lindenthaler.

6        A       Good morning.

7        Q       Ms. Lindenthaler, by whom are you employed?

8        A       By the New York State Police Mid Hudson Regional

9    Crime Laboratory.

10       Q       What is the nature of your employment?

11       A       Forensic scientist in the toxicology section.

12       Q       Where is the Mid Hudson Regional Crime

13   laboratory?

14       A       In Newburgh, New York.

15       Q       Does that crime laboratory cover the area of Long

16   Island in State Police cases?

17       A       Yes, it does.

18       Q       How long have you been working for the State

19   Police at the crime laboratory?

20       A       As a forensic scientist, since November 28th

21   2002.

22       Q       Could you tell the jury, please, what a forensic

23   scientist is?

24       A       It is a scientist that analyzes evidence to

25   assist in matters of law.

Lindenthaler - Direct - McCormick

1    Q    Do you have a particular specialization within

2    the general forensic science field?

3    A    I am within the toxicology section.

4    Q    Can you describe for the jury, please, what are

5    your duties at the crime laboratory?

6    A    I analyze biological fluids, mainly blood and

7    urine, for the presence of drugs and/or volatile substances,

8    such as alcohol.

9    Q    Is that a routine part of your job?

10    A    Yes, it is.

11    Q    About how many times have you done those tests?

12    A    At least 800.

13    Q    Ms. Lindenthaler, can you describe for the jury

14    or explain to the jury what is ethanol alcohol?

15    A    It is the alcohol that is commonly found in

16    alcoholic beverages.

17    Q    In order to become a forensic scientist in the

18    field of toxicology did you have to obtain any particular

19    education or training?

20    A    Actually, you need a four-year degree, which I

21    have a four-year degree.  I have a Bachelor of Science

22    degree with a major in zoology and a minor in forensic

23    toxicology from SUNY Oswego.  I have a masters degree in

24    forensic science criminalistics, and professional and

25    advanced investigation from the University of New Haven.

GIGI WRIGHT, RPR    (516) 571-2503

1      I was an intern at the Mid Hudson Regional Crime
2  Laboratory for approximately three years.  And I also had to
3  undergo extensive training in forensic toxicology at the
4  forensic investigation center, and at the Mid Hudson
5  Regional Crime Laboratory under the supervision of a senior
6  analyst.  And I also have to complete proficiency tests and
7  competency tests in the areas that I perform case work.

8      Q    Do you belong to any professional organizations?

9      A    The Northeastern Association of Forensic
10  Scientists and the Society of Forensic Toxicologists.

11      Q    Ms. Lindenthaler, have you been licensed or
12  certified by the Department of Health to conduct analysis of
13  blood and urine for the purposes of determining drug or
14  alcohol content?  Drug and alcohol content, I should say.

15      A    From the D.O.H., for alcohol, yes.

16      Q    For alcohol?

17      A    Yes.  I'm sorry.

18      Q    Thank you.  I ask to approach you with what I ask
19  be marked People's Exhibit 64 for identification purposes.
20  Do you recognize this copy?

21              (Whereupon, the item referred to received and
22      marked People's Exhibit 64 for identification.)

23              COURT OFFICER:  People's Exhibit 64 for
24      identification.

25      A    Yes, I do.

Lindenthaler - Direct - McCormick

1    Q    What do you recognize that copy to be?

2    A    It is my blood and urine alcohol permit that was

3    issued by the New York State Department of Health.

4    Q    Is that particular analyst permit cover the time

5    of July 2005?

6    A    Yes, it does.

7    MS. McCORMICK:  Your Honor, I would ask to

8    admit that documents into evidence as People's Exhibit

9    64 in evidence.

10    THE COURT:  Please show it to counsel.

11    MR. LaMAGNA:  No objection, your Honor.

12    THE COURT:  Received.

13    (Whereupon, People's Exhibit 64 for

14    identification now received and marked People's Exhibit

15    64 in evidence.)

16    COURT OFFICER:  People's Exhibit 64 in

17    evidence.

18    Q    Ms. Lindenthaler, have you ever testified as an

19    expert in the field of analytical forensic toxicology?

20    A    In forensic toxicology, yes.

21    Q    In fact, how many times have you testified as an

22    expert?

23    A    Five.

24    Q    Have you ever been denied expertise status in a

25    court of law?

GIGI WRIGHT, RPR    (516) 571-2503

Lindenthaler - Direct - McCormick

```
1     A     No.

2                MS. McCORMICK:  Your Honor, at this time I

3     would ask that Lisa Lindenthaler be deemed an expert in

4     the field of forensic toxicology.

5                MR. LaMAGNA:  No objection.

6                THE COURT:  Witness is recognized as an

7     expert in this field.

8     Q     Ms. Lindenthaler, were you working on July 5th

9     2005?

10    A     Yes, I was.

11    Q     And that was at the Mid Hudson Regional Crime Lab

12    in Newburgh?

13    A     That is correct.

14    Q     Did you come down from Newburgh to give your

15    testimony here?

16    A     Yes, I did.

17    Q     On that date, July 5th 2005, did you have

18    occasion to analyze a sample of blood from a kit belonging

19    to the defendant Martin Heidgen?

20    A     Yes.

21               MR. LaMAGNA:  Objection.

22               THE COURT:  Sustained.

23    Q     Did you have occasion to analyze a sample of

24    blood from a kit that was marked with the name of Martin

25    Heidgen?
```

Lindenthaler - Direct - McCormick

```
 1      A      Yes, I did.

 2      Q      I ask to approach you with what has been marked

 3   as People's Exhibit 17 for identification purposes.

 4            Do you recognize that?

 5      A      Yes, I do.

 6      Q      What do you recognize it to be?

 7      A      It is our laboratory case number 05ML2653, with

 8   the name Martin Heidgen.  That's our case that I analyzed

 9   for blood alcohol -- drug and alcohol content, excuse me.

10      Q      You have referred to some number on that kit.

11   What are the numbers that you are referring to?

12      A      That's the laboratory case number that is

13   assigned to this kit when it comes in.

14      Q      At the time that you received that kit is that

15   the number that you referred to?

16      A      Yes.

-17     Q      Is that the same kit that you received and

18   analyzed-on July 5th 2005?

19      A      Yes, it is.

20      Q      At the time that you received that kit did you

21   make an examination of the kit as to its seals and the

22   general condition of it?

23      A      Yes, I did.

24      Q      Could you describe for the jury what it is that

25   you observed about the kit?
```

GIGI WRIGHT, RPR    (516) 571-2503

Lindenthaler - Direct - McCormick

1      A      I observed that it was a sealed kit, and then I

2  further go into it and do an inventory of the case.  It was

3  sealed cardboard, and then it was a sealed plastic box, and

4  then there was two sealed gray top lid tubes.

5      Q      So all of the seals on this kit when you examined

6  it were they in intact, or were they broken?

7      A      They were intact.

8              MS. McCORMICK:  Your Honor, at this time I

9          would ask that People's Exhibit 17 for identification

10         be moved into evidence as People's Exhibit number 17.

11             MR. LaMAGNA:  Objection, your Honor.

12             THE COURT:  Overruled.

13             MR. LaMAGNA:  Judge, she has not identified

14         the content of the box.

15             THE COURT:  Subject to that.  Subject to

16         that.

17             MS. McCORMICK:  At this time, Judge, I ask to

18         approach with a knife for the witness to open People's

19         Exhibit number 17 and identify the contents of the box.

20     Q      Ms. Lindenthaler, would you take a look at the

21  contents of that box.  I ask you are the contents the same

22  as when you last saw that blood kit after your analysis on

23  July 5th 2005?

24     A      Yes, it is.

25             MS. McCORMICK:  At this time, your Honor, the

Lindenthaler - Direct - McCormick

1        People offer into evidence People's Exhibit number 17.

2                    MR. LaMAGNA:   Judge, may I?

3                    THE COURT:   Sure.

4        VOIR DIRE EXAMINATION

5        BY MR. LaMAGNA:

6        Q      Miss, is it Lindenthaler?

7        A      Lindenthaler.

8        Q      My name is Stephen LaMagna.  I'm just going to

9        ask you a couple of questions concerning this kit.  Okay?

10       A      Okay.

11       Q      You have not seen this kit since or the contents

12       of this kit since July 5th 2005; is that correct?

13       A      July 5th -- 15th 2005.

14       Q      And this is exactly what you received on July 5th

15       in a sealed container?

16       A      Yes, that is correct.

17       Q      And for the record these are two vials of blood,

18       correct?

19       A      That is correct.

20       Q      With red seals on the top, correct?

21       A      That is correct.

22       Q      There are no names on the tubes, correct?

23       A      That is correct.

24       Q      And there was no initials of any police officers

25       on the tube; is that correct?

Lindenthaler - Direct - McCormick

1    A    Can I see the kit again?

2    Q    Sure.

3    A    All I see are initials on the "sealed by" line.

4    Q    On the seal itself?

5    A    Right.

6    Q    So the seals that you received on the vials that

7    you received on 7/5/05 are red, correct?

8    A    That is correct.

9    Q    And on the actual tube there is no name of the

10   defendant, correct?

11   A    That is correct.

12   Q    And there is no initials of a police officer,

13   correct?

14   A    On the tube, no.

15        MR. LaMAGNA:  I object to the introduction.

16   This is not the blood.

17        THE COURT:  Overruled.

18        MR. LaMAGNA:  Judge, could we approach?

19        THE COURT:  It is not necessary on this

20   point.

21        (Whereupon, People's Exhibit 17 for

22   identification now received and marked People's Exhibit

23   17 in evidence.)

24        COURT OFFICER:  People's 17 in evidence.

25   BY MS. McCORMICK:

1      Q.    Ms. Lindenthaler, you indicated that there are

2   initials on the "sealed by" line.  What are you referring

3   to?

4      A    On the red seals, on the actual blood tube, there

5   are initials.  There is a "sealed by," and there is a line,

6   and there is initials on that line.

7      Q    So there are initials on the seals; are there

8   not?

9      A    On the seals, yes.

10     Q    On the seals, on the tubes with the blood?

11     A    Yes.

12             MR. LaMAGNA:  Objection.  It is not on the

13        tube.  It is on the seal.

14             THE COURT:  Sustained.

15     Q    There are initials on the seals?

16     A    That is correct.

17     Q    The seals are on top of the tubes?

18     A  _  Yes.

19     Q    Are you able to make out the initials on those

20   seals?

21     A    I am not quite sure what the first letter is.

22   Then it looks like P.O.

23     Q    Ms. Lindenthaler, I would like you to take out,

24   and, actually, if you could show the jury, could you take

25   out the vial of blood that you actually used to test the

1      sample, that you extracted a sample from for testing?  Could

2      you show that vial of blood to the jury?

3                    (Whereupon, the witness complies.)

4          Q      And the seal on the top of that vial of blood,

5      when you received it on July 5th 2005, was that seal intact?

6          A      Yes, it was.

7          Q      Was there any evidence of it having been

8      perforated?

9          A      No, there was not.

10         Q      Any evidence of it having been torn?

11         A      No, there was not.

12         Q      Any evidence of it having been tampered with in

13     any way with whatsoever?

14         A      No.

15         Q      The red on top of that vial, is that the seal

16     itself?

17         A      Yes, it is.

18         Q      Does that red -- does that red seal encompass the

19     entire top of that vial?

20         A      Yes, it does.

21         Q      Is there a second vial of blood in that blood

22     kit?

23         A      Yes, there is.

24         Q      Would you take that vial of blood and please show

25     it to the jury.  I won't ask you to hand it to them.  Show

1    it the jury.

2                   MS. McCORMICK:  Would it be possible for the

3         witness to step down from the witness stand to have the

4         jury view it?  I am sure they don't want to handle it,

5         as it is blood, but so they might get a better look.

6                   THE COURT:  Sure.

7    Q    Would you step down.

8                   (Whereupon, the witness complies.)

9    Q    Ms. Lindenthaler, is that second tube that you

10   just showed to each of the members of the jury, is that

11   second tube still sealed?

12   A    Yes, it is.

13   Q    Was that second tube ever opened?

14   A    No, it was not.

15   Q    So the seal encompassing the top of that vial of

16   blood has never been breached; is that correct?

17   A    That is correct.

18   Q  ~ It remains in the identical condition as you

19   received it on July 5th 2005?

20   A    Yes, it does.

21   Q    What is the purpose of the second tube of blood?

22   A    We save the second tube for independent analysis,

23   if it is requested.

24   Q    Was it requested?

25   A    No.

1        Q        Ms. Lindenthaler, with respect to each of the

2     seals on that kit, would you please go through them now.

3     You have described for the jury that both of the blood tube

4     seals were intact without any evidence of tampering; is that

5     correct?

6        A        That is correct.

7        Q        And that you are the person who actually opened

8     the one tube of blood; is that also correct?

9        A        That is correct.

10       Q        Let us refer to the two seals that were contained

11    on the plastic interior box of that blood kit.   When you

12    received that blood kit were those seals on the interior box

13    and intact?

14       A        Yes, they were.

15       Q        Meaning that neither of them had any indication

16    of being torn?

17       A        No.

18       Q    -- Being opened?

19       A        No.

20       Q        Being tampered with in any way?

21       A        No.

22                MS. McCORMICK:   Your Honor, once again, let

23       me withdraw that for a moment.

24       Q        They are now torn; is that correct?

25       A        That is correct.

Lindenthaler - Direct - McCormick

```
 1      Q     Are you the person who tore them?

 2      A     Yes.

 3            MS. McCORMICK:  Your Honor, I would ask the

 4      Court's guidance on whether we wish to hand that

 5      interior blood kit to the jury or whether

 6      Ms. Lindenthaler can once again display it for the

 7      jury.

 8            THE COURT:  Is it safe to handle?

 9            THE WITNESS:  I don't think I would.

10            THE COURT:  Would you display it?

11            THE WITNESS:  Yes.

12            (Whereupon, the exhibit was displayed to the

13      jury.)

14      Q     Ms. Lindenthaler, those seals that you --

15      actually, the entire internal box that you just displayed

16      for the jury has two seals at either end.  That was intact

17      on the day you received it; is that correct?

18      A     That is correct.

19      Q     And those seals, as they are in that box, they

20      were filled out to the extent that they remain filled out in

21      that box?

22      A     That is correct.

23      Q     Did they contain, at the point that you received

24      it, did it contain the name of the defendant?

25      A     Yes, they did.
```

Lindenthaler - Direct - McCormick

1    Q    What was that defendant's name?

2    A    Martin Heidgen.

3         MR. LaMAGNA:  Judge, I am going to object.

4    I'm going to object.  She is articulating that this

5    blood belongs to Martin Heidgen.

6         THE COURT:  She is saying the box is marked

7    "Martin Heidgen."

8         MR. LaMAGNA:  She is going to testify what

9    she did with this blood, and I have an objection.

10        THE COURT:  Objection is overruled.

11   Q    Ms. Lindenthaler, let us now turn to the exterior

12   box, the cardboard box, with respect to this blood kit.

13   When you received it can you tell the jury were there seals

14   on the outside of that box?

15   A    Yes, there were.

16   Q    How many seals were sealing the outside cardboard

17   box of that blood kit?

18   A    .. At least three.

19   Q    And were each of those three seals intact on the

20   outside of that box?

21   A    Yes, they were.

22   Q    When you say, "three" are two of them paper seals

23   with name of the defendant and other information on them?

24   A    Yes, they are.

25   Q    And can you indicate for the jury what was the

GIGI WRIGHT, RPR    (516) 571-2503

```
 1    name of the defendant that was on those seals as you

 2    received it?

 3        A     Martin Heidgen.

 4        Q     And the third seal?

 5        A     It is one that was placed around the kit by our

 6    evidence technician once it came in, and she dates and

 7    initials it.

 8        Q     Would that be Maureen Roman?

 9        A     That is Maureen Roman.

10        Q     Is that a clear plastic tape seal?

11        A     Yes, clear with red lettering.

12        Q     What is the distinction between the red lettering

13    seals and the blue lettering tape seals?

14        A     Our evidence technicians use the red and clear.

15        Q     All three of the seals that you observed when you

16    first took that box were they intact?

17        A     Yes, they were.

18        Q     Were they torn in any way?

19        A     No, they were not.

20        Q     Did they appear to evidence any tampering

21    whatsoever?

22        A     No.

23        Q     Ate this point, Ms. Lindenthaler, can you

24    describe for this jury, please, how did you actually come in

25    possession of that box?
```

1      A      My director came back to me with a submission

2      form and a rush request, asking if I could do the analysis

3      on the blood sample, because fatalities were involved. So I

4      requested the evidence from the evidence receiving section.

5      Maureen Roman got the evidence out, and it was then logged

6      into my possession, where I then brought it back to my work

7      area.

8      Q      Do you have any documentation indicating that

9      this lab submission procedure was followed?

10     A      On the chain of custody it shows that it is

11     logged out into my possession.

12     Q      That is part of the record of this case?

13     A      Yes.

14     Q      Let me ask you, Ms. Lindenthaler, if we'll just

15     back up for a second, physically where is the blood located

16     when you make a request for it?

17     A      It is in the vault in the evidence receiving

18     section.

19     Q      Is that inside of the front door, but separate

20     from the public area of the lab?

21     A      Yes.

22     Q      When you made a request to get the blood kit did

23     you actually enter the vault to take that kit?

24     A      No, I did not.

25     Q      How do you physically receive the kit?

1        A        Maureen went into the vault and brought the

2    evidence out into the area where I am, I believe, to go to

3    sign out the evidence.

4        Q        When she gives you that kit are any additional

5    procedures followed by the lab indicating that you received

6    it?

7        A        My password is entered into the computer, and it

8    is logged into the chain of custody.

9        Q        At the time that you received the kit was there a

10    yellow lab sticker affixed to that kit?

11        A        Yes, there was.

12        Q        And what was the lab number affixed to that

13    particular kit when you received it?

14        A        It is 05ML2653.

15        Q        Has that lab number associated with that blood

16    sample ever changed?

17        A        No, it has not.

18        Q        -- Do you have anything to do with, or does it

19    control in any way what you do, the BCI that is associated

20    with a case?

21        A        No.

22        Q        Is it only the lab number that you use?

23        A        Yes.

24        Q        Never changed?

25        A        Never changed.

1       Q       Can you describe for the jury at this time how it

2   is, what you actually physically do to test that blood

3   sample?

4       A       After the inventory in which I documented

5   everything that was present, I performed an alcohol analysis

6   on the specimen and it was --

7       Q       When you say "an inventory" what is it that you

8   mean literally?

9       A       To check first to make sure that the evidence

10  matches what is listed on the submission form, that is a

11  blood kit; that the case number matches; that the name

12  matches; and then I go ahead and document that it was a

13  sealed cardboard box.

14          Then I'll break the seals, open it up, check the

15  inner portion to see if there is everything present, to see

16  if it is sealed.  Again, I mark it is a sealed plastic box.

17          I then break those seals, go inside the kit, and

18  then I document what is present inside.  And in this case it

19  was the two sealed gray topped tubes.

20          And then I also noted that there were no names on

21  the blood tubes, and that there was an additional form in

22  the blood kit.  And that is part of the inventory procedure.

23      Q       With respect to the tubes themselves,

24  Ms. Lindenthaler, by looking at them could you tell whether

25  or not they were blood kit tubes?

1    A    They look like typical blood kit tubes.

2    Q    Is there an indication of any of the chemicals

3    contained in those tubes before they are filled with blood?

4    A    It says potassium oxalate and sodium chloride.

5    Q    What would be the purpose of those chemicals in

6    the tubes?

7    A    One is an anticoagulant and one is a

8    preservative.  The anticoagulant prevents clotting of the

9    blood; and the preservative helps prevent fermentation of

10   the blood.

11   Q    I'm sorry, I interrupted you.  Would you please

12   continue with what you physically did to test that blood

13   sample.

14   A    The alcohol analysis was the first testing that

15   was performed for this.  The sample is piped out into vials

16   using an internal standard.

17   Q    I'm sorry, I'm going to keep doing it.  Could you

18   explain to the jury, please, what does it mean to pipe out a

19   sample?

20   A    Basically it is sampling.  There is one tube into

21   the internal standard.  One line goes into the internal

22   standard, and then there is another line that actually goes

23   into the blood tube.  It has a probe with a button.  You

24   push the button and simultaneously you are pushing the

25   internal standard, and then the sample, and you push the

Lindenthaler - Direct - McCormick

1    button again and it goes into the vials you want it to.

2         Q    You are basically transferring blood from the one

3    test tube into two clean test tubes?

4         A    That is correct.

5         Q    Is that essentially a fancy term for extracting

6    out liquid?

7         A    Pretty much.

8         Q    With respect to the pipe or nozzle itself, is it

9    as wide as a turkey baster?

10        A    No, it is very small.

11        Q    So, now, taking a look at that blood sample, were

12   you able to visually observe whether or not the

13   anticoagulant that was supposed to be present in those tubes

14   had functioned on this blood sample?

15        A    It appeared to.  It was fluid in nature.  I

16   didn't visually see any clots.

17        Q    And if there had been clots in the blood sample

18   would the piper with the small end, small suction portion,

19   be able to extract out the liquid?

20        A    If it hit a clot it would get stuck.

21        Q    Was there anything like that in this case?

22        A    No.

23        Q    No clots?

24        A    No.

25        Q    I'm sorry.  Now, you said that you extracted out

Lindenthaler - Direct - McCormick

1    blood into the clean test tubes that you were going to use

2    for the samples.

3         A    Into two clean vials, yes.

4         Q    And one of them contained what you called an

5    internal standard; is that correct?

6         A    Both of them contain the internal standard.

7         Q    What is internal standard?

8         A    It is just used, we know the machine is

9    functioning and helps us get the quantitative value.

10        Q    What is it literally?  Is it something you are

11   adding to the blood sample?

12        A    It is another alcohol not found in alcoholic

13   beverages.

14        Q    Is it a known quantity of a chemical that you are

15   expecting to receive at the end of the testing to make sure

16   it is functioning properly?

17        A    Yes.

18        Q    Not ethanol alcohol?

19        A    Not ethanol alcohol.

20        Q    Adds nothing to the alcohol content of the blood

21   whatsoever?

22        A    That is correct.

23        Q    Chemically different altogether?

24        A    Yes.

25        Q    No possibility of the machine or the instrument,

1      I should say, confusing the two?

2          A      No.

3          Q      Could you now continue with what you did with

4      those two vials of extracted blood and the internal

5      standard?

6          A      The vials are then analyzed by an automated head

7      space instrument called a gas chromatograph instrument.

8      ··What that instrument does, is the bottles are heated to

9      create an equilibrium between the liquid and vapor phase.

10     Any volatiles that are present, which is in the liquid, are

11     now present in the vapor.  And what it does, the instrument

12     will take a portion of this vapor and it flows through two

13     columns -- one is qualitative, which tells you what you

14     have; and one is quantitative, which assigns the value --

15     and then it generates, prints out, what we'll call the data

16     to make sure it is acceptable.

17         Q      Ms. Lindenthaler, was that procedure followed

18     with the blood in that kit?

19         A      Yes, it was.

20         Q      And are there any checks conducted on the

21     instruments at the time of the testing of that blood?

22         A      Yes.  We run a composite sample to ensure that

23     the instrument is separating out different volatile

24     substances.  And we run a series of positive and negative

25     controls of certain values.

Lindenthaler - Direct - McCormick

1      Q      A composite sample, meaning it is a bunch of

2   things that are put into a separate test to see whether the

3   instrument is reading them properly?

4      A      Right.  To make sure it can separate everything

5   out.

6      Q      Did you do all of those checks in conjunction

7   with testing the defendant's blood?

8      A      Yes, I did.

9             MR. LaMAGNA:  Objection.

10     Q      The blood from that kit?

11     A      Yes, I did.

12     Q      And was there any problem with the functioning of

13  the gas chromatograph on the day at the time that you

14  conducted that test?

15     A      No, there was not.

16     Q      Do you have any doubt in your mind whether that

17  instrument was functioning properly on that day?

18     A      No, I do not.

19     Q      Did you conduct any other blood alcohol tests on

20  July 5th 2005?

21     A      No, I did not.

22     Q      Could you please describe then for the jury, you

23  said you took out two samples to run through the instrument.

24  Is that correct?

25     A      That is correct.

Lindenthaler - Direct - McCormick

1      Q      So how many tests were actually conducted on the

2  defendant's blood?

3                  MR. LaMAGNA:  Objection.

4                  THE COURT:  Sustained.

5      Q      Are the two samples tested simultaneously --

6  excuse me -- to arrive at a single result?

7      A      The two samples are tested, but each one gives

8  its own result.

9      Q      At the conclusion of this process did you receive

10  a result as to the blood alcohol concentration to a

11  reasonable degree of scientific certainty?

12      A      Yes, I did.

13                  MR. LaMAGNA:  Objection, Judge.  Judge, I

14          would request to approach.

15                  THE COURT:  We will give the jury five

16          minutes on this one.  Don't talk about the case,

17          please.

18                  (Whereupon, the jury exited the courtroom.)

19                  THE COURT:  Go ahead, Mr. LaMagna.

20                  MR. LaMAGNA:  Your Honor, Judge, the

21          testimony in this case, they have over my objection,

22          allowed that evidence to go in purporting it to be my

23          client's blood.  The law is very clear on the

24          admissibility of fungible evidence such as blood.  The

25          Court of Appeals is very clear to be admissible, real

1    evidence, especially fungible items such as blood, the

2    offering party, in this case the prosecution, must

3    establish two elements for admissibility, not weight,

4    but admissibility:  That is, one, the evidence is

5    identical to that involved in the crime and; two, that

6    it has not been tampered with.

7                 I cite People versus Julian, 41 NY2d 340;

8    New York Court of Appeals, People versus Miller, 174

9    Appellate Division 2d 901; People versus Rudder 202

10   Appellate Division 2d 123.

11                THE COURT:  Do they say what the standard is?

12                MR. LaMAGNA:  The standard for admissibility

13   is the identical nature of the fungible item.

14                THE COURT:  Beyond a reasonable doubt, clear

15   and convincing, prima facie is what is the standard.

16                MR. LaMAGNA:  The standard for the

17   admissibility is beyond a reasonable doubt.  And we

18   have testimony by the actual officer, the trooper, who

19   took the blood, that is the important person in this

20   chain.  He testified unequivocally that, and that was

21   Trooper O'Hare who observed the blood being taken,

22   testified that after he observed the nurse take the

23   blood from the defendant he put white seals over the

24   blood tubes, the blood tubes containing the blood taken

25   from Mr. Heidgen.  And he testified to that at page 98

1    and 99 of that transcript.

2           He also testified to identify those vials he

3    put his initials on those vials.  He clearly stated

4    that at page 81 and 82.  Then he testified that he

5    filled out red integrity seals, but didn't use them for

6    other people to use, and then handed the sealed vials,

7    allegedly, with his initials on them with white seals

8    over the tops of them to other police officers in an

9    unsealed condition.

10          Ms. Lindenthaler just testified that at the

11   lab what she received was anything but identical.  In

12   fact, it is just the opposite.  She received vials with

13   no initials by Trooper O'Hare, and she received vials

14   with red labels, not white labels.

15          THE COURT:  She said she couldn't read the

16   initials.

17          MR. LaMAGNA:  She couldn't read the initials

18   on the label, not on the vial.  It was very clear.  And

19   I'll read the record of Trooper O'Hare who testified

20   that he put his initials on the tube, not the label.

21   He also put his initials on the label, the white

22   labels, which don't appear on these tubes.  These are

23   absolutely not the same tubes as the tubes that Trooper

24   O'Hare testified that he put the labels on, and also

25   put his initials on.

1        And I will refer the Court to the section

2    where he clearly stated what he did, which is

3    completely opposite of the material this chemist

4    received. And I direct you to pages 60 and 61: "You

5    took the white seals with the information that you had

6    placed on it and laid it on the top of the gray

7    stopper, correct?

8                "ANSWER: Yes, sir.

9                "QUESTION: And you took another white seal

10   and placed it on the top of the gray stopper of the

11   second tube?

12               "ANSWER: Yes, sir.

13               "QUESTION: Then you placed it in the plastic

14   kit, correct?

15               "ANSWER: Yes, sir.

16               "QUESTION: Then you took the integrity

17   seals, the red ones, correct?

18               "ANSWER: Yes, sir.

19               "QUESTION: And you sealed the inner box with

20   those?

21               "ANSWER: No, not at that time, sir.

22               "QUESTION: Okay. So you just filled out

23   those integrity seals?

24               "ANSWER: Yes, sir.

25               "QUESTION: So all that was in, and you are

1       almost finished, the completed interior box just

2       contained the two tubes?  You did not seal those tubes,

3       that box?

4                   "ANSWER: No, sir."

5                   And he further testified at 81 and 82:

6                   "QUESTION:  Somebody else filled in the rest

7       of the integrity seals?

8                   "ANSWER:  Yes, sir.

9                   "QUESTION:  And somebody else put those

10      integrity seals on the inner box?

11                  "ANSWER:  Yes, sir.

12                  "QUESTION:  Not you?

13                  "ANSWER:  No, sir.

14                  "QUESTION:  Did you put any identifying

15      characteristics by name or initials on the actual tubes

16      of the blood that was taken by Nurse Busco?

17                  "ANSWER:  I put my initials on the test

18      tubes.

19                  These Are not the same.  They are not

20      identical.  The trooper was clear about what he said he

21      used on these tubes.  He said they are white seals, and

22      he said he put his initials to identify the seals, to

23      identify the tube.  What Ms. Lindenthaler received at

24      the lab to be tested is anything put identical.

25      Anything put identical.  Red is red; white is white;

1    initials are initials.  Initials that are there aren't

2    there.  In order for the prosecution to be able to

3    admit that evidence, not only do they have to show that

4    it is identical to what was received, but that it

5    hasn't been tampered with.

6              Well, this box and these tubes went from

7    Trooper O'Hare to Trooper Stafford, from Trooper

8    Stafford to Investigator Baez all in an unsealed

9    condition.  And I might add that when O'Hare handed it

10   to Trooper Stafford those very vials that they are

11   trying to say are the same ones that this lab

12   technician received had white labels over the top of

13   the gray stoppers and Trooper O'Hare's initials on that

14   vial to identify that vial, and those are not there on

15   these vials.  There is no question that this does not

16   match those vials.  No question.  There is no

17   assurances that this wasn't tampered with.  It clearly

18   was one way or the other.  It is not the same.  It is

19   just not the same.

20             And these tubes and that blood kit is not

21   identical to the blood taken from Mr. Mr. Heidgen.  It

22   is simply not admissible.  The New York Court of

23   Appeals is clear on this.  It is just not admissible.

24             THE COURT:  Which one of you would like to

25   respond?

Lindenthaler - Direct - McCormick

1        MS. McCORMICK:  Your Honor, in spite of the

2    animated nature of the argument --

3        MR. LaMAGNA:  I object to that.

4        MS. McCORMICK:  -- the blood is the evidence,

5    not the color of the seals.  The blood itself is the

6    evidence.  There is testimony by that trooper, and I do

7    not have the trooper's testimony.

8        MR. LaMAGNA:  I have it on direct, I believe

9    that he stated that he marked the seals.

10        MS. McCORMICK:  No.

11        MR. LaMAGNA:  I just read it.

12        MS. McCORMICK:  You read the cross.

13        MR. LaMAGNA:  He said it.  That is part of

14    the record; is it not?

15        MS. McCORMICK:  I believe he also said that

16    he marked the seals on direct.

17        THE COURT:  All right.  Hold on.

18        MS. McCORMICK:  In any event, I will find it.

19    If the Court would give me a minute.

20        Referring to page 25 line 24.

21        THE COURT:  I'm sorry.  Would you mind going

22    into chambers and showing us that box?

23        We will be right back.

24        (Brief pause in proceedings.)

25        THE COURT:  Did you find what you were

GIGI WRIGHT, RPR    (516) 571-2503

Lindenthaler - Direct - McCormick

1     looking for?

2               MS. McCORMICK:  At page 25 of the transcript

3     beginning at line 25,

4               "QUESTION:  Indicating, for the record, the

5     items that were discarded by Nurse Busco was the

6     Vacutainer and needle.

7               "ANSWER:  I then stepped aside to fill out

8     the seals properly.  Unfortunately, I didn't know the

9     name of the subject.  At this time I wasn't able to

10    complete them, so I filled out as much as I can.  I put

11    my initials, date and time the blood was taken, and I

12    put them over the top of the tube.

13              THE COURT:  Does he discuss the color of the

14    seal?

15              MS. McCORMICK:  At that point he does not,

16    Judge.  But I can't say that he did not say that at any

17    time in this record.  He indicates that he put it on

18    the top of the seal.  I do not dispute counsel's

19    statement that he indicated that he used a white seal.

20              THE COURT:  All right.  I'm went back in

21    chambers with the witness and with my law secretary and

22    with the court officer.  We, my law secretary and I,

23    looked closely, with the witness' assistance, at the

24    red seals.  There are initials on the red seals.

25              MR. LaMAGNA:  Yes.

1          THE COURT:  He cannot determine the last

2     initial is O we cannot determine with precision what is

3     the first initial is.  It could be a "P" or a "D."  The

4     witness was Daniel O'Hare.  What we are going to do is

5     -- can you get a hold of O'Hare?

6          MS. McCORMICK:  Yes, your Honor.

7          MR. LaMAGNA:  Judge --

8          MS. McCORMICK:  I'm not actually done.  If I

9     could make a bit more of a record, Judge?  And the

10     record is, that this blood was observed by this

11     trooper, who indicated whether or not he got the color

12     of the seal correct, that he took that blood, he

13     inverted those tubes, he sealed it with his initials.

14     When he says he put his initials on the tubes, the

15     seals were on the tubes.  The salient point here though

16     is that the tubes themselves were given to Stafford.

17     Within a very short time Investigator Baez took that

18     box, opened them and observed the red seals.  I made an

19     inquiry to clarify things for me.

20          You are asking me to rule out a significant

21     piece of evidence.  In order to do that or in order to

22     rule it in, I don't intend to make a mistake.

23          MR. LaMAGNA:  I agree, Judge.

24          THE COURT:  And to that end, I don't intend

25     to make a mistake.

Lindenthaler - Direct - McCormick

1           MR. LaMAGNA:  Judge, I couldn't agree with

2      you more.

3           THE COURT:  I'm going to have Trooper O'Hare

4      in a hearing right now to determine whether or not

5      those are the seals he used and whether or not those

6      are his initials.  If they are not, the objection is

7      sustained; if they are, the objection is overruled.

8           MR. LaMAGNA:  Judge, could I say something?

9      If you read the cases --

10          THE COURT:  I don't need to read the cases

11     for the purposes of finding this fact.

12          MR. LaMAGNA:  Could I just reiterate?

13          THE COURT:  Yes.  I read your cases.  By the

14     way, I read them.

15          MR. LaMAGNA:  The record --

16          THE COURT:  I just heard you say "the

17     record."  I am not going to make a decision on a record

18     that could contain a mistake.  I will not make a

19     mistake on this issue.

20          MR. LaMAGNA:  I understand -- I just wanted

21     to get out --

22          THE COURT:  I understand both of your

23     arguments completely.  There is only one way to resolve

24     this:  Get Trooper O'Hare on the stand.

25          MR. LaMAGNA:  I'm not disagreeing with that.

1              THE COURT:  Let's do it.

2              MR. LaMAGNA:  I'm not disagreeing that

3     Trooper O'Hare did not, as he testified, put his

4     initials on seals to be used later.

5              THE COURT:  He might have made a mistake on

6     the color of the seal.  He might have.  If he did he is

7     going to say that.

8              MR. LaMAGNA:  He can't now change his

9     testimony.

10             THE COURT:  I'm not going to allow something

11    of this importance to be accomplished by a mistake in a

12    record.  We are going to get the facts.

13             MR. LaMAGNA:  I agree, Judge.  It is not just

14    the color.  First of all, it is not just the color.  He

15    also said he put his initials on the test tubes.

16             THE COURT:  Mr. LaMagna, I understand your

17    argument.

18             MR. LaMAGNA:  I just want to get out one last

19    point that just came up:  He also testified that the

20    needle and the holder were discarded by Nurse Busco,

21    and that all of -- and that all that remained in that

22    plastic box were the two tubes.  If you look at that

23    plastic box now not only did he say they were white

24    labels, very clearly, instead of the red labels; he put

25    his initials.

Lindenthaler - Direct - McCormick

1      THE COURT:  Would you agree with me,

2   Mr. LaMagna, that if Trooper O'Hare looks at those

3   vials of blood and says these are the vials, and these

4   are my initials, that satisfies this inquiry?

5      MR. LaMAGNA:  No.

6      THE COURT:  I agree with that.

7      MR. LaMAGNA:  It will be completely

8   contradicting his prior testimony.

9      THE COURT:  That is a very good argument to

10   make to the jury; not to me.  The witness for the

11   moment is excused.

12      Please call Trooper O'Hare.

13      How long do you need to get him?

14      MS. McCORMICK:  I'm going to find that out.

15      THE COURT:  Let me know before I take a break

16   here.

17      Okay, let's take a break.

18      (Whereupon, a brief recess was held.)

19      THE COURT:  Bring in the jury.

20      COURT OFFICER:  Jury entering.

21      (Whereupon, the jury entered the courtroom

22   and upon taking their respective seats, the following

23   occurred:)

24      THE CLERK:  Jurors are present and seated,

25   your Honor.

1           THE COURT:  Thank you.  Welcome back.

2           Rather than have you seated than standing,

3   the objection for which you were asked to retire has

4   not yet been resolved.  I don't expect it to be

5   resolved until some time after 2 o'clock.  I'm not

6   going to waste your time.  We are going to call another

7   witness or two in the meantime, that would have taken

8   place later in the trial, so as not to delay these

9   proceedings.  As soon as the People are ready we will

10  hear from the next witness.

11          MS. McCORMICK:  Why don't I start with the

12  simpler of the two and just call Trooper Eric Bruns.

13          COURT OFFICER:  Step up.  Remain standing,

14  raise your right hand and face the clerk.

15          E R I C   B R U N S,          a witness

16          called on behalf of the People, having been

17          first duly sworn by the Clerk of the Court,

18          was examined and testified as follows:

19          THE CLERK:  You may put your hand down.

20          State your name, spelling your last name,

21  shield number and command for the record.

22          THE WITNESS:  Eric Bruns, B-R-U-N-S, shield

23  1851.

24          THE CLERK:  Command?

25          THE WITNESS:  State Police Valley Stream.

1          THE CLERK:  Thank you.  Please take a seat.

2    DIRECT EXAMINATION

3    BY MS. McCORMICK:

4          Q     Troop Bruns, good morning.

5          A     Good morning.

6          Q     Sir, were you working on the night of July 2nd

7    2005?

8          A     Yes, I was.

9          Q     Can I ask you, sir, what was your assignment?

10         A     The Meadowbrook Parkway.  I was patrolling with

11   Trooper Pat Siegler.

12         Q     He was your partner?

13         A     He was.

14         Q     And Trooper Bruns, just in general, how long have

15   you worked with the New York State Police?

16         A     Since January 2002.

17         Q     On that particular night, July 2nd, can you tell

18   the jury, please, what was your tour of duty?  What times

19   were you supposed to work?

20         A     I was actually coming onto a shift from overtime.

21   I was there from 11 to five, I believe.

22         Q     Did there come a time when you were involved in

23   the investigation of a crash which occurred in the

24   southbound lanes just north of the Babylon Turnpike overpass

25   on July 2nd 2005 at about 2 o'clock in the morning?

Tpr. Bruns - Direct - McCormick

1      A      Yes, ma'am.

2      Q      Could you describe for the jury, please, your

3   arrival at that crash scene?

4      A      Upon arriving at the crash scene we were flagged

5   down by a New York City court officer in the middle lane,

6   who advised that there was a bad accident, and he was

7   distraught.  And he said there were bodies all over the

8   place, and he was not prepared to handle a scene like that.

9             At that point Trooper Siegler blocked the lanes

10  and I proceeded up to the accident scene.  There were other

11  units there, Nassau County, I believe; and, I believe,

12  Freeport P.D. also arriving at about the same time we

13  arrived.

14            In the center lane I observed a limousine with

15  heavy front-end damage, and also a pickup truck next to that

16  in the far left lane also with heavy damage to the front

17  end, and the involved parties, the few fatalities involved,

18  obvious fatalities.

19     Q      Trooper Bruns, with respect to the scene itself,

20  how long were you on that crash scene on July 2nd 2005?

21     A      Approximately six to eight hours.

22     Q      Six to eight hours?

23     A      Yes, ma'am.

24     Q      Was the Meadowbrook Parkway closed for that

25  entire portion of the time?

Tpr. Bruns - Direct - McCormick

1      A    Yes, ma'am.

2      Q    During those six to eight hours while you were on

3   the scene did you have an opportunity to walk the entire

4   crash scene?

5      A    I did.

6      Q    Did you make specific observations of the crash

7   damage to the vehicles?

8      A    Yes, ma'am.

9      Q    Did you observe at any time the fire department's

10  extrication of persons involved in the crash from those

11  vehicles?

12     A    Yes, ma'am.

13     Q    I ask to approach you with what I ask to be

14  marked as People's Exhibits 65, 66, 67 and 68 for

15  identification purposes.

16              (Whereupon, four photographs received and

17         marked People's Exhibits 65, 66, 67 and 68 for

18         identification.)

19              COURT OFFICER:  People's Exhibits 65 through

20         68 for identification.

21     Q    Trooper Bruns, would you take a look at those

22  four items, please.  And just having looked at them, when

23  you look at them, when you are finished, I will ask you the

24  question:  Whether you recognize them.

25     A    Yes, ma'am.

Tpr. Bruns - Direct - McCormick

1   Q      What do you recognize them to be?

2   A      This is the photos of the accident scene shortly

3   after, I imagine, after we arrived.

4   Q      Do those photographs, the four of them, fairly

5   and accurately represent the crash scene as you remember it

6   from July 2nd 2005?

7   A      Yes, ma'am.

8               MS. McCORMICK:  At this time, your Honor, I

9   would ask that those four photographs be moved into

10  evidence.

11              THE COURT:  Show them to counsel.

12              MR. LaMAGNA:  Judge, I am just going to

13  object to the cumulative nature of these photographs.

14              THE COURT:  Well, let me see them, please.

15              It may offer the jurors some guidance.

16  Objection overruled.

17              (Whereupon, People's Exhibits 65 through 68

18  for identification now received and marked People's

19  Exhibits 65 through 68 in evidence.)

20              COURT OFFICER:  People's Exhibits 65 through

21  68 in evidence.

22  Q      Trooper, can I ask you to step down and approach

23  the presenter, please.

24  A      Sure.

25  Q      Trooper Bruns, referring first to People's

GIGI WRIGHT, RPR    (516) 571-2503

1    Exhibit number 65 in evidence.  You said that you recognize

2    that.  Is that correct?

3         A    Yes, ma'am.

4         Q    And can I ask you Trooper, what is depicted in

5    that photograph?

6         A    The actual scene:  southbound Meadowbrook Parkway

7    just prior to the overpass of Babylon Turnpike --

8         Q    Continue.

9         A    -- as it was when we arrived at the limousine and

10   the truck.

11        Q    Trooper, does that photograph fairly and

12   accurately depict the damage patterns to those vehicles at

13   the rear of those vehicles?

14             MR. LaMAGNA:  Objection.

15             THE COURT:  Sustained to the leading.

16        Q    Okay.  What do you see about the damage patterns

17   on the back of those vehicles?

18             ~    MR. LaMAGNA:  Objection.  I don't know what

19        damage patterns are.

20        Q    Do you see any damage on the back of the

21   vehicles?

22        A    Yes, ma'am.

23        Q    Referring now to People's Exhibit number 66 in

24   evidence.  Trooper, can you describe for the jury, please,

25   with respect to People's Exhibit 66, what is occurring in

1    that photograph?

2         A     What is occurring in the photograph?

3         Q     Yes.

4         A     The extrication, I guess, of the limo driver.

5    And at that time, again, this is the damage to both vehicles

6    that would be a northbound shot facing southbound.

7         Q     Does it fairly and accurately represent the

8    damage in the area to the front of both of those vehicles?

9         A     Yes, ma'am.

10        Q     Same question is going to apply to People's

11   Exhibit number 67 in evidence.  It is a little dark.  Does

12   the photograph that you observed on the stand and that is

13   being projected there, a little dark, does it fairly and

14   accurately the represent the damage to the front of the

15   pickup truck and the area in front of the pickup truck?

16        A     Yes, ma'am.

17        Q     And same question with respect to People's

18   Exhibit 68 in evidence:  Does that fairly and accurately

19   represent the damage to the front of the pickup truck, the

20   side front of the limousine, and the area on the roadway in

21   front of both of those vehicles?

22        A     Yes, it does.

23        Q     Thank you.

24              MS. McCORMICK:  I have nothing further.

25              THE COURT:  Mr. LaMagna.

GIGI WRIGHT, RPR    (516) 571-2503

Tpr. Bruns - Cross - LaMagna

1    CROSS-EXAMINATION

2    BY MR. LaMAGNA:

3         Q    Trooper Bruns -- is it Burns or Bruns?

4         A    Bruns.

5         Q    You are partners with Trooper Siegler?

6         A    I was a partner with Pat that night, yes.

7         Q    You arrived at the scene at the same time Trooper

8    Siegler did?

9         A    Correct.

10        Q    Were you present when Trooper Siegler retrieved

11   the wallet in the pickup truck?

12        A    Was I present being on the scene, or with Trooper

13   Siegler?

14        Q    Were you with him when he did that?

15        A    No.  I don't recall.

16        Q    Do you even know if he found a wallet?  Were you

-17  aware of that?

18        A    ~  I am aware that there was a wallet retrieved,

19   yes.

20        Q    That was within ten or fifteen minutes of your

21   arrival at the scene?

22        A    No.  I don't know exactly what time it was.  I

23   know it wasn't for quite some time.  It wasn't anything

24   within a few minutes of arriving at the scene.

25        Q    So it was later?

Inv. Walsh - Direct - McCormick

```
 1        A      It was later.

 2                      MR. LaMAGNA:  I have nothing further, Judge.

 3                      MS. McCORMICK:  Nothing further, your Honor.

 4                      THE COURT:  Thank you.

 5                      (Whereupon, the witness exits the courtroom.)

 6                      MS. McCORMICK:  Your Honor, the People call

 7        Investigator Bill Walsh.  This is a return to the stand

 8        for Mr. Walsh.  He was here previously.

 9                      THE CLERK:  You are reminded you are still

10        under oath, Mr. Walsh.  Thank you.

11                      THE WITNESS:  Yes.

12    DIRECT EXAMINATION

13    BY MS. McCORMICK:

14        Q      Good morning, Mr. Walsh.

15        A      Good morning.

16        Q      Once again, you have previously testified in this

17    courtroom; have you not?

18        A   .. Yes, I have.

19        Q      On this case?

20        A      Yes.

21        Q      And you are an investigator with the district

22    attorney's office?

23        A      That's correct.

24        Q      Special Investigator, I think; is that right?

25        A      That's the title.
```

GIGI WRIGHT, RPR    (516) 571-2503

1    Q    Special Investigator Walsh, sorry about calling

2    you when you didn't know you were going to be called to

3    testify, sir.  Could you explain to the jury why you are

4    attired the way you are today?

5    A    I'm doing an undercover operation this afternoon.

6    Q    Investigator Walsh, did you have occasion to

7    return to the Meadowbrook Parkway this past Monday night,

8    September 18th?

9    A    Yes, I did.

10    Q    And in returning to that parkway you were in the

11    company of Investigator Harris?

12    A    Yes.

13    Q    Did there come a time when that parkway was

14    closed down to any traffic?

15    A    Yes.  It was approximately 11:45 p.m.

16    Q    And where was the parkway closed from and to, if

17    you know?

18    A    - It was from the Babylon Turnpike exit to the

19    turnaround, the southern turnaround by the Loop Parkway.

20    Q    Investigator Walsh, you previously testified in

21    which a videotape or a DVD was admitted into evidence of a

22    daytime run depicting the geographic area of that roadway

23    traveling northbound in the southbound lanes from the area

24    of the turnaround through the Babylon Turnpike overpass; is

25    that correct?

1       A    That's correct.

2       Q    That was People's Exhibit 60 in evidence.  Did

3  you replicate that run in a nighttime setting this past

4  Monday, September 18th?

5       A    Yes, I did.

6       Q    Did you have occasion to review the DVD

7  associated with that run?

8       A    Yes, I did.

9       Q    Did you actually film it?

10      A    Yes, I did.

11      Q    Did you film it using the same camera that you

12  used during the first run?

13      A    Yes.

14      Q    Was there any particular nighttime equipment or

15  anything available for use on that camera?

16      A    No, sir.

17      Q    The camera itself is a basic home movie camera

18  that records direct to DVD?

19      A    That's correct.

20           MS. McCORMICK:  At this time, your Honor, I

21      ask to approach the witness --

22           MR. LaMAGNA:  I'm going to stipulate to

23      entering it into evidence, Judge.  Just except that I

24      ask that the jury know that the length of the video

25      from the turnaround to the Babylon Turnpike exit has no

1        relevance so far as the length of the time as it

2        relates to this case.

3                    THE COURT:  That's correct.  The jury has not

4        yet heard any evidence with respect to how long, if at

5        all, the defendant traveled on that roadway.  This

6        evidence is being offered, in fact, being stipulated

7        to, for the purpose of illustration to you as to what

8        the Meadowbrook Parkway looks like in terms of its

9        topography in terms of lighting, and what it looks like

10       through a home video camera at night for the assistance

11       that that may provide you.

12                   (Whereupon, People's Exhibit 69, a DVD, so

13       marked and received in evidence.)

14       Q       Investigator Walsh, with respect to that, as you

15       traveled northbound in those southbound lanes, the

16       northbound travel lanes were still open; is that correct?

17       A       That's correct.

18       Q       There was nobody coming at you on the parkway

19       that night; is that correct?

20       A       That's correct.

21       Q       So this is just topography?  Just geography?

22       A       Yes.

23                   MS. McCORMICK:  At this time, your Honor, I

24       ask that the lights be dimmed in the courtroom and the

25       DVD be shown to the jury.

Inv. Walsh - Direct - McCormick

1          THE COURT: Yes.

2              (Whereupon, People's Exhibit 69, a DVD, was

3          played in open court.)

4          THE COURT:  Could we get the lights back on.

5      Q     Investigator Walsh, I would note for the record

6    that as a cloud passed over the courtroom it became darker.

7    Did the image become clearer on the screen?  Did you see

8    that?

9      A     Yes.

10     Q     The image that you projected is somewhat darker

11   than that which you observed through the camera; is that

12   correct?

13     A     That's correct.

14     Q     I would simply note for the record -- withdrawn.

15          On the night that you were on the Meadowbrook

16   Parkway, the lighting conditions on either side of the

17   roadway were there street lamps in use?

18     A     Yes.

19     Q     Was there any problem seeing the roadway ahead of

20   you?

21     A     No.

22     Q     Thank you.

23          MS. McCORMICK: I have nothing further, Judge.

24          THE COURT:  Mr. LaMagna?

25          MR. LaMAGNA:  No questions.

GIGI WRIGHT, RPR    (516) 571-2503

Inv. Walsh - Direct - McCormick

1        THE COURT:  Thank you, Investigator.  You may

2    step down.

3        (Whereupon, the witness exits the courtroom.)

4        THE COURT:  Let me see counsel, please.

5        (Whereupon, a discussion was held at the

6    bench, off the record.)

7        THE COURT:  All right.  It would seem, ladies

8    and gentlemen, through no fault of anybody, that there

9    are no additional witnesses left this morning.  I

10   expect to be busy all afternoon.  However,

11   unfortunately, the reservation of the objection, as I

12   discussed with you, is for me to resolve.

13       I will not be able to resolve that process

14   until I have come to a conclusion.  We may not get to

15   you exactly at 2 o'clock.  But I would ask you to be

16   here at 2 o'clock, knowing that you could wind up

17   waiting a little bit.

18       You know all of the admonitions:  Don't talk

19   to each other, don't let anyone talk to you, don't go

20   to the scene.  All of those things you know.  Have a

21   nice lunch.  See you at 2 o'clock.

22       (Whereupon, the jury exited the courtroom.)

23       THE COURT:  You can have your witness here at

24   1:30?

25       MS. McCORMICK:  That's what I am told, Judge.

GIGI WRIGHT, RPR   (516) 571-2503

Inv. Walsh - Direct - McCormick

1          THE COURT:   This matter is recessed for

2      hearing at 1:30.

3                  (Whereupon, a luncheon recess was held.)

4                  (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1                              o0o

2                  A F T E R N O O N   S E S S I O N

3                              o0o

4              (In open court.  Defendant present; jury not

5         present.)

6              THE COURT:  Bring in the witness.

7              (Whereupon, Trooper O'Hare is recalled to the

8         witness stand.)

9              THE CLERK:  Trooper O'Hare, you are reminded

10        you are still under oath.

11             Case on trial, Indictment 1910N of 2005,

12        People versus Martin Heidgen.

13             People ready?

14             MR. HAYDEN:  People ready.

15             THE CLERK:  Defendant ready?

16             MR. LaMAGNA:  Defendant is ready.

17             THE CLERK:  Defendant is present, your Honor.

18             THE COURT:  Please let the record reflect

19        that this hearing is called at the request of the Court

20        to resolve an objection raised to the analysis of blood

21        by Lisa Lindenthaler earlier this morning.

22             In order to resolve that objection I find it

23        necessary to recall Trooper O'Hare for an inquiry

24        through counsel by the Court.

25             Would you please examine the Trooper as I

1       think you understand.

2                MR. LaMAGNA:  Just for the record, to

3       preserve the record, I made an opposition to this

4       recalling of Trooper O'Hare.

5                THE COURT:  Well, it is your objection that I

6       am trying to sort out.

7                MR. LaMAGNA:  I understand.

8       DIRECT EXAMINATION

9       BY MS. McCORMICK;

10      Q    Good afternoon, Trooper.  How are you?

11      A    Good, ma'am.

12      Q    Trooper, I am going to ask to approach you with

13      what has been marked in evidence as People's Exhibit 17 in

14      evidence.

15           Trooper, I believe that you previously identified

16      People's number 17 when it was marked only for

17      identification.  Do you recognize that item?

18      A    Yes, ma'am.

19      Q    What do you recognize it to be?

20      A    State Police blood kit.

21      Q    Is that the blood kit that you used in the

22      extraction of blood from the defendant Martin Heidgen on

23      July 2nd 2005?

24      A    Yes, ma'am.

25      Q    And, once again for the record, Trooper, how do

Trooper O'Hare - Direct - McCormick

1    you know that that is the particular blood kit?

2        A    The white seals right here.  It is tough to see,

3    but my initials are on there that I put.

4        Q    Trooper O'Hare, at the time that you testified

5    that blood kit was still in the sealed condition; is that

6    correct?

7        A    Yes, ma'am.

8        Q    Trooper, that blood kit is currently opened,

9    having been opened by the previous witness, Lisa

10   Lindenthaler, having been opened in court.  I would ask you

11   at this time to make a careful examination of the contents

12   of People's Exhibit number 17.  Please do that.

13           Trooper, can you please open the plastic box and

14   take a look at the tubes themselves.

15       A    Yes.

16       Q    With respect to those tubes, Trooper O'Hare, do

17   you recognize them?

18       A    ~ Yes, ma'am.

19       Q    What do you recognize them to be?

20       A    The tubes, the blood tubes, regarding this

21   incident.

22       Q    Are they the blood tubes containing the blood

23   that you observed Nurse Dorothy Busco draw on July 2nd 2005?

24       A    To the best of my recollection, yes.

25       Q    In looking at those tubes, what about the tubes

Trooper O'Hare - Direct - McCormick

1    themselves indicates to you that they are the identical

2    tubes that were used on that night for that purpose?

3         A    On the red integrity seal, my initials and the

4    date.

5              THE COURT:  Did you put the red integrity

6         seal over that and seal the tube yourself?

7              THE WITNESS:  Yes, sir, I did.

8              THE COURT:  And you put those initials on it?

9              THE WITNESS:  Yes, sir, I did.

10        Q    Trooper O'Hare, you previously indicated in

11   testimony that you used the white seals.  Can you explain to

12   the Court what the distinction is in those things, or why

13   you said that?

14        A    To the best of my recollection, your Honor, at

15   the time I believe I used the white seals.  Looking now I

16   see I used the red integrity seals.

17             THE COURT:  There is no question in your mind

18        at this time that you, yourself, sealed the tube with

19        the red seal and you put your initials on the seal?

20             THE WITNESS:  Yes, your Honor.

21             THE COURT:  And you recognize your initials

22        at this time?

23             THE WITNESS:  Yes, sir.  It is right there.

24        Q    Trooper O'Hare, you recognize the initials on

25   that seal.  Did you write the initials on the seal before it

Trooper O'Hare - Direct - McCormick

1    was placed over the tube?

2         A    Yes, ma'am.

3         Q    When you received the blood tubes from Nurse

4    Busco where did you go in the emergency room with those

5    blood tubes?

6         A    I stepped over to the side, about a foot away

7    from where she drew the blood.  There was a table there.  I

8    placed the kit down and filled out the integrity seals and

9    sealed them.

10        Q    At that time, Trooper, did you fill out all of

11   the seals that were contained in the kit to the extent that

12   you were able to fill them out?

13        A    I filled them out to the best of my capability.

14        Q    The red seals that are reflected there, are they

15   among the things that you filled out in the emergency room

16   right after you received the blood of the defendant?

17        A    Yes, ma'am.

18        Q    " Did you ever lose sight of those blood tubes

19   before you placed the red seals on top of them?

20        A    No, ma'am.

21        Q    When you put your initials and the date on the

22   red seals, how is it that you actually sealed the blood?  Is

23   that the next thing you did?

24        A    Yes, ma'am.

25        Q    Then what became of those tubes?

GIGI WRIGHT, RPR    (516) 571-2503

1    A    After I was done filling out as much as I could

2    with the documentation I passed the kit onto Trooper

3    Stafford.

4              THE COURT:  With the plastic box within the

5         cardboard box?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  But not yet sealed?

8              THE WITNESS:  Correct.  Putting in it into

9         the plastic box and not sealing the cardboard box as

10        well.

11             THE COURT:  How about the Lab-1; was the

12        Lab-1 in the box?

13             THE WITNESS:  I don't recall.

14   Q    Why didn't you seal that internal box at the

15   timed that you handed it to Trooper Stafford?

16   A    The plastic box, you are supposed to get the

17   defendant's name and put it on the test tubes.  I did not

18   have that due to the fact he was unconscious.  I left the

19   plastic box unsealed, so when his name was discovered it

20   could be put on the test tubes.

21   Q    Is there any doubt in your mind, Trooper O'Hare,

22   in examining that kit, that that is the blood that you

23   received from, that you watched Nurse Busco extract from the

24   body of Martin Heidgen, and that you put the seals on on

25   July 2nd 2005?

1374

Trooper O'Hare - Cross - LaMagna

1    A    Yes, this is his blood.

2    Q    Any doubt in your mind?

3    A    No doubt, ma'am.

4    Q    Thank you.

5         MS. McCORMICK:  Nothing further.

6         THE COURT:  Mr. LaMagna.

7         MR. LaMAGNA:  Judge, may I have that exhibit

8    back.

9         THE COURT:  Yes.  Sure.

10   CROSS-EXAMINATION

11   BY MR. LaMAGNA:

12   Q    Trooper O'Hare, you remember testifying in this

13   trial on September 12th 2006?

14   A    Yes, sir.

15   Q    Now, prior to testifying you testified earlier

16   that you reviewed all of the paperwork in anticipation of

17   your testimony, correct?

18   A    Yes, sir.

19   Q    And in anticipation of your testimony you

20   actually met with members of the District Attorney's office,

21   prior to testifying, correct?

22   A    Yes, sir.

23   Q    And in those conversations with the District

24   Attorney's Office you went over your testimony, didn't you?

25   A    Yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

1       Q      And you said that you refreshed your recollection

2    as to everything that happened on July 2nd 2005, correct?

3       A      Yes, sir.

4       Q      And you reviewed all of the paperwork and had

5    these discussions with the District Attorney's Office prior

6    to testifying on September 12th 2006, didn't you?

7       A      Yes, sir.

8       Q      And you testified concerning the contents of this

9    box, correct?

10      A      Yes, sir.

11      Q      Now, the assistant district attorney asked you

12   concerning the contents of this box as it relates to the

13   seals, correct?

14      A      Yes, sir.

15      Q      And you just testified that there is no doubt in

16   your mind that you put the red seals on; is that what you

17   just testified to?

18      A      Yes, I believe so.

19      Q      And you testified to that based upon looking at

20   the interior of the box, correct?

21      A      Yes, sir.

22      Q      And that's what you based your testimony on

23   today, correct?

24      A      Yes, sir.

25      Q      Based upon the fact that in the box the tubes

Trooper O'Hare - Cross - LaMagna

1    have red seals, correct?

2         A    Yes, sir.

3         Q    Not that you remember that; it is because you

4    looked in the box and you believed you made a mistake

5    because the seals are red, correct?

6         A    Yes, sir.

7         Q    And it is only based upon you looking at this box

8    now that you are saying it must have been that I put the red

9    seals, correct?

10        A    Yes, sir.

11        Q    Because they appear here, correct?

12        A    And to the best of my recollection, sir.

13        Q    Well, you testified a week ago that you used the

14   white seals, correct?

15        A    Yes, sir.

16        Q    So what I am asking you, as you testified just

17   before, when you looked at this box the seals were red, and

18   you assumed, based upon the fact that there is red seals,

19   that is what you did?  Isn't that what you just testified

20   to?

21             MS. McCORMICK:  Objection, Judge.

22             THE COURT:  Sustained.

23        Q    Isn't it that you testified that there is no

24   doubt in your mind that you put the red seals based upon

25   looking in this box?  Isn't that what you just testified to?

```
 1                   MS. McCORMICK; Objection, Judge.  That is not
 2         what I asked.  I asked whether he has any doubt.
 3                   MR. LaMAGNA:  I asked him the question --
 4                   THE COURT:  All right.
 5                   MR. LaMAGNA:  -- two minutes ago.
 6                   THE COURT:  Next question.
 7         Q    And that's what refreshed your recollection, by
 8    looking at those vials, correct?
 9         A    Yes, sir.
10         Q    Not an independent recollection as you testified
11    to on the 12th; it is based upon looking at these tubes,
12    correct?
13         A    Yes, sir.
14         Q    Now you testified also, just on direct
15    examination, that when you handed the box or the kit to
16    Trooper Stafford the kit wasn't sealed, correct?
17         A    The boxes, sir?
18         Q    The kit.  The outer box or the inner box were not
19    sealed, correct?
20         A    That is correct.
21         Q    So anybody could have done anything with those
22    tubes, correct?
23         A    Not under police presence, sir.
24         Q    Well, my point is they were not sealed, isn't
25    that correct?
```

Trooper O'Hare - Cross - LaMagna

1        MS. McCORMICK:  Objection.

2        THE COURT:  Sustained.

3    Q    They were not sealed, were they?

4        .  MS. McCORMICK:  Objection. .

5        THE COURT:  Sustained.

6    Q    When you handed the unsealed kit to Trooper

7    Stafford you did not see that box again, isn't that correct?

8    A    Yes, sir.

9    Q    So the last that you saw that box, the outer box

10   and the inner box and the contents of that box, was when you

11   handed it to Trooper Stafford in an unsealed condition,

12   correct?

13   A    Yes, sir.

14   Q    And you testified on September 12th that, in

15   fact, you had written out or placed certain information,

16   your initials on every one of the seals that was contained

17   in that box, correct?

18   A  -  Yes, sir.

19   Q    Seals that you didn't use, correct?

20   A    Yes, sir.

21   Q    For others to use, correct?

22   A    Yes, sir.

23   Q    So other people were going to use seals with your

24   initials that you put on it at a later date, correct?

25   A    Yes, sir.

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1    Q    Not in your presence, correct?

2    A    Yes, sir.

3    Q    Now, directing your attention to the minutes of

4    that trial, of this trial on September 12th, 2006, page 60

5    and 61.  Do you remember me asking you this question:

6         You took one of the white seals with the

7    information that you had and you laid it on top of the gray

8    stopper, correct?

9         "ANSWER:  Yes, sir."

10        You don't have to look at the district attorney.

11        MS. McCORMICK:

12        THE COURT:  There is no jury here at this

13   point.

14   Q    Isn't that what you said?

15   A    If that is what the notes are.

16   Q    Don't you recall saying that?

17   A    I recall, yes, sir.

18   Q    "And you took another white seal and you placed

19   it on top of the gray stopper of the second tube, correct?"

20        And your answer was:  "Yes, sir."

21        Do you remember that?

22   A    Yes, sir.

23   Q    "QUESTION:  Then you placed it into the plastic

24   box, plastic kit, correct?

25        "ANSWER:  Yes, sir."

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1      Do you remember that.

2      A    Yes, sir.

3      Q    "And then you took the two integrity seals, the

4   red ones, correct?

5           "ANSWER:  Yes, sir."

6           Do you remember that?

7      A    Yes, sir.

8      Q    "And you sealed the inner box, correct?

9           "ANSWER: not at that time, sir.

10          "Okay, so you just filled out the integrity

11      seals?

12          "Yes, sir.

13          "So all that was in, now that we are almost

14      finished, the completed interior box contains just the

15      two tubes, correct?

16          "Yes, sir."

17          Do you remember that?

18      A    Yes, sir.

19      Q    "But you didn't seal them, correct?

20          "I sealed the top of the tubes, but not the

21      inside box.

22          Meaning you didn't use the red integrity seals,

23   correct?  Isn't that what you testified to?

24      A    Yes, sir.

25      Q    Directing now your attention to page 98:

GIGI WRIGHT, RPR    (516) 571-2503

1          "QUESTION:  Those white seals that you put over

2    the top of the blood tubes were not completely filled out;

3    is that correct?

4          "ANSWER:  That is correct, sir."

5          Do you remember giving that answer?

6     A     Yes, sir.

7     Q     Referring to page 81 and '82:

8          "QUESTION:  Somebody else filled in the rest of

9      the integrity seals, correct?

10         "ANSWER:  Yes, sir."

11         Do you remember that?

12    A     Yes, sir.

13    Q     The integrity seals are the red seals, correct?

14    A     Yes, sir.

15    Q     "And somebody else put those integrity seals on

16   the inner box, correct?

17         "ANSWER:  Yes, sir."

18         Do you remember giving that answer?

19    A     Yes, sir.

20    Q     Those are the red seals, correct?

21    .A     Yes, sir.

22    Q     "QUESTION:  And you did not put any identifying

23      characteristics by name or initial on the actual tubes

24      of the blood that was taken by Nurse Busco, correct?

25         "ANSWER: I put my initials on the test tubes."

1          Do you remember giving that answer?

2     A    Yes, sir.

3     Q    And to your recollection today you put your

4    initials on the actual test tubes, correct?

5     A    Yes, sir, to the best of my recollection.

6     Q    Now, I want you to look at these tubes and tell

7    me if your initials appear on those tubes?

8     A    I don't see my initials on the tubes.

9     Q    The initials that you say you put on the tubes on

10   July 2nd 2005 do not appear on the tubes in that box,

11   correct?

12    A    Yes, sir.

13    Q    Now, could I have that back, please.

14         So that you have an independent recollection of

15   putting your initials on the actual blood tubes, correct?

16    A    To the best of my recollection, yes, sir.

17    Q    They do not appear on these tubes, correct?

18    A    Yes, sir.

19    Q    And your testimony with respect to the red seals

20   being on this kit today is not based upon your independent

21   recollection, it is based upon you looking at the box today;

22   isn't that correct?

23    A    Yes, sir.

24    Q    Now, do you recall testifying at page 51,

25   referring to Nurse Busco, "she took out the two tubes?

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Cross - LaMagna

```
 1              "ANSWER:  Yes, sir."

 2              Do you remember that?

 3    A    Yes, sir.

 4    Q    "Right?

 5              "ANSWER:  Yes.

 6              "Do you remember that?

 7              "ANSWER:  Yes, sir.".

 8              "She took out the needle, correct?

 9              "ANSWER:  Yes, sir.

10              "QUESTION:  There was nothing left in the inner

11         box at this point, correct?

12              "ANSWER:  Yes, sir.  All of the paperwork I took

13         out, put underneath the cardboard, and I'm holding it."

14              Do you remember that?

15    A    Yes, sir.

16    Q    "QUESTION:  You then saw her take the vacutainer

17         needle, correct?

18              "ANSWER: Uh huh.  Yes, sir.

19              Do you remember that?

20    A    Yes, sir.

21    Q    "QUESTION:  You saw her open up the needle?

22              "ANSWER:  Yes, sir."

23              Do you remember that?

24    A    Yes, sir.

25    Q    That is your recollection; you observed the nurse
```

GIGI WRIGHT, RPR    (516) 571-2503

Trooper O'Hare - Cross - LaMagna

1    take the actual vacutainer needle from you, correct?

2         A    Yes, sir.

3         Q    You saw her crack it open and unseal it, correct?

4         A    Yes, sir.  To the best of my recollection yes,

5    sir.

6         Q    You saw her use that needle?

7         A    Yes.

8         Q    You saw her put the needle in the holder,

9    correct?

10        A    Yes, sir.

11        Q    You saw her actually stick Marty with the needle,

12   correct?

13        A    Yes, sir.

14        Q    And you testified that she discarded that needle

15   and that holder, correct?

16        A    I never saw her throw it out.

17        Q    You testified you never received it back,

18   correct?

19        A    Yes, sir.

20        Q    And you testified that all that was left in the

21   container were the two tubes that you had, correct?

22        A    Yes, sir.

23        Q    And that is what you gave to Trooper Stafford,

24   correct?

25        A    Yes, sir.

Trooper O'Hare - Redirect - McCormick

1        Q     I ask you to look at this box again.  Can you

2    open it?

3              (Witness complies.)

4        Q     In fact, isn't there an unsealed, unused

5    vacutainer needle and holder in that kit?

6        A     Yes, sir.

7        Q     And your recollection is that she used the

8    needle, the holder, and she never gave it back to you,

9    correct?

10       A     Yes, sir.

11             MR. LaMAGNA:  One moment, Judge.

12       Q     And what you just testified to about putting your

13   initials and the use of the needle is based upon your

14   recollection, correct?

15       A     Yes, sir.

16             MR. LaMAGNA:  Nothing further, Judge.

17   REDIRECT EXAMINATION

18   BY MS. McCORMICK:

19       Q     Is that the same recollection that caused you to

20   say that you used white seals at the time?

21       A     Yes, ma'am.

22             MR. LaMAGNA:  Objection.

23             THE COURT:  Overruled.

24       Q     Is that the same recollection that caused you to

25   say that you wrote initials on the tubes?

Trooper O'Hare - Redirect - McCormick

1      A      Yes, ma'am.

2      Q      Trooper O'Hare, how many months has it been since

3  you looked at that actual blood kit, the internal contents?

4      A      Not since the date of the incident, ma'am.

5      Q      So it is about fourteen months?

6      A      Yes, ma'am.

7      Q      You have not taken a look at that since that

8  time?

9      A      No, ma'am, I have not.

10     Q      When you were testifying as to the events of that

11 day -- withdrawn.

12            Opening that blood kit, looking at that blood kit

13 today, and examining that blood kit does that refresh your

14 recollection of the events of July 2nd 2005?

15     A      Yes, ma'am.

16     Q      At the time that you testified previously in this

17 case were you testifying from your best recollection?

18     A      Yes, ma'am.

19     Q      Does looking at that blood kit and observing the

20 red seals, the lack of initials, and the fact that there are

21 a needle and holder, I guess, in that blood kit, refresh

22 your recollection as to the actual events of July 2nd 2005?

23     A      Yes, ma'am.

24     Q      Can you explain to the Court, please, how it is

25 that your initials are not on those blood tubes?

Trooper O'Hare - Redirect - McCormick

1      A    Sir, to the best of my recollection I believe I

2  put my initials on the tubes.  In fact, all I did was put my

3  initials on the red integrity seals after the blood was

4  drawn.

5      Q    Was that a mistake in your recollection, Trooper?

6      A    That is the best of my recollection, yes, ma'am.

7      Q    When counsel asked you whether you filled out all

8  six of the seals to be used in this case, is that an

9  accurate statement?

10      A    Yes, ma'am.

11      Q    He said that you filled out seals to be used by

12  others with your initials on them; is that accurate?

13      A    Yes, ma'am.

14      Q    Trooper O'Hare, I want you to look again closely

15  at the red seals over those tubes.  Are they both your

16  initials and your handwriting?

17      A    Yes, ma'am.

18      Q    Trooper O'Hare, when you left seals to be

19  completed with the defendant's name and other information

20  that you did not yet have to be used by others did you leave

21  the red seals to be used by somebody else to seal those

22  tubes?

23      A    No, ma'am.

24      Q    Who sealed those tubes?

25      A    I did, ma'am.

Trooper O'Hare - Redirect - McCormick

1    Q    When did you seal them?

2    A    Right after the blood was drawn, ma'am.

3    Q    Does it really come down to, Trooper, that you

4    used a red seal instead of a white seal?

5              MR. LaMAGNA:  Objection.

6              THE COURT:  Sustained.

7    Q    Did you use a red seal instead of a white seal?

8    A    Yes, ma'am, I did.

9    Q    Did you recollect from your independent

10   recollection that you believed you had used white instead of

11   red?

12   A    Yes.  At the time my best recollection was I

13   believe I used white, but I used red.

14   Q    Did you handle any other blood kits on July 2nd

15   2005?

16   A    No, ma'am.

17   Q    Just immediately before it?

18   A    No, ma'am.

19   Q    The days following it?

20   A    No, ma'am.

21   Q    This is the only blood kit that you handled that

22   you would have written your initials on each of those seals?

23   A    Yes, ma'am.

24   Q    And do those tubes have your handwriting, your

25   seals, on them?

Trooper O'Hare - Redirect - McCormick

1    A    Yes, ma'am, they do.

2    Q    Could you take a look at the seals on the

3    interior box, the plastic box, of that blood kit?

4    A    Yes, ma'am.

5    Q    What color are they?

6    A    They are white.

7    Q    And the color of the seals on the external box,

8    the cardboard box?

9    A    The ones with my initials on them?

10   Q    Yes.

11   A    They are white.

12   Q    So there were six seals that night with that

13   blood kit; is that correct?

14   A    Yes, ma'am.

15   Q    You initialed only six seals that night with that

16   blood kit; is that correct?

17   A    Yes, ma'am.

18   Q    ~ Four white ones, two red ones; is that correct?

19   A    Yes, ma'am.

20   Q    Are there four white and two red seals used

21   ultimately to seal this entire kit?

22   A    Yes, ma'am.

23   Q    And you had not written your initials on any

24   other seals, on any other blood kits, at any time before or

25   immediately after this crash?

1     A     Yes, ma'am.

2     Q     I have nothing further.

3              MR. LaMAGNA:  May I?

4              THE COURT:  Yes.

5     RECROSS-EXAMINATION

6     BY MR. LaMAGNA:

7     Q     Trooper O'Hare, on September 12th when you

8     testified in this trial, you said while you were aiding

9     Nurse Busco in gaining the withdrawal of the blood from

10    Mr. Heidgen you were following the instructions of the

11    Lab-1, correct?

12    A     Correct.

13    Q     Let me show this to you, Exhibit E, Defendant's

14    Exhibit E in evidence.  Take a moment and review that.

15             (Witness complies.)

16    Q     Have you reviewed that?

17    A     Yes.

18    Q     May I have that back.

19             Trooper O'Hare, you clearly recognize your

20    initials on those red seals, correct?

21    A     Yes, sir.

22    Q     Those are yours, correct?

23    A     Yes, sir.

24    Q     You put them there, correct?

25    A     Yes, sir.

Trooper O'Hare - Redirect - McCormick

1      Q     But you testified at the hearing that you didn't

2    use those red seals, the integrity seals; isn't that

3    correct?

4      A     Yes, sir.

5      Q     That was your recollection, correct?

6      A     Yes, sir.

7      Q     That's what you testified to; isn't that correct?

8      A     Yes, sir.

9      Q     That's what you believed, correct?

10     A     Yes, sir.

11     Q     That's what you thought you did, correct?

12     A     Yes, sir.

13     Q     That's what you believed you did, correct?

14     A     Yes, sir.

15     Q     That's why you testified that way, correct?

16     A     Yes, sir.

17     Q     It is only now, upon looking at this box, that

18   you are changing your testimony, correct?

19     A     Yes, sir.

20     Q     So by looking at that box is influencing your

21   recollection; isn't that true?

22              MS. McCORMICK:  Objection.

23              THE COURT:  Sustained.

24     Q     Proper procedure, according to the Lab-1, is that

25   two white seals, one goes over one gray top of a vacutainer

GIGI WRIGHT, RPR     (516) 571-2503

Trooper O'Hare - Redirect - McCormick

1    tube, correct?

2        A    Yes, sir.

3        Q    That's the proper way to do it, correct?

4        A    Yes, sir.

5        Q    That's what the instructions say, correct?

6        A    Yes, sir.

7        Q    And that's what you believed you did, correct?

8        A    Yes, sir.

9        Q    Another white seal, as you previously testified

10   to, the proper procedure is to put that over the other gray

11   top or gray tube, correct?

12       A    Yes, sir.

13       Q    That's the proper procedure, correct?

14       A    Yes, sir.

15       Q    You are aware of the proper procedure, correct?

16       A    Yes, sir.

17       Q    You have taken blood before, correct?

18       A    Yes, sir.

19       Q    You followed procedure before, correct?

20       A    Yes, sir.

21       Q    You know what to do with these blood tubes,

22   correct?

23       A    Yes, sir.

24       Q    You know which labels to put on the blood tubes,

25   correct?

Trooper O'Hare - Redirect - McCormick

```
 1        A     Yes, sir.

 2        Q     And you testified that the white seals were the

 3   seals that you used for the vials, correct?

 4        A     Yes, sir.

 5        Q     And you testified that the red seals that you

 6   filled out with your signature were left unused for others

 7   along the chain to use, correct?

 8        A     Yes, sir.

 9        Q     And others along the chain did use them, correct?

10      . A     Yes, sir.

11        Q     And they used them outside of your presence,

12   correct?

13        A     Yes, sir.

14        Q     So, really all you are identifying is a red seal

15   that you say you know you filled out, correct?

16        A     Yes, sir.

17        Q     And a red seal with your initials on it, correct?

18        A   .. Yes, sir.

19        Q     That you had previously testified that you did

20   not use, correct?

21        A     Yes, sir.

22        Q     It was for others to use, correct?

23        A     Yes, sir.

24        Q     And you testified you put your initials on the

25   actual tube, correct?
```

GIGI WRIGHT, RPR   (516) 571-2503

Trooper O'Hare - Redirect - McCormick

1    A    Yes, sir.

2    Q    And that's proper procedure too, to identify the

3    actual tube; isn't that correct?

4    A    Yes, sir.

5    Q    And you put the defendant's name, correct?

6    A    Yes, sir.

7    Q    You didn't have that correct?

8    A    Yes, sir, that's correct.

9    Q    But you identified the tube by putting your

10   initials on it, correct?

11   A    Yes, sir.

12   Q    So you could identify the tube, the actual tube;

13   is that correct?

14   A    Yes, sir.

15   Q    Your initials don't appear on these tubes, do

16   they?

17   A    No, sir, they do not.

18   Q    And you also testified that all that was left in

19   the kit that you handed, unsealed, to another trooper only

20   had the two tubes in it, correct?

21   A    Yes, sir.

22   Q    No needle, correct?

23   A    Correct.

24   Q    And no holder, correct?

25   A    Correct.

1    Q    And you saw Nurse Busco use the needle, correct?

2    A    Yes, sir.

3    Q    And you saw her open it, correct?

4    A    Yes, sir.

5    Q    And the kit only comes with one needle and one

6    holder, correct?

7    A    Correct.

8    Q    And that was not in the box that you gave to

9    Trooper Stafford, correct?

10   A    To the best of my recollection, yes, sir.

11   Q    But it is in there now, isn't it?

12   A    Yes, sir.

13            MR. LaMAGNA:  Nothing further, Judge.

14   FURTHER REDIRECT EXAMINATION

15   BY MS. McCORMICK:

16   Q    Trooper O'Hare, were the red seals the only two

17   red seals of the six seals used by you to seal the top of

18   those blood tubes?

19   A    Yes, ma'am.

20   Q    Did you leave the four white seals for other

21   people to continue sealing that kit?

22   A    Yes, ma'am.

23   Q    Trooper O'Hare, the needle is in the kit.  Is it

24   your independent recollection that Nurse Busco used that

25   needle, now having refreshed it, do you still believe she

1    used the needle from the kit?

2                    MR. LaMAGNA:  Objection.

3                    THE COURT:  Sustained.

4        Q    Trooper O'Hare, how do you explain the needle in

5    the kit?

6                    MR. LaMAGNA:  Objection.

7                    THE COURT:  Sustained.

8        Q    Trooper O'Hare, have you refreshed your

9    recollection as to the events of that night?

10       A    Yes, ma'am.

11       Q    Was it busy in that emergency room?

12       A    Yes, ma'am.

13       Q    Was it crowded in that emergency room?

14       A    Yes, ma'am.

15       Q    Were you standing to the rear of Nurse Busco, to

16   her side, as approximately ten other people were working on

17   the defendant that night?

18       A    Yes, ma'am.

19       Q    Did you believe that she used the needle from the

20   kit?

21       A    Yes, ma'am.

22                   MR. LaMAGNA:  Objection.

23                   THE COURT:  Sustained.

24       Q    Do you recall, having refreshed your

25   recollection, whether or not Nurse Busco used the needle

     1    from the kit on that night?

     2                    MR. LaMAGNA:  Objection.

     3                    THE COURT:  Sustained.

     4                    MS. McCORMICK:  Nothing further, Judge.

     5                    THE COURT:  All right, I take a minute to

     6    make my decision.

     7                    Thank you, Trooper.  You are excused.

     8                    (Whereupon, the witness exits the courtroom.)

     9                    (Whereupon, a brief recess was held.)

    10                    THE COURT:  The objection to further

    11    testimony by Lisa Lindenthaler is sustained.

    12                    Please produce the jury.

    13                    COURT OFFICER:  Jurors entering.

    14                    (Whereupon, the jury entered the courtroom,

    15    and upon taking their respective seats, the following

    16    occurred:)

    17                    THE COURT:  People, call your next witness.

    18                    THE CLERK:  Jurors are present and seated,

    19    your Honor.

    20                    THE COURT:  Thank you.

    21                    The objection that had been interposed by

    22    Mr. LaMagna had been sustained.

    23                    People.

    24                    MR. HAYDEN:  Dr. Sean McCance.

    25                    COURT OFFICER:  Step up.  Remain standing,

1     raise your right hand, and face the clerk.

2               S E A N   M c C A N C E,         a witness

3               called on behalf of the People, having been

4               first duly sworn by the Clerk of the Court,

5               was examined and testified as follows:

6               THE CLERK:   You can put your hand down.

7               State your name, spelling your last name for

8        the record.

9               THE WITNESS:   Dr. Sean McCance,

10       M-C-C-A-N-C-E.

11              THE CLERK:   Thank you.   Please take the

12       stand.

13  DIRECT EXAMINATION

14  BY MR. HAYDEN:

15       Q    Good afternoon, Doctor.

16       A    Good afternoon.

17       Q    How old are you?

18       A    Forty-one.

19       Q    Are you a doctor licensed to practice medicine in

20  the State of New York?

21       A    Yes.

22       Q    How many years have you been licensed to practice

23  medicine?

24       A    Eleven.

25       Q    What kind of medicine do you practice?

Dr. McCance - Direct - Hayden

1      A     Spine surgery.

2      Q ·   Describe your educational background.

3      A     I went to college at Forham University; Medical

4  School at Columbia; residency at University of Rochester, in

5  upstate New York; and Fellowship in spine surgery in

6  Minneapolis.

7      Q     Describe your professional background.

8      A     I am an attending spine surgeon at Lenox-Hill

9  Hospital.  I am also co-director of spine surgery at Mt.

10  Sinai Hospital.  I'm pretty much full-time surgery.

11     Q     Do you know a man named Neil Flynn?

12     A     I do.

13     Q     Have you treated Neil Flynn for injuries suffered

14  on the early morning of Saturday July 2nd of 2005?

15     A     I did.

16     Q     When did you first meet Neil Flynn?

17     A     In relation to this accident, I met him

18  approximately six weeks after the accident.  I met him

19  first, initially, in relationship to, he was an attorney in

20  another trial that I was a witness in.

21     Q     Describe the location where you first met Neil

22  Flynn with relation to the injuries that he suffered in this

23  crash.

24     A     The location was my office in New York City.

25     Q     Did you examine Neil Flynn?

Dr. McCance - Direct - Hayden

1        A       I did.

2        Q       Were x-rays taken?

3        A       He brought x-rays and an MRI and a CT scan with

4   him at the time of the visit.

5        Q       Describe any injury you observed to Neil Flynn's

6   back?

7        A       He had back spasm, back pain, limitations of

8   motion, and physical exam findings consistent with a

9   ruptured disk at L4-5, and compression fracture at L1.

10       Q       What does that mean?

11       A       It means that he, in the course of the trauma

12  that he sustained, he ruptured a disk at L4-5.  The disk is

13  the cushions between the vertebrae that acts like a shock

14  absorber.  It ruptured and pushed out into the spinal canal

15  and was hitting the nerves.  And the L1 vertebrae, which is

16  the first vertebrae of the lower back, had been crushed to a

17  degree by the impact.

18       Q    -- Did you perform surgery on Neil Flynn's back?

19       A       I did.

20       Q       When was that?

21       A       I have to check my chart.  It was in August, I

22  believe, of the summer of 2005.

23       Q       What was the purpose of the surgery?

24       A       The purpose of the surgery was to remove the

25  herniated disk material from the spinal canal.  It was

1    thereby decompressing the nerves and taking the pressure off

2    the nerves; and also to stabilize the fracture we injected

3    some cement into that vertebrae to stop it from compressing

4    further and try to give pain relief.

5        Q    What was the results of the surgery?

6        A    I think that the result was reasonable.  We got a

7    large amount of the disk material out of the spinal canal

8    and took the pressure off the nerves, and that was

9    successful.  And I think that the cement injection caused

10   the procedure to help to stabilize the fracture as well.

11       Q    Describe the condition of Neil Flynn's back as it

12   is today?

13       A    Has an injured L4-5 disk, which we removed the

14   ruptured material in the disk itself.  After that procedure

15   he has some residual injury to it.  The L1 fracture is

16   stabilized, but in a partially compressed position.

17       Q    Describe any pain that condition would cause?

18       A    Well, I think to summarize his position, he had

19   severe pain prior to the surgery because of the pressure on

20   the nerves.  A lot of that was relieved.  He has residual

21   nerve problems that are not severe.

22            He has back pain related to the fracture, which

23   is more chronic.  I think that the overall condition of his

24   back is one of some ongoing lower back pain, some of which

25   is probably permanent.

1      Q      How would that affect Mr. Flynn over the

2      day-to-day course of his life?

3      A      It would probably affect him in terms of how he

4      lifts and moves and what kind of physical activities he

5      could participate in, how long he could work in one position

6      without changing position, without getting up.  I know the

7      last time I examined him in the office he was working

8      shorter hours than normal.

9      Q      You called it a chronic condition.  Do you mean

10     that will be with him for the rest of his life?

11     A      Yes.  I think because of the changes that

12     occurred from the injury.  Whenever a body part is injured

13     it never goes back to the original state.  The residual of

14     the injury will be with him for the rest of his life.

15                    MR. HAYDEN:  Nothing further, your Honor.

16           Thank you.

17                    THE COURT:  Mr. LaMagna.

18                    MR. LaMAGNA:  Nothing, your Honor.

19                    THE COURT:  Thank you, Doctor.

20                    (Whereupon, the witness exits the courtroom.)

21                    THE COURT:  People?

22                    Mr. HAYDEN:  May we approach?

23                    THE COURT:  Yes.

24                    (Whereupon, a discussion was held off the

25           record.)

Dr. McCance - Direct - Hayden

1        THE COURT:  All right, at this time we are

2    going to give you at least a fifteen-minute break.

3    Don't talk about the case.  We'll get you as soon as we

4    are ready.

5        (Whereupon, the jury exited the courtroom,

6    and a brief recess held.)

7                      o0o

8        (In open court.  Defendant present.)

9        THE COURT:  Please produce the jury.

10       COURT OFFICER:  Jury entering.

11       (Whereupon, the jury entered the courtroom,

12   and upon taking their respective seats, the following

13   occurred:)

14       THE CLERK:  Case on trial, Indictment 1910N

15   of 2005, People verse Martin Heidgen.

16       People ready?

17       MR. HAYDEN:  Ready, your Honor.

18       THE CLERK:  Defense ready?

19       MR. LaMAGNA:  Defense ready.

20       THE CLERK:  Jury is present, defendant is

21   present and jury is seated.

22       MS. McCORMICK:  Your Honor, the People call

23   Ray Townsend.

24       COURT OFFICER:  Step up, sir.  Remain

25   standing, raise your right hand and face the clerk.

Townsend - Direct - McCormick

1              R A Y M O N D    T O W N S E N D,         a

2              witness called on behalf of the People,

3              having been first duly sworn by the Clerk of

4              the Court, was examined and testified as

5              follows:

6                   THE CLERK:  State your name, spelling your

7         last name.

8                   THE WITNESS:  Raymond Townsend,

9         T-O-W-N-S-E-N-D.

10                  THE CLERK:  Thank you.  Please take a seat.

11   DIRECT EXAMINATION

12   BY MS. McCORMICK:

13        Q    Good afternoon, Mr. Townsend.

14        A    Good afternoon.

15        Q    Mr. Townsend, can you tell the jury, please, how

16   are you employed, sir?

17        A    I'm the general manager of U.S.A. Funerals.

18        Q    U.S.A. Funerals?

19        A    Yes.

20        Q    Is that a limousine company, sir?

21        A    Yes, it is.

22        Q    On July 2nd 2005 did you have a person in your

23   employment by the name of Stanley Rabinowitz?

24        A    Yes, I did.

25        Q    As of July 2nd 2005 how long had Mr. Rabinowitz

1    been in your employ?

2         A    He would have been there three years on July

3    22nd, I believe.

4         Q    The vehicle that was involved in the crash on the

5    Meadowbrook Parkway, at approximately 2 o'clock in the

6    morning, just north of the Babylon Turnpike overpass, on

7    July 2nd 2005 was owned by your company?

8         A    Yes, it was.

9         Q    That was a vehicle with license plate US 15?

10        A    Yes, it was.

11        Q    At the time -- could you describe for the jury

12   when did you purchase that vehicle?

13        A    We purchased that vehicle in -- October of 2002

14   is when we ordered it.  We received it in about November of

15   2002.

16        Q    I ask to approach you with what I ask be deemed

17   marked as People's Exhibits 70 and 71 for identification

18   purposes.

19             (Whereupon, two bills of sale, received and

20        marked People's Exhibits 70 and 71 for identification.)

21             COURT OFFICER:  People's Exhibits 70 and 71

22        for identification.

23        Q    Can you look at both of those documents, please,

24   sir.

25        A    Yes.

1      Q      Do you recognize them?

2      A      Yes, I do.

3      Q      First, referring to People's Exhibit number 70,

4    which I believe has the designation US 15 on it, is that

5    correct, the number on the back of the item, to make sure it

6    is the right one?

7      A      Yes, it is.

8      Q      What do you recognize that to be, sir?

9      A      That's the bill of sale for US 15.

10      Q      Is US 15 the limousine that was involved in the

11   crash on July 2nd 2005?

12      A      Yes, it was.

13      Q      Is that bill of sale part of the business records

14   of U.S. Funerals?

15      A      Yes, it is.

16      Q      Is it in the ordinary course of business to

17   retain that record?

18      A      Yes, it is.

19      Q      Was that document created or obtained at or about

20   the time of the purchase of the limousine?

21      A      Yes, it was.

22             MS. McCORMICK:  Your Honor, at this time I

23         ask this document be moved into evidence as People's

24         Exhibit 70 in evidence.

25             THE COURT:  Please show it to counsel.

Townsend - Direct - McCormick

1    MR. LaMAGNA:  No objection, your Honor.

2    THE COURT:  It is received.

3    (Whereupon, People's Exhibit 70 for

4    identification now received and marked People's Exhibit

5    70 in evidence.)

6    COURT OFFICER:  People's Exhibit 70 in

7    evidence.

8    Q    At this time I would ask you to take a look at

9    People's Exhibit 71 for identification purposes.

10    Do you recognize that document, sir?

11    A    Yes, ma'am, I do.

12    Q    What is that?

13    A    That is the bill of sale for US 24.

14    Q    US 24 is another limousine?

15    A    Yes, it is.

16    Q    Is there any significance of US 24 as it relates

17    to US 15, the vehicle involved in the crash?

18    A    -- Yes.  They are the exact same model.

19    Q    Were they purchased at the same time?

20    A    Within two weeks of each other, yes.

21    Q    Were they outfitted in the same way?

22    A    Exactly the same.

23    Q    Is that document, once again, in the ordinary

24    course of your business to retain?

25    A    Yes, it is.

GIGI WRIGHT, RPR    (516) 571-2503

Townsend - Direct - McCormick

1    Q    Was that document created and on obtained at or

2    about the time that US 24 was purchased?

3    A    Yes, it was.

4              MS. McCORMICK:  At this time, your Honor, I

5    would ask that be moved into evidence as People's

6    Exhibit 71.

7              THE COURT:  Please show it to counsel.

8              MR. LaMAGNA:  No objection.

9              THE COURT:  It is received.

10             (Whereupon, People's Exhibit 71 for

11   identification now received and marked People's Exhibit

12   71 in evidence.)

13             COURT OFFICER:  People's Exhibit 71 in

14   evidence.

15   Q    Mr. Townsend, those vehicles from an appearance

16   standpoint were identical?

17   A    Yes, they were.

18   Q    I ask to approach you with what I ask to be

19   marked People's Exhibit 72 for identification purposes.

20             (Whereupon, a photograph received and marked

21   People's Exhibit 72 for identification.)

22             COURT OFFICER:  People's Exhibit 72 for

23   identification.

24   Q    Do you recognize that, Mr. Townsend?

25   A    Yes, I do.

1    Q    What do you recognize that to be?

2    A    That's US 24.

3    Q    Is that the twin, for lack of a better term, of

4    US 15?

5    A    Yes.

6    Q    But in an undamaged condition?

7    A    Yes, it is.

8    Q    Is that photograph a fair and accurate

9    representation of the condition of US 24?

10   A    Yes.

11             MS. McCORMICK:  Your Honor, at this time I

12   would ask that that be marked into evidence as People's

13   Exhibit number 72.

14             THE COURT:  Please show it to counsel.

15             MR. LaMAGNA:  Judge, I have no objection.  It

16   is just to demonstrate what the car looked like prior

17   to the accident?

18             MS. McCORMICK:  Yes.

19             THE COURT:  It is received.

20             (Whereupon, People's Exhibit 72 for

21   identification now received and marked People's Exhibit

22   72 in evidence.)

23             MS. McCORMICK:  Your Honor, with the Court'S

24   permission I would ask that that photograph be

25   displayed to the jury.

GIGI WRIGHT, RPR    (516) 571-2503

Townsend - Direct - McCormick

1          THE COURT:  Yes.

2          COURT OFFICER:  People's Exhibit 72 in

3     evidence.

4          (Whereupon, People's Exhibit 72 displayed to

5     the jury.)

6      Q    Mr. Townsend, you indicated that US 24 and US 15

7    are outfitted had in the same way.  Is that correct?

8      A    Yes, they are.

9      Q    Is one of those that it is outfitted with a GPS

10    system?

11     A    Yes, it is.

12     Q    Could you tell the jury what is a GPS system?

13     A    It is a device located in the car that allows us

14    to track the movements and locations of each of our

15    vehicles.

16     Q    Do the letters GPS stand for Global Positioning

17    Satellite?

18     A  .. That's what it stands for, yes.

19     Q    Could you describe for the jury what is the

20    purpose of having it in the vehicle?

21     A    It allows us to maintain control of the vehicle's

22    location, vehicle's speed and area where we operate it.

23     Q    Mr. Townsend was the GPS system in effect on the

24    night of July 2nd 2005 on US 15?

25     A    Yes, it was.

1    Q    Was someone tracking the movements of US 15 at

2    your company?

3    A    Yes, they were.

4    Q    Is that a real-time tracking of the vehicle, sir?

5    A    Yes, ma'am, it is.

6    Q    Can you describe for the jury how the GPS is used

7    in terms of tracking the vehicle by the dispatcher?

8    A    On the dispatch screen you can see all of the

9    vehicles that have a GPS in it, and what the dispatcher

10   periodically does is he keys down on a screen and he pulls

11   up each individual vehicle, and you can also hit a button

12   that would show you a location of all vehicles at the same

13   time.  You could look for individual vehicles or your whole

14   fleet.

15   Q    Does the GPS send a signal to the dispatcher when

16   the vehicle has stopped?

17   A    Yes, it does.

18   Q    Did your company receive a signal that US 15 had

19   become stopped sometime on July 2nd 2005?

20   A    Yes, we did.

21   Q    Did you do anything in response to that?

22   A    I was notified at around 3 a.m. that the vehicle

23   was stopped.  The dispatcher on duty had tried to radio

24   Stanley through his NexTel two-way radio, and tried to

25   contact Stanley through his cell phone, and he was unable to

1    do so.

2        Q    Did you have occasion to respond to the scene of

3    that crash at that time?

4        A    Yes, I did.

5        Q    With respect to the GPS, is it designed to track

6    or to create a report that indicates the travel path of a

7    vehicle at regular intervals?

8        A    Yes, it does.

9        Q    Does that GPS system create a report that is kept

10   in the regular course of business by your company?

11       A    Yes, it does.

12       Q    I ask to approach you with what I ask be marked

13   People's Exhibit 73 for identification purposes.

14            COURT OFFICER:  People's Exhibit 73 for

15        identification.

16            (Whereupon, a GPS report received and marked

17        People's Exhibit 73 for identification.)

18       Q    ~ Mr. Townsend, do you recognize that, sir?

19       A    Yes, I do.

20       Q    What do you recognize that to be?

21       A    This is the GPS report on US 15 on the night of

22   the accident.

23       Q    And does that indicate the travel path of

24   Mr. Rabinowitz's limousine from 1:32, I think it is, in the

25   morning up until the time of the crash?

1        A        Yes, it does.

2        Q        It does not specify though the specific time of

3        the crash, does it, sir?

4        A        No, it doesn't.

5        Q        Could you tell the jury what is the last time

6        indicated and the destination on the GPS report?

7        A        The last time recorded is 2:01:32 a.m. on the

8        Senator Normal J. Levy Memorial Parkway, which is also the

9        Meadowbrook Parkway.

10       Q        You said 2:01?

11       A        2:01:32.

12       Q        Is that a report something that is kept in the

13       regular course of your business, sir?

14       A        Yes.

15       Q        Was that report generated at or about the time of

16       July 2nd 2005?

-17       A        Yes, it was.

18       Q        " Is it in the regular course of your business to

19       keep that report?

20       A        Excuse me?

21       Q        Is it the regular course of your business to keep

22       that report?

23       A        Yes, it is.

24                MS. McCORMICK:  At this time, your Honor, I

25                ask it be moved into evidence as People's Exhibit 73 in

1        evidence.

2                         THE COURT:   Counsel?

3                         MR. LaMAGNA:   No objection, your Honor.

4                         THE COURT:   It is received.

5                         (Whereupon, People's Exhibit 73 for

6               identification now received and marked People's Exhibit

7               73 in evidence.)

8                         COURT OFFICER:   People's Exhibit 73 in

9               evidence.

10       Q       Mr. Townsend, again referring to People's Exhibit

11       number 73 in evidence, can you tell the jury what is the

12       last time and speed recorded of the limousine prior to the

13       stopped destination?

14       A       The last time recorded is 2:01 a.m. with a speed

15       of 60 miles per hour.

16       Q       And Mr. Townsend, again, you said that both US 24

17       and US 15 were outfitted identically; is that correct?

18       A       ~ That's correct.

19       Q       Is one of the components or one of the -- I don't

20       know what the word is that is used -- one of the instruments

21       used in both limousines something called a drive cam system?

22       A       Yes.   All of our vehicles have drive cams.

23       Q       Could you please explain to the jury what is a

24       drive cam?

25       A       Drive cam is a windshield mounted, forward-facing

1    camera, that films in a constant loop.  When a certain

2    amount of G-Force is applied to the instrument inside of the

3    camera it then records and stores the event ten seconds

4    before and ten seconds after.  That event is stored to the

5    camera until it is downloaded into my computer.

6         Q    Do you download the information from the drive

7    cam on a regular basis?

8         A    Yes, I do.

9         Q    Do you do that on a daily basis?

10        A    Yes, I do.

11        Q    With is the purpose of that download?

12        A    Purpose is to monitor different events throughout

13   the day, driving habits, accidents.

14        Q    And in this case, from US 15 was there a drive

15   cam mounted in that vehicle?

16        A    Yes, there was.

17        Q    Was that drive cam mounted in the same manner as

18   it was mounted on US 24?

19        A    Yes, it was.

20        Q    I'm sorry.

21             Mr. Townsend, did you have occasion to download

22   the information contained in the drive cam that was removed

23   by the State Police from US 15, sir?

24        A    Yes, I did.

25        Q    What did you do with that information?

Townsend - Direct - McCormick

1      A      I made a copy onto a CD, and I gave it to the New

2   York State Police.

3      Q      When you said that the drive cam is, it triggers

4   recording by G-Forces, in layman's terms, what does that

5   mean?

6      A      A G-Force is basically a sudden acceleration or

7   deceleration, just the amount of force that is used.

8      Q      Could you excuse me for one minute, your Honor.

9             Mr. Townsend, I ask to approach you with what I

10  ask to be marked as People's Exhibit 74 for identification

11  purposes.

12             (Whereupon, a photograph of a drive cam

13         marked People's Exhibit 74 for identification.)

14             COURT OFFICER:  People's Exhibit 74 for

15         identification.

16     Q      You have never seen that before?

17     A      The picture, no, I haven't.

18     Q      What did you recognize it to be?

19     A      This is a drive cam system camera.

20     Q      Is it mounted behind the rearview mirror?

21     A      Yes, it is.

22     Q      Is that a fair and accurate representation of

23  where the drive cam was mounted on US 15 on the day of July

24  2nd 2005 before the crash?

25     A      Yes, it is.

GIGI WRIGHT, RPR   (516) 571-2503

Townsend - Direct - McCormick

1            MS. McCORMICK:  Your Honor, at this time I

2      would like to move that into evidence as People's

3      Exhibit 74.

4            THE COURT:  Show it to the counsel.

5            MR. LaMAGNA:  For demonstrative purposes I

6      have no objection.

7            THE COURT:  It is received.

8            COURT OFFICER:  People's Exhibit 74 in

9      evidence.

10           (Whereupon, People's Exhibit 74 for

11     identification now received and marked People's Exhibit

12     74 in evidence.)

13           MS. McCORMICK:  I have no further questions.

14           THE COURT:  Mr. LaMagna?

15           MR. LaMAGNA:  No questions, your Honor.

16           THE COURT:  Thank you.

17           (Whereupon, the witness exits the courtroom.)

18           THE COURT:  People, your next witness.

19           MR. HAYDEN:  Greg Nizewitz.

20           COURT OFFICER:  Step up, remain standing,

21     raise your right hand and face the clerk.

22           G R E G   N I Z E W I T Z,      a witness

23           called on behalf of the People, having been

24           first duly sworn by the Clerk of the Court,

25           was examined and testified as follows:

GIGI WRIGHT, RPR    (516) 571-2503

```
 1                    COURT OFFICER:  State your name, spelling

 2           your last name.

 3                    THE WITNESS:  Greg Nizewitz, N-I-Z-E-W-I-T-Z.

 4                    THE CLERK:  County of residence?

 5                    THE WITNESS:  Nassau.

 6      DIRECT EXAMINATION

 7      BY MR. HAYDEN:

 8           Q    Good afternoon, Mr. Nizewitz.  How old are you?

 9           A    Twenty-four.

10           Q    What is your occupation?

11           A    I'm a teacher.

12           Q    High school?

13           A    High school.

14           Q    Do you know a man named Martin Heidgen?

15           A    I do.

16           Q    Briefly describe him physically.

17           A    About six feet, 180 pounds, good shape.

18           Q    Do you see Martin Heidgen in this courtroom

19      today?

20           A    Yes.

21           Q    Would you point him out for the jury and describe

22      for the record what he is wearing today?

23           A    Wearing a blue jacket, tie, shirt.  He is sitting

24      between the two lawyers right there.

25                    MR. HAYDNE:  May the record reflect, your
```

1       Honor, that the witness has indicated the defendant

2       Martin Heidgen?

3              THE COURT:  Record will show reflect.

4       Q    Describe your relationship with the defendant as

5  it was in the summer of 2005?

6       A    I would say we were friends.

7       Q    I'm directing your attention to the afternoon of

8  Friday, July 1st of 2005.

9              Did you meet the defendant that Friday afternoon?

10      A    Yes, I did.

11      Q    Where did you meet him?

12      A    At the House of Brews.

13      Q    Where is the House Brews bruise located?

14      A    On 46th Street in Manhattan.

15      Q    Is it just west of the theater district?

16      A    Yeah.  It is on Restaurant Row, I guess it is

17  called.

18      Q    Describe the House of brews for the jury.

19      A    It is a local bar, nothing too elaborate, just

20  regular long, thin bar.

21      Q    Describe the circumstances under which you met

22  the defendant at the House of Brews that Friday afternoon?

23      A    I had a couple of friends up from college.  I was

24  showing them around New York.  Marty was working in the city

25  at the time, so we kind ever arranged to meet up after he

1    was done with work and after my friends were done looking

2    around the city, meet up for a couple of drinks after, in

3    the afternoon.

4         Q    Who else was present while you were with the

5    defendant at the House of Brews that Friday afternoon?

6         A    It was me, my two friends from school, Eric Gamma

7    and Lynn Bowman; and when I got there Marty was there with

8    Amy Howard.

9         Q    What school are you talking about?

10        A    University of Virginia.

11        Q    Was the defendant already at the House of Brews

12   when you arrived?

13        A    Yes, he was.

14        Q    Whom was he with?

15        A    Amy Howard.

16        Q    What was the approximate time you arrived?

17        A    About 4:30.

18        Q    Approximately how long were you with the

19   defendant at the House of Brews?

20        A    I would say about three hours.

21        Q    Was the defendant still at the House of Brews

22   when you left?

23        A    Yeah.

24        Q    What was the approximate time you left?

25        A    About 7:30.

1    Q    What were you and the defendant doing in the

2  House of Brews?

3    A    Just catching up, good friends, talking about

4  Friday, talking sports, talking fantasy baseball.  Thinking

5  about the weekend ahead, Fourth of July plans.

6    Q    Were you drinking while you were at the House of

7  Brews?

8    A    Yes.

9    Q    What were up drinking?

10   A    Bohemia beer.

11   Q    How many Bohemia beers did you drink?

12   A    I would say about six.

13   Q    Did you see the defendant drinking that

14  afternoon?

15   A    Yes.

16   Q    What was the defendant drinking?

17   A    Bohemia beers.

18   Q    How many beers did you see the defendant drink?

19   A    I would say about six also.

20   Q    Bohemia beer contains alcohol?

21   A    Yes.

22   Q    Twelve-ounce bottles?

23   A    Yes.

24   Q    Do you remember who paid for your beers at the

25  House of Brews?

```
 1      A     We all chipped in.

 2      Q     How about the defendant's beers?

 3      A     I'm sure he paid for himself.

 4      Q     Do you remember the defendant paying for anyone

 5   else's beers?

 6      A     Yeah.

 7      Q     Whom?

 8      A     We all bought rounds for each other throughout

 9   the time, I guess.

10      Q     Did you have anything to eat at the House of

11   Brews?

12      A     No.

13      Q     Did you see the defendant have anything to eat at

14   the House of Brews?

15      A     Not that I recall, no.

16      Q     Did the conversation revolve primarily around

17   sports?

18      A     I would say yeah.

19      Q     Football?

20      A     Fantasy baseball.  It was the summer getting

21   ready for football, but it was still summer so we were

22   talking about baseball mostly.

23      Q     Describe any observations you made of the

24   defendant while you were with him that Friday afternoon?

25      A     He seemed happy, ready for the weekend, just
```

1      excited, friendly.

2           Q      Good mood?

3           A      Good mood, yeah.

4           Q      Do you remember the defendant's slurring his

5      words that afternoon?

6           A      Not at all.

7           Q      Do you remember the defendant staggering that

8      afternoon?

9           A      Not at all.

10          Q      Do you remember the defendant stumbling at all

11     that afternoon?

12          A      Nope.

13          Q      Do you remember observing any effects of the

14     alcohol that you saw the defendant consume at the House of

15     Brews?

16          A      No.

17                 MR. HAYDEN:  Nothing further, your Honor.

18          Thank you.

19                 THE COURT:  Mr. LaMagna.

20     CROSS-EXAMINATION

21     BY MR. LaMAGNA:

22          Q      Good afternoon, Greg.  We have spoken before?

23          A      Yes.

24          Q      Talked about this case?

25          A      Yes.

Nizewitz - Cross - LaMagna

```
 1      Q    Now you say you are a teacher?

 2      A    Yes.

 3      Q    Where do you teach?

 4      A    Connetquot High School.

 5      Q    How long had you known Marty prior to July 2nd

 6   2005?

 7      A    A little less than a year.

 8      Q    And you met Marty through mutual friends of

 9   yours?

10      A    Yes, Josh Zigman.

11      Q    And Josh introduced you and your group of friends

12   to Marty as well?

13      A    Right.

14      Q    And you and your group of friends are a pretty

15   tight-knit group?

16      A    Yeah.  We all hit it off pretty quickly.

17      Q    Meaning your friends hit it off pretty quickly

18   with Marty, correct?

19      A    Yes.

20      Q    You and your group of friends are a pretty

21   tight-knit group?

22      A    Yes.

23      Q    He was accepted into that group; is that correct?

24      A    Yes.

25      Q    Now, you said that at some point you had met
```

```
 1   Marty at the House of Brews.  Is that correct?

 2        A    Yes, it is.

 3        Q    This was a Friday, wasn't it?

 4        A    Right.

 5        Q    And you had friends in from college?

 6        A    Yes.

 7        Q    University of Virginia, I believe?

 8        A    Correct.

 9        Q    And you were showing them around New York?

10        A    Yeah.

11        Q    You wanted to introduce them to Marty, correct?

12        A    Yeah.

13        Q    And you, as a matter of fact, had spoken to Marty

14   a few days before to arrange this, correct?

15        A    Yeah, we planned it out.

16        Q    Marty was in agreement or agreeable to meet these

17   new people?

18        A    Yeah.

19        Q    At some point you arrived at the House of Brews;

20   is that correct?

21        A    Yes, it is.

22        Q    Around 4:30?

23        A    Right.

24        Q    Marty was already there?

25        A    Right.
```

Nizewitz - Cross - LaMagna

```
 1        Q    He was there with Amy?

 2        A    Right.

 3        Q    He was in a good mood?

 4        A    Yeah.

 5        Q    Happy?

 6        A    Yeah.

 7        Q    Laughing?

 8        A    Yes.

 9        Q    Not depressed at all?

10        A    Not depressed.

11        Q    Discussed many things?

12        A    Yeah.

13        Q    Discussed fantasy baseball?

14        A    Yeah.

15        Q    All types of sports and things like that?

16        A    Yeah.

17        Q    When Marty met your friends did they seem to get

18   along?

19        A    Yeah, definitely.

20        Q    They were talking?

21        A    Yeah.

22        Q    Laughing?

23        A    Yes.

24        Q    Having a good time?

25        A    Yeah.
```

Nizewitz - Cross - LaMagna

1    Q    Nothing out of the ordinary?

2    A    Nothing out of the ordinary.

3    Q    Nothing unusual?

4    A    Nope.

5    Q    Seemed perfectly happy and fine?

6    A    Right.

7    Q    Now, you testified on direct examination that one

8    of the topics that you were talking about with Marty were

9    the plans for the upcoming Fourth of July weekend; is that

10   correct?

11   A    A little bit, yeah.

12   Q    You and your friends, including Marty, had plans

13   for that weekend, right?

14   A    Right.

15   Q    One of the plans for that weekend was to get

16   together, or a party, at Amanda Goldman's house that very

17   night, correct?

18   A    Correct.

19   Q    You were not going to that party however?

20   A    Right.

21   Q    You were with your friends in the city, correct?

22   A    Yes.

23   Q    And a group of people, including Marty, went to

24   that party, correct?

25   A    From what I know, yes.

Nizewitz - Cross - LaMagna

1     Q     Other plans that you had for that weekend

2     culminated in the fact that there was going to be this big

3     barbecue at the Goldman residence, correct?

4     A     Yes.

5     Q     And Amanda's brother was also born on the Fourth

6     of July, right?

7     A     Yeah.

8     Q     So that was always like a big traditional

9     barbecue that you and your friends would have, correct?

10    A     Yes.

11    Q     This was going to be Marty's first barbecue

12    there, correct?

13    A     Yes.

14    Q     He articulated to you that he was excited to see

15    what this whole big barbecue was about?

16    A     Definitely.

17    Q     You discussed that with him?

18    A     Yeah.

19    Q     He was excited about that, correct?

20    A     Yeah.

21    Q     You had these discusses, right?

22    A     Right.

23    Q     And at some point you -- withdrawn.

24          While you were at the House of Brews -- you had

25    been there before?

Nizewitz - Cross - LaMagna

1     A     Yeah.

2     Q     You had been there before with Marty?

3     A     Right.

4     Q     They have a Happy Hour?

5     A     Yeah.

6     Q     There is a bartender named Jessica, correct?

7     A     Yeah.

8     Q     Marty had shown interest in her, correct?

9     A     A little bit, yeah.

10    Q     And, in particular, that night he was flirting

11    with her, correct?

12    A     Yes, he was.

13    Q     And when you left, in fact, you had asked Marty

14    to go to dinner with you in the city, correct?

15    A     Yeah.

16    Q     He decided to stay, correct?

17    A     Yes.

18    Q     Because he was getting along pretty well, I think

19    you said, with Jessica, right?

20    A     I would say so.

21    Q     I guess trying to get her number, correct?

22    A     Yeah.

23    Q     Now at some point you learned that, in fact, that

24    night Marty did get her number, correct?

25    A     Yeah.  I learned that after the fact.

Nizewitz - Redirect - Hayden

1      Q      And you left the House of Brews around 7:30,

2    correct?  Is that correct?

3      A      Correct.

4      Q      You never made it to Amanda Goldman's house, of

5    course?

6      A      Right.

7      Q      When you left Marty he was still in the same good

8    mood?

9      A      Yeah.

10     Q      Same happy mood?

11     A      Yes.

12     Q      Same laughing, smiling, nothing out of the

13   ordinary, correct?

14     A      Right.

15     Q      Seemed perfectly fine?

16     A      Yeah.

17            MR. LaMAGNA:  Nothing further, Judge.

18   REDIRECT EXAMINATION

19   BY MR. HAYDEN:

20     Q      Jessica was the bartender; is that right?

21     A      That's correct.

22     Q      Marty was at the bar when you met him?

23     A      Yeah.

24     Q      Nothing further, your Honor.

25            THE COURT:  Thank you.

GIGI WRIGHT, RPR    (516) 571-2503

Nizewitz - Redirect - Hayden

1           At this time we are going to break for the

2      evening.  You know all of the admonitions.  Don't talk

3      to anybody.  Don't let anybody talk to.  You, we can't

4      acknowledge you, if we run into you.  Don't go to the

5      scene.  Please don't talk to the press or look at the

6      news, television, radio.  You see the flashbulbs out

7      there, you know it is all over every place.  You have

8      to trust me, it is not fair if you look at the news

9      reports.  What is fair is to listen to the evidence as

10     you hear it yourselves, and as you see it yourselves.

11     That's fair.

12          Have a nice night.  See you at 9:30.

13          (Whereupon, the jury exited the courtroom,

14     and the following occurred:)

15          (In open court.  Defendant present.  Jury is

16     not present.)

17          THE CLERK:  Do the People have an application

18     at this time?

19          MS. McCORMICK:  Yes, your Honor.  The People

20     are making an application pursuant to 240.40(2)(b)(v)

21     of the C.P.L.  At this time the People would be

22     requesting that the defendant be required to submit to

23     a buccal swab, that would be a saliva swab, of his

24     mouth.

25          It is the People's position that testimony

1     has developed during this trial, testimony that we were

2     not aware of, that has caused the Court to rule to

3     exclude extremely crucial evidence in this case; that

4     being the blood evidence and the result of the blood

5     alcohol content from the defendant.

6                The People have previously investigated how

7     long it would take in order to have a DNA comparison

8     done between a buccal swab and the defendant's blood

9     from the existing blood kit, so there could be no

10    dispute, no question, that the blood in fact is the

11    blood of Martin Heidgen.

12               That being the case, Judge, and in light of

13    the development of testimony, the People would argue

14    that we are not late in making this application.  It is

15    an application that has only developed specifically on

16    today's date.

17               THE COURT:  What section is this pursuant to?

18               MS. McCORMICK:  240.40(2)(b)(v)

19               THE COURT:  Give me a moment, please.  I will

20    hear from you.  Just give me a moment.

21               Go ahead, please.

22               MS. McCORMICK:  Your Honor, the buccal swab

23    is a completely non-invasive means by which to obtain

24    non-testimonial evidence, physical evidence, from the

25    defendant by which a DNA analysis can be conducted,

1       which will provide this Court with conclusive

2       information and evidence that the blood sample sought

3       to be submitted in this case by the People is, in fact,

4       the blood of Martin Heidgen.

5                  The People again reiterate that this is not

6       late in coming because it was developed during the

7       course of the trial, by the trial testimony, and could

8       not have been anticipated by the People as being an

9       issue.

10                 The People are asking that in light of the

11      crucial nature and seriousness of this case, with two

12      deaths and three serious injuries, that the Court

13      consider granting this application.  It will not hold

14      up these proceedings.

15                 I am ensured by the Nassau County Medical

16      Examiner's lab that this can be accomplished within

17      three days, your Honor.  We will do whatever is

18      necessary to have it completed by the beginning of next

19      week.

20                 MR. LaMAGNA:  Judge, I am going to absolutely

21      oppose that application.

22                 Number one, I don't know how the prosecution

23      can say that this testimony just developed; they

24      weren't aware of it.  These are their witnesses.  These

25      were the witnesses that they didn't anticipate them

1    testifying this way?  These were their witnesses.

2    These were the police witnesses, not even civilian

3    witnesses, who took the evidence, who were prepared by

4    the district attorney, who testified that they went

5    over all of this.  It can't be that that is

6    unanticipated evidence or that that was surprise by my

7    own witnesses and after I prepared them.

8            Section 240 deals with an application by the

9    prosecutor during the time of discovery.  They had

10   every opportunity for the last fourteen or fifteen

11   months, when they had the blood in their possession, to

12   make an application under Section 240.  All discovery

13   was done.  We asked for this material.  They had every

14   opportunity to do it.  They said that there was none,

15   no other tests, other than the serology test.  We

16   relied upon that in discovery.  We opened to this jury,

17   we cross-examined all of their government witnesses

18   already with respect to our theory of our defense based

19   upon the discovery we received from them.

20           240.40 and 240.20 does not talk about having

21   further discovery to change their theory of their case

22   in the middle of a trial to the detriment of a

23   defendant.  That would be like in a robbery case an

24   eyewitness doesn't I.D. the defendant and now they ask

25   for fingerprints or DNA that they already had.

1    THE COURT: Let me ask you this: Do you have

2    a case?

3    MR. LaMAGNA: Well, this just came up.

4    THE COURT: I understand that. But you are

5    telling me that I can't do this. Do you have

6    authority?

7    MR. LaMAGNA: The authority is under

8    discovery rules; that that is why we have discovery

9    rules, so a defendant is apprised of the evidence that

10   is going to be presented to him, against him, by the

11   district attorney so they can adequately prepare a

12   defense --

13   THE COURT: I understand.

14   MR. LaMAGNA: -- to these charges.

15   THE COURT: I understand. Are you telling me

16   that I don't have authority to order this?

17   MR. LaMAGNA: Not in the middle of the trial,

18   after we have opened.

19   THE COURT: Do you have authority?

20   MR. LaMAGNA: I will provide that to you.

21   MS. McCORMICK: I will point to People versus

22   Colavito, which I handed up to the Court earlier, 87

23   NY2d 423.

24   THE COURT: Do you have a copy handy?

25   MS. McCORMICK: No, I don't.

1           THE COURT:  What is it again?

2           MS. McCORMICK:  87 NY2d 423, a 1996 case

3       dealing with late discovered evidence.  And I have to

4       point out --

5           MR. LaMAGNA:  It is not late discovered

6       evidence.

7           MS. McCORMICK:  I have to point out that the

8       concept of this discovery, that there is some time

9       frame in which investigations of an incident must end,

10      is not reflected in the C.P.L., and not reflected in

11      any case presented by counsel.

12          Cases routinely are continually investigated

13      throughout the pendency of the case from its inception

14      through the trial.  Things develop during the

15      preparation of witnesses for trial.  Things develop

16      during the trial.  There is nothing that counsel will

17      be able to cite to you that prohibits this Court from

18      reacting and responding to something that developed in

19      this courtroom today.

20          It is an outrage for defense counsel to say

21      that the People are changing our theory.  How could it

22      possibly be a change in our theory to use evidence that

23      was always intended to be used, to demonstrate that the

24      defendant was intoxicated to a degree of .28.  That was

25      always the intent.  There is no surprise.  There is no

1    prejudice.

2              The only thing that there is is the surety

3    that could be provided to this Court by unanticipated

4    testimony from a confused witness today, who did not

5    provide a basis that was expected by the People to be

6    provided, for your Honor to allow the admission of that

7    blood.

8              This is an evidentiary matter, your Honor,

9    and it is clearly within the discretion of this trial

10   Court.

11             MR. LaMAGNA:  Judge, I couldn't disagree

12   more.  We are in the middle of a trial.  In fact, we

13   are toward the end of a trial.  If during the course of

14   the trial, as here, evidence is inadmissible on

15   constitutional grounds or statutory grounds, they can't

16   then shift gears and say, well, we are going to try a

17   different way to get it in, when they had it all along.

18   This is not newly discovered evidence.  This is not a

19   further investigation.  They didn't just locate a

20   sample of blood in some evidence locker that has been

21   there for two years while we are on trial.  They had it

22   all along.  We asked for this.  They didn't do it.

23   They cannot do it now, after we opened to this jury,

24   after we cross-examined these witnesses.  It cannot

25   happen now.  It is not unanticipated evidence.  These

1        were their witnesses.  This is not some new evidence.

2        This isn't a continuing investigation.

3              The issue is the blood.  They have had the

4        blood for fourteen months.  And if they were going to

5        do this they should have done it then.  If this

6        happened, it happened.  But we cannot, we cannot be

7        prejudiced by the fact that they couldn't get their

8        officers, their officers couldn't lay the proper

9        foundation for a piece of evidence.

10             We already have a ruling, essentially, that

11       whatever was in there has been somewhat mishandled or

12       tainted.  That blood is unreliable to be even tested

13       now.  But from the point of view of discovery --

14             THE COURT:  You dispute that DNA would

15       provide some certainty as to whose blood that is?

16             MR. LaMAGNA:  Not now, because I --

17             THE COURT:  You don't dispute that DNA would

18       prove if it is Mr. Heidgen's blood?

19             MR. LaMAGNA:  No.

20             THE COURT:  That it is Mr. Heidgen's blood?

21             MR. LaMAGNA:  I don't know what happened to

22       that blood.

23             THE COURT:  Neither do I.

24             MR. LaMAGNA:  If we don't know what happened

25       to that blood that specimen is unreliable to be tested

1        right now because it went from hand-to-hand to hand in

2        an unsealed condition.  It has different seals on it.

3        We don't know what happened to it.  It is not a

4        reliable sampling.

5                THE COURT:  All we know by my ruling is that

6        I didn't feel that there was a sustainable chain of

7        custody for whoever's blood that is.

8                MR. LaMAGNA:  I agree.

9                THE COURT:  There is a means with relative

10       certainty to determine that it is not Mr. Heidgen's

11       blood or that it is Mr. Heidgen's blood.

12               MR. LaMAGNA:  But at this stage of the

13       proceedings, after we opened to this jury and

14       cross-examined witnesses with a theory based upon what

15       we received in discovery, when they already had that

16       evidence for fourteen months, was to argue the

17       mishandling of that blood.  And that is what we argued.

18       That is what we opened to.  And now they cannot shift

19       gears to the tremendous detriment of a defendant on

20       trial in a murder case with evidence they already had.

21               This is not newly discovered evidence.  As I

22       said, it is not a piece of blood evidence or hair

23       follicles or anything that was just recently discovered

24       somewhere.  They had it.  If they were going to use it

25       they should have noticed us fourteen months ago so we

1    would have been able to prepare a defense knowing that

2    that was going to come in.  That cannot happen in the

3    middle of a trial, right now, with what is going on.

4    It just cannot happen.  He cannot get a fair trial.

5    And this trial is done.

6        MS. McCORMICK:  Your Honor, the trial is a

7    search for the truth.  The truth is that this counsel

8    argued it is not his blood.  And it is the identity of

9    the blood that is the source of the problem in terms of

10   its admission.  This is not a constitutional issue; it

11   is simply a fact issue, which fact can be indisputably

12   resolved by a DNA test.

13       This is not late.  He can still argue all of

14   the things that he wants to argue.  He can still argue

15   that the blood was mishandled.  I'm not aware of

16   anything in this Court's ruling that says anything

17   about that the blood sample itself contained in that

18   kit was tampered with.  I would argue, rather

19   extensively, that there is no evidence that the blood

20   sample contained in that kit was tampered with in any

21   way.  The only question presented by Trooper O'Hare's

22   testimony is the identity of that sample, and only the

23   identity.

24       Lisa Lindenthaler testified that all of the

25   seals on that kit were intact; that the seals on that

1    test tube were completely intact; that the seals around

2    the plastic box were intact; the seals on the outside

3    cardboard box were intact, and each of the people in

4    the chain who handled that explained at what point

5    those items were sealed. O'Hare made his mistakes, but

6    he indicated that he took blood from this defendant and

7    he sealed it, and he handed that kit to Stafford.

8    Investigator Baez opened that kit, the next person to

9    open it, and he observed red sealed tubes that were in

10    that kit at that time, and he made the judgment that

11    the interior plastic box should be sealed for integrity

12    purposes at that moment.

13    At that point, Judge, this kit is sealed.

14    Trooper O'Hare testified to this Court that he took

15    blood samples and affixed red seals. He mistakely

16    first said white seals. He clarified that it is red

17    seals. That box was closed and handed to Trooper

18    Stafford, and shortly after Investigator Baez took that

19    kit and sealed it. There is no indication that the

20    seals were tampered with, and there is no indication

21    that this blood was tampered with.

22    The only question to be resolved here is the

23    identity of that blood, and it could be done with a DNA

24    test. And it is within this Court's discretion to do

25    it.

1           MR. LaMAGNA:  Judge, again, I couldn't

2     disagree more.  We don't know what happened.  Everybody

3     is saying there was a mistake that he said white seals,

4     red seals.  He was very clear he used white seals.  He

5     never said he made a mistake.  Even if he did we don't

6     know.  The issue of whether that red seal was changed

7     or not is irrelevant.

8           The point is it went from one hand to another

9     hand to another hand and it changed.  I don't know what

10    happened.  But that is not the point here.  This is a

11    discovery issue while a defendant is on trial.  As

12    articulated by the assistant district attorney in her

13    first application, well, it is not late.  It is

14    egregiously late.  That is why all discovery was to be

15    completed by a specific date, as defined by Judge

16    Donnino.  We finished discovery.  They had this sample

17    all the time.  This is not newly discovered evidence.

18    That is the salient point here.

19          It is one thing if the prosecution comes in

20    after discovery had been completed by court order, and

21    then said, while we are in the middle of trial we just

22    found a new sample in some evidence locker that belongs

23    to this case.  It was newly discovered.  We didn't know

24    it existed, because we didn't know it existed we didn't

25    do the testing beforehand when we had the opportunity.

Nizewitz - Redirect - Hayden

1      That's not here.

2             They had the blood sitting in an evidence

3      locker for fourteen months, and because they didn't

4      anticipate this happening the defendant should not be

5      prejudiced by the fact that it didn't get in, and now

6      we are going to start asking for DNA samples when we

7      were not prepared for that type of defense.  We opened

8      to this jury.  We cross-examined based upon what we

9      received from the district attorney about what evidence

10     was going to be presented against us on a discovery

11     schedule.

12             THE COURT:  Excuse me.

13             MR. LaMAGNA:  Judge, just to finish --

14             THE COURT:  Are you done?  If you give me ten

15     seconds I will be able to listen to the conclusion of

16     your argument.

17             MS. McCORMICK:  Likewise, Judge.  I did find

18     Colavito, my copy of it.

19             MR. LaMAGNA:  Certainly I would need an

20     opportunity to get some cases.

21             THE COURT:  To do what?  The opportunity is

22     now.

23             MR. LaMAGNA:  I just heard it.  I don't have

24     the opportunity or an appeals bureau upstairs.

25             MS. McCORMICK:  I got it myself.

 1                THE COURT:  Give us a few seconds.

 2                (Brief pause in proceedings.)

 3                THE COURT:  I didn't mean to cut anybody off.

 4        Please continue.

 5                MR. LaMAGNA:  Judge, as I was saying, had we

 6        known under the proper time limits of the discovery

 7        schedule that we had that there was DNA evidence my

 8        theory of my case would have been completely different.

 9        I would have opened differently.  I would have

10        cross-examined differently.  Our defense would have

11        been completely different.  They had this blood all

12        along.

13                And what is more important, if the chain has

14        been broken the integrity of that chain has been

15        broken.

16                THE COURT:  No, the chain of custody was

17        important when we considered whether, given the

18        witness' proferring of the evidence to the jury, it had

19        sufficient integrity to allow it to go to the jury.  It

20        had nothing to do with --

21                MR. LaMAGNA:  I agree.  But we don't know.

22        That's the point.

23                THE COURT:  Perhaps we should.

24                MR. LaMAGNA:  Not now.  If they wanted to do

25        that they had every opportunity.  This is not newly

1    discovered evidence.  We opened to this jury.  We

2    argued to this jury what our theory of our case is

3    based upon what we received from the district

4    attorney's office.

5              MS. McCORMICK:  Your Honor --

6              MR. LaMAGNA:  This is not newly discovered

7    evidence.

8              MS. McCORMICK:  Your Honor, the People's

9    claim is not that it is newly discovered in a technical

10   sense, in that the blood was has been available.  The

11   need to have it tested by DNA has been developed by the

12   defense attorney's relentless assault on the identity

13   of whose blood is in that vial.

14             I have to address this issue of discovery

15   time limits, which are not contained in the statute,

16   which are a continuing obligation on the People, on

17   both parties.  We have to provide in discovery that

18   which we have.  If we don't have it we can't provide

19   it.

20             I point the Court to 240.60 and the

21   continuing duty to disclose.  If, after complying with

22   the provisions of this article or an order pursuant

23   thereto, a party finds, either before or during trial,

24   additional material subject to discovery or covered by

25   such order, he shall promptly comply with the demand or

1          order.

2                    There is nothing in the discovery statute

3          that is to be interpreted in the manner that defense

4          counsel continues to argue.  That is a closed door.  At

5          some point time ran out.  As things developed they must

6          be addressed in the search for the truth.

7                    The truth of the matter is that this is the

8          defendant's blood, and this Court has it within its

9          discretion, and within its authority, to allow the

10         People to address this issue which has developed

11         through testimony here today.

12                   MR. LaMAGNA:  Judge, if you look at the case.

13                   THE COURT:  Excuse me.

14                   MR. LaMAGNA:  Judge --

15                   MS. McCORMICK:  I'm not finished.  I have one

16         further thing to say:  In this courthouse, before Judge

17         DeRiggi -- I don't know the name of the case -- this

18         identical issue with respect to the identity of blood

19         was addressed in a case with Bob Biancavilla and

20         Stephen Scaring, where Mr. Scaring had made allegations

21         that the blood had been confused with the victim's in

22         that case and the defendant.  Judge DeRiggi ruled that

23         the People could submit that blood and did submit that

24         blood for DNA testing to confirm the identity of the

25         defendant's blood.

1          MR. LaMAGNA:  I don't know about that.  That

2     is a trial level court, which didn't have the

3     opportunity to be appealed yet.  We don't know what the

4     Court of Appeals or Appellate Division in looking at

5     and reading it the first time will do.  If you look at

6     the case that was submitted by the district attorney's

7     office it is distinguishable from what happened here,

8     and it is exactly what I'm saying to the Court.

9     Here --

10          THE COURT:  Go ahead.

11          MR. LaMAGNA:  Here they are saying, two weeks

12    into the defendant's trial, the prosecutor announced

13    that two of the money orders had been located.  They

14    had lost them.  They didn't have them.  They found

15    them, like a blood sample found in an evidence locker.

16    Here they had it all along.

17          We opened.  We devised a theory of our case.

18    In the middle of a trial a prosecutor who loses

19    evidence, for whatever reason, constitutional grounds

20    or otherwise, cannot now say, all right, we lost and we

21    are going to win anyway; we are going to try another

22    way to the prejudice of the defendant.

23          Had we known there was DNA it would be a

24    completely different theory.  He is not going to get a

25    fair trial, and I got to tell you it is reversible to

Nizewitz - Redirect - Hayden

1    do that right now.

2              THE COURT:  The last thing in the world I'm

3    going to worry about is reversal.  What I'm going to do

4    in the interest of justice, in the interest of

5    fairness, in this instance justice requires the Court

6    to be fair to both sides.  Fairness in a case of this

7    enormity and under these circumstances requires that

8    the People's application be granted.

9              Nine-thirty tomorrow.

10             MR. LaMAGNA:  I need to make a record, Judge.

11             THE COURT:  Nine-thirty tomorrow.

12             MR. LaMAGNA:  I did not have an opportunity,

13   your --

14             THE COURT:  Due to the hour, I'm not making a

15   record now.

16             MR. LaMAGNA:  I didn't have the opportunity

17   to research this issue like they did, Judge.  I need to

18   make a record on that.

19                        o0o

20             (Whereupon, the trial was adjourned to

21   Thursday, the 21st day of September 2006, at 9:30 a.m.)

22

23

24

25


GIGI WRIGHT, RPR    (516) 571-2503

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL PART 31
2    ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
3
4              -against-
5
     MARTIN HEIDGEN,
6
                              DEFENDANT.
7    ---------------------------------------x
     INDICTMENT #:  1910N-06
8
                              Mineola, New York
9                             September 21, 2006
10
     B E F O R E:   HONORABLE ALAN L. HONOROF
11                     Acting Supreme Court Justice
12
     A P P E A R A N C E S:
13
                    HON. KATHLEEN M. RICE
14                  District Attorney, Nassau County
                       262 Old Country Road
15                     Mineola, New York 11501
                    BY:  ROBERT HAYDEN, ESQ.
16                     Assistant District Attorney
                          and
17                     MAUREEN McCORMICK, ESQ.
                       Assistant District Attorney
18
19                  STEPHEN LaMAGNA, ESQ.
                       Attorney for the Defendant
20                     666 Old Country Road
                       Garden City, New York
21                  BY:  STEPHEN V. LaMAGNA, ESQ.
                          and
22                     GREGORY MARTELLO, ESQ.
23                          o0o
                        CONTINUED TRIAL
24                          o0o
                       Gigi Wright, R.P.R.
25                  Official Court Reporter

Proceedings

1          (In open court. Defendant present.)

2          THE CLERK:  Case on trial, Indictment 1910N

3     of 2005, People versus Martin Heidgen.

4          People ready?

5          MR. HAYDEN:  Ready, your Honor.

6          THE CLERK:  Defendant ready?

7          MR. LaMAGNA:  Defendant is ready.

8          THE CLERK:  Defendant is present, your Honor.

9          THE COURT:  I understand there is an

10    application.

11         MR. LaMAGNA:  Yes, Judge, continuing from

12    yesterday's argument, I don't feel I had a full

13    opportunity to fully articulate what our position was.

14    You said we could finish it this morning.

15         I just learned though, however, from the

16    District Attorney's Office that an order  --

17         THE COURT:  I didn't say you could finish it

18    this morning.  I ruled last night, and I said for

19    immediate execution.

20         MR. LaMAGNA:  Judge, if I recall, and I am

21    going to get the record, I said, Judge, I still need to

22    make a record.

23         THE COURT:  I heard you say that.

24    Nonetheless I closed the case.  I ended the argument

25    and I made a decision.

Proceedings

1      MR. LaMAGNA:  Judge, my point is that I

2   didn't have a full opportunity to make whatever

3   argument that I wanted based upon --

4      THE COURT:  That may be true that you felt

5   that you did not.  Your argument was adequate for my

6   purposes --

7      MR. LaMAGNA:  I understand.

8      THE COURT:  -- in order to enable me to make

9   the decision which I made, which has been acted upon,

10   and is over.  If you have an application to reargue I

11   will listen to an application, but not yet reargument.

12      MR. LaMAGNA:  I have actually two

13   applications:  One, would be a reargument, or in my

14   view, a continuation of that argument.

15      THE COURT:  No, I will not characterize it as

16   that.

17      MR. LaMAGNA:  And to stay pending that

18   reargument an opportunity to be heard from the legal

19   perspective of the district attorney's application

20   yesterday, that before any type of bodily fluid can be

21   taken from an individual three criteria have to be laid

22   out by the prosecution before a decision can be made

23   whether or not that sample is to be taken.  And that is

24   by statute.  And that is, that there was probable cause

25   that obviously the individual committed a crime; number

Proceedings

1      two, that the manner in which --

2                    THE COURT:  What statute are you referring

3      to?

4                    MR. LaMAGNA:  In 240.

5                    And that it is the least intrusive means; and

6      three -- and this is the salient point -- that the

7      likelihood of whatever result you will get will be

8      material and relevant.

9                    THE COURT:  You don't think that the result

10     would be material or relevant?

11                   MR. LaMAGNA:  No, not if the actual material

12     that is being tested has already been adjudicated as

13     being under Julian and all of the cases that come after

14     that, the chain has been broken.

15                   Whether it is a DNA test, whether it is a BAC

16     test, whether it is a drug test or any other type of

17     test, if the actual sample itself has not been shown by

18     beyond a reasonable doubt that it is identical to the

19     actual sample taken by the -- from the defendant to the

20     time it got to the chemist and again; secondly, that it

21     has not been.

22                   THE COURT:  It sounds like a reargument

23     instead of an application for a reargument.

24                   MR. LaMAGNA:  Judge, there is the two

25     arguments:  There is going to be an application for a

Proceedings

1        reargument.

2                THE COURT:  Make that application.

3                MR. LaMAGNA:  Judge, I would ask for an

4        application to reargue based upon the fact that I have

5        this.

6                THE COURT:  Application is denied.

7                MR. LaMAGNA:  Judge, then I would ask you to

8        stay the execution of the district attorney from using

9        this.

10               THE COURT:  That application is also denied.

11               MR. LaMAGNA:  Because we want a writ of

12       prohibition to the Appellate Division.

13               THE COURT:  Denied.  You can take whatever

14       you wish to the Appellate Division.  In the meantime

15       the district attorney is not stayed.  In fact, I want

16       these results.

17               MR. LaMAGNA:  Judge, again, just for the

18       record, I received an application, or the Court did, by

19       the District Attorney's Office yesterday afternoon.  I

20       did not have an opportunity to --

21               THE COURT:  Is this an exception to my

22       ruling?

23               MR. LaMAGNA:  Well.

24               THE COURT:  All you have to say is

25       "exception."

Proceedings

```
 1              MR. LaMAGNA:  It is.

 2              THE COURT:  I deny your application to

 3    reargue and I deny your application for a stay.

 4              Please produce the jury.

 5              COURT OFFICER:  Jury entering.

 6              (Whereupon, the jury entered the courtroom,

 7    and upon taking their respective seats, the following

 8    occurred:)

 9              THE CLERK:  Jurors are present and seated,

10    your Honor.

11              THE COURT:  Thank you.  Welcome back, ladies

12    and gentlemen.

13              MR. HAYDEN:  Tracy Sodikoff.

14              COURT OFFICER:  Step up.  Remain standing,

15    raise your right hand and face the clerk.

16              T R A C Y  S O D I K O F F ,          a

17              witness called on behalf of the People,

18              having been first duly sworn by the Clerk of

19              the Court, was examined and testified as

20              follows:

21              THE CLERK:  You can put your hand down.

22    Please state your name, spelling your last name for the

23    record.

24              THE WITNESS:  Tracy Sodikoff,

25    S-O-D-I-K-O-F-F.
```

Sodikoff - Direct - Hayden

```
 1              THE CLERK:  Thank you.  Please take a seat.

 2    DIRECT EXAMINATION

 3    BY MR. HAYDEN:

 4       Q    Good morning, Ms. Sodikoff.

 5       A    Good morning.

 6       Q    What is your occupation?

 7       A    I work in marketing.

 8       Q    Do you know a man named Martin Heidgen?

 9       A    I do.

10       Q    Briefly describe him physically?

11       A    He is tall, he has brown hair, tan skin and he is

12    a skinny.

13       Q    Do you see Martin Heidgen in this courtroom

14    today?

15       A    I do.

16       Q    Would you point him out, please and describe for

17    the record what he is wearing today?

18       A    He is right there, and he is wearing a navy blue

19    suit and navy blue tie.

20              (Witness indicating.)

21              MR. HAYDEN:  Let the record reflect, your

22       Honor, that the witness has indicated the defendant

23       Martin Heidgen?

24              THE COURT:  Record will so reflect.

25       Q    How did you first meet the defendant?
```

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Direct - Hayden

1        A        Through a mutual friend.

2        Q        Was that at a house?

3        A        At a friend's party.

4        Q        Describe your relationship with the defendant as

5    it was in early July of 2005?

6        A        We were friends.

7        Q        How often would you see the defendant each month

8    over the time that you knew him?

9        A        Either every weekend or every other weekend.

10        Q        Describe the circumstances under which you have

11    seen the defendant?

12        A        At a social gathering at a friend's house or a

13    party.

14        Q        Was this a common group of friends?

15        A        Yes.

16        Q        You shared that common group of friends?

17        A        Yes.

18        Q        Was the defendant the newest member of that group

19    of friends?

20        A        Yes.

21        Q        Had you seen the defendant drink socially at

22    those gatherings?

23        A        Yes.

24        Q        Was that a number of times?

25        A        Yes.

Sodikoff - Direct - Hayden

1     Q     Was it common knowledge among your group of
2     friends that there would always be a place to crash?
3     A     Yes.
4                 MR. LaMAGNA:  Objection.
5                 THE COURT:  I heard it.
6                 I'm going to allow it subject to connection.
7     Q     Was a young man named Dave Weiss among your group
8     of friends?
9     A     Yes.
10    Q     Did David Weiss tell your group of friends that
11    they always have his home available as a place to crash?
12    A     Yes.
13                MR. LaMAGNA:  Objection.
14                THE COURT:  Overruled.
15    Q     Are Amanda and Justin Goldman members of your
16    group of friends?
17    A     Yes.
18    Q     Did they always volunteer their home as a place
19    to crash?
20    A     Yes.
21                MR. LaMAGNA:  Objection.
22                THE COURT:  Overruled.
23    Q     Was the defendant present when Dave Weiss was
24    volunteering his home as a place to crash?
25    A     Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Direct - Hayden

1           MR. LaMAGNA:  Objection.

2           THE COURT:  Overruled.

3      Q    Was the defendant present when Amanda and Justin

4    Goldman were volunteering their home as a place to crash?

5      A    Yes.

6      Q    Were there always designated drivers available

7    among your group of friends?

8      A    Yes.

9      Q    I'm directing your attention to the last week

10   ends of June 2005.  Did you speak with the defendant then

11   about his mother?

12     A    Yes.

13     Q    When did that conversation take place?

14     A    About a week before the accident.

15     Q    Where did that conversation take place?

16     A    At Dave Weiss' house.

17     Q    Describe the circumstances under which that

18   conversation took place?

19     A    Marty had told me that his mother had recently

20   gotten remarried, and that he was concerned that his new

21   stepfather might not be nice to his mother or hurt her in

22   some way, and he said if something like that had ever

23   happened that he wouldn't be afraid to hurt or kill his new

24   stepfather.

25           MR. LaMAGNA:  Objection, Judge.

Sodikoff - Direct - Hayden

1       THE COURT:  Sustained.

2       Q     Describe the observations you made of the

3    defendant during the course of that conversation?

4       A     He was very sad.  And he was very depressed and

5    just wasn't his usual self.  He is usually very happy and

6    boisterous, and he was the complete opposite.

7             MR. LaMAGNA:  I'm going to object to that

8       too, Judge.  That was a week before this.

9             THE COURT:  Sustained.

10      Q     Did you have a conversation with the defendant

11   that same weekend about drinking and driving?

12      A     Yes.

13            MR. LaMAGNA:  Objection.

14            THE COURT:  Overruled.

15      Q     Did you tell the defendant personally that there

16   would always be a place for him to crash after drinking?

17      A     Yes.

18      Q     Did he say he understood?

19      A     Yes.

20      Q     Did you tell him that there would always be a

21   designated driver if he needs one?

22      A     Yes.

23      Q     Did he say he understood?

24      A     Yes.

25      Q     That was approximately a week before the crash in

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Direct - Hayden

```
 1    this case?

 2                    MR. LaMAGNA:  Objection.

 3         A    Yes.

 4                    THE COURT:  Overruled.

 5         Q    I'm directing your attention to the night of

 6    Friday, July 1st of 2005.  Did you go to a party that night?

 7         A    Yes.

 8         Q    Where was the party?

 9         A    On Sandra Lane in Merrick.

10         Q    1366 Sandra Lane?

11         A    Yes.

12         Q    Where is Sandra Lane with relation to the

13    Meadowbrook Parkway?

14         A    Less than a five-minute drive.

15         Q    Who threw the party?

16         A    Justin and Amanda Goldman.

17         Q    Describe the party?

18         A    It was a gathering of about fifteen friends, the

19    regular group of friends that we have, and it was just

20    people getting together, drinking socially, having fun and

21    getting prepared for the holiday weekend.

22         Q    Had you worked that Friday?

23         A    Yes.

24         Q    Did you drink before arriving at the party?

25         A    No.
```

Sodikoff - Direct - Hayden

1     Q     What time did you arrive?

2     A     Around 10 o'clock.

3     Q     Who do you remember at the Goldman's house when

4     you arrived?

5     A     Justin Goldman, Amanda Goldman, Brian Burkhardt

6     Josh Zigman, and I arrived with Michael Malloy.

7     Q     Did you drink at the party?

8     A     Yes.

9     Q     What did you drink?

10    A     I had a few beers and I had an Irish Car Bomb

11    shot.

12    Q     What do you mean by an Irish Car Bomb?

13    A     An Irish Car Bomb is a glass of beer with a shot

14    of Whiskey and Baileys Irish Cream dropped into it.

15    Q     Were you intoxicated?

16    A     Yes.

17    Q     Did the defendant arrive at the Goldmans' party?

18    A     Yes.

19    Q     When do you remember the defendant arriving?

20    A     A little before midnight.

21    Q     Describe any observations you remember making of

22    the defendant when he arrived at the Goldmans' party?

23    A     I'm sorry, can you repeat the question?

24    Q     Sure.  Describe any observations you remember

25    making of the defendant when you saw him arrive at the

Sodikoff - Direct - Hayden

1   Goldmans' house for the party?

2        A    He seemed like he was in a good mood and he

3   seemed pretty normal.  He seemed like he was, you know, just

4   his everyday self.

5        Q    Did you see the defendant leave the party that

6   night?

7        A    No.

8        Q    Did the defendant say good night to you?

9        A    No.

10       Q    Did you see the defendant say good night to

11  anyone?

12       A    No.

13       Q    Did you hear the defendant say good night to

14  anyone?

15       A    No.

16       Q    How long would you estimate the defendant was at

17  the party that night?

18       A    Maybe a little over an hour-and-a-half.

19       Q    Did you see the defendant drinking alcohol at the

20  party?

21       A    Yes.

22       Q    What did you see him drink?

23       A    I saw him have a few beers and two Irish Car Bomb

24  shots.

25       Q    What was going on at the party?

Sodikoff - Direct - Hayden

1    A      There was a lot of social activity, there was

2    some drinking games, people just hanging around in different

3    groups, there were some dancing.  Just social activity.

4    Q      Tell the jury what you mean when you say,

5    "drinking games"?

6    A      We were playing a game called beer pong, which is

7    played on a table, and there is two teams, and you throw a

8    ping pong ball from opposite ends, where there was also a

9    beer, and the objective is to get the other team to drink

10   more beer than you drink.

11   Q      What happens if you get a ping pong ball into the

12   other beer?

13   A      The other team has to drink that beer.

14   Q      Did you play ping pong that night?

15   A      Yes.

16   Q      Did you see the defendant play ping pong that

17   night?

18   A      Yes.

19   Q      Did you dance with the defendant that night?

20   A      Yes.

21   Q      Describe the observations you made of the

22   defendant while he was dancing?

23   A      He seemed like he was having a good time and

24   enjoying himself.

25   Q      Did you see him staggering at all when he was

Sodikoff - Direct - Hayden

1    dancing?

2         A    No.

3         Q    Stumbling at all when he was dancing?

4         A    No.

5         Q    Did you have a conversation with the defendant

6    that night?

7         A    Yes.

8         Q    Do you remember those conversations?

9         A    I remember one conversation that we had, the last

10   time that I saw him, and we discussed the fact that a lot of

11   the girls at the party thought that he was the cutest guy at

12   the party, and they all would like to be with him if they

13   could.

14        Q    Describe his reaction.

15        A    He didn't really have a reaction.  He kind of

16   just took it in stride.

17        Q    Did the defendant appear aware of his

18   surroundings while you were with him that night?

19        A    He did.

20        Q    Did you have any difficulty understanding the

21   defendant?

22        A    No.

23        Q    Did he ever say he had difficulty understanding

24   you?

25        A    No.

Sodikoff - Direct - Hayden

1      Q      How often had you seen the defendant during the

2   eight months you had known him before the night of the

3   party?

4      A      Probably about two dozen times.

5      Q      Had you seen the defendant when he was not

6   drinking alcoholic beverages?

7      A      Yes.

8      Q      Had you seen the defendant when he was drinking

9   alcoholic beverages?

10     A      Yes.

11     Q      Had you observed the effects of alcohol on the

12  defendant?

13     A      Yes.

14     Q      Based on your prior observations of the defendant

15  and upon your observations of the defendant on the night of

16  the house party at 1366 Sandra Lane, do you have an opinion

17  about whether he was intoxicated that night?

18     A      Yes.

19     Q      What is your opinion?

20     A      I believe that he was intoxicated.

21            MR. HAYDEN:  Your Honor, may I please have 49

22     and 52 in evidence shown to the witness.

23            (Handing.)

24     Q      Do you recognize those photographs?

25     A      Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Direct - Hayden

1        Q      Are those photographs the vicinity of 1366 Sandra

2    Lane?

3        A      Yes.

4        Q      Do you see the approximate location of 1366

5    Sandra Lane --

6        A      Yes.

7        Q      -- in each of those photographs?

8        A      Uh huh.  Yes.

9               MR. HAYDEN:  With the Court's permission,

10              your Honor, the People would ask that the witness be

11              permitted to use these yellow markers to indicate the

12              approximate location of 1366 Sandra Lane, which has

13              been written on each of the markers on those

14              photographs, please?

15              THE COURT:  No problem.

16              (Witness complies.)

17              MR. HAYDEN:  With the Court's permission may

18         the witness step down before the presenter?

19              THE COURT:  Sure.

20        Q      Ms. Sodikoff, could you step right over here,

21    please.

22              Using that photograph, Ms. Sodikoff, please point

23    out the approximate location of 1366 Sandra Lane?

24        A      Approximately here.

25              (Witness indicating.)

GIGI WRIGHT, RPR .  (516) 571-2503

Sodikoff - Cross - LaMagna

1          MR. HAYDEN:  That, your Honor, was 49 in

2     evidence.

3          THE COURT:  Fine.

4          MR. HAYDEN:  This is 52 in evidence.

5     Q     Using that photograph, please point out the

6     approximate location of 1366 Sandra Lane?

7     A     Right here.

8     Q     Do you see the Meadowbrook Parkway in that

9     photograph?

10    A     Yes.  Right here.

11         (Witness indicating.)

12         MR. HAYDEN:  Let the record reflect, your

13    Honor, lines running along the upper right quadrant of

14    the photograph as you are looking at it.

15         Please retake the witness stand, Ms. Sodikoff

16         MR. HAYDEN:  Nothing further, your Honor.

17         THE COURT:  Mr. LaMagna

18         MR. LaMAGNA:  Thank you.

19    CROSS-EXAMINATION

20    BY MR. LaMAGNA:

21    Q     Good morning, Tracy.

22    A     Good morning.

23    Q     My name is Steven LaMagna.  I'm going to ask you

24    a few questions today.  You and I have spoken; have we not?

25    A     Yes.

Sodikoff - Cross - LaMagna

```
 1        Q     We spoke about three times, do you recall?

 2        A     Yes.

 3        Q     Back in July or August of last year?

 4        A     Okay.

 5        Q     And sometime around January and then just

 6   recently in August; is that correct?

 7        A     I believe so, yes.

 8        Q     Now, you have known Marty prior to July 2nd for

 9   about eight months; is that correct?

10        A     Yes.

11        Q     And you met him through a mutual friend of yours,

12   correct?

13        A     Yes.

14        Q     That would be Josh Zigman?

15        A     Yes.

16        Q     In fact, Marty and Josh worked together, correct?

17        A     Yes.

18        Q     And he introduced Marty to your group of friends,

19   correct?

20        A     Yes.

21        Q     And you guys had a pretty tight-knit group,

22   didn't you?

23        A     Yes.

24        Q     And you testified that what you guys usually do

25   is go little house parties or gatherings; is that correct?
```

GIGI WRIGHT, RPR   (516) 571-2503

Sodikoff - Cross - LaMagna

```
 1        A     Yes.

 2        Q     That is pretty usual for your group?

 3        A     Yes.

 4        Q     You play cards Sunday nights, correct?

 5        A     Yes.

 6        Q     Marty joins you with that, too?

 7        A     Yes.

 8        Q     In fact, Marty was embraced by your group,

 9    correct?

10        A     Yes.

11        Q     Everybody liked Marty?

12        A     Yes.

13        Q     Marty was a friendly guy, correct?

14        A     Very.  Yes.

15        Q     Right?

16        A     Yes.

17        Q     Everybody considered him a good guy, correct?

18        A     Yes.

19        Q     Everybody liked Marty?

20        A     Yes.

21        Q     And now, talking about actually that night, you

22    and your friends, including Marty, had plans for that

23    weekend, correct?

24        A     Yes.

25        Q     One of the plans was that Amanda Goldman was
```

Sodikoff - Cross - LaMagna

1    having a little party to start off the Fourth of July

2    weekend, correct?

3           A       Yes.

4           Q       One of the plans also was there was going to be a

5    barbecue that Monday at Amanda Goldman's house too, correct?

6           A       Yes.

7           Q       Amanda's brother was born on the Fourth of July,

8    correct?

9           A       Yes.

10          Q       With your group that was a pretty big deal;

11   everybody looked forward to that big barbecue, correct?

12          A       Yes.

13          Q       There was a lot of food, a lot going on, correct?

14          A       It was an annual party, yes.

15          Q       Everybody was always excited about going to that

16   party, correct?

17          A       Yes.

18          Q       Including Marty, because that was his first

19   barbecue there?

20          A       Yes.

21          Q       He articulated he was excited, looking forward to

22   the weekend and the barbecue, correct?

23          A       Yes.

24          Q       You do know that, correct?

25          A       Yes.

Sodikoff - Cross - LaMagna

1    Q    Amanda's party that Friday night was at the

2    address of 1366 Sandra Lane?

3    A    Yes.

4    Q    That's where Amanda lives, correct?

5    A    Yes.

6    Q    She lives with her parents, correct?

7    A    Yes.

8    Q    In fact, her parents weren't home though that

9    night, correct?

10    A    Correct.

11    Q    She was having all you guys over at this party

12    and her parents were away, correct?

13    A    Yes.

14    Q    And everybody knew that her parents were away and

15    she was having this party, correct?

16    A    Yes.

17    Q    Yourself included, Marty, whoever else was there,

18    correct?

19    A    Probably everyone that was there, yes.

20    Q    That her parents were away?

21    A    Yes.

22    Q    Now, you said that you arrived there around 10

23    o'clock; is that correct?

24    A    Yes.

25    Q    And there was some people already there; is that

Sodikoff - Cross - LaMagna

```
1     correct?

2          A     Yes.

3          Q     Marty had not arrived at that point?

4          A     No, he had not.

5          Q     Is that correct?

6          A     Correct.

7          Q     You had stated previously that Marty arrived

8     around 11:30.  Is that a fair estimate?

9          A     Around 11:30, maybe a little bit later.

10         Q     And prior to arriving you were made aware that

11    Marty needed directions to Amanda Goldman's house, correct?

12         A     Yes.

13         Q     Marty had called Amanda for directions, correct?

14         A     Correct.

15         Q     You were aware that he got lost going there and

16    Amanda had to give him directions again, correct?

17         A     I didn't know that she had to give him directions

18    again.

19                    MR. HAYDEN:  Objection.

20                    THE COURT:  Hold on.  Wait a minute.  What is

21         the nature of the objection?

22                    MR. HAYDEN:  Objection is it is all hearsay.

23                    THE COURT:  Well, that's true.  I'm going to

24         overrule the objection.

25         Q     All you knew was that Marty called Amanda before
```

Sodikoff - Cross - LaMagna

1        arriving there for directions to her house, correct?

2        A        Correct.

3        Q        And at some point Marty did arrive, correct?

4        A        Yes.

5        Q        Now, you knew Marty lived in Valley Stream?

6        A        Yes.

7        Q        And you knew he worked in Manhattan with Josh?

8        A        Yes.

9        Q        And you knew he took the train back and forth to

10       the city?

11       A        Yes.

12       Q        He commuted?

13       A        Yes.  Uh huh.

14       Q        If you know, if you were coming from Valley

15       Stream where Marty lived, to get to Amanda's house you would

16       take the Southern State going east, correct?

17       A        Coming from his house?

18       Q        From his house.

19       A        Yes, going east.

20       Q        Right.  To the Meadowbrook Parkway?

21       A        Uh huh.

22       Q        Correct?

23       A        Yes.

24       Q        And coming south, correct?

25       A        Uh huh.

Sodikoff - Cross - LaMagna

1    Q    To Babylon Turnpike and up Meadowbrook Road to

2    Sandra Lane?

3    A    That probably wouldn't be the quickest way to get

4    there it, but that would take you there.

5    Q    That would take you there?

6    A    Indirectly, yes.

7    Q    Is Sandra Lane off Meadowbrook Road?

8    A    It is right off Meadowbrook Road.  You wouldn't

9    need to take Meadowbrook Parkway.

10   Q    I thought you said in some statement that that is

11   what you -- that's how you would go there?

12                MR. HAYDEN:  Objection.

13                THE COURT:  Sustained.

14   Q    In any event, it is in North Merrick, correct?

15   A    Yes.

16   Q    So when Marty arrives at 11:30 you had an

17   opportunity to observe him, correct?

18   A    Yes.

19   Q    You testified he was in a good mood?

20   A    Yes.

21   Q    He was friendly?

22   A    He was.

23   Q    He was talkative, correct?

24   A    Yes.

25   Q    You said he was happy, correct?

Sodikoff - Cross - LaMagna

```
 1        A     Yes.

 2        Q     He was excited about the weekend, correct?

 3        A     Yes.

 4        Q     Like everybody was, right?

 5        A     Uh huh.

 6        Q     This was a party, correct?

 7        A     It was a party, yes.

 8        Q     Everybody was in a great mood?

 9        A     Yes.

10        Q     Including Marty?

11        A     Yes.

12        Q     You were in his presence for the time period that

13   you were in Amanda Goldman's house, correct?

14        A     Yes.

15        Q     It is a house party, people were out on the deck,

16   correct?

17        A     Yes.

18        Q     People were in the kitchen?

19        A     Yes.

20        Q     Correct?

21        A     Yes.

22        Q     People were in the living room?

23        A     Yes.

24        Q     So, during the course of the time you were in his

25   presence you had an opportunity to observe him, correct?
```

Sodikoff - Cross - LaMagna

1       A       Yes.

2       Q       And you testified that some of you were playing a

3   game called beer pong?

4       A       Yes.

5       Q       And that's, as you articulated it, playing with

6   beer glasses and popping the pong ball into it, correct?

7       A       Yes.

8       Q       And you played that and Marty played that,

9   correct?

10      A       Yes.

11      Q       And some other kids played that too?

12      A       Yes.

13      Q       Now, when Marty arrived, how many people were

14  already in the house?

15      A       Maybe ten.

16      Q       And when you were playing beer pong, that was out

17  on the back porch or was that in the kitchen?

18      A       On the back porch.

19      Q       During that time Marty was laughing, correct?

20      A       Sure, yes.

21      Q       Talking?

22      A       Uh huh.  Being social.

23      Q       Being social.  Having a good time?

24      A       Yes.

25      Q       Nothing seemed wrong, nothing seemed out of the

Sodikoff - Cross - LaMagna

```
 1   ordinary, correct?

 2        A    Correct.

 3        Q    He seemed perfectly happy?

 4        A    Correct.

 5        Q    And having a good time, correct?

 6        A    Yes.

 7        Q    Now, you said you saw him drink a couple of beers

 8   and two of these shots, correct?

 9        A    Yes.

10        Q    And you never saw him stumbling, correct?

11        A    Correct.

12        Q    Never saw him slurring?

13        A    Correct.

14        Q    Talking.  He was articulate, correct?

15        A    Yes.

16        Q    When you were asked previously of why do you feel

17   he was intoxicated, do you remember saying, well, we were

18   all giggling and playing games and dancing, and you could

19   just tell when somebody is drinking; is that fair and

20   accurate?

21        A    Yes.

22        Q    So Marty was giggling, correct?

23        A    Yes.

24        Q    Laughing, correct?

25        A    Yes.
```

Sodikoff - Cross - LaMagna

```
 1      Q    Having a good time, correct?

 2      A    Yes.

 3      Q    And that's what you thought at the time, correct,

 4   and that's what you think today, correct?

 5      A    Yes.

 6      Q    And that is what makes you also believe in your

 7   estimation that he was intoxicated, correct?  Isn't that

 8   what you testified to?

 9      A    Well, also the fact that I saw him drinking and I

10   knew that he came from a bar.

11      Q    Well, I'm asking you what you observed.

12      A    What I observed, I observed him drinking and

13   having a good time.

14      Q    You said you were drinking too, correct?

15      A    Yes.

16      Q    Now you spoke to investigators about this case,

17   didn't you?

18      A    Yes.

19      Q    And didn't you tell me that the investigators

20   were very belligerent with you and threatening with you when

21   you were giving a statement and that you were not happy with

22   them?

23           MR. HAYDEN:  Objection.

24      A    I wouldn't say they were belligerent.

25           THE COURT:  Whoa.  Whoa.  When one of these
```

Sodikoff - Cross - LaMagna

1      guys says, "objection," you have to stop.

2                    THE WITNESS:   I'm sorry.

3                    MR. LaMAGNA:   Judge, just a little leeway.

4                    THE COURT:   Overruled.   Temporarily.

5      Q      And when you first met with these detectives on,

6      I believe it was July 5th --

7      A      Uh huh.

8      Q      -- you said that they were putting words in your

9      mouth or mischaracterizing what you were saying, and you

10     were unhappy; you wanted to make a new statement?  Didn't

11     you tell me that?

12     A      I didn't say that they were threatening me or

13     that --

14     Q      Did they threaten --

15                   MR. HAYDEN:   Could he just not step on the

16     witness's statements, please?

17                   THE COURT:   Please give an answer to the last

18     question.

19     A      At the time I spoke I felt confused and not

20     necessarily one hundred percent happy with the statement

21     that I had given.

22     Q      To the police?

23     A      Yes.

24     Q      And didn't you tell me that they threatened that

25     if you don't give them all of the names they are going to

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Cross - LaMagna

1    rip the friends out of their offices in New York City?

2        A    They told me if I didn't give them the names.

3        Q    Did you tell me that?

4            THE COURT:  Whoa.  Whoa.

5            MR. HAYDEN:  Don't interrupt.

6        Q    I just wanted a yes or no.

7            MR. HAYDEN:  Don't interrupt.

8        A    They told me if I didn't give them the names of

9    the people that were at the party that they would find them

10   anyway, and that they already knew who most of them were.

11       Q    Didn't you use the words to me that they were

12   going to rip them out of their offices?

13       A    They told me that they knew where somebody worked

14   and they were going to go down to their office.

15       Q    So you didn't tell me that?

16       A    I don't remember using the words ripping them out

17   of their office.

18       Q    Is it possible you said that?

19       A    I probably didn't say that, no.

20       Q    Well, I got it wrong?

21       A    It's possible.

22           MR. HAYDEN:  Objection.

23           THE COURT:  Sustained.

24       Q    Now, you told me that you weren't happy with the

25   statement that you gave to the police, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Cross - LaMagna

1    A    At the time, yes.

2    Q    And you felt, according to when I spoke to you,

3    that you felt that they were not listening to you and they

4    didn't care; they just wanted to get what they wanted.

5    Didn't you tell me that?

6              MR. HAYDEN:  Objection.

7              THE COURT:  Sustained.

8    Q    Did you tell -- did you tell the police that you

9    were very drunk that night and that your memory wasn't that

10    clear and you said they didn't care?

11    A    I didn't tell them that my memory wasn't clear.

12    I told them that I was drunk.

13    Q    And you told them that you smoked marijuana that

14    night too?

15    A    Yes.

16    Q    And Marty didn't smoke any marijuana, correct?

17    A    Correct.

18    Q    Did you tell the police that because of the

19    drinking that you had done and the smoking of the marijuana

20    that your memory was a little bit foggy?

21    A    No, I never said that.

22    Q    Let me ask you this:  Because of the alcohol, you

23    said you were drunk, and because of the marijuana, do you

24    think that that could have affected your ability to remember

25    what was happening that night?

GIGI WRIGHT, RPR    (516) 571-2503

Sodikoff - Cross - LaMagna

1    A    No, I remember everything that happened that

2    night.

3    Q    You said at some point, you remember the last

4    time you remember seeing Marty was about 1:30; is that

5    correct?

6    A    Yes.

7    Q    And when you saw him at 1:30, the last time you

8    saw him, you were dancing with other people with him to some

9    music; is that correct?

10    A    Well, we had a conversation after that in the

11    kitchen, and that was the last time I saw him.

12    Q    So right before that is when you were dancing to

13    some music with Marty?

14    A    Yes.

15    Q    Again, he was in a good mood; is that right?

16    A    Yes.

17    Q    He was having fun?

18    A    Yes.

19    Q    Laughing?

20    A    Yes.

21    Q    Engaging with everybody?

22    A    Yes.

23    Q    Throughout the entire night would it be fair to

24    say that from the time that you saw him to the time, the

25    last time you saw him, he was always in a good mood; is that

Sodikoff - Redirect - Hayden

```
 1    correct?

 2         A    That night?

 3         Q    That night.

 4         A    Yes.

 5         Q    Laughing?

 6         A    Yes.

 7              MR. HAYDEN:  Objection, Judge.

 8              THE COURT:  Sustained.

 9         Q    Would it be fair to say that the last time you

10    saw him, around 1:30, there was nothing out of the ordinary

11    with respect to Marty?

12         A    Yes.

13         Q    Just normal good mood?

14         A    Yes.

15         Q    Thank you.

16    REDIRECT EXAMINATION

17    BY MR. HAYDEN:

18         Q    Did anyone try to get you to change your

19    statement in this case?

20         A    Yes.

21         Q    Who tried to get you to change your statement?

22         A    Steven LaMagna had asked me if I wanted to change

23    my statement that he would help me change my statement.

24         Q    Are you satisfied with your testimony here today?

25         A    Yes.
```

Sodikoff - Redirect - Hayden

1    Q    The truth, the whole truth and nothing but the

2    truth?

3    A    Yes.

4         MR. HAYDEN:  Nothing further, your Honor.

5    Thank you.

6    RECROSS-EXAMINATION

7    BY MR. LaMAGNA:

8    Q    When I spoke to you you told me you were not

9    satisfied with the statement that you gave to the police,

10   isn't that what you just also testified to originally?

11   A    At the time I was not satisfied.

12   Q    When I spoke to you I said you have every right

13   to make a new statement if you were not happy with that

14   statement; isn't that correct?

15   A    That is correct.

16   Q    And that's what I told you; if you want to make a

17   new statement you could make a new statement and change it,

18   correct?

19   A    Correct.

20   Q    You told me you were not happy with your original

21   statement that you gave to the police; isn't that correct?

22   A    Correct.

23   Q    That's what you just testified to before,

24   correct?

25   A    Correct.

Sodikoff - Redirect - Hayden

1      MR. LaMAGNA:  Nothing further.

2      MR. HAYDEN:  Nothing further.

3      THE COURT:  Thank you.  You are excused.

4      THE WITNESS:  Thank you.

5      (Whereupon, the witness exits the courtroom.)

6      MR. HAYDEN:  Could we approach for just a

7   moment?

8      THE COURT:  Yes.

9      (Whereupon, a discussion was held off the

10  record.)

11      THE COURT:  All right, ladies and gentlemen,

12  I think that we'll take about a ten-minute break at

13  this time.  Please don't talk about the case.  See you

14  in ten minutes.

15      (Whereupon, the jury exited the courtroom.)

16      (Whereupon, a brief recess was held.)

17      COURT OFFICER:  Jury entering.

18      (Whereupon, the jury entered the courtroom

19  and upon taking their respective seats, the following

20  occurred:)

21      THE CLERK:  Case on trial, Indictment 1910N

22  of 2005, People versus Martin Heidgen.

23      People ready?

24      MR. HAYDEN:  Ready, your Honor.

25      THE CLERK:  Defense ready?

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1           MR. LaMAGNA:  Ready, your Honor.

2           THE CLERK:  Defendant is present and the

3     jurors are seated, your Honor.

4           THE COURT:  Thank you.

5           People?

6           MR. HAYDEN:  Elizabeth Serwin.

7           COURT OFFICER:  Remain standing next to the

8     steps.  Face the clerk:

9           E L I Z A B E T H   S E R W I N,        a

10          witness called on behalf of the People,

11          having been first duly sworn by the Clerk of

12          the Court, was examined and testified as

13          follows:

14          THE CLERK:  In a loud voice, state your name,

15    spelling your last name for the record.

16          THE WITNESS:  Elizabeth Serwin, S-E-R-W-I-N.

17          THE CLERK:  Thank your.  Please take a seat.

18    DIRECT EXAMINATION

19    BY MR. HAYDEN:

20          Q     Good morning, Ms. Serwin.

21          A     Good morning.

22          Q     What is your occupation?

23          A     I'm a market editor.

24          Q     Are you a licensed driver?

25          A     Yes, I am.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1    Q    Where were you licensed to drive?

2    A    New York State.

3    Q    How long have you been licensed to drive?

4    A    Thirteen years.

5    Q    Have you estimated the speed of motor vehicles?

6    A    Yes, I have.

7    Q    Have you estimated the speed of motor vehicles

8    along expressways, highways and parkways?

9    A    Yes, I have.

10    Q    Have you estimated the speed of motor vehicles

11    coming toward you, along the opposite side of expressways,

12    highways, and parkways?

13    A    Yes, I have.

14    Q    How long have you been estimating speeds of motor

15    vehicles?

16    A    For so long as I have been driving.

17    Q    How often do you estimate the speed of motor

18    vehicles?

19    A    Occasionally.

20    Q    Are you familiar with the Meadowbrook Parkway?

21    A    Yes, I am.

22    Q    Had you driven along the southbound Meadowbrook

23    Parkway before July of 2005?

24    A    Yes.

25    Q    How often have you driven along the southbound

Serwin - Direct - Hayden

1    Meadowbrook Parkway before July of 2005?

2          A      On average, anywhere from four to six times a

3    week.

4          Q      I'm directing your attention to around 2 o'clock

5    on the early morning of Saturday, July 2nd 2005.  Were you

6    driving a motor vehicle then?

7          A      Yes, I was.

8          Q      Describe it?

9          A      A 1994 Toyota Corolla.

10         Q      What road were you driving?

11         A      The Meadowbrook Parkway.

12         Q      What direction?

13         A      I was heading south.

14         Q      What lane?

15         A      I was in the center lane.

16         Q      Were you south of Merrick Road then?

17         A      Yes, I was.

18         Q      Were you alone then?

19         A      Yes, I was.

20         Q      Where were you coming from at around 2 o'clock

21   that Saturday morning?

22         A      I was coming home from work.

23         Q      Where were you working that night?

24         A      At that time I was working at a restaurant in

25   Syosset called Mims.

Serwin - Direct - Hayden

1     Q    Briefly describe Mims for the jurors.

2     A    Mims is a family-style restaurant, bar, they have

3   American cuisine.  It is a local place.

4     Q    Describe the work you did at the restaurant that

5   night?

6     A    I was a waitress.

7     Q    Had you had anything to drink that night?

8     A    Yes.  I had a beer and-a-half

9     Q    Describe the circumstances under which you drank

10   beer that night?

11     A    It was after work, over the duration of two hours

12   I was doing my side work and talking with co-workers.

13     Q    What does your side work involve?

14     A    It is basically just tying up loose ends,

15   counting your money, doing a lot of cleaning.

16     Q    Where were you going at around 2 o'clock that

17   Saturday morning?

18     A    I was on my way home.

19     Q    Where were you living then?

20     A    In Long Beach.

21     Q    Did you notice a motor vehicle at around 2

22   o'clock that Saturday morning?

23     A    Yes, I did.

24     Q    What first drew your attention to that vehicle?

25     A    Um, in the distance I could see a pair of

Serwin - Direct - Hayden

1   headlights and immediately I noticed that there was no

2   obstruction from the headlights; meaning that if the vehicle

3   would have been on the other side of the road there would

4   have been a flicker from the median.  But I noticed right

5   away that there was no flicker, that the headlights were

6   straight forward.  Straight forward.

7        Q     When you say "a flicker," you mean there are

8   posts along the fence of the guardrail?

9        A     Yes.  The median, there are posts so when the

10  headlights hit it, it flickers.

11       Q     And you didn't see that?

12       A     No, I didn't.

13       Q     How far were you from the oncoming headlights

14  when you first noticed them?

15       A     I would say I was roughly a few football fields

16  away.

17       Q     Is that a rough estimate?

18       A     Yes, that is a rough estimate.

19       Q     Are you good at estimating distances?

20       A     Not particularly.

21       Q     Describe what you did after noticing northbound

22  headlights coming at you along the southbound center lane?

23       A     Once I realized that the vehicle was heading

24  toward me in the same lane, I immediately veered into the

25  right lane and then veered off completely to the side of the

GIGI WRIGHT, RPR   (516) 571-2503

1491

Serwin - Direct - Hayden

1    road and came to a stop on the shoulder.

2        Q    What did you do then?

3        A    Came to a complete stop and at around the same

4    time that this was happening the vehicle is passing me and I

5    beep.  Three times.

6        Q    What type of vehicle were you observing?

7        A    It was a large pickup truck.  It had a flatbed

8    and a cab.

9        Q    Did you see the pickup truck after it passed you?

10       A    I watched the pickup truck pass me and I turned

11   over my left shoulder and watched it continue down the

12   Meadowbrook Parkway.

13       Q    Until you lose sight of the taillights?

14       A    Correct.

15       Q    Describe what else you saw when you looked over

16   your left shoulder at the passing pickup truck?

17       A    I realized then that there were two other

18   vehicles pulled over behind me on the shoulder of the road.

19       Q    Were the headlights of those two vehicles pulled

20·  off onto the shoulder of the road behind you on or off?

21       A.·  They were both on.

22       Q    Where was the pickup truck with relation to

23   Merrick Road when you first noticed it?

24       A    I was a little more than a mile south of Merrick

25   Road when I first saw the headlights of the pickup truck.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1    Q    The oncoming headlights were further south?

2    A    Correct.

3    Q    Did you ever see the pickup truck leave the

4    center lane as it was coming at you?

5    A    No.

6    Q    Did you ever see the pickup truck leave the

7    center lane after it had passed you?

8    A    No.

9    Q    Did you ever see the pickup truck weaving in the

10   center lane as it was coming at you?

11   A    No.

12   Q    Did you ever see the pickup truck weaving in the

13   center lane after it passed you?

14   A    No.

15   Q    Did you ever see the tires of the pickup truck

16   touch the lane markings of the center lane as it was coming

17   at you?

18   A    No.

19   Q    Did you ever see the pickup truck swerve in any

20   way as it was coming at you?

21   A    No.

22   Q    Did you ever see the pickup truck swerve in any

23   way after it passed you?

24   A    No.

25   Q    Did the pickup truck stay within the markings of

Serwin - Direct - Hayden

1    the center lane the entire time you were watching it?

2        A    Yes.

3        Q    Could you see the driver as you were watching the

4    pickup truck?

5        A    No.

6        Q    Were your headlights on the entire time you were

7    watching the pickup truck?

8        A    Yes.

9        Q    How long would you estimate you were watching the

10   pickup truck?

11       A    From the first time I saw the headlights?

12       Q    Yes.

13       A    Anywhere from eight to twelve seconds.

14       Q    Is that a rough estimate?

15       A    Yes.  That's a rough estimate.

16       Q    Did you notice any change in the operation of the

17   pickup truck over the time you were watching it?

18       A    No.

19       Q    Did you notice any change in the speed of the

20   pickup truck over the time that you were watching it?

21       A    No.

22       Q    Were you able to estimate the speed of the pickup

23   truck?

24       A    Yes.

25       Q    What speed do you estimate?

Serwin - Direct - Hayden

1    A    I would say roughly 70 to 75 miles per hour.

2    Q    Did you call 911 after observing the pickup truck

3    that morning?

4    A    Yes, I did.

5    Q    When did you call 911?

6    A    After I pulled back onto the Meadowbrook Parkway

7    I then called 911.

8    Q    How long were you on the, off the road on the

9    grassy area after you pulled off?

10   A    Could you repeat that?

11   Q    I'm sorry.

12   A    That's okay.

13   Q    When you pulled off the road, describe the area

14   onto which you pulled your car?

15   A    It was a very wide shoulder.  There was the trees

16   were set back quite a distance from the road, which isn't

17   very typical of the Meadowbrook Parkway in that area.

18   Q    Was it a grassy area?

19   A    Yes, it was a grassy area.

20   Q    Did you pull onto the grassy area?

21   A    Yes, I did.

22   Q    How long were you off the road on the grassy area

23   before you pulled back onto the Meadowbrook?

24   A    Not very long.

25   Q    How long after you pulled back onto the

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1   Meadowbrook did you call 911?

2       A    Maybe less than a minute.  It was quite soon

3   after I got back on the road.

4       Q    Did you give a location while speaking with the

5   911 operator?

6       A    Yes.

7       Q    Did you initially reach a Nassau County 911

8   operator?

9       A    Yes.

10      Q    Were you then connected to a state police 911

11  operator?

12      A    Yes.

13      Q    Did you use an exit number while describing your

14  location?

15      A    Yes, I did.

16      Q    What number did you use?

17      A    At the time I said Exit 7.

18      Q    Was that wrong?

19      A    Yes.

20      Q    What exit were you talking about?

21      A    I was talking about Exit 9.

22      Q    Merrick Road?

23      A    Correct.

24      Q    Did you eventually sign a written statement

25  describing your observations of the pickup truck?

1496

Serwin - Direct - Hayden

1    MR. LaMAGNA:  Objection.

2    THE COURT:  I'll take a yes or no.

3    A    Yes.

4    Q    When did you sign that statement?

5    A    July 13th of 2005.

6    Q    Have you reviewed that statement before

7    testifying today?

8    A    Yes.

9    Q    Have we discussed your observations before you

10    were testifying today?

11    A    Yes.

12    Q    Have you discussed your observations while out

13    along the Meadowbrook Parkway?

14    A    Yes.

15    Q    Were you driven along the southbound parkway in a

16    state police car to determine your location when you first

17    noticed the oncoming headlights?

18    A    Yes.

19    Q    A number of times?

20    A    Yes.

21    Q    Were you driven along the southbound Meadowbrook

22    Parkway to determine the location of the oncoming headlights

23    when you first noticed them?

24    A    Yes.

25    Q    Did you determine your approximate location when

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1    you first noticed the oncoming headlights?

2         A    Yes.

3         Q    Did you determine the area of the oncoming

4    headlights when you first noticed them?

5         A    Yes.

6              MR. HAYDEN:  Your Honor, may I please have

7         these three photographs which have been introduced as

8         33, 38 and 47 in evidence shown to the witness, please?

9              THE COURT:  Yes.

10             (Handing.)

11        Q    Do you recognize those photographs?

12        A    Yes.

13        Q    Are those photographs of the vicinity where you

14   were when you first noticed the oncoming headlights coming

15   right at you?

16        A    Yes.

17        Q    Are those photographs of the vicinity of where

18   you were when you first noticed those oncoming headlights?

19        A    Yes.

20             MR. HAYDEN:  Your Honor, at this time the

21        People ask that the witness be permitted to use one of

22        these yellow markers, which have been filled out pickup

23        truck and Serwin, to indicate the approximate location

24        of the pickup truck wherever she can on those three

25        photographs, and the approximate location of herself on

1498

Serwin - Direct - Hayden

1    each of those photographs, wherever she can?

2                THE COURT:  All right.

3                (Whereupon, witness complies.)

4    Q    May I please have those back.

5                MR. HAYDEN:  With the Court's permission, may

6    Ms. Serwin step down before the presenter and indicate

7    to the jurors what each of these photographs depict.

8                THE COURT:  Yes.

9                (Whereupon, the witness steps down from the

10   witness box.)

11   Q    Ms. Serwin, stand over here, please.

12               MR. HAYDEN:  I am now placing 33 on the

13   presenter, your Honor.

14   Q    Ms. Serwin, do you recognize that photograph?

15   A    Yes.

16   Q    Is that a photograph of the southbound

17   Meadowbrook Parkway?

18   A    Yes.

19   Q    We are looking south?

20   A    Correct.  This is heading south.

21   Q    Is that approximately a mile or so south of

22   Merrick Road?

23   A    Yes.

24   Q    Would you show the jurors your approximate

25   location when you first noticed the headlights coming at

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1    you?

2        A    I was in the center lane and further up here is

3    when I first saw the headlights.

4                MR. HAYDEN:  This is 38, your Honor.

5        Q    Do you recognize that photograph?

6        A    Yes.

7        Q    Is that the photograph of the southbound

8    Meadowbrook Parkway?

9        A    Yes.  But from a northern perspective.  Traffic

10   would be heading this way coming south.

11       Q    We are looking northbound there?

12       A    Correct.

13       Q    Have you indicated your location on that

14   photograph?

15       A    Yes.  This is around the area where I pulled over

16   and came to a complete stop, so I was, I estimate, right

17   around in here, and then the pickup truck is passing me at

18   the same time here in the center lane.

19       Q    Is that while you were pulled over?

20       A    Yes.

21       Q    Is that the view you had while you were pulled

22   over?

23       A    Yes.

24               MR. HAYDEN:  This is People's Exhibit 47,

25          your Honor.

GIGI WRIGHT, RPR   (516) 571-2503

Serwin - Direct - Hayden

1    A    Yes.

2    Q    Do you recognize that photograph?

3    A    Yes, I do.

4    Q    Is that a photograph of the southbound

5    Meadowbrook Parkway?

6    A    Yes.

7    Q    Are we looking south in that photograph?

8    A    Yes.

9    Q    Do you see the approximate area where you were

10   pulled off onto the grassy area alongside of the southbound

11   Meadowbrook Parkway in that photograph?

12   A    Yes.

13   Q    Show the jurors?

14        (Witness indicating.)

15   A    This area.

16   Q    Do you see the approximate location of the pickup

17   truck as it was passing you just after you pulled off onto

18   the grassy shoulder?

19   A    Yes.

20   Q    Point that out?

21   A    It would be right here in the center lane.

22        (Witness indicating.)

23   Q    Please retake the witness stand.

24        (Whereupon, the witness steps back into the

25   witness box.)

Serwin - Direct - Hayden

1      Q      When you first noticed the pickup truck, was the

2   pickup truck in the vicinity of a bridge along southbound

3   Meadowbrook Parkway?

4      A      Yes.

5      Q      Was that the first bridge after Merrick Road

6   going southbound?

7      A      Yes.

8              MR. HAYDEN:  May I please have these two

9         photographs marked for identification and shown to the

10        witness, your Honor.

11             (Whereupon, the item referred to received and

12        marked People's Exhibit 75 and 76 for identification.)

13             COURT OFFICER:  People's Exhibit 75 and 76

14        for identification.

15     Q      Please take a look at those photographs,

16   Ms. Serwin.

17     A      Okay.

18     Q      Do you recognize those photographs?

19     A      Yes, I do.

20     Q      Are those overhead photographs of the southbound

21   Meadowbrook Parkway, south of Merrick Road?

22     A      Yes, they are.

23     Q      Do you see the bridge where you first noticed the

24   defendant on each of those photographs?

25     A      Yes, I do.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1        Q       Are those photographs fair and accurate

2   representations of the road configurations and bridge

3   configurations and Merrick Road configurations as they were

4   on July 2nd of 2005?

5        A       Yes.

6                MR. HAYDEN:  People offer those in evidence,

7   your Honor.

8                THE COURT:  Please show them to counsel.

9                MR. LaMAGNA:  No objection.

10               THE COURT:  All right, they are received.

11               (Whereupon, People's Exhibit 75 and 76 for

12   identification now received and marked People's Exhibit

13   75 and 76 in evidence.)

14               COURT OFFICER:  75 and 76 in evidence.

15               MR. HAYDEN:  With the Court's permission,

16   your Honor, may the witness please use these yellow

17   markers to indicate the approximate location where the

18   pickup truck was when Ms. Serwin first noticed the

19   oncoming headlights?

20               THE COURT:  Yes.

21       A       Do you want me to mark where I am?

22       Q       Can you mark where you are or can you tell on

23   those photographs?

24       A       I can.  I just wasn't sure if you wanted that.

25       Q       Sure.  If you can place your location and the

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1    defendant's approximate location?

2    A    Okay.

3         (Witness complies.)

4         MR. HAYDEN:  Your Honor, with the Court's

5    permission, may Ms. Serwin step down and show the

6    jurors her approximate location when she first noticed

7    the oncoming headlights and the pickup truck's

8    location?  Your Honor, this is 75 in evidence.

9    Q    Just indicate to the jury where you were when you

10   first noticed the oncoming headlights?

11   A    I would have been in this area right about here.

12   And the headlights were coming were, coming from up here.

13        MR. HAYDEN:  This is 76, your Honor.

14   Q    Please indicate once again your location and the

15   location of the pickup truck?

16   A    Since it is so far out, it is almost really at

17   this point right on top of each other.

18        (Witness indicating.)

19   Q    Please retake the witness stand.  Thank you.

20        Have you listened to copies of your 911 calls?

21   A    Yes, I have.

22   Q    A copy of the Nassau County call?

23   A    Yes.

24   Q    And a copy of the State Police call?

25   A    Yes.

1504

Serwin - Direct - Hayden

1    Q    Have you marked those copies in any way?

2    A    Yes, I initialed them.

3         MR. HAYDEN:  May I please have this initial

4    tape which has been marked at the bottom "Nassau"

5    marked as 77 for identification.

6         (Whereupon, the item referred to received and

7    marked People's Exhibit 77 for identification.)

8         COURT OFFICER:  People's Exhibit 77 marked

9    for identification.

10        MR. HAYDEN:  And may I please have this

11   second audiotape, which has S.P. for State Police on

12   the bottom marked as 78 for identification and shown to

13   the witness.

14        THE COURT:  Yes.

15        (Whereupon, the item referred to received and

16   marked People's Exhibit 78 for identification.)

17        COURT OFFICER:  People's Exhibit 78 for

18   identification.

19   Q    Would you take a look at the tape that has been

20   marked a as 77 for identification.

21   A    Okay.

22   Q    Do you recognize that audiotape?

23   A    Yes.

24   Q    Is that the audiotape of the Nassau call?

25   A    Yes, it is.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Direct - Hayden

1        Q      Is that audiotape a fair and accurate

2    representation of your entire 911 call with the Nassau

3    County 911 operator?

4        A      Yes, it is.

5        Q      Would you please take a look at 78.  Do you

6    recognize 78?

7        A      Yes, I do.

8        Q      Is that a fair and accurate representation of

9    your entire 911 call with the State Police operator?

10       A      Yes, it is.

11       Q      Did you hear both of those tapes earlier today?

12       A      Yes, I did.

13       Q      Did you mark them earlier today?

14       A      Yes, I did.

15       Q      With your initials?

16              And the date.

17              MR. HAYDEN:  People offer those in evidence,

18    your Honor.

19              MR. LaMAGNA:  No objection.

20              THE COURT:  They are received.

21              (Whereupon, People's Exhibit 77 and 78 for

22    identification now received and marked People's Exhibit

23    77 and 78 in evidence.)

24              COURT OFFICER:  People's Exhibit 77 and 78 in

25    evidence.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

1          MR. HAYDEN:  May I please play these for the

2     jurors, your Honor.

3          THE COURT:  Yes.

4          (Whereupon, People's Exhibit 77 played for

5     the jury.)

6          MR. HAYDEN:  That was exhibit 77, your Honor.

7          This is 78.

8          THE COURT:  All right.

9          (Whereupon, People's Exhibit 78 was played

10    for the jury.)

11         MR. HAYDEN:  Nothing further, your Honor.

12    thank you.

13         THE COURT:  Mr. LaMagna.

14         MR. LaMAGNA:  Thank you.

15    CROSS-EXAMINATION

16    BY MR. LaMAGNA:

17    Q     Hi, Ms. Serwin.  How are you?

18    A     Good.  How are you?

19    Q     My name is a Steven LaMagna.  I represent

20    Mr. Heidgen.  I'm going to ask you a couple of questions

21    here this morning.  If you don't understand the question or

22    want me to repeat it, I will.

23    A     Okay.

24    Q     We have never talked, have we?

25    A     No.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

1   Q   We have never met, have we?

2   A   No.

3   Q   How old are you?

4   A   29.

5   Q   And what do you do for a living?

6   A   I'm a market editor at a magazine.

7   Q   Do you still work at the restaurant, at Mims?

8   A   No.

9   Q   That was last year?

10  A   Uh huh.

11  Q   And do you still live in Long Beach?

12  A   No, I live in Brooklyn now.

13  Q   But you lived in Long Beach on July 2nd 2005?

14  A   Yes.

15  Q   And how long had you lived in Long Beach prior to

16  that?

17  A   A little over a year.  Just about a year.

18  Q   Prior to?

19  A   Yes.

20  Q   And then how much subsequent?

21  A   I moved to Brooklyn in March of this year.  So

22  that would be another nine months.

23  Q   So you lived in Long Beach about a year and nine

24  months or so, is that fair to say?

25  A   Yes.

Serwin - Cross - LaMagna

1    Q    And how long had you lived on Long Island?

2    A    That was it.

3    Q    That was it.

4         And where did you live prior to?

5    A    Minneapolis, Minnesota.

6    Q    Now, you said that you drove on the Meadowbrook

7    Parkway how many times a week?

8    A    It depended on whether or not I had to work.

9    Some weeks I would work two days a week, sometimes six.

10   Q    You averaged it four to six times a week?

11   A    Yes, because I would use the Meadowbrook for

12   other purposes besides work.

13   Q    The Meadowbrook Parkway takes you to the beach,

14   south of -- south of Merrick Road takes to you the beach or

15   Long Beach?

16   A    Correct.

17   Q    The Loop Parkway?

18   A    Yes.

19   Q    You are very familiar with the Meadowbrook

20   Parkway, obviously?

21   A    Yes.

22   Q    You are on it four to six times a week; is that

23   correct?

24   A    I -- what?

25   Q    You are on it four to six times a week?

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

1    A    Oh, yes.  Correct.

2    Q    That's how you get from Long Beach up north to

3    any of the other parkways; is that correct?

4    A    Correct.

5    Q    So it would be fair to say that you are

6    relatively familiar with the Meadowbrook?

7    A    Yes.

8    Q    Now, you just testified before that you had met

9    with members of the New York State Police.  Is that correct?

10    A    Yes.

11    Q    You had been shown photographs, correct?

12    A    Correct.

13    Q    Shown maps, correct?

14    A    Correct.

15    Q    In fact, they took you out to the Meadowbrook

16    Parkway, correct?

17    A    Correct.

18    Q    And when you looked at the Meadowbrook Parkway

19    that was during the day or was that at night?

20    A    It was during the day.

21    Q    You would agree that things don't always look the

22    same in the day or night?

23    A    I agree.

24    Q    They showed you certain maps and asked you where

25    you were you on certain maps; is that correct?

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

1        A      Yes.

2        Q      And you met with members of the district

3    attorney's office as well?

4        A      Yes.

5        Q      And that was in anticipation of your testimony

6    here today?

7        A      Yes.

8        Q      They showed you these maps, correct?

9        A      Correct.

10       Q      And they showed you these photographs correct?

11       A      Correct.

12       Q      How many times would you say you met with members

13   of the New York State Police since last July?

14       A      Since last July?  Three.  Three times.  Because I

15   also testified in the grand jury hearing as well.

16       Q      So you met with the district attorney's office

17   quite a few times?

18       A      Once or twice before that, and then twice before

19   this.

20       Q      Twice before today?

21       A      Yes.  So I believe it was four, but it might have

22   only been three.  I'm not exactly sure.  Before the grand

23   jury it might have only been once.

24       Q      These were the issues that you discussed,

25   correct?

Serwin - Cross - LaMagna

1    A    Correct.

2    Q    Now, directing your attention to July 2nd, 2005.

3    You testified that you were driving originally south in the

4    southbound lanes; is that correct?

5    A    South in the center lane, yes.

6    Q    You were in your center lane, correct?

7    A    Yes.  Correct.

8    Q    You testified that you observed headlights coming

9    from the distance in your direction, correct?

10   A    Correct.

11   Q    Now, you also testified here on direct

12   examination that it was, it appeared to you to be about two

13   football fields; is that correct?

14   A    Yes.

15   Q    And then you said to the district attorney that

16   you are not really good with distances, correct?

17   A    Correct.

18   Q    You do remember previously testifying that you

19   remember seeing in the distance two hundred feet?

20   A    Yes.

21   Q    And two hundred feet would even be less than one

22   football field?

23   A    Right.

24   Q    So when you testified today about the two

25   football fields, what do you think?  You previously

Serwin - Cross - LaMagna

1   testified two hundred feet, is that more accurate?

2        A     No.  What I said today is more accurate.

3        Q     You think it is longer now?

4        A     I believe, yes.

5        Q     Is that as a result of reviewing all of these

6   maps and photographs?  Did that help you figure out that it

7   was longer than you previously testified to?

8        A     It did help, yes.

9        Q     So when you testified before in the grand jury

10  two hundred feet, that was not as an accurate estimate?

11       A     I'm sorry.

12       Q     As an accurate estimate?

13       A     No, it was not.

14       Q     Being familiar with the Meadowbrook Parkway you

15  agree that after Merrick Road there are no more exits until

16  you get to the toll booths or to the Loop Parkway going

17  south, correct?

18       A     Correct.

19       Q     Now, being familiar with the Meadowbrook Parkway

20  and being on it so many times per week you -- withdrawn.

21            When you passed or when this car passed you, you

22  were on the shoulder, correct?

23       A     Correct.

24       Q     You called 911, correct?

25       A     I did call 911, yes.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

1    Q    You reported what happened, correct?

2    A    Correct.

3    Q    And when you called 911, they said where did the

4    car pass you, correct?

5    A    Yes.

6    Q    And you said M7, Exit 7, correct?

7    A    Yes.

8    Q    Exit 7 is Babylon Turnpike, isn't it?

9    A    Yes.

10   Q    Exit 8 going south is Sunrise Highway, correct?

11   A    Yes.

12   Q    And Exit 9 going south is Merrick Road, correct?

13   A    Yes.

14   Q    And then after Merrick Road going south there is

15   no exits until the Loop Parkway, correct?

16   A    Correct.

17   Q    And when you were on the phone with 911 this

18   incident just happened, correct?

19   A    Yes.

20   Q    Within seconds, correct?

21   A    Correct.

22   Q    That's when you called 911, correct?

23   A    Yes.

24   Q    You had just left the shoulder, correct?

25   A    Correct.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

```
 1        Q     So everything that just happened is crystal clear

 2   in your mind, correct?

 3        A     Yes.

 4        Q     It just happened, correct?

 5        A     Yes.

 6        Q     So when you called 911 and they said to you

 7   "where are you?  Where did the car pass you" you testified

 8   you told 911, and it is on the tape we just heard it?

 9        A     Uh huh.

10        Q     You said Exit M7, correct?

11        A     Yes.  That's correct.

12        Q     Now, showing you People's Exhibit 75 in evidence,

13   you said this is you, correct, Ms. Serwin?

14        A     Uh huh.

15        Q     And this is where you saw the truck, correct?

16        A     Correct.

17        Q     This is the bridge down to the beach, right?

18        A     Uh huh.

19        Q     You don't even see any exits over here yet?

20        A     Correct.

21        Q     You are way south of even Merrick Road.  Merrick

22   Road doesn't even appear in this picture, correct?  This is

23   where you say you were?

24        A     Correct.

25        Q     But yet when you called 911, right when it
```

Serwin - Cross - LaMagna

1    happened, you said you were at Exit 7, correct?

2        A    I said I just passed Exit 7, correct.

3        Q    So where did he pass you?  He passed you through

4    Exit 7?

5        A    They asked me where I was and I said I was past.

6        Q    You said Exit 7?

7        A    Yes, I did.

8        Q    You are already on the road moving further south

9    and you are still saying Exit 7, correct?

10       A    Correct.

11       Q    Now, I don't know if we even have a map here, but

12   you are saying this is you, correct, all the way down here,

13   correct?

14       A    Uh huh.

15       Q    All the way up here, this exit, that's Exit 9,

16   correct.  That's Merrick Road?

17       A    Correct.

18       Q    You are saying you were not even at Exit 9, not

19   at Exit 8, but Exit 7, even north of here, correct?

20       A    That's what I did say, yes.

21       Q    That's what you told 911, but yet just today you

22   are saying you are all the way down here; is that correct?

23       A    That's correct.

24       Q    When you pulled over -- withdrawn.

25            You said you are driving in the center lane going

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Cross - LaMagna

```
 1    south, correct?

 2         A     Correct.

 3         Q  .  Two o'clock in the morning, correct?

 4         A     Correct.

 5         Q     Very dark out, correct?

 6         A     Correct.

 7         Q     There was no traffic, correct?

 8         A     No.

 9         Q     You didn't see any other cars on the road other

10    than him at this time, correct?

11         A     Correct.

12         Q     It was just you, and you saw headlights coming at

13    you, correct?

14         A     Correct.

15         Q     No other cars on the road in the dark, correct?

16         A     Correct.

17         Q     You said when you noticed headlights you pulled

18    over to your right, to the right lane, in the direction that

19    you are driving, that right lane, correct?

20         A     Correct.

21         Q     And then you said you pulled over onto the

22    shoulder, correct?

23         A     Correct.

24         Q     And you came to a full stop, correct?

25         A     Correct.
```

Serwin - Cross - LaMagna

1    Q    And you were fully stopped on the shoulder of the

2    highway, correct?

3    A    Correct.

4    Q    The Meadowbrook Parkway, correct?

5    A    Correct.

6    Q    So you are completely off the road, correct?

7    A    Correct.

8    Q    You are on the shoulder grass area, correct?

9    A    Correct.

10    Q    Headlights are on, correct?

11    A    Correct.

12    Q    And then after you had pulled over and after you

13    were stopped off the road on the median, you said the car

14    passed you and you honked your horn at him, correct?

15    A    Yeah.  As the truck was passing me I honked at

16    it, yes.

17    Q    So a car is passing you in the dark on an empty

18    highway at this point, correct?

19    A    Correct.

20    Q    You are not even on the road; you are off the

21    road, correct?

22    A    Correct.

23    Q    You are on the grassy median, correct?

24    A    Correct.

25    Q    Car is passing you by and as it passed you you

Serwin - Cross - LaMagna

1    honked your horn, correct?

2         A    Correct.

3         Q    You would agree, would you not, that it would be

4    possible that you appear to be simply a disabled vehicle

5    honking at a car?  Wouldn't you agree with that?

6                   MR. HAYDEN:  Objection.

7                   THE COURT:  Sustained.

8         Q    So when this car passed you --

9                   THE COURT:  Excuse me, Mr. LaMagna.

10                  (Brief pause in proceedings.)

11        Q    So, after the car passed you were honking at the

12   passer?

13        A    Correct.

14        Q    The car didn't stop?

15        A    Correct.

16        Q    Kept driving, correct?

17        A    Correct.

18        Q    Middle lane, correct?

19        A    Correct.

20        Q    Didn't deviate in any way to the right or to the

21   left, correct?

22        A    Correct.

23        Q    Just drove right past you?

24        A    Correct.

25        Q    As you were off the pavement, on the side of the

Serwin - Redirect - Hayden

```
1    road on the grass, correct?

2        A    Correct.

3        Q    And you reviewed or listened to the 911 tape this

4    morning, correct?

5        A    Correct.

6        Q    And that 911 tape is fair and accurate, correct?

7        A    Correct.

8        Q    That's exactly what you told the 911 operator

9    when she asked you where you were and you said Exit M7,

10   correct?

11       A    Correct.

12            MR. LaMAGNA:  I have nothing further, Judge.

13            THE COURT:  People?

14            MR. HAYDEN:  Yes, your Honor.

15   REDIRECT-EXAMINATION

16   BY MR. HAYDEN:

17       Q    Defense counsel asked you on cross-examination

18   about going out to the scene with members of the State

19   Police.  Do you remember that?

20       A    Yes.

21       Q    Was there a mile marker in the area where you

22   believe you were when you first noticed the oncoming

23   headlights?

24       A    Yes.

25       Q    What was that mile marker?
```

Serwin - Redirect - Hayden

```
 1     A     1030.

 2     Q     Defense counsel asked you about giving an

 3   estimate of two hundred feet distance between you and the

 4   headlights coming right at you.  Do you remember that?

 5     A     Yes.

 6     Q     Was that an estimate in the grand jury?

 7     A     Excuse me?

 8     Q     Was that an estimate?

 9     A     Yes, that was an estimate.

10     Q     A rough estimate?

11     A     A very rough estimate.

12     Q     Defense counsel asked you numerous questions

13   about your telling the 911 operator Exit 7.

14     A     Correct.

15     Q     Were you certain of the exit numbers when you

16   made that call?

17     A     No.

18     Q     Describe your state of mind when you made that

19   call?

20           MR. LaMAGNA:  Objection.

21           THE COURT:  Sustained.

22     Q     Were you excited then?

23     A     I was petrified, and I had adrenaline running

24   through me.  I was very shaky.

25     Q     You testified during cross-examination about
```

Serwin - Redirect - Hayden

```
 1    taking the Meadowbrook Parkway numerous times.

 2         A      Correct.

 3         Q      Is that right?

 4         A      Yes.

 5         Q      Where were you going when you took the

 6    Meadowbrook Parkway all those times?

 7         A      Usually just to Mims.  And every once in a while

 8    to Pearl Paint on Old Country Road.  So I -- I used it for

 9    work, and other than that most of my ongoings were in the

10    city, so I was on the train.

11         Q      While you were taking it southbound where were

12    you going?

13         A      To home.

14         Q      Did you ever get off at Babylon Turnpike?

15         A      Never.

16         Q      Sunrise Highway?

17         A      Never.

18         Q      Merrick Road?

19         A      Once.

20         Q      Defense counsel asked you about pulling off to

21    the side of the road.  Did you pull off to the side of the

22    road quickly?

23         A      Yes.

24         Q      Were the oncoming headlights right in front of

25    you when you pulled off?
```

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Redirect - Hayden

1     A      They -- yes, they were coming right toward me as

2   I was pulling off, yes.

3     Q      Were you coming right at the oncoming headlights

4   then?

5     A      As I was pulling -- yes, as I was pulling over.

6   I was coming toward the headlights.

7     Q      The oncoming headlights were coming toward you?

8     A      Yes.

9     Q      You were coming -- you were going right at the

10  oncoming headlights?

11    A      Yes.

12    Q      Then you pulled over?

13    A      Well, it was very reactionary.  I was going and

14  once I realized what was happening I veered into the right

15  lane, and then veered off and to the shoulder, and came to a

16  complete stop.  As far as the vehicle's headlights coming

17  directly at me, it was within a split few seconds when I

18  first realized that the headlights were in my lane, and then

19  I immediately began to veer off to the side.

20    Q      Quickly?

21    A      Yes.  Quickly.

22    Q      Fast as you could?

23    A      Yes.

24    Q      Defense counsel kept referring to a car that you

25  were seeing.  It was a pickup truck; is that right?

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Redirect - Hayden

1     A     Right.  It was a pickup truck.

2             MR. HAYDEN:  With the Court's permission,

3     your Honor, may I display 76 again?

4             THE COURT:  Sure.

5     Q     Ms. Serwin, would you step down again please.

6           Do you see Merrick Road there?

7     A     Yeah.

8     Q     Now, after you pulled off onto the grassy area

9     alongside the road --

10    A     Uh huh.

11    Q     -- and the pickup truck passed you, did you get

12    back onto the southbound Meadowbrook Parkway?

13    A     Yes, I did.

14    Q     Did you go right over that bridge where you first

15    saw that pickup truck?

16    A     Yes.

17    Q     Did you know where you were then?

18    A     Yeah, I did.  The next day I realized that I had

19    given the wrong exit.

20    Q     Did you keep going after you got back on the

21    roadway?

22    A     Yes.  This is the only way to get to Long Beach.

23    Q     Did you drive directly then to Long Beach?

24    A     Yes.

25    Q     Anymore exits?

Serwin - Recross - LaMagna

```
 1      A      Just the exit to get onto the Loop Parkway.

 2      Q      That's it?

 3      A      Uh huh.

 4      Q      And that was all you saw after the pickup truck

 5   had gone past you then?

 6      A      Correct.

 7             MR. HAYDEN:  Nothing further, your Honor.

 8   Thank you.

 9   RECROSS-EXAMINATION.

10   BY MR. LaMAGNA:

11      Q      So long as you are standing, Ms. Serwin.  Just

12   looking at this, you identified for us Merrick Road,

13   correct?  Can you do that again, please?

14      A      Yes.

15      Q      That's Merrick Road?

16      A      Yes.

17      Q      You are saying you were right here?

18      A      Right.

19      Q      This is a long distance to Merrick Road, right?

20      A      Yes, it is.

21      Q      How many miles would you say based upon your

22   experience of driving the Meadowbrook Parkway so many times?

23      A      About a mile and-a-half.

24      Q      About a mile and-a-half from here all the way to

25   here, correct?
```

GIGI WRIGHT, RPR    (516) 571-2503

1525

Serwin - Recross - LaMagna

| 1 | A | Yes. |
|---|---|------|

2   Q   That Merrick Road is M9, correct?

3   A   Correct.

4   Q   North of that would be the Sunrise Highway exit,

5   correct?

6   A   Correct.

7   Q   That would be M8?

8   A   Right.

9   Q   Correct?

10   A   Correct.

11   Q   And the next one would be Babylon Turnpike,

12   correct?

13   A   Which is 7.

14   Q   Which is 7?

15   A   Correct.

16   Q   So you are familiar with these exits, correct?

17   A   In the fact that I know that they are there, yes.

18   Q   That they are there, of course.  Okay, you may

19   retake the stand.

20       So, when you were looking at that map, once you

21   go that at least mile and-a-half, Merrick Road south, there

22   are no exits, correct?

23   A   Correct.

24   Q   There are no exit signs, correct?

25   A   Correct.

GIGI WRIGHT, RPR    (516) 571-2503

1526

Serwin - Recross - LaMagna

1    Q    There are no exits to get off, correct?

2    A    Correct.

3    Q    Once you passed Merrick Road you are on the

4    Meadowbrook Parkway going south, correct?

5    A    Correct.

6    Q    So, when somebody asks you if you are calling 911

7    what exit you are at, there are no exits to even be confused

8    with down there.  There are no exits down there, correct?

9    A    Correct.

10    Q    So, when 911 asked you -- withdrawn.

11         This isn't the first time, I would suspect,

12    maybe, I don't know, that you have been involved in

13    testifying in a courtroom in a case, has it been?

14    A    Yes.

15    Q    And you testified that you went to all of these

16    locations that you depicted on the maps with the State

17    Police, correct?

18    A    Correct.

19    Q    And that was just recently?

20    A    Yes.

21    Q    This is fourteen months after the incident,

22    correct?

23    A    Correct.

24    Q    And you were driving with them to all of these

25    areas south of the Merrick Road exit, correct?

Serwin - Recross - LaMagna

1    A    Correct.

2    Q    Certain places were pointed out and you said, I

3    think this is where I was at, correct?

4    A    No.  I actually, after the incident happened I

5    went out by myself.  I'm talking about with the State

6    Police.

7              MR. HAYDEN:  Please let her finish.

8              THE COURT:  Next question.

9              MR. LaMAGNA:  I object to that.  I'm --

10             THE COURT:  Next question.

11   Q    So when you went with the police just recently?

12   A    Uh huh.

13   Q    You went to various locations, correct?

14   A    Yes.

15   Q    Areas that you depicted on this map, correct?

16   A    Correct.

17   Q    You said to them, as I was asking, I think this

18   looks like where I was, correct?

19   A    I knew the area.

20   Q    So you said this is where I know I was, correct?

21   A    Correct.

22   Q    But, yet, seconds after this incident occurred an

23   operator asked you where this car passed you, and you said

24   Exit 7, correct?

25   A    That's correct.

Serwin - Recross - LaMagna

1           MR. LaMAGNA:   Nothing further.

2    FURTHER REDIRECT EXAMINATION

3    BY MR. HAYDEN:

4           Q       You testified during cross-examination that you

5    went out on your own?

6           A       What?

7           Q       You testified you went out on your own?

8           A       Yes.

9           Q       Tell the jury about that.

10          A       Um, well, I drive the route all the time coming

11   home.  And after I had first met with Investigator Harris on

12   my way home that day, I had a friend with me and we drove

13   along that area that I was pretty sure it happened in, and

14   just retraced my steps, because it was still fresh in my

15   mind, that's when I determined.  The biggest part about the

16   Meadowbrook Parkway is there is not a lot of shoulder in

17   order to pull over on.  I knew definitively that when I had

18   pulled over there was plenty of room, and that there was

19   lots of grass and trees set back, and to me I was very

20   grateful that I was at a spot where I was able to pull over.

21   That's when I first determined that this was indeed the area

22   that I had pulled over.  And that was back in July of last

23   year.  That was --

24          Q       South of Merrick Road?

25          A       South of Merrick Road, yes.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Recross - LaMagna

1    Q    Was your reference to Exit 7 a simple mistake?

2    A    It was.  In my mind the numbers of the exit and

3    the actual exits themselves, I know that they are there, but

4    I don't use them.  So when the 911 operator asked me which

5    exit it was near, I was just trying to think what the last

6    number was of the exits, not the actual exit.  So I said 7,

7    when really it was 9, not thinking about what the numbers

8    were.  Because I don't use them, and everything had happened

9    so fast and I was so shaky that I just, and I knew right

10   away the next day, like thinking back on it, what I said,

11   that I had made a mistake so far as the exit numbers were

12   concerned.

13              MR. HAYDEN:  Nothing further, your Honor.

14   FURTHER RECROSS-EXAMINATION

15   BY MR. LaMAGNA:

16   Q    Ms. Serwin, on Exhibit 76 you said you were right

17   by the bridge, correct?

18   A    Well, that's really far back, so it is hard.  I

19   mean it is going --

20   Q    Do you want to look?  You are approaching the

21   bridge?

22   A    Correct.

23   Q    And there is no exits, so when they asked you

24   where you were you didn't say I was near the bridge.  You

25   didn't say I -- correct?

Serwin - Recross - LaMagna

1        A      No, that's correct.

2        Q      You didn't say I was near Merrick Road, correct?

3    You said Exit 7?

4        A      Right.  I did.

5               MR. LaMAGNA:  Nothing further.

6               THE COURT:  Thank you, Ms. Serwin.  You are

7    excused.

8               (Whereupon, the witness exits the courtroom.)

9               THE COURT:  Ladies and gentlemen, given the

10   time and given I have certain other obligations to

11   other cases, in order to give you as much of the

12   afternoon as possible, I am going to let you break for

13   lunch at this time.  I am going to ask you to be back

14   at 2 o'clock, understanding that I may not be able to

15   get to you right at two.  If you are back at least that

16   solves one problem.

17              You know you can't talk about this case among

18   yourselves or with anyone else.  Keep an open mind

19   about the case.  Don't listen to any accounts or

20   discussions about the case in the event it is reported

21   in newspapers or other media.

22              Don't visit the premises.  Don't let anybody

23   talk to you about the case.

24              Don't allow anybody to suggest any benefit or

25   payment in exchange for any information concerning this

Serwin - Recross - LaMagna

1    trial.

2              If at any time you run into any of us, we

3    can't even acknowledge that we see you because it would

4    be, it could seem inappropriate, so we won't do it.

5              Have a nice lunch.  See you at 2 o'clock.

6              THE CLERK:  Remain seated as the jury exits

7    the courtroom.

8              (Whereupon, a luncheon recess was held.)

9                        o0o

10

11          A F T E R N O O N   S E S S I O N

12                       o0o

13          (In open court.  Defendant present.)

14             THE CLERK:  Case on trial, Indictment 1910N

15   of 2005, People versus Martin Heidgen.

16             People ready?

17             MR. HAYDEN:  Ready, your Honor.

18             THE CLERK:  Defendant ready?

19             MR. LaMAGNA:  Defendant is ready.

20             THE CLERK:  Defendant is present, your Honor.

21             THE COURT:  Thank you.  Before I hear the

22   applications that I know are coming, I want to be very

23   clear that this Court will not countenance a delay in

24   these proceedings.  Consequently I am ordering the

25   District Attorney's Office to make available to you,

Serwin - Recross - LaMagna

1    immediately, access to the blood that was apparently

2    taken by the police at the time of the arrest.

3          You may begin your DNA analysis immediately,

4    and get whatever expert opinions you need to but there

5    will be no delay in your ability to start that

6    proceeding.

7          MR. LaMAGNA:  Judge, I understand we can

8    start at least our analysis, but what ultimately will

9    happen is once, assuming they'll get a report at some

10    point, it is that analysis that also needs to be

11    reviewed.

12          THE COURT:  I understand.  In the meantime

13    you can analyze the blood --

14          MR. LaMAGNA:  At first stage --

15          THE COURT:  -- immediately.

16          MR. LaMAGNA:  I agree.

17          THE COURT:  And you can get your expert on

18    board, right away.  Today.  This afternoon, as far as

19    I'm concerned.

20          MR. LaMAGNA:  For the record though, we still

21    need to get an expert, interview the expert and hire an

22    expert.  Again, we are not the government.  We don't

23    have these people part of the police department, the

24    State Police that are associated with the Medical

25    Examiner's Office that are associated with us.

GIGI WRIGHT, RPR    (516) 571-2503

1533

Serwin - Recross - LaMagna

1    THE COURT:  Once again Mr. LaMagna, don't

2    take this the wrong way, I will not countenance any

3    delay in these proceedings.

4         MR. LaMAGNA:  Right now I'm not asking for

5    any.

6         THE COURT:  I understand.

7         There is applications?

8         MS. McCORMICK:  Actually, your Honor with

9    respect to that one issue, before we leave there, I

10   want to make clear to the Court I heard that the DNA,

11   the preliminary report, will be due this Friday

12   afternoon, with possibly the final report and testimony

13   available on Monday.  Investigator Harris, as we speak,

14   is at that lab retrieving that blood so that it is

15   available to counsel.  At the Court's request over

16   lunch I contacted Mr. LaMagna and told him that we have

17   that blood, and will have that blood available whenever

18   he needs it to be taken anywhere to be tested.

19        THE COURT:  Very good.  Thank you,

20        MS. McCORMICK:  Thank you, your Honor.

21        THE COURT:  Now, there is an application?

22        MR. LaMAGNA:  Right.  Again with that, of

23   course, we will cross those bridges when we get there.

24        THE COURT:  I just want to be clear at the

25   moment.

GIGI WRIGHT, RPR    (516) 571-2503

Serwin - Recross - LaMagna

1       MR. LaMAGNA:  Okay.

2       Judge, I mentioned to Mr. Hayden, I

3   understand a witness is going to be called this

4   afternoon and there is also a 911 tape.  I have no

5   objection to the 911 tape coming in as an excited

6   utterance or present sense impression.  However, there

7   is one line that I would ask to be redacted because it

8   gives a conclusion, a factual conclusion, that will be

9   up to the jury to make that determination.  And

10  Mr. Hayden said it may take about fifteen minutes to

11  redact that line.  The line, in sum and substance, he

12  almost killed me and somebody else.

13      Now, that is not what he is observing; that

14  is -- I mean he could testify as to what he saw, what

15  he heard, any of that stuff, but the conclusion, the

16  factual conclusion as it relates to the charge, that's

17  up to the jury to determine based upon what he saw,

18  what he heard; not the conclusion that is in that tape.

19      The rest of the tape I have no objection to

20  because that is what he saw at the time contemporaneous

21  with the incident.

22      It is just that conclusion that is up to a

23  jury to determine from those facts.

24      MS. McCORMICK:  Your Honor, this particular

25  witness, Mr. Caruso, is one of the victims in this case

Serwin - Recross - LaMagna

1    to the extent that there is a charge relating to him, a

2    Reckless Endangerment charge.  While it is both a

3    present sense impression and excited utterance, it is

4    also state of mind.  This was his perception of the

5    endangerment that he was in at that time.

6         He is -- the present sense impression is not

7    being presented without the witness.  Counsel is free

8    to cross-examine him about his perceptions, but it

9    clearly goes to his state of mind, the endangerment

10   that he felt at that time.

11        MR. LaMAGNA:  Judge, the issue is intent.

12   The witness can't say he intended to do this.

13        THE COURT:  You can't really intend reckless

14   conduct.

15        MR. LaMAGNA:  No.  I'm using that as an

16   example.  I'm saying he made a conclusion about what

17   was in his mind.

18        THE COURT:  On the other hand, if I am in a

19   car and a pickup truck comes hurdling at my car, not

20   yielding a lane, coming directly at me in the wrong

21   direction of travel for the parkway I'm on, and I take

22   evasive action in my mind to save my life and I watch

23   it hit into someone else, that is something I'm

24   observing.

25        MR. LaMAGNA:  If this person will testify to

GIGI WRIGHT, RPR   (516) 571-2503

Serwin - Recross - LaMagna

1       those facts as he saw them; that's one thing.  I have

2       no objection to that.

3               THE COURT:  Fine.  I have a policy which has

4       served me well and; that is, not to rule on objections

5       until they are made.  So let's see what the testimony

6       is.

7               MR. LaMAGNA:  Well, I don't want it played

8       before.

9               THE COURT:  Before it gets played I assume

10      there is going to be some kind of foundation laid, and

11      I assume there is going to be some testimony by

12      somebody who finds himself to have been exposed to a

13      grave risk of death as set forth in the indictment.  So

14      let's find out.

15              MR. LaMAGNA:  Okay.  I understand.

16              THE COURT:  I understand that you alerted me

17      that you are probably going to object at some point

18      during the next witness.

19              MR. LaMAGNA:  That's articulated.

20              THE COURT:  Produce the jury, please.

21              COURT OFFICER:  Jury entering.

22              (Whereupon, the jury entered the courtroom,

23      and upon taking their respective seats, the following

24      occurred:)

25              THE CLERK:  Jurors are present and seated,

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1      your Honor.

2                  THE COURT:  Thank you.  Sorry for the delay.

3      We have been actually working on the case while you

4      were waiting for us.  I do apologize for the lateness

5      in your return.

6                  People.

7                  MS. McCORMICK:  Your Honor, the People call

8      Joseph Caruso.

9                  COURT OFFICER:  Step up.  Remain standing,

10     raise your right hand.

11                 J O S E P H   C A R U S O ,        a witness

12     called on behalf of the People, having been first duly

13     sworn by the Clerk of the Court, was examined and

14     testified as follows:

15                 THE CLERK:  You can put your hand down.

16     State your name, spelling your last name.

17                 THE WITNESS:  Joseph Caruso, C-A-R-U-S-O.

18                 THE CLERK:  Take a seat.

19     DIRECT EXAMINATION

20     BY MS. McCORMICK:

21         Q     Good afternoon, Mr. Caruso.

22         A     Good afternoon.

23         Q     Would you tell the jury how old you are, sir?

24         A     Thirty-five.

25         Q     How are you employed?

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

```
 1       A     I work on Wall Street.

 2       Q     I'm going to direct your attention to July 2nd

 3   2005.  Do you remember that date?

 4       A     I do.

 5       Q     At about 2 o'clock in the morning where were you

 6   coming from, sir?

 7       A     Coming home from a birthday party.

 8       Q     Do you remember where the birthday party was?

 9       A     Huntington.

10       Q     Can you tell the jury, please, were you drinking

11   at that birthday party?

12       A     I was.

13       Q     How many alcoholic drinks did you consume at that

14   party?

15       A     Two.

16       Q     Are you sure of the number?

17       A     Positive.

18       Q     Why are you positive, sir?

19       A     Because I don't drink any more than that when I'm

20   eating birthday cake.

21       Q     I'm sorry?

22       A     Birthday cake and alcohol do not mix.

23       Q     Mr. Caruso, could you tell the jury, please,

24   where were you going to on that night?

25       A     To my girlfriend's in Long Beach.
```

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

```
 1      Q      Do you remember what route you were traveling?

 2      A      I was traveling the Meadowbrook Parkway south.

 3      Q      From up on the north shore?

 4      A      From the Northern State.  From Huntington.

 5      Q      Are you a licensed driver, sir?

 6      A      Yes.

 7      Q      Licensed in the State of New York?

 8      A      Yes.

 9      Q      How long have you been licensed?

10      A      Seventeen years.

11      Q      Are you familiar with the speeds that are

12   traveled on side streets?

13      A      Yes.

14      Q      Are you familiar with the speeds that are

15   traveled on highways?

16      A      Yes.

17      Q      In the course of your driving do you estimate the

18   speed of other vehicles?

19      A      I do.

20      Q      Did there come a time, sir, when you were

21   traveling southbound on the Meadowbrook Parkway when you

22   came to the area of the Merrick Road overpass?

23      A      Yes.

24      Q      Could you describe the lighting on the

25   Meadowbrook at that point?  Were you able to see?
```

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1      A      I was.

2      Q      When you arrived around the area of the

3  Meadowbrook overpass please tell the jury what happened.

4      A      I was driving my car.  I had looked up briefly.

5  I thought I had seen headlights.  I thought it could be

6  rather impossible.  I went down again to change a CD in my

7  car, and then I got a feeling, and I looked up and then

8  realized there was a car coming.

9      Q      When you say that you looked up and you saw

10  headlights --

11      A      Yes.

12      Q      -- where were you located on the Meadowbrook

13  Parkway when you first saw those headlights?  Do you

14  remember?

15      A      I was in the center lane going through, under,

16  the overpass.

17      Q      Do you recall where the headlights were in front

18  of you?

19      A      Yes.  To the center, right in front of me, center

20  lane.

21      Q.      Sir, can you describe for the jury once you

22  recognized those as headlights what did you do?

23      A      I was kind of freaked out a little, and I noticed

24  that my car kind of drifted a little to the left.  I noticed

25  it appeared as if the car was drifting with me.  I then came

Caruso - Direct - McCormick

1  back to the middle lane and realized that I was, that my

2  life was in danger.

3              MR. LaMAGNA:  Objection.

4              THE COURT:  Overruled.

5      A      And as I continued I noticed the car was

6  approaching me and I went into the right lane.  As I went

7  into the right lane the car passed me.  I briefly looked

8  down and then I looked up into my rear view mirror, saw the

9  taillights behind me, and then pulled off to the side of the

10  road.

11      Q      When you say that you saw the taillights behind

12  you, did you ever see those taillights illuminate into brake

13  lights?

14      A      No.

15      Q      When you say that the car passed you what kind of

16  vehicle passed you that night, Mr. Caruso?

17      A      Silver pickup.

18      Q      At the time that the vehicle, the headlights were

19  coming directly at you, could you tell what kind of vehicle

20  it was at that point?

21      A      No.

22      Q      When you moved into the right lane and the pickup

23  truck passed you how close was the distance between your

24  vehicle and his?

25      A      Seven, eight feet.

Caruso - Direct - McCormick

1  Q     Did you have any sensation of movement as the

2  vehicle passed?

3  A     I did.  The car rattled like, as if a big blast

4  of wind hit my car and shook it.

5  Q     Can you tell the jury, please, do you know about

6  how fast you were traveling down the Meadowbrook at that

7  time?

8  A     About 65, 70.

9  Q     And you explained to the jury that you have

10  estimated speeds of vehicles; is that correct?

11  A     Yes.

12  Q     Were you able to estimate the speed of that

13  oncoming pickup truck?

14  A     About the same, within ten miles or so, ten miles

15  or an hour or so.  Between 70 and 80.

16  Q     Pickup truck was doing 70, 80?

17  A     Yes.

18  Q     And you were doing 65, 70?

19  A     Yes.

20  Q     As you looked up and observed those headlights in

21  front of you, do you have an approximate idea of the

22  distance between yourself and those headlights?

23  A     When I first saw them?

24  Q     Yes.

25  A     A quarter mile.

Caruso - Direct - McCormick

1    Q      And when you ultimately had to get out of the

2    way, you had --

3                 MR. LaMAGNA:  Objection.

4                 THE COURT:  Sustained.

5    Q      When you ultimately changed lanes, can you tell

6    the jury approximately how far were those headlights in

7    front of you, directly in front of you at that point?

8    A      One hundred fifty feet.

9    Q      Mr. Caruso, as those headlights came toward you

10   did they veer at all to one side or the other?

11   A      No.

12   Q      At the time that you drifted to the left you said

13   that the pickup truck moved as well.  Is that correct?

14   A      It seemed to be, yes.

15   Q      What direction did it move away from you?

16   A      With me.  To my left.

17   Q      Would it be fair to say it seemed like it was

18   tracking you?

19                 MR. LaMAGNA:  Objection.

20                 THE COURT:  Sustained.

21   Q      When you moved left did the pickup truck move in

22   a different direction or --

23   A      When I moved left, it moved left.  I went back to

24   the middle lane, and one of my thoughts was that I was in a

25   pretty wild game of chicken.

1544

Caruso - Direct - McCormick

1        MR. LaMAGNA:  Objection.

2    Q    That's what you thought?

3        MR. LaMAGNA:  Objection.

4        THE COURT:  Sustained.

5    Q    Mr. Caruso, when you observed the vehicle coming

6    directly at you, did you observe it slow down at all as it

7    came at you?

8    A    No.

9    Q    Did you observe that vehicle at any time drift

10   and then catch itself?

11   A    No.

12   Q    Did you observe any kind of erratic speed changes

13   in the vehicle?

14   A    No.

15   Q    Did you observe the vehicle stop and start in any

16   kind of way?

17   A    No.

18   Q    Did you observe the vehicle try to exit the

19   roadway?

20   A    No.

21   Q    Did you observe the vehicle go to the shoulder of

22   the roadway?

23   A    I did not.

24   Q    After the vehicle passed you, did it do any of

25   those things?

Caruso - Direct - McCormick

```
1        A     No.

2        Q     Did you observe, as the vehicle passed you, in

3    your rear view mirror did you observe the vehicle?

4        A     No.

5        Q     Did you observe -- what did you observe about the

6    vehicle's speed at that time?

7        A     It stayed constant.  Kept going.

8        Q     Did you observe the vehicle shift from lane to

9    lane after it passed you?

10       A     No.

11       Q     Mr. Caruso, were there any other cars on the road

12   ahead of you that night on the Meadowbrook Parkway?

13       A     There was.  I realized there was a car in front

14   of me as I pulled off to the side of the road and dialed

15   911.

16       Q     Now, you say that initially as the vehicle passed

17   you you took a second, you looked in your rear view mirror,

18   and then where did you pull off to the side?

19       A     I pulled off to the right side, off of the

20   Meadowbrook.

21       Q     And where was the vehicle that was ahead of you?

22       A     When I noticed the vehicle ahead of me I looked

23   up, I was on hold with the State Police, and they were, the

24   car was getting back onto the road again in front of me.

25       Q     Do you recall the type of car it was at all?
```

Caruso - Direct - McCormick

1    A    I don't.  Possibly a Camry.  I only recall seeing

2    the taillights click on and off and then go.

3    Q    Now, you described that you pulled over to the

4    shoulder of the road.  Is that correct?

5    A    Yes.

6    Q    Describe, if you can for this jury, what you did

7    when you got to the shoulder?

8    A    When I got to the shoulder I was kind of freaked

9    out a little bit, and then picked up the phone, called 911,

10   recomposed myself, I was kind of in a state of frustration,

11   and then proceeded.  I left.

12   Q    Did you call 911 immediately upon stopping?

13   A    About five seconds afterwards, yes.

14   Q    And did you have occasion, sir, today to listen

15   to 911 tapes in the district attorney's office?

16   A    I did.

17   Q    I'm going to ask to approach you with what I ask

18   to be marked as People's Exhibits 79 and 80 for

19   identification purposes.

20            (Whereupon, audiotapes received and marked

21       People's Exhibits 79 and 80 for identification.)

22            COURT OFFICER:  People's Exhibits 79 and 80

23       for identification.

24   Q    Mr. Caruso, can you take a look at People's

25   Exhibit number 79 first.

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1       A       Yes.

2       Q       Are there any markings on there, sir, that would

3       identify to you what it is?

4       A       Yes.

5       Q       What are the markings?

6       A       My initials and date.

7       Q       Is that -- can I see 79 for a minute.  People's

8       Exhibit 79 is listed as NYSP Caruso.  The initials and date,

9       sir, what does that indicate to you?

10      A       Today's date and my name's initials.

11      Q       Is that the occasion that you listened to that

12      earlier today?

13      A       Yes.

14      Q       Was it a fair and accurate representation of your

15      911 call to the NYSP, New York State Police?

16      A       Yes.

17              MS. McCORMICK:  Your Honor, at this time I

18      would ask to move People's Exhibit 79 into evidence.

19              MR. LaMAGNA:  Judge, I have had an

20      opportunity to listen to that tape.  I will renew the

21      objection that was articulated earlier.

22              THE COURT:  That objection is overruled.

23              (Whereupon, People's Exhibit 79 for

24      identification now received and marked People's Exhibit

25      79 in evidence.)

Caruso - Direct - McCormick

1              COURT OFFICER:  People's Exhibit 79 in

2      evidence.

3         Q    Looking at People's Exhibit number 80, which I

4      think is marked Nassau/Caruso --

5         A    It is.

6         Q    -- do you recognize that, sir?

7         A    I do.

8         Q    What do you recognize it to be?

9         A    The tape that I listened to this morning with my

10     initials and date on it.

11        Q    Did you listen to that tape for whether or not it

12     was a fair and accurate representation of your call to the

13     Nassau 911 system first?

14        A    I did.

15        Q    Is it fair and accurate?

16        A    Yes.

17             MS. McCORMICK:  Your Honor, at this time I

18     would move People's Exhibit 80 in evidence.

19             MR. LaMAGNA:  Same objection.

20             THE COURT:  Overruled.

21             They are both received.

22             (Whereupon, People's Exhibit 80 for

23     identification now received and marked People's Exhibit

24     80 in evidence.)

25             COURT OFFICER:  People's Exhibit 80 in

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1      evidence.

2                    MS. McCORMICK:  Your Honor, at this time I

3      would ask that People's Exhibit 80 first and then 79 in

4      evidence be played for the jury.

5                    THE COURT:  Go ahead.

6                    (Whereupon, the tape was played.)

7         Q      Is that the complete tape that you heard this

8      morning, Mr. Caruso, as to the Nassau County portion?

9         A      Yes.

10                   MS. McCORMICK:  At this time the People will

11     play People's Exhibit 79 in evidence.

12                   (Whereupon, the tape was played.)

13        Q      Mr. Caruso, can you tell the jury what was going

14     through your mind at that point?

15        A      Again, frustration, scared to death, couldn't

16     believe what just happened.  Disbelief.

17        Q      Can you explain to the jury why here today your

18     testimony is that the pickup truck was going 70 to 80 and

19     you said a hundred miles an hour on the tape?

20        A      I was in a state of, like I said, disbelief.  And

21     looking back when your life is at danger and you think

22     you're going to die --

23                   MR. LaMAGNA:  Objection.

24                   THE COURT:  Overruled.

25        A      -- things kind of get blown out of proportion.

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1    Q    As you sit here today though, sir, having had a

2    chance to reflect, can you tell this jury what was the speed

3    of that pickup truck as it passed you?

4    A    I would say 70 to 80.

5         MS. McCORMICK:  Your Honor, at this time I

6         have to get the easel.  I would ask that the witness

7         step down from the witness box --

8         THE COURT:  Yes.

9         MS. McCORMICK:  -- and approach with People's

10        Exhibit number 49 in evidence.

11        (Witness complies.)

12   Q    I'm going to set this up, Mr. Caruso.  This is a

13   set of dots, okay.  Can you take a look, first of all, at

14   People's 29 in evidence.  Do you recognize that, sir?

15   A    I do.

16   Q    What do you recognize that photograph to

17   represent?

18   A    Meadowbrook Parkway.

19   Q    Is it an aerial view encompassing the Merrick

20   Road overpass and then heading south?

21   A    Yes.

22   Q    Do you see the area on that photograph, sir,

23   where you first observed -- where you were when you first

24   observed the pickup truck?

25   A    Yes.

Caruso - Direct - McCormick

1    Q    Can you indicate that please with one of those

2    yellow stickers with your name "Caruso" on it, please?

3    A    Where I first saw the pickup?

4    Q    When you first saw him where were you?

5    A    Underneath.

6    Q    Underneath the overpass?

7    A    Yes.

8    Q    Using a sticker with the word "pickup truck"

9    could you please indicate for the jury where that pickup

10   truck was to the best of your ability on the roadway.

11   A    Do you want me to put it on the second time I saw

12   him, when I looked down and looked up and realized it was a

13   pickup truck?

14   Q    The first time that -- actually the first time

15   you saw him, if you remember?

16   A    Okay.

17        (Witness complies.)

18   Q    Mr. Caruso, so could you please retake the stand

19   and keep the dots with you.

20   A    Sure.

21   Q    Mr. Caruso, I have a couple of additional

22   photographs that are already in evidence.  I am going to

23   approach you with them one at a time.  I am going to ask you

24   that you be handed People's Exhibit 37 in evidence.

25        Before we get to People's Exhibit 37, Mr. Caruso,

Caruso - Direct - McCormick

1    did you have an opportunity, in preparation of your

2    testimony, to revisit this area that is reflected in these

3    photographs?

4         A    I did.

5         Q    Did you do that with the State Police?

6         A    Yes.

7         Q    Did you circle the area -- when I say "circle," I

8    mean, go over the roadway -- several times with the State

9    Police?

10        A    Yes.

11        Q    And did that assist you in refreshing your

12   recollection as to your position and the defendant's

13   position at that time?

14        A    It did.

15        Q    Were you at all influenced by anybody to say

16   anything in particular, or did you determine the points

17   where you were and where he was?

18        A    I wasn't influenced.  It wasn't too hard to

19   remember.

20        Q    Had you been down that roadway since the night of

21   the crash?

22        A    Yes.  Many, many, many times.

23        Q    Did you ever have occasion in those times to not

24   relive, but to review where you were, where the truck was?

25        A    I think about it every time I go down this road,

Caruso - Direct - McCormick

1    and I have told people that have driven in the car with me

2    about that specific instance, that night, and what had

3    happened.

4         Q    The photographs that you have before you reflect

5    daytime; is that correct?

6         A    Yes.

7         Q    There is a difference between daylight

8    observations of the roadway and nighttime; is that correct?

9         A    Yes.

10        Q    For the purposes of demonstrating to the jury

11   where you were, can you tell the jury what is in photograph

12   number 37, please?

13        A    The underpass, the view of the exit sign going

14   onto Merrick Road, and the road itself.

15        Q    Does that photograph, 37, accurately reflect a

16   picture of where your car was located at the time that you

17   looked out --

18        A  -  Yes.

19        Q    -- at the defendant?

20        A    Uh huh.  In the center lane.

21        Q    You were in the center lane.

22             Can you take one of those dots and put your name

23   "Caruso" where you were located.

24             (Witness complies.)

25        Q    I am approaching the witness with People's

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1    Exhibit number 48.  Could I see that last one for a minute

2    though?

3        A    Yes you.

4        Q    Do you recognize that photograph, sir?

5        A    Yes, sir, I do.

6        Q    What do you recognize that to represent?

7        A    This is -- this represents moments before we

8    actually passed each other.

9        Q    Is the area where you passed each other reflected

10   in that photograph?

11       A    Yes.

12       Q    Could you take a yellow sticker with your name

13   "Caruso" and a yellow pickup sticker with "pickup" where

14   each of you were at the time that you passed one another.

15            (Witness complies.)

16       Q    Thank you.  Can I ask that the witness be given

17   back People's Exhibit 37.

18            -- Mr. Caruso, I neglected to ask you whether

19   People's Exhibit 37 reflects where it is that you first saw

20   the pickup truck.

21       A    Put a dot there?

22       Q    First, does it reflect it in the photograph?

23       A    Yes, it does.

24       Q    Then can you please put a dot with the word

25   "pickup truck" and where you first saw that pickup truck.

GIGI WRIGHT, RPR    (516) 571-2503

1555

Caruso - Direct - McCormick

1      (Witness complies.)

2      Q      At the time that you were out at the scene of the

3  roadway with the State Police did you make a notation to

4  yourself as to any kind of object in the roadway that would

5  indicate the place where the pickup truck was at the time

6  that you first saw it?

7      A      Yes.

8      Q      And is it reflected in that photograph?

9      A      It is.

10     Q      What is the object that you pointed to?

11     A      It is the back of a construction sign on the

12  opposite side of the road.

13     Q      Now, again, Mr. Caruso, approaching you with

14  People's Exhibit number 45 in evidence.  I would ask you,

15  sir, what does that photograph depict?

16     A      This is where I had driven off the side of the

17  road and made the, stopped my car and made the 911 call.

18     Q      At the time that you are at the side of the road

19  do you ever look back to see the pickup truck?

20     A      No.  I had already glanced, I was still on the

21  road driving when I looked in my rear view mirror.

22     Q      Is that the last you saw him?

23     A      Yes, ma'am.

24     Q      No brake lights?

25     A      No.

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Direct - McCormick

1    Q    No swerving?

2    A    No.

3    Q    Mr. Caruso, could you put a sticker with your

4    name on it where you pulled over on the side of the road in

5    that photograph?

6              (Witness complies.)

7              MS. McCORMICK:  With the Court's permission,

8         could Mr. Caruso step down so I could project these on

9         the presenter so the jury can see?

10             THE COURT:  Yes.

11   Q    Mr. Caruso, if you could walk over by that

12   television screen.  These are going to be projected on it,

13   and explain to the jury what it is.  First, People's Exhibit

14   number 37.

15   Q    Do you see those dots, Mr. Caruso?

16   A    Yes.

17   Q    Can you tell the jury, please, pointing to each

18   one of those dots, what it is that you are looking at?

19   A    My car.  The truck.

20   Q    And the truck is, again, aligned with the white

21   construction sign in that photograph?

22   A    Yes.

23   Q    Now, looking again, Mr. Caruso, at actually --

24   one second.  Just back to People's Exhibit 37.  Is this the

25   spot that you recognize it as a pickup truck, or it is not?

Caruso - Direct - McCormick

1       A       It is.

2       Q       You recognized?

3       A       Not as a pickup truck, headlights.  I did not

4    recognize it was a pickup truck until we actually passed

5    together.

6       Q       Can you indicate just by pointing where it is

7    that your vehicle drifted to the left?

8       A       Here.

9       Q       And why did your vehicle drift to the left at

10   that point?

11      A       I don't know.

12      Q       You don't know?

13      A       No.

14      Q       At that time is the pickup truck coming at you?

15      A       Yes.

16      Q       At that time the pickup truck, when you first

17   observed it, what lane was it in, sir?

18      A       I want to say the middle lane.

19      Q       Center lane?

20      A       Yes.

21      Q       When you drifted to the left where did the pickup

22   truck go?

23      A       It appeared as if it was going with me to my

24   left.

25      Q       To your left; to its right?

Caruso - Direct - McCormick

1    A    Yes.

2    Q    And then when you went back into the center lane

3    and you passed the pickup truck what lane was that pickup

4    truck in?

5    A    The middle lane.  When we passed I was in the

6    right, he was in the middle.

7    Q    So you drifted to the left?

8    A    Uh huh.

9    Q    Is that correct?

10    A    Yes.

11    Q    You corrected to the center?

12    A    Yes.

13    Q    And at the time the pickup truck passed you he

14    was in the center lane; is that right?

15    A    Yes.

16    Q    You were in the right lane?

17    A    Yes.

18    Q    Referring to People's Exhibit number 48.

19    Mr. Caruso, can you tell the jury what it is that is

20    reflected by those dots?

21    A    This is when we passed.

22    Q    And you said that you were about seven to eight

23    feet apart from one another?

24    A    Ten.

25    Q    Ten?

Caruso - Direct - McCormick

1       A       Seven, eight.  Between seven and ten.

2       Q       Is that area in the photograph just before the

3  entrance ramp comes on from Merrick Road onto the southbound

4  Meadowbrook?

5       A       Say that again?

6       Q       Sorry.  Is the area where the dots are, next to

7  the grass there, right about the area?

8       A       At the end of the grass, yes.  And I would say

9  that my car was, because I was moving to the right and he

10  was staying steady, my car was probably two feet to the

11  right, two or three feet inside of the right-hand lane,

12  moving further toward the right, where I was, drove a little

13  further and then got off.  He was in the middle somewhere

14  around here.  And this is the gap between us.

15      Q       So when you say two to three feet to the right

16  and getting off?

17      A       Maybe three or four feet to the left going by

18  where the line was.

19      Q       Are you at a diagonal heading toward the side of

20  the road at that point?

21      A       Diagonal, I don't know.  Driving still, yes.

22      Q       And then, sir, as the pickup truck passed you,

23  what was your speed?

24      A       Seventy, 65.

25      Q       His speed?

GIGI WRIGHT, RPR    (516) 571-2503

1560

Caruso - Direct - McCormick

1    A    Same.  Maybe tops 80.  Seventy.

2    Q    Mr. Caruso, I'm going to ask you to take a look

3  at People's Exhibit 45 in evidence.  Can you tell the jury

4  what does that dot reflect?

5    A    Where my car -- where I had pulled over.

6    Q    What is the viewpoint on that photograph?

7  Looking south or north?

8    A    This is looking back.  This would be if I was

9  sitting on the back of my car when I stopped.  Looking

10  actually in the direction that the truck was moving.

11    Q    By the time you had stopped he was no longer in

12  your view?

13    A    No.

14    Q    And can you see in that photograph, can you

15  indicate for the jury where it is that you glanced at your

16  rear view mirror when you last saw him?  Can you tell?

17    A    Probably here, I would say.

18    Q    And where were his taillights when you were

19  looking in your rear view mirror?  Where were they on the

20  roadway?

21    A    Here.

22    Q    Going under the overpass?

23    A    Heading toward it, yes.

24    Q    Thank you.  You can retake the witness stand.

25        MS. McCORMICK:  Your Honor, I have no further

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Cross - LaMagna

1          questions.

2                    THE COURT:  Mr. LaMagna.

3                    MR. LaMAGNA:  Thank you, Judge.

4     CROSS-EXAMINATION

5     BY MR. LaMAGNA:

6          Q    Good afternoon, Mr. Caruso.  How are you?

7          A    Okay.

8          Q    I'm going to ask you a couple of questions here

9     today.  We never spoke about this case; is that correct?

10         A    Correct.

11         Q    Now, the night that you just described, this was

12    around 2 o'clock in the morning?

13         A    Yes.

14         Q    It was dark, correct?

15         A    Yes.

16         Q    And I believe, if I may, that picture depicts the

17    first time that you saw this car coming at you, correct?

18         A    That picture -- I looked up first as I was, I

19    would say maybe 20 feet before that, looked up, looked down

20    and looked up again.

21         Q    It was like seconds?

22         A    Not even.

23         Q    So that is a general estimate?

24         A    Yes.

25         Q    When you saw this car coming at you?

Caruso - Cross - LaMagna

1    A    Yes.

2    Q    And that picture depicts you are probably

3  underneath the overhang?

4    A    I would say so.

5    Q    Overpass?

6    A    Yes.

7    Q    And to your best estimate that is where you saw

8  the car coming around that bend, I guess that is?

9    A    Yes.

10    Q    Is that when you saw the car drifting as it was

11  coming around?

12    A    No.

13    Q    From the south?

14    A    I wouldn't say the first time I saw it I did not

15  notice it drifting.

16    Q    It was the second time from this viewpoint,

17  correct?

18    A    Yes.

19    Q    So, it was at this viewpoint that you recognized

20  that --

21    A    When my car was moving to the left I noticed his

22  moving with mine.

23    Q    I understand.  I'm talking about the vantage

24  point.  At first you looked up and then you said you went

25  down to your radio or something; is that correct?

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Cross - LaMagna

1   A   Yes.

2   Q   Changed a CD?

3   A   Yes.

4   Q   And then you looked up again and this is --

5   A   Yes.

6   Q   -- pretty much where --

7   A   I would say so.

8   Q   -- you are, and what you are saying; is that

9   fair?

10   A   Yes.

11   Q   And it was dark, very little traffic on the road,

12   correct?

13   A   Yes.

14   Q   In fact, there was no traffic other than you said

15   you saw another car pulled over; is that correct?

16   A   After I had pulled over that was the first time I

17   noticed, yes, there was another car in front of me.

18   Q   Prior to pulling over the only cars you saw was

19   the car coming at you, correct?

20   A   Yeah.

21   Q   Now, you testified -- withdrawn.

22       So looking at this photograph -- for the record,

23   I don't know what number that was.

24           THE COURT:  Mr. Hayden.

25           MR. HAYDEN:  This is People's Exhibit 37.

Caruso - Cross - LaMagna

1    Q    -- 37 in evidence, that is pretty much the first

2  time that you realized, I got to get over?

3    A    Yes.

4    Q    And you testified that you pulled over to the

5  right, correct, to the right lane?

6    A    I went to the left and then back to the center.

7    Q    After this?

8    A    Yes.  To the left, to the center, to the right

9  and then off the road.

10    Q    Then to the shoulder?

11    A    Yes.

12    Q    And that exit sign, the M9 east, that is the exit

13  sign to get on to Merrick Road, correct?

14    A    Yes.

15    Q    And that overpass is the Merrick Road overpass?

16    A    Yes.

17    Q    Correct?

18    A    Yes.

19    Q    Now, would it be fair to say that this incident,

20  or this situation lasted seconds?

21    A    Yes.

22    Q    Would ten seconds be too long?

23    A    Too long.

24    Q    Five seconds?

25    A    Seven.

Caruso - Cross - LaMagna

1  Q    About seven seconds?

2  A    I would say the whole entire thing.

3  Q    Now, I understand when you testified that when

4  this happened you were very excited, and when you called 911

5  you testified that when you said a hundred you realized that

6  emotion was more involved in that?

7  A    Yes.

8  Q    And upon reflection you testified that you

9  believed the car was going around 70 miles an hour, give or

10  take?

11  A    Yes.

12  Q    Pretty much matching your speed, correct?

13  A    Yes.

14  Q    Now, just for clarity, you had testified in the

15  grand jury, correct?

16  A    Yes.

17  Q    Do you recall testifying, that when the car got

18  very close I immediately drove into the right lane and onto

19  the shoulder?

20  A    Yes.

21  Q    Now, I know this was fourteen months ago, and I

22  know it is in your head, when you went to the shoulder --

23  what I'm asking you is when you were on the shoulder, the

24  car had already passed you or --

25  A    Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Caruso - Cross - LaMagna

1    Q    -- or was it almost like it was happening?

2    A    No.  No.

3    Q    So it was, you hit the shoulder after the car

4    passed?

5    A    Yes.

6    Q    You stopped and called 911?

7    A    Yes.

8    Q    Now, when you were passing under the overpass to

9    -- this is 48, People's Exhibit 48 -- this is about the time

10   that you passed?

11   A    Yes.

12   Q    A couple of seconds after the overpass, correct?

13   A    Yes.

14   Q    And what is depicted where you put "Caruso," this

15   is actually the exit ramp from Merrick Road onto the

16   parkway, correct?

17   A    Yes.

18   Q    And between the time that you saw the car or

19   identified the car when you were under the overpass to here,

20   two seconds out of the seven?

21   A    Two to three seconds, yep.

22   Q    And then the car passed you, correct?

23   A    Yes.

24   Q    And it passed you in the center lane, correct?

25   A    Yes.

Caruso - Cross - LaMagna

1   Q    And continued in the center lane, correct?

2   A    When I looked back in my rear view mirror, it

3   appeared he was in the center lane, yes.

4   Q    Is it fair to say that when you looked up you saw

5   him for a second through the rear view mirror?

6   A    Yes.

7   Q    After you saw this car pass you, looked in the

8   mirror for a second, didn't see it again?

9   A    No.

10  Q    So you don't know if it slowed up down, pulled

11  over, did anything?

12  A    I only know he passed me extremely fast.

13  Q    I understand.  Same speed you were going?

14  A    Yes.

15  Q    After that that was the last you saw of this car,

16  you called 911, and you pulled back on the road and you go

17  home?

18  A    Yes.

19  Q    And that photograph confirms, when you said on

20  the 911 tape you were passing through the Merrick Road area,

21  you meant the overhang, right?

22  A    Yes.

23  Q    From Merrick Road?

24  A    Yes.

25  Q    And after you made the 911 call you went home,

Caruso - Redirect - McCormick

1    I'm assuming?

2         A    Yes.

3         Q    Or went to Long Beach?

4         A    Yes, went to Long Beach.

5         Q    And from the time -- so the time from when you

6    first saw the car to the time you passed, just for clarity

7    sake, was about seven seconds, correct?

8         A    Say that again?

9         Q    From the time you recognized the car --

10        A    The entire incident was about seven seconds.

11        Q    And about two to three seconds from the time of

12   the first photograph under the overpass to passing you,

13   correct?

14        A    Yes.

15             MR. LaMAGNA:   I have nothing further, Judge.

16   REDIRECT EXAMINATION

17   BY MS. McCORMICK:

18        Q    Mr. Caruso, you said that there was another car

19   ahead of you pulled over?

20        A    Yes.

21        Q    At the time that you pulled over; is that right?

22        A    Yes, ma'am.

23        Q    And prior to this had you taken any particular

24   notice of the other car?

25        A    I did not.

Caruso - Redirect - McCormick

1     Q     Had you even realized there was another car ahead

2   of you?

3     A     No.

4     Q     Do you know how many other cars were ahead of you

5   that night?

6     A     I don't.  I just remember saying on the 911 call

7   that he almost killed me and somebody else.  I realized it

8   was someone else, because I was looking ahead.  I was

9   dialing and I noticed the car that had already pulled over

10   in front of me.

11    Q     That's the person, the person in that car was the

12   somebody else you were talking about?

13    A     Yes.

14    Q     The seven seconds and the two seconds are they

15   rough estimates of time, sir?

16    A     Yes.

17    Q     And on cross-examination defense attorney asked

18   you whether or not you were upset at the time that you made

19   the 911 call.  Is that right?

20    A     If I was upset?

21    Q     Yes.

22          MR. LaMAGNA:  Objection.

23          THE COURT:  Sustained.

24    Q     What were you when you made that 911 call?

25    A     Like I said before, frustrated that it took so

Caruso - Redirect - McCormick

1    long for me to speak to who I needed to speak to.  I was

2    freaked out.  I was scared.  I was just -- I couldn't

3    believe what had just happened.

4         Q    Mr. Caruso, I'm going put up People's Exhibit 37

5    one more time.  You don't have to get down off the stand.

6    If you can take a look at the dots that you previously

7    identified.  This is where you realized it was a pickup

8    truck?

9         A    That's when I realized there were lights in front

10   of me, yes, it was a car.

11        Q    This is pretty big dot?

12        A    Yes.

13        Q    When you were out at the scene you indicated that

14   you saw the signs in the area.  This is the white

15   construction sign you are referring to?

16        A    Yes.

17        Q    It is right behind this dot; is that correct?

18        A    .. Somewhere in that vicinity, yes.

19        Q    Thank you.

20             MS. McCORMICK:  I have nothing further?

21             MR. LaMAGNA:  Nothing, Judge.

22             THE COURT:  Thank you.

23             (Whereupon, the witness exits the courtroom.)

24             THE COURT:  People.

25             MS. McCORMICK:  Your Honor, the People call

Weber - Direct - McCormick

1   Stephen Weber.

2            COURT OFFICER:  Step up.  Remain standing.

3   Raise your right hand.

4            S T E P H E N   W E B E R,   a witness

5            called on behalf of the People, having been

6            first duly sworn by the Court, was examined

7            and testified as follows:

8            THE COURT:  Please state your name, spelling

9   your last name, and county of residence.

10           THE WITNESS:  Stephen Weber, W-E-B-E-R.

11  Suffolk County.

12  DIRECT EXAMINATION

13  BY MS. McCORMICK:

14       Q    Good afternoon, Mr. Weber.

15       A    Good afternoon.

16       Q    Sir, could you tell the jury, please how old, you

17  are?

18       A    I'm 44 years old.

19       Q    How are you employed?

20       A    I'm a systems analyst for a computer company I

21  have owned and operated for about 20 years now.

22       Q    You own and operate it?

23       A    Yes.

24       Q    Are you married, sir?

25       A    Yes, I am.

Weber - Direct - McCormick

1    Q    How many kids do you have?

2    A    I have two children, a boy and girl.

3    Q    I think that you said you lived in Suffolk

4    County?

5    A    Yes, Kings Park.

6    Q    I'm going to direct your attention, Mr. Weber, to

7    July 2nd 2005, around 2 o'clock in the morning.  Can you

8    tell the jury where were you coming from, sir?

9    A    Coming from Jugs and Strokers.

10    Q    What is Jugs and Strokers?

11    A    It is a bar.  It is a motor vehicle club/bar.

12    Q    Where is that located?

13    A    That's located in Merrick, New York, just about

14    maybe a half mile east of the Meadowbrook Parkway.

15    Q    Were you on a motorcycle that night?

16    A    Yes, I was.

17    Q    Do you remember about how long you were at Jugs

18    and Strokers that night?

19    A    Well, I was in and out most of the time.  I

20    usually go there with a friend.  I was alone that night and

21    I had been up and down Ocean Parkway a few times, went down

22    to Freeport, went down to the nautical mile where you ride

23    up and down to see and be seen, that sort of stuff.

24    Q    Mr. Weber, could you tell the jury at 2 o'clock

25    in the morning, after you were at Jugs and Strokers where

Weber - Direct - McCormick

1    were you going to?

2         A     I was going home.

3         Q     Where was home?  What town?

4         A     That's Kings Park, forty miles away on the north

5    shore, in Suffolk County, east of where I was.

6         Q     When you were at Jugs and Strokers could you tell

7    the jury were you drinking there?

8         A     Usually when I go, when I go to Jugs, I don't

9    have anything to drink.  If I do on rare occasion, I might

10   have one or two beers.  Sometimes, on very rare occasions,

11   three.  But if I recall if I had anything to drink that

12   night, I just don't recall.

13        Q     You are not sure one way or the other?

14        A     Yes.  Exactly.

15        Q     Why would you only have two or three?

16        A     Well, because it is, well, Jugs and Strokers is

17   40 miles a way from my house.  It is just that I'm on a

18   motorcycle.  A car is one thing.  It is very serious as

19   well, but on a motorcycle you really need to keep your wits

20   about you.  And driving late at night it is not something,

21   something that I do.

22        Q     Do you have to exercise a particular awareness on

23   a motorcycle?

24        A     Yes.  I call it motorcycle eyes.  The things that

25   I could do on a motorcycle are different than a car, you

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

```
 1    know, because you cut, you give more distances, and you are

 2    just more aware of what is going on.  You look for

 3    intersections, and so by no means would drinking be, you

 4    know, you just can't do it, at least not for me.  I can't do

 5    it.

 6         Q    Mr. Weber, are you a licensed driver in the State

 7    of New York?

 8         A    Yes, I am.

 9         Q    How many years have you been a licensed driver?

10         A    Almost 30 years.

11         Q    Can you tell the jury are you familiar with the

12    speeds that are traveled on side streets, sir?

13         A    Sure.  Absolutely.

14         Q    Are you familiar with speed that are traveled on

15    a highway?

16         A    Yes.

17         Q    While you are riding in a motorcycle or in a car,

18    do you estimate the speed of other vehicles in your area?

19         A    Yeah.  Mostly on the motorcycle.  On a car, you

20    know, I look at the speedometer.  On a motorcycle I'm aware

21    of not only speeds they are going, but speeds they are going

22    in relationship to other vehicles.  It helps me move through

23    the traffic.  I like to drive faster than the other people,

24    so I don't have to count on people to react to me.

25         Q    Slow down a second.
```

Weber - Direct - McCormick

1        A      I'm sorry.

2        Q      That's okay.  That's all right.  Could you

3    explain to the jury what you mean by you like to drive a

4    little faster?  What do you mean?

5        A      When on a motorcycle, like if you are driving

6    down the road, and going slower than traffic, as people come

7    up to you they have to recognize you and then go around you,

8    and you have to count on them, their ability to recognize

9    you.  I have driven since I'm, like, 10 years old on dirt

10   bikes, been on the road all my life.  I found if I just

11   drive five miles an hour faster than traffic I have my

12   destiny in my own hands, and I feel very confident about my

13   ability to operate a motorcycle without getting into

14   trouble.

15       Q      Okay, Mr. Weber, did there come a time when you

16   entered the northbound Meadowbrook Parkway from Sunrise

17   Highway?

18       A      Yes.  That is when I was going home.  I was

19   taking the Meadowbrook Parkway home from Jugs that night.

20       Q      Can you describe for the jury how you entered the

21   parkway and what were your observations?

22       A      Okay, so what is happening is when I'm coming

23   home from Jugs I'm going down Sunrise Highway westbound

24   toward the Meadowbrook.  You get on the ramp, and it is not

25   like a perfect oval, it goes very straight, and cuts very

Weber - Direct - McCormick

1    quickly.  I'm familiar with that.  I have driven that spot

2    many times.  I'm always very careful.  The road is shiny and

3    is there is moisture and stuff.

4              As I'm approaching it I stand on my pegs and look

5    down in the oncoming way, and look to see what cars are

6    coming, and then I judge how I'm going to go across traffic.

7    Usually I go right to the left-hand lane immediately.

8    Quickly.  I wait for the cars to pass, and I just go to the

9    left-hand lane.  That's just the way I drive.

10              I saw in the distance two cars were coming up and

11   I'm just, I'm not to the end yet, and I am looking and I see

12   there are two cars, one in the middle lane, one in the

13   right-hand lane, on my side of the road.

14        Q    They are coming northbound?

15        A    Yeah.  Yeah.  Coming northbound on the

16   Meadowbrook.

17        Q    I'm going to interrupt for just for one second.

18   Sorry to stop you there.  When you are standing on your pegs

19   looking, are you looking northbound or southbound?

20        A    I'm -- at this point, you know, I'm looking

21   southbound, because that is the way the cars are coming.

22        Q    Now, you say that there are a couple of cars

23   coming northbound in the lane that you are about to enter?

24        A    No.  No.  Yeah.  I guess so.  No.  The answer is

25   yes, they were.  But when I say the lane, I'm about to enter

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1  the lane, I'm entering the left-hand immediately.  I'm going

2  right from the right, to the center, to the left-hand lane.

3  They were crossing my path, and I was letting them cross my

4  path.

5      Q      What lanes were those two cars in coming

6  northbound as you were trying to enter the Meadowbrook?

7      A      They were in the center and right-hand lane, and

8  I was going for the left-hand lane.

9      Q      You saw them coming?

10      A      Yes, I did.  Yeah.

11      Q      You saw their headlights?

12      A      Yes.  Yes.

13      Q      Were you able to see them and recognize them as

14  cars from the lighting provided?

15      A      Yeah.  Yeah.  Oh, yeah.  They were very close to

16  me.  They were driving very slow too.  At that time at night

17  they were driving very slow.

18      Q      Did you make any other observations of any other

19  vehicles while you were looking southbound from your

20  position on the entrance ramp entering the Meadowbrook

21  Parkway?

22      A      Yes, I did.

23      Q      What did you see?

24      A      I saw what looked like a pickup truck that was on

25  the wrong side of the road.  It was on the wrong side of the

Weber - Direct - McCormick

1    road.  I was looking down.  There is like a railing that I

2    used like a mental guideline, and the road, like, goes down.

3    It -- the road dips down.  So I could see, when I'm looking

4    down, I could see all the way down a good distance.  I could

5    see it was on the wrong side of the road.  I just wasn't

6    sure, you know.  I kind of doubted myself for a second.  It

7    is just uncommon.  It is uncommon for me to see that.

8              And so, and so as I approached, I waited for the

9    cars to pass me, and so then as I approached it, I started

10   giving it the gas, and as I'm giving it the gas I'm trying

11   to look in front of me, and look behind me, but this truck

12   has me, you know, I'm very concerned about it.  I'm just not

13   sure.

14             A lot of times at night they have construction,

15   and they will section off, like, one side of the highway and

16   leave the other side open, and all of a sudden you'll see

17   someone driving next to you.  And it seemed weird.  It was a

18   pickup truck.  I was looking to see orange cones.  In the

19   meantime I'm trying to keep my eye on the road.  I'm trying

20   to keep my eye on the road.  Yeah.

21        Q    I'm going to slow you down, Mr. Weber.  You said

22   you were looking for cones.

23        A    Yes.

24        Q    Where were you looking for cones?

25        A    Like, in the road.  What happens is that

Weber - Direct - McCormick

1    sometimes if there is construction they'll have cones in the

2    road where it will direct you, like, to one lane where you

3    might go into oncoming traffic, and they are having

4    construction and they section it off in some way.  I'm

5    looking for orange cones or lights, or something to indicate

6    that it was a construction zone.

7         Q     And that construction zone that you were looking

8    for was on the southbound side of the Meadowbrook?

9         A     Yeah.

10        Q     Why were you looking to see if there was a

11   construction zone?

12        A     Well, because it seemed, I seen the guy driving,

13   driving, and he is on the wrong side of the road, and it

14   seemed like that that is the first thing, around that area,

15   they were doing construction.  I'm not sure if it was

16   directly, you know, that night, but, I mean, probably it

17   wasn't that night but they had been working on the roads

18   down there.  I was just concerned.  That is why I looked.

19             THE COURT:  Ms. McCormick, before you ask

20        your next question, it has been a little over an hour

21.       and I am going to give everybody a five, ten minute

22        break, including my court reporter.  Don't talk about

23        the case.

24             (Whereupon, a brief recess was held.)

25             THE COURT:  Would you bring the witness back

Weber - Direct - McCormick

1    on the stand.

2              (Whereupon, the witness resumes the stand.)

3              COURT OFFICER:  Jury entering.

4              (Whereupon, the jury entered the courtroom,

5    and upon taking their respective seats, the following

6    occurred:)

7              THE CLERK:  Case on trial, Indictment 1910N

8    of 2005, People versus Martin Heidgen.

9              People ready?

10             MR. HAYDEN:  Ready, your Honor.

11             THE CLERK:  Defense ready?

12             MR. LaMAGNA:  Defendant is ready, your Honor.

13             THE CLERK:  Defendant is present and the

14   jurors are seated, your Honor.

15             THE COURT:  All right.  Welcome.

16   CONTINUED DIRECT EXAMINATION

17   BY MS. McCORMICK:

18        Q    Mr. Weber, I think that I left you as you were

19   looking down southbound from your northbound entrance

20   vantage point.  I believe you testified that there was a car

21   in the center and right lane.  Is that correct?

22        A    That's correct.

23        Q    Let's take it from there.  What do you do after

24   those cars passed where you are.

25        A    Okay, so what I do, after the cars just start to

Weber - Direct - McCormick

1    pass me, you know, I go very fast.  I hit my gas really hard

2    and I --

3        Q    Does that mean you accelerated?

4        A    Yes, I accelerated, because I'm trying to get to

5    the left-hand lane pretty quick.  And then I see this pickup

6    truck coming.  Now I'm definitely sure he is on the other

7    side of the, on the other side of the --

8        Q    Guide rail?

9        A    Yeah.  Yeah, I'm sorry, the guide rail.

10            And so, as he is coming up, I am just meeting him

11   just like, like, like, this.  And I'm trying to regulate my

12   speed, so I'm not in front of him, but just right next to

13   him to get just get a better look.

14       Q    So you are in the northbound left lane?

15       A    That's correct.

16       Q    He is over by the center guide rail?

17       A    Yes.

18       Q    And what lane do you think he is in on the other

19   side?

20       A    To the best of my recollection he was in the, all

21   the way -- he was right next to the guide rail, the lane,

22   depending on which way you're going, he was in the left-hand

23   lane.  Yeah.  Yeah.  Yeah, he was in the left-hand lane,

24   going northbound.  Wrong way in the southbound.

25       Q    You are in the left lane; he is in the left lane.

Weber - Direct - McCormick

```
 1    To the best of your recollection, do you know whether or not

 2    he changed lanes?  Did you ever see him change lanes?

 3         A    No, I never seen him change lanes.

 4         Q    When you saw him you remember him in the left

 5    lane?

 6         A    Yes, as sure as I can be, because he was very,

 7    very close.

 8         Q    Very close.  About how close?

 9         A    I would say ten feet.  It could have been more

10    like to that thing right there, the gate.  It was very

11    close.

12         Q    Indicating the area of --

13         A    Where the swinging gate there.

14         Q    The doorway into the --

15         A    Yeah.

16         Q    -- into the well area?

17         A    Yes.  That's about the right distance.

18         Q    And you were traveling next to him?

19         A    Yes, I was.  I was a little bit, a little bit,

20    you know, yeah, I was exactly next to him.  Yes.  Yes.  But

21    I was a little bit behind where the driver and passenger

22    doors were.

23         Q    How fast were you going at this point?

24         A    At this point I was going about 70 miles an hour,

25    to the best of my recollection.  I remember that I was
```

Weber - Direct - McCormick

1   rapidly accelerating.   I was in third gear.   And to the best

2   of my recollection, you know, on a motorcycle you don't look

3   down at the speedometer, you are looking at the things

4   around you, so, so, I'm fairly comfortable with speeds,

5   because I always judge it all the time on the motorcycle,

6   and 70 miles an hour, that's how fast I believe I was going.

7        Q     How fast was he going next to you?

8        A     He was going the exact same speed.   I keyed my

9   speed to him.

10        Q     Did you have an opportunity to look at him?

11        A     Yes, I did.

12        Q     Could you describe to the jury how you

13   accomplished that?

14        A     At the some time I'm trying to keep an eye on the

15   road ahead of me, I'm rapidly accelerating, I'm looking at

16   the pickup truck, the gentleman in the pickup truck next to

17   me.   I'm trying to still assess the situation.   I saw him

18   clear as day.   The only light that I could see, like, was

19   inside of the truck, it was like, it was the light coming up

20   from dashboard.   I couldn't paint a picture.   I saw his

21   profile clear as day.   Clear as day.   As clear as I could

22   tell you.

23        Q     About how old was he?

24        A     I would say between 25 and 35, that would be

25   my -- yeah.   Yeah.   About that range, 25 and 35.

GIGI WRIGHT, RPR     (516) 571-2503

Weber - Direct - McCormick

1    Q    Dark hair, light hair?

2    A    To the best of my recollection it definitely

3    wasn't light hair.  I would have seen that.  So, yeah, I

4    think it was dark hair.  I couldn't tell you whether it was

5    drown or black, that type of thing.  It definitely wasn't

6    blond hair.

7    Q    Do you think that you could make an

8    identification if you saw that person again?

9    A    No.  No.  No.  I couldn't.  He was in silhouette.

10   He never turned and faced me.  I'm looking at the side.  He

11   is going, he is going like, like, like this, and I'm right

12   next to him.  And I'm looking in the cab and I'm seeing the

13   lights coming up, and I see his profile.  He never, he never

14   looked at me.  He never turned.  His eyes were straight

15   ahead of him the whole time.

16   Q    Let's talk about your motorcycle for a second,

17   Mr. Weber?

18   A    Is your motorcycle a quiet motor vehicle?

19   A    No, it is very loud.  Very -- well, it's loud.

20   Well, it's loud.  Yeah, it's loud.  I have louder ones.

21   That one is just loud.

22   Q    What brand motor vehicle?

23   A    It's a Harley Davidson.

24   Q    Sir, you know I remember where we were before

25   now, you were talking about construction cones.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    A    Yeah

2    Q    You were looking for construction cones in the

3    southbound lanes?

4    A    Yes, I was.

5    Q    Did you see any?

6    A    No.  No.  No.

7    Q    Did it appear to you that the road was closed in

8    any way from either police or construction crews or anything

9    else?

10   A    No.  At first, at first I didn't see any cars.

11   It looked like, like the truck was the only car on the road,

12   so it looked really empty.  But then as things progressed I

13   saw a car, like, in the distance that was, it looked like it

14   was getting off, or it was a far distance away.

15   I didn't, like, I wasn't sure, because it wasn't

16   like flashing its lights or anything like that.  It just,

17   you know, it took me a few more seconds to realize it wasn't

18   a construction zone.

19   Q    The car in the distance was in the southbound

20   lane of the Meadowbrook Parkway?

21   A    Yes, southbound lane.

22   Q    On the other side from you?

23   A    Yes.  It was far.  You know, it looked like it

24   was like turning off on the, on Sunrise, but I'm not sure.

25   It was a just a car in the distance.

Weber - Direct - McCormick

1    Q    All the way to the right-hand side?

2    A    All the way to the right, and all the way behind

3    him.  I must have missed it at first, or what have you.

4    Q    So he may have been in the exit ramp to Sunrise?

5    A    Yes.

6    Q    That was the only other car you saw in the area?

7    A    That was it the whole time.

8    Q    Now, you say that you were driving next to the

9    defendant in the pickup truck, right?

10   A    Yes, I was.

11   Q    In the time that you --

12        MR. LaMAGNA:  Objection.

13        THE COURT:  Sustained.

14   Q    Withdrawn.

15        You were driving next to the pickup truck?

16   A    Yes.

17   Q    And as you were driving did you observe the

18   pickup truck at any time swerving from side-to-side?

19   A    No.  No.

20   Q    Did you observe the pickup truck slow down at any

21   point that you were driving next to him?

22   A    No.  Speed was constant.  It was the same speed.

23   He looked like a guy driving down the road.

24   Q    Did he at any time start to drift and pull

25   himself back?

Weber - Direct - McCormick

1    A    No.  No.

2    Q    Did you observe the pickup truck at any time

3    erratically changing speed from fast to slow?

4    A    None of that.  No, I didn't.

5    Q    Did you observe the pickup truck stopping and

6    starting in any way?

7    A    No.  No.  Absolutely not.

8    Q    Did you observe the pickup truck attempting to

9    pull off on to a shoulder?

10   A    No.

11   Q    Did you observe the pickup truck ever attempt to

12   exit that roadway?

13   A    No.  I mean, as clear as I could say, no,

14   absolutely not.  It just looked like a guy driving down the

15   road.

16   Q    At the time that you were driving next to the

17   pickup truck there is a guide rail between you; is that

18   correct?

19   A    Yes, there is.  A wooden one.

20   Q    Can you describe for the jury, please, how long

21   are were able to drive next to him?

22   A    I drove with him, I would say, the time,

23   coming -- as he was driving up, I had an opportunity, there

24   was more time, you know, our encounter was longer than the

25   time I was right next to him.  The time I was right next to

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1   him, I would say it was a good, real five to seven seconds.

2        Q    Does there come a time when that center guide

3   rail ends in the middle of the parkway?

4        A    Yeah.  And, yeah.  Yes.  Yes.  And that startled

5   me, because I was aware all of a sudden the guardrail ends,

6   and like the road tends to split away a little bit.  It

7   starts to "V," and I realize there was nothing between me

8   and the pickup truck, and I'm on he a motorcycle, so I was

9   concerned that perhaps he might all of a sudden notice and

10  veer off, and so wouldn't take him by surprise.  Yes.

11       Q    What did you do in response to that awareness

12  that the guide rail was no longer there?

13       A    Well, I quickly let go of my throttle.  Because I

14  was in a low gear, the bike lunged forward, and I moved over

15  one lane, because I wanted to give, keep a kind of a buffer.

16  At this point I have come to the realization that the guy,

17  that there is a someone driving the wrong way, and they may

18  or may not know they are doing that.  I felt like I was

19  getting to the point that I wanted to figure out a plan that

20  I could warn him, but still make some sort of a buffer zone

21  so I wouldn't get run over.

22       Q    So, where did you physically go as the guide rail

23  ended and the roadway --

24       A    I went to the center lane, one lane over, one

25  lane over.  I went one lane over.

Weber - Direct - McCormick

1    Q    Did you continue to maintain your speed of 70

2    miles per hour?

3    A    No.  I rapidly decelerated, because at that speed

4    the gearing on the bike, I had the bike up at a very high

5    RPM, and I was giving it gas.  I realized, I let go, I

6    rapidly decelerated and my whole body was pulled forward as

7    it was decelerating, but I didn't apply the brakes.

8    Q    What happened next as you moved to the center

9    lane.

10    A    The people who were behind me, the two cars I had

11    passed them when I was accelerating, they beeped.  One of

12    the cars beeped, and it startled me.  And I realized that

13    perhaps maybe I slowed down a little more than I thought I

14    slowed down, and it startled me, and it was actually a call

15    to action.  I realize, okay, now I got to do something.  And

16    I hit the gas real hard on the bike to see if I, because I

17    had lost sight of him just as I hit that, when I

18    decelerated, and the guy beeped and I turned around and

19    there were bushes.  I lost sight.  I lost sight of the

20    pickup truck.

21    Q    Before you lost sight of the pickup truck -- let

22    me withdraw that.

23         In the center median is there any kind of brush

24    or shrubbery in there?

25    A    Yes.  What happens is there are like bushes,

GIGI WRIGHT, RPR   (516) 571-2503

Weber - Direct - McCormick

1    yeah, yeah, there are bushes, like one set of bushes, then

2    there is a space, then there is another set of bushes, and

3    then there is more trees and a bridge, and some other things

4    come quickly after that, but a lot more shrubbery.  At first

5    there is just small trees and bushes.

6          Q    Do you remember, Mr. Weber, when it is that you

7    actually lost sight of the pickup truck?

8          A    I would say what happened is that after the first

9    set of bushes I lost sight of him, because during the rapid

10   deceleration the person beeping me and then, then, I kind of

11   crouched underneath my windshield a little bit, because I

12   have been close to accidents before where debris has come

13   off of vehicles and actually hit me, and I wanted to make

14   sure if there was an accident that I wouldn't, you know get

15   hurt, so I was kind of below my windshield a little bit, so

16   my profile is a little bit lower, so I lost sight.

17         Q    Okay.  The area where you are talking about,

18   there is a first set of bushes and a space and a second set

19   of bushes.  Is that just before the Babylon Turnpike

20   overpass as you are traveling northbound on that Meadowbrook

21   Parkway?

22         A    Yes.  It is just before.  It is a little bit of a

23   distance, but yeah.  Yeah.  It is right before it.

24         Q    When you say, "a little bit of a distance" is it

25   just before the Babylon Turnpike overpass there is a

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    widening?

2        A    Yes.

3        Q    There is grassy shoulder right at that point?

4        A    Yes, there is.  It gets wider and wider and

5    wider.  It starts off small and gradually get wider, until

6    it is a good set of real estate between.  Very.  Yes.  Yes.

7        Q    Did he ever try to get on that grassy shoulder on

8    the right side of the road?

9        A    No.  No.

10            MR. LaMAGNA:  Objection.

11            THE COURT:  Sustained.

12        Q    Did you ever observe the vehicle move toward the

13    center median?

14        A    No, I didn't.  Just from my judgment from riding,

15    no way, because if he would have gone on that median he

16    would have flipped over because at the speed we were going.

17    Just no way.  There is no way.

18        Q    The speed that you were going, I think you said

19    for the five to seven seconds that you paralleled him, was

20    how fast was he going.  Was it constant throughout the whole

21    time?

22        A    Yes.  To the best of what I could see, and I feel

23    pretty confident about what I saw, but to the best of what I

24    can see he remained constant the whole way, even when I

25    slowed down.  As best as I could see he remained the same

1592

Weber - Direct - McCormick

1     speed.  I didn't see any, like, brake lights go on.  He

2     might have hit it, but I wouldn't know if he took his foot

3     off the gas pedal.  I don't know.  From what I saw it looked

4     like he was going the same speed.  He again, he looked like

5     a guy driving down the road.

6          Q     Looked like a guy driving down the road.  You saw

7     his face; is that correct?

8          A     I saw the profile of his face.  He was looking

9     forward.  Forward.  I saw his face like this.  Very clear,

10    like a black and white TV.

11         Q     The first time you looked at his face how long

12    did you look at him for?

13         A     I would say a second.

14         Q     Okay.  And then is that the point where you were

15    looking for the construction cones?

16         A     Yeah.  Yeah.  If I was to act it out, what I was

17    doing is I was driving and over the course of five seconds I

18    looked at him, I took a good look at him, because I wanted

19    to get an idea if he was a construction guy.  I looked

20    behind, looked ahead, looked at him again, looked at the

21    car, the truck, and then I looked back, and looked at him

22    again.  And it was like that, that type of thing, until all

23    of a sudden I noticed that, I actually saw a little bit

24    ahead of time, the railing up ahead, and I saw that it was

25    going to disappear.  And I have driven that road many times.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    widening?

2        A     Yes.

3        Q     There is grassy shoulder right at that point?

4        A     Yes, there is.  It gets wider and wider and

5    wider.  It starts off small and gradually get wider, until

6    it is a good set of real estate between.  Very.  Yes.  Yes.

7        Q     Did he ever try to get on that grassy shoulder on

8    the right side of the road?

9        A     No.  No.

10              MR. LaMAGNA:  Objection.

11              THE COURT:  Sustained.

12       Q     Did you ever observe the vehicle move toward the

13   center median?

14       A     No, I didn't.  Just from my judgment from riding,

15   no way, because if he would have gone on that median he

16   would have flipped over because at the speed we were going.

17   Just no way.  There is no way.

18       Q     The speed that you were going, I think you said

19   for the five to seven seconds that you paralleled him, was

20   how fast was he going.  Was it constant throughout the whole

21   time?

22       A     Yes.  To the best of what I could see, and I feel

23   pretty confident about what I saw, but to the best of what I

24   can see he remained constant the whole way, even when I

25   slowed down.  As best as I could see he remained the same

Weber - Direct - McCormick

1    speed.  I didn't see any, like, brake lights go on.  He

2    might have hit it, but I wouldn't know if he took his foot

3    off the gas pedal.  I don't know.  From what I saw it looked

4    like he was going the same speed.  He again, he looked like

5    a guy driving down the road.

6         Q    Looked like a guy driving down the road.  You saw

7    his face; is that correct?

8         A    I saw the profile of his face.  He was looking

9    forward.  Forward.  I saw his face like this.  Very clear,

10   like a black and white TV.

11        Q    The first time you looked at his face how long

12   did you look at him for?

13        A    I would say a second.

14        Q    Okay.  And then is that the point where you were

15   looking for the construction cones?

16        A    Yeah.  Yeah.  If I was to act it out, what I was

17   doing is I was driving and over the course of five seconds I

18   looked at him, I took a good look at him, because I wanted

19   to get an idea if he was a construction guy.  I looked

20   behind, looked ahead, looked at him again, looked at the

21   car, the truck, and then I looked back, and looked at him

22   again.  And it was like that, that type of thing, until all

23   of a sudden I noticed that, I actually saw a little bit

24   ahead of time, the railing up ahead, and I saw that it was

25   going to disappear.  And I have driven that road many times.

Weber - Direct - McCormick

1    It is not like a surprise to me.  So, I realized it was

2    going to end, and it was actually slightly before it ended

3    that I started to ease up and then let off the gas.

4        Q    Mr. Weber, the times that you looked at the

5    driver of the pickup truck was he slumped over the wheel?

6        A    No.  Not at all.

7        Q    Was he slumped forward?

8        A    No.  Absolutely not.

9        Q    Slumped backwards?

10       A    No.

11       Q    Did you observe his head bobbing in any way or

12   rocking?

13       A    No.  No.  No.

14       Q    Were you able, sir, to observe his expression?

15       A    Yeah.  Yeah.

16       Q    What was his expression to you?

17       A    If I was to again show you, you, it was that he

18   had his, you know, his face was just looking forward.  He

19   seemed like he was very intent at driving.  A lot of times

20   late at night --

21                 MR. LaMAGNA:  Objection.

22                 THE COURT:  Sustained.

23       Q    Without telling us what is in his head,

24   Mr. Weber, how did you observe him?  Did he look panicked to

25   you?

Weber - Direct - McCormick

1    A    No.  No.  No.  He looked, from me visualizing

2    him, and seeing other drivers --

3                MR. LaMAGNA:  Objection.

4                THE COURT:  I'll allow it.

5    A    As you drive a motorcycle, you spends miles, and

6    sometimes I put 50,000 miles on my motorcycle, and you have

7    games where you look inside of people's cars and check them

8    out as you're going by, and it keeps your wits about you on

9    the road and stuff.  I did.  I was looking at the guy.  The

10   guy clearly, clearly to me, he looked like his head was

11   straight ahead.  And he looked like he had, he had, his

12   hands were clearly, both hands were on the steering wheel,

13   and that seemed a little odd to me, because many people.

14               MR. LaMAGNA:  Objection.

15               THE COURT:  Sustained.

16   Q    Okay.  Let's end it there.

17        With respect to the point at which you lost him.

18   A    Okay.

19   Q    We will get back to that.  You lost sight of him

20   through the median; is that correct?

21   A    Yes.  Yeah.  Actually, yeah.  Yeah.  The trees

22   blocked my view.

23   Q    After the car honks, and you say it makes you

24   sort of call to action?

25   A    Call to action, yeah.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    Q    What action did you take?

2    A    I nailed the bike again.  Number one, I didn't

3    want these people to hit me.  I realized at that point there

4    was something seriously wrong, and I wanted to see what I

5    could do to warn the guy.

6    Q    What did you do?

7    A    I hit the accelerator really hard on the bike and

8    I took off pretty quickly.

9    Q    Heading northbound still on the Meadowbrook

10   Parkway?

11   A    Yes.  Same direction.

12   Q    What happens next?

13   A    And then, I don't know, maybe, excuse me, I do

14   know -- that's a figure of speech -- about two seconds later

15   I heard a flub, a screech and a bang, really loud.  I mean,

16   I have a loud bike.  It was very loud.  And I knew there was

17   an accident at that point.

18   Q    The loud bike, is your reference to the bike

19   because you were able to hear it over your own motorcycle?

20   A    Yes, very much so.

21        Also the exhaust is kind of, it sounds on a

22   motorcycle, it is not too loud to you a lot, but it is a

23   very loud motorcycle, and I heard it.  I mean, my bike is

24   very loud, but I heard it clearly over that.

25   Q    What did you do when you heard the crash?

Weber - Direct - McCormick

```
 1        A     Well, the first thing I did was, I started to
 2   look through the trees to see if I could see where the
 3   accident was.  But I was also looking on the road in front
 4   of me.  I wanted to make sure no debris got into the road
 5   that I was going to run over or anything.  I was looking for
 6   it.  Just where I thought the accident was I looked and I
 7   didn't see anything through the trees.  I thought perhaps I
 8   passed it.  I think that maybe I slowed down a little bit,
 9   more than I thought, and I misjudged the distance.
10        Q     Did there come a time where you saw the
11   collision?
12        A     Yeah.  Yeah.  Yeah.  What happened, I was going,
13   and I was looking behind, and I was looking, and then I just
14   saw some lights and stuff, like people coming to a stop.
15   And then I turned around, and over my shoulder there was a
16   clearing in the trees, and I saw the taillights.  It looked
17   like, I saw there was smoke in the area.  I mean, there was
18   smoke in the area, and people were immediately on the scene,
19   and they were like stopping.  And, yeah, I'm not sure if I
20   could add anything more.  Yeah.  That was it.
21        Q     What did you do after you saw that?
22        A     I kept going.  You know on a motorcycle, you
23   know, there were people immediately on the scene, and on a
24   motorcycle I see many accidents.  I have seen maybe worse
25   accidents before, and something that you see all of the time
```

Weber - Direct - McCormick

1    on a motorcycle.  You are in a unique position, because when

2    there is debris on the road and oil and other things, I

3    can't get too close to it.  And people aren't looking at

4    what they are doing, you know, when it gets close to an

5    accident.  So then I was on the other side of the highway,

6    and I would have to go down, get off, come around and, just,

7    you know, I'm a computer guy, I couldn't offer anything.

8    And, you know, you know, under the circumstances, I'm glad I

9    didn't.

10        Q      Mr. Weber, you said you had seen worse

11   collisions.  I am going to ask you to take a look at

12   People's Exhibit 65 in evidence.  Do you recognize that,

13   sir?

14        A      Yes, I do.

15        Q      What do you recognize that to be?

16        A      Well, this is the accident that I saw.

17   Absolutely.  Because that, I mean, subsequent to that when I

18   first saw the accident in the paper, I saw everything all

19   over the place.  That wasn't the view I saw.  Because I

20   looked at this, this is what I saw.  It didn't look too bad

21   to me, it just didn't look too bad.  You can't see all of

22   the stuff you saw in the paper.

23             This is what I saw that night going through the

24   trees, looking backwards.  That, that is what I saw, besides

25   this and the flares.  It was just this, and everything was

Weber - Direct - McCormick

1    still settling.  All of the vehicles had already stopped.

2        Q    So is it fair to say that your vantage point on

3    this crash was from the rear of it looking forward?

4        A    Yes, over my shoulder.

5        Q    Through the clearing in the trees?

6        A    Yes.

7        Q    I'm going to put it on the presenter.

8             So from behind, Mr. Weber, the crash didn't look

9    that bad to you?

10       A    Right.

11       Q    Does that photograph, minus that bright light and

12   the fact that the door is open, is that what you saw when

13   you looked through the trees?

14       A    That's what I saw exactly.

15       Q    Thank you.  Mr. Weber, did you make a statement

16   to the police at that time?

17       A    No, I didn't.  No, I went right home.

18       Q    Can you describe for the jury how it is that you

19   came forward in this incident?

20       A    It was Labor Day.  I was looking through -- I

21   usually don't read the paper, I do the crossword puzzle, and

22   stuff -- it was Labor Day, and I wanted a new hard drive for

23   my computer, I went to the sales, and I went to Newsday, to

24   the third page, and saw the picture.  Even though it wasn't

25   exactly what I saw, I knew just by looking at it that the

Weber - Direct - McCormick

1    situation and everything that that was what I saw.

2        Q    That was the crash that you observed?

3        A    Yes.

4        Q    You saw a photograph in the paper?

5        A    Yes, I did.

6        Q    Now, Labor Day, which Labor Day are we talking

7    about?

8        A    The one that just passed.

9        Q    2006?

10       A    Yes.

11       Q    Prior to that you had not come forward to anybody

12   about this crash?

13       A    Well, the following -- I mean not, to officials.

14   That weekend to my friend, who usually does accompany me to

15   Jugs, he was having an engagement/Fourth of July party, and

16   I mentioned it to people at the Fourth of July party, and

17   they said they heard about it too, and they mentioned there

18   were a couple of fatalities involved.  Again, you know, you

19   see those things and you think that, you know, people work

20   it out, you know.

21       Q    When you saw it in the paper over Labor Day this

22   year what did you do?

23       A    Well, at first I didn't tell anyone.  I went to a

24   pay phone and I, you know, I didn't want to come forward,

25   you know.  So I went to a pay phone.  I wanted to give them

Weber - Direct - McCormick

1    the information that I had.  It has been years since I used

2    a pay phone.  I went through change quickly.  And I came

3    home and talked to my wife and she said, listen, it is not

4    like you are calling up and saying John Smith did it.  You

5    have to be there as part of the testimony.  You have to say

6    you're going to coming forward or you are not going to come

7    forward.  And so that was the extent of her advice.  And

8    then I talked to my children about it, and I told them about

9    what I saw and, you know --

10               MR. LaMAGNA:  I'm going to object.

11               THE COURT:  I'm going to allow it.

12         A     And I talked to them about what I saw.  And I

13    told them that, you know, and I told them about the case

14    and, you know, your children sometimes when you tell them

15    things they tell you the things you told them back to you.

16    My little daughter, she said to me that I had to be brave

17    and doing the right thing.  It is often clear what the right

18    thing is, but it is often difficult to do.

19               MR. LaMAGNA:  Objection.

20               THE COURT:  I that it is clear enough.

21               MS. McCORMICK:  Yes, your Honor.

22         Q     At this time, Mr. Weber, I'm going to ask you if

23    you can step down from the witness stand, and I'm going to

24    show you a big picture.  Okay.

25               First, Mr. Weber, I'm going to ask you to take a

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    look at People's Exhibit 32A in evidence.  I'm going to ask

2    you to stand on my side over here.

3         A    Very well.

4         Q    And give you some of these world famous dots with

5    the words "Weber" and "Pickup truck" on the dots.  Can you,

6    Mr. Weber, take a look at that photograph, People's Exhibit

7    32A.  Can you first tell the jury what that is an aerial

8    view of?

9         A    Let me just get my bearings here.  Okay.  That is

10   of Meadowbrook interchange at Sunrise -- okay.  Here I am.

11   I'm sorry.  It just takes me a second to orientate myself.

12   This is where Sunrise and the Meadowbrook Parkway cross.

13        Q    Do you see on that photograph, sir, the Babylon

14   Turnpike overpass?

15        A    Yes.  That is down here.

16             MS. McCORMICK:  Indicating for the record the

17        top left portion of the photograph.

18        Q    Can you indicate by pointing, sir, where it is

19   that you were coming from at Jugs and Strokers?

20        A    Jugs and Strokers is off the screen.  It is about

21   from here, probably that more distance down the road.

22        Q    Along Sunrise Highway?

23        A    Yes, on the southbound side.

24        Q    Indicating for the record an area, I don't know,

25   the top right corner of the photograph?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1      A    Yes.

2      Q    Mr. Weber, those dots might be a little bit for

3  this.  Maybe we should get markers instead of dots for this

4  one.

5           Can you indicate, because the roadway is small

6  and the dots are big, can you take this marker and can you

7  indicate for the record, for the jury to see, with the

8  letter "A," where you entered the Meadowbrook Parkway, the

9  spot on the entrance ramp where you first looked and saw the

10 pickup truck?

11     A    Okay.  The spot on the entrance, could I just

12 step over here?

13     Q    Sure.

14     Q    When you make the mark --

15     A    Where I first saw the pickup truck coming up to

16 here was right before I hit this here.  I would say right

17 here.

18           (Witness indicating.)

19           THE COURT:  Some of these jurors can't see.

20 Can you point where you made the "A"?

21           THE WITNESS:  Right here.  This tree, you can

22 see underneath this tree.  Right there.  Right here.

23 Right here.

24     Q    Can you indicate on this photograph where it is

25 that you met up with the pickup truck in the roadway, when

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    you and he were right next to each other, with a "B"?

2         A    Right here.  Right here.  Right here.

3              (Witness indicating.)

4         Q    Would you point to where you put that "B"?

5         A    Right here.  And I kind of just zipped across

6    like that.

7         Q    Can you see on this aerial photograph where it is

8    that you and he separated, and you went into that center

9    lane?  Would you indicate that with a "C," sir?

10        A    Right here.  First group here.

11             (Witness indicating.)

12        Q    Pointing to the jury, let them see where you

13   indicated the "C."

14        A    Right there.  Right there.

15        Q    And finally, Mr. Weber, on this photograph, can

16   you, if it is visible, can you indicate with the letter "D"

17   where it is that you were located when you were able to see

18   the crash over your shoulder through the trees?

19        A    Very well.  So I was right here.  Maybe just a

20   little bit down further from.  Right about there.

21             (Witness indicating.)

22        Q    If you would move over and point that out again

23   for the jury.

24        A    It was right over here.  This is the clearing.

25   Right there.

Weber - Direct - McCormick

1    Q    At this time could I have the pen back, and can I

2    ask you to take the dots with you and retake your position

3    in the witness stand.

4    A    Very well.

5    Q    Mr. Weber, I'm going to ask to approach with a

6    bunch of pictures already placed into evidence, beginning

7    with People's Exhibit number 35 in evidence.  Can you take a

8    look at that for me, sir?

9         What do you recognize that to be?

10   A    That is the, that's the entrance ramp coming off

11   of Sunrise going to the Meadowbrook Parkway.

12   Q    Is the area of the entrance ramp where you first

13   saw the defendant reflected in that photograph, or is it

14   outside there?

15   A    No.  When I first saw him it was, when I saw the

16   truck was down here a little bit.  I was still on the

17   straight part of the road.  This is just where it starts to

18   curve.

19   Q    Is the area where you came together with him at

20   the guide rail for the first time reflected in that

21   photograph?

22   A    Yes, it is.

23   Q    Would you put a sticker that says "pickup truck"

24   in the area where you and you first came together?

25        (Witness complies.)

Weber - Direct - McCormick

1    Q    I'm going to ask to approach you with People's

2    Exhibit 42 in evidence, and ask you, Mr. Weber, if you could

3    take a look at that for me, please?

4    A    All right.

5    Q    Do you recognize People's Exhibit 42?

6    A    Yes, I do.

7    Q    What is depicted in that photograph, sir?

8    A    That's as I'm coming up to the road.  That's my

9    sight looking down this, down south on the Meadowbrook

10   Parkway.

11   Q    So that is your viewpoint as you are looking into

12   oncoming traffic before entering?

13   A    Yes.  Yes.

14   Q    Do you see in that photograph the area where you

15   first observed the pickup truck on the wrong side of the

16   road?

17   A    Yes, I do.

18   Q    Can you take one of those "pickup truck" stickers

19   and mark it on that photograph, please?

20            (Witness complies.)

21   Q    I'm going to ask you to approach you with

22   People's Exhibit number 40 in evidence, and ask you if you

23   can take a look at that for me, please?

24   A    Yes, that's the guardrail.

25   Q    Mr. Weber, does that picture accurately reflect

Weber - Direct - McCormick

1    the width of the guardrail at the point where you and the

2    defendant came together?

3        A    Yes, that width, yes, it does.

4        Q    Is there a paper measure indicated in the

5    photograph?

6        A    Yes.  I see one right across the road here.

7        Q    Can I give you People's Exhibit 39 at this time.

8    And ask you if a measurement is reflected in the photograph

9    of that?

10       A    Yes, it is.

11       Q    What is the measurement?

12       A    It says ten feet.

13            MR. LaMAGNA:  Objection.  It is in evidence.

14       Q    Would you say it again?

15            MR. LaMAGNA:  Withdrawn, Judge.

16       Q    Okay.  Would you say it again, please?

17       A    Ten feet.

18       Q    Mr. Weber, I'm going to approach you with

19   People's Exhibit number 36 in evidence.  Can you take a look

20   at that, sir?

21       A    Yes, I see.  I recognize this, yes.

22       Q    What do you recognize that to be?

23       A    This is pretty much exactly the spot where I

24   moved into the center lane.

25       Q    Could you take one of your dots with your name

Weber - Direct - McCormick

1    "Weber" on it and place it on the spot where you were when

2    you moved to the center lane away from the pickup truck?

3                   (Witness complies.)

4                   MS. McCORMICK:  Your Honor, with the Court'S

5           permission could Mr. Weber step down to the presenter

6           at this time?

7           A    Sure.

8           Q    Over to the TV screen.  Thanks, Mr. Weber.  This

9    is going to project up here so you can explain to the jury

10   what it is.  You can stand over there.  All right.

11                  First, your Honor, People' Exhibit number 35.  Do

12   you see your dot on the roadway there?

13          A    Yes.

14          Q    What does that dot reflect that photograph?

15          A    That reflects the point where I was right next to

16   the pickup truck?

17          Q    And that is a view looking northbound in the

18   northbound lanes?

19          A    Yes, it is.

20          Q    People's 36 in evidence.  There is a dot, it is a

21   little bright there -- thank you for pointing to it out --

22   it is in the left hand, just below center of the photograph.

23   What does that -- first of all, what does that picture

24   reflect?

25          A    This is the bridge, on the other side of the

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Direct - McCormick

1    bridge, when I looked back and saw the accident.  I'm not

2    sure what this is.  This is the bridge right in front of the

3    accident.

4          Q     That is the Babylon Turnpike overpass?

5          A     Yes, it is.

6          Q     The dot?

7          A     The dot is where, is when I pulled over.  I was

8    already into the center lane by that dot.  I had just --

9    where I pulled over it was, I began to pull over right at

10   the first clump of trees.  This is the second clump of

11   trees.  The first clump of trees is when I pulled over the

12   center lane and let off the gas.  Right here I was already

13   decelerating.

14         Q     Mr. Weber, does that photograph reflect that wide

15   grassy median with the shrubbery before the Babylon Turnpike

16   overpass?

17         A     Yes, it does.  It seems like it is thin here.  To

18   me, to my memory, as best I could see, there was a lot more

19   real estate there.

20         Q     Let me show you again, I'm just going to hold it

21   for a second.  Let me show you again People's Exhibit number

22   32 in evidence.  Now, come over to the jury for a second.  I

23   will hold it.  Come on over a second.

24               In People's Exhibit 32A in evidence, do you see

25   the grassy median before the Babylon Turnpike overpass in

Weber - Direct - McCormick

1    this photograph?

2         A     Yes, I do.

3         Q     Would you circle that wide grassy median before

4    the overpass?

5         A     This is the wide grassy median before the

6    overpass.  You see it is skinny up here, and then it gets

7    wider, and right here it is at its maximum width.

8         Q     Where on this photograph does the guide rail

9    actually end?

10        A     It ends about -- I would say it is not in this

11   picture -- I would say it is about right here.

12        Q     Then from that point on it is median?

13        A     Yes.

14        Q     Could you put an "X" about where the guide rail

15   ends?

16        A     Right there.

17               (Witness indicating.)

18        Q     Mr. Weber, could you head back to the presenter.

19               Mr. Weber, is this the distance between your lane

20   and the pickup truck as you observed it on July 2nd 2005?

21        A     Yes.  This is distance right here.  I was pretty

22   close to this side.  Yeah, absolutely, that's the distance.

23        Q     Finally, Mr. Weber, I'm going to ask you to step

24   over again to this easel, and put up one more large

25   photograph, which is People's Exhibit 27A in evidence.

Weber - Direct - McCormick

1           Mr. Weber, I'm going to ask that you take a dot

2   that says "crash."  The area of the collision that you

3   witnessed or the aftermath that you witnessed is that

4   reflected on that photograph?

5           A     Yes, it is.

6           Q     Could you put a dot with the word "crash" where

7   that crash was?

8           A     Right there.

9                 (Witness complies.)

10          Q     Thank you, Mr. Weber.

11                MS. McCORMICK:  I have no further questions.

12   You can retake the stand.

13                THE COURT:  Based on the time, I don't want

14          to limit the cross-examination, and I think that at

15          this point we will break for the evening.  Be back here

16          at 9:30.  I gave you have the admonitions right before

17          lunch.  You know all of them.  You can tell them to me.

18                The most important one for you tonight is,

19          this evening, this afternoon, tonight, tomorrow

20          morning, don't read about this in any of the

21          newspapers.  Don't watch it on any of the TV stations.

22          Don't listen to it on any of the radio stations.  It is

23          not fair if you do that.  You have to the determine the

24          facts in this case from what you hear from the witness

25          stand and the exhibits admitted, and nothing that

1

Weber - Direct - McCormick

1     anybody else says about it is important.  What you hear

2     yourself is important.  And nothing else.  Please don't

3     read, listen or watch anything.  Have a nice night.

4     Nine-thirty, please.

5                    (Whereupon, the jury exited the courtroom.)

6                    MR. LaMAGNA:  Judge, I believe we are getting

7     down to certain witnesses coming up, and I would

8     request from the district attorney the detailed or the

9     itemized bill or invoice from Wade Bartlett, the

10    accident reconstruction expert.  I will provide mine as

11    well.

12                   THE COURT:  Any objection?

13                   MS. McCORMICK:  I'm not putting him on the

14    stand.  Why would I be presenting it?

15                   THE COURT:  Well, she is not putting him on

16    the stand.

17                   MR. LaMAGNA:  They are not putting their

18    accident reconstructionist on the stand?

19                   THE COURT:  I just heard that myself.  See

20    you tomorrow.

21                              o0o

22                   (Whereupon, the trial was adjourned to

23    Friday, the 22nd day of September 2006, at 9:30 a.m.)

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NASSAU : CRIMINAL PART 31
2   ---------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK

3

4            -against-

5

    MARTIN HEIDGEN,
6
                              DEFENDANT.
7   ---------------------------------------x
    INDICTMENT #:  1910N-06
8
                              Mineola, New York
                              September 22, 2006
9                             VOLUME V

10

    B E F O R E:   HONORABLE ALAN L. HONOROF
11                     Acting Supreme Court Justice

12

    A P P E A R A N C E S:
13
                    HON. KATHLEEN M. RICE
14                  District Attorney, Nassau County
                       262 Old Country Road
15                     Mineola, New York 11501
                    BY:  ROBERT HAYDEN, ESQ.
16                       Assistant District Attorney
                            and
17                  MAUREEN McCORMICK, ESQ.
                       Assistant District Attorney
18

19                  STEPHEN LaMAGNA, ESQ.
                       Attorney for the Defendant
20                     666 Old Country Road
                       Garden City, New York
21                  BY:  STEPHEN V. LaMAGNA, ESQ.
                            and
22                  GREGORY MARTELLO, ESQ.

23                       o0o
                    CONTINUED TRIAL
24                       o0o
                    Gigi Wright, R.P.R.
25                  Official Court Reporter


            GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1      (In open court.  Defendant present.  Jury not

2  present.)

3          THE CLERK:  Case on trial, Indictment 1910N

4  of 2005, People versus Martin Heidgen.

5          People ready?

6          MR. HAYDEN:  Ready, your Honor.

7          THE CLERK:  Defendant ready?

8          MR. LaMAGNA:  Defendant is ready, your Honor.

9          THE CLERK:  Defendant is present, your Honor.

10          THE COURT:  I am told there is an

11  application?

12          MS. McCORMICK:  Yes, your Honor.  As the

13  Court ordered on the 19th -- was it the 19th of

14  September -- a buccal swab was ordered in this case.

15  That swab was done immediately as per the Court's

16  instructions on that evening.  I had indicated to the

17  Court yesterday that the DNA lab was expecting

18  preliminary results by Friday.

19          I received a call after court concluded last

20  evening, after hours actually, that the swabs, both of

21  the swabs, came back with mixed samples; more than one

22  person's DNA on each of the two swabs.

23          The affidavits that I was referring to as I

24  came in the door, that I was waiting to be notarized

25  from upstairs, are from six people who observed the

Proceedings

1    swab being taken.

2                 I need to inform the Court that the two mixed

3    samples are two male samples.  The person who swabbed

4    the defendant in the jail on that night was a female

5    investigator for Tammy Mickoliger.  Tammy Mickoliger

6    was observed by the six persons, who affidavits we are

7    awaiting, to have put onto, to open a buccal swab kit,

8    to remove latex gloves from that kit, to put on those

9    gloves, to open the sealed swabs, they were contained

10   in fully enclosed wrappers.  While wearing the latex

11   gloves, that she removed the swabs, and proceeded to

12   swab the interior of the defendant's cheek.  After each

13   swab, putting it immediately in the sealed cardboard --

14   putting it in the tube and sealing it.

15                The second swab, same procedure.  She alone

16   touched those swabs.  She alone touched the swab kit

17   and took it, physically, to the M.E.'s genetics lab at

18   the Nassau County Medical Examiner's Office.  Whereupon

19   it was given to Dan Arana of that office at 8:35 p.m.

20                Mr. Arana informed me of multiple or dual DNA

21   samples on each of the swabs, and that they had

22   excluded members, male members, of the lab staff by

23   referring to DNA profiles that the lab keeps on file.

24   So, the DNA that is observed on both of those swabs

25   cannot be from the male lab staff.

Proceedings

1        But I do need to inform the Court that the
2     lab, through its director, Pat Buffolino, would like
3     to, and is conducting, a second check to make sure that
4     all of the procedures, all of the standards, were met.
5        Mr. Arana informed me last night, however,
6     that the instrument was checked using controls and
7     standards, and that there was no problem with the
8     instrument.
9        The initial conclusion, they would like to
10    run confirmatory tests on the initial conclusion to
11    that those swabs were mixed prior to the arrival of the
12    lab.  In light of the fact of the procedures employed
13    by Tammy Mickoliger, and she being a female, it would
14    seem that the mixed swab is the result of some behavior
15    or some, or something done, with the defendant's mouth
16    prior to being brought to the infirmary at the County
17    Jail where the swab was conducted.
18        As a result, Your Honor, the People are
19    requesting this morning that the defendant be subjected
20    to an additional sample, a second sample, taken for the
21    purpose of comparing his DNA to the blood.
22        I should, before I go any further, state to
23    you that preliminary results also indicate that one of
24    the two components on the swabs does match the blood in
25    the tubes that were submitted for comparison.

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1           In order for there to be an assurance of this

2       as being an accurate test, the People are requesting

3       that the defendant be required to submit to a blood

4       test, that he be required to give a blood sample so

5       that this mixing of DNA cannot be accomplished again.

6           We have some reason to believe, based on the

7       information from Mr. Arana, that some substances can

8       remain in a person's mouth for twenty-four hours, if

9       they have been in the mouth for a substantial period of

10      time.

11          Blood seems to be the only way to get an

12      assurance that there will not, again, be a mixed DNA

13      sample.

14          We have members of the Crime Scene Unit from

15      Nassau County Police upstairs, prepared to take that

16      blood.  We also have Investigator Mickoliger available,

17      if the Court wishes to speak to her.  And she also

18      brought another buccal swab kit in the event that the

19      Court chooses another option.

20          MR. LaMAGNA:  Judge, just hearing what the

21      district attorney said, the reason we are in this

22      situation is because the blood sample that the police

23      took was mishandled in the first place.

24          Now we hear that the swabs that were taken at

25      the jail by the personnel in the infirmary somehow is

Proceedings

1    compromised.  And that is wrong.  And somehow the

2    inference is, well, we couldn't have done anything

3    wrong; maybe it was the defendant's fault.  I mean,

4    that is absurd.

5            This is the second or third time that they

6    mishandled evidence in this case, and now that they

7    don't have a swab that is of sufficient value to get

8    this, I am going to oppose this again.  They have to

9    lay out, pursuant to statute, the three standards to

10   take the buccal swab.  They have not done that.

11           THE COURT:  I don't want to reargue that.

12           MR. LaMAGNA:  It is a new swab at this point.

13           THE COURT:  The DNA that was not

14   Mr. Heidgen's was it identified?

15           MS. McCORMICK:  It was not identified to

16   another person by name, your Honor.  Although, it is

17   within the data bank relative to another case.

18           THE COURT:  What kind of case?

19           MS. McCORMICK:  Sexual assault case, your

20   Honor.  But I hesitate on that because, as I indicated

21   previously, Pat Buffolino is requesting the opportunity

22   to do confirmatory testing, just to be certain of the

23   preliminary tests that were already done.

24           What I am indicating to the Court this

25   morning are the preliminary results from the DNA lab.

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1          MR. LaMAGNA:  I would like a copy of those

2     results too, Judge.

3          MS. McCORMICK:  I don't have any kind of

4     report at this time.  But I do have to respond briefly

5     to Mr. LaMagna's statement.  There is no indication

6     that anything in this buccal swab was mishandled.  That

7     is an absurdity.

8               The purpose of the affidavits, including one

9     from the sergeant in the Correctional Facility, two

10    from district attorney's investigators, and then also

11    from state police, is that this buccal swab is anything

12    but mishandled.  It was a taken by a female

13    investigator.  It is simply not possible that she

14    contaminated this swab, scientifically impossible that

15    she contaminated this swab.

16              So Mr. LaMagna's argument that the defendant

17    did not take part in this is not supported by the

18    evidence.  And clearly, Judge, the inference is that he

19    tried to thwart this test by mixing a sample.

20    Although, again, I hesitate because I also would like

21    to have the final report from the DNA lab.  But that is

22    the appearance at this time.

23         MR. LaMAGNA:  Judge, that is their

24    application.  They were in control of this testing.  I

25    don't know where the swab came from.  I don't know

Proceedings

1   where the swab was used from, I don't know if the swab

2   was contaminated or used on another test.  Just because

3   a female did it, and it doesn't match a female DNA

4   profile, the fact is that this was their equipment.

5   These are the people who were taking it, and they have

6   two DNA samples or mixed DNA samples.  Again, this is

7   their mishap.  As it has been with the blood

8   collection, as it has been with all of this stuff.

9           THE COURT:  It would be interesting if that

10   other sample turned out to be a wanted sex offender

11   presently incarcerated in the Nassau County

12   Correctional Center.

13           MR. LaMAGNA:  That's their problem.

14           THE COURT:  That would be an interesting

15   thing to find out.

16           MR. LaMAGNA:  Yes, it would.

17           MS. McCORMICK:  We are looking into that,

18   Judge.

19           MR. LaMAGNA:  They are the ones who have

20   access to all of these people.

21           THE COURT:  How long will it take to get the

22   affidavits?

23           MS. McCORMICK:  Ms. Errico is getting the

24   last of them from the sergeant at the jail as we speak.

25           THE COURT:  Let's put the witness back on the

Proceedings

1    stand and continue the cross-examination.  When we get

2    the affidavits I will take a break and read the

3    affidavits, and I'll come up with some kind of a

4    decision on this application.

5              MR. LaMAGNA:  Judge, I would also request you

6    to order the D.A. to turn over to me all of this data,

7    and all of this information because I want my -- I,

8    pursuant to your order, I made contact yesterday, last

9    night, but actually haven't physically made contact

10   with him yet, but we are talking and missing each other

11   a little bit, so I want all of that information.

12             MS. McCORMICK:  I would have done it anyway,

13   Judge.

14             Just so that the record is clear, upon

15   receipt back of the blood kit yesterday afternoon, that

16   blood kit was briefly in my office with Investigator

17   Harris, and then from my office is now locked in a safe

18   in the Investigators' Division of the District

19   Attorney's Office, where it will remain until the

20   defense requests to take take a sample from it for

21   their own testing.  I just don't have it yet.

22             THE COURT:  Hopefully Mr. LaMagna will be

23   able to do that during the course of business today,

24   rather than waste time.

25             MR. LaMAGNA:  Well, actually, because, of

GIGI WRIGHT, RPR   (516) 571-2503

Proceedings

1   course, of the holidays this week, Kobelinski called

2   me, Lawrence Kobelinski -- I'm sure you know him.

3         THE COURT:  Yes.

4         MR. LaMAGNA:  -- called me last night,

5   returned my call last night, after my call when I left

6   the office around 10:30, and left a voice mail.  I

7   called him this morning on the way to court, got his

8   voice mail.  I spoke to his secretary.  She told me,

9   although he gave me his home phone number, I have to

10   call him before 1 o'clock today.

11         THE COURT:  Do the best you can.

12         MR. LaMAGNA:  Just for the record, I'm

13   trying.

14         MS. McCORMICK:  There is one other aspect

15   before we break, is that Mr. Arana from the lab is

16   available to your Honor this morning, if you wish him

17   to appear.  I have his cell phone number to bring him

18   over if you need him here.  I do not have an affidavit

19   from him.

20         THE COURT:  Let me see what is in the

21   affidavit.

22         MS. McCORMICK:  His is not one of them, just

23   to be clear.

24         THE COURT:  I understand.

25         Please produce the jury and get the witness

Weber - Cross - LaMagna

1    back on the stand.

2              (Whereupon, the witness Stephen Weber,

3    previously sworn, retakes the witness stand.)

4              COURT OFFICER:  Step up.  Just take a seat.

5              THE COURT:  Good morning, Mr. Weber.

6              THE WITNESS:  Good morning, sir.

7              THE CLERK:  Mr. Weber, I would like to remind

8    you you are still under oath.

9              THE WITNESS:  Yes.

10             COURT OFFICER:  Jury entering.

11             (Whereupon, the jury entered the courtroom,

12   and upon taking their respective seats, the following

13   occurred:)

14             THE CLERK:  Jurors are present and seated,

15   your Honor.

16             THE COURT:  All right.  Thank you.

17   Mr. LaMagna.

18             MR. LaMAGNA:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. LaMAGNA:

21   Q    Good morning, Mr. Weber.

22   A    Good morning.

23   Q    How are you?

24   A    Good.

25   Q    My name is Steven LaMagna.  I'm Mr. Heidgen's

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

 1    attorney.  I am going to ask you a couple of questions this

 2    morning concerning your testimony from yesterday.  Now, if

 3    you don't understand a question please ask me to repeat it

 4    and I will.

 5        A    Okay.

 6        Q    How old are you?

 7        A    I'm 44.

 8        Q    And you live in Suffolk County?

 9        A    Yes, I do.

10        Q    Is that in Kings Park?

11        A    That's correct.

12        Q    How long have you lived there?

13        A    Kings Park, I have lived there for about 35

14    years.

15        Q    So you are almost a life-long resident?

16        A    Yeah.  I grew up there and then I went to college

17    and when I decided to buy a home I bought a home there.

18        Q    Back to Kings Park?

19        A    Yep.

20        Q    You said you are married?

21        A    Yes, I am.

22        Q    And you have two children?

23        A    Yes, two children, that's correct.

24        Q    Now, I want to take you back to July 1st 2005.  I

25    know it is fourteen months ago, but I want to bring you back

Weber - Cross - LaMagna

1     to that evening.  You said you were in a bar called Jugs and

2     Strokers?

3         A     Yeah, for part of the evening, that's correct.

4         Q     That's in Merrick, by the way?

5         A     Yes, it is.

6         Q     On Sunrise Highway?

7         A     Yes, it is.

8         Q     It is on the south side of Sunrise Highway?

9         A     Yes, it is.

10        Q     Across from the train station, pretty much?

11        A     Well, I'm not familiar with the area.  I just

12    know, I know where Jugs is, and I know how to get there and

13    back.

14        Q     Okay.  What time did you arrive there?

15        A     I'd estimate between eight and 9 o'clock.

16        Q     And you were driving your motorcycle?

17        A     Yes, I was.

18        Q     That's a Harley Davidson?

19        A     Yes, it is.

20        Q     Do they have horns on these things?

21        A     Yes, they do.

22        Q     You were wearing a helmet?

23        A     I was wearing a shorty helmet, that's correct.

24        Q     What kind of helmet.

25        A     It's called a shorty helmet.  It is a helmet that

Weber - Cross - LaMagna

1    exposes your ears.

2         Q    There is no visor?

3         A    No, there isn't.  I was wearing glasses.

4         Q    Dark glasses?

5         A    No, evening glasses.

6         Q    They are not tinted or anything, right?

7         A    No.  No.  They have a slight yellowish tint for

8    oncoming lights, but other than that they are very similar

9    to the glasses you have on today but they don't have any

10   corrective lenses about them.

11        Q    Now, when you arrived at Jugs and Strokers that

12   was around 9 o'clock?

13        A    Between eight and nine.

14        Q    Can you be any more specific?

15        A    No.  As far as -- no.  No, I can't.

16        Q    So the best estimate you could give is between

17   eight and nine?

18        A    Yeah, that sounds like right.

19        Q    Now, when you arrived there was it crowded?

20        A    No.  No.

21        Q    How many people would you say were in the bar?

22        A    You know, it's difficult for me to say for that

23   evening precisely, but usually there at that time --

24        Q    I don't care about usually.  Why is it difficult

25   to remember how many people were there that evening?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

```
 1      A     Oh, sure, because that's a place that I frequent

 2   very often, and the events that stick out in my memory that

 3   night is my encounter on the Meadowbrook Parkway.

 4      Q     I didn't ask you about that.

 5      A     Well, I'm just answering your questions to the

 6   best you asked me, why I didn't remember and I'm telling you

 7   why I didn't remember.

 8                   MS. McCORMICK:  Your Honor, I ask counsel to

 9           not battle with the witness, please.

10                   THE COURT:  Take the answer as you find it.

11      Q     What I am asking you is:  When you are at Jugs

12   and Strokers that night you can't tell us from your memory

13   how many people were there that night; is that what you are

14   saying?

15      A     No, I am not.

16      Q     So how many people were there that night?

17      A     What I'm saying is you are asking me to remember

18   fourteen months ago to a place that I go often.  To give you

19   an exact number of how many people were there, no.

20      Q     Just an estimate.

21      A     I would say that the place was not crowded at

22   all.

23      Q     So it was pretty empty?

24      A     Pretty much so, yeah.

25      Q     Twenty-five people, 30 People, just an estimate?
```

Weber - Cross - LaMagna

1      A      If I had to give you an estimate, to the best of

2   my recollection, I would say there was maybe a dozen, maybe

3   two dozen max.

4      Q      So between twelve and 24 people, to the best of

5   your recollection?

6      A      The place wasn't crowded, that's what I am

7   saying.  You asked me to put a number on it.  You know, how

8   many people are here?  I can't tell you how many people are

9   in this room.  Clearly it was not crowded.

10     Q      It is hard to give an estimate at this point?

11     A      I am just saying it wasn't crowded.

12     Q      Okay.  Now, where did you park your vehicle?

13     A      I parked it up front.

14     Q      Front of the bar?

15     A      Yes.

16     Q      Was that area crowded?

17     A      What happens -- crowded, I would say, I would say

18  it was moderately crowded.  That's the prime spot for anyone

19  who comes there, you know.  That's why I got there at that

20  time; I wanted to park out in front.  Those are the first

21  spots to get taken.  I would say half of the spots were

22  taken.  If I were to give you an estimate on motorcycles, I

23  would say about ten motorcycles.

24     Q      About ten.  That's where people want to park?

25     A      That's the prime spot.  You sit out front, you

Weber - Cross - LaMagna

```
 1    sit on your motorcycle and people walk by and ask you what

 2    did you do to this?  I did this.  Where did you get that?

 3        Q      A club atmosphere?

 4        A      Yes, very much so.

 5        Q      Now, what time did you leave your home before

 6    going?

 7        A      I would estimate, if I got there between eight

 8    and nine, it is about forty miles away from my house -- I

 9    take Ocean Parkway on the way out there -- I would say about

10    forty minutes.  Forty minutes earlier than my estimation of

11    when I got there.  It takes me forty minutes to get there

12    from my house.

13        Q      I understand that.  Do you have a recollection of

14    what time you left?

15        A      Based upon eight or 9 o'clock, minus 40 minutes,

16    I would say some time after seven.

17        Q      That's based upon the estimation of what time you

18    got to the bar?

19        A      Exactly.

20        Q      Now, how long were you in the bar?

21        A      In the bar that night?

22        Q      You said you left.

23        A      Yeah.

24        Q      So the first time?

25        A      Let me say -- in the bar or at the bar?  At Jugs
```

Weber - Cross - LaMagna

1   and Strokers, I was there before I left the first time, at

2   least a couple hours.  I was in the bar, maybe in and out a

3   few times just to go to the bathroom, say hello to people.

4   Some times they cook hamburgers around the back, those types

5   of things.  I'm not sitting at the bar.

6       Q   I understand.  Try to listen.

7       A   I'm just trying to answer the question the way

8   you are asking it.  I'm sorry I'm not answering the way you

9   want me to.

10      Q   I know you are.  I don't mean necessarily the bar

11  area --

12      A   Yes.

13      Q   -- the establishment?

14      A   Establishment, a couple of hours.

15      Q   How long were you there?

16      A   A couple hours.  Two hours.

17      Q   Two hours before you left?

18      A   I would say so.

19      Q   Before you left to go to Freeport?

20      A   No.  No.  No.  I went to Ocean Parkway first.

21      Q   You went to Ocean Parkway first?

22      A   Yes.

23      Q   From the first time, from eight or 9 o'clock, you

24  were in Jugs and Strokers for about two hours?

25      A   Yeah.  I would say so, yeah.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    Q    Is that the best --

2    A    Yeah.  Yeah.  Yes.  Yes.  That's sounds, again,

3  we are going back fourteen months.  It is a place I go all

4  the time.  It is very difficult for me to differentiate one

5  night from the other, up until the point we are on the

6  Meadowbrook Parkway.  To the best of my recollection, that's

7  it.

8    Q    I understand, Mr. Weber.  I know it is fourteen

9  months ago.  I'm just trying to ask you to the best of your

10  recollection --

11    A    And I'm trying to answer you.

12    Q    -- how many hours you were there.

13    A    I have answered you.

14    Q    You are in Jugs and Strokers for about two hours.

15  Okay.  You were going from the bar area, you said outside,

16  you said there were people hanging out outside, looking at

17  the bikes, and that kind of thing.

18    A    I would like to put a finer point on it:  I was

19  outside most of the time, and every once in a while I walked

20  inside to the bar area.

21    Q    When you went to the bar area were you drinking?

22  You said you didn't recall?

23    A    I don't recall if I had.  Often when I go to Jugs

24  I do not drink at all.  I ride with a lot of people from

25  N.A. and A.A. and, you know, they have their own clubs and

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1     stuff, it is just not socially acceptable.  Usually we do

2     other things; we go to Starbucks and stuff like that.  So,

3     you know, you are asking me if I had a drink that night --

4          Q     That's exactly what I'm asking you.

5          A     I have no idea.

6          Q     You can't recall from fourteen months ago whether

7     you had drinks that night?

8          A     You are asking if I can recall fourteen months

9     ago on July 1st or 2nd 2005 if I had any alcohol, I say I

10    have no idea.

11         Q     That's what I'm asking you.

12         A     I have no idea.

13         Q     So, then you were in the club two hours, you

14    leave, correct?

15         A     Yep.

16         Q     And where go you go?

17         A     That night what I do is I go down Ocean Parkway,

18    I take a very similar route, but instead of going north on

19    the Meadowbrook I go south, and I'll go down past the Loop,

20    down by the bridges.  I'll go, there is spot by the first

21    water tower where the bikes hang out.  I go see who hanging

22    out there down there.  I didn't see anybody, so I went down

23    to --

24         Q     Where is that?

25         A     Oh, that's like, oh, where the Wantagh Parkway

Weber - Cross - LaMagna

1   comes down and there is this big water tower.  It looks like

2   a big --

3       Q       Is that at the beach?

4       A       Yes, at the beach.  Ocean Parkway, right along

5   the beach.  Ocean Parkway is a road that runs along the

6   beach there.

7       Q       There is an establishment there or is it just an

8   area?

9       A       No.  No.

10      Q       An area where you go to meet people and hang out?

11      A       It is a spot on the side of the road by the water

12  tower.  There is, like, a parking area.  You are really not

13  supposed to go there.  If you go there too long the police

14  chase you away.  You hang out there for a few minutes to see

15  if you could hookup with anybody to go down Ocean Parkway.

16      Q       You leave Jugs and Stroker?

17      A       Strokers.  Like the stroking of an engine.

18  Strokers.

19      Q       You leave Jugs and Strokers after about two hours

20  of being there.  So it is about either ten to 11 at this

21  point, correct?  You arrived at eight or nine; this would be

22  about ten or 11?

23      A       Sounds right.

24      Q       Well, is it?

25      A       Well, I mean, if I go according to your time

Weber - Cross - LaMagna

1     line.

2          Q      I'm going according to your time line.

3          A      I'm telling you I'm not a hundred percent sure

4     what time it was.  I say I got there about eight or 9

5     o'clock.  That sounds right.  If you say that I left my

6     house at 7 o'clock, or I said I left my house at 7 o'clock,

7     that sounds about right.  To say -- I say about two hours, I

8     say after about two hours I went on a ride, yeah, that

9     sounds about right.  You want me to put a time on it, you

10    know, I'm telling you to the best of my recollection, my

11    memory.  You know, the things that I really remember is when

12    I pulled onto that Meadowbrook Parkway that night.

13         Q      I'm not asking you about that right now.

14         A      I understand.  I am just answering your

15    questions.

16         Q      You leave Jugs and Strokers after about two

17    hours?

18         A      That sounds right.

19         Q      And when you go to Ocean Parkway, it is just an

20    area where some people will congregate, and you went there

21    to just see if anybody was there?

22         A      I was alone that night.  I had a free pass for

23    the evening.  I didn't want to go home.

24         Q      That's a known hangout where you run into people

25    you know?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1     A    Yeah.  There are four or five places along Ocean

2   Parkway that are like that, and I visited all of them that

3   night.

4     Q    This is where people, where, I guess, motorcycle

5   people go?

6     A    Yeah, to meet other people on motorcycles, see if

7   you want to go for a run.  We play a game follow the --

8     Q    What is "a run"?

9     A    You get on the bikes, you have no particular

10  place to go, and you ride around, you see things, you talk

11  to people, you stop by.  You play, like, follow the leader.

12  It sounds infantile, but you go down the thing, one person

13  takes the lead, you zip around, and follow behind them and

14  play follow the leader.  It's a hobby.  I'm into riding.

15    Q    When you go down there do you see anybody you

16  know?

17    A    No, not really.  No.  Or else I would have been

18  riding with them.

19    Q    So then you go back to Jugs?

20    A    No.  No.  No.  No.  What I did was I proceeded

21  down to where the old OBI was.

22    Q    Okay.

23    A    And then I drove around there to see if anyone

24  was down there.

25    Q    Okay.  Just so I understand, and the jury does,

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    after Ocean Parkway you go further east?

2        A      Still on Ocean Parkway.

3        Q      You go further east to where the old OBI was?

4        A      That's correct.

5        Q      That's in Babylon, correct?

6        A      If you say so.  It is just a stop on the Ocean

7    Parkway for me.

8        Q      Okay.  It is in Suffolk County?  It's east,

9    correct?

10       A      Yeah.

11       Q      So what time do you get to where the old OBI is

12   in Suffolk County?

13       A      I have no idea.  I'm sorry.  I just have no idea.

14   I couldn't tell you.  How long a distance, maybe a half hour

15   from that point.  Maybe.  Maybe fifteen minutes.

16       Q      So would you say it is around midnight at this

17   point, 1 o'clock in the morning, somewhere in that area?

18       A      I'm not sure what you are getting at.  I

19   mentioned to you a number of times up until that evening I

20   do things that I do every -- very often.  It is a -- and to

21   distinguish that night and, you know, it is very difficult

22   for me.  If you want to nail me down on that type of level,

23   fifteen minutes here and and ten minutes here, it's

24   difficult.

25              I'm telling you I went down Ocean Parkway.  I

Weber - Cross - LaMagna

1   stopped at the old OBI.  I stopped at Captree.  I tried to

2   get into the Lido Beach, I couldn't.

3        Q      Is that after the OBI?

4        A      It's a loop.  You go around.  Sometimes you might

5   stay for a little while, sit on your bike, see if anyone

6   sees you.  Sometimes you might not.  Whether I did that that

7   night, I don't know.  It was fourteen months ago.

8        Q      Did you see anybody?

9        A      It was an event.  What I did that night at Jugs

10  and Strokers that was not a one-time event.  If I never did

11  that, of course, I would remember those things.  I'm just

12  saying, you are asking me to nail me down to a particular

13  time and thing, up until that point, until I saw the guy on

14  the road, it was just another night.

15       Q      Okay.  So getting back, you were at the OBI, you

16  can't recall what time that was, and then after the OBI you

17  continued to go east on Ocean Parkway?

18       A      That sounds right.

19       Q      Well, I'm asking you.  I don't know.

20       A      I'm not sure.  You are asking me to agree to your

21  words, I already stated my words.

22       Q      Let me ask you this:  After OBI where did you go

23  next?

24       A      After OBI I went down toward Captree.  Captree.

25       Q      That's what I thought you said before.  So then

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1   you went further east to Captree.  What happened then at

2   that point?

3        A    I went to Captree, and they have it closed off.

4   But you could get in because they allow the boats to come in

5   to drop off.  I kind of went around the thing, buzzed around

6   the parking lot.

7        Q    Didn't stop?

8        A    No.  No.  No.  Just go in and see if anyone is

9   hanging out, that kind of thing.

10       Q    Didn't you see anybody hanging out?

11       A    No one that I knew that I stopped to talk to, I

12  don't believe.  I don't remember something like that.  I

13  really didn't see anybody.

14       Q    After Captree, did you go further east?

15       A    No.  No.  No.  No.  You are out east at that

16  point.

17       Q    You turned around?

18       A    I went back.

19       Q    And you went back where?

20       A    I went back down Ocean Parkway going back to

21  Jugs.

22       Q    Coming back into Nassau County?

23       A    Yeah.  Yeah, Nassau County.  And I think that I

24  stopped at the, there is another beach there, I think it is

25  Lido Beach, but I'm not sure.  But, sometimes it is manned,

Weber - Cross - LaMagna

```
 1     you know, there are people checking, and at lot of times

 2     they wave the bikes through.  But I don't believe, I believe

 3     that night, it stuck out in my memory, I talked to the guy a

 4     little bit at the gate, and he wouldn't let me in, so I

 5     zipped along.

 6          Q     You think it could be Lido Beach?

 7          A     Well, I mean, I could tell you where it is, you

 8     know.  It is, you know --

 9          Q     Where is it?

10          A     Right on the Nassau County/Suffolk County border.

11     Right to the right there.  The road goes from two lanes to

12     three lanes.  It is shortly after that.  There is a little

13     a, they have boats there and a camping area there, and there

14     is a refreshment stand.

15          Q     It is a beach club?

16          A     It is a public beach, but they don't allow

17     non-residents in there.  A lot of times they wave

18     motorcycles through.  They go like this, and you zip on

19     through.

20          Q     That night?

21          A     Evidently not.

22          Q     Not that night anyway?

23          A     Exactly.  It all depends on who is there and how

24     you handle it.

25          Q     This was Fourth of July weekend, correct?
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    A    Yep.

2    Q    You are sure about that?

3    A    Oh, yeah, sure.  I mean, sure.  Yeah.

4    Q    Okay.  I'm just asking you.

5    A    I'm not sure?  When you say Fourth of July

6    weekend, I know that is what we are talking about.  It would

7    seem strange for you to ask me that again.

8    Q    I'm asking you if you recall it was that weekend?

9    A    Yeah.

10   Q    You are sure?

11   A    You know, I sat down and talked to this guard and

12   so, am I sure, yeah.  I think so.  I mean, sure it could be.

13   Yeah, it sounds right.

14   Q    That was that Friday night of the Fourth of July

15   weekend?

16   A    Yeah, sounds right.

17   Q    You said then you went back to Jugs and Strokers?

18   A    That's correct.

19   Q    Do you have any recollection as to what time you

20   arrived back --

21   A    I tell you --

22   Q    -- at Jugs and Strokers?

23   A    You keep on asking me about the time.  It's not

24   like I'm looking at a watch.

25   Q    If you don't know it answer no.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    A    I have no idea.  No idea.

2    Q    Answer no, if it is a yes or no.  That would be

3    great.  Okay.  You don't have a recollection of the time you

4    arrived back at Jugs and Strokers --

5    A    No.

6    Q    -- is that correct?

7    A    No.  And, and, and, to be quite honest I don't

8    have a recollection.  The times you walked me through

9    already, I'm agreeing to what you are saying because you are

10   nailing me down to the time, and my honest thing is that I

11   don't watch the clock.  I just was out that night and did

12   what I normally would do when I'm allowed out.  And, you

13   know, I did what I normally do.  Well, I certainly didn't

14   want to go -- I certainly didn't want to go home.

15   Q    Okay, so we are back at Jugs and Strokers now,

16   right?

17   A    Yeah.

18   Q    Now, when you went back into the bar did you have

19   a drink then?

20   A    I mean, you have asked me that question like ten

21   times.  I keep on telling you I don't recall.  Why do you

22   keep on asking me?  I said I don't recall.

23   Q    Now that you are back at the bar, I'm asking you

24   again.

25   A    Okay.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    Q    Now that you are back --

2    A    I don't recall.

3    Q    -- did you have a drink --

4    A    I don't recall.

5    Q    -- at that time?

6    A    I don't recall.

7    Q    Did you testify on direct examination that you

8    went down to Freeport?

9    A    Down to the Nautical Mile, yes.

10   Q    That was after you went back to the Jugs and

11   Strokers --

12   A    Yeah.  Yeah.  Yeah.

13   Q    -- the second time?

14   A    Yeah.

15   Q    Okay.  So you go back to.  How long were you at

16   Jugs and Strokers the second time?

17   A    I don't know.  I don't know.  Maybe, you know,

18   again, you are asking me to give a definitive to something,

19   to something I don't know.

20   Q    I'm asking for an estimate of the time.

21   A    Half-hour, maybe an hour.

22   Q    I'm asking you to give me an estimate of the time

23   that you, if you can recall those events, how long you were

24   at that bar the second time?

25   A    I don't know.  Maybe half-hour, hour.  You know,

Weber - Cross - LaMagna

1    there was nothing doing.

2         Q      Okay, it was still empty?

3         A      No.  No.  No, there were more people there.   I

4    didn't know anybody.  I had no one to hang out with.

5         Q      So you leave.  Again, if you don't know, just

6    say, I don't know.  If you don't know, say I don't know.   Do

7    you know what time or do you have any recollection of what

8    time it was that you left Jugs and Strokers the second time?

9         A      No, I don't have any recollection.

10        Q      You do recall going to Freeport, however?

11        A      Yeah.  Sure.  Sure.

12        Q      And you are sure about that?

13        A      Sure as I could be, yeah.

14        Q      Even when you say sure as you can be, I'm going

15   to ask you:  Is it possible that your memory is not clear

16   for that night --

17        A      Well, well, again, again, when I -- .

18        Q      -- about going to Freeport?

19        A      About going to Freeport, I'm pretty sure.  You

20   know, I mean, how do I assign a quantitative value to pretty

21   sure?  Again, these are things I would do all the time.

22        Q      You don't go out by yourself all the time, as you

23   said before?

24        A      Yeah.  Yeah.  Yeah.  That's true, but I do go out

25   by myself often.  Not all of the time, but often.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    Q    Okay.  So you go to Freeport and you said to see

2    or be seen?

3    A    See and be seen, cruise up and down the Nautical

4    Mile.

5    Q    What does that mean actually?.

6    A    You are on a Harley Davidson.  It's a beautiful

7    night out, you drive slow, you nod at other, you rev the

8    engines for the kids and wave at the people, and that kind

9    of stuff.  You look for other riders, see if anything is

10   doing.  That is what you do when you ride.

11   Q    Now, when you were in Freeport was Freeport

12   crowded Friday, the Fourth of July weekend?

13   A    Yes.  Yeah, I remember that because it took me a

14   a while to go up and down, because it is, you know, it is a

15   single road and there is like restaurants and people coming

16   in and out.  And it was, it was pretty crowded.  I had a

17   little bit, you know, it was kind of a drag, because I had

18   to stop the engine.  That stuck out in my mind because it

19   was a little bit crazy.

20   Q    Right.  And how long were you in Freeport?

21   A    I don't know.  I don't know.  However long, but I

22   I tell you sometimes I could zip.  It was crowded, so I

23   don't -- sometimes I could zip up and down that block in

24   fifteen minutes; other times it could take me hour a

25   and-a-half.

Weber - Cross - LaMagna

1     Q    I'm interested in what you do remember, not what

2    it normally is.  If you don't remember, you don't remember.

3     A    That's all right.

4     Q    After Freeport did you go back to Jugs and

5    Strokers a third time?

6     A    I went there once.

7     Q    Right.

8     A    Then I came back down to Ocean Parkway, that's

9    twice, and then third time, yes.

10     Q    Yes.  So you went back three times.  This is the

11    third time you went back?

12     A    Yeah, that sounds right.

13     Q    And, again, if you don't know you don't know.

14     A    I got that part.

15     Q    Do you recall what time you arrived at Jugs and

16    Strokers this third time?

17     A    No.  No.  No.  No.  I would -- I -- no.

18     Q    Was it crowded?  Was it more crowded?

19     A    Yeah.  Yeah.  Yeah.  It is starting to get pretty

20    crowded at that time of night, sure.

21     Q    Do you recall this time of having any alcoholic

22    beverages?

23     A    No.

24     Q    So you don't recall whether you drank or didn't

25    at all that night?  It's possible, but you don't recall; is

Weber - Cross - LaMagna

1   that fair to say?

2          A      I don't remember if I had anything to drink that

3   night.  The whole night.  I do not remember.

4          Q      Now at some point recently, after the Labor Day

5   weekend, this past Labor Day weekend, you testified that you

6   contacted the authorities concerning what you had observed

7   fourteen months ago; is that correct?

8          A      Yeah.  Yeah.

9          Q      And you said that was based upon an article you

10  read in the newspaper; is that correct?

11         A      Yes.

12         Q      And --

13         A      Well, it was -- let me put a finer point on it:

14  It was mainly the picture I saw and then afterwards I

15  remember, yeah.  Exactly.

16         Q      You see an article in the newspaper, or a

17  photograph in the newspaper, and it clicked in your mind,

18  hey, this is the same scene that I had seen fourteen months

19  ago?

20         A      Yeah.

21         Q      Correct?

22         A      Yeah.  But, again, putting a finer point upon it,

23  it is that, it is that, yeah, but, it wasn't like -- yeah, I

24  mean -- yeah, but.

25         Q      I'm listening.  I'm sorry.

Weber - Cross - LaMagna

1     A     I saw you talking, and I didn't want to talk

2     while you are talking.  So, so, so, yeah, yeah, yeah, I

3     realized it was a trial going on.  It is not like I forgot

4     about the incident.  I have always kept --

5          Q     You never contacted the authorities for the last

6     fourteen months?

7     A     Correct.  Exactly.

8          Q     What you testified to, when you looked in the

9     newspaper, as you just said, you saw a photograph of the

10    accident scene and it clicked in your mind, I remember that?

11    A     Yeah.  Yeah.

12         Q     That's the part I saw; isn't that correct?

13    A     Exactly.

14         Q     I'm going to show you exhibit 65, People's

15    Exhibit 65 in evidence.

16               Do you remember seeing that yesterday?

17    A     Yeah, I do.

18         Q     And you testified yesterday that when you passed

19    the accident scene you only saw the rear of the accident

20    scene as depicted in that picture, correct?

21    A     That's correct.

22         Q     You only saw the backs of the cars, correct?

23    A     Yes.  Over my shoulder as I was turning around.

24         Q     I understand that.  And to you, at the time you

25    said it didn't seem that significant because you only saw

Weber - Cross - LaMagna

1       the rear?

2              A      No.  I mean, to my recollection, I'm not sure I

3       agree to your words, when I say it didn't look that bad.

4              Q      I understand what you are saying.

5              A      .I would like to use my own words.  I don't want

6       to agree to what you say.  People give you -- I have my own

7       mind.  I want to speak my mind.

8              Q      I understand that.  This is the photograph, 65.

9       I want to publish it to the jury of what you observed that

10      night, correct?

11             A      Oh, I'm sorry.

12             Q      This is what you observed that night?

13             A      Yeah, sure.  I mean, the picture in the paper

14      looked very different than that.  Although --

15             Q      We are going to get there.

16                    So when you observed the photograph in the

17      newspaper that clicked in your mind, and you said that looks

18      like the accident, I am assuming, since that is the only

19      scene you saw, was the rear.  Was the photograph in the

20      newspaper showing the rear end of that accident?

21             A      You know, what I noticed about the thing in the

22      newspaper, I only glanced at it a few times, all right, the

23      most shocking thing about it was the front of the vehicles.

24             Q      You never saw the front of the vehicles?

25             A      Not from behind, because it looked like it was

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    gone.  And when I saw it, it didn't look like that.  I saw

2    it from the rear.

3         Q    What I'm saying to you is:  If you never saw the

4    front of these vehicles fourteen months ago, and there is a

5    photograph of an accident in the newspaper that shows the

6    front of the vehicles, why would you associate that

7    photograph with the scene that you said was all that you saw

8    here, the rear end?

9         A    Because, because, it was -- I knew the spot.  I

10   was -- I knew the spot.  I could see it.  I could see the

11   bridge.  I could see everything I saw.  Just because it was

12   at a different angle, I could see it was the same accident.

13   Was there another accident that night?

14        Q    So you are saying that the photograph that you

15   saw in the newspaper, as you just said, showed terrible

16   front-end damage?

17        A    Yeah.  I did not see that at all.  But it was

18   clear to me that was the accident scene from the other

19   things.  There is more in the picture than just the rear of

20   the cars, and I knew the incident.  I drive that road all

21   the time.

22        Q    I understand.

23             Now, what date did you call the authorities?

24        A    It was on Labor Day.

25        Q    That Monday?

Weber - Cross - LaMagna

1    A    Sunday -- no, it was a Sunday newspaper.  It was

2    the Sunday newspaper.

3    Q    The day before Labor Day?

4    A    Yes.  Sunday newspaper, yeah.

5    Q    You called on Sunday, and the article said the

6    trial would be starting --

7    A    That --

8    Q    -- that Tuesday?

9    A    That week, yeah.

10   Q    And who did you call?

11   A    First I called Newsday.

12   Q    And then who did you speak to after Newsday?

13   A    Just the person, after about five dollars worth

14   of change, I got a person at a desk.  You know, you have to

15   call and then they keep asking for money as you go along.

16   It is a little different from last time I used a pay phone.

17   Q    Did you eventually speak to an investigator or

18   some law enforcement authority?

19   A    Yeah.  Subsequent to that I went home.  I went

20   home and spoke to my wife about it and she --

21   Q    I'm asking you --

22   A    I'm just trying to tell you.

23   Q    Try to listen to my question.

24        Did you ultimately speak to somebody from law

25   enforcement?

Weber - Cross - LaMagna

1    A    Yes, I did.

2    Q    When was that?

3    A    That was later on that day.

4    Q    Same day, Sunday?

5    A    Yes.  I called them on the phone.

6    Q    Okay.  Who did you speak to?

7    A    It was the person who was answering the phone.

8    He identified himself as a trooper but, you know, I was so

9    nervous, I have no idea what his name was.

10   Q    Why would you be nervous?

11   A    Because the last thing I want to do is to talk to

12   the police about anything.  I mean, not that -- I love the

13   police, I don't want anybody to get mad at me, it is just

14   that, you know, I am a good person, you know, it just gets

15   me nervous.  I don't want to talk to the police.  I was just

16   concerned.  Secondly, I was very concerned because I hadn't

17   reported it up to that point.  I was a afraid I was going to

18   get in trouble.  That's why I talked to my kids about it.

19   Q    How else did you speak to after the trooper?  Did

20   you speak to another investigator?

21   A    That day?

22   Q    That day.

23   A    That day I got a call back, and the guy told me,

24   he really scared the whatever out of me, he was pretty upset

25   with me because I hadn't reported it up until this point --

Weber - Cross - LaMagna

1    Q    In fourteen months.

2    A    Yeah.  Yeah.  Again --

3    Q    The case is starting the next day.

4    A    Yeah.  He seemed very upset with me.  After I

5 hung up from him --

6    Q    Who did you speak to?

7    A    I'm trying to answer your question.  You are

8 interrupting me.

9    Q    Who did you speak to?  Do you know the name of

10 the individual you spoke to?

11    A    The trooper I initially called?

12    Q    Yes.

13    A    No.  No.  I do not know him.

14    Q    Did you ultimately speak to an Investigator

15 Harris?

16    A    Yes, I did.

17    Q    When was that?

18    A    That was, I would say, I spoke to -- I'm first on

19 the phone later on that evening.  I had called him, he

20 called me back, I was out, blah, blah, blah, and I finally

21 talked to him, I guess, late in the afternoon.

22    Q    Sunday?

23    A    Sunday, yes.  Sunday.

24    Q    Did you speak with him the next day?

25    A    Yes, I did.

Weber - Cross - LaMagna

| | | |
|---|---|---|
| 1 | Q | That was Labor Day? |
| 2 | A | Yes, it was. |
| 3 | Q | That was Monday.  Where did you meet with him? |
| 4 | A | I met with him and the D.A. |
| 5 | Q | Where? |
| 6 | A | At my home. |
| 7 | Q | Okay.  Did a member of the district attorney's |

8    office also come?

| | | |
|---|---|---|
| 9 | A | Yes. |
| 10 | Q | Who was that? |
| 11 | A | This lady right there. |
| 12 | Q | Ms. McCormick? |
| 13 | A | Yes. |
| 14 | Q | Ms. McCormick and Investigator Harris come to |

15   your home, correct?

| | | |
|---|---|---|
| 16 | A | Yes, they do. |
| 17 | Q | And they interview you, correct? |
| 18 | A | Yes, they do. |

19              THE COURT:  Excuse me, Mr. LaMagna.

20              (Brief pause in proceedings.)

21              THE COURT:  May I see counsel at the bench.

22              (Whereupon, a discussion was held at the

23   sidebar, off the record.)

24    Q    So on Monday afternoon or so Investigator Harris

25   and Ms. McCormick come to your home, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

```
 1        A     Yes.

 2        Q     They interview you, correct?

 3        A     Yeah.

 4        Q     Ask you what you saw, what happened, you are

 5   sure, all that stuff, right?

 6        A     Yeah.

 7        Q     Did they bring with them any photographs, any

 8   maps, anything to show you the accident scene?

 9        A     You know, I'm not sure.  I printed out a picture

10   of the accident scene myself.  Well, I'm telling you, you

11   asked me if I saw a picture of the accident scene.  What I

12   am going to say is that I don't recall if it was my picture

13   or their picture I was looking at, but I was looking -- you

14   know, in fact, it was from the newspaper.  I had the

15   newspaper there.

16        Q     They didn't bring with them --

17        A     I don't think so.

18        Q     -- any photographs of the scene?

19        A     I don't think so.  But -- yeah, I don't think so.

20        Q     You don't think so.  Okay.

21              Now, did there come a time that you met -- how

22   long did that interview last?

23        A     Couple of hours.

24        Q     And did you make a statement?

25        A     Do I make a statement?  You mean, did I sign
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    anything?  No.  No.

2         Q    Yes.

3         A    No.

4         Q    They didn't take any statement from you at that

5    time?

6         A    If you are saying a statement where I signed

7    something?

8         Q    Yes.

9         A    No.  No.  I didn't sign anything.  I told them

10   what I saw and the events, and they asked me a few things.

11        Q    The investigator didn't take a written statement

12   for you to sign, correct?

13        A    Written statement?

14        Q    A written statement.

15        A    No.  No.  No.  You asked me that three times.  I

16   answered you three times.  No, I didn't do a written

17   statement.

18        Q    Now, did you meet with them prior to you

19   testifying here today?

20        A    Yes.  Next time I met with them was yesterday

21   morning.

22        Q    So you just met with them the one time?

23        A    Yes.

24        Q    At your home, on Monday, Labor Day.  And the next

25   time you met with them was yesterday?

Weber - Cross - LaMagna

```
1       A      That's correct.

2       Q      Have you had any phone conversations --

3       A      Well, I called Investigator Harris the following

4    day, because they asked me if I had spoken to anyone about

5    the accident prior to Labor Day, and at the time I told them

6    that I --

7       Q      I'm sorry.

8       A      I'm answering your question.

9       Q      I just wanted to know if you spoke to anybody in

10   between that day and yesterday?

11      A      Yes.

12      Q      And that was Investigator Harris?

13      A      That's what I was just telling you before you

14   interrupted me.

15      Q      How many times would you say you spoke to him?

16      A      Once.

17      Q      It was those three times you had communication

18   with law enforcement between the time that you met them and

19   today; is that correct?

20      A      I met with them at my house, I called

21   Investigator Harris, and the following time was yesterday

22   morning.

23      Q      Now, prior to Sunday, before Labor Day, seeing

24   the photograph of this accident, fourteen months before, no

25   photograph or any story or anything that you have heard or
```

Weber - Cross - LaMagna

1    read, or any conversation you had with anybody connected

2    with that you actually observed what happened that night?

3         A    No.  No.  No.  No.  I knew.  I saw that accident,

4    and the following weekend I had spoke to a few friends about

5    it, and they said they heard about it.  And at that time I

6    admit that I didn't come forward because I thought, I

7    thought it was going to be over with.  And I thought that, I

8    thought that I would get in trouble for not stopping and

9    being involved in what was going on.  I just didn't, I

10   didn't want to be part of it.  I'm sorry.

11        Q    At this point you are part of it.

12        A    I realized that there was a trial going, and I

13   have something very important to offer, so it went to the

14   next level.  And I realized that I had to --

15        Q    Right.

16        A    -- I had to do the right thing, like my daughter

17   said.

18        Q    Right.  Now, you would agree, would you not that

19   as time passes memories fade a little bit, don't they?

20        A    Some types of memories, yeah.

21        Q    That would be a fair statement?

22        A    Some types of memories, yes.

23        Q    Times, for instance; that you don't remember

24   whether you were drinking?  I mean, things fade, correct?

25        A    Those minor memories, yes.  Some memories, no.  I

Weber - Cross - LaMagna

1    could tell you --

2         Q    You would  agree --

3         A    I want to answer your question.  I could

4    certainly tell you where I was when President Reagan was

5    shot.  I could tell you when the guy landed on the moon.  I

6    could tell you, those are things I could tell you, what was

7    in that room.  But I can't tell you what I had for dinner

8    last week.

9         Q    You would agree, would you not, that situations

10   that happened to you are more significant than things you

11   observed happen to other people?  Would you agree with that?

12                  MS. McCORMICK:  Objection.

13                  THE COURT:  Sustained.

14        A    I don't know what you are talking about.

15        Q    Now, you testified that the whole incident that

16   you observed, the whole event, from the time that you were

17   on the entrance ramp to the time that you lost sight of the

18   pickup truck was in seconds, correct?

19        A    Was in seconds, yes.

20        Q    Can you estimate seven seconds?

21        A    Well, I would say --

22        Q    Six?

23        A    Well I would say, okay.

24        Q    Six seconds, eight seconds?

25        A    You know, I tell you time slowed down so much for

Weber - Cross - LaMagna

1    me.  When you see something like that it lasts forever, all

2    right.  So, so, knowing the distance and knowing how fast I

3    was going -- I'm answering your question.  You are asking me

4    to estimate something that I didn't have a watch on.  I'm

5    using the things around me to best estimate it.

6         Q    Can you just give me a number?  How much was it?

7         A    I'm trying to figure that out, if you let me

8    figure it out.  I'm figuring it out.

9              And so when I was pulling up to, to the entrance

10   ramp, there were a few seconds as the cars were going by.  I

11   caught a glimpse of the truck and then, then the cars went

12   by.  I was looking, so there were a couple of seconds there,

13   and then what happened was the cars went by me and --

14        Q    Mr. Weber, could I ask you something --

15             MS. McCORMICK:  Objection, Judge.

16             MR. LaMAGNA:  Could I --

17             MS. McCORMICK: Judge --

18             THE COURT:  Whoa.  Whoa.  I can't hear you

19   both at the same time.

20             What is the objection?

21             MS. McCORMICK:  My objection is that counsel

22   keeps interrupting the witness.  Could he just be

23   allowed to finish his answer?

24             MR. LaMAGNA:  He was not responsive to the

25   question.  If you could go through these machinations

Weber - Cross - LaMagna

1    about how you arrive at a time, do that without

2    articulating it.

3                THE COURT:  You have seen this witness on the

4    stand for two days.  You know how he is going to answer

5    your questions.  I'm not going to interrupt him.

6        Q    Well, as much as you can can you articulate how

7    many seconds?  I thought, I may be wrong, I thought you said

8    that it --

9        A    There are two separate events.  There are two

10   separate events, okay?  There is riding up the entrance

11   ramp, and there are a couple of seconds there where I saw

12   the vehicle, and in the distance; and then as I was pulling

13   up to the vehicle, as we were merging, there was a couple of

14   seconds there where I saw him.  The time that I was going

15   side-by-side with the vehicle, and I was looking into the

16   vehicle, I estimate that point, where I was looking at the

17   vehicle and looking, around five to seven seconds.  That's

18   my best, best estimation.

19       Q    Okay.  So you have that amount of seconds from

20   the time you got to the entrance ramp to the time that you

21   lose sight of the --

22       A    Yeah.  Yeah.

23       Q    -- of the pickup truck, correct?

24       A    That sounds right, yes.

25       Q    Now, it was nighttime.  It was dark, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1     A     Yes.  It was nighttime and, yeah, it was dark, at

2     least from my perspective where I was seeing.

3     Q     You are merging onto a highway, correct?

4     A     Yes.  Yes, I was.

5     Q     And you pulled onto the ramp?

6     A     Uh huh.

7     Q     To merge, correct?

8     A     Yeah.

9     Q     You look back to see if there were cars coming to

10    safely merge, correct?

11    A     Yes.  But I, before I got to the point where I

12    was looking, before I got to the point where I would begin

13    merging, I had already assessed the situation.  I took an

14    initial glance, because I time my speed because of the way I

15    drive I don't want to come to a full stop on the ramp, I'll

16    slow down my speed or speed it up based upon my judgment of

17    the traffic that is coming.  So, so, yes, sir, I took a look

18    first before I got to the part where I was going to enter

19    onto the highway?

20    Q     You are on the ramp?

21    A     Yes, I'm on the ramp.

22    Q     You are on the ramp approaching the merge?

23    A     That's correct.

24    Q     You look to see if it is safe to hit the merge,

25    correct?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1  A    Yeah, go into the left-hand lane very quickly.

2  Q    I know you want to go to the left lane.

3  A    Yeah.

4  Q    Now did you turn your head to look, or did you

5  use your rear view mirror?

6  A    No, I turned my head.

7  Q    And you said that you noticed two cars coming up

8  from the south, correct?

9  A    Yes.  Yes.  But, yeah, that, that, that is

10  correct.  But I actually noticed the two cars a little

11  further down the ramp because they were closer.

12  Q    You were further down the ramp?

13  A    No.  I'm saying if I'm coming up the ramp, I'm

14  coming up here, there are two cars right here.  I noticed

15  them first.  And I am not --

16  Q    They are on the Meadowbrook Parkway?

17  A    Yeah.  Yeah, they are on the Meadowbrook, but I'm

18  not.  But I haven't gotten to the point where I noticed the

19  pickup truck at this point.

20  Q    I understand.

21  A    These guys, so I saw them, and I eased up, and as

22  they passed I looked for more, and as I was coming down the

23  ramp that's when I saw the pickup truck in the distance.

24  Q    The two cars that you say were coming, going

25  north as you were approaching the ramp, you said that they

Weber - Cross - LaMagna

1      were going slowly?

2              A       Yes, abnormally slow.

3              Q       How fast were they going?

4              A       I would say, like, fifty miles an hour.  Yeah,

5      yeah, they were abnormally slow.  But it was out of the

6      ordinary, but not so out of the ordinary.

7              Q       You estimate them going about fifty?

8              A       Again, it is tough, because I wasn't right next

9      to them.  I was judging them from a different angle.

10             Q       From behind you?

11             A       Well, well, no, no.  I was at a right angle to

12     them, and so I'm judging there things, so at that time it is

13     difficult.  I'm used to judging people when I'm going down

14     the road, there is them next to me, and things like that.  I

15     compare their speed and my awareness of my speed at that

16     point.

17                     At that point I all I could tell you is they were

18     going abnormally slow.  If you ask me about how they were

19     going, I would say about 50 miles per hour.

20             Q       That is your best estimate, a guess, that kind of

21     thing?

22             A       Yes.

23                     MS. McCORMICK:  Objection to "guess."

24                     THE COURT:  Sustained.

25             Q       So when you got to the ramp you wanted them to

GIGI WRIGHT, RPR     (516) 571-2503

Weber - Cross - LaMagna

1    pass you, correct?

2         A    Uh huh.

3         Q    Did you slow down for them to --

4         A    Yeah.  Yeah.  Yeah.

5         Q    -- get through?

6         A    Yeah.  Uh huh.

7         Q    What was the lowest speed you slowed down to at

8    the time that you were at the ramp to allow them to proceed

9    past you?

10        A    It's tough to say, because I would estimate about

11   ten miles an hour.  I didn't -- if I go much slower than

12   that the bike becomes unstable.  The thing weighs about 800

13   pounds.  So I slowed to about ten miles an hour.  I banged

14   it down to first gear, because I knew I was going to have to

15   take off from that position and, so, yes.

16                 THE COURT:  Hold up for a second.

17                 (Whereupon, a discussion was held at the

18        sidebar, off the record.)

19        Q    Okay, so you are around ten miles an hour?

20        A    Yeah.

21        Q    That's when you want to -- withdrawn.

22        A    I'm like slowing down, gauging myself.  I just

23   wanted had them to go past me, and I want to jut out?

24        Q    They do?  They pass you?

25        A    Yeah.

Weber - Cross - LaMagna

1    Q    So you were at about ten miles an hour before you

2    get onto the parkway?

3    A    Uh huh.

4    Q    Correct?

5    A    Yes.

6    Q    And it is in between this time that you say you

7    noticed the headlights of the pickup truck, correct?

8    A    Well, before I actually started to proceed out is

9    when I noticed the headlights.  It is when I was waiting for

10   the cars I was slowing down.  I was waiting for them to

11   pass, and that's when I noticed the headlights in the

12   distance, and they were coming up.

13   Q    And your head was turned watching these two other

14   cars until they finally passed you?

15   A    When you say turned, you know, It was a glance.

16   I try not to stare.  I glance here, glance here, glance

17   here, glance here.  I'm always glancing while looking.  I

18   glanced, absolutely.

19   Q    You glanced to your left?

20   A    Yes, left.

21   Q    And where was the first spot you saw this pickup

22   truck?

23   A    The first time I saw the pickup truck, the very

24   first time, was coming up to the, coming up to the ramp, as

25   I was waiting for the cars to pass and I was looking down

Weber - Cross - LaMagna

```
 1    the road, that's when I first saw it.

 2         Q    Okay.  And you said that the road was eerily

 3    empty, you said?

 4         A    Oh, yeah.  Oh, yeah.

 5         Q    Dead?

 6         A    Except on my side.  Except on my side, those two

 7    cars other.  Then I did not see any other cars until a few,

 8    a little while later.

 9         Q    At that point?

10         A    Yeah.  No, there with a were no cars, zero.

11         Q    Your side or the other side?

12         A    Well, the two cars.

13         Q    Other than the two cars.

14         A    Well, I -- yeah, yeah, in my immediate area, uh

15    huh, yes.

16         Q    I think you said it was eerily empty?

17         A    No.  On the other side, yes, it was eerily empty.

18    There was no one there.

19         Q    Other than the one car that was going the wrong

20    way?

21         A    Yes.  Yeah.

22         Q    Now, this was at the the M8 exit, correct?

23         A    I have no idea.

24         Q    Sunrise Highway?

25         A    Yeah, Sunrise Highway.
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1     Q    And the Sunrise Highway exit is between the

2  Merrick Road Exit and the Babylon Turnpike exit, correct?

3     A    Yes.

4     Q    I know where you were when you saw the car

5  approaching the wrong way.  When you first saw it where was

6  that car?

7              MS. McCORMICK:  Objection to "car," your

8  Honor?

9              THE COURT:  Sustained.

10    Q    The pickup.

11    A    I don't understand your question.

12    Q    When you were approaching the ramp you said you

13  saw from your gaze what appeared to be headlights --

14    A    Yeah.

15    Q    -- coming from --

16    A    Uh huh.

17    Q    You are at the exit ramp going on from Sunrise

18  Highway?

19    A    Uh huh.

20    Q    Where did you first see that car travel from?

21    A    You mean the truck?

22    Q    The truck.  Where was it?

23    A    When I was approaching, I mean, I'll tell you,

24  but I'm not just not sure.  You are confusing me with the

25  way you are presenting it.

Weber - Cross - LaMagna

1    Q    Where was the car?

2    A    I'm trying to answer.  Let me take a breath and

3    I'm going to answer.  So while I was coming up, I was coming

4    out of the entrance ramp, I saw him in the distance.  I

5    waited for the cars to pass, and then I saw the guy coming

6    up, and at this point it was apparent he was on the wrong

7    side.  So as I accelerated I had to hit it pretty hard.  I

8    nailed it.

9    Q    Okay, Mr. Weber, where was the car?  Was it --

10    A    You mean the truck?

11    Q    The truck.  The truck.  Where was the truck from

12    where you were if it was behind you?

13    A    It was behind me.  Yeah, yeah, it was behind me.

14    Q    Was it -- could you see all of the way down to

15    Merrick Road from where you were?

16    A    To Merrick, you know, I could point it out on a

17    picture.  There, there, there is like a dip in the road, and

18    then, and then it is right down there is where I first saw

19    him.  The road comes up, and there is a spot that I miss him

20    and then I pick him up again when he comes over the crest of

21    the hill.  No.  No.  That is not the picture.

22    Q    This picture?

23    A    No.  No.  No.  That is not it.  Let me see.

24    Q    Let me show you People's Exhibit --

25    A    Yeah.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

```
 1     Q     -- 42 in evidence.

 2     A     Yes.  I could see it now.

 3           THE COURT:  What is it that, Mr. LaMagna?

 4           MR. LaMAGNA:  Forty-two in evidence.

 5           THE COURT:  Thank you.

 6     A     Yes.  Yes.

 7     Q     Okay.  That is --

 8     A     This is it.

 9     Q     That's the viewpoint from when you were on the

10  ramp?

11     A     Yeah.

12     Q     Getting on?

13     A     That's correct.  Uh huh.

14     Q     That's when you were like going ten miles an

15  hour, correct?  You were waiting just to go on?

16     A     Yeah.  Yeah.

17     Q     Or is it before?

18     A     Yeah.  Give or take, yeah, sure.

19     Q     Now, you are waiting for the two cars on your

20  side, the slow cars, to pass you so you could have a free

21  entrance on to the parkway to get over to the left-hand

22  side?

23     A     Exactly.

24     Q     Correct?

25     A     Yes.
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    Q     That took a few seconds for those cars to come

2  and pass you, so you could have --

3    A     Yeah.

4    Q     -- egress on to the parkway, correct?

5    A     Yes.

6    Q     At the time that you get to the parkway, would

7  you say the truck was even with you now or ahead of you now,

8  because you said you had to gun it --

9    A     Yeah.  Yeah.

10   Q     -- to catch up to it?

11   A     As we -- we merged together.  I was gauging my

12  speed.  I wanted to take a closer look at the truck to see

13  what was going on.  I purposely gauged my speed so we would

14  meet at the same time.  I didn't want to be in front of him.

15  I gauged it so I was just a tail behind him, so that's the

16  way I did it.

17   Q     Now, the truck is driving, you said, straight;

18  looked like some guy driving?

19   A     Yeah.  Straight.

20   Q     And you started out at ten miles an hour and you

21  gunned it?

22   A     Uh huh.

23   Q     To get up to speed, correct?

24   A     Yeah.

25   Q     And, again, this whole encounter lasted seconds,

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

```
 1    correct?

 2         A      Yeah, around.

 3                THE COURT:  Mr. LaMagna, before you ask your

 4    next question we have been at this about an hour.  I'm

 5    going to give the jury a ten-minute break.  Don't talk

 6    about the case.

 7                (Whereupon, the jury exited the courtroom and

 8    a brief recess held.)

 9                THE CLERK:  Mr. Weber, you are still under

10    oath, okay?

11                COURT OFFICER:  Jury entering.

12                (Whereupon, the jury entered the courtroom,

13    and upon taking their respective seats, the following

14    occurred:)

15                THE CLERK:  Case on trial, Indictment 1910N

16    of 2005, People versus Martin Heidgen.

17                People ready?

18                MR. HAYDEN:  Ready, your Honor.

19                THE CLERK:  Defendant ready?

20                MR. LaMAGNA:  Defendant is ready, your Honor.

21                THE CLERK:  Defendant is present and the

22    jurors are seated, your Honor.

23                THE COURT:  Thank you.  Mr. LaMagna.

24    BY MR. LaMAGNA:

25         Q      Mr. Weber, where we just broke we were just
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1   talking about when you had gunned your motorcycle to catch

2   up to the truck.

3        A     Well, well, to time it so we were together at the

4   same time, yeah.

5        Q     You would agree that if a vehicle is traveling,

6   as the truck was, at highway speed, and you are at ten miles

7   an hour, in order for you to maintain or to catch or to

8   reach the same speed as that car you would have to go at

9   least, initially, faster to catch up to the momentum that

10  that car has already, correct?

11       A     I mean, if you say so. All I'm -- well, I was in

12  front of him, he was behind me, and I was coming there and

13  so, and so, I gunned it. I gave the bike all it has. You

14  have to do the analysis, I don't know. I gave the bike all

15  it had.

16       Q     You gunned it for a reason; you needed to --

17       A     Catch.

18       Q     -- get speed?

19       A     Yes.

20       Q     And you said for about a second or two, or a few

21  seconds, when you got even, you both were driving in the

22  same direction, correct?

23       A     Yes, that's correct.

24       Q     Separated by about ten feet, correct?

25       A     Yeah.

Weber - Cross - LaMagna

1    Q    Which was the guardrail.  Nighttime, no other

2    cars on the road, correct?

3    A    Yes.

4    Q    It would appear that both of you, well --

5    withdrawn.

6         So you are both driving in the same direction

7    going north, correct?

8    A    Yeah.

9    Q    And then you said you downshifted?

10   A    No, I didn't downshift.

11   Q    What did you do?

12   A    Well, at what point?  At no time during this

13   whole encounter did I downshift.

14   Q    At some point you did something and slowed down

15   where you actually jerked.

16   A    What happened was I was in third gear, going 70

17   miles per hour, and that is, although not the end of the

18   power bend, but the revs are very high.  If you let off the

19   gas, the bike, the engine gearing rapidly decelerates the

20   motorcycle.

21   Q    So you slowed down?

22   A    Yeah.  But, but again, it was by, I guess I have

23   to say, you asked me a question, I have to answer it, again

24   I didn't apply the brakes.  I let go of the gas and the bike

25   rapidly decelerated.

GIGI WRIGHT, RPR   (516) 571-2503

Weber - Cross - LaMagna

1    Q    So you decelerated.  You testified on direct

2    examination that you never looked at your speedometer.

3    A    Yeah, that's true.  Yeah.

4    Q    So this is just an estimate that you are making

5    today from fourteen months ago, correct?  Yes or no?

6    A    Well, I have to think about it.  You have to give

7    me a second.  You are asking me am I estimating that I was

8    going 70 miles per hour, yes, I was estimating.  I'm going

9    70 miles per hour.

10    Q    At this particular time, you would agree, would

11    you not, that your attention was divided between certain

12    tasks that you were doing during those seconds correct?

13    A    Was I divided, yeah, sure, uh huh.

14    Q    You are driving a motorcycle, correct?

15    A    Yes.

16    Q    You are driving a motorcycle on a highway,

17    correct?  You are looking where you're going, correct?

18    A    Things I do every day, yes.  The only difference

19    is that I have this guy driving next to me.

20    Q    What I'm saying to you is your attention is

21    divided doing various tasks during those seconds?

22    A    Yes, in the way it is divided every day.  That is

23    the nature of driving a motorcycle.

24    Q    I understand that.

25    A    I'm just answering your question.

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Cross - LaMagna

1    Q    At this particular time that's what we are

2  talking about?

3    A    Yes.

4    Q    You are driving your motorcycle, correct?

5    A    Uh huh.

6    Q    Driving it on a parkway, correct?

7    A    Uh huh.

8    Q    You were riding, you were looking, excuse me, you

9  were looking ahead to where you were driving, correct?

10    A    Uh huh.

11    Q    You were also looking to your left, correct?

12    A    Yeah.

13    Q    All of these things were happening at the same

14  time, correct?

15    A    That's correct.

16    Q    So your attention had to be, you would agree,

17  somewhat divided between all of these tasks?

18    A    I was definitely multi-tasking in the way I do

19  all the time, yes.

20    Q    And this all happened within a matter of seconds?

21    A    Seconds, yeah.

22    Q    Therefore, when you estimate a speed, your speed,

23  without obviously using the speedometer, it is an estimate.

24  This is an estimate based upon your driving next to this

25  truck for those few seconds; is that correct?

Weber - Cross - LaMagna

1    A    It was an estimate based upon my awareness of my

2  speed, that I have been driving a motorcycle for 34 years,

3  and, yeah, yeah, it was an informed estimate.

4    Q    This is an estimate that you are articulating

5  today that happened fourteen months ago, correct?

6    A    Sure.  Yes.  That's correct.  Yes.  Yes.  The guy

7  was going 70 miles per hour.

8    Q    And that's an estimate based upon your attention

9  divided between the tasks that you just articulated,

10  correct?

11        MS. McCORMICK:  Objection.

12    A    I'm not sure I would agree with you.  I'm certain

13  the guy was going 70 miles per hour.  If you were saying I

14  was doing other things at the same time, yeah, things I do

15  every day when I go out on the road, with the exception of

16  this guy being next to me.

17    Q    I understand.

18        Now, after you passed Babylon Turnpike --

19    A    I don't think -- okay, yeah, go ahead.

20    Q    Do you recall passing Babylon Turnpike?

21    A    Yes, uh huh.  I thought you were going to ask me

22  something else before that point.

23    Q    Let me finish asking the question before you

24  answer.

25    A    Excuse me, I don't do this every day.  I'm a

GIGI WRIGHT, RPR   (516) 571-2503

Weber - Cross - LaMagna

1    little nervous.

2         Q     Now, you said that when you passed Babylon

3    Turnpike you looked back and you saw, after hearing a boom,

4    you saw a scene similar to what is depicted in Exhibit 65,

5    correct?

6         A     Yes.  I have to tell you when I heard the boom,

7    it was slightly before the bridge.

8         Q     But passing it, when you were able to look,

9    that's what you saw?

10        A     That's correct.  A scene similar to that.  That

11   was taken some time after.  There is some fire trucks and

12   other things there, but those were the vehicles I saw.

13        Q     I know that that wasn't there.

14        A     You asked me and I told you.

15        Q     Now, once you passed it you stated you never

16   stopped?

17        A     No.

18        Q     Correct?

19        A     That's correct.

20        Q     You never called 911, correct?

21        A     That's correct.

22        Q     You never got off the next exit to seek help,

23   correct?

24        A     No.  I went straight home.

25        Q     And you never reported this incident, correct?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Redirect - McCormick

```
 1        A     Until Labor Day, that's correct.

 2        Q     And you told us, until this past Labor Day, when

 3    you saw an article in the paper, correct?

 4        A     That's correct.

 5        Q     Do you normally read -- this was "Newsday," I

 6    think you said.  Do you normally read "Newsday"?

 7        A     Never.

 8        Q     Never read "Newsday"?

 9        A     Never.

10        Q     Did you read it today?

11        A     No, I did not.

12        Q     Did --

13        A     I read it yesterday.

14        Q     Did you receive any phone calls from people at

15    "Newsday" today?

16        A     Are you asking me today did I receive phone calls

17    from people who -- I'm not sure I understand your question.

18        Q     Did you receive any phone calls today from

19    anybody from "Newsday"?

20        A     I didn't receive any phone calls today, so that's

21    that.

22                  MR. LaMAGNA:  I have nothing further, Judge.

23    REDIRECT EXAMINATION

24    BY MS. McCORMICK:

25        Q     Good morning Mr. Weber.
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Redirect - McCormick

1          Mr. Weber, counsel was asking you a lot about how

2   much you had to drink --

3       A     Uh huh.

4       Q     -- at the bar that night at Jugs and Strokers?

5       A     Yep.

6       Q     Sir, when you are riding your motorcycle how much

7   would you be drinking on --

8       A     Usually zero.  You know, I approach it the way

9   you approach a sport, you know.

10          MR. LaMAGNA:  Objection.

11          THE COURT:  Overruled.

12      A     Because where --

13      Q     How many?

14      A     I approach it the way you approach a sport.  You

15  are riding, you are zipping with other people, it is more

16  than if you are walking a solid line.  Would you drink a

17  beer before playing baseball?  Would you drink a beer before

18  a basketball game?  You would be terrible.  It is not

19  something you do.  It is like a sport.

20      Q     What does it mean to have a free pass for the

21  night?

22      A     That means I got permission to go out by my wife.

23      Q     Sir, when you said that it sounded right, that

24  the conversation with the guard was July Fourth weekend, the

25  guard at the beach?

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Redirect - McCormick

```
 1        A     Yes.

 2        Q     Do you have any doubt in your mind that the crash

 3   you observed, that the crash you observed was July Fourth

 4   weekend?

 5        A     No way.

 6        Q     Was your only sounding right something having to

 7   do with the conversation with the guard?

 8        A     Yeah, exactly.

 9        Q     You think it was that?

10        A     I'm pretty sure.

11        Q     How come if you never read "Newsday" you called

12   "Newsday" when you saw this?

13        A     Because it was Labor Day.  I needed another hard

14   drive for my computer, and I was looking for a sale.  I was

15   checking out Best Buy to see what they had.

16        Q     Why did you call them once you saw it in the

17   paper?

18        A     I didn't want to talk to the police.  I wanted to

19   see ahead of time if they were looking for people to

20   testify, to see if it was something active.  I was scared.

21   It was the article I saw.  The last thing I wanted to do was

22   talk to the police.

23        Q     Did you reach somebody at "Newsday"?

24        A     Yeah.

25        Q     You are on a pay phone?
```

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Redirect - McCormick

```
1        A    Yes.

2        Q    Why a pay phone?

3        A    I didn't want them to know who is calling.   I

4   wanted to still, I wanted, I didn't want to come forward.   I

5   didn't want to come forward.

6        Q    You said you had a couple of meetings with the

7   State Police, with me; is that right?

8        A    Yeah.  Yeah.  Yeah.  Two meetings, yeah.

9        Q    Did you ever go back out to the roadway,

10  Mr. Weber?

11       A    Yes, I did.

12       Q    Is that separate from those meetings?

13       A    Separate, yes.  Yes.  Yes.  Yes.  Yes.

14       Q    I'm sorry?

15       A    I'm sorry.  Yes.  Yes.

16       Q    No, that's okay.  Mr. Weber, do you remember when

17  it is that you went back out to the roadway?

18       A    Oh, I went -- okay, this -- Sunday, yeah.  Yeah.

19  Saturday.  Saturday.  This past Saturday, yeah.

20       Q    Okay.  Who did you meet out at that roadway?

21       A    I met you.

22       Q    Okay.  Now the conversation that you had with

23  Investigator Harris; you said that first you called the

24  trooper, somebody gave you a hard time about not calling for

25  fourteen months; you spoke to Harris; and you had some other
```

Weber - Redirect - McCormick

1    conversation with Harris; is that right?

2         A    Yes.  I called him back the following day after

3    -- no, two days later, after the interview.

4         Q    And you were trying to say what that was about.

5    Could you tell the jury what that was about?

6         A    Yeah.  Yeah.  At the interview, the district

7    attorney had asked me if I could remember did I mention any

8    events of the accident to anybody prior to this date, and I

9    told her I just didn't recall.  But then I talked to a few

10   of my friends, and I told them what was going on, and they

11   said, no, we went to a party that weekend and you were there

12   and, you know, it was an engagement party and you told us

13   all about it.

14              MR. LaMAGNA:  Objection.

15        A    And I told him and called him and let him know

16   about that.

17             MR. LaMAGNA:  Objection.

18        Q    You told Investigator Harris that they had

19   reminded you?

20        A    Yeah, and after they told me I remember.

21        Q    Now, the night of this crash, the night that you

22   came together with the pickup truck, you said it was dark on

23   the road; is that right?

24        A    Yes.

25        Q    Any problems seeing anybody's headlights?

Weber - Redirect - McCormick

1    A    No.  No.  No.

2    Q    I'm going to look at, once again, this People's

3    Exhibit 42 in evidence.  You have a dot on there, right,

4    Mr. Weber?

5    A    Yes.

6    Q    And the dot is an indication when you were

7    looking southbound from your vantage point trying to enter

8    the Meadowbrook Parkway.  That dot says that's where the

9    pickup truck is; is that right?

10   A    Yes.

11   Q    You described a little gully in the road?

12   A    Yeah.

13   Q    Is that gully reflected in the photograph?

14   A    Yes, it is.  It's right pretty much where my dot

15   is.

16   Q    Is the gully right underneath your dot?

17   A    Yeah.

18   Q    May I have that back.  I'm going to ask you --

19   you don't have to get down -- take a look at that projector,

20   Mr. Weber.  Is that your dot on that photograph?

21   A    Yeah.

22   Q    I am putting my pen there.  Is that the gully in

23   the road you are referring to?

24   A    Yes.

25   Q    You talked about that the road was empty that

Weber - Redirect - McCormick

1    night.

2         A    Yes.

3         Q    Are you talking about the northbound side or

4    southbound side?

5         A    It was the southbound side.

6         Q    So the side where the pickup truck was driving

7    the wrong way was pretty empty?

8         A    It was empty, yeah.

9         Q    At some point you did see another vehicle?

10        A    Yes, I did.

11        Q    Once again, can you describe for the jury -- and

12   it is not a pickup truck?

13        A    No.  No.  No.

14        Q    That one you had no problem seeing.  Where was

15   the other vehicle, and was it on the southbound side?

16        A    It was on the southbound side, but it was going

17   the right way, and it was all the way, it looked like it was

18   going, it was in the furthest lane.  It might have even been

19   on an exit lane.  It was something I saw in the background

20   quickly.  And, yeah, yeah, something I saw in the background

21   quickly.  Yeah, they weren't like flashing their lights or

22   sitting or anything, nothing like that.  It looked like they

23   slowed down a lot.

24        Q    As you are looking at the pickup truck driver,

25   looking back, looking forward, are you looking or are you

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Redirect - McCormick

1    glancing?

2         A    I'm glancing.   I'm glancing.

3         Q    Now, on cross-examination counsel asked you about

4    a second or two, that you were traveling next to the

5    motorcycle.

6         A    A --

7         Q    Let me just break it down.

8              You had indicated in some detail that you think

9    it was a second or two that you looked down the roadway.

10        A    Uh huh.

11        Q    A second or two for you to get to the railing?

12        A    Yeah.

13        Q    Is that right?

14        A    Yeah.

15        Q    And then how long were you actually traveling, to

16   the best of your estimation, parallel, right next to the

17   pickup truck before you guys parted?

18        A    I would say about five seconds.

19        Q    So it wasn't just a second or two?

20        A    No.   No.   No.   It was broken down into like three

21   separate times.

22        Q    You have a couple of seconds that you see him

23   gown in the gully in that photograph?

24        A    Yes.

25        Q    A couple of seconds coming onto the roadway, and

Weber - Redirect - McCormick

1    coming up next to him?

2        A      Yes.

3        Q      And an additional five or so seconds after that

4    that you are traveling parallel to him?

5        A      That's correct.

6        Q      You still see him for a little bit before you

7    lose sight of him at the shrubbery there?

8        A      Yeah.  But at that point a car had beeped and I

9    turned around and, you know, I lost, I didn't observe myself

10   losing sight of him.  All of a sudden he was gone.

11       Q      Sir, did you estimate the speed of that pickup

12   truck for the first time here in court, or in any of these

13   recent meetings, or did you estimate this speed on the night

14   you were traveling next to him?

15       A      Definitely that night.  I'm certain of that.

16               MR. LaMAGNA:  Objection.

17               THE COURT:  Overruled.  I will allow the

18       question.

19       Q      I'm sorry?

20       A      Yeah, it was that, it was that night.  Yeah.

21   Yeah.  Absolutely.

22       Q      Do you have any doubt about your speed, that you

23   were traveling on that night as the pickup truck was

24   parallel next to you?

25       A      You know, maybe five miles an hour either way.

Weber - Recross - LaMagna

1    But, you know, no.  I mean, sure as I can be, it was 70

2    miles an hour.  I mean, could it have been 65; could it have

3    been 75, maybe.  But I am, you know, that's based upon my

4    years of experience of driving and driving a motorcycle and

5    not using a speedometer because of the nature.  And my best

6    estimate, that I feel comfortable with, is that it is 70

7    miles an hour.

8         Q    Do you have any doubt about your estimate of the

9    pickup truck's speed?

10        A    No.  No.  No.  No.

11             MS. McCORMICK:  Nothing further.

12   RECROSS-EXAMINATION

13   BY MR. LaMAGNA:

14        Q    You just testified that you recall a car getting

15   onto an exit on the southbound side.  Is that correct?

16        A    You know, it was in the distance and I, it looked

17   to me, yeah, it looked like it was getting off an exit.

18   Yes.  Yeah.  Yes.

19        Q    You remember that today from fourteen months ago?

20        A    Yes, I do.

21        Q    The investigator didn't tell you there was

22   another car?  Did you see it?

23        A    No.

24        Q    Nothing like that?

25        A    No.  In fact, when I originally mentioned it to

Weber - Recross - LaMagna

1      the investigator he smiled and nodded like, oh, okay, you

2      know, like that was something.

3          Q      That's how it happened?

4          A      That that was something important.

5          Q      You don't have any particular training or special

6      education in the determination of speeds of vehicles, do

7      you?

8          A      Well, the fact that I'm alive today and I haven't

9      gotten into a motorcycle accident is pretty good.

10         Q      Do you have any specific training?

11         A      You mean did I go to school for it, no.

12         Q      So when you estimate that's your estimation

13     correct?  It could be wrong, right?

14         A      It could be wrong?

15                MS. McCORMICK:  Objection.

16                THE COURT:  Sustained.

17         Q      Yeah, you could be wrong?

18                MS. McCORMICK:  Objection.

19                THE COURT:  Sustained.

20                MR. LaMAGNA:  Nothing further.

21                MS. McCORMICK: Nothing further, Judge.

22                THE COURT:  Thank you.

23                (Whereupon, the witness exits the courtroom.)

24                THE COURT:  At this time, ladies and

25     gentlemen, an issue has come up that requires my

GIGI WRIGHT, RPR    (516) 571-2503

Weber - Recross - LaMagna

1    attention with the lawyers to resolve, but it does not

2    require us to delay you.

3            I'm going to give you a head start on the

4    weekend now.  We will meet you back here at 9:30,

5    Monday morning.

6            MS. McCORMICK:  Your Honor, excuse me.  May

7    we approach briefly?

8            THE COURT:  Yes.

9            (Whereupon, a discussion was held at the

10   sidebar, off the record.)

11           THE COURT:  We have a short witness.  He is a

12   student at Villanova and he is here today.  I'm not

13   going to give you such a head start on the weekend.  It

14   is not going to be long.

15           Mr. Hayden.

16           MR. HAYDEN:  Matthew Sussingham.

17           COURT OFFICER:  Step up.   Remain standing,

18   raise your right hand and face the clerk.

19           M A T T H E W    S U S S I N G H A M,

20           a witness called on behalf of the People,

21           having been first duly sworn by the Clerk of

22           the Court, was examined and testified as

23           follows:

24           THE CLERK:  You can put your hand down.

25           State your name, spelling your last name for

GIGI WRIGHT, RPR    (516) 571-2503

Sussingham - Direct - Hayden

```
 1          the record.
 2                      THE WITNESS:  Matt Sussingham,
 3          S-U-S-S-I-N-G-H-A-M.
 4                      THE CLERK:  Thank you.  Please take a seat.
 5     DIRECT EXAMINATION
 6     BY MR. HAYDEN:
 7          Q      Good morning, Mr. Sussingham.
 8                 How old are you?
 9          A      Twenty.
10          Q      Are you a student?
11          A      Yes, I am.  At Villanova.
12          Q      What year?
13          A      I'm a junior.
14          Q      What are you studying?
15          A      Economics.
16          Q      Are you a licensed driver?
17          A      I am.
18          Q      Where were you licensed to drive?
19          A      New York State.
20          Q      How long have you been licensed to drive?
21          A      Three years.
22          Q      Are you familiar with the Meadowbrook Parkway?
23          A      Yes.
24          Q      How often had you driven on the Meadowbrook
25     Parkway before July of 2005?
```

Sussingham - Direct - Hayden

1    A    Pretty much every day since I got my license.

2    Q    I'm directing your attention to around 2 o'clock

3  on the early morning of Saturday, July 2nd of 2005.

4        Were you driving a motor vehicle then?

5    A    Yes.

6    Q    Describe the vehicle you were driving.

7    A    A '96 Mercury Sable station wagon.

8    Q    What road were you driving then?

9    A    Meadowbrook Parkway.

10    Q    What direction?

11    A    I was going south.

12    Q    What lane?

13    A    I was in the right lane.

14    Q    Were you driving past the exit ramp for westbound

15  Sunrise Highway then?

16    A    Yes.

17    Q    Were you approaching the exit ramp for eastbound

18  Sunrise Highway?

19    A    Yes.

20    Q    Were you alone then?

21    A    Yes, I was.

22    Q    Where were you coming from at around 2 o'clock

23  that Saturday morning?

24    A    I was coming from my friend's house in

25  Farmingdale.

Sussingham - Direct - Hayden

1    Q    What had you been doing that night?

2    A    I went to the Met game, and then I went to her

3    house, and then I was going home.

4    Q    Had you had anything to drink that night?

5    A    I had two beers at the Met game.

6    Q    Where were you going at around 2 o'clock that

7    Saturday morning?

8    A    I was going home.

9    Q    Where do you live?

10   A    In Merrick, just off of the Meadowbrook.

11   Q    Were you going to get off the Meadowbrook along

12   the exit ramp for eastbound Sunrise Highway?

13   A    Yes.

14   Q    Did you notice a motor vehicle as you were

15   driving past the exit ramp for westbound Sunrise Highway?

16   A    I did.

17   Q    Where was the vehicle when you first noticed it?

18   A    It was in the center lane, and it was coming over

19   the hill crest over Sunrise Highway.

20   Q    What lane was the vehicle in as you saw it coming

21   northbound over the crest over Sunrise Highway?

22   A    It was in the middle lane.

23   Q    Was the oncoming vehicle moving at highway speed?

24   A    Yes.

25   Q    Describe the vehicle's location as you first

Sussingham - Direct - Hayden

1    noticed it moving northbound along the southbound center

2    lane?

3        A    Its location?  What do you mean?

4        Q    It was right over the crest of that overpass?

5        A    Yes.  It was just coming straight.  It was going

6    over the Sunrise Highway bridge, and it came over, and I saw

7    it about fifteen yards ahead of me, thirty yards ahead of

8    me.

9        Q    You saw it coming up over the rise?

10       A    Yes.

11       Q    How far was the vehicle from you when you first

12   noticed it?

13       A    Fifteen to 30 yards, somewhere in between there.

14       Q    What did you do after noticing the vehicle coming

15   northbound along the southbound center lane?

16       A    I really didn't know what was going on at first,

17   and then I screamed, "What the fuck is going on," and it

18   passed me.

19       Q    Could you tell what type of vehicle it was as it

20   passed you?

21       A    Only when it approached my car, not until it was

22   right next to me I realized it was a pickup truck.

23       Q    What color?

24       A    Gray, dark gray.

25       Q    Did you see the driver as the pickup truck passed

Sussingham - Direct - Hayden

1    you moving northbound along the southbound center lane?

2        A    No, I didn't see the driver.

3        Q    Could you still see the pickup truck after it

4    passed you moving northbound along the southbound center

5    lane?

6        A    I didn't hear the question.  Repeat the question.

7    Can you repeat the question?

8        Q    Sure.  Could you still see the pickup truck after

9    it passed you moving northbound along the southbound center

10    lane?

11       A    Yeah.  I watched it in my rear view mirror for

12    about three or four seconds, because I got off the exit.

13       Q    You were observing it then through your rear view

14    mirror?

15       A    Yes.

16       Q    Did you ever see the pickup truck leave the

17    center lane as it was approaching northbound along the

18    southbound center lane?

19       A    No, I didn't see that.

20       Q    Did you ever see the pickup truck leave the

21    center lane after it passed you?

22       A    No.

23       Q    Did you ever see the pickup truck weaving in the

24    center lane as it was approaching northbound along the

25    southbound center lane?

GIGI WRIGHT, RPR    (516) 571-2503

Sussingham - Direct - Hayden

1    A    No, it remained in the lane for the most part.

2    Q    Did you ever see the pickup truck weaving in the

3    center lane after it passed you?

4    A    No.

5    Q    Did you ever see the tires of the pickup truck

6    touch the lane markings of the center lane as it was

7    approaching northbound along the southbound center lane?

8    A    No.

9    Q    Did you ever see the tires of the pickup truck

10   touch the lane markings of the center lane after it passed

11   you?

12   A    No.

13   Q    Did you ever see the pickup truck slow down as it

14   was approaching northbound along the southbound center lane?

15   A    No, it kept a pretty constant speed.

16   Q    Did you ever see the pickup truck slow down after

17   it passed you?

18   A    No.

19   Q    Did the pickup truck stay within the markings of

20   the center lane the entire time you were watching it?

21   A    Yes.

22   Q    Did you ever see any change in the operation of

23   the pickup truck while you were watching it?

24   A    No.

25   Q    Did you ever notice any change in the speed of

Sussingham - Direct - Hayden

1        the pickup truck while you were watching it?

2              A      No.

3              Q      Were your headlights on the entire time the

4        pickup truck was approaching you?

5              A      Yeah.

6              Q      Did you eventually sign a written statement

7        describing your observation of the pickup truck?

8              A      I did.

9              Q      When did you sign the statement?

10             A      July 6th, I think was the date, 2005.

11             Q      Have you reviewed your statement before

12       testifying today?

13             A      Yes.

14             Q      Have we discussed your observations before you

15       testified today?

16             A      Yeah.

17                    MR. HAYDEN:   With the Court's permission,

18             your Honor, may 32A A in evidence be shown to the

19             witness, please?

20                    THE COURT:   Sure.

21             Q      Do you recognize that photograph?

22             A      Yes, I do.

23             Q      Is that a fair and accurate representation of the

24       vicinity where you were observing the pickup truck moving

25       northbound along the southbound center lane?

Sussingham - Direct - Hayden

1    A    Yes, it is.

2                MR. HAYDEN:  With the Court's permission,

3    your Honor, may the witness be permitted to use these

4    yellow markers to place the approximate location of the

5    pickup truck when Mr. Sussingham first noticed it, and

6    Mr. Sussingham's location when he first noticed the

7    pickup truck?

8                THE COURT:  Yes.

9                (Witness complies.)

10                MR. HAYDEN: Your Honor, with the Court's

11    permission may Mr. Sussingham please step down before

12    the jury and indicate to them his position when he

13    first noticed the pickup truck and the pickup up

14    truck's position when Mr. Sussingham first noticed it?

15                THE COURT:  Yes.

16    A    I saw him when I was here at this exit ramp, and

17    he was over here.  And then we passed each over just around

18    this area.  And I was in the right lane, and then I was

19    going toward this exit lane, right here.  And as he was

20    passing me I was just about to go in the right, and that's

21    where, and he was in this vicinity, right here.

22                (Witness indicating.)

23    Q    Mr. Sussingham, did you proceed along this exit

24    lane here?

25    A    Yes.  I came off the exit lane and I proceeded to

1    go east on Sunrise Highway.

2         Q    Please retake the witness stand.

3              MR. HAYDEN:  Nothing further, your Honor.

4    Thank you.

5              THE COURT:  Mr. LaMagna.

6    CROSS-EXAMINATION

7    BY MR. LaMAGNA:

8         Q    How are you today?

9         A    I'm good.  How are you?

10        Q    I'm going to ask you a couple of questions, I'm

11   Mr. Heidgen's attorney, just concerning the events of that

12   night, if that is okay.

13        A    That's no problem.

14        Q    It was dark out at that time of night, correct?

15        A    It was nighttime.

16        Q    And no traffic, correct?

17        A    There wasn't -- I didn't really see any.

18        Q    Only other car that you saw was his car coming at

19   at you, correct?

20        A    Yes.  Him and I, yeah.

21        Q    Other than, obviously, going the wrong way as you

22   have said on direct examination, the car was driving in the

23   center lane, correct?

24        A    Yes, that's right.

25        Q    It didn't deviate to the right or to the left?

Sussingham - Cross - LaMagna

1    A    No.

2    Q    Didn't turn into your lane, correct?

3    A    No, it didn't.

4    Q    Didn't head toward your car, correct?

5    A    No, it stayed in the middle lane.

6    Q    Stayed in the middle lane, correct?

7    A    Yes.

8    Q    You were actually coming off the parkway going

9    onto, heading toward the ramp to get off the parkway,

10   correct?

11   A    I was on my way, but I was still in the right

12   lane.

13   Q    The right lane comes into a ramp, correct?

14   A    Well, there is an exit lane to the right of the

15   right lane afterwards.

16   Q    It is four lanes at that point?

17   A    It was three lanes and then becomes four lanes.

18   Q    It then becomes four lanes and you take that

19   fourth lane to the ramp to get off?

20   A    It was just where it was becoming four lanes and

21   I was about to get off of the parkway.

22   Q    That's when you passed?

23   A    Yes.

24   Q    Now, this thing happened very quickly, correct?

25   A    Yes.

Sussingham - Cross - LaMagna

1    Q    Seconds?

2    A    Maybe ten seconds, total.

3    Q    Total.  You didn't certainly expect to see this,

4  correct?

5    A    Absolutely not.

6    Q    Now, when you of came off of the exit ramp

7  actually -- withdrawn.

8         When you have went onto the exit ramp the car had

9  already passed you?

10   A    Yes.

11   Q    It was around that same time?

12   A    Wait, what?  What do you mean?  I was --

13   Q    Were you turning on?

14   A    No, I was --

15   Q    -- on to that fourth lane?

16   A    I was still in the right lane.  I hadn't gone

17  into the exit lane yet when he passed me.

18   Q    Then you went into the exit lane?

19   A    Yes.

20   Q    Onto the ramp and off?

21   A    Yes.

22   Q    You didn't stop, correct?

23   A    Right.

24   Q    The time that you came around the car was already

25  gone, correct?

Sussingham - Cross - LaMagna

1    A    That's right.  I only saw him for like three

2    seconds in my rear view.

3    Q    When you first saw the car there is a crest

4    coming over Sunrise Highway?

5    A    That's right.

6    Q    So, the crest goes high and then down?

7    A    Yes.

8    Q    So when you are heading south, looking down the

9    southbound lanes, you see this crest, correct?

10   A    Yes.

11   Q    So you don't have a direct view straight down

12   because of the crest, correct?

13   A    That's right.

14   Q    So at some point you see the car coming over the

15   crest and then you were able to see it, correct?

16   A    Yes, once he started coming over the top I saw

17   him.

18   Q    That's when you were able to see him, correct?

19   A    Yes, that's correct.

20   Q    Had there been no crest you would have been able

21   to see straight ahead, correct?

22   A    No, sir.  Like --

23   Q    That crest is at Sunrise Highway; is that

24   correct?

25   A    That's right.

Sussingham - Cross - LaMagna

1    Q      Now, it was your testimony that there was no

2    change in any direction with respect to the manner in which

3    the car was driving; is that correct?

4    A      He seemed to stay in the middle lane the whole

5    time.

6    Q      The whole time you saw him?

7    A      Yes.

8    Q      And your whole encounter lasted tops, what did

9    you say?

10   A      Ten seconds.

11   Q      Ten seconds.

12          MR. LaMAGNA:  I have nothing further.

13          MR. HAYDEN:  No, your Honor.

14          THE COURT:  Thank you, sir.

15          (Whereupon, the witness exits the courtroom.)

16          THE COURT:  All right, ladies and gentlemen,

17   between now and Monday morning, as you know, you must

18   not discuss this case amongst yourselves or with anyone

19   else until the entire case has been completed and you

20   are given the charge on the law which applies to the

21   counts of the indictment which will be given to you for

22   your consideration.  You must keep an open mind until

23   all of the evidence is presented and you are charged as

24   to the law.

25          You must not read or listen to any accounts

Sussingham - Cross - LaMagna

1       or discussions of the case in the event it is reported

2       by newspapers or other media.

3               You must not visit or view the premises or

4       place where the events or offenses charged were

5       allegedly committed, or any other premises or place

6       involved in the case.

7               You are not to permit any party to discuss

8       the case with you or attempt to influence you.  You

9       must promptly report to the Court any incident within

10      your knowledge involving an attempt by any person to

11      improperly influence you or any member of the jury.

12              Prior to discharge you may not accept any

13      payment or gratuity in consideration for supplying any

14      information concerning this trial.

15              I also advise you if at any time any of the

16      participants in this trial should meet you in the

17      hallways or outside of the building, we may not speak

18      to you or even acknowledge you to avoid any appearance

19      of impropriety.

20              Have a nice weekend.  See you at 9:30 Monday

21      morning.

22              (Whereupon, the jury exited the courtroom.)

23              MR. LaMAGNA:  Judge, are we planning on

24      starting right now --

25              THE COURT:  Yes.

GIGI WRIGHT, RPR   (516) 571-2503

Sussingham - Cross - LaMagna

1          MR. LaMAGNA:  -- with the witness.

2          Judge, I would ask for five minutes.

3          THE COURT:  You got it.

4          (Whereupon, a brief recess held.)

5          (In open court.  Defendant present; jury not

6     present.)

7          THE CLERK:  Case on trial, Indictment 1910N

8     of 2005, People versus Martin Heidgen.

9          People ready?

10          MR. HAYDEN: Ready, your Honor.

11          THE CLERK:  Defendant ready?

12          MR. LaMAGNA:  Defense ready.

13          THE CLERK:  Defendant is present, your Honor.

14          THE COURT:  All right.  Is there a witness to

15     be called at this time for an oral affidavit under

16     oath?

17          MS. McCORMICK:  Yes, your Honor.  I would

18     note for the record, first, that I have provided to

19     counsel copies of the six affidavits that have been

20     submitted earlier this morning to the Court.

21          Those affidavits are from Joseph Krietz,

22     Sergeant of Internal Affairs Unit, employed by the

23     Nassau County Sheriff's Department; Tammy Mickoliger,

24     Investigator New York State Police, she is the person

25     who actually took the swabs; Eric Baez, Investigator

GIGI WRIGHT, RPR    (516) 571-2503

Buffolino

1       State Police; Michael Hellers, Investigator State

2       Police; Michael, it says, M.L. Debor, Investigator in

3       the Nassau County District Attorney's Office; and

4       William Walsh, Investigator Nassau County District

5       Attorney's Office.  These persons were present when

6       Tammy Mickoliger actually took the sample or observed

7       the sample being taken.  There are six separate

8       affidavits.

9             In addition, Pat Buffolino from the M.E.'s

10      Forensic Genetics lab is present to give oral

11      affidavits to the Court.

12            Mr. Buffolino.

13            COURT OFFICER:  Step up.  Remain standing,

14      raise your right hand and face the clerk.

15            P A S Q U A L E   B U F F O L I N O,

16            a witness called on behalf of the People,

17            having been first duly sworn by the Clerk of

18            the Court, was examined and testified as

19            follows:

20            THE CLERK:  You can put your hand down.

21            State your name, spelling your last name

22      witness for the record.

23            THE WITNESS:  Dr. Pasquale Buffolino,

24      B-U-F-F-O-L-I-N-O.

25            THE COURT:  Mr. Buffolino, what is your

Buffolino

1       position?  Do you have an official position?

2                   THE WITNESS:  Currently I'm the director of

3       the Nassau County Department of Forensic Genetics,

4       which is the forensic DNA laboratory for Nassau County.

5                   THE COURT:  Did you have an opportunity

6       within the last day or so to participate in the

7       securing of a buccal swab for a DNA sample by Martin

8       Heidgen?

9                   THE WITNESS:  I did.

10                   THE COURT:  What did you do with respect to

11      the securing of this swab and the subsequent analysis

12      of it?

13                   THE WITNESS:  In terms of the accepting of

14      evidence analysis, it was conducted by a Daniel Arana,

15      who is a Forensic Geneticist within the laboratory, who

16      processed the sample for a DNA profile within the

17      laboratory.

18                   THE COURT:  Okay.  And was that processed?

19                   THE WITNESS:  Yes, it was.

20                   THE COURT:  Are you aware of the results of

21      the processing analysis of that sample?

22                   THE WITNESS:  I am.  It has been reviewed by

23      me.

24                   THE COURT:  What are your findings?

25                   THE WITNESS:  Currently, in the preliminary

GIGI WRIGHT, RPR     (516) 571-2503

Buffolino

1    phase, the buccal swab taken from the subject contained

2    a mixture of two males, of which the minor contributor

3    of that mixture is consistent to the donor of the two

4    blood vials which we received the day prior to the

5    buccal swab.

6            THE COURT:  Said in another way, the DNA of

7    Martin Heidgen is present on that buccal swab?

8            THE WITNESS:  I didn't confirm it is him

9    since there is a mix of two individuals.  But one of

10   the individuals in that mixture is consistent to the

11   blood donor.

12           THE COURT:  Were you able to come up with any

13   information regarding the DNA of the second donor?

14           THE WITNESS:  Yes, I was.

15           THE COURT:  And that information is?

16           THE WITNESS:  The major contributor was

17   determined to be a juvenile in our local database,

18   which was a case that was processed by Laboratory

19   Corporation of America in 2003.  It was a statutory

20   case, consensual sex, 17-year-old with a 13-year-old,

21   which is closed at this point.

22           But because it was a statutory case we

23   processed the evidentiary material, which in that case

24   was a vaginal swab from the 13-year-old; placed that

25   unknown profile into the database, and it matched the

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1      major component of the mix in the buccal swab obtained

2      from the subject.

3                    THE COURT:  Thank you, sir.

4                    THE WITNESS:  Thank you.

5                    (Whereupon, the witness exits the courtroom.)

6                    THE COURT:  On the basis of the affidavits

7      submitted, as well as the in-court sworn testimony,

8      this Court finds as follows:  Probable cause exists for

9      this Court to order a test of the defendant's DNA.

10                    Based on the extensive record throughout the

11     pendency of this case the taking of the defendant's

12     blood at present is the least intrusive method of

13     obtaining the defendant's DNA at this point in time.

14                    There is a significant probability that the

15     DNA tests will reveal the results that will serve to

16     clarify the relevant issues at this trial.

17                    This Court orders that the defendant submit

18     to the taking of his blood for purposes of further

19     testing.

20                    MR. MARTELLO:  Your Honor, we have an

21     application.  Your Honor, may I be heard?

22                    THE COURT:  Yes.

23                    MR. MARTELLO:  Your Honor, first of all, my

24     first application is that we request all paperwork and

25     test results concerning the witness; any tests that

Proceedings

1    they did, so we can have it reviewed by our expert.

2              Number two --

3              THE COURT:  I think that the district

4    attorney has already agreed to that.

5              MR. MARTELLO:  Thank you, your Honor.

6              Number two, your Honor, as you know we have

7    previously objected to the taking of the DNA sample.

8    You had ruled that the DNA sample was going to be

9    taken.  We are presently in the process of having a

10   writ prepared so this vital issue of whether or not the

11   DNA sample should be taken will be reviewed by an

12   appellate court.

13             I would just ask this Court if it could hold

14   off on the execution of the order that it has just

15   made, so that it would afford us to the opportunity to

16   get a writ signed so that we can have a full and fair

17   hearing before an appellate court on this issue.

18             The key is, Judge, that once government

19   action takes place; that is, that the blood is

20   extracted from the defendant, the appellate court will

21   not have jurisdiction; they will not be able to sign

22   the writ.  We will not have a full and fair hearing on

23   this issue.

24             So if you could hold the order of this Court

25   that DNA is to be taken.  I would just ask this Court

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1     to afford us the opportunity to file the writ before

2     the execution of your order is done so that we could be

3     brought before an appellate court.  Should the blood be

4     taken before we file the writ, we will have no

5     recourse.  I think it will just be fair that we be

6     allowed the opportunity to speak to an appellate court

7     on this crucial issue.

8           MS. McCORMICK:  Your Honor, as the swab has

9     already been taken from the defendant, I'm not sure I

10    see the relevance or the significance of the second

11    blood in delaying these proceedings.  But your Honor

12    has been very clear that you will not countenance a

13    delay in these proceedings.  The only way to ensure

14    that this trial moves forward at its expected pace is

15    that the blood sample be executed today.

16          It is the People's position that there is

17    evidence to support the fact that the defendant

18    thwarted the first of these attempts to do this DNA

19    analysis, and he should not benefit from that at this

20    point.

21          THE COURT:  Yes.  Go ahead.

22          MR. MARTELLO:  Just briefly.  We are not

23    looking to delay the proceedings here, Judge.  But any

24    delay that does occur should not be to the detriment of

25    the defendant.  This is a vital issue in this case.  It

Proceedings

1    is certainly worth being reviewed by an appellate

2    court, because we have filed our objections numerous

3    times on this.  We are just asking for an amount of

4    time to get this writ signed.

5              THE COURT:  It seems to me that the appellate

6    court, in this case the Appellate Division, Second

7    Department, has all of the powers of this Court and

8    more.  It can certainly reverse any decision that I

9    make.  That application is denied.

10             MR. MARTELLO:  Judge, just so you know, it

11   actually cannot, not during the trial.  That would be

12   afterwards.  That would be an interlocutory appeal.

13   That's why the critical element, Judge, is all we need

14   is a few hours.  Once the government action happens,

15   once the blood is drawn, you are foreclosing our

16   ability to be heard before the Court.  There can be no

17   appeal.  Once you do this we cannot go before the

18   Court.

19             THE COURT:  It seems to me that you are

20   arguing an equitable issue.  It also seems to me that

21   your client comes to this Court of equity with unclean

22   hands.

23             Your application is denied.

24             MS. McCORMICK:  Your Honor, if I may, may I

25   make one last record before we leave the issue of the

Proceedings

1      blood, and I apologize and do it at my own peril.      I

2      have to correct the record.

3              I understand completely the Court's ruling

4      with respect to the lack of admissibility of the blood

5      as it relates to Trooper O'Hare's testimony.  But, in

6      the course of counsel making his argument, both

7      yesterday and the day before, I think, if I have my

8      days right, he cited to this Court an incorrect

9      standard, and I feel it is my obligation as an officer

10     of this Court to correct it.

11              Mr. LaMagna, on at least two separate

12     occasions, and I believe more on the first day, cited

13     to this Court that the standard for admission of this

14     evidence was beyond a reasonable doubt.

15              THE COURT:  I asked him that question.

16              MS. McCORMICK:  Yes, you did.  And he

17     answered it and he raised it again yesterday.  That is

18     not the standard for the admissibility of chain of

19     custody evidence.  It is reasonable assurance.  The

20     case cited by him, People versus Julian, I provided

21     that to the Court again yesterday, along with other

22     examples of cases where the chain of custody had been

23     broken and the reasonable assurance standard had been

24     met.

25              People versus Sarmiento, People versus Arthur

Proceedings

1    and People verse Slater, all of those cases were

2    provided both to counsel and to your Honor yesterday.

3    I feel it is my obligation to bring to this Court's

4    attention that the wrong standard has been cited to

5    this Court.

6           MR. LaMAGNA:   Reasonable assurance standard

7    is the second prong of the articulation of People

8    versus Julian, a Court of Appeals case.   The first

9    issue goes to the identical nature of it.   If the chain

10   has been broken, the People --

11          MS. McCORMICK:   It is moot at this point.

12          THE COURT:   It doesn't make any difference at

13   all.  Have a nice weekend.

14          Ms. McCORMICK:   Thank you, your Honor.

15                       o0o

16          (Whereupon, the trial was adjourned to

17   Monday, the 25th day of September 2006, at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NASSAU : CRIMINAL PART 31
 2    ------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
 4              -against-
 5
      MARTIN HEIDGEN,
 6
                              DEFENDANT.
 7    ------------------------------------x
      INDICTMENT #:   1910N-06
 8
                                  Mineola, New York
 9                                September 25, 2006
10
      B E F O R E:    HONORABLE ALAN L. HONOROF
11                        Acting Supreme Court Justice
12
      A P P E A R A N C E S:
13
                     HON. KATHLEEN M. RICE
14                   District Attorney, Nassau County
                        262 Old Country Road
15                      Mineola, New York 11501
                     BY:  ROBERT HAYDEN, ESQ.
16                        Assistant District Attorney
                              and
17                        MAUREEN McCORMICK, ESQ.
                          Assistant District Attorney
18
19                   STEPHEN LaMAGNA, ESQ.
                        Attorney for the Defendant
20                      666 Old Country Road
                        Garden City, New York
21                   BY:  STEPHEN V. LaMAGNA, ESQ.
                              and
22                        GREGORY MARTELLO, ESQ.
23                           o0o
                          CONTINUED TRIAL
24                           o0o
                        Gigi Wright, R.P.R.
25                      Official Court Reporter
```

Proceedings

1              (All parties present.  Defendant present.)

2              THE COURT:  Bring in the jury.

3              COURT OFFICER:  Jury entering.

4              (Whereupon, the jury entered the courtroom,

5       and upon taking their respective seats, the following

6       occurred:)

7              THE CLERK:  Case on trial, Indictment 1910N

8       of 2005, People verse Martin Heidgen.

9              People ready?

10             MR. HAYDEN:  Ready, your Honor.

11             THE CLERK:  Defendant ready?

12             MR. LaMAGNA:  Defendant ready.

13             THE CLERK:  Defendant is present, your Honor,

14       and the jurors are seated.

15             THE COURT:  Welcome back, ladies and

16       gentlemen.

17             Just before we get started I told you at the

18       outset that this case was going to get a significant

19       amount of media attention.  It has.  I have told you

20       continuously to avoid any coverage regarding this case,

21       inadvertently you may have heard something in the press

22       concerning comments about evidence by counsel or even

23       the Court.

24             As you know, the press does not have all of

25       the information and often makes comments out of

GIGI WRIGHT, RPR    (516) 571-2503

Proceedings

1    context, and may offer misleading or incomplete

2    information.  Any reported comments attributed to the

3    defendant, counsel, the district attorney or the Court

4    are not evidence.

5            It would not be fair to either the defendant

6    or the prosecution if any comments made by anyone

7    reported in the press be considered as it having any

8    weight or bearing on the issues in this case.  They do

9    not.

10           People.

11           MS. McCORMICK:  Your Honor, the People call

12   Reverend Steed Davidson.

13           COURT OFFICER:  Step up.  Remain standing,

14   raise your right hand and face the clerk.

15           S T E E D   D A V I D S O N,           a

16           witness called on behalf of the People,

17           having been first duly sworn by the Clerk of

18           the Court, was examined and testified as

19           follows:

20           THE CLERK:  You may put your hand down.

21   State your name, spelling your last name for the

22   record.

23           THE WITNESS:  Steed Davidson,

24   D-A-V-I-D-S-O-N.

25           THE CLERK:  Please take a seat.

Davidson - Direct - McCormick

1             MS. McCORMICK:  May I?

2    DIRECT EXAMINATION

3    BY MS. McCORMICK:

4         Q     Good morning, Reverend Davidson.

5         A     Good morning.

6         Q     I'm sorry to keep you waiting sir, and you as

7    well.

8               Could you tell the jury, please, your age, sir?

9         A     I'm 40 years old.

10        Q     Can you tell the jury how are you employed?

11        A     Right now I'm teaching at Luther College.  I'm a

12   professor of religion.

13        Q     Where is Luther College?

14        A     In Decora, Iowa.

15        Q     You flew in from Iowa?

16        A     Yes.

17        Q     Can you tell the jury are you married, sir?

18        A     Yes, I am married.

19        Q     With respect to driving are you a licensed

20   driver?

21        A     Yes, I am.

22        Q     Where are you licensed, sir?

23        A     State of New York.

24        Q     Now you say that you are in Iowa.  How recent is

25   that move to Iowa?

Davidson - Direct - McCormick

1    A    Moved to Iowa in August.

2    Q    Of this year?

3    A    Of this year.

4    Q    On July 2nd 2005 were you living in New York at

5    that time?

6    A    Yes, I was.

7    Q    What town were you living in at that time?

8    A    Freeport.

9    Q    Now, again, I got off the topic of licensing too

10   quickly.  Sorry.  How long have you been a licensed driver?

11   A    Since I was 17 years old.

12   Q    Are you familiar, sir, with the speeds vehicles

13   travel on side streets?

14   A    Yes.

15   Q    Are you familiar with the speeds of vehicles

16   traveled on highways?

17   A    Yes.

18   Q    In the course of your driving do you estimate the

19   speed of other vehicles around you?

20   A    Yes.

21   Q    I'm going to direct your attention then to July

22   2nd 2005.  Can you tell the jury about 2 o'clock in the

23   morning where were you coming from, sir?

24   A    I was coming from Westbury and heading back home

25   to Freeport.

Davidson - Direct - McCormick

1   Q   What were you doing in Westbury that night?

2   A   Went to dinner and a movie with my mother and my

3   sister.

4   Q   Your mother and your sister?

5   A   Yes.

6   Q   Do your mother and sister live in New York as

7   well?

8   A   No.

9   Q   Where do you they live, sir?

10   A   They live in Trinidad, Tobago.

11   Q   Are your mother and sister in New York at this

12   time?

13   A   No.

14   Q   They are in Trinidad and Tobago?

15   A   Yes.

16   Q   You were coming from a movie and dinner in

17   Westbury?

18   A   Yes.

19   Q   Where were you going to?

20   A   Freeport.

21   Q   To your home?

22   A   To my home, yes.

23   Q   Were your mother and sister staying with you at

24   that time?

25   A   Yes, they were.

Davidson - Direct - McCormick

1  Q    Can you tell the jury, please, what route did you

2  take from Westbury down to Freeport?

3  A    Traveling south along the Meadowbrook Parkway.

4  Q    And did there come a time when you approached the

5  Babylon Turnpike overpass?

6  A    Yes.

7  Q    Actually let me back you up a little bit.

8  Reverend Davidson, could you tell the jury do you remember

9  approaching the Southern State Parkway?

10  A    Yes.  Normally when I drive on the Meadowbrook

11  Parkway I would be in the left lane, just before getting

12  into the Southern -- where the Southern State Parkway joins

13  the Meadowbrook, and then afterwards I would cross over to

14  the center lane, because I don't like being in the center

15  lane in that merge lane, it is just funny, with oncoming

16  traffic.

17  Q    Let me back you up again one more step, Reverend

18  Davidson.  How familiar are you with the Meadowbrook?

19  A    Very familiar.

20  Q    In the time that you lived in Freeport -- how

21  long did you live in Freeport?

22  A    At that time for about two years.

23  Q    Did you travel the Meadowbrook Parkway on a

24  regular basis?

25  A    Yes.

Davidson - Direct - McCormick

1    Q    Did you have a regular pattern in how you

2  approached driving on the Meadowbrook Parkway?

3    A    Yes, uh huh.

4    Q    And did you have a particular lane that was your

5  preference?

6    A    Yes.  I would drive in the center lane, but would

7  go to the left lane before getting to, where it joins with

8  the Southern State Parkway.

9    Q    That is because of the way it merges in?

10    A    Yes.

11    Q    As you got to the Southern State Parkway you were

12  in the left lane; is that correct?

13    A    Yes, uh huh.

14    Q    Was there any vehicles in front or behind you at

15  that time?

16    A    I can't recall seeing any in front of me.  There

17  was one behind me.

18    Q    After you passed that merge with the Southern

19  State Parkway did you return to your usual center lane?

20    A    Yes, I did.

21    Q    What happened at that point?

22    A    Okay, so I'm driving in the center lane and I

23  realized a vehicle behind me is passing very slowly.  It

24  takes a while to pass.  Then I figured out it was a

25  limousine.  It was fairly long and it was passing very

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1   slowly.

2        Q    You say that that limousine passed you?

3        A    Yes.

4        Q    What lane was the limousine in while you were in

5   the center lane?

6        A    In the left lane.

7        Q    The limousine was in the left?

8        A    Yes.

9        Q    Do you recall Reverend Davidson what was the

10  speed that you were traveling as you were heading southbound

11  on the Meadowbrook Parkway?

12       A    Traveling between 50 and 55.

13       Q    Why do you know that?

14       A    Because I kept looking at the speedometer.  My

15  mother was with me in the car, and she doesn't want me to

16  drive very fast.  I was making sure I stayed at that speed.

17  I kept looking at it.

18       Q    Okay.  And as the limousine slowly passed you to

19  your left, sir, did you estimate the speed that it was

20  traveling?

21       A    Yeah.  I put it at about 55 to 60.

22       Q    So a little bit faster than you?

23       A    A little bit faster than I was going.

24       Q    Not wildly fast?

25       A    No.

Davidson - Direct - McCormick

1     Q      Did there come a time when the whole of the
2  limousine got ahead of you?

3     A      Yes.

4     Q      And do you remember whether there was a signal
5  indicated from the limousine that he was going to come over
6  into your lane?

7     A      No.

8     Q      You don't remember?

9     A      I don't remember seeing any signal, no.

10    Q      Can you tell the jury then what is the next thing
11 that you remember?

12    A      Well, soon after that I saw lights coming in our
13 direction from the south and I --

14    Q      When you say, "lights" are you, what are you
15 specifically referring to,? Street lights? What type of
16 lights?

17    A      Lights from a vehicle. I seen these lights
18 moving in a northerly direction coming up toward us.

19    Q      Were they headlights?

20    A      They were headlights.

21    Q      And they were coming toward you?

22    A      Yes.

23    Q      And can you describe for the jury where it is
24 that you saw them up ahead?

25    A      They were on the left, in the left lane.

GIGI WRIGHT, RPR     (516) 571-2503

Davidson - Direct - McCormick

1      Q    And in the area of the Babylon Turnpike overpass.

2  Do you remember whether they were before, after or

3  underneath the overpass?

4      A    I can't recall if it was before or after.

5      Q    Is the first recollection you have of those

6  lights, did they appear to you as two separate headlights or

7  a single light when you first realized that they were coming

8  toward you?

9      A    Two separate headlights.

10      Q    Would you please describe for the jury then what

11  happens next?

12      A    So, when I determined that it was an oncoming

13  vehicle, by the time I could have thought or done something

14  it ran head first into the limousine that was still in the

15  left lane.

16      Q    Did you have any time to react to that, the

17  oncoming vehicle?

18      A   Very, very little.

19      Q    Did you have any time to respond to it in any

20  way?

21      A    Well, the, oncoming vehicle hit the limousine and

22  it started moving into my lane, and I had to try to turn to

23  avoid hitting the limousine.

24      Q    What came into your lane?

25      A    The limousine.

Davidson - Direct - McCormick

1    Q    At the point at which the pickup truck hit the

2    limousine where was the limousine?

3                    MR. LaMAGNA:  Objection.  He didn't

4        articulate "pickup truck."

5                    THE COURT:  Sustained.

6    Q    I'm sorry.  I didn't understand.  I'll rephrase

7    the question.

8                    Did the pickup truck strike the limousine?

9    A    Yes.

10   Q    Which portion of the pickup truck struck which

11   portion of the limousine, sir?

12   A    The front of the pickup truck struck the front of

13   the limousine.

14   Q    And at the point that they crashed how far was

15   the limousine ahead of you in that center lane?  Do you

16   know?

17   A    Not very far, just a few feet.

18   Q    Did you see the limousine brake?

19   A    I don't know if it broke, but it moved.  It

20   swerved into my lane.

21   Q    So you don't know?

22   A    No, I don't know.

23   Q    Do you know whether the limousine swerved into

24   your lane before or after the crash?

25   A    It could be just be about the same time.  I

GIGI WRIGHT, RPR   (516) 571-2503

Davidson - Direct - McCormick

1     wasn't certain.  Just like a split second different, whether

2     it was the crash that pushed it or tried to pull away, I

3     don't know.

4         Q     Is the time it took from the time you saw the two

5     headlights to the crash very fast?

6         A     Very fast.  Not more than five seconds.

7         Q     I am going to ask you to close your eyes for a

8     second, Reverend Davidson, and try and estimate how much

9     time you saw from the time of the headlights to the time of

10    that crash?

11        A     Uh huh.

12        Q     Using literal time.  Would you close your eyes?

13        A     Okay.

14        Q     Headlights, one one-thousand, two on-thousand,

15    three one-thousand, four one-thousand, five one-thousand,

16    six one-thousand, seven one-thousand, eight one-thousand,

17    nine one-thousand, ten one-thousand.  Do you have no

18    estimate of the time?

19        A     I'm just shaking my head saying not much.  Not

20    that much.

21        Q     I'm sorry, not that much?

22        A     Three or four seconds.  I know it would not be

23    more than five.  Just about three or four seconds I see the

24    lights and then the crash takes place.

25        Q     Is that your rough estimate of the time, sir?

Davidson - Direct - McCormick

1    A    My best estimate, yes.

2    Q    Could you tell the jury did anything occur with

3  your car as the pickup truck and the limousine collided?

4    A    Yes.  I tried to avoid hitting or running into

5  the limousine, and I, my car got hit by the limousine and it

6  got spun around 180 degrees.

7    Q    So your car, which had been facing southbound, is

8  now facing northbound?

9    A    Northbound, yes.

10   Q    Still in the southbound lanes?

11   A    Yes.

12   Q    Did your car stop at the time of the crash or did

13  it continue further down?

14   A    It continued for some distance before I was able

15  to bring it under control.

16   Q    That some distance did you go past the Babylon

17  Turnpike overpass?

18   A    Yes.

19   Q    You did.  With respect to the limousine and the

20  pickup truck Reverend Davidson when they hit did they

21  continue moving?

22   A    No.

23   Q    Or did they come to a stop?

24   A    No.

25   Q    They came to a stop?

Davidson - Direct - McCormick

1   A   Yes.

2   Q   What about the pickup truck, did it just stop

3   right at the nose of the limousine?

4   A   No.  Well afterwards I realized that it had

5   turned around the other way.

6   Q   But where the limousine ended up is where the hit

7   occurred?

8   A   Yes.

9   Q   Reverend Davidson, after your car came to a stop

10  south of the overpass what did you do?

11  A   I just checked to see that no one in my car was

12  hurt, and I came out of the car and walked back to the crash

13  scene.

14  Q   And do you remember where it is that you went

15  first, sir?

16  A   I walked up to the limousine and tried to see

17  what was going on there, and then I walked over to the

18  pickup truck, tried to see what was going on there as well.

19  Q   Let me back you up to the limousine Reverend

20  Davidson.  When you walked up to the limousine which portion

21  did you approach first?

22  A   I approached the driver's side.

23  Q   And what did you observe about the condition of

24  that limousine as you approached it?

25  A   It was extensively damaged.  It seemed as if the

Davidson - Direct - McCormick

1   entire engine had just disappeared and the front of it was

2   gone.  I couldn't see the driver's area.  It was just all

3   gone.  There -- nothing was there.

4        Q     And after you made that observation you proceeded

5   to the pickup truck?

6        A     Went to the pickup truck.

7        Q     What portion of the pickup truck did you go to at

8   this point?

9        A     Walked around to the driver's side.

10       Q     What did you observe at the driver's side of the

11  pickup truck?

12       A     The driver was there, and he was slumped over the

13  steering wheel.

14       Q     When you say slumped over the steering wheel, do

15  you remember was he still seated upright high above the

16  steering wheel or where was he in relationship to the

17  steering wheel?

18       A     His face was in the steering wheel.

19       Q     So at even height with the steering wheel?

20       A     Yes.

21       Q     Did you talk to the person in the pickup truck at

22  that time?

23       A     No.

24       Q     What was going on there?

25       A     There were, I guess, one or two other persons who

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1   were on the scene as well, just looking at what was

2   happening, and I think that the driver of the pickup truck

3   was moaning, and someone said that he might have been

4   unconscious.  Someone was trying to talk to him to keep him

5   conscious.

6        Q    Was that a police officer or a civilian?

7        A    It was a civilian.

8        Q    How long, approximately, did you stay at the

9   driver's side of the pickup truck?

10       A    No more than a minute.

11       Q    And then where did you go from there, Reverend

12  Davidson?

13       A    I walked to the back of the limousine, away from

14  the limousine, to make a 911 call.

15       Q    And you did call 911?

16       A    I called 911.

17       Q    Did you enter that limousine?

18       A    No.

19       Q    What occurred at that time?

20       A    I was on the phone with the 911 operator, and

21  while I was talking someone came out of the limousine

22  screaming, screaming for help.

23       Q    Was that a man or a woman?

24       A    It was a woman.

25       Q    And what door did she come out of the limousine

GIGI WRIGHT, RPR   (516) 571-2503

Davidson - Direct - McCormick

1   from?

2       A   It was the rear door.

3       Q   Did you stay on the phone with 911 at that time?

4       A   Yes.  Uh huh.

5       Q   You completed that phone call?

6       A   Yes.

7       Q   What did you do after that, Reverend Davidson?

8       A   I walked back to the front of the two vehicles,

9   just to see what was going on, and then I walked back again

10  to the back and --

11      Q   Back of what, sir?

12      A   Sorry, the back of the limousine.  Because I was

13  just kind of pacing and --

14      Q   Had police arrived at this time?

15      A   No.  No.

16      Q   Approximately how much time has passed?

17      A   Maybe about five minutes.

18      Q   How did it seem to you?

19      A   It was long.  It seemed like a longer time.

20      Q   What happened next?

21      A   I -- when I got back to the back of the limousine

22  I saw this woman sitting on the roadside leaning against the

23  guardrail.  And she was holding someone.  I went up to her

24  to ask if she was fine, if everything was okay, and she was

25  just there hugging this person, and she was staring blankly

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1    and didn't answer me.  When I got closer what I thought was

2    someone she was talking to, I realized it was just the head.

3                      MR. LaMAGNA:  Objection.

4                      THE COURT:  Overruled.

5         Q     What did you do after you made that observation,

6    Reverend Davidson?

7         A     I turned around and walked away.  When I walked

8    away I saw my mother and sister coming up to the scene, and

9    I walked toward them and asked them to go back.

10        Q     What was your purpose in doing that?

11        A     So they couldn't see what I saw.

12        Q     Did there come a time when the police arrived at

13   that crash scene?

14        A     Yes.

15        Q     What did you do after your mother and sister went

16   back to the car?

17        A     When the police came I went and identified myself

18   to the police.

19        Q     Identified yourself as a person in the crash?

20        A     Yes.

21        Q     Gave your name and a statement at that time?

22        A     Yes.

23        Q     Reverend Davidson, your vehicle was it able to be

24   driven away from that crash scene?

25        A     No.

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1    Q    It had to be towed?

2    A    Yes.

3    Q    So how did you get out of the crash scene?

4    A    Police officer took us home.

5    Q    Drove you to your house?

6    A    Yes.

7    Q    Reverend Davidson, at this time I'm going to ask

8    you to, just from where you are, to just take a look, first,

9    at People's Exhibit number 30 in evidence.  I'm just going

10   to put it up here.  I hope it projects.

11        Actually, I'm going to show you a big picture of

12   that too, Reverend Davidson.  Is that a fair and accurate

13   representation of the Meadowbrook Parkway as it approaches

14   the Babylon Turnpike overpass from the left lane?

15   A    Yes.

16   Q    And then this photograph --

17        MR. LaMAGNA:  What photograph was that?

18        MS. McCORMICK:  Thirty.

19   Q    And then People's Exhibit number 46, is that also

20   a left lane vantage point of the southbound lanes of the

21   Meadowbrook Parkway beyond the Babylon Turnpike overpass?

22   A    Yes.

23   Q    You said that you were very familiar with that

24   road from living in Freeport, right?

25   A    Uh huh.

GIGI WRIGHT, RPR   (516) 571-2503

Davidson - Direct - McCormick

1    Q    Does that fairly represent the turns and the rise

2    in the road as it continues beyond the overpass?

3    A    Yes.

4    Q    Thank you, Reverend Davidson.

5         MS. McCORMICK:  If you would, with the

6    Court's permission, could Reverend Davidson step down

7    from the stand and view some of these larger

8    photographs.

9         THE COURT:  Sure.

10   Q    Could I ask you to come out of the well.  It is

11   so big it is a little bit awkward.

12        First and foremost, Reverend Davidson, I'm going

13   to ask you with respect to People's Exhibit number 21 in

14   evidence, have you seen this diagram before?

15   A    Yes.

16   Q    In my office?

17   A    Yes.

18   Q    Do you see, sir, your vehicle reflected on this?

19   Could you step over here.  The jury needs to see as well.

20   Do you see your vehicle reflected on this diagram, sir?

21   A    Yes.

22   Q    Is there a designation of a V something that

23   reflects your vehicle?

24   A    Yes, V3.

25   Q    Would you point that out to the jury.

Davidson - Direct - McCormick

1        (Witness complies.)

2        Q     Is it your testimony that your vehicle as a

3    result of this collision slid from the point of impact,

4    turned around 180 degrees and wound up facing the wrong

5    direction at this location?

6        A     Yes.

7        Q     Thank you, Reverend Davidson.  I'm going to ask

8    you to look at People's Exhibit 2B in evidence.

9              Reverend Davidson, I know that the crash occurred

10   at night.  But is that a fair and accurate daytime

11   photograph of the crash that you observed as you walked back

12   up the Meadowbrook Parkway?

13       A     Yes.

14       Q     Could you, using People's Exhibit 2B in evidence,

15   could you explain to the jury, please, where you came from

16   and went to as you came walking up the Meadowbrook Parkway?

17       A     Uh huh.

18       Q     You can point to it?

19       A     Okay.  I would be walking up from the south.

20   When I first came up I went here in this area, the driver's

21   side.

22             MS. McCORMICK:  Indicating for the record,

23        your Honor, the driver's side of the limousine

24        reflected in the center of the photograph.

25       Q     Was the driver's side of that limousine pulled

Davidson - Direct - McCormick

1    open at the time that you first observed it?

2    A    No.

3    Q    It is open in that photograph; is it not, sir?

4    A    Yes, yes, it is.

5    Q    About how long did you stay in that position at

6    the driver's side of the limousine?

7    A    Maybe just about ten to fifteen seconds.

8    Q    Was there anything that you could do for the limo

9    driver at that point?

10   A    No.  I could not see into the vehicle.  I didn't

11   know what was happening inside.  I couldn't see.

12   Q    After that ten to fifteen seconds where did you

13   go from there?

14   A    Walked from there around here to the driver's

15   side of the pickup truck.

16            MR. McCORMICK:  Indicating for the record,

17       your Honor, to the right side of the photograph to the

18       driver's door of the pickup truck.

19   Q    Was there somebody else already at that drivers's

20   door at the time that you saw that?

21   A    Yes.

22   Q    How close did you get to the driver's door?

23   Where about did you actually stand?

24   A    I would say about here.

25            MS. McCORMICK:  Indicating, your Honor, the

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1     driver's side front corner headlight area where it

2     would have been if it hadn't been damaged.

3          Q     Is that the vantage point at which you made your

4     observations of the defendant?

5          A     Yes.

6          Q     Excuse me, the driver of the pickup truck?

7          A     Yes.

8          Q     Did you ever hear that driver speak?

9          A     No.

10         Q     Was the person speaking to him and asking him

11    questions?

12         A     No.

13         Q     What was the person speaking to him doing then?

14         A     The person was trying to encourage him to keep

15    conscious.

16         Q     And you never heard him speak?

17         A     No.

18         Q     From those observations where did you go next?

19         A     I went from here around, walked around the

20    limousine, and didn't see anything, and I was standing here

21    when I made the call.

22         Q     And the door that is open on the limousine in

23    that photograph, is that the door that the woman came out

24    out of yelling for help?

25         A     Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1  Q    And that would be the driver's side rear of the

2  limousine?

3  A    Yes.

4  Q    And you made observations of Mrs. Flynn and then

5  you walked back down the roadway; is that correct?

6  A    While I -- when I was finished with the call I

7  came back around, looked again, and then walked back, and

8  that's when I saw her sitting around here.

9  Q    Indicating behind the vehicles, next to the guide

10  rail.  That's what you described as a pacing?

11  A    Yes.

12  Q    Waiting for help to arrive?

13  A    Yes.

14  Q    At the conclusion of this, sir, you approached

15  the State Police and gave your name and identified yourself

16  as a person involved in this crash?

17  A    Yes.

18  Q    And where did you -- where were they that you

19  gave your information to at the crash, behind the crash?

20  A    They were kind of generally around here.

21  Q    At some point were there quite a lot of emergency

22  vehicles on the scene?

23  A    Yeah.

24  Q    And then how would you describe the scene at that

25  point?

Davidson - Direct - McCormick

1    A    Well, it started getting chaotic, because I think

2   there were maybe two or three ambulances, a number of fire

3   ambulances, a number of police cars.  Just a lot of

4   personnel on the scene.

5    Q    Were you present as they attempted to extricate

6   people from the limousine?

7    A    No.  Because as soon as I identified myself, the

8   officer said wait by your car.  I left and went back to my

9   car for the rest of the time.

10    Q    If you would stay there, sir, I'm going to

11   replace 2B with People's Exhibit 12.  Do you recognize that,

12   sir?

13    A    Yes.  That's my car.

14    Q    That's your car?

15    A    Yes.

16    Q    Could you indicate for the jury, please, what

17   damage your car sustained as a result of this crash?

18    A    This area of the rear driver's side was damaged

19   and it seemed like the axle was bent as well.  So the tire

20   was shoved somewhat up into this area.  Couldn't drive it.

21    Q    That's why it wouldn't move?

22    A    Yes.  Uh huh.

23    Q    It was something about the wheel?

24    A    Yes.  Uh huh.

25    Q    Do you have any idea what portion of this

Davidson - Direct - McCormick

1    limousine impacted your vehicle --

2         A    No.

3         Q    -- too fast?

4         A    Yes.

5         Q    I'm showing you now People's Exhibit number 4B in

6    evidence.  Is that the vehicle in its damaged condition as

7    you observed it when you first walked up to that crash

8    scene?

9         A    Uh huh, yes.

10        Q    Reverend Davidson, this wheel that is on its side

11   indicated in the center of this photograph, was that wheel

12   in the same location --

13        A    Yes.

14        Q    -- as you walked up?

15        A    Yes.

16        Q    Off the car and laying on its side?

17        A    Yes.

18        Q    Did you ever see that wheel in motion at all or

19   was it already stationary on the ground there?

20        A    No.  No.  I have this vivid recollection of the

21   wheel being there, as it had just dropped off in place where

22   the rest of the car should have been.  That I remember very

23   vividly.

24        Q    So, in other words is this area here by the

25   spring, inside the damage is the area where the wheel would

Davidson - Direct - McCormick

1      have been?

2           A     Yes.

3           Q     This is before Mr. Rabinowitz or the limo driver

4      was extricated; is that correct?

5           A     Yes.

6           Q     Again, Reverend Davidson, People's Exhibit 6 in

7      evidence, did you see the limousine driver at all in this

8      vehicle?

9           A     No.

10          Q     Did you recognize any part of this damage area as

11     belonging to his person?

12          A     No.  I could not see the driver's compartment.

13          Q     And, finally, Reverend Davidson, this is a

14     backward view up to the driver's compartment.  Does that

15     fairly and accurately represent what you described as the

16     part of the car that no longer exists?

17          A     Yes.

18          Q   _ Thank you.  You may retake the witness stand.

19                Reverend, you met with members of the State

20     Police and the District Attorney's Office in preparing for

21     your testimony; is that correct?

22          A     That's correct.

23          Q     And is one of those times yesterday, was it

24     evening or afternoon or whatever, one of those times

25     yesterday?

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

```
 1        A      Yesterday.

 2        Q      Did you have an opportunity at that time, sir, to

 3    view the contents of a VHS video cassette?

 4        A      Yes.

 5        Q      I ask to approach the witness with what has

 6    already been marked in evidence as People's Exhibit 14.

 7               Can you take a look at that Reverend Davidson.

 8    Is that the videotape that you viewed when you came to the

 9    office?

10        A      Yes.

11        Q      And how do you know?

12        A      I signed and dated it.

13        Q      Did you also view a DVD version of that same

14    content?

15        A      Yes.

16               MS. McCORMICK:  I would ask this be marked

17    for identification at this time as People's Exhibit 81

18    for identification.

19               (Whereupon, the item referred to received and

20    marked People's Exhibit 81 for identification.)

21               COURT OFFICER:  People's Exhibit 81 for

22    identification.

23        Q      Looking at People's Exhibit 81 for

24    identification, Reverend Davidson, do you recognize that?

25        A      Yes.
```

GIGI WRIGHT, RPR     (516) 571-2503

Davidson - Direct - McCormick

1    Q    What do you recognize that to be?

2    A    The DVD version of the videotape that I saw.

3    Q    And you viewed that?

4    A    I viewed this.

5    Q    How do you know that that is the one you viewed?

6    A    I signed and dated it.

7    Q    Dated yesterday's date?

8    A    Yesterday's date.

9    Q    Was it a fair, accurate and complete version of

10   that videotape?

11   A    Yes.

12        MS. McCORMICK:  Your Honor, I would ask that

13   that be moved into evidence as People's Exhibit 81 in

14   evidence.

15        THE COURT:  Please show it to counsel.

16        MR. LaMAGNA:  Was this previously entered

17   into evidence?

18        MS. McCORMICK:  The VHS.

19        MR. LaMAGNA:  Well, if it is reproduced onto

20   a DVD I don't think that he is competent to testify as

21   to that procedure or whether or not --

22        THE COURT:  He is not being asked about the

23   procedure.  She is asking if it is the same as what is

24   on the VHS, and he said yes.

25        MR. LaMAGNA:  Judge, it is already in

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1    evidence.   I mean I just have the objection with

2    respect to him being able to testify that it is in the

3    exact same condition as that one --

4              THE COURT:  He said he looked at it.

5              MR. LaMAGNA:  I don't know --

6              THE COURT:  Do you object?

7              MR. LaMAGNA:  I object on those grounds.

8              THE COURT:  Overruled.

9    Q    Let me ask an additional question of the witness.

10         Reverend Davidson, what you saw on that DVD, does

11   that fairly and accurately represent, in your mind, the

12   headlights that you observed oncoming in the left lane on

13   the Meadowbrook Parkway just before it crashed into the

14   limousine?

15   A    Yes.

16             MS. McCORMICK:  Then at this point I continue

17   to ask that it be moved into evidence as People's

18   Exhibit 81 in evidence.

19             THE COURT:  It is received.

20             (Whereupon, People's Exhibit 81 for

21   identification now received and marked People's Exhibit

22   81 in evidence.)

23             COURT OFFICER:  People's Exhibit 81 in

24   evidence.

25   Q    With respect to your observations of those

Davidson - Direct - McCormick

1     headlights as they came toward you and the limousine, did

2     you ever see those headlights swerve to the side?  Did you

3     see that?

4          A     No.

5          Q     Did you observe the speed of that oncoming

6     vehicle with those headlights?  Did you see it slow down at

7     all before the crash?

8          A     I didn't see it slow down.

9          Q     What did you observe about the manner in which

10    those headlights came toward yourself and the limousine?

11         A     It was coming very quickly.

12         Q     Did you observe the headlights attempt to exit

13    the roadway at any point?

14         A     No.

15         Q     Did you observe those headlights try to get onto

16    the shoulder of that, on the right shoulder before the

17    Babylon Turnpike overpass?

18         A     No.

19         Q     Did you observe the vehicle drifting and catch

20    itself in any way?

21                    MR. LaMAGNA:  Objection.

22                    THE COURT:  Sustained.

23         Q     Did you observe that vehicle stop and start in

24    any fashion?

25         A     No.

1745

Davidson - Direct - McCormick

1    Q    Can you say how fast that vehicle was traveling?

2    A    I can't say exactly how fast.  I know it was

3    coming quickly.

4         MS. McCORMICK:  At this time I ask to

5    approach the witness with what I ask to be marked as

6    People's Exhibit 82 for identification purposes.

7         (Whereupon, the item referred to received and

8    marked People's Exhibit 82 for identification.)

9         COURT OFFICER:  People's Exhibit 82 for

10   identification.

11   Q    Reverend Davidson, do you recognize People's

12   Exhibit 82 for identification?

13   A    Yes.

14   Q    Is that an audiotape?

15   A    It is an audiotape.

16   Q    What do you recognize that to be an audiotape of?

17   A    The 911 call that I made on that night.

18   Q    How do you recognize that as the tape of your

19   call?

20   A    I signed it and I dated it.

21   Q    Was that yesterday as well?

22   A    Yesterday.

23   Q    And, sir, when you listened to that tape in my

24   office was that a fair and accurate representation of the

25   call that you remember making on July 2nd 2005?

GIGI WRIGHT, RPR   (516) 571-2503

Davidson - Direct - McCormick

1    A    Yes.

2              MS. McCORMICK:  Your Honor, at this time I

3    ask that that be moved into evidence as People's

4    Exhibit 82 in evidence.

5              THE COURT:  Please show it to counsel.

6              MR. LaMAGNA:  No objection.

7              THE COURT:  It is received.

8              (Whereupon, People's Exhibit 82 for

9    identification now received and marked People's Exhibit

10    82 in evidence.)

11              COURT OFFICER:  Exhibit 82 in evidence.

12              MS. McCORMICK:  Your Honor, with the Court's

13    permission at this time I ask to play People's 82 in

14    evidence for the jury.

15              THE COURT:  Yes.

16    Q    Before I do this, Reverend Davidson, when you

17    were making the call did you first get a Nassau County

18    operator?

19    A    Yes.

20    Q    And did they transfer your call to a New York

21    State Police operator?

22    A    Yes.

23    Q    And listening to this tape yesterday did it

24    encompass both of those calls?

25    A    Yes.

GIGI WRIGHT, RPR    (516) 571-2503

Davidson - Direct - McCormick

1    Q    Thank you.

2         (Whereupon, the People's Exhibit 82, the

3    audiotape, was played to the jury in open court.)

4    Q    Reverend Davidson, as you just listened to that

5    911 call, and you were being asked your location there was a

6    voice with the, or the sound of a woman shrieking or

7    screaming.  Did you recognize that, sir?

8    A    Yes.

9    Q    Is that the voice of who you later learned to be

10   Jennifer Flynn as she came out of the back of that

11   limousine?

12   A    Yes.

13   Q    What was she calling for?

14        MR. LaMAGNA:  Objection.

15        THE COURT:  Overruled.

16   Q    What was she calling for?

17   A    She was screaming for help.

18        MS. McCORMICK:  Your Honor, with the Court's

19   permission I forgot to show Reverend Davidson People's

20   Exhibit 30A in evidence.  It is the large version of

21   the picture I had up on that screen.  I'll put it back

22   up.  May the witness step down?

23        THE COURT:  Yes.

24   Q    Reverend Davidson, is this the same photograph as

25   the one that is behind us on the screen back there?

Davidson - Cross - LaMagna

1       A     Yes.

2       Q     Again you previously stated that this is a fair

3    and accurate depiction of the left lane vantage point as it

4    comes to the Babylon Turnpike overpass at a certain point.

5       A     Yes.

6       Q     Can you see in this photograph, Reverend

7    Davidson, can you see the oncoming southbound lanes of the

8    Meadowbrook Parkway beyond -- I'm going to start that over.

9    Can you see the ongoing southbound of the Meadowbrook

10   Parkway beyond the Babylon Turnpike overpass from this

11   vantage point?

12      A     No.

13      Q     Can you see a portion of the northbound lanes of

14   the Meadowbrook Parkway underneath that overpass?

15      A     Yes.

16      Q     Can you point to the jury, please, as to where

17   those northbound lanes are visible underneath the overpass?

18      A     Just this small portion here.

19      Q     You know what, Reverend Davidson, I'm going to

20   ask to give you one of these yellow dots.  Can I ask you to

21   put a yellow dot on that photograph where it is that you can

22   see the northbound lanes coming underneath that overpass.

23            (Witness complies.)

24      Q     Thank you, Reverend Davidson.  You may take your

25   seat.  I have nothing further, Judge.

GIGI WRIGHT, RPR    (516) 571-2503