STATE OF NEW YORK  :  NASSAU COUNTY

     SUPREME COURT PART 61

– – – – – – – – – – – – – – – – – –X

THE PEOPLE OF THE STATE OF NEW YORK, :

           -against-         : IND. # 1910N/05

MARTIN ROBERT HEIDGEN,         :

          Defendant.     :

– – – – – – – – – – – – – – – – – –X

                 262 Old Country Road
                 Mineola, New York
                 April 3, 2006

B E F O R E:
        HON. ALAN L. HONOROF,
            Acting Supreme Court Justice.


APPEARANCES:

        HON. KATHLEEN M. RICE
        Nassau County District Attorney
        By: ROBERT T. HAYDEN, ESQ. and
            MAUREEN McCORMICK, ESQ.,
            Assistant District Attorneys
                for the People

        STEPHEN LaMAGNA, ESQ.
               for the Defendant


           –    –    –


       Huntley and Mapp Hearing


           –    –    –


                 Hanni J. Planos, CSR
                 Official Court Reporter

People v. Heidgen                                    2

1              THE CLERK:  Indictment 1910N/05, People

2      against Martin Robert Heidgen.

3              MR. HAYDEN:  Robert T. Hayden, for the

4      People.

5              MR. LaMAGNA:  For the defendant, Stephen

6      LaMagna, 666 Old Country Road, Garden City, New York.

7              THE CLERK:  You are Martin Heidgen?

8              THE DEFENDANT:  Yes, sir.

9              THE CLERK:  Case on for hearing.

10             People ready?

11             MR. HAYDEN:  People are ready, your Honor.

12             THE CLERK:  Defendant ready?

13             MR. LaMAGNA:  Defense is ready.

14             THE CLERK:  Both sides ready.

15             THE COURT:  Mr. Hayden, would you outline the

16     scope of the hearing and talk about Rosario, please?

17             MR. HAYDEN:  Yes, your Honor.

18             Let the record reflect that I gave Rosario

19     material to Mr. LaMagna on Friday, and I gave a couple

20     additional items to him, three pages of notes from

21     Investigator Harris.  The first page of one set of

22     notes, which is three pages, dealt with conversation

23     with Amy Hauck.  And there was an additional page, a

24     single page, that simply mentioned the name McCarthy

25     and brother Michael.

1          I have a list of the items I gave to

2     Mr. LaMagna on Friday.  I'd like to submit a copy of

3     this list to the Court.

4          I also have a copy of the Rosario material

5     for the Court, except for tapes, which were given to

6     Mr. LaMagna.

7               THE COURT:  Acknowledge receipt?

8               MR. LaMAGNA:  Yes, I do, your Honor.

9               THE COURT:  And the scope of the hearing?

10              MR. HAYDEN:  Your Honor, this is primarily a

11    Huntley Hearing with some Mapp aspects involving the

12    defendant's wallet and a cell phone.

13              In addition, we'll cover the taking of blood

14    in this case.

15              THE COURT:  All right.

16              Would you call your first witness, please?

17              MR. HAYDEN:  Police Officer Christopher

18    Pandolfo.

19    P. O.  C H R I S T O P H E R    P A N D O L F O ,

20    Shield Number 132, assigned to the Freeport Police

21    Department, having been first duly sworn by the

22    Clerk of the Court, was examined and testified as

23    follows:

24              THE WITNESS:  Police Officer Christopher

25    Pandolfo, P-a-n-d-o-l-f-o, Shield 132, Freeport Police

```
 1        Department.
 2                    THE COURT:  You may inquire.
 3                    MR. HAYDEN:  Thank you, your Honor.
 4   DIRECT EXAMINATION
 5   BY MR. HAYDEN:
 6        Q    Good morning, officer.
 7        A    Good morning.
 8        Q    How long have you been a member of the Freeport
 9   police department?
10        A    Little over nine years.
11        Q    Do you know a man by the name of Martin Heidgen?
12        A    Yes.
13        Q    Briefly describe him.
14        A    Male white, mid-twenties, dark hair.
15        Q    Do you see Martin Heidgen in this courtroom
16   today?
17        A    Yes.
18        Q    Please point him out and describe for the record
19   what he's wearing.
20        A    He's wearing a button-down shirt.
21                    MR. HAYDEN:  Let the record reflect, your
22        Honor, that the witness has indicated the defendant,
23        Martin Heidgen.
24                    THE COURT:  The record will so reflect.
25        Q    I'm directing your attention to the early morning
```

P. O. Pandolfo—for People—direct/Mr. Hayden          5

1    of Saturday, July 2nd of 2005.  Were you working then?

2          A     Yes.

3          Q     What was your assignment that morning?

4          A     I was on patrol, full uniform, in a marked patrol

5    car.

6          Q     How were you dressed?

7          A     Full uniform.

8          Q     Describe the weather that morning.

9          A     It was warm, little humid, clear, dry.

10         Q     Did you respond that morning to the vicinity of

11   the southbound lanes of the Meadowbrook Parkway just north

12   of the Babylon Turnpike overpass?

13         A     Yes.

14         Q     What was the approximate time you arrived?

15         A     Approximately 2:05 a.m.

16         Q     Describe the circumstances under which you

17   responded there.

18         A     I was flagged down by a citizen on Sunrise

19   Highway who told me there was a serious accident on the

20   Meadowbrook Parkway, and that there were no police at the

21   scene; looked like people were hurt.

22         Q     Where on the Meadowbrook Parkway?

23         A     I was advised it was north of Merrick Road.

24         Q     By that citizen?

25         A     Yes.

1    Q    Did you see a limousine when you arrived there?

2    A    Yes, I did.

3    Q    Where was the limousine?

4    A    The limousine was in the middle lane of the

5    southbound portion of the Meadowbrook Parkway just north of

6    the overpass on Babylon Turnpike.

7    Q    Describe the observations you made of the

8    limousine.

9    A    The limousine was pretty much, the front of the

10   car was destroyed.

11   Q    Did you see a woman named Jennifer Flynn in the

12   vicinity of the limousine?

13   A    Yes, I did.

14   Q    Where was she?

15   A    She was a little north of the limousine, leaning

16   up against the guardrail in the left lane.

17   Q    Did you approach her?

18   A    Yes, I did.

19   Q    What happened when you approached her?

20   A    When I first approached her I thought she had a

21   child with her and I asked her if she was okay.  And as I

22   got closer I noticed that she was holding a child's head in

23   her arms.

24   Q    Did you hear screaming from the limousine?

25   A    Yes, I did.

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 7 of 275 PageID #: 2921

1       Q       Did you look inside?

2       A       Yes.

3       Q       What did you see?

4       A       There were numerous people in the back of the car

5    with serious injuries.

6       Q       Describe any observations you made of the

7    driver's compartment of the limousine.

8       A       The driver's compartment was crushed and the

9    driver was obviously dead.

10              MR. LaMAGNA:   I'm sorry, I didn't hear that.

11      A       The driver of the car was obviously dead.

12      Q       Did you see a pick-up truck in the vicinity of

13   the limousine?

14      A       I did.

15      Q       Where was the pick-up truck?

16      A       It was adjacent to the limousine, facing

17   southbound in the left lane.

18      Q       Describe any observations you made of the pick-up

19   truck.

20      A       Severe front end damage.

21      Q       Did you see the defendant inside of the pick-up

22   truck?

23      A       I did.

24      Q       Where was he?

25      A       He was behind the driver's wheel.  The dashboard

1    was pushed up and the seat was kind of in an upright

2    position.  He was sitting upright with his legs spread wide

3    apart.

4          Q      Was the driver's window open when you first saw

5    the defendant?

6          A      Yes, it was.

7          Q      Did you see anyone else inside the pick-up truck?

8          A      No.

9          Q      Describe any observations you made of the

10   defendant when you first saw him behind the steering wheel

11   in the pick-up truck.

12         A      He was staring straight ahead with his head kind

13   of looking down.

14         Q      Did you did speak to the defendant?

15         A      Yes, I did.

16         Q      Where were you when you spoke with the defendant?

17         A      When I first asked him if he was okay, I was

18   standing on the guardrail.  He didn't respond.  I got down,

19   put my hand in the cab, put my hand on his shoulder.  I

20   asked him louder, what happened, where he was, and he turned

21   away from me, and that was it.

22         Q      What did he say when you asked him what happened

23   and where he was?

24         A      I asked him if he was okay.  He turned to me and

25   said, "What happened?  Where am I?"

1      Q      Is that all he said?

2      A      That's it.

3      Q      Did he ever answer your question about whether he

4  was okay?

5      A      No.

6      Q      Describe any observations you made of the

7  defendant's breath while you were with him then.

8      A      When I got into the pick-up truck cab I

9  recognized the odor of alcohol, his eyes were glazed over,

10  glassy.

11     Q      Describe any observations you made of the

12  defendant's speech.

13     A      It was extremely low and slurred.  I could hardly

14  make out what he was saying.

15     Q      Did you have any further contact with the

16  defendant?

17     A      No.

18            MR. HAYDEN:  Nothing further, your Honor.

19            THE COURT:  Mr. LaMagna?

20            MR. LaMAGNA:  May inquire, your Honor?

21            THE COURT:  Yes, please.

22  CROSS-EXAMINATION

23  BY MR. LaMAGNA:

24     Q      Good morning, officer.

25     A      Good morning.

1       Q    My name is Stephen LaMagna and I'm the attorney

2   for Mr. Heidgen.  I'm going to ask you a couple questions

3   here today.  If you don't understand the question, please

4   ask me to repeat it, and I will.

5            You're a member of the Freeport police

6   department; is that correct?

7       A    Yes.

8       Q    And how long have you been a member of the

9   Freeport police department?

10      A    Nine years and three months.

11      Q    And did you always have the same tour or did you

12  have different tours of duty during the course of those nine

13  years?

14      A    My first year I worked the day tour and since

15  then I worked night tours.

16      Q    How long have you been doing night tours?

17      A    Eight years now.

18      Q    And is your assignment routine radio motor

19  patrol?

20      A    Yes.

21      Q    Directing your attention to July 2, 2005, were

22  you also working a night tour radio motor patrol in the

23  Freeport police department?

24      A    Yes.

25      Q    And during the course of your patrol you said

1    that a civilian flagged you down, correct?

2         A    Yes.

3         Q    Where was that?

4         A    It was in the vicinity of the Home Depot on

5    Sunrise Highway.

6         Q    And the individual said, "Hey, there is a

7    terrible car accident, you need to get over there"?

8         A    He was honking his horn.  He said, Officer, looks

9    like there was a bad accident on the Meadowbrook."  He said

10   on the cell phone "There is no police there.  I think people

11   are hurt."

12        Q    Did you take that individual's name and number?

13        A    No, sir.

14        Q    And did you respond or did you first call

15   headquarters or any other police agency before going to the

16   scene?

17        A    I notified my command that there was a possible

18   accident on the Meadowbrook Parkway.

19        Q    And that was en route to the accident scene; is

20   that correct?

21        A    Yes.

22        Q    And the accident was on the Meadowbrook Parkway

23   at the Babylon Turnpike exit; is that correct?

24        A    Yes.

25        Q    Now, directing your attention to that date, you

1    said you arrived at the scene at approximately 2:05; is that

2    correct?

3          A     Yes, sir.

4          Q     Did you make any notation of when you arrived?

5          A     No.

6          Q     Now, when you arrived were you the first officer

7    at the scene?

8          A     There was another officer, county unit, that was

9    further north by the exit.  He was directing traffic off the

10   side of the road.

11         Q     So you were one of the first officers at the

12   scene; is that correct?

13         A     Correct.

14         Q     And when you arrived at the scene, you noticed

15   the two cars that were involved in this accident; is that

16   correct?

17         A     Yes.

18         Q     And you made various observations that you

19   articulated on direct examination, correct?

20         A     Yes.

21         Q     Now, you said at some point you went over to the

22   Chevy pick-up, correct?

23         A     Yes.

24         Q     And that was an Silverado, 1999 Silverado; is

25   that correct?

1        A        I believe so.

2        Q        And that's the car that Mr. Heidgen was in,

3  correct?

4        A        Yes.

5        Q        And you said when you approached that car, do you

6  remember what time, in the timeframe that was, that you

7  approached the Chevy pick-up?

8        A        It was within the first minute or two being

9  there.

10       Q        When you approached the Chevy pick-up was there

11  smoke still coming out of the cars?  It was pretty much

12  right after the accident, correct?

13       A        I don't recall smoke, steam.  I remember there

14  was gasoline leaking.

15       Q        It was horrible damage to each car, correct?

16       A        Yes.

17       Q        Now, you said when you approached the Chevy

18  pick-up, were you coming from, approaching the driver's side

19  of the car or were you approaching the passenger side of the

20  car?

21       A        I believe I approached the driver's side first.

22       Q        And when you approached the driver's side you

23  stated that you observed Mr. Heidgen staring straight ahead,

24  correct?

25       A        Yes.

1        Q       His eyes were open?

2        A       Yes.

3        Q       Did you observe any injuries to Mr. Heidgen?

4        A       He had a cut on his chin with a small blood

5   stain.   That was it.

6        Q       At some point you said to him, "Are you all

7   right?"  Is that correct?

8        A       Yes.

9        Q       And at some point he turned and looked at you,

10  correct?

11       A       He turned his head and looked at me, correct.

12       Q       So he responded to your question by turning and

13  looking at you but didn't say anything at this point,

14  correct?

15       A       After my second --

16       Q       The first time you said, "Are you all right?" he

17  just turned and looked at you, correct?

18       A       No, not the first time.

19       Q       Was that the second time?

20       A       Yes.

21       Q       He turned and looked at you, correct?

22       A       Yes.

23       Q       And then you asked him again, "Are you all

24  right?"  Correct?

25       A       Yes.

1      Q      And when you asked him if he was all right,

2  didn't he respond to you, "I don't know"?

3      A      "I don't know.  What happened?  Where am I?"

4      Q      You asked him if he was all right and what had

5  happened, correct?

6      A      Yes.

7      Q      So let's separate those two questions.  The first

8  question you asked him, "Are you all right?"  Correct?

9      A      Yes.

10     Q      And he responded to you by saying "I don't know,"

11  correct?

12     A      "I don't know.  Where am I?"

13     Q      And that was to the second question, "What

14  happened?"  He says, "I don't know."  "Are you all right?

15  What happened?"  He asked you what happened, correct?  What

16  did happen?

17     A      "What happened?  Where am I?"

18     Q      And did you respond to those questions that

19  Mr. Heidgen had then asked you?

20     A      No.

21     Q      So when you arrived at the location of the

22  accident the defendant was clearly conscious, correct?

23     A      He was conscious, yes.

24     Q      He was staring straight ahead, correct?

25     A      Yes.

1      Q      You asked him if he is all right, what happened.

2  He responded to that question by turning and looking at you,

3  correct?

4      A      Yes.

5      Q      And then you asked him again, "Are you all

6  right?"  His response to you was, "I don't know."  And to

7  your question what happened, he says, "I don't know.  What

8  did happen?"  Correct?

9      A      Something to that effect.

10     Q      And you then did not respond to his question of

11 you concerning what had happened, correct?

12     A      He turned his head away, and I said, "Hold on.

13 We got help coming."

14     Q      And he remained in the car, correct?

15     A      Yes.

16     Q      And this, would you estimate, was between 2:05

17 and 2:10?

18     A      Yes.

19     Q      Could it have been a little later than that, 2:15

20 maybe?

21     A      No.

22     Q      So no later than 2:10, correct?

23     A      Correct.

24     Q      Did you make a call to Officer Nolan to go to

25 that scene too?

1     A     I requested assistance over the radio.

2     Q     And then Officer Nolan did arrive; is that

3   correct?

4     A     Yes.

5     Q     Were you present when Officer Nolan was talking

6   to the defendant?

7     A     No.

8     Q     And the conversation that you had with

9   Mr. Heidgen was before he was extracted from the car,

10  correct?

11    A     Yes.

12    Q     And those are the only statements the defendant

13  had made to you in your relation to this case; is that

14  correct?

15    A     That's correct.

16          MR. LaMAGNA:  I have nothing further, your

17      Honor.

18          THE COURT:  Redirect?

19          MR. HAYDEN:  Briefly.

20  REDIRECT EXAMINATION

21  BY MR. HAYDEN:

22    Q     What was the first thing you said to the

23  defendant?

24    A     "Are you okay?"

25    Q     Did he respond to that question?

1      A      No.

2      Q      Did he look at you?

3      A      No.

4      Q      Did he respond in any way whatsoever?

5      A      No.

6      Q      With his eyes?

7      A      No.

8      Q      Verbally?

9      A      No.

10     Q      What's the next thing you said?

11     A      I said again to him when I got into the cab, and

12     that's when he turned his head and looked at me and he said,

13     "What happened?  Where am I?"  Something to that effect.

14     "What happened?  Where am I?"

15     Q      That's only after you got into the cab with him?

16     A      Yes.

17             MR. HAYDEN:  Nothing further, your Honor.

18     Thank you.

19             THE COURT:  Recross?

20     RECROSS-EXAMINATION

21     BY MR. LaMAGNA:

22     Q      The first time when you approached the vehicle

23     that the defendant was in, you approached the pick-up, and

24     you shouted at him if he was okay, that was the first time,

25     correct?

1        A        Correct.

2        Q        And his response to that first inquiry was that

3    he looked up at you as you were standing on the guardrail,

4    correct?

5        A        I don't recall if I was at the guardrail or

6    already in the cab.

7        Q        But he looked up at you, correct?

8        A        Yes, he looked up.

9        Q        So he responded to your inquiry, not verbally,

10   but you yelled at him, "Are you okay?"  You testified on

11   cross-examination he looked up at you and he stared at you,

12   correct?

13       A        Yes.

14       Q        And then you asked him again, "Are you okay?"

15   That's what happened, correct?

16       A        Yes.

17       Q        And then he responded to you, "I don't know.

18   What happened?  Where am I?"  Correct?

19       A        Yes.

20       Q        He was clearly conscious, correct?

21       A        He was conscious.

22       Q        He was answering your questions, correct?

23       A        Yes.

24       Q        And he asked you a question, correct?

25       A        Yes.

1    Q    And you didn't respond to his question, did you?

2    A    The only thing I remember saying to him, "Hold

3  on.  I got help coming."

4    Q    So he didn't respond to your question?

5    A    No.

6         MR. LaMAGNA:  Nothing further.

7  FURTHER DIRECT EXAMINATION

8  BY MR. HAYDEN:

9    Q    I want to make this clear:  Did he respond to you

10  at all when you first spoke to him?

11         MR. LaMAGNA:  Objection.  I'm going object.

12    I think the officer answered it twice that he looked up

13    at him.  Whether it was an oral response or a response,

14    it's still a response:

15         If the assistant district attorney wants to

16    ask a more specific question, did he verbally respond,

17    that's okay.  But a response is an ambiguous statement.

18         THE COURT:  You, gentlemen, are a little bit

19    new to my courtroom.  If you have an objection, all you

20    need to say is objection, and then I'll deal with it.

21         Objection is overruled.

22    A    He did not respond to my first question.

23    Q    Is it your testimony he didn't respond with his

24  eyes or verbally?

25    A    I don't believe he responded the first time with

1    his eyes, no.

2         Q     He didn't look at you then?

3         A     I don't believe so, no.

4              MR. HAYDEN:  Nothing further.

5              THE COURT:  Mr. LaMagna?

6    FURTHER CROSS-EXAMINATION

7    BY MR. LaMAGNA:

8         Q     Officer Pandolfo, do you remember preparing a

9    supporting deposition concerning the events that you

10   observed on July 2, 2005?

11        A     Yes.

12        Q     And that supporting deposition was prepared on

13   July 14th of '05; is that correct?

14        A     Yes.

15              MR. LaMAGNA:  May I have this marked

16        Defendant's A for identification, please?

17              THE COURT:  Yes.

18              (Supporting deposition was marked as

19        Defendant's Exhibit A for identification.)

20              THE CLERK:  Defendant's A for ID.

21        Q     Officer, I show you what's been marked

22   Defendant's A for identification.  I ask you to read that to

23   see if that refreshes your recollection with respect to what

24   Mr. Heidgen did when you shouted at him if he was okay.

25        A     Okay.

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 22 of 275 PageID #: 2936

1      Q     Six lines from the bottom.

2      A     Yes.

3      Q     So when you shouted at the defendant if he was

4  okay, the driver of the pick-up, Mr. Heidgen, looked up at

5  you as you were standing on the guardrail, correct?

6            Isn't that what it says there?

7                MR. HAYDEN:  Objection as to what it says.

8                THE COURT:  Sustained.

9      A     It says, I was --

10               MR. HAYDEN:  Objection.

11               THE COURT:  Sustained.

12     Q     Officer, when you shouted at him if he was okay,

13  the driver of the pick-up looked up at you as you were

14  standing on the guardrail.  Does that refresh your

15  recollection as to exactly what happened?

16     A     When I asked him, I was standing at the

17  guardrail.  I was getting down from the guardrail and I

18  asked him again.

19     Q     Sir, are you saying that that statement that you

20  prepared on July 14th of '05 is inaccurate?

21               MR. HAYDEN:  Objection.

22               THE COURT:  Sustained.

23     Q     When you asked the defendant are you okay, he

24  responded to you by looking up and turning and looking at

25  you, correct?

1          A       Would you repeat the question, please?

2          Q       When you asked the defendant, you yelled at the

3     defendant if he was okay, the defendant responded to you by

4     looking up and looking at you, correct?

5                    MR. HAYDEN:  Objection.

6                    THE COURT:  Sustained.

7          Q       Is that what happened?

8          A       I was on the guardrail getting down from the

9     guardrail when he started to turn his head.

10         Q       Towards you?

11         A       Towards me.

12         Q       And looked at you, correct?

13         A       Yes.

14         Q       After you yelled at him if he was okay, correct?

15         A       Yes.

16                   MR. LaMAGNA:  Nothing further.

17                   THE COURT:  Mr. Hayden?

18    FURTHER DIRECT EXAMINATION

19    BY MR. HAYDEN:

20         Q       Was that the first time you asked if he was okay?

21         A       I asked him twice.  The second TIME he answered

22    me.

23         Q       Was it the second time that he looked in your

24    direction?

25         A       I believe so.

1          MR. HAYDEN:  Nothing further, your Honor.

2          MR. LaMAGNA:  Nothing further.

3          THE COURT:  Thank you, officer.

4          (The witness was excused.)

5          THE COURT:  Mr. Hayden?

6          MR. HAYDEN:  Officer Timothy Nolan.

7   P. O.   T I M O T H Y   N O L A N ,   Shield Number

8      137, assigned to the Freeport Police Department,

9      having been first duly sworn by the Clerk of the

10     Court, was examined and testified as follows:

11          THE WITNESS:  Police Officer Timothy Nolan,

12     N-o-l-a n, Shield 137, Freeport Police Department.

13          THE COURT:  Mr. Hayden?

14          MR. HAYDEN:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MR. HAYDEN:

17     Q     Good morning, officer.

18     A     Good morning.

19     Q     How long have you been a member of the Freeport

20   police department?

21     A     A little more than nine years.

22     Q     Do you know a man named Martin Heidgen?

23     A     Yes, I do.

24     Q     Briefly describe him.

25     A     He's a male white, brown hair, approximately 25

1    years old.

2        Q      Do you see Martin Heidgen in this courtroom

3    today?

4        A      Yes, I do.

5        Q      Please point him out and describe for the record

6    what he's wearing today.

7        A      He's sitting to the right over there, wears a

8    gray shirt.

9                    MR. HAYDEN:  Let the record reflect, your

10           Honor, that the witness has indicated the defendant,

11           Martin Heidgen.

12                   THE COURT:  The record will so reflect.

13       Q      I'm directing your attention to the early morning

14   of Saturday, July 2nd of 2005.  Were you working then?

15       A      Yes, I was.

16       Q      What was your assignment that morning?

17       A      I was assigned to post number 11 within the

18   Village of Freeport.

19       Q      How were you dressed?

20       A      I was dressed in uniform.

21       Q      Using a motor vehicle?

22       A      Yes.

23       Q      Describe it.

24       A      It's a white police car, marked, with the Village

25   of Freeport, and it has the numbers 929 on it.

1       Q       Describe the weather that morning.

2       A       It was hot and humid.

3       Q       Did you respond that morning to the vicinity of

4   the southbound lanes of the Meadowbrook Parkway, just north

5   of the Babylon Turnpike overpass?

6       A       Yes, I did.

7       Q       What was the approximate time you arrived?

8       A       In between 2:05 and 2:10 in the morning.

9       Q       Describe the circumstances under which you

10  responded there.

11      A       I received a call for assistance from Officer

12  Pandolfo regarding a serious motor vehicle accident at the

13  location.

14      Q       Did you see a limousine when you arrived there?

15      A       Yes, I did.

16      Q       Where was the limousine?

17      A       The limousine was stopped in the middle lane of

18  the southbound traffic just north of the Babylon Turnpike

19  overpass.

20      Q       Describe any observations you made of the

21  limousine.

22      A       The limousine had extensive and serious front end

23  damage.

24      Q       Did you see a woman named Jennifer Flynn in the

25  vicinity of the limousine?

1    A    Yes.

2    Q    Where was she?

3    A    She was seated in the center median up against

4    the guardrail, just north of where a pick-up truck was

5    located.

6    Q    Describe any observations you made of her.

7    A    She was just sitting there, appeared to be in

8    shock, not moving, not speaking.  And she also appeared to

9    be holding a head.

10    Q    Did you look inside the limousine?

11    A    Yes, I did.

12    Q    What did you see?

13    A    I saw two males and one female, all screaming out

14    in pain, with obvious serious injuries.

15         I also observed what appeared to be a child's

16    body lying on the ground of the limousine.

17    Q    On the floor?

18    A    On the floor, yes.

19    Q    Describe any observations you made of the

20    driver's compartment of the limousine.

21    A    The driver's compartment was completely crushed

22    in, what appeared to be a person was inside.  We were not

23    able to really see too much of that person, and he obviously

24    had suffered fatal injuries.

25    Q    Did you see a pick-up truck in the vicinity of

1    the limousine?

2         A    Yes, I did.

3         Q    Where was the pick-up truck?

4         A    The pick-up truck was facing southbound.  It was

5    in the left lane of traffic next to the limo.

6         Q    Describe any observations you made of the pick-up

7    truck.

8         A    The pick-up truck also had very severe front end

9    damage.

10        Q    Did you see the defendant inside the pick-up

11   truck?

12        A    Yes, I did.

13        Q    Where was he?

14        A    He was seated where the driver would normally be

15   seated in the pick-up truck.  He was countered forward, up

16   against the dashboard in between the seat.  He was sitting

17   basically with his legs spread apart, kind of in a baseball

18   catcher's type position.

19        Q    Where was he with relation to the steering wheel?

20        A    The steering wheel had been pushed off to the

21   side, so he was basically almost directly right next to it.

22        Q    Driver's seat?

23        A    Driver's seat, yes.

24        Q    Did you see anybody else inside the pick-up

25   truck?

1     A     No one else was inside.

2     Q     Describe any observations you made of the

3  defendant when you saw him alongside the steering wheel in

4  the driver's seat of the pick-up truck.

5     A     The only thing I observed was that he had a small

6  laceration to his chin.

7     Q     Did you help remove the defendant from the

8  pick-up truck?

9     A     Yes, I did.

10    Q     Did you speak with the defendant after he was

11 removed from the pick-up truck?

12    A     Yes, I did.

13    Q     Where was the defendant when you spoke to him?

14    A     The defendant was placed on a back board after we

15 removed him from the pick-up truck.

16    Q     Where was he with relation to the pick-up truck?

17    A     We had taken him out of the pick-up truck and

18 started to place him on a stretcher.  We placed him

19 approximately 15 feet in front of the limousine in the

20 center lane of traffic onto the ground.

21    Q     Describe any conversation you had with the

22 defendant.

23    A     We had taken him out and put him down on the

24 ground.  I asked him if he was okay, if he was hurting

25 anywhere.  He was looking at me but didn't reply with any

1    answer.  And we had placed him down onto the ground.

2              I asked him what his name was; he was telling me

3    what his name was but it was difficult to understand him, so

4    I attempted to get closer to him.  He was slurring whatever

5    answer he was giving me.

6              After asking him numerous times I finally heard

7    what he was saying, and the answer he gave me was Marty.

8              I then asked him where he was coming from, and

9    again he was slurring his words.  I was very close to him.

10             I asked him again numerous times where he was

11   coming from, and finally I was able to understand him that

12   he was saying Long Beach, Long Beach.

13        Q    How far were I from the defendant while you were

14   speaking with him then?

15        A    I was a my knees, and I got very close.  I was

16   less than a foot away from him.

17        Q    Describe any observations you made of his breath.

18        A    There was a strong odor of alcoholic beverages

19   coming from him.

20        Q    His speech?

21        A    Speech was very slurred.  Again it was difficult

22   to hear him.

23        Q    His eyes?

24        A    Very glassy, bloodshot, groggy.

25        Q    Where was the defendant eventually placed after

P. O. Nolan - for People - cross                31

1    having been removed from the pick-up truck?

2         A    Stretcher was brought from an ambulance.  We

3    picked up the back board and placed him onto that stretcher

4    and wheeled the stretcher over to a Nassau County police

5    ambulance and placed him inside it.

6         Q    Did you have any further contact with the

7    defendant after he was placed in the ambulance?

8         A    No, I did not.

9         Q    Did you speak with the state police about your

10   observations?

11        A    Yes, I did.

12        Q    When what was that?

13        A    After my initial conversation with the defendant

14   I spoke to a State Police trooper and advised him that the

15   defendant was indeed intoxicated, that he probably would

16   have to be placed under arrest.

17             MR. HAYDEN:  Nothing further, your Honor.

18             MR. LaMAGNA:  May I inquire, your Honor?

19             THE COURT:  Yes.

20   CROSS-EXAMINATION

21   BY MR. LaMAGNA:

22        Q    Good morning, Officer Nolan.

23        A    Good morning.

24        Q    May name is Stephen LaMagna.  I'm going to ask

25   you a couple questions this morning.  If you don't

1   understand the questions, please feel free to ask me to

2   repeat it, and I will.

3       A      Yes.

4       Q      You're a member also of the Freeport police

5   department; is that correct?

6       A      Yes, sir.

7       Q      And had you known Officer Pandolfo prior to your

8   involvement in this case?

9       A      Yes, sir.

10      Q      And since the incident of July 2, '05 till today,

11  have you discussed this matter with Officer Pandolfo?

12      A      Yes, sir.

13      Q      And you had to have these discussions with

14  members of the district attorney's office, correct?

15      A      Yes.

16      Q      And did you speak to Officer Pandolfo this

17  morning about the nature of your testimony and his?

18      A      My testimony, no.

19      Q      About the incident, what you both observed?

20      A      I'm sorry?

21      Q      About the incident, about what you observed and

22  what he observed?

23      A      What we both observed?  I didn't speak directly

24  to him about it, no.

25      Q      Now, at some point, approximately at 2:10 a.m.

1   you received a call from Officer Pandolfo for assistance; is

2   that correct?

3       A     Approximately.

4       Q     And you arrived at the scene of this accident at

5   the Meadowbrook Parkway and Babylon Turnpike; is that

6   correct?

7       A     Yes.

8       Q     And when you arrived there, did you see Officer

9   Pandolfo?

10      A     Yes, I did.

11      Q     And did you speak to him pretty much about what

12  was happening?

13      A     He advised me of the incident, yes.

14      Q     And you made your own observations obviously,

15  correct?

16      A     Of the scene?

17      Q     Yes.

18      A     Yes.

19      Q     Now, when you spoke to Officer Pandolfo

20  initially, that was by the Chevy pick-up; is that correct?

21      A     He was standing by the Chevy pick-up.

22      Q     And were there any other officers at the scene at

23  this time, or they were just starting to roll out?

24      A     At this time officers, other responding officers,

25  were starting to arrive.

1       Q      You state that you went to the limousine.

2.             Actually you made some observations prior to

3   going to the limousine, correct?

4       A      When I first pulled up, yes.

5       Q      Then you went to the limousine, correct; you made

6   certain observations there?

7       A      After I went to the pick-up truck?

8       Q      Before you went to the pick-up truck.

9       A      Well, they were both side by side.

10      Q      Did you go to the defendant and speak to the

11  defendant prior to going to the limousine or after?

12      A      I went and had my conversation with the defendant

13  after I went to the limousine.

14      Q      After you went to the limousine you realized the

15  extraction may take a longer period of time, so you went

16  over to the Chevy pick-up; is that correct?

17      A      Originally I went to the Chevy pick-up, spoke to

18  Officer Pandolfo.

19      Q      Yes.

20      A      Then I went over to the limousine.

21      Q      Yes.  And then you went back to the Chevy?

22      A      Then I went back to the Chevy, correct.

23      Q      Now, you made certain observations of Mr. Heidgen

24  at that time when you went back to the Chevy pick-up,

25  correct?

P. O. Nolan - for People - cross                    35

1      A      The second time.

2      Q      Yes.  And was he staring straight ahead?  Was he

3   looking at you?

4      A      Well, while he was inside the pick-up?

5      Q      Inside the truck, pick-up?

6      A      Inside the pick-up truck there were other

7   officers extracting him.  I was waiting for them to extract

8   him.

9      Q      Did you aid in the extraction process of

10  Mr. Heidgen?

11     A      When the team that was extracting him pushed him

12  out, I took the back board, yes.

13     Q      What is a back board?

14     A      Back board is what you place an injured

15  individual on in order to basically stabilize their back.

16     Q      And you were helping in that process; is that

17  correct?

18     A      Yes.  Helping him get out after he was placed on

19  the back board.

20     Q      In fact, Mr. Heidgen attempted to get up numerous

21  times from the back board; is that correct?

22     A      While we were bringing him over in the center

23  lane of traffic he kept lifting his head.

24     Q      And you kept telling him to stop, to relax, lay

25  flat?

1       A       Yes, sir.

2       Q       And did he continue to keep trying to get up or

3   did he lay flat?

4       A       Eventually he laid flat.

5       Q       So he followed your command and remained flat on

6   the back board, was it?

