1   STATE OF NEW YORK : NASSAU COUNTY
    SUPREME COURT      : PART 33
2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
    THE PEOPLE OF THE STATE OF NEW YORK,
3
                      - against -              : IND: 1910N-05
4
    MARTIN HEIDGEN,                                   SENTENCE
5
                                               : NYSID:  5195576K
6
                              Defendant.
    - - - - - - - - - - - - - - - - - - - - - X
7
                              February 28, 2007
8                             262 old country Road
                              Mineola, New York


10  Before:

11
                THE HONORABLE ALAN L. HONOROF,
12              Acting Supreme Court Justice.

13
    For the People:
14

15              HON. KATHLEEN RICE
                District Attorney - Nassau County
16              BY:  MAUREEN MCCORMICK, ESQ.
                Assistant District Attorney
17

18  For the Defendant:

19
                STEPHEN LAMAGNA, ESQ.
20              GREGORY MARTELLO, ESQ.
                666 old Country Road
21              Garden City, New York   11530

22

23

24
                                    BUFF BRANSON, RPR
25                              Senior Court Reporter

People v. Heidgen

1                THE CLERK:   The following case is on for

2     sentence, the People of the State of New York against

3     Martin Robert Heidgen under Indictment 1910N of 2005.

4                Sir, you are Martin Heidgen?

5                THE DEFENDANT:  I am.

6                THE CLERK:   Appearances for the defendant,

7     please?

8                MR. LAMAGNA:   Stephen LaMagna, 666 old

9     Country Road, Garden City, New York.

10               THE CLERK:   Appearances for the People?

11               MR. HAYDEN:   Robert T. Hayden and Maureen

12     McCormick, your Honor.

13               THE COURT:   Thank you.

14               THE CLERK:   Do the People wish to be heard

15     before sentence is imposed, and do they have any

16     victim impact statements?

17               MS. McCORMICK:  Yes, your Honor, the People

18     do wish to be heard, and the Court and defense

19     counsel have been apprised there are eight members of

20     the victim's family who request to speak before your

21     Honor this morning.

22               THE COURT:   Application is granted.

23               MS. McCORMICK:  May I begin, Judge?

24               THE COURT:   Yes.

25               MS. McCORMICK:  Your Honor, on July 2nd,

People v. Heidgen

2005, the defendant, a 24-year-old man, engaged in
drinking alcohol.  No crime in that, Judge. He was
in Manhattan.  He went to a place called the House of
Blues and he started drinking with friends.

The problem began with Mr. Heidgen's choice
not to stop, not to stop for a period of almost nine
hours.  He stayed at the House of Blues, and how much
he had to drink is the subject of some questions. He
returned to Nassau county, and he continued drinking
until nearly two o'clock in the morning.

It's unknown exactly when he left the party
on Sandra Lane where he had continued his drinking,
but he did leave, and he had been drinking at that
party.  He had been drinking so much, in fact, your
Honor, that in spite of metabolism over nine hours,
at the time his blood was tested after this crash, he
still had in his system a .28 blood alcohol
concentration, .28, three and a half times what is
the established legal limit for driving while
intoxicated.

There was extensive toxicology testimony in
this case that revealed that that .28 was in the area
of the defendant still having, still having in his
system, 14 drinks.

But that's not what makes this crime the

People v. Heidgen

1      crime of murder, the crime of murder for which he was

2      charged, the crime of murder for which he was

3      convicted by a jury, who, in spite of allegations of,

4      after the fact, through the interviews conducted by

5      this office, we learned tried desperately to follow

6      the court's instruction and were diligent in their

7      obligations as citizens, an obligation that should be

       honored.

9              It was clear from the jury's deliberation.

10     It was clear from the notes that they sent that they

11     had immediately gone to the heart of the matter, what

12     was the defendant's state of mind.

13             His state of mind can only be elicited by

14     the facts in this case, Judge, and while I mean no

15     disrespect ever to the people that I serve, I say

16     that this is not a DWI death.  That's not what this

17     case is.

18             This is a case of depravity, and depravity

19     is something different, something more.  The law has

20     made that distinction.  This defendant's depravity

21     can be seen through his actions.

22             He had the opportunity to stay where he was.

23     He was welcome to stay in the home where he was

24     drinking, and having consumed enough alcohol to be a

25     .28, he chose, instead, to get in his car and drive

People v. Heidgen

1   4,375 pounds of steel uncontrolled, in his

2   estimation, although appearing very controlled, down

3   Nassau County streets.

4   Your Honor, I direct the court to the

5   probation report with respect to this one fact alone

6   where the defendant himself states -- he admitted,

    however, that part of not staying at the house that

    he was at was that he did not want to stay there and

9   have to sleep on the floor. He wanted to sleep in

10  his own bed.

11  His claimed rationale, his claimed reason

12  for endangering the lives of everyone who came across

13  his path, and taking the lives of Katie Flynn and

14  Stan Rabinowitz, of destroying the lives of their

15  community, their family, their extended family, is

16  because he wanted to sleep in his own bed after he

17  consumed enough to be a .28.

18  Again, Judge, it's not what makes it the

19  murder per se, because the question is what was going

20  on in the defendant's mind, as per Feingold.

21  .This defendant managed to control, in a

22  deliberate way, operate his motor vehicle without

23  incident for five miles, from the point on Sandra

24  Lane to the point at the Meadowbrook Parkway where he

25  inexplicably, because there's been no testimony about

People v. Heidgen

1    how, he became turned around and going the wrong way.

2         But we do know from the series of witnesses

3    beginning with Elizabeth serwin, Joseph Caruso,

4    Mr. weber, Matthew Sussingham, that over a period of

5    at least 2.9 miles, 2.9 miles, this defendant

6    proceeded in the left lane of the southbound

7    Meadowbrook Parkway going north.

8         He proceeded at highway speeds estimated to

9    be between 60 and 70 miles per hour. He was

10   unwavering.  His operation of that motor vehicle was

11   controlled.  It was deliberate.  He didn't just

12   simply miss a turn and slide off the road because his

13   ability to operate had been.substantially affected by

14   alcohol.  He maintained that road. He maintained

15   that speed.  There was an air of deliberation and of

16   controlling every action this defendant took.

17        Still, having been faced with any number of

18   warnings that he was going the wrong way, that he was

19   being passed by oncoming headlights, people honking

20   at. him, people blinking their lights at him, people

21   veering suddenly out of the way to avoid being killed

22   themselves, still he continued in that deliberate,

23   controlled operation of his motor vehicle.

24        Thirteen thousand feet, more than that,

25   Doctor closson testified about the effects of alcohol

People v. Heidgen

1   on perception reaction time, and that the most it

2   could be extended to was the outrageous time of five
    seconds.

4       This defendant had multiple times, he had

5   every opportunity to proceed to react, to stop, to

6   slow, to get out of the way, and he never took them.

7       That is what makes this case depraved

8   indifference to human life, because, fudge, there are

9   facts about this case and the way they align with the

10  law that need to be discussed. But before we get to

11  those facts, I would like to talk about the defendant

12  himself and what we know of the defendant himself.

13      The court has had access to hundreds of

14  hours of telephone calls from the defendant to any

15  number of parties from the jail. The People have not

16  heard them, but the People wish, nonetheless, that

17  the court consider the content of those

18  conversations, the attitude of the defendant, and

19  what we believe has to be a continued lack of remorse

20  because there has been no remorse expressed in this

21  courtroom or out of it.

22      The People have sent to the court sentencing

23  letters with letters attached, unguarded letters to

24  friends.  we ask the court to consider them. we ask

25  the court to consider the fact that when asked by a

People v. Heidgen

1  friend if he would drink again, he said, yes, but he
might not drive though.

Nowhere in the letters that were provided to
4  the court is there any remorse expressed or concern
5  for the victims.  I think it is fair to state that it
6  is all about the defendant from the defendant.

7  The defendant expresses himself as a victim
8  in this case. He continually blames other people.
9  Tracy sodikoff, his friend, is going to be the reason
10  he has to go to jail, not his own behavior, not the
11  choices he made, not the deliberate way he acted.
12  she's going to be responsible.

13  The victims' families don't like him because
14  they are being lied to by the prosecution. The
15  police are lying. They are conspiring against him.
16  He is the victim in his own mind, but he is only the
17  victim in his own mind, because, in reality, he is
18  nothing, nothing of a victim. He is purely and
19  absolutely the offender.

20  This man who, after this crash, can be
21  questioned and comes up with movie quotes, who is
22  devising a scheme of lies, who claims in his letters
23  to his friend Josh zigman, which was part of this
24  trial, that he knew we couldn't use -- we couldn't
25  use those statements against him because he claimed

People v. Heidgen

1　　he had never received his Miranda warnings.

That begins a pattern of behavior of

3　　believing he can out smart this system, that he's

4　　better than this system that. was betrayed throughout

5　　the course of this trial. This defendant sat in this

6　　courtroom emotionless.  Never did he express the

7　　slightest sign of remorse, even as he listened to

8　　devastated family member after devastated family

9　　member describing scenes that no one should ever have

10　　to view or hold in their hearts as they will for the

11　　rest of their lives.

12　　　　　　　No, Judge, this man, after causing this

13　　crash, was in the hospital being questioned by

14　　Investigator Harris, and he said, I thought I was

15　　talking myself out of a DWI.  He's protecting

16　　himself.  He thinks he is going to protect his

17　　friends from whatever repercussions, but he's not

18　　claiming to know that he has seriously injured or

19　　killed people in another car.

20　　　　　　　As I said during summation, and I will say

21　　again, protect them from what? Protect them from his

22　　own crash, if he had not seriously injured or killed

23　　people?  I submit to this Court that the series of

24　　statements by this defendant back and forth render

25　　him incredible.

People v. Heidgen

1    He claims in letters to friends that he
2    blacked out while driving, and, yet, in his probation
3    report, there are very clear and vivid imagines that
4    he recalls about operating his motor vehicle that
5    night.  He suddenly remembers, Judge, that he
6    believes he tried to slow down just before the crash,
7    because that's just as the alcohol hit him, that .28.
8    suddenly things got very wrong.

9    Now, for the first time, he recalls a car
10   passing him on the right and thought it was strange,
11   but none of his letters say that, none of his
12   statements to the police said that.  Now he says he
13   tried to slow down.

14   In that probation report, Judge, it is
15   astonishing how he focuses on himself, but along the
16   lines of his persistent behavior of trying to beat
17   this system, the court is aware of the behavior of
18   this defendant as it relates to a DNA -- court
19   ordered DNA test.

20   The only emotion ever expressed by this
21   defendant was in court the day that your Honor
22   suppressed the blood test, the blood and the blood
23   test results.  That was the only time the defendant
24   was seen slightly weeping for joy.

25   But when the court ordered that the

People v. Heidgen

1  defendant submit to a DNA test, instead, this

defendant made every attempt to thwart that DNA test,

3  and testimony was provided to your Honor by

4  Mr. Buffalino from the DNA lab that instead of it

5  being a sample, there was additional, a second

6  sample, a majority sample that belonged to another

7  person who turned out to be an inmate with the

8  defendant.

9  MR. LAMAGNA:  Judge, I object to that line

10  of statements for the purposes of this hearing. That

11  is not part of the record.

12  THE COURT:  It was not part of the record,

13  but it is a part of what I am taking into

14  consideration.  I am not limited to the record in my

15  determination today.  overruled.

16  MS. MCCORMICK:  Part of what needs to be

17  considered in that fact, Judge, is that as the

18  defendant was taken from his cell and brought down

19  for the buccal swab testing, surrounded by officers

20  to make observations and. make sure that everything

21  went well, he smugly turned to Trooper Harris and

22  said, I'm watching you guys.

23  The clear implication is that he was trying

24  to beat them again, first by believing that he could

25  get around the statement by his claim that Miranda

-People v.Heidgen

1  wasn't given to him, and, now, again, by thwarting
2  the test.

3  Your Honor, in the defendant's probation
4  report it has to be noted that the defendant feels
5  that he has -- the way he has been portrayed in the
6  media is hurtful. His concern, again, goes to
7  himself.

8  There are other items that must be
9  considered by this court in terms of the defendant's
10  character.  while it is true and it is reported in
11  the defendant's probation report that he had been
12  stopped for suspicion of driving while intoxicated
13  and was acquitted, he was found not guilty in a bench
14  trial, the police report relating to that incident
15  indicates that he had the smell of alcoholic
16  beverage --

17  MR. LAMAGNA:  objection, your Honor.
18  THE COURT:  Sustained.

19  MS. McCORMICK:  Your Honor, the defendant on
20  a prior occasion was given the opportunity to take a
21  breath test and refused that opportunity resulting in
22  the suspension of his license --

23  MR. LAMAGNA:  Objection.
24  MS. McCORMICK:  -- in Arkansas.
25  THE COURT:  Overruled.

People v.Heidgen

1       MS. McCORMICK:  The defendant, in saying
2    that he is offended by the portrayal of him in the
3    media states:  They don't know me. Heidgen stated
4    that his character is immutable and maintained that
5    one foolish or reckless or negligent act doesn't
6    define me.

7       He concludes his statement, unbelievably,
8    with a statement that somehow, he hopes that somehow
9    he can live with the fact he is responsible for the
10   death of these two people, which he finally mentions,
11   and he says that somehow, his final words, I can
12   smile again like I used to.

13      Your Honor, he has robbed the smiles, he has
14   robbed the life, not just of the two people he
15   killed, but of countless others who are affected by
16   their deaths, and still his final thoughts are that
17   he be able to smile again.

18      There is a distinction in the law, your
19   Honor, between a person who is depraved and a person
20   who is reckless or -- I hesitate to say the words
21   simply reckless because I always worry that that will
22 . somehow minimize to the victims of reckless criminals
23   the acts of their crimes.

24      This defendant starts with being reckless,
25   but he elevates his own activity to depravity. There

People v. Heidgen

1    is a distinction in the same way between the words

2    accident, which were used frequently throughout this

3    trial, and a preventable crime.

4         The word accident could consume anything

5    from a child knocking over a glass of milk to

6    something as horrific as this where the results,

7    though unintended,. were absolutely avoidable and

8    preventable.

9         There is a distinction in the law, Judge,

10   between the definition of intoxication provided by

11   People v. Cruz which says that the driver has

12   voluntarily consumed alcohol to the extent that he is

13   incapable of employing the physical and mental

14   ability he is expected to possess in order to operate

15   a vehicle as a reasonable and prudent driver.

16        A reasonable and prudent driver is something

17   substantially different than a person who has

18   intentionally blinded themselves, who has effectively

19   put a blindfold on and chosen to get behind the wheel

20   of a four thousand pound missile through our streets.

21        There are only two ways to interpret the

22   facts before your Honor.  This defendant was aware of

23   where he was. This defendant, in the state that he

24   was in, for the evidence that your Honor heard about

25   the condition of his life, and the fact that he left

People v. Heidgen

that party without saying good-bye to anyone, found himself, whether intentionally or otherwise, going the wrong way and simply said, tough, I'm going for it.

Everything about his behavior indicates that he was operating that car in a deliberate and controlled manner, and if that's what he did, and only he knows what he did, if that's what his mind set was at that moment, that can be considered nothing but depraved, and I would submit everything about these facts and the way he operated that car says that's exactly what he did. He was one exit away from the one he had to take to get home, and he was just going for it.

But, fudge, for argument's sake, if this defendant had actually, as claimed originally in the black-out contention, if he rendered himself, not substantially affected in his ability to operate a motor vehicle, but blind, selectivity blind -- and it has to be selectivity blind because he manages to maintain the curves of the roadway, maintained his speed.  He doesn't slide off. If he has truly blinded himself with alcohol, if he has truly rendered himself oblivious, he could not have maintained this road the way he did.

People v. Heidgen

But, if he had, if that's the contention,
blinding yourself, not drinking to the point of
intoxication, not being .09 or a ten, and not taking
the turn properly, turning wide, maybe striking
another car, if you have rendered yourself in a
position that you can actually travel three miles the
wrong way and not be aware of it, and you,
nonetheless, got in your car and tried to drive home,
that too is an utter disregard for human life. It is
depraved.

The jury, in its wisdom, found so. The
jury, in its wisdom considered, all of these facts
for five days.

This is a result oriented crime, Judge.
Because the defendant did not target particular
victims, the randomness of his victims is one of the
things that plays into how he should be sentenced.
When he put into motion these depraved -- the
depraved mind and the acts that resulted in these
horrific deaths and injuries, he had no idea how many
people could suffer as a result of his behavior.

The very breadth of the risk that he took is
something that has to be considered by this Court,
because the fact of the matter is that had the
defendant been able to have been stopped prior to the

People v. Heidgen

1    crash occurring, these same actions committed by the

2    defendant would have resulted in a charge of reckless

3    endangerment.

4        It is the fact that he killed these people

5    that elevates this case to murder. It is the result

6    that not only changes the charge, but the results

7    themselves must be considered in effecting a fair

8    sentence for this defendant, and his results are

9    unspeakable.

10       His results caused a mother to hold her

11   child's head in her hands.  His results caused the

12   death of Stanley Rabinowitz.

13       The irony in this should not be lost on

14   anyone.  Stanley Rabinowitz was a man who drove a

15   limousine and volunteered his time to see that drunk

16   drivers got home free of charge. Stanley Rabinowitz

17   was a man who was operating a limousine from a

18   wedding in which the Flynns and the Tagneys went from

19   the most beautiful day, the most celebratory day in

20   their lives.

21       The court has seen the photographs from that

22   day.  The Court observed for itself, as did all of

23   the other jurors, that in the back of the limousine,

24   the shells that the children collected and are

25   pictured in the photographs given to the court, are

People v. Heidgen

1   still in the back of that limousine. The Court

2   observed Mr. Rabinowitz's eye glasses are still

3   embedded in the windshield of that limousine.

4           The Flynns and the Tagneys did everything

5   right.   They attended a wedding. They celebrated

6   with their family. They have beautiful family

7   photographs.   What should have been perfect memories

8   of a perfect day were destroyed after they acquired a

9   limousine so as not to take any risks of being tired

10  or having consumed any alcohol.

11          They were doing everything right, and this

12  defendant who did everything wrong, everything wrong,

13  stole from them the most precious things in their

14  lives, and they will never be the same. The concept

15  that time heals all wounds is a lie, and it cannot be

16  said to these families.

