To Be Argued By:
Jillian S. Harrington
Time Requested: 30 minutes

# Supreme Court of the State of New York
# Appellate Division:Second Department



THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

-against-

MARTIN HEIDGEN,

*Defendant-Appellant.*

Appellate
Division
Case No.
2007-02662

---

# BRIEF FOR DEFENDANT-APPELLANT

---

Jillian S. Harrington, Esq.
Attorney at Law
*Attorney for Defendant-Appellant*
*Martin Heidgen*
P.O. Box 6006
Monroe Twp, New Jersey 08831

61 Broadway, Suite 1601
New York, New York 10006
(718) 490-43235

Supreme Court, Nassau County, Indictment No. 1910N/05

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,        STATEMENT
                                                       PURSUANT
                        Respondent,              TO RULE 5531

- against -

MARTIN HEIDGEN,

                       Defendant-Appellant.

------------------------------------------------------------------------x

1.      The indictment number in the court below was 1910N/05.

2.      The full names of the parties were The People of the State of New York against Martin Heidgen.

3.      This action was commenced in Supreme Court, Nassau County.

4.      This action was commenced by the filing of an indictment.

5.      The trial in this matter began with jury selection on or about September 5, 2006 and concluded with a verdict rendered on or about October 17, 2006.

6.      This appeal is from a judgment convicting appellant following a jury trial of two counts of Murder in the Second Degree [P.L.§125.25(2)]; three counts of Assault in the First Degree [P.L.§120.10(3)]; two counts of operating a vehicle while under the influence of alcohol [V.T.L.§1192].

7.      This is an appeal from the judgment rendered on February 28, 2007 (Honorof, J.).

8.      Appellant is proceeding on the original record.

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CASES AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    III.    Verdict and Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    POINT I.

    THE PEOPLE FAILED TO PROVE MARTIN HEIDGEN'S
    GUILT OF CRIMES INVOLVING A DEPRAVED
    INDIFFERENCE TO HUMAN LIFE BEYOND A REASON-
    ABLE DOUBT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        I.    PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . 33

        II.    APPLICABLE LEGAL PRINCIPLES . . . . . . . . . . . . . . . 35

            A.    Penal Law Statutes . . . . . . . . . . . . . . . . . . . . . . . . 35
            B.    Standard of Review of Sufficiency of the
                Evidence Claims . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF CONTENTS (cont'd)

C.  In Accordance with *Feingold*, Depraved
    Indifference Is a Mental State . . . . . . . . . . . . . . . . . . . 35

III.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

A.  Does Intoxication Negate Depraved
    Indifference? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
B.  When Making a Determination of Depraved
    Indifference, it Is the State of Mind at the Time
    Of the Incident – Not When He Began Drinking –
    That Should Be Judged . . . . . . . . . . . . . . . . . . . . . . . 41
C.  The People's Proof Failed to Establish Depraved
    Indifference . , . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

POINT II.

MR. HEIDGEN WAS DENIED HIS RIGHT TO A FAIR
TRIAL AS A RESULT OF THE TRIAL COURT'S DECISION
TO PERMIT A DNA TEST IN THE MIDDLE OF TRIAL
AND THEN  REVERSE HIS OWN DECISION AND
ADMIT THE PREVIOUSLY EXCLUDED  BLOOD SAMPLE
PURPORTED TO BE MR. HEIDGEN'S . . . . . . . . . . . . . . . . . . . . . . . . 63

I.  PROCEDURAL BACKGROUND  . . . . . . . . . . . . . . . . . . . 64

II.  APPLICABLE LEGAL PRINCIPLES  . . . . . . . . . . . . . . . . 69

A.  The Admissibility of Real Evidence  . . . . . . . . . . . . . . 69
B.  Statutory Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . 69

III.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## TABLE OF CONTENTS (cont'd)

A.  The Court's Decision to Permit this Scientific
Testing in the Middle of Trial Was Procedurally
Erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

B.  Permitting DNA Testing Precluded Mr. Heidgen
from Receiving a Fair Trial . . . . . . . . . . . . . . . . . . . . . 73

C.  No DNA Test Could Render Reliable a Piece of
Evidence the Court Already Deemed Unreliable
and Excluded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

D.  This Error Cannot Be Deemed Harmless . . . . . . . . . . 78

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

POINT III.

MARTIN HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED
AND IMPROPERLY ADMITTED INTO EVIDENCE. . . . . . . . . . . . . . . 81

I.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . 81

II.  THE APPLICABLE LEGAL PRINCIPLES . . . . . . . . . . . . . 86

III.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

A.  Mr. Heidgen's Blood Was Drawn after the
Expiration of the 2-hour Time Limit Mandated
by Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

B.  Mr. Heidgen's Blood Was Drawn Without His
Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

C.  The Police Did Not Have a Search Warrant for
Mr. Heidgen's Blood . . . . . . . . . . . . . . . . . . . . . . . . . . 93

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

iv

## TABLE OF CONTENTS (cont'd)

POINT IV.

THE TRIAL COURT ERRED IN PRECLUDING THE DEFENSE
FROM PRESENTING THE TESTIMONY OF A POLICE
ACCIDENT RECONSTRUCTIONIST . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
    I.      FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 95

    II.     APPLICABLE LEGAL PRINCIPLES . . . . . . . . . . . . . . . . 98

    III.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

    IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

POINT V.

MR. HEIDGEN'S RIGHT TO A FAIR TRIAL WAS VIOLATED
BY THE TRIAL COURT'S FAILURE TO ADDRESS CERTAIN
INSTANCES OF JUROR MISCONDUCT AND HIS ERRON-
EOUS FINDING THAT OTHERS WERE UNSUBSTANTIATED . . . . 104
    I.      PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . 104

    II.     APPLICABLE LEGAL PRINCIPLES . . . . . . . . . . . . . . . . 108

    III.    ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

           A.    The Court Erred in Limiting the Scope of the
               §330.30 Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
           B.    The Court Erred in Denying the §330.30
               Motion Following the Hearing . . . . . . . . . . . . . . . . 113

    IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

# TABLE OF AUTHORITIES

**CASE**                                                                    **PAGE**

Boddie v. Connecticut, 401 U.S. 371 (1971) ............................ 98

Emeagwali v. Brooklyn Hospital Ctr., 60 A.D.3d 892 (2d Dept. 2009) ...... 102

In re B., 45 A.D.2d 724 (2d Dept. 1974) ............................... 89

Irvin v. Dowd, 366 U.S. 717 (1961) ................................... 108

Jackson v. Virginia, 443 U.S. 307 (1979) ............................. 35

Mattot v. Ward, 48 N.Y.2d 455 (1979) ................................. 99

Parker v. Gladden, 385 U.S. 363 (1966) ............................... 108

People v. Allen, 73 N.Y.2d 378 (1988) ................................ 89

People v. Almond, 151 A.D.2d 820 (3d Dept. 1989) ..................... 88

People v. Alomar, 55 A.D.3d 617 (2d Dept.2008) ....................... 76

People v. Anderson, 249 A.D.2d 405 (2d Dept. 1998) ................... 110

People v. Arnold, 96 N.Y.2d 358 (2001) .............................. 111

People v. Berk, 88 N.Y.2d 257 (1995) ................................ 98

People v. Brown, 48 N.Y.2d 388 (1979) ...................... 108, 109, 111

People v. Challis, 172 A.D.2d 552 (2d Dept. 1991) .................... 89

People v. Childs, 29 A.D.3d 709 (2d Dept. 2006) ..................... 80

People v. Contes, 60 N.Y.2d 620 (1983) .............................. 35

## TABLE OF AUTHORITIES (cont'd)

CASE                                                                    PAGE

People v. Coon, 34 A.D.3d 869 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

People v. Crimmins, 36 N.Y.2d 230 (1975) . . . . . . . . . . . . . . . . . . . . . . . 102

People v. Daniels, 84 A.D.2d 916 (4th Dept. 1981) . . . . . . . . . . . . . . . . . . 84

People v. Daniels, 265 A.D.2d 909 (4th Dept. 1999) . . . . . . . . . . . . . . . . . 45

People v. Dashnau, 187 A.D.2d 966 (4th Dept. 1992) . . . . . . . . . . . . . . . . 111

People v. Davis, 21 A.D.3d 1336 (4th Dept. 2005) . . . . . . . . . . . . . . . . . 73

People v. DeLucia, 20 N.Y.2d 275 (1967) . . . . . . . . . . . . . . . . . . . . . . . 108

People v. Dingle, 30 A.D.3d 1121 (1st Dept. 2006) . . . . . . . . . . . . . . . . . 53

People v. Edgerton, 115 A.D.2d 257 (4th Dept. 1985) . . . . . . . . . . . . . . . 109, 113

People v. Feingold, 7 N.Y.3d 288 (2006) . . . . . . . . . . . . . . . 33, 35, 36, 38, 39, 55

People v. Friedgood, 58 N.Y.2d 467 (1983) . . . . . . . . . . . . . . . . . . . . . . . 110

People v. Gomez, 65 N.Y.2d 9 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 46

People v. Gray, 86 N.Y.2d 10 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 99

People v. Hoffman, 282 A.D.2d 928 (4th Dept. 2001) . . . . . . . . . . . . . . . . 45

People v. Julian, 41 N.Y.2d 340 (1977) . . . . . . . . . . . . . . . . . . 64, 69, 75, 79

People v. Kates, 53 N.Y.2d 591 (1981) . . . . . . . . . . . . . . . . . . . . . . . . 90

People v. Keating, 283 A.D.2d 589 (2d Dept. 2001) . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES (cont'd)

<u>CASE</u>                                                                    <u>PAGE</u>

<u>People v. Kelly</u>, 288 A.D.2d 695 (3d Dept. 2001) . . . . . . . . . . . . . . . . . . . . . . . 98

<u>People v. Lafferty</u>, 177 A.D.2d 1043 (4th Dept. 1991) . . . . . . . . . . . . . . . . . . 111

<u>People v. Lazartes</u>, 23 A.D.3d 400 (2d Dept. 2005) . . . . . . . . . . . . . . . . . . . 44, 61

<u>People v. Magnano</u>, 175 A.D.2d 639 (4th Dept. 1991) . . . . . . . . . . . . . . . . . . 113

<u>People v. Maragh</u>, 94 N.Y.2d 569 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 110, 112

<u>People v. Miller</u>, 174 A.D.2d 901 (3d Dept. 1991) . . . . . . . . . . . . . . . . . . . . 64

<u>People v. Negron</u>, 91 N.Y.2d 788 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

<u>People v. Padula</u>, 197 A.D.2d 747 (3d Dept. 1993) . . . . . . . . . . . . . . . . . . . . 46

<u>People v. Payne</u>, 3 N.Y.3d 266 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 38

<u>People v. Redd</u>, 164 A.D.2d 34 (1st Dept. 1990) . . . . . . . . . . . . . . . . . . . . . . 108

<u>People v. Register</u>, 60 N.Y.2d 270 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>People v. Rivera</u>, 184 A.D.2d 153 (1st Dept 1993) . . . . . . . . . . . . . . . . . . . . 76

<u>People v. Romano</u>, 8 A.D.3d 503 (2d Dept. 2004) . . . . . . . . . . . . . . . . . . . 111, 112

<u>People v. Ruffell</u>, 55 A.D.3d 1271 (4th Dept. 2008) . . . . . . . . . . . . . . . . . . . 72

<u>People v. Sanchez</u>, 98 N.Y.2d 373 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>People v. Skardinski</u>, 24 A.D.3d 1207 (4th Dept. 2005) . . . . . . . . . . . . . . . . . . 91

<u>People v. Suarez</u>, 6 N.Y.3d 202 (2005) . . . . . . . . .   32, 33, 37, 42, 44, 45, 47, 56, 62

## TABLE OF AUTHORITIES (cont'd)

**CASE**                                                                **PAGE**

People v. Thacker, 166 A.D.2d 102 (1st Dept. 1991) . . . . . . . . . . . . . . . . . . . . . 61

People v. Valencia, 58 A.D.3d 879 (2d Dept. 2009) . . . . . . . . . . . . . . . 40, 41, 43

People v. Wells, 53 A.D.3d 181 (1st Dept. 2008) . . . . . . . . . . . . . . . . . . . . 42, 43

People v. Williams, 184 A.D.2d 437 (1st Dept. 1992) . . . . . . . . . . . . . . . . . . 46

People v. Wimes, 49 A.D.3d 1286 (4th Dept. 2008) . . . . . . . . . . . . . . . . . . 40, 41

Schmerber v. California, 384 U.S. 757 (1966) . . . . . . . . . . . . . . . . . . . . . . . 86

Turner v. Louisiana, 379 U.S. 466 (1965) . . . . . . . . . . . . . . . . . . . . . . 104, 108

United States v. Beach, 296 F.2d 153 (4th Cir. 1961) . . . . . . . . . . . . . . . . . . 109

United States v. Weiss, 752 F.2d 777 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . 109


**STATUTES**

C.P.L.§240.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

C.P.L.§240.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 69, 72

C.P.L.§240.90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 72

C.P.L.§330.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 104, 105, 110, 113

C.P.L.§470.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 99

N.Y. Const. Art. I, §6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 63, 73, 95, 104

## TABLE OF AUTHORITIES (cont'd)

| CASE | PAGE |
|---|---|
| P.L.§15.05 | 40 |
| P.L.§120.10 | i, 1, 32, 35 |
| P.L.§120.25 | 36 |
| P.L.§125.25 | i, 1, 32, 35 |
| U.S Const. Amend. VI | 63, 95 |
| U.S. Const. Amend. XI | 104 |
| U.S. Const. Amend. XIV | 38, 63, 95, 104 |
| V.T.L.§1192 | i, 1 |
| V.T.L.§1194 | 85, 86, 87, 88 |

x

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- against -

MARTIN HEIDGEN,

*Defendant-Appellant.*

-------------------------------------------------------------------x

## BRIEF FOR DEFENDANT-APPELLANT

## PRELIMINARY STATEMENT

This is an appeal from a judgment rendered on February 28, 2007, in Nassau

County Court (Honorof, J.) convicting Martin Heidgen, after a jury trial, of two

counts of Murder in the Second Degree [P.L.§125.25(2)]; three counts of Assault in

the First Degree [P.L.§120.10(3)]; and two counts of operating a vehicle while under

the influence of alcohol [V.T.L.§1192]. (T.2678-80). On February 28, 2007, Mr.

Heidgen was sentenced to an indeterminate term of imprisonment of 18 years to life.

(S.138).[1]

-----------------------

[1] Numbers in parentheses preceded by the letters: "S" refer to the pages of the
transcript of the sentencing; "T" refer to the pages of the trial transcript; "H" refer to
the pages of the pre-trial suppression hearing.

## QUESTIONS PRESENTED FOR REVIEW

1.  Whether the people failed to prove Martin Heidgen's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt?

2.  Whether Mr. Heidgen was denied his right to a fair trial as a result of the trial court's decision to permit a DNA test in the middle of trial and then reverse his own decision and admit the previously excluded blood sample purported to be Mr. Heidgen's?

3.  Whether Martin Heidgen's blood was illegally obtained and improperly admitted into evidence?

4.  Whether the trial court erred in precluding the defense from presenting the testimony of a police accident reconstructionist?

5.  Whether Mr. Heidgen's right to a fair trial was violated by the trial court's failure to address certain instances of juror misconduct and his erroneous finding that others were unsubstantiated?

2

## STATEMENT OF FACTS

I.   **The People's Case**

At 2:10 a.m. on July 2, 2005, NYS Trooper Patrick Siegler responded to the

southbound lanes of the Meadowbrook Parkway. Upon arriving, Siegler observed a

limousine facing south in the center lane, a pick up truck in the left lane, and a Nissan

Maxima facing north in the right lane. He saw Stanley Rabinowitz in the front seat

of the limousine and Jennifer Flynn seated on the center median. Siegler then looked

inside the limousine where he saw several injured passengers. In the pick up, he saw

Mr. Heidgen sitting mostly upright with his eyes open. (Siegler: T.318-22)

Mr. Heidgen was removed from the pick up and placed in an ambulance.

Siegler got into the ambulance and observed that Mr. Heidgen's eyes were watery and

bloodshot and there was a strong odor of alcohol on his breath. Siegler asked Mr.

Heidgen his name but got no response. Siegler then exited the ambulance and, after

the ambulance left at approximately 2:33 a.m., he went to Mr. Heidgen's pick up

where he found a wallet on the floor and learned Mr. Heidgen's name from his

Arkansas driver's license. Siegler gave that information to Inv. Harris and then Tr.

Stafford at the hospital. (Siegler: T.323-26, 344)

Siegler further added that at 2:33 a.m., the decision was made to arrest Mr.

Heidgen but no one told Mr. Heidgen. (Siegler: T.341-42)

3

On July 1, 2005, Jennifer Flynn attended her sister's wedding. At approximately 1:30 a.m., Mrs. Flynn got into a limousine with her mother, father, husband and two daughters Grace and Kate to go home to Long Beach. Mrs. Flynn recalled hearing a crash and being thrown forward. Her father's legs were stuck in the bar and the limousine screeched to a stop. Mrs. Flynn got up, put her daughter Grace down and went for help. When she returned to the limousine, she looked for her daughter Kate and then saw Kate's head on the floor and picked her up and held her. (J.Flynn: T.348, 351-52, 355, 358-60)

Neil Flynn testified that, after attending his sister-in-law's wedding, he got into a limousine with his family. Mr. Flynn was falling asleep in the rear of the limousine when it crashed, knocking him unconscious. When he woke, he heard his wife say their daughter was dead. He saw his father-in-law suspended in the middle of the limousine with his legs jammed against the passenger side and head against the roof. (N.Flynn: T.372-76)

The police pulled Mr. Flynn from the limousine and placed him in an ambulance which transported him to the hospital. His injuries included: two broken vertebrae, crushed lumbar, broken nose, collapsed lung, damaged heart, broken ribs, and tears to his eye and mouth. (N.Flynn: T.378-79)

Denise Tangney, Jennifer Flynn's mother, was in a limousine driven by Stanley

4

Rabinowitz with her husband and daughter's family when she noticed a light in the distance coming toward the limousine. After they crashed, she awoke on the floor between the bench and bar. She heard Jennifer ask where Kate was and then heard her say that she was dead. (D.Tangney: T.393-95)

Mrs. Tangney next recalled waking up in the hospital with injuries including: damaged right knee and hip, and skin and muscle torn off her leg requiring artificial rods and pins to be inserted in her legs. (D.Tangney: T.398, 402-04)

Christopher Tangney, Jennifer Flynn's father, is a retired Nassau County police officer. He recalled leaving his daughter's wedding at approximately 1:30 a.m. and getting into Stanley Rabinowitz's limousine. Mr. Tangney, who was not wearing his seatbelt, was seated in the rear of the limousine behind Mr. Rabinowitz and could see out the limousine's front window. (C.Tangney: T.408-10, 413-15)

As the limousine traveled in the left lane of the southbound Meadowbrook Parkway at approximately 60 MPH, Mr. Tangney noticed a bright light coming toward them at what he estimated to be approximately 65 MPH. He then realized it was a car and was about to say something when he heard Rabinowitz gasp and try to get to the right but a small car was next to them. They crashed and the impact threw him and his wife forward and decapitated his granddaughter Kate. Mr. Tangney was suspended in the limousine with his legs tangled in the bar. A short time later, Mr.

