*To be argued by*
Maureen McCormick
(30 minutes)

# NEW YORK SUPREME COURT

## Appellate Division - Second Department

### THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

**A.D. No. 2007-2662**
**Ind. No. 1910N/05**

*- against -*

### MARTIN HEIDGEN,

*Defendant-Appellant.*

# RESPONDENT'S BRIEF

### KATHLEEN M. RICE
District Attorney, Nassau County
Attorney for Respondent
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Judith R. Sternberg
Jacqueline Rosenblum
Michael Soffer
 Assistant District Attorneys
  *of Counsel*

## T A B L E   O F   C O N T E N T S

Page

Preliminary Statement ........................................ i

Statement of Facts
    Introduction ............................................. 1
    The Trial
      The People's Case ..................................... 3
      The Defense .......................................... 20
    The Verdict and Sentence ............................... 24

Point I
    Because Defendant Failed To Timely Object To The
    Sufficiency Of The Evidence, That Issue Is Not
    Reviewable As A Matter Of Law; In Any Event, The
    Evidence Was Legally Sufficient To Establish
    Defendant's Guilt of Depraved-Indifference Murder
    And Assault. ........................................... 25

      Defendant failed to preserve his argument that
      the evidence was legally insufficient to
      establish that he acted with depraved indifference
      to human life. ....................................... 26

      No court has ever held that a defendant's
      intoxication necessarily precludes a finding
      of depraved indifference ............................. 28

      Whether proof of intoxication is admissible
      to negate evidence of depraved indifference
      is a moot issue on this appeal ....................... 31

      The People do not dispute that defendant's
      mens rea should be assessed as of the time
      that he drove ........................................ 32

      The evidence was sufficient to establish
      defendant's mens rea of depraved indifference
      beyond a reasonable doubt ............................ 33

Point II
    A Sample Of Defendant's Blood Was Legally Drawn
    And Tested ............................................. 42

Point III
   The Court Reasonably Exercised Its
   Discretion When It Ordered DNA Testing
   Of Defendant's Blood ................................... 50

      Introduction ......................................... 50

      The factual background and the order of
      the court ........................................... 50

      The court's initial preclusion of evidence
      of the lab results was erroneous ...................... 52

      The trial court properly exercised its
      discretion to allow DNA testing mid-trial .............. 59

      Assuming arguendo that evidence concerning
      the blood analysis should have been
      precluded, that error was harmless .................... 62

Point IV
   The Trial Court Did Not Err In Refusing To
   Qualify As An Expert Reconstructionist A
   Witness Who Declared Himself Not To Be
   Such An Expert ....................................... 67

Point V
   The Trial Court Exercised Sound Discretion
   When It Summarily Denied Portions Of
   Defendant's Motion To Set Aside The Verdict
   And Ordered A Limited Hearing To Address
   Only Those Allegations In The Motion That
   Warranted Further Inquiry; The Court Properly
   Denied The Outstanding Portion Of The Motion
   Following The Hearing ................................. 80

      Factual and Procedural History ....................... 80

      The trial court exercised sound discretion
      when it limited the scope of the hearing .............. 85

      The court properly denied defendant's
      motion to set aside the verdict ...................... 95

Point VI
    The Claim That New York's "Legislative
    Scheme" Precluded The Prosecution Of
    Defendant's Conduct As Depraved-Indifference
    Murder Is Both Unpreserved And Meritless ................. 98

Conclusion .................................................. 100

Certificate of Compliance

# NEW YORK SUPREME COURT

Appellate Division - Second Department

———···⫶···———

## THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

### - against -

## MARTIN HEIDGEN,

*Defendant-Appellant.*

———···———

### RESPONDENT'S BRIEF

———

## Preliminary Statement

Martin Heidgen appeals from a judgment of the Supreme Court, Nassau County (Honorof, J.), rendered February 28, 2007, convicting him, following a jury trial, of murder in the second degree (Penal Law § 125.25[2]) (two counts), assault in the first degree (Penal Law § 120.10[3]) (three counts), and operating a vehicle while under the influence of alcohol (V.T.L. § 1192) (two counts), and sentencing him to eighteen years to life imprisonment for each count of murder, eighteen years'

i

imprisonment plus five years' post-release supervision for each count of assault, and one hundred eighty days' incarceration for each count of driving under the influence of alcohol, all terms to run concurrently.

There were no codefendants.

Defendant is incarcerated pursuant to the judgment.

On March 19, 2008, following his plea of guilty to tampering with physical evidence (Penal Law § 215.40[2]) (indictment 1735N/07), defendant was sentenced to a term of imprisonment of one to three years, to be served consecutively to the sentences imposed pursuant to the judgment here on appeal. Defendant's appeal from the later judgment is pending before this Court (A.D. 2008-02745).

## STATEMENT OF FACTS

### Introduction

On July 1, 2005, Jennifer and Neil Flynn, their two daughters (Katie and Grace), and Jennifer's parents (Denise and Christopher Tangney) were at a family wedding. In the early morning of July 2, the Flynns and Tangneys were heading home in a limousine driven by Stanley Rabinowitz. They were travelling south on the Meadowbrook Parkway.

On July 1, 2005, defendant spent the day drinking -- first at a bar and eventually at a party. In the early morning of July 2, he got into his pickup truck and headed north in the southbound lanes of the Meadowbrook Parkway. He drove into oncoming traffic, facing the headlights of driver after driver who swerved out of his way, flashed their lights at him, and honked their horns. He drove alongside a blaring motorcycle that paced him on the opposite side of the highway divider. And, as his headlights shone into Mr. Rabinowitz's headlights, he drove directly into the limousine. He crushed Stanley Rabinowitz to death. He decapitated Katie Flynn. He caused devastating, life-altering physical injuries to Denise and Christopher Tangney and to Neil Flynn.

When questioned later, defendant told the police that he was upset and depressed, that "everything was going wrong" since he moved to New York, that he was in "a hole" financially, that he had drunk a lot of alcohol, and that he had been in a "self-destruct mode."

Following a jury trial, defendant was convicted of two counts of murder in the second degree for the deaths of Stanley Rabinowitz and Katie Flynn, three counts of assault in the first degree for the injuries inflicted on Neil Flynn and Denise and Christopher Tangney, and two counts of operating a vehicle while under the influence of alcohol.

Defendant now appeals to this Court. He argues that the People failed to prove that he acted with depraved indifference to human life, that his blood should not have been drawn without his consent, that evidence of his blood alcohol content should have been excluded from trial, that the court abused its discretion when it refused to qualify one of his witnesses as an expert, and that the verdict should have been set aside on the ground of juror misconduct. A brief filed by the Nassau County Criminal Courts Bar Association, as amicus curiae, argues that the evidence was insufficient to establish defendant's guilt of depraved-indifference murder, and that no drunk-driving case may be prosecuted as a crime of depraved indifference. None of the

2

arguments presented on defendant's behalf is meritorious and none warrants reversal of his judgment of conviction.

The Trial

   The People's Case

   Defendant and GREG NIZEWITZ had arranged to meet at a bar in Manhattan on the afternoon of July 1, 2005. Defendant was already there when Nizewitz arrived at about 4:30, and defendant drank six 12-ounce bottles of beer while they were together. At 7:30 p.m., Nizewitz left. Defendant remained. While they were together, defendant flirted with the bartender and seemed "happy, ready for the weekend." He did not exhibit any effects of the alcohol he had consumed (Nizewitz: 1419-29).[1]

   Between 11:00 p.m. and midnight, defendant arrived at a party at the Merrick home of Amanda Goldman. Defendant and his friends, including TRACY SODIKOFF and JOSHUA ZIGMAN, regularly got together on weekends, and defendant drank "socially" at those gatherings (Sodikoff: 1456, 1460-61; Zigman: 1783).[2] About

_____

[1] Parenthetical references are to the pages of the transcript.

[2] Zigman and defendant had met in November 2004, when both worked for New York Life Insurance Company, and Zigman became defendant's closest friend. In February 2005, Zigman left that company to work for Key 2 Health Care, and defendant joined him at that firm, doing telemarketing. In late June 2005, Zigman took a new job to earn more money. Defendant stayed on at Key 2 (continued. . .)

a week before this party, defendant and Sodikoff had spoken about drunk driving. Sodikoff had told defendant that there would always be a designated driver and "a place for him to crash" after drinking, and defendant had said that he understood (Sodikoff: 1457-60).[3]

That night, on his way to the Goldmans' house, defendant got lost when he got off the parkway, and he called to ask directions (Sodikoff: 1472; Zigman: 1825-26). Once at the party, defendant seemed to be in a "good mood," as he always was (Sodikoff: 1462; Zigman: 1780, 1784). He told Zigman that he had gotten the telephone number of the bartender at the bar they frequented, and they discussed plans for the weekend (Zigman: 1785, 1827). Defendant's friends saw him drink "a few beers" and two "Irish Car Bombs," beers with shots of whiskey and Bailey's Irish Cream (Sodikoff: 1461-62; Zigman: 1785, 1829). Sodikoff and defendant danced at the party. Defendant was not unsteady on his feet, did not slur his words, and spoke rationally and appropriately. Having previously observed the

---

[2](continued. . .)
Health. In August 2005, Key 2 Health closed down (Zigman: 1763, 1765-69, 1780-82).

[3] There was an open invitation for anyone to stay overnight at the friends' regular parties, and defendant had accepted that invitation at least once. Defendant had also taken a ride from a designated driver (Zigman: 1776-78, 1828).

effects of alcohol on defendant, Sodikoff believed that he was intoxicated that night. Zigman said that defendant may have been "buzzed" (Sodikoff: 1463-65; Zigman: 1787-88).

Defendant stayed at the party a little over an hour and one-half. Although he had never before left their gatherings without saying goodbye, defendant did not say goodbye that night and neither Sodikoff nor Zigman saw him leave (Sodikoff: 1462; Zigman: 1789). According to defendant's cell phone, he called Amanda Goldman at 1:45 a.m. (State Police Investigator MICHAEL HARRIS: 1229).

On that same day, Katie Flynn's aunt was married and seven-year-old Katie and her younger sister Grace were her flower girls. Her parents JENNIFER and NEIL FLYNN and grandparents CHRISTOPHER and DENISE TANGNEY were also in attendance and, after the reception, at about 1:30 a.m., the Flynns and the Tangneys left together in a limousine driven by Stanley Rabinowitz (J.Flynn: 348-52, 355-57; N.Flynn: 370, 372-74; D.Tangney: 389-90; C.Tangney: 414-15).

Meanwhile, ELIZABETH SERWIN was driving southbound in the center lane of the Meadowbrook Parkway and was slightly more

than a mile south of Merrick Road when she saw headlights from a northbound vehicle coming at her, also in the center lane. She veered to the right lane, and then off onto the shoulder. As the northbound vehicle -- a pickup truck -- passed her, Serwin beeped her horn three times. Two other vehicles had pulled onto the shoulder behind Serwin. The northbound truck, which was moving at about seventy to seventy-five miles per hour, never left the center lane in which it was travelling. Serwin called 911 (Serwin: 1488-94).

JOSEPH CARUSO was also driving south in the center lane on the Meadowbrook. He was at the Merrick Road overpass (over a mile north of the location at which Serwin veered out of the way of the pickup truck), and he, too, saw headlights coming at him from a vehicle in his lane. Caruso's car moved to the left, and the vehicle coming at him also moved to Caruso's left. Caruso steered back to the center lane and, as the oncoming vehicle got closer, Caruso got into the right lane. As the oncoming vehicle passed, Caruso saw that it was a silver pickup truck. Caruso pulled off the road and called 911. Caruso had been driving at about sixty-five to seventy miles per hour and estimated that the truck was going between seventy and eighty miles an hour (Caruso: 1539-45, 1562).

6

MATTHEW SUSSINGHAM was driving southbound in the right lane of the Meadowbrook Parkway. As he neared the exit ramp for Sunrise Highway, he saw the pickup truck travelling the wrong direction in the southbound center lane. The truck maintained a steady speed and never veered from its lane as it passed Sussingham (Sussingham: 1690-94).

STEPHEN WEBER was riding his motorcycle in the left northbound lane of the Meadowbrook Parkway when he saw a pickup truck ahead of him, on the opposite side of the divider, travelling north in the southbound parkway lane (Weber: 1577-78, 1581). Weber pulled up next to the pickup, which was in the lane adjoining the divider, and kept pace with it (Weber: 1581). Both the motorcycle and the pickup were moving at seventy miles per hour and maintained that steady speed as Weber drove next to the truck (Weber: 1583, 1586-87, 1686). Weber lost sight of the truck at a point where the divider ended and shrubbery separated the northbound and southbound lanes (Weber: 1589-90).

STEED DAVIDSON was driving at a speed of about fifty to fifty-five miles per hour in the center southbound lane of the Meadowbrook Parkway when he was passed by a limousine in the left lane. The limousine was moving at about fifty-five to sixty miles per hour. Shorty after the limousine passed,

7

Davidson saw headlights coming from the left southbound lane of the parkway.   Before Davidson could react, the oncoming vehicle collided "head first" with the limousine, which was only a few feet ahead of Davidson's car.   The limousine collided with Davidson's car (Davidson: 1719-26).[4]

Denise and Christopher Tangney had seen the headlights coming toward them (D.Tangney: 392-94; C.Tangney: 420-21).[5]   The oncoming vehicle was in the center lane and then moved into the limousine's lane.   Mr. Rabinowitz could not veer out of the way because another vehicle (Steed Davidson's car) was alongside the limousine (C.Tangney: 421).   And "then the [limousine] exploded" (J.Flynn: 358; C.Tangney: 421).   Steven Weber, who had been pacing the truck with his motorcycle, heard the screech and the explosion.   It was only two seconds after he had lost sight of the pickup truck on the other side of the parkway divider (Weber: 1595).[6]

---

[4] The distance between the location at which Elizabeth Serwin veered out of defendant's way and the location of the collision was approximately 2.5 miles (C. SWEENEY [state police investigator]: 952).

[5] Based on his experience as a police officer, Mr. Tangney estimated that defendant's car was moving at approximately sixty-five miles per hour (C. Tangney: 427).

[6] The last report generated by the limousine's global positioning system indicated that the limousine was travelling at sixty (continued. . .)

