# Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

D32275
W/kmb

_____AD3d_____

Argued - January 24, 2011

PETER B. SKELOS, J.P.
THOMAS A. DICKERSON
LEONARD B. AUSTIN
JEFFREY A. COHEN, JJ.

---

2007-02662

DECISION & ORDER

The People, etc., respondent,
v Martin Heidgen, appellant.

(Ind. No. 1910/05)

---

Jillian S. Harrington, New York, N.Y., for appellant.

Kathleen M. Rice, District Attorney, Mineola, N.Y. (Tammy J. Smiley, Judith R. Sternberg, Jacqueline Rosenblum, and Michael Soffer of counsel), for respondent.

Cornell Bouse, Garden City, N.Y. (Richard J. Barbuto and Stefani Goldin of counsel), for amicus curiae Nassau County Criminal Courts Bar Association.

Anthony Girese, Bronx, N.Y. (Colleen Phillips and Joseph McCormack of counsel), for amicus curiae District Attorneys Association of State of New York.

Appeal by the defendant from a judgment of the Supreme Court, Nassau County (Honorof, J.), rendered February 28, 2007, convicting him of murder in the second degree (two counts), assault in the first degree (three counts), and operating a vehicle while under the influence of alcohol (two counts), upon a jury verdict, and imposing sentence.

ORDERED that the judgment is affirmed.

On July 1, 2005, after spending several hours in a bar in Manhattan, at which he consumed at least six beers, the defendant attended a friend's party in Merrick in Nassau County. He arrived at the party, which consisted of a small gathering of his friends, between 11 P.M. and midnight. The house where the party was being held was approximately a five-minute drive from the Meadowbrook State Parkway.

At the party, the defendant was seen consuming several alcoholic drinks. Two of the defendant's friends who were at the party described the defendant as intoxicated or "buzzed." However, neither one observed the defendant stumbling or staggering while he was dancing, nor was he observed to be slurring his words.

The defendant remained at the party for 1½ to 2 hours before leaving in his pickup truck. Despite having previously received offers to sleep over or utilize a designated driver rather than drive after drinking, the defendant chose to get into his pickup truck and drive while intoxicated.

Shortly before 2:00 A.M. on July 2, 2005, Elizabeth Serwin was driving southbound in the center southbound lane of the Meadowbrook State Parkway, more than one mile south of the exit for Merrick Road, when she saw headlights of an oncoming vehicle also in the same center lane in the distance a "few football fields away." She testified that she immediately veered into the right lane and eventually to the shoulder of the road to her right. She honked her horn three times as an oncoming pickup truck, which was later determined to have been operated by the defendant (hereinafter the pickup truck), passed her. As she looked over her shoulder watching the pickup truck travel northbound in the southbound lanes, she observed two other vehicles pulled over on the shoulder of the road. During the time that Serwin saw the pickup truck, it did not swerve or reduce its speed, which she approximated to be 70 to 75 miles per hour as it passed her.

Joseph Caruso, also driving south on the Meadowbrook State Parkway, testified that he first saw the pickup truck approximately one mile north of the location where Serwin veered out of the path of the pickup truck. Caruso saw the headlights of the pickup truck about a quarter of a mile away, directly in his path of travel. Caruso attempted to move to the left southbound lane, but the pickup truck tracked him and also moved towards the left southbound lane, causing Caruso to steer back to the center lane to avoid a collision with the northbound pickup truck. As the pickup truck was almost upon Caruso's vehicle, Caruso moved into the right southbound lane, just as the pickup truck passed his vehicle. Once the pickup truck passed, Caruso observed the tail lights of the pickup truck in his rear view mirror, and noted that the brake lights never illuminated during the time he had them in view.

Caruso also noticed that the pickup truck did not veer away or slow down as it headed towards him. He estimated that the pickup truck was traveling at a rate of speed between 70 and 80 miles per hour.

Matthew Sussingham testified that, as he was driving southbound in the right southbound lane of the Meadowbrook State Parkway, just south of the exit ramp for westbound Sunrise Highway, he saw the pickup truck traveling northbound in the center southbound lane near the Sunrise Highway overpass and coming over a crest over Sunrise Highway approximately 15 to 30 yards away, traveling at "highway speed" in the wrong direction towards him. Sussingham continued to watch the pickup truck pass by the exits for Sunrise Highway in his rearview mirror, and never saw it move from the center lane, weave, or slow its rate of travel.

As the pickup truck continued its northbound path in the lanes for southbound traffic on the Meadowbrook State Parkway, Steven Weber, who was operating a motorcycle, saw the

pickup truck traveling the wrong way in the southbound lanes, as Weber watched from the entrance ramp for westbound traffic on Sunrise Highway seeking to enter the northbound lanes of the Meadowbrook State Parkway. Weber immediately moved into the left northbound lane of the Meadowbrook State Parkway, pulling up to the median strip parallel to the pickup truck, which was in the lane immediately adjacent to the opposite side of the median strip. Weber then kept pace with the pickup truck at a steady speed of 70 miles per hour until he lost sight of it, just south of the Babylon Turnpike overpass, due to the obstruction caused by bushes in the median strip. It was at this time that Weber heard a crash.