7       A       Yes, when we placed him down onto the ground.

8       Q       And he was clearly conscious at that time,

9   correct?

10      A       At that time?

11      Q       Yes.

12      A.      Yes.

13      Q       Now, you said you had asked Mr. Heidgen two

14  questions, correct?

15      A       Actually I asked him four questions.

16      Q       "What's your name?"

17              Well, one that you testified to earlier you asked

18  him what his name was?

19      A       Yes.

20      Q       And you asked him where he was coming from,

21  correct?

22      A       Yes.

23      Q       And these questions that you asked of him were at

24  approximately 2:25 a.m.?

25      A       About.

1       Q       And when you asked him what his name was he

2  responded to you by responding Marty; is that correct?

3       A       Yes.

4       Q       And did you later learn that the defendant's name

5  is in fact Marty?

6       A       Yes.

7       Q       So you asked the defendant a question, correct?

8       A       Yes.

9       Q       The defendant responded to your question,

10  correct?

11       A       Yes.

12       Q       And he responded by articulating a name, correct?

13       A       Yes.

14       Q       The name he articulated was Marty, correct?

15       A       Yes.

16       Q       And Marty is in fact his name, correct?

17       A       Yes.

18       Q       So his response to you was not only responsive

19  but accurate, correct?

20       A       Yes.

21       Q       And you asked him a subsequent question, correct?

22       A       Yes.

23       Q       And you asked him where he was coming from,

24  correct?

25       A       Yes.

1       Q       And again Mr. Heidgen responded to that question,

2    correct?

3       A       Yes.

4       Q       And he responded to that question by articulating

5    a response to you by stating Long Beach, correct?

6       A       Yes.

7       Q       And are you familiar with the Meadowbrook State

8    Parkway?

9       A       Yes.

10      Q       Are you familiar with the geography around the

11   Meadowbrook Parkway?

12      A       Right where we are at that time particular time?

13      Q       I withdraw that.

14              Are you familiar with the geography south of the

15   Meadowbrook Parkway?

16      A       Not so much.

17      Q       Are you familiar with Long Beach?

18      A       Yes.

19      Q       And Long Beach is south of the Meadowbrook

20   Parkway?  You take the Meadowbrook Parkway south to get to

21   Long Beach, correct?

22      A       Yes.

23      Q       So if you're coming from Long Beach and you're at

24   the Meadowbrook Parkway and Babylon Turnpike going north, it

25   would make sense somebody would be coming from Long Beach,

1    correct?

2                   MR. HAYDEN:   Objection.

3                   THE COURT:   Sustained.

4        Q     So is Long Beach south of the Meadowbrook

5    Parkway?

6        A     South of where we are at that time, yes.

7        Q     Yes.  So the defendant responded to your question

8    to where you were coming from is Long Beach, correct?

9        A     Yes.

10       Q     And given the geography of the area it made

11   sense, correct?

12                  MR. HAYDEN:   Objection.

13                  THE COURT:   Sustained.

14       Q     Now, after the defendant articulated his name was

15   Marty and that he was coming from Long Beach, did you relay

16   that information to any of the State Police?

17       A     At that time?

18       Q     No, subsequent to that.

19       A     Subsequent to that, yes.

20       Q     Who did you relay that information to?

21       A     Investigator Harris.

22       Q     And how much time elapsed between the time the

23   defendant made these statements, which you said was around

24   2:25, to the time that the defendant was transported to the

25   hospital, if you know?

1       A       Repeat the question.

2       Q       How much time elapsed between the time the

3    defendant gave you these statements to the time that he was

4    transported to the hospital, if you know?

5       A       Approximately ten minutes.

6               MR. LaMAGNA:  I have nothing further, your

7       Honor.

8               THE COURT:  Redirect?

9               MR. HAYDEN:  No, your Honor.

10              THE COURT:  Thank you, officer.

11              (The witness was excused.)

12              THE COURT:  Mr. Hayden?

13              MR. HAYDEN:  Trooper Patrick Siegler.

14   Trooper   P A T R I C K   S I E G L E R ,   Shield

15       Number 349, assigned to the New York State Police,

16       having been first duly sworn by the Clerk of the

17       Court, was examined and testified as follows:

18              THE WITNESS:  Trooper Patrick Siegler,

19       S-i-e-g l e r, Shield 349, New York State police,

20       Brentwood.

21   DIRECT EXAMINATION

22   BY MR. HAYDEN:

23      Q       Good morning, trooper.

24      A       Good morning.

25      Q       How long have you been a member of the New York

1   State Police?

2        A     Approximately six years.

3        Q     Do you know a man named Martin Heidgen?

4        A     Yes.

5        Q     Briefly describe him.

6        A     White male, twenties, dark hair.

7        Q     Do you see Martin Heidgen in this courtroom

8   today?

9        A     I do.

10        Q     Please point him out and describe for the record

11   what he's wearing today.

12        A     In the gray shirt, seated to my left.

13              MR. HAYDEN:  Let the record reflect that the

14        witness identified the defendant, Martin Heidgen.

15              THE COURT:  The record will so reflect.

16        Q     I'm directing your attention to the early morning

17   of Saturday, July 2nd of 2005.  Were you working then?

18        A     Yes, I was.

19        Q     What was your assignment that morning?

20        A     I was assigned to Patrol Post 981, which includes

21   the Meadowbrook Parkway.

22        Q     How were you dressed?

23        A     In uniform.

24        Q     Using a motor vehicle?

25        A     Marked State Police vehicle.

1    Q    Were you working with a partner?

2    A    I was working with trooper Eric Bruns.

3    Q    How was he dressed?

4    A    Also in uniform.

5    Q    Describe the weather that morning.

6    A    It was quite humid, very warm.

7    Q    Did you respond that morning to the vicinity of

8  the southbound lanes of the Meadowbrook Parkway just north

9  of the Babylon Turnpike overpass?

10    A    Yes.

11    Q    When was the approximate time you arrived?

12    A    Approximately 2:10 a.m.

13    Q    Describe the circumstances under which you

14  responded there.

15    A    I received a radio dispatch from SP Farmingdale

16  communications, advising us to check for an accident on the

17  Meadowbrook Parkway northbound in the area of Merrick Road.

18    Q    Did you see a limousine when you arrived?

19    A    Yes.

20    Q    Where was the limousine?

21    A    It was on the Meadowbrook, southbound in the

22  center lane, facing south.

23    Q    Describe any observations you made of the

24  limousine.

25    A    The front end of the limousine was destroyed.

1      Q      Did you see a woman named Jennifer Flynn in the

2  vicinity of the limousine?

3      A      Yes, I did.

4      Q      Where was she?

5      A      She was in the center median, sitting next to the

6  guardrail.

7      Q      Describe any observations you made of her.

8      A      She appeared to be in shock.

9      Q      Did you look inside the limousine?

10     A      Yes, I did.

11     Q      Describe any observations you made when you

12  looked inside the limousine.

13     A      There were several people inside the limousine in

14  various states of serious injuries.

15     Q      Describe the observations you made of the

16  driver's compartment of the limousine.

17     A      The driver's compartment was completely crushed

18  around driver's area.

19     Q      Did you see a pick-up truck in the vicinity of

20  the limousine?

21     A      There was a pick-up truck in the left-hand lane

22  adjacent to the limousine, also facing south.

23     Q      Describe any observations you made of the pick-up

24  truck.

25     A      Pick-up truck also had heavy front end damage.

1    Q      Did you see the defendant inside the pick-up

2  truck?

3    A      Yes.

4    Q      Where was he?

5    A      He was behind the wheel of the pick-up truck.

6    Q      Was the driver's window open when you first saw

7  the defendant?

8    A      Yes.

9    Q      Did you see anyone else inside the pick-up truck?

10   A      No.

11   Q      Describe any observations you made of the

12  defendant when you first saw him behind the steering wheel

13  of the pick-up truck?

14   A      Looking straight ahead, sitting mostly upright,

15  had a small cut under his chin that I could see.

16   Q      Did you speak with a man named Michael Ierardi

17  when you arrived at the scene of the collision?

18   A      Yes, I did.

19   Q      Who is he?

20   A      I believe he's a New York City court officer.  He

21  was one of the first to arrive at the scene.  He was

22  standing in the lane of traffic just prior to the Babylon

23  Turnpike exit.  He had flagged us down.

24   Q      When did you first speak with Michael Ierardi?

25   A      Just at the moment we arrived.

1     Q     What did he tell you?

2     A     He told us that he was very shaken up.  He said

3  the accident, it's very bad, there is people dead in there.

4  There is a lot of people injured.

5     Q     Did you eventually speak with a man named Steve

6  Davidson at the scene of the collision?

7     A     Yes.

8     Q     Who is he?

9     A     Mr. Davidson was traveling southbound on the

10  Meadowbrook Parkway in a Nissan Maxima with two of his

11  family members.  He had been the third vehicle involved in

12  the accident.

13     Q     When did you speak with Steve Davidson?

14     A     Approximately 2:20.

15     Q     What did Steve Davidson tell you then?

16     A     He told me that he was travelling southbound; he

17  was in the center lane.  The limousine approached his

18  vehicle from the rear, moved into the left-hand lane and

19  passed him. And as the limousine was passing him, he

20  observed the pick-up truck coming northbound in the

21  southbound lanes, and he tried to pull to the right, the

22  limousine tried to pull to the right. The limousine was

23  struck head on by the pick-up truck, and at or about the

24  same time his vehicle was struck on the left rear by the

25  limousine.

1      Q      Did he tell you anything about speed?

2      A      I had asked him how fast he was going.  He said

3  he was going approximately 55.  He said the limousine was

4  going only a little faster than he was.

5      Q      Did you see Steve Davidson's Maxima?

6      A      Yes.

7      Q      Where was the Maxima?

8      A      Maxima was just south of the Babylon Turnpike

9  overpass, mostly in the right lane, facing northbound.

10      Q      Did you notice any damage to the Maxima?

11      A      There was damage on the left rear quarter panel.

12      Q      Was the defendant removed from the pick-up truck?

13      A      Yes.

14      Q      Where were you while the defendant was being

15  removed from the pick-up truck?

16      A      I believe I was just finishing speaking to

17  Mr. Davidson.

18      Q      Where was the defendant placed after being

19  removed from the pick-up truck?

20      A      He was placed into a Nassau County police

21  ambulance.

22      Q      Did you join the defendant in the ambulance?

23      A      Yes, I did.

24      Q      Had you spoken to any Freeport police officer

25  before joining the defendant?

1      A      I had spoken to Police Officer Nolan from the

2  Freeport police department as he was on the stretcher being

3  loaded into the ambulance, and Officer Nolan had indicated

4  to me that the defendant was intoxicated.

5      Q      Describe the defendant's position when you joined

6  him in the ambulance.

7      A      He was lying on his back, wearing a neck brace.

8      Q      Was he facing you as you entered the ambulance?

9      A      He was looking straight up at the ceiling.

10     Q      Where was his head with relation to the front of

11 the ambulance?

12     A      Towards the front of the ambulance.

13     Q      Describe any initial observations you made of the

14 defendant when you entered the ambulance and saw him then.

15     A      When I entered the ambulance and I observed the

16 defendant, I looked in his eyes.  His eyes were watery and

17 bloodshot, and there was a strong smell of, odor of alcohol

18 coming from his breath.

19     Q      Did the defendant look in your direction when you

20 entered the ambulance?

21     A      No, he did not.

22     Q      Who was in the ambulance when you entered?

23     A      I believe AEMT Cook was in the ambulance.

24     Q      Where was he?

25     A      He was sitting to the right.

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 48 of 275 PageID #: 2962

1     Q      Where did you position yourself in the ambulance?

2     A      Just to the left of the stretcher.

3     Q      Did you try to speak with the defendant?

4     A      I had asked him his name.

5     Q      Where were you when you asked defendant his name?

6     A      Just to the left of the stretcher, as I

7  described.

8     Q      Did the defendant respond in any way?

9     A      No, he did not.

10    Q      What did he do?

11    A      He didn't make any verbal answer; he didn't look

12  at me, he didn't acknowledge me.

13    Q      What did you do then?

14    A      I repeated, I asked him a second time, "What's

15  your name?"

16    Q      Louder?

17    A      Yes.

18    Q      What happened then?

19    A      He didn't look at me and he didn't respond.

20    Q      Did the defendant ever utter an intelligible

21  sound while you were with him?

22    A      No.

23    Q      Did the defendant ever look at anyone directly

24  while you were with him?

25    A      No.

1      Q      Did you or anyone else tell the defendant he was

2    under arrest while you were with him?

3      A      No.

4      Q      Did you leave the ambulance?

5      A      Repeat the question.  I didn't hear.

6      Q      Did you leave the ambulance?

7      A      Yes.

8      Q      Describe the circumstances under which you left

9    the ambulance.

10     A      Trooper O'Hare was sent to retrieve a blood kit

11   from his vehicle by Trooper Knapp.  Trooper O'Hare was

12   returning and left the ambulance, and they left for the

13   hospital.

14     Q      Describe any observations you made of the

15   defendant during that time you spent with him inside the

16   ambulance.

17     A      His eyes were open, he was looking straight up at

18   the ceiling.  He was moaning a little bit.

19     Q      Describe any observation you made of his breath.

20            MR. LaMAGNA:  Objection.

21     A      Strong odor of alcohol on his breath.

22            THE COURT:  Overruled.

23     Q      Was the ambulance driven away?

24     A      Yes, it was.

25     Q      When?

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 50 of 275 PageID #: 2964

1       A       Approximately 2:33 a.m.

2       Q       Did you recover the defendant's wallet that

3  night?

4       A       Yes.

5       Q       When did you recover the defendant's wallet?

6       A       After the ambulance had left I still did not know

7  who he was.  I went over to the pick-up truck to try and

8  find some kind of document that belonged to him.  I shined

9  my flashlight inside the pick-up truck.  I was not able to

10 get inside because of the damage to it.

11              I saw with my flashlight a wallet on the driver's

12 side floormat.  There was a piece of a broken fishing pole

13 inside.  The fishing pole, I looked at that and lifted the

14 wallet up with it.

15      Q       What did you do after you retrieved the wallet?

16      A       I opened the wallet and found an Arkansas photo

17 license inside.  The photo license, the picture of the --

18 The picture that was on the license appeared to be one and

19 the same of the person who just left in the ambulance who

20 was behind the wheel of the pick-up truck at the time of the

21 accident.

22      Q       Is that how you identified the defendant that

23 night?

24      A       Yes.

25              MR. HAYDEN:  Nothing further, your Honor.

1              THE COURT:  I need to take care of some

2      housekeeping.  We'll break at this time until 2

3      o'clock, at which time cross-examination of the trooper

4      will take place.

5              MR. HAYDEN:  Your Honor, may I ask one final

6      question of the trooper?

7              THE COURT:  Yes.

8              MR. HAYDEN:  I'm sorry.

9  BY MR. HAYDEN:

10     Q      Trooper, was a determination made to arrest the

11 defendant?

12     A      Yes.

13     Q      What was the approximate time of that

14 determination?

15     A      Approximately 2:33 a.m.

16     Q      Was that determination communicated to the

17 defendant in any way?

18     A      No.

19             MR. HAYDEN:  Thank you, your Honor.

20             THE COURT:  You're welcome.  2 o'clock.

21             (Luncheon recess.)

22                   *       *       *

23

24

25

1                      AFTERNOON SESSION

2              (Trooper Siegler resumed the witness stand.)

3              THE COURT:  Mr. LaMagna?

4              MR. LaMAGNA:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. LaMAGNA:

7         Q    Good afternoon, Trooper Siegler.

8         A    Good afternoon.

9         Q    I mentioned I'm the attorney for Mr. Heidgen.  I

10   will ask you a couple questions this afternoon.  If you

11   don't understand the questions, please ask me and I'll

12   repeat that.

13        A    Okay.

14        Q    On the paperwork you're listed as the arresting

15   officer; is that correct?

16        A    Correct.

17        Q    And you are the arresting officer; is that

18   correct?

19        A    Correct.

20        Q    And the time of the arrest was 2:33 a.m. on July

21   2, 2005; is that correct?

22        A    Yes.

23        Q    Now, prior to that time, at approximately 2:06,

24   you received a radio call; is that correct?

25        A    Correct.

1       Q       And that was to respond to the location of the

2   Meadowbrook Parkway and Babylon Turnpike; is that correct?

3       A       Yes.

4       Q       And you responded to that location at that time?

5       A       Yes.

6       Q       And what time did you say you arrived at that

7   location?

8       A       Approximately ten minutes after 2.

9       Q       About 2:10?

10      A       Yes.

11      Q       And when you arrived at the location you made

12   various observations.  Were there other police officers

13   present at the time?

14      A       Yes.

15      Q       And did you speak to any of them?

16      A       Just briefly to see what they had seen so far.

17      Q       Who did you speak to?

18      A       Initially I don't recall their names.  Just there

19   was a couple of Freeport police officers and some Nassau

20   County police officers.

21      Q       Were you the first trooper on site?

22      A       Yes.

23      Q       And when you arrived you made an observation of

24   the limousine and the 1999 Silverado pick-up, correct?

25      A       Correct.

1       Q       And both had extensive front end damage, correct?

2       A       Yes.

3       Q       Now, directing your attention to sometime

4    thereafter, approximately 2:20 a.m., you were speaking to a

5    civilian witness, correct?

6       A       I was speaking to Steve Davidson.  He was another

7    motorist involved in the accident.

8       Q       And that was at 2:20 a.m.?

9       A       Correct.

10      Q       And at some point thereafter you spoke to a

11   Trooper Knapp; is that correct?

12      A       Yes.

13      Q       Where was that?

14      A       Just near the area of the overpass of Babylon

15   Turnpike.

16      Q       And Trooper Knapp informed you that Mr. Heidgen

17   was being taken from his vehicle and being placed into an

18   ambulance, correct?

19      A       That's correct.

20      Q       And you as a result went to the ambulance where

21   Mr. Heidgen was located at that time; is that correct?

22      A       Correct.

23      Q       Was he already in the ambulance?

24      A       No, he was -- they were loading him in.

25      Q       Was he on a stretcher?

1       A       Yes.

2       Q       Do you recall who was loading Mr. Heidgen into

3    the ambulance?

4       A       No.

5       Q       So you didn't participate in the extraction of

6    Mr. Heidgen from his car to the stretcher; is that correct?

7       A       Correct.

8       Q       Now, when you arrived at the pick-up, was

9    Mr. Heidgen still in the pick-up or was he already out of

10   the pick-up?

11      A       At what time are you referring to?

12      Q       When you first --

13      A       When I first arrived at the scene?

14      Q       Yes.

15      A       He was still in the vehicle.

16      Q       Is that when you made the observation that you

17   articulated in the direct examination when you saw him?

18      A       Yes.

19      Q       And the door was open; is that correct?

20      A       No, the window was open.

21      Q       The window was open.  I'm sorry, that's my

22   mistake.

23              So the window was open and Mr. Heidgen was behind

24   the wheel; is that correct?

25      A       Yes.

Trooper Siegler - for People - cross                    56

1       Q       You say he was looking straight ahead?

2       A       Yes.

3       Q       And he had a cut on his chin?

4       A       Yes.

5       Q       His eyes were open?

6       A       Yes.

7       Q       He was conscious?

8       A       Yes.

9       Q       And that's when you went over and did your

10   interview of Mr. Davidson; is that correct?

11      A       Yes.

12      Q       And then you went back to the area where

13   Mr. Heidgen was, that he was getting transported into the

14   ambulance, correct?

15      A       Yes.

16      Q       So you observed Mr. Heidgen being placed into the

17   ambulance; is that correct?

18      A       Yes.

19      Q       And you observed him in the ambulance, right?

20      A       Yes.

21      Q       And you said he was laying on his back prior?

22      A       Yes.

23      Q       Staring straight up, correct?

24      A       Yes.

25      Q       And you went into the ambulance, correct?

1        A       Yes.

2        Q       And in the ambulance was yourself, AMT Cook and

3    Mr. Heidgen; is that correct?

4        A       Yes.

5        Q       You said you observed the defendant with

6    bloodshot, glassy eyes; is that correct?

7        A       That's correct.

8        Q       And you stated that you had asked him his name

9    and he ignored you, correct?

10               MR. HAYDEN:   Objection.

11               THE COURT:   Sustained.

12       Q       You asked him his name and he didn't respond to

13   you, correct?

14       A       That's correct.

15       Q       And you asked him again and again he didn't

16   respond to you, correct?

17       A       Yes.

18       Q       He was staring straight ahead, correct?

19       A       Yes.

20       Q       And you said you noticed him moaning, correct?

21       A       Yes.

22       Q       Now, you were also told by Officer Knapp, were

23   you not, that a trooper was coming with a blood kit, is that

24   correct, to the ambulance?

25       A       Yes.

1      Q      And that trooper was Trooper O'Hare, correct?

2      A      Correct.

3      Q      And did there come a time that Trooper O'Hare

4   came to the ambulance?

5      A      Yes.

6      Q      Approximately what time was that?

7      A      Approximately 2:30.

8      Q      About 2:30.

9              And when Trooper O'Hare arrived at the ambulance

10  he took your place and you left the ambulance, correct?

11     A      Yes.

12     Q      Now, is that the first time you saw Trooper

13  O'Hare at the scene?

14     A      No.

15     Q      You had seen him earlier?

16     A      I had seen him at the scene, yes.  I don't

17  believe we had any discussion, though.

18     Q      So when Trooper O'Hare came to the ambulance

19  where you were around 2:30, did he have with him the blood

20  kit?

21     A      Yes.

22     Q      And were you told he's going to the hospital with

23  Mr. Heidgen, correct?

24     A      Yes, myself and Trooper Knapp discussed that.

25     Q      And was it discussed that he would take your spot

1    and he would go with him?

2         A     And I would remain at the scene.

3         Q     Okay.  And you saw the blood kit, correct?

4         A     Yes.

5         Q     And did you see the ambulance leave with O'Hare,

6    the defendant, and the AEMT?

7         A     Yes.

8         Q     Now, while you were in the ambulance with

9    Mr. Heidgen you never placed him under arrest; is that

10   correct?

11        A     I did not verbally communicate to him that he was

12   under arrest, as he did not understand my previous question.

13                MR. LaMAGNA:  Judge, I'd ask that that be

14        stricken.  That was responsive.

15                THE COURT:  Granted.

16        Q     You did not place Mr. Heidgen under arrest in the

17   ambulance; is that correct?

18        A     That's incorrect.

19        Q     Did you articulate to Mr. Heidgen that he was

20   under arrest?

21        A     No, I did not.

22        Q     In your presence in the ambulance do you recall

23   if anybody articulated to Mr. Heidgen that he was under

24   arrest?

25        A     No.

1     Q      When the ambulance left with Trooper O'Hare, the

2   defendant and the EMT to the hospital -- withdrawn.

3           Subsequent to the ambulance going to the hospital

4   did you notify Trooper O'Hare that the defendant was in fact

5   under arrest?

6     A      Personally I did not notify him.  He knew from

7   Trooper Knapp already.

8     Q      I'm asking you what you did, not what you think

9   he knew.  Did you?

10    A      No, I did not personally inform him.

11    Q      And based upon your conversations with Trooper

12  Knapp and Trooper O'Hare, Trooper O'Hare was to accompany

13  the defendant to the hospital for the purposes of getting a

14  blood sample from the defendant; is that correct?

15    A      Correct.

16    Q      When you left the ambulance Mr. Heidgen was in

17  the same condition as he was when you first went into the

18  ambulance; he was staring straight ahead at the ceiling?

19    A      Yes.

20    Q      Eyes open?

21    A      Yes.

22    Q      Still moaning?

23    A      Still moaning.

24    Q      Still conscious?

25           MR. HAYDEN:   Objection.

1        THE COURT:  Sustained.

2    Q    Was he conscious when the ambulance left?

3        MR. HAYDEN:  Objection.

4        THE COURT:  Sustained.

5        MR. LaMAGNA:  Nothing further, Judge.

6        THE COURT:  Redirect?

7        MR. HAYDEN:  No, your Honor.

8        THE COURT:  Thank you, trooper.

9        (The witness was excused.)

10        THE COURT:  Mr. Hayden?

11        MR. HAYDEN:  Trooper Daniel O'Hare.

12        For the record, your Honor, Maureen

13    McCormick, assistant district attorney McCormick, will

14    be asking questions of Trooper O'Hare.

15        THE COURT:  Fine.

16        MS. McCORMICK:  Thank you, your Honor.

17  Trooper  D A N I E L   O ' H A R E ,      Shield

18    Number 5012, assigned to the New York State

19    Police, having been first duly sworn by the Clerk

20    of the Court, was examined and testified as

21    follows:

22        THE WITNESS:  Trooper Daniel O'Hare,

23    O'-H-a-r-e, Shield 5012, New York State Police.

24        MS. McCORMICK:  Your Honor, may I?

25        THE COURT:  Yes.

1    DIRECT EXAMINATION

2    BY MS. McCORMICK:

3          Q       Good afternoon.

4          A       Good afternoon.

5          Q       How long have you been working with the New York

6    State Police?

7          A       Approximately four years.

8          Q       Were you working on July 2, 2005?

9          A       I was.

10         Q       Can you tell the Court, please, what was your

11   tour that date?

12         A       My tour was a two-shift, which is from 7 p.m. to

13   7 a.m.

14         Q       Who were you working with?

15         A       Trooper Michael Stafford, shield 503.

16         Q       Trooper O'Hare, did you have occasion to respond

17   to a collision in the southbound lanes of the Meadowbrook

18   Parkway at Babylon Turnpike, just north of it, just after 2

19   a.m.?

20         A       Yes.

21         Q       And can you describe for the Court, please, what

22   you observed about the vehicles when you responded to that

23   location?

24         A       I responded to that location to see two vehicles

25   with severe front end damage.

1       Q       Can you describe the location of the vehicles and

2  the type of vehicles, to the best of your recollection?

3       A       It was two vehicles.  One was a black limousine,

4  one was a silver pick-up, and they were both southbound on

5  the Meadowbrook, just north of the Babylon Turnpike.

6       Q       Upon arriving at the location, trooper, did you

7  have occasion to speak to any other New York State Police

8  personnel?

9       A       Yes, I did.

10      Q       Can you tell the Court who it is that you spoke

11 to?

12      A       The first trooper I spoke to was Trooper William

13 Knapp, shield 4641.

14      Q       At the time that you arrived, Trooper O'Hare,

15 were there other police vehicles and New York State Police

16 department their?

17      A       Yes.

18      Q       Can you describe for the Court approximately how

19 many?

20      A       There were many; State Police vehicles, Nassau

21 County police, Freeport police, EMS and Fire Department.

22      Q       And you spoke to Trooper Knapp upon your arrival?

23      A       That is correct.

24      Q       Can you tell the Court what did you do after you

25 spoke to Trooper Knapp?

1          A       I first spoke to trooper -- I went back to my

2     marked unit and got a blood kit.

3          Q       What did Trooper Knapp tell you to do?

4          A       He told me there was a serious accident, fatality

5     involved, and one of the drivers is possibly DWI.

6          Q       And you said you got a blood kit.  Can you tell

7     the Court, what is a blood kit?

8          A       The blood kit is a New York State blood kid that

9     is used to get blood from a subject for a DWI.

10         Q       And where was that located?

11         A       It was located in the trunk of the marked unit.

12         Q       Did you acquire a blood kit from your vehicle?

13         A       Yes.

14         Q       What did you do with the blood kit?

15         A       I held onto it.

16         Q       Where did you go next?

17         A       Next I walked over to the Silverado pick-up.

18         Q       What did you observe when you went over to

19     Silverado pick-up?

20         A       I observed a subject behind the steering wheel

21     getting removed from the vehicle with the help of EMS and

22     the fire department.

23         Q       Did you ever come to learn the name of that

24     person that you saw inside the pick-up?

25         A       Yes, I did.

1    Q     What was his name?

2    A     Martin Heidgen.

3    Q     Do you see the person that you saw inside the

4  pick-up being extricated in this courtroom today?

5    A     Yes.

6    Q     Would you briefly describe him for the Court?

7    A     He's a white male with dark hair.

8    Q     Clothing?

9    A     He's wearing a gray shirt.

10         MR. HAYDEN:  Your Honor, I'd ask that it

11   indicate for the record the defendant.

12         THE COURT:  The record will so reflect.

13         MS. McCORMICK:  Thank you.

14   Q     Trooper, you said that you observed the defendant

15  still inside the vehicle; is that correct?

16   A     That is correct.

17   Q     How close did you get to the defendant at that

18  time?

19   A     A few feet away.

20   Q     What was going on while you walked over to that

21  pick-up truck?

22   A     EMS and fire were trying to get him out of the

23  vehicle.

24   Q     About how many people were surrounding, if that's

25  correct -- Was he surrounded?

1        A       Pretty much.

2        Q       How many people were with the defendant at that

3    time?

4        A       There were about five to six people around him.

5        Q       Were you one of the people extricating him or

6    were you standing?

7        A       I was standing back.

8        Q       Were you able at that time, Trooper O'Hare, to

9    make any observations about the defendant's person?

10       A       None at that time.

11       Q       What happens next?

12       A       He was removed from the pick-up, put on a back

13   brace, put on a gurney and brought over to an ambulance.

14       Q       Where did you go?

15       A       After he was put in the ambulance I entered the

16   ambulance with him.

17       Q       Prior to his being put into the ambulance did you

18   have an opportunity to make observations of the defendant?

19       A       None at this time.

20       Q       When he was put into the ambulance what, if

21   anything, happened next?

22       A       After that I got into the ambulance, seating

23   myself to the left side of the subject and trying to get

24   some information out of him.

25       Q       Was anybody else in the ambulance with you?

1      A      Yes, there was.

2      Q      Who was that, please?

3      A      EMT Cook, shield 83.

4      Q      Trooper O'Hare, when you say that you went into

5  the ambulance to the left of the subject, can you describe

6  how the defendant was positioned in that ambulance?

7      A      He was positioned that his head was closest to

8  the front of the vehicle and his feet were closest to the

9  back of the vehicle.

10     Q      Was he upright or laying down?

11     A      He was laying down.

12     Q      And you went to his left, or the left as you

13  looked into the ambulance from the back open doors?

14     A      The left as you look from the back of the

15  ambulance doors.

16     Q      And where was EMT Cook?

17     A      He was on the other side.

18     Q      About how close would you say that you were to

19  the defendant's head from where you were positioned?

20     A      Inside the ambulance?

21     Q      Yes.

22     A      A foot, maybe two.

23     Q      Did you have occasion at this time to make any

24  observations of the defendant inside the ambulance?

25     A      Yes.

1    Q    Was the ambulance lit?

2    A    Yes, it was.

3    Q    Can you describe for the Court, please, what did

4  you observe about the defendant?

5    A    I detected a strong odor of alcoholic beverage,

6  and also noticed that his eyes were very bloodshot and

7  glassy.

8    Q    Did you notice anything else about him at that

9  time?

10    A    That was it at that time.

11    Q    Can you tell the Court, was he being treated in

12  any way?

13    A    Yes, he was.

14    Q    What kind of treatment was he receiving?

15    A    EMT Cook was trying to remove his clothes and

16  just doing different things to secure him into the gurney.

17    Q    Besides the back board, did he have any other

18  medical apparatus?

19    A    Yes, he did.

20    Q    What was what that?

21    A    He had a neck brace on.

22    Q    Did you have occasion to, from his position with

23  the neck brace, get close to his eyes?

24    A    Yes.

25    Q    How close did you get to his eyes?

1      A      Approximately a foot.

2      Q      How close did you get to his mouth?

3      A      Approximately a foot.

4      Q      At the time that you were a foot away from his

5 face, trooper, did you speak to the defendant?

6      A      Yes, I did.

7      Q      What did you say to him?

8      A      I asked him his name.

9      Q      And what did he respond?

10      A      I got no response.

11      Q      Trooper, when you say you had no response, what

12 are you referring to?

13      A      I got no response I could understand.   There was

14 a lot of moans and groans, a lot of incoherent speech;

15 nothing I could articulate as an answer.

16      Q      Trooper, when you were about a foot away from the

17 defendant's face were you able to see his eyes?

18      A      Yes, I was.

19      Q      When you spoke to the defendant, did his eyes

20 meet yours?

21      A      No, they did not.

22      Q      Can you describe the position of his eyes while

23 you were speaking to him?

24      A      He was just lying straight up.

25      Q      The moans and groans, trooper, as you asked him a

1    question, were the moans and groans in response to your

2    questions?  Could you tell?

3        A     No.

4              MR. LaMAGNA:  Objection.

5              THE COURT:  I'll allow it.

6        Q     You can answer.

7        A     There were moans and groans throughout; before I

8    would ask him a question, during and after.

9        Q     How many times did you try to speak to the

10   defendant in the back of the ambulance?

11       A     Several times.

12       Q     And each time what is it that you were asking

13   him, trooper?

14       A     His name mostly.  And after a while I was asking

15   him to calm down.

16       Q     Why did you ask him to calm down?

17       A     He kept moving his arms.

18       Q     What did you do in response to his moving his

19   arms?

20       A     We tied down his arms with straps on the gurney.

21       Q     When you say "we," who is that?

22       A     Myself and EMT Cook.

23       Q     In your experience in the ambulance, did EMT Cook

24   try to converse with the defendant?

25       A     Yes.

1    Q       And could you describe that for the Court,

2   please?

3    A       EMT Cook basically was --

4               MR. LaMAGNA:  Objection, your Honor.

5               THE COURT:  Overruled.

6    A       He --

7               THE COURT:  Wait a minute.

8               Why?

9               MR. LaMAGNA:  He's articulating questions

10   that the EMT asked the defendant and what the defendant

11   referred to another person.

12              THE COURT:  Hearsay is allowed.

13              MR. LaMAGNA:  Two times over.

14              THE COURT:  Two times over is also allowed.

15              Overruled.

16   Q       You may answer, trooper.

17   A       EMT Cook was just telling him to calm down, to

18   relax, let us try to help you.

19   Q       During the course of that conversation, if you

20   can call it that, did the defendant acknowledge EMT Cook in

21   the ambulance?