17          Judge, I need to point out, from the

18  probation report, the astute observations of the

19  probation officer who says that one sentence,

20  however, that any limited expressions of remorse from

21  the defendant may be more about regret for his own

22  life which is in ruins than a heart felt reflection

23  of remorse for the victims' losses.

24          The victims' losses are the results of this

25  crime.   The victims' losses, and the fact that two

People v. Heidgen

1     lives were taken, three lives' physical health

2     destroyed, and countless others' emotional health.

3     Judge, it has to be pointed out that the

4     entire Flynn family were coming home from that

5     wedding down that route, down the Meadowbrook. The

      first person who responded to that crash was the

7     victim's great uncle. He saw his brother, that young

      child's cousin, Gracie and Katie's cousin, arrived on

9     that scene to see that family decimated after just

10    having celebrated with them.

11    This charge, because it does not specify its

12    victims, must also include an assessment of the

13    results, and, at this time, your Honor, the People

14    who can convey those results better than I will ever

15    be able to are the victims' families, and I ask them

16    to come and make their statements, but only after we

17    beg the court that justice demands, for the character

18    of this defendant, for his behavior, for his lack of

19    remorse, for the fact that he still doesn't get it,

20    for the damage he's done and the extreme nature of

21    his depravity, that this defendant be sentenced to 25

22    years to life.

23    At this time, your Honor, the People would

24    ask that Nolan Rabinowitz come up.

25    MR. N. RABINOWITZ: Thank you, your Honor,

People v. Heidgen

1    for your understanding, your patience, and your

2    attention.

3              My name is Nolan Rabinowitz. I'm Stanley

4    Rabinowitz' youngest son.

               My father was 59 years --

6              THE COURT:   Take your time, Mr. Rabinowitz.

7              MS. MCCORMICK:   With the court's permission,

8    may I stand with the victim?

9              THE COURT:   Yes.

10             MS. MCCORMICK:   Thank you.

11             MR. N. RABINOWITZ: My father was 59 years

12   old when he was killed, just at the age of

13   retirement, and just a short time after getting

14   married.

15             He was taken away from me way before his

16   time.   He wasn't here for me during my sudden divorce

17   this year when I really needed him.  He won't be here

18   for my next wedding.

19             My future children will never have the

20   pleasure of knowing firsthand their grandfather's

21   smile or gentle ways. Now they will only know my

22   father through stories, like past presidents in

23   history books. Like tragic history-book stories,

24   they will know that he was killed on July the 2nd,

25   2005, and they will know about this trial.

People v. Heidgen

1    Another way my children will know their

grandfather is in the way in which I will raise them,

3    my father as my guide.

4    When my son is eight years old and he is

5    interested in helping me build a shed, I will teach

6    him everything I know about shed billing and give him

7    a piece of wood and a nail.

8    When my son is twelve years old, when that

9    shed project has now turned into a three-tiered deck

10   with support for a hot tub, I'll show him how and why

11   I designed it the way I did, and we'll build it side

12   by side, because I know that, if he is as interested

13   in it as I was, he will remember every detail about

14   the project down to how many post holes we dug and

15   how much concrete is used to support each post.

16   I'll be the type of father that hands my son

17   the power tools and, after a little instruction,

18   says, here, now it's your turn.

19   Every year I'll make sure to plan a family

20   vacation and expose my son to sites like the giant

21   sequoia trees in California and the alligators in the

22   Everglades.

23   When my son is thirteen years old, I'll be a

24   the father who not only agrees to but offers to take

25   my son and his friends to the roller rink every week,

People v. Heidgen

1   because maybe this Friday night will be the night

2   when he gets the opportunity to skate holding hands

3   with the cutest girl in his class.

4           I will be the father that would either

5   prefer to pick him up, no matter how late, to insure

6   that he and his friends get home safely, and driving

7   will never be an issue.

8           When my son is fifteen years old, no matter

9   how embarrassing the situation may be,  I'll try to

10  understand the influences he may be under and

11  seriously ask him if protection is needed for his new

12  girlfriend.

13          I will ask him this because I love him and I

14  want to protect him and I want the best for his

15  future and not because I think he will remember this

16  conversation for the rest of his life.

17          This is the best that I can do, and because

18  of the actions of one person, two innocent peoples'

19  lives have been killed, and countless lives have been

20  horribly and unforgivably impacted.  The convicted

21  individual that caused this deserves no less than the

22  maximum time away from society.

23          Your Honor, thank you very much for

24  listening and understanding.

25          THE COURT:  You are welcome.

People v. Heidgen

1    MS. MCCORMICK:  Your Honor, at this time the

2    mother of Mr. Rabinowitz's children, Joyce

3    Rabinowitz, would like to make a statement.

4         MRS. J. RABINOWITZ: Judge Honorof, I want

     you to know that Stanley Rabinowitz was a good man.

6    I don't say those words without facts to back them

7    up.  He only spoke well of someone or he didn't say

8    anything at all.

9         Stan was always there to lend a helping hand

10   to anyone, a neighbor, a stranger, a friend, his

11   sons, me.

12        Stan worked his entire life from the time he

13   was just a boy. He deserved a chance to live to a

14   ripe old age and enjoy the fruits of his labor. He

15   deserved the right he had to walk down the aisle at

16   the wedding of his son, Keith, which was last August

17   when he married Bonnie as planned.

18        He deserved the right he had to meet and

19   play with his grandchildren, to enjoy his new

20   marriage, to collect social security, and to

21   ultimately retire.

22        Some people may say what impact could Stan's

23   death have on me. After all, we were divorced for a

24   number of years. Was he a part of my life? But the

25   truth of the matter is, he has always been a part of

People v. Heidgen

1   my life. we were going steady when I was fourteen

2   years old.  He was at my junior high school

3   graduation.  The week before he was killed, we sat

4   together at our son's engagement party. we hugged

5   each other each time we saw one another. we cared

6   about each other.  I always wanted stan to be happy,

7   whether we were married or not.

8           with Stan gone, there is a void in my sons'

9   lives that I try my best to fill, but I know I can't.

10  I am not stan.  I am not their father.

11          Since losing stan, my family has cried a

12  million tears.  we have had sleepless nights and we

13  have suffered beyond comprehension.  I personally

14  have had anxiety problems driving on the highway, and

15  each day as I go to work, I relive Stan's last

16  moments remembering the video again and again.

17          I refuse to go out in any situations where I

18  would have to drive home after midnight since that is

19  usually a time when drunk drivers are on the road.  I

20  have had flair ups with skin disorders and

21  nervousness as a result of the defendant and the

22  trial that he has put us through.

23          My children comment to me that I worry about

24  everything, and I guess that has become a reality for

25  me.  I have had stomach disorders, probably because I

People v. Heidgen

now realize that people like this defendant can be so
callous and show no remorse for their actions even
when their actions cause death.

Even his family members are so self-centered
that they care nothing for the victims here. They
have made statements to the press that this defendant
is a scape goat and a victim of a political plot
against him.  It is just unbelievable that people can
be that cruel.

My feelings and anguish also encompass the
suffering of the Flynn and Tangney family. Hearing
the testimony at trial and the descriptions of their
injuries and the operations they have endured resound
in my head often.  I cry for them and their loss of
that beautiful child, Katie.  Many tears have been
shed by my family for their suffering.

I respectfully request that your Honor make
the proper and warranted decision in this matter.
Martin Heidgen did heinous crimes against the people
of this state and against my family and the Flynn and
Tangney family.

He knew exactly what he was doing. He did
it purposefully.  He proved the kind of man he is
that day, as he did in court when he was ordered to
have a DNA test done.

People v. Heidgen

1    Your Honor advised the defendant's attorney

2    that his client came to court with dirty hands, but

3    the defendant actually showed us his dirty mouth and

4    deviousness and untrustworthiness.  Martin Heidgen

5    deserves the maximum sentence of 25 years to life in

6    prison.

7    unfortunately, we cannot bring Stanley and

8    Katie back to us, but we can prevent him from doing

9    this again to others. we must protect the public

10   from this unremorseful and dangerous man.  Thank you.

11   THE COURT:  You are welcome.

12   MS. MCCORMICK:  Your Honor, Keith Rabinowitz

13   would like to speak now, his first son.

14   I have been corrected, his second son.

15   MR. K. RABINOWITZ:  Your Honor, my father

16   was a very honest and decent man. His friends loved

17   him for the person he was, not for what he had or

18   owned.

19   He was the type of person who his friends

20   and family could always count on. His opinion on any

21   matter was always held i.n the utmost regard by all of

22.  his friends and family. He would say, if you don't

23   have anything good to say, don't say anything at all.

24   My father was only thirteen when he lost his

25   father to Parkinson disease. He quickly became the

People V. Heidgen

1    man of the house, working to help support the

2    household.  He learned responsibility at a very young

3    age, and he did anything and everything he could to

4    better himself and his family.

5         He was a very sensible, wise and level

6    headed, safety minded and cautious person. when we

7    would go out on the boat, he would have everybody sit

8    still and listen to him giving the rules of the boat,

9    what to do and not to do, and made sure everyone

10   understood them.  He knew it was his responsibility

11   to protect his passengers and guests, which he always

12   took very seriously.  He genuinely cared about people

13   and would help anyone in need to the best of his

14   ability.

15        My father took pride in everything he did

16   and gave a hundred -- a hundred and ten percent in

17   all that he did and taught me and my brother to do

18   the same.

19        when he had a pick up to do when he was

20   driving, he took a little extra time to make sure

21   that everything went right. He would put a smile on

22   his face to make people feel good.

23        The night of the crash some of the other

24   drivers were arguing about the trip to Long Beach,

25   and it was him who came forward and who volunteered

People V. Heidgen

1    to drive, maybe not because he wanted to, but because

2    it was the right thing to do.

3           My father really was my best friend. He was

4    the first person I would call to talk to about

      anything, good or bad, and I held his opinion in the

6    highest regard.

7           when he was married to Rita in October of

8    '04, I was honored and happy to sign his marriage

:9    certificate because I knew it would make him happy,

10    and making him happy was the most important thing to

11    me.

12          when I met Bonnie, my dad was the first

13    person I called.  I said, Dad, I think I met the one.

14    My father's relationship with Bonnie grew very strong

15    and they came to love and respect each other  very

16    much.   They got along very well, sometimes talking on

17    the phone for hours. He was always welcome over at

18    our house, and we always encouraged him to stop by

19    any time.

20          when it was time for me to propose to

21    Bonnie, my father and I planned out the surprise

22    together.   I told him how honored I was that he was

23    part of the surprise, and we both felt very good

24    about that.   He was very happy.  I told him we wanted

25    to have kids and start our family and that one of the

People v. Heidgen

1    reasons for this was to give him grandchildren. He

2    was very excited that she would be part of our

3    family, the future for us, grandchildren, and his

4    future.

5        My father always told me to watch out for

6    the other guy and be careful on the road between

7    1:00 a.m. and the morning. My father was a guy who

8    would give someone who had been drinking too much a

9    ride home for free.

10       Martin Heidgen never showed any remorse

11   toward me or my family at any time through this trial

12   or at any time. He seems to think that he is the

13   victim in this, and he has refused to take

14   responsibility for his actions.

15       Anyone playing chicken on the wrong side of

16   the road without care of anyone's life, including

17   their own, doesn't deserve to live.  I can't even

18   fathom that someone who has seen so much pain and

19   horror seems not to even care about any of the pain

20   they caused.

21       Unfortunately, our state does not believe in

22   the death penalty in this case, and we are forced to

23   concur with the sentence imposed on him by you. That

24   is why I ask of you to impose the maximum sentence

25   allowable by law.  Thank you.

## People v. Heidgen

1       THE COURT:  You are welcome.

2       MS. McCORMICK:  Your Honor, the next victim

3   to speak is Rita Rabinowitz, Stanley Rabinowitz' new

4   wife.  They had not yet had their first anniversary.

5       MRS. R. RABINOWITZ: Martin Heidgen, due to

6   your selfishness and wanton lack of concern for human

7   life, you took the life of Stanley Rabinowitz and

8   Katie Flynn.  Katie hadn't begun to live yet, and

9   Stan, who was so full of life, had his cut short by

10  your senseless act of murder.

11      Stan Rabinowitz was a strong man, yet gentle

12  and tender.  People were drawn to him because of his

13  personality, crazy sense of humor, honesty, kindness

14  and wisdom.  He was a wonderful husband, father,

15  grandfather and friend.  He had a big heart and loved

16  easily.

17      He was my oasis in the desert, my bright and

18  shining star, and he taught me to love again.  *we*

19  loved our life together and had wonderful plans for

20  the future.  All that was ripped away from us by you

21  on July 2nd, 2005, in the early hours of the morning.

22      we had only been married for nine months.

23  There is a hole in my heart that will never be

24  filled.  You killed my soul mate, best friend and the

25  love of my life. Stan was truly my gift.

People v. Heidgen

1           Your Honor, I respectfully request that you

sentence martin Heidgen to the maximum that the law

3    allows.  Twenty-five years to life will never bring

4    Stan back to me, but martin Heidgen will be in a

5    place where he cannot kill anyone else while driving

6    drunk or break hearts ever again. Thank you.

7           THE COURT:  You are welcome.

8           MS. MCCORMICK:  Your Honor, before I

9    introduce the members of the Flynn family, I will ask

10   the Court to bear in mind, in consideration of

11   sentencing, the eight-inch binder of letters and

12   petitions and photographs that have been submitted by

13   the Flynn family as well as the number of letters

14   from the Rabinowitz family and friends.

15          Your Honor, at this time, the first speaker

16   from the Flynn and Tangney families will be

17   Christopher Tangney.

18          THE COURT:  Mr. Tangney, will you be able to

19   stand for this, or would you like to sit down?

20          MR. C. TANGNEY:  No, I'm fine. Thank you.

21          Your Honor, thank you for this opportunity

22   to address the court.

23          Thank you, Maureen and Bob, for your

24   compassion and help on this trial.

25          My family has suffered irreparable damage

People v. Heidgen

1   inflicted by martin Heidgen. Everything that has

2   happened, Stanley's death, Katie's death, Neil's

3   injuries, henna's injuries, Denise 's injuries,

4   Gracie's injuries and my injuries, were all set in

5   motion by the choice that evil Marty made.

    Martin Heidgen, like Charles Manson, has

7   lured Stevie and Greg to believe he is the victim.

8   He is not.  I am.  My family is. we, as a people, as

9   a society, are. We are the victims, not just my

10  family, the Rabinowitzes, but all of us. We, as a

11  people, have a right to be safe and comfortable when

12  moving about on the roadways.

13  During this trial Stevie and Greg have

14  distorted the facts and outright lied. They have

15  portrayed evil Marty as a victim. He is anything

16  but.  He has lied to the police. He has lied to his

17  friends.  He has lied to his family. He was caught

18  polluting court directed tests. He has tampered with

19  evidence to the degree of taking another man in his

20  mouth to foil a court ordered DNA test.

21  Stevie, in his opening statement, said that

22  Marty was innocent but should pay for his crimes. At

23  no time has the defense team come forward with a

24  plea.  They have gone out of their way to delay,

    confuse and lengthen this trial and confuse the jury.

People V. Heidgen

1   The conduct of the defense team was

2   appalling. Stevie's incessant clicking of his pen

3   while miss McCormick was on direct, his animated

4   gestures and arm waiving in the presence of the jury

5   while miss McCormick's and Mr. Hayden's backs were

6   turned, these acts were childlike and unprofessional.

7   Denise was on the stand giving testimony a

8   short time when Greg accused her of -- and the

9   charges -- of being politically motivated, inferring

10   that the charges were not warranted.

11   Greg inferred the charges were some campaign

12   agenda of Kathleen Rice when, in fact, he knew the

13   indictment and charges were at the direction of then

14   DA Denis Dillon. This was another deception.

15   My family, the Rabinowitzes, society, we all

16   deserve justice.  I mean, we are the victims here.

17   we did nothing wrong.

18   Your Honor, as a judge, you look at the

19   reports, the clinical police, medical records of

.20   events.  You impose a sentence on the jury's verdict.

21   .when you impose that sentence, you are to be

22   impartial.

23   when you look at us, you don't see or hear

24   my wife whimpering every night in her sleep from the

25   pain, and you don't see the lack of Neil's, Denise's,

People v. Heidgen

1    and my ability to move, to get dressed in the

2    morning, our limited abilities caused by evil Marty.

3    You don't see an athlete, a 37-year-old father,

4    unable to pick up his children. He can't chase after

5    them, wrestle or roughhouse with them. This is a two

6    year old, a four year old, and a six year old who

7    should not have been robbed of a father's

8    roughhousing.

9    You don't see Lisa, a newlywed, apologizing

10    to me hundreds of times over the past year for having

11    a wedding so far away. She did nothing wrong to

12    deserve this guilt. She got married.

13    You don't see Denise, Jenna and me cry every

14    day.

15    You did not see me avoid Neil for over a

16    year, not talk to him, not get caught alone in a room

17    with him, for fear I would look at him, because he

18    looked so much like Katie.

19    You don't see a family that at one time

20    spent every holiday, vacation and weekend together.

21    Now, one of us, conspicuously and purposely, stays

22    away for fear that we are moving along without Katie.

23    Your Honor, I don't know how you look at the

24    reports, the various paperwork, the verdict and

25    impose a sentence devoid of emotion, especially with

People v. Heidgen

1    us sitting right in front of you and in your face a

2    family demanding justice.  It is not only us that

3    needs justice and protection but society as well.

4            when you look at us, we are nothing special.

5    we are everybody. we are the guys in the white hats,

6    just an average family returning home from a wedding.

7            Your Honor, you must protect us from the

8    evil Martys who choose to act without regard to the

9    rules and the laws of society.

10           Evil Marty chose to drive drunk that night.

11   He knew what he was doing. He entered into a course

12   of conduct that proves he knew exactly what he was

13   doing.  He specifically snuck away from his friends

14   without saying good-bye because he knew they would

15   provide a place for him to stay. He knew that his

16   condition -- that in his condition they would

17   intervene and he didn't want the hassle. He chose to

18   leave.  He chose to drive and he knew his condition.