5

Tangney's brother arrived and untwisted his legs. When the first responders arrived, they removed Neil and Grace Flynn and then cut the side of the limousine and removed Mr. and Mrs. Tangney and transported them to the hospital. His injuries included: lower right leg broken off between ankle and knee (was re-attached), left femur broken (steel plate inserted), bowel disconnected, torn lung, stomach, liver and spleen, damaged hip, and internal bleeding. (C.Tangney: T.421-33)

On July 2, 2005, Gerard Catanese, M.D., performed an autopsy of Stanley Rabinowitz. Dr. Catanese determined the cause of death was multiple internal injuries and fractures due to blunt impact consistent with a motor vehicle collision. As a result, Dr. Catanese marked "accident" as the manner of death. (Catanese: T.452-55, 462-63)

Michael Demartino, M.D., performed an autopsy of Kate Flynn on July 3, 2005 and determined she died as a result of blunt force injury with decapitation consistent with a motor vehicle crash. He further testified that on the death certificate, he checked "accident" for manner of death and noted the report indicated that the investigation showed the deceased was a "rear seat unrestrained passenger". (DeMartino: T.465-67, 472-73, 477-78)

Michael Tangney, Christopher Tangney's brother, testified that he was on his way home traveling in the center lane of the Meadowbrook Parkway after his niece's

6

wedding, when he noticed a black limousine in the middle lane and a pick up truck in the left lane, both facing southbound. Without knowing his family was in the limousine, Mr. Tangney told his wife who was driving to stop and he got out of the car. He told his wife to call 911 and then approached the limousine from the passenger side and walked around the front and saw the interior cabin crushed with a man inside. He reached in and tried to find a pulse but found none. He walked to the rear of the limousine and opened the door and saw his brother and sister-in-law. (M.Tangney: T.484, 488-93)

PO Christopher Pandolfo was flagged down on the Sunrise Highway by a citizen who told him of an accident on the Meadowbrook Parkway. He notified his command and then drove to the scene. Upon arriving, a police officer approached him and said his family had been in the accident. He approached a woman on the road who was holding a child's head and then radioed for help. (Pandolfo: T.531)

Pandolfo looked in the rear of the limo and saw several injured passengers. He then approached the pick up and saw the dash pushed up against the driver whose legs were bent far apart. He asked Mr. Heidgen who was conscious if he was okay and what happened but received no response. He grabbed Mr. Heidgen's shoulder to get a response and he said "I don't know where I am. What happened?" The officer noticed a smell of liquor and his eyes were glassy. (Pandolfo: T.533-37, 563-64)

7

PO Timothy Nolan arrived at the accident scene at about 2:05 a.m. and observed a silver pick up and limousine with extensive front-end damage. Nolan walked to the truck's passenger side and looked in through the closed window. He observed Mr. Heidgen pushed between the seat and the dash in a crouched position with his legs spread wide apart. Nolan helped remove Mr. Heidgen who was conscious from the pick up truck. Nolan asked Mr. Heidgen if he was okay and if anything hurt but he did not respond. When they placed him on the floor, Nolan asked him his name. He answered "Marty". He then asked Mr. Heidgen where he was coming from and he replied "Long Beach". (Nolan: T.572-75, 579-82, 592)

At approximately 2 a.m., NYS Trooper Daniel O'hare responded to the accident scene with his partner Michael Stafford. Upon arriving, he saw two vehicles with heavy front-end damage. Tr. Knapp instructed O'Hare to go to the hospital with Mr. Heidgen because his blood needed to be drawn. O'Hare retrieved a NYS Police blood kit from his patrol car and accompanied Mr. Heidgen to the hospital in the ambulance. (O'Hare: T.597-99, 601-05)

While in the ambulance, O'Hare remained near Mr. Heidgen's head and observed a strong odor of alcohol. He described Mr. Heidgen's eyes as bloodshot and watery. He asked Mr. Heidgen his name but he did not respond. (O'Hare: T.609-10)

Five minutes after they arrived at the hospital, Tr. O'Hare asked Nurse Busco

8

to draw Mr. Heidgen's blood for evidence. He watched as she opened the blood kit and removed everything leaving the box empty. While also reading the kit's instructions, he then observed Busco clean the injection site with the kit's non-alcohol swab before drawing 2 tubes of Mr. Heidgen's blood using the needle she removed from the kit. After she drew the first tube, she gave it to O'Hare. While the second tube was being drawn, O'Hare inverted the first tube at least 20 times per the kit's instructions and then did the same for the second tube. He then placed the blood-filled tubes in the kit. When the nurse was done, she discarded the kit's used vacutainer and needle. (O'Hare: T.613-14, 620, 643, 647-48, 650-52, 679, 684)

Tr. O'Hare displayed a sample kit for the jury which he explained includes a plastic box inside another box. The plastic box includes: a Lab-1 form on which information is provided regarding the defendant and the incident; 6 integrity seals (4 white and 2 red); instructions on taking blood specimens; a blood collection report; consent form; a non-alcohol swab to clean injection site; a vacutainer and needle; holder for the tubes, a biohazard sticker; and 2 glass tubes for blood with gray tops containing anticoagulant. According to O'Hare, all of the items in the kit were used to obtain Mr. Heidgen's blood. (O'Hare: T.615-17, 643-45)

Once the blood was drawn, O'Hare stepped out of the room and partially filled out all of the seals. He put his initials and the date and time the blood was drawn on

the seals but said he could not complete them because he did not know Mr. Heidgen's name. He testified that he filled them out with the information he had because he thought others would use them at a later time to seal the kit. He then put the partially completed white seals over the tops of the blood tubes and wrote his initials on the tubes themselves before placing them back in the kit. He said that he did not seal the kit at that time even though the instructions tell you to do so because he did not have all of the information. Once he was finished with the blood tubes, he moved onto the kit's paperwork. He asked Nurse Busco to sign the blood collection report but did not fill in the time and date. He also neglected to sign it himself in the space designated for the signature of the officer who observed the blood draw. He admitted this was an oversight and acknowledged the importance of the verification. He also explained that he did not fill out the Lab I, although he acknowledged he was supposed to, because he did not have a lot of the information requested on the form despite the fact that the instructions state that the person who watched the blood draw should fill out the form. He further testified that someone else must have completed the seals and forms that he started although he did not know who. (O'Hare: T.620, 653-58, 661, 668, 674-76, 683, 689)

After O'Hare was finished with his paperwork, he handed the unsealed kit to Tr. Stafford. O'Hare claimed Stafford never told him Mr. Heidgen's name even

though Stafford was there while O'Hare filled out the paperwork. Stafford left with the blood kit and O'Hare remained with Mr. Heidgen until he was relieved later that morning. (O'Hare: T.622, 624, 645-47, 654)

At trial, Tr. O'Hare was shown People's Ex. #17 for identification which he claimed was the blood kit used to obtain and store Mr. Heidgen's blood on July 2, 2005. He testified he recognized the kit because of the white seals used to close it which contained his initials and R.N. Busco's name as the person who drew the blood. The white seals also had Mr. Heidgen's name which he admitted he did not write. (O'Hare: T.625, 661)

Dorothy Busco, a registered nurse at Nassau University Medical Center, testified that Mr. Heidgen was placed in a trauma room upon arriving at the emergency room and 8 to 10 people worked on him. He responded to noxious and painful stimuli. Approximately 10 minutes after he arrived, a trooper asked her to draw Mr. Heidgen's blood with a kit he provided her. (Busco: T.696-99)

To draw Mr. Heidgen's blood, Busco placed a tourniquet on his arm, cleaned the area with a swab from the kit and inserted one of the hospital's sterile needles. After drawing the first tube of blood, she gave it to the trooper to invert, and then drew the second. She then drew the blood needed for the hospital and hooked up the IV. The trooper was standing almost next to her while she drew the blood. When

11

asked about Tr. O'Hare's testimony that she used the needle from the kit, she explained she used the hospital's needle rather than the one included with the police kit because, in addition to drawing blood for the police, she needed to establish an IV line for blood draw for medical purposes and the kit's needle could not be used to establish an IV. She also said that she told the District Attorney she used a different needle about 10 days earlier. (Busco: T.701-03, 752-56, 765-69)

Maureen Roman an evidence technician in the NYS Police Mid-Hudson Regional Crime Lab, testified that she received a sealed blood kit with a General II submission form detailing the items submitted (People's Ex. #17) from Inv. John Ramos. Upon receiving the box, she placed tape on it, initialed it, and placed a bar code on it. She then entered the kit's information in the computer and placed it in the vault.(Roman: T.705-13; Ramos: T.798-803)

NYS Trooper Michael Stafford went to the Nassau University Medical Center to obtain a blood kit from Tr. O'Hare who was to stay at the hospital with Mr. Heidgen. He claimed he did not know Mr. Heidgen's name when he went to the hospital. Upon arriving, he found Tr. O'Hare with the kit in hand filling out the seals. O'Hare gave Stafford the unsealed blood kit which Stafford gave to Inv. Baez when he arrived at the hospital 2 hours later. Baez signed the Lab I form but did not look in the box or write on the kit or other forms. When it was pointed out to him on cross-

12

examination that his name was on the box, he said it was not his handwriting. (Stafford: T.779-84, 787-89, 794-95)

On July 2, 2005, NYS Police Inv. Michael Drake received a sealed blood kit (People's Ex. #17) from Tr. Hemmerich with Mr. Heidgen's name on it. He also received a General II form which he signed after inspecting the box. He placed the box in the vault and locked it. (Drake: T.837-40)

NYS Trooper John Whittall of the Collision Reconstruction Unit examined the three vehicles involved in this accident for mechanical problems. After watching the video and from his own inspection, he determined that the limousine was functioning properly. (Whittall: T.869-71, 876)

NYS Police Inv. Christopher Sweeney, of the Collision Reconstruction Unit, responded to the accident scene at approximately 2:45 a.m. Upon arriving, he examined the road for tire marks but found none which he explained does not mean the vehicles were not breaking or slowing down. He observed scrape marks in the road between the left and center lanes indicative of the area of impact which he explained may not be the exact location of impact because the precise location is difficult to determine. After completing his survey, Sweeney used an electronic total work station to take measurements and angles and record them and then took photos at the scene. (Sweeney: T.914-15, 918-26, 991-92)

13

On July 5, 2005, Inv. Sweeney removed a dash-mounted camera from the limousine and brought it to U.S. Limo where they downloaded the data from the camera onto a computer which they burned onto CD's (Sweeney: T.936-37).

Later that day, Inv. Sweeney participated in the execution of a search warrant at 14 Oceanview Avenue in Valley Stream. He took photographs of the 2-story residence and then entered through Mr. Heidgen's apartment in the back of the building. During the search, Sweeney photographed empty bottles of Grande Old Parr Scotch on top of the refrigerator. After they searched the apartment, they searched the main part of the house which appeared to be unoccupied. (Sweeney: T.938-43)

Inv. Sweeney further testified that along the Meadowbrook Parkway, south of the Baylon Turnpike, in close proximity to the accident scene, there is a two-sided, green and white sign facing south that says "Norman J. Levy Memorial Parkway" so that if you were driving the wrong way on the highway, you could still read it. (Sweeney: T.985-86, 999)

At approximately 4:50 a.m. on July 2nd, NYS Police Inv. Eric Baez went to Nassau University Medical Center and retrieved an unsealed blood kit from Tr. Stafford. Because he knew he had to sign the Lab I chain of custody report, he examined the contents of the kit which included 2 tubes of blood with gray stoppers. The tubes were sealed with red integrity seals which had the initials "DPO" and the

14

date, "7/2/05". When he opened the box, he removed the paperwork and filled in the Lab I but not the General II. (Baez: T.1032-35, 1069, 1086-87)

On cross-examination, Baez acknowledged that the General II and Lab I showed 2 different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the ME toxicology department. The General II indicated that the blood went from Harris to Hemmerich (not from Harris to ME as the Lab I indicated) and then from Hemmerich to Drake to Newburgh BCI evidence to Mid Hudson Crime lab (not the ME). In other words, the 2 chain of custody reports showed the blood going to 2 different places − 1 to Mid Hudson Lab and the other to the ME's toxicology department. (Baez: T.1088-92, 1099)

Baez further testified that he used 2 of the seals O'Hare filled out (with his initials, the date and time, but no name included for subject) to seal the plastic container that held the blood tubes which had red seals with initials and the date but no name for the subject. And, although he learned Mr. Heidgen's name at the accident scene, he did not put it on the seals, paperwork or kit cover because he could not confirm the name. On cross-examination, Baez admitted the red seals were supposed to be used to seal the box − not the blood tubes − and the white seals were to be placed on the blood tubes. He further admitted that the kit should have been sealed by the person who witnessed the blood draw in order to preserve the sample's

15

integrity but O'Hare did not do that. (Baez: T.1034, 1038, 1078-82, 1128)

Baez placed the sealed plastic container in the cardboard box with the paperwork. After leaving the hospital, he returned to the accident scene and gave the blood kit to Inv. Harris. (Baez: T.1041-42)

On the afternoon of July 2nd, Inv. Baez returned to the hospital with Det. Harris and spoke with a doctor who gave them permission to speak with Mr. Heidgen. At approximately 12:30 p.m., they found Mr. Heidgen in the ICU tied to the bed with gauze. They informed him that he was under arrest for DWI but did not tell him the consequences of the accident. Harris used a card from his wallet to advise Mr. Heidgen of his <u>Miranda</u> rights. He nodded that he understood the rights and agreed to speak with them but they did not ask him to sign a form. Baez had no problem understanding him and described him as pleasant, courteous, polite and respectful. The conversation ended when he requested an attorney. They did not ask him for a written statement because his hands were restrained. (Baez: T.1043-44, 1047-49, 1102, 1106-10, 1129)

Finally, Baez testified that the kit was opened in his presence the day before he testified at which time he examined the contents which he recalled were the same as when he had sealed it. (Baez: T.1041-42)

NYS Police Inv. Michael Harris arrived at the accident scene at approximately

16

2:35 a.m. and observed a limousine and pick up with extensive front-end damage. Mr. Heidgen had already been removed to the hospital so Harris spoke with 20-25 witnesses and monitored the medical personnel. (Harris: T.1152-56, 1220)

At approximately 4:20 a.m., Inv. Harris sent Inv. Baez to Nassau County Medical Center to pick up a blood kit. Since Tr. Siegler had already found his wallet in his pick up, they had a tentative identification of Mr. Heidgen at that time. Baez returned at approximately 6:50 a.m. and gave Harris the closed blood kit which he placed under the driver's seat of his car and locked the door. At approximately 8:55 a.m., after the scene was cleared, Harris returned to his car and drove to the Nassau County ME to submit the kit for toxicology analysis but no one was there. While they made some calls to find where to bring the kit, Harris opened the outer box and examined its contents. He removed the paperwork and looked at the plastic container with 2 white seals on it which did not have Mr. Heidgen's name or a supervisor's initials. He saw 2 tubes of blood sealed with red seals with the date and initials "DPO". He then wrote Mr. Heidgen's name on the seals on the plastic container and put his initials in the spot for a supervisor's initials. He also filled in information on the Lab I and put it in the outer box and sealed the box with 2 seals. (Harris: T.1157-63, 1172-73, 1223, 1226-27)

When it was discovered that the ME's office was closed for the holiday

17

weekend, the decision was made to transport the blood kit to the NYS Police's Newburgh Lab. Harris drove the kit to the Valley Stream barracks and NYS Trooper Lawrence Hemmerich picked up the kit from Harris in Valley Stream and brought it to State Police Newburgh and gave it to Inv. Michael Drake who signed the General II and placed the kit in the vault.(Harris: T.1173-74; Hemmerich: T.814-16; Drake: T.837-39).

At approximately 11:30 a.m. on July 2nd, Harris received a call from the hospital informing him that Mr. Heidgen was conscious and alert. Harris and Baez drove to the hospital where they found Mr Heidgen in the ICU with his hands restrained. After they introduced themselves, Harris read Mr. Heidgen his Miranda warnings after which they asked if he wished to speak with them and he shook his head. Harris then asked Mr. Heidgen what happened. Heidgen replied that he had a fight on the phone with his ex-girlfriend Lindsay Long in Arkansas, his boss owes him $1000, he moved to New York from Arkansas and he got into a "self-destruct" mode. He added that he was very upset and drank a fifth of Old Parr Scotch. Harris then asked Mr. Heidgen how he felt about himself to which he replied that he was disgusted and embarrassed. When they asked if he was trying to hurt himself, Mr. Heidgen responded: "No, never before". Mr. Heidgen added that he was driving around and then got a moment of clarity and decided to go home. When the officers

18

asked Mr. Heidgen what he hit with his truck, Mr. Heidgen said he thought he hit a

tree or median. The officers did not tell him what actually happened. The officers then

questioned Mr. Heidgen about his whereabouts earlier that day. He said he met his

friend Greg Nizewitz at a bar in NYC at about 5 p.m. and drank 4 Bohemian beers.

He left the city about 8 p.m. and got a call from Lindsay about an hour later and they

spoke for 10-12 minutes. He said he left his house about 2 a.m. and drove around.

When the officers again asked if he was trying to hurt himself, he replied: "No, not

under any circumstances". And when asked the question a third time, he reiterated

"No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." Mr.

Heidgen then asked for an attorney and the interrogation ended. (Harris: T.1174,

1194-1204, 1246)

Inv. Harris described Mr. Heidgen as pleasant and upset and said he made eye

contact during the interrogation. He added that he had no problem understanding him.

(Harris: T.1205, 1208)

On July 5, 2005, Harris was present during the execution of a search warrant

at Mr. Heidgen's apartment. There he observed empty liquor bottles and a hunting

rifle. (Harris: T.1213-14, 1285)

Lisa Lindenthaler, a forensic scientist at the Mid-Hudson regional crime

laboratory, was declared an expert in forensic toxicology by the court. Lindenthaler

19

testified that on July 5, 2005, she analyzed for alcohol a sample of blood from a sealed kit [People's Ex. #17] marked with Mr. Heidgen's name. The kit contained two blood tubes, the tops of which were sealed with red seals but no initials written on the tubes. (Lindenthaler: T.1317-25, 1331-35)

At that point, Ms. Lindenthaler's testimony was interrupted by a defense objection to the admission of the blood and a hearing was conducted out of the presence of the jury at which Tr. O'Hare was called to testify. Following that testimony, the court ruled that the People were precluded from introducing the blood evidence. (T.1369-97) That hearing is detailed *infra* at Point II.