In the aftermath of that "explosion," Jennifer Flynn saw her mangled family, strewn about and tangled within the limousine. She climbed over her mother and husband and younger daughter and ran into the parkway, screaming for help. When she returned to the limousine, she saw her child's head on the floor. She picked up her daughter's head and told her father that "Kate was dead." She asked about the driver, and her father told her that he, too, was dead. As help arrived, Jennifer Flynn sat by the guardrail of the parkway, holding her child's head, watching "the confusion" as help arrived (J.Flynn: 358-63). Mrs. Flynn told the officers she did not want to leave until she knew that her family had gotten out of the limousine. And when everyone was removed from the vehicle, and they told her it was time to go, she started to cry "because [she] knew that [she] would never hold her [daughter] again" (J.Flynn: 358-64).

When police arrived at the scene, they found "bodies tangled up" in the limousine, Stanley Rabinowitz "crushed" in the driver's area, and defendant behind the steering wheel of

---

[6](continued. . .)
miles per hour at 2:01 a.m. Exhibit 81 was a video of the seconds prior to impact, downloaded from a camera in the limousine (R. TOWNSEND [owner of limousine company]: 936-37, 1414).

9

his truck, a cut on his lip.  Defendant smelled of liquor, and his eyes were glassy (Freeport Police Officer CHRISTOPHER PANDOLFO: 530-33, 537; State Police Trooper PATRICK SIEGLER: 319-21).  Officer Pandolfo asked defendant his name and what had happened.  In a low, slurred mumble, defendant responded, "I don't know where I am.  What happened?"  (Pandolfo: 536-37, 565).

Trooper DANIEL O'HARE was assigned to accompany defendant to the hospital (Siegler: 325, 340).  O'Hare took a New York State Police Blood Kit from his car for the purpose of taking a blood sample from defendant "as he was under arrest for DWI" (Siegler: 325; O'Hare: 601), and left the scene in an ambulance with defendant and an emergency medical technician at 2:33 a.m. (Siegler: 325; O'Hare: 603, 608).

At the hospital, defendant was attended to by Nurse DOROTHY BUSCO.  Defendant's eyes were closed, he was "arousable to noxious or painful stimuli," and he would moan or speak "a word or two" -- "nothing really coherent" or intelligible  (Busco: 698-99; O'Hare: 613).  Several minutes after defendant's arrival in the emergency room, Trooper O'Hare requested that Nurse Busco

draw defendant's blood (O'Hare: 613-14).[7]  She did so, filled the two tubes from the blood kit O'Hare had brought, and gave the tubes to O'Hare (O'Hare: 619, 692; Busco: 704).  Defendant's blood samples were transferred to several officers and eventually arrived at the Mid Hudson Crime Laboratory in Newburgh.[8]   On July 5, 2005, forensic scientist LISA LINDENTHALER analyzed a blood sample from one of the test tubes in the kit marked with defendant's name.  Lindenthaler determined that the sample had a blood alcohol content of .28 percent (Lindenthaler: 1317, 1321-22, 1328-29, 2065 2067-68).[9]

At about 12:30 p.m., on July 2, Investigators Harris and ERIC BAEZ spoke to defendant in the hospital.  Defendant's wrists were wrapped with gauze and tied to the bed rails. Defendant's restraints were not the result of any request from the police.  There was a curtain drawn around defendant's bed,

---

[7]  At the pre-trial hearing, the parties presented evidence concerning whether defendant was capable of understanding that he was under arrest or giving meaningful consent to the drawing of a blood sample.  That evidence is discussed in Point II.

[8] Extensive evidence was elicited concerning the blood kit and the chain of custody of the samples that were drawn.  To the extent that that evidence is relevant to the issues raised here, it is discussed in Point III.

[9] DNA testing done mid-trial established that the blood tested by Lindenthaler was defendant's.

and medical personnel were in the open bay (Baez: 1043-45; Harris: 1194-95). Before speaking to defendant, the investigators were given the "okay" by medical personnel (Baez: 1048). Defendant was informed that he was under arrest for driving while intoxicated, but was not told that two people had died (Baez: 1109; Harris: 1246). Investigator Harris advised defendant of his constitutional rights, which defendant waived (Baez: 1047; Harris: 1196-98).[10]

Defendant said that ever since he had moved to New York from Arkansas the prior October, "everything was going wrong," and nothing he did was ever enough. He said that he had gone to school for four years and was now working in sales, that he earned $25,000 a year, that his rent was $300 a month, that his boss owed him $1,000, and that he was financially "in such a hole" (Harris: 1199-1200, 1203-04).

Defendant told the officers that he and his ex-girlfriend from Arkansas had argued on the telephone (Harris: 1199). His grandmother, with whom he was close, had recently died (Harris: 1203). He said that his truck was all he had in his life (Harris: 1203).

---

[10] Defendant does not dispute the admissibility of his statement.

Defendant said that he had been upset and depressed, that he drank a lot of alcohol, and that he "got into a 'self-destruct' mode" (Harris: 1199, 1202).  Defendant said that he drank a fifth of Old Parr scotch (Harris: 1199-1200).  He said that he had driven from Sunrise Highway to the Southern State Parkway and that he was trying to get home (Harris: 1200-01). He said he thought he was driving south on the Meadowbrook Parkway.  He "wasn't paying that much attention," and did not remember getting off the parkway "or making any U-turns" (Harris: 1203).  He thought that he had hit a tree or a median (Harris: 1201).  He knew he was hurt after the impact.  He was "basically knocked out" and "the next thing he knew" he was in the hospital (Harris: 1201).  He said that he was "disgusted and embarrassed" and had "disrespected [his] parents" (Harris: 1200).

When asked if he had tried to hurt himself, defendant responded, "No.  Never before." (Harris: 1200).  He denied having "problems with alcohol" and said that he drank and blacked out "while in college, but not as a professional" (Harris: 1200, 1202).

Defendant said that, on the day of the collision, he had taken the railroad from Valley Stream to his place of work, Key

13

2 Health Care, in New York City, arriving there at about 3 p.m.
At about 5 p.m., he met friends at a bar in the city.  He had
four beers, left the bar at about 8 p.m., and took the train
home to Valley Stream.  About an hour later, he said, he got a
call from his ex-girlfriend, and the two argued.  Defendant said
that, at about 1:00 or 2:00 a.m., he left the house and was
"just driving around," going south on the Meadowbrook Parkway.
Defendant said that he did not try to hurt himself (Harris:
1201-04).  He said that he "wouldn't cash out like this.  [He]
would wait for another hand to be dealt" (Harris: 1205, 1263).
Defendant then requested counsel and the conversation was
terminated (Baez: 1047-48; Harris: 1205).

On the afternoon of July 5, a search warrant was executed
at defendant's apartment in the house owned by defendant's
mother.  Several empty liquor bottles, including an Old Parr
scotch bottle,[11] were on top of the refrigerator.  A metal flask
with the initials MRH was on top of the microwave oven.  Another
flask was near the bed.  It did not appear that anyone lived in
the main living area of the house, i.e., the area aside from

---

[11] Josh Zigman testified that the bottle of scotch had been in
the same spot in defendant's kitchen for some time (Zigman:
1812).  He did not know whether the bottle was empty when he saw
it (Zigman: 1845).

defendant's apartment (Sweeney: 938-42, 986; Harris: 1211-14; exhs. 24, 25 [photograph and bottle]).

Some time after his arrest, defendant asked Josh Zigman to speak to Tracy Sodikoff about a statement she had given the police. Defendant "didn't agree" with Sodikoff's statement "about [defendant] being depressed." Zigman and Sodikoff had already spoken and she had said that there were things in her statement to the police that "she wasn't happy about." Zigman had told her that "if she was upset about it she should talk to them." He did not ask her to change her statement (Zigman: 1792-93, 1823).

Some months later, while defendant was in jail awaiting trial, he wrote a letter to Zigman (exh. 84 [defendant's letter]; 1801-08). In that letter, defendant said that much of what he had told the police was untrue (Zigman: 1810). He said that he and his girlfriend had not argued on the night of the party and that he had no financial problems (Zigman: 1813). He claimed to have used a line from a movie when he told the police that he had been in a "self-destructive mode" (Zigman: 1815). Defendant said that he lied to the police to protect Amanda and Justin Goldman, whose parents had not been at home when defendant and the others partied and drank in their house

(Zigman: 1810-11).   In his letter, defendant wrote that he lied to the police to portray himself "as an unfortunate victim of circumstance worthy of leniency."   He wrote that he said this instead of "telling them where I really was, and what my friends and I do every other weekend.   It makes us sound like such a bunch of hooligans and I should be punished as such" (exh. 84; 1802).

Zigman had never known defendant to be depressed and was surprised when he learned that defendant had told police that he was on the night of the crash (Zigman: 1793, 1795).   Defendant had never complained to him about his girlfriend, about work, or about his apartment (Zigman: 1817).   The two never spoke about the crash (Zigman: 1794).

Dr. WILLIAM CLOSSON, a forensic toxicologist, explained that alcohol reduces the functioning of the brain, and that the effect of alcohol varies depending on whether the person who has consumed the alcohol is a "naïve" drinker -- one who drinks infrequently -- or a "practiced drinker" -- one who drinks on a weekly or more frequent basis and who has developed a tolerance upon repeated exposure.   The tolerant drinker would be better able to perform physical functions "such as walking on a line."   Cognitive abilities, the witness explained, are affected by

alcohol in both a naïve drinker and a tolerant drinker to about the same degree.   A tolerant drinker would be familiar with the effects of alcohol on himself (Closson: 2122, 2127-30).

A blood alcohol content ("B.A.C.") of .28 percent, in the average man, would be the result of having approximately fourteen drinks in his system (Closson: 2145).   The expected effects of that B.A.C. on an average man would include difficulty in thinking clearly, blurred vision, difficulty tracking an object visually, and greatly reduced peripheral vision ("tunnel vision"), such that the intoxicated person would see only those things directly in front of him.   A .28 percent B.A.C. would also result in reduced ability to perform multiple tasks at once, such as steering a car and at the same time paying attention to other vehicles, traffic signals, and lights (Closson: 2131-33).

A B.A.C. of this percentage would result in increased "perception reaction time" -- the time between a person's perception of stimuli and his response to that stimuli.   Dr. Closson explained that the average perception reaction time for a sober person driving a car is approximately one-half to one and one-half seconds (Closson: 2133).   An intoxicated person's perception reaction time would be greater -- but no more than

three to five seconds (Closson: 2134-35).   A failure to react to visual and auditory stimuli for over two and one-half minutes could not be attributed to alcohol (Closson: 2134-35, 2143).

Dr. Closson explained that a person with a B.A.C. of .28 percent might feel invulnerable and disregard grave and substantial risks to himself and others.   This would be consistent with driving dangerously and with a belief that the driver "is unaffected by the other people on the road" (Closson: 2136-38).   An intoxicated person is capable of making decisions, capable of perceiving his surroundings, and capable of recognizing headlights and other cars (Closson: 2178).   An intoxicated person would still see and hear, and his consumption of alcohol would not prevent him from reacting to multiple stimuli over a period of minutes (Closson: 2176-77, 2183).

*   *   *   *   *

Jennifer Flynn required surgery on her foot (J.Flynn: 365).

Five-year-old Grace Flynn's spleen was torn.   She was hospitalized in the pediatric intensive care unit for four to five days (J.Flynn: 364).

18

Neil Flynn's back was broken.    There was damage to his heart, kidneys, and liver (Dr. PETER GELFAND: 830-31).    He required spine surgery, the results of which were "reasonable," but left Mr. Flynn in chronic, lifelong, pain (Dr. SEAN McCANCE: 1400-02).

Denise Tangney was treated for a broken left hip, broken right leg, and lacerations of the left leg.    She was in a rehabilitation facility for a month, was released, and then began to decline.    It was determined that her left hip had "broken down," necessitating a second surgery and the removal of "all of the hardware that was in there."    Mrs. Tangney underwent a right total knee replacement and a left total hip replacement. As of the date of trial, Mrs. Tangney was taking pain medication and was expected to have lifelong post-traumatic arthritis.    She was effectively prematurely aged by twenty to thirty years (Dr. CHRISTIAN NAHAS: 859-66).

Christopher Tangney required transfusion of four pints of blood, almost eighty percent of the blood in his body.    He was operated on for multiple life-threatening abdominal injuries, and subsequently required transfusion of another four pints of blood.    Mr. Tangney's hip was fractured, and two fractures to

his lower leg required additional surgery to set the bone with metal screws and plates (Dr. ALAIN DERZIE: 904-06).

All of Stanley Rabinowitz's ribs were fractured, his breast plate was fractured, his pelvis was fractured, his heart was "traumatically torn," and his aorta, lungs, liver, spleen, and intestines were lacerated.   Mr. Rabinowitz's arms and legs were fractured.   There was hemorrhaging of his brain.   He died of "multiple internal injuries and fractures due to blunt impact." He was fifty-nine years old (Dr. GERARD CATANESE: 450-57).

Seven-year-old Katie Flynn died of "blunt force injury with decapitation" (Dr. MICHAEL DeMARTINO: 465, 467, 472).

The Defense

JOSEPH FOSTER grew up with defendant in Arkansas.   In December 2004, Foster visited defendant and took photographs of defendant's apartment, including the kitchen, in which was a bottle of Old Parr Scotch, which appeared to Foster to be empty. Foster testified that defendant was known to recite lines from movies (Foster: 1885-91).

BURKE MORLEDGE lived in Arkansas and had known defendant since high school. On the afternoon of July 1, 2005, the two spoke on the telephone. Defendant was at a bar during that call. Defendant was happy during their conversation and discussed plans to visit Arkansas (Morledge: 1908-11).

MARGAT APONTE, defendant's mother, moved from Arkansas to Valley Stream, New York. In October 2004, about five years after his mother moved to Valley Stream, defendant also moved to Valley Stream, from Arkansas, to be with her, and he lived, rent-free, in a studio apartment attached to her house. On April 23, 2005, six months after defendant's arrival, his mother married Victor Aponte, moved out of the Valley Stream house, and joined her husband in his house in Islip. Defendant did not attend his mother's wedding. Instead, on the day before the wedding, he took a plane to Little Rock, Arkansas. The day after the wedding, he returned to New York. He had previously arranged this trip to Arkansas for a fishing trip with a friend who was about to be married. When defendant returned to New York, he prepared dinner for his mother and her husband, and they celebrated (Aponte: 2197-2200, 2204-06, 2211, 2219-20, 2228-30; stipulation at 2192). Ms. Aponte planned to rent out the Valley Stream home, and defendant "was going to be the landlord."