Weber never observed the pickup truck swerve or slow down, or the brake lights illuminate. He also did not see the pickup truck attempt to pull over or stop. Weber observed the defendant operating the pickup truck and looking straight ahead during the entire time that Weber was watching the defendant. During that time, Weber saw the lights of another vehicle, traveling in the southbound lanes of the Meadowbrook State Parkway, exit the parkway.

At the same time that the defendant was driving the wrong way in the southbound lanes of the Meadowbrook State Parkway, a limousine was proceeding south in the left southbound lane of the Meadowbrook State Parkway. The limousine encountered the pickup truck headed directly towards it just north of the Babylon Turnpike overpass. The limousine, driven by Stanley Rabinowitz, was carrying a family, consisting of Jennifer Flynn and Neil Flynn, their two daughters, seven-year-old Katie Flynn and five-year-old Grace Flynn, and Jennifer's parents, Christopher Tangney and Denise Tangney, back home from the wedding of the Tangneys' youngest daughter.

Upon observing the pickup truck as it was heading directly towards the limousine, Rabinowitz attempted to veer into the center southbound lane so as to avoid it. However, there was another southbound vehicle traveling in the center lane alongside the limousine preventing Rabinowitz from completing the maneuver. Christopher Tangney, who was seated in the rear of the limousine facing forward, thereby allowing him to see the road through the windshield, recounted that the pickup truck "moved over . . . towards us. And then Mr. Rabinowitz tried to move again. And then the truck . . . seemed to follow us." The jury was able to observe a video of the path that the pickup truck took immediately before it collided with the limousine, tracking the limousine's movement as described by Christopher Tangney in his testimony, since the limousine was equipped with a camera which recorded the movement of the pickup truck during the seconds immediately preceding the collision.

The pickup truck collided head-on with the limousine, apparently having tracked the limousine's movement, crushing and killing Rabinowitz, decapitating Katie Flynn, and causing severe, and, in some instances, life-threatening, injuries to the remaining passengers in the limousine.

Steed Davidson, the driver of the vehicle which had been traveling southbound in the center southbound lane of the Meadowbrook State Parkway adjacent to the limousine at the time of the collision, testified that the pickup truck was "coming quickly" towards his vehicle and the limousine, and did not slow down before the crash. He also testified that the pickup truck did not attempt to exit the parkway or go towards the shoulder of the roadway.

Melissa Graffeo, one of the first people on the scene of the collision after it occurred,

Case 2:15-cv-00819-LDH   Document 10-12   Filed 01/04/16   Page 4 of 15 PageID #: 3618

called the 911 emergency number at 2:01 A.M. The police officers responding to the scene of the collision observed that the defendant was sitting upright with his eyes open.

The defendant was placed under arrest at the scene, and was later informed of his arrest by Investigator Eric Baez of the New York State Police. Upon being so advised, the defendant told the police that from the time he had moved to New York from Arkansas the previous October, "everything was going wrong" and "nothing he did was ever enough." The defendant recounted to the police that he had argued with his ex-girlfriend over the phone, had financial problems, had recently lost his grandmother with whom he had been close, and was very upset, depressed, and in a "self-destructive mode."

The jury convicted the defendant of two counts of murder in the second degree (Penal Law § 125.25[2]), three counts of assault in the first degree (Penal Law § 120.10[3]), and two counts of operating a vehicle while under the influence of alcohol (Vehicle and Traffic Law § 1192). The defendant was sentenced to an indeterminate term of imprisonment of 18 years to life on his convictions of each count of murder in the second degree, a determinate term of 18 years of imprisonment plus 5 years of postrelease supervision on his convictions of each count of assault in the first degree, and a definite term of 180 days of incarceration on his convictions of each count of operating a vehicle while under the influence of alcohol, all terms to run concurrently.

Contrary to the People's contention, the defendant's argument that the evidence was legally insufficient to support the convictions of murder in the second degree under Penal Law § 125.25(2) and assault in the first degree under Penal Law § 120.10(3), crimes which require proof of depraved indifference, is preserved for appellate review (see CPL § 470.05[2]; see also People v Squires, 68 AD3d 900; People v Beriguete, 51 AD3d 939; People v Mendez, 34 AD3d 697). Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620, 621), we find that it was legally sufficient to support the defendant's convictions of depraved indifference murder and assault in the first degree.

Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the factfinder's opportunity to view the witnesses, hear the testimony and observe demeanor (see People v Mateo, 2 NY3d 383, cert denied 542 US 946; People v Bleakley, 69 NY2d 490). The question of whether the defendant possessed the mens rea of depraved indifference to human life is highly fact-sensitive, requiring a case-by-case analysis. Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633). Accordingly, the decisions of the Court of Appeals in People v Prindle (16 NY3d 768) and People v Valencia (14 NY3d 927, affg 58 AD3d 879), relied upon by the defendant and our dissenting colleague, do not foreclose a finding of depraved indifference under the particular facts of this case, notwithstanding that the defendant's blood alcohol concentration registered .28%.

A person acts with depraved indifference if he or she does not care if another is injured or killed (see People v Feingold, 7 NY3d 288, 296). "'Depraved indifference murder [or assault] differs from intentional murder [or assault] in that it results not from a specific, conscious intent to cause death [or injury], but from an indifference to or disregard of the risks attending

September 13, 2011                                                                                                    Page 4.
PEOPLE v HEIDGEN, MARTIN

defendant's conduct'" (*id.* at 293, quoting *People v Gonzalez*, 1 NY3d 464, 467; *see People v Suarez*, 6 NY3d 202, 214 ["(D)epraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not"]; *People v Jernatowski*, 238 NY 188, 191).