22              MR. LaMAGNA:  Objection.

23              THE COURT:  Sustained.

24   Q       Did the defendant speak to EMT Cook?

25   A       No.

1      Q      Did the defendant look in the direction of EMT

2   Cook?

3      A      No.

4      Q      Did the defendant do anything with respect to EMT

5   Cook telling him to calm down?  Did he actually calm down?

6      A      No.

7                  MR. LaMAGNA:  Objection.

8                  THE COURT:  Overruled.

9      Q      Trooper, during the time you were in the back of

10  that ambulance did the defendant ever acknowledge you or EMT

11  Cook speaking to him?

12                 MR. LaMAGNA:  Objection.

13                 THE COURT:  Overruled.

14     A      No.

15     Q      Did the defendant ever look at either yourself or

16  EMT Cook while you were speaking to him?

17     A      No.

18     Q      Did the defendant ever utter intelligible speech?

19     A      No.

20                 MR. LaMAGNA:  Objection to intelligible.

21                 THE COURT:  Sustained.

22     Q      Did he say anything you understood?

23     A      No.

24     Q      Can you describe for the Court the type of sounds

25  that you heard the defendant make in the back of that

1   ambulance?

2        A        They sounded like moans and groans.

3        Q        Now, did there come a time, trooper, that you

4   left the crash scene?

5        A        Yes.

6        Q        And did you remain in the ambulance with the

7   defendant?

8        A        Yes.

9        Q        Where did you go?

10       A        We went to the Nassau University Medical Center.

11       Q        And approximately how long a trip was it from the

12   crash scene to the Medical Center?

13       A        Approximately ten minutes.

14       Q        Did EMT Cook remain in the ambulance with you?

15       A        Yes.

16       Q        Can you describe the demeanor of the defendant

17   during that ten-minute ride from the crash scene to the

18   hospital?

19       A        More moans and groans, occasionally moving his

20   arms again, trying to get them out of the restraints.

21       Q        As you approached the hospital can you recall,

22   trooper, was there any change in the defendant's behavior

23   from the point when you first entered the ambulance to when

24   you arrived at the hospital?

25       A        Yes.

1       Q       And what was the nature of the change?

2       A       He started to moan and groan less and started to

3  move his arms less.

4       Q       When you arrived at the hospital?

5       A       That's correct.

6       Q       Can you tell the Court, please, what happened

7  when you did arrive at the hospital?

8       A       We removed the subject from the ambulance and

9  brought him into the --

10       Q      When you say that you removed him, did you

11  physically participate in taking him out of the ambulance?

12       A      Yes.

13       Q      And did you still have a blood kit with you?

14       A      Yes.

15       Q      What happened next?

16       A      He was then brought into, where numerous doctors

17  and nurses were attending to him.

18       Q      And where were you in relationship to the

19  defendant while he was in the --

20       A      I was at the foot of the bed, or at the foot of

21  his gurney.

22       Q      Approximately how many members of medical staff

23  were around the defendant when you first got into the --

24       A      Approximately five or six.

25       Q      Trooper, were you present when any of that

1    medical staff attempted to speak to the defendant?

2        A     Yes.

3        Q     And can you convey to the Court, please, what was

4    said to him and what his responses were?

5                    MR. LaMAGNA:  Objection.

6                    THE COURT:  Overruled.

7        A     They were asking for his name and they got no

8    response.

9        Q     ·Approximately how many times did they ask him for

10   his name?

11       A     They asked him a couple times.

12       Q     And again, trooper, did the defendant speak in

13   response to those questions at any time?

14       A     No.

15       Q     Trooper, were you able to see the defendant's

16   eyes at that point?

17       A     At that point, no.

18       Q     Is that because of where you were positioned?

19       A     That's correct.  I was at the foot of the bed.

20       Q     Was the defendant making any sounds whatsoever?

21       A     None that I could hear.

22       Q     Trooper, did there come a time when you asked a

23   member of the medical staff to draw blood pursuant to

24   Vehicle and Traffic Law 1194?

25       A     Yes.

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 76 of 275 PageID #: 2990

1    Q    And do you know what time that was?

2    A    That was approximately 2:40, 2:45 a.m.

3    Q    And, trooper, can you tell the Court who it is

4  that you spoke to about drawing blood from the defendant?

5    A    Registered Nurse Busco.

6    Q    And did there come a time when she took blood

7  from the defendant for the purpose of VTL 1194?

8    A    Yes.

9    Q    Can you describe for the Court, please, how that

10  took place?

11    A    I opened up the State Police blood kit.  She

12  removed the items that she needed from there to withdraw the

13  blood, and did so.

14    Q    When you say that you opened it, trooper, was it

15  closed in a particular manner?

16    A    There was an adhesive seal that I had to open up,

17  to open open the plastic container that contained the tools

18  needed to take the blood sample.

19    Q    Is it fair to say that you had to break the seal?

20    A    That is correct.

21    Q    Was that blood kit sealed prior to your arrival

22  at the hospital?

23    A    Yes, it was.

24    Q    Now, you said that the nurse removed the tools in

25  the blood kit?

1        A     Yes.

2        Q     What are you referring to, to the best of your

3   ability?

4        A     The vacuumer needle and tube and the test tubes

5   that she needed to take a sample.

6        Q     And did you observe Nurse Busco physically draw

7   blood from the body of the defendant?

8        A     Yes.

9        Q     And did she use the materials provided in that

10  blood kit?

11       A     Yes.

12       Q     What did she do after she obtained a vial of

13  blood?

14       A     She gave me the vial of blood.

15       Q     How many vials were drawn from the defendant?

16       A     Two.

17       Q     And what did you do with those vials after they

18  were handed to you?

19       A     Put them back in the blood kit.

20       Q     Before putting them in the blood kit did you do

21  anything else with them?

22       A     I inverted them.

23       Q     By that, trooper, do you mean that you turned

24  them upside down a couple times?

25       A     That is correct.

1       Q      And did you do anything else with respect to the

2  tops of the blood vials?

3       A      I then sealed them with adhesive seals that was

4  also in the blood kit.

5       Q      Did you initial that seal?

6       A      That is correct.

7       Q      And you said you put it back inside the box?

8       A      Yes.

9       Q      Which box are you referring to now?

10      A      The plastic box.

11      Q      Can you tell the Court, please, how many boxes

12  are actually part of the blood kit?

13      A      Two boxes.  There is the plastic box and there is

14  a cardboard box that goes over the plastic box.

15      Q      So is it fair to say plastic box is an interior

16  box and the cardboard box is the exterior box?

17      A      Yes.

18             MS. McCORMICK:  Thank you.  I have nothing

19      further.

20  CROSS-EXAMINATION

21  BY MR. LaMAGNA:

22      Q      Good afternoon, Trooper O'Hare.

23             My name is Stephen LaMagna, and I'm the attorney

24  for Mr. Heidgen.  I'll been asking you some questions this

25  afternoon.  Okay?

1       A       Okay.

2       Q       Now, Trooper, prior to testifying here today, did

3   you review any notes, statements, that you had made relative

4   to your participation in this investigation?

5       A       Yes, sir.

6       Q       And you reviewed those?

7       A       Yes, sir.

8       Q       And you also testified, I believe, in the Grand

9   Jury.  Did you review your testimony that you had previously

10  given to the Nassau County Grand Jury as well?

11      A       Yes, sir.

12      Q       Now, when did you first become a member of the

13  New York State Police?

14      A       September 9, 2002.

15      Q       And was there an academy or training period

16  first?

17      A       Yes, sir, there was a six-month academy program.

18      Q       When did you begin your official duty as a state

19  trooper?

20      A       I graduated from the New York State Police

21  Academy on March 19, 2003.

22      Q       And you began working as a New York State trooper

23  at that time?

24      A       Yes.

25      Q       That was in March of 2003?

1        A       Correct.

2        Q       Bringing your attention, then, to this

3    investigation of July 2, 2005, you had been a trooper for a

4    little more than two years; is that correct?

5        A       That is correct.

6        Q       And what was your assignment for the two years

7    prior to this incident?

8        A       As far as my location?

9        Q       Yes.

10       A       I spent a year upstate in Newburgh, New York,

11   Troop F.  And after that I came down here to Troop L, Long

12   Island.

13       Q       Was that for radio motor patrol or traffic

14   enforcement, or anything else?

15       A       Newburgh station was called the complaint

16   station, unlike Long Island, which is a highway station for

17   the parkways.

18       Q       In Newburgh you received complaints?

19       A       That is correct.

20       Q       That's pretty much an office job, I guess, or

21   desk job?

22       A       I was on the road the whole time.  I wouldn't

23   call it a desk job.

24       Q       It's not?

25       A       No, it's not a desk job.

1      Q      When you were transferred down here to

2    Farmingdale, were you part of a radio motor patrol?

3      A      That is correct.

4      Q      Generally what were your duties?

5      A      Patrolling the New York State parkways.

6      Q      And what would you do?

7      A      Vehicle and traffic enforcement, accident

8    investigations.

9      Q      Now, with respect to this case, how many homicide

10   cases had you worked on prior to this matter?

11     A      You want just motor vehicle fatalities or do you

12   want --

13            MR. LaMAGNA:  Yes, I'm sorry, motor vehicle

14        fatalities.

15     A      Okay.  Approximately three or four.

16     Q      Prior to this?

17     A      Yes.

18     Q      And had you ever had the opportunity to secure a

19   blood sample from a driver before?

20     A      I have secured blood before, yes.

21     Q      How many times did you have to do that?

22     A      Approximately five or six.

23     Q      Now, I want to direct your attention to July 2,

24   2005.  You were operating a radio motor patrol at that time,

25   correct?

Hanni J. Planos, CSR

1        A       Yes.

2        Q       And you received a radio call to an accident

3    scene on the Meadowbrook Parkway at Babylon Turnpike; is

4    that correct?

5        A       That's correct, yes.

6        Q       And that was around 2:05 a.m.?

7        A       That's right, yes.

8        Q       You arrived at the scene around 2:20; is that

9    correct?

10       A       Yes, sir.

11       Q       And the first person, or your first contact at

12   the scene was Trooper Knapp; is that correct?

13       A       Yes, sir.

14       Q       And where was that in relation to the accident

15   scene?

16       A       Right around the accident scene.  We were within

17   a few feet from both vehicles.

18       Q       And Mr. Heidgen was still in the vehicle at that

19   point?

20       A       Yes, sir.

21       Q       Was he in the process of being extricated or was

22   he still seated behind the wheel?

23       A       He was still behind the wheel.

24       Q       And Trooper Knapp instructed you to go to your

25   car and get a blood kit; is that correct?

1       A     Yes, sir.

2       Q     And he further instructed you that you, along

3   with the blood kit, will be traveling to the hospital with

4   Mr. Heidgen; is that correct?

5       A     Yes, sir.

6       Q     And that was for the purpose of securing a blood

7   sample, correct?

8       A     Yes, sir.

9       Q     And that was going to be your job, correct?

10      A     Yes, sir.

11      Q     Now, after you received, or retrieved, I should

12  say, the blood kit, you didn't give it to anybody, Trooper

13  Knapp or anybody else; is that correct?

14      A     Yes, sir.

15      Q     You kept it yourself, right?

16      A     Yes, sir.

17      Q     Because it was going to go with you to the

18  hospital, correct?

19      A     Yes, sir.

20      Q     And this was what time, would you say,

21  approximately?

22      A     Shortly after we arrived, shortly after --

23      Q     2:25?

24      A     Approximately in that time range.

25      Q     And at some point you boarded the ambulance,

1   correct?

2        A     Yes, sir.

3        Q     And that was after Mr. Heidgen was placed into

4   the ambulance; is that correct?

5        A     Yes, sir.

6        Q     You weren't in the ambulance prior to that,

7   right?

8        A     No, sir.

9        Q     And in the ambulance at the time was Trooper

10  Siegler, EMT Cook and Mr. Heidgen, correct?

11       A     I observed Mr. Heidgen and EMT Cook.  I didn't

12  observe Trooper Siegler.

13       Q     You didn't replace Trooper Siegler in the

14  ambulance?

15       A     No, I didn't see Trooper Siegler.  I don't recall

16  seeing him, sir.

17       Q     Do you know who Trooper Siegler is?

18       A     Yes, sir, I do.

19       Q     Now, as you stated before, you were instructed to

20  take a blood kit to the hospital to get a blood sample from

21  Mr. Heidgen, correct?

22       A     Yes, sir.

23       Q     And did you know which hospital you were going to

24  prior to your leaving?

25       A     Yes.

1       Q       That would be Nassau County University Medical

2    Center, correct?

3       A       Yes, sir.

4       Q       And the ride to Nassau County Medical Center from

5    the accident scene is a relatively short distance, correct?

6       A       Yes, sir.

7       Q       And you estimated it took about ten minutes or

8    so?

9       A       Approximately.

10      Q       To get to the hospital?

11      A       Yes, sir.

12      Q       So would you say you arrived at the hospital

13   around 2:40ish?

14      A       Approximately, sir.

15      Q       And these are all approximate times, correct?

16      A       Yes, sir.

17      Q       And when you got into the ambulance Mr. Heidgen

18   was conscious, correct?

19      A       Yes, sir.

20      Q       And he was staring at the ceiling as he was lying

21   flat on his back, correct?

22      A       Yes, sir.

23      Q       And the EMT was performing medical services on

24   him, correct?

25      A       Yes, sir.

1     Q     His eyes were open?

2     A     Yes, sir.

3     Q     And you said you heard some moans, correct?

4     A     Yes, sir.

5     Q     And some groans, correct?

6     A     Yes, sir.

7     Q     And you also said that he was flailing around a

8     bit, correct?

9     A     Yes, sir.

10    Q     Flailing his arms?

11    A     Just moving his arms around.

12    Q     Wasn't moving his legs?

13    A     Not that I can recall.

14    Q     In fact, he was moving so much you had to

15    restrain him, correct?

16    A     Yes, sir.

17    Q     And that was necessary for his health or for the

18    purpose of performing medical treatment on him, or you don't

19    know?

20    A     I believe it would be both, sir.

21    Q     Now, within a short period of time you arrived at

22    Nassau County University Medical Center, correct?

23    A     Yes, sir.

24    Q     Correct?

25    A     Yes, sir.

1    Q       EMT Cook and the defendant, correct?

2    A       Yes, sir.

3    Q       You had with you your blood kit, correct?

4    A       Yes, sir.

5    Q       For purposes of getting his, the defendant's,

6 blood sample, correct?

7    A       Yes, sir.

8    Q       Now, when you arrived at the hospital it has been

9 your testimony that the defendant was now unconscious,

10 correct?

11   A       Yes, sir.

12   Q       And those are the words that you have used in

13 this case, correct?

14   A       Yes, sir.

15   Q       You testified to that in the Grand Jury, correct?

16   A       Yes, sir.

17   Q       You prepared various memorandums concerning a

18 supporting deposition concerning this case, correct?

19   A       Yes, sir.

20   Q       And it is your position that when you arrived at

21 the Nassau County Medical Center at about 2:40ish, the

22 defendant was unconscious, correct?

23   A       Not as soon as we arrived.

24   Q       When you arrived in the emergency room?

25   A       Yes, shortly after we got into the emergency

1    room.

2          Q      Unconscious?

3          A      Yes, sir.

4          Q      Now, when you arrived in the emergency room,

5    there was a lot going on there I suspect, correct?

6          A      Yes.

7          Q      A lot of doctors?

8          A      Yes, sir.

9          Q      Nurses, other medical staff, correct?

10         A      Yes, sir.

11         Q      And when the defendant was brought to the

12   emergency room he was brought into an area for medical

13   treatment to take place, correct?

14         A      Say that again?  I'm sorry.

15         Q      He was brought into an area of the ER and medical

16   treatment was beginning to be performed on him, correct?

17         A      Yes, sir.

18         Q      In fact, the physicians started to perform tests

19   on him?

20         A      Yes, sir.

21         Q      And there was a nurse, or nurses, also performing

22   medical treatments on him, correct?

23         A      Yes.

24         Q      And it's your testimony at this time that he was

25   unconscious, correct?

1    A      Yes, sir.

2    Q      And it was during this time that you approached a

3  nurse and said we need blood, correct?

4    A      Yes.

5    Q      And you handed her the blood kit, correct?

6    A      I opened up the blood kit for her and held it out

7  for her, and she removed the necessary tools from it.

8    Q      You opened up the outer box?

9    A      Yes, sir.

10   Q      And inside were the needles, correct?

11   A      Yes, sir.

12   Q      Test tubes, correct?

13   A      Yes.

14   Q      And she took that from you?

15   A      She removed if from the box, yes, sir.

16   Q      And you were present during this entire time,

17  correct?

18   A      Yes.

19   Q      And in fact she drew the blood from Mr. Heidgen

20  at your request as the doctor is performing his

21  examinations, correct?

22   A      There was numerous things going on.  I have no --

23   Q      But a doctor, a physician, was performing tests

24  and medical procedures on him at the time blood was being

25  drawn, correct?

1      A     As I recall, yes.

2      Q     And after the blood was being drawn you received

3   the test tubes, correct?

4      A     Yes.

5      Q     Two of them, correct?

6      A     Correct.

7      Q     And the physician conducted several more tests

8   and procedures and then Mr. Heidgen was admitted into the

9   intensive care ward of the hospital, correct?

10     A     Yes, sir.

11     Q     And you were with him during that period of time,

12   correct?

13     A     Yes, sir, I was.

14     Q     From the time the physician concluded his

15   examination of the defendant, did you follow Mr. Heidgen

16   into the ICU unit of the hospital?

17     A     Yes, sir.

18     Q     And that's in a different area than the initial

19   situation room, correct?

20     A     Yes, sir.

21     Q     And you followed out of the emergency room unit

22   to the Intensive Care Unit, correct?

23     A     Yes, sir.

24     Q     Now, from the time you arrived in the emergency

25   room to the time that the blood was taken, lasted only

1   several minutes, correct?

2        A     Approximately five minutes.

3        Q     And during the course of that time, that whole

4   time, the defendant remained unconscious, correct?

5        A     Yes, sir.

6        Q     According to you, correct?

7        A     Yes, sir.

8        Q     And in fact, after the blood was drawn while the

9   physician was continuing his examination, he was still

10  unconscious, correct?

11       A     Yes, sir.

12       Q     And you observed the medical treatment that was

13  being performed on Mr. Heidgen, correct?

14       A     Yes, sir.

15       Q     You were standing right there, correct?

16       A     Yes, sir, I was.

17       Q     And how much time elapsed between the time the

18  emergency room physician completed his examination and the

19  time you arrived in the ICU unit?

20       A     I'd say approximately 40 minutes.

21       Q     Now, you never informed Mr. Heidgen that he was

22  under arrest, did you?

23       A     No, sir.

24       Q     And upon arriving at the hospital and prior to

25  the nurse withdrawing blood from Mr. Heidgen, you never

1    requested the defendant to consent to giving a blood sample

2    of his blood for the purpose of ascertaining his blood

3    alcohol content pursuant to Vehicle and Traffic Law 1194?

4         A     No.

5         Q     Since you didn't do that, you obviously never

6    informed the defendant of his statutory refusal warnings

7    since you never asked him to consent in the first place; is

8    that correct?

9              MS. McCORMICK:   Objection.

10             THE COURT:   Sustained.

11        Q     Did you ever give him his refusal warnings?

12             MS. McCORMICK:   Objection.

13             THE COURT:   Sustained.

14        Q     Now, you never requested to apply for, or

15   received, a Court order or a warrant to take the defendant's

16   blood, did you?

17        A     No, I did not.

18        Q     In fact, that evening, prior to requesting the

19   nurse to take the defendant's blood, did you speak to any

20   assistant district attorney or any member of the district

21   attorney's office who was on call?

22             MS. McCORMICK:   Objection.

23             THE COURT:   Overruled.

24        A     Can you repeat the question?

25        Q     Prior to you requesting the nurse to withdraw the

Trooper O'Hare - for People - cross                    93

1    defendant's blood, did you speak to any assistant district

2    attorney or any member of the district attorney's office who

3    was on call that night?

4          A     No, sir.

5          Q     So you didn't receive any direction or any advice

6    from the district attorney's office of what to do in this

7    situation with respect to the requesting of blood?

8                MS. McCORMICK:   Objection.

9                THE COURT:   Sustained.

10         Q     Now, once you received the tubes from the

11   nurse --

12               Now, did you know who this nurse was?

13         A     Prior to that?

14         Q     Yes.

15         A     No, sir.

16         Q     You asked for her name, and she wrote it on one

17   portion of the blood kit of who drew the blood, and she

18   wrote her name?

19         A     I wrote it down on the blood kit, I wrote her

20   name down.

21         Q     Now, after the blood tubes were taken what did

22   you do to the actual vials or tubes that were given to you

23   by Miss Busco?

24         A     At first I inverted them several times, turned

25   them upside down, put them in the plastic.

1          There is also an adhesive tape that goes over the

2    top of the vials, labeled with my initials on them.   Those I

3    put on the vials.

4          Q    Let's just stop there.

5               Now, on the actual vials there is a label,

6    correct?

7          A    Yes.

8          Q    Did you place the defendant's name on the vial?

9          A    At that point, no, sir.

10         Q    At any point did you?

11         A    No, sir.

12         Q    So you never placed the name on the vial?

13         A    On the vial, no, sir.

14         Q    So you get the vial?

15         A    Correct.

16         Q    Continue, then.

17         A    Inverted several times, put adhesive seal on top,

18    put it in the plastic container.   Same thing with the second

19    vial.

20         Q    Plastic container, which is the interior

21    container?

22         A    Correct.   Same thing with the second vial; closed

23    the plastic container, sealed it up with more adhesive

24    seals.

25         Q    And then you filled out the paperwork with the

1    defendant's name, the nurse, your name?

2         A     I did not put the defendant's name at that time

3    because I was unable to get his name at that time.

4         Q     But at some time you put his name on?

5         A     His name was put on later, yes, sir.

6         Q     And then what did you do with it?

7         A     Then I gave it to Trooper Stafford, Shield 503,

8    Michael Stafford.

9         Q     Was he with you at the hospital at the time or

10   did you have to wait?

11        A     He was right next to me, sir.

12        Q     It went from you to Stafford?

13        A     Yes, sir.

14        Q     And then, do you know what Stafford did with it?

15              MS. McCORMICK:   Objection.

16              THE COURT:   Sustained.

17        Q     That was the last you did with it?

18        A     Yes, sir.

19        Q     Once you were successful in getting the blood

20   sample, did you call Trooper Knapp and say, I got the blood?

21        A     No, sir.

22        Q     Did you inform anybody at the time that you

23   secured a blood sample from Mr. Heidgen?

24        A     I did not, sir.

25        Q     And it was Trooper Knapp who sent you to the

1   hospital to get the blood sample, correct?

2        A     Yes, sir.

3        Q     And how long were you at the hospital?

4        A     I was relieved at approximately 5:45 a.m.

5        Q     And you were relieved by whom?

6        A     Trooper Joseph Zawol.

7        Q     Now, when you saw the defendant from the time he

8   arrived in the ER through the examinations by the physicians

9   and the nurse and the blood to the ICU, he was unconscious,

10  you say; he was out?

11       A     Yes, sir.

12             MR. LaMAGNA:  I have nothing further, Judge.

13             THE COURT:  Redirect?

14             MS. McCORMICK:  Thank you, Judge.  Just

15       briefly.

16  REDIRECT EXAMINATION

17  BY MS. McCORMICK:

18       Q     Trooper O'Hare, do you have any medical training?

19       A     I'm a certified first respondent with the New

20  York State Police.

21       Q     Trooper, when you say that somebody is conscious,

22  what do you mean by that?

23       A     Their eyes are open and they're able to answer my

24  questions.

25       Q     So was the defendant, Martin Heidgen, ever

1   conscious by your definition at any time that you saw him?

2        A     No, ma'am.

3        Q     Did he ever respond to your questions?

4        A     No, ma'am.

5        Q     Were his eyes open?

6        A     Yes, ma'am.

7        Q     Trooper, you said that you went to the ER and

8   that there were doctors in the ER; is that correct?

9        A     Yes, ma'am.

10       Q     Do you recall the name of the treating doctor for

11  Mr. Heidgen?

12       A     Dr. Michles.  I thought it was Michles, but it's

13  pronounced Michles (like Michaels).

14       Q     Dr. Michles was in the room with the defendant

15  when blood was taken?

16       A     Yes, ma'am.

17       Q     Did the doctor ever tell you not to take the

18  blood?

19       A     No, ma'am.

20       Q     Of course Nurse Busco took the blood.  Did the

21  doctor ever tell the nurse not to take the blood?

22       A     No, ma'am.

23       Q     Did you observe the nurse actually inject the

24  defendant with the needle?

25       A     Yes, ma'am.

1    Q    Did he respond to the pain of the needle?

2              MR. LaMAGNA:  Objection.

3              THE COURT:  Sustained.

4    Q    Well, trooper, do you know what medical tests or

5    what was being done to the defendant at the time that the

6    blood was being drawn?

7    A    Miscellaneous medical services.  I know he had a

8    tube down his throat and they were taking off his clothes.

9    Q    When did they put the tube down his throat?

10   A    Pretty soon after we got to the ER.

11   Q    Before or after they were asking him his name and

12   questions?

13   A    After they asked his name.

14   Q    Did he ever respond to them?

15   A    No, ma'am.

16   Q    Can you tell the Court why you didn't ask the

17   defendant whether he would consent to a chemical test?

18   A    Because he wasn't able to answer my basic

19   questions of his name.

20             MS. McCORMICK:  Thank you.  I have no further

21        questions.

22   RECROSS-EXAMINATION

23   BY MR. LaMAGNA:

24   Q    Trooper, do you remember giving testimony before

25   the Nassau County Grand Jury on August 29, 2005?

1       A       Yes, sir.

2       Q       Do you recall questions by Mr. Hayden asking you

3   to describe the observations you made of Martin Heidgen

4   after he was placed in the ambulance, and your answers is:

5   "He was conscious"?

6       A       Yes, sir.

7       Q       So when the assistant district attorney asked you

8   for your definition of what conscious and unconscious means,

9   you testified that he was never in a position of

10  consciousness, in your definition; isn't that what you just

11  said to her?

12                      MS. McCORMICK:  Judge, I object.

13                      THE COURT:  Overruled.

14      A       Repeat the question.  I'm sorry.

15      Q       You remember testifying in August 2005 that the

16  defendant was conscious in the ambulance, correct?

17      A       Correct.

18      Q       And you remember testifying during

19  cross-examination that the defendant was conscious when he

20  was in the ambulance, correct?

21      A       Correct, sir.

22      Q       You remember testifying on cross-examination that

23  it was only when he arrived in the ER that he became

24  unconscious, correct?

25      A       Yes, sir.

1      Q      And you know the distinction, and you just

2   articulated on redirect between conscious and unconscious,

3   correct?

4      A      Yes.

5      Q      And you even answered my question, by unconscious

6   you said you mean out, and you said yes, correct?

7      A      Yes, sir.

8      Q      So there is no question in your mind, then, that

9   in the ambulance the defendant was conscious, correct?

10     A      Yes.

11            MR. LaMAGNA:   Thank you, Judge.

12   FURTHER DIRECT EXAMINATION

13   BY MS. McCORMICK:

14     Q      Trooper O'Hare, when you were asked in the Grand

15   Jury, is that your complete answer that he was conscious --

16     A      I have to refer to my notes.

17            MS. McCORMICK:   Your Honor, may the witness

18       refer to his testimony?

19            THE COURT:   Yes.

20            MS. McCORMICK:   Line 24.

21     A      Okay, I remember.   What was the question?

22     Q      What was your complete response to the question

23   of your observations of the defendant in the ambulance?

24     A      He was conscious, speaking incoherently.

25     Q      Was the defendant ever able to respond to any of

```
1   the questions given by you or the EMT?

2               MR. LaMAGNA:  Objection.

3               THE COURT:  No, ma'am.

4               THE COURT:  Overruled.

5       Q    Were his eyes --

6               THE COURT:  Excuse me, what --

7               MR. LaMAGNA:  As to whether or not he was

8       able.  He can't answer.

9               THE COURT:  Sustained.

10      Q    Did he ever respond to you on any of the

11  questions that you asked him in the ambulance?

12      A    No, ma'am.

13      Q    Did he ever respond to any of the questions or

14  instructions given to him by EMT Cook?

15      A    No, ma'am.

16      Q    Did he ever direct his eyes toward you or EMT

17  Cook?

18      A    No, ma'am.

19      Q    Did he ever shake his head or acknowledge you or

20  EMT Cook in any way in that ambulance?

21      A    No, ma'am.

22              MR. LaMAGNA:  Objection.

23              THE COURT:  Overruled.

24      A    No, ma'am.

25      Q    So his eyes were simply open?
```

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 102 of 275 PageID #: 3016

1      A      Yes, ma'am.

2      Q      And the sounds he made, any English language that

3   you could understand?

4      A      No, ma'am.

5                 MS. McCORMICK:  Nothing further.

6                 THE COURT:  Mr. LaMagna, anything else?

7                 MR. LaMAGNA:  Nothing further.

8                 THE COURT:  Thank you, officer.  You're

9         excused.

10                (The witnesses was excused.)

11                THE COURT:  Who is next, Mr. Hayden?

12                MR. HAYDEN:  Trooper Joseph Zawol.

13   Trooper  J O S E P H    Z A W O L ,    Shield Number

14         364, assigned to Farmingdale, New York State

15         Police, having been first duly sworn by the Clerk

16         of the Court, was examined and testified as

17         follows:

18                THE WITNESS:  Trooper Joseph Zawol,

19         Z-a-w-o-l, Shield 364, Farmingdale, New York State

20         Police.

21   DIRECT EXAMINATION

22   BY MR. HAYDEN:

23      Q      Good afternoon.

24      A      Good afternoon.

25      Q      How long have you been a member of the New York

1    State Police?

2          A     Just a little over four years.

3          Q     Do you know a man named Martin Heidgen?

4          A  .  Yes, I do.

5          Q     Briefly describe him.

6          A     Middle age.  Excuse me, middle twenties, white

7    male, approximately six feet.

8          Q     Do you see Martin Heidgen in this courtroom

9    today?

10         A     Yes, I do.

11         Q     Please describe what he's wearing today.

12         A     He's wearing a gray button-down colored shirt.

13               MR. HAYDEN:  Let the record reflect, your

14   Honor, that the witness indicated the defendant, Martin

15   Heidgen.

16               THE COURT:  The record will so reflect.

17         Q     I'm directing your attention to the morning of

18   Saturday, July 2nd of 2005.  Were you working then?

19         A     Yes, I was.

20         Q     How were you dressed?

21         A     State Police uniform.

22         Q     Did you respond that morning to the Nassau County

23   University Medical Center?

24         A     Yes, I did.

25         Q     What was the approximate time you got there?

1      A       Approximately 6 a.m.

2      Q       Describe the circumstances under which you

3  responded to the Medical Center.

4      A       Approximately 5 a.m. when I entered the State

5  Police headquarters from my normal tour of duty I was

6  advised that there was a car accident with severe injuries,

7  possibly a fatality.  And I was told to go out on the road

8  on patrol.  And at approximately 5:45 I was advised to go to

9  the Nassau County University Medical Center and relieve

10 Trooper Stafford and Trooper O'Hare.

11     Q       Where did you go when you arrived at the Medical

12 Center?

13     A       When I got to the Medical Center I went to the

14 Intensive Care Unit on the second floor.

15     Q       What happened when you arrived there?

16     A       When I got there I saw Trooper Stafford and

17 Trooper O'Hare.  They were standing at the bedside of the

18 defendant, and they said that that was the subject that was

19 involved in the car accident.

20     Q       Did they leave?

21     A       Yes, they did.

22     Q       Did you remain?

23     A       Yes, I did.

24     Q       Describe the defendant's location when you first

25 saw him.

1      A      He was located in the bed of the Intensive Care

2   Unit.  It's the first bed.  As soon as you walk in, it's on

3   the left-hand side.

4      Q      Describe any observations you made of the

5   defendant when you first saw him.

6      A      When I first saw him he had dried blood covering

7   his face.  He was also unconscious, and he had cloth

8   bandages or straps holding his wrists to the bedside.

9      Q      Did you eventually notice the defendant open his

10   eyes that morning?

11      A      Yes, I did.

12      Q      Proceed.

13      A      What drew my attention was approximately 9 a.m.,

14   9:15 a.m. I heard a tapping.  When I looked over, the

15   defendant was tapping his fingernails against the bedside,

16   the bed post.  That's when I stood up and looked at him, and

17   he was looking up towards the ceiling.

18      Q      Describe any observations you made of the

19   defendant after you first noticed him with his eyes open.

20      A      When I looked at him he had numerous machines

21   attached to him; tubes, one being down his throat or into

22   his mouth.

23      Q      Did a nurse eventually speak with the defendant?

24      A      Yes, she came over to him.

25             When she had the tube removed from his throat she

1   asked if his name was Martin, and he said yes.  He gave a

2   head nod, he acknowledged that he was Martin.

3          She also asked him if he knew where he was.

4   Again he gave a head nod.  And she asked if he remembered

5   what happened to him.

6          At that time that's when I stood up from the

7   table that was directly across from his bed, and he began

8   saying that he was in the city, he remembered having a

9   couple drinks, just a few, with his friends.  And when he

10  left, he took the train to Valley Stream.

11         While he was on the train he actually had a phone

12  conversation with his ex-girlfriend and he got into an

13  argument with her, and then he went home.

14         I asked him if his ex-girlfriend was home with

15  him, and he said no, she's actually in Arkansas.

16         And he said when he got home he got very upset

17  and into a self-destruct mode.  At that time he left the

18  house and he went out.

19         He asked if everything was all right.  He hoped

20  that his vehicle was okay, that's the only thing that he

21  has.

22         And he said that he appreciates us helping him

23  out and being there to help him, and he's sorry for taking

24  up our time.

25     Q    What was the approximate time that the nurse

1    began speaking with the defendant?

2         A      It was approximately 9:15, 9:30.

3         Q      Who was present while the nurse was speaking with

4    the defendant?