19           He chose to drive, and as he drove, he

20   decided to self-destruct.  I don't know exactly when

21   he chose.-to kill.  I do know it was decided around

22   2:00 a.m. on July 2nd, 2005, in the vicinity of the

23   toll plaza on the Meadowbrook Parkway, because that's

24   when an evil Marty decided to kill and kill he did.

25           His first attempt failed when he tried to

People v. Heidgen

1   crash into Elizabeth serwin forcing her to the

2   shoulder.   she evaded and lived.

3          His second attempt further north on the

4   Meadowbrook Parkway, while more aggressive, also

5   failed when he tried to crash into Mr. Caruso.

6   Mr. Caruso had to veer across two lanes on to the

    shoulder to avoid being killed.

8          Further north near the Babylon Turnpike, on

9   the third attempt to kill, he was successful.   I am

10  the victim of that crash.   I am also an eye witness.

11  I witnessed Marty track us. when he changed lanes --

12  when we changed lanes, he changed.   I watched him aim

13  at us.   I watched him turn into us at full speed.

14         Mr. Rabinowitz tried to evade the on coming

15  onslaught.   I watched evil Marty crash into us.   I

16. watched his truck climb up over the hood of the limo,

17  and I watched as Marty killed and maimed. Your

18  Honor, I watched Marty aim at us with intent and

19  purpose.

.20        Your Honor, you must protect us and you must

21  extract justice for what has happened. The only

22  justice warranted for this evil, evil piece of shit,

23  is that he gets 25 years to life.   I seek justice for

24  the acts of Marty Heidgen. Only the maximum is

25  dictated.   Thank you.

People v. Heidgen

1        THE COURT:   Before you ask your next victim

2   to speak,  I am going to. adjourn these proceedings for

3   about ten minutes.

4        (whereupon, a brief recess was taken.)

5        THE COURT:   Miss McCormick?

6        MS. MCCORMICK:   Your Honor, in listening to

7   Christopher Tangney's statement, before I bring in

8   Denise Tangney, I realized that I neglected to bring

9   something to the court's attention that I think bears

10  on this sentencing.

11       The court is aware that there had been

12  statements made by one of the defendant's friends,

13  Tracy sodikoff, that the week before this incident

14  the defendant had become intoxicated and had left the

15  party, again, without saying good-bye to anybody,

16  what she believed was an attempt to evade having his

17  keys taken, because, according to all of those

18  friends, it was their practice not to drive, to take

19  the keys and remain where they were.

20       Your Honor is aware that miss sodikoff made

21  a statement that she confronted the defendant just

22  one week earlier about never doing that again and was

23  given assurances by the defendant that it was a

24  one-time event, an anxiety attack, and that that

25  prompted belief of the proximity of that behavior.

People v. Heidgen

1       The promises elicited, the fact that he was

2    directly told that it was unacceptable and now the

3    proximity to this event is something that I think the

4    Court should bear in mind in sentencing.

5       I apologize for leaving that out initially.

6    Mr. Tangney's statement, since he referred to it, I

7    thought it needed some clarification.

8       Denise Tangney was a victim and is the

9    grandmother of Katie and she is the next speaker,

10   your Honor.

11       THE COURT:   would you like to sit down.

12       MRS. D. TANGNEY: No. Thank you.

13       Judge Honorof, thank you for the opportunity

14   to address this Court.

15       THE COURT:   You are welcome.

16       MRS. D. TANGNEY:   I heard your admonitions

17   to the jury. You told them to be impartial. You

18   told them to stick to the evidence. You told them to

19   separate the facts from sympathetic emotion, and

20   almost as impossible as that is to do now, I'm

21   attempting to address you today from that

22   perspective.

23       I have tried to compartmentalize our deep

24   scars, our catastrophic losses of our physical and

25   spiritual and our emotional beings, our entire family

People v. Heidgen

1       unit.  i have tried to put that aside for the brief

2       opportunity to speak to you and come to it from a

3       different perspective.

4                   In your decision today, I ask you to

5       consider why there's-so much media here today. why?

6       why?

7                   In determining the sentence for this

8       depraved human being, I ask you to consider why our

9       circumstances, our story, this case, why has it

10      touched so many across the united States, and I've

11      gotten letters from overseas. why is that?

12                  In my bed for a year and a half, unable to

13      do anything but sit and read and think and pray, I

14      have pondered why you open the paper and every day

15      there's somebody's tragedy in there.  Why has our

16      case resonated with so many? why is that?

17                  I believe it's because this depraved

18      individual violated everything that represents right

19      and good.  This depraved individual violated a

20      family, our family. He violated loving,

21      interdependence, loving, mutual support, violated

22      loving, customs, joy, loving, responsibility.

23                  we did everything right that night, and we

24      had every right as citizens to expect to travel on a

25      public highway and expect to tuck in four children in

People v. Heidgen

1      bed that night.

2            why are they here? why is the media here?

3      Because we are everybody.  We are every man. our

4      face is everybody's face. We are every mother. we

5      are every father.  we are every grandparent. we are

6      every family.

7            Interdependence, mutual support, customs,

8      joy, responsibility, doesn't that describe the tenant

9      of a healthy society? Aren't laws meant to protect

10     the very fabric of a civilized society? Isn't that

11     why we are here today? Isn't that why you and

12     everybody else that works in this building gets up in

13     the morning?

14           It's 2007 but the premises is primal to me.

15     society has rules. It has rules to protect it's

16     integrity, and, since the age of the caveman, if an

17     individual violated the integrity of the group, they

18     were shunned and they are were ostracized.  why?  *To*

19     protect the group, and living in this group and

20     reaping the benefits of this group demands

21     responsibility.

22           in this day and age, you want to abandon

23     your kids, you want to shave your head, you just go

24     to rehab.  You extort money, forfeit public trust,

25     you say you are sorry and then you go to rehab.

People v. Heidgen

1      Today, your Honor, your decision has the

opportunity to tell this depraved individual, and

3      those who are like him, that this court will not

4      tolerate a laisez-faire attitude towards social

5      responsibility.

6      This pathetic, depraved individual chose to

7      live outside the boundaries of social and lawful

8      conduct.  My family and the Rabinowitz' family are

the victims of that choice.

10      My comments today are addressed to you and

11      to lady justice who is blind to all the emotions and

12      everything except for the facts, and the fact is that

13      Neil, Chris and $I$ were brutally assaulted.  The fact

14      is that we lost our Kate to murder.

15      In the midst of this whole time, we can't

16      lose sight that we have lost our little girl. She's

17      not a cause. she's not a social agenda. she's our

18      baby and the light of our life. she's the glue that

19      keeps our family family. she is pure joy, and we are

20      poorer for her absence.

21      Jenna and Neil will parentdifferently.

22      Neil will practice law differently.  They will

23      interact with the world around them differently void

24      of her absence.

25      Her sister and her brother are going to grow

People V. Heidgen

1  up differently, void of her loving influence. Her

2  friends, her school, Long Beach, anyone and any

3  person that she was supposed to touch in her life are

4  poorer for her absence.

5  This depraved individual is responsible for

6  that.  This depraved individual must take

7  responsibility for the way he chose to live his life.

8  This court has the responsibility to demand

9  responsibility from this person and from its

10  citizens.

11  Judge, I request the maximum sentence for

12  each count charged against him, three assaults and

13  two murders.  Thank you.

14  THE COURT:  You are welcome.

15  MS. McCORMICK:  The next speaker is Jennifer

16  Flynn.

17  MRS. FLYNN:  I loathed standing before you

18  today knowing that I am expected to sum up the impact

19  of the crash in a statement. It cannot be done, but

20  I stand before you because no one should live like I

21  do.

22  I am here for Grace, Eamon, Colm, for my

23  family, friends, neighbors and for the thousands of

24  people that have been extraordinarily kind to us. It

25  is courage that brings me here, not revenge, because

People v. Heidgen

it's the right thing to do.

2           we, as a society, have allowed drunk driving

3        to continue.  Katie didn't die from cancer, cystic

4        fibrosis or some other terrible disease which compels

          us to send money to a foundation praying that

6        scientists will cure.  we donate all we can afford.

7        we raise funds. we pray and hope that someone will

8        come up with a cure. Everyone agrees that these

9        scourges needs to be eradicated.

10        Drunk driving exists because we allow it to.

11       with drunk driving, you can't just write a check and

12       hope for the best. It requires us to look at how we

13       have been tolerating drunk driving with insufficient

14       jail time, inadequate charges and ridiculous

15       self-improvement classes.

16       why do we accept laws that are written *in*

17       such a way that law enforcement must prove someone's

18       state of mind?  I have the blood, the confession, the

19       witnesses, the videotape and the unrepentant

-20      sociopath driver.

21       People actually said to me that if he was

22       not convicted of murder, at least he'll get

23       manslaughter and some jail time.  why would *I* accept

24       that?  why do we accept that?

25       Kate was murdered needlessly by a deliberate

People V. Heidgen

1    act.  Drunk driving could be dramatically reduced

2    tomorrow if we changed our mind set and punished

3    drunk drivers.  It's easy to give jail time. It's

4    easy to stick someone in a program, but it doesn't

5    work.

6         I wish that I had the opportunity to spend

7    Thursday nights in a class somewhere.  I wish I had

8    the opportunity to pay a fine.  I wish I could spend

9    ten years in jail. By ten years worth of calendars,

10   I would cross every day off, and, at the end,  I would

11   get my life back. But my tomorrow will never get

12   better ever.

13        Drunk driving continues because people

14   aren't afraid not to. Punishments are not that big

15   of a deal. They are not severe enough because

16   society doesn't view it as the crime it should which

17   brings me to the trial.

18        why do we accept it when the New York Times

19   reports that this is a drunk driving bungle, bungle?

20   Bungle is the word they actually used. Bungle is a'

21   term you should use if you drop a bag of chips or, at

22   worst, roll through a stop sign.

23        Katie's head was severed from her body. The

24   entire front end was embedded in Stanley Rabinowitz.

25   To clean it up and water it down so it's more

People v. Heidgen

1   palatable for the papers and the news, the jury and

2   the defendant is wrong.

3        setting aside how insulting that is to Kate,

4   Mr. Rabinowitz and our family, it was a disservice to

5   drivers everywhere to not discuss the crash as it

6   actually happened.  If it were not constantly watered

    down, maybe we would punish drunk drivers

8   appropriately.

9        Maybe if you knew that the crash didn't end

10  on impact, if you knew how things unfolded after

11  impact, people could form an informed opinion on

12  drunk driving.

13       Two dead, three others maimed in a car

14  accident, as the defense would like to paint this,

15  doesn't even come close to describing the carnage of

16  that night.

17       The defendant has rights -- and I am a true

18  believer in the system -- but his rights don't

19  supersede mine, and if the decisions are to be made,

20  they should be based on all the facts, and it didn't

21  end on impact and it should count.

22       who cleans it up for me? who cleans it up

23  for the court officers and police officers who don't

24  even know us and are still visibly affected during

25  their testimony by the horrors of July 2nd, a year

People V. Heidgen

1   and a half later, or the EMTS and police officers

2   that were not permitted to testify because it would

3   have been prejudicial? who cleans us out of their

4   nightmares?

5   It should count for sentencing today and

6   people should know so that change might be made and

7   society's tolerance and acceptance of this crime.  I

8   shouldn't be dismissed as a grieving mother. what

9   happened to me and Kate should be known and be given

10  the weight it deserves.

11  I sat with Kate on the Meadowbrook Parkway

12  and calmly and knowingly told officer Collins, the

13  officer stationed to sit with me, that my life was

14  over.   There was nothing exaggerated,or dramatized in

15  that statement because he drove seventy miles an hour

16  and mowed us down with a head-on crash.  I was left

17  to pick up my most beautiful, loving, first born

18  seven-year-old daughter's head off the floor of a

19  limousine, to sit on the ground holding her and

20  watching helplessly those I love in so much pain, to

21  see my father's leg cut off and his body mangled, my

22  husband moaning in pain and screaming for Kate, the

23  unnatural and scary positioning of my mother, the

24  blood and bodily remains strewn on the seats and my

25  helpless, scared five-years-old hurt daughter crying

People v. Heidgen

1      in the corner.

2              It sounds flat on paper.  I hate saying it

3      out loud, but living it can't be described:

4              Driving with Kate to the hospital, crying as

5      I knew I was getting closer and closer, knowing it

6      was the end, and kissing her good-bye, having minutes

7      to get it together as I was rolled into an empty

8      corridor to wait at the opened back entrance of the

9      ER where I would meet Grace;

10             How scarey it was to see my baby on a

11     gurney, not knowing how we would make it through the

12     night or any day thereafter, saying good-bye to my

13     father as he was transferred to a hospital better

14     equipped to treat his horrendous injuries, letting

15     him know how much I loved him, how peaceful Kate

16     looked in her sleep, and how she could not have felt

17     any pain;

18             Calling Neil's mother with the devastating

19     news about Kate and having nothing to say about

20     Neil's condition, how frightening it was to be at the

21     hospital without him, how scared I was for his

22     survival physically and mentally, pleading into

23     friends' answering machines to pick up the phone so

24     they could get to south Nassau Hospital before the

25     state trooper that I was told was sent to tell him

People v. Heidgen

that his daughter was dead, all the secondhand

information I was getting about his condition and

doubting he was well enough too hear about Kate;

watching the clock minute by minute, waiting

for 7:00 a.m. so that my mother could start her first

of many surgeries, still not knowing if it was

because she wasn't stable enough to be operated on or

if the hospital was waiting for the surgical team;

At about 7:00 a.m., the hospital staff

realized that Grace was never examined, knowing that

she was bleeding internally and would need to be

watched for several days in the pediatric intensive

care unit, not knowing how much she knew and how much

we could tell her.

we spent five days together in the hospital.

As we were discharged, Grace and I sat in a wheel

chair being rolled out to the car when she saw a

newspaper with Kate's picture on the cover.  I had to

tell her and the boys by myself when we got out.

we stayed with relatives for a couple of

days hoping Neil would be released and that we could

go back to my mother's house together. But it would

be three weeks before he was released and we needed

to get home..

It was two weeks before the doctors released

People v. Heidgen

my parents and my husband, transferring them to a
rehabilitation facility and permitting them to go by
ambulance to Kate's wake and funeral.

I visited three hospitals a day, comforting
my. one year old, three year old, five year old,
planned a wake and funeral mass by myself. That
should count and that should be weighed. Two dead,
others injured is an unfair incomplete depiction of
that crash.

After the mass, Neil and I went back to the
rehab facility. I had just had a funeral mass for my
perfect, spectacular child, and Neil still could not
come home with us. Because of his injuries, he slept
in a recliner while I slept in his hospital bed, the
two of us holding hands for as long as we had the
strength to keep them outstretched.

Our house was being renovated by my father
and the six of us had been staying at my parent's
house.  Now we had no home to go home to, no one to
go with, broken bodies and spirits. Friends,
neighbors and strangers came together like an Amish
barn raising to build us a place where could try our
best to live. We spent four months living in one
room, myself and the kids on the bed, Neil in the
recliner, and Kate in a small, small cardboard box on

People v. Heidgen

1    a shelf in the closet next to my T-shirts.

2        He spent all day crying and drinking and all

3    night staring at the television. For the first few

4    months, I never spoke in the morning because I

5    couldn't believe I had to live another day without

6    her. For the next few months, I didn't speak in the

7    evening because I couldn't believe I lived the whole

8    day without her.

       My father came home four weeks after the

10    crash and my mother five and a half weeks after the

11    crash. All of us living in one home wailing from the

12    pain both mental and physical. It was helpful

13    because we needed each other and horrible because

14    it's too hard to be with people you love in that pain

15    and not be able to help each other.

16        we moved back home the weekend of Kate's

17    birthday. on what should have been Kate's eighth

18    birthday, we brought ashes to the beach, spreading

19    her in the place that once brought her so much joy.

20        The past year and a half required more

21    surgeries for all of us. The physical and mental

22    pain we lived with could not and should not be

23    referred to and cleaned up as also injured.

24        I don't want to describe what my life is

25    like, but would it make a difference if you knew how

People V. Heidgen

he ended all of our lives because he could and
because he wanted to? would it change the way we
view and punish this crime?

The papers cleaned it up. The trial cleaned
it up.  I put my makeup on and I stay busy with my
children,  but if you knew that I was half the person
that I used to be, would it make a difference? It
should.

I spell, count or pray to keep my mind from
going to where it's difficult to come back from. The
crash and living without her affects every TV show I
watch, every book I read, every conversation I have,
every activity I engage in and all the relationships
I have.

Food, drugs, alcohol and exercise do not
provide respite.  I gasp for air as I walk through
the aisles of waldbaum's.  I get so overwhelmed with
grief or gratitude when I meet the people who are so
kind to us that I can't speak.  I fumble over my
words and I am reduced to tears in a second.

i try to be the best mother, wife, daughter
and friend that I am or can be, but I'm half the
woman I was.  I am most happy when I'm with my
children.  Yet being with them makes me want them
more.  I had four kids in six years. we didn't have

People v. Heidgen

1   a chance to grow as individuals yet. we were one

2   unit, each piece making up one personality. Her

3   absence is palpable.

4       My marriage has suffered.   I have loved my

5   husband since I was seventeen.   But it is

6   excruciatingly difficult to be with someone in that

7   much pain and to feel the same way and not be able to

8   do anything about it.

9       I am quiet, disconnected and withdrawn.

10  There is no conversation that follows what happened

11  to us.   There is no subject worth talking about, so I

12  don't.

13      My friends and family mark the loss of Katie

14  and us.  we are trying.  I spend time with relatives.

15  I wake up with a rash.  I go to a birthday party or

16  holiday.  I wake up with an infection.  I sat through

17  the trial coughing and sneezing.

18      Living with the stress makes me physically

19  ill.  I have suffered from infections, headaches,

20  back pain, cuts and colds that take an inordinate

21  amount of time to heal.  I can't sleep.  I'm

22  incredibly sad.  i wonder what we are doing here, and

23  I hope that heaven is everything I want it to be.

24      we are a good, strong people, a loving

25  family with close friends living in a great community

People v. Heidgen

1    and every day is a struggle, a

2    can't-get-the-door-open air-on-my-face-fast-enough

3    struggle.

4           If people knew all of this, would it make a

5    difference in the way that we punish drunk drivers?