Raymond Townsend, the general manager of USA Funerals, testified that on July 2, 2005, Stanley Rabinowitz was driving one of their limousines equipped with a GPS system. That GPS generated a report which showed the limousine's last recorded speed was 60 MPH at 2:01 on the Meadownbrook Parkway. Townsend further testified that all of their cars are equipped with a forward-facing camera mounted on the windshield. He downloaded the information from Rabinowitz's camera and put it on a CD for police. (Townsend: T.1404-05, 1410-16)

At approximately 4:30 p.m. on July 1, 2005, Greg Nizewitz met up with Mr. Heidgen at the House of Brews in Manhattan. He testified that he met Mr. Heidgen about a year earlier through a mutual friend, Josh Zigman. They each drank about 6

20

Bohemian beers at the bar and talked about fantasy baseball. Nizewitz described Mr. Heidgen as happy, in a good mood and excited for the holiday weekend including a party at Amanda Goldman's house that evening. Nizewitz left the bar at about 7:30 and Mr. Heidgen, who he noted was not effected by the alcohol, stayed at the bar to continue flirting with the bartender Jessica whose phone number he was trying to get. He also noted that Mr. Heidgen was not at all depressed. (Nizewitz: T.1422-29)

Tracy Sodikoff met Mr. Heidgen through Josh Zigman and he became a member of their group of friends. Sodikoff recalled that before Mr. Heidgen arrived at the party at Amanda Goldman's house a little before midnight on July 1, 2005, she heard Amanda give him directions on the phone. When he arrived, he was in a good mood, "pretty normal" and happy. And while at the party, she found him to be perfectly happy, laughing and enjoying himself. She saw him drink a few beers and 2 Irish car bomb shots. They talked at the party and she told him a lot of girls thought he was the cutest guy there and would all like to be with him which he seemed to take in stride. (Sodikoff: T.1456, 1460-64, 1468, 1472, 1476-77)

On July 2, 2005, Elizabeth Serwin was driving on the southbound Meadowbrook Parkway on the way home from work at a restaurant where she drank 1½ beers. In the distance, about 2 football field lengths away, she saw a pair of headlights on her side of the road in the center lane. She veered to the right and then

21

stopped on the shoulder. She beeped her horn as the pick up, not veering or swerving, passed her going about 70-75 MPH. She called 911 and told police she was at Exit M7 but she was actually at Exit M9. (Serwin: T.1487-94, 1511)

At 2 a.m. on July 2, 2005, Joseph Caruso was driving home on the southbound Meadowbrook Parkway from a party where he had two drinks. When he was near an overpass, he saw headlights in the center lane about a quarter of a mile away. He was driving about 65-70 MPH and moved into the right lane and the silver pick up passed him going about 70-80 MPH. He then pulled off the road and called 911. (Caruso: T.1538-45, 1559-60)

Stephen Weber testified he called Newsday on Labor Day 2006, more than a year after this accident and a few days before this trial began, after seeing a photo of the accident in the newspaper. He then called police and told them that on July 2, 2005, he was driving his motorcycle in the Meadowbrook Parkway's northbound left lane when he noticed a pick up driving on the wrong side of the road – going northbound in the southbound lanes (on the other side of the road). Weber said he did not look at his speedometer but estimated they were both going about 70 MPH. He further testified that the pick up did not slow down and was not drifting. He could see the driver looking forward with both hands on the wheel. He stayed next to the pick up for 5-7 seconds until the guardrail ended, and then moved to the center lane. He

22

tried to make a plan to warn the driver who he realized may not know he was on the wrong side of the road but lost sight of the truck because of the bushes in the center median just before the Babylon Turnpike overpass. Two seconds later, he heard a loud screech and bang. (Weber: T.1571-77, 1581-83, 1588-89, 1593-95, 1599, 1673)

Steed Davidson was driving on the Meadowbrook Parkway at 2 a.m. on July 2, 2005, in the center lane when a limousine passed him in the left lane. He was traveling at 50-55 MPH and the limousine was going 55-60. Soon after, he saw headlights 50-75 feet ahead in the left lane coming in his direction. The oncoming car hit the limousine head on in the left lane. When the vehicles hit, the limousine came into the center lane and struck his car causing it to spin around. He checked his passengers and then got out of his car and walked to the crash scene and called 911. (Davidson: T.1719-23, 1726-28, 1750-51)

Joshua Zigman became friends with Mr. Heidgen after they met while attending a training class in November 2004 at New York Life Insurance. He described himself as Mr. Heidgen's closest friend in New York and said that he had never seen him in a bad mood. He described him as an "upbeat, happy person". (Zigman: T.1762-63, 1780, 1795)

On July 1, 2005, Zigman attended a party at Amanda Goldman's house. Mr. Heidgen called at about 11:15 p.m. for directions from the Meadowbrook Parkway

23

because he was lost and then arrived 15 minutes later in a happy, upbeat, good mood. They spoke at the party and Mr. Heidgen was happy because he had been flirting with a bartender at the House of Brews for a couple of weeks and she gave him her phone number earlier that day. They also discussed their plans for the holiday weekend including a July 4th barbeque which Mr. Heidgen was excited about. He saw Mr. Heidgen drink 3 beers. (Zigman: T.1772, 1784-86, 1789, 1825-28)

While in jail awaiting trial, Mr. Heidgen wrote Zigman a letter in which he said that he had not spoken with Lindsay on July 1st and lied to police because he thought he had hit a tree or the median and he wanted to protect their friends Amanda and Justin Goldman. He said the bottle of Scotch on top of his refrigerator had been empty for months which Zigman testified he recalled seeing. He also said he had no bills except student loans and that his grandmother had left him money when she died which she wanted him to use to buy real estate. Finally, he said he used lines from the movies Ocean's Eleven and Pulp Fiction during his conversation with police which they were now trying to use against him even though he told them three times he was not trying to hurt himself. In particular, Mr. Heidgen quoted the line "I was upset. I fell into a self-destructive pattern." Zigman added that Mr. Heidgen often quoted movies. (Zigman: T.1801-11, 1815)

On September 22, 2006 Tammy Mickoliger was in the Nassau County Jail's

24

medical facility while Mr. Heidgen's blood was drawn by Albert Parillo, a police department paramedic, using a blood kit she provided. (Mickoliger: T.1975-76; Parillo: T.1926, 1963-64). After each tube of blood was drawn, she inverted the tube and wrote Mr. Heidgen's name and her initials on the kit's white and red seals and the tubes (Parillo: T.1978-80). She then filled out the Lab I and placed seals over the tubes which she placed in the plastic box which she sealed with red seals. She then placed the plastic box in the cardboard outer box and finished the paperwork and placed it in the outer box which she sealed with the 2 remaining white seals. When she was done, she delivered the kit to the ME's office. (Mickoliger: T.1981-85)

Daniel Arana, declared an expert in forensic genetics by the court, testified that on September 20, 2006, he received a sealed blood kit from Inv. Harris containing 2 blood tubes. The seal of one of the tubes was intact and the other had been broken and had clear tape over it to reseal it. He took a sample from each tube and submitted it for DNA typing and then re-sealed the tubes and returned them to the kit which he re-sealed. (Arana: T.2014, 2018-19, 2022, 2024)

On September 22, 2006, Arana received a blood kit from Inv. Mickoliger containing 2 blood tubes. He took samples from each tube which he submitted for DNA typing. He then resealed the tubes and gave them to another analyst to perform tests to verify the results. He compared the DNA profiles of the blood taken from Mr.

25

Heidgen on September 22nd with the blood in the kit he was given on September 20th and determined they were identical. (Arana: T.2025, 2028, 2035)

Forensic toxicologist Lisa Lindenthaler was then re-called and testified that on July 5, 2005, she performed a blood alcohol test on the blood in the kit [People's Ex. #17] and determined the blood alcohol content was .28% ethyl alcohol by weight. (Lindenthaler: T.2060-62, 2068)

Dr. William Closson, the director of toxicology at Bendiner and Schlesinger Laboratories, was declared an expert in forensic toxicology by the court. Dr. Closson, who was paid by the DA, testified that he was given documents about blood testing performed by Lisa Lindenthaler and determined that she performed the tests in a scientifically valid manner. (Closson: T.2122-25)

Dr. Closson then explained how alcohol is absorbed into the blood and described alcohol as a central nervous system depressant that acts like an anaesthetic. He also described how alcohol effects the brain's ability to process information and its effect on a person's psychomotor skills. (Closson: T.2127-28)

When asked a hypothetical question regarding the effects on a man with a .28 BAC, Dr. Closson responded that he would likely have difficulty processing stimuli, thinking, vision, ability to track an object across a field of vision (described as "tunnel vision" which makes a person stare straight ahead), peripheral vision, divided

26

attention activity (ability to perform multiple tasks simultaneously) and reaction time. Dr. Closson added that an intoxicated person may have a reduced inhibition and disregard risks which can cause their judgment to be clouded which can lead them to drink even more and have difficulty processing directions especially in an unfamiliar environment. (Closson: T.2131-33, 2165, 2168)

Finally, Dr. Closson estimated that based on studies of average people, a .28 BAC means that a person had 14 drinks in his system. (Closson: T.2145-47)

## II.     The Defense Case

Joseph Foster, a friend of Mr. Heidgen's for twenty years, testified that they met while attending Catholic school in Little Rock, Arkansas. Foster, who still lives in Arkansas, testified that after Mr. Heidgen moved to New York, they spoke about once a week and that Mr. Heidgen often quoted movies. Finally, Foster recalled that he and his fiancé came to New York on December 31, 2004 and stayed in Mr. Heidgen's apartment. While there, he took some photos, one of which depicted what appeared to be an empty Scotch bottle. (Foster: T.1885-91, 1997-98)

Burke Morledge testified that he met and became close friends with Mr. Heidgen while they were high school seniors in Little Rock. After Mr. Heidgen moved to New York in 2004, they kept in touch and spoke a couple of times a month. Mr. Heidgen called him on July 1, 2005 at about 5:30 from a bar to tell him that he

27

ran into someone from Little Rock and asked if he knew the person. He described Mr.

Heidgen, who was planning a trip to Little Rock in a few weeks,

as jovial and happy during their conversation. (Morledge: T.1909-10)

Mr. Heidgen's mother, Margot Aponte, testified that her son moved to New

York in October 2004 from Arkansas shortly after he graduated from the University

of Mississippi. Mrs. Aponte married Victor Aponte in April 2005 in a small civil

ceremony that her son was unable to attend because he had plans to go on a pre-paid

fishing trip with a friend who was getting married. Although the People made much

of her son missing the wedding, Mrs. Aponte explained that he never expressed any

concern about her marriage and when he returned from his fishing trip, he cooked and

served them a dinner to celebrate their marriage. She added that he was very happy

for them and spent time with her new husband. (Aponte: T.2197-2200, 2227)

When asked about her son's attitude toward money and his career, Mrs. Aponte

explained that he was never worried about making money and being successful. She

described him as a very optimistic and smart young man who felt successful. She also

testified that he liked his job and the people he was working with and was generally

having a good time and enjoying his life in New York. With respect to his financial

situation, Mrs. Aponte explained that she did not charge him rent to live in her house.

She also testified that his father was helping him with his bills including his car

28

payment, insurance and student loans and he had inherited $20,000 when his grandmother recently passed away. (Aponte: T.2203, 2213, 2221-26, 2335)

NYS Police Sgt. Scott Crawford, of the NYS Police accident reconstructionist unit, testified that on July 2, 2005, he was assigned to perform an accident reconstruction on the Meadowbrook Parkway. He arrived at the scene at approximately 2:52 a.m. and walked around to observe any evidence. He then documented his findings with a total work station using an electronic laser to measure distances and angles which were used to create a forensic mapping of the scene. (Crawford: T.2240-46)

After recording the measurements, Sgt. Crawford analyzed the actual collision by performing a reconstruction of the accident. As a result, he reached conclusions which he memorialized in a report dated January 13, 2006 which was turned over to the District Attorney. (Crawford: T.2247-48)

Sgt. Crawford was then asked by defense counsel to describe his training and experience for the jury. Following his detailed questioning regarding Sgt. Crawford's experience and training, defense counsel asked the court to declare Crawford an expert in accident reconstruction. This was followed by *voir dire* examination by the People during which Crawford said "technically" he is not an expert in angular momentum (the type of analysis he used) or comfortable with it because "There is

29

usually too many variables in it". (Crawford: T.2248-49, 2253-56)

Following the prosecution's *voir dire* after which she objected to the declaration of the police witness as an expert, the court asked Crawford if he had ever been qualified as an expert to which he replied he had not. Oral argument was then heard by the court after which he sustained the People's objection thus ending the defense examination of the witness. (T.2256, 2262-63)

Steven Schneider, declared by the court to be an expert in professional engineering specializing in accident reconstruction and highway safety design, was retained by the defense to perform an accident reconstruction and review the safety of the highway's design. In furtherance of that effort, Mr. Schneider reviewed the drive cam, videos and police reports and made several visits to the site of the accident. (Schneider: T.2274)

Schneider performed an analysis of the speeds the vehicles were traveling at the time of the accident. Using the GPS report and drive cam video, Schneider determined to a reasonable degree of scientific certainty that the limousine was traveling at 62 MPH eight seconds before the crash and 49 MPH at the time of impact. He then determined the speed of the pick up using two different types of analysis – linear momentum and the time-distance formula. Using the linear momentum formula, Schneider determined that the pick up was traveling at 33 MPH

30

at the time of impact. And, using the time-distance formula, he determined that the

pick up was going 38 MPH at impact.  (Schneider: T.2304-05, 2312, 2323-24)

## III.   Verdict and Sentencing

On October 17, 2006, the jury convicted Mr. Heidgen of two counts of Murder

in the Second Degree; three counts of Assault in the First Degree; and two counts of

Operating a Vehicle While Under the Influence of Alcohol (T.2678-80). On February

28, 2007, Mr. Heidgen was sentenced to an indeterminate term of imprisonment of

18 years to life. (S.138)

## ARGUMENT

## POINT I.

## THE PEOPLE FAILED TO PROVE MARTIN HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE DOUBT.

On appeal, Mr. Heidgen contends that the People failed to prove his guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt. Following a trial by jury, Mr. Heidgen was convicted of two counts of Murder in the Second Degree [P.L.§125.25(2)], and three counts of Assault in the First Degree [P.L.§120.10(3)], both of which require proof that he acted with a depraved indifference to human life. However, even viewing the evidence in the light most favorable to the People as we are required to do, the evidence that Mr. Heidgen was acting with a culpable mental state of depraved indifference when his blood alcohol level was, according to the People, a .28, simply did not rise to the level of proof beyond a reasonable doubt. The evidence did not show that Mr. Heidgen acted with a mental state that was "at least as morally reprehensible as intentional murder [People v. Suarez, 6 N.Y.3d 202 (2005)], or "so wanton, so deficient in a moral sense of concern, so devoid of regard for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person

32

who intentionally causes the death of another." <u>People v. Payne</u>, 3 N.Y.3d 266, 271 (2004). As a result, the conviction on each of these counts should be vacated and the underlying indictment dismissed.

## I.   PROCEDURAL BACKGROUND

Mr. Heidgen gave the trial court every opportunity to remedy this issue by presenting not 1 but 3 pre-trial motions to dismiss the depraved indifference charges. By motion dated October 20, 2005, Mr. Heidgen requested, *inter alia*, dismissal or reduction of those counts of the indictment involving depraved indifference arguing his conduct simply did not demonstrate the requisite depraved indifference to human life in accordance with the state of the law at the time. That request was denied by decision dated December 15, 2005 (Dillon, J.).

Next, as a result of the Court's decision in <u>People v. Suarez</u>, 6 N.Y.3d at 202, Mr. Heidgen moved the court to renew his motion to dismiss wherein he argued that, in light of <u>Suarez</u>, in which the Court took steps to define "depraved indifference to human life", the evidence presented to the Grand Jury should be re-examined. That request was denied by decision dated April 24, 2006 (Honorof, J.).

Finally, following the Court of Appeals' decision in <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006), Mr. Heidgen once again renewed his motion to dismiss the charges involving depraved indifference. There, he argued that, in accordance with

33

Feingold, depraved indifference was no longer to be analyzed using the Register formulation and now should be determined based on an examination of the defendant's state of mind as of the time of the alleged criminal conduct. Once again, that request was denied by the court.

The trial court was given yet another opportunity to dismiss the depraved indifference counts at the end of the People's case upon defense counsel's motion to dismiss. There, defense counsel argued:

> Based upon the New York Court of Appeals case that recently decided in People versus Feingold, wherein the Court of Appeals has established a new standard where the district attorney must prove beyond a reasonable doubt the state of mind, not the surrounding circumstances, but the state of mind of an individual acted in a depraved indifference to human life.
>
> I believe that the trial evidence that has been presented in this case by the district attorney's office has failed, and is not legally sufficient to sustain that charge as the law has recently been promulgated by the New York Court of Appeals in Feingold.

(T.2194-95). That request was denied (T.2195).[2]

Finally, after trial, in his written C.P.L.§330.30 motion, Mr. Heidgen gave the court one final opportunity to cure the error but the trial court denied that motion as well.

---

[2] This motion by defense counsel preserved this claim for appellate review. C.P.L.§470.05(2).

34

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   *Penal Law Statutes*

Murder in the Second Degree, depraved indifference murder, requires the People to prove that "under the circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person". P.L.§125.25(2).

Assault in the First Degree requires proof that "under circumstances evincing a depraved indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person." P.L.§120.10(3).

### B.   *Standard of Review of Sufficiency of the Evidence Claims*

The standard for reviewing the legal sufficiency of evidence in a criminal case is the same under both state and federal law. It is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'." People v. Contes, 60 N.Y.2d 620, 621 (1983) *quoting* Jackson v. Virginia, 443 U.S. 307 (1979).

### C.   *In Accordance with Feingold, Depraved Indifference Is a Mental State*

Up until the Court of Appeals' decision in People v. Feingold, the New York courts were following the formulation developed in People v. Sanchez, 98 N.Y.2d

373 (2002) and People v. Register, 60 N.Y.2d 270 (1983), wherein the court held that depraved indifference referred to the "factual setting in which the risk creating conduct must occur" and advocated an objective analysis of the conduct. Id. at 278. Now, under Feingold, however, what came to be known as the "Register/Sanchez formulation" is no longer applicable.