Defendant's grandmother died in April 2005, and he was to inherit $20,406 (Aponte: 2202-03). Ms. Aponte testified that defendant's father helped with defendant's student loan payments and paid his car loan and insurance, and that if those bills were in arrears, it was probably because his father "was late" (Aponte: 2204, 2234-35). She testified that defendant enjoyed working in New York (Aponte: 2198).

STEVEN SCHNEIDER, a licensed engineer, was qualified as an expert accident reconstructionist, without objection by the People.[12] He performed "an accident reconstruction and highway safety analysis" of the collision (Schneider: 2266, 2274). Schneider testified that, according to the limousine's global positioning system and drive cam (a camera in the front of the car), the vehicle was travelling at sixty miles per hour thirty seconds prior to impact, and sixty-two miles an hour eight seconds prior to the application of the brakes (Schneider: 2299-3202). Schneider estimated that the limousine was moving at forty-nine miles per hour at impact, and the brakes were applied

---

[12] Defendant called Scott Crawford to testify as an expert, but the court refused to so qualify the witness. That issue is discussed in Point IV.

one and three-quarter seconds prior to impact (Schneider: 2304, 2423).

Using a linear momentum analysis, Schneider estimated that defendant's truck was moving at thirty-three miles per hour at the moment of impact (Schneider: 2305-12).  Schneider testified that it was necessary to establish the exact angle of impact in order to determine the appropriate momentum formula to use for this collision (Schneider: 2401).  According to the photographs from the limousine's camera, the limousine was turning to its right at the moment of impact, while defendant's truck was turning very slightly to its left (Schneider: 2400, 2405). Schneider assessed the angle of impact solely by looking at the pictures from the limousine's camera, and did not consider the damage to the vehicles or the roadway debris (Schneider: 2401, 2407).

Using another form of analysis, a time-distance formula, Schneider estimated that defendant's truck was moving at a speed of between twenty-seven and thirty-eight miles per hour at impact (Schneider: 2323-25).

The Verdict and Sentence

Defendant was convicted of murder in the second degree (two counts), assault in the first degree (three counts), and operating a vehicle while under the influence of alcohol (two counts). He was sentenced to eighteen years to life imprisonment for each count of murder, eighteen years' imprisonment plus five years' post-release supervision for each count of assault, and one hundred eighty days' incarceration for each count of driving under the influence of alcohol, all terms to run concurrently.

## POINT I

BECAUSE DEFENDANT FAILED TO TIMELY OBJECT TO THE
SUFFICIENCY OF THE EVIDENCE, THAT ISSUE IS NOT REVIEWABLE AS A
MATTER OF LAW; IN ANY EVENT, THE EVIDENCE WAS LEGALLY SUFFICIENT
TO ESTABLISH DEFENDANT'S GUILT OF DEPRAVED-INDIFFERENCE MURDER
AND ASSAULT (answering defendant's brief, Point I; amicus curiae
brief, Point One).

Defendant drove in the wrong direction on the Meadowbrook
Parkway for at least two and one-half miles before he collided
with a limousine driven by Stanley Rabinowitz.  During that two
and one-half miles, he passed signs reading "Wrong Way," he
drove directly toward the headlights of at least two vehicles
that veered out of his lane, he passed at least three other
vehicles that were heading south on the same side of the parkway
on which he was driving north, and he drove for a distance
alongside a motorcycle travelling in the same direction he was
going, but on the opposite side of the highway divider.  He
braked, according to the defense, when he saw the limousine,
driving toward him.  The jury was entitled to conclude that, if
he did brake for this one vehicle, it was because this was the
one vehicle that did not get out of his way.  The jury was
entitled to conclude, based on legally sufficient evidence, that
defendant acted recklessly and with depraved indifference when
he drove for miles in the wrong direction, ignoring repeated and
obvious and unmistakable signals that he was doing so, and that
he continued in this conduct simply because he did not care

25

about the consequences. Defendant has waived review of his argument that the evidence was insufficient to establish his mens rea of depraved indifference beyond a reasonable doubt, and his argument is, in any event, meritless.

Defendant failed to preserve his argument that the evidence was legally insufficient to establish that he acted with depraved indifference to human life.

Defendant points out that he repeatedly moved to dismiss on the ground of legal insufficiency all the charges in the indictment that alleged depraved indifference to human life (defendant's brief at 33-34). And he did repeatedly seek this relief, but not at the one time that would have preserved the issue for appellate review as a matter of law.

A defendant may move for a trial order of dismissal on the ground of legally insufficient evidence at the close of the People's case and, again, at the close of all the evidence. See C.P.L. § 290.10(1). The Court of Appeals has held that a defendant who unsuccessfully moves for dismissal at the end of the People's case (as defendant did here), and thereafter presents a defense (as defendant did here), has not preserved the issue of the sufficiency of the evidence as a matter of law for appellate review, absent a renewed motion at the close of

all the evidence.   See People v. Kolupa, 13 N.Y.3d 786, 787
(2009) (by moving to dismiss only after the People's case, and
not again at the close of all the evidence, defendant "failed to
preserve his argument that the People introduced insufficient
evidence" to establish guilt) (emphasis added); People v. Lane,
7 N.Y.3d 888, 889 (2006) (same).   This Court has cited People v.
Hines, 97 N.Y.2d 56 (2001), for the proposition that when a
defendant unsuccessfully moves for a trial order of dismissal at
the close of the People's case, and thereafter presents
witnesses whose testimony supplies additional evidence of guilt,
he "waives his right to attack the quantum of proof adduced by
the People during their case in chief."   People v. Soto, 8
A.D.3d 683, 684 (2d Dept. 2004) (emphasis in original).   Thus,
the Court concluded that "[t]he issue is one of waiver, not
preservation."   Id.   But whether deemed waiver of the issue, or
a lack of preservation, defendant's failure to put in issue the
sufficiency of the evidence at the close of the testimony should
preclude review now.[13]   Defendant's argument is, in any event,
meritless, as is his position concerning several issues that he

---

[13] Defendant also raised this claim belatedly in a motion
pursuant to C.P.L. § 330.30.   However, because defendant failed
to renew his mid-trial motion for dismissal on the ground of
insufficient evidence, "this was not an issue of law that could
properly be adjudicated in a CPL 330.30 motion."   People v.
Hines, 97 N.Y.2d at 61.

raises even before addressing the specifics of the evidence against him.

No court has ever held that a defendant's intoxication necessarily precludes a finding of depraved indifference.

It has now been established by the Court of Appeals that depraved indifference to human life is an independent mens rea (People v. Feingold, 7 N.Y.3d 288, 294 [2006]), and that an otherwise reckless homicide or assault is elevated to a crime of depraved indifference when the defendant's reckless conduct is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another." People v. Suarez, 6 N.Y.3d 202, 211 (2005) (quoting People v. Russell, 91 N.Y.2d 280, 287-88 [1998]).

Facially, the conduct involved here -- consciously driving in the wrong direction, into oncoming traffic -- is precisely the type of behavior that is contemplated by the depraved-indifference statutes. It differs in no effective way from shooting into a crowd (see People v. Payne, 3 N.Y.3d 266, 271 [2004]), and evidences the same lack of regard for the lives of others. And so, to avoid the obvious conclusion to be drawn

from his conduct, defendant argues that he did not consciously engage in this conduct and, therefore, did not have the requisite mens rea. But defendant argues further. He argues that the Court of Appeals has effectively said that drunk driving cannot co-exist with a mens rea of depraved indifference (defendant's brief at 37-38). This is not the law or an accurate statement of Court of Appeals precedent.

According to defendant, when the Court of Appeals, in Suarez, 6 N.Y.3d 202, gave examples of conduct that reflected depraved indifference, it omitted any situation involving an intoxicated driver, thereby signifying an "obvious" intent to "exclude driving while intoxicated" from the offenses that could be appropriately prosecuted on a theory of depraved indifference (defendant's brief at 37). The Court of Appeals has never said that.

The People do not dispute the facial validity of the statement that intoxicated driving, in itself, is not evidence of depraved indifference (see defendant's brief at 38). But it was never the People's theory of proof that defendant was guilty of depraved-indifference murder and assault simply because he was drunk when he drove and caused two deaths and catastrophic injuries. The theory advanced was that this defendant, while

29

under the influence of -- but conspicuously and demonstrably tolerant of -- alcohol, drove in the wrong direction on the parkway and then, when he was consciously aware that he was going the wrong way, took no action to avert the tragic consequences to innocent people in his way. Nothing in any case cited by defendant would suggest that a jury is precluded from finding that a defendant who has engaged in this conduct, with this state of mind, cannot be held accountable for a depraved-indifference crime. Indeed, this Court, in People v. Mooney, 62 A.D.3d 725 (2d Dept. 2009), implicitly rejected such a conclusion when it affirmed a defendant's convictions for depraved-indifference assault and depraved-indifference reckless endangerment, alleged to have been committed while the defendant was driving drunk. See also People v. Thomas, 68 A.D.3d 482 (1st Dept. 2009) (defendant convicted of depraved-indifference reckless endangerment as well as both driving under the influence of alcohol and operating a motor vehicle while impaired by drugs). Obviously, appellate courts have determined that intoxication is not a free pass to lethal conduct where, as here, the evidence, viewed as a whole, "was legally sufficient to establish that the defendant acted with the culpable mental state of depraved indifference to human life" at the time that he drove -- regardless of the alcohol and drugs in his system. Mooney, 62 A.D.3d at 726.

Whether proof of intoxication is admissible
to negate evidence of depraved indifference
is a moot issue on this appeal.

Defendant argues that proof of intoxication may be offered
to negate proof of depraved indifference (see Penal Law
§§ 15.05[3], 15.25) (defendant's brief at 40-41). The Court of
Appeals has not determined this issue (see People v. Valencia,
14 N.Y.3d 927, 929-31 [2010] [Graffeo, J., concurring]), this
Court has repeatedly declined to reach the question (see People
v. Battles, 65 A.D.3d 1162, 1163 [2d Dept. 2009]; Valencia, 58
A.D.3d 879, 880 [2d Dept. 2009]), and it is not a relevant
question in this case.

The court here announced, prior to trial, that the defense
could use evidence of intoxication to negate proof of depraved
indifference (57), and in its instructions to the jurors, the
court repeatedly instructed that they "could consider whether
the defendant's mind was infected by intoxicants to such a
degree that he was incapable of forming the mental state of
depraved indifference to human life" (2593, 2626, 2654-55,
2671). The jurors are presumed to have followed those
instructions. See People v. Baker, 14 N.Y.3d 266, 273 (2010).
And so, while the issue defendant poses has not been determined
by this Court, the Court of Appeals, or the Legislature, it was
determined in this trial in accord with the position defendant

31

urges.     To   warrant   the   relief   he   seeks,   defendant   must,
therefore,   persuade   this   Court   not   simply   that   he   was
intoxicated,   but   that   the   proof   of   his   intoxication   negated   any
"valid   line   of   reasoning   and   permissible   inferences   from   which   a
rational   jury   could   have   found   the   elements   of   the   crime   proved
beyond   a   reasonable   doubt"   (People v. Danielson, 9 N.Y.3d 342,
349 [2007]).[14]   This,   as   is   discussed   below,   he   cannot   do.


The People do not dispute that defendant's mens
rea should be assessed as of the time that he drove.

Defendant   cites   People v. Valencia, 58 A.D.3d 879 (2d Dept.
2009),   aff'd,   14 N.Y.3d 927 (2010),   for   the   proposition   that   his
mens   rea   must   be   assessed   at   the   time   he   is   alleged   to   have
driven   with   depraved   indifference,   and   not   at   an   earlier   time
(defendant's   brief   at   41-43).     The   prosecution   has   never
suggested   otherwise   in   this   case,   and,   at   trial,   the   People
presented   proof   that,   at   the   time   he   drove,   defendant   was   aware
of   the   multiple   indications   that   he   was   travelling   in   the   wrong
direction,   and   he   chose,   with   depraved   indifference   to   human
life,   to   ignore   those   signs.     Thus,   this   case   is   unlike
Valencia,   where   the   court   (the   finder   of   fact   in   that   case)

---

[14] It should be noted that this was not defendant's position at
trial, where he argued to the jury that the blood evidence was
unreliable and that he drove as he did because he was simply
lost and confused.

32

specifically found that the defendant was "oblivious" and had no mens rea at the time he drove.  See Valencia, 14 N.Y.3d at 928 (Graffeo, J. concurring).   It is, rather, a case in which a properly-instructed jury concluded that, in spite of his intoxication, defendant was aware of his conduct and the danger that it created for others, and that he was depravedly indifferent to that danger.

**The evidence was sufficient to establish defendant's mens rea of depraved indifference beyond a reasonable doubt.**

"A verdict is legally sufficient when, viewing the facts in a light most favorable to the People, 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt.'"   People v. Danielson, 9 N.Y.3d at 349 (quoting People v. Acosta, 80 N.Y.2d 665, 672 [1993]).   The sole element in issue here is mens rea.   The evidence more than provided a valid line of reasoning and reasonable inferences that justified a finding that defendant acted with the mens rea of depraved indifference.

A mountain of evidence established that, at the time defendant drove, and despite his intoxication, he was aware of his circumstances and ignored them, with depraved indifference to the consequences.   The evidence established that defendant

33

was what the expert witness described as a "practiced drinker"
-- one who, upon repeated exposure, had developed a tolerance to
alcohol. Defendant's apartment was strewn with empty liquor
bottles and flasks, his wallet contained membership cards to
seven different drinking clubs in Arkansas (1308), he had spent
the afternoon and early evening of July 1 in a bar, drinking at
least six beers, and he went to a party on the night of July 1,
and there he drank still more. The extent of defendant's
drinking, and his conduct while under the effect of the alcohol
he had consumed, more than warranted the conclusion that
defendant was, indeed, a "practiced drinker," exceptionally
tolerant of his levels of alcohol and very much aware of and in
control of his behavior.