The evidence presented to the jury established that, 15 to 30 minutes before the collision, the defendant, although intoxicated, remained steady on his feet and held conversations without slurring his speech. Furthermore, the other drivers who observed the pickup truck traveling on the Meadowbrook State Parkway testified that the pickup truck maintained a steady speed, successfully negotiated the curves of the parkway, and stayed within one lane of travel, except in those instances where the defendant apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the pickup truck. The testimony also established that, for the approximately 2.5 miles that the defendant was observed driving the wrong way on the Meadowbrook State Parkway prior to the impact with the limousine, the defendant passed "wrong way" signs, the back side of highway signs, at least five sets of headlights shining directly at him, at least one set of headlights suddenly veering to one side, and tail lights on the other side of the guide rail. In addition, he was confronted with a horn blaring three times and the noise of a loud motorcycle on the other side of the median strip keeping pace with him in the same direction. Given all of the foregoing evidence, it was reasonable for the jury to conclude that the defendant was aware that he was driving the wrong way and deliberately chose to continue to proceed in the northbound direction, against traffic, without regard for the grave danger to himself and others traveling on the parkway that night.

The defendant's reliance on *People v Valencia* (14 NY3d 927) is misplaced, and does not dictate a different result, notwithstanding that it also involved an intoxicated motorist traveling the wrong way on a parkway. Contrary to the analysis by our dissenting colleague, this matter is distinguishable from *Valencia* in that there was no evidence in *Valencia* that the defendant tracked the other vehicles when they changed lanes to avoid him. Indeed, Valencia's counsel specifically argued that there was no evidence of a disregard for human life, relying on the fact that the defendant did not swerve into the path of the other drivers.

Moreover, in rendering the verdict that the defendant was guilty of assault in the first degree pursuant to Penal Law § 120.10(3), the trial court in *Valencia*, after a bench trial, stated that the evidence established that the defendant was highly intoxicated at the time of the accident and "was simply *oblivious* to all of the indices of alarm and warning attendant to his dangerous travel on the parkway" (emphasis added). Unlike *Valencia*, the evidence here did not establish that the defendant was intoxicated to a degree of total oblivion or mania (*cf. People v Coon*, 34 AD3d 869, 870 [the defendant "suffered an atypical idiopathic reaction to the substance such that, at the time of the attack, he was experiencing cocaine intoxication delirium"]). The testimony of eyewitnesses and the People's expert established that the defendant here was neither totally oblivious nor incapable of comprehending the gravity of his actions due to his intoxication. Here, the People presented evidence showing that when the defendant was last seen by his friends at the party, less than 30 minutes before the crash, and when the other drivers observed him driving the wrong way on the Meadowbrook State Parkway, he was not "simply oblivious," as was the case in *Valencia*.

Furthermore, the *Valencia* trial court found the defendant to have the requisite mens rea to commit depraved indifference assault based upon his decision earlier in the evening to drink

heavily, knowing that he would be operating his vehicle later on that evening, and not as a result of his actions at the time that he was driving in the wrong direction on the parkway. In reversing the conviction, this Court rejected the prosecution's argument that "the mens rea component of depraved indifference assault may be satisfied by considering the defendant's state of mind *at a point much earlier in time than the accident*, when the defendant allegedly made a conscious decision to consume an excessive amount of alcohol with the awareness that he subsequently would be operating a motor vehicle" (*People v Valencia*, 58 AD3d at 880 [emphasis added]).

Unlike the trial court's finding in *Valencia*, the jury here was presented with evidence which established that the defendant's mens rea was formed when he continued to travel in the wrong direction on the Meadowbrook State Parkway and tracked other vehicles that were traveling in the correct direction and attempting to get out of his way. Given the defendant's statements to the police that he was in a "self-destructive mode" and depressed about the state of his life at the time, it was reasonable for the jury to find that the defendant possessed the requisite mens rea for depraved indifference at the time that the impact with the limousine occurred. This is especially germane since the jury also had before it a letter written by the defendant, while incarcerated and awaiting trial, to one of his friends, wherein he recounted the statements he made to the police and proclaimed that he was lying at the time that he made the statements in an attempt to paint himself "as an unfortunate victim of circumstance worthy of leniency," rather than telling the police the truth about having been drinking at a friend's house that night. In so doing, the defendant confirmed the accuracy of the police officers' testimony concerning the statements he made to them. In light of the foregoing, the jury's finding that the defendant exhibited a depraved indifference to the lives of those he encountered on the Meadowbrook State Parkway, as well as his own, was warranted (*see People v Suarez*, 6 NY3d at 214; *People v Jernatowski*, 238 NY at 191).

Furthermore, the defendant did not testify on his own behalf. Thus, the only manner in which the jury heard the defendant's "own words" concerning his state of mind was through the testimony of the police officers, who recounted the defendant's statement to them at the hospital, and through the defendant's letter. In that letter, the defendant admitted that he would lie to protect his friends and family and to make himself appear sympathetic and not as a "hooligan." Despite the defendant's admission of his propensity to lie, the dissent relies upon the statements contained in this letter, written after the defendant was made aware that he was facing multiple murder and assault charges, rather than upon the defendant's earlier self-incriminating statements made to the police at a time when he did not yet realize he was facing such charges. Given the jury's ability to consider all of the defendant's statements and to weigh the veracity of each in light of the defendant's acknowledgment that he had no compunction about lying, we are unwilling to set its verdict aside as against the weight of the evidence on the basis of this letter.