5         A      When he first started talking it was just the

6    nurse and the defendant at bedside.  She was on his left

7    side.  And then when he began telling the story about what

8    happened, I stood up from the table and I went to the right

9    side of his bed.  I was on his right.

10        Q      Was it just you and the nurse?

11        A      Correct.

12        Q      How long did the nurse remain?

13        A      She was there briefly.  When he started getting

14   into the story, I guess she was just checking up on his

15   stats, or the equipment, everything that was there.  And

16   afterwards when she found out everything was all right, or

17   whatever she had to do, she left, and I remained standing

18   there, talking to the defendant.

19        Q      Had you spoken with the nurse before she began

20   speaking with the defendant?

21        A      The defendant was unconscious.  I asked if he was

22   all right.  I asked if he had any damaged organs or broken

23   bones or anything, and she said he had a slight fracture to

24   his right ankle, I believe she said.  That was about it.

25        Q      What happened after you finished speaking with

1    the defendant?

2         A      When I finished talking to him, I just said to

3    stay there, there is going to be a couple other people

4    coming in asking some questions.  Just wait right here and

5    I'll be here with you.

6              I went back to the table and I sat down.

7              When I sat down, two investigators came in and I

8    said I'm going to write a little note.  He just gave a

9    little statement, we'll copy it down.

10             At that time I got my pad and pen and wrote down

11   the things that he said.  When I finished, I put my initials

12   on it, and I believe I put the date on it as well.

13        Q      Did you write down everything you remembered?

14        A      Yes.

15        Q      What did you do with those notes?

16        A      When I finished writing it I handed it over to

17   Investigator Baez.  Investigator Harris and Investigator

18   Baez were the two investigators that were at the scene at

19   the Nassau County Medical Center.

20        Q      What was the approximate time that the

21   investigators arrived?

22        A      They came at approximately 11:15, 11:30.

23        Q      Did you ever tell the defendant he was under

24   arrest?

25        A      No, I did not.

1      Q      Did you ever hear anyone else tell the defendant

2   he was under arrest before the investigators arrived?

3      A      No.

4      Q      Did the defendant ever object to your presence?

5      A      No.  He actually thanked us for being there, for

6   helping him out.

7      Q      Did you engage in any further conversation with

8   the defendant?

9      A      No, I did not.

10            MR. HAYDEN:  Nothing further, your Honor.

11            THE COURT:  Cross?

12            MR. LaMAGNA:  Thank you, your Honor.

13   CROSS-EXAMINATION

14   BY MR. LaMAGNA:

15      Q      Good afternoon, trooper.

16      A      Good afternoon.

17      Q      Is it Zawol?

18      A      Zawol.

19      Q      Now, you arrived at the Nassau County Medical

20   Center at approximately 5:45; is that correct?

21      A      5:45, 6 a.m.

22      Q      And you relieved Officer O'Hare; is that correct?

23      A      Trooper Dan O'Hare and Trooper Stafford.

24      Q      Trooper O'Hare?

25      A      Yes, sir.

1    Q    And were you given a briefing about what had

2    happened?

3    A    They just said --

4    Q    Not what they said.  Were you briefed?

5    A    Yes, I was.

6    Q    And it was your assignment that day to guard

7    Mr. Heidgen, correct?

8    A    When I first got in to work, no, it wasn't.

9    Q    Well, eventually that's what you were doing,

10   right?

11   A    Yes.

12   Q    Because Mr. Heidgen at that time was in custody,

13   correct?

14        MR. HAYDEN:  Objection.

15   Q    You were guarding him?

16        MR. HAYDEN:  Objection.

17        THE COURT:  Overruled.

18        MR. HAYDEN:  Custody?

19   Q    You knew he was under arrest?

20   A    He was never advised that he was under arrest.

21   Q    I'm not asking you that.  You were told as a

22   trooper in law enforcement he's under arrest, you're going

23   to guard him, correct?

24   A    I wasn't to guard him at that time, I was just to

25   watch him.

1       Q      If he got up and walked past you, you would allow

2  him to do that?

3       A      He was restrained by the cloth.

4       Q      We'll get to the restraints in a minute.

5       A      Okay.

6       Q      But you're telling me that if he got up and

7  walked right past you into the elevator and out the building

8  you would have allowed him to do that?

9       A      No.

10      Q      You were guarding him; were you not?

11      A      I was watching him.

12      Q      Okay, that's how you depict it.  You were

13  watching him, you were not guarding him as a law enforcement

14  agent; is that correct?

15      A      Yes.

16      Q      You knew he was under arrest, though, didn't you?

17      A      Nobody advised me he was under arrest.

18      Q      You knew he was under arrest, didn't you?

19      A      I didn't know he was under arrest because nobody

20  said that to me.

21      Q      Nobody said he was under arrest, you were just

22  watching there, watching him in the hospital after a fatal

23  car accident like this, correct?

24             MR. HAYDEN:  Objection.

25             THE COURT:  Sustained.

1       Q       I understand, Officer Zawol.

2               So the defendant's hands were bound to the body,

3    correct?

4       A       Yes, sir.

5       Q       And at some point after you had your conversation

6    with the defendant you said to him, just sit tight, other

7    investigators are coming to talk to you, correct?

8       A       Yes, sir.

9       Q       Other people from law enforcement, correct?

10      A       Yes, sir.

11      Q       But yet he was free to leave, according to you,

12   correct?

13                   MR. HAYDEN:  Objection.

14                   THE COURT:  Sustained.

15      Q       So at some point you hear some fingernail

16   tapping, correct?

17      A       Yes, sir.

18      Q       And the defendant was woken, was up, correct?

19      A       Yes, sir.

20      Q       And you heard a nurse performing medical duties

21   or treatment of him at some point, correct?

22      A       I saw it, yes.

23      Q       You also heard her asking questions, correct?

24      A       Yes, sir.

25      Q       And you got up, correct?

1      A      Yes.

2      Q      And you started to listen to what this nurse was

3  asking Mr. Heidgen and what Mr. Heidgen was saying to her,

4  correct?

5      A      Correct.

6      Q      And because you were watching him and you knew

7  what had happened earlier that night, you thought it was

8  important to listen, correct?

9      A      Yes, I did.

10      Q      Because there was an ongoing criminal

11  investigation, correct?

12      A      To my knowledge, yes.

13      Q      Not that he was under arrest, right?

14             MR. HAYDEN:   Objection.

15             THE COURT:   Sustained.

16      Q      So you got up and started listening to what the

17  nurse was saying to him, and she asked him what his name

18  was, correct?

19      A      Yes.

20      Q      Where he lives, correct?

21      A      I didn't hear her ask where he lived.

22      Q      And at some point you walked over to the bed,

23  correct?

24      A      Yes.

25      Q      Where the nurse was, correct?

1     A      I was on the opposite side of the bed.

2     Q      So you're on his right side or his left side?

3     A      I was on the right, she was on the left.

4     Q      And when the nurse asked Mr. Heidgen what

5   happened, what did he say?  Is that when he said he was in

6   Manhattan with friends?

7     A      Yes.

8     Q      What did you say?

9     A      I just let him talk.

10    Q      You didn't say a single word, not a single word?

11    A      When he got to his ex-girlfriend, I asked if she

12  lived in New York, and he said, no, she lived in Arkansas,

13  and that's how the whole fighting started.

14    Q      And then what did you say?

15    A      I said what happened next?

16    Q      And then what did he say?

17    A      And then he began saying that he got home, he got

18  into his self-destructive mode and drank a lot of Scotch.

19    Q      What did you say?

20           MR. HAYDEN:  Objection.

21           THE COURT:  Sustained.

22    Q      I didn't mean to cut you off.  Are you finished

23  with that?

24    A      Yes.

25    Q      Then what did you say?

1     A     At that time he thanked us for being there.  I

2  just told him that there was going to be some other people

3  here to talk to him and "I'll be here with you".

4     Q     Now, did you ask him how he got home from New

5  York when he was talking about taking the train home from

6  Valley Stream?

7     A     I don't recall.

8     Q     Well, reading your notes it says:  "He took a

9  train to Valley Stream," clearly in answer to a question.

10         "How did you get home from the city?"  Did you

11  ask him that?  Is it possible you asked him that?

12     A     Might be possible.  I don't recall.

13     Q     And then he said, according to your notes:  "He

14  drove home."  Did you ask him, "Well, how did you get home

15  from the train station"?

16     A     I didn't ask him that question at all.

17     Q     So you started questioning him when it came to

18  the part about the girlfriend?

19     A     Yes.

20     Q     And that's when you asked him what happened next?

21     A     Correct.

22     Q     And "what's the deal with your girlfriend" type

23  of thing; is that correct?

24     A     I didn't ask what the deal is with your

25  girlfriend.  I just asked where she lived.

1      Q      And then he told you?

2      A      Yes.

3      Q      Did you ask him if he drank at all?

4      A      No.

5      Q      So all your questions began when you were talking

6   about the girlfriend and you asked him what happened next?

7      A      Yes, that's correct.

8      Q      Subsequent to that is when he said he got into a

9   fight with the girlfriend and then he got in the

10  self-destruct mode, and that was subsequent to what happened

11  next, correct?

12     A      Yes.

13     Q      Is that a yes?

14     A      Yes.

15     Q      And then after he said he drank a lot of Scotch,

16  too; that was after, right?

17     A      Yes.

18     Q      So this is all after you asked him what happened

19  next, correct?

20     A      Yes.

21     Q      And after that he thanked all of you for helping

22  him, correct?

23            MR. HAYDEN:  Objection.

24            MR. LaMAGNA:  That's what he said.

25            MR. HAYDEN:  All of you?

1            THE COURT:   Sustained.

2       Q       Didn't you testify on direct examination that at

3    the end he thanked all of you?

4       A       He thanked me.  "All of us" meaning the nurses,

5    doctors.

6       Q       That's what you said, right?

7       A       Yes, sir.

8       Q       Were you present when Investigator Harris and

9    Baez appeared?

10      A       Yes, I was.

11      Q       And did you know that that they were on their

12   way?

13      A       To the hospital?

14      Q       Yes.

15      A       I was advised that they would show up at some

16   time.  I'm not sure exactly when they were coming.

17      Q       After you heard what the defendant had to say to

18   the nurse and to your questions, did you call Harris or Baez

19   and say, he's up, come over?

20      A       I never spoke to Investigator Baez or Harris on

21   the phone.  I don't recall ever talking to them.

22      Q       Do you recall anybody notifying them that the

23   defendant was up?

24      A       I believe I kept talking to my sergeant at the

25   station, advising him of the status of the defendant.

1        Q        What does that mean?

2        A        If the defendant was alert or still unconscious.

3        Q        You had orders if he woke up, give them a call,

4    he's alert, give them a call?  Is that what you're saying?

5        A        Yes, sir.

6        Q        How many phone calls did you make back and forth?

7        A        That I don't recall.

8        Q        And your sergeant wanted to know this information

9    concerning the status of Mr. Heidgen, right?

10        A        Yes.

11        Q        But yet, according to you, he wasn't under

12    arrest, right?

13        A        Right.

14                MR. HAYDEN:  Objection.

15                THE COURT:  Sustained.

16                MR. LaMAGNA:  Nothing further.

17    REDIRECT EXAMINATION

18    BY MR. HAYDEN:

19        Q        You testified during cross-examination that there

20    were restraints on the defendant's wrists?

21        A        Yes.

22        Q        Did you place any restraints on the defendant's

23    wrists?

24        A        No.

25        Q        Did you see anyone in law enforcement place any

1  restraints on the defendant's wrists?

2      A    No.

3      Q    Did you touch the defendant in any way?

4      A    No.

5      Q    Did you see anyone in law enforcement touch the

6  defendant in any way?

7      A    No.

8      Q    Describe the restraints you saw on the

9  defendant's wrists?

10     A    It was cloth.  It was like a roll of gauze that

11  was tied around his wrists.

12     Q    Describe how they were tied.

13     A    It was just a single knot tied around the lower

14  portion of his chest, closest to his hands.

15     Q    Were there tubes in the defendant then?

16     A    When I first walked into the room there were

17  tubes in his mouth, yes.

18     Q    Is that when you saw the restraints?

19     A    Yes.

20          MR. HAYDEN:  Nothing further.

21          THE COURT:  Recross?

22  RECROSS-EXAMINATION

23  BY MR. LaMAGNA:

24     Q    The restraints were around his wrists, correct?

25     A    Yes.

1      Q      Tied to the bed posts, correct?

2      A      Yes.

3             MR. LaMAGNA:  Nothing further, Judge.

4             THE COURT:  Anything else?

5             MR. HAYDEN:  No, your Honor.

6             THE COURT:  Thank you, officer.

7             (The witness was excused.)

8             THE COURT:  People?

9             MS. McCORMICK:  Your Honor, the People call

10     Investigator Mike Harris.

11  Investigator  M I C H A E L   W.   H A R R I S ,

12     Shield Number 1156, assigned to the New York State

13     Police Department, having been first duly sworn by

14     the Clerk of the Court, was examined and testified

15     as follows:

16             THE WITNESS:  Investigator Michael W. Harris,

17     H-a-r-r-i-s, shield number 1156, New York State Police.

18             MS. McCORMICK:  May I inquire?

19             THE COURT:  Please.

20  DIRECT EXAMINATION

21  BY MS. McCORMICK:

22     Q      Good afternoon, Investigator Harris.

23     A      Good afternoon.

24     Q      How long have you been working for the New York

25  State Police?

1      A      I'm sworn, making it 22 years now.

2      Q      How long have you been an investigator?

3      A      13 years.

4      Q      And investigator is the equivalent of a Nassau

5  County police detective?

6      A      Yes, ma'am.

7      Q      And were you working on July 2, 2005?

8      A      Yes, ma'am.

9      Q      Did you respond to a crash on the Meadowbrook

10 Parkway just north of Babylon Turnpike in the southbound

11 lanes after 2 a.m.?

12     A      Yes, ma'am.

13     Q      And can you tell the Court, please, what did you

14 observe upon your arrival at that location?

15     A      I arrived around 2:35 a.m.  Upon arrival I

16 noticed multiple police vehicles from various agencies;

17 Nassau County, Freeport, New York State Police, also

18 observed fire apparatus, multiple police personnel from the

19 various departments I just mentioned, and volunteer firemen

20 at the scene.

21          Also at the scene I observed two vehicles just

22 north of Babylon Turnpike.  First vehicle I observed in the

23 far left lane was a pick-up truck facing the southwest

24 direction with extensive front end damage.

25          In the middle lane, lane number two, I observed a

1   black limousine facing the southwest direction with

2   extensive front end damage.

3       Q      Investigator Harris, what was your role in that

4   crash scene?

5       A      I'm the case agent.  I'm the investigator that

6   made the investigation of the crash scene.

7       Q      As that main investigator, did you have occasion

8   to go over to the 1999 pick-up truck?

9       A      Yes, ma'am.

10      Q      And what did you do when you went over to that

11  truck?

12      A      During the course of my investigation I inspect

13  the vehicles, I inspect the vehicles for any evidence or any

14  personal properties of victims that are involved in the

15  accidents.

16             So I safeguard all the evidence and safeguard all

17  the personal properties.

18             During the course of that time, at the 1999

19  pick-up truck, I observed a cell phone on the passenger side

20  floor of the vehicle.

21      Q      And what did you do with that cell phone once you

22  observed it there?

23      A      I safeguarded it, took it in my possession, and

24  transported it to Valley Stream BS evidence locker.

25      Q      Is it remained locked in that evidence locker at

1    this point?  Is it there now?

2         A    Yes, ma'am.

3         Q    Investigator, at the time that you went over to

4    the vehicle was the operator of that vehicle still in the

5    vehicle?

6         A    No, ma'am.

7         Q    Where was he?

8         A    He was on the way to the hospital.

9         Q    Did there come a time when you went to the

10   hospital to take a statement from the operator of that

11   vehicle?

12        A    Yes.

13        Q    Can you tell the Court what time you did that?

14        A    Approximately 12:30 p.m.

15        Q    So it's now been past the next morning, 12:30 in

16   the afternoon?

17        A    Yes, ma'am.

18        Q    Same day?

19        A    Yes, ma'am.

20        Q    And who did you go to to take that statement

21   from?

22        A    From the defendant, Martin Heidgen.

23        Q    Do you see Martin Heidgen in this courtroom

24   today?

25        A    Yes, ma'am.

1        Q       Could you briefly describe him for the record?

2        A       The gentleman to my left, wearing a gray shirt,

3    next to his attorney.

4        Q       Approximate age?

5        A       Approximately mid- to late twenties; white male,

6    short hair.

7                MS. McCORMICK:  Your Honor, I ask that the

8        record reflect that the investigator indicated the

9        defendant.

10               THE COURT:  The record will so reflect.

11               MS. McCORMICK:  Thank you.

12       Q       Investigator Harris, you said you went to the

13   hospital about 12:30 in the morning, to the hospital?

14       A       Yes.

15       Q       Can you describe to the Court your arrival at the

16   hospital, please?

17       A       We arrived at the hospital, myself and my

18   partner, Investigator Eric Baez.

19               Main reason we went to the hospital was to check

20   on the victims at the hospital, to check on the injuries,

21   and also possibly interview the defendant at the time.

22       Q       So where did you go first when you got there?

23       A       First got there, we checked on the victims,

24   checked on the statuses, to see how they were doing.

25               Then we were able to speak to Trooper Zawol, who

1     was guarding the defendant at the time.

2          Q     So did you go to the room where the defendant was

3     staying in the hospital?

4          A     Yes, ma'am.

5          Q     Do you recall where that was in the hospital?

6          A     In ICU unit of Nassau County University Medical

7     Center.

8          Q     When you arrived in that room, would you describe

9     basically the room for the Court, please?

10         A     A basic layout was a bay area, had four beds.

11    And the defendant was in bed number one towards the main

12    corridor.

13         Q     Was Trooper Zawol with him?

14         A     Yes, ma'am.

15         Q     Where was he located in relationship to the

16    defendant?

17         A     Right next to his bed.

18         Q     Was there anybody in the bed right next to the

19    defendant?

20         A     No, ma'am.

21         Q     What did you do when you came into the room?

22         A     Came in, we spoke Trooper Zawol.  He advised us

23    that the defendant has -- we spoke to a nurse in his

24    presence.  He was able to participate in the conversation.

25               And after the fact he took some statements down

1      from the defendant.

2          Q      Did you have an opportunity to review those

3      statements?

4          A      Yes, ma'am.

5          Q      How were they captured?

6          A      They were written down on a small piece of paper

7      signed by the trooper.

8          Q      Where did you have this conversation with Trooper

9      Zawol?

10         A      We had this conversation outside the main

11     corridor and in eye view of the defendant.

12         Q      Did you have an opportunity to make observations

13     of the defendant at that time?

14         A      Yes, ma'am.

15         Q      Is that the first time that you saw the

16     defendant, investigator?

17         A      Yes, ma'am.

18         Q      Can you describe his physical condition to the

19     best of your ability?

20         A      At that point in time he was alert, he was

21     conscious, he was medically restrained to his gurney, to his

22     bed; excuse me, his bed.  And it appeared that he was

23     responsive and he could answer questions.

24         Q      What do you mean by medically restrained,

25     investigator?

1        A       They had straps around his wrists and he was tied

2    to the bed, I guess to prevent him from taking off the IVs.

3        Q       Investigator, did you, or to your knowledge, did

4    any other law enforcement have anything to do with his

5    wrists being restrained to the bed?

6        A       No, ma'am.

7        Q       Was he handcuffed in any way at that time?

8        A       No, ma'am.

9        Q       Can you tell the Court, please, did you engage

10   the defendant in conversation at that time?

11       A       Yes, ma'am.

12       Q       Describe those circumstances, please.

13       A       Like I explained before, myself and Investigator

14   Baez, were attempting to speak to the defendant.

15               Investigator Baez advised the defendant that he

16   was under arrest for driving while intoxicated, and he told

17   the defendant that I was going to read him his Miranda

18   rights.

19       Q       Did the defendant appear to you, could you see

20   whether he was in any apparent pain at that time?

21       A       No, ma'am.

22       Q       Did he request anything from you at that time;

23   water, food, anything?

24       A       No, ma'am.

25       Q       Could you describe the conversation as it took

1    place with the defendant?

2        A      After that I read him my Miranda rights from the

3    card that was issued to me in the New York State Police

4    Academy back in 1983.

5                MS. McCORMICK:  Your Honor, I ask to approach

6           the witness and ask that this be deemed marked People's

7           Exhibit 1 for identification purpose.

8                (Rights card was deemed marked as People's

9           Exhibit 1 for identification.

10               THE CLERK:  It's deemed marked.

11       Q      Trooper, do you recognize that?

12       A      Yes, ma'am.

13       Q      What do you recognize that to be?

14       A      This is my card that I read the rights from that

15   day.

16       Q      How do you recognize it?

17       A      It's in poor condition.  I had it laminated, so

18   this is the card.

19       Q      Trooper, is that rights card in the same

20   condition, or substantially the same condition, as it was

21   when you read the rights to the defendant on July 2, 2005?

22       A      Yes, ma'am.

23               MS. McCORMICK:  Your Honor, I ask to approach

24          the witness with something that counsel has already

25          been given.  It is a photocopy of the same rights card.

1     Q  .  Could you take a look at it, investigator, and

2  inform the Court whether that is an identical copy of the

3  card in your hand?

4              THE COURT:  Let's mark that People's 1.

5              MS. McCORMICK:  Thank you, Judge.

6              (Copy of rights card was marked as People's

7        Exhibit 1 for identification.)

8              THE CLERK:  People's 1 is marked for

9        identification.

10     Q     Trooper, would you please compare your rights

11  card with that copy that you're holding in your hand?  Is

12  that an identical copy of your rights card?

13     A     Yes, ma'am.

14     Q     Again, does that reflect the rights that you read

15  to the defendant on July 2, 2005?

16     A     Yes, ma'am.

17              MS. McCORMICK:  Your Honor, at this time the

18        People request that we put into evidence the copy of

19        the defendant's rights card; excuse me, the

20        investigator's rights card, rather than the original.

21              THE COURT:  Please show it to Mr. LaMagna.

22              (Handing to Mr. LaMagna.)

23              MR. LaMAGNA:  For purpose of the hearing, no

24        objection.

25              THE COURT:  Received People's 1.

1              (People's Exhibit 1 for identification was

2       received and marked in evidence.)

3              THE CLERK:  People's 1 is marked in evidence.

4              You want it shown to back to the witness?

5              MS. McCORMICK:  Yes.  Thank you.

6              (Handing to the witness.)

7       Q     Investigator Harris, would you demonstrate to

8   Court, please, the manner in which you read the defendant

9   his rights on July 2, 2005?

10      A     Yes.  I said:  Sir, you have the right to remain

11  silent.  Anything you say can and will be used against you

12  in a court of law.  You have the right to talk to a lawyer

13  and have him present with you while you are being

14  questioned.

15             If you cannot afford to hire a lawyer one will be

16  appointed to represent you free of charge before any

17  questioning, if you wish.

18             You may decide at any time to exercise these

19  rights and not answer any questions or make any statement.

20             Do you understand each of these rights I have

21  read, I have explained to you?  And he said yes.  And he

22  motioned with his head, yes.

23             Then I asked him:  Having these rights in mind,

24  do you wish to talk to us now?  And he said yes, and

25  motioned his head yes.

1      Q      Investigator, just to clarify, did he both speak

2    the word "yes" and shake his head or just one or the other?

3      A      Both.

4      Q      Both.  And while you were speaking to him, could

5    you tell the Court, please, where was he looking?

6      A      He was looking directly at me and then appeared

7    to understand everything I was saying.

8      Q      Did you make eye contact with him?

9      A      Yes, ma'am.

10      Q      Did you have occasion, after reading him those

11    rights and receiving those responses, to ask him any

12    questions?

13      A      Yes, ma'am.

14      Q      Could you please tell the Court the contents of

15    the conversation that you had with the defendant on that

16    day?

17      A      Basically myself and Investigator Baez, who was

18    recording all the questions and responses of the defendant

19    at the time, we asked him what happened.

20                  THE WITNESS:  Your Honor, can I use my notes?

21                  THE COURT:  If you need to refresh your

22        recollection, go ahead.

23                  THE WITNESS:  Yes.

24                  THE COURT:  I think we'll take five minutes

25        and resume in about five minutes.

1              MS. McCORMICK:   Thank you, your Honor.

2              (Recess.)

3              MS. McCORMICK:   Your Honor, before we

4        proceed --

5    BY MS. McCORMICK:

6        Q     Investigator Harris, with respect to the notes

7    that you have before you, sir, who actually penned those

8    notes?

9        A     Investigator Baez wrote down the answers and the

10   questions in my presence during the time of the interview.

11       Q     At the conclusion of the interview, did you and

12   Investigator Baez confer as to the creation of those notes

13   that you have before you?

14       A     Yes, ma'am.

15       Q     Did you speak with him in creating those notes?

16       A     Yes, ma'am.

17       Q     Do you concur that they represent the

18   conversation that you had with the defendant on July 2,

19   2005?

20       A     Yes, ma'am.

21       Q     Investigator Harris, could you please convey to

22   the Court the content of the conversation that you had with

23   the defendant in the hospital on July 2, 2005?

24       A     Yes, ma'am.   The defendant was asked what

25   happened.   He stated  he had a fight with his ex-girlfriend,

1    he moved to New York back in October.  His boss owes him a

2    thousand dollars, he works in Manhattan, he works on 40th

3    Street and Broadway.  He was depressed, upset, and he went

4    into self-destruct mode.  He drank a lot of alcohol.

5          Q     Did you ask him anything else?

6          A     Yes, ma'am.  I asked him what kind of alcohol; he

7    told us John Barr Scotch.  And then we asked him how much;

8    he said a fifth of Scotch.  And he said ever since he moved

9    to New York he had financial problems.  Whatever he did

10   didn't seem was enough.

11         Then we asked him if he knows what roads he was

12   driving on, or what roads did he take, and he stated he

13   remembered driving on Sunrise Highway to the Southern State.

14         Then we asked him, how do you feel about

15   yourself?  He stated he was disgusted and embarrassed.  And

16   we asked the defendant, "Did you try to hurt yourself?"  He

17   said, "No, never before."

18         And then he stated that he disrespected his

19   parents.

20         Then we asked the defendant, did he have any

21   problems with alcohol, and he stated no, nothing.

22         Then we asked the defendant what route did he

23   take, what roads did he drive on, and he stated he was just

24   driving around, he just had to get out of his house, he

25   found a moment of clarity, and then he decided to go home.

1        And then he stated that he just wanted to work

2   and make a living.  He went to school for four years, and

3   he's in such a hole and he's embarrassed, and he's

4   embarrassed and humiliated.

5        Q    You can continue if there is more, investigator.

6        A    Okay.  Then we asked the defendant where is your

7   family?  And he stated that his mother -- her name was

8   Margot Aponte -- and his stepfather were in Niagara Falls on

9   a vacation.  And he said that they lived in Islip, New York.

10  And he didn't know how to get in contact with them.

11       We asked about his father.  He provided his name

12  as Kurt Heidgen.  He lives in Arkansas, he lives in a

13  trailer home.  And he provided a cell phone number for him.

14       Then we asked him what roads was he traveling on

15  again, and he stated he was traveling on Sunrise Highway,

16  trying to get home.

17       Then we asked the defendant, "What did you hit?"

18  And he stated that he hit a tree or a median.  After he hit,

19  basically he was knocked out, he knew he was hurt.  Next

20  thing he knew he was in the hospital.

21       Then we asked the defendant about his little

22  problem he had in Mississippi, and he answered that "Ole

23  Miss --," he doesn't consider that --

24            MR. LaMAGNA:  Objection to that part of the

25       statement.

1          THE COURT:   Pardon me?

2          MR. LaMAGNA:   I object to that part of the

3     statement.

4          THE COURT:   Overruled.

5          You want to be heard further?

6          Would you like the officer to step out for a

7     minute?

8          MR. LaMAGNA:   Briefly.   If I may approach?

9          THE COURT:   Officer, just step out for a

10     minute.

11          (The witness left the courtroom.)

12          MR. LaMAGNA:   I believe part of the statement

13     that he was about to articulate was concerning some

14     issues where there was an arrest, but the case was

15     dismissed and there is no conviction.

16          So since this is a hearing to determine

17     admissibility, that part of the statement is

18     inadmissible.   To begin with, there is no conviction.

19     There is no anything.

20          THE COURT:   Well --

21          MR. LaMAGNA:   It's an arrest.

22          THE COURT:   It would be for the purposes of

23     continuity, and given that there is no jury here, I'm

24     going to allow any statement that he made to come in so

25     I can hear it.

1              MR. LaMAGNA:  For the purposes of the

2       hearing.

3              THE COURT:  If you have an objection to a

4       portion of the statement standing, for purposes of the

5       People's direct case, let me know at the conclusion of

6       the hearing and I'll rule on it.

7              MR. LaMAGNA:  That's fine, Judge.

8              THE COURT:  Okay.

9              (The witness resumed the witness stand.)

10             THE COURT:  You can continue.

11  BY MS. McCORMICK:

12      A      (Continuing) He answered, "Ole Miss --," he

13  didn't consider what happened in Mississippi any trouble.

14  He was stopped by a local PD; he refused to take a test.  He

15  hired an attorney and he was found not guilty.

16             Then the defendant was asked what about his

17  ex-girlfriend, what is her name, where does she live.  He

18  said her name was Lindsay Long.  She lives in Little Rock,

19  Arkansas.  She lives off Denny Road.  He provided that she

20  didn't have any phone; she usually calls him using a calling

21  card.  And he provided her date of birth as December 6,

22  1980, and he said she was 24 years old.

23             Then we asked the defendant, "Did you work on

24  Friday?"  And he said, yes, he went to work, he left from

25  the Valley Stream, Long Island, railroad train station.  He

1    arrived in the city approximately 3 p.m.  When he got to

2    work he made some phone calls, he checked his e-mails.  Then

3    he met some friends over at a bar on Restaurant Row, on 46th

4    Street, between Eighth and Ninth.  And one of the friends

5    that he met there was named Craig Nyzowitz.  He provided

6    that he was 24 years old, he was from Plainview, New York.

7            He also stated that at the time he was at the bar

8    he had four Bohemian beers, and he stayed at the bar until

9    about 8 o'clock and he went home.

10           He arrived to the Valley Stream train station

11   around 8:30, 8:40 p.m. and he walked straight home.

12           Then we asked him what happened after that, and

13   he stated that approximately 9 o'clock his girlfriend, his

14   ex-girlfriend, called him.  They had an argument on the

15   phone.  They talked for about ten to twelve minutes.  And he

16   said the relationship that he had with her, they went off

17   and on going for the last five years.

18           The defendant was asked what was the

19   self-destruct mode, and he said it alleviated hardship and

20   stress.

21           Then the defendant was asked:  Have you ever

22   drank and blacked out?  He answered, "Yes, in college, but

23   not as a professional."

24           The defendant was asked:  What time did you leave

25   the house?  He stated it was late, around 1 a.m.  He was

1   watching Fear Factor, and then Blind Date came on after

2   that, so he left the house after Blind Date.

3          Then we asked, So what time did you actually

4   leave the house?  And he stated that he left around 2 a.m.,

5   he just drove around and he didn't stop anywhere.

6          He was also asked, Where did the accident occur?

7   And he stated:  On Meadowbrook State Parkway or Southern

8   State Parkway, and that's mostly the roads that he travels

9   on.

10          Then he was asked, Were you fishing down at Jones

11   Beach?  And he answered no.

12          Then he was asked:  How did you get to the

13   Meadowbrook State Parkway?  He said he took the Southern

14   State Parkway to Exit 22 or 23, and he believed he was going

15   southbound on the Meadowbrook State Parkway.

16          Then he was asked:  Do you remember any of the

17   roads you were on?  Did you know if you were, did you exit

18   the road, if you made any U-turns?  He stated he was just

19   driving around, he didn't exit anywhere off the parkway and

20   he didn't make any U-turns.

21          Also, right after that, he inquired about his

22   truck, and he stated that his truck is all he's got in his

23   life.

24          He was asked about his address in Valley Stream.

25   We asked him what's the address he lived at in Valley

1   Stream.  He answered 14 Oceanview Avenue, Valley Stream, New

2   York.

3             We asked him did he have a phone for that

4   address.  He said no, he had a cell phone.  He provided a

5   cell phone number.

6             And we asked him what did he do for a living, and

7   he said he was into sales.

8             Then we asked him about the truck.  We asked him

9   if the vehicle was registered in his name, and he said, yes,

10  it's in his name and his grandmother's name.

11            He also told us that his grandmother had passed

12  away.  So we asked him did her death bother you, and he

13  stated, yes, we were close.  But she was 98 years of age and

14  her death was more of like a celebration.

15            We asked him if he was the only child, he

16  answered yes.

17            We asked the defendant what else could you tell

18  us about yourself?  He said he had a BS in history and he

19  minored in Spanish.

20            We asked the defendant what is your salary, how

21  much rent do you pay at your apartment?  He stated he makes

22  25 grand a year and he pays $300 a month for rent.

23            Then he stated that he was so humiliated and

24  embarrassed for what happened today, and he wanted to pay

25  the price and penance for what he had done.

1     Then we asked the defendant who could we contact

2   in the immediate area in case of emergency, and he told me

3   he had an uncle named Francisco Rodriguez, who lived in

4   Queens, and he believed that he works in a realty company

5   and he lives with Esther or Betty Rodriguez, and all this

6   information was in his cell phone, so he couldn't give me

7   the information about them whatsoever.

8     We asked him if the vehicle had insurance, and he

9   stated, yes, He had U.S.A.A. Insurance; it's a national

10  company for veterans.  His father was in Vietnam, so he was

11  entitled to it.

12    We asked the defendant, Did you try and hurt

13  yourself?  He answered, "No, not under these circumstances.

14  I've thought about it like everybody else, but I never

15  plotted and I never thought about doing it."

16    Then we asked the defendant, You weren't trying

17  to hurt yourself tonight?  Were you trying to hurt yourself

18  before?  He said, "No, sir, I wouldn't cash out like this.