6    would it force a remedy for the inadequacy of the

7    current system?

8           It doesn't end with two dead, others

9    injured.  It's not that neat. Although time will

10   make us more resilient as we learn to live this new

11   life, it will never be good. How we live to get

12   there should count for sentencing and be known so

13   that changes can be made.

14          Living without Kate is more difficult that I

15   can or care to convey, but the manner in which she

16   was stolen leaves my breathless. One man chose to

17   end her life.

18          The murder charges, correctly chosen because

19   it fits the crime, were submitted under Denis Dillon,

20   the previous DA. . The current DA prosecuted the case.

21   By  reporting the defense's claim that this charge was

22   brought by Kathleen Rice's political motivation,

23   without adding that it was actually her predecessor

24   who brought the charge, is wrong.

25          This is not about political agendas. It is

People v. Heidgen

1    not about Kathleen Rice. It is about Katherine Marie

2    Flynn.  It is about Stanley Rabinowitz. The charge

3    of depraved indifference murder was chosen because it

4    fit the crime committed.

5                His reptilian attorneys misled the jury and

6    the public with complaints that the charge was

     tantamount to intentional murder when he was only

8    charged with depraved indifference murder.  where is

9    the follow-up statement that challenges him on his

10   blatant lies? How can we ever have a necessary

11   dialogue if the public thinks that we are crazy

12   grieving parents and that this is a political witch

13   hunt?

14               If Newsday is going to go print articles

15   with three defense attorneys or liberal law

16   professors who state we'll never win, where are the

17   three retired prosecutors that counterbalance that

18   pathetically wrong drivel?

19               I am not saying you have to give the victims

20   preferential treatment, but be fair.  How does it

21   serve the public if we are led to believe that this

22   is a battle that can't be won?

23               our crash fits the new appellate rulings

24   perfectly.  who else would have the videotape, the

25   number of witnesses, sympathetic victims? why are we

People v. Heidgen

1   writing the laws in such a way that it makes

2   prosecuting these cases so difficult? why do we

3   tolerate it? why is it not discussed in detail?

4   we give the media the perfect vehicle to put

5   this dialogue out there. We all drive on the same

6   roads and the focus should be on changing the system.

7   His foul, disgusting defense attorneys have

8   lied about how remorseful this murderer is. we know

9   he isn't sorry because he tried to have his blood

10  thrown out. He tried to beat the DNA test.  He

11  allowed a strategy based blatantly on false distances

12  and speed.  He showed not a scintilla of remorse

13  throughout the entire trial.

14  we know he isn't sorry from the letters he

15  wrote from prison.  we know from the court officers

16  who took him to and from the courtroom. we know from

17  the correction officers who take him to the law

18  library where he researches his appeal. He never

19  grieves.  He is not sad. He never mentions us. He

20  is only concerned with himself. The remorse would

:21  not make him less guilty, but it would make him

22  human.

23  I request that he receive the maximum

24  sentence available.  He drove such an incredible long

25  distance the wrong way. It's the entire length of

People V. Heidgen

1    our boardwalk.  To go that far and pass all those

2    people and never break or turn when on his side of

3    the road before the overpass are wide areas of grass

4    on both sides. He aimed his truck right at us and

5    plowed into us at a crushingly high speed.

6         He stole her life. He ended ours.  I

7    request that he be sentenced to 25 years to life. It

8    is not out of revenge.  I take no pleasure in knowing

9    he'll be serving that length of time.  I will not be

10   soliciting convicts to have him beaten weekly.

11        I almost never think of him because he's in

12   jail, and that is the way it's supposed to be. He

13   should serve 25 years to life because it is the

14   correct punishment for the crimes committed. Life is

15   worth that, Kate's life, Stanley Rabinowitz' life and

16   our lives.

17        Thank you for taking the time to read the

18   binder.  I hope it was considered, and thank you for

19   fairness throughout the trial and the opportunity to

20   be heard here today.

21             THE COURT:  You are welcome.

22             MS. MCCORMICK:  Your Honor, Neil Flynn.

23             THE COURT:  Mr. Flynn, as you know, I read

24   the letter you sent me personally. Would you prefer

25   to sit down for this?

People v. Heidgen

1      MR. N. FLYNN: No, your Honor.

2          Good morning, your Honor, M. Hayden, miss

3      McCormick.

4          There are two tangential but important

5      issues I am going to deal with before the bulk of my

6      remarks.

           The first is the reprehensible behavior of

8      the defense attorneys who were under the direction

9      and control of this defendant. while you may have

10      convinced yourselves that you were engaged in

11      ethical, even laudatory efforts to defend the rights

12      of this filthy child killer against the over charge

13      of murder, your dishonest, unethical behavior

14      throughout the proceedings belies that contention.

15          From the very outset it was clear that the

16      truth would have no influence on your presentation,

17      thus undermining whatever tenuous claim you might

18      have otherwise made to acting honorably in a

19      distasteful cause.

20          when, at the suppression hearing, you

21      produced that unethical quack to bolster your

22      unsupported allegations of police and prosecutorial

23      impropriety, it was clear that you would stoop to any

24      level to free this filthy killer from justice.

25          without any facts to support your

People V. Heidgen

1     contentions, you recklessly slandered the police and
      the prosecution inventing wild claims of evidence
3     tampering, conspiracy and perjury.   Your willingness
4     to slander hard working, honest people to protect the
5     interest of a filthy child killer remain consistent
6     throughout the trial and continues to date.

7            You lied repeatedly to the jury, to the
8     Court and to the public regarding the provenance of
9     the blood sample. Incredibly, you repeated these
10    lies even after that filthy killer drank another
11    criminal's juices in a desperate attempt to escape
12    justice.

13           Even after it was clear to everyone that he
14    knew the blood was his and that its contents were
15    damning, you were perfectly willing to take advantage
16    of the jury's ignorance and lie to their faces. Your
17    glib willingness to lie over and over again on behalf
18    of a filthy child killer was, unbelievably enough,
19    not the most disgusting aspect of your performance.

20           It wasn't even your habit of patting him on
21    the back or rubbing his shoulders in a feigned effort
22    to revive his spirits despite his absolute lack of
23    remorse or emotional response for the horrors he had
24    reaped, no, the absolute low point was, when
25    questioning the medical examiner about my daughter's

People v. Heidgen

1     death, you actually stood not 20 feet away from my

2     wife and 1 and blamed us for killing our daughter by

3     failing to put a seat belt on her, when you knew we

4     had and that your client used that very seat belt to

5     cut her head off.   I knew by then that you were

6     unethical liars, but I did not know what absolute low

7     lives you really were until you blamed me for killing

8     my own daughter.

9          You continue -- you can continue to lie to

10    anyone stupid enough to listen and pretend you were

11    simply taking on an unpleasant but necessary task in

12    defending this filthy child killer, but everyone who

13    saw you lie day in an,d day out, and everyone who saw

14    you blame us for our daughter's death, knows that

15    there is no puss filled sink hole that you wouldn't

16    swim in in order to garner the publicity and thereby

17    the money that a successful defense would bring you.

18    say what you want, but you and I both know that you

19    are just whores.

20          As for you, you greasy little boot ticker,

21    everything I just said holds true for you as well.

22    You should feel obliged to tell every potential

23    client you were sick day they taught

24    cross-examination at law school.   You are not an

25    accident reconstruction expert, are you (gesturing)?

People v. Heidgen

1       As for you, you filthy child killer, you are

2   utterly beneath me, my wife and my daughter's

3   memories, so I won't waste much time on you.  I just

4   want you to know two things.

5       understand, you and I aren't through, not by

6   a damn sight.  So you better make the most of your

7   time in prison because that's as good as it gets for

8   you from here on out.

9       second, nobody in this room gives a damn if

10  you are sorry, most of all because it doesn't matter.

11  Neither my family nor I would care even if you were

12  truly repentant.  what you did can never be overcome.

13      But the fact is, you aren't the least. bit

14  sorry.  Everyone who has paid any attention can tell

15  that you couldn't care less that you cut my little

16  girl's head off and forced my wife to hold her

17  lifeless daughter in her arms for hours.

18      So whatever empty claims of apology you plan

19  to make will fall on deaf ears. But, if you do

20  bother to beg for mercy, be advised, do not mention

21  my daughter or my family.  I will  not allow you to

22  use us in your filthy charade.

23      Your Honor, in that regard, I urge you to

24  disregard anything he might say out of hand, not

25  allow him to make a further mockery of these

People v. Heidgen

1    proceedings.  He has done contortions to deceive this

2    Court without regard to the institution of justice or

3    the truth.  Do not countenance his request for mercy

4    because he is unworthy, and do not believe his false

5    pleas of apology or sorrow.

6        In addition to this statement, I have

7    submitted a letter to Judge Honorof because I do not

8    intend to reveal the true depths of my family's

9    suffering in open court.  I have made this decision,

10   not because I am embarrassed or ashamed, but simply

11   because I do not wish to give the defendant the

12   satisfaction of hearing the full extent of the pain

13   he has caused us.

14       I believe he would revel in hearing of our

15   true suffering because he is an immoral sociopath.  I

16   believe this because, as the videotape clearly shows,

17   he intentionally rammed our limousine and because he

18   clearly believes himself to be the aggrieved party in

19   these proceedings.

20       His disregard for the lives of innocent

21   strangers was manifested in his behavior on that

22   night, and his disregard for the rules of decent

23   society have been manifest every day since.

24       From the outset it was clear that this was

25   not a DWI involving homicide.  It was a multiple

People v. Heidgen

1    murder committed by a depraved killer who happened to

2    be drunk.  when you look at the evidence, this

3    conclusion is inescapable.

4         From his concern only for his truck to his,

5    by his own admission, hideously contrived, calculated

6    statement to Investigators Harris and Baez, to his

7    self-absorbed correspondence to his friends, to his

8    constant complaints to his jailers and fellow

9    criminals, to his attempt to beat the DNA test, to

10   his absolute lack of emotional response to the most

11   compelling testimony regarding his crimes, all of

12   this clearly points to an evil, narcissistic

13   personality, not simply someone who had too much to

14   drink and made bad decisions.

15        Whether you accept this premise is

16   immaterial since intent is not an issue, and, in the

17   event the results of his actions were so devastating

18   to so many people, he must receive the maximum

19   punishment available.  Anything less would be an

20   affront to the memories of Katie and Stanley and to

21   our families as well as a rebuke to society in

22   general which has finally awoken to the horrors of

23   drunken driving.

24        unfortunately the court is constrained by

25   the vagaries of our law and the extremely lax

People v. Heidgen

1    sentencing statutes in place in New York. The

2    defendant benefits from the fact that he killed two

3    people and physically crippled three others by virtue

4    of a single act.

5         Had he done these things separately,

6    concurrent sentences would be available exposing him

7    to much more time behind bars. Instead, his multiple

8    crimes are counted as a single act with a single

9    sentence while his multiple victims suffer multiple

10   agonies.

11        This paradox is even worse when viewed in

12   light of the fact that New York allows for a sentence

13   of as little as fifteen years for murder, in this

14   case multiple murder.  This is offensive and wrong.

15        The lenient nature of New York's sentencing

16   law stems from an overindulgence of criminals

17   exemplified by the emphasis placed on the idea of

18   rehabilitation.  unfortunately we now know after many

19   decades of leniency that rehabilitation does not

20   work.

21        one must only review the recidivism rates in

22   general or examine the number of murder victims whose

23   killers were on parole to reached this conclusion.

24   However, even if one subscribes to the hope of

25   rehabilitation, it should not trump the true

People v. Heidgen

1     underpinnings of the penal system, deterrence and,

2     most importantly, retribution.

           The widespread media attention paid to this

    case provides a significant opportunity to deter

    potential drunk drivers through the imposition of the

    harshest sentence available. For too long drunk

7     driving was treated as a minor infraction carrying

8     the risk of just a fine or possibly a license

9     suspension. This is, in large part, why it is still

10     rampant.

11            By imposing the maximum available sentence,

12     this court can convey the message that society will

13     no longer treat drunk driving with a wink and a nod

14     and a slap on the wrist. The case for a strong

15     message on the issue of deterrence is clear.

16     However, more important for my purposes is the issues

17     of retribution.

18            For too long retribution has been disparaged

19     as revenge by those who coddle criminals. It is

.20     seldom mentioned when, in fact, it is the most basic

21     and most important of the three tenants of the penal

22     system.

23            Deterrence is a wonderful side effect, but

24     it does not address the crimes at issues which is

25     what the sentence is actually supposed to do.

People v. Heidgen

Neither does rehabilitation address the actual crimes for which the criminal is being punished. worse, it elevates the interests of the criminal above those of society in general.

In this case, of course, rehabilitation should not even be considered. If we believe the defendant, he is simply a victim of circumstance with nothing to rehabilitate. Alternatively, we must recognize that his absolute lack of remorse, his consistent dishonesty and attempts to thwart justice during the trial, the pre-trial hearing and into the post-trial motions, render him a noncandidate for rehabilitation.

Deterrence and rehabilitation should be considered desirable byproducts of a prison sentence, but its true purpose should be retribution for what the criminal has done to his victims. In that regard, I will now attempt, futilely, I assure you, to convey some small sense of the horror and devastation the defendant has wreaked on me and my family.

when my wife advised me that it was time to start a family, I was very sceptical.  I was not particularly fond of children, had very little experience with them and enjoyed my life just the way

People v. Heidgen

1     it was.  I now know how foolish this outlook was as I

2     have learned that fatherhood is the greatest endeavor

3     a man can undertake.  My children are the focus of my

4     existence.  They justify my life. Without them, I

5     would be nothing. Katie taught me all of this.

6,          When I met her for the first time in the

7     delivery room, it was as if someone flicked a light

8     switch.  My doubts and fears disappeared and I

9     instantly fell in love with her.  As she grew, my

10    wife and I came to realize that being parents was the

11    most satisfying thing to which we could ever aspire.

12          Katherine taught us what it really meant to

13    be a family, to be in love, with her and each other.

14    She opened my eyes as to what my life should really

15    be about.  She helped elevate my love for my wife to

16    a level I didn't know existed. Sharing Katie brought

17    us together and strengthened our marriage in a manner

18    I cannot describe.

19          From the beginning, we knew Kate was a

20    special child.  Our older relatives advised us not to.

21    get used to that type of behavior from our children

22    because you only get one like that. Now, as the

23    father of four, I realize how true this was.

24          Unlike other children, Kate woke up smiling,

25    not crying, each morning. She would wait patiently

People v. Heidgen

1    in her crib until her mother or I would peek around

2    the door jamb, and when she saw us, her face would

3    light up like the sun. At the age of six months, she

4    earned the first of many nicknames, smiling Kate.

5    You can see from the pictures that that nickname was

6    apt.

7           Kate's incredible effect on us quickly

8    convinced yen and I to have more children.  As our

9    family moved from three to six in just five years,

10   life just kept getting better, and Kate shined as

11   both a daughter and a sister.

12          She was a quintessential big sister. She

13   doted on her younger siblings and always included

14   them in her games, even when she had friends over.

15   she was Grace's best friend and loving guardian to

16   Eamon and Colm. She loved to her help her mother in

17   the kitchen, and my father-in-law once remarked that

18   she was more mechanically inclined than yen and I put

19   together.

20          I often say that while my wife and I are the

21   foundation of our family, Kate is the cornerstone,

22   the first and most important building block placed,

23   without which there would be no more. Her absence

24   has crippled our family as severely as you can

25   imagine.

People v. Heidgen

Every aspect of my life is defined by grief

2     and anxiety over Katherine's death. The first

3     sensory input I received upon regaining consciousness

4     that night was the sound of my wife screaming, Neil,

5     Katie's dead, Katie's dead. of course, I didn't want

6     to believe. I told yen, No, she can't be, she is

7     just hurt real bad, she'll be okay, I'll get help.

8     of course, I didn't know my wife was holding my

9     daughter's head in her hands when she yelled to me.

10     Ten knew Kate would never be okay, and

11     despite my words, so did I. I simply didn't want to

12     accept it.

13     Throughout that night, I begged the

14     emergency workers and medical personnel to let me

15     die. Today the only thing that keeps from me suicide

16     is the responsibility of raising my other children.

17     If Katie were an only child, I would have taken my

18     own life a long time ago.

19     while my physical injuries are the least of

20.     my worries, they are objectively significant, and I

21     will take a moment to describe them so you understand

22     the context in which I suffer Katherine's loss.

23     The defendant broke my back in two places,

24     he ruptured two of my spinal discs. He broke my nose

25     and'three of my ribs. He collapsed one of my lungs,

People v. Heidgen

1   damaged my heart, liver and bladder.

2         I spent a month in three different

3   hospitals.  I was separated from my wife for a week

4   immediately after our daughter was killed.  I had to

5   be released from the hospital on a day pass to attend

6   her wake and funeral in a wheel chair and gave her

7   eulogy in a back brace propped up on crutches.

8         I have undergone two surgical procedures and

9   will probably require future surgery because the

10  fracture has not properly healed.  I attend physical

11  therapy two times a week for intense two-hour

12  sessions.  I am deprived of my family's company

13  during this time, but it is necessary because,

14  without therapy, I am physically incapable of

15  working.

16        I am in constant pain which is exacerbated

17  by every physical movement, including breathing and

18  blinking.  coughing and sneezing are agonizing.  I

19  slept in a recliner for five months after the crash

20  because I couldn't lie flat in bed.

21        I can no longer run, bend or twist.  My

22  right leg gives out several times a month and I fall

23  down.  I cannot play physically with my children.

24  sometimes they forget and jump on me. This makes me

25  cry out in pain, and, on many occasions, I have come

People v. Heidgen

1  close to striking them.   This is unspeakably ugly to

2  me.

3          My wife has to shovel snow from our

4  sidewalk.   I have to ask friends to put up our

5  Christmas tree or move pieces of furniture.   I cannot

6  change a flat tire, climb a ladder or carry grocery

7  bags.   I take 17 pills a day including

8  antidepressants, blood pressure medications, muscle

9  relaxers and painkillers.

10          The physical limitations briefly described

11  here are, as I said, the least of my worries.   They

12  pale in comparison to the emotional and mental

13  torment I suffer every day because of what this

14  filthy child killer did to us.