In Feingold[3] the Court ruled that "depraved indifference to human life is a culpable mental state" requiring juries to look into the minds of defendants to determine whether, at the time of the alleged crime, they possessed the *mens rea* of depraved indifference. In this landmark decision, the Feingold Court did away with Register's purely objective standard representing a fundamental change in the definitional underpinnings of crimes requiring a *mens rea* of depraved indifference. In analyzing a defendant's conduct, courts and juries are now required to examine a defendant's mental state, not just look at the objective circumstances of the conduct.

Even before Feingold, in Suarez the Court ruled that depraved indifference murder should only be charged in "a small, finite or rare category" of "unusual" cases and made it clear that

---

[3] While the charge in People v. Feingold was Reckless Endangerment [P.L.§120.25], the Court of Appeals explicitly ruled that "the term 'depraved indifference' has the same meaning in both the depraved indifference murder statute and the reckless endangerment statute." People v. Feingold, 7 N.Y.3d at 294. Thus, it should apply equally to the Assault statutes as well.

36

depraved indifference is best understood as an utter disregard for the value of human life – a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy" as to render the actor as culpable as one whose conscious objective is to kill.

People v. Suarez, 6 N.Y.3d at 214-15.

The Suarez Court also provided the "quintessential examples" of depraved indifference murder including: firing into a crowd, driving an automobile along a crowded sidewalk at a high speed, opening the lion's cage at the zoo, placing a time bomb in a public place, poisoning a well from which people draw water, opening a drawbridge as a train is about to pass over it, and dropping stones from an overpass onto a busy highway. Id. Conspicuously absent from this comprehensive list is any case involving a defendant committing a crime while intoxicated and, even more notably, there is no case cited involving driving while intoxicated. That omission is obviously the result of the Court's intention to exclude driving while intoxicated from the specific list of "rare" and "unusual" cases it wished to hold up as examples of depraved indifference crimes even where the end result is the tragic loss of life. The list of "quintessential examples" included only sober acts committed by defendants

37

who consciously disregarded the risks presented by their conduct. This was a deliberate omission by the Court which did not intend to transform driving while intoxicated, even where a fatality is involved, into depraved indifference murder.

## III.   ANALYSIS

The due process clauses of both the State and Federal constitutions require the People to establish each and every element of an offense charged beyond a reasonable doubt to sustain a conviction. U.S. Const., Amend XIV; N.Y. Const., Art. I, §6. And, since the Feingold Court established that "depraved indifference to human life is a culpable mental state" [People v. Feingold, 7 N.Y.3d at 294], the People were required to prove that Mr. Heidgen acted with that mental state. Their failure to do amounts to a constitutional violation requiring reversal of his conviction.

Simply stated, the facts of this case do not rise to the level of what the Court of Appeals now requires to make out a *prima facie* case of depraved indifference murder.[4] That is, he did not exhibit the culpable mental state equivalent to "shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage at the zoo." Id. at 293, *quoting* People v. Payne, 3 N.Y.3d at 272. These examples involve intentional acts designed to create a great danger of injury or death

---

[4] While the arguments herein are focused on the charges of depraved indifference murder, this claim pertains to all counts involving depraved indifference.

even though the perpetrator may not have had the specific intent to cause such injury or death. There was no evidence that Mr. Heidgen had such intent to either create or cause great danger of injury or death.

The Court of Appeals in Feingold completely altered the standard for evaluating a defendant's conduct by holding that depraved indifference is "a culpable mental state" separate and apart from the *mens rea* of recklessness, and requiring juries to look into the minds of defendants to determine whether they acted with a depraved indifference to human life. And, while the "*mens rea* of depraved indifference can, like any other *mens rea*, be proved by circumstantial evidence," [People v. Feingold, 7 N.Y.3d at 296], the evidence at Mr. Heidgen's trial overwhelmingly pointed to his conduct being committed, not with depravity equivalent to intentional murder, but during a state of intoxication that negated the formation of the culpable mental state of depraved indifference. People v. Coon, 34 A.D.3d 869 (2006).

There is no dispute here that Mr. Heidgen was driving after he had been drinking and that tragically two people died and others were injured as a result. The defense conceded this at trial. However, Mr. Heidgen has consistently disputed (and continues to do so) the People's claim that his actions were committed with a mental state of depravity.

39

A.    *Does Intoxication Negate Depraved Indifference?*

In this case, the Court is presented with the question whether the *mens rea* of

depraved indifference can be negated by intoxication. While New York's Penal Law

states that intoxication does not negate recklessness where the "person who creates

such a risk but is unaware thereof <u>solely</u> by reason of voluntary intoxication"

[P.L.§15.05(3)], the same cannot be said for the *mens rea* of depraved indifference.

And, although this remains an open question in this Court [<u>People v. Valencia</u>, 58

A.D.3d 879, 880 (2d Dept. 2009) (This Court, dealing with a depraved indifference

DWI murder case, noted it was not deciding "the separate question of whether

voluntary intoxication may negate the *mens rea* of depraved indifference.")], this

question was answered in the affirmative by the Third Department in <u>People v. Coon</u>,

34 A.D.3d 869, where the court held that since Coon, who while suffering from

cocaine intoxication brought on by his voluntary use of crack cocaine, used a butcher

knife to cut his victim's throat, "was too intoxicated to form a specific criminal intent,

he also would be incapable of possessing the culpable mental state necessary to prove

depraved indifference." <u>Id.</u>

In <u>People v. Wimes</u>, 49 A.D.3d 1286, (4th Dept. 2008), the Fourth Department

also recognized that intoxication may negate the *mens rea* of depraved indifference.

In addressing a challenge to the the factual sufficiency of a plea allocution, that Court

40

noted that "Although there had been testimony at trial that defendant was intoxicated at the time of the incident, there was no mention of intoxication during the plea allocution, despite the fact that intoxication could have negated the element of depraved indifference in the crime to which defendant pleaded guilty". Id. at 1287.

As the People repeatedly argued to the jury, Mr. Heidgen was "deliberately drunk, a point 28 blood alcohol concentration; three and-a-half times the legal limit." (T.2513, 2516). And the People's witness, Dr. Closson testified that hypothetically, a person with a .28 BAC has about 14 drinks in his body at that moment and made a conservative estimate that Mr. Heidgen had consumed at least 20 drinks (T.245). That begs the question, if he was that drunk – a .28 – could he form the *mens rea* of depraved indifference? Other New York courts have said that he could not.

B.   *When Making a Determination of Depraved Indifference, It Is the State*
     *of Mind at the Time of the Incident – Not When He Began Drinking –*
     *That Should Be Judged*

This Court in People v. Valencia, 58 A.D.3d at 880, affirmatively held that the People cannot argue that the *mens rea* component of depraved indifference may be satisfied by considering the defendant's state of mind at a point much earlier than the accident, when he decided to consume an excessive amount of alcohol: "the defendant's state of mind at the time he consumed the alcohol was too temporally remote from his operation of the vehicle to support a conviction for depraved

indifference".

Therefore, to satisfy their burden of proof beyond a reasonable doubt, the People were required to prove that Mr. Heidgen's state of mind *at the time of the accident* was such that he evinced a depraved indifference to human life. As discussed in greater detail *infra*, they failed to do so for the simple reason that his state of mind was not, as the Court of Appeals has described, one which reflects "wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts". People v. Suarez, 6 N.Y.3d at 214.

Moreover, a reversal in this case would not contradict the First Department's decision in People v. Wells, 53 A.D.3d 181 (1st Dept. 2008), which is clearly distinguishable on its facts as well as the legal reasoning upon which that Court relied. According to the Wells Court, it was the manner in which Wells was driving that rendered his actions depraved: "The fact that defendant continued driving in the same manner after almost striking Falek['s vehicle] – indeed reacting to Falek's attempt to get his attention by 'punch[ing]' the gas pedal and taking off again – demonstrated a depraved disregard of the very high risk of death or serious physical injury that his conduct posed to others." Id. at 190. The Court further held that

> defendant's mental state at the time of the collision... is not
> dispositive; rather, culpability is appropriately assessed at
> the time defendant made the conscious decision to embark

> on a course of conduct that inevitably resulted in his operation of a motor vehicle in a state of extreme intoxication. The *mens rea* of depraved indifference... is established by circumstantial evidence demonstrating that defendant made a conscious decision to drink and then, after consuming an excessive amount of alcohol to the point of becoming 'totally wasted.' to drive on city streets at a high rate of speed through red traffic lights, thereby creating a grave risk of death to pedestrians and occupants of other vehicles.

Id. at 193.[5] That is in clear contrast to this Court's decision in Valencia wherein this Court clearly held that "the defendant's state of mind at the time he consumed the alcohol was too temporally remote from his operation of the vehicle to support a conviction for depraved indifference." People v. Valencia, 58 A.D.3d at 880. Thus, any reliance in this case by the People on Wells would be misplaced.

C.    *The People's Proof Failed to Establish Depraved Indifference*

A review of the record reveals that the People failed to present sufficient evidence that Mr. Heidgen acted with the *mens rea* of depraved indifference. While the consequences of his actions were tragic, and any argument made here is not meant to minimize the tragedy, his mental state at the time of the accident was not depraved

---

[5] There was a dissent to this portion of the Court's decision. Like the majority's decision in People v. Valencia, the Wells dissent held that the focus of the *mens rea* determination should be on his "*mens rea* when he engaged in the conduct – which included driving at high speed on city streets through red lights– that caused the victim's death." People v. Wells, 53 A.D.3d at 196.

43

indifference. In <u>Suarez</u>, the Court of Appeals characterized conduct that evinced depraved indifference as "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life and lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" and added that such conduct will reflect "wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts". <u>People v. Suarez</u>, 6 N.Y.3d at 214. Despite the tragic result here, to use any of those terms to describe Mr. Heidgen, who got lost while trying to drive himself home, albeit in an intoxicated state, would be a gross exaggeration.

This Court has held that even where death results, you need something more than recklessness to establish depraved indifference and that something more just is not present here. <u>People v. Lazartes</u>, 23 A.D.3d 400, 403 (2d Dept. 2005) (In depraved indifference cases, the "burden is upon the People to prove something more than merely reckless conduct, particularly where, as here, death results from a motor vehicle accident."). And, the fact that there was a chance of death resulting from his actions, does not suffice to raise the criminal conduct from manslaughter to depraved indifference murder:

> Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been. Otherwise, manslaughter in the second degree would routinely and

44

> automatically become depraved indifference murder in as
> much as the victim (who was, after all, killed) was
> necessarily exposed to a grave or substantial risk of death.
> The critical statutory language that separates second-
> degree manslaughter from depraved indifference murder is
> the defendant's underlying depraved indifference.
> Circumstances evincing a depraved indifference to human
> life' are not established by recklessness coupled only with
> actions that carry even an inevitable risk of death.

People v. Suarez, 6 N.Y.3d at 213. That is precisely what happened here.

An examination of the pre-Feingold cases involving fatal accidents where depraved indifference was found with intoxicated drivers reveals that Mr. Heidgen's conduct falls short of the type of conduct the courts deemed depravedly indifferent. See e.g. People v. Keating, 283 A.D.2d 589 (2d Dept. 2001) (Defendant sped down residential streets at rates twice the speed limit, ignoring traffic signals, colliding with several vehicles, before hitting the victim and fleeing the accident scene.); People v. Hoffman, 282 A.D.2d 928 (4th Dept. 2001) (Defendant struck a car and after being stopped by police who took his keys, grabbed a second set of keys from his girlfriend and drove off, leading police on a chase at 80 MPH, passing cars on the right. Defendant ignored his passengers' pleas to stop and did not attempt to brake when he drove down an off-ramp colliding with another car killing 2 people.); People v. Daniels, 265 A.D.2d 909 (4th Dept. 1999) (After running a red light, defendant engaged in a chase with police at 100 MPH and told a passenger who asked him to

45

stop that he "was not going to jail for a DWI". He continued weaving between lanes
and finally lost control going 80 MPH in a 35 MPH zone, killing 2 passengers.);
People v. Padula, 197 A.D.2d 747 (3d Dept. 1993) (During the evening rush hour,
defendant drove a "high-powered sports car at excessive speed" and, despite his
passengers' pleas to stop, did not brake and ran red light, colliding with a car, killing
a passenger.); People v. Williams, 184 A.D.2d 437 (1st Dept. 1992) (After
sideswiping a car, defendant led police on a high speed chase, sideswiping cars,
running red lights and stop signs and then "rac[ed] through a construction site causing
20 workers to dive out of the way"; then struck and dragged the victim and kept
driving until he hit a bus.); People v. Gomez, 65 N.Y.2d 9 (1985) (After careening
across traffic and striking 2 vehicles, defendant drove on the sidewalk at over 50
MPH and struck a child, when a passenger in his car begged him to stop, the
defendant said "no, I cannot brake... I have killed a person already" and accelerated
further, crossed the street and drove on the opposite sidewalk where he struck another
child. He then crossed another street, drove onto the sidewalk, nearly striking several
more people.).

Without in any way minimizing the result, Mr. Heidgen's conduct does not
approach that exemplified in the above-referenced cases. Those cases involved
drivers who were fully aware of their conduct, who committed extraordinary and

46

intentional aggravating acts such as engaging in high speed chases with police, continuing after striking vehicles and people, ignoring passengers' pleas to stop or making statements evincing an intent to kill. Mr. Heidgen's actions did not even approach the extreme conduct displayed in those cases.

Moreover, if the *mens rea* of depraved indifference was meant to include those who get behind the wheel of a vehicle while intoxicated, then it would need to be charged in every DWI case and that is clearly not what the legislature or Court of Appeals intended. The act of driving while intoxicated, even where there is a fatality, is not the unique, rare or unusual case the Court of Appeals discussed in <u>Suarez</u> which is clear from the omission of this type of conduct from the Court's list of "quintessential examples" of acts of depraved indifference. <u>People v. Suarez</u>, 6 N.Y.3d at 214. As defense counsel noted on summation:

> This isn't a person who didn't care for the life or lives of others. This isn't a person who puts a bomb in Penn Station and doesn't care who gets killed. That is a depraved minded murderer. That is a person who doesn't care who dies. That's a kid who drank too much and was lost trying to get home.

(T.2464).

The People's theory of this case was essentially that Mr. Heidgen was so depressed about his life and angry with himself that he deliberately drove on the

47

wrong side of the road, not caring about the danger he posed to those in his path. They attempted to prove Mr. Heidgen was so sick of his life that he ignored the warnings he must have observed while driving and continued to drive approximately 2½ miles on the wrong side of the Meadowbrook Parkway "not because he meant to cause death, but because he just didn't care? Just doesn't give a damn" (T.2561). The People were wrong and despite their efforts, they could not make this case into a depraved indifference murder.

Although the People produced a large number of witnesses, only a very few of them gave any testimony that bore on the crucial element of Mr. Heidgen's state of mind at the time of the accident and none of whom said that he was anything but happy that night. According to the parade of witnesses produced by the People, Mr. Heidgen began drinking the day before the accident (which occurred at about 2 a.m.) at approximately 4:30 p.m. at the House of Brews in Manhattan with his friend Greg Nizewitz. Nizewitz testified that while at the bar, they talked about sports and plans for the upcoming holiday weekend including an annual party at their friend Amanda Goldman's house (T.1422-23, 1429). Nizewitz described his friend as being in a good mood, happy, and excited about the upcoming weekend (T.1423). When asked whether he would describe Mr. Heidgen as depressed, he replied "not depressed" (T.1426). Nizewitz also testified that, as further evidence of the fact that Mr. Heidgen

48

was looking forward and making plans for the future, he got the phone number of the bartender who he had been flirting with (T.1429). And, while they were at that bar, Mr. Heidgen also called another friend Burt Morledge in Arkansas and discussed coming there for a visit in a few weeks. Morledge described Mr. Heidgen as "jovial, happy" during their conversation. (T.1910) Those are not actions of a man who was planning to hurt himself and/or others. Those are the actions of a young man looking forward to his future.

Later that evening, Mr. Heidgen went to a party at Amanda Goldman's home, arriving at approximately 11-11:30 p.m. after calling for directions. Partygoers described him as being in an upbeat, good mood, "pretty normal", perfectly happy, giggling and laughing and enjoying himself – hardly words you would use to describe a depraved mind murderer. (T.1461-63, 1472, 1783-84). Joshua Zigman testified that while at the party, they discussed a plan for a July 4th barbeque, and Mr. Heidgen was bragging about getting a bartender's phone number earlier that night (T.1785, 1827-28). Zigman even went so far as to say he was surprised that Mr. Heidgen would have told police that he was depressed because he knew him to be an "upbeat, happy person" who liked his job and had no problems with his apartment or finances (T.1695, 1834-37). In fact, none of the party guests testified that Mr. Heidgen was anything but happy. Nothing the witnesses said about him even remotely alluded to

him being in a depraved state of mind that night.

Witnesses recalled that Mr. Heidgen left the party at about 1:30 a.m. and, although the prosecution made much of the fact that he did not make long goodbyes to his friends who he planned to see the following day [T.2538], nothing at all indicated he left there in a state of depression or anger, much less that he was suicidal. But, in their attempt to retrofit this case into depraved indifference murder, the prosecution attempted to portray Mr. Heidgen as a depressed young man who did not like his job, was upset that his mother remarried 3 months earlier and moved to Central Islip, had financial problems, and was upset about an ex-girlfriend in Arkansas. And, in order to contradict their own witnesses who testified that he was happy that night, the People claimed he was fooling them with a mask of happiness: "Whatever rage or depression the defendant was in that night, and that rage and depression that he was studiously hiding from his friends, behind one of those social masks..." (T.2515). This far-fetched theory was belied by the evidence and can be described as nothing less than a desperate attempt by the prosecution to transform a tragic accident into depraved indifference murder.

In support of their theory that Mr. Heidgen's actions were motivated by a depraved indifference to human life, the People made much of Mr. Heidgen's statement to police 10 hours after the accident that he had been home until 2 a.m., had

a fight with his ex-girlfriend, got into "a self destruct mode", drank a fifth of scotch and had financial problems (T.1199). The prosecution treated this as some sort of declaration by Mr. Heidgen that he did not care what happened to him or anyone else. However, each of those statements was refuted by the People's own witnesses and evidence. For example, we know that he was not drinking alone at home - he was drinking at a bar in New York City and then at a party at the Goldman's house. As for his ex-girlfriend, there was no evidence in the phone records that Mr. Heidgen even spoke with her that day, much less fought with her.[6] In fact, he was obviously not sitting around in New York pining over his ex-girlfriend who lived more than 1,200 miles away in Little Rock, Arkansas. Quite to the contrary, he was out at bars, having fun and going to parties with his new group of friends and getting phone numbers from women including a bartender that very night. As for the financial problems, while it is true that he may not have been making a fortune, he was only 23-years old and had a good, steady job in New York City which his friend and mother testified he liked (T.1834, 2226). His mother further testified that her son was not paying rent to live in her house and his father was paying his car loan, car insurance, student loan

---

[6] It is noteworthy that when defense counsel offered the phone records as evidence, the prosecution objected to their admission (T.1232-34). This is further evidence of the People's attempt to keep up their portrayal of Mr. Heidgen as depressed and diminish the defense theory that he was trying to get home.

and cell phone bills. Thus, with no bills to pay, his salary was essentially discretionary income. And, in addition, he had recently inherited $20,000 from his grandmother (T.2203, 2235). With regard to the bottle of scotch, there was also testimony that the Scotch bottle on top of his refrigerator had been there and empty for months.[7] In short, all of the reasons the prosecution gave for Mr. Heidgen not caring about his actions or their consequences that night were refuted by the testimony of their own witnesses.