For instance, although defendant drank to excess on July 1,
2005, and into the morning of July 2, 2005, he was able to make
conversation with his friends. That conversation was rational
and appropriate, and defendant spoke without slurring his words
(1463-64, 1787-88). He danced, and was not unsteady on his
feet. And later, after he slipped out without saying goodbye
(unlike his practice at any prior party with his friends), he
made a cell phone call. Thus, he was able to find his cell
phone. He was able to properly dial Amanda Goldman's number.
He claims (with no proof whatsoever) that he placed that call

because he became lost on his way home. Assuming that that was the purpose of the call, defendant effectively concedes that he was aware of where he was, or at least where he wasn't. He was, according to his own proof and his own argument, coherent and aware through all of this.

But sometime shortly after that, if defendant's story were to be credited, drunken unawareness set in. It was then that defendant drove past multiple signs reading, "Wrong Way" (999). He drove past driver after driver, repeatedly facing and ignoring headlights in his lane, honking horns, and cars swerving out of his path, not understanding the import of what was happening. He did not, he would have had the jury believe, understand the import of a motorcycle driving beside him, in the same direction -- but on the other side of the lane divider. But somehow, when facing the one set of headlights that could not and did not get out of his way, defendant suddenly again became aware of his circumstances and, he claims, hit the brakes.

Defendant's version of his awareness is highly selective and equally implausible. Based on the evidence, it is more plausible -- and the jury was entitled to conclude -- that this defendant, who danced without staggering and spoke without

35

slurring, who appeared entirely normal to his friends, who knew where he wanted to go and claims to have known that he was lost, and who could find and properly operate a cell phone, was fully aware of what he was doing. Regardless of defendant's intoxication, and even if he were lost, as he claimed, the evidence overwhelmingly established that defendant knew what he was doing -- and did not care -- when he was driving in the wrong direction. Indeed, the evidence established that he had to have known.

Contrary to defendant's argument (defendant's brief at 57-58), Elizabeth Serwin was driving in the center lane of the parkway when she saw defendant's truck coming toward her -- in her lane (1490). She veered off the road, as did two cars behind her. That was over two miles before the collision. A mile north, Joseph Caruso was also driving in the center lane of the parkway when he saw headlights coming directly at him -- in his lane.[15] Caruso moved to the left, and defendant moved in his direction. Caruso veered to the right, and then off the road. Further north, Stephen Weber, on his motorcycle on the

---

[15] The toxicologist testified that an average man with a B.A.C. of .28 would experience "tunnel vision," i.e., he would see only those things directly in front of him (2131-33). Both Serwin and Caruso were, contrary to defendant's brief, directly in front of him.

northbound side of the highway, saw defendant's truck on the other side of the road divider, also travelling north. Weber pulled alongside defendant in an attempt to alert him that he was going in the wrong direction. Weber kept pace with defendant until he lost sight of him because of shrubbery dividing the northbound and southbound lanes. That was moments before the collision.

Defendant had to have been aware of these unavoidable signs that he was driving the wrong way. Intoxication may have slowed defendant's response time, but it did not slow it by two minutes (2183), or, as defendant would suggest, eradicate it. Intoxication did not render him deaf or blind. And even assuming he was affected by tunnel vision, he would have seen two sets of headlights, a mile apart, driving directly into his lane. Thus, the jury was warranted in concluding that the only difference between Serwin's and Caruso's headlights and the headlights of the limousine was that the limousine's headlights did not veer away. The jury was entitled to conclude that those cars' headlights were different only because they did veer out of his way. The jury was entitled to conclude that defendant did not pass in and out of awareness in a pattern that conveniently, and incredibly, exculpated him, but, rather, that, while under the influence of alcohol, but demonstrably tolerant

37

of that alcohol, defendant had repeated opportunities to stop his reckless conduct over a course of at least two and one-half miles, and he chose not to. The jury was entitled to conclude that he chose not to because he simply did not care about anyone else on the road.

Alternatively, the jurors could have been wholly persuaded by defendant's strenuous argument that his blood had been tampered with and that the chemical analysis and blood reading were unreliable. And in that case, they could again have believed that defendant, only mildly "buzzed" according to his friend Zigman, was aware of, and with depraved indifference, disregarded repeated, obvious warnings that he was driving in the wrong direction, into oncoming traffic. And that, too, would have been more than sufficient, credible evidence to sustain the verdict.

Nonetheless, defendant argues, as he did at trial, that, according to everyone who knew him, defendant was an upbeat, happy person, and that he was in a good mood prior to leaving the party, and that evidence of defendant's apparent demeanor earlier that evening refuted any suggestion that he was angry or depressed when he drove. Of course, as defendant has himself pointed out, evidence of his apparent state of mind at a time

prior to the collision is not proof of his mens rea at the time he drove. See Valencia, 14 N.Y.3d 927.

Moreover, to the extent that defendant's argument may be viewed as a suggestion that there was no reasonable explanation or motive for his conduct, it should be noted that motive was not an element of any of the crimes with which defendant was charged, and it was not the People's burden to explain why defendant behaved as he did. See People v. Timmons, 54 A.D.3d 883, 885 (2d Dept. 2008). Nonetheless, the evidence established that, according to defendant's own statement to the police, he was unhappy and depressed, he was in debt, nothing he did was ever "enough," and, as defendant put it, he was in a "self-destruct mode" (1199-1200, 1202-04). It further established that six months after defendant moved to New York from Arkansas to be with his mother, his mother moved out of their shared home and had plans to rent out the house. The evidence established that defendant had had a job with New York Life Insurance. He left that job to follow his friend Joshua Zigman to a company named Key 2 Health Care, only to have Zigman quit, four months later, for a new job, leaving defendant with a company that was apparently failing and which was, in fact, out of business within two months of Zigman's exit. And while Zigman testified that defendant was always at the office by 8:20 a.m. and stayed

until 6:30 or 7 p.m. (1819), defendant told the police that he arrived at Key 2 Health at 3 p.m., on the afternoon preceding the collision, and he left only two hours later (1201). In fact, defendant's friend testified that defendant was in a bar by 4:30 (1420). The evidence established that, as defendant phrased it, "everything was going wrong" (1200).

There was further evidence that defendant wrote a letter to Zigman, claiming that everything he said to the police shortly after the collision was a lie, and that he told those lies in order to portray himself as "an unfortunate victim of circumstance worthy of leniency" (exh. 84, 1802). That letter, however, was written months after defendant was indicted and knew the nature of the charges against him. It was written with the same mindset that caused him to ask Zigman to speak to Tracy Sodikoff about her statement to the police that defendant had been depressed (1792-93). There was no reason to believe defendant's belated and self-serving denial of his frame of mind.

But of course, as noted, the People were not required to establish motive. The law does not require the prosecution to make comprehensible a demented game of "chicken" that is, ultimately, incomprehensible. And so, even if there had been no

proof whatsoever concerning defendant's mood, or even if the jury believed, as defendant's witnesses testified, that defendant was an unrelentingly happy guy, the evidence was still sufficient to establish his guilt beyond a reasonable doubt. The proof of defendant's conduct and mens rea at the time he drove was conclusive and overwhelming. That evidence established that, regardless of defendant's mood or state of mind earlier that night or at any time prior, when he drove, he had, and his conduct manifested, a depraved indifference to human life.

Defendant would reduce this case to the question of whether he was "on the road that night looking for victims" (defendant's brief at 61). But that is not the issue, and that has never been the allegation here. If it were, defendant would have been charged with intentional murder. He was charged with, and convicted of, depraved-indifference murder not because he was "looking for victims," but because he did not care whether he found victims.

POINT II

A SAMPLE OF DEFENDANT'S BLOOD WAS LEGALLY DRAWN AND TESTED (answering defendant's brief, Point III).

At about 2:00 a.m. on July 2, 2005, defendant drove directly into a limousine driven by Stanley Rabinowitz. According to the testimony at the pretrial hearing, the unresponsive and incoherent defendant was arrested at about 2:30 a.m., just as the ambulance left to take him to the hospital. Ten to fifteen minutes later, at the hospital, Trooper O'Hare asked a hospital nurse to draw a sample of defendant's blood for the purpose of chemical testing, and the blood sample was taken. According to defendant, this procedure was unauthorized and the results of the testing were inadmissible because the police neither informed him that he was under arrest, nor asked for his consent prior to the taking of the blood sample. The hearing court found otherwise, and the court's findings were fully supported by the evidence.

A defendant who has been legally arrested[16] for intoxicated driving is "deemed to have given consent" to the taking of a blood sample within two hours of his arrest.   See V.T.L.

---

[16] The hearing court found that defendant's arrest was supported by probable cause (H271) (references preceded by "H" are to the pretrial hearing minutes).   Defendant does not dispute that finding.

§ 1194(2)(a)(1).   A defendant may refuse the testing, and the law provides penalties for that refusal.   <u>See</u>   V.T.L. § 1194(2)(b).   But the law requires neither the "empty gesture" of announcing the "formal arrest" of an unconscious or delirious or otherwise incoherent defendant (<u>People v. Goodell</u>, 79 N.Y.2d 869, 871 [1992]; <u>accord</u> <u>People v. Lerow</u>, 79 A.D.3d 66, 70 [4th Dept. 2009]; <u>People v. Bagley</u>, 211 A.D.2d 882, 883 [3d Dept. 1995]), nor the consent of a defendant who is so disoriented or incapacitated that he is unable to give it (<u>see</u> <u>People v. Kates</u>, 53 N.Y.2d 591 [1981]; <u>People v. Dixon</u>, 149 A.D.2d 75 [2d Dept. 1989]).

The evidence at the hearing established that several police officers and state troopers attempted to speak to defendant during the thirty to forty minutes between their arrival at the crash scene and the taking of defendant's blood sample.   None of those officers was able to meaningfully communicate with him. Officer Pandolfo, for instance, arrived at the scene only minutes after the crash.   He found defendant behind the steering wheel of his truck, staring straight ahead (H7-8).   Defendant was unresponsive when the officer asked him whether he was "okay."   When the officer then moved closer, put his hand on defendant's shoulder, and asked him what had happened and whether he knew where he was, defendant turned away.   When the

officer again asked him if he was "okay," defendant turned to him and said, "I don't know. What happened? Where am I?" (H8, 15). There was an odor of alcohol in the truck, defendant's eyes were glazed, his speech was low and slurred, and his words were barely intelligible (H9).

Officer Nolan met the same response as he assisted in removing defendant from his truck and putting him on a stretcher. When Nolan asked defendant whether he was "okay," defendant simply looked at him and made no reply. When Nolan asked defendant his name, he could not understand the slurred response he initially got. After repeatedly asking the question, the officer finally was able to make out the name "Marty." Nolan asked numerous times where defendant was coming from and was finally able to understand him say "Long Beach." It was difficult to hear or understand defendant, he smelled of alcohol, and his eyes were glassy and bloodshot (H29-30).

Trooper Siegler got into the ambulance and detected the strong odor of alcohol on defendant's breath. Defendant did not look at Siegler and neither responded nor in any way acknowledged Siegler's presence when Siegler asked him his name. Defendant did not "utter an intelligible sound." His eyes were open, he was looking straight up at the ceiling, and he was

slightly moaning. Defendant was arrested at 2:33 a.m., as the ambulance left the scene of the crash. The arrest was not announced to defendant (H47-51).

The last officer to attempt to communicate with defendant before his blood was drawn was Trooper O'Hare, who, with Emergency Medical Technician Cook,[17] accompanied defendant in the ambulance. O'Hare, too, observed that defendant smelled of alcohol and that his eyes were glassy and bloodshot. O'Hare repeatedly asked defendant his name, and defendant responded incoherently (H66-70). At no time while they were in the ambulance did defendant look at or in any way acknowledge either O'Hare or Cook, and at no time was O'Hare able to understand anything defendant said (H72). The ride to the hospital took approximately ten minutes. Once there, members of the medical staff asked defendant his name and they, too, got no response. At O'Hare's request, a nurse drew a sample of defendant's blood (H73-76). O'Hare did not seek defendant's consent to the procedure because defendant had been unable to tell the trooper so much as his name (H98). It was then approximately 2:40 or 2:45 a.m. (H75-76).

---

[17] Cook did not testify.

45

Thus, as established by the testimony of the police who interacted with defendant from the moment they arrived on the scene until the blood sample was drawn, defendant did not respond to the people around him, he did not know where he was, his speech was incoherent, and it took repeated efforts even to get him to say his name in a way that could be understood. Obviously, as a result of the horrific high-impact collision, defendant was so incoherent and disoriented that it would have been pointless to inform him that he was under arrest[18] or to ask him for meaningful consent to the medical procedure. Nonetheless, defendant argues that, based on the testimony of Raffi Zohrabian, an emergency room doctor who examined defendant, and who testified on defendant's behalf, the court should have found otherwise. Dr. Zohrabian's testimony does not support defendant's position.

---

[18] The hearing court did not directly address whether defendant was so incoherent that it was unnecessary to formally announce his arrest. It did, however, find that defendant was so incoherent that it was unnecessary to ask him to agree to the drawing of his blood (H273), and it can reasonably be inferred that this finding applied equally to the necessity of formally announcing the arrest, since the arrest and the drawing of the blood took place within ten to fifteen minutes of each other. In any event, this Court may make its own findings of fact and conclusions of law concerning the need to have formally announced defendant's arrest "where, as here, the record is sufficient to do so." People v. Sterling, 71 A.D.3d 654 (2d Dept. 2010).

46

Dr. Zohrabian did testify that defendant was awake, aware of his surroundings, and "alert enough to understand [a] request to submit to a blood test" (H199). Indeed, the doctor testified that defendant "definitely understood what the [blood] test [was] all about and what his responsibility was in terms of responding to the officer's request, and therefore he knew quite well that the blood that was taken from him had some implications" (H205). And, according to the witness, defendant was "aware of his surroundings" because he "came in with his eyes open" (H228), and "[w]hen [a] person comes in with his eyes open spontaneously, [he] is definitely aware of his surroundings" (H227).