Our dissenting colleague further notes that the defendant's blood was drawn at 2:40 A.M. without his consent because the defendant "was so intoxicated" and was "unable to provide" consent. However, the jury also heard evidence that the defendant told the police that he was "basically knocked out" as a result of the impact, and next remembered being in the hospital. In addition, the jury heard testimony that the defendant's pickup truck suffered "severe front-end damage," and viewed numerous photographs documenting such damage. Moreover, the testimony established that the defendant was removed from the scene in a neck brace on a backboard, and eventually was moved to an intensive care unit of a nearby hospital after being taken for computed

axial tomography scans, commonly known as CAT scans, and X-rays. Thus, contrary to the conclusion reached by the dissent, we cannot say that the defendant's inability to provide consent when his blood was drawn was necessarily a result of his consumption of alcohol earlier in the evening.

In addition, the jury heard testimony from the prosecution's expert, a forensic toxicologist, that an average male, weighing 180 pounds and standing 5 feet, 10 inches, with a blood alcohol concentration of .28%, would necessarily have had approximately 14 "drinks" in his system, and if that average male began drinking at 4:30 P.M. and continued until 1:00 A.M. or 1:30 A.M., he would necessarily have had 20 "drinks" in his system, with a drink equaling a unit of alcohol such as 12 ounces of beer or 1 shot of liquor. The jury also heard testimony from the People's expert that a blood alcohol concentration of .28% would not prevent a person, such as the defendant, from reacting to different stimuli, such as oncoming headlights, the reverse side of highway signs, and blaring car horns, for a period of 2½ minutes. The expert also stated that a person's response to stimuli would be completely shut down only if the person were rendered unconscious. The jury was also informed that an intoxicated person on an unfamiliar road confused by his or her surroundings would not be expected to maintain a steady speed and drive in a straight line, as the defendant did. Thus, the expert's testimony, which was wholly uncontroverted by the defendant, when considered with the testimony of those who observed the defendant immediately before the impact, provided a basis for the jury to reasonably determine that the defendant had the requisite mens rea to commit depraved indifference murder and assault at the time that the impact occurred.

Similar to the decision in *People v Valencia*, the Court of Appeals' decision in *People v Prindle* (16 NY3d 768) does not warrant reversal of the defendant's convictions of depraved indifference murder and assault. The evidence in *Prindle* established that the defendant was driving erratically on a two-way road in an attempt to avoid apprehension by the police for the larceny he had just committed. Here, the defendant was not attempting to avoid the police at the time of the accident. Rather, the evidence established that the defendant entered a divided highway against the direction of the "wrong way" signs, accelerated to and maintained a speed of 70 miles per hour, ignored numerous other obvious indicia that he was traveling the wrong way against traffic, and tracked oncoming vehicles that attempted to avoid his vehicle, all while he was in a self-described "self-destructive mode."

The dissent notes that the defense presented testimony from an accident reconstruction expert that, applying a linear momentum formula, the defendant's pickup truck was traveling at 33 miles per hour. However, this same expert also testified that application of a time-distance formula yields the conclusion that the defendant's pickup truck could have been traveling at 38 miles per hour at the time of impact, and that the expert could not calculate the speed at which the vehicle was traveling at any time prior to impact. Nevertheless, the jury was presented with testimony from Weber that, immediately prior to the impact, at the point that the northbound and southbound lanes for travel on the Meadowbrook State Parkway became separated by a median strip landscaped with bushes, Weber kept pace with the defendant's vehicle while traveling at a speed of 70 miles per hour. In any event, the fact that the defendant continued to drive in a northbound direction, despite being presented with numerous indicia that he was traveling in the wrong direction, into the path of oncoming vehicles headed in the correct southbound direction on the Meadowbrook State Parkway, while traveling at speeds appropriate for travel on a highway evinced his depravity

September 13, 2011  Page 7.
PEOPLE v HEIDGEN, MARTIN

(*cf. People v Lazartes*, 23 AD3d 400, 405 [the fact that the defendant was speeding on a highway, standing alone, did not establish depravity, especially where the "unrefuted evidence indicated that, notwithstanding occasionally achieving excessive rates of speed, the defendant repeatedly slowed his vehicle where the traffic conditions so warranted"]). The evidence, thus, demonstrated that the defendant acted with depraved indifference to the grave risk of injury to other persons traveling on the highway, as well as to himself.