19  I would wait for another hand to be dealt."

20    Then he requested to have an attorney present and

21  we stopped questioning him.

22    Q     Can you describe to the Court how it is that he

23  requested to have an attorney present; do you remember what

24  he actually said?

25    A     He said, "I think I want an attorney present

1    now."

2        Q    Did you have any other conversation with him at

3    that point?

4        A    Just a brief one, asking him if he needed

5    anything from the nurse and doctor, and he said no.

6        Q    Were you asking him that as you were leaving the

7    room?

8        A    Yes.

9        Q    While you were in the room with the defendant,

10   investigator, who else was in the vicinity of the

11   defendant's bed?

12       A    At the time, behind closed curtains, just myself

13   and Investigator Baez, and outside Trooper Zawol and Trooper

14   Grasso.

15       Q    When you say outside, do you mean outside the

16   room or outside the curtain that surrounds the bed?

17       A    Outside the curtain area.

18       Q    And, investigator, during the time that you were

19   speaking to the defendant, from what you could ascertain did

20   he have any trouble understanding the questions that he was

21   being asked?

22                    MR. LaMAGNA:  Objection.

23                    THE COURT:  Overruled.

24       A    He had no trouble whatsoever.

25       Q    Did he ask you to repeat any of the questions?

1        A       No, ma'am.

2        Q       Did he respond in a timely fashion to each of the

3   questions asked of him?

4        A       Yes, ma'am.

5        Q       Were his responses, in your estimation,

6   appropriate to the questions being asked?

7        A       Yes, ma'am.

8                    MS. McCORMICK:  Nothing further.  Thank you.

9                    MR. LaMAGNA:  Thank you, Judge.

10  CROSS-EXAMINATION

11  BY MR. LaMAGNA:

12       Q       Good afternoon, Investigator Harris.  How are

13  you?

14       A       Good afternoon, sir.

15       Q       I'm going to ask you some questions this

16  afternoon.  If you don't understand the question, please

17  feel free to ask me to repeat it, and I will.

18       A       Okay.

19       Q       Now, are you the lead investigator on this case?

20  When you say case investigator --

21       A       Yes, case agent.

22       Q       And that means you're responsible for all the

23  dynamics with respect to the case; gathering evidence,

24  making sure everything is done right, making sure the

25  paperwork is right; is that correct?

1      A      Yes, sir.

2      Q      And it's important to make sure that all of these

3   things are done correctly, correct?

4      A      Yes, sir.

5      Q      That all the statements are taken correctly; is

6   that correct?

7      A      To the best of my recollection.

8      Q      That all the evidence is properly secured,

9   correct?

10     A      Yes, sir.

11     Q      That's all your responsibility; is that not true?

12     A      Yes, sir.

13     Q      Because you're the lead investigator, correct?

14     A      Yes, sir.

15     Q      And it's very important to accurately memorialize

16  everything that occurs that's of significant value when

17  you're putting together an investigation such as this; isn't

18  that correct?

19     A      Yes, sir.

20     Q      Because some day, like today, you may be coming

21  to court and you want to be accurate as to what happened

22  many months in the past, correct?

23     A      Yes, sir.

24     Q      So it's always important to document everything

25  of import at the time that either it was said or done,

1   correct?

2        A      To document what's important, yes.

3        Q      Now, directing your attention to July 2, 2005,

4   you received a radio call for an accident that occurred on

5   Meadowbrook Parkway and and Babylon Turnpike, correct?

6        A      No, sir.

7        Q      You didn't see receive a call?

8        A      No, I received a call on my cell phone.

9        Q      So you received a phone call?

10       A      Yes.

11       Q      To go to that location?

12       A      Yes.

13       Q      That was on July 2, 2005, correct?

14       A      Yes, sir.

15       Q      And you arrived there at approximately 2:35 a.m.?

16       A      Yes, sir.

17       Q      Had the defendant, Martin Heidgen, already been

18   transported to the hospital at that time?

19       A      He was en route to the hospital.

20       Q      So he was already gone from the scene?

21       A      Yes, sir.

22       Q      And this 2:35 time is an approximate time?

23       A      As was recorded by SB Farmingdale at my arrival

24   time.

25       Q      Were you made aware at that point that Trooper

1    O'Hare had gone with Mr. Heidgen to the hospital to secure a

2    blood sample?

3        A     Yes.

4        Q     And that information was given to you by Trooper

5    Knapp; is that correct?

6        A     Yes, sir.

7        Q     And when were you notified of that fact?

8        A     Within minutes of me arriving at the scene.

9        Q     Were you ever notified thereafter that in fact

10   Trooper O'Hare did in fact get a sample of blood from

11   Mr. Heidgen?

12                   MS. McCORMICK:  Objection.  Beyond the scope.

13                   THE COURT:  Beyond the scope?  No.

14                   THE WITNESS:  I can answer that, sir?

15                   THE COURT:  Yes.

16       A     I was told.

17       Q     And when was that?

18       A     Approximately --

19                   MS. McCORMICK:  Judge, I'm going to object.

20                   THE COURT:  If you don't say why, I'll

21   sustain it.

22                   MR. LaMAGNA:  He's in the middle of his

23   answer.

24                   THE COURT:  Well, I think she's objecting to

25   the question, so I would have to strike the answer.

Case 2:15-cv-00819-LDH   Document 10-7   Filed 01/04/16   Page 146 of 275 PageID #: 3060

1          Next question, please.

2     Q     Well, at some point you realized that you were

3 informed that a blood sample was obtained, correct?

4     A     During the course of the investigation, yes.

5     Q     I'm sorry.  You can finish.

6     A     During the course of the investigation, yes.

7     Q     And the purpose I'm asking you that, at some

8 point you went to the hospital and interviewed Mr. Heidgen;

9 is that correct?

10     A     Yes.

11     Q     So my point is, did you have that information

12 prior to you interviewing Mr. Heidgen?

13     A     Yes.

14     Q     You already know that, correct?

15     A     Yes.

16     Q     Did you receive a phone call or any notification

17 from Trooper Zawol, or anybody else, regarding the fact that

18 Mr. Heidgen was awake and talking at around 11 o'clock?

19     A     I don't recall, sir.

20     Q     When you went to the hospital, you said on direct

21 examination one of the reasons certainly was to check upon

22 the status of the victims, correct?

23     A     Yes, sir.

24     Q     And one of the reasons was to interview

25 Mr. Heidgen, correct?

Investigator Harris - for People - cross          147

1      A      I said possibly interview.

2      Q      An attempt to, correct?

3      A      Possibly interview Mr. Heidgen.

4      Q      So that was one of the things that you were

5   trying to accomplish.  Whether it happened or not you

6   wouldn't know until you reached him, correct?

7      A      Can you repeat that?

8      Q      I'm saying that's one of the things that you were

9   trying to do.  You wouldn't have known that until you met

10  with him.  I understand that.

11     A      Absolutely.

12     Q      But were you notified by anybody, Officer Zawol

13  or otherwise, prior to your going to the hospital at that

14  particular time, that he was already up to talking?

15     A      I don't recall.

16     Q      When you arrived at the bedside of Mr. Heidgen

17  what time was that?

18     A      Approximately between 12:15 and 12:30.

19     Q      Now it's approximately an hour after Trooper

20  Zawol spoke to Mr. Heidgen; is that correct?

21            MS. McCORMICK:  Objection.

22            THE COURT:  If he knows.

23     Q      If you know.

24     A      Give or take 45 minutes.

25     Q      What I'm asking you, was it a coincidence that

1    you showed up approximately an hour after Trooper Zawol

2    spoke to the defendant or did he call you and say, Come, the

3    defendant is up and talking?

4              MS. McCORMICK:  Objection.

5              THE COURT:  Sustained.

6         Q    Well, so you don't recall whether or not you

7    received a call or not.  Could have been, but you don't

8    know.  Is that a fair statement?

9         A    I don't recall receiving any phone calls.

10        Q    And it was your intention to go to the hospital

11   at that time regardless of what was happening with Trooper

12   Zawol; is that correct?

13        A    Yes, sir.

14        Q    And you arrive at the defendant's bedside at

15   about 12:15; is that correct?

16        A    Approximately.

17        Q    Now, the defendant was being guarded by Trooper

18   Zawol, correct?

19        A    Yes, sir.

20        Q    And that was his assignment for that day,

21   correct?

22        A    Yes, sir.

23        Q    Was he assigned to guard Mr. Heidgen with anybody

24   else?

25              MS. McCORMICK:  Objection.

1              THE COURT:  Would you have assigned him?

2              THE WITNESS:  I had the sergeant assign him.

3              THE COURT:  You had a sergeant assign him?

4              THE WITNESS:  Yes.

5              THE COURT:  Overruled.

6      Q      So did you have anybody else assigned to guard

7   Mr. Heidgen other than Trooper Zawol?

8      A      My orders were to have a police presence with

9   Mr. Heidgen.

10     Q      Is there anybody else other than Trooper Zawol?

11  Was he by himself?

12     A      At that time, yes.

13     Q      And you and Investigator Baez show up around

14  12:15; is that correct?

15     A      Approximately.

16     Q      And one of the purposes, at least one of the

17  purposes, in going there was an effort to try to interview

18  Mr. Heidgen, correct?

19     A      Yes, sir.

20     Q      And knowing this, or having this in mind, did you

21  bring with you any type of recording device to record the

22  interview that you were going to ultimately have with

23  Mr. Heidgen?

24     A      No, sir.

25     Q      Didn't bring any video recorder with you?

1    A    No, sir.

2    Q    Didn't bring any audio recorder with you?

3    A    No, sir.

4    Q    No hand-held micro recorder?

5    A    No, sir.

6    Q    Does the New York State Police have any of these

7  devises?

8              MS. McCORMICK:   Objection.

9              THE COURT:   Sustained.

10    Q    Officer, knowing that you were going to attempt

11  to try to interview Mr. Heidgen in this matter, did you

12  bring with you any preprinted supporting deposition forms by

13  the New York State Police?

14              You don't have to look at her.

15    A    I'm not looking at her.   I'm looking to the left.

16              Yes, I had some supporting deposition, and I had

17  the General 19 Statement form.

18    Q    And on those statement forms there is a portion

19  designated, when you're interviewing a suspect or a person

20  in custody, that articulates the Miranda warnings, correct?

21    A    On the General 19.

22    Q    And it lists before the body of where the

23  individual suspect would be making his statement, above it,

24  are all the Miranda warnings, correct?

25    A    Yes, it does.

1       Q       And after that there are the questions:  Do you

2    understand?  And I waive these Miranda warnings.  And there

3    is a spot for the signature of a suspect or person in

4    custody, acknowledging he waived his Miranda warnings,

5    correct?

6       A       Yes.

7       Q       Did you use one of those forms in this case?

8       A       No, that form --

9       Q       You had it with you, though, right?

10      A       Yes, this form is used for a written statement.

11      Q       What, you didn't use it?  You had it with you but

12   you didn't use it, correct?

13      Q       Now, prior to attempting to interview

14   Mr. Heidgen, did you speak to any of the doctors or any of

15   the nurses who were attending him prior to you attempting to

16   interview him?  Did you speak to any of them?

17      A       Attending Mr. Heidgen?

18      Q       Yes.

19      A       I don't recall.

20      Q       Did you speak to any doctors or nurses prior to

21   your interviewing Mr. Heidgen and ask them is he physically

22   able to be interrogated at this time?  Is he under any type

23   of medication?  Is he in any pain?  Is it okay for us to

24   talk to him?  Did you do any of that?

25      A       I don't recall.

1      Q      If you would have, certainly you would have

2   detailed that in your notes, correct?

3      A      If I had a doctor's name, yes, I would.

4      Q      That would have been an important factor,

5   correct?

6      A      Yes.

7      Q      It's important to memorialize every important

8   fact that occurs; isn't that correct?

9                MR. HAYDEN:  Objection.

10               THE COURT:  Sustained.

11     Q      Now, you spoke to Trooper Zawol, and he

12   articulated to you with a certain degree of specificity what

13   in fact the sum and substance of his conversation was with

14   Mr. Heidgen, correct?

15     A      Yes, sir.

16     Q      So you had somewhat of an idea of what you would

17   be asking Mr. Heidgen based upon what Trooper Zawol told

18   you, correct?

19     A      Would have been part of the questioning.

20     Q      Now, when you arrived at the bedside, can you

21   please physically describe the area for us?

22     A      It's a four-bed bay area utilized for emergency

23   medical victims.  And he was the first bed to the main

24   corridor.

25     Q      Closest to the door?

1        A       Closest to the door.  And there was nobody else

2    to the right of him.

3        Q       Where was Trooper Zawol guarding Mr. Heidgen?

4        A       Sitting right outside his bed, right next to his

5    bed.

6        Q       So he wasn't out in the hallway, he was actually

7    bedside?

8        A       Yes.

9        Q       And that was because Mr. Heidgen was under

10   arrest, correct?

11       A       Yes.

12       Q       And Officer Zawol was apprised of that fact,

13   correct?

14               MS. McCORMICK:  Objection.

15               THE COURT:  Sustained.

16       Q       Now, were there drapes around the bed; you know,

17   those hospital drapes?

18       A       Drapes, were they there?  Curtains?

19       Q       Yes.

20       A       Curtains were there.

21       Q       Curtains.  Were they opened, were they closed?

22       A       They were open.

23       Q       They were open.  And did Mr. Heidgen have an

24   oxygen mask --

25       A       No, sir.

1       Q       -- attached to him at that time?

2       A       No, sir.

3       Q       You're sure about that?

4       A       I'm positive.

5       Q       That's something you would remember?

6       A       Yes.

7       Q       So he wasn't being given oxygen through a mask

8  covering his nose or his mouth?

9       A       No.

10      Q       Was he sleeping or was he up when you arrived?

11      A       Alert and conscious.

12      Q       He was up?

13      A       Yes.

14      Q       And who was present other than you, Investigator

15  Baez and Trooper Zawol?

16      A       At what point?

17      Q       When you arrived.

18      A       That's it.

19      Q       And that's all there were for the entire time,

20  then, right?

21      A       No, Trooper Grasso came also.

22      Q       Trooper Grasso, was he there during the

23  investigation of Mr. Heidgen?

24      A       No, he was not with me and Investigator Baez.

25      Q       He came over subsequent to that?

1      A      He came at the point in time, around that time.

2      Q      Around what time?

3      A      During the time of the interview.

4      Q      So he was present --

5      A      He was not physically present with us during the

6    interview.

7      Q      He was outside?

8      A      He was outside.

9      Q      You had seen him?

10     A      Have I seen him?  I saw him after the fact.

11     Q      So you knew he was there, but he didn't interrupt

12   it?

13     A      Not during the interview.

14            THE COURT:  Let me see counsel at the bench.

15            (Off the record discussion at bench.)

16            THE COURT:  At this point we'll break until

17   9:30 on Wednesday morning.

18            Thank you very much.

19            (The hearing was recessed until April 5,

20   2006.)

21                   *       *       *

22

23

24

25

1   STATE OF NEW YORK  :  NASSAU COUNTY

2       SUPREME COURT, PART 31

3   ---------------------------------------X

4   THE PEOPLE OF THE STATE OF NEW YORK     :

5           -against-                       :   Ind. # 1910N/05

6   MARTIN ROBERT HEIDGEN,                  :

7

8                           Defendants.     :
    ---------------------------------------X

9                               262 Old Country Road
                                Mineola, New York
10                              April 5, 2006

11  B E F O R E :

12              HON. ALAN H. HONOROF,
                    Acting Supreme Court Justice.
13

14

    A P P E A R A N C E S :
15

                (As previously noted.)
16

                *       *       *       *       *
17

18

19              (The witness, Investigator Michael Harris,

20      resumed the witness stand.)

21              THE CLERK:  Indictment 1910N/05, the People

22      against Martin Heidgen.

23              Hearing continued.   People ready?

24              MR. HAYDEN:  Ready, your Honor.

25              THE CLERK:  Defendant ready?

1          MR. LaMAGNA:  Defendant ready.

2          THE CLERK:  Both sides ready.

3          THE COURT:  Continue, please.

4          MR. LaMAGNA:  May I inquire?

5          THE COURT:  Please.

6    CROSS-EXAMINATION (Cont'd.)

7    BY MR. LaMAGNA:

8        A     Good morning, Investigator Harris.  How Are you?

9        A     Good morning.  Fine, thank you.

10       Q     Now, investigator, we were last talking --

11   actually Monday -- I think we left off somewhere where you

12   were describing the hospital room where Mr. Heidgen was

13   located.  Do you recall that?

14       A     Yes, sir.

15       Q     And you had testified that at approximately 12:30

16   or so you arrived to attempt to get an interview of

17   Mr. Heidgen along with Investigator Baez, correct?

18       A     Repeat that question, sir?

19       Q     At approximately, around 12:30 or so you, along

20   with Investigator Baez, went to Mr. Heidgen's hospital room

21   in an attempt to interview him; is that correct?

22       A     Yes, sir.

23       Q     And one of your objectives in going to the

24   hospital that day at that time was to attempt to interview

25   Mr. Heidgen, correct?

1        A      Yes, sir.

2        Q      Now, in between Monday when we broke for

3    testimony and today you didn't discuss this matter or your

4    testimony with anybody, did you?

5        A      No, sir.

6        Q      Not with any other detectives, police officers,

7    troopers?

8        A      No, sir.

9        Q      Not with any members of the district attorney's

10   office?

11       A      No, sir.

12       Q      Now, when you presented yourself at the hospital

13   you testified that at that time that you brought with you no

14   tape recording devices, audiotape devices, or any recording

15   devices at all; is that correct?

16       A      Yes, sir.

17       Q      And you testified on direct examination that you

18   did the questioning of Mr. Heidgen and Investigator Baez was

19   transcribing the questions you asked and the answers that

20   Mr. Heidgen had given to you, correct?

21       A      No, sir, I didn't say that.

22       Q      Did you testify on direct examination that it was

23   Investigator Baez who wrote down everything that happened?

24       A      He recorded everything, and I said we both asked

25   questions of Mr. Heidgen.

1      Q     Forgive me, then.

2            You asked questions as well as Investigator Baez,

3    correct?

4      A     Yes, sir.

5      Q     So it wasn't just you?

6      A     Yes, sir.

7      Q     But it was Investigator Baez who transcribed what

8    was being said by both you and he, correct?

9      A     Yes, sir.

10     Q     And transcribed what was being said by

11   Mr. Heidgen, correct?

12     A     Yes, sir.

13     Q     And that transcription was being done

14   contemporaneous with the statements as they were being made,

15   correct?

16     A     Yes, sir.

17     Q     And you testified on direct examination that

18   subsequent to that interview you reviewed the notes of

19   Investigator Baez and that they were accurate and they

20   accurately reflect what was being said, correct?

21     A     Yes, sir.

22     Q     You also testified on Monday that you brought

23   with you to the interview a pre-prepared New York State

24   Police, pre-printed New York State Police statement form,

25   correct?

1     A     Yes, sir.

2     Q     And that form, at the top section, articulates

3   with specificity the constitutional Miranda warnings,

4   correct?

5     A     Yes, sir.

6     Q     And underneath the Miranda warnings there is a

7   spot for the individual to whom the Miranda warnings are

8   being given, there is a space where he can sign,

9   acknowledging that he received those Miranda warnings,

10   correct?

11     A     Yes, sir.

12     Q     And you did not use that form for the interview

13   with Mr. Heidgen that day, correct?

14     A     That form is used --

15     Q     Did you use that form?  Did you use that form

16   when you interviewed Mr. Heidgen?

17     A     No, sir.

18     Q     In fact, you didn't even have Mr. Heidgen sign,

19   at least the top part of the form, which articulates with

20   specificity the Miranda warnings, correct?  Yes or no?

21     A     No.  Can I explain why?

22     Q     I'm just asking you yes or no.

23     A     Can I explain why?

24     Q     No.  I'm asking you did you or did you not do

25   that?  Answer my question.

1    A      We didn't have to, no.

2    Q      You didn't have to so you didn't?

3    A      We didn't have to.

4    Q      Okay.  Now, underneath that where the question

5    says, where the acknowledgment of the Miranda warnings are

6    by the individual there is a place to sign.  Did you have

7    Mr. Heidgen sign that?  Yes or no?

8    A      No.

9    Q      Now, present with you was Investigator Baez as

10   well as Trooper Zawol; is that correct?  At the time of the

11   interview, I'm sorry.

12   A      Just me and Investigator Baez.

13   Q      Were there any nurses present?

14   A      No, sir.

15   Q      Were there any doctors present?

16   A      No, sir.

17   Q      There is a curtain, correct?

18   A      Yes, sir.

19   Q      Did you close the curtain when you were talking

20   with him?

21   A      Yes, sir.

22   Q      So the curtain was closed.  It was you, Baez and

23   Mr. Heidgen, correct?

24   A      Yes, sir.

25   Q      Now, prior to you engaging Mr. Heidgen and

1   beginning your interrogation of him, did you speak to any

2   doctor requesting permission to speak to him?

3       A    I don't recall.

4       Q    You don't recall?

5       A    I don't recall at this time.

6       Q    So then you would not recall whether you inquired

7   of a doctor whether his physical or medical condition was

8   such that he was able to be interrogated or questioned by

9   you, correct?

10      A    I don't recall at this time.

11      Q    If you had, that would be an important issue,

12  would you agree?

13              MS. McCORMICK:  Objection.

14              THE COURT:  Sustained.

15      Q    Would it be an important fact?

16              MS. McCORMICK:  Objection.

17              THE COURT:  Sustained.

18      Q    You didn't memorialize any of that in any notes,

19  did you?

20              MS. McCORMICK:  Objection.

21              THE COURT:  Overruled.

22      A    I don't recall.

23      Q    You want to review your notes?

24      A    These are not my notes.

25      Q    Do you want to review your notes to refresh your

1    recollection to see if you noted that you spoke to any

2    doctor concerning whether it was safe or advisable to talk

3    to Mr. Heidgen that day?

4        A    No, sir.

5        Q    You don't want to?

6        A    No, sir.

7        Q    It wouldn't refresh your recollection whether or

8    not you did that, or you didn't do it?

9        A    I don't have my notes here with me, sir.

10            MS. McCORMICK:  Objection.

11            THE COURT:  Overruled.

12            Have the investigator's notes been provided

13       by Rosario?

14            MS. McCORMICK:  Yes.

15            THE COURT:  Then you have those notes?

16            MR. LaMAGNA:  I have those notes.

17            THE COURT:  I'm just making sure about that.

18       Q    For the record, investigator, you have turned

19    over all of your notes, memorandum, memoranda of any sort to

20    the district attorney, correct?

21       A    Yes, sir.

22            MR. LaMAGNA:  And for the record, your Honor,

23       I have received all of the Rosario material from the

24       district attorney's office.

25            THE COURT:  Thank you.

1      Q      So my question is, you don't recall whether you

2   spoke to any doctor prior to interviewing Mr. Heidgen.  And

3   my question to you is:  If you reviewed your notes, would

4   that refresh your recollection as to whether or not you did

5   or you didn't?

6      A      I don't recall speaking to any doctors and my

7   notes do not reflect that.

8      Q      Now, with respect to the notes prepared

9   contemporaneous with this investigation prepared by

10  Investigator Baez, those notes consist of six pages,

11  correct?

12     A      In reference to the statement?

13     Q      Yes.

14     A      Yes, sir.

15     Q      And the statement that you referred to in your

16  direct examination, that is in the form of a question,

17  answer, question, answer, correct?

18     A      Yes, sir.

19     Q      Known as a Q and A, correct?

20     A      Yes.

21     Q      And it articulates with specificity the questions

22  asked by either you or Investigator Baez, correct?

23     A      Yes, sir.

24     Q      And it articulates with specificity the responses

25  to the questions articulated by Mr. Heidgen, correct?

1       A       Yes, sir.

2       Q       And you used this statement in your direct

3   examination to refresh your recollection as to what was said

4   that night, correct?

5       A       Yes, sir.

6       Q       And as you stated earlier, you prepared no notes,

7   memoranda, memorandum, or statements concerning that

8   interview; you left it to Investigator Baez, correct?

9       A       Yes, sir.

10      Q       And there does not exist any notes, memorandum,

11  memoranda, prepared by you concerning that interview,

12  correct?

13      A       Yes, sir.

14      Q       And subsequent do that interview, you didn't

15  prepare any notes, memoranda, memorandum, concerning that

16  interview, correct?

17      A       Yes, sir.

18      Q       And again, just for clarity's sake, you reviewed

19  that six-page detailed Q and A, correct?

20      A       Yes, sir.

21      Q       And you reviewed it right after the interview,

22  correct, while your memory was still fresh?

23      A       Yes, sir.

24      Q       And again it was accurate, correct?

25      A       Yes, sir.

1      Q      In fact, you made no corrections at all to the

2    six-page detailed Q and A prepared by Investigator Baez of

3    that interview, correct?

4      A      Correct, left it as is.

5      Q      In fact, you made no addendums to the six-page

6    detailed Q and A prepared by Investigator Baez, correct?

7      A      Correct.

8      Q      And in fact, you added nothing to the six-page Q

9    and A, correct?

10                 MS. McCORMICK:  Objection.

11                 THE COURT:  I think it's pretty clear.

12                 Sustained.

13     Q      Now, what was the first thing you said to

14   Mr. Heidgen when you approached him in that hospital room?

15     A      Can I check my notes to reflect for that?

16                 THE COURT:  Sure.

17     Q      You're checking your notes or Investigator Baez's

18   notes?

19     A      What I have right now, these notes right here.

20     Q      That's Investigator Baez's notes?

21     A      Uh-hum.

22            "Do you know what roads you were on?"

23     Q      Well, let's back up.  Did you introduce yourself

24   to him?

25     A      Oh, yes.

1       Q       That's where I'm going.

2       A       Okay.

3       Q       When I asked you what was the first thing you

4  said to Mr. Heidgen, literally, what was the first thing you

5  said to him?

6       A       Introduction; my name.

7       Q       What did you say?

8       A       I'm Investigator Michael W. Harris of the New

9  York State Police.  And Investigator Baez introduced himself

10 as Investigator Eric Baez.

11      Q       And what did you say next?

12      A       Asked him how are you doing.  He said he was

13 okay.  And then Eric Baez told him that he was under arrest

14 for driving while intoxicated.

15      Q       So you told him he was under arrest for driving

16 while intoxicated.  Okay.

17      A       Investigator Baez told him.

18      Q       In your presence?

19      A       Yes, in my presence.

20      Q       And then at some point thereafter you stated on

21 direct examination that you read Mr. Heidgen his

22 constitutional Miranda warnings, correct?

23      A       Yes, sir.

24      Q       And what exactly did you say to him?

25      A       After Investigator Baez told him that he was

1   under arrest for driving while intoxicated, he told

2   Mr. Heidgen that I was going to read him his Miranda rights.

3   I took my card and I read him his rights.

4        Q     And you read it off the card?

5        A     Yes, sir.

6        Q     What did you say?

7              THE WITNESS:  Can I do it again, sir?

8              THE COURT:  Sure.

9              THE CLERK:  The witness has People's 1 in

10       evidence.

11       Q     And if you will, can you read it in the manner in

12   which you read it or you recall reading it to Mr. Heidgen?

13       A     Yes.  I said:  "Sir, I'm going to read you the

14   Miranda warnings.  You have the right to remain silent.

15   Anything you say can and will be used against you in a court

16   of law.

17              "You have the right to talk to a lawyer and have

18   him present with you while you're being questioned.

19              "If you cannot afford to hire a lawyer one will

20   be appointed to represent you free of charge before any

21   questioning, if you wish.

22              "You may decide at any time to exercise these

23   rights and not answer any questions or make any statements.

24              "Do you understand each of these rights I have

25   explained to you?"  He said yes.  And he nodded his head

1    yes.

2              Then I said:  "Having these rights in mind, do

3    you wish to talk to us now?  And he said yes, and nodded his

4    head yes.

5         Q    And then you said, What happened?

6         A    Then Investigator Baez asked him what happened.

7         Q    Right after that, correct?

8         A    Yes, sir.

9         Q    Now, are you looking at the notes prepared by

10   Investigator Baez; is that what you're referring to?

11        A    Yes, sir.

12        Q    On the top of that, of those notes, it

13   articulates the time, correct?

14        A    Yes, sir.

15        Q    Date of this interview, correct?

16        A    Indicates the time of the Miranda warning.

17        Q    It says 7/2/05, correct?

18        A    That's the date, not the time.

19        Q    And the time is 12:30 p.m., correct?

20        A    Yes, sir.

21        Q    In fact, nowhere on that detailed Q and A does it

22   articulate anywhere the statements concerning you giving

23   Mr. Heidgen his Miranda warnings; isn't that correct?

24        A    12:30 p.m. is on that.

25        Q    Doesn't say Miranda?

1      A      Doesn't say.

2      Q      Has a time and date, correct?

3      A      Has a time and date.

4      Q      Says Investigator Harris, correct?

5      A      Yes.

6      Q      Investigator Baez, correct?

7      A      Yes.

8      Q      First Q -- and that stands for question, correct?

9      A      Yes, sir.

10     Q      "What happened?"  Correct?

11     A      Absolutely.

12     Q      Nowhere before that does it appear in this

13  detailed five-page question and answer that you said fairly

14  and accurately reflected what you said and what Investigator

15  Baez said to Mr. Heidgen?  Doesn't appear that you read him

16  his Miranda warnings; isn't that true?

17     A      Yes, sir.

18     Q      Now, you would agree that the Miranda warnings is

19  an important fact in the duties that you performed, correct?

20             MS. McCORMICK:  Objection.

21             THE COURT:  Sustained.

22     Q      You articulated on numerous occasions Monday and

23  today that as an investigator it's important for you to take

24  notes of every important fact, correct?

25             MS. McCORMICK:  Objection.

1          THE COURT:  Sustained.

2     Q     You're familiar with the New York State Police

3  manual, aren't you?

4     A     Yes, I am.

5     Q     In fact, the New York State Police manual is a

6  manual prepared by the State Police and given to its

7  troopers and personnel, correct?

8     A     Yes, sir.

9     Q     And it articulates certain procedures that they

10  would like for you to do in certain situations, correct?

11     A     Yes, sir.

12     Q     And you're familiar with those procedures,

13  correct?

14     A     Yes, sir.

15     Q     And you follow those procedures, correct?

16     A     Yes, sir.

17     Q     And isn't it a fact that in the procedures, New

18  York State Police Field Manual, Article 32, that it states

19  it is advisable to make detailed notes concerning the

20  advising of rights and waiving of rights, including the time

21  this is done; isn't that correct?

22          MS. McCORMICK:  Objection.

23          THE COURT:  Sustained.

24     Q     Are you aware of that?  Is that the procedure?

25          MS. McCORMICK:  Objection.

```
 1                    THE COURT:  Sustained.

 2        Q     Did you take notes of the Miranda warnings that

 3   you allegedly gave Mr. Heidgen?

 4                    MS. McCORMICK:  Objection.

 5                    THE COURT:  Sustained.

 6        Q     Did you prepare notes --

 7                    MS. McCORMICK:  Objection.

 8        Q     -- concerning that issue?

 9                    MR. LaMAGNA:  Did he prepare notes?

10                    THE COURT:  Overruled.

11        A     No, I didn't.

12        Q     Did you prepare notes anywhere articulating that

13   Mr. Heidgen waived the Miranda warnings prior to you

14   interrogating him?

15                    MS. McCORMICK:  Objection.

16                    THE COURT:  Sustained.

17        Q     Did you prepare any notes at all concerning or

18   memorializing Mr. Heidgen waiving his rights?

19                    MS. McCORMICK:  Objection.

20                    THE COURT:  Sustained.

21                    MR. LaMAGNA:  Judge, I'm asking any notes to

22        that fact.

23                    THE COURT:  I understand.  Objection

24        sustained.

25        Q     And nowhere at the beginning, middle or end in
```

1   the detailed question and answer that was prepared by

2   Investigator Baez does it appear that you gave Mr. Heidgen

3   his Miranda warnings or that he waived his Miranda warnings,

4   correct?

5               MS. McCORMICK:  Objection.

6               THE COURT:  Sustained.

7               MR. LaMAGNA:  He's reviewing this.  He's

8          testifying from this.

9               THE COURT:  It's been beaten to death.

10              Objection sustained.

11              MR. LaMAGNA:  I understand.

12   Q     And you testified on direct examination that

13   after this interrogation was concluded, Mr. Heidgen then

14   articulated to you he wants a lawyer, correct?

15   A     No, I didn't.

16   Q     Didn't you testify --

17         Well, then, didn't you say that Mr. Heidgen at

18   the conclusion said "I want a lawyer"?

19   A     No, I did not.

20   Q     Did he say to you he wanted a lawyer?

21   A     Yes, he did.

22   Q     When was that?

23   A     After my last question in reference to this.

24   Q     That was after?

25   A     Not at the conclusion of what we were going to

1    ask him.

2          Q      So at the end of the, after the last question

3    here, he then said "I want a lawyer," correct?

4          A      After the last question on this form, yes, he

5    said he wanted a lawyer, yes.

6          Q      And that doesn't appear on this either, does it?

7          A      No, it does not.

8          Q      Now, with respect to the alleged interview you

9    stated that Mr. Heidgen articulated to you in reference to

10   what had happened, among other things, "I got into a

11   self-destruct mode," correct?

12         A      Yes.

13         Q      You he said he was very upset and depressed,

14   correct?

15         A      Yes.

16         Q      He said, "I drank a lot of alcohol," correct?

17         A      Yes.

18         Q      Referring to the self-destruct mode, correct?

19         A      Yes, sir.

20         Q      And that's what he articulated to you concerning

21   what he meant by the self-destruct mode, correct?

22                MS. McCORMICK:   Objection.

23                THE COURT:   Sustained.

24         Q      He also stated to you he was embarrassed,

25   correct?

1      A      Yes, sir.

2      Q      You asked him if he had any problems with

3  alcohol, correct?

4      A      Yes, sir.

5      Q      And he said "no, nothing," right?

6      A      Yes, sir.

7      Q      You also asked him what route he took, correct?

8      A      Yes, sir.

9      Q      And he said he was driving around, had to get out

10  of his house, correct?