15          From my first waking moment, my thoughts are

16  dominated by sadness, grief and anxiety. At least

17  three times a day I am overwhelmed by grief and break

18  down in tears despite the fact that I take two

19  powerful antidepressants.   I frequently cry in front

20  of my children. This is extremely painful to me and

21  damaging to them.

22          My children suffer along with Jen and I.

23  Grace told us that she wished we had all died that

24  night.   She has slept in our bed every night since

25  coming home from the hospital. she can't be alone in

People v. Heidgen

1    a room for more than a few seconds without being

2    overcome by fear. she attends therapy, but it does

3    not help.  she has told us that her therapists don't

4    know what they are doing and therapy does nothing.

5    Grace is six.

6         I also attended therapy for over a year. It

7    meant more time away from my family, but I hoped it

8    would ease my pain. It did not, and I abandoned it.

9    I have no hope of life without grief.  I do not look

10   forward to the future except to the extent it brings

11   me closer to the release of death.

12        My son Eamon lives in fear of the defendant

13   who he refers to as the bad man who killed Katie. He

14   too sleeps in our bed every night because his room is

15   closest to the landing and he's afraid the bad man

16   will get him first when he comes up the stairs.  I

17   tell him that I will protect him, but we both know

18   that I didn't protect Katie. so my words are empty.

19   He cries over the loss of his sister every day.

20        My son colm is to young to comprehend these

21   events.  His suffering consists of being deprived of

22   the love and compassion of his big sister, watching

23   his parents and siblings suffer from being deprived

24   of their full support and nurturing care.  I expect

25   that in time his memory of Katie will fade to

People v Heidgen

1   shadows.  This saddens me.

2        When I wake, I silently wish Kate good

3   morning.  I do not believe she can hear me but I hope

4   so.  I rise slowly because of the pain in my back.  I

    limp to the bathroom and swallow the first of eight

6   painkillers and six muscle relaxers I will take each

7   day.

8        I perform my ablutions through a veil of

9   tears, wracked with sobs.  I dress and descend the

10  stairs, stopping on the landing to kiss the cold

11  glass covering Kate's picture saying I love you Katie

12  as I do so.  I sullenly kiss my wife and three of my

13  children good-bye.

14       I drive to work alone frequently crying or

15  screaming with rage.  When I see a clear blue sky, I

16  speak to Katie again, not believing, only hoping she

17  hears me.  I struggle through my workday consumed and

18  distracted by my grief and pain.  I have no

19  confidence in my ability to continue to provide for

20  my family and this makes my anxiety worse.

21       When i return home from work, I take my

22  dinner alone in my room.  I cannot stand to sit at

23  the table with Kate's empty chair. Each night, I

24  make some excuse for my other three children as to

25  why I cannot eat with them, but they know I'm lying.

People v. Heidgen

1    I do not know how my wife does it, beyond my

2    general knowledge that she is the strongest woman I

3    ever met.  I fear someday it will prove to much for

4    her.  It pains me to see this once vibrant woman

5    crushed under the weight of her suffering. she alone

6    knows how much I miss Kate.  Although we console each

7    other as best we can, I cannot stop her pain.

8    we hug, but rarely kiss. our embraces are

9    not passionate, only conciliatory.  Our conversations

10   are brief and usually marked by tears.

11   By eight o'clock, I'm exhausted and bent

12   over with pain.  I take a heavy dose of medication so

13   I can get a few hours of uninterrupted sleep.

14   I no longer pray with my three other

15   children.  I have no faith.  I tell them that we must

16   wish Kate good night and sweet dreams and that

17   someday we will be reunited with her.  I do not

18   believe this but I hope it is true.  My hope is

19   desperate because I believe it is futile.

20   As I drift into fitful, drug induced sleep,

21   I try to talk silently to Katie to tell her about her

22   brothers and sister, but I feel awkward and foolish

23   because I don't know if she can hear me.

24   This is especially painful because when Kate

25   was here with me things were never awkward. we could

People v. Heidgen

1     sit in silence holding hands and watching TV or laugh

2     and sing uproariously and unselfconsciously. Now I

3     am reduced to stumbling, halting words in my head and

4     find myself repeating I miss you over and over again.

5     I feel guilty for burdening her with my grief.

6          My sleep is punctuated by nightmares and I

7     wake often.  I rarely dream of Katie alive.  I have

8     done so only three times since her death. Although

9     waking from these dreams is incredibly painful, I

10    wish I had them more often.  I wake after three or

11    four hours and stare aimlessly at the pointless

12    television.  I drift back to sleep in the early

13    morning for a few more fitful hours before starting

14    the cycle again.

15         I do not know joy.  I have no hope for a

16    better future here on earth.  I hope but do not

17    believe I will see my daughter again. Iam wracked

18    with guilt for denying my other three children the

19    father they deserve but I cannot overcome my sadness.

20    My life is desolate:

21         MS. MCCORMICK:  That concludes the victim

22    impact statements.

23         THE COURT:  May I see counsel at the bench,

24    please?

25              (whereupon, an off-the-record conversation

People v. Heidgen

1       took place at the bench.)

2               THE COURT:   I think, at this time, ladies

3       and gentlemen, we are going to break the proceedings

4       until a quarter to two. See you then.

5               (whereupon, a luncheon recess was taken.)

6               A F T E R N O O N  S E S S I O N

7               THE CLERK:   On the record please,

8       Indictment 1910-05, the People against martin

9       Heidgen.   Case on for sentencing.

10              MR. LAMAGNA:   Defendant ready.

11              THE COURT:   Mr. Martello, Mr. Lamagna, would

12      one you of like to address me?

13              MR. LAMAGNA:   Judge, before Mr. Martello and

14      I make our statement to the Court, we would ask the

15      Court's indulgence to have various family members of

16      the Heidgen family address this Court.

17              THE COURT:   Yes, of course.

18              MR. LAMAGNA:' We would ask first for victor

19      Aponte.

20              MR. APONTE:   Good afternoon, your Honor.

21              THE COURT:   Good afternoon, Mr. Aponte.

*22             MR. APONTE:   My name is victor Aponte.  I am

23      Marty's stepfather.   I met Marty in 2004 when he

24      moved to New York.   I was dating his mother at the

25      time.   I asked Marty for his mother's hand in

People v. Heidgen

1    marriage.

2              I was so impressed with Marty's southern
3    politeness and his maturity for his young age. Marty
4    showed so much enthusiasm towards his job. Every day
5    he came home talking about his plans for the future
6    and job opportunities in New York.

7              He showed me -- he told me that getting on
8    the train every morning with everyone headed to work
9    was like getting a burst of energy. He loved being
10   part of the working force.  His dedication and
11   perseverance was admirable for a young man of his
12   age.

13             Marty always was so willing to help his
14   mother and me in any task that we asked. on Sundays
15   we would watch football games and discuss the plays.
16   He enjoyed cooking for us on weekends. It amazed me
17   to see his culinary abilities. Marty is very family
18   oriented and enjoys good conversation over a well
19   prepared meal.

20             For people to say that Marty and i were
21   having problems over my marriage with his mother is
22   nothing but a lie.

23             I was very impressed with his love and
24   respect for his mother. Many times Marty told me
25   that he was -- he told me that he was working hard

People v. Heidgen

1      and looking forward to a good future so he could take

2      care of his mother. He said that he would never

3      consider putting her in a retirement home.

4      what I saw in Marty was a happy, young man

5      who was looking forward to his future and fascinated

6      with the challenges in life. Marty's ability to

7      relate to young children helped establish a great

8      relationship with my grandson Andrew who was always

9      asking when he would see Marty again to play.

10      Marty is a very kind-hearted person who

11      under no circumstances would purposely hurt anyone.

12      His hundreds of hours of charitable work is proof of

13      the kind of person that Marty is. He did volunteer

14      work for the Dorkus House of battered women. This

15      place provides support and a home for women who have

16      nowhere to go after being beaten by their husbands or

17      boyfriends.

18      He helped the Leap Frog program in oxford,

19      Mississippi.  This charity helps underprivileged kids

20      and provides mentorship for them; Marty also coached

21      a soccer team for children, seven and eight-year

22      olds, at the YMCA. He co-directed soccer camps for

23      kids ages five through twelve at the Little Rock

24      Athletic Club.  He designed T-shirts for the 5K run

25      with proceeds benefiting st. Judes Cancer Research

People v. Heidgen

1     Hospital in Memphis.

2          This, your Honor, is the life of someone who
3     would never, never set out to intentionally hurt
4     anyone.

5          The day of duly 2nd, 2005, Marty made the
6     mistake of drinking and driving after a 4th of July
7     party.  This caused a tragic accident which resulted
8     in the loss of the lives of Katie Flynn and Stanley
9     Rabinowitz.  Marty will always have to live with this
10    guilt on his conscience.

11         I know Marty made a mistake for which he
12    wants to take responsibility but to punish him for a
13    long sentence would not be fair and just.

14         Marty got lost because he barely drove on
15    Long Island.  He worked in the city and took the
16    train.  He had very little experience driving on the
17    Island.

18         Your Honor, this is a young man who has lead
19    a life of service to others. At the age of 24, Marty
20    had given more to society than most people do in a
21    lifetime.

22         His character is immutable.  It doesn't
23    change because of one mistake.  I am not talking
24    about someone would has a pattern of hurting people.
25    on the contrary, he is always ready to help those in

People V. Heidgen

need.

2      Please, your Honor, give him an opportunity
3   to redeem himself. Justice is about fairness. what
4   good would it be for society and for Marty to spend
5   many years in prison?

6      I beg of you, your Honor, take all this into
7   consideration and make a decision as a parent and as
8   a judge that is fair for everyone. Please; your
9   Honor, Marty is my wife's only child. Please, be
10  lenient.   Thank you.

11      THE COURT:   You are welcome.

12      MR. LAMAGNA:   Your Honor, we would ask that
13  Kurt Heidgen address the court.

14      THE COURT:   Yes.

15      MR. K. HEIDGEN:   Your Honor, I'm Marty
16  Heidgen's father.   I think I know him as well as
17  anybody and probably better than anybody. we have a
18  close relationship.

19      it really is painful to hear the prosecutor
20  categorize him the way she has but there's not really
21  any basis as far as--- you know, the case is bad
22  enough, tragic enough, and I can only imagine the
23  agonies the Rabinowitzes and Flynns have gone
24  through.   I mean, I can't imagine.   It's beyond
25  comprehension.   But to say that he would deliberately

People v. Heidgen

1    do anything like this, it breaks my heart, because

2    he's a good person and it's the furthest thing from

3    the truth.

4    It was a tragic accident. The end results

5    are the same as so many accidents. Again, you know,

6    he's devastated. It's been 20 months since the

7    accident on July the 2nd. we have all suffered a

8    lot. Maybe in comparison to the other families,

9    maybe it's not much. I don't know how it can be any

10    worse because he's an only son, an only child. They

11    have had the burden of seeing him two or three times

12    a week and it's tuff. It's really tuff. It's tuff

13    for all of us.

14    I don't live here. I'm an over-the-road

15    truck driver, so I'm, you know, in forty-eight states

16    and I try to get back here as often as I can. As a

17    truck driver, I see drinking and driving and

18    accidents all the time. It's tragic. There's no

19    easy answer to the problem and I don't have an

20    -answer.

21    I.-think that, you know, just putting

22    somebody in prison for a long time is not necessarily

23    a positive thing because it didn't seem like I heard

24    anything this morning about, you know, what positive

25    could come out of this, except that maybe this tragic

People V. Heidgen

1    accident, there will be more thought put into warning

2    young people particularly about the dangers of

3    drinking and driving.

4            That's something Marty would be very good

5    at.   He relates very well to young people and he's

6    devastated.   As you will hear when his achievements

7    are run through, the work with the center, the young

     kids, he really likes the young kids'. He has coached

9    them.

10           so little Katie's death was -- you know

11   again, for a week he couldn't talk. we couldn't

12   speak to him because he was totally devastated by

13   what he had done. Maybe some of his sorrow was for

14   himself.   I don't know.   But it seemed it was the

15   tragedy he caused more than anything else.   I don't

16   know what the results were.

17,          I think Margo is going to tell you about

18   some of his achievements.   I could start listing them

19   but, to me -- he graduated in 2003 from the

20   university of Mississippi with a degree in history

21   and also in Spanish. He went out and was successful

22   working.

23           He had many friends from all walks here.   I

24   was most proud that he went through a private school

25   system, a catholic school system, and he was a good

People V. Heidgen

1     student.  He went through with a lot of privileged

2     kids in a private school. But, in the full spectrum,

3     mostly more affluent kids, and he related to those

4     kids real well. But he went outside that school and

5     related to kids in public schools.  He related to

6     blacks, Hispanics, all kinds of people.

7             I think that was evident in the way he was

8     liked by his peers. He was captain of the soccer

9     team, captain of the rifle team. They liked him and

10    respected him.

11            So I am proud of him for his character, the

12    way he was able to reach other people and didn't have

13    any preconceptions about anybody and got along with

14    everybody.  They liked him and we loved him for that

15    aspect.

16            So, you know, what's happened is just --

17    most of these **DUI** cases are a good person did a bad

18    thing.  You know, again, it's devastating. Words can

19    can't, you know, solve the problem. We would just

20    like to reach out somehow to the people. They are

21    not here right now, but, obviously they are extremely

22    angry and, you know, it's just a tragic thing.

23            I ask you to take these things into

24    consideration about Martin Heidgen and try to find it

25    in your heart to see that there's goodness in his

People v. Heidgen

1   heart and that he would someday be a real positive

2   influence as far as relating his personal tragedy to

3   others.  If he could just save one life, it would be

4   well worthwhile.

5          If he has the opportunity at sometime in the

6   future to do that, knowing him like I do, I know

7   that's what he would do. He'll be a great citizen

8   and is a great citizen, but he would be a real

9   positive influence on many people.  Thank you, your

10  Honor.

11          THE COURT:  You are welcome.

12          MR. LAMAGNA:  Margo Aponte.

13          MRS. APONTE:  Good afternoon, your Honor.

14          THE COURT:  Good afternoon.

15          MRS. APONTE:  Good afternoon, everybody.

16          I am Marty's mother.  I want to take this

17  opportunity to tell the Flynn family and the

18, Rabinowitz family how truly and deeply sorry I feel

19  for the pain and suffering my son, Marty, has caused

20  in your lives. You are and always will be in my

21  prayers.

22          This is a tragedy that has affected so many

23  lives.  I have also experienced pain because of

24  what's happening to my son, my only child.

25          I know you and your family understand how

People v. Heidgen

1    this accident, this disaster, has turned everyone's

2    life into a nightmare. My son made a horrible

3    mistake.  He understands he has to take full

4    responsibility for what he did.

5         I know my son.  I raised him to be

sensitive, kind-hearted person.   In the 21 years

7    prior to the accident, Marty has been a faithful

8    servant to God, to his family and to those in need.

9         There's only a small number of young adults

10   with a service record like Marty's. Your Honor, you

11   have over a hundred letters written to you from all

12   over the country that speak about Marty and his

13   character.

14        All  the letters, in different words, all say

15   what kind of person my son is, responsible with a

16   strong work ethic, an exemplary citizen, optimistic,

17   athletic and always involved in sports, a good friend

18   who has always and will always give whatever he has

19   to his friends.

20        He was elected captain of his high school

21   soccer team by his peers, not only because he was one

22   of the best team players, but also because they

23   believed he was the fairest leader. During his high

24   school years, he joined the ROTC where, again, he was

25   elected by his peers to be the captain of the rifle

People v. Heidgen

1   team.

2           Marty always stayed very active. He did

3       hundreds of hours of community service, always

        helping those less fortunate, coaching unprivileged

5       children and providing mentorship for them in the

6       Leap Frog program in oxford, Mississippi. He also

7       volunteered to coach a soccer team for children ages

8       seven and eight at the YMCA.

9           My son, your Honor, would come home talking.

10      He was so proud of having an opportunity to help

11      children with difficulties in sports. He would say,

12      Mom, that is why I like soccer, because anyone can

13      play, tall people, short people, It doesn't matter a

14      person's size, It's about skills, mom, and I can help

15      these children develop them and feel good about

16      themselves.  This., your Honor, is how my son feels.

17          Marty also helped organize fundraising

18      activities to help the Dorkus House and battered

19      women.  He helped sell and deliver poinsettias during

20      Christmas to raise money for these abused women.

21      This is my son. which young man at the age of 16

22      would spend his free time helping battered women?  My

23      son did.

24          During this time, he also worked at the

25      athletic club in Little Rock where he headed the Down

People v. Heidgen

1    under Program.  This is for children ages four

2    through seven.  I remember so many parents would stop

3    and tell me how much the children loved Marty and how

4    appreciative the parents were of his love and

5    dedication to the little ones.

6        Marty continued his volunteer work in

7    college.  He volunteered his time in organizations

8    such as st. Jude's Cancer Research Hospital where he

9    organized and participated in different charitable

10   fundraising activities.

11       In the Pi Kappa Alpha fraternity, he

12   volunteered to be a chaplain and also the

13   philanthropy chairman.  My son never forgot his

14   responsibilities to others, your Honor.

15       As parents, Marty's father and I taught him

16   love, compassion and religious principles. He went

17   to catholic schools, and, with so much pride, we saw

18   our Marty develop into a caring, optimistic and

19   responsible human being.  This, your Honor, is my

20   son.

21       Measure the man by his actions. Look at his

22   life.  Put the incident in perspective.  I implore

23   you, while in the quiet of your chambers, to consider

24   my son and judge his actions in the context of his

25   entire life.

People v. Heidgen

1   I know Marty is deeply remorseful for the

2   pain he has caused the Rabinowitz and the Flynn

3   family.  My son has.to live with his conscience the

rest of his life. He is in utter shock as to how his

5   life has changed. He is living in pain and remorse.

6   Every time I visit him, he tells me his faith in God

7   is helping him get through this.

8   All of our lives have been changed since

9   that tragic morning of July 2nd, 2005. It was clear

10   that my son was lost, not knowing where he was going

11   on an unlit parkway. He was unfamiliar with the

12   roads in New York. He only had lived here a few

13   months.  He worked in the city where he took the

14   train.  He was going to meet friends. He called them

15   several times to get directions. He called them

16   again when he was lost.