In particular, in their quest to transform this case into a depraved indifference murder, the prosecution latched onto and harped about Mr. Heidgen's statement to police that he got into a "self destruct mode" which they interpreted to mean that he was trying to kill or harm himself and/or others (T.1199). However, that reliance was sorely misplaced for two reasons. First, the statement is in no way an admission that he had any intent to harm himself and/or anyone else. In fact, during their interrogation, 3 times the police asked Mr. Heidgen if he was trying to hurt himself and all 3 times he unequivocally and forcefully replied that he was not, once

---

[7] Two witnesses supported Mr. Heidgen's explanation that the bottle had been on top of the refrigerator for months. Josh Zigman testified he was in Mr. Heidgen's apartment and recalled Mr. Heidgen had pointed it out to him and said he liked the old bottle. And, Joseph Foster recalled seeing the bottle on December 31st during a visit from Arkansas. The bottle, which appeared empty, was in a photograph Mr. Foster had taken during that visit. (T.1844, 1890)

emphatically stating "No. Not under any circumstances." and the other 2 times replying: "No, never before" and "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." (T.1199-1200, 1204, 1261). Those are not the answers of a man so despondent that he wanted to end his life. Those are the definitive answers of a man who was headed home, which is where he told police he was going when he got into the accident (T.1200-01, 1260). See e.g. People v. Dingle, 30 A.D.3d 1121 (1st Dept. 2006).

The second reason the People's reliance on Mr. Heidgen's statements to police was misplaced becomes evident when viewed in conjunction with a letter he wrote to his close friend Josh Zigman 10 months after the accident while in jail awaiting trial. In that letter, which was introduced into evidence by the People [People's Ex. #84], Mr. Heidgen explained that: (1) in his statement to police following the accident (at which time he did not know 2 people had died – he thought he hit a tree or median), his objective was to protect their friends Amanda and Justin Goldman whose house he had been drinking at that evening because loyalty is very important to him; (2) the scotch bottle on top of his refrigerator had been empty for months; (3) he never spoke with his ex-girlfriend on July 1st so he had no argument with her; (4) he had no financial problems; and (5) in his statement to police, he quoted lines from the movies Ocean's Eleven and Pulp Fiction – the line being: "I was upset I fell into a

53

self-destructive pattern" – which police were now trying to use against him despite the fact that he told them 3 times he was not trying to hurt himself. Zigman added that quoting movies is something Mr. Heidgen did often [T.1810-11, 1815, 1844] which was also corroborated by his friend from Arkansas, Joseph Foster (T.1891).

In an effort to divert the jury's attention away from the fact that the letter completely contradicted the theory of their case, in their summation the People called it "an unbelievable letter, a letter that could only be construed as protecting his image" (T.2543). However, to use the prosecutor's words, it seems "unbelievable" to think Mr. Heidgen, now in jail for several months and facing trial for 2 murders, would be focused on protecting "his image".

Furthermore, before convicting an intoxicated driver of depraved indifference murder, we must ask ourselves what was his objective in driving? Was it to harm or kill someone whether intentionally or with a disregard for the grave risk that it could happen? Or was the objective, as it was in this case, simply to get home without any assessment of risk? If the answer is the latter – to get home – then this cannot be depraved indifference murder. And we know this because the cases cited by the Court of Appeals as the quintessential examples of depraved indifference murder involved some conscious, intentional conduct on the part of the defendant. For example, the person who shoots into a crowd or places a bomb in a public place or opens the lions'

54

cage at the zoo, while not intending to harm or kill, did so "because [he] simply doesn't care whether grievous harm results or not." People v. Feingold, 7 N.Y.3d at 296. Those are examples of depraved acts. The act of drinking and driving does not rise to that level of depravity. And, since a person may not be guilty of a depraved indifference crime without being depravedly indifferent [Id. at 288], this conviction of depraved indifference murder cannot stand.

In addition, it is also noteworthy that, at the time he was interrogated by police, Mr. Heidgen was not aware that 2 people had died in the accident. When the officers asked him what he hit with his truck, Mr. Heidgen said he thought he hit a tree or median and the officers did not bother to tell him what actually happened (T.1201-02, 1246). In fact, in an obvious effort to get him to talk, the officers even went so far as to tell Mr. Heidgen's mother that she should not tell her son what really happened. (Aponte: T.2213). Had the officers been forthcoming with the actual consequences of the accident, the interrogation likely would have been much different and may never have happened at all.

If there was any ambiguity in his statements to police including his statement that he was in "self destruct mode", that ambiguity was cleared up by his 3 unambiguous statements that he was not trying to hurt himself and his explanation that he was trying to get home. Simply stated, there is absolutely nothing in Mr.

Heidgen's statement to police that demonstrates the "uncommon brutality and inhumane cruelty required for depraved indifference murder". People v. Suarez, 6 N.Y.3d at 215. And despite the District Attorney's best efforts to turn this into one, this was not a depraved indifference murder. This was a happy, young man who had been out having fun, playing drinking games with his friends, trying to get himself home at the end of the night.

Furthermore, in support of their theory that Mr. Heidgen consciously disregarded the risk that his conduct posed to others, the People also argued that the way he drove his truck "was steady; it was straight. He maintained his lane. He maintained that 70 mile an hour speed. Everything about the way he drove that car indicated that it was done deliberately..." (T.2513). The prosecutor even quoted his witness Stephen Weber who said Mr. Heidgen "just looked like a guy driving down the road... he's not slumping in that car, his head is not bobbing. He's not looking around in a frantic kind of way for an exit, or reading signs. He looks like a guy with both hands on the wheel, just driving down the road." (T.2519-20). However, what the People described is, according to the testimony of their own expert Dr. William Closson, wholly consistent with the amount of alcohol the People contended Mr. Heidgen consumed before driving:

A:    ...A person who is under the influence of alcohol

56

cannot perform those various activities [involved in driving a car] simultaneously, and those individuals tend to focus on one of those activities.

If they are driving a car it may be focused on the steering wheel, or it may be focused on an object directly in front of them, or it may be focused on the accelerator pedal, but they can't effectively focus on all of those activities at the same time.

Q:    Doctor, with respect to what you described as tunnel vision would it be fair to say that tunnel vision enables a person to see only the things directly in front of them?

A:    Yes. They ignore everything to the sides.

(T. 2132-33). Thus, the People's own expert negates their claim that because he was observed by their witnesses staring straight ahead and operating his truck, that Mr. Heidgen was ignoring everything around him – all of the so-called warning sings – that he was traveling on the wrong side of the road, that he must not have cared about the potential consequences of his actions. Instead it was the result of the intoxication.

Moreover, despite the People's claims to the contrary, the road conditions were such that Mr. Heidgen would not have been alerted that he was driving on the wrong side of the road until right before the accident. The prosecution witnesses Serwin, Weber and Sussingham testified that the road was empty when they saw the pick up [Serwin: T.1516; Sussingham: T.1697; Weber: T.1665] so he would not have seen headlights coming toward him and realized he was driving on the wrong side of the

57

road. In fact, the only driver who testified that Mr. Heidgen passed him while he was driving on the road was Caruso. Serwin testified that she pulled off the road onto the shoulder before the pick up passed her (Serwin: T.1991). Sussingham testified he was all the way to the left approaching the ramp to exit the parkway when Mr. Heidgen passed (Sussingham: T.1691). Weber was on the other side of the road when he spotted Mr. Heidgen who he testified was looking straight ahead [Weber: T.1593] and likely did not even see him. And, Inv. Sweeney further testified that there was a 2-sided sign that said "Norman J. Levy Memorial Parkway" on the center median just south of the Babylon Turnpike overpass very close to the accident scene facing southbound so that it could be read by a person driving the wrong way on the road like Mr. Heidgen (Sweeney: T.984-86, 1001). Thus, if Mr. Heidgen did not know he was driving on the wrong side of the road until moments before the accident because cars were not coming at him and he was able to read a sign telling him the name of the roadway, then he cannot be said to have acted with depraved indifference as the People claimed.

That he did not know that he was driving on the wrong side of the road until immediately before the accident is further supported by the testimony regarding Mr. Heidgen's speed. Although Mr. Heidgen's speed and failure to slow down upon seeing the limousine was repeatedly mentioned by the prosecution who sought to

58

convince the jury that it should be viewed as evidence of his depravity, the People's reliance on that argument was refuted by the evidence. First, the People's only evidence of Mr. Heidgen's speed was from lay witnesses driving on the Meadowbrook Parkway who claimed they estimated his speed at between 65 and 80 MPH (T.427, 1494, 1559, 1583). However, according to Steven Schneider, an accident reconstruction and highway safety design expert, based on many traffic studies, such civilian speed determinations "are highly inaccurate" and unreliable (T.2274, 2340-41). And, although a police expert performed an accident reconstruction and speed analysis, the People mysteriously chose not to put him on the stand. Then, in what can only be presumed to be an attempt to keep out his conclusions because they did not fit the theory of their case, the People objected when the defense called the officer and tried to qualify him as an expert, thus precluding his opinions from becoming part of the record. See *infra* at Point IV.

On the other hand, as recognized by the court, "The People closed their case without putting in an indication of speed. The only indication of speed that has been presented from an expert point of view is by the defense" (T.2427). It was Mr. Heidgen who presented unrefuted, expert testimony regarding the speed of the vehicles. Mr. Schneider testified that, based on information he received from the GPS and the limousine's drive camera, in the 8 seconds prior to the limousine beginning

59

to brake, it was traveling at 60 MPH and at impact approximately 49 MPH (T.2302-04). He also determined to a reasonable degree of engineering certainty that Mr. Heidgen's truck was traveling at 33 MPH at the time of impact under one calculation and 38 MPH using another type of analysis (T.2305-06, 2312, 2319, 2323-26). And there was testimony by prosecution witness Caruso, the only driver to testify Mr. Heidgen passed him, that when he passed Mr. Heidgen about .8 of a mile before the accident, the pick up was going about 70 MPH. That would mean that, in that .8 of a mile, Mr. Heidgen slowed from 70 to between 33 and 38 MPH. That drastic deceleration would indicate a person trying to fix his mistake, not a person with a depraved mind looking to hurt himself and/or others. Thus, the People's claim that Mr. Heidgen was speeding down the Meadowbrook Parkway, passing cars and signs warning him that he was on the wrong side of the road, not caring what damage he caused, is completely belied by the record which clearly indicates that he was slowing down when he struck the limousine. That fact negates the People's claim of depraved indifference and even recklessness. As defense counsel explained on summation, in slowing down Mr. Heidgen was "trying to self correct. He slowed down. What do you do when you are lost; you slow down and you look for signs." (T.2482). In fact, he had been lost earlier on the way to Amanda Goldman's house and had called for directions and then called the Goldman house again at 1:45 a.m., shortly after leaving

60

the party, likely for the same reason (T.1228-29, 1825-26). Those are the indications of a man who is lost, not a depraved mind murderer.

Moreover, this Court has held that evidence that a defendant was slowing down where conditions warranted "is the antithesis of a depraved, as opposed to a reckless, state of mind." People v. Lazartes, 23 A.D.3d at 405 (Court reversed depraved indifference murder conviction where defendant's speeding occurred on roadway designed to accommodate greater rates of speed than residential roads, at an hour where traffic conditions were lighter, the possibility of damage to pedestrians or residences was virtually non-existent, no contact occurred between defendant's vehicle and other vehicles prior to the accident and defendant slowed when traffic warranted.); People v. Thacker, 166 A.D.2d 102, 108 (1st Dept. 1991) (Conviction for depraved indifference murder reversed where "although it was undoubtedly reckless for defendant to have consumed alcohol and to have neglected to apply his brake... these actions do not rise to the level of 'unmitigated wickedness' or 'extreme inhumanity' which characterizes depraved indifference".).

## IV. CONCLUSION

This entire argument can be summed up with one simple question – was Mr. Heidgen on the road that night looking for victims? The obvious answer to that question is, no, he was not looking for victims, he was just trying to get home. And

that answer precludes a finding that he had a *mens rea* of depraved indifference. And, as the Court of Appeals stated in reversing the conviction in <u>People v. McPherson</u> (the companion case to <u>People v. Suarez</u>), "defendant's conduct may have reflected recklessness, but [it] did not fall within the small, finite category of cases evidencing utter depravity, uncommon brutality and inhumane cruelty required for depraved indifference murder". <u>People v. Suarez</u>, 6 N.Y.3d at 215. He was just trying to get home.

Thus, viewing the evidence in the light most favorable to the People as we must, the People failed to prove Mr. Heidgen's state of mind was that of depraved indifference to human life. Therefore, the conviction should be reversed and the underlying indictment dismissed.

## POINT II.

### MR. HEIDGEN WAS DENIED HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S DECISION TO PERMIT A DNA TEST IN THE MIDDLE OF TRIAL AND THEN REVERSE HIS OWN DECISION AND ADMIT THE PREVIOUSLY EXCLUDED BLOOD SAMPLE PURPORTED TO BE MR. HEIDGEN'S.

Mr. Heidgen's State and Federal constitutional rights to a fair trial and due process were violated by the court's decision to permit a DNA test in the middle of trial and then reverse his decision to preclude the admission of blood evidence purported to be Mr. Heidgen's. U.S Const. Amends. VI and XIV.; N.Y. Const. Art. I, §6. This decision to permit DNA testing and then admit the blood was erroneous on the grounds that: (1) it violated the statutory discovery rules; (2) it violated Mr. Heidgen's right to a fair trial as he had already formed and presented his defense based on the understanding that there was no DNA testing performed; and (3) no DNA test could render reliable this piece of evidence which the court had already deemed unreliable and excluded from evidence because it was materially different than the blood evidence obtained by the police at the hospital on July 2, 2005 and because the chain of custody reports were fatally flawed. As a result, Mr. Heidgen's conviction should be reversed and a new trial ordered excluding this evidence.

## I.    PROCEDURAL BACKGROUND

Following the testimony of several of the People's witnesses including Tr. O'Hare (who was present during the collection of Mr. Heidgen's blood while at the hospital after the accident) and Lisa Lindenthaler (the forensic scientist who tested the blood the People claimed to be Mr. Heidgen's), defense counsel moved the court to preclude the admission into evidence of the blood sample in accordance with People v. Julian, 41 N.Y.2d 340 (1977) and People v. Miller, 174 A.D.2d 901 (3d Dept. 1991) (T.1341). There, counsel argued that, because blood is a fungible item, the People were required to prove the evidence (1) is identical to and in the same condition as that involved in the crime; and (2) has not been tampered with (T.1342). Counsel further argued that the blood should be excluded as a result of the trial testimony of Tr. O'Hare who testified that he (a) observed the taking of the blood, (b) placed partially filled out white seals over the tops of the blood tubes; (c) initialed the blood tubes themselves; (d) partially filled out the information on the red seals which would be placed on the kit by someone else at a later time; (e) did not place Mr. Heidgen's name on the seals, tubes or kit because he did not know it; (e) watched Nurse Busco use the needle from the blood kit to draw Mr. Heidgen's blood and then discard it; and (f) neglected to complete the forms included with the blood kit which are included with the kit to ensure the integrity and proper handling of the blood

64

evidence. That testimony was materially different than that of forensic scientist Lisa Lindenthaler who testified that she received blood tubes with red seals over the tops of the tubes, not white seals as Tr. O'Hare claimed he used, and no initials printed on the tubes themselves, which O'Hare testified he had done (T.1324, 1342-45). It was also refuted by the testimony of Inv. Harris who said that when he sent Inv. Baez to the hospital to get the blood, they had already found Mr. Heidgen's wallet in his pick up and, thus, knew his name (T.1226). These discrepancies became obvious when the blood kit was opened in court and the kit's unopened, unused needle was in it. Finally, as a further attack on the trustworthiness of the blood evidence, counsel added that according to the troopers' testimony, the unsealed kit containing the blood tubes was passed from Tr. O'Hare to Tr. Stafford to Inv. Baez thus leaving no assurances that the evidence had not been tampered with (T.1346).

Prior to ruling on the defense motion to preclude the blood, the court ordered the People to re-call Tr. O'Hare for a hearing out of the presence of the jury "to determine whether or not those are the seals he used and whether or not those are his initials. If they are not, the objection is sustained; if they are, the objection is overruled." (T.1350).

Later that day, Tr. O'Hare was called to the stand over defense objection (T.1368-97). There, he testified that he recognized his initials on the white and red

seals. He further testified that he put white seals on the tubes but acknowledged that the blood tubes the People were seeking to put in evidence had red seals on them (T.1370-71, 1376). He also testified that he wrote his initials on the seals prior to applying them to the tubes and on other seals that he did not use which he believed other officers would use later to seal the box containing the blood tubes. He claimed he did not seal the box before handing it off because the defendant's name needed to be placed on the tubes but he did not know it. (T.1372-73, 1378)

On cross-examination, Tr. O'Hare further testified that, despite writing his initials on the very blood tubes themselves, upon looking at the tubes presented by the People at this hearing which they purported to contain Mr. Heidgen's blood, his initials were not there (T.1382). Finally, O'Hare testified that he observed Nurse Busco use the needle from the blood kit to draw Mr. Heidgen's blood and discard it when she was done and that all that was in the box when he handed it over to Stafford were the blood tubes. However, when asked to look in the blood kit the People were attempting to offer into evidence at trial, he found the kit's unopened, unused needle and the blood tube holder. (T.1382-85)

Immediately following his testimony, the court ruled that "The [defense's] objection to further testimony by Lisa Lindenthaler is sustained" which effectively precluded the admission of the blood into evidence (T.1397).

At the end of that trial day, the People moved the court pursuant to C.P.L. §240.40(2)(b)(v), for an order requiring Mr. Heidgen to submit to a buccal swab to obtain a sample of his DNA (T.1431-32). The People argued the DNA test was necessary because of "testimony that we were not aware of, that has caused the Court to rule to exclude extremely crucial evidence in this case; that being the blood evidence and the result of the blood alcohol content from the defendant." (T.1432).