The doctor further testified, however, that defendant was "disoriented" and confused, and that his responses to questions were nonsensical, "incomprehensible," and "inappropriate" (H214, 219, 224, 225, 227, 230). He testified that he could not understand what defendant was saying, but that defendant was nonetheless "responsive" in the sense that he was uttering random words and that this was "better than nothing" from the "surgical trauma point of view" (H219, 221, 222, 223). The doctor explained that defendant could be understood to the extent that the sounds he made were words, but, "[o]bviously he

was not probably saying the right words, probably not
appropriate words, but he did utter words" (H224).

Zohrabian was unable to recount a single question that he
asked defendant that led him to conclude that defendant was
cognizant of where he was and what was going on (H228-229).
Indeed, while claiming that defendant was "responsive" and that
he "communicated" with defendant, when the doctor was asked
whether he "understood" defendant, he answered, "Of course not"
(H219).

Thus, it was apparent that, as the hearing court found, the
doctor's evaluation of defendant was made in the context of his
role as a physician determining defendant's medical condition
for the purpose of treatment, applying "a completely distinct
standard" from that used in a legal context for the purpose of
assessing a defendant's ability to reasonably understand and
knowingly consent (H272-73). Applying the latter standard, and
implicitly finding the police officers' testimony credible, the
court held that defendant was "so disoriented" that consent was
"impossible," and that his blood was, therefore, properly drawn
without his consent (H273). That determination by the hearing
court is entitled to great deference in this proceeding, and
should not be disturbed "unless clearly unsupported by the

record." <u>People v. Latimer</u>, 904 A.D.3d 763, 764 (2d Dept. 2010). The determination here was overwhelmingly supported by the record.

## POINT III

THE COURT REASONABLY EXERCISED ITS DISCRETION WHEN IT ORDERED DNA TESTING OF DEFENDANT'S BLOOD (answering defendant's brief, Point II).

### Introduction

At trial, the court ruled that the People failed to establish an adequate chain of custody for the blood sample that was taken from defendant, and it precluded the introduction of evidence concerning the blood alcohol content of the sample that was tested. Upon subsequent application by the People, the court ordered that a blood sample be taken from defendant so that the DNA from that blood could be compared with the DNA of the sample tested at the police lab, and thereby clarify the issue. Defendant opposed this procedure and now argues that it is ground for reversal of the judgment. Defendant is wrong. Indeed, the court's error here was its original preclusion of the results of the testing of defendant's blood, and any subsequent error was harmless.

### The factual background and the order of the court

Following the collision, defendant was taken to a hospital, where a sample of his blood was drawn. Trooper O'Hare watched as the blood was drawn, and the test tubes were handed directly to him. The blood then passed through the hands of several

state troopers and laboratory workers, all of whom testified at trial, and it was ultimately analyzed by Lisa Lindenthaler, a forensic scientist in the Mid Hudson Crime Lab.   Because of Trooper O'Hare's confusion and obvious lapses of memory concerning the color of the seals he placed on the test tubes, as well as whether the needle used to draw the blood was that contained in the kit or one from the hospital, the court excluded evidence concerning the results of the testing of defendant's blood (1397).

The People then moved for an order requiring defendant to submit to a buccal swab of his mouth, for the purpose of DNA testing that would determine whether the blood delivered to and tested at the lab was defendant's (1431).   Defense counsel opposed the motion on the ground that there was no statutory authorization for this discovery mid-trial, that the defense had opened to the jury and cross-examined witnesses on the assumption that the sole testing done was that of the serologist who analyzed the then-excluded blood samples, and that the prosecution's request suggested a change in its theory of the case (1434).   Stating that the proposed testing could determine with relative certainty whether the blood was defendant's (1439), the court granted the People's application "in the interest of justice" (1448).

51

The buccal swab was taken and the testing indicated the presence of two donors, one of whom was the same donor whose blood was in the test tubes taken from the hospital, the other of whom was a male in the "local database" (1706).[19]   The court then ordered defendant to supply a blood sample for DNA testing "to clarify the relevant issues at this trial" (1797).[20]   The blood sample was taken and submitted for DNA analysis.   The DNA of the sample taken mid-trial matched the DNA of the sample in the blood kit taken from the hospital on the night of the collision (2013, 2018, 2023-26, 2028, 2033-35).   Lindenthaler, the forensic scientist whose testimony had been previously precluded, was then permitted to testify that the blood delivered to the Mid Hudson lab had a blood alcohol content of .28 percent (2067-68).

The court's initial preclusion of evidence
of the lab results was erroneous.

If there were error in the proceedings concerning the admissibility of evidence concerning defendant's blood alcohol content, it was in the court's initial determination that the

---

[19] Defendant's attempt to thwart the taking and testing of the buccal swab resulted in his indictment for, and subsequent plea of guilty to, tampering with physical evidence.

[20] This testimony, the parties' arguments, and the court's ruling were all conducted outside the presence of the jury.

People failed to establish an adequate chain of custody for the samples that were ultimately delivered to the Mid Hudson lab. Defendant's blood was drawn by a hospital nurse, who handed the two test tubes directly to Trooper O'Hare. The blood was then transported or stored by eight other troopers and lab workers, each of whom testified to the continuous custody and safe-keeping of the samples. This was sufficient to establish "reasonable assurance" of the "identity and unchanged condition" (People v. Julian, 41 N.Y.2d 340, 343 [1977]) of the blood.

Nurse Busco testified that she drew two test tubes of blood from defendant and immediately gave those test tubes to Trooper O'Hare (704).

Trooper O'Hare testified that he saw the nurse take the blood, he immediately took the test tubes from her, he put the tubes into a kit, he never lost sight of the kit, and he gave it to Trooper Stafford at the hospital (619, 622, 624, 692). He handled no other blood on that day, shortly before, or shortly thereafter (1388).[21]

---

[21]  O'Hare had written his name on the top of the paperwork accompanying the blood kit, but he failed, as defendant notes, to indicate that it was he who took the blood from the nurse and passed it on to Stafford (664). Defendant is wrong, however, when he states that, according to O'Hare, the paperwork (continued. . .)

Trooper Stafford testified that he took the blood samples, in the closed blood kit, from O'Hare (783, 786).  Stafford gave the kit, exactly as he had received it, to Investigator Baez (783, 789).

Investigator Baez took the blood kit from Stafford, and delivered it to Investigator Harris at the crash scene (783, 789, 1042).  Baez was involved with no other blood kit on that day or during the week preceding or following that day (1119).  The State Police in Nassau County were involved with no other blood kit on that day or in the week preceding or following it (1119).

Investigator Harris received the blood kit from Baez and locked it in his car.  When he returned to his car, after the scene was cleared, the blood kit was as he had left it (1157-60).  He drove to the Medical Examiner's Office to submit the blood for analysis, but was informed that no toxicologist was on duty and that none would be available (1160-61).  He then drove

---

[21] (continued. . .)
incorrectly indicated that the blood went from Stafford to Baez (defendant's brief at 77).  What O'Hare said was that the paperwork was incorrect to the extent that it did not indicate that the blood went from the nurse to O'Hare before it went to Stafford, and then to Baez (674).  O'Hare never testified that Stafford did not pass the blood to Baez.  Indeed, he could not know to whom Stafford gave the blood.

to the state police barracks, where arrangements were made for Trooper Hemmerich to transport the blood kit to the state police station in Newburgh for testing by the state lab serving Long Island (1174). There was no other blood kit in Harris's car, and he was involved with no other blood kit on that day or for a week preceding or following that day (1160).[22]

Trooper Hemmerich testified that he received the blood kit from Harris and transported it to the state police station in Newburgh. There, he delivered it to Investigator Drake (814-15). Hemmerich never lost sight of the kit (822).

Investigator Drake testified that he received the blood kit from Hemmerich, and then put the kit into a refrigerator in the evidence locker (837-39).

Investigator Ramos received a call from Drake, informing him that the blood kit was to be transported to the Newburgh Regional Crime Laboratory (799). He removed the blood kit from

---

[22] Defendant attacks the chain of custody on the ground that, according to the paperwork accompanying the blood kit, the kit went to "two completely different places for analysis," i.e., the medical examiner's toxicology office and the Newburgh police lab (defendant's brief at 76). This was obviously explained by Investigator Harris's testimony.

the vault and delivered it to Maureen Roman, an evidence technician at the lab (799-803).

Roman testified that Investigator Ramos delivered the blood kit to her at the lab. (706-07). She put the kit into a refrigerator in the sealed vault, where it remained until it was given to the analyst (713).

Thus, every single person who had contact with defendant's blood sample testified that he or she received and safeguarded that sample and passed it on, unchanged, until it was analyzed by the toxicologist. Nonetheless, defendant disputed the integrity of the chain of custody, and the court initially precluded the evidence, because Trooper O'Hare, who witnessed the drawing of the blood and took the blood tubes from the nurse, testified that he sealed those tubes with white tape. The tubes were, in fact, sealed with red tape. Indeed, that was the testimony of every witness who looked at the tubes (Baez: 1033-34; Harris: 1161; Lindenthaler: 1324). This inconsistency between O'Hare's testimony and that of the other witnesses was, however, explained. It was explained by this simple testimony:

> Q [prosecutor]: Trooper O'Hare, you
> previously indicated in testimony that you

used the white seals.   Can you explain to
the Court . . . why you said that?

A [O'Hare]:    To    the    best    of    my
recollection,  your  Honor,  at  the  time  I
believe[d]  I  used  the white  seals.   Looking
now I see I used the red integrity seals.

THE COURT:    There  is  no  question  in  your
mind at this time that you, yourself, sealed
the tube with the red seal and you put your
initials on the seal?

THE WITNESS:   Yes, your Honor.

THE COURT:    And   you   recognize   your
initials at this time?

THE WITNESS:   Yes, sir.   It is right there
(1371).[23]

Notwithstanding this explanation, as well as the witness's

acknowledgement that, after fourteen months, his recollection

was mistaken and he actually sealed the test tube with a red

seal and initialed the samples (1387-88), the court precluded

testimony concerning the blood analysis (1397).   That ruling was

error.

When evidence, such as blood, "is not patently identifiable

or is capable of being replaced or altered, admissibility

generally requires that all those who have handled the item

'identify  it  and  testify  to  its  custody  and  unchanged

---

[23] This  testimony  was  given  outside  the  presence  of  the  jury
(1368).

condition.'" People v. Connelly, 35 N.Y.2d 171, 174 (1974) (quoting People v. Sansalone, 208 Misc. 491, 493 [County Ct. N.Y. County 1955]); accord People v. Julian, 41 N.Y.2d 340, 343 (1977). Here, although the samples passed through many hands, all of those hands were accounted for, and each witness testified, identified the evidence, and confirmed that it was in unchanged condition. And to the extent that Trooper O'Hare was mistaken in his recollection of the color of seals he affixed fourteen months prior to his testimony, he corrected his error and assured the court that his initials were on the tubes and that he sealed them with red, not white, tape. This simple explanation was entirely credible and did not undermine the unbroken chain of custody that was established by every person who handled the blood. Compare People v. Miller, 174 A.D.2d 901, 902-03 (3d Dept. 1991) (gap in chain of custody was "subject to possible innocent and simple explanations," but "record reveal[ed] no explanation or clarification"). The absolutely unbroken chain of custody here established was not rendered unreliable simply because Trooper O'Hare became confused about the color of the seal he placed on test tubes, especially in light of his correction of his initial error. Thus, the trial court should not have precluded the introduction of the blood analysis in the first instance.

**The trial court properly exercised its
discretion to allow DNA testing mid-trial.**

Having initially determined that there was insufficient proof that the blood delivered to the State police lab was the same blood that was taken from defendant, the trial court precluded testimony about the analysis of the evidence. The People then moved for an order requiring defendant to submit to a buccal swab of his cheek for the purposes of testing the swab for DNA, comparing that DNA to the DNA of the blood delivered to the lab, and thereby allowing a reliable determination whether the blood taken to the lab was defendant's.

The prosecutor asked for this relief on the grounds that Trooper O'Hare's unexpected testimony concerning the seals on the test tubes had made it appropriate, and that the procedure would not delay the proceedings (1432-33, 1437). She urged the court to exercise its discretion in the interest of advancing the trial's function to seek the truth (1440).

Defense counsel opposed the application on the ground that it was untimely, that it reflected an attempt by the People to change the theory of the case mid-trial, and that it would prejudice the defense, which, according to counsel, had opened

to the jury and cross-examined witnesses based on the belief
that there would be no DNA evidence (1434).

Citing justice and fairness, the court granted the People's
application (1448), and a buccal swab was taken. As discussed
previously, defendant tampered with the saliva sample in his
mouth, necessitating the subsequent taking of a blood sample.
That sample was taken, its DNA was identical to the DNA of the
blood sample delivered to the police lab, and it was thereby
determined that the blood delivered to the lab was defendant's.
The People's expert was thereafter permitted to testify to the
B.A.C. of the sample she tested.

Defendant argues that the court's order, which ultimately
resulted in proof that the blood tested at the police lab was
defendant's, violated his state and federal constitutional
rights, as well as his statutory rights pursuant to C.P.L.
article 240 (defendant's brief at 73). This ruling implicated
no constitutional rights, and the decision not to strictly
enforce New York's discovery statute was permissible as a
reasonable exercise of the court's discretion in light of the
compelling circumstances of this case.

It is well established that a blood sample is a form of non-testimonial evidence, and that a court may order a defendant to provide such evidence. See Schmerber v. California, 384 U.S. 757, 761 (1966); C.P.L. § 240.40 (2)(b)(v). Indeed, C.P.L. § 240.90(1) provides for such an order upon a prosecutor's application. And while that section provides that the prosecutor's application shall be made before the commencement of trial, it has been held that "[v]iolation of CPL 240.90(1) does not require suppression or reversal unless constitutionally protected rights are implicated," and such rights are not implicated in the case of non-testimonial evidence. People v. Finkle, 192 A.D.2d 783, 788 (3d Dept. 1993).