Even though our dissenting colleague recognizes that it is not established in New York that intoxication can be asserted as a defense to conduct envincing depraved indifference that results from severe inebriation, he nevertheless suggests that "we must all admit that without a mens rea of recklessness, the *statutory* prohibition contained in Penal Law § 15.05(3) is no longer applicable." The dissent posits this conclusion even though this Court, in *Valencia*, noted that "we have no occasion to decide the separate question of whether voluntary intoxication may negate the mens rea of depraved indifference" (*People v Valencia*, 58 AD3d at 880). Further, Judge Graffeo, concurring with the Court of Appeals' majority in that matter, echoed the fact that this was the current state of the law in New York with respect to this issue (*see People v Valencia*, 14 NY3d at 928). Judge Graffeo explained that, under the "objective circumstances" standard set forth in *People v Register* (60 NY2d 270, *cert denied* 466 US 953) for depraved indifference offenses, "it was recognized that the intoxication defense did not apply to the depraved indifference element" (*People v Valencia*, 14 NY3d at 929 [citation omitted]), and asked the Legislature to address the question of whether there had been a change in the law given the shift from the "objective circumstances" standard to the "subjective culpable state of mind" standard set forth in *People v Feingold* (7 NY3d 288) (*People v Valencia*, 14 NY3d at 931). It would not be appropriate for this Court, as the dissent suggests, to evaluate this case as if the Legislature had resolved this issue in favor of accepting voluntary intoxication as a defense to an element of depraved indifference. To date, the Legislature has not addressed this issue. In short, we decline to apply the approach urged by the dissent since it has neither been adopted by the Legislature nor announced by the Court of Appeals.

Thus, contrary to the approach taken by our dissenting colleague, the evidence presented to the jury established that the defendant engaged in reckless conduct which created a "grave" risk of death, thereby evincing a depraved indifference to human life. Accordingly, we conclude that the People established the defendant's guilt of two counts of murder in the second degree and three counts of assault in the first degree beyond a reasonable doubt.

Further, the Supreme Court properly denied the defendant's motion pursuant to CPL 330.30 to set aside his conviction on the ground that the jurors improperly considered the defendant's prior arrest for and conviction of driving while intoxicated. "Improper influence includes even well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial" (*People v Maragh*, 94 NY2d 569, 573 [internal quotation marks omitted]). A defendant must demonstrate that the alleged misconduct impaired his or her right to a fair trial (*id.* at 574; *see People v Gardella*, 55 AD2d 607).

One of the jurors testified, at a hearing held in connection with the defendant's motion, that another of the jurors stated during deliberations that the defendant had "a prior DWI" when he was in college. However, upon hearing that information, that juror did not immediately change her vote from a conviction for manslaughter to a conviction for murder. She stated that the

September 13, 2011 Page 8.
PEOPLE v HEIDGEN, MARTIN

information had an influence on her, but that it was not the only influence, even though, in a statement she provided to the prosecution, she denied that the information had any influence on her vote. Moreover, each of the other jurors who testified at the hearing stated that no such statement was made. Thus, the evidence adduced at the hearing failed to establish the defendant's claim of juror misconduct (*see People v McDonald*, 40 AD3d 1125).

In addition, the trial court providently exercised its discretion in denying, without a hearing, that branch of the defendant's motion which was to set aside the verdict on the ground that the jury improperly deliberated about the jail time the defendant could receive if he were convicted of manslaughter in the second degree as opposed to murder in the second degree, because the evidence submitted with the motion did not demonstrate that the jury's determination of guilt or innocence was affected by any such consideration (*see People v Holmes*, 72 AD2d 1, 6; *People v Bautista*, 25 AD3d 341, 342).

The trial court likewise providently denied, without a hearing, that branch of the defendant's motion which was to set aside the verdict on the ground that the jury deliberated about the defendant's decision not to testify and his failure to call a specific witness to testify, because the evidence submitted with the motion did not establish that the jury was subject to an outside influence with respect to these issues (*see People v Camacho*, 293 AD2d 876, 877; *People v Foss*, 267 AD2d 505, 510).

The defendant's remaining contentions are without merit.

SKELOS, J.P., DICKERSON and AUSTIN, JJ., concur.

COHEN, J., dissents in part and concurs in part, and votes to modify the judgment, on the law and the facts, by reducing the conviction of murder in the second degree (two counts) to manslaughter in the second degree (two counts) and the conviction of assault in the first degree (three counts) to assault in the second degree (three counts), and vacating the sentences imposed on those counts and, as so modified, affirming the judgment and remitting the matter to the Supreme Court, Nassau County, for resentencing on those counts, with the following memorandum:

One could hardly imagine a greater human tragedy resulting from the lethal mix of excessive alcohol consumption and driving than that which occurred on the Meadowbrook State Parkway in the early morning hours of July 2, 2005. Two innocent people, including a child, were killed and several seriously injured by the head-on collision caused by the defendant while he was in, by any standard, a highly intoxicated state. Lives were taken needlessly and the lives of many still living were shattered forever. It is beyond cavil that the evidence established that the defendant committed homicide. However, he did not commit murder, as defined within the framework of the Penal Law, and his prosecution on two counts of depraved indifference murder constituted an inappropriate expansion and wrongful application of our current homicide laws.

For the reasons more fully set forth below, I most respectfully dissent and would modify the judgment, on the law and facts, by reducing the convictions of murder in the second degree (two counts) to manslaughter in the second degree (two counts), reducing the convictions of assault in the first degree (three counts) to assault in the second degree (three counts), and vacating

September 13, 2011                                                                                                         Page 9.
                              PEOPLE v HEIDGEN, MARTIN

the sentences on said convictions and, as so modified, affirming the judgment and remitting the matter to the Supreme Court, Nassau County, for resentencing on the reduced counts. In short, even when viewing the particular facts of this case most favorably to the prosecution (*see People v Contes*, 60 NY2d 620, 621; *see also Jackson v Virginia*, 443 US 307, 319; *People v Kennedy*, 47 NY2d 196, 203), by applying the standards set forth in *People v Valencia* (14 NY3d 927), and, more recently in *People v Prindle* (16 NY3d 768), they are legally insufficient to support the convictions of depraved indifference murder in the second degree and assault in the first degree which lie at the very heart of this appeal. Furthermore, even if the evidence were legally sufficient, the convictions were certainly against the weight of the evidence (*see People v Romero*, 7 NY3d 633). In all other respects, I agree with the majority's conclusions.