11     A      Yes.

12     Q      And he said at some point he decided to go home,

13  correct?

14     A      Yes, sir.

15     Q      And that's what he told you, he was driving to go

16  home, correct?

17     A      Yes, sir.

18     Q      And you were talking to him, and he says "I just

19  want to work and earn a living," correct?

20     A      Yes, sir.

21     Q      And you asked him what did he hit, and he thought

22  he hit a tree, correct, or a median?

23            MS. McCORMICK:  Objection.

24            THE COURT:  As to?

25     Q      Isn't that what he said?

1              THE COURT:  As to what he said, it's okay.

2        A      He stated he hit a tree.

3        Q      Yes, that's what he stated to you, right, when

4    you asked him that?

5        A      Yes, sir.

6        Q      "What did you hit?"  He says he hit a tree or

7    median, correct?

8        A      Yes, sir, that's what he stated.

9        Q      And in relation to this issue of self-destruct

10   mode where he said "self-destruct mode.  I drank a lot of

11   alcohol," you made a further inquiry of him concerning that,

12   correct?

13       A      Yes, sir.

14       Q      And you asked him, "Well, what is self-destruct

15   mode?" relative to the answer he gave you previously,

16   correct?

17       A      Yes, sir.

18       Q      When he said "self-destruct mode.  I drank a lot

19   of alcohol," his answer was, "something to alleviate stress

20   and hardship," correct?

21       A      Yes.

22       Q      He defined it for you, correct?

23       A      Yes, he did.

24       Q      You asked him what it meant to him, what he meant

25   by self-destruct mode, and he told you, correct?

1              MS. McCORMICK:  Objection.

2    A     Yes, sir.

3              THE COURT:  Sustained.

4    Q     Now, at one point, in fact three times -- and
5    we'll go through them -- you asked him if he was trying to
6    hurt himself that night, correct?  You asked him that,
7    correct; three times, correct?

8    A     Yes, sir.

9    Q     First time:  "Did you try and hurt yourself?"
10   You asked him that, right?

11   A     Yes, sir.

12   Q     And he said, no, correct?

13             MS. McCORMICK:  Objection.

14   Q     He said, "no, never before," correct?

15             MS. McCORMICK:  Excuse me?

16   A     Yes, sir.

17   Q     Then again you asked him later on in this
18   statement, "Did you try and hurt yourself?"  You asked him
19   again, didn't you?

20   A     Yes, sir.

21   Q     And again he said no, correct?  And there is a
22   period, correct?

23   A     Yes.

24   Q     And he said, "No, not under any circumstances,"
25   correct?

1      A      Yes.

2      Q      "I have thought about it like everyone else, but

3  I never plotted or actually thought of doing it."  That's

4  what he told you, correct?

5      A      Yes, sir.

6      Q      And that's the second time you asked him,

7  correct?

8      A      Yes, sir.

9      Q      And that's the second time he told you no,

10  correct?

11      A      Yes, sir.

12      Q      And you further asked him a third time, isn't

13  that correct, whether he was trying to hurt himself that

14  night, correct?

15      A      Yes, sir.

16      Q      And you said, "You weren't trying to hurt

17  yourself tonight?"  Isn't that what you said?

18      A      No, sir.

19      Q      "You weren't trying to hurt yourself tonight?"

20             Excuse me, that's what you said then, right?

21      A      Yes, sir.

22      Q      And he said, "no, sir," correct?

23      A      Yes, sir.

24      Q      "I wouldn't cash out like this.  I would wait for

25  another hand to be dealt," correct?

1      A      Yes, sir.

2      Q      So three times you asked him if he was trying to

3   hurt himself and three times he told you no, correct?

4      A      Yes, sir.

5      Q      And when you asked him where he was going that

6   night he was saying he was trying to go home, correct?

7      A      That's what he stated, sir.

8      Q      And when you asked him what self-destruct mode

9   is, he said because he drank a lot, it was to alleviate

10  stress and hardship, right?

11              MS. McCORMICK:  Objection.

12              THE COURT:  Sustained.

13              MR. LaMAGNA:  Your Honor, at this time, for

14         the purpose of this hearing, I'd like to have the notes

15         introduced in evidence as, I think we're up to

16         Defendant's A in evidence, for the purpose of this

17         hearing.

18              THE COURT:  Any objection?

19              MS. McCORMICK:  No objection.

20              THE COURT:  They're received whatever the

21         next defendant's exhibit is.

22              THE CLERK:  Defendant's Exhibit B is marked

23         in evidence.

24              (Defendant's Exhibit B for identification was

25         received and marked in evidence.)

1      Q      Now, prior to your statement concerning, that you

2   had given Mr. Heidgen his Miranda warnings, prior to this

3   statement at approximately 12:30, no Miranda warnings had

4   ever been given to, or read, to Mr. Heidgen, correct?

5      A      Yes, sir.

6      Q      And in reviewing the Rosario material that I

7   received from the district attorney, there doesn't exist at

8   all, whether it was prepared that day or subsequent, any

9   note that you took memorializing the fact that you gave

10   Mr. Heidgen his Miranda warnings; is that correct?

11             MS. McCORMICK:  Objection.

12             THE COURT:  Sustained.

13      Q      At any time subsequent to that -- that's the gist

14   of the question -- any time subsequent?

15             MS. McCORMICK:  Objection.

16             THE COURT:  Overruled.

17      Q      Any time subsequent to that day?

18      A      No, sir.

19      Q      Never prepared any note or memorandum

20   articulating, or memorializing, that you gave him his

21   Miranda warnings, correct?

22             THE COURT:  Sustained.

23      Q      Subsequent, investigator, what I want to ask you

24   is -- I know you answered that day.  Anything, any time

25   subsequent to that day did you prepare or memorialize a note

1   articulating that?

2                MS. McCORMICK:  Objection.

3                THE COURT:  Sustained.

4        Q      Are there any notes you could review of your own

5   to refresh your recollection that you gave him his Miranda

6   warnings?

7                MS. McCORMICK:  Objection.

8                THE COURT:  Been there.  Next question.

9                MR. LaMAGNA:  Nothing further, Judge.

10               THE COURT:  Redirect?

11               MS. McCORMICK:  Yes, your Honor.  Briefly.

12       Thank you.

13   REDIRECT EXAMINATION

14   BY MS. McCORMICK:

15       Q      Investigator Harris, you said that you had a --

16   what was it? -- a form, General 19, from New York State

17   Police with you?

18       A      Yes, ma'am.

19       Q      Is that correct?

20       A      Yes.

21       Q      Investigator Harris, you also indicated that the

22   last question on the six-page list, or notations of

23   questions and answers given by the defendant, that after

24   that he asked for an attorney; is that right?

25       A      Yes, sir.  Yes, ma'am.

1     Q     It's okay.

2           Investigator, were you done talking to the

3     defendant when he requested an attorney?

4     A     No.

5     Q     Had you intended to ask him additional questions?

6     A     Yes, ma'am.

7     Q     When he asked for an attorney, what did you do in

8     response to that request?

9     A     Stopped questioning him.

10    Q     With respect to the form, General 19, can you

11    tell the Court what the purpose of that form is?

12    A     General 19 is a written statement.    If he was

13    going to record the question and answers down to a written

14    statement, we would have put it on that form and he would

15    have signed that he would have, that he would have waived

16    his right to speak with us and signed that form, saying that

17    this is actually true what he said and what we asked him.

18    Q     For a written statement?

19    A     Yes, for a written statement.

20    Q     Was it your intention to obtain a written

21    statement from the defendant?

22    A     Yes, ma'am.

23    Q     And why didn't you do that?

24    A     Due to the fact that he said he wasn't going to

25    speak to us no more, he wanted a lawyer.

1      Q      With respect to the defendant's hands, were the

2   defendant's hands free to sign anything while you were in

3   his presence speaking to him?

4      A      No, ma'am.

5      Q      Could you explain for the Court, please?

6      A      He was a medically restrained at the point in

7   time.

8      Q      He was not handcuffed?

9      A      Not handcuffed.

10     Q      When you say medically restrained, could you tell

11   the Court where his hands were physically located?

12     A      On the side of his bed.  He was medically

13   restrained to the railing on the side of his bed.

14                 MR. LaMAGNA:  Objection to medically

15           restrained.  How is he going to know that?

16                 THE COURT:  Did you restrain him?

17                 THE WITNESS:  No, I did not.

18                 THE COURT:  Overruled.

19     Q      I'm sorry, I think we had --

20     A      He was restrained, restrained with straps on the

21   side of his bed posts.

22     Q      So was he able to lift his hands at all from the

23   side of the bed?

24     A      No, ma'am, he could just -- very limited

25   movement.

1      Q      And, investigator, while you were speaking to the

2    defendant were the curtains that surrounded his bed opened

3    or closed?

4      A      Closed.

5      Q      Was anybody else within the confines of the

6    curtains next to his bed other than yourself and

7    Investigator Baez and the defendant?

8      A      That's it, just us.

9      Q      With respect to the self-destruct mode and the

10   statement that the defendant made about alleviating stress

11   and hardship, did he ever specifically tell you what he was

12   doing to alleviate stress and hardship?

13     A      During that statement, no.

14              MS. McCORMICK:   I have nothing further.

15              THE COURT:   Recross?

16              MR. LaMAGNA:   Yes, your Honor.

17   RECROSS-EXAMINATION

18   BY MR. LaMAGNA:

19     Q      Now, investigator, you talked about some form 19;

20   is that correct?

21     A      General 19.

22     Q      I don't know what that is.   What is that?

23     A      It's a written, it's a form that you write a

24   written statement on with Miranda warnings on it, and the

25   defendant signs it.

1      Q      And you said you didn't give it to him because

2  procedurally that's for a written statement; is that

3  correct?

4      A      Absolutely.

5      Q      And whose procedure was that?

6      A      New York State Police.

7      Q      And you followed that procedure, correct?

8      A      Yes, I did.

9      Q      Well, isn't there also another procedure of the

10  New York State Police that when an individual waives his

11  Miranda warnings you are to take detailed notes of that, of

12  giving the Miranda warnings, acknowledging the suspect

13  waived his Miranda warnings, date and time; isn't that

14  correct?

15              MS. McCORMICK:  Objection.

16              THE COURT:  Sustained.

17              MR. LaMAGNA:  Judge, can we approach, please?

18              THE COURT:  Not necessary.  Next question.

19      Q      He testified as to following procedure --

20              THE COURT:  Don't ask him about procedure.

21  Ask him what he did.

22      Q      You didn't write any notes, correct?

23              THE COURT:  Sustained.

24              MR. LaMAGNA:  We already went through that?

25              THE COURT:  Yes, we did.  A lot.

1              MR. LaMAGNA:  But if he's talking about

2       procedure why he didn't --

3       Q      Well, investigator, let me ask you this:  You had

4       that form with you, correct?

5       A      Yes.

6       Q      At the time you gave the defendant his Miranda

7       warnings, correct, he had not given you a statement yet

8       obviously, correct?

9              MS. McCORMICK:  Objection.

10             THE COURT:  Overruled.

11      A      Correct.

12      Q      And when he acknowledged to you that he was going

13      to waive those rights and talk to you, nothing prevented you

14      from saying, all right, here is this form -- at least for

15      the Miranda purpose -- why don't you sign it and acknowledge

16      that you took it?  You could have done that?

17             MS. McCORMICK:  Objection.

18             THE COURT:  Sustained.

19      Q      Did you do that?

20             MS. McCORMICK:  Objection.

21             THE COURT:  Sustained.

22      Q      Did you have him sign anything?  Did you have him

23      sign anything acknowledging that he waived his rights?

24             MS. McCORMICK:  Objection.

25             THE COURT:  Sustained.

1     Q     On the same form that the district attorney's

2     office, assistant district attorney's office, talked about

3     that was Form 19, anything written on that Form 19?

4               MS. McCORMICK:  Objection.

5               THE COURT:  Sustained.

6     Q     Did you use the Form 19?

7               MS. McCORMICK:  Objection.

8               THE COURT:  Sustained.

9     Q     Now, the assistant district attorney just asked

10    you if the defendant explained to you what he meant by

11    self-destruct mode; is that correct?  You said no, he

12    didn't; is that correct?

13    A     That's correct, sir.

14    Q     In fact, wasn't there an answer given by the

15    defendant, "I got into a self-destruct mode.  Very upset and

16    depressed.  I drank a lot of alcohol," correct?

17              MS. McCORMICK:  Objection.

18              THE COURT:  Overruled.

19    Q     Isn't that what he said?

20    A     Repeat that?

21    Q     "I got into a self-destruct mode.  Very upset and

22    embarrassed.  I drank a lot of alcohol."  Isn't that what he

23    said?

24              First page.

25    A     In that order, no, he didn't say it in that

1    order.

2         Q    Can you please look at the first page?  Didn't he

3    say, "I got into a self-destruct mode.  Very upset and

4    depressed.  I drank a lot of alcohol"?  Isn't that what he

5    said?

6         A    Yes, sir.

7         Q    And then later on you did ask him, despite the

8    question you answered by the assistant district attorney,

9    you did ask him what he meant by self-destruct mode relative

10   to drinking a lot of alcohol, didn't you ask him, "What is

11   self-destruct mode?"

12              MS. McCORMICK:  Objection.

13              THE COURT:  As far as the argument, it's

14        sustained.  I'll allow the question.

15        Q    Page 4.

16        A    Okay.

17        Q    And he told you, "something to alleviate the

18   stress and hardship," correct?

19        A    That's what he stated, sir.

20        Q    And you asked that question relative to

21   self-destruct mode, correct?

22        A    Yes, sir.

23        Q    Based upon what he told you, correct?

24        A    This is what he stated, sir.

25        Q    Based upon what he told you earlier, correct?

1          MS. McCORMICK:  Objection.

2          THE COURT:  Sustained.

3      Q    He told you "I drank a lot of alcohol," and you

4   asked, "What does that mean?

5          MS. McCORMICK:  Objection.

6      Q    He said, "Something to alleviate the stress and

7   hardship," correct?

8          THE COURT:  Sustained.

9          MR. LaMAGNA:  Nothing further, Judge.

10  FURTHER DIRECT EXAMINATION

11  BY MS. McCORMICK:

12     Q    Investigator Harris, did you take a written

13  statement from the defendant?

14     A    No, I did not.

15     Q    Did you read the defendant his Miranda warnings?

16     A    Yes, I did.

17     Q    Did he waive his Miranda rights and agree to

18  speak to you?

19     A    Yes, he did.

20     Q    Are you clear on that point?  Any haze?  Do you

21  recall it?

22     A    Recall it.

23     Q    Detective, with respect to self-destruct mode,

24  did you ever ask the defendant what he meant by

25  self-destruct mode relative to drinking alcohol?

1    A     No, I did not.

2              MS. McCORMICK:   I have nothing further.

3              MR. LaMAGNA:   Nothing further.

4              THE COURT:   Thank you, investigator.

5              THE WITNESS:   Thank you.

6              (The witness was excused.)

7              THE COURT:   People, your next witness.

8              MR. HAYDEN:   People rest, your Honor.

9              THE COURT:   People rest.

10             Mr. LaMagna?

11             MR. LaMAGNA:   Judge, I'm going to make an

12   application at this point, specifically with respect to

13   the blood.

14             Specifically, your Honor, the statute that

15   articulates the parameters in which a blood sample is

16   admissible is very clear on the manner in which a blood

17   sample can be drawn and, more importantly, specifically

18   by whom.

19             In this particular case it is argued that one

20   of the statutorily authorized individuals that took the

21   blood was a registered professional nurse, and that is

22   one of the few people under the statute that can take

23   blood.  And that is an element of the admissibility of

24   blood being used.

25             The district attorney did not call the nurse.

1    There has been no evidence that the person who actually

2    took this blood was a professional registered nurse,

3    licensed in this state, whose license was in good

4    standing and continuous on the date in question.

5              THE COURT:  There was sworn uncontradicted

6    testimony.

7              MR. LaMAGNA:  There was not.

8              THE COURT:  There was.

9              MR. LaMAGNA:  By a police officer.

10             THE COURT:  Nonetheless, sworn and

11   uncontested.

12             MR. LaMAGNA:  I asked him if he knew her.  He

13   said he didn't know.

14             There was no testimony concerning how he knew

15   this person was an RN.  He didn't testify if he spoke

16   to her and asked her if she's an RN.  He didn't testify

17   that he spoke to the doctor or checked with the New

18   York State Department of Education whether this person

19   was an RN.

20             Having somebody say based upon no evidence in

21   this case where he got that information from, and he

22   didn't know this person, you need either a

23   certification from the state, which would be very easy

24   to get --

25             THE COURT:  You have a case?

1              MR. LaMAGNA:  Moser.  Yes, I do, Judge.

2              THE COURT:  And it says that?

3              MR. LaMAGNA:  Let me just get it to make

4    sure.

5              THE COURT:  Okay.

6              MR. LaMAGNA:  And I will research that issue

7    more, but I do believe, and it's my argument.

8              THE COURT:  So are you asking me to reserve

9    decision?

10             MR. LaMAGNA:  Well, if you make a decision,

11   but if you reserve decision --

12             THE COURT:  I can't make a decision if you

13   don't have your argument in complete form at this time.

14             MR. LaMAGNA:  Judge, I believe it is Moser,

15   and I will get you that cite.

16             But I will direct the Court to the statute

17   1194, which articulates with specificity as an element

18   of who needs to be, what person needs to be available,

19   or person, to whom the blood needs to be taken by.

20             THE COURT:  I'm aware of those provisions.

21             MR. LaMAGNA:  Judge, I will get you the Moser

22   case.

23             THE COURT:  Okay.  Decision he is reserved.

24             Do you have a case?

25             MR. LaMAGNA:  Yes.

1          THE COURT:  Call your first witness, please.

2          MR. LaMAGNA:  Dr. Zohrabian.

3    Dr.   R A F F I    Z O H R A B I A N ,     a witness

4        called on behalf of the Defendant, having been

5        first duly sworn by the Clerk of the Court, was

6        examined and testified as follows:

7          THE WITNESS:  Dr. Raffi, R-a-f-f-i,

8        Zohrabian, Z-o-h-r-a-b-i a n.  Profession:  I'm

9        attending surgeon at the Department of Emergency

10       Medicine at Nassau County University Medical Center,

11       East Meadow, New York.

12         MR. LaMAGNA:  Your Honor, may I inquire?

13         THE COURT:  Please.

14   DIRECT EXAMINATION

15   BY MR. LaMAGNA:

16       Q     Good afternoon, Dr. Zohrabian.

17       A     Good afternoon.

18       Q     You're a medical doctor; is that correct?

19       A     Yes, medical doctor, MD.

20       Q     Are you licensed to practice medicine in the

21   State of New York?

22       A     Yes, I am.

23       Q     And how many years have you been licensed to

24   practice medicine in New York?

25       A     In New York, I would say about 30 years, 32

1    years; something like that.

2         Q      Did you, after graduating medical school, did you

3    specialize in any particular field of medicine?

4         A      Yes.

5         Q      What was that?

6         A      General surgery.

7         Q      And are you Board certified?

8         A      Yes, I am.

9         Q      To perform surgery?

10        A      Yes, I am.

11        Q      When were you Board certified?

12        A      1982, and re-certified twice after that.

13        Q      And are you on the staff of any hospitals

14   currently?

15        A      Yes.

16        Q      And what hospitals are those?

17        A      Nassau County University Medical Center and Mercy

18   Medical Center in Rockville Centre.

19        Q      And how long have you been on the staff of Mercy

20   Medical Center?

21        A      Mercy, since 1980.  Would be about 25 years, 26

22   years.  And NCMC, I finished my residency there, and I

23   became an attending.  And from 1999 on I've become a

24   fulltime attending in the emergency room as surgical

25   attending.  Prior to that I was partial, what we call a

Dr. Zohrabian - for Deft. - direct          195

1    sessional attending.

2         Q     And how long have you been on the staff of Mercy

3    Hospital?

4         A     How long?

5         Q     Yes.

6         A     1980 on.

7         Q     1980 to the present?

8         A     Yes.

9         Q     How long have you been on the staff at Nassau

10   University Medical Center?

11        A     1993 on.  Let's puts it this way:  1993 on, '93

12   to '99 sessional.  '99 to the present time, fulltime.

13        Q     What was your job?  What is your job description

14   at Mercy Hospital?

15        A     My job description at Mercy Hospital, I'm a

16   surgical house officer.

17        Q     What is your job description at Nassau University

18   Medical Center?

19        A     I'm attending surgeon in the Department of

20   Emergency Medicine.

21        Q     Is that as an ER physician?

22        A     Yes.

23        Q     And as an ER physician do you evaluate patients

24   that come in as a result of trauma?

25        A     Yes, I do.

1      Q      And do you form an assessment of those

2   individuals when they come into the ER as a result of the

3   trauma?

4      A      Yes, I do.

5      Q      How long have you been an ER physician at Nassau

6   County University Medical Center?

7      A      Since 1993.

8      Q      And what duties in a general sense does an ER

9   physician perform?

10     A      An ER physician performs any duty that is

11  determined necessary for a patient that comes into the

12  emergency room.

13     Q      Would that be trauma or otherwise?

14     A      Whether it be medical condition, surgical

15  condition, other condition, psychiatric condition, that is

16  the broad range that we have for emergency room medicine in

17  general.

18     Q      And with your specialty, did you evaluate all the

19  patients that come in as a result of trauma?

20     A      Yes.  I am in that specialty basically.  I'm in

21  the specialty of general surgery that handles all trauma.

22  And my job description there is to handle every emergency

23  surgical case, including the trauma.

24     Q      And how many patients over the years have you

25  treated as an emergency room physician in the evaluation and

1   assessment of individuals that come into trauma?

2       A     Trauma patients, I would say thousand or two.

3   Thousandths.  I would not be able to give you a specific

4   number, but it would be thousandths.

5       Q     In your specialty as an ER physician, have you

6   performed examinations of individuals who arrived in the ER

7   as a result of car accidents and injuries of car accidents?

8       A     Yes.

9       Q     How many patients?

10      A     Thousandths, again in thousandths.

11      Q     Now, as an ER physician, do your duties include

12  performing examinations and assessments of patients to

13  determine their level of consciousness, their ability to

14  understand their surroundings and comprehend their

15  condition?

16      A     Yes.

17      Q     Is that a neurological examination?

18      A     Yes, that's the neurological examination when you

19  assess for a head injury.

20      Q     How many of those examinations and assessments

21  have you performed in your experience?

22      A     In the thousandths.  That's part of the

23  examination of a trauma patient.

24      Q     In your experience as a physician, have you had

25  performed examinations of patients who come in to determine

1   whether or not these patients are capable of giving consent

2   to a request to perform medical procedures, that is,

3   informed consent?

4        A    Yes.

5        Q    And how many patients have you examined in the ER

6   with respect to that issue?

7        A    Well, again thousandths.

8        Q    I direct your attention to July 2, 2005, at

9   approximately 2:35 a.m.  Were you working at the ER facility

10  at the Nassau County University Medical Center?

11       A    Yes, I was.

12       Q    And what was your shift that night?

13       A    Shift starts at 7 p.m. the night before and ends

14  7 a.m. on the same day as you described.

15       Q    Directing your attention again to July 2, 2005,

16  at approximately 2:35 a.m., did an individual now known to

17  you as Martin Heidgen come into the ER?

18       A    Yes, sir.

19       Q    And at that time in your capacity as the ER

20  physician, did you perform the examination on Martin Heidgen

21  at that time in the ER?

22       A    Yes, I did.

23       Q    Do you recall the events of that evening?

24       A    Yes.

25       Q    Did you have an opportunity to observe

Dr. Zohrabian - for Deft. - direct                199

1   Mr. Heidgen at that date and time?

2        A    Yes.

3        Q    Was he awake?

4        A    Yes.

5        Q    Was he conscious?

6        A    Yes.

7        Q    Was he responsive?

8        A    Yes.

9        Q    And was he aware of his surroundings?

10       A    Yes, he was.

11       Q    Was he alert enough to understand or request to

12  submit to a blood test?

13       A    Yes, he was.

14            MR. HAYDEN:  Objection.

15            THE COURT:  Overruled.

16       Q    What time, approximately, did you give him your

17  medical assessment or examination of Mr. Heidgen?

18       A    We start?

19       Q    Yes.

20       A    We started 2:35 and continued the assessment for

21  another 15 minutes.

22       Q    After your examination was completed, was

23  Mr. Heidgen transferred to another unit for further

24  treatment?

25       A    Yes.

1      Q      At the time you performed your medical

2   examination of Mr. Heidgen, during the examination was

3   Mr. Heidgen awake?

4      A      Yes, he was.

5      Q      Was he conscious?

6      A      Yes, he was.

7      Q      Was he responding?

8      A      Yes, he was.

9      Q      Was he aware of his surroundings?

10      A      Yes, he was.

11      Q      Now, as part of this examination that you

12   performed of Mr. Heidgen, in your capacity as the ER

13   physician -- a physical examination --

14      A      Didn't hear that.

15      Q      A physical examination?

16      A      Yes, physical examination.

17      Q      Was there also a component that was a

18   neurological examination?

19      A      Yes.

20      Q      During your examination of Mr. Heidgen was a

21   state trooper there?

22      A      Yes.

23      Q      During your examination was a nurse present?

24      A      Yes.

25      Q      Do you recall the nurse's name?

1      A      Yes.

2      Q      And what was that?

3      A      Dorothy Busco.

4      Q      And was she performing her duties at that time?

5      A      Yes, she was.

6      Q      One of her duties was placing IVs into

7   Mr. Heidgen; is that correct?

8      A      Yes.

9      Q      During the course of your examination did the

10   nurse, to your recollection, draw a sample of blood from

11   Mr. Heidgen?

12     A      Yes, she did.

13     Q      Was that sample drawn by the nurse at the request

14   of the New York State trooper?

15     A      Yes.

16     Q      Based upon your medical examination of

17   Mr. Heidgen did you make a medical assessment of his level

18   of consciousness for the purposes of medical treatment at

19   that time?

20     A      Yes.

21     Q      And what was that assessment?

22     A      The assessment is the head injuries, severity

23   score, and that we normally rely on the Glasgow coma score.

24   And that evaluates three functions that we are quite easy to

25   determine.  The first one is the eye opening.  And obviously

1    this gentleman, the eyes were open spontaneously.

2              And then we go to the verbal response.  And at

3    that point we assessed that he was able to respond to our

4    questions but giving us only a few words at a time.  He was

5    uttering words.  So that dropped his verbal response

6    slightly on that score.

7              However, in the last portion of the, the motor

8    response, he was obeying commands, he was performing all the

9    things we asked him to do.  Therefore he scored well on

10   that.  We gave him a score of 13, on a full score of 15.

11             So it was 13 over 15.  So he's a little below

12   normal, but reasonable.

13        Q    As we sit here today, perfectly normal, we're at

14   12; is that correct?

15        A    Yes, we're at 15.

16        Q    So a score of 13 would indicate to you --

17        A    -- that there is a component of minor head

18   injury.

19        Q    Would that allow that individual to understand

20   his surroundings?

21        A    Yes.

22        Q    Would he be able to comprehend requests made of

23   him?

24        A    Yes, he would.

25        Q    Would he have been able to understand a request

1    made of him to consent to certain medical procedures?

2          A     Yes.

3          Q     And he would have been able to understand the

4    request to consent to, certainly, a blood sample being

5    drawn?

6          A     Absolutely.

7                     MR. HAYDEN:   Objection.

8                     THE COURT:   Overruled.

9          Q     Now, you said your evaluation during that period,

10   between 2:35 and 2:45, was at 13, correct?

11         A     Yes.

12         Q     Now, with respect to the eye spontaneity, you

13   just testified he scored a 4; is that correct?

14         A     Correct.

15         Q     What's the highest score you can get on that?

16         A     It's a 4.

17         Q     It's a 4?

18         A     Yes.  So he got 4 on that.

19         Q     Now, as far as the score on best motor response,

20   obeys commands, what's the highest score there?

21         A     Well, he obeyed commands, which is best score he

22   can get.  That's a 6.

23         Q     And he got the best?

24         A     He got 6.

25         Q     Now, on verbal, he scored what?

1    A    He scored less than the normal.

2    Q    And that score was?

3    A    If I'm not mistaken, we will put 3, because the 3

4  was component of uttering words.  They were comprehensible

5  but they were just a word at a time, like one word and

6  stops, one word and stops.

7         Normally when we score well, he should be

8  oriented and he should not be confused, and the confusion is

9  uttering words.  He was between minor conscious, uttering a

10  word or two.  So we gave him 3 there.

11   Q    What's the highest score?

12   A    On that it should be 5.

13   Q    So he was in between?

14   A    He was in between.

15   Q    Were the words he uttered to you understandable?

16   A    Yes.

17   Q    Was he responsive?

18   A    Yes.

19   Q    He was responsive to speech?

20   A    Right.

21   Q    Now, was there a trooper present during the time

22  that the exam was being given?

23   A    Yes.

24   Q    Did you hear the trooper or do you recall the

25  trooper saying anything?

1      A      Specifically I won't be able to tell you details

2   of that.

3      Q      I didn't hear.

4      A      Specifically I would not be able to tell you.

5   I'm sure the trooper must --

6      Q      Without saying what you're sure of, we only want

7   what you recall.

8      A      I don't recall much of the conversation.

9      Q      Now, Dr. Zohrabian, based upon your medical

10  examination of Mr. Heidgen on that night at that time, do

11  you have an opinion based upon a reasonable degree of

12  medical certainty whether Mr. Heidgen was capable of giving

13  his informed consent or request made of him to perform

14  medical procedures, including that of submitting a sample of

15  blood for the purpose of ascertaining a blood alcohol level?

16     A      Yes.

17     Q      What is that that opinion?

18     A      That opinion is that he definitely understood

19  what the test is all about and what his responsibility was

20  in terms of responding to the officer's request, and

21  therefore he knew quite well that the blood that was taken

22  from him had some implications.

23     Q      Is there any question in your mind?

24     A      No, there is no question in my mind.

25     Q      And does that opinion encompass the entire period

1  of time from the beginning of your examination?

2      A    It did.

3      Q    To the end of the examination?

4      A    To the end of the examination.

5      Q    Including the time that the blood was drawn?

6      A    Yes.

7      Q    Now, did you have any contact with Mr. Heidgen

8  after your examination was completed and the blood was

9  drawn?

10     A    No.

11     Q    Was this the extent of your involvement and

12  treatment and assessment?

13     A    The extent of the examination is the extent

14  whereby I have treated him in the emergency room from the

15  trauma room all the way to the CT Scan.  That period of

16  time, between 15 to 20, 25 minutes, exactly the details

17  which has to be looked into the record, because of the fact

18  that Mr. Heidgen had a little bit of agitation afterwards,

19  he became a little belligerent.

20     Q    After what?

21     A    After the blood was taken, after a while he

22  realized --

23     Q    Let me just stop you there for a minute, just to

24  go back to the examination point.

25          After you completed your examination was that the

1    extent of your involvement with the treatment of Mr. Heidgen

2    personally?

3         A     Well, that is part of my involvement.  There is

4    also involvement including the diagnostic portion of that.

5         Q     Did you do that, doctor?

6         A     Of course.  It's part of the whole sphere of

7    exam.

8         A     And if you look at the record, and what we got is

9    examination of the case.  He was subsequently intubated.

10        Q     That was subsequent?

11        A     Subsequent to my exam.

12        Q     Subsequent to blood being drawn?

13        A     Yes.  Subsequent to the blood being taken.

14        Q     I just want to timeline it.  I'm talking about at

15   the time that the blood was drawn and at the time your exam

16   was finished.  After your exam was finished was Mr. Heidgen

17   transferred to another unit of the hospital for further

18   treatment and testing?

19        A     That other unit is the CT Scan unit.

20        Q     Is that a yes?

21        A     Yes, it's the CT Scan unit.

22                   MR. LaMAGNA:  Nothing further.

23                   THE COURT:  Let me see counsel.

24                   (Off the record discussion at bench.)

25                   THE COURT:  All right.  At this time we're

1    going to break and we'll commence cross-examination at

2    2 o'clock.

3              Thank you everybody.

4              (Luncheon recess.)

5                   *      *      *

6              AFTERNOON SESSION

7                   *      *      *

8              MS. McCORMICK:  Your Honor, may I make an

9    application at this point?

10             THE COURT:  Yes.

11             MS. McCORMICK:  Your Honor, on the basis of

12   the defendant putting in issue the defendant's physical

13   condition, the People put in an issue of consciousness

14   of the defendant.

15             THE COURT:  He testified he was unconscious.

16             MS. McCORMICK:  The testimony presented by

17   the doctor, Dr. Zohrabian, however, contests the

18   People's contention, and thus raises, brings into issue

19   the defendant's physical condition.

20             The People would contend at this point that

21   the defendant has thereby waived his doctor-patient

22   privilege, and the People would ask to be allowed and

23   be permitted, and must have the defendant's medical

24   records before we can accurately proceed on our

25   rebuttal case.

1          THE COURT:  Forget about the rebuttal for the

2     moment.  I'll reserve decision on that.  We have yet to

3     hear cross-examination.

4          MS. McCORMICK:  I misspoke.

5          THE COURT:  Not at all.  You are giving me a

6     heads up.

7          MS. McCORMICK:  I misspoke.

8          Part of my concern with the medical records

9     has to do with the cross-examination of this doctor.

10    We are at a serious disadvantage without having them in

11    order to cross-examine him about the condition of the

12    defendant throughout his treatment in that hospital.

13    We have two pages of notes only from Dr. Zohrabian, but

14    not the medical records themselves.

15         THE COURT:  Mr. LaMagna?

16         MR. LaMAGNA:  Judge, the law is very clear,

17    Judge, with respect to privilege.  My client naturally

18    enjoys a physician-patient privilege.  The case law in

19    this matter clearly states that when a defendant in a

20    criminal action is forced to defend a condition that

21    was placed in issue by the People vis-a-vis the fact

22    that he was unconscious as a method of fulfilling the

23    requirements of 1194, we have not waived any privilege.