17   My son made the terrible mistake to drive

18   under the influence of alcohol which resulted in this

19   horrible accident.  For that, he takes full

20   responsibility.

21   Is it fair to charge him with murder?

22   Absolutely not.  At least twelve other alcohol

23   related accidents have happened on Long Island since

24   Marty's and no one has been charged with murder.

25   we just saw how Karen Fisher, with a

People v. Heidgen

1    previous record, with a suspended driver's license,

2    who has driven while intoxicated with children in the

3    car, killed Garden city priest monsignor william

4    Costello and left the scene of the accident, has been

5    charged with manslaughter. Just this month, they

6    negotiated a plea bargain.

7        Then there's Young Cho, a drunken driver

8    with a vehicular assault conviction, who killed a

9    father and is charged with manslaughter.

10       In July of 2005, a former firefighter killed

11   a teenager and received thirty-two days behind bars

12   and then, in January of 2007, Danielle Baymack is

13   charged with second degree manslaughter for the death

14   of fellow officer while driving drunk.  The list goes

15   on and on, your Honor.

16       In each of these cases, the accused received

17   manslaughter.  My son is the only one charged with

18   murder.  Did he have a prior record?  No.  But he

19   alone was singled out.

20       Your Honor, where is the justice here?

21   Marty's case is also a DWI case.  It is not a murder

22   case.  Please, your Honor, don't single him out and

23   place him in a class by himself. He's guilty of

24   driving drunk which resulted in the death of two

25   people but no more than those peoples I have listed.

People v. Heidgen

1        The tragic circumstances of all the media

2     attention pushed this to be a murder case but it is

3     not.

4           what I ask you today, your Honor, is to

5     provide all the families involved justice. Look at

6     Marty's life and how my son has contributed to

7     society.  Judge his actions in context. Look at his

8     life.  was his life reckless? No, it was not. He

9     was a caring individual who helped others all the

10    time and just made a horrible mistake. He's prepared

11    to pay for that.

12          Please, your Honor, for the sake of what is

13    just, temper your decision taking all that I have

14    said into consideration.  Please, give my son an

15    opportunity to redeem himself.   Thank you.

16          MR. LAMAGNA:  Your Honor, Father Thomas.

17          FATHER THOMAS:  Good afternoon, your Honor.

18          THE COURT:  Good afternoon.

19          FATHER THOMAS:  Thank you for the permission

20    to address you today and all those who are present.

21          Before I offer my prepared remarks,  I think

22    I would be very remiss not to recognize the

23    extraordinary accounts that we heard this morning of

24    the pain and suffering from this accident. It was

25    truly extraordinary, and as I will indicate later in

People v. Heidgen

1    my prepared remarks, as I have prayed for all of you

2    these past months, I promise you, to the Rabinowitz

3    and Flynn families, to continue praying, most likely,

4    for all my life as a priest.

5            I come here for two reasons:   To join with

6    the Marty's family to ask for mercy and leniency and,

7    also, to give voice with Marty. It is our faith

     tradition, in the ]ewish-Christian tradition, to

9    never ever Abandon another human being for any

10   reason.   I can only be true to myself, as a priest

11   who has grown to know and love this young man, to

12   never abandon him.   So, as I promise to pray for

13   victims, I also promise never to abandon him.

14           Some may wonder why a priest would insert

15   himself in this room, in this tragedy, in this

16   caldron of pain and suffering.   I present myself

17   today as a priest, a minister of faith who has been

18   very attentive to this case.   But, most of all, I

19   present myself because I am a pastor and martin

20   Heidgen is my parishioner.

21           In the catholic tradition to which Martin

22   and I belong, as do many in this tragedy, I bear the

23   very sacred responsibility to minister to martin for

24   a spiritual and pastoral well being.   Martin has

25   given me the privilege of offering that ministry,

People v. Heidgen

1    and, I have come to know him very well.  I say

2    without qualification, I know his heart, and I would

3    be less a man not to be here today and to meet my

4    responsibility as a pastor.

5            This entire tragedy has been filled with so

6    much pain and so much sorrow, so much sadness and

7    grief.  This morning you heard broken hearts speak.

8            It is so evident that Katie Flynn was so

9    deeply and well loved as a daughter, sister and a

10   granddaughter, and Stanley Rabinowitz was so well

11   loved as a dad and a husband.

12           The broken heartedness we heard this

13   morning, I'm sure, saddened everyone in this room and

14   is almost indelibly described in our hearts and minds

15   and memories.

16           As I indicated earlier, I assure you, I come

17   here as a priest who was has prayed, not only in the

18   morning but also in the evening, for all of you, for

19   the Flynn and Rabinowitz families, for Katie and

20   Stanley, for martin and his family and for you,

21   Judge.

22           The pain of the Flynn and Rabinowitz

23   families is beyond what I have ever experienced and

24   what I can imagine.  I am not a spouse.  I am not a

25   parent.  But, as a priest, repeatedly, I have shared

People v. Heidgen

1    in the pain of spouses and siblings. It is my

2    vocation.

3          My prayers these months have been for many

4    intentions but all my prayers have been governed by a

5    desire for healing, healing for all. Because I have

6    not experienced the profound sadness and loss of the

    families of Katie and Stanley, I can only share my

8    empathy and continue to pray for your healing as I

9    have promised and for the healing of all others who

10   loved these two people.

11        I respect, I have reverence, I recognize the

12   holiness and sacredness of the Rabinowitz family, the

13   grief and sadness of the Rabinowitz family and the

14   Flynn family. As another human being and as a

15   priest, I share that role. It is the right thing for

16   all of us to do. It is what God calls us to do, to

17   reverence that grief that we heard.

18        At the same time, in my vocation as pastor,

19   I know too that martin has been very well loved by

20   his family, and though different from the pain of the

21   Flynn and Rabinowitz families, as his mom and dad and

22   stepdad just shared, martin's family is also filled

23   with sadness over these past 20 months. I am here

24   because I have come to know their pain through my

25   ministry.

People V  Heidgen

1       I believe the court needs to know about
2       that.  I know that martin accepts responsibility for
3       what happened in July of 2005, and I know he
4       struggles every day with that responsibility. He
5       feels it deeply in his heart and I know that with
6       certainty.  I join with his mom and dad in
7       acknowledging his responsibility and join to that
8       this plea for leniency and mercy.

9       Concerning the accident and deaths of Katie
10      and Stanley, he was profoundly sad. He has shared
11      with me repeatedly on numerous occasions his feelings
12      and emotions about this tragedy. He has expressed to
13      me his deep since of remorse and repentance. we have
14      shared readings about this topic from scripture and
15      contemporary literature.

16      He feels deeply the responsibility he
17      shoulders for what has happened. The deaths and
18      injuries caused by his driving while intoxicated
19      causes him much sadness and sorrow. He too is
20      destroyed and broken hearted. His words and his
21      tears have made-this clear. He knows he is
22      responsible.  At the same time, there was no
23      intention on his part to cause harm.

24      I am often called as a priest to minister to
25      people in grief and sorrow and remorse.  I am often

People v. Heidgen

1    called to discern with people their intentions.  I do

2    it often.  I have no doubt about the depths of

3    Martin's sorrow and I have no doubt that he had any

4    intention to cause anyone harm in the early morning

5    hours of duly 2nd, 2005.

6         Some have questioned his expression of

7    remorse.  we all know that some people express their

8    remorse and sorrow in very public ways.  usually such

9    public expression is very sincere and heartfelt.

10   Occasionally its sincerity is in question.

11        some people, such as martin, express their

12   remorse or sorrow in more private ways. Maybe you

13   are one of those people and sometimes that is

14   questioned.  But that someone expresses sorrow in a

15   more private manner in no way reflects necessarily a

16   lack of depth of sorrow.  Again, I declare to you,

17   Martin feels both responsible and profoundly

18   remorseful for all that has transpired.

19        He has been convicted under the description

20   of having exhibited depraved indifference to life.

21   All who new martin prior to this accident know that

22   he never demonstrated any kind of behavior indicative

23   of a depraved indifference to life.  In fact, just

24   the opposite was true.

25        As his parents just said, he always

People V  Heidgen

1    expressed a love for life, a love, kindness and

2    compassion for others, care, respect and reverence

3    for others.  His personal history, academic, athletic

4    and socially, all indicate a love and respect for

5    life.  He tells me with great delight how during high

6    school he worked with kids in summer camp and soccer

7    clinics.  The administration of his high school in

8    Arkansas had nothing but positive things to say to me

9    about him.

10   At college, he brought his faith and

11   conviction to his fraternity and served as a

12   chaplain.  In that role, he organized prayer services

13   and organized community projects. In addition, he

14   became involved in inter-faith projects and worked

15   with victims of abuse, as his mother just outlined.

16   in his immediate employment after college,

17   he used his bilingual skills to assist Spanish

18   speaking clients.  Throughout his high school and

19   college years, he expressed a love for life and

20   respect for others, a true reverence for the gift of

21-  what it means to be a human being, and all those

22   experiences taken together make even more profound

23   his sense of responsibility and guilt and remorse for

24   the deaths of Katie and Stanley.

25   It is no exaggeration, my friends, to say

People v. Heidgen

1        that martin has expressed and practiced an unusually

2        high level of faith for a young man in his twenties.

3        In the short time that martin was a parishioner in

4        valley stream, his presence was noted each Sunday at

5        mass because not too many single young men of his age

6        are regular church goers. Martin's quiet, but

7        regular, weekend attendance was noteworthy and always

8        observed.

9               His religious formation that his mother

10       spoke about and his religious practice that I have

11       noticed indicate that he knows well and feels very

12       humanly the experience of guilt and remorse, the need

13       for that very sacred experience necessary for every

14       human being, the need for repentance.

15              Even under the circumstances of these past

16       20 months, he has continued to express his faith. At

17       the weekly mass at the county jail, martin has

18       ministered both as sacristan and as lector. He has

19       assisted the priest there and set up for mass and he

20       proclaimed the Sacred readings to the other inmates.

21              He has outreached to the other inmates at

22       the jail using, again, his bilingual skills to teach

23       English.  He has been most cooperative with the

24       policies and procedures of the jail.

25              This tragedy continues to be traumatic and

People v. Heidgen

1    it continues to be traumatic for martin. People in
     trauma struggle every day, as we heard this morning,
3    to maintain their faith, to believe in God's love and
4    to find meaning and confidence in God's word.  I have
5    been amazed at his ability to maintain his life of
6    spirit and soul this past year and a half.

          I say -- I can say with no embarrassment, my
8    visits to him has enriched my humanity and my
9    priesthood.

10         I hear a man who is intelligent and
11   articulate about many topics from sports to politics
12   to religion.  i see a young man who can still greet
13   me when he walks through the visitor's section of the
14   prison, still greet me with a smile. Yet,  I know his
15   heart is heavy with sorrow.

16         He is a person who knows he is responsible
17   for a terrible tragedy that does require punishment.
18   But, at the same time, as is so often the case with
19   human experience, he yearns, desires, longs, hopes,
20   for another opportunity to live a life in which he
21   can make a positive contribution to the lives of
22   others.

23         So, for me, as a priest, as a human being,
24   as a man who has grown to know this young man so
25   well, the question is, how does justice allow for

People v. Heidgen

1   that opportunity.   we have to be confident that
2   justice does that.

3           Today's sentencing of martin is the
4   concluding step in the legal process of this court
5   that has the sacred charge and awesome responsibility
6   to effect useful justice. In the Jewish-Christian
7   faith and tradition that so many in this room share,
8   justice is understood as one of the greatest virtues,
9   a virtue so awesome that the psalmist of the
10  Jewish-Christian tradition ultimately leaves the
11  fulfillment of justice to God.

12          still, as seen in the story of Moses and
13  through the proclamation of the prophets, God who
14  creates us in his own image and likeness, as Genesis
15  tell us, invites us to join with God in working out
16  justice.  So justice is part of our faith tradition
17  we share as well part of our nation's ambition and
18  this court's ambition.

19          So true justice always transcends politics.
20  True justice, the People have the right to expect to
21  be consistent, fair minded and even handed. The
22  tradition of justice looks to prior example. True
23  justice does not set example to make a point. True
24  justice makes  sure its consistent with law.   So
25  justice always depends on wisdom and is often checked

People v. Heidgen

1 by temperance.

2   So that brings me directly to the precise

3 question for the final step today: what is the

4 appropriate sentence for martin? certainly a just

5 sentence is one that respects the truth and surely it

6 has a healthy purpose.

7   Does an appropriate sentence serve the

8 purpose of retribution? Retribution usually leaves

9 the human person unsatisfied and still hurting. we

10 experienced that this morning.

11   Does an appropriate sentence serve the

12 purpose of deterrence? Sociological studies question

13 the deterrent value of harsh sentences.

14   Is the purpose of martin's sentence

15 rehabilitation?  His past behavior, attitudes and

16 actions, as we have come to know them, do not

17 demonstrate the great need for rehabilitation. He

18 has no previous criminal record. His prison behavior

19 has been excellent.

20   So what is it that we hope for today, a very

21 difficult question.  whatever sentence is given will

22 serve as a punishment for martin's responsibility for

23 the deaths that his driving while intoxicated caused

24 a year and a half ago.

25   The time he serves in prison will be a time

People v. Heidgen

1    that he continues to deal with what he has done.  I

2    know him well enough, I know him better than anyone

3    in this courtroom, except for his family, and, with

4    that knowledge, I expect that martin will use the

5    time as best he can.

6              It is my hope that he will continue to share

7    his gifts and talents with other inmates as he has

8    already done here in Nassau County. It is my prayer

9    that he will be able to maintain his interior

10   strength that has allowed him to be a man of such

11   strong spirit and soul.

12             As his pastor, it is my responsibility to

13   continue to assist him in that regard and I assure .

14   the court I will continue to take that responsibility

15   seriously.

16             His family requests leniency and mercy.  I

17   join in making that request.  I believe the maximum

18   sentence of 25 years to life will only serve the

19   purpose of retribution.  A sentence of lesser

20   duration will encourage and allow this man to

21   continue to understand his responsibility, to do

22   whatever he can to be a positive influence in the

23   very difficult prison system and to look forward to

24   returning as a productive member of our society.

25             we who know martin best know that he is not

People v. Heidgen

1    a person with a depraved indifference for life and we

2    believe he had no intent to hurt anyone on that

3    tragic morning.  we also give witness that when he

4    returns from prison, whenever that will be, he will

5    not be a danger to society.

6          Along with his family, your Honor, I ask you

7    to offer him leniency and mercy as you assign his

8    sentence and I thank you for your time.

9          THE COURT:   Thank you, Father.

10         MR. LAMAGNA:  If I may?

11         THE COURT:  Yes.

12         MR. LAMAGNA:  Your Honor, this is the

13   culmination of probably one of the most difficult

14   matters, I think, any of us will probably see. The

15   pain and suffering, the sorrow that has been

16   exhibited in this case.  This case truly was about a

17   tragedy of immeasurable proportions.

18         unfortunately we cannot change what has

19   happened and we can not undo what has been done.  I

20   come before this court, not only as an advocate and

21,  as an attorney representing a client, but I also come

22   to this Court as a person, as a father, as a son with

23   deep sorrow and grief stricken for the pain that we

24   all were influenced by during the course of this

25   trial.  In fact, I speak for everybody who has been

People v. Heidgen

1   associated with this case that we will forever feel

2   the palpable pain that was exhibited in this

3   courtroom.

4   Now, I believe it was Mrs. Tangney who said

    that they are the victims here. They certainly are

6   the victims, the Flynn family, the Rabinowitz family

7   and the Tangney family. They are the victims. They

8   always have been.  There has never been any dispute

9   concerning that.

10  They did everything right that night. They

11  did take the limousine to avoid -- to be safe.  I

12  agree with that.  We all agree with that. That's

13  what makes what happened that night so tragic.

14  But I'm also grief stricken from hearing

15  everything that was said today, for, also, the loss

16  of a promising young man, a 23 year old, that we see

17  before this court charged and now convicted of murder

18  for a moment in time that, if he could take it back,

19  he certainly would.  I think miss McCormick said,

20  that moment in time that caused such tragedy, I

21  couldn't agree more.

22  There are times in life where a moment

23  becomes a defining moment in a person's life but that

24  moment doesn't define who that person is or how they

25  had lived their life.

People v. Heidgen

1    Certainly July 2nd, 2005, was the defining

2    moment in many people's lives that appeared in this

3    courtroom and it was a defining moment in Marty's

4    life.  But, again, that moment does not define who

5    stands before you to be sentenced today. It doesn't

6    define the manner in which he lived his life prior to

7    that dreadful, tragic night and it is one of the

8    issues that I ask this court to consider when meteing

9    out a sentence. It is not only the crime itself, the

10   conduct, the impact on the victims, but also who

11   stands before you to be sentenced.

12   Now, we heard many things concerning who

13   Martin Heidgen is. Many of the things and many of

14   the statements made by many of the people were from

15   people who never met Mr. Heidgen, never spoke to

16   Marty, never associated with Marty.

17   The truth -- the truth is there is an

18   objective truth, empirical truth, and then there's

19   truth that people want to believe is the truth

20   because they need to believe that that is the truth.

21   Many of the things that were said about

22   Martin today and throughout the last 20 months were

23   from people who never even spoke to Marty, never knew

24   his background, but it was a truth that they believed

25   to be the truth because they needed it to be that

People v. Heidgen

1    truth because of the monumental tragedy that occurred
2    here.  But what was said is empirically and
3    objectively not the truth about the young man who
4    stands before you.

5    Now, your Honor, I had submitted about a
6    hundred -- a little more than a hundred letters to
7    you that I know you have read. Those are from people
8    who know Marty their entire lives. These are from
9    people who Marty has influenced positively for the 23
10   years that he has been either in Arkansas or in New
11   York.

12   Prior to July 2nd, 2005, by reading these
13   letters and from all accounts, whether it's through
14   the letters or through probation, Marty lived a
15   caring, wonderful, selfless life, an honorable life
16   that brought him to this defining moment, a life any
17   parent would have been proud of.

18   we have heard through Marty's mom how he was
19   raised,  we know he was raised in Arkansas and he
20   went to Catholic school.  what's important to note,
21   Judge, *is* that all of the things .that this. young man
22   did at 15, 16 years old, he didn't need to do, didn't
23   have to do and he wasn't forced to do. He
24   voluntarily did this because this is what he wanted
25   to do.