The defense strenuously objected to the People's motion arguing that: (1) the evidence offered for admission at trial was absolutely not in the same condition as it was at the time the blood was drawn from Mr. Heidgen – at the time the blood was drawn, Tr. O'Hare placed white seals on the blood tubes and the blood evidence the People tried to introduce to the jury had red seals; at the time the blood was collected, O'Hare put his initials on the filled blood tubes and the blood tubes the People tried to introduce at trial had no initials; when O'Hare gave the blood kit to Tr. Stafford at the hospital, all that was left in the kit were the filled blood tubes; but the kit the People tried to introduce at trial contained an unopened, unused needle; (2) there were two different chains of custody for the blood which had the blood, in an unsealed box, going to different places and being handled by different people; (3) the People's claim that the testimony just developed was incorrect since the testimony at issue was from one of their own police witnesses and thus was not newly discovered

67

evidence not available before trial; (4) this request could and should have been made during the statutorily proscribed discovery period; (5) the People had every opportunity during the 14-month period between the accident and trial to seek an order to test the blood which was in their custody; (6) during discovery the defense requested the results of all serology and other tests and was told there were none and formed the theory of their defense, planned their case, and questioned the People's witnesses based on that declaration; and, (7) the People cannot just shift gears and try a different way to get a piece of evidence admitted which has been deemed inadmissible based on its obvious unreliability. (T.1433-39)

Despite defense counsel's cogent arguments, the court ruled the proposed DNA test was "a means with relative certainty to determine that it is not Mr. Heidgen's blood or that it is Mr. Heidgen's blood" [T.1439] and then immediately, without an adjournment to permit the defense to conduct any legal research (despite the fact that it was the end of the day), granted the People's request noting "The last thing in the world I'm going to worry about is reversal." (T.1448)

The following morning, defense counsel attempted to re-open discussion of the issue and articulate his position after having the opportunity to conduct legal research. The court refused and also denied the defense's request to stay the execution of the order permitting the District Attorney to utilize the DNA to give the defense

68

time to seek a writ of prohibition from this Court. (T.1453-54).

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   *The Admissibility of Real Evidence*

In People v. Julian, 41 N.Y.2d at 342-43, the Court of Appeals established the

test for the admissibility of real evidence:

> To be admissible, any piece of real evidence must be shown to accurately portray a relevant and material element of the case. When real evidence is purported to be the actual object associated with a crime, the proof of accuracy has two elements. The offering party must establish, first, that the evidence is identical to that involved in the crime; and, second, that it has not been tampered with... Proof of a complete chain of custody is one accepted technique for showing the authenticity of a fungible item of real evidence.

### B.   *Statutory Provisions*

C.P.L.§240.40(2)(b)(v) states in pertinent part that

> Upon motion of the prosecutor, and subject to constitutional limitation, the court... (b) may order the defendant to provide non-testimonial evidence. Such order may, among other things, require the defendant to... (v) Permit the taking of samples of blood, hair or other materials from his body...

C.P.L.§240.90(1) requires: "A motion by a prosecutor for discovery shall be

made within forty-five days after arraignment, but for good cause shown may be

made at any time before commencement of trial."

69

## III.   ANALYSIS

This issue begins with the recognition that the trial court was correct in his initial ruling that the blood evidence was inadmissible as a result of the dramatic defects in the chain of custody and marked differences in the condition of the evidence presented by the prosecution at trial as revealed by the testimony of the People's witnesses. The discrepancies in this testimony obviously convinced the court that the blood evidence, which was crucial to the People's case, could not be relied upon prompting the court to exclude it (T.1397). Although the inquiry regarding the blood should have ended with that ruling, without permitting the defense to research the issue or seek the input of this Court, the trial court acquiesced to the People's request to obtain Mr. Heidgen's DNA for the purpose of confirming that it was his blood in the improperly handled blood tubes which they claimed would render the blood evidence reliable. As argued by defense counsel at the time, that decision violated Mr. Heidgen's right to a fair trial on several grounds. The first argument was based on statutory procedure which is that this request was too late. The People's claim that the DNA testing was necessary because the issue just developed was incorrect because the issue arose from the testimony of their own witnesses and thus could not be considered newly discovered evidence which was not available to them earlier. The People had every opportunity during the approximately 14 months

70

between the accident and trial to test the blood which was in their custody. They never did and should not have been permitted to do so in the middle of trial to cover for their own failure to properly investigate and prepare their case.

The defense's second argument against the DNA order was that during discovery, the defense made a timely request for results of all serology and other tests and was told there were none so they formed the theory of their defense, planned their case, and questioned the People's witnesses based on that information. By allowing the People to perform this DNA testing in the middle of trial, the entire case was fundamentally changed leaving the defense to scramble to alter their case resulting in a violation of Mr. Heidgen's constitutional fair trial rights.

Finally, defense counsel argued that this was just an attempt by the People to shift gears and try a different way to get a piece of evidence admitted which had properly been deemed inadmissible. The court had already ruled the blood was unreliable based on the broken chain of custody and glaring differences in the descriptions of the blood evidence by the People's own witnesses. Thus, any alleged confirmation obtained by the People through DNA testing that Mr. Heidgen's blood was in the tubes should not render reliable this evidence that was already deemed unreliable by the court.

71

A. *The Court's Decision to Permit this Scientific Testing in the Middle of Trial Was Procedurally Erroneous*

While the trial court is empowered to order a defendant to provide "non-testimonial evidence" including DNA samples at the People's request [C.P.L. §240.40(2)(b)(v)], that authority is not limitless. In an obvious effort to avoid situations such as the one presented here where the discovery period ended and a defendant relied upon the People's assertion as to what evidence they would present, the legislature enacted C.P.L.§240.90(1) which mandates a motion by a prosecutor for discovery of this type be made within 45 days after arraignment or, where "good cause" can be shown, may be made up to the commencement of trial. Id. That limitation – before the commencement of trial – was a clear declaration by the legislature that it did not want this type of discovery motion made during trial and for very good reason.

In the case at bar, we are faced with a situation where the discovery motion was made smack in the middle of trial. This was a blatant violation of C.P.L.§240.90(1) which requires such a motion to be made before the trial starts. See People v. Ruffell, 55 A.D.3d 1271 (4th Dept. 2008) (Court held even though made after the 45-day period for discovery passed, "under the circumstances of this case ... the motion [for DNA] was properly granted for 'good cause shown' before the commencement of

trial."). To grant this application in the middle of trial was clear error. See People v. Davis, 21 A.D.3d 1336 (4th Dept. 2005) (Finding untimely the People's mid-trial request to fingerprint defendant.).

The court himself made it clear he was not interested in the soundness of his decision, but only with the appearance of the proceedings when he stated: "The last thing in the world I'm going to worry about is reversal." (T.1448). However, the trial court's duty was to ensure that the defendant received a fair trial which necessarily means following the rules enacted by the legislature and failure to do so should result in the reversal about which the court claimed a lack of concern.

B.   *Permitting DNA Testing Denied Mr. Heidgen His Right to a Fair Trial*

In addition to being procedurally erroneous, permitting DNA testing in the middle of trial resulted in a violation of Mr. Heidgen's State and Federal constitutional rights to a fair trial and due process. U.S Const. Amends. VI and XIV; N.Y. Const. Art. I, §6. All criminal defendants have a statutory right to be provided with any written report of scientific tests conducted by law enforcement. C.P.L.§240.20. As defense counsel vigorously argued, they already formed the theory of their defense, planned their case and questioned the prosecution's witnesses based on the People's representation made in response to their timely pre-trial discovery demands made pursuant to C.P.L.§240.20 that DNA testing had not been done. That

73

defense included a vigorous attack on the blood evidence, clearly a successful strategy given that the trial court precluded the People from admitting the evidence before going back and changing that ruling after allowing DNA testing. It is clear from the record that this defense was directly related to the People's discovery responses. Had the defense known pre-trial, when it would have been appropriate, that such testing would be performed, they may have had a completely different trial strategy which would not have included such a forceful attack on the blood evidence.

Moreover, the court's decision to preclude the evidence only to later admit it actually placed Mr. Heidgen in a worse position than he would have been in had the court not precluded it. This was so because the defense was left scrambling to recover from the tremendous prejudice suffered by what the People claimed to be a verification that the tubes contained Mr. Heidgen's blood. Without the DNA testing, the defense was in a better position to attack the reliability of the blood evidence which was clearly in a completely different condition than it had been in at the time it was drawn by Busco. This decision by the court to change his mind was significantly more than an evidentiary ruling. It had a devastating effect on the defense case and likely severely damaged the credibility of defense counsel who prepared his case and presented it up to that point with the understanding that no testing of this type had been conducted. As a result, Mr. Heidgen was denied his

74

constitutional rights to a fair trial and due process.

      C.    *No DNA Test Could Render Reliable a Piece of Evidence the Court Already Deemed Unreliable and Excluded*

The final reason put forth by the defense against this DNA test was that it was nothing more than an attempt by the People to try a different way to get a piece of evidence admitted which had been deemed unreliable and precluded by the court. Any alleged confirmation obtained by the People through a DNA test could not render it reliable. Although the DNA test may arguably have established Mr. Heidgen's blood was in the tubes, no test could prove the blood had not been tampered with. All of the reasons the court had for precluding the blood – the material differences between Tr. O'Hare's description of the blood tubes he passed on to Tr. Stafford in the unsealed box and those described by Lisa Lindenthaler and presented at trial and the differences in the chain of custody – were still there after the DNA test was performed. In short, the blood evidence was still as unreliable after the DNA test as it was before the test and should have remained excluded.

While it is true that proof of an incomplete chain of custody may be excused where there are reasonable assurances of the identity and unchanged condition of the evidence [People v. Julian, 41 N.Y.2d at 343], "where the circumstances fail to provide such assurances... a gap in the chain of custody affects the admissibility of

the evidence, not just its weight". <u>People v. Rivera</u>, 184 A.D.2d 153, 156 (1st Dept 1993); <u>People v. Alomar</u>, 55 A.D.3d 617 (2d Dept.2008).

In this case we have significantly more than an incomplete chain of custody. Here we have two chain of custody reports that showed the blood evidence going to different people and to different places. That should have given rise to serious doubts about the integrity and reliability of the evidence. The People's own witnesses admitted at trial that the chain of custody report showed Mr. Heidgen's blood being given to different people and being taken to two completely different places for analysis. Inv. Baez testified that the General II and Lab I showed 2 different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the Medical Examiner's toxicology department. In contrast, the General II indicated that the blood went from Harris to Hemmerich (not from Harris to ME as the Lab I indicated) and then from Hemmerich to Drake to the Newburgh BCI evidence to Mid Hudson Crime lab (not the ME). In other words, the 2 chain of custody reports showed the blood going to 2 different places – 1 to Mid Hudson Lab and the other to the ME's toxicology department. (Baez: T.1088-92, 1099). And Tr. O'Hare, arguably the People's most important witness at trial, admitted during his testimony that the Lab I, which he acknowledged travels with the kit and is used to ensure the integrity of the evidence, was wrong in that it should have said Mr. Heidgen to Nurse Busco

76

to O'Hare but he left himself out. He further testified that the form indicated (written by someone else) that the blood was passed from Stafford to Baez and that was wrong as well. (O'Hare: T. 664-5, 673-74) This testimony by the People's own police witnesses clearly demonstrates that the chain of custody reports could not be relied upon to determine the authenticity and reliability of the blood evidence proffered by the People and provide assurances that it was identical to that taken on the night of the accident. What we have here is more than an incomplete chain of custody. It is a completely defective one which destroyed the reliability of the evidence.

Moreover, there were no such "reasonable assurances" of the identity and unchanged condition of the evidence as described in Julian to cure the defective chain of custody. The blood kit was passed from person to person in an unsealed condition and without Mr. Heidgen's name being written on it or the tubes inside leaving it vulnerable to tampering. And the testimony of the People's witnesses demonstrated that the blood evidence Tr. O'Hare described was not even remotely the same, let alone identical to the evidence the People presented for admission at trial. There were several critical differences. First, O'Hare testified that while in the hospital he placed his initials on the blood tubes themselves but the tubes Lisa Lindenthaler testified she received and the tubes the People offered for admission at trial had no initials on them. Second, O'Hare testified that he placed white seals over the tops of the blood

77

tubes in the hospital but the tubes Lindenthaler testified she received and the tubes presented by the People for admission at trial had red seals over the tops. And, third, O'Hare testified that he watched Nurse Busco remove the needle from the blood kit and use it to draw Mr. Heidgen's blood and then discard it, but when the kit was opened at trial, it contained an unopened, unused needle. Those descriptions of the blood evidence by the People's witnesses versus the reality of what was presented in court, could not have been more different.

Given that the blood evidence proffered by the People at trial was materially different than that described by the People's own witnesses which led the court to make the correct decision to exclude the blood in the first instance, any proof that Mr. Heidgen's DNA was in the tubes did not exclude the possibility that the blood had been tampered with. The blood evidence cannot be described as identical, in fact, it does not even resemble the blood evidence described by O'Hare. The court was obviously deeply concerned about the evidence as demonstrated by his initial decision to preclude it and that should have been the end of the road for the blood. Its resurrection based on a DNA test resulted in an unfair trial requiring reversal.

D.   *This Error Cannot Be Deemed Harmless*

This egregious error cannot be deemed harmless given that the evidence had already been excluded as unreliable. The kit containing the blood was passed from

78

person to person in an unsealed condition and the kit proffered by the People at trial materially differed from the one the People's witnesses described as having been obtained on the night of the accident. And, although the court recognized that these differences rendered the blood unreliable and went so far as to exclude it, the court then went ahead and reversed himself and admitted it after the People conducted a DNA test which only proved, if anything, that Mr. Heidgen's blood was in the tubes. That DNA test could not provide the necessary "reasonable assurances" that the blood had not been contaminated or tampered with. People v. Julian, 41 N.Y.2d at 343.

What is more, the integral part of a DWI-related homicide is the defendant's blood alcohol content. Thus, once the court let the blood evidence back in, the blood became the centerpiece of the People's case. The court's decision resulted in grave prejudice to the defense which had planned and presented its case, including a vigorous attack on the reliability of the blood, based on the fact that no such DNA testing had been performed. The decision to permit DNA testing was a tremendous blow to the defense which was procedurally incorrect and substantively unfair. Therefore, it cannot be said that the admission of this evidence was harmless.

## IV.   CONCLUSION

In short, what we had here was a desperate attempt by the People to resurrect a crucial piece of evidence which had been suppressed by the court due to the grossly

negligent manner in which it was handled by police and because the People were unprepared for the attack the defense mounted against it. The defects in the handling of the blood, the chain of custody reports and the material differences in the blood evidence itself described by the People's witnesses exposed by the defense clearly could have been discovered by the People with the appropriate examination of the evidence and preparation of their witnesses. In fact, in support of her application for DNA testing, the prosecutor admitted the request was being made because of the defense's "relentless assault on the identity of whose blood is in that vial" [T.1445] which should be recognized as a job well done by defense counsel given what he revealed by mounting that attack. And then, because they did not do their job, the court gave them another chance by permitting them to conduct a DNA test smack in the middle of trial in violation of the discovery statutes. In reality, this request for DNA testing was made because of poor police work which was uncovered by the defense. As a result, Mr. Heidgen's conviction should be reversed and the case remanded for a new trial excluding the blood evidence. People v. Childs, 29 A.D.3d 709 (2d Dept. 2006) (Where the People failed to demonstrate a complete chain of custody for the evidence supporting those counts, or reasonable assurances as to identity and unchanged condition of evidence, conviction must be vacated).

## POINT III.

## MARTIN HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND IMPROPERLY ADMITTED INTO EVIDENCE.

On appeal, Mr. Heidgen contends that his blood was illegally seized by police, and then was improperly admitted into evidence at trial. As a result, the conviction should be reversed and a new trial ordered.

## I.   FACTUAL BACKGROUND

In April 2006, a combined Huntley/Mapp hearing was conducted addressing, *inter alia*, the admissibility of a blood sample taken from Mr. Heidgen (Honorof, J.). There, PO Christopher Pandolfo testified that shortly after arriving at the accident scene on July 2, 2005, he approached Mr. Heidgen who was alone, seated behind the wheel of his pick up. When Pandolfo approached Mr. Heidgen, who he described as conscious with his eyes open, Mr. Heidgen inquired: "What happened? Where am I?" (Pandolfo: H.3-5, 8, 14-15).

PO Timothy Nolan also responded to the scene and testified that Mr. Heidgen was conscious and that, although his speech was low and slurred, he responded accurately to questions and followed commands. (Nolan: H.24-26, 29-30, 36-39)

Tr. Siegler spoke with Mr. Heidgen in the ambulance. Although he did not

81

answer Siegler's questions, his eyes were open, he was moaning and conscious. According to his paperwork, Tr. Siegler arrested Mr. Heidgen at 2:33 a.m., which would have been while he was en route to the hospital. Siegler admitted at the hearing that Heidgen was not notified of the arrest. (Siegler: H.40-42, 44-51, 56-60)

At approximately 2:30 a.m., Tr. O'Hare entered the ambulance with a blood kit to escort Mr. Heidgen to the hospital. During the 10-minute ride to the hospital, Mr. Heidgen's eyes were open, and he was moaning, groaning and moving. EMT Cook who was tending to Mr. Heidgen, told him to calm down and relax so they could help him. Tr. O'Hare and EMT Cook placed gurney straps on Mr. Heidgen to restrain him to allow Cook to perform necessary medical procedures. During this time, O'Hare, a certified first responder, reluctantly admitted Mr. Heidgen was, by the trooper's own definition, conscious – his eyes were open and he was able to answer questions. (O'Hare: H.64-66, 69-73, 85-87, 96-102)

O'Hare further testified that, shortly after arriving in the hospital, Mr. Heidgen became unconscious at which time he asked Nurse Busco to draw his blood. She drew two tubes of Mr. Heidgen's blood which she handed him. Tr. O'Hare stayed with Mr. Heidgen in the emergency room and accompanied him to the ICU where he stayed until he was relieved. Throughout the time he was with Mr. Heidgen, O'Hare never told him he was under arrest and never sought his consent to draw his blood. He also

did not request a search warrant for his blood or consult with the DA before obtaining it. (O'Hare: H.74-78, 87-93, 96-98, 100-02)

Tr. Zawol was sent to the hospital to relieve O'Hare. Zawol was instructed to "watch" Mr. Heidgen and inform his sergeant when he regained consciousness. When Mr. Heidgen awoke, Zawol spoke with him. Mr. Heidgen thanked everyone for being there and helping him. Tr. Zawol informed Mr. Heidgen that investigators were coming to speak with him and said "Just wait right here and I'll be here with you." Although he admitted he would not have let Mr. Heidgen leave, at no time did Zawol inform him that he was under arrest or advise him of his <u>Miranda</u> rights.[8] In fact he was not formally arrested and Mirandized until Invs. Harris and Baez arrived at the hospital that afternoon.[9] (Zawol: H.104-18; Harris: H.123-24, 127-31, 167)

After the People rested, the defense moved to suppress the blood on the ground that the People failed to show the blood was drawn by a registered professional as required by statute. The hearing court reserved decision and Mr. Heidgen presented his case. The issue was revisited after both sides rested but the application was ultimately denied. (H.190-92, 253-54, 263, 273).