Here, where no constitutionally protected right was in issue, there was good cause for the People's late application and reasonable ground for the court to grant that application. Obviously, if the prosecution had had any reason to expect that the testimony would establish anything other than a complete chain of custody, it would have requested a blood sample for DNA testing within the statutorily established time-frame. The prosecutor explained, however, that Trooper O'Hare's testimony was wholly unanticipated and took the People by surprise (1432-33, 1436-37). In this circumstance, where there was no bad faith by the prosecutor (cf. People v. Colavito, 87 N.Y.2d 423,

61

428 [1996]), it was not unreasonable for the court to fashion an appropriate remedy in the interest of furthering "the truth-seeking function of the trial" (People v. Jenkins, 98 N.Y.2d 280, 284 [2002]).  See also Judiciary Law § 2(3) (a court is authorized "to devise and make new process and forms of proceeding, necessary to carry into effect the powers and jurisdiction possessed by it").

Assuming arguendo that evidence concerning
the blood analysis should have been
precluded, that error was harmless.

Even if the court erred in allowing evidence concerning defendant's B.A.C., that error was harmless.  First, as discussed, the court's original decision to suppress the blood evidence was erroneous because, regardless of Trooper O'Hare's confusion concerning which needle the nurse used to draw the blood and the color of the seals that he applied to the blood tubes, there was never any question about the possession of the blood samples that were taken.  O'Hare's memory lapse concerning the seals he used did not undermine the proof that the samples were accounted for every moment from the time they were drawn through the time they were tested in the laboratory in Newburgh. For this reason, the court should not have, in the first

instance, granted defendant's motion to exclude testimony concerning the testing of that blood.

When the court later permitted testing that would eventually establish that the blood tested at the laboratory was indeed defendant's, defendant was not prejudiced. Because defendant's motion to preclude evidence of the lab results should not have been granted in the first place, he was not harmed by subsequent procedures that resulted in the admission of admissible evidence.

Neither should defendant be heard to argue that this somehow prejudiced him in presenting his defense. The defense was surely not based on an assumption that the People would be precluded from presenting evidence of the blood analysis, and defendant does not suggest that it was. Rather, defendant argues that it was his plan to "vigorous[ly] attack . . . the reliability of the blood, based on the fact that no . . . DNA testing had been performed" (defendant's brief at 79). But defendant still maintained that the blood sample was unreliable. As reflected in seven full pages of counsel's summation (2483-89), he argued that the evidence concerning the blood alcohol analysis was unreliable for a multitude of reasons. It was unreliable, counsel argued, because the evidence that

defendant's blood had an alcohol content of .28 was inconsistent with the testimony of defendant's friends concerning both what he had drunk that night and their observations of him.  And it was unreliable, he continued, because "[t]hose tubes were changed" (2484).  As reflected in page after page of the transcript, counsel argued that there were flaws in the chain of custody, beginning with O'Hare's testimony that he put red labels on test tubes that obviously had white labels.  And, counsel argued, it was irrelevant that DNA testing was conducted, because the issue was whether the blood was in the same condition that it was in when taken from defendant (2485-86).  Thus, contrary to the argument defendant made at trial, and which he renews here, the mid-trial testing of his blood, and the introduction of the evidence concerning his B.A.C. did not undermine his defense or unfairly prejudice him.

Of course, "evidence of guilt . . . is always prejudicial in a familiar sense of that word." Colavito, 87 N.Y.2d at 429. But in this case, defendant's B.A.C. reading was essential to proving his guilt of only one of the charges against him – a violation of V.T.L. § 1192(2).  In relation to all the counts of the indictment that alleged a mens rea of depraved indifference, the result of the test -- a .28 BAC reading -- was actually useful evidence for the defense, rendering it significantly more

difficult for the People to prove his state of mind than had there been no such proof.

The jurors heard extensive evidence about the effects of high blood alcohol content on the average drinker. They were then repeatedly instructed by the court that evidence of intoxication could be considered in determining whether "defendant's mind was infected by intoxicants to such a degree that he was incapable of forming the mental state of depraved indifference to human life" (2593, 2626, 2654-55, 2671). Thus, this evidence put before the jury the issue of whether, despite all the evidence of defendant's depravedly indifferent conduct, his intoxication precluded him from formulating a mens rea. And it required the People to prove that, a .28 B.A.C. notwithstanding, defendant's intoxication did not negate the ability of this extremely practiced drinker to form and act with the mens rea of depraved indifference.[24]

---

[24] Indeed, defendant suggests that a B.A.C. of .28 precludes the formation of the mens rea of depraved indifference, and that other New York courts have so held (defendant's brief at 41). Of course, a finder of fact can find that the evidence in a particular case is insufficient to prove that an intoxicated defendant possessed a culpable mens rea. See, e.g., Valencia, 14 N.Y.3d 927. But defendant cites no case that holds, and respondent asserts that no case could reasonably hold, that a B.A.C. of .28 necessarily, in all cases, and regardless of the evidence, negates proof of depraved indifference.

In sum, none of the evidence concerning defendant's blood alcohol level was prejudicial to him.  It did not prove that he was depravedly indifferent or make it easier for the People to establish his mens rea.  To the contrary, this evidence made it more difficult to establish defendant's mens rea.  And in the absence of this evidence, defendant's guilt would have been just as apparent -- indeed, more apparent -- and the jury's verdict could not possibly have been different concerning the crimes of depraved indifference.  See People v. Arafet, 13 N.Y.3d 460, 468 (2009) ("Nor do we see any likelihood that the jury would have acquitted defendant if it had not heard the improperly admitted evidence."); People v. Crimmins, 36 N.Y.2d 230, 241-242 (1975)(error of law harmless where "the proof of the defendant's guilt, without reference to the error, is overwhelming" and where there is no "significant probability ... that the jury would have acquitted the defendant had it not been for the error").

Thus, the jury's verdict does not reflect the effect of improperly prejudicial evidence.  It reflects the overwhelming proof that defendant was not the average drinker, that he was extraordinarily tolerant of the alcohol he drank, and that he drove that night recklessly and with depraved indifference to human life.

## POINT IV

THE TRIAL COURT DID NOT ERR IN REFUSING TO QUALIFY AS AN EXPERT RECONSTRUCTIONIST A WITNESS WHO DECLARED HIMSELF NOT TO BE SUCH AN EXPERT (answering defendant's brief, Point IV).

New York State Police Sergeant Scott Crawford was directed to perform a reconstruction of the collision that defendant caused on July 2, 2005 (2241-42). Crawford memorialized his findings in a written report that he prepared five months later (2247). The report contained conclusions about the relative speeds of the limousine and defendant's car at impact (2248). With respect to defendant's car, the report stated both that the speed of defendant's truck "[was] estimated to be 45 MPH" and that the speed "could have been as high as 45 MPH," but could not be conclusively determined "due to a lack of post-impact tire marks" (Crawford report at 6).[25]

Crawford's report was subsequently reviewed by an independent consultant, Wade Bartlett, hired by the People. Bartlett was retained because Crawford's findings appeared to be at odds with other available evidence in the case (1020). Bartlett prepared two reports, but they contained findings that were inconsistent with each other and with the Crawford report

---

[25] A copy of the Crawford report, which also concludes that defendant took "no apparent evasive action" to avoid the crash (report at 6), will be furnished to the Court upon request.

(1020-21).   Concerned about presenting scientifically unreliable evidence to the jury, the People sent all three reports to another expert to review, and provide an opinion about, the methodologies employed by Crawford and Bartlett.[26]   Ultimately, this expert concluded that the proper methodologies were not used for the type of collision involved in this case (1024-25).

The People did not call Crawford as a witness at trial. Instead, he was called by defendant, who sought to have him qualified as an expert in accident reconstruction.   Toward this end, defense counsel asked Crawford about his training and experience.   Crawford testified that he completed three two-week classes and had been involved in forty to fifty accident reconstructions.   He further testified that these classes included instruction on determining speed.   Based on this foundation, defense counsel asked the court to declare Crawford an expert in accident reconstruction (2248-53).

During the prosecutor's voir dire examination, Crawford acknowledged that it had been almost ten years since he had

---

[26] This expert was John Kwasnoski, "a professional in the field of physics for 31 years [and] a teacher of accident reconstruction in thirty states" (1021).   Kwasnoski also reviewed a report prepared by defense expert Steven Schneider, whose conclusions were based upon a third methodology.

taken the three classes on accident reconstruction. It was further revealed that, although he had been "involved" in fifty or so accident reconstructions, he had been the primary reconstructionist only ten or twelve times (2254).[27] Crawford further acknowledged that he had reconstructed an angular head-on collision only once in his career, that this had been eight years prior to the crash in this case, and that he had had no relevant training in angular head-on collisions since 1996 or 1997 (2254-55). Most significantly, when the prosecutor asked Crawford whether he considered himself to be an expert in "the particularized area of angular head-on collision momentum calculations," Crawford stated that he did not. He explained that this was because he was "not very comfortable with angular momentum," which involved a number of unknown variables requiring assignment (2256). Based on the foregoing, the prosecutor objected to the declaration of Crawford as an expert (2256). The court asked Crawford whether he had ever been qualified as an expert witness, and he replied that he had not (2256, 2257).

---

[27] Crawford explained that the non-primary or "secondary" reconstructionist merely assists. He does not prepare reports, but simply makes observations, helps at the scene, and confers with other reconstructionists (2254).

Defense counsel argued that Crawford should be declared an expert because he took the requisite courses and had sufficient experience.  He further argued that, despite Crawford's claim that he was not comfortable with angular momentum, he was necessarily an expert because he was assigned to, and did prepare, a report based on these properties, without objection (2257, 2260).[28]  The fact that Crawford was now calling his own credentials into question, counsel argued, merely evinced his willingness to appease a prosecutor who was unhappy with his conclusion about the estimated speed of defendant's vehicle at impact (2257-58, 2260).  Last, counsel noted (without explaining the relevance to the issue being decided), that Crawford's name was on the People's witness list (2261-62).

The prosecutor countered by noting that Crawford worked for the New York State Police and that that agency, not the District Attorney's Office, had assigned him to do a reconstruction in this case.  She pointed out that the People had "no hand in" the assignment, and had neither solicited nor sanctioned Crawford's report (2260-61).  The People were required, she explained, to

---

[28] Whether this contention is true is not made clear by the record.  This is because defense counsel objected, successfully, when the prosecutor tried to ascertain what formulas or calculations Crawford used in this case to estimate defendant's speed (Crawford: 2256).

turn the report over to the defense once it was generated, notwithstanding the fact that it had always been the People's position that the methodology employed by Crawford was flawed and did not "meet the threshold foundation requirement of reliability" (2261).

The prosecutor argued that Crawford was not qualified to give an opinion about defendant's speed at impact because the particular momentum equation in this case was extraordinarily difficult and concededly beyond his capabilities. As such, she argued, Crawford would not be able to inform the jurors in any way that would assist them (2261). Last, the prosecutor noted that she had no obligation to call Crawford to testify merely because he was one of sixty-three names that appeared on the People's list of prospective witnesses (2262).

The court sustained the prosecutor's objection (2262). It noted that the mere fact that Crawford had been assigned to make a report, or had made a report, was not dispositive of whether he was qualified to give an opinion to the jury as an expert (2258). The court further observed that Crawford had called his own credentials into question, essentially conceding that he was unqualified to discuss the issues in the case, and he had never previously been qualified as an expert in any jurisdiction

(2259, 2260). For these reasons, the court concluded that Crawford was not qualified to testify as an expert.

Following the court's ruling, defendant chose not to re-call Crawford. Instead, to establish defendant's speed at impact, he called Steven Schneider. The court qualified Schneider, without objection by the prosecutor, as an expert in accident reconstruction (2274).

On appeal, defendant argues that he was deprived of "his State and Federal constitutional rights to a fair trial and to present a defense" when the court "preclude[d] him from presenting [Crawford's] expert testimony" (defendant's brief at 95). Defendant's argument is meritless.

The trial court did not prevent defendant from presenting the testimony of an expert in accident reconstruction, nor was he in any way precluded from presenting a defense that depended upon the testimony of an expert in accident reconstruction. Indeed, defendant called a witness who testified as an expert in accident reconstruction, and he was certainly free to call others who were similarly qualified. Defendant chose not to do so. Thus, the issue for this Court's review is not whether defendant was deprived of his constitutional right to present a

72

defense, as he contends.    Instead, the issue, properly framed, is whether the court abused its discretion when it concluded that Crawford lacked the requisite skill, knowledge, confidence, and experience from which it could be assumed that he would render a reliable opinion.

Expert testimony may be received in evidence "when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror."   De Long v. Erie County, 60 N.Y.2d 296, 307 (1983).  A properly qualified expert may give testimony that is based upon a post-impact reconstruction and analysis of an automobile collision.   See, e.g., Sitaras v. Ricciardi & Sons, 154 A.D.2d 451, 451-52 (2d Dept. 1989).

This does not mean, however, that any witness being offered as an expert must be qualified as one.    To the contrary, to qualify as an expert, a witness must possess "the requisite skill, training, education, knowledge or experience from which it can be assumed that the information imparted or the opinion rendered is reliable."   Matott v. Ward, 48 N.Y.2d 455, 459 (1979).   Although "[e]xpert conclusions need not be asserted with certainty," a "witness [must] demonstrate[] a degree of

confidence [in] his conclusions to satisfy accepted standards of reliability." People v. Brown, 67 N.Y.2d 555, 664-65 (1987).

It is well established that "a witness's qualification to testify as an expert rests in the discretion of the trial court, and its determination will not be disturbed in the absence of a serious mistake, an error of law, or abuse of discretion." Werner v. Sun Oil Co., 65 N.Y.2d 839, 840 (1985); Crawford v. Koloniaris, 199 A.D.2d 235, 236 (2d Dept. 1993) (citing Werner and noting that "a witness's qualification to testify as an expert . . . rests in the broad discretion of the trial court and such a determination will not lightly be disturbed"); People v. Hanright, 187 A.D.2d 1021 (4th Dept. 1992) (citing Werner and finding no error in precluding testimony about accident reconstruction and point of impact by expert in human-factors engineering). In this case, reversal is unwarranted because the record amply demonstrates that there was no legal error, improvident exercise of discretion, or serious mistake.

Defendant sought to have Crawford qualified as an expert in accident reconstruction so that he could tell the jury that defendant's estimated speed at the time of impact was forty-five miles per hour. The purpose of this testimony was to show that defendant took corrective action, i.e., slowed down, prior to

the crash. This testimony, he argues, was critical to his defense because it would have "contradicted the People's theory that [defendant] did not slow down," and corroborated his "expert's determination that he was slowing down" (defendant's brief at 102).