On Friday, July 1, 2005, the then 24-year-old defendant met a friend at a bar in Manhattan, where from 4:30 P.M. to 7:30 P.M., he drank six 12-ounce bottles of beer while in his friend's company. The friend left the bar at 7:30 P.M., but the defendant remained. The defendant eventually left the bar and traveled to the Nassau County home of a friend to attend a party. The defendant arrived at the party sometime between 11:00 P.M. and midnight. At this party, his friends observed the defendant drinking "a few beers" and two drinks consisting of beer with shots of whiskey and Irish cream liquor. The friends who saw him at this party described him as "intoxicated" and "buzzed." The friends also testified that the defendant was in a "good mood," that he had gotten the telephone number of the bartender at the bar they frequented, and that the friends and the defendant discussed plans for the upcoming weekend. The defendant remained at this party for a little more than 1½ hours and, although he had never done so before, left without saying goodbye to anyone.

At roughly 2:00 A.M. on the morning of July 2, 2005, the defendant, after driving his pickup truck the wrong way on the Meadowbrook State Parkway for approximately 2½ miles, collided head-on with a limousine operated by Stanley Rabinowitz, which carried Jennifer Flynn, Neal Flynn, Katie Flynn, Grace Flynn, Christopher Tangney, and Denise Tangney. The majority correctly notes that the defendant's blood alcohol concentration (hereinafter BAC) at the time was .28%. That BAC is 3½ times the level that section 1192(2) of the Vehicle and Traffic Law defines as rendering a driver "intoxicated." In fact, at approximately 2:40 A.M., the defendant was so intoxicated that his blood was drawn at a nearby hospital by Nurse Dorothy Busco, upon the request of New York State Trooper Daniel O'Hare, without the defendant's consent, as he was incapable of providing consent. Indeed, expert testimony established that the defendant's BAC would necessarily be the result of roughly 14 drinks in his system at the time of the accident, and suggested that he consumed at least 20 drinks from 4:30 P.M. until the time that his BAC was tested.

Both depraved indifference murder in the second degree (Penal Law § 125.25[2]) and depraved indifference assault in the first degree (Penal Law § 120.10[3]) require a mens rea of recklessness "[u]nder circumstances evincing a depraved indifference to human life." Manslaughter in the second degree (Penal Law § 125.15[1]) requires only a mens rea of recklessness. Although both manslaughter in the second degree and "depraved indifference" crimes require, at the very least, a culpable mental state of recklessness, the criminal conduct is elevated to depraved indifference if there exist, as described above, "circumstances evincing a depraved indifference to human life" (Penal Law § 125.25[2]). When one acts with depraved indifference, one's conduct is so wanton, so deficient in a moral sense, so devoid of regard of the life or lives of others, and so blameworthy

as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another (*see People v Suarez*, 6 NY3d 202, 211). Indeed,

> "[D]epraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy' as to render the actor as culpable as one whose conscious objective is to kill" (*id.* at 214, quoting *People v Russell*, 91 NY2d 280, 287; *see also People v Feingold*, 7 NY3d 288, 296).

Furthermore, this mens rea and the relevant actus reus must both be present at a time close to one another, i.e., the People, in order to establish the culpable mental state of depraved indifference, must prove that the act of consuming alcohol was not "too temporally remote" from the operation of a motor vehicle (*see People v Valencia*, 14 NY3d 927).

Intoxication is not a defense to a criminal charge (Penal Law § 15.25). This Court has recognized that intoxication, like a mitigating defense, "merely reduces the gravity of the offense by negating an element" (*People v Walton*, 70 AD3d 871, 874, quoting *People v Harris*, 98 NY2d 452, 475). In *People v Walton*, we recognized that an intoxication defense can mitigate depraved indifference murder to the lesser offense of reckless manslaughter (*see People v Walton*, 70 AD3d at 874; *People v Harris*, 98 NY2d at 475, citing *People v Atkinson*, 7 NY3d 765, 766; *People v Jean–Baptiste*, 44 AD3d 792, 793, *affd* 11 NY3d 539; *People v McPherson*, 35 AD3d 765, 766). Furthermore, since the shift from the "objective circumstances" standard set forth in *People v Register* (60 NY2d 270, *cert denied* 466 US 953) to the "subjective culpable state of mind" standard set forth in *People v Feingold* (7 NY3d 288), the mens rea for depraved indifference murder is no longer merely recklessness. In concurring with the Court of Appeals' decision in *People v Valencia* (14 NY3d 927), Judge Graffeo recognized that "there remains [a] disagreement between courts as to whether the transformation of depraved indifference into a subjective state of mind precludes intoxication as a defense to that mens rea" (*id.* at 931), and that the Court of Appeals left open the issue of "[whether] the voluntary consumption of alcohol to the point of extreme inebriation preclude[s] the formation of a depravedly indifferent state of mind" (*id.* at 928). However, at the very least, we must all admit that without a mens rea of recklessness, the *statutory* prohibition contained in Penal Law § 15.05(3) is no longer applicable.