24         And I would cite to the Court People versus

25    Osborn, which clearly states a very similar situation,

1    that a party does not waive the privilege whenever

2    forced to defend an action in which his or her mental

3    and physical condition is in controversy.

4         Cross-examination regarding the defendant's

5    condition at the hospital was undertaken to show that

6    her consent to blood taken at the request of the police

7    was involuntary, not to excuse her conduct or to show

8    that her appearance was the result of injuries rather

9    than intoxication.

10         The case law clearly states, and the statute

11   clearly states, that if a defendant places his physical

12   condition in issue to somehow explain the conduct that

13   it was something other than intoxication, that's one

14   thing.  But on the issue at a Suppression Hearing, on

15   the issue whether consent in those cases was either

16   voluntary or involuntarily made as a result of his

17   physical condition, or more so in this case, where they

18   place the issue of consciousness in issue on their

19   direct case, we are only defending and forced to defend

20   and controvert that position.

21         And the law is very clear that that does not

22   in any way constitute a waiver of the privilege.  In

23   fact, in those cases the scenario was, where there was

24   consent and then the defendant brought in the doctor

25   and placed the medical records in evidence to show that

1    his condition was something that he was unable to

2    voluntarily and intelligently consent, here we even

3    have one step further.  They place his physical

4    condition in issue by articulating that he was

5    unconscious.

6              Any time a defendant has to defend what the

7    prosecution is alleging and bringing in his physical

8    condition and placing it in issue, we have no choice

9    but to defend that, and that by no means is a waiver of

10   his patient-physician privilege.

11             THE COURT:  In the first place, do you have

12   the defendant's medical records?

13             MR. LaMAGNA:  I do have his records, yes.

14             THE COURT:  Let me see them in my office,

15   please.

16             MR. LaMAGNA:  I don't have them with me.

17             THE COURT:  That was my question.  How long

18   do you need to get them?

19             MR. LaMAGNA:  This afternoon.

20             THE COURT:  Ten minutes, half-hour?  How long

21   do you need?

22             MR. LaMAGNA:  You want it right now?

23             THE COURT:  Yes, I do.

24             MR. LaMAGNA:  Half an hour.

25             THE COURT:  Half an hour.

1          MS. McCORMICK:  Your Honor, if may, I have

2     the case of People versus Osborn.

3          THE COURT:  I'll read all the cases, as well

4     as the others.

5          (Recess.)

6          THE COURT:  During the break I had the

7     opportunity to take a look at the case law provided and

8     cited and came to a conclusion, which I didn't realize

9     at the time -- it was already moot -- in that the

10    People are in receipt of the doctor's Emergency Room

11    report, which are the limit of that doctor's records

12    prepared by him, and that would have been the extent to

13    which I would have permitted the discovery in any

14    event.

15          In that you already have those records,

16    please get the doctor on and we'll start the

17    cross-examination.

18          MS. McCORMICK:  Your Honor, if I may just

19    address the point as to the records?  With respect to

20    the other medical personnel who will be called now in

21    this case, these doctors are at a disadvantage in that

22    they are unable to review their own information

23    provided in his chart since we don't have it to get

24    them to testify.

25          THE COURT:  I never cross a bridge before I

1      get to it.  Right now I'm up to cross-examination of

2      this doctor, which we're ready to do.

3                    MS. McCORMICK:  Thank you, your Honor.

4                    (Dr. Zohrabian resumed the witness stand.)

5                    THE COURT:  Mr. Hayden?

6                    MR. HAYDEN:  Yes, your Honor.

7      CROSS-EXAMINATION

8      BY MR. HAYDEN:

9          Q     Good afternoon, doctor.

10         A     Good afternoon.

11         Q     We met the other day?

12         A     Yes.

13         Q     Monday?

14         A     I think so.

15         Q     Monday night?

16         A     Monday night, yes.

17         Q     About 7:45?

18         A     Yes.

19         Q     Investigator Harris was there?

20         A     Yes.

21         Q     We met in the Department of Emergency Medicine?

22         A     Yes.

23         Q     You brought us into the trauma room?

24         A     Correct.

25         Q     You showed us the trauma room?

1      A      Uh-hum.

2      Q      You showed us a sign on the wall of the trauma

3   room?

4      A      Correct.

5      Q      We discussed Martin Heidgen?

6      A      Yes.

7      Q      His condition that night?

8      A      Correct.

9      Q      Your observations that night?

10     A      Correct.

11     Q      We used words like disoriented?

12     A      Yes.

13     Q      You used each word very carefully?

14     A      Yes.

15     Q      You didn't want to misinform me?

16     A      Correct.

17     Q      You wanted me to understand?

18     A      Yes.

19     Q      We used the word inappropriate?

20     A      The verbal response.  There were three items in

21   the beginning, that he was confused and, even worse, he was

22   uttering only words.  The words were understandable, they

23   were not incomprehensible.  That's the level of verbal

24   response.

25     Q      We discussed the word inappropriate?

Dr. Zohrabian-for Deft.-cross/Mr. Hayden          215

1      A      Inappropriate?  You could say that.  We could say

2   that.

3      Q      It's true?

4      A      True.

5      Q      You took down your observations?

6      A      What do you mean by that?

7      Q      You wrote down the observations you made?

8      A      Yes.

9      Q      You wrote down all the important observations?

10     A      Yes.

11     Q      You were you were as concrete as you could be?

12     A      Correct.

13     Q      Very important to get important observations down

14  in writing?

15     A      Correct.

16     Q      You tried to be as precise as you could?

17     A      Correct.

18     Q      You tried to be as concrete as you could?

19     A      Right.

20     Q      You certainly tried to be as thorough as you

21  possibly could?

22     A      Correct.

23     Q      When did you begin working the day you met Martin

24  Heidgen?

25     A      At 7 p.m. the night before.

1      Q      How many doctors were you supervising?

2      A      You're talking about in the trauma room per se or

3  are you talking in general in my section of where I

4  practice?

5      Q      You were supervising doctors that night?

6      A      Yes, correct.

7      Q      How many doctors were you supervising?

8      A      The doctors that I supervised were only the

9  doctors that were in the trauma room at that time.

10     Q      How many doctors were you supervising?

11     A      At that time?

12     Q      How many doctors were you supervising that night?

13     A      The only doctors that I was supervising were the

14  doctors that came down as part of the trauma team responding

15  to the call.  That is the only doctors that I supervised in

16  the ER.

17     Q      How many doctors were you supervising that night?

18     A      I would say about three to four.

19     Q      How many patients were you attending that night?

20     A      It's hard to figure.  I cannot really get out

21  that information right now.  I would say in a shift we

22  always see about 30 to 40 patients, and specifically on that

23  time there were multiple traumas that came in.  I would say

24  we received about 30 or 40 patients somehow in a shift.

25     Q      Describe the other traumas you were attending

1    when Martin Heidgen came in.

2         A       There were other traumas involved as well.  But

3    as far as I know, I have to go back to the records; I don't

4    have an independent recollection.

5              I know there were two other serious traumas at

6    the time, and there were two other patients in the regular

7    treatment area that were also injured.  However, they were

8    not as serious trauma -- I would say I was probably having

9    three to four other injuries related to the same accident.

10        Q       You cannot describe any of those other patients?

11        A       Well, I could give you a vague general idea, if

12   you want to know that.

13        Q       You can't give us a specific recollection of the

14   other patients?

15        A       The other two patients that I was specific that I

16   have a specific recollection.

17             MR. LaMAGNA:  Judge, I'm going to object to

18        the medical condition of other individuals that he even

19        knows to review.

20             THE COURT:  You ask medical condition?

21             MR. HAYDEN:  No, your Honor, I asked for

22        specific recollections about other patients he was

23        dealing with before he even met Martin Heidgen.

24             THE COURT:  He can ask him that.

25        A       Well, I can tell you that.  I'm not quite sure

1   about the timeframe, how these patients arrived, but I can

2   tell you vaguely the two other cases I recall very well was

3   a girl about nine years old, and I think her mother, who was

4   also involved in the same accident.

5           Now, whether there was another gentleman involved

6   in the same accident, I'm not sure whether I took care of

7   him or somebody else did.

8       Q       You have only vague recollections of each of

9   those other persons?

10      A       Well, I cannot remember the details as you are

11  asking me right now.  I'm not prepared for that.

12      Q       That would be a vague recollection?

13      A       Yes, it would be vague recollection.

14      Q       One of the most important pieces of information

15  you can take from a patient is his name?

16      A       Correct.

17      Q       You want to know who he is?

18      A       Yes.

19      Q       His identity?

20      A       Right.

21      Q       His first name?

22      A       Uh-hum.

23      Q       His last name?

24      A       Correct.

25      Q       Where he lives?

Dr. Zohrabian-for Deft.-cross/Mr. Hayden        219

1        A      Correct.

2        Q      Of course you did that in Martin Heidgen's case?

3        A      Correct.

4        Q      You told the Judge he was responsive?

5        A      Yes, responds.

6        Q      He communicated with you?

7        A      I did communicate with him.

8        Q      You understood him?

9        A      Of course not.  He just uttered a few words.

10   That is as much as his response was.

11       Q      You couldn't understand him?

12       A      No.

13       Q      Couldn't understand a thing he said?

14       A      I could understand a word or two, that's about

15   it.

16       Q      You testified he was responsive?

17       A      Well, he's responding.  You ask him a question,

18   he responds.  This is a response.  Except response is not as

19   good as you and me would respond.  He's responding, but with

20   few words.

21       Q      You asked his name?

22       A      Yes.

23       Q      First name?

24       A      Yes, I asked his name, his last name, and he

25   would give me, mumbling few words, which I couldn't

1    understand.

2         Q    You asked where he lived?

3         A    I probably did.

4         Q    The name Martin does not appear on the records?

5         A    Correct.

6         Q    The name Heidgen does not appear on the records?

7         A    That's correct.

8         Q    The town Valley Stream does not appear on the

9    records?

10        A    Correct.

11        Q    That's where he lives?

12        A    Now I know, yes.

13        Q    Now, there is a name on the records?

14        A    Correct.

15        Q    The name on the records is Dwayne?

16        A    Correct.

17        Q    Is that right?

18        A    Correct.

19        Q    Where did that come from?

20        A    Maybe one of the attendants said his name was

21    Dwayne.  I know we asked the question, and I asked also the

22    officer that brought the patient in.

23        Q    You asked Martin Heidgen his name?

24        A    Yes.

25        Q    He didn't give you a first name?

1     A     He didn't give my anything.  He said a few words.

2     Q     Didn't give you a last name?

3     A     No.

4     Q     Not a thing?

5     A     Not a thing.

6     Q     You didn't write down a single question you asked

7   him on the records you kept?

8     A     It's not necessary.

9     Q     You didn't do it?

10    A     No, I didn't, but it's not not necessary to

11  report it.

12    Q     You didn't write down a single question you asked

13  him?

14    A     Yes, I did not write that down, correct.

15          MR. LaMAGNA:  Objection.  Asked and answered.

16          THE COURT:  It was asked, I don't think it

17  was answered.  Overruled.

18    Q     You didn't write down a single answer he gave?

19    A     The answer is few words.

20    Q     You didn't write down a single answer he gave?

21    A     Well, I can only tell you his response were few

22  words.

23    Q     He said "few words"?

24    A     That's all he said.

25    Q     You asked his name, he said "few words"?

Dr. Zohrabian-for Deft.-cross/Mr. Hayden          222

1        A      He might have said something.

2               MR. LaMAGNA:   Objection.

3        A      I'm not sure exactly what, but all what he said

4   were few words.   One word, stop; one word, stop.

5               THE COURT:   Overruled.

6        Q      You never wrote down one word?

7        A      Well, how much should I write on a chart?

8        Q      You never wrote down one word he said?

9        A      But he said a few words.

10       Q      Doctor, for the record, are you telling the Court

11  you asked his name, and he said "few words"?

12       A      Yes, yes.

13       Q      That was his responsible?

14       A      That was his response.

15       Q      You found that responsive to your question?

16       A      Yes, that's a response.   Is better than he not

17  saying anything, better than he giving me incomprehensible

18  sounds.

19       Q      You're telling the Court he said "few words," in

20  quotes, "few words," in response to every question asked?

21       A      Correct.

22       Q      Did you ask him what he meant?

23       A      If he can not explain more than word, how can you

24  explain in more than word what he meant?

25       Q      You said he explained a word.

1     A     You ask him a word, he says a word.  Then you ask

2  him his name again, he says another word.  You ask him for

3  his age, he gives you a word.  When you ask what his

4  allergies is, he says a word.  All of these words don't make

5  sense.

6     Q     But you said it didn't make sense?

7     A     Wait a second.  You are assessing this man's

8  verbal response.  According to the score that we're talking

9  about, the Glascow coma score, the best person would be the

10  oriented one, down the bottom would be the confused one.

11         He is on the third level, which is uttering

12  words.  If he gets words, he will mumble a few sentences.

13  And if he gets words more than that, he will say nothing.

14  The verbal response on him comes down to a 3 out of 5.  That

15  is how we assess.

16     Q     You just told the Court he wasn't making any

17  sense.

18     A     Well, a word at a time, if you think that makes

19  sense to me, maybe makes some sense.  But from your layman's

20  point of view, that is awful.  But from the surgical trauma

21  point of view, that response is better than nothing.  That

22  response is good.  Because that only brought his Glascow

23  coma score only by two points.  Therefore, instead of him

24  being a 15 over 15, he wasn't at 13 over 15.  That alone

25  means a minor head injury at best.

1    Q    Tell the Court the word that the defendant

2   uttered when you asked him his name.

3    A    That is something that I cannot recall at this

4   point, neither could I remember.  I cannot tell you what his

5   response was, what words he used.  That is very difficult

6   for me to recall, even to remember.

7    Q    You used the number 3 in characterizing his

8   speech.

9    A    Correct.

10    Q    You told me on Monday night that 3 meant

11   inappropriate words?

12    A    I have no objection to what you describe.  You

13   can say up to words.  I would say few words, as long as we

14   understand the word.

15         The word could be well articulated, comes out a

16   reasonable word, that is great.  If he comes up with only

17   some mumbling sounds that do not make sense, that is not a

18   considered incomprehensible word.

19         So the words that he uttered, it made resonation

20   to the ears that you could understand what he was saying.

21   Obviously he was not probably saying the right words,

22   probably not appropriate words, but he did utter words.

23    Q    You had asked him a question, he'd utter a word,

24   and each time that word would be inappropriate?

25    A    Most likely.

1     Q     You wrote it?

2     A     Exactly, you're right.

3     Q     So it was inappropriate?

4     A     Was not appropriate, was inappropriate words, but

5     they were words.

6     Q     The word would not match the question?

7     A     That's correct.

8     Q     The word would not suit the question?

9     A     Correct.

10     Q     The word was inappropriate to the question?

11     A     Correct.

12     Q     You expressed your opinion that the defendant was

13     capable of giving consent?

14     A     Yes.

15     Q     Please tell the Court, take your time, tell the

16     Court every word he uttered that indicated to you he was

17     capable of giving consent.  Take your time.

18     A     It's not the words that he utters will give him

19     the state of mind that he can actually say yes or no or

20     understand the question per se.  It's the overall picture of

21     the Glascow coma score that makes the difference between

22     somebody's head injury, whether it is serious, minimal or

23     minor.

24          If you ask a person to raise the right arm, he

25     does it, he obeys the command.  Raise your leg, he raises

1    his leg.  If he comes in with the eyes open spontaneously,

2    and if he utters words that, as you said, are

3    inappropriately placed, it still puts this person in a

4    minimal category of head injury.

5              That kind of person, despite all the looks, will

6    be able to understand at least that some blood will be

7    drawn, some tests will be done, and there is a surrounding

8    of doctors, physicians, police officers, paramedics that are

9    trying to take care of him.  That understanding has to be

10   pretty well established and at that level of head injury.

11   That's all I can tell you.

12             Now, it's my opinion, okay?  And it is the way I

13   see things.

14        Q    If every answer he gives is inappropriate to the

15   question, how could he ever consent to anything?

16        A    All he has to say for a blood test is yes or a

17   no.  If you ask him to raise his right arm, he raises it.  I

18   think he's responding reasonably well.

19        Q    Doctor, if his answers are inappropriate and he

20   says yes, how do you know he doesn't mean no?

21        A    Well, listen, I cannot go to the mind, inside the

22   mind of the person.

23        Q    You can't get in there?

24        A    I am raising here, I'm giving you my opinion,

25   which is based on certain data.

1        The data in our surgical, neurosurgical

2   literature is for any head injury to have some impact on the

3   reasonableness of the brain; means understanding and

4   expressing that.  Should have to be really below that level

5   of 13 over 15 to say this person has reasonableness, serious

6   injuries.

7        So basically whatever he's saying, whatever he's

8   doing doesn't make sense at this level.

9        When the young person is able to raise their

10  hand, raising this and doing this, but, quote, unquote, is

11  not giving me a reasonable response by reasonable words,

12  still in my mind there is no indication to assume that he is

13  not able to understand my question.

14       Q    You can't get into his head?

15       A    No.

16       Q    He's not making sense?

17       A    Correct.

18       Q    You testified he was aware of his surroundings?

19       A    Yes.

20       Q    Tell the Court the question you asked and the

21  answer he gave that indicated to you he was aware of his

22  surroundings.

23       A    When the person comes with his eyes open

24  spontaneously, is definitely aware of his surroundings, just

25  like that.

1      Q      Did you ask him "Where are you?"

2      A      Well, you're asking me to remember all the

3   questions I asked.  Obviously I asked him a question, "What

4   happened?"

5      Q      And you've gotten appropriate answers?

6      A      Of course I gotten appropriate answers.  However,

7   he came in with his eyes open.  That means he's aware of his

8   surroundings.

9      Q      Did you ask "Where are you?"

10     A      I cannot recall the details.  I asked all five

11  things that are pertinent to a head injury or any trauma

12  patient.

13             First of all, What's your name?  How old are you?

14  Do you have any allergies?  Are you taking any medication?

15  And what happened?  These are five simple questions.  Most

16  of these answers he answered yes or no.  For instance, could

17  be, Do you have any allergies?  Yeah.  Do you take any

18  medications?  Yes or no.  These are the routine questions I

19  asked.  Obviously I asked those questions.

20             However, responses were uttering words only.

21  There were no comprehensible or what you call meaningful

22  sentences, as you are trying to allude to, which would put

23  this patient in a better scenario.  No, it was not.  As you

24  mentioned, a completely awake, alert, in the sense that he's

25  making good sense, of course not.  He is down on that level

1    of verbal responsible.  He's down that scale, he's down to

2    3.

3           So obviously there is some head injury involved,

4    or some other drugs, chemicals or whatever, that could turn

5    his brain to that category.  I cannot tell you.

6           Q     You cannot give the Court a single question you

7    asked that indicated he was unaware of his surroundings?

8           A     The only best response to the Court is the

9    following:  He came in, eyes open, spontaneous.  You ask him

10   to do something, he will do it.

11          This is the only thing in my mind that says that

12   he is doing reasonably well, that he's aware of his

13   surroundings.  That is the only state of mind I can give to

14   the Court.  The rest is matter of opinion.  Opinion maybe,

15   or different dilemmas that you can be faced with.

16          Q     You can not give the Court a single question you

17   asked that indicated he was aware of his surroundings?

18                MR. LaMAGNA:  Objection.

19                THE COURT:  Sustained.  Don't answer.

20          Sustained.

21          Q     You cannot give the Court a single word he

22   uttered that indicated he was aware of his surroundings?

23                MR. LaMAGNA:  Objection.

24                THE COURT:  Sustained.

25                Don't answer, please.

1    Q    A sample was taken of his blood?

2    A    Yes.

3    Q    With your approval?

4    A    Yes.

5    Q    You testified he was intubated?

6    A    Yes.

7    Q    Because he was combative?

8    A    Yes.

9    Q    He was incoherent?

10   A    Yes.

11   Q    He was incomprehensible?

12   A    The words were incomprehensible, yes.

13   Q    He was disoriented?

14   A    Yes, because orientation is the second level.  He

15   passed that; he became worse than that; he was confused.  So

16   with wording further down, yes, he was disoriented.

17   Q    He was disoriented?

18   A    Correct.

19   Q    Disoriented indicates, tends to show, he was

20   unaware of his location?

21   A    Well, if he opens his eyes, looks around, he's in

22   a room with lots of lights, lots of physicians, he knows

23   something must have happened.  He's disoriented.  He may not

24   know where he is, what hospital he is in, but he knows he's

25   in some area different than what he normally would have

1    been.

2            So your outlook to the same problem is different

3    from our outlook.  Disorientation for you maybe is a very

4    important issue.  For us, as long as the person has his eyes

5    open, is confused, but would be able to tell you at least

6    he's in a room with lights.

7        Q    Disoriented tends to show he was unaware of his

8    situation?

9        A    True.

10       Q    Disoriented tends to show he was unable to give

11   consent to anything?

12       A    Could be just the opposite at times.

13       Q    Disoriented tends to show he was unable to give

14   consent to any medical procedure?

15       A    No, no.  Medical procedure we definitely would go

16   ahead and do it in the emergency room.  He gets his lines

17   and gets blood.

18            How much consent we are going to get from the

19   patient -- we are going to say, please, we put two lines in

20   your arms.  And that's what normally patients do, they stay

21   quite, they are reasonable, they understand.  And we put in

22   the two lines.

23            When we have -- That's how we proceed in a trauma

24   room when we have to establish two large bore, intravenous

25   lines.

1          Obviously that doesn't require much of a consent,

2     that is automatic consent.  Whether you like it or not,

3     you're going to give those two lines.

4          Q     Your use of the word "disoriented" tends to show

5     he was incapable of giving consent to a medical procedure?

6                    MR. LaMAGNA:  Objection.

7                    THE COURT:  Sustained.

8          Q     Your use of the word "disoriented" indicates he

9     was incapable of giving his consent to the taking of his

10    blood?

11                   MR. LaMAGNA:  Objection.

12                   THE COURT:  Overruled.

13                   THE WITNESS:  Should I answer?

14                   THE COURT:  Yes, please.

15         A     The procedural pattern of drawing the blood from

16    the patient for alcohol, drug, whatever, has nothing to do

17    with me.  I am the only one that supervises from the

18    technical aspects point of view, that when the police

19    officers or the troopers come in and give me those two

20    tubes, that I have to give it back to them filled with the

21    blood, I do it; me or anybody else in the trauma room, most

22    obviously the nurses.

23              So obviously that protocol of me trying to spend

24    my time and energy and efforts to take those two units of

25    blood for me is irrelevant.  Only if it is a problem of a

Dr. Zohrabian - for Defendant - redirect          233

1    source that has to be addressed immediately; i.e.,

2    chemicals, some substance that the person on medication is

3    taking, that maybe his blood pressure or his heart is going

4    fast, then I would be able to know something better, then

5    I'll draw it, otherwise I'm not interested about that.  I

6    personally am not interested about that.

7          Q     Your use of the word "disoriented" indicates he

8    was incapable of giving consent to the taking of his blood?

9               MR. LaMAGNA:  Objection.

10              MR. HAYDEN:  No answer.

11              THE COURT:  Sustained.

12              I think we have the answer that we're going

13        to get, I think.

14              MR. HAYDEN:  Nothing further.

15              MR. LaMAGNA:  May inquire, your Honor?

16   REDIRECT EXAMINATION

17   BY MR. LaMAGNA:

18        Q     Now, doctor, the Glascow coma score is comprised

19   of how many components?

20        A     Three components.

21        Q     Is any one of those components dispositive of any

22   one particular issue or is it a totality of the

23   circumstances when if relates to consciousness?

24        A     It is the totality, the totality of the three

25   components put together that makes the understanding of the

1    head injuries status, or the mental status.

2         Q    Now, we talked about the components of the verbal

3    side of the Glascow coma score.  Let's talk about the,

4    "obeys commands component," okay?

5              Now, when you articulated in your notes

6    concerning your examination of Mr. Heidgen as it relates to

7    the obeys commands, what point on that score did you give

8    him?

9         A    He got the best score.

10        Q    That was a 6, correct?

11        A    Right.

12        Q    In the component of "obeys command," you would

13   ask the patient to raise his right hand, correct?

14        A    Correct.

15        Q    And was that one of the questions you asked?

16        A    That is how we test command:  Do this, do this,

17   do this, do that.

18        Q    And when you asked Mr. Heidgen to raise his arms,

19   raise his legs, do this, do that, did he obey those

20   commands?

21        A    Yes, he did.

22        Q    So he raised his arm when you told him to raise

23   his arm?

24        A    Correct.

25        Q    He moved his leg when you told him to move his

1  leg?

2      A      Yes.

3      Q      He nodded his head when you told him to nod his

4  head?

5                  MR. HAYDEN:   Objection to leading.

6                  THE COURT:   Sustained.

7      Q      But as far as all of the commands, physical

8  commands, that you asked Mr. Heidgen to perform, he

9  performed them, correct?

10     A      He did that, yes.

11     Q      By performing physical acts, does that indicate

12 that the individual is comprehending what you're asking him?

13     A      That's correct.

14     Q      So if you told somebody to raise their left leg

15 and they raise their left leg, would you determine that to

16 be that he's understanding what you're saying?

17     A      That's exactly what I'm trying to say.

18     Q      Are there times where people can be, as you said,

19 deficient or down on one of the levels and high on other

20 levels?

21     A      Sure, can be.

22     Q      And in making a determination of consciousness

23 you have to factor in all of these factors, correct?

24     A      Correct.

25     Q      Now, when you gave him a score of a four on the

1    eye open and spontaneous, what level was that in the scale?

2         A     That's the best level.

3         Q     So his eyes were open, correct?

4         A     His eyes were open.

5         Q     And when you say spontaneous, was he following

6    your hand movement?

7         A     Spontaneous meaning he comes in awake with his

8    eyes open.   That's what it means.

9         Q     Was he looking at you?

10        A     He looks at me, looks at everybody, anybody else.

11        Q     When you were performing your examinations of

12   him, these neurological exams, was he looking at you?

13        A     Yes, he was.

14        Q     So is it a determination based upon motor

15   function, eye spontaneity as well as verbal responses that

16   you reach your conclusion?

17        A     Yes.

18        Q     And if a person obeys commands and follows them,

19   every single one of them, that would be a strong indication

20   that he was answering?

21              MR. HAYDEN:   Objection.

22              THE COURT:   Sustained.

23        Q     Now, with respect to the verbal side that

24   Mr. Hayden was questioning you about, you said he uttered a

25   few words; is that correct?

1    A    Correct.

2    Q    Does that mean he said individual words, a word

3  at a time rather than a sentence?

4    A    Correct.

5    Q    So he didn't say to you "utter a few words," you

6  meant he uttered a few words; is that correct?

7              MR. HAYDEN:  Objection.

8              THE COURT:  Sustained.

9    Q    Have you ever had an experience where an

10  individual, where an individual was unable to speak but yet

11  communicated to you by either nodding yes or no?

12             MR. HAYDEN:  Objection.

13             THE COURT:  Sustained.

14    Q    In your opinion, would Mr. Heidgen have been able

15  to give consent through acknowledging a question by either

16  nodding his head yes or nodding his head no?

17             MR. HAYDEN:  Objection.

18             MR. LaMAGNA:  That was part of --

19             THE COURT:  Hold on a second.

20             All right.

21    Q    My last question to you, sir, was:  Based upon

22  your examination of him and him being able to respond to

23  your commands physically, would he have been able, in your

24  opinion, to communicate by nodding his head yes or nod his

25  his head no?

Dr. Zohrabian – for Defendant – redirect          238

1      A      He could have done it, but maybe he didn't do it.

2   That I'm not sure.

3      Q      Could he have done it?

4      A      He could have done it.

5             MR. HAYDEN:  Objection.  He should let the

6      doctor finish his answer.

7             THE COURT:  Yes, sustained.

8      Q      Could he have done it?

9      A      He could have done it, but he didn't.

10      Q      But he didn't?

11      A      Because that's the reality of the thing here.  He

12   could have done it, he didn't do it.  Could have done it,

13   was he able to do it, this is all the questions you've been

14   asking me, and I'm telling you that aspect of the problem,

15   to me it's irrelevant.  Why?  Because I know his head

16   injuries are minor ones.  That is my concern.

17      Q      And that is based upon the fact that when you

18   would ask him to perform physical commands, would he comply

19   with those physical commands?

20             MR. HAYDEN:  Objection.

21             THE COURT:  Sustained.

22      Q      Did he comply with your physical examination

23   command?

24             MR. HAYDEN:  Objection.

25             THE COURT:  Sustained.

1     Q     Doctor, based upon the three components of the

2     Glascow coma score, would Mr. Heidgen have been in a

3     position to give consent to a medical procedure?

4                         MR. HAYDEN:  Objection.

5                         THE COURT:  Sustained.

6                         MR. LaMAGNA:  No further questions.

7                         MR. HAYDEN:  Nothing, Judge.

8                         THE COURT:  Thank you, doctor.

9                         (The witness was excused.)

10                        THE COURT:  Mr. LaMagna, anything else?

11                        MR. LaMAGNA:  Nothing further, Judge.

12                        THE COURT:  Defendant rests?

13                        MR. LaMAGNA:  Yes.

14                        THE COURT:  Both sides rest?

15                        MR. HAYDEN:  No, your Honor.

16                        THE COURT:  Let me see counsel.

17                        (Brief recess.)

18                        THE COURT:  Mr. Hayden?

19                        MR. HAYDEN:  The People rest, your Honor.

20                        THE COURT:  Both sides having rested, this

21    Court will take oral arguments tomorrow morning at

22    9:30.  Thank you very much, counsel.

23                        MR. HAYDEN:  Yes, your Honor.

24                        (The hearing was recessed until April 6,

25        2006.)

```
 1   STATE OF NEW YORK  :  NASSAU COUNTY

 2       SUPREME COURT, PART 31

 3   ----------------------------------------X

 4   THE PEOPLE OF THE STATE OF NEW YORK     :

 5           -against-                        :  Ind. # 1910N/05

 6   MARTIN ROBERT HEIDGEN,                   :

 7                         Defendant,         :
     ----------------------------------------X
 8
                                   262 Old Country Road
 9                                 Mineola, New York
                                   April 6, 2006
10
     B E F O R E:
11
                     HON. ALAN H. HONOROF,
12                         Acting Supreme Court Justice.

13

14   A P P E A R A N C E S :

15           (As previously noted, Mr. Hayden not being
       present.)
16
              *      *      *      *      *
17

18           THE CLERK:  Hearing continued.

19       People ready?

20       MS. McCORMICK:  People ready.

21       THE CLERK:  Defendant ready?

22       MR. LaMAGNA:  Defendant is ready.

23       THE CLERK:  Both sides ready.

24       MS. McCORMICK:  My only request, Judge, I

25   think there are family members in the hallway who
```

People v. Heidgen                                241

1    aren't aware that we are starting.

2              May I inform them of that?

3              THE COURT:  Sure.

4              MS. McCORMICK:  Thank you.

5              THE CLERK:  For the record, please,

6    Indictment 1910N/05, People against Martin Robert

7    Heidgen.

8              Hearing continued.  Both sides ready?

9              THE COURT:  Mr. LaMagna?

10             MR. LaMAGNA:  Judge, may I?

11             THE COURT:  Sure.

12             MR. LaMAGNA:  Judge, the issues presented in

13   this hearing were a Huntley Hearing and a Mapp Hearing.

14             With respect to the issues on the Mapp

15   Hearing, the propriety of the extraction of the blood

16   sample, we move to suppress based upon various grounds.

17   The hearing has been held, the evidence has been

18   presented.

19             Judge, with respect to the issue on the

20   blood, Section 1194, subsection 2, (a)(1).

21             THE COURT:  At the risk of interrupting you,

22   Mr. LaMagna, which I know I'm doing, can we talk about

23   first probable cause for arrest?

24             MR. LaMAGNA:  Judge, the arrest, as I

25   understand it from the testimony, occurred at 12:30.

1    That was when Investigators Harris and Baez formally

2    placed Mr. Heidgen under arrest.

3              For the purpose of that hearing, I would

4    concede probable cause of that issue.

5              THE COURT:  Probably cause not being an

6    issue.  The issue of blood came before or after the

7    issue of the statement?

8              MR. LaMAGNA:  Well, there are a couple of

9    statements that precede --

10             THE COURT:  Let's talk about everything in

11   order.

12             MR. LaMAGNA:  You want chronological order?

13             THE COURT:  Yes.

14             MR. LaMAGNA:  Judge, with respect to two

15   statements, I believe one was made to Officer Pandolfo

16   and one was made to Officer Nolan.  Those two

17   statements preceded the extraction of the blood.

18             Officer Pandolfo's statement, which I believe

19   occurred at approximately 2:15 or so at the scene, was

20   never noticed to the defendant in the voluntary

21   disclosure.

22             THE COURT:  That statement being what

23   happened, where was he?

24             MR. LaMAGNA:  Yes.

25             THE COURT:  Ms. McCormick, do you agree that

1    was not noticed?

2              MS. McCORMICK:  No, your Honor, I'm afraid

3    that I would have to check that before.

4              THE COURT:  Let's take a look, because if it

5    wasn't noticed, then Mr. LaMagna was correct.

6              MS. McCORMICK:  If I could just take a look?

7              THE COURT:  Yes, take your time.

8              MS. McCORMICK:  I'm afraid it may be in the

9    documents that are upstairs.

10             THE COURT:  The VDF is upstairs?

11             MS. McCORMICK:  Yes.

12             I do not have the VDF with me, Judge.  I have

13   an affirmation in front of me from Mr. Hayden, dated

14   December 1, 2005, indicating the statement at that

15   time.

16             THE COURT:  That statement that I just

17   mentioned, what happened?

18             MS. McCORMICK:  Yes, "I don't know what

19   happened" and "Where am I?"

20             THE COURT:  Do you acknowledge receipt of

21   that?

22             MR. LaMAGNA:  In December?

23             THE COURT:  Yes.

24             MR. LaMAGNA:  Yes.

25             THE COURT:  Well, then, it would seem that it

1      was properly noticed.