People v. Heidgen

1      He didn't have to join and serve in the
2  ROTC.  He chose to do that.  He didn't have to work.
3  He chose to. He didn't work in some sporting goods
4  store.  He didn't work at some Mcoonald's. He chose,
5  at 16 years old, to work as a supervisor of a day
   care center.  That is the tragic irony here, that
7  Marty spent a bulk of his young adult life working
8  with children, not because he had to, but because he
9  chose to, and that is the truth. This is the life he
10  has lead.

11      Not only did he work as a supervisor of a
12  day care center, he co-directed a summer camp when he
13  was at school for children five to twelve years old,
14  not because he had to, but because of who he is, a
15  man who is standing before this court to be
16  sentenced.

17      Furthermore, he volunteered, as we heard
18  from his mom, at the local YMCA to coach young
19  children on the weekends in soccer, children who
20  either didn't have parents that were available to
21  coach their children or children who came from
22  single-family homes that didn't have a dad to be
23  there.  He did it. He didn't have to. He chose to.

24      This is the type of person that stands
25  before you.  He was voted captain of his soccer team,

People V. Heidgen

1   not because he was the best player, but because he

2   was voted by his peers for his leadership qualities,

3   his compassion and to deal with other people. That's

4   not the only thing we heard. while in the ROTC, he

5   was voted captain of his rifle team.

6   The reason I bring this up, Judge, is how

7   many young people have come before you in our

8   judicial system, or in our personal lives, that we

9   have seen at such a young age, when you are a

10  teenager, that gave so much?

11  I see teenagers all the time that live

12  pretty much as, no offense to that teenager, but

13  pretty much selfish lives, not in a negative sense,

14  but they don't need to be doing anything at this

15  point. They are living their lives going to school

16  and playing. He chose not to do that and that is the

17  truth. That is a fact.

18  So not only do we have to look upon the

19  tremendous tragedy of this case, which is obvious,

20  the desires of the victims and their families, but I

21  ask you, look at the person whom is about to be

22  sentenced, what his life was like.

23  That moment, that defining moment of

24  duly 2nd, 2005, does not define the manner in which

25  he, this young man, lead his life.

People v. Heidgen

1           The letters that I submitted, that I had the
2       opportunity as well to read, from over a hundred
3       people, all have a similar theme about them, about
4       how they articulate their thoughts of Marty, caring,
5       compassionate, loving human being, as you recall in
6       some of those letters. They all say the same.

7           These aren't letters just from family
8       members or friends.  we have letters from neighbors.
9       Neighbors like we have, where we see a young child
10      growing up before our eyes, our neighbors. You have
11      letters from them, neighbors who have known martin
12      since he was a baby, as he grew through high school.

13          You have letters from teachers, elementary
14      teachers that still recall having martin in their
15      classrooms.  we have letters from college professors,
16      one in particular who starts out her letter, if you
17      may recall, saying it is remarkable that I can even
18      recall a student given the nature of the university
19      of Mississippi where there's four hundred people in a
20      classroom.  That says something.  That means
21      something.  It's who this person is.

22          It's the moment, it was a defining moment,
23      but it doesn't define him.

24          we have letters from attorneys who were
25      either fathers of friends of his, assistant district

People v. Heidgen

1    attorneys who lived on his block and watched him

2    grow, who actually represented, as defense attorneys,

3    and prosecuted cases like this, as we all have,

4    members of the clergy, co-workers, employers, the

5    whole gamut of all of the people that you as a person

6    living in this world would come into contact with.

7    All of them submitted letters, letters from

8    all around the country, on behalf of martin. They

9    didn't have to do that. They are not family members.

10    They are college professors, teachers, neighbors, but

11    they did.

12    They bestirred themselves to put pen to

13    paper on behalf of somebody they may not have seen in

14    the last three or four years, or, in some cases, in

15    seven or eight years, but they remembered him from

16    their classrooms and they wrote that letter. That

17    says something.

18    How many 23 years olds, at the time this

19    accident occurred, would have been able to have one

20    hundred people from all walks of life, at such a

21    young age, to influence that many people, to write

22    letters on his behalf?  I don't know how many people

23    who are sixty who have met that many people in their

24    lives who would be able to have a hundred people

25    write in on behalf of them.

People v. Heidgen

1    The people who have spoken of martin and of
2    his character today have never met him. They don't
3    know him.  I urge you, Judge, listen to what has been
4    said by people who know him as to who the person is
5    that stands before you.

6        Now, many times defendants stand before you
7    with terrible criminal records, terrible backgrounds.
8    In fact, the legislature actually penalizes, under
9    certain circumstances, for a prior conviction, as a
10   predicate to have you make -- to make you serve more
11   of a sentence. so a bad character, a bad past, a bad
12   background enures to the detriment of a defendant who
13   stands before you ready to be sentenced.

14       *So* too -- so too must a person's good
15   background, good character, the manner in which he
16   lived in a positive way, it has to have some positive
17   influence in arriving at what a just sentence would
18   be.

19       Now, it is not my position today to
20   relitigate any of the facts of this case. The trial,
21   we went through that. There is a verdict. At this
22   point, Mr. Heidgen is convicted of murder and your
23   Honor is going to sentence him today on that charge.

24       The purpose here, your Honor, is the
25   obvious.  I am going to articulate truthfully -- not

People v. Heidgen

 1  based upon what I am saying, I'm his advocate here,

 2  I'm his attorney, don't take my word for his

 3  character, take the word of the hundreds of letters

 4  from the people who put pen to paper to try to

 5  explain to you, who now has this awesome

 6  responsibility now of sentencing somebody.

 7  Somebody said earlier this morning that

 8  justice is blind and that is true. Justice is that

 9  elusive quality that we try to balance the needs of

10  all competing interests out of society, out of the

11  aggrieved parties, the victims and the pain they

12  receive, as well as where does this person fit in, in

13  the context of all others that come before you.

14  unfortunately, as we heard from Marty's mom

15  at length, terrible DWI related homicide,

16  manslaughters or murders, are not treated

17  consistently within our system. Justice, in our

18  criminal justice system, has to have consistency that

19  all people are treated equally who are similarly

20  situated who have committed the same crime, should be

21  treated similarly.

22  Now, martin's mom mentioned the Karen Fisher

23  case and, for obvious reasons, in that case that

24  person received a sentence of three and a half to ten

25  years -- or she hasn't been sentenced yet. That was

People v.Heidgen

1      the plea agreement.   But what was most important or

2      significant to me when I read that was it said,  Karen

3      Fisher meekly standing *in* a large courtroom empty but

4      for her estranged husband, empty.

5              This courtroom has never been empty. Even

6      when we needed to do an adjournment, it was never

7      empty.   What does that say now with respect to cases

8      that have this cavalcade of media attention on it?

9      Do people in the spotlight in a high profile case,

10     defendants, get treated more harshly than in a quiet

11     courtroom?  I suspect not.  It can't be.  We can't

12     believe that that could happen in our experiences but

13     there is some imbalance in what's happening.

14              High profile cases like the Staten Island

15     Ferry, yes, ten, twelve people were killed by a

16     person who was in the position and the job to ferry

17     people to work, and besides the ten or twelve people

18     that died, people were maimed, amputations and the

19     like.   He wasn't charged with murder.  I think he did

20     a year.

21              Joseph Grant, a New York City police officer

22     killed a family of four and a police officer;

23     manslaughter, five to fifteen.   Two to six, time

24     served and probation, Christina Page (phonetic).

25              I don't know what that means necessarily.

People v. Heidgen

what I do know is that justice needs to be aligned.

2      People who commit similar acts with similar results,

.3     regardless of the attention given, cannot be held to

4      a higher standard than others.

5      People who commit a DWI related homicide of

6      a non-US citizen who has no family at all in the

7      united States can't get a better sentence by virtue

8      of that than somebody who commits the same crime with

9      the same result to a US citizen who has victim's

10     rights and MADD and family members saying we want

11     more time.  It can't be that way.

12     we can't value the lives of people. That

13     one person's life is not worth more than another

14     person's life.

15     The pain is all the same.  I can't imagine

16     what the Flynns and the Tangneys and the Rabinowitzes

17     went through.  I can only empathize but I can never

18     imagine.

19     Judge, the legislature gives you the

20     discretion on murder cases to sentencing a defendant

21     from 15 years to life to a maximum of 25 to life.

22     That is a ten-year window, almost double, difference

23     between the minimum and maximum, same crime, murder.

24     They are all murder. who gets the 25 to life? The

25     worst, heinous, intentional murderer.  some murderers

People v. Heidgen

1    get 15, it's still a murder.

2    so who fits in the 15, if we know what the

3    25 to life murderer is? what murderer or what

4    conviction for murder gets 15? Certainly an

5    unintentional murder, certainly somebody who has a

6    past that devoted his entire life to helping others.

7    This was a defining moment in his life. It

8    does not define who stands before you.  His deeds,

9    the manner in which he lived his life, defines who he

10   is, how he lived his life.

11   In light -- I have asked myself, learning

12   about his background, how can somebody who in so few

13   years of life have given so much of himself to

14   volunteer work, to charity work, to working with

15   children and positively influenced so many people at

16   such a young age, yet, in one moment, so negatively

17   and tragically affect others, and that's the

18   conundrum here.

19   People say that Marty is not remorseful. we

20   heard that from various speakers today. we heard

21   that from the prosecution table.  There's no book

22   about how somebody is supposed to react under stress

23   or under extreme circumstances.  There's times people

24   are crying at a table, and they say, oh, that's

25   crocodile tears, that's not good. Sometimes people

People v. Heidgen

don't say anything.  well, he's not paying attention.
He doesn't care. Some people are smiling because
they are nervous. oh, well, he thinks this is a
joke.

we can't look at somebody, especially a 23
to now 25 year old, in the eye of this hurricane
where he is sitting charged with murder looking at
life in prison, and say, well, I am going to look at
him and I am going to ask him -- I'm going to say to
myself is he showing remorse.

He can't speak during the pendency of a
criminal trial. we all know that. He can't get up
and give an interview for all these people and say I
am remorseful, I am so sorry. The few times he did,
he was told not to say anything, by myself,
certainly, and by various courts along the way. He's
a criminal defendant. He can't speak during the
pendency.

I have spoken to him. I can tell you -- at
least this I can tell you, is that he has always
expressed remorse to me. He has always wanted to
accept responsibility for this.

The defense in this case was not to excuse
his actions.  The defense in this case was defending
the charge of murder, the unusual charge of murder,

People v. Heidgen

1    not unprecedented, but unusual, unprecedented here,

2    certainly.  That is what it was.

3            An individual who is convicted of

     manslaughter who has a .28 reading and kills another

5    because of that drunk driving, the maximum sentence

6    would be five to fifteen. That same act as a murder

7    for the depraved indifference jumped the sentence

8    from 15 to 25 to life. The minimum sentence on the

9    murder charge for the same conduct and result is

10   three times the maximum of the manslaughter, three

11   times by virtue of that, from five to 15 to 15 to

12   life.

13           certainly, Judge, I urge you that that three

14   times the sentence of other similarly situated cases,

15   whether it's a prosecuting attorney's decision in

16   county to county to county -- that's another thing

17   that maybe the legislature needs to deal with at some

18   point.   But there's such discretion now with using

19   this depraved indifference, which the court of

20   appeals is still grappling with what it really means,

21   but if it can be used so indiscriminately from county

22   to county to county, the same acts, three times the

23   maximum sentence of the traditional charge of

24   manslaughter is certainly a severe enough penalty,

25   upgraded penalty, from what other people may be

People v. Heidgen

1  charged with and convicted of.

2  THE COURT: Mr. LaMagna, forgive me. My

3  court reporters have been working for an hour and a

4  half now. I am not curtailing you in any way, if you

5  intend to finish.

6  MR. LAMAGNA: Three minutes?

7  THE COURT: okay. Go ahead.

8  MR. LAMAGNA: Judge., I urge you to consider

9  the truth, the manner in which he lived his life

10  before this. None of us in this courtroom, including

11  your Honor, knows him. Those hundred people know him

12  and that should speak volumes. It should, at

13  least -- it certainly is relevant to the man who

14  stands before you, and 15 to life, given these

15  circumstances, I believe, is just.

16  Judge, there is one letter, and I will

17  conclude, that I submitted by an attorney who was

18  Martin's friend's dad who I think encapsulates pretty

19  much what I wanted to say, so if I may conclude with

20  that:

21  As an adult who has known martin Heidgen for

22  most of his life and seen him grow up literally in

23  front of my eyes, I want to express to you my

24  observations in regards to the question of who is

25  Marty Heidgen.

People v. Heidgen

1    I'm not going to read the whole letter.

Marty has always been a well rounded

3    all-American boy, much as my son, Joseph, and the

4    sons of most average American families you can

5    imagine.  He has always been fun loving, outgoing,

6    witty and a pleasure to be around.  My wife and I

7    have always found Marty to be respectful and well

8    mannered.  I have never known him to exhibit any

9    unduly aggressive or hostile behavior. He is truly

10   your typical American boy.

11        He and Joseph can sit for hours talking

12   about sports and their plans for the future. Marty

13   has always expressed a desire to pursue a meaningful

14   career and his goal is to attend law school. He and

15   Joe were both in the marine Corp., ROTC at catholic

16   high school and Marty was on the soccer team.

17        I often saw Marty at the Little Rock

18   Athletic club when I went there to work out and he

19   was employed there in the area where adults left

20   their children to play while they worked. He seems

21   to have a real rapport with the kids.

22        I am not trying to say that Marty is a

23   perfect person, none of us are. what I am saying is

24   that Marty is like most other young -- like most any

25   other young person who you would be proud to call

People v. Heidgen

1    your son.

From years of knowing Marty and observing
3    his behavior and character, I know that he would not
4    intentionally bring harm to anyone and that the
5    accident in New York would leave him unbelievably
6    distraught and anguished for the families involved,
including his own.

8    Marty is not a bad person. Marty is a good
9    person.  He is the same good person today that he was
10    the date of the incident. He made a mistake which
11    unfortunately resulted in terrible consequences.
12    Many of us have sons and daughters who have made
13    similar mistakes.  But for the grace of God, we could
14    have been sitting in the position that Marty is
15    today.

16    I don't write this letter to excuse Marty's
17    actions or to minimize the consequences of his
18    actions which leave us all grief stricken for the
19    families involved.  Rather, I am writing to let you
20    know that Marty is, like most of us, a caring, well
21    intentioned, level human being and not a monster,
22    which, by human nature is a reflective conclusion
23    others understandably might jump to given the
24    magnitude of this tragedy.

25    I think that says it.

People v.Heidgen

1    The only thing, Judge, that I will leave you

2    with, that I do disagree with, unfortunately, like.

     everybody else who is involved in this trial, Marty

4    is not the same person he was before this accident,

5    just like many of us, certainly the Flynn family, the

6    Rabinowitz family and the Tangney family. The person

7    you observed under the stress of this cavalcade of

8    media is not the same 23 year old kid that's in those

     letters.

10    I would ask you to bear that in mind in

11    arriving at any just sentence and I trust and I have

12    all the confidence that you will. Thank you, Judge.

13    THE COURT:  Thank you, Mr. LaMagna.

14    we'll take a ten minute break.

15    (whereupon, a brief recess was taken.)

16    MR. MARTELLO:  Your Honor, may I proceed?

17    THE COURT:  Yes, please.

18    MR. MARTELLO:  Your Honor, first of all

19    thank you very much for affording me the opportunity

20    to address.the Court.  I know the time is late and I

21    am going to reduce my.prepared remarks accordingly.

22    I know a lot has been said here, Judge.

23    Judge, you heard from a lot of people here

24    today and you heard a lot of opinions about who Marty

25    is, what he's done and how he should be punished.

People v. Heidgen

1    The great thing about this country is that everyone

2    does have a right to an opinion and a right for their

3    opinion to be heard. It was a vital part of this

4    process in this sentencing hearing for you to hear

5    all these opinions.

6           Likewise, Judge, another great thing about

7    this country is that the law protects an individual

8    sitting in a courtroom from opinions.  The law is

9    above those opinions.  The law treats everyone

10   equally and does not allow itself to be pressured by

11   the opinion of the public or the government or even

12   the media.

13          This courtroom, Judge, is the one safe haven

14   for Marty Heidgen to be viewed fairly as to what he

15   did and only what he did, regardless of what the

16   public opinion is.

17          Judge, as you know, public opinion can. cut

18   both ways.  There have been cases where the public is

19   more lenient toward the defendant and they come here

20   to Court to ask for a less harsh sentence for a

21   defendant that is similarly situated.  Then there are

22   times when the public opinion feels that the

23   defendant should be more harshly treated.

24          In both instances, the public opinion is not

25   really the relevant thing here. The law is what must

People v.Heidgen

1    control.  In our country the law guarantees that

2    every citizen will be consistently judged as all

3    other citizens in a similar situation are judged.

4    Judge, I don't have to remind this Court,

5    because I know what type of judge you are, that you

6    are above the fray of public opinion, and only

7    because the court is above that fray of public

8    opinion can Marty be judged just for what he did.

9    Now, you know, Judge, when Mr. LaMagna and I

10   took this case, we knew it was a very unpopular case.

11   You know, we understood from the very beginning who

12   the victims are. It's clearly the Tangney,

13   Rabinowitz and Flynn families.  we are never saying

14   that Marty here is a victim, but even a person

15   accused of what he has been accused of deserves a

16   defense.

17   Though our heart goes out to the families,

18   we have to keep asking yourselves, just like

19   Miss Tangney asked, why has this case received so

20   much attention.

21   Mr. LaMagna alluded to the fact of the

22   Staten Island Ferry case, the case of Karen Fisher

23   where a priest was killed. In all those instances,

24   families were destroyed, but yet there has not been

25   this focus on those cases to have a certain result.

People v. Heidgen

1       The district attorneys in those cases have made much

2       less recommendations in their sentence, and, like,

3       Miss Tangney, we had to ask the question why, what

4       was it about this case.

5               It's almost as if the collective anger of

6       all of society over the last 30 years, of all the

7       senseless tragedies on the roads that have occurred

8       at the hands of drunk drivers, have been visited on

9       Marty Heidgen.  It's almost as if he has become a

10      flash point, a poster child, if you will, for all the

11      sins of other drunk drivers of the last 30-plus

12      years.  He has almost become a poster child of what's

13      wrong with the laws today and, frankly, Judge, that's

14      wrong.