---

[8] The hearing court determined Mr. Heidgen was under arrest at this time and suppressed statements Mr. Heidgen made to Tr. Zawol. (H.272).

[9] Medical personnel bound Mr. Heidgen's wrists to the bedpost with gauze strips; he was not handcuffed. (Zawol: H.105, 112, 118-19; Harris: H.127, 183).

83

The defense called Raffi Zohrabian, M.D., attending emergency room doctor at Nassau County University Medical Center. Dr. Zohrabian testified that he has been a doctor for more than 30 years and an emergency room attending surgeon since 1993. Dr. Zohrabian testified that he treated Mr. Heidgen after the accident including examining him for 15 minutes and administering neurological and physical examinations. Dr. Zohrabian calculated Mr. Heidgen's Glascow coma score which measured his level of consciousness by measuring eye movement, verbal and motor response. Mr. Heidgen received top scores in the eye movement and motor response portions of the exam and scored slightly lower – 3 out of 5 – on the verbal portion. The full score was a 13 out of 15 which he described as "a little below normal, but reasonable". Dr. Zohrabian explained that despite Mr. Heidgen's answers to questions being inappropriate and not always understandable, he was able to answer "yes" or "no" questions and was reasonably conscious. Overall, Dr. Zohrabian's tests revealed Mr. Heidgen was alert, able to comprehend and obey commands, and had eye spontaneity. There was no question in Dr. Zohrabian's mind, based upon a reasonable degree of medical certainty, that Mr. Heidgen was definitely capable of consenting to medical procedures, including giving a blood sample, and that he was able to appreciate the implications of his blood being drawn. In fact, Dr. Zohrabian testified that after the blood was drawn, Mr. Heidgen became belligerent and was intubated

84

so he could no longer speak. (Zohrabian: H.193-207, 214-15, 219-30, 234-39)

After both sides rested, the court heard oral argument. Defense counsel argued, *inter alia*, that troopers failed to formally arrest Mr. Heidgen for purposes of drawing blood pursuant to V.T.L. §1194(2)(a)(1) and further that they failed to seek his consent prior to drawing his blood. Mr. Heidgen was not formally arrested until Invs. Harris and Baez arrived at the hospital sometime after 12:00 p.m. – approximately 10 hours after his blood was drawn and well outside the statute's 2-hour window. Despite Dr. Zohrabian's testimony that Mr. Heidgen was conscious and able to consent, the police did not attempt to obtain it.

The People countered by arguing that Mr. Heidgen was not able to understand he was being arrested so the troopers were under no obligation to tell him he was. They further argued that, despite Dr. Zohrabian's testimony that he was conscious and able to understand, Mr. Heidgen could not consent to the blood draw because he was nonresponsive at the scene and in the ambulance and unconscious at the hospital. The People claimed Mr. Heidgen therefore impliedly consented to his blood being drawn.

The hearing court determined that Mr. Heidgen's blood was properly drawn and admissible on the People's direct case. In so holding, the court reasoned that Mr. Heidgen was arrested at the accident scene and, finding a distinction between the medical definitions of consciousness and responsiveness and those used in law, the

85

court ruled Mr. Heidgen was unable to consent to his blood being drawn and therefore, there was no need to request it. (H.245-51; 260-64; 272-73)

## II.   APPLICABLE LEGAL PRINCIPLES

V.T.L.§1194(2)(a)(1) states that a police officer may direct the administration of a chemical analysis to determine the alcoholic content of blood upon:

> having reasonable grounds to believe such person to have been operating in violation of any subdivision of section eleven hundred ninety-two of this article and within two hours after such person has been placed under arrest for any such violation. . .

The Supreme Court has geld that the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State" and the taking of a suspect's blood is considered a search and seizure which must comply with the mandates of the Fourth Amendment. Schmerber v. California, 384 U.S. 757, 767 (1966).

## III.   ANALYSIS

A.   *Mr. Heidgen's Blood Was Drawn after the Expiration of the 2-hour Time Limit Mandated by Statute*

Pursuant to statute, a chemical blood test is permissible when an officer has a reasonable basis to believe a person has been operating a vehicle while under the influence of alcohol. However, that power is not limitless. The statute specifically

86

states that the blood must be drawn within 2 hours after the suspect has been arrested. V.T.L.§1194(2)(a)(1). However, Mr. Heidgen's blood was drawn approximately 10 hours before he was placed under arrest. The blood sample was therefore improperly obtained.

When police arrived at the scene at about 2 a.m., Mr. Heidgen was conscious and seated at the wheel of his truck. His eyes were open, he asked questions and gave appropriate responses to questions. Several officers testified they smelled alcohol on his breath, observed red, watery eyes and described his speech as slurred. (Pandolfo: H.7-9, 13-14; Nolan: H.28-31; Siegler: H.47-49, 57; O'Hare: H.68). Believing they had probable cause to arrest him at that time, Tr. O'Hare – with a blood kit in hand – accompanied Mr. Heidgen to the hospital to obtain his blood. They left in the ambulance at approximately 2:25 a.m. and arrived at the hospital approximately fifteen minutes later but the time of arrest was noted on police paperwork as 2:33 a.m. although no one bothered to tell Mr. Heidgen. (Siegler: T.51-52; O'Hare: T.76-83)

During the 10-minute ride to the hospital, Mr. Heidgen remained conscious, his eyes were open, he was moaning, groaning and moving. He received medical treatment in the emergency room, including an evaluation of his consciousness, an examination on which he scored almost perfectly. At approximately 2:45 a.m., while he was conscious, O'Hare asked a nurse to draw his blood. That means police were

87

with a conscious Mr. Heidgen for approximately 40 minutes but did not bother to tell him he was under arrest, read him his rights or ask his consent to draw his blood. Approximately ten hours passed from the time Mr. Heidgen's blood was drawn until police formally arrested him – clearly outside the 2-hour time limit proscribed in the statute.[10] People v. Daniels, 84 A.D.2d 916 (4th Dept. 1981) (V.T.L.§1194 provides the exclusive method by which police may direct blood be taken from a motorist; defendant's blood sample was properly suppressed where the blood was drawn before defendant was arrested.); People v. Almond, 151 A.D.2d 820 (3d Dept. 1989).

The police had every opportunity to formally arrest Mr. Heidgen but failed to do so. They arrived at the scene as early as 2:00 a.m., and went with him to the hospital and stayed with him in the emergency room and ICU. Tr. Zawol, who was directed to go to the hospital to "watch" Mr. Heidgen, spoke with him when he awoke at approximately 9:00 a.m. and, rather than inform him that he was under arrest, lulled him into a false sense of security by telling him to stay right there and "I'll be here with you." Zawol admitted he would not have let Mr. Heidgen leave the hospital. (Zawol: H.108) Everyone except Mr. Heidgen knew he was under arrest but noone bothered to tell him before taking his blood.

---

[10] Tr. Zawol testified investigators arrived at the hospital between 11:15 and 11:30 a.m., although that time is about an hour earlier than the time Inv. Harris testified to, it was still almost 9 hours after Mr. Heidgen's blood was drawn.

88

Nor can it be argued that Mr. Heidgen knew or should have known he was under arrest. The hearing testimony revealed he was strapped to the ambulance gurney to enable EMT Cook to perform medical procedures and was later restrained to his hospital bed with gauze, likely for the same reason. Although not indicative of an arrest in and of itself, Mr. Heidgen was not handcuffed. People v. Allen, 73 N.Y.2d 378 (1988). Nor is it dispositive that there was a police presence in his hospital room. This court has held the mere fact that a police officer displays his badge and identifies himself does not constitute an arrest. In re B., 45 A.D.2d 724 (2d Dept. 1974). In fact, Mr. Heidgen's response to Tr. Zawol being at his bedside was one of gratitude, not one of concern regarding his legal status (Zawol: H.106). It is clear that a reasonable person in Mr. Heidgen's position would not have considered himself under arrest under those conditions. People v. Challis, 172 A.D.2d 552 (2d Dept. 1991) (Based on police action at car accident scene and hospital— defendant not handcuffed, placed in police car for his own protection and his movements not restrained— defendant was not under arrest and a reasonable person in his position would not have thought himself under arrest).

Viewing the totality of the circumstances, Mr. Heidgen was not formally arrested until more than 10 hours after the accident. Given the testimony at the hearing by police and the experienced doctor who treated him in the emergency room,

89

the police paperwork indicating the time of arrest as 2:33 a.m., does not cure this serious infirmity. Hence, Mr. Heidgen's blood was improperly drawn in violation of the V.T.L. and should have been suppressed.

### B.    *Mr. Heidgen's Blood Was Drawn Without His Consent*

Additionally, Mr. Heidgen was conscious and able to consent to having his blood drawn yet police never asked him for that consent. Accordingly, the court's ruling to admit the blood on the People's direct case was erroneous.

Although able to consent to his blood being drawn, police did not offer Mr. Heidgen the opportunity to do so. While the V.T.L. provides for implied consent for a blood sample, that provision applies when a driver is unconscious or so disoriented he cannot consent. The Court of Appeals in People v. Kates, 53 N.Y.2d 591 (1981), discussed the distinction between the unconscious and severely disoriented driver and the conscious driver and held that the drawing of blood from an unconscious driver or one that is so disoriented that police are unable to get his consent, is not improper. Id. That was not the case here.

It is undisputed that when police arrived at the scene, Mr. Heidgen was conscious. His eyes were open, he answered questions and followed commands. (Nolan: H.24-26, 29-30, 36-39) While in the ambulance, he remained conscious. (O'Hare: H.69-75, 85-86, 96-100). And, if you believe Tr. O'Hare, Mr. Heidgen did

not lose consciousness until after arriving at the hospital. Although O'Hare, who was at the hospital with a police blood kit in hand solely for the purpose of obtaining a blood sample as his supervisor had directed him to do, spent approximately 40 minutes with a conscious Mr. Heidgen, he never bothered to ask his consent. In fact, there was no testimony that O'Hare even bothered to speak with Mr. Heidgen's doctors to see if he was capable of consenting. Instead he just followed his supervisor's order to get the blood without any consideration of Mr. Heidgen's rights. This was improper and warranted suppression. People v. Skardinski, 24 A.D.3d 1207 (4th Dept. 2005) (Even where defendant may have feigned unconsciousness, it was necessary to arrest her and obtain her consent for a blood sample.).

The most compelling evidence presented at the hearing that police should and could have sought Mr. Heidgen's consent to take his blood was the testimony of experienced emergency room attending surgeon Dr. Zohrabian who performed neurological and physical examinations which proved Mr. Heidgen was conscious, aware of his situation and able to consent to having his blood drawn:

> Q:  Now, Dr. Zohrabian, based upon your medical examination of Mr. Heidgen on that night at that time, do you have an opinion based upon a reasonable degree of medical certainty whether Mr. Heidgen was capable of giving his informed consent or request made of him to perform medical procedures, including that of submitting a sample of blood for the purpose of ascertaining a blood

alcohol level? . . .

A:    That opinion is that he definitely understood what the test is all about and what his responsibility was in terms of responding to the officer's request, and therefore he knew quite well that the blood that was taken from him had some implications.

Q:    Is there any question in your mind?

A:    No, there is no question in my mind.

Q:    And does that opinion encompass the entire period of time from the beginning of your examination?

A:    It did.

Q:    To the end of the examination?

A:    To the end of the examination.

Q:    Including the time that the blood was drawn?

A:    Yes.

(Zohrabian: H.205-206). That testimony was unrefuted. The People did not bring in any doctors or medical personnel to testify about Mr. Heidgen's condition. It was the defense that brought in Dr. Zohrabian who examined Mr. Heidgen in the emergency room that night and he unequivocally declared that Mr. Heidgen was conscious and capable of consenting to medical procedures. That testimony should have been dispositive of this issue.

92

At the hearing, the People argued Mr. Heidgen was unable to understand that he was under arrest and that his physical condition rendered him incapable of consenting. According to the People, it was therefore not necessary to tell him that he was under arrest. They further argued that the troopers were not obligated to seek his consent before requesting hospital personnel to draw his blood. (H.259-64) That theory is clearly belied by the hearing record which demonstrates that, despite his state of intoxication, Mr. Heidgen was conscious and able to consent (or decline) to have his blood drawn. The People's own witness, Tr. O'Hare, a trained first responder, admitted Mr. Heidgen was conscious in the ambulance (O'Hare: H.99). And, an unbiased doctor performed physical and neurological examinations of Mr. Heidgen in the emergency room and determined he was indeed conscious and capable of understanding his situation and the implications of having his blood drawn. Dr. Zohrabian's unrefuted testimony should not have been ignored by the court.

C.   *Police Did Not Obtain a Warrant for Mr. Heidgen's Blood*

Finally, in addition to the means of legally obtaining a suspect's blood sample upon suspicion of DWI discussed *supra*, the police could have obtained a warrant for the blood. All they would have had to do was contact a judge over the telephone and ask for the warrant and they would have gotten it. But they chose not to. Instead, they just had a nurse draw Mr. Heidgen's blood, without any legal authority to do so. And,

93

quite frankly, in a case such as this one, where there were two fatalities and intoxication was suspected, the police would have been prudent to make the obtain the warrant regardless of whether they believed they had implied consent to take the blood.

## IV.   <u>CONCLUSION</u>

In sum, Mr. Heidgen's blood was taken in violation of the V.T.L. and his Fourth Amendment right protecting against unreasonable searches and seizures and should therefore have been precluded at trial. Accordingly, the conviction should be reversed and a new trial ordered excluding the blood evidence.

94

## POINT IV.

## THE TRIAL COURT ERRED IN PRECLUDING THE DEFENSE FROM PRESENTING THE TESTIMONY OF A POLICE ACCIDENT RECONSTRUCTIONIST.

Mr. Heidgen was denied his State and Federal constitutional rights to a fair trial and to present a defense as a result of the court's decision to preclude him from presenting the expert testimony of NYS Police Sgt. Scott Crawford who performed an accident reconstruction in this case. U.S. Const. Amends. XIV and VI; N.Y. Const. Art. I §6. As a result, Mr. Heidgen's conviction should be reversed and a new trial ordered.

### I.   FACTUAL BACKGROUND

At trial, the defense called Sgt. Crawford of the accident reconstructionist unit who testified that on July 2, 2005, he performed an accident reconstruction on the Meadowbrook Parkway. Upon arriving, Crawford walked the scene to observe any evidence. Then, along with Inv. Sweeney, he documented his findings with a total work station used to measure distances and angles which they used to create a forensic map of the scene. In addition, at a later date, Sgt. Crawford used a roll wheel to measure the Parkway's lane lines by hand. (T.2240-46) After recording the measurements, Crawford analyzed the collision by performing a reconstruction. As

95

a result, he reached conclusions which he memorialized in a report dated January 13, 2006, which was given to the District Attorney. (T.2247-48)

After describing his investigation, defense counsel asked Sgt. Crawford to outline his training and experience. He testified that to be qualified as an accident reconstructionist, he completed three two-week courses amounting to 248 hours of training after which he received certificates from the Institute of Police Technology and Management at the University of Florida. Sgt. Crawford explained those courses covered topics including, *inter alia*, identifying evidence at an accident scene, speed estimates, drawing diagrams of collisions, momentum formula calculations, and time distance evaluations. He further testified that since completing those courses, he has participated in between 40 and 50 accident reconstructions. (T.2248-49, 2253)

Following his detailed questioning regarding Sgt. Crawford's experience and training in accident reconstruction, defense counsel asked the court to declare Crawford an expert in accident reconstruction. (T.2253). The prosecutor then conducted *voir dire* examination during which Crawford again stated that he had participated in approximately 50 accident reconstructions, but added that he had been the primary reconstructionist on 10 to 12 of them. Crawford noted that "technically" he is not an expert in angular momentum or comfortable with it because "There is usually too many variables in it". (T.2253-56)

96

Following the DA's *voir dire* after which she objected to the declaration of Sgt.

Crawford as an expert, the court asked Crawford if he had ever been qualified as an

expert to which he replied that he had not. (T.2256)

Oral argument was then heard. Defense counsel argued that Sgt. Crawford

> is a New York State Trooper, a sergeant, who took the
> requisite courses in accident reconstruction, and who was
> assigned to do an accident reconstruction in this case. He
> has done fifty. He has been the primary on twelve. He
> prepared a report. Defense certainly didn't ask him to do a
> report; the New York State Police did, and submitted a
> report to the district attorney's office, that was turned over
> to us and to the Court by affirmation in January. He made
> certain conclusions. Whether the district attorney likes
> those conclusions or not, or whether the district attorney
> thinks this State Trooper is competent... They are opinions
> based on his expertise.

(T.2257-58). Counsel added that Crawford's credibility is ultimately an issue for

cross-examination (T.2258). When the court argued that he has never been declared

an expert, counsel stated that the witness told him he was never declared an expert

because this was the first case he worked on as the primary reconstructionist that went

to trial and that his qualifications should be more important than his lack of

experience testifying in court. (T.2259-60)

Defense counsel further noted that, despite Crawford's claim that he is not

comfortable with angular momentum, "He wrote the report based upon these exact

properties, the momentum analysis. If he felt at the time in January that he should not have been doing it, he didn't say anything about it. It is only now, months later, after these reports were turned over to the D.A.'s Office that he is saying, well, I don't-- I'm not so comfortable anymore, because the speed here is not what they like." Counsel further noted that Sgt. Crawford was on the People's witness list and it was not until the middle of trial that they decided not to call him (T.2260-61).

The court sustained the People's objection. The jury returned to the courtroom and never heard from Sgt. Crawford again. (T.2262-63)

## II.   **APPLICABLE LEGAL PRINCIPLES**

It is fundamental that a defendant is entitled to "a meaningful opportunity to be heard". Boddie v. Connecticut, 401 U.S. 371, 377 (1971). And, when asked by the People to preclude evidence, a court is required to weigh the possibility of prejudice to the prosecution against the right of the defendant to present his case. People v. Berk, 88 N.Y.2d 257, 266 (1995). Preclusion of evidence is a drastic remedy which should be employed only in the most egregious situations. People v. Kelly, 288 A.D.2d 695 (3d Dept. 2001).