But, as the court properly found, Crawford's estimation of defendant's speed lacked the requisite indicia of reliability. This is because he, admittedly, did not possess the knowledge, experience, or confidence necessary to render an opinion about defendant's estimated speed at impact given the type of crash that occurred in this case. Crawford candidly told the court, under oath, that he was not comfortable with angular head-on collision momentum calculations and did not consider himself an expert in this particularized area.[29] Surely, it would have been an abuse of discretion for the court to declare that Crawford was an expert when he insisted that he was not.

Moreover, the voir dire examination made clear that Crawford's education in, and experience with, angular momentum

[29] Angular analysis, as noted by defendant's accident reconstruction expert, is extremely sensitive. If the angular analysis were off by even one degree, the resulting estimation of speed could be off by as much as twenty or thirty miles per hour (Schneider: 2379).

was limited, remote, and possibly dated.  See Beeley v. Spencer, 309 A.D.2d 1303, 1305 (4th Dept. 2003) (accident reconstructionist called by the defendant lacked the requisite qualifications to testify about the functioning of the plaintiff's brakes); People v. Hanright, 187 A.D.2d at 1021 (expert in human-factors engineering had insufficient experience in accident reconstruction "to permit any inquiry into that subject or regarding the point of impact"); Lombard v. Dobson, 16 A.D.2d 1031 (4th Dept. 1962) (engineer with "a few months' training in the technical and scientific reconstruction of accidents" held not qualified to testify as to vehicle's speed).

Crawford's experience with accident reconstruction generally was also somewhat limited, in that he had previously been the primary reconstructionist only ten to twelve times, and had never been declared an expert by any court.  By comparison, Steven Schneider, the defense witness who the court qualified as an expert, testified that he had performed "hundreds" of accident reconstructions involving head-on collisions and had been qualified as an expert "dozens of times," in various jurisdictions (2268, 2270, 2272, 2274).  Given these facts, it cannot be said that the court below abused its discretion as a matter of law, or that it committed a serious mistake or legal error, when it concluded, as gatekeeper, that Crawford's

estimation of speed was not presumptively reliable. To the contrary, the record fully supports the court's determination that Crawford did not possess the "requisite degree of skill, training, education, knowledge or experience" to be qualified as an expert in this case. Accordingly, defendant's claim of error regarding Crawford provides no basis for reversing his conviction.

In any event, notwithstanding defendant's contention that the court's ruling "severely damaged, if not crippled [his] defense" (defendant's brief at 102), the error here, if any, was harmless. As a threshold matter, there was overwhelming evidence of defendant's speed. Three disinterested eyewitnesses (one of whom was driving alongside defendant, pacing him until the moments before the crash), testified that defendant's speed was between seventy and eighty miles per hour (Serwin: 1492-94; Caruso: 1552; Weber: 1583, 1586-87, 1686). In addition, two disinterested eyewitnesses testified that defendant maintained a steady rate of speed (Sussingham: 1691-94; Weber: 1583, 1586-87, 1686). Crawford's after-the-fact estimate of defendant's speed, qualified by an acknowledgment that the accuracy of the estimate was affected by the "lack of pre-impact and post-impact tire marks," would have been insufficient to rebut the testimony of these witnesses. Thus, the error, if any, was harmless. See

77

People v. Mixon, 203 A.D.2d 906, 910 (4th Dept. 1994) (any error in court's refusal to permit expert testimony concerning lighting and angles of vision was harmless where there was overwhelming evidence of defendant's guilt); People v. Lind, 61 A.D.2d 955 (1st Dept. 1978) (error in denying request for handwriting expert was harmless where overwhelming evidence of guilt was established by eyewitnesses and "additional handwriting analysis would not have been sufficient to rebut [the eyewitness] testimony").

Moreover, the testimony that defendant unsuccessfully sought to introduce through Crawford was subsequently introduced through Steven Schneider, who was properly qualified as an expert. Thus, for this additional reason, even assuming error, that error was harmless. See People v. Umali, 37 A.D.3d 164, 166 (1st Dept. 2007) (error in precluding defendant from calling his investigator to testify about a witness's bias against him was harmless, where the intended testimony was established through other evidence).

In sum, the court's refusal to qualify Crawford as an expert in accident reconstruction was justified and proper. In any event, a contrary ruling could have had no effect on the

verdict.    For all of the foregoing reasons, defendant's claim of error provides no basis for reversing his conviction.

POINT V

THE TRIAL COURT EXERCISED SOUND DISCRETION WHEN IT SUMMARILY DENIED PORTIONS OF DEFENDANT'S MOTION TO SET ASIDE THE VERDICT AND ORDERED A LIMITED HEARING TO ADDRESS ONLY THOSE ALLEGATIONS IN THE MOTION THAT WARRANTED FURTHER INQUIRY; THE COURT PROPERLY DENIED THE OUTSTANDING PORTION OF THE MOTION FOLLOWING THE HEARING (answering defendant's brief, Point V).

Factual and Procedural History

On or about November 28, 2006, defendant moved to set aside the jury's verdict pursuant to C.P.L. § 330.30(2). He alleged that some of the jurors convicted him of murder, rather than manslaughter, because they were fatigued and felt pressured to do so by the tenor of the deliberations. In addition, defendant alleged that several irregularities occurred during the course of the deliberations, including one juror imparting to other jurors that, while in college, defendant was convicted of driving while intoxicated. This allegation was untrue.

Defendant appended to his moving papers affidavits from jurors Loy Malcolm (juror #1) and Craig Cavaco (juror #9). Malcolm alleged the following misconduct on the part of herself and other jurors:

> 1. the deliberations were heated, eventually causing her to change her vote to guilty of second-degree murder (Malcolm affidavit, paras. 5-8, 19, 22-24, 41, 43) (Malcolm made no claim, however, that any juror threatened her with physical harm or that she was ever concerned for her personal safety);

2.  juror #7, Patrick Clark, said during the
    course of the deliberations that he intended
    to discuss the case with his mother over the
    weekend (paras. 13-14) (Malcolm did not
    allege that Clark actually spoke with his
    mother or that he imparted to the other
    jurors any information that he might have
    obtained from his mother.  Nor did Malcolm
    allege that Clark changed his opinion about
    the case after the weekend);

3.  juror Charmen Brown told Malcolm that juror
    #4, Anthony Macchiarulo, stated that he
    intended to discuss the case with his
    mother-in-law (para. 14)(defendant provided
    no affidavit from either Brown or
    Macchiarulo confirming this hearsay
    allegation);

4.  Malcolm and juror Brown, had a discussion
    about the case at a local supermarket on a
    Saturday (paras. 15-17) (there was no
    allegation as to what was discussed between
    them, nor any allegation that Brown or
    Malcolm learned any new information or
    changed their votes as a result of this
    discussion);

5.  Malcolm and juror #2, Bette O'Hare,
    discussed the case at the hotel where they
    were sequestered (paras. 26-27); (there was
    no allegation that either Malcolm or O'Hare
    learned any new information or changed their
    votes as a result of this conversation);

6.  juror O'Hare also stated to Malcolm that she
    had seen news accounts of the case (para.
    28) (Malcolm did not say what O'Hare claimed
    to have heard or seen, nor did Malcolm
    suggest that this influenced her or O'Hare's
    vote in any way);

7.  sympathy for the victims affected many of
    the jurors' votes (para. 29);

8.   after being sequestered, some jurors changed
     their votes to guilty of murder (para. 31)
     (defendant  did  not  object  to  the
     sequestration; indeed, he consented to it);

9.   juror #11, Michele Vargas, told Malcolm and
     others that defendant had "a prior DWI when
     he  was  in  college," an  allegation  that
     influenced Vargas and other jurors (paras.
     32-34)[30];

10.  juror Vargas said that she planned to write
     a book about the case and sell it after the
     trial (para. 35);

11.  jurors #7, #11, and #12, among others,
     appeared  to  believe  it  significant  that
     defendant did not testify and did not call
     his ex-girlfriend from Arkansas to testify
     (para. 36); and

12.  juror #4, Anthony Macchiarulo, told the
     other  jurors  that,  if  defendant  were
     convicted of manslaughter, with time off for
     good behavior, he would serve only four or
     five  years,  a  term  which  other  jurors
     thought would be too lenient (paras. 38-40).

Cavaco's affidavit alleged:

1.   he regretted that he changed his vote as a
     result of pressure from other jurors (Cavaco
     Affidavit,  paras.  5,  7,  10,  24)  (like
     Malcolm, Cavaco made no claim that he was
     physically  attacked  or  threatened  with
     physical harm);

2.   Anthony Macchiarulo (juror #4) said that
     defendant  would  serve  only  four  or  five
     years  in  prison  if  he  were  convicted  of

---

[30] This allegation appeared only in Malcolm's affidavit; it was
not repeated in juror Cavaco's affidavit.

manslaughter, and that other jurors were troubled by that prospect (paras. 17-20);

3.   jurors considered defendant's failure to testify and call a particular witness (para. 21);

4.   juror Vargas intended to write a book on her experiences (para. 22); and

5.   Robert Pike (juror #6) took notes and did not turn them over when asked by a court officer to do so (para. 23).

On or about December 29, 2006, the People filed opposition papers in response to defendant's motion to set aside the verdict. In those papers, the People consented to a hearing limited to the issue of whether the jurors were in possession of the alleged extra-record allegation that defendant had previously been convicted of driving while intoxicated and, if so, what impact, if any, that allegation had on the verdict. The People argued that defendant's remaining allegations of misconduct were either too speculative or inadequately supported to justify a hearing, or that, even if true, they did not warrant the relief sought and should not, therefore, be the subject of a hearing.[31]

---

[31] The People's responsive papers are in the court file and, in the interest of brevity, are not fully summarized here.

In an order dated February 2, 2007, the court ordered a hearing solely on the issue of whether the jurors "considered as evidence information not contained in the record -- that the defendant had a prior DWI conviction, and what effect if any this information may or may not have had on the jury's verdict." The court determined that the remaining allegations of misconduct raised in defendant's motion did not warrant further inquiry at a hearing because they were too speculative or insufficiently supported to justify a hearing, or because the general rule preventing jurors from impeaching their own verdicts would preclude relief based on these allegations (see decision of the Supreme Court, Nassau County [Honorof, J.] [February 2, 2007]).

The hearing was conducted on February 13, 2007. After hearing the testimony of defendant's witness (juror Loy Malcolm) and the witnesses for the People (jurors Robert Pike, Michelle Vargas, Michael Derita, and Bette O'Hare), and after hearing the arguments of both sides, the court was "unconvinced that there was any extrinsic evidence brought into the deliberations that affected a substantial right of the defendant." It denied the motion to set aside the verdict (HH160-61).[32]

---

[32]  Numerical references preceded by "HH" are to the pages (continued. . .)

Defendant now claims that the court's decision to limit the scope of the hearing deprived him of a fair trial, and that the court erred in denying that portion of the motion that was the subject of the hearing. Defendant's claims are meritless.

**The trial court exercised sound discretion when it limited the scope of the hearing.**

A court's decision to deny a C.P.L. § 330.30 motion without conducting a hearing should be disturbed on appeal only if the court abused its discretion. See People v. Samandarov, 13 N.Y.3d 433, 436 (2009). There was no such abuse here when the court denied, without a hearing, those portions of defendant's motion to set aside the verdict that stated no legal basis for relief (see C.P.L. § 330.40[2][e][i]), or were insufficiently supported to warrant a hearing (see C.P.L. § 330.40[2][e][ii]), and ordered a limited hearing to address the one allegation of juror misconduct that raised a possible basis for relief and, thus, warranted further inquiry.

It is well established that jurors are generally not permitted to impeach their own verdicts with allegations

---

[32](continued. . .)
of the transcript of the C.P.L. § 330.30 hearing.

concerning the tenor or content of their deliberations, and that claims of juror misconduct during the deliberations may not serve as a basis to set aside a verdict unless the misconduct substantially prejudiced the defendant.  See generally C.P.L. § 330.30(2); People v. Irizarry, 83 N.Y.2d 557, 561 (1994); see also People v. Testa, 61 N.Y.2d 1008, 1009 (1984).  Thus, with the exception of allegations of "improper influence" (People v. Maragh, 94 N.Y.2d 569, 573 [2000]), jurors should not be heard to impeach their own verdict with testimony regarding the deliberative process.  See Maragh, 94 N.Y.2d at 573; People v. Testa, 61 N.Y.2d at 1009; see generally People v. De Lucia, 20 N.Y.2d 275 (1967).   And hearings on the content of jury deliberations are appropriate only when a defendant's motion sufficiently alleges that the improper outside influence impacted the deliberations and prejudiced his substantial rights.  See People v. Young, 74 A.D.3d 1471, 1474 (3d Dept. 2010); see also Irizarry, 83 N.Y.2d at 561; People v. Clark, 81 N.Y.2d 913, 914-15 (1993); People v. Testa, 61 N.Y.2d at 1009; People v. Brown, 48 N.Y.2d 388, 394 (1979).   Indeed, the "assiduous protection of the secrecy and sanctity of the jury's deliberative process counsels that such a hearing not be undertaken except in extraordinary circumstances."  People v. Rodriguez, 71 N.Y.2d 214, 218 n. 1 (1988); see also People v. Harrell, 284 A.D.2d 248, 249 (1st Dept. 2001).

Here, the only significant allegation of juror misconduct that involved an improper outside influence was that juror Michelle Vargas informed other jurors that defendant had a prior DWI conviction. That claim -- and that claim alone -- alleged a possible ground for relief and warranted further inquiry. The other allegations of juror misconduct were not proper subjects for a hearing because, even if true, they did not fall within the exception to the general rule prohibiting a juror from impeaching his or her own verdict, and/or they were insufficiently supported or too speculative to warrant any further inquiry.

Accordingly, the court properly denied, without a hearing, those aspects of defendant's motion that alleged: 1) the jurors impermissibly discussed and considered the sentences applicable to manslaughter versus murder; 2) the jurors discussed defendant's failure to testify and to call a particular witness to testify; and 3) certain jurors had private conversations about the case with other jurors outside of the jury room. These allegations of misconduct, even if true, did not constitute the type of outside influence required to set aside the verdict pursuant to C.P.L. § 330.30(2), even though the alleged conduct may have violated the court's instructions. Thus, those allegations did not provide a legal basis for

relief, and the court properly denied those claims without a hearing (see C.P.L. § 330.40[2][e][i]).