"A person who fails to perceive a substantial and unjustifiable risk by reason of his [or her] intoxication acts recklessly" (*People v Elysee*, 12 NY3d 100, 105). A person who acts with depraved indifference has no specific, conscious intent to cause a specific result, i.e., the death of another person or persons, but possesses the mens rea of being indifferent to, unconcerned with, and/or acting with complete disregard of the grave risks of death created by his or her conduct (*see* Penal Law § 125.25[2]; *People v Feingold*, 7 NY3d at 294-296; *People v Gonzalez*, 1 NY3d 464, 467-468). Furthermore, depravity requires the conscious appreciation of a grave risk. If death

September 13, 2011     Page 11.
PEOPLE v HEIDGEN, MARTIN

results from such wanton depraved act, the result rightfully calls for a sentence commensurate with intentional murder, a class A felony, including a life sentence of incarceration.

In *People v Valencia*, the evidence presented included that the defendant: had a BAC three times the legal limit; drove at night in the wrong direction on a parkway at a high rate of speed; failed to stop or slow down despite attempts by other drivers to warn him of the dangers he was creating; and, after traveling in this manner for four miles, crashed head-on into one vehicle and then careened into another vehicle. There, the defendant alleged that he "'didn't know' what had happened and 'didn't care'" (*People v Valencia*, 14 NY3d at 932). Yet, despite that statement, and the other evidence presented at trial, the Court of Appeals concluded that the defendant there was intoxicated and recklessly driving, but not acting with depraved indifference (*see People v Valencia*, 14 NY3d 927). It is my opinion that the instant matter is virtually indistinguishable from *People v Valencia*.

In *People v Prindle*, decided by the Court of Appeals in February 2011, the defendant, fleeing apprehension for the theft of a $400 snowplow blade, led police on an erratic chase on a two-way road, running at least five red lights, repeatedly driving at high speeds, including in the lanes of oncoming traffic, before smashing into the rear driver's side of the victim's vehicle, killing her (*People v Prindle*, 16 NY3d 768). Again, the Court of Appeals determined that the defendant did not act with depraved indifference.

As a matter of law, the evidence in this case was not legally sufficient to establish that the defendant exhibited depraved indifference and, accordingly, I would reduce the defendant's convictions of depraved indifference murder in the second degree and assault in the first degree to the lesser-included offenses of manslaughter in the second degree and assault in the second degree, respectively, as the defendant is no more depravedly indifferent than were the defendants in *People v Prindle* or *People v Valencia*. The majority concludes that when viewing the evidence in the light most favorable to the prosecution, a reasonable jury could conclude that the defendant was aware that he was driving "the wrong way and deliberately chose to continue to proceed in the northbound direction, against traffic, without regard for the grave danger to himself and others traveling on the parkway that night," and that given "the defendant's statement to the police that he was in a 'self-destructive' mode, it was reasonable for the jury to find that he possessed the requisite mens rea at the time that the impact with the limousine occurred." I disagree, and conclude that no rational or reasonable juror could infer that the defendant was suicidal, and acted with depraved indifference to an appreciated grave risk, merely because he stated that he was in a "self-destructive" mode. Thus, the evidence was legally insufficient to support the essential elements of murder in the second degree or assault in the first degree. It was not established beyond a reasonable doubt that the defendant was aware of the danger of his conduct, aware of the grave and high probability of injury and death his conduct portended, and wholly indifferent to any such probability.

In any event, even if this evidence were legally sufficient, the verdict of guilt on the charges of murder in the second degree and assault in the first degree is unquestionably against the weight of the totality of the evidence presented at trial. While the majority notes that the defendant advised police that he was in a "self-destructive" mode, the evidence also established that the defendant wrote from prison to his friend and admitted that much of what he had told the police was untrue, including that he and his girlfriend had argued on the night of the party, that he had financial

problems and was in a "self-destructive" mode. Indeed, he stated in this letter that he had used "a line from a movie" when he told the police that he had been in a "self-destructive mode." He was seeking sympathy; he never stated he was suicidal, and a reasonable view of the evidence does not establish that he was on a suicide mission wherein he cared not whose life or how many lives he took along the way. It would be a vast and unreasonable leap to equate his statement that he was in a "self-destructive" mode, even if it were not subsequently revealed to be feigned, with a suicide mission, particularly in light of all the evidence presented. Indeed, in the same letter in which he admitted that he lied to the police, he expressed embarrassment as to the partying lifestyle he and his friends enjoyed and stated that his "self-destructive" comment was a ruse and an attempt to deflect the opinion that they were all "a bunch of hooligans and . . . should be punished as such." I am unwilling to dismiss the defendant's own repudiation of the alleged possible suicide mission. The evidence also included the defendant's decidedly nonsuicidal demeanor and actions, such as his "good mood" and optimistic outlook, in that he was making plans with friends for the remainder of the holiday weekend less than an hour before the accident while "partying" with his friends. Still further, if the defendant were truly making a conscious effort to kill himself, without regard to whom he took with him, he certainly had ample opportunity to do so earlier on his 2½ mile wrong-way drive on the Meadowbrook State Parkway, as he had encountered at least three vehicles prior to the limousine which carried his victims.