2              MR. LaMAGNA:  But not pursuant to CPL 710.30.

3      I didn't receive it within the prescribed time.

4              THE COURT:  I think I have the discretion to

5      allow it provided there was adequate notice to you, and

6      I think that I will allow it based on the notice that

7      you do have.

8              MR. LaMAGNA:  And then there was the second

9      statement by Officer Pandolfo --

10             THE COURT:  Pandolfo?

11             MR. LaMAGNA:  I'm sorry, Nolan.

12             -- which occurred at approximately 2:25.

13             THE COURT:  That statement was --

14             MR. LaMAGNA:  "What's your name?"  And "Where

15     were you coming from?"

16             THE COURT:  To which he said Marty.

17             MR. LaMAGNA:  He said Marty.

18             THE COURT:  And Long Beach, two times.

19             MR. LaMAGNA:  That's correct.

20             THE COURT:  Are they noticed?

21             MR. LaMAGNA:  Those were noticed, yes.

22             THE COURT:  Okay.

23             MR. LaMAGNA:  Those were noticed within the

24     prescribed period of time.

25             THE COURT:  And you claim that a product of

1.     custodial interrogation?

2           MR. LaMAGNA:  Yes, I am.

3           I believe that the statements by the officers

4      at the scene had already articulated that they detected

5      an odor of alcohol on his breath, slurred speech, and I

6      believe articulated these findings to Trooper Knapp and

7      other troopers, and clearly under those circumstances

8      he was in custody and they should have Mirandized him.

9           THE COURT:  Those statements appear to me to

10     be investigatory, and properly so, and pedigree.  I'm

11     going to allow those statements as well.

12          MR. LaMAGNA:  Now, that brings us --

13          THE COURT:  Now we're at the blood.

14          MR. LaMAGNA:  The blood.

15          THE COURT:  Okay.

16          MR. LaMAGNA:  And there are further

17     statements.

18          THE COURT:  We'll talk about those later.

19          MR. LaMAGNA:  Judge, as I was stating, the

20     statute that's in question, in 1194.2(a)(1), and that

21     provides the exclusive method by which the police may

22     direct the extraction of blood.  And I cite People

23     versus Daniel, 84 Appellate Division 2d, 916.

24          Now, in pertinent part with respect to that

25     statute, it reads that any test -- blood in this

People v. Heidgen                          246

1    case -- must be taken within two hours of formal

2    arrest.  Probable cause alone is insufficient.  And I

3    quote again People versus Daniel.

4            Here, prior to the extraction of the blood,

5    my client was never formally placed under arrest.  In

6    fact, the evidence was quite clear that the first time

7    he was formally placed under arrest is by Trooper

8    Harris and Trooper Baez sometime around 12:30 in the

9    hospital, after the blood had been taken.

10           Now, there are two seminal cases on this

11   issue of the arrest.  There is Goodel, which is cited

12   at 79 NY 2d 869, and Almond, at 151 Appellate Division

13   2d 820.

14           Now, those are the two cases, one on the one

15   side -- Goodel basically saying if the individual is

16   unconscious it would be an empty gesture to place the

17   person under arrest.  I agree with that.

18           However, on the other side of that is People

19   versus Almond.  Now, the Court of Appeals, in its

20   decision in Goodel, purposely made reference to Almond

21   and distinguished the case of Almond absent facts of

22   that case with the Goodel decision.

23           Now, in Goodel, the police officers, when

24   they arrived at the scene of the collision, the

25   defendant was already comatose, in a coma, and then

1    remained in a coma for two weeks after the accident.

2              Now, interestingly in Almond, which is a case

3    as similar as you can get with different cases in this

4    case, the defendant was taken from the scene of the

5    accident to the hospital, a trooper was directed by his

6    superiors to follow the defendant to the hospital and

7    get a blood sample.  The defendant at the hospital was

8    found to be hysterical and emotional and was sedated by

9    medical personnel and as a result became unconscious.

10   The blood was then drawn.

11             And the Court said he had to have been placed

12   under arrest prior to that.  Whether it was his

13   unconsciousness due to his alcohol or due on an injury

14   or due to medical personnel placing him in that state

15   due to sedation, the fact remains at the scene, or

16   while there was that probable cause, they needed to

17   arrest him and formally place him under arrest.  And

18   that's what the Court of Appeals brought out even in

19   the Goodel case.

20             The facts here would have warranted the

21   defendant being placed under arrest.  The evidence

22   shows that at the scene the defendant was conscious and

23   awake.  He was responsive, he spoke to two police

24   officers who testified here, which statements were

25   being proffered to be used at trial by the district

1      attorney.

2              His responses, the first was at 2:10 and the

3      next was at 2:25, ten minutes before the defendant

4      allegedly arrived at the hospital in this unconscious

5      state, ten minutes before he's being asked what's your

6      name, according to the testimony of the trooper, he

7      answered and articulated Marty.  Ten minutes before he

8      arrives at the hospital, the trooper asked him a

9      subsequent question:  Where are you coming from?  Long

10     Beach.

11             Now, what's interesting here, too, is that

12     while the defendant was in between being extracted and

13     placed in the ambulance, he's on his back board trying

14     to get up, Trooper O'Hare or Siegler was telling him to

15     stay down, but at the same time Trooper Knapp

16     instructed O'Hare to go get the blood kit to take his

17     blood sample.

18             The individuals, the police officers,

19     Pandolfo and Nolan, testified that prior to that they

20     articulated the fact of the alcohol on the breath, the

21     slurred speech and glassy eyes to Knapp, way before

22     that.  That's what disturbed Knapp to tell O'Hare to go

23     get the blood kit.  So there was the probably cause

24     right then and there.

25             And interestingly, after the defendant was

1    placed in the ambulance, still awake and still

2    conscious -- and that is the testimony of Trooper

3    O'Hare -- he was conscious when he was in the

4    ambulance.  As soon as the ambulance left, Trooper

5    Siegler said, Well, on paper we put him formally under

6    arrest.

7            Well, they never articulated it to him.  He

8    had already just left.

9            Well, if that's the case, that they put on

10   their police paperwork time of arrest, 2:33, just when

11   he left the scene while he was awake and conscious with

12   Trooper O'Hare en route with the blood kit, well,

13   certainly they should have let him know he was under

14   arrest since everybody else there knew, and they never

15   did that.

16           Therefore, based upon the authority of

17   Almond, which is very similar, they did not fulfill

18   their requirements of 1194, where the test has to be

19   within two hours of formal arrest, and the defendant

20   has to be formally arrested unless Goodel will apply,

21   which is factually distinguishable from this case.  And

22   even the Court of Appeals factually distinguished

23   Almond, which is similar to this case, in their

24   decision in Goodel.

25           So for that reason, number one, I would

1        request suppression for that reason.

2                Judge, we also made an argument to the level

3        of Mr. Heidgen's consciousness or his ability to

4        consent to the blood test at the time that the blood

5        test was taken.

6                Now, this is very problematic in this case in

7        that there has been no testimony that they have even

8        attempted to ask for consent.

9                So when you look at the case law about

10       consent, whichever case that follows, that if a person

11       is unconscious or in any way so incapacitated that it

12       would be impossible to get his consent, the problem

13       here and the record here is we don't know.  They never

14       asked him.

15               They never asked him at the scene, when they

16       could have; they never asked him, certainly in the

17       ambulance when they were going there for the specific

18       purpose of taking his blood.

19               On the whole route there they never asked

20       him, Will you consent to take a blood test?  We don't

21       know what his response would have been.

22               At least if they came here and said, your

23       Honor, we were there, we asked him.  Will you consent

24       to take a, submit a sample of your blood for the

25       purpose of ascertaining your blood alcohol level, and

1   he didn't answer me or he said something I didn't

2   understand.  We asked him again and he still doesn't do

3   it, so we concluded he can't give it.

4           That didn't happen.  We don't know.

5           Now, we heard from Dr. Zohrabian.  He's an

6   emergency room physician.  He was the physician on

7   call.  He was the physician who saw him.  He made notes

8   of his examination, and he testified to that.

9           Now, whether he was consistent, inconsistent

10  or not, the bottom line is, in his medical opinion,

11  regardless of his ability to verbalize, all of his

12  other functions, although diminished, in his view were

13  still sufficient enough that he would have understood,

14  understood at least the issues of consent here.

15          He testified on cross and on direct that

16  every command he asked of him he followed.  Physical

17  commands:  Raise your hand; he raised his right hand.

18  Raise your left hand; he raised his left hand.  All of

19  those commands he said he followed, and he gave him the

20  highest grade on that.  His eyes were open and awake,

21  which contradicts the testimony of O'Hare, who said he

22  was completely out.  Eyes closed.  Out.

23          As far as the medical doctor testifying, that

24  under the circumstances, although he was certainly

25  diminished in his ability to perceive and to

1    articulate, he was still at a level, even though

2    diminished, able to consent or to understand the issue

3    of consent.

4          And again, I would argue that unfortunately

5    the record doesn't, there was nothing by any trooper

6    saying we asked him. Had they asked him, it would be a

7    different story. I think they should have asked him.

8          The case law is such, the thing, the doctor's

9    testimony is such, and I think ten minutes before

10   arriving at the hospital he's answering questions of

11   the police: What's your name? Where are you coming

12   from? And correct responses were given only ten

13   minutes before, and that is something I would ask this

14   Court to consider in the totality of the circumstances

15   surrounding that.

16         I think in the end, Judge, that there was an

17   inexperienced trooper. I think he was only on the job

18   a couple years. He was sent to the hospital to get the

19   blood kit, to get the blood kit. That's what he did.

20   He just asked the nurse, "Get me the blood."

21         I think they should have called the district

22   attorney's office, or certainly secured a warrant, and

23   they didn't.

24         I think the facts here are somewhat ambiguous

25   as to definitive state whether or not it was impossible

1    for my client to give his consent.  And on a close call

2    like that I don't think they should have taken it.

3    First of all there was no arrest.  Secondly, I think

4    the medical testimony puts it over the edge that he

5    could have.

6          Now, Judge, I did ask you at the conclusion

7    of the People's case to preclude based upon the fact

8    that they didn't call the nurse or didn't bring

9    certification concerning her professional licensure.  I

10   did research the issue, and I did not find any positive

11   or negative case law on it.

12         THE COURT:  Don't we have the doctor

13   testifying that the blood was drawn at his direction?

14   I think that was his quote.

15         MR. LaMAGNA:  And that was on my case.

16         THE COURT:  Correct.  Doesn't matter.

17         MR. LaMAGNA:  Well, I made the application at

18   the end and you reserved on that.

19         THE COURT:  That's why I reserved on it.

20         MR. LaMAGNA:  So I think with respect to the

21   issue of the nurse, who is one of the enumerated people

22   who can take the blood, I think they should have

23   brought in a certification stating that she was in fact

24   a registered nurse, licensed by the State of New York,

25   or have her testify that's who she is.  Otherwise we

1      have the statement of a police officer.

2               THE COURT:  We also have the statement of the

3      doctor that the blood was drawn at his direction.

4               MR. LaMAGNA:  It still needs to be done by a

5      registered nurse.

6               THE COURT:  Still uncontradicted testimony by

7      the police officer.

8               MR. LaMAGNA:  Now, the two remaining

9      statements, your Honor, was one statement made by

10     Trooper Zawol in the hospital room at approximately

11     11:30 a.m. --

12              THE COURT:  Hold on.  Let me catch up to

13     that.

14               They had a few drinks in the city, a few

15     drinks, and went to Valley Stream, girlfriend in

16     Arkansas, self-destruct mode, hoped vehicle was okay,

17     thanks for helping.

18              MR. LaMAGNA:  That was the substance.

19              THE COURT:  Okay.

20              THE COURT:  And your argument is?

21              MR. LaMAGNA:  That when the trooper began

22     asking questions of him in follow-up questions, such as

23     what happened next, then what happened, that turned

24     even arguably his spontaneous statement into

25     interrogation.  And I cite People versus Ackerman, 162

1    AD 2d 793, and People versus Lynes, 49 NY 2d 286.

2              THE COURT:  I'm not going to ask

3    Ms. McCormick to respond to that now, but I did note

4    that that questioning did take place, and I wrote down

5    and circled "no rights," so I won't ask the People to

6    respond to that in their argument.

7              MR. LaMAGNA:  Whether --

8              THE COURT:  What their position is as to what

9    appears to be custodial interrogation with no rights.

10             MR. LaMAGNA:  Yes.  And that's essentially my

11   argument.

12             THE COURT:  I understand.

13             MR. LaMAGNA:  Moving on to the main

14   statement, the main statement, as testified to by

15   Investigator Harris, was a question and answer

16   interrogation made by Harris as well as Baez in the

17   hospital room, curtain drawn.  And it's in evidence,

18   the statement.

19             According to Harris, Baez, contemporaneous

20   with the questions being asked and the answers being

21   given, wrote down every question and every answer that

22   was asked of him.  Is it inaccurate -- notes of the Q

23   and A exactly what was said, everything that was said.

24             THE COURT:  Well, he said all of that stuff

25   happened after he read him his rights off that little

1    card that he carries with him for the last 30 years.

2            You dispute that the officer gave the rights?

3            MR. LaMAGNA:   I am disputing, yes, I am

4    disputing that he gave him the rights prior to the

5    interrogation, because my argument would be that

6    looking at that Q and A, that if the rights were given

7    prior to that Q and A, the first five questions and the

8    first two answers, or three answers given by the

9    defendant, would have appeared on top of that

10   statement.

11           It gives us pause to believe that a 17-year

12   veteran, or 13-year investigator, and a 30-year veteran

13   who is interrogating a suspect in this type of case and

14   goes to the trouble of accurately articulating every

15   question law enforcement made and every answer the

16   suspect gave, would not have that preamble of his

17   constitutional rights articulated with the same

18   specificity that they put down every other question.

19   It should give us all pause.

20           These were his constitutional rights.   These

21   were the first five things he said to him, which were

22   the most important five things, because before you

23   could even question a person in custody you have to

24   give him those rights.   It gives pause why they don't

25   appear there.

People v. Heidgen                    257

1          And it gives further pause that there is no

2      record anywhere that they gave him the rights.   There

3      is no note anywhere that he gave him his constitutional

4      rights.   There is no signed rights card.   They knew,

5      and he testified that prior to going to the hospital

6      one of the reasons he's going to the hospital was to

7      interview him.   He brought with him a preprinted

8      statement sheet.   Whether it was for a written

9      statement or not, the memoranda warnings are on there.

10     Once you give Miranda warnings, you get a signed rights

11     card.   Well, you have him sign it, acknowledging that.

12     That's basic police procedure.   We've all seen that,

13     especially in a case like this.

14          More importantly, they went to the effort of

15     preparing such a detailed, not just statement, a Q and

16     A, question and answer.   Why wouldn't it be there?

17     They didn't just forget.

18          And it's interesting that at the end of that,

19     when it's over, now he says he wants his lawyer.

20     Judge, it gives pause.   And as the trier of fact, you

21     will make your determination based upon everything, and

22     credibility, and I ask you to consider that.   It should

23     give us pause why it's not there, especially something

24     so important.   Not a single note to that.

25          There are things that make sense and things

People v. Heidgen                    258

1    that don't make sense.  And out of all of these things

2    there are issues that can go either way.  Some are

3    ambiguous.  The fact that these experienced

4    investigators specifically are going to speak to him,

5    interrogate him, don't have a signed rights card, don't

6    have any note saying he waived his rights, and that Q

7    and A, everything is in there, there were no

8    corrections made to it, first five things said to him

9    are missing.

10                So for all of those reasons, your Honor, I

11   ask you to consider the defendant's motion.

12                THE COURT:  Thank you, Mr. LaMagna.

13                Ms. McCormick?

14                MS. McCORMICK:  Yes, your Honor.

15                I do raise at this point the absence of

16   discussion about the property record from the vehicle.

17   And I would ask if the defense concedes that that

18   property is properly recovered and the People are

19   permitted to introduce it at trial?

20                MR. LaMAGNA:  That was his wallet?

21                MS. McCORMICK:  And the cell phone, Judge.

22                MR. LaMAGNA:  Judge, I am not conceding that

23   at this point, no.

24                THE COURT:  And why would the police not be

25   entitled to take that?

1    MR. LaMAGNA:  Because I believe the police

2    took it prior to his arrest.  So at the time they took

3    it, there was no probable cause.  It wasn't incident to

4    his lawful arrest.

5         THE COURT:  On the one hand you told me they

6    had probable cause and should have arrested him right

7    then and there, and then you told me he --

8         MR. LaMAGNA:  Subsequent, when he testified,

9    when he testified he pulled the wallet out of the car.

10   He pulled the wallet out of the car way before the

11   statements were made and the articulation of the eyes

12   and the breath.

13        THE COURT:  Okay.  Thank you, Mr. LaMagna.

14        MS. McCORMICK:  Your Honor, with respect to

15   informing the defendant that he was under arrest, the

16   case law is actually quite clear.  Counsel correctly

17   cites People versus Goodel from Court of Appeals, but

18   there are a series of cases that address this issue.

19   People versus Steel, 265 AD 2d, 586, 1999; People

20   versus Hart, 266 AD 2d 698, 1999; People versus Ladd,

21   89 NY 2d, Court of Appeals, 893, 1996.

22        Your Honor, the Court consistently held where

23   the defendant is incapable of understanding the fact

24   that he's being placed under arrest, there is no need

25   under these circumstances to formally inform him of the

1      fact that he's under arrest.

2              While counsel has indicated that statements

3      given to Officers Pandolfo and Nolan at the collision

4      scene indicate that he was awake, aware, alert,

5      conscious, none of that is accurate from the testimony.

6      Officer Pandolfo indicated to this Court through his

7      testimony that he had to speak to the defendant a few

8      times before he could get any acknowledgment from him.

9      And his response was not anything that was responsive

10     to the question:  Are you all right?  His response was

11     a glazed, disoriented turning of the head where he said

12     to Officer Pandolfo, Where am I?  What happened?

13             The next response to Officer Nolan also had

14     to be pulled from a defendant who was described by

15     Officer Nolan as disoriented, as dazed, as having to be

16     shaken and addressed in order to elicit "Marty" and

17     saying "Long Beach" twice.

18             While that did answer the officer's question,

19     that's not the heart of the matter to this issue.  The

20     heart of the matter is that at this point this

21     defendant is being now removed from the wreckage of a

22     vehicle in which he's trapped.  He is moved onto a

23     stretcher.  The police department, all of them, and the

24     emergency vehicles, are focused on helping him at this

25     moment.  He's put on a stretcher, he's placed in an

1    ambulance.

2         Officer Siegler speaks to Officer Knapp.

3    There are conversations had on the scene, and the

4    determination is made after the defendant is placed

5    into the ambulance that he would be formally placed

6    under arrest.

7         Officer Siegler was quite clear at this point

8    in the ambulance there was no testimony that this

9    defendant was responsive to anyone's questions, that he

10   was following anyone with his eyes, that he was

11   following commands.  To the contrary, all of the

12   testimony from Trooper Siegler and Trooper O'Hare

13   indicated that it was the exact opposite:  Not

14   responsive, not saying any words, not able to say any

15   words, not talking to anyone who was speaking to him.

16        This meets definition, Judge, of his being

17   unable to understand the consequences of being placed

18   under arrest, and so there was no formal need to inform

19   him of his arrest as every indication was that he would

20   not be able to understand it.

21        This carries over now until the taking of the

22   blood.  His arrival at the hospital has the testimony

23   of Officer O'Hare, of him being removed from the

24   ambulance and taken into the trauma room.  From Officer

25   O'Hare's vantage point he appeared to be unconscious,

1    that his condition from the ambulance where he had at

2    first been moving his arms and trying to remove some of

3    his restraint, moaning, groaning, not speaking, had

4    quieted as they approached the hospital.  And Officer

5    O'Hare's testimony is that at the time the blood was

6    taken, this defendant was unconscious.  This defendant

7    had never, during the entire time, been able to respond

8    to any questions.

9            There is a decided difference in

10   Dr. Zohrabian's testimony.  Dr. Zohrabian's medical

11   assessment, as he testified -- and I have to say, it

12   was somewhat confused testimony, back and forth.  He

13   was clearly implying what was in his belief and medical

14   estimate, to what responsive means.  He said that as he

15   spoke to the defendant, the defendant attempted to

16   utter a few words, unable to tell us what the words

17   were.  He specifically said the defendant was

18   disoriented, that the answers were inappropriate.

19           This is not the status of a person who could

20   be asked credibly, reasonably, responsibly, whether or

21   not they would consent to give a blood test.  To the

22   contrary, your Honor, had the trooper asked and been

23   given any kind of response that he interpreted as being

24   a consent, we would be here arguing that he was in no

25   condition to give that consent.

1          The case law is very clear, People versus

2     Kates, 53 NY 2d 591, 595-06, 1981 Court of Appeals

3     case.   The defendant who was unconscious or so

4     disoriented that the police were unable -- there is not

5     an impossibility standard.   It's unable -- because of

6     his disorientation "to obtain his consent," this is

7     when implied consent is appropriately used.

8          The New York State Police appropriately

9     applied the statute for this circumstance.   All of the

10    evidence indicates that this defendant -- even the

11    testimony from Dr. Zohrabian -- was not in a position

12    to comprehend on what was being asked of him and to

13    reasonably respond to the question about whether or not

14    to consent to give his blood.

15         Dr. Zohrabian, there was some confusion in

16    terms of his idea of what medical consciousness

17    constituted, but it's up to your Honor to decide

18    whether the level of consciousness that was described

19    from the testimony from Officer Siegler, Officer

20    O'Hare, Troopers Siegler and O'Hare, and Dr. Zohrabian

21    could ever qualify as a conscious defendant who would

22    be able to comprehend and make a voluntary and knowing

23    decision to give his blood.

24         The People suggest that the evidence is very

25    clear that he is not, that defendant and that the

1    troopers should not, and did not ask him for his

2    consent because he was unable to give it.

3              With respect to the taking of the blood at

4    the time frame in which it's taken, the testimony also

5    is clear.  Trooper Siegler indicated that this

6    defendant, for the purposes of the New York State

7    Police, was considered to be under arrest when he was

8    in the ambulance at approximately 2:33 a.m.  The

9    defendant was not informed of that because he could not

10   understand it at that point.  But the blood was drawn

11   well within two hours of the implied consent.  It was

12   drawn approximately 2:45, 2:47, so there is no issue as

13   to that.  And as the Court has indicated, it was drawn

14   by a registered nurse, by the uncontroverted sworn

15   testimony of Trooper O'Hare that she was a registered

16   nurse, and a registered nurse is in fact permitted to

17   take blood from a defendant under these circumstances.

18             With respect to the statement giving or

19   rather taken by Trooper Zawol, Trooper Zawol was

20   sitting in the hospital in the vicinity of the

21   defendant's hospital bed.  Counsel has made a point

22   that the defendant was never informed that he was under

23   arrest.

24             THE COURT:  The trooper believed he was under

25   arrest.

1          MR. HAYDEN:  The trooper did.

2          But the case law in this case is subtle,

3    there are nuances about it.  But it's clear the issue

4    is not what is in the trooper's mind as he's speaking

5    to the defendant.  And I would cite the cases of People

6    versus Fenti.

7          THE COURT:  Before you do that, can we agree,

8    legally speaking, that the defendant was in custody

9    when he was guarded by that trooper?

10          MR. HAYDEN:  Your Honor, the defendant was

11    under arrest and he was in custody.

12          THE COURT:  That was known to the trooper.

13    And the trooper knowing that and not advising him of

14    his rights asked him questions pertinent to the

15    investigation then ongoing as to the DWI and the

16    murder.

17          MS. McCORMICK:  Yes, Judge, I would not be

18    able to say that that is not the case.

19          However, custody for these purposes is a

20    subtle event.  It's subtle to the extent that the issue

21    is, would a reasonable person in the position of the

22    defendant, innocent of any charges, believe that he was

23    in custody when he was speaking?  That is the issue.

24    It is not whether the trooper knew he was under arrest,

25    believed he was under arrest or would have stopped him

1    if he attempted to leave.  And that's why I cite People

2    versus Fenti, 175 AD 2d, 599; People versus Joy, 114

3    AD 2d, 517, Second Department, 1985.

4              The issue under the Court of Appeals case of

5    Yukl, 25 NY 2d, 585, is the state of mind of the

6    defendant.

7              This defendant awoke in a hospital after

8    having a collision.  He sees a trooper at the foot of

9    his bed.  The nature and content of the statement

10   itself lends itself to the fact that he did not believe

11   that he was in custody.  He was conversing with the

12   trooper -- first with the nurse, then with the

13   trooper -- and ended with the statement that he made

14   shortly after by saying thank to the trooper for

15   helping him.

16             It is clear from the statement given, from

17   the fact that the defendant was not informed that he

18   was under arrest because of his inability to receive

19   that information, that this defendant was of a state of

20   mind that he was not in custody, and it is his state of

21   mind that rules and determines the issue as to this

22   statement.

23             That's the People's argument.

24             THE COURT:  All right.

25             MS. McCORMICK:  With respect to the

1    statements taken by Investigator Harris, your Honor,

2    Investigator Harris is a 17-year veteran.

3            THE COURT:   22-year veteran and 13 years as

4    investigator.

5            MS. McCORMICK:   He was very clear.   His

6    testimony was forthright, and I of course leave it to

7    the Court to judge his credibility.   But he made made a

8    very clear statement and demonstrated for the Court the

9    demeanor, the means, the method by which he informed

10   this defendant of his Miranda warnings and the

11   responses given by the defendant.   And of course those

12   responses were that he would speak to him.

13           He also indicated for the Court that at the

14   top of the notes page was the time 12:30, which to him

15   was the time that he had administered those rights.

16           Counsel made an issue of having taken such a

17   detailed statement, the content of which involves the

18   events at issue, the collision itself, what happened,

19   the background.

20           Of course that statement had to be detailed

21   when taken, because it's subjective, it's changeable.

22   There was no reason for Investigator Harris to write

23   down the same Miranda warnings he administered every

24   time from the same card.   The substantive -- it will

25   not change.   He brought the card to court and he

1    demonstrated to the Court that this is the card he read

2    from, these are the rights.

3              There is no issue as to whether or not he

4    spoke those words because they're written down on the

5    card.  There would be no reason for him to rewrite

6    them.  A 17-year veterans would have no reason to

7    specifically note that he gave those rights before the

8    statement, because a sergeant wouldn't have taken the

9    statement without it.

10             Investigator Harris indicated for this Court

11   that it was his intention to take a written statement

12   from the defendant after speaking to him orally first,

13   but that at the point at which the defendant requested

14   to speak to an attorney, he concluded speaking to the

15   defendant, as is appropriate under the law, so the

16   written statement wasn't taken.

17             In the first instance, there is no

18   requirement that the defendant sign a rights card.

19   There is no requirement, as has been implied, that

20   there be notes given about the fact that rights were

21   given.  The sworn testimony of the investigator is

22   sufficient to establish this element beyond a

23   reasonable doubt.

24             The fact that the forms were taken, brought

25   by the investigator to take a written statement, and

1    the issue raised about why he didn't sign those forms,

2    is somewhat factually impossible to the extent that the

3    defendant's arms and hands are restrained.  He was not

4    even in a position to sign it, but the investigator was

5    clear they hadn't gotten to that point before the

6    defendant requested an attorney, and the questioning

7    was stopped.

8              Your Honor, I submit to the Court that there

9    is no issue here.  Investigator Harris was clear, he

10   was forthright.  He gave a sworn statement that the

11   rights were administered, that the defendant was in a

12   position and condition at that point where he appeared

13   to understand those rights, where he appeared to be

14   willing to speak, and he made a very detailed statement

15   of which notes were taken.  There is no violation of

16   the defendant's constitutional rights.

17             With respect to the property recovered from

18   the defendant's vehicle, one vehicle, VTL 603.1

19   requires the police department, whether they be State

20   police or local department, to investigate collisions

21   involving injury.  That investigation includes the

22   impoundment of vehicles, investigatory search of those

23   vehicles, if the vehicle is to be impounded.

24             In this case where there were two fatalities,

25   there can be no doubt that those vehicles were going to

1     be taken into custody and that those vehicles would

2     receive an investigatory search.

3          In any event, under People versus Mena-Coss,

4     210 AD 2d, 745, 1994, there is authority to search a

5     vehicle pursuant to a DWI arrest.  Trooper Siegler was

6     clear, this defendant was placed under arrest by the

7     New York State Police before the ambulance left that

8     scene.  Investigator Harris indicated that the review

9     of that vehicle occurred as the ambulance left that

10    scene.

11         I would submit that in any event, whether

12    this issue of the exact timing of the arrest falls into

13    place, that the objects within the vehicle are in plain

14    view.  They looked into the vehicle and saw them simply

15    sitting on the ground, in one instance on the driver's

16    side floor of the vehicle, in the other instance on the

17    passenger side floor of the vehicle.

18         People versus Sanders indicates that objects

19    in plain view are not subject to a Mapp Hearing or,

20    rather, to suppression due to Mapp.  That's 143 AD 2d,

21    1065.

22         Specifically, Judge, in vehicular assaults

23    and homicides, the case of Warmuth deals with the

24    external review of a vehicle and looking through the

25    windows of that vehicle, and any objects that are

1        observed are obtainable by the police as a part of

2        their investigation.  Warmuth is at 187 AD 2d, 473, and

3        followed by Jones, 56 AD 2d 142.

4              In sum, Judge, the New York State Police

5        followed the rules in this instance.  The People have

6        gone forth putting forth the legality of the police

7        conduct in this instance, and there is no reason in the

8        facts and from the testimony that would support the

9        suppression of any of the statements, the blood or the

10       property recovered from the defendant's vehicle.

11             Thank you, your Honor.

12             THE COURT:  The Court, having conducted a

13       hearing on this matter, taken testimony and argument of

14       counsel, finds and determines the following:

15             The defendant, Mr. Heidgen, was discovered by

16       the Freeport police department, having been involved in

17       a serious accident involving fatalities on the

18       Meadowbrook Parkway on July 2, 2005, at approximately

19       2:05 in the morning.

20             Pursuant to an investigation, which involved

21       members of the New York State Police, the defendant was

22       arrested at the scene pursuant to probable cause.  The

23       items recovered from the defendant's pick-up were

24       legally obtained by the police and will be permitted to

25       be used by the People on their direct case.  The

1    statements made both at the scene and in the initial

2    stages of the investigation were made pursuant to, as I

3    already indicated, proper investigation and pedigree,

4    and will be permitted.

5          The Court, however, determines that the

6    statement made to Trooper Joseph Zawol between 9:15 and

7    9:30, when the defendant was indisputably in custody,

8    was an interrogation, as contemplated by the statute

9    and cases that follow, and as a result of custodial

10   interrogation.  Those statements of admission or

11   confession will not be permitted by the People on their

12   direct case.

13         As to the issue of the blood being drawn by

14   the members of the police, the question arises as to

15   whether or not the defendant was in a position to give

16   consent or to refuse.

17         While the doctor testified in his opinion

18   that the defendant was conscious and responsive, those

19   conclusions were made in his estimation, given his task

20   of surgically assessing the needs of the defendant.

21   And the ability of the defendant to tolerate medical

22   procedures or comprehend medical procedures is a

23   different and completely distinct standard from that

24   what we use in the law when making a decision whether a

25   defendant is conscious or so disoriented as to make the

People v. Heidgen                    273

1    acquisition of consent unnecessary, which the Court

2    does find in this case.

3            There was no necessity of the police to

4    inquire of the defendant as to whether or not he wanted

5    to give blood or would consent to give blood or would

6    refuse to give blood, as the defendant was so

7    disoriented to make that consent impossible.  The blood

8    was drawn properly, and the results of that blood

9    analysis will be allowed by the People on their direct

10   case.

11           As to the statement given to Investigators

12   Harris and Baez, the Court finds and determines that

13   the defendant was administered his rights pursuant to

14   Miranda, and knowingly freely and intelligently waived

15   those rights to counsel and to keep silent, and gave

16   that statement voluntarily and pursuant to law.  The

17   People will be allowed to use those statements on their

18   direct case.

19           That constitutes the findings and

20   determinations of this Court.  A written decision will

21   follow.

22           This case is sent forthwith to Judge Donnino

23   for trial purposes.

24           As to the statements given to Trooper Zawol,

25   they were involuntarily made and will not be allowed by

People v. Heidgen                                    274

1      the People on their direct case.  However, should the

2      occasion arise on a cross-examination opportunity,

3      should the defendant open the door, the People will be

4      allowed to use those statements if the door is opened.

5                  Thank you.

6                  MR. HAYDEN:  Your Honor, may I approach

7      briefly?

8                  THE COURT:  Yes, sure.

9                  (Off-the-record discussion at bench.)

10                 (End of hearing.)

11                       *         *         *

12

13

14

15

16    CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE
      TRANSCRIPT, ONLY IF AN ORIGINAL, AND ONLY IF CERTIFIED BY
17    THE COURT REPORTER.

18                    _____

19                         Hanni J. Planos, CSR
                            Official Court Reporter

20

21

22

23

24

25

I N D E X

WITNESSES:

|  | DX | CX | RDX | RCX |
|---|---|---|---|---|
| FOR THE PEOPLE: |  |  |  |  |
| P. O. Christopher Pandolfo .......... 3 | 9 | 17 | 18 |
| P. O. Timothy Nolan ................ 24 | 31 |  |  |
| Trooper Patrick Siegler ............ 40 | 52 |  |  |
| Trooper Daniel O'Hare .............. 62 | 78 | 96 | 98 |
| Trooper Joseph Zawol .............. 102 | 109 | 118 |  |
| Investigator Michael W. Harris .... 120 | 142 | 181 | 184 |
| FOR THE DEFENDANT: |  |  |  |  |
| Dr. Raffi Zohrabian ............... 193 | 213 | 233 |  |

E X H I B I T S

|  | ID | EVID |
|---|---|---|
| FOR THE PEOPLE: |  |  |
| 1 - Rights card ................................ 128 |  |
| 1 - Copy of rights card ........................ 129 | 130 |
| FOR THE DEFENDANT: |  |  |
| A - Supporting deposition ........................ 21 |  |
| B - Statement ......................................... 179 |  |

Hanni J. Planos, CSR