15              As you know, Judge, he's not supposed to pay

16      for what's happened 30 years ago. He's only supposed

17      to pay for what he did and for who he is. If the

18      laws are to be changed, there's another venue for

19      that.  Here, as we sit here today, we are judging

20      Marty Heidgen just for his acts on July 2nd, 2005,

21.     and not for all that has gone on on the streets and

22      on the highways over the 30-plus years.

23              Now, Judge, you know -- and again -- I know

24      I am pressed for time.

25              THE COURT:  You're not pressed for time.

People N. Heidgen

1      MR. MARTELLO:  All right.  Thank you, Judge.

2          Judge, I want to tell you, and I'm not

3      pandering to you by saying this, but I've gotten to

4      know you quite well over the last couple of months

5      and I know your representation and, again, please

6      don't accept this as pandering, but you are a good

7      man.  You're a moral man.  I see it in your actions

8      and in your words.  I haven't always agreed with your

9      rulings here in court, but I always knew whatever

10     your rulings were, they were from the heart and they

11     were what you believed to be right.

12         Sometimes justice, an and act of justice,

13     requires us to do unpopular things, and you have

14     ruled and made unpopular rulings just simply because

15     they were right.

16         I am going to ask you today to make what may

17     be an unpopular ruling, but as I alluded to you

18     before, we, as the guardians of the law, chiefly you,

19     Judge, we have to be above the fray of what the

20     public may want, whether they want a harsher sentence

21     or lighter sentence.

22         Now, I'm not asking you, Judge, to affix a

23     sentence to Marty because it's what I want or what

24     the families want or the government or the media.  I

25     am asking you because it's right. If the truth be

People v. Heidgen

1     told, Marty's family, if they were to have their way,

2     if they were to get what they really they want, they

3     would ask you to return Marty to the bosom of their

4     home, to the safety of their home. That would be

5     their opinion because they are his parents.

6     But that opinion isn't necessarily right. I

7     understand it, but it's not necessarily right. He

8     must be punished for what he did, but that's an

9     opinion that the courts must be above, that fray.

10    Likewise, the victims' families, they are

11    completely justified in their feelings, but there is

12    no measure of punishment that could he exacted here

13    in this courtroom today that would be sufficient for

14    the victims' families.  Now, that's their opinion.

15    Again, just because it's their opinions does not make

16    it right.

17    Lastly, I come to the district attorney.

18    Now, the government is asking -- making a

19    recommendation of 25 years to life. Again, that's

20    their opinion, and they have a right to it, to that

21    recommendation.  But just because it's their opinion,

22    again, does not make it right. I need you, Judge, to

23    see through that.

24    The district attorney is, as you know, is a

25    very important arm of the government.  They are the

People v. Heidgen

1          prosecuting arm of the government.    By virtue of the

2          social conduct we have here in society, we entrust in

3          the DA's office to employ the proper discretion in

4          making recommendations upon a defendant.

5                     we, as citizens of this county, put our

6          lives in the hands of the DA by asking them to use

7          their discretion when we, as citizens, do something

8          wrong.   When we do something wrong, we ask the DA,

9          judge us fairly, to use your discretion.

10                    I submit to you here, Judge, that the

11         district attorney's recommendation is inappropriate.

12         I believe that they did not properly use their

13         discretion here.

14                    They -- and I understand the DA has to speak

15         for the victim, but they too must use their

16         discretion and be able to distinguish between the

17         actions of one defendant versus the actions of

18         another defendant.

19                    The DA has asked for 25 years to life,

20         Judge.   That is the maximum sentence allowable in New

21         York state, the maximum. Now,. it seems to me that

22         the maximum sentence should be reserved just for the

23         most heinous members of our society, the most evil,

24         because you can't give any greater of a sentence.

25                    so when they recommend to you, your Honor,

People v. Heidgen

1    25 years to life for this 25 year old young man, who

2    has this terrible tragedy, but we must keep in mind

3    it was borne from drinking, from a terrible mistake

4    in judgment, they are asking for 25 years to life for

5    him.

6         I asked the district attorney in a

7    rhetorical sense, what would be reserved, what would

8    they ask for in the most heinous, the most evil in

9    society.

10        Clearly, despite the terrible, terrible

11   tragedy that has occurred here because of Marty's

12   actions, I don't believe anyone in this courtroom

13   could possibly say he is the most evil we have in

14   society, that he is the most heinous we have in

15   society.

16        Suppose there was a contract killer here

.17  before this court and the district attorney had to

18   make a recommendation, a contract killer accused of

19   putting a gun to somebody's head and being paid a

20   hundred thousand dollars to do it, more evil, more

21   heinous than that.

22        A gang member that slit someone's throat

23   just because that's the initiation right to get into

24   the gang.  That person -- could you get any more

25   depraved than that, any more evil.

People v. Heidgen

1    The rapist and the murderer, or the mugger

2    that lies in wait in an alleyway, doesn't know how

3    much money you have in your pocket. You could have a

4    couple hundred dollars or \$10,000, but he will kill

5    you just the same for that money in your wallet, any

6    more depraved than that person.

7    But yet, the only recommendation, the only

8    sentence that could be given to those most heinous,

9    evil people is 25 years to life. I suggest to you,

10   judge, that it is the obligation of us, as officers

11   of the court, to do our best to use our discretion,

12   to distinguish between those most evil and those that

13   have done a terrible thing, nonetheless, and must be

14   punished.

15   Don't mistake what I am saying, Judge. I

16   know Marty must be punished and he must be punished

17   significantly. A terrible tragedy has occurred as a

18   result of his actions. But, regardless of how

19   terrible this tragedy is, there have been people in

20   our society that are so -- that are evil and purely

21.  heinous, that that maximum charge should be reserved

22   for.

23   Judge, as I said -- and I disagree with the

24   DA's recommendation but, fortunately, in this

25   country, they are not the last word. You are the

People v. Heidgen

1     last word, Judge. You know, both physically and

2     symbolically, you sit higher than everyone here, and

3     there is avery good reason for that, Judge, because

4     you are empowered with the very tough job to be wiser

5     than all of us, to not give sway to public opinion,

6     to not give sway to, let's say, an over reaching

7     government.  You are the final arbiter here in this

8     sanctuary here, Judge.  You are the last resort.

9     Judge, I know -- I know you. want to send a

10    message here, Judge, and you absolutely should. But

11    I'm just going to ask you, Judge, to send the right

12    message.  Don't send the message that he should be

13    punished because of the collectively anger of all the

14    sins and tragedies that have happened on the road at

15    the hands of drunk drivers over the last 30 years.

16    Don't sentence him to that as the public seems to

17    want.

18    Don't sentence him by grouping him with the

19    most heinous criminals, the most evil members of

20    society, as the government wants you to group him in.

21    Do not put him in with those people. Don't sentence

22    him consistent with that.

23    Those are the wrong messages, Judge.  I

24    think the message that this court should send is that

25    driving while intoxicated in this county, or anywhere

People v. Heidgen

1    in this state, will not be tolerated, and, if you do

2    so, you are going to be punished and you are going to

3    be punished severely, but you're going to be punished

4    justly, consistent with other citizens in our society

5    similarly situated regardless of what the rest of the

6    public wants.

7            You're going to be punished as a person that

8    has done a terrible thing as •a result of drinking,

9    but you're not going to be punished consistent with

10   the Jeffrey Dahmers of the world or the collin

11   Fergusons of the world. You're not going to be

12   judged as harshly as those most evil people in our

13   society.

14           The maximum punishment must be reserved for

15   those people, and, if it is not, then we are watering

16   down the punishment we give to those most evil people

17   in society, if we can give it to this young man here

18   today.

19           Judge, I told you I would try to be brief.

20   I think I have accomplished that, but I would like to

21   leave you with this, Judge.

22           You know, this courtroom doesn't guarantee

23   that justice is going to happen here today. There's

24   no guarantees.  These four walls, all it guarantees

25   is that we have a chance to have justice here today.

People v. Heidgen

1     You have heard from so many people, now

2     including myself, and I suspect the person you most

3     want to hear from is Marty himself. But, Judge, you

4     have heard from so many people, and you have heard so

5     many opinions, please listen to that one concept of

6     justice.   That, to me, is the overriding concern

7     here, not to let him off the hook. He must be

8     punished significantly but he must be distinguished

9     from the most evil in society. Please, allow this

10    courtroom to have a chance for justice to happen.

11    I want to thank you, Judge, for allowing me

12    to address you. It's been a pleasure to serve with

13    you in your courtroom.   I know now Marty wants to

14    speak to you, and, with your permission, he would

15    like to address the court.

16                 THE COURT:   Thank you.

17                 THE DEFENDANT:   Good afternoon.   There is

18    really no easy way to begin this.   I haven't had the

19    opportunity to address all involved until now.   I

20    have been anxious though to say how I.felt since the

21    beginning but I couldn't because of the

22    circumstances.   I have wanted to take responsibility

23    for this, Judge, from the moment this happened.

24    It has been difficult to find words that

25    express how I truly feel. Nevertheless, I am going

People v. Heidgen

to speak to everyone today from both my mind and my heart.

First and foremost, I am very sorry. I am very sorry every day, every hour and every minute, for the deaths of Katie Flynn and Stanley Rabinowitz and for the physical and emotional pain that you have suffered and will continue to suffer.

Even though words do not fully express the sorrow and emptiness that I feel now, nor can I imagine that I will always feel, your anger towards me is justified and understandable. I am most angry at myself, fudge.

I can also understand that you all are never going to forgive me. I am mean, nor did I intend for this to happen. I was just trying to go home. The reason this accident happened was because of my foolish and selfish decision to drink and drive. That is why this terrible accident happened and that is why good people died and good people were hurt. It was my responsibility to put-down my keys, that night. That is the biggest failure of my :life so far.

I also want to take this opportunity to address other young people in this community about drinking and driving and irresponsible social

People v. Heidgen

1    drinking.   If you respect yourself and love others,

2    do not drink and drive. It is deadly. Please, take

3    it from me, all of us in this courtroom have lost

4    because of my decision to drink and drive. Don't

5    think that something like this can't happen to you.

6    All of us here are proof that it can.

7              In. my opinion, blood alcohol limits should

8    be 0.0 to properly reflect society's view on drinking

9    and driving.   That way there's no ambiguity or

10   excuses.   There are no opportunities to bend the

11   rules.

12             I am also, fudge, a good person with warm

13   feelings and compassion.   I have shown that

14   throughout my life by my actions.   I have spent

15   thousands of hours in my teenage and adult life

16   working with children and needy members of the

17   community.   I have been a coach, a role model and a

18   mentor for kids.   I feel like I have let all those

19   people down.

20             That time has been the most rewarding and

21   special in my life. Being a part of building a

22   child's self esteem and character is truly special.

23   Empowering a child is an amazing skill that I have

24   been blessed with and kids have changed for me in

25   miraculous ways.   They have taught me to never judge,

People v Heidgen

1      to love and to listen. There viewpoint is not

2      politicized or polluted.  They have a natural

3      unconscious bias towards good.  I am sure Katie was

4      just like that.

5            I also have respect and admiration for the

6      older citizens of society.  My grandparents have

7      taught me wisdom, compassion and a lot of love.

8      These things are what makes the death of Stanley so

9'     hard for me to take.  I would never harm a child or a

10     man like him.

11           I hope that this court will give me the

12     opportunity to grow after this experience and allow

13     me to aid in the growth of the community.

14           I also want to say I am sorry to the good

15     people of Long Island who welcomed me with open and

16     loving arms when I moved here eight months before

17     this accident.  I betrayed the trust that you gave

18     me.

19           This foolish and unintentional act does not

20     define who I am and I ask the Court and everyone here

21     not to confuse the tragic events of July 2nd, 2005,

22     with who I am.  I am not a depraved person or a

23     monster, nor have I ever been at any moment in my

24     life.  I am just a normal, kind and caring guy who

25     had a great life before this accident.

People v. Heidgen

1    I am not saying good people should get a
2    free pass when they break the law.  *I* think their
3    whole lives should be considered.

4    *I* understand, Judge, the anger you must feel
5    by listening to the events of that night and the
6    testimony in this trial.  Just know that I have
7    already begun a life sentence of anguish, grief and
8    heartache long before this sentence.

9    I have also heard the accounts that say I
10   show no remorse.  For people to write that I am
11   unremorseful is very shocking to me.  All I have is
12   remorse, not for me, but for the souls of the
13   deceased.  My demeanor is a result of the shock of
14   the events transpiring around me which still to this
15   day seem very surreal. It is also a sign of my
16   belief in God's plan.  It's a comfort *I* have my
17   parents and family.  I have put my full faith in God
18   that this is His plan.

19   Once again, I want to say again how very
20   sorry I am.  I will always live with this.  I am a
21   person of faith and I pray that God gives you all the
22   strength to deal, as much as possible, from all of
23   this.

24   Now I want to offer Katie, Stanley, the
25   Flynns, the Rabinowitzes, the Tangneys and you,

People v. Heidgen

1  Judge, my greatest gift, as defined in my life, the

2  gift of love.  Love defines who I am.  Thank you,

3  judge.

4  THE COURT:  I am going to take a two-minute

5  break to give the family an opportunity to come back

6  in before I discuss the sentence.

7  (whereupon, a brief recess was taken.)

8  THE CLERK:  Will the defendant, please,

9  rise?

10  THE COURT:  Mr. Heidgen, you have been

11  present all day and heard how you have affected lives

12  of those who have lived to experience and endure the

13  pain that you have caused.  .Any attempt that I would

14  make to discuss the enormity of their loss, both in

15  terms of the lives lost due to your actions or the

16  pain they endure on a daily basis, both physical and

17  emotional, would pale in comparison to the heartbreak

18  in the expressions that we have just heard.

19  As a judge of this court for the past ten

20  years, it has been my duty to sentence many

21  individuals who have intentionally taken lives from

22  innocent people.  But I have rarely been in a

23  position to sentence one who has taken lives and

24  affected so many because of pure blatant, callous and

25  wanton disregard for the consequences of his actions

People v. Heidgen

1     and their affect on innocent victims.

2           while your pleas may sound genuine, you will

3     remember that I have been privy to letters and phone

4     calls made by you while in the Nassau county

      Correctional Center.  The letters and phone calls

6     speak volumes about who you are and where your true

7     sympathies lie.

8           I was also privy to your attempt to falsify

9     the DNA results ordered by this Court during your

10    trial.  That conduct speaks volumes about the callous

11    disregard and contempt with which you view authority,

12    law and the necessity for you to adhere to the rules

13    of our society.

14          However, I will not punish you now for that

15    act.  That charge will have to be brought and proven

16    beyond a reasonable doubt, like any allegation of a

17    criminal nature.  My sentence here today reflects

18    only the sanction I believe you deserve for the

19    charges of which you have been convicted.

20          The pleas of your attorneys, your family and

21    .yourself do not fall on totally deaf ears.  I know

22    that it is true that you didn't intend to take the

23    lives of Stanley Rabinowitz or Katie Flynn and, while

24    you didn't intend to cause devastating injuries to

25    the Tangneys and the Flynns, through the course of

People v. Heidgen

1   the evidence presented, I am also aware that, unlike

2   so many other defendants this court has sentenced,

3   you have no prior criminal convictions.

However, it is also abundantly clear that

5   you were aware of the risks that you took, both with

6   respect to yourself and anyone unfortunate enough to

7   cross your path on the night of duly 2nd, 2005, and

8   you consciously chose to disregard those risks. That

disregard goes to a level of culpability consistent

10  with those who intentionally'take a life.   This is

11  why I will sentence you to a term whereby you may

12  well spend the rest of your life in prison.

13  Before I do, I can only express this court's

14  heartfelt condolences to the families that your

15  actions have so deeply affected, the Rabinowitzes,

16  the Flynns, the Tangneys, and your own family who had

17  hoped so much for your life to take a different path.

18  The record should reflect I have before me a

19  presentence report prepared by the probation

20  department, reviewed by counsel, to which both sides

21  have expressed their comments.

22  It is the judgment of this Court that for

23  the crime of murder in the second degree, two counts

24  thereof, each a class Al felony for which you stand

25  convicted under counts one and two of

People v. Heidgen

1  Indictment 1910N-05, you, martin Heidgen, are hereby

2  sentenced to two indeterminate terms of imprisonment

3  each of which will have a range -- will have a

4  maximum of life and a minimum of eighteen years

5  It is the further judgment of this court

6  that for the crimes of assault in the first degree,

7  three counts thereof, each a class B violent felony

8  for which you also stand convicted under counts

9  three, four and five of Indictment 1910N-05, you,

10  Martin Heidgen, are also sentenced to three

11  indeterminate terms of imprisonment, each for

12  eighteen years, with five years of post-release

13  supervision.

14  It is the further judgement of this court,

15  for the crime of driving while intox i cated, two

16  counts thereof, each an unclassified misdemeanor for

17  which you also stand convicted under counts eight and

18  nine of Indictment 1910N-05, you, martin Heidgen, are

19  hereby sentenced to two definite terms of

20  imprisonment of 180 days and a fine of $1,500.

21  In addition, your New York state driver's

22  license or privileges to operate a motor vehicle in

23  the state of New York are revoked for six months.

24  All of the terms of imprisonment just

25  imposed will run concurrently.

People v. Heidgen

1    Are there orders of protection here?

2    MS. MCCORMICK:   There are not.

3    THE COURT:   In addition, **it** is directed that

4    a DNA sample be taken. You are directed to pay

5    restitution in the amount of $4,052 by civil

6    judgment.   You are also assessed a mandatory

7    surcharge of $250, DNA fee of $50, DWI surcharge of

8    $25 and a crime victim assistance fee of $20, all

9    payable by civil judgment.

10   it is further ordered that you are committed

11   to the New York state Department of corrections at

12   Fishkill, New York, to be dealt with there according

13   to law.

14

15   Certified to be a true and
     accurate transcript.

16

17

18

19                              /.)--2 . ^.___: 1
                                BUFF BRAN'SON , RPR
20                              Senior Cou⌐t Reporter

21

22

23

24

25