## III.   **ANALYSIS**

As an initial matter, this issue is preserved for appellate review by defense counsel's timely objection to the court's ruling precluding Sgt. Crawford's expert

testimony (T.2262-63); C.P.L.§470.05(2); People v. Gray, 86 N.Y.2d 10 (1995).

In the case at bar, we are faced with the defense calling a NYS Police Sergeant who was on the People's witness list. He is a trained, qualified, certified, accident reconstructionist whose supervisors thought enough of his expertise to assign him to be the primary accident reconstructionist in this serious highway accident case involving 2 deaths and who prepared a report regarding this accident. However, it appears that when the People did not like the result of Crawford's report, they made the strategic decision not to call him as a witness and then blocked Mr. Heidgen from doing so by objecting to the court's declaration of him as an expert thereby precluding him from offering his expert opinions regarding the speed of the vehicles. This outrageous conduct by the People, sanctioned by the trial court who refused to declare him an expert, resulted in a violation of Mr. Heidgen's State and Federal constitutional rights to due process, a fair trial and to present a defense.

The Court of Appeals has held that a witness who testifies as an expert, "should be possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the information imparted or the opinion rendered is reliable". Mattot v. Ward, 48 N.Y.2d 455, 459 (1979). That Sgt. Crawford possessed that skill, training, education, knowledge and experience was clearly demonstrated by defense counsel who established that he had attended the courses necessary to

99

qualify him as an accident reconstructionist. And, the NYS Police was obviously satisfied with those qualifications because they assigned him to participate in 40 to 50 accident reconstructions, on 10 to 12 of which he acted as the primary reconstructionist (T.2254-56). To now say that he was not "comfortable" with the calculation necessary to conduct that reconstruction, seems all too convenient. If the NYS Police believed Crawford was qualified to perform this reconstruction and the 40 to 50 others, so too should the trial court have been satisfied.

In arguing against the declaration of Sgt. Crawford as an expert, the People claimed that

> in preparing the witness, in speaking to him, in reviewing the foundations that he used in his report, it cannot meet the threshold foundation requirement of reliability... In this case, this momentum equation, it is the most difficult, the most sensitive in all of accident reconstruction, and he can't do it.

(T.2261). This statement by the prosecution makes it clear they did not want Crawford to testify because his findings did not support their case. If his speed calculations were what they wanted them to be, that is, if they supported the People's theory that Mr. Heidgen was speeding at a consistent rate and not slowing down at the time of the accident, they would have called him to the stand themselves or would have been all for the defense doing it. Instead, they desperately tried to stop his expert

100

opinions regarding speed from getting before the jury. To say that "he can't do it", referring to the speed calculations, when he did do it and was trained to do it and had prepared a report based on it, was a blatant attempt to stop the jury from hearing their own witness' expert opinions.

As defense counsel effectively argued, despite Crawford's claim that he is not comfortable with angular momentum, "He wrote the report based upon these exact properties, the momentum analysis. If he felt at the time in January that he should not have been doing it, he didn't say anything about it. It is only now, months later, after these reports were turned over to the D.A.'s Office that he is saying, well, I don't-- I'm not so comfortable anymore, because the speed here is not what they like." (T.2260-61). Clearly, based on defense counsel's statement concerning Sgt. Crawford's opinion regarding the speed of Mr. Heidgen's truck, it was not consistent with the People's theory at trial but, rather was consistent with the defense theory that he was slowing down immediately before the accident which, as discussed *supra* at Point I, would negate a finding of depraved indifference.

Moreover, the court's reliance on the fact that Sgt. Crawford had never been declared an expert was misplaced. Defense counsel explained he was never declared an expert because none of the cases on which he had been the primary reconstructionist went to trial (T.2259-60). This explanation should have satisfied the

101

court and not been the basis for denying the request. This was not a situation where a court had previously refused to declare him an expert. This just happened to be the first time anyone tried and every expert has to have a first time.

Furthermore, as defense counsel noted, since Sgt. Crawford's credentials and experience clearly qualified him as an expert, the credibility and reliability of his opinions should have been a matter for the jury to evaluate. People v. Negron, 91 N.Y.2d 788, 892 (1998) ("[A] jury is entitled to assess the credibility of witnesses and determine, for itself, what portion of their testimony to accept and the weight such testimony should be given."). The People would have had a fair opportunity to test those credentials and findings on cross-examination and the jury would have been free to accept or reject the testimony. Emeagwali v. Brooklyn Hospital, 60 A.D.3d 891 (2d Dept. 2009).

Finally, this error was not harmless. People v. Crimmins, 36 N.Y.2d 230, 242 (1975). In fact, not only was it not harmless, the preclusion of Sgt. Crawford's testimony severely damaged, if not crippled, Mr. Heidgen's defense. Had this expert been permitted to testify, his findings would have had a dramatic effect upon the defense, as it would have contradicted the People's theory that Mr. Heidgen did not slow down when he realized he was traveling on the wrong side of the road and corroborated Mr. Heidgen's expert's determination that he was slowing down. That

102

is precisely the reason the People sought to block Crawford's testimony.

## IV.   <u>CONCLUSION</u>

In sum, the trial court's decision to deny the defense's request to declare Sgt. Crawford an expert in the field of accident reconstruction which precluded Mr. Heidgen from presenting this expert testimony, resulted in the denial of his State and federal constitutional rights. As a result, the conviction should be reversed and the case remanded for a new trial.

## POINT V.

## MR. HEIDGEN'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE TRIAL COURT'S FAILURE TO ADDRESS CERTAIN INSTANCES OF JUROR MISCONDUCT AND HIS ERRONEOUS FINDING THAT OTHERS WERE UNSUBSTANTIATED.

On appeal, Mr. Heidgen contends he was denied his State and Federal constitutional right to a fair trial before a jury whose verdict was based solely on the evidence presented in court. U.S. Const. Amends. XI and XIV, N.Y. Const. Art I, §6; Turner v. Louisiana, 379 U.S. 466, 471 (1965). Mr. Heidgen, via a C.P.L.§330.30 motion, brought to the trial court's attention several instances of juror misconduct, each of which warranted a fact-finding hearing and setting aside of the jury's verdict. Although the court conducted a hearing, it was limited to the issue of whether the jurors discussed that Mr. Heidgen had a prior DWI. The failure to permit the defense to present evidence of other instances of misconduct was error and requires reversal of the conviction and a new trial. In addition, the court's decision after the hearing that the extrinsic evidence brought into the jury's deliberations did not violate Mr. Heidgen's fair trial right was also error requiring reversal.

## I.   PROCEDURAL BACKGROUND

By motion dated November 28, 2006, the defense moved the court pursuant to

104

C.P.L.§330.30 to set aside the jury's verdict based on misconduct during deliberations.

In his affirmation in support of the §330.30 motion, defense counsel explained that following the jury's verdict, he read several newspaper articles which quoted the foreperson as saying she did not believe the proper verdict had been reached and described improper conduct during deliberations. As a result, counsel successfully contacted 4 jurors, 2 of which (Jurors #1 and 9 - Loy Malcolm and Craig Cavaco) came to his office and provided affidavits detailing their experiences. Those affidavits were attached as exhibits to counsel's §330.30 motion.

According to the jurors' affidavits, throughout their deliberations, the jury was split between a conviction for Manslaughter in the Second Degree and Murder in the Second Degree and it was apparent they could not reach a unanimous verdict.

Defense counsel affirmed that his investigation revealed that during the course of deliberations, the jury discussed extra-record information concerning the difference in what sentence would be imposed if Mr. Heidgen was convicted of Manslaughter vs. Murder. According to the jurors' affidavits, those discussions were aimed at convincing the jurors voting for Manslaughter to change their votes to Murder. The jurors further affirmed that these discussions clearly influenced some of the jurors.

In addition, Malcolm stated that Juror #11, an advocate for a Murder

105

conviction, said that Mr. Heidgen had a prior DWI in college in an effort to convince

Malcolm and others to change their vote to Murder.

Malcolm further informed counsel that the jury discussed and considered the

fact that Mr. Heidgen did not testify at trial and that the defense failed to call certain

witnesses including his ex-girlfriend Lindsay Long.

In response, the People conceded there should be a hearing but argued it should

be limited to a determination regarding whether the jurors discussed that Mr. Heidgen

had a previous DWI and, if so, what impact it had on the verdict.

By order dated February 2, 2007, the trial court ruled that

> the only allegation made by the defendant which requires
> further inquiry, and upon which basis a hearing is now
> granted, is that jurors considered as evidence information
> not contained in the record - that the defendant had a prior
> DWI conviction and what effect if any this information
> may or may not have had on the jury's verdict.

Decision at p. 2. The court further ordered: "Specifically excluded from the issues

litigated at the hearing is the allegation that jurors discussed possible punishment

during their deliberations, and that the information regarding possible sentences was

obtained from extra-record sources" and found the remaining issues raised either

speculative or insufficiently supported to warrant inquiry. Id.

On February 13, 2007, the court conducted a hearing limited to the issue of

106

whether there was discussion among the jurors that Mr. Heidgen had a prior DWI. There, the defense called Loy Malcolm, the jury foreperson, who testified that during deliberations the jury was divided– 5 for Manslaughter, 5 for Murder and 2 undecided (HH.11).[11] Malcolm, who explained that she was advocating for a Manslaughter conviction, testified that while she was discussing the case with a small group of approximately 4 jurors, Juror Michelle Vargas, in an effort to persuade them to switch their votes to Murder, said Mr. Heidgen had a prior DWI while in college (HH.13-16, 21). Malcolm further testified that Vargas' statement influenced her vote which was not solely based on the evidence presented at trial (HH.17-18).

The People called several other jurors as witnesses including Michele Vargas who testified that she did not tell any of the jurors that Mr. Heidgen had a prior conviction for driving while intoxicated (HH.96).

Immediately after oral argument, the court denied Mr. Heidgen's motion: "this court is unconvinced that there was any extrinsic evidence brought into the deliberations that affected a substantial right of the defendant. Having failed to carry their burden of proof, the defendant's motion is denied in all respects" (HH.161).

---

[11] Numbers in parentheses preceded by the letter "HH" refer to the pages of the §330.30 hearing.

## II.   APPLICABLE LEGAL PRINCIPLES

It is axiomatic that a criminal defendant enjoys the right to have a fair trial before a jury whose verdict is based solely on the evidence presented at trial. People v. Brown, 48 N.Y.2d 388 (1979); Turner v. Louisiana, 379 U.S. at 471-72 *citing* Irvin v. Dowd, 366 U.S. 717 (1961) ("[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial and indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process... his verdict must be based upon the evidence developed at the trial...").

## III.   ANALYSIS

While it is true that generally a criminal defendant may not impeach a verdict by probing into their deliberations, the showing of improper, extra-record influence is a necessary exception to that rule. People v. Brown, 48 N.Y.2d at 393 (Jurors are prohibited from conducting personal specialized assessments not within the common knowledge and experience of a juror and communicating that "assessment" or opinion to fellow jurors). The policy considerations underlying the general rule against impeachment of a verdict must be balanced against the defendant's constitutional right to a trial by an impartial jury and a finding that such improprieties occurred requires the setting aside of the verdict. People v. Redd, 164 A.D.2d 34 (1st Dept. 1990); People v. DeLucia, 20 N.Y.2d 275 (1967); Parker v. Gladden, 385 U.S. 363

108

(1966). Simply stated, extra-record information that comes to the attention of a juror is presumptively prejudicial [People v. Edgerton, 115 A.D.2d 257 (4th Dept. 1985)] and may be overcome only "by an affirmative showing by the People that the information was harmless". United States v. Weiss, 752 F.2d 777, 782 (2d Cir. 1985).

Moreover, improper influence upon a jury's deliberations embraces not only attempts to corruptly affect the jury, but also well-intentioned jury conduct which puts the jury in possession of evidence not introduced at trial. People v. Brown, 48 N.Y.2d at 393 quoting United States v. Beach, 296 F.2d 153 (4th Cir. 1961). In determining whether a jury has been subjected to improper influence, the court must examine the facts "to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered". People v. Brown, 48 N.Y.2d at 394. Here, there can be no doubt that the information placed before the jury was prejudicial.

A.    *The Court Erred in Limiting the Scope of the §330.30 Hearing*

With respect to claims of juror misconduct, each case must be examined on its unique facts to determine the nature of the misconduct and likelihood that defendant was prejudiced. Id. "The trial court is invested with discretion and post-trial fact finding powers to ascertain and determine whether the activity during deliberations constituted misconduct and whether the verdict should be set aside and a new trial ordered." People v. Maragh, 94 N.Y.2d 569, 574 (2000). And, a court is correct in

109

summarily denying a motion to set aside a verdict, without a hearing, if the application is supported only by hearsay allegations or speculative claims of prejudice contained in an attorney's affidavit. People v. Friedgood, 58 N.Y.2d 467 (1983). Here, there was much more than just defense counsel's affirmation. In his §330.30 motion, defense counsel requested that the verdict be set aside based on juror misconduct which included: (1) discussion regarding a prior DWI; (2) discussion regarding the difference in sentence Mr. Heidgen would receive if convicted of manslaughter vs. murder; (3) improper private meetings and discussions between jurors; and (4) discussion regarding defendant's failure to testify at trial or call certain witnesses. The motion was supported by affidavits of two jurors and defense counsel detailed his conversations with two others.

However, rather than order a fact-finding hearing at which the allegations made by Mr. Heidgen as supported by the affidavits of his attorney and 2 jurors could be fully explored, the court limited the scope of the hearing to the issue of whether the jurors had discussed that Mr. Heidgen had a prior DWI. That decision severely hindered Mr. Heidgen's ability to determine whether his conviction was obtained based on erroneous and improper discussions among the jurors.

This is not a case where the defendant improperly asked the court to delve into the tenor of the jury's deliberations. People v. Anderson, 249 A.D.2d 405, 406 (2d

110

Dept. 1998). Here, we have a situation where the court was asked to evaluate the claim that information not presented at trial was provided to and discussed by the jurors which likely effected the outcome of this case. That is a classic example of "improper influence" which "includes jury conduct that tends to place the jury in possession of evidence not introduced at trial". People v. Arnold, 96 N.Y.2d 358, 364-365 (2001); People v. Brown, 48 N.Y.2d at 393. And the courts have held that the possession of such information requires a new trial. See e.g. People v. Romano, 8 A.D.3d 503 (2d Dept. 2004) (Court upheld trial court's decision to set aside verdict where jurors read and discussed newspaper articles about the case and discussed defendant's guilt before deliberations.); People v. Dashnau, 187 A.D.2d 966 (4th Dept. 1992) (Reversal required where juror told fellow jurors defense counsel was a private attorney being paid by defendant who, therefore, must be a drug dealer to be able to afford the attorney's services.); People v. Lafferty, 177 A.D.2d 1043 (4th Dept. 1991) (Court ordered new trial where juror said she read newspaper report indicating defendant had been in jail for 8½ years).

Specifically, Mr. Heidgen's claim regarding the jurors' discussion of the potential sentences he faced if convicted should have been explored. Both Malcolm and Cavaco affirmed that during deliberations, Anthony Macchiarulo discussed the sentences Mr. Heidgen faced if convicted of Manslaughter vs. Murder. Malcolm

111

further affirmed that Macchiarulo told jurors he did not believe a Manslaughter conviction provided enough jail time since he would only serve 4 or 5 years. According to both jurors, who described this information as persuasive and having influenced the jury, other jurors agreed with Macchiarulo's assessment. That is precisely what the courts have attempted to avoid– a juror conducting his own investigation and discovering extra-record information not presented at trial which he brings back to the jury room and utilizes in casting his vote. People v. Maragh, 94 N.Y.2d at 574 ("In assessing whether a particular activity rises to the level of misconduct, our calculus includes an appreciation that the complained-of conduct must be something more than an application of everyday experience, for that is precisely what peer jurors are instructed and expected to use in their assessment of evidence.").

Finally, it would have been appropriate for the court to permit the defense to explore all of these claims of misconduct because, while taken individually they were each sufficient to warrant reversal, taken together they certainly paint a picture of a jury that violated the court's instructions and statutes governing jury conduct. And, in Romano, a case where the defense revealed several instances of juror misconduct, this Court recognized that the cumulative effect of the jury's misconduct created a substantial risk of prejudice to the defendant's rights. People v. Romano, 8 A.D.3d

112

at 504. That was certainly the case here but the breadth of misconduct could not be explored because of the court's decision to limit the scope of the hearing.

B.    *The Court Erred in Denying the §330.30 Motion Following the Hearing*

At the §330.30 hearing, the testimony was limited to the issue of whether a juror told other jurors Mr. Heidgen had a prior DWI. There, Loy Malcolm testified that during deliberations and while she was discussing the case with a small group of jurors, Michelle Vargas, in an effort to persuade them to switch their votes to Murder, said that Mr. Heidgen "had a prior DWI... when he was in school" (HH.13-16, 21). Malcolm further testified that Vargas' statement influenced her vote which was not solely based on the evidence presented at trial (HH.17-18). That statement rendered Vargas an unsworn witness providing critical information without Mr. Heidgen having the ability to confront or cross-examine as guaranteed by the Sixth Amendment.

The discussion of the prior conviction in and of itself should have sufficed to warrant reversal. People v. Magnano, 175 A.D.2d 639 (4th Dept. 1991) (Court held new trial required where "during jury deliberations, a juror initiated a discussion of defendant's bad reputation in the community and his prior conviction for selling untaxed cigarettes."); People v. Edgerton, 115 A.D.2d at 258 (Court reversed conviction in arson case where one of the jurors told others that defendant had set other fires). But what makes this incident even more egregious is that Mr. Heidgen

113

did not have a prior conviction for DWI or anything else. That kind of prejudice in a case as emotionally and politically charged as this one was insurmountable especially coupled with the other alleged instances of misconduct which the trial court refused to explore.

## IV.   CONCLUSION

In sum, the trial court erred by not holding a full fact-finding hearing to address all of Mr. Heidgen's allegations of juror impropriety and then erred in finding, after the limited hearing, that the claim of misconduct was unsubstantiated. As a result, the conviction should be set aside and a new trial ordered.

## CONCLUSION

For the reasons stated above, this court should reverse the judgment of conviction and dismiss the underlying indictment. In the alternative, the case should be remanded to the trial court for a new trial.

Respectfully submitted,

JILLIAN S. HARRINGTON
Attorney at Law
*Attorney for Defendant-Appellant*
*Martin Heidgen*
P.O. Box 6006
Monroe Twp., NJ 08831

61 Broadway, Suite 1601
New York, New York 10006
(718) 490-3235

## CERTIFICATE OF COMPLIANCE
### Pursuant to 22 NYCRR§670.10.3(f)

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used as follows:

Name of Typeface:  Times New Roman
Point Size: 14
Line Spacing: Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc. is 27,453 words.

115