For instance, consideration of punishment cannot be considered an improper outside influence, even if the information came from an outside source. Because information regarding punishment is not evidence on the question of a defendant's guilt or innocence, a juror who offers such information is not acting as an unsworn witness against the defendant and his or her conduct does not fall within the exception for outside influences. See People v. Bautista, 25 A.D.3d 341, 342 (1st Dept. 2006); People v. Hoskins, 198 A.D.2d 764, 765 (4th Dept. 1993), vacated by 234 A.D.2d 1013 (4th Dept. 1996) (granting the defendant's petition for a writ of error coram nobis); see also People v. Holmes, 72 A.D.2d 1, 6 (1st Dept. 1979).

Furthermore, the alleged improper consideration of defendant's failure to testify or call a particular witness was not a proper subject for a hearing. The consideration of a defendant's failure to present a defense, although a violation of the court's instructions, "cannot reasonably be viewed as the result of any external or improper influence." People v. Camacho, 293 A.D.2d 876, 877 (3d Dept. 2002); accord People v.

88

Foss, 267 A.D.2d 505, 510 (3d Dept. 1999); People v. Broughton,
3 Misc.3d 1104(A), 2004 WL 1087428, at *3 (Sup. Ct. Westchester
County 2004).

In addition, the allegations that jurors Malcolm and Brown
discussed the case at a local supermarket on a Saturday (Malcolm
affidavit, paras. 15-17), and that jurors Malcolm and O'Hare
discussed the case at the hotel during their sequestration
(Malcolm affidavit, para. 27), did not raise claims that
warranted a hearing.   Even if true, such misconduct would not
serve as a ground for relief, especially given the absence of
any allegation that juror Brown or juror O'Hare changed her vote
as a result of those conversations, and juror Malcolm still held
out for a manslaughter verdict.   See People v. Anderson, 249
A.D.2d 405, 405-06 (2d Dept. 1998) (although jurors might have
violated the requirement that they deliberate together, that
misconduct did not warrant setting aside the verdict); People v.
Lehrman, 155 A.D.2d 693, 694 (2d Dept. 1989) (same); People v.
Horney, 112 A.D.2d 841, 843 (1st Dept. 1985) (same).   Indeed,
there was no suggestion in defendant's motion papers that the
alleged outside deliberations included any non-jurors, revealed
any off-the-record information, or might have prejudiced
defendant in any way.

Defendant's other allegations of juror misconduct were similarly insufficient to warrant a hearing. For example, defendant's allegation that jurors #4 and #7 expressed their intention to discuss the case with family members over the weekend (Malcolm affidavit, paras. 13-14, 18) was speculative because there was no allegation that either juror did, in fact, discuss the case with non-jurors, or that they obtained any outside information or opinions from the alleged discussions. Second, Malcolm's claim regarding juror #4 (Anthony Macchiarulo) was based solely on the hearsay allegation of juror #3 (Charmen Brown), which was insufficient to warrant a hearing. See People v. Bradley, 258 A.D.2d 936, 936 (4th Dept. 1999) (no abuse of discretion when court denied, without a hearing, a motion to set aside verdict where sole support for allegation of juror misconduct was "a juror's hearsay account of another juror's statements during deliberations").

Similarly, there was no ground for a hearing based on defendant's allegation that juror O'Hare had seen television news accounts of the case and had stated, "but that's why we have clickers" (Malcolm affidavit, para. 28). The allegation did not specify what, if anything, O'Hare had actually seen. Nor did it allege that anything she may have seen actually influenced her vote or the vote of any other juror. Moreover,

even if true, the allegation did not establish any misconduct by O'Hare because it indicated that O'Hare changed channels whenever a news report about the case appeared on television. Therefore, the court properly excluded this topic from the hearing.

Defendant's allegations concerning the tenor of the deliberations did not warrant a hearing. The tenor of jury deliberations -- even exceptionally heated deliberations -- may not be considered in a motion to set aside the verdict on the grounds of juror misconduct. See People v. Karen, 17 A.D.3d 865, 867 (3d Dept. 2005); People v. Silverman, 239 A.D.2d 445, 446 (2d Dept. 1997); People v. Anderson, 249 A.D.2d at 405-06; People v. Redd, 164 A.D.2d 34, 36-38 (1st Dept. 1990). Thus, Malcolm's and Cavaco's second thoughts, regrets, or allegations of pressure from other jurors (Malcolm affidavit, paras. 5-8, 19, 41, 43; Cavaco affidavit, paras. 5, 24) could not serve as proper grounds for setting aside the verdict in this case. Therefore, they were not a proper subject for a hearing, and the court correctly excluded those issues from the hearing.

Defendant's allegations that sympathy for the victims affected some of the jurors' deliberations (Malcolm affidavit, paras. 27, 29) did not warrant a hearing. A juror's

consideration of sympathy for a victim is not the type of outside influence that might warrant setting aside the verdict, notwithstanding that such consideration might violate the court's instructions.  See People v. South, 2002 WL 1610504 at *1-2 (County Court, Westchester County, June 24, 2002), aff'd, 47 A.D.3d 734 (2d Dept 2008).

Furthermore, juror Cavaco's contention that juror #6 took notes and failed to turn them over to the court officer when directed to do so (Cavaco affidavit, para. 23) did not reveal any improper outside influence that might have prejudiced defendant.  Even if the allegation were true, Cavaco did not say what the juror did with his notes, or assert that he used them in any improper way during the deliberations such that defendant was prejudiced.  Therefore, these allegations were insufficient to warrant a hearing.

Finally, the allegation that juror Vargas expressed an intention to write a book (Malcolm affidavit, para. 35; Cavaco affidavit, para. 22) revealed no misconduct at all, much less the kind of misconduct that might warrant setting aside the verdict.  Therefore, the court acted well within its discretion when it excluded this topic from the hearing.

92

Defendant's contention that the court should have permitted him to explore all of his claims of juror misconduct at the hearing because, "taken together" (defendant's brief at 112), they could have cumulatively affected a substantial right is simply meritless.   A defendant is not entitled to a hearing based on his legally and/or factually insufficient allegations of juror misconduct merely because he makes a number of such allegations.   Such a rule would be senseless and would eviscerate the public policy interest of protecting the sanctity of jury deliberations.   Of course, where a specific and potentially prejudicial claim of juror misconduct is supported by factual allegations sufficient to warrant a hearing, a defendant is entitled to a hearing to explore that specific allegation of misconduct.  He is not entitled to bootstrap into the hearing other allegations of misconduct that were either not sufficiently supported in his motion papers or did not provide a legal basis for relief.

Defendant's reliance on <u>People v. Romano</u>, 8 A.D.3d 503 (2d Dept. 2004), to support his claim that a broader hearing should have been permitted here because the cumulative effect of the alleged juror misconduct could have created a substantial risk of prejudice to defendant's rights (defendant's brief at 112-13) is misplaced.   In <u>Romano</u>, the evidence established that jurors

and alternate jurors had improper communications both before and during deliberations, and that jurors and alternates read and discussed newspaper articles about the case. Romano, 8 A.D.3d at 504. Each allegation of juror misconduct in Romano constituted the type of outside influence that could indeed warrant setting aside a verdict. See People v. Marrero, 83 A.D.2d 565, 565 (2d Dept. 1981) (exposure of jurors to opinions of alternate jurors about relevant matters in the case constituted "outside influences" sufficient to warrant setting aside verdict); People v. Smith, 187 A.D.2d 365, 368 (1st Dept. 1992) (a juror reading and relating to other jurors a newspaper article about the case is the type of improper outside influence that could justify setting aside the verdict). Therefore, those allegations, both individually and cumulatively, could have warranted setting aside the verdict. That is not the case here. Here, none of the allegations of juror misconduct that were excluded from the hearing constituted the type of improper outside influence that could have warranted setting aside the verdict. Cumulatively, these allegations still did not constitute the type of outside influence required to set aside the verdict, and, thus, did not warrant a hearing. Therefore, the facts here are significantly distinguishable from those in Romano.

In sum, the only allegation in defendant's motion papers that even marginally justified a hearing was the claim that jurors heard that defendant had a prior conviction for driving while intoxicated. Therefore, the court ordered a limited hearing to determine the validity of that allegation. The court properly excluded from the hearing those allegations that could be, and were, summarily denied based on the face of the pleadings.

The court properly denied defendant's
motion to set aside the verdict.

Issues regarding the scope of the hearing aside, the court properly denied defendant's motion to set aside the verdict following the hearing because defendant failed to meet his burden of establishing that an improper outside influence entered the jury deliberations, much less that it affected one of his substantial rights. Trial courts have broad discretion in deciding motions to set aside a verdict, and those decisions should be disturbed on appeal only if the record establishes an abuse of that discretion. See People v. Testa, 61 N.Y.2d at 1009; Romano, 8 A.D.3d at 504. No such abuse occurred here.

The setting aside of a verdict pursuant to C.P.L. § 330.30(2) is warranted only when a defendant proves, by a

preponderance of the evidence (see C.P.L. § 330.40[2][g]), that an improper outside influence infiltrated the jury deliberations and prejudiced his substantial rights.  See People v. Lemay, 69 A.D.3d 757, 758 (2d Dept. 2010).  Here, defendant called one witness at the hearing: juror Loy Malcolm.  She testified that during the deliberations, another juror, Michelle Vargas, told her and other jurors that, when in college, defendant had been convicted of driving while intoxicated (Malcolm: HH15, 21). Malcolm's testimony, however, was directly contradicted by Vargas, who testified that she never told any other juror that defendant had a prior DWI conviction (Vargas: HH96-98). Moreover, three other jurors called by the People testified that they did not hear Vargas, or anyone else, tell any other jurors that defendant had a prior DWI conviction (Pike: HH73; Derita: HH124-26; O'Hare: HH140-41).

Malcolm's credibility was further undermined by her own prior inconsistent statements to members of the District Attorney's Office on December 20, 2006.[33]  On that date, in contrast to her testimony at the hearing, Malcolm said only that a juror -- whose name she could not remember -- mentioned

---

[33]  An audio recording and a written transcription of this conversation were introduced into evidence at the hearing (HH33-37).

defendant's prior "drinking in college." She made no mention at that time of any allegation of prior drinking and driving. Moreover, she told the prosecutors that, as soon as defendant's prior drinking in college was mentioned, other jurors immediately stated that that was irrelevant, and the matter was dropped (Malcolm: HH27-28, 38, 47). Malcolm further indicated at the interview that these alleged comments did not cause her to change her mind about her verdict (Malcolm: HH50). See People's hearing exh. 1, p. 27 (transcription of Malcolm's tape recorded interview at the District Attorney's Office).

Because Malcolm's hearing testimony was incredible, defendant failed to meet his burden of establishing that the jurors had been subjected to an outside influence that impacted his substantial rights. Accordingly, the County Court properly denied defendant's motion to set aside the verdict, and there is no reason to disturb that court's determination. See Romano, 8 A.D.3d at 504 (determination of court following C.P.L. § 330.30 hearing is "entitled to great deference on appeal").

## POINT VI

THE CLAIM THAT NEW YORK'S "LEGISLATIVE SCHEME" PRECLUDED THE PROSECUTION OF DEFENDANT'S CONDUCT AS DEPRAVED-INDIFFERENCE MURDER IS BOTH UNPRESERVED AND MERITLESS (answering the amicus curiae brief, Point Two).

The amicus curiae argues that, because the Legislature has enacted statutes which specifically address a defendant's intoxicated driving that results in death to another, that conduct must be prosecuted pursuant to those statutes, and may not be prosecuted as depraved-indifference murder pursuant to Penal Law § 125.25.   Defendant never raised this issue in the court below, and it is, therefore, unpreserved for review as a matter of law here.   See C.P.L. § 470.05(2).   The argument is, in any event, meritless.

"The existence of a specific statute prohibiting the conduct involved, does not prevent prosecution under a more general statute."   People v. Eboli, 34 N.Y.2d 281, 287 (1974); see People v. Robinson, 95 N.Y.2d 179, 184 (2000) ("absent a contrary legislative intent, 'overlapping in criminal statutes, and the opportunity for prosecutorial choice they represent, is no bar to prosecution'") (quoting People v. Eboli, 34 N.Y.2d at 287).   Thus, while the Legislature has clearly chosen to specifically address deaths caused by intoxicated drivers (see

Penal Law §§ 125.12, 125.13, 125.14),[34] it has never manifested any intent to preclude prosecution under "a more general statute," such as the depraved-indifference-murder statute, and prosecution under that statute was not precluded. See People v. Walsh, 67 N.Y.2d 747, 748-49 (1986) ("general rule" is that "a prosecution may be obtained under any penal statute proscribing certain conduct, notwithstanding that the penal statute overlaps with a more specific statute").

---

[34] Penal Law § 125.14 (aggravated vehicular homicide) was enacted in 2007 (L. 2007, ch. 345 § 2), after the date of defendant's criminal conduct.

CONCLUSION

THE JUDGMENT OF CONVICTION SHOULD BE AFFIRMED.

Dated:   Mineola, New York
         September 22, 2010

                          Respectfully submitted,

                          Kathleen M. Rice,
                          District Attorney, Nassau County
                          262 Old Country Road
                          Mineola, New York 11501
                          516-571-3800

Tammy J. Smiley
Judith R. Sternberg
Jacqueline Rosenblum
Michael Soffer
       Assistant District Attorneys
            *of Counsel*

100

## CERTIFICATE OF COMPLIANCE WITH 22 N.Y.C.R.R. § 670.10.3(f)

JUDITH R. STERNBERG does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a monospaced typeface (Dark Courier) of 12-point size; the footnotes are single-spaced and utilize the same typeface and point size; and, according to the word count of the word processing system used (Word 2003), the brief contains 20,517 words, exclusive of the cover, table of contents, proof of service, and certificate of compliance.

Dated:   Mineola, New York
         September 22, 2010

JUDITH R. STERNBERG
Assistant District Attorney