The majority also suggests that the testimony that "the defendant's vehicle apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the defendant's vehicle" supports the jury's verdict based on the theory that the defendant may have been suicidal. Again, I most respectfully disagree.

The People presented the testimony of Dr. William Closson, an expert in forensic toxicology. Dr. Closson explained that alcohol reduces the functioning of the brain, and that a .28% BAC would result in a reduced ability to perform multiple tasks simultaneously, resulting in tunnel vision such that the intoxicated person only sees those things directly in front of him or her. Accordingly, Dr. Closson also testified that oncoming headlights would be within the view of an intoxicated driver, and if those headlights suddenly veered to one side, the driver would be expected to react. Dr. Closson further testified that the reaction time of an intoxicated driver to stimuli, such as headlights, is greatly diminished.

I turn now to the testimony of the witnesses to the collision, including Reverend Steed Davidson, Denise Tangney, and Christopher Tangney. The testimony of these witnesses established that Reverend Davidson was lawfully operating his vehicle in the center southbound lane of the Meadowbrook State Parkway, when the limousine operated by Mr. Rabinowitz passed him on the left. Their testimony also established that the defendant was in the center southbound lane and then moved into the limousine's lane just prior to the collision, but that Mr. Rabinowitz could not veer away from the defendant's vehicle because Reverend Davidson's vehicle was directly to his right. I reject the majority's argument that he was "tracking" headlights because he was suicidal, and conclude that such an interpretation arises from a misapprehension of the expert's testimony. Given the defendant's probable tunnel vision, his lane change to the limousine's lane was more likely a reaction to his observation of the headlights of Davidson's vehicle. Such an action, in my opinion, militates against the conclusion that the defendant acted with depraved indifference. Furthermore, the defendant's accident reconstruction expert opined, after applying a linear momentum analysis,

that at the time of impact the defendant's truck was moving at 33 miles per hour, rather than the 70-75 miles per hour estimated by the other drivers on the Meadowbrook State Parkway who had observed the defendant traveling over the relevant 2½-mile stretch. Such reduction in speed also militates against any suggestion by the majority that the defendant was on a "suicide mission."

There is no credible evidence, just speculation, that the defendant deliberately drove his vehicle the wrong way on the parkway in wanton disregard of human life and, thus, acted with depraved indifference towards human life (*see People v France*, 57 AD2d 432, 434).

Accordingly, I cannot agree with the majority's attempts to distinguish the Court of Appeals' decisions in *People v Prindle* (16 NY3d 768) and *People v Valencia* (14 NY3d 927) from the facts before us. To distinguish *People v Prindle* would necessitate a finding that the evasion of police vehicles in the course of a high-speed chase while sober is a less culpable state of mind than driving on the wrong side of a highway at 70 miles per hour, at night, in a highly intoxicated state. Likewise, distinguishing *People v Valencia* necessitates finding, in the evidence presented to the jury, that the defendant was neither totally oblivious nor incapable of apprehending the gravity of his actions due to his intoxication. I do not subscribe to such conclusions.

While clearly not available at the time this defendant was charged, I take judicial notice that, two years after this incident—only months following the defendant's conviction in 2007—and, as indicated in the relevant bill jacket, at least partially in response to this matter, the Legislature defined the new crime of aggravated vehicular homicide (*see* L 2007, ch 345), a class B felony punishable by an indeterminate prison sentence ranging from 8 1/3 to 25 years (*see* Penal Law §§ 70.00[2][b], 3[b]; § 125.14). In enacting this new legislation, the Legislature, as justification, stressed the need to provide law enforcement officials and prosecutors with the "tools" necessary to charge and convict criminals who commit an offense involving driving while intoxicated that results in injury or death (L 2007, ch 345 at 8).

Viewing the evidence in a light most favorable to the prosecution, there is scant, if any, evidence from which a jury could reasonably infer that the defendant possessed the mens rea required to convict the defendant of a depraved indifference crime. Thus, I find no valid line of reasoning which supports the jury's conclusion that the defendant possessed the mental culpability required to convict him of depraved indifference murder in the second degree or assault in the first degree. The defendant was too inebriated to form such a mens rea.

While the almost unspeakable horror caused by the defendant's actions is enough to evoke strong notions that injustice and inequity would result if the convictions of murder in the second degree and assault in the first degree were reduced, I respectfully suggest that we must not give any legal weight to the obviously tragic *result* of the collision when evaluating the defendant's state of mind. We must strictly evaluate and construe the defendant's actions in conjunction with his culpable mental state at the time of the incident when determining what crime was actually committed. After doing so, and weighing the evidence developed at trial, the convictions of the depraved indifference crimes cannot stand. The defendant was highly intoxicated and he was a operating a motor vehicle. The defendant recklessly committed crimes, including homicide, and his punishment should be commensurate with these crimes.

September 13, 2011                                                                                              Page 14.
PEOPLE v HEIDGEN, MARTIN

Accordingly, I would reduce the defendant's conviction of the two counts of murder in the second degree to manslaughter in the second degree (*see People v Valencia*, 14 NY3d 927) and, concomitantly, reduce his conviction of the three counts of assault in the first degree to three counts of assault in the second degree, vacate the sentences imposed thereon, and remit the matter to the Supreme Court, Nassau County, for resentencing on those counts.

ENTER:

*Matthew G. Kiernan*
Matthew G. Kiernan
Clerk of the Court