**To Be Argued By:**
*Jillian S. Harrington, Esq.*
**Time Requested:**
**30 minutes**

Appellate Division, Second Department Case No. 2007-2662
Nassau County Indictment No. 1910/05

# Court of Appeals

### STATE OF NEW YORK

----- ✦ -----

### THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent-Appellee,*

### - against -

### MARTIN HEIDGEN,

*Defendant-Appellant.*

# BRIEF FOR DEFENDANT-APPELLANT

**JILLIAN S. HARRINGTON, ESQ.**
**Attorney at Law**
***Attorney for Defendant-Appellant***
***Martin Heidgen***
**P.O. Box 6006**
**Monroe Twp., NJ 08831**

**148 Madison Avenue, 11ᵗʰ Floor**
**New York, New York 10016**
**Phone:  (718) 490-3235**
**jbhesq@aol.com**

September 5, 2012

NEW YORK STATE
COURT OF APPEALS
-----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,           STATEMENT
                                               PURSUANT
                 Respondent,                          TO RULE 5531

                 - against -

MARTIN HEIDGEN,

                Defendant-Appellant.

-----------------------------------------------------------------------x

1.     The indictment number in the court below was 1910N/05.

2.     The full names of the parties were The People of the State of New York against Martin Heidgen.

3.     This action was commenced in Supreme Court, Nassau County.

4.     This action was commenced by the filing of an indictment.

5.     The trial in this matter began with jury selection on or about September 5, 2006 and concluded with a verdict rendered on or about October 17, 2006 convicting Mr. Heidgen of two counts of Murder in the Second Degree [P.L.§125.25(2)]; three counts of Assault in the First Degree [P.L.§120.10(3)]; two counts of operating a vehicle while under the influence of alcohol [V.T.L.§1192].

6.     As result, on February 28, 2007 Mr. Heidgen was sentenced to an indeterminate term of imprisonment of eighteen years to life.

7.     This appeal is from a decision of the Appellate Division, Second Department affirming Mr. Heidgen's conviction.

8.     Appellant is proceeding on the appendix method.

i

# TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO C.P.L.R. §5531. . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CASES AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.     The People's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.   Verdict and Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    IV.   Decision of the Appellate Division, Second Department. . . . . . . . . 27

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    POINT I.

    THE PEOPLE FAILED AS A MATTER OF LAW TO
    PROVE MARTIN HEIDGEN'S GUILT OF CRIMES
    INVOLVING A DEPRAVED INDIFFERENCE TO HUMAN
    LIFE BEYOND A REASONABLE DOUBT. . . . . . . . . . . . . . . . . . . . . . 30

        I.     PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . . 31

        II.    APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . . . . . 33

            A.     Penal Law Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF CONTENTS (cont'd)

B.     Standard of Review of Sufficiency of the
       Evidence Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
C.     In Accordance with <u>People v. Feingold,</u>
       Depraved Indifference Is a Mental State. . . . . . . . . . . 34

III.    PRESERVATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.     ANALYSIS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

       A.     Does Intoxication Negate Depraved
              Indifference?.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
       B.     The People's Proof Failed to Establish
              Depraved Indifference as a Matter of Law . . . . . . . . . . 44

              1.     Mr. Heidgen's Level of Intoxication. . . . . . . . . . 49
              2.     Mr. Heidgen Was Not Suicidal. . . . . . . . . . . . . 50
              3.     Mr. Heidgen's Speed on the Meadow-
                     brook Parkway. . . . . . . . . . . . . . . . . . . . . . . . . 58
              4.     Mr. Heidgen Did Not Ignore the Signs
                     That He Was Driving on the Wrong Side
                     of the Road.. . . . . . . . . . . . . . . . . . . . . . . . . . . 65

       C.     Recent Decisions of Note Regarding the *Mens
              Rea* of Depraved Indifference to Human Life. . . . . . . . 68

IV.     CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

POINT II.

MR. HEIDGEN WAS DENIED HIS RIGHT TO A FAIR
TRIAL AS A RESULT OF THE TRIAL COURT'S DECISION
TO PERMIT DNA TESTING IN THE MIDDLE OF TRIAL
AND THEN  REVERSE HIS OWN DECISION AND ADMIT
THE PREVIOUSLY EXCLUDED  BLOOD SAMPLE
PURPORTED TO BE MR. HEIDGEN'S.. . . . . . . . . . . . . . . . . . . . . . . . 74

## TABLE OF CONTENTS (cont'd)

I.      PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . 75

II.     APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . . . 79

        A.      The Admissibility of Real Evidence. . . . . . . . . . . . . 79
        B.      Applicable Statutory Provisions. . . . . . . . . . . . . . . 80

III.    ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        A.      The Court's Decision to Permit Scientific
                Testing in the Middle of Trial Was Procedurally
                Erroneous. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
        B.      Permitting DNA Testing Precluded Mr. Heidgen
                from Receiving a Fair Trial. . . . . . . . . . . . . . . . . . . 86
        C.      No DNA Test Could Render Reliable a Piece of
                Evidence the Court Already Deemed Unreliable
                and Excluded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
        D.      This Error Cannot Be Deemed Harmless. . . . . . . . . . 91

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

POINT III.

MARTIN HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED
AND IMPROPERLY ADMITTED INTO EVIDENCE. . . . . . . . . . . . . . . 94

I.      FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . 94

II.     THE APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . . 99

III.    ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

        A.      Mr. Heidgen's Blood Was Drawn after the
                Expiration of the 2-Hour Time Limit Mandated
                by Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

iv

# TABLE OF CONTENTS (cont'd)

    B.    Mr. Heidgen's Blood Was Drawn Without His
Consent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

    C.    The Police Did Not Have a Search Warrant for
Mr. Heidgen's Blood. . . . . . . . . . . . . . . . . . . . . . . . . 106

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

POINT IV.

THE TRIAL COURT ERRED IN PRECLUDING THE DEFENSE
FROM PRESENTING THE TESTIMONY OF A POLICE
ACCIDENT RECONSTRUCTIONIST. . . . . . . . . . . . . . . . . . . . . . . . . . 108

I.    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . 108

II.    THE APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . 111

III.    ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

POINT V.

MR. HEIDGEN'S RIGHT TO A FAIR TRIAL WAS VIOLATED
BY THE TRIAL COURT'S FAILURE TO ADDRESS CERTAIN
INSTANCES OF JUROR MISCONDUCT AND HIS ERRON-
EOUS FINDING THAT OTHERS WERE UNSUBSTANTIATED. . . . . 117

I.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . . . 117

II.    THE APPLICABLE LEGAL PRINCIPLES. . . . . . . . . . . . 122

III.    ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

    A.    The Court Erred in Limiting the Scope of the

## TABLE OF CONTENTS (cont'd)

§330.30 Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

B.    The Court Erred in Denying the §330.30
Motion Following the Hearing. . . . . . . . . . . . . . . . 126

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 128

AFFIRMATION OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

# TABLE OF AUTHORITIES

**CASE**                                                                                    **PAGE**

<u>Boddie v. Connecticut</u>, 401 U.S. 371 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . 111

<u>Irvin v. Dowd</u>, 366 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

<u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Mattot v. Ward</u>, 48 N.Y.2d 455 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

<u>Parker v. Gladden</u>, 385 U.S. 363 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

<u>People v. Allen</u>, 73 N.Y.2d 378 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

<u>People v. Alomar</u>, 55 A.D.3d 617 (2d Dept. 2008). . . . . . . . . . . . . . . . . . . . . . . 88

<u>People v. Arnold</u>, 96 N.Y.2d 358 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

<u>People v. Berk</u>, 88 N.Y.2d 257 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

<u>People v. Briguette</u>, 51 A.D.3d 939 (2d Dept. 2008). . . . . . . . . . . . . . . . . . . . . . 36

<u>People v. Brown</u>, 48 N.Y.2d 388 (1979). . . . . . . . . . . . . . . . . . . . . . 121, 123, 124

<u>People v. Contes</u>, 60 N.Y.2d 620 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>People v. Coon</u>, 34 A.D.3d 869 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

<u>People v. Crimmins</u>, 36 N.Y.2d 230 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

<u>People v. Dashnau</u>, 187 A.D.2d 966 (4th Dept. 1992). . . . . . . . . . . . . . . . . . . . . 125

<u>People v. DeLucia</u>, 20 N.Y.2d 275 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

<u>People v. Dingle</u>, 30 A.D.3d 1121 (1st Dept. 2006). . . . . . . . . . . . . . . . . . . . . . . 56

## TABLE OF AUTHORITIES (cont'd)

**CASE**                                                                                              **PAGE**

People v. Edgerton, 115 A.D.2d 257 (4th Dept. 1985). . . . . . . . . . . . . . . . . . . . 127

People v. Feingold, 7 N.Y.3d 288 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 34, 40, 41

People v. Finkle, 192 A.D.2d 783 (3d Dept. 1993). . . . . . . . . . . . . . . . . . . . . . . 85

People v. Friedgood, 58 N.Y.2d 467 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . 123

People v. Gray, 86 N.Y.2d 10 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

People v. Heidgen, 87 A.D.3d 1016 (2d Dept. 2011). . . . . . 1, 2, 28, 29, 32, 33, 42,
                                        43, 46, 48, 49, 55, 58, 61, 62, 64, 68, 70, 121

People v. Hines, 97 N.Y.2d 56 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

People v. Julian, 41 N.Y.2d 340 (1977). . . . . . . . . . . . . . . . . . . . . . 75, 80, 88, 92

People v. Kates, 53 N.Y.2d 591 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

People v. Lafferty, 177 A.D.2d 1043 (4th Dept. 1991). . . . . . . . . . . . . . . . . . . . 125

People v. Lazartes, 23 A.D.3d 400 (2d Dept. 2005). . . . . . . . . . . . . . . . . . . 60, 116

People v. Magnano, 175 A.D.2d 639 (4th Dept. 1991). . . . . . . . . . . . . . . . . . . . 127

People v. Maragh, 94 N.Y.2d 569 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 123, 125

People v. McPherson, 89 A.D.3d 752 (2d Dept. 2011). . . . . . . . . . . . . . 41, 66, 72

People v. Mendez, 34 A.D.3d 697 (2d Dept. 2006). . . . . . . . . . . . . . . . . . . . . . 36

People v. Negron, 91 N.Y.2d 788 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

# TABLE OF AUTHORITIES (cont'd)

**CASE**                                                                          **PAGE**

People v. Payne, 3 N.Y.3d 266 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 31, 39, 40

People v. Prindle, 16 N.Y.3d 768 (2011). . . . . . . . . . . . . . . . . . . . . . . . 69, 70

People v. Register, 60 N.Y.2d 270 (1983). . . . . . . . . . . . . . . . . . . . . . . . 34

People v. Rivera, 184 A.D.2d 153 (1st Dept 1993). . . . . . . . . . . . . . . . . . . 88

People v. Romano, 8 A.D.3d 503 (2d Dept. 2004). . . . . . . . . . . . . . . . . . . 125

People v. Sanchez, 98 N.Y.2d 373 (2002). . . . . . . . . . . . . . . . . . . . . . . . 34

People v. Squires, 68 A.D.3d 900 (2d Dept. 2009). . . . . . . . . . . . . . . . . . . 36

People v. Soto, 8 A.D.3d 683 (2d Dept. 2004). . . . . . . . . . . . . . . . . . . . . . 36

People v. Suarez, 6 N.Y.3d 202 (2005). . . . . . . . . . . .   30, 34, 35, 45, 46, 47, 57, 72

People v. Thacker, 166 A.D.2d 102 (1st Dept. 1991). . . . . . . . . . . . . . . . . . 61

People v. Valencia, 58 A.D.3d 879 (2d Dept. 2009). . . . . . . . . . . . . . . . . . 43, 69

People v. Valencia, 14 N.Y.3d 927 (2010). . . . . . . . . . . . . . . . . . . . 42, 43, 68, 69

People v. Walton, 70 A.D.3d 871 (2d Dept 2010). . . . . . . . . . . . . . . . . . . . 43

People v. Williams, 5 N.Y.3d 732 (2005). . . . . . . . . . . . . . . . . . . . . . . . 39

People v. Wimes, 49 A.D.3d 1286 (4th Dept. 2008). . . . . . . . . . . . . . . . . 43, 44

Schmerber v. California, 384 U.S. 757 (1966). . . . . . . . . . . . . . . . . . . . . 99

Turner v. Louisiana, 379 U.S. 466 (1965). . . . . . . . . . . . . . . . . . . . . 117, 121

## TABLE OF AUTHORITIES (cont'd)

**CASE**                                                                         **PAGE**

United States v. Beach, 296 F.2d 153 (4th Cir. 1961). . . . . . . . . . . . . . . . . . . . . . . 123

United States v. Weiss, 752 F.2d 777 (2d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . 122

**STATUTES**

C.P.L.§240.20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

C.P.L.§240.40. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 80, 83

C.P.L.§240.90. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 83, 84

C.P.L.§290.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39, 85

C.P.L.§330.30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 31, 38, 117, 118, 126

C.P.L.§470.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

N.Y. Const. Art. I, §6. . . . . . . . . . . . . . . . . . . . . . . . . 40, 74, 86, 108, 117

P.L.§15.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

P.L.§120.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 30, 33

P.L.§120.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

P.L.§125.25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 30, 33

U.S Const. Amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 108

U.S. Const. Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . 40, 74, 86, 108, 117

V.T.L.§1192.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1

V.T.L.§1194.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION : SECOND DEPARTMENT**
-----------------------------------------------------------------------x
**THE PEOPLE OF THE STATE OF NEW YORK,**
        *Respondent,*


    **- against -**


**MARTIN HEIDGEN,**
       *Defendant-Appellant.*
-----------------------------------------------------------------------x

## <u>BRIEF FOR DEFENDANT-APPELLANT</u>

## <u>PRELIMINARY STATEMENT</u>

This is an appeal from a judgment rendered on February 28, 2007, in Nassau County Court (Honorof, J.) convicting Martin Heidgen, after a jury trial, of two counts of Murder in the Second Degree [P.L.§125.25(2)]; three counts of Assault in the First Degree [P.L.§120.10(3)]; and two counts of operating a vehicle while under the influence of alcohol [V.T.L.§1192]. (T.2678-80). On February 28, 2007, Mr. Heidgen was sentenced to an indeterminate term of imprisonment of 18 years to life. (S.138).[1]

That judgment of conviction was affirmed by the Appellate Division, Second Department by decision and Order dated September 13, 2011. <u>People v. Heidgen</u>, 87

---

[1] Numbers in parentheses preceded by the letters: "S" refer to the pages of the transcript of the sentencing; "T" refer to the pages of the trial transcript.

1

A.D.3d1016 (2d Dept. 2011). (A4).[2]

## STATEMENT OF JURISDICTION

Mr. Heidgen presents five issues for review by this Court. The first is whether the People failed, as a matter if law, to prove Martin Heidgen's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt. The question is preserved for review. At the conclusion of the People's case, defense counsel made a detailed motion to dismiss (A1303). He was not required to make another motion at the conclusion of the defense case because he did not present evidence of guilt. People v. Heidgen, 87 A.D.3d at 1020.

The second issue is whether Mr. Heidgen was denied his right to a fair trial as a result of the trial  court's decision to permit a DNA test in the middle of trial and then  reverse his own decision and admit the previously excluded  blood sample purported to be Mr. Heidgen's. This issue was clearly preserved for review by a defense objection to the taking of the blood in the middle of trial and to admit the blood which had previously been excluded (A730-A736).

The third issue is whether Mr. Heidgen's blood was illegally seized by police,

---

[2] Numbers in parentheses preceded by the letter "A" refer to the pages of Defendant-Appellant's Appendix.

2

and then improperly admitted into evidence at trial. This issue was preserved for appellate review as a result of Mr. Heidgen's pre-trial motion to dismiss after which a hearing was conducted to determine the admissibility of the blood evidence (A1651-A1915).

The fourth issue is whether the trial court erred in precluding the defense from presenting the testimony of a police accident reconstructionist. This issue is preserved for appellate review by defense counsel's timely objection to the court's ruling precluding Sgt. Crawford's expert testimony (A1368).

The final issue is whether Mr. Heidgen's right to a fair trial was violated by the trial court's failure to address certain instances of juror misconduct and his erroneous finding that others were unsubstantiated. This issue is preserved for review by the defense motion made pursuant to C.P.L. §330.30 (A1916).

## STATEMENT OF FACTS

### I.    The People's Case

At 2:10 a.m. on July 2, 2005, NYS Trooper Patrick Siegler responded to the southbound lanes of the Meadowbrook Parkway. Upon arriving, Siegler observed a limousine facing south in the center lane, a pick up truck in the left lane, and a Nissan Maxima facing north in the right lane. He saw Stanley Rabinowitz in the front seat of the limousine and Jennifer Flynn seated on the center median. Siegler then looked inside the limousine where he saw several injured passengers. In the pick up, he saw Mr. Heidgen sitting mostly upright with his eyes open. (Siegler: A20-A24)

Mr. Heidgen was removed from the pick up and placed in an ambulance. Siegler got into the ambulance and observed that Mr. Heidgen's eyes were watery and bloodshot and there was a strong odor of alcohol on his breath. Siegler asked Mr. Heidgen his name but got no response. Siegler then exited the ambulance and, after the ambulance left at approximately 2:33 a.m., he went to Mr. Heidgen's pick up where he found a wallet on the floor and learned Mr. Heidgen's name from his Arkansas driver's license. Siegler gave that information to Inv. Harris and then Tr. Stafford at the hospital. (Siegler: A25-A28, A46)

Siegler further added that at 2:33 a.m., the decision was made to arrest Mr. Heidgen but no one told Mr. Heidgen. (Siegler: A43-A44)

4

Christopher Tangney, Jennifer Flynn's father, is a retired Nassau County police officer. He recalled leaving his daughter's wedding at approximately 1:30 a.m. and getting into Stanley Rabinowitz's limousine. Mr. Tangney, who was not wearing his seatbelt, was seated in the rear of the limousine behind Mr. Rabinowitz and could see out the limousine's front window. (C.Tangney: A50-A52, A55-A57)

As the limousine traveled in the left lane of the southbound Meadowbrook Parkway at approximately 60 MPH, Mr. Tangney noticed a bright light coming toward them at what he estimated to be approximately 65 MPH. He then realized it was a car and was about to say something when he heard Rabinowitz gasp and try to get to the right but a small car was next to them. They crashed and the impact threw him and his wife forward and decapitated his granddaughter Kate. Mr. Tangney was suspended in the limousine with his legs tangled in the bar. A short time later, Mr. Tangney's brother arrived and untwisted his legs. When the first responders arrived, they removed Neil and Grace Flynn and then cut the side of the limousine and removed Mr. and Mrs. Tangney and transported them to the hospital. His injuries included: lower right leg broken off between ankle and knee (was re-attached), left femur broken (steel plate inserted), bowel disconnected, torn lung, stomach, liver and spleen, damaged hip, and internal bleeding. (C.Tangney: A63-A75)

At approximately 2 a.m., NYS Trooper Daniel O'Hare responded to the

accident scene with his partner Michael Stafford. Upon arriving, he saw two vehicles with heavy front-end damage. Tr. Knapp instructed O'Hare to go to the hospital with Mr. Heidgen because his blood needed to be drawn. O'Hare retrieved a NYS Police blood kit from his patrol car and accompanied Mr. Heidgen to the hospital in the ambulance. (O'Hare: A89-A91, A93-A97)

While in the ambulance, O'Hare remained near Mr. Heidgen's head and observed a strong odor of alcohol. He described Mr. Heidgen's eyes as bloodshot and watery. He asked Mr. Heidgen his name but he did not respond. (O'Hare: A101-A102)

Five minutes after they arrived at the hospital, Tr. O'Hare asked Nurse Busco to draw Mr. Heidgen's blood for evidence. He watched as she opened the blood kit and removed everything leaving the box empty. While also reading the kit's instructions, he then observed Busco clean the injection site with the kit's non-alcohol swab before drawing 2 tubes of Mr. Heidgen's blood using the needle she removed from the kit. After she drew the first tube, she gave it to O'Hare. While the second tube was being drawn, O'Hare inverted the first tube at least 20 times per the kit's instructions and then did the same for the second tube. He then placed the blood-filled tubes in the kit. When the nurse was done, she discarded the kit's used vacutainer and needle. (O'Hare: A105-A106, A112, A132, A136-A141, A168, A173)

6

Tr. O'Hare displayed a sample kit for the jury which he explained includes a plastic box inside another box. The plastic box includes: a Lab-1 form on which information is provided regarding the defendant and the incident; 6 integrity seals (4 white and 2 red); instructions on taking blood specimens; a blood collection report; consent form; a non-alcohol swab to clean injection site; a vacutainer and needle; holder for the tubes, a biohazard sticker; and 2 glass tubes for blood with gray tops containing anticoagulant. According to O'Hare, all of the items in the kit were used to obtain Mr. Heidgen's blood. (O'Hare: A107-A109, A132-A134)

Once the blood was drawn, O'Hare stepped out of the room and partially filled out all of the seals. He put his initials and the date and time the blood was drawn on the seals but said he could not complete them because he did not know Mr. Heidgen's name. He testified that he filled them out with the information he had because he thought others would use them at a later time to seal the kit. He then put the partially completed white seals over the tops of the blood tubes and wrote his initials on the tubes themselves before placing them back in the kit. He said that he did not seal the kit at that time even though the instructions tell you to do so because he did not have all of the information. Once he was finished with the blood tubes, he moved onto the kit's paperwork. He asked Nurse Busco to sign the blood collection report but did not fill in the time and date. He also neglected to sign it himself in the space designated

for the signature of the officer who observed the blood draw. He admitted this was an oversight and acknowledged the importance of the verification. He also explained that he did not fill out the Lab I, although he acknowledged he was supposed to, because he did not have a lot of the information requested on the form despite the fact that the instructions state that the person who watched the blood draw should fill out the form. He further testified that someone else must have completed the seals and forms that he started although he did not know who. (O'Hare: A112, A142-A147, A150, A157, A163-A165, A172, A178)

After O'Hare was finished with his paperwork, he handed the unsealed kit to Tr. Stafford. O'Hare claimed Stafford never told him Mr. Heidgen's name even though Stafford was there while O'Hare filled out the paperwork. Stafford left with the blood kit and O'Hare remained with Mr. Heidgen until he was relieved later that morning. (O'Hare: A114, A116, A134-A136, A143)

At trial, Tr. O'Hare was shown People's Ex. #17 for identification which he claimed was the blood kit used to obtain and store Mr. Heidgen's blood on July 2, 2005. He testified he recognized the kit because of the white seals used to close it which contained his initials and R.N. Busco's name as the person who drew the blood. The white seals also had Mr. Heidgen's name which he admitted he did not write. (O'Hare: A117, A150)

Dorothy Busco, a registered nurse at Nassau University Medical Center, testified that Mr. Heidgen was placed in a trauma room upon arriving at the emergency room and 8 to 10 people worked on him. He responded to noxious and painful stimuli. Approximately 10 minutes after he arrived, a trooper asked her to draw Mr. Heidgen's blood with a kit he provided her. (Busco: A185-A188)

To draw Mr. Heidgen's blood, Busco placed a tourniquet on his arm, cleaned the area with a swab from the kit and inserted one of the hospital's sterile needles. After drawing the first tube of blood, she gave it to the trooper to invert, and then drew the second. She then drew the blood needed for the hospital and hooked up the IV. The trooper was standing almost next to her while she drew the blood. When asked about Tr. O'Hare's testimony that she used the needle from the kit, she explained she used the hospital's needle rather than the one included with the police kit because, in addition to drawing blood for the police, she needed to establish an IV line for blood draw for medical purposes and the kit's needle could not be used to establish an IV. She also said that she told the District Attorney she used a different needle about 10 days earlier. (Busco: A190-A192, A200-A204, A213-A217)

NYS Trooper Michael Stafford went to the Nassau University Medical Center to obtain a blood kit from Tr. O'Hare who was to stay at the hospital with Mr. Heidgen. He claimed he did not know Mr. Heidgen's name when he went to the

hospital. Upon arriving, he found Tr. O'Hare with the kit in hand filling out the seals. O'Hare gave Stafford the unsealed blood kit which Stafford gave to Inv. Baez when he arrived at the hospital 2 hours later. Baez signed the Lab I form but did not look in the box or write on the kit or other forms. When it was pointed out to him on cross-examination that his name was on the box, he said it was not his handwriting. (Stafford: A227-A232, A235-A237, A242-A243)

On July 2, 2005, NYS Police Inv. Michael Drake received a sealed blood kit (People's Ex. #17) from Tr. Hemmerich with Mr. Heidgen's name on it. He also received a General II form which he signed after inspecting the box. He placed the box in the vault and locked it. (Drake: A274-A277)

NYS Police Inv. Christopher Sweeney, of the Collision Reconstruction Unit, responded to the accident scene at approximately 2:45 a.m. Upon arriving, he examined the road for tire marks but found none which he explained does not mean the vehicles were not breaking or slowing down. He observed scrape marks in the road between the left and center lanes indicative of the area of impact which he explained may not be the exact location of impact because the precise location is difficult to determine. After completing his survey, Sweeney used an electronic total work station to take measurements and angles and record them and then took photos at the scene. (Sweeney: A296-A297, A300-A308, A366-A367)

On July 5, 2005, Inv. Sweeney removed a dash-mounted camera from the limousine and brought it to U.S. Limo where they downloaded the data from the camera onto a computer which they burned onto CD's (Sweeney: A318-A319).

Later that day, Inv. Sweeney participated in the execution of a search warrant at 14 Oceanview Avenue in Valley Stream. He took photographs of the 2-story residence and then entered through Mr. Heidgen's apartment in the back of the building. During the search, Sweeney photographed empty bottles of Grande Old Parr Scotch on top of the refrigerator. After they searched the apartment, they searched the main part of the house which appeared to be unoccupied. (Sweeney: A320-A325)

Inv. Sweeney further testified that along the Meadowbrook Parkway, south of the Babylon Turnpike, in close proximity to the accident scene, there is a two-sided, green and white sign facing south that says "Norman J. Levy Memorial Parkway" so that if you were driving the wrong way on the highway, you could still read it. (Sweeney: A360-A361, A374)

At approximately 4:50 a.m. on July 2nd, NYS Police Inv. Eric Baez went to Nassau University Medical Center and retrieved an unsealed blood kit from Tr. Stafford. Because he knew he had to sign the Lab I chain of custody report, he examined the contents of the kit which included 2 tubes of blood with gray stoppers. The tubes were sealed with red integrity seals which had the initials "DPO" and the

date, "7/2/05". When he opened the box, he removed the paperwork and filled in the Lab I but not the General II. (Baez: A380-A383, A417, A434-A435)

On cross-examination, Baez acknowledged that the General II and Lab I showed two different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the ME toxicology department. The General II indicated that the blood went from Harris to Hemmerich (not from Harris to ME as the Lab I indicated) and then from Hemmerich to Drake to Newburgh BCI evidence to Mid Hudson Crime lab (not the ME). In other words, the two chain of custody reports showed the blood going to two different places – one to Mid Hudson Lab and the other to the ME's toxicology department. (Baez: A436-A440, A447)

Baez further testified that he used two of the seals O'Hare filled out (with his initials, the date and time, but no name included for subject) to seal the plastic container that held the blood tubes which had red seals with initials and the date but no name for the subject. And, although he learned Mr. Heidgen's name at the accident scene, he did not put it on the seals, paperwork or kit cover because he could not confirm the name. On cross-examination, Baez admitted the red seals were supposed to be used to seal the box – not the blood tubes – and the white seals were to be placed on the blood tubes. He further admitted that the kit should have been sealed by the person who witnessed the blood draw in order to preserve the sample's

12

integrity but O'Hare did not do that. (Baez: A382, A386, A426-A430, A477)

Baez placed the sealed plastic container in the cardboard box with the paperwork. After leaving the hospital, he returned to the accident scene and gave the blood kit to Inv. Harris. (Baez: A389-A390)

On the afternoon of July 2nd, Inv. Baez returned to the hospital with Det. Harris and spoke with a doctor who gave them permission to speak with Mr. Heidgen. At approximately 12:30 p.m., they found Mr. Heidgen in the ICU tied to the bed with gauze. They informed him that he was under arrest for DWI but did not tell him the consequences of the accident. Harris used a card from his wallet to advise Mr. Heidgen of his Miranda rights. He nodded that he understood the rights and agreed to speak with them but they did not ask him to sign a form. Baez had no problem understanding him and described him as pleasant, courteous, polite and respectful. The conversation ended when he requested an attorney. They did not ask him for a written statement because his hands were restrained. (Baez: A391-A392, A395-A397, A451, A455-A459, A478)

Finally, Baez testified that the kit was opened in his presence the day before he testified at which time he examined the contents which he recalled were the same as when he had sealed it. (Baez: A490-A491)

At approximately 4:20 a.m., NYS Police Inv. Michael Harris sent Inv. Baez to

Nassau County Medical Center to pick up a blood kit. Since Tr. Siegler had already found his wallet in his pick up, they had a tentative identification of Mr. Heidgen at that time. Baez returned at approximately 6:50 a.m. and gave Harris the closed blood kit which he placed under the driver's seat of his car and locked the door. At approximately 8:55 a.m., after the scene was cleared, Harris returned to his car and drove to the Nassau County ME to submit the kit for toxicology analysis but no one was there. While they made some calls to find where to bring the kit, Harris opened the outer box and examined its contents. He removed the paperwork and looked at the plastic container with two white seals on it which did not have Mr. Heidgen's name or a supervisor's initials. He saw two tubes of blood sealed with red seals with the date and initials "DPO". He then wrote Mr. Heidgen's name on the seals on the plastic container and put his initials in the spot for a supervisor's initials. He also filled in information on the Lab I and put it in the outer box and sealed the box with two seals. (Harris: A505-A511, A520-A521, A563, A566-A567)

When it was discovered that the ME's office was closed for the holiday weekend, the decision was made to transport the blood kit to the NYS Police's Newburgh Lab. Harris drove the kit to the Valley Stream barracks and NYS Trooper Lawrence Hemmerich picked up the kit from Harris in Valley Stream and brought it to State Police Newburgh and gave it to Inv. Michael Drake who signed the General

14

II and placed the kit in the vault.(Harris: A521-A522; Hemmerich: A262-A264; Drake: A274-A276).

At approximately 11:30 a.m. on July 2nd, Harris received a call from the hospital informing him that Mr. Heidgen was conscious and alert. Harris and Baez drove to the hospital where they found Mr Heidgen in the ICU with his hands restrained. After they introduced themselves, Harris read Mr. Heidgen his <u>Miranda</u> warnings after which they asked if he wished to speak with them and he shook his head. Harris then asked Mr. Heidgen what happened. Heidgen replied that he had a fight on the phone with his ex-girlfriend Lindsay Long in Arkansas, his boss owes him $1000, he moved to New York from Arkansas and he got into a "self-destruct" mode. He added that he was very upset and drank a fifth of Old Parr Scotch. Harris then asked Mr. Heidgen how he felt about himself to which he replied that he was disgusted and embarrassed. When they asked if he was trying to hurt himself, Mr. Heidgen responded: "No, never before". Mr. Heidgen added that he was driving around and then got a moment of clarity and decided to go home. When the officers asked Mr. Heidgen what he hit with his truck, Mr. Heidgen said he thought he hit a tree or median. The officers did not tell him what actually happened. The officers then questioned Mr. Heidgen about his whereabouts earlier that day. He said he met his friend Greg Nizewitz at a bar in NYC at about 5 p.m. and drank 4 Bohemian beers.

15

He left the city about 8 p.m. and got a call from Lindsay about an hour later and they spoke for 10-12 minutes. He said he left his house about 2 a.m. and drove around. When the officers again asked if he was trying to hurt himself, he replied: "No, not under any circumstances". And when asked the question a third time, he reiterated "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." Mr. Heidgen then asked for an attorney and the interrogation ended. (Harris: A522, A533-A544, A586)

Inv. Harris described Mr. Heidgen as pleasant and upset and said he made eye contact during the interrogation. He added that he had no problem understanding him. (Harris: A545, A548)

On July 5, 2005, Harris was present during the execution of a search warrant at Mr. Heidgen's apartment. There he observed empty liquor bottles and a hunting rifle. (Harris: A553-A554, A624)

Lisa Lindenthaler, a forensic scientist at the Mid-Hudson regional crime laboratory, was declared an expert in forensic toxicology by the court. Lindenthaler testified that on July 5, 2005, she analyzed for alcohol a sample of blood from a sealed kit [People's Ex. #17] marked with Mr. Heidgen's name. The kit contained two blood tubes, the tops of which were sealed with red seals but no initials written on the tubes. (Lindenthaler: A648-A656, A662-A666)

16

At that point, Ms. Lindenthaler's testimony was interrupted by a defense objection to the admission of the blood and a hearing was conducted out of the presence of the jury at which Tr. O'Hare was called to testify. Following that testimony, the court ruled that the People were precluded from introducing the blood evidence. (A685-A713)  That hearing is detailed *infra* at Point II.

At approximately 4:30 p.m. on July 1, 2005, Greg Nizewitz met up with Mr. Heidgen at the House of Brews in Manhattan. He testified that he met Mr. Heidgen about a year earlier through a mutual friend, Josh Zigman. They each drank about 6 Bohemian beers at the bar and talked about fantasy baseball. Nizewitz described Mr. Heidgen as happy, in a good mood and excited for the holiday weekend including a party at Amanda Goldman's house that evening. Nizewitz left the bar at about 7:30 and Mr. Heidgen, who he noted was not effected by the alcohol, stayed at the bar to continue flirting with the bartender Jessica whose phone number he was trying to get. He also noted that Mr. Heidgen was not at all depressed. (Nizewitz: A719-A726)

Tracy Sodikoff met Mr. Heidgen through Josh Zigman and he became a member of their group of friends. Sodikoff recalled that before Mr. Heidgen arrived at the party at Amanda Goldman's house a little before midnight on July 1, 2005, she heard Amanda give him directions on the phone. When he arrived, he was in a good mood, "pretty normal" and happy. And while at the party, she found him to be

17

perfectly happy, laughing and enjoying himself. She saw him drink a few beers and two Irish car bomb shots. They talked at the party and she told him a lot of girls thought he was the cutest guy there and would all like to be with him which he seemed to take in stride. (Sodikoff: A752, A756-A760, A764, A768, A772-A773)

On July 2, 2005, Elizabeth Serwin was driving on the southbound Meadowbrook Parkway on the way home from work at a restaurant where she drank 1½ beers. In the distance, about 2 football field lengths away, she saw a pair of headlights on her side of the road in the center lane. She veered to the right and then stopped on the shoulder. She beeped her horn as the pick up, not veering or swerving, passed her going about 70-75 MPH. She called 911 and told police she was at Exit M7 but she was actually at Exit M9. (Serwin: A782-A789, A806)

At 2 a.m. on July 2, 2005, Joseph Caruso was driving home on the southbound Meadowbrook Parkway from a party where he had two drinks. When he was near an overpass, he saw headlights in the center lane about a quarter of a mile away. He was driving about 65-70 MPH and moved into the right lane and the silver pick up passed him going about 70-80 MPH. He then pulled off the road and called 911. (Caruso: A826-A833, A847-A848)

Stephen Weber testified he called Newsday on Labor Day 2006, more than a year after this accident and a few days before this trial began, after seeing a photo of

the accident in the newspaper. He then called police and told them that on July 2, 2005, he was driving his motorcycle in the Meadowbrook Parkway's northbound left lane when he noticed a pick up driving on the wrong side of the road – going northbound in the southbound lanes (on the other side of the road). Weber said he did not look at his speedometer but estimated they were both going about 70 MPH. He further testified that the pick up did not slow down and was not drifting. He could see the driver looking forward with both hands on the wheel. He stayed next to the pick up for 5-7 seconds until the guardrail ended, and then moved to the center lane. He tried to make a plan to warn the driver who he realized may not know he was on the wrong side of the road but lost sight of the truck because of the bushes in the center median just before the Babylon Turnpike overpass. Two seconds later, he heard a loud screech and bang. (Weber: A859-A865, A869-A871, A876-A877, A881-A883, A887, A950)

Steed Davidson was driving on the Meadowbrook Parkway at 2 a.m. on July 2, 2005, in the center lane when a limousine passed him in the left lane. He was traveling at 50-55 MPH and the limousine was going 55-60. Soon after, he saw headlights 50-75 feet ahead in the left lane coming in his direction. The oncoming car hit the limousine head on in the left lane. When the vehicles hit, the limousine came into the center lane and struck his car causing it to spin around. He checked his

passengers and then got out of his car and walked to the crash scene and called 911. (Davidson: A982-A986, A989-A991, A1013-A1014)

Joshua Zigman became friends with Mr. Heidgen after they met while attending a training class in November 2004 at New York Life Insurance. He described himself as Mr. Heidgen's closest friend in New York and said that he had never seen him in a bad mood. He described him as an "upbeat, happy person". (Zigman: A1025-A1026, A1043, A1058)

On July 1, 2005, Zigman attended a party at Amanda Goldman's house. Mr. Heidgen called at about 11:15 p.m. for directions from the Meadowbrook Parkway because he was lost and then arrived fifteen minutes later in a happy, upbeat, good mood. They spoke at the party and Mr. Heidgen was happy because he had been flirting with a bartender at the House of Brews for a couple of weeks and she gave him her phone number earlier that day. They also discussed their plans for the holiday weekend including a July 4th barbeque which Mr. Heidgen was excited about. He saw Mr. Heidgen drink three beers. (Zigman: A1035, A1047-A1049, A1052, A1084-A1087)

While in jail awaiting trial, Mr. Heidgen wrote Zigman a letter in which he said that he had not spoken with Lindsay on July 1st and lied to police because he thought he had hit a tree or the median and he wanted to protect their friends Amanda and

Justin Goldman. He said the bottle of Scotch on top of his refrigerator had been empty for months which Zigman testified he recalled seeing. He also said he had no bills except student loans and that his grandmother had left him money when she died which she wanted him to use to buy real estate. Finally, he said he used lines from the movies Ocean's Eleven and Pulp Fiction during his conversation with police which they were now trying to use against him even though he told them three times he was not trying to hurt himself. In particular, Mr. Heidgen quoted the line "I was upset. I fell into a self-destructive pattern." Zigman added that Mr. Heidgen often quoted movies. (Zigman: A1060-A1070, A1074)

Daniel Arana, declared an expert in forensic genetics by the court, testified that on September 20, 2006, he received a sealed blood kit from Inv. Harris containing two tubes. The seal of one of the tubes was intact and the other had been broken and had clear tape over it to reseal it. He took a sample from each tube and submitted it for DNA typing and then re-sealed the tubes and returned them to the kit which he re-sealed. (Arana: A1152, A156-A157, A1160, A1162)

On September 22, 2006, Arana received a blood kit from Inv. Mickoliger containing two blood tubes. He took samples from each tube which he submitted for DNA typing. He then resealed the tubes and gave them to another analyst to perform tests to verify the results. He compared the DNA profiles of the blood taken from Mr.

Heidgen on September 22nd with the blood in the kit he was given on September 20th and determined they were identical. (Arana: A1163, A1166, A1173)

Forensic toxicologist Lisa Lindenthaler was then re-called and testified that on July 5, 2005, she performed a blood alcohol test on the blood in the kit and determined the blood alcohol content was .28% ethyl alcohol by weight. (Lindenthaler: A1198-A1200, A1206)

Dr. William Closson, the director of toxicology at Bendiner and Schlesinger Laboratories, was declared an expert in forensic toxicology by the court. Dr. Closson, who was paid by the DA, testified that he was given documents about blood testing performed by Lisa Lindenthaler and determined that she performed the tests in a scientifically valid manner. (Closson: A1238-A1241)

Dr. Closson then explained how alcohol is absorbed into the blood and described alcohol as a central nervous system depressant that acts like an anaesthetic. He also described how alcohol effects the brain's ability to process information and its effect on a person's psychomotor skills. (Closson: A1243-A1244)

When asked a hypothetical question regarding the effects on a man with a .28 BAC, Dr. Closson responded that he would likely have difficulty processing stimuli, thinking, vision, ability to track an object across a field of vision (described as "tunnel vision" which makes a person stare straight ahead), peripheral vision, divided

attention activity (ability to perform multiple tasks simultaneously) and reaction time. Dr. Closson added that an intoxicated person may have a reduced inhibition and disregard risks which can cause their judgment to be clouded which can lead them to drink even more and have difficulty processing directions especially in an unfamiliar environment. (Closson: A1247-A1249, A1281, A1284)

Finally, Dr. Closson estimated that based on studies of average people, a .28 BAC means that a person had fourteen drinks in his system. (Closson: A1261-A1263)

## II.   **The Defense Case**

Joseph Foster, a friend of Mr. Heidgen's for twenty years, testified that they met while attending Catholic school in Little Rock, Arkansas. Foster, who still lives in Arkansas, testified that after Mr. Heidgen moved to New York, they spoke about once a week and that Mr. Heidgen often quoted movies. Finally, Foster recalled that he and his fiancé came to New York on December 31, 2004 and stayed in Mr. Heidgen's apartment. While there, he took some photos, one of which depicted what appeared to be an empty Scotch bottle. (Foster: A1111-A1117, T.1997-98)

Burke Morledge testified that he met and became close friends with Mr. Heidgen while they were high school seniors in Little Rock. After Mr. Heidgen moved to New York in 2004, they kept in touch and spoke a couple of times a month. Mr. Heidgen called him on July 1, 2005 at about 5:30 from a bar to tell him that he

ran into someone from Little Rock and asked if he knew the person. He described Mr. Heidgen, who was planning a trip to Little Rock in a few weeks, as jovial and happy during their conversation. (Morledge: A1135-A1136)

Mr. Heidgen's mother, Margot Aponte, testified that her son moved to New York in October 2004 from Arkansas shortly after he graduated from the University of Mississippi. Mrs. Aponte married Victor Aponte in April 2005 in a small civil ceremony that her son was unable to attend because he had plans to go on a pre-paid fishing trip with a friend who was getting married. Although the People made much of her son missing the wedding, Mrs. Aponte explained that he never expressed any concern about her marriage and when he returned from his fishing trip, he cooked and served them a dinner to celebrate their marriage. She added that he was very happy for them and spent time with her new husband. (Aponte: A1306-A1309, A1336)

When asked about her son's attitude toward money and his career, Mrs. Aponte explained that he was never worried about making money and being successful. She described him as a very optimistic and smart young man who felt successful. She also testified that he liked his job and the people he was working with and was generally having a good time and enjoying his life in New York. With respect to his financial situation, Mrs. Aponte explained that she did not charge him rent to live in her house. She also testified that his father was helping him with his bills including his car

payment, insurance and student loans and he had inherited $20,000 when his grandmother recently passed away. (Aponte: A1312, A1322, A1330-A1335)

NYS Police Sgt. Scott Crawford, of the NYS Police accident reconstructionist unit, testified that on July 2, 2005, he was assigned to perform an accident reconstruction on the Meadowbrook Parkway. He arrived at the scene at approximately 2:52 a.m. and walked around to observe any evidence. He then documented his findings with a total work station using an electronic laser to measure distances and angles which were used to create a forensic mapping of the scene. (Crawford: A1346-A1352)

After recording the measurements, Sgt. Crawford analyzed the actual collision by performing a reconstruction of the accident. As a result, he reached conclusions which he memorialized in a report dated January 13, 2006 which was turned over to the District Attorney. (Crawford: A1353-A1354)

Sgt. Crawford was then asked by defense counsel to describe his training and experience for the jury. Following his detailed questioning regarding Sgt. Crawford's experience and training, defense counsel asked the court to declare Crawford an expert in accident reconstruction. This was followed by *voir dire* examination by the People during which Crawford said "technically" he is not an expert in angular momentum (the type of analysis he used) or comfortable with it because "There is

usually too many variables in it". (Crawford: A1354-A1355, A1359-A1362)

Following the prosecution's *voir dire* after which she objected to the declaration of the police witness as an expert, the court asked Crawford if he had ever been qualified as an expert to which he replied he had not. Oral argument was then heard by the court after which he sustained the People's objection thus ending the defense examination of the witness. (A1362, A1368)

Steven Schneider, declared by the court to be an expert in professional engineering specializing in accident reconstruction and highway safety design, was retained by the defense to perform an accident reconstruction and review the safety of the highway's design. In furtherance of that effort, Mr. Schneider reviewed the drive cam, videos and police reports and made several visits to the site of the accident. (Schneider: A1378)

Schneider performed an analysis of the speeds the vehicles were traveling at the time of the accident. Using the GPS report and drive cam video, Schneider determined to a reasonable degree of scientific certainty that the limousine was traveling at 62 MPH eight seconds before the crash and 49 MPH at the time of impact. He then determined the speed of the pick up using two different types of analysis, linear momentum and the time-distance formula. Using the linear momentum formula, Schneider determined that the pick up was traveling at 33 MPH

at the time of impact. And, using the time-distance formula, he determined that the pick up was going 38 MPH at impact. (Schneider: A1408-A1409, A1416, A1427-A1428)

## III.   <u>Verdict and Sentencing</u>

On October 17, 2006, the jury convicted Mr. Heidgen of two counts of Murder in the Second Degree; three counts of Assault in the First Degree; and two counts of Operating a Vehicle While Under the Influence of Alcohol (T.2678-80). On February 28, 2007, Mr. Heidgen was sentenced to an indeterminate term of imprisonment of 18 years to life. (S.138)

## IV.   <u>The Decision of the Appellate Division, Second Department</u>

The Appellate Division found that, viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient to support the defendant's convictions of depraved indifference murder and assault in the first degree. In so holding, the majority pointed to the following facts which they say support a finding of depraved indifference: (1) 15-30 minutes before the collision, Mr. Heidgen, although obviously intoxicated remained steady on his feet and held conversations with friends at a party without slurring his speech; (2) drivers on the Meadowbrook parkway testified Mr. Heidgen maintained a steady speed, successfully negotiated curves of the parkway and stayed in his lane of travel except in those

27

instances when he "apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the pickup truck"; (3) for the approximately 2.5 miles  Mr. Heidgen was traveling the wrong way, he passed 'wrong way' signs, the back side of highway signs, and at least five sets of headlights shining directly at him; (4)  Mr. Heidgen was confronted with a horn blaring three times and the noise of a loud motorcycle on the other side of the median keeping pace with him in the same direction; and (5) Mr. Heidgen's statement to police while at the hospital that he was in "self-destruct" mode. People v. Heidgen, 87 A.D.3d at 1021-22.

Justice Cohen dissented, finding that "there is scant, if any, evidence from which a jury could reasonably infer that the defendant possessed the *mens rea* required to convict the defendant of a depraved indifference crime. Id. at 1034.

The only other issue addressed by the Appellate Division was the issue with regard to the jury's misconduct. The court held that the evidence adduced at the §330.30 hearing failed to establish Mr. Heidgen's claim of juror misconduct because one of the jurors testified at the hearing that

> another of the jurors stated during deliberation that the defendant has 'a prior DWI' when he was in college. However, upon hearing that information, that juror did not immediately change her vote from a conviction for manslaughter to a conviction for murder. She stated that the information had an influence on her, but that it was not the only influence, even though in a statement she provided

28

to the prosecution, she denied that the information had any
influence on her vote.

Id. at 1026.

The Appellate Division majority further held that the trial court did not err in
limiting the scope of the hearing and refusing to address the issue regarding the jury's
consideration of the jail time Mr. Heidgen faced if convicted of manslaughter as
opposed to murder "because the evidence submitted with the motion did not
demonstrate that the jury's determination of guilt or innocence was affected by any
such consideration." Id. at 1026-27.

The Court held that the remaining issues were without merit. Id. at 1027.

**ARGUMENT**

**POINT I.**

**THE PEOPLE FAILED AS A MATTER OF LAW TO PROVE MARTIN HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE DOUBT.**

Mr. Heidgen contends that, as a matter of law, the People's evidence was not legally sufficient to establish beyond a reasonable doubt that he acted with the *mens rea* of depraved indifference. Following a jury trial, Mr. Heidgen was convicted of two counts of Murder in the Second Degree [P.L.§125.25(2)], and three counts of Assault in the First Degree [P.L.§120.10(3)], both of which require proof that he acted with a depraved indifference to human life. However, even viewing the evidence in the light most favorable to the People as we are required to do, and contrary to the Appellate Division, Second Department's unsupported decision affirming his conviction, the evidence that Mr. Heidgen acted with a culpable mental state of depraved indifference when his blood alcohol level was, according to the People, a .28, simply did not rise to the level of proof beyond a reasonable doubt. The evidence did not show that Mr. Heidgen acted with a mental state that was "at least as morally reprehensible as intentional murder [People v. Suarez, 6 N.Y.3d 202 (2005)], or "so wanton, so deficient in a moral sense of concern, so devoid of regard

30

for the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another." People v. Payne, 3 N.Y.3d 266, 271 (2004). As a result, the convictions on these counts should be vacated and the indictment dismissed.

## I.   PROCEDURAL BACKGROUND

Mr. Heidgen gave the trial court every opportunity to remedy this issue by presenting three pre-trial motions to dismiss the depraved indifference charges. Each of those requests was denied by the courts. And the court was given yet another opportunity to dismiss the depraved indifference counts at the end of the People's case upon defense counsel's motion to dismiss. There, defense counsel argued:

> Based upon the New York Court of Appeals case that recently decided in People versus Feingold, wherein the Court of Appeals has established a new standard where the district attorney must prove beyond a reasonable doubt the state of mind, not the surrounding circumstances, but the state of mind of an individual acted in a depraved indifference to human life.
>
> I believe that the trial evidence that has been presented in this case by the district attorney's office has failed, and is not legally sufficient to sustain that charge as the law has recently been promulgated by the New York Court of Appeals in Feingold.

That request was denied (A1303-A1304).

Finally, after trial, in his written C.P.L.§330.30 motion, Mr. Heidgen gave the

trial court a final opportunity to cure the error but the he denied that motion as well.

On direct appeal, the Appellate Division held that, viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient to support the defendant's convictions of depraved indifference murder and assault in the first degree. In so holding, the majority pointed to the following facts which they say support a finding of depraved indifference: (1) 15-30 minutes before the collision, Mr. Heidgen, although obviously intoxicated [a .28 BAC] remained steady on his feet and held conversations with friends at a party without slurring his speech; (2) drivers on the Meadowbrook parkway testified Mr. Heidgen maintained a steady speed, successfully negotiated curves of the parkway and stayed in his lane of travel except in those instances when he "apparently tracked the headlights of the oncoming vehicles as they attempted to avoid" him; (3) for the approximately 2.5 miles Mr. Heidgen was traveling the wrong way he passed 'wrong way' signs, the back side of highway signs and at least five sets of headlights shining directly at him; (4) Mr. Heidgen was confronted with a horn blaring three times and the noise of a loud motorcycle on the other side of the median keeping pace with him in the same direction; and (5) Mr. Heidgen's statement to police while at the hospital that he was in "self-destruct" mode. People v. Heidgen, 87 A.D.3d at 1021-22.

Justice Jeffrey A. Cohen dissented, finding that "there is scant, if any, evidence

from which a jury could reasonably infer that the defendant possessed the *mens rea* required to convict the defendant of a depraved indifference crime". Id. at 1034.

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   *Penal Law Statutes*

Murder in the Second Degree, depraved indifference murder, requires the People to prove that "under the circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person". P.L.§125.25(2).

Assault in the First Degree requires proof that "under circumstances evincing a depraved indifference to human life, [the defendant] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person." P.L.§120.10(3).

### B.   *Standard of Review of Sufficiency of the Evidence Claims*

The standard for reviewing the legal sufficiency of evidence in a criminal case is the same under both state and federal law. It is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'." People v. Contes, 60 N.Y.2d 620, 621 (1983) *quoting* Jackson v. Virginia, 443 U.S. 307 (1979).

C.  *In Accordance with People v. Feingold, Depraved Indifference Is a Mental State*

Up until this Court's decision in <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006)[3], the New York courts were following the formulation developed in <u>People v. Sanchez</u>, 98 N.Y.2d 373 (2002) and <u>People v. Register</u>, 60 N.Y.2d 270 (1983), wherein the court held that depraved indifference referred to the "factual setting in which the risk creating conduct must occur" and advocated an objective analysis of the conduct. <u>Id.</u> at 278. What came to be known as the "<u>Register</u>/<u>Sanchez</u> formulation" was no longer in effect once this Court decided <u>Feingold</u> wherein this Court ruled that "depraved indifference to human life is a culpable mental state" requiring juries to look into defendants' minds to determine whether, at the time of the alleged crime, they had the *mens rea* of depraved indifference. In this landmark decision, the Court did away with <u>Register</u>'s purely objective standard replacing it with the requirement that, in analyzing a defendant's conduct, the trier of fact is now required to examine a defendant's mind, not just the objective circumstances of the conduct.

Even before <u>Feingold</u>, in <u>People v. Suarez</u> this Court ruled that depraved indifference murder should only be charged in "a small, finite or rare category" of

---

[3] While the charge in <u>Feingold</u> was Reckless Endangerment [P.L.§120.25], this Court explicitly ruled "the term 'depraved indifference' has the same meaning in both the depraved indifference murder statute and the reckless endangerment statute." <u>People v. Feingold</u>, 7 N.Y.3d at 294.

34

"unusual" cases and made it clear that

> depraved indifference is best understood as an utter disregard for the value of human life – a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy" as to render the actor as culpable as one whose conscious objective is to kill.

People v. Suarez, 6 N.Y.3d at 214-15.

The Suarez Court also provided the "quintessential examples" of conduct which would appropriately be charged as depraved indifference murder including: firing into a crowd, driving an automobile along a crowded sidewalk at a high speed, opening the lion's cage at the zoo, placing a time bomb in a public place, poisoning a well from which people draw water, opening a drawbridge as a train is about to pass over it, and dropping stones from an overpass onto a busy highway. Id. Conspicuously absent from this list is any case involving a defendant committing a crime while highly intoxicated and, even more notably, there is no case cited involving driving while intoxicated. That omission is obviously the result of the Court's intention to exclude driving while intoxicated from the specific list of "rare" and "unusual" cases it wished to hold up as examples of depraved indifference crimes

even where the end result is the tragic loss of life. The list of "quintessential examples" included only sober acts committed by defendants who consciously disregarded the risks presented by their conduct. This was a deliberate omission by the Court which did not intend to transform driving while intoxicated, even where a fatality is involved, into depraved indifference murder.

## III.   **PRESERVATION**

In the Appellate Division below, the People argued that the issue regarding their failure to prove Mr. Heidgen's guilt beyond a reasonable doubt was not preserved for appellate review because defense counsel failed to renew his motion to dismiss after the defense case.

The Appellate Division disagreed and correctly held that the issue was preserved for review. Without explaining its holding, the court cited its own decisions in People v. Squires, 68 A.D.3d 900 (2d Dept.2009), People v. Briguette, 51 A.D.3d 939 (2d Dept. 2008) and People v. Mendez, 34 A.D.3d 697 (2d Dept. 2006). In each of those cases, the court held that, even though no motion to dismiss was made at the end of the defense case, the sufficiency of the evidence arguments had not been waived where witnesses called by the defense did not supply evidence of guilt. Those cases are all in line with this Court's holding in People v. Soto, 8 A.D.3d 683, 684 (2d Dept. 2004) in which, citing People v. Hines, 97 N.Y.2d 56 (2001), this Court held

that, when the defendant's motion to dismiss at the close of the People's case is denied, and the defendant presents witnesses whose testimony supplies additional evidence of guilt, the defendant should re-new his motion to dismiss at the close of the defense case. And, this Court has defined "additional evidence of guilt" as evidence which could unintentionally "fill a gap in the prosecution's proof". Id. at 60. As obviously recognized by the Appellate Division, here no additional evidence of "guilt" was presented by the defense. Rather, the witnesses called by the defense were two of Mr. Heidgen's friends from Arkansas (not in New York on the night of the accident), his mother, Sgt. Crawford (the accident reconstructionist whose testimony was cut short by the court's refusal to declare him an expert) and Stephen Schneider (an expert accident reconstructionist hired by the defense). A review of all of this testimony reveals that the witnesses did not fill in any gaps in the People's case so a second motion to dismiss was not required after the defense case concluded.

In addition, this issue is preserved by virtue of the defense's post-trial motion to dismiss. A review of the record reveals that at the end of the People's case, defense counsel made a detailed motion to dismiss arguing, *inter alia*, that, in accordance with Feingold, the People failed to prove Mr. Heidgen acted with depraved indifference. Then, immediately after the defense rested its case, the following occurred:

THE COURT:     Any motions?

37

> MR. LAMAGNA:  Judge, this is the time that we want to do the issue that I had brought up in chambers.
>
> THE COURT:      But I'm speaking in terms of other types of motions. Are you reserving?
>
> MR. LAMAGNA: I'm reserving.

(A1528). That colloquy clearly demonstrates that the trial court was referring to a motion for a trial order of dismissal which he offered the defense the opportunity to reserve until after the jury's verdict and defense counsel took him up on that offer and made his argument in his C.P.L.§330.30 motion. Thus, although defense counsel did not repeat the detailed motion he had made earlier at the conclusion of his own case, he, at the offer of the court, reserved the right to do so at a later time.

Reserving on a motion is a practice recognized by the C.P.L. and regularly engaged in at trial. C.P.L.§290.10(1) states:

> At the conclusion of the people's case or at the conclusion of all the evidence the court may... upon motion of the defendant (a)issue a 'trial order of dismissal'...upon the ground that the trial evidence is not legally sufficient to establish the offense charged therein... or (b)reserve decision on the motion until after the verdict..."

Since the statute makes it clear that the motion can be made at the end of the People's case *or* after all the evidence is in, reserving the motion at the offering of the court should render the issue preserved for appellate review.

38

In <u>People v. Payne</u>, the trial court reserved on a motion to dismiss at the close of the People's case which was not renewed after the defense case. The Court held

> Where... the court has reserved decision, the defendant has preserved a claim of insufficiency, and the trial court would then rule on the CPL 290.10 motion as if the motion were made at the close of all the evidence. We decline to expand <u>Hines</u> and elevate preservation to a formality that would bar an appeal even though the trial court, aware that the motion was pending, had a full opportunity to review the issue in question.

<u>People v. Payne</u>, 3 N.Y.3d 266, 273. The same theory should apply here where the court prompted defense counsel to reserve his motion after the defense case.

Moreover what is important here is that the court was on notice that the defense was contending the People failed to meet their burden of proof. The court's suggestion to counsel that he reserve the motion indicated he was aware of the defense's position that the People's case should be dismissed for failure to prove guilt beyond a reasonable doubt which, after all, is the primary purpose underlying the preservation requirement. <u>See</u> <u>generally</u> <u>People v. Williams</u>, 5 N.Y.3d 732 (2005).

However, should this Court find the issue was not preserved for appellate review, Mr. Heidgen requests that the Court review the issue in the interest of justice. This is not a depraved indifference murder and the failure to review the issue because of a technicality where the court was clearly aware of the issue and, indeed prompted

39

the defense to reserve the motion, would result in a gross miscarriage of justice. Mr. Heidgen has been convicted of the wrong crime and comes before this Court asking the Court to right the wrong.

## IV.   ANALYSIS

The due process clauses of both the State and Federal Constitutions require the People to establish each and every element of an offense charged beyond a reasonable doubt. U.S. Const., Amend XIV; N.Y. Const., Art. I, §6. And, since the Feingold Court established that "depraved indifference to human life is a culpable mental state" [People v. Feingold, 7 N.Y.3d at 294], the People were required to prove that Mr. Heidgen acted with that mental state. Their failure to do amounts to a constitutional violation requiring reversal of his conviction.

Simply stated, the facts of this case do not rise to the level of what this Court now requires to make out a *prima facie* case of depraved indifference murder.[4] That is, he did not exhibit the culpable mental state equivalent to "shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage at the zoo." Id. at 293, *quoting* People v. Payne, 3 N.Y.3d at 272. These examples involve intentional acts designed to create a great danger of injury or death even though the

---

[4] While the arguments here are focused on the charges of depraved indifference murder, this claim pertains to all counts involving depraved indifference.

perpetrator may not have had the specific intent to cause such injury or death. As Justice Belen noted in his dissent in People v. McPherson, 89 A.D.3d 752, 765 (2d Dept. 2011), "in general, a defendant who possesses the *mens rea* of depraved indifference intends to commit the act that results in the death or injury of another person, but is depravedly indifferent to the grave risk of death or injury to others as a consequence of his or her conduct..." There was no evidence that Mr. Heidgen had such intent to drive on the wrong side of the road or to create or cause great danger of injury or death. Absent proof that Mr. Heidgen intended to drive on the wrong side of the road and was suicidal, there is no way the People could have proved beyond a reasonable doubt that he acted with a depraved indifference to human life.

This Court in Feingold completely altered the standard for evaluating a defendant's conduct by holding that depraved indifference is "a culpable mental state" and requiring triers of fact to look into defendants' minds to determine if they acted with depraved indifference. And, although the "*mens rea* of depraved indifference can, like any other *mens rea*, be proved by circumstantial evidence," [People v. Feingold, 7 N.Y.3d at 296], the evidence at Mr. Heidgen's trial overwhelmingly pointed to his conduct being committed, not with depravity equivalent to intentional murder, but during a state of intoxication that negated the formation of the culpable mental state of depraved indifference. People v. Coon, 34

41

A.D.3d 869 (2006).

There is no dispute here that Mr. Heidgen was driving after he had been drinking and that tragically two people died and others were injured as a result. The defense conceded this at trial. However, Mr. Heidgen has consistently disputed the People's claim that his actions were committed with a depraved mind.

A.   *Does Intoxication Negate Depraved Indifference?*

In this case, the Court is presented with the question of whether the *mens rea* of depraved indifference can be negated by intoxication. While New York's Penal Law states that intoxication does not negate recklessness where the "person who creates such a risk but is unaware thereof <u>solely</u> by reason of voluntary intoxication" [P.L.§15.05(3)], the same cannot be said for depraved indifference. As the Appellate Division majority noted in this case, Judge Graffeo in her concurrence in <u>People v. Valencia</u> urged the Legislature "to address the question of whether there had been a change in the law given the shift from the 'objective circumstances' standard to the 'subjective culpable state of mind' standard set forth in <u>People v. Feingold</u>." <u>People v. Heidgen</u>, 87 A.D.3d at 1025-6 *citing* <u>People v. Valencia</u>, 14 N.Y.3d 927, 931 (2010). And in his dissent in this case, Justice Cohen noted that "[i]ntoxication is not a defense to a criminal charge" but also noted that "intoxication like a mitigating defense 'merely reduces the gravity of the offense by negating an element'.'" <u>People</u>

v. Heidgen, 87 A.D.3d at 1030 *citing* People v. Walton, 70 A.D.2d 871, 874 (2d Dept. 2010). Justice Cohen further noted that, since the shift was made to Feingold's subjective culpable state of mind standard of review, the *mens rea* for depraved mind murder is no longer merely recklessness and that, as a result, "at the very least, we must admit that without a *mens rea* of recklessness, the *statutory* prohibition contained in Penal Law §15.05(3) is no longer applicable (emphasis in original)." People v. Heidgen, 87 A.D.3d at 1030.

Furthermore, although this remains an open question in this Court [People v. Valencia, 14 N.Y.3d at 931] and the Second Department, [People v. Valencia, 58 A.D.3d 879, 880 (2d Dept. 2009)], other Appellate Divisions have answered this question in the affirmative. The Third Department, in People v. Coon, 34 A.D.3d 869, held that since the appellant, who while suffering from cocaine intoxication brought on by his voluntary use of crack cocaine, used a butcher knife to cut his victim's throat, "was too intoxicated to form a specific criminal intent, he also would be incapable of possessing the culpable mental state necessary to prove depraved indifference." The Fourth Department, in People v. Wimes, 49 A.D.3d 1286 (4th Dept. 2008), held that intoxication may negate depraved indifference. In addressing a challenge to the factual sufficiency of a plea allocution, that Court noted that "Although there had been testimony at trial that defendant was intoxicated at the time

of the incident, there was no mention of intoxication during the plea allocution, despite the fact that intoxication could have negated the element of depraved indifference in the crime to which defendant pleaded guilty". Id. at 1287.

As the People repeatedly argued to the jury, Mr. Heidgen was "deliberately drunk, a point 28 blood alcohol concentration; three and-a-half times the legal limit." (A1596, A1599). And the People's witness, Dr. Closson testified that hypothetically, a person with a .28 BAC has about 14 drinks in his body at that moment and made a conservative estimate that Mr. Heidgen had consumed at least 20 drinks (A585). That begs the question, if he was that drunk – a .28 – could he form the *mens rea* of depraved indifference? Other New York courts have said that he could not and Mr. Heidgen urges this Court to take the next step in line of Feingold cases and find that, given his extreme state of intoxication, he could not form the mental state of depraved indifference to human life.

B.    *The People's Proof Failed to Establish Depraved Indifference as a Matter of Law*

A review of this trial record reveals that, as a matter of law, the People's evidence was insufficient to establish Mr. Heidgen acted with a *mens rea* of depraved indifference to human life. While the consequences of his actions were tragic, and any argument made herein is not meant to minimize the tragedy, his mental state at the

44

time of the accident was not depraved indifference. In <u>Suarez</u>, this Court characterized conduct that evinced depraved indifference to human life as "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life and lives of others, and so blameworthy as to render the actor as culpable as one whose conscious objective is to kill" and added that such conduct will reflect "wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts". <u>People v. Suarez</u>, 6 N.Y.3d at 214. Despite the very tragic result here, to use any of those terms to describe Mr. Heidgen, who got lost while trying to drive himself home from an area with which he was not familiar, albeit in an intoxicated state, would be a gross exaggeration.

This Court has held that even where death results, you need something more than recklessness to establish depraved indifference and that something more just is not present here. And, the fact that there was a chance of death resulting from his actions, does not suffice to raise the charge from manslaughter to depraved indifference murder:

> Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been. Otherwise, manslaughter in the second degree would routinely and automatically become depraved indifference murder in as much as the victim (who was, after all, killed) was

> necessarily exposed to a grave or substantial risk of death. The critical statutory language that separates second-degree manslaughter from depraved indifference murder is the defendant's underlying depraved indifference. Circumstances evincing a depraved indifference to human life' are not established by recklessness coupled only with actions that carry even an inevitable risk of death.

People v. Suarez, 6 N.Y.3d at 213. That is precisely what happened here.

Moreover, if the *mens rea* of depraved indifference was meant to include those who get behind the wheel of a vehicle while intoxicated, then it would need to be charged in every DWI case and that is clearly not what the legislature or this Court intended as demonstrated by the creation of a new statute to address precisely this type of case.  As Justice Cohen noted in his dissent below:

> two years after this incident – only months following the defendant's conviction in 2007 – and, as indicated in the relevant bill jacket, at least partially in response to this matter, the Legislature defined the new crime of aggravated vehicular homicide, a class B felony punishable by an indeterminate prison sentence ranging from 8⅓ to 25 years. In enacting this new legislation, the Legislature, as justification, stressed the need to provide law enforcement officials and persecutors with the 'tools' necessary to charge and convict criminals who commit an offense involving driving while intoxicated that results in injury or death (internal citations omitted).

People v. Heidgen, 87 A.D.3d at 1034. As demonstrated by the enactment of this statute, the act of driving while intoxicated, even where there is a fatality, is not the

unique, rare or unusual case that this Court described in <u>Suarez</u> which is clear from the omission of this type of conduct from the Court's list of "quintessential examples" of depraved conduct. <u>People v. Suarez</u>, 6 N.Y.3d at 214. As defense counsel noted in his summation:

> This isn't a person who didn't care for the life or lives of others. This isn't a person who puts a bomb in Penn Station and doesn't care who gets killed. That is a depraved minded murderer. That is a person who doesn't care who dies. That's a kid who drank too much and was lost trying to get home.

(A1547).

In the case at bar, the theory of the People at trial and the Appellate Division's majority was essentially that Mr. Heidgen was suicidal – that he was so depressed about his life and angry with himself that he deliberately continued to drive on the wrong side of the road after realizing that he had gotten on the roadway going the wrong way, not caring about the danger he posed to those in his path. The People attempted to prove that Mr. Heidgen was so sick of his life that he ignored warnings he must have observed and continued to drive approximately 2½ miles on the wrong side of the Meadowbrook Parkway. The People were wrong and, despite their efforts to contort their evidence into what they needed it to be, they could not transform this tragic accident into depraved indifference murder.

According to the Appellate Division majority, the evidence supports a finding of depraved indifference to human life because Mr. Heidgen: (1) was at the Goldmans' party where, although intoxicated, he was steady on his feet and not slurring his speech 15-30 minutes before the accident; (2) told police he was in a "self-destruct" mode and depressed about his life; (3) maintained a steady speed and stayed in one lane of travel except when he tracked the headlights of oncoming vehicles as they attempted to avoid him; and (4) for the approximately 2½ miles he traveled, passed "wrong way" signs, the back side of highway signs, and at least five sets of headlights and tail lights on the other side of the road and disregarded a horn blaring and the noise from a motorcycle on the other side of the median keeping pace with him and traveling in the same direction. People v. Heidgen, 87 A.D.3d at 1021. They claim that those factors established depraved indifference as a matter of law. However, in coming to this conclusion, the majority conspicuously omitted the most powerful pieces of evidence and twisted others to attempt to transform what was a horribly tragic accident into a depraved indifference murder. In reality, a review of the record reveals that there was no evidence that Mr. Heidgen (1) was suicidal or even unhappy; (2) intentionally got onto the Meadowbrook Parkway going the wrong way; or (3) continued to drive in the wrong direction once he realized his error. Therefore, this conviction for depraved indifference murder and assault cannot stand.

48

### 1.   Mr. Heidgen's Level of Intoxication

In support of their theory that the People established depraved indifference beyond a reasonable doubt, the Appellate Division majority cites the fact that "15 to 30 minutes before the collision, the defendant, although intoxicated, remained steady on his feet and held conversations without slurring his speech". Id. According to the People, Mr. Heidgen's BAC was a .28. Despite the majority's efforts to argue that this level of intoxication is not relevant because he was steady on his feet and able to coherently speak with his friends, the effect of that high level of intoxication cannot be dismissed. As the People's expert witness Dr. Closson testified, a person with a .28 BAC would likely have difficulty processing stimuli, thinking, vision, ability to track an object across a field of vision (described as "tunnel vision" which makes a person stare straight ahead), peripheral vision, divided attention activity (ability to perform multiple tasks simultaneously) and reaction time. Dr. Closson added that an intoxicated person may have a reduced inhibition and disregard risks which can cause their judgment to be clouded which can lead them to drink even more and have difficulty processing directions especially in an unfamiliar environment. (Closson:A1247-A1249, A1281, A1284) Finally, Dr. Closson estimated that, based on studies of average people, a .28 BAC means that a person had 14 drinks in his system at that moment and made a conservative estimate that Mr. Heidgen had

consumed at least 20 drinks that day. (Closson: A1261-A1263) That is a tremendous amount of alcohol, the effect of which cannot be so easily dismissed just because Mr. Heidgen did not fall down or slur his words.

### 2. Mr. Heidgen Was Not Suicidal

In their quest to transform this tragic accident into depraved indifference murder, the prosecution and the Appellate Division majority claimed Mr. Heidgen was suicidal. However, although the People produced a large number of witnesses, only a very few of them gave any testimony that bore on the critical element of Mr. Heidgen's state of mind at the time of the accident and none of whom said that he was anything but happy that night and a far cry from suicidal. According to the parade of witnesses produced by the People, Mr. Heidgen began drinking the day before the accident (which occurred at about 2 a.m.) at approximately 4:30 p.m. at the House of Brews in Manhattan with his friend Greg Nizewitz. Nizewitz testified that while at the bar, they talked about sports and plans for the upcoming holiday weekend including a party at their friend Amanda Goldman's house (A719-A720, A726). Nizewitz described Mr. Heidgen as being in a good mood, happy, and excited about the upcoming weekend (A720). When asked whether he would describe Mr. Heidgen as depressed, he replied "not depressed" (A723). Nizewitz also testified that, as further evidence of the fact that he was looking forward and making plans for the

future, Mr. Heidgen asked for and got the telephone number of the bartender he had been flirting with at the bar (A726). And, while they were at that bar, Mr. Heidgen also called another friend Burt Morledge in Arkansas and discussed coming there for a visit in a few weeks. Morledge described Mr. Heidgen as "jovial, happy" during their conversation. (A1136) Those are not actions of a man planning to hurt himself and/or others. Those are the actions of a young man looking forward to a having fun with his friends that night and his future.

Later that evening, Mr. Heidgen attended a party at Amanda Goldman's home, arriving at approximately 11-11:30 p.m. after calling for directions. Partygoers described him as being in an upbeat, good mood, "pretty normal", perfectly happy, giggling and laughing and enjoying himself – hardly words you would use to describe a depraved mind murderer. (A757-A759, A768, A1046) Joshua Zigman testified that while at the party, they discussed plans for a July 4th barbeque, and Mr. Heidgen was bragging about getting a bartender's phone number earlier that day (A1048, A1086-A1087). Zigman even went so far as to say he was surprised that Mr. Heidgen would have told police that he was depressed because he knew him to be an "upbeat, happy person" who liked his job and had no problems with his apartment or finances (A971, A1093-A1096). In fact, none of the party guests testified that Mr. Heidgen was anything but happy and nothing they said about him even remotely alluded to him

51

being in a depraved state of mind that night.

Witnesses recalled that Mr. Heidgen left the party at about 1:30 a.m. and, although the prosecution made much of the fact that he did not make long goodbyes to the friends he planned to see the next day [A1621], nothing at all indicated he left depressed or angry, much less that he was suicidal. But, in their attempt to retrofit this case into a depraved indifference murder, the People tried to portray Mr. Heidgen as a depressed young man who did not like his job, was upset that his mother remarried and moved to Central Islip, had financial problems, and was upset about an ex-girlfriend in Arkansas. And, in order to contradict their own witnesses who testified that he was happy that night, and attack Mr. Heidgen's character, the People claimed he was fooling them with a mask of happiness: "Whatever rage or depression the defendant was in that night, and that rage and depression that he was studiously hiding from his friends, behind one of those social masks..." (A1598). Indeed, if Mr. Heidgen was holed up in his apartment, not speaking with anyone and drinking dangerous amounts of alcohol by himself and not in a social setting, then that would be the picture of a man about whom a valid claim of depression and self-destruction could be made. That is not the picture of Mr. Heidgen that all of the witnesses who saw him on the day of the accident described. And any attempt by the People to draw their own picture of him as such is based purely on speculation and the fictional tale

52

they have spun in a desperate attempt to transform a tragic accident into depraved indifference murder. Unfortunately for Mr. Heidgen, the Appellate Division majority believed that fictional tale and affirmed Mr. Heidgen's conviction.

Despite his obviously happy demeanor, the Appellate Division majority latched onto Mr. Heidgen's statement to police made ten hours after the accident that he had been home until 2 a.m., had a fight with his ex-girlfriend, got into "a self destruct mode", drank a fifth of scotch and had financial problems (A538). The majority, like the People had done at trial, treated this as a declaration by Mr. Heidgen that he was suicidal and did not care what happened to him or anyone else. However, each of those statements was refuted by the People's own witnesses and evidence. For example, we know that he was not drinking alone at home - he was drinking at a bar in New York City in the afternoon and then at a party at the Goldmans' house in the evening. As for his ex-girlfriend, there was no evidence in the phone records that Mr. Heidgen even spoke with her that day, much less fought with her.[5] In fact, he was obviously not sitting around pining over his ex-girlfriend who lived more than 1200 miles away in Little Rock, Arkansas. Quite to the contrary, he was out at bars, having

---

[5] It is noteworthy that when defense counsel offered the phone records as evidence, the prosecution objected to their admission (A572-A574). This is further evidence of the People's attempt to keep up their portrayal of Mr. Heidgen as depressed and diminish the defense theory that he was trying to get home.

fun and going to parties with his new group of friends and getting phone numbers from women including a bartender that very night. As for the financial problems, while it is true that he may not have been making a fortune, he was only 23-years old and had a good, steady job in New York City which his friend/co-worker and mother testified he liked (A1093, A1335). His mother further testified that her son was not paying rent to live in her house and his father was paying his car loan, car insurance, student loan and cell phone bill. Thus, with no bills to pay, his salary was essentially discretionary income. And, in addition, he had recently inherited $20,000 from his grandmother (A1312, A1344). With regard to the empty scotch bottle on top of his refrigerator, there was testimony that it had been there for months.[6] In short, all of the reasons the prosecution gave for Mr. Heidgen not caring about his actions or their consequences that night were refuted by the trial testimony and evidence. It is also worth noting that when Mr. Heidgen's apartment was searched after the accident, a hunting rifle was found [Harris: A624] which, if Mr. Heidgen wanted to kill himself would have access to a weapon that could have done the job.

---

[6] Two witnesses supported Mr. Heidgen's explanation that the bottle had been on top of the refrigerator for months. Zigman testified he was in the apartment and recalled Mr. Heidgen had pointed it out to him and said he liked the old bottle. And, Foster recalled seeing the bottle on December 31st during a visit from Arkansas. The bottle, which appeared empty, was in a photograph Foster had taken during that visit. (A1103, A1116)

The majority's error in relying on this statement to police to establish that Mr. Heidgen was suicidal is also evident when the statement is viewed in conjunction with a letter he wrote to his friend Josh Zigman ten months after the accident while in jail awaiting trial. In that letter, which was introduced into evidence by the People, Mr. Heidgen explained that: (1) in his statement after the accident, his objective was to protect his friends Amanda and Justin Goldman whose house he had been drinking at that evening because loyalty is very important to him; (2) the scotch bottle on top of his refrigerator had been empty for months; (3) he never spoke with his ex-girlfriend on July 1st so he did not argue with her; (4) he had no financial problems; and (5) in his statement to police, he quoted lines from the movies Ocean's Eleven and Pulp Fiction – the lines from Ocean's Eleven being: "I was upset I fell into a self-destructive pattern" – which police were now trying to use against him even though he told them he was not trying to hurt himself. At trial, Zigman and Foster both testified that quoting movies is something that Mr. Heidgen is notorious for doing (A1069-A1070, A1074, A1103, A1117).

The Appellate Division majority discounted this letter claiming that, because Mr. Heidgen admitted in the letter that he lied to police, it should not be believed. They claimed that the letter just "confirmed the accuracy of the police officers' testimony concerning the statements that he made to them." People v. Heidgen, 87

A.D.3d at 1023. However, the majority conspicuously neglected to mention a critical part of that interrogation which is that three times the police asked Mr. Heidgen if he was trying to hurt himself and all three times he unequivocally replied that he was not, once emphatically stating "No. Not under any circumstances" and the other two times replying: "No, never before" and "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." (A538-A539, A544, A600). Those are not the answers of a man so despondent that he wanted to end his life. Those are the definitive answers of a man who was headed home, which is where he told police he was going when the accident occurred (A539-A540, A599); See e.g. People v. Dingle, 30 A.D.3d 1121 (1st Dept. 2006). Any confusion about where he was going should end right there. Thus, since the majority cannot reconcile the fact that, although he said he was in self-destruct mode, he also said that he was not trying to kill himself, they completely ignored his forceful rejections of the notion that he was suicidal. The majority cannot have it both ways. They cannot on the one hand say that the letter proves the accuracy of the statements to police but then leave out the most critical part of those statements.

The bottom line is that if there was any ambiguity in his statements to police including his statement that he was in "self destruct mode", that ambiguity was cleared up by his three unambiguous statements that he was not trying to hurt himself

and his explanation that he was trying to get home. Simply stated, there is absolutely nothing in Mr. Heidgen's statement to police that demonstrates or would infer the "uncommon brutality and inhumane cruelty required for depraved indifference murder". People v. Suarez, 6 N.Y.3d at 215. And despite the District Attorney's best efforts to turn this into one, this was not a depraved indifference murder. This was a happy, young man who had been out having fun, trying to get himself home at the end of the night.

Also ignored by the majority is the fact that everything in Mr. Heidgen's letter was supported by the trial evidence. As for his objective being to protect their friends Amanda and Justin Goldman whose house he had been drinking at that evening, this is obvious because he did not mention that he was at their house for a party when he was interrogated by police in the hospital. With regard to the scotch bottle, Zigman testified he was in Mr. Heidgen's apartment and recalled he had pointed it out and said he liked the old bottle. Foster also testified he recalled seeing the empty bottle during a New Years' visit from Arkansas. (A1103, A1116) As for his ex-girlfriend, the phone records revealed he had not spoken with her that day. As for the alleged financial problems, he had a good job which witnesses testified that he liked, he was not paying rent to live in his mother's house, his father was paying his car loan, car insurance, student loan and cell phone bills, and he recently inherited $20,000 from

his grandmother. (A1093, A1312, A1335, A1344) Finally, as for the movie quotes regarding "self-destruct mode", Zigman and Foster testified Mr. Heidgen was notorious for quoting movies (A1069-A1070, A1074, A1103, A1117). Thus, the Appellate Division majority's attempt to dismiss this letter as unreliable must fail as the People's own evidence at trial clearly points to its accuracy and reliability.

It is also worth noting that, at the time he was interrogated by police, Mr. Heidgen was not aware that two people had died in the accident. When the officers asked him what he hit with his truck, Mr. Heidgen said he thought he hit a tree or median and the officers did not bother to tell him what actually happened (A541-A542, A586). In fact, the officers even went so far as to tell Mr. Heidgen's mother that she should not tell her son what really happened. (A1322).  Had the officers been forthcoming with the actual consequences of the accident, the interrogation likely would have been much different and may never have happened at all.

### 3.    Mr. Heidgen's Speed on the Meadowbrook Parkway

According to the Appellate Division majority, another factor that established depraved indifference is that Mr. Heidgen "maintained a steady speed, successfully negotiated the curves of the parkway stayed within one lane of travel, except in those instances where the defendant apparently tracked the headlights of the oncoming vehicles as they attempted to avoid the pickup truck." People v. Heidgen, 87 A.D.3d

at 1021.

With regard to speed, the Appellate Division majority and the People relied on the testimony of the lay witnesses while discounting the testimony of the only expert to testify about speed. As recognized by the trial court, it was Mr. Heidgen who presented unrefuted, expert testimony regarding speed: "The People closed their case without putting in an indication of speed. The only indication of speed that has been presented from an expert point of view is by the defense" (T.2427). And that expert, Stephen Schneider, testified that he determined to a reasonable degree of engineering certainty that Mr. Heidgen's pickup truck was going 33 MPH at the time of impact under one calculation and 38 MPH using another type of analysis (A1409-A1410, A1416, A1423, A1427-A1430). And there was testimony by prosecution witness Caruso, the only driver to testify Mr. Heidgen passed him, that when he passed Mr. Heidgen about .8 of a mile before the accident, he was going about 70 MPH, not an uncommon highway speed. That would mean that, in that .8 of a mile between when Mr. Heidgen passed Caruso and the accident, Mr. Heidgen slowed down from 70 MPH to between 33 and 38 MPH.[7] That is the only speed determination that counts

---

[7] The Appellate Division inexplicably discounts Schneider's expert testimony in favor of the estimates of the drivers on the road because the expert came up with two different speed estimates using two different formulas. The Appellate Division had to do this because these speed estimates demonstrate that Mr. Heidgen was slowing down at the time of impact which destroys their theory that he was ignoring

because that drastic decrease in speed would indicate a person trying to fix his mistake, not a person with a depraved mind looking to hurt himself and/or others. Thus, the theory advocated by the People and the Appellate Division majority that Mr. Heidgen was speeding down the Meadowbrook Parkway, passing cars and signs warning him that he was on the wrong side of the road, not caring what damage he caused, is belied by the record which clearly indicates that he was slowing down when he struck the limousine. That fact negates a claim of depraved indifference and even recklessness. As defense counsel explained on summation, in slowing down Mr. Heidgen was "trying to self correct. He slowed down. What do you do when you are lost; you slow down and you look for signs." (A1565). In fact, he had been lost earlier on the way to Amanda Goldman's house and had called for directions and then called again at 1:45 a.m., shortly after leaving the party, likely for the same reason (A568-A569, A1084-A1085). Those are the indications of a man who is lost, not a depraved mind murderer.[8]

———————————————

the signs around him and continuing to drive the wrong way.

[8] The Second Department has held that evidence that a driver was slowing down where conditions warranted "is the antithesis of a depraved, as opposed to a reckless, state of mind." People v. Lazartes, 23 A.D.3d 400, 405 (2d Dept. 2005) (Court reversed depraved indifference murder conviction where defendant's speeding occurred on roadway designed to accommodate greater rates of speed than residential roads, at an hour where traffic conditions were lighter, the possibility of damage to pedestrians or residences was virtually non-existent, no contact occurred between

Because it does not jive with their theory of the case, the Appellate Division majority disregards the expert trial testimony that Mr. Heidgen was driving 33or 38 MPH depending on the type of formula used to calculate the speed. People v. Heidgen, 87 A.D.3d at 1024-5. Instead, they rely on the testimony of a motorcyclist driving on the opposite side of the road who estimated that he and Mr. Heidgen were going 70 MPH. And the People did the same thing at trial and in the court below. Because they did not like the expert's testimony that supported Mr. Heidgen's theory that this was an accident, they relied instead on testimony from lay witnesses driving on the Meadowbrook Parkway who claimed they estimated Mr. Heidgen's speed at between 65 and 80 MPH (A724, A789, A847, A871). However, according to Mr. Schneider, an accident reconstruction and highway safety design expert, based on many traffic studies, such civilian speed determinations "are highly inaccurate" and unreliable (A1378, A1444-A1445). Thus, reliance upon the testimony of these lay witnesses when a reliable expert testified to the contrary is misplaced.

It is also more than noteworthy that Mr. Schneider was not the only expert to

---

defendant's vehicle and other vehicles prior to the accident and defendant slowed when traffic warranted.); People v. Thacker, 166 A.D.2d 102, 108 (1st Dept. 1991) (Conviction for depraved indifference murder reversed where "although it was undoubtedly reckless for defendant to have consumed alcohol and to have neglected to apply his brake... these actions do not rise to the level of 'unmitigated wickedness' or 'extreme inhumanity' which characterizes depraved indifference").

reconstruct this accident. It was revealed that the People had several reports prepared with regard to speed but chose not to have any of the people who prepared those reports take the stand. And, although they admitted that a police expert, Scott Crawford, performed an accident reconstruction and speed analysis in which he determined that Mr. Heidgen was traveling at approximately 45 MPH at the time of impact, the People mysteriously chose not to put him on the stand and then blocked Mr. Heidgen from calling him by objecting to the defense request to qualify him as an expert, thus precluding his opinions from becoming part of the record. See infra at Point IV. It is obvious that they made the strategic decision not to call the officer and then to block the defense from doing so in an attempt to keep out his conclusions because they did not fit into the theory of their case. That is hardly the truth-seeking function a trial is supposed to serve.

Another claim with regard to speed made by the Appellate Division majority is that Mr. Heidgen was tracking the other vehicles on the road. They used variations of this word "track" four times in their opinion when a review of the record reveals that Mr. Heidgen did no such thing. According to the majority, the "defendant tracked the other vehicles when they changed lanes to avoid him" [People v. Heidgen, 87 A.D.3d at 1021-5]. That is not what happened and is certainly not what the evidence proved. What happened is that Mr. Heidgen, in his extremely intoxicated state, had

tunnel vision. That is what the People's own expert witness Dr. Closson explained

happens when a person drives after consuming the extremely large amount of alcohol

the People contended Mr. Heidgen did before driving:

> A:     ...A person who is under the influence of alcohol
> cannot perform those various activities [involved in driving
> a car] simultaneously, and those individuals tend to focus
> on one of those activities.
>
> If they are driving a car it may be focused on the
> steering wheel, or it may be focused on an object directly
> in front of them, or it may be focused on the accelerator
> pedal, but they can't effectively focus on all of those
> activities at the same time.
>
> Q:     Doctor, with respect to what you described as tunnel
> vision would it be fair to say that tunnel vision enables a
> person to see only the things directly in front of them?
>
> A:     Yes. They ignore everything to the sides.

(A1248-A1249). Thus, the People's own expert negates the claim that because he was

observed by their witnesses staring straight ahead and changing lanes in response to

seeing headlights that he was tracking the vehicles. Instead, it explains that what

happened was a reaction that resulted from the intoxication. Thus, any claim by the

Appellate Division majority that Mr. Heidgen was tracking the other cars is pure

speculation on their part and not at all supported by the evidence. Indeed, Justice

Cohen in his dissent noted that he

reject[ed] the majority's argument that he was 'tracking' headlights because he was suicidal, and conclude that such an interpretation arises from a misapprehension of the expert's testimony. Given the defendant's probable tunnel vision, his lane change to the limousine's was more likely a reaction to his observation of the headlights of Davidson's vehicle. Such an action in my opinion militates against the conclusion that the defendant acted with depraved indifference.

People v. Heidgen, 87 A.D.3d at 1033.

Moreover, it seems that if, for the sake of argument, the Appellate Division majority was correct and Mr. Heidgen was tracking the other vehicles, then doing so would be an intentional act, not a depraved one. In other words, if he was tracking other vehicles, knowing that a head-on collision would kill himself and the passengers of any vehicle he crashed into, then he was intending to cause death or injury which would be an example of an intentional murder. And there is absolutely no evidence that was the case. That is, there is no proof as to where Mr. Heidgen got onto the Parkway, no proof that he was intentionally driving in the wrong direction and no evidence that he was doing so because he was suicidal. Any claim that any of that is true is based on pure speculation.

Finally, it is more than noteworthy that when imposing a sentence of eighteen years to life, the trial court noted "I know that it is true that you didn't intend to take the lives of Stanley Rabinowitz and Katie Flynn" (S.136). This statement by the court

64

and the sentence he imposed demonstrate his belief that this was a tragic accident. It is doubtful that a judge would sentence a man to eighteen years to life rather than the statutory maximum sentence of twenty-five years to life if he believed that he had intended such harm.

        4.     Mr. Heidgen Did Not Ignore the Signs That He Was Driving on the Wrong Side of the Road

On direct appeal, the People's theory was that Mr. Heidgen was not depraved because he was driving drunk, but because "while under the influence of -- but conspicuously and demonstrably tolerant of -- alcohol, drove in the wrong direction on the parkway and then, when he was consciously aware that he was going the wrong way, took no action to avert the tragic consequences to innocent people in his way". Resp Br. at 29-30.[9] The Appellate Division agreed, claiming that Mr. Heidgen must have known he was traveling in the wrong direction because there were "wrong way" signs on the Parkway. However, while Mr. Heidgen does not contest that those signs were there, what the Appellate Division majority conveniently left out is that near the accident scene there is also a two-sided sign facing south that says "Norman J. Levy Memorial Parkway" so if you were driving the wrong way, you could read it. (A360-A361, A374, A376). Therefore, if he was able to read that sign, he would not

---

    [9] "Resp. Br." Refers to the Respondent's Brief filed by the People in the Appellate Division, Second Department.

have known he was going the wrong way. In fact, there was not a scintilla of evidence to prove that Mr. Heidgen knew he was driving the wrong way.

Another major flaw in the theory posited by the People and the Appellate Division majority is that they failed to prove he "consciously" drove in the wrong direction into oncoming traffic after becoming aware of his error. In fact, the evidence at trial refuted that claim. And, if the People's theory that consciously driving on the wrong side of the road and taking no action to avert the oncoming traffic demonstrates depraved indifference is true, then the converse must also be true. That is, then it must also be true that a driver who does not know he is driving on the wrong side of the road and slows down cannot be acting with depraved indifference. As Justice Belen noted in his dissent in People v. McPherson, 89 A.D.3d at 762:

> although several oncoming drivers swerved out of the
> defendant's path over the course of several miles, the
> People produced no evidence at trial which demonstrated,
> beyond a reasonable doubt, that the defendant understood
> that he was driving the wrong way down the parkway prior
> to the head-on collision, with utter disregard for the
> consequences, as might be evidenced with, for example,
> evidence that the defendant's vehicle continued on its
> course after colliding with an object or other vehicle.

Thus, given the evidence presented in this case, the People's theory that this was depraved indifference murder fails as a matter of law.

Next, the Appellate Division majority claims that Mr. Heidgen must have

66

known that he was going the wrong way and continued on anyway because he drove past cars without getting out of their way. The court is wrong and, not only is this claim not supported by the record, it is actually refuted by the record. First, there was testimony from prosecution witnesses Serwin, Weber and Sussingham that the road was empty when they saw Mr. Heidgen's truck [A811, A942, A973] so he would not have seen headlights coming toward him. And, of those drivers who passed him, only one was actually in close proximity to him. Serwin testified she pulled off the road onto the shoulder before the truck passed her (T1991). Sussingham testified he was all the way to the left approaching the exit ramp when the truck passed him (A967). Weber was on the other side of the road when he spotted Mr. Heidgen who he testified was looking straight ahead [A881] and did not even see him. The only driver who testified Mr. Heidgen passed him while on the road was Caruso who moved into the right lane as the truck passed him (A828-A831, A847-A848). Thus, the theory that Mr. Heidgen must have known he was going the wrong way and continued anyway is a tale created to support a depraved indifference charge when, in reality, the evidence showed Mr. Heidgen did not know he was driving the wrong way until approximately .08 of a mile before the accident and, when he did realize it, he dramatically reduced his speed (from 70-80 MPH according to the People's witnesses to 33-38 MPH according to unrefuted expert testimony) in an effort to self-correct.

67

If suicide was his mission, he surely would not have slowed down.

C.   *Recent Decisions of Note Regarding the Mens Rea of Depraved Indifference to Human Life*

The Appellate Division majority went to great lengths to distinguish this case from People v. Valencia,14 N.Y.3d 927 (2010). The majority wrote that Valencia does not apply here because (1) there was no evidence that Valencia tracked the other vehicles when they changed lanes to avoid him; (2) "the evidence here did not establish that the defendant was intoxicated to a degree of total oblivion or mania; (3) and there was evidence that the defendant's *mens rea* was formed when he continued to travel in the wrong direction on the Meadowbrook Parkway. People v. Heidgen, 87 A.D.3d at 1021-3. The majority was wrong about each of these factors.

First, as discussed in greater detail *supra*, there is no evidence that Mr. Heidgen tracked the other vehicles on the road. Any lane change he may have made was not to track the other vehicles but, rather, was a reaction to the headlights coming at him and his high level of intoxication. In other words, although it was the wrong reaction to move into the lane of the oncoming headlights as they changed lanes, it was the reaction of a man who was intoxicated and driving in an unfamiliar area. Just because it was the wrong reaction, does not, as the Appellate Division majority claims, mean that he was tracking the other vehicles. Second, the testimony at trial established that

Mr. Heidgen's BAC was .28 which is significantly higher than Valencia's BAC of .21. People v. Valencia, 14 N.Y.3d at 932. That large difference cannot be disregarded. Indeed, the testimony as to why they did not need Mr. Heidgen's consent to draw his blood at the hospital was that he was too intoxicated to consent – not that he was too injured. Third, also as discussed *supra*, there is no evidence that Mr. Heidgen ignored the signs that he was driving in the wrong direction and continued on anyway. In fact, Valencia traveled significantly longer than Mr. Heidgen – 3.9 miles – with plenty of indicators that he was traveling in the wrong direction[10] and, when told about the accident, even stated that he "didn't know" what had happened and "didn't care". Id. Therefore, all of the majority's reasons for distinguishing this case from Valencia are unsupported.

The majority also unsuccessfully attempted to distance Mr. Heidgen's case from People v. Prindle, 16 N.Y.3d 768 (2011) in which a sober driver who was afraid of being apprehended for the theft of a snowplow blade led police on a 2½ to 4 mile, high-speed chase while driving in and out of an oncoming lane of traffic and eventually crashing into another vehicle, killing the passenger. Interestingly, the only

_____

[10] "Along the way, [Valencia] passed five red–and–white wrong-way signs, seven large overhead exit signs that could not be read because he was approaching them from the opposite direction, and 61 other signs that could not be read because they were backwards for the defendant's direction of travel." People v. Valencia, 58 A.D.3d at 881.

distinguishing characteristic that the Appellate Division majority could come up with is the fact that <u>Prindle</u>, who was sober, was speeding in an attempt to avoid police at the time of his accident as opposed to Mr. Heidgen who they claim

> was not attempting to avoid the police... Rather, the evidence established that the defendant entered a divided highway against the direction of the "wrong way" signs, accelerated to and maintained a seed of 70 miles per hour, ignored numerous other obvious indicia that he was traveling the wrong way against traffic, and tracked oncoming vehicles that attempted to avoid his vehicle, all while he was in a self-described 'self-destructive mode'.

<u>People v. Heidgen</u>, 87 A.D.3d at 1024. Once again, that is not what the evidence at trial established. It is interesting that the majority completely omitted the fact that Prindle was sober when he engaged police (driving a car with its lights and sirens activated) in a 2½-to-4-mile chase, barreling through at least five red lights, repeatedly driving at high speeds and in the lanes of oncoming traffic, sometimes increasing speed. <u>People v. Prindle</u>, 16 N.Y.3d at 771. Those facts clearly demonstrate that Prindle knew what he was doing and intentionally and consciously disregarded the risk he was creating to the other people driving on the same roadway yet this Court determined that the evidence did not demonstrate depraved indifference but, rather, "at most, the evidence adduced was legally sufficient to support a finding of reckless manslaughter". <u>Id.</u> The Appellate Division majority in this case fails to

acknowledge all of these facts – instead choosing only to mention that Mr. Heidgen was not being chased by police. That surely is not enough to distinguish this case from <u>Prindle</u> which clearly stands for the proposition that you need something more than speed and erratic driving to establish depraved indifference. Thus, how can it be said that Prindle was less culpable than Mr. Heidgen? Mr. Heidgen was speeding – so was Prindle. Mr. Heidgen was driving on the wrong side of the road – so was Prindle. The difference is that Prindle knew exactly what he was doing. Prindle was sober and clearly aware that he was driving on the wrong side of the road and did so intentionally and consciously and could have stopped at any time while there is absolutely no evidence whatsoever that Mr. Heidgen was aware that he was driving on the wrong side of the road and made the conscious and intentional decision to continue to do so once he realized his error.

## IV.   <u>CONCLUSION</u>

This entire argument can be summed up with one simple question – was Mr. Heidgen on the road that night looking for victims? The obvious answer to that question is, no, he was not, he was trying to get home. That answer precludes a finding that he had the *mens rea* of depraved indifference to human life. And, as this Court stated in reversing the conviction in <u>People v. McPherson</u> (the companion case to <u>People v. Suarez</u>), "defendant's conduct may have reflected recklessness, but [it]

71

did not fall within the small, finite category of cases evidencing utter depravity, uncommon brutality and inhumane cruelty required for depraved indifference murder". People v. Suarez, 6 N.Y.3d at 215. And, as Justice Belen aptly noted in his dissent in People v. McPherson, 89 A.D.3d at 765:

> Without minimizing the defendant's conduct or the tragic results, I contend that glaringly absent from the evidence adduced at trial is evidence, for example, that the defendant intentionally drove in the wrong direction on the parkway at a high rate of speed or continued on his path once he realized he was driving in the wrong direction on the parkway, conduct which could demonstrate "an utter disregard for the value of human life" (People v. Suarez, 6 N.Y.3d at 214). Instead, the evidence demonstrated that the defendant, by reason of his severe intoxication, acted recklessly by failing to perceive that he was driving the wrong way on the parkway.

The evidence Justice Belen noted was absent in McPherson's case is also absent from this case where all the evidence established was that Mr. Heidgen was intoxicated, lost, and trying to get home from a party. Although the People presented the testimony of witnesses who observed Mr. Heidgen driving on the night of the accident, none of them could say that he was aware that he was driving on the wrong side of the road or that once he realized it, he consciously continued to do so not caring about the potential danger he was creating. Witnesses testified that they honked their horns to alert Mr. Heidgen that he was on the wrong side of the road but

none of them could say that he heard them. And, none of their witnesses gave any testimony that even remotely indicated that he was suicidal. In other words, none of them People's witnesses gave any testimony which could establish beyond a reasonable doubt that Mr. Heidgen was acting with a depraved indifference to human life either prior to or at the time of the accident.

Thus, viewing the evidence in the light most favorable to the People as we must, the evidence, as a matter of law, was insufficient to prove Mr. Heidgen's state of mind was that of depraved indifference to human life. Therefore, the conviction on the counts involving a depraved indifference to human life should be reversed and the underlying indictment dismissed.

## POINT II.

## MR. HEIDGEN WAS DENIED HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S DECISION TO PERMIT DNA TESTING IN THE MIDDLE OF TRIAL AND THEN REVERSE HIS OWN DECISION AND ADMIT THE PREVIOUSLY EXCLUDED BLOOD SAMPLE PURPORTED TO BE MR. HEIDGEN'S.

Mr. Heidgen's State and Federal constitutional rights to a fair trial and due process were violated by the trial court's decision to permit a DNA test in the middle of trial and then reverse his decision to preclude the admission of blood evidence purported to be his. U.S Const. Amends. VI and XIV.; N.Y. Const. Art. I, §6. This decision to permit DNA testing and then admit the blood was erroneous because: (1) it violated New York's discovery statute; (2) it violated Mr. Heidgen's right to a fair trial as he had already formed and presented his defense based on the information that no DNA testing had been performed; and (3) no DNA test could render reliable this evidence which the court had already deemed unreliable and excluded because it was materially different than the evidence obtained at the hospital on July 2, 2005 and because the chain of custody reports were fatally flawed. This issue was presented for review to the Appellate Division, Second Department which, despite the obvious error that resulted in completely unreliable evidence being presented to the jury,

shockingly failed to address the issue in its decision. As a result, Mr. Heidgen's conviction should be reversed and a new trial ordered excluding this evidence.

## I.   PROCEDURAL BACKGROUND

Following the testimony of several of the People's witnesses including Tr. O'Hare (who was present during the collection of Mr. Heidgen's blood at the hospital after the accident) and Lisa Lindenthaler (the forensic scientist who tested the blood the People claimed to be Mr. Heidgen's), defense counsel objected to the admission of the blood sample in accordance with People v. Julian, 41 N.Y.2d 340 (1977) (A672). Counsel argued that, because blood is a fungible item, the People were required to prove the evidence (1) is identical to and in the same condition as that involved in the crime; and (2) has not been tampered with (A673). Counsel further argued that the blood should be excluded as a result of Tr. O'Hare's trial testimony that he (a) observed the taking of the blood, (b) placed partially filled out white seals over the tops of the blood tubes; (c) initialed the blood tubes themselves; (d) partially filled out the information on the red seals which would later be placed on the kit by someone else; (e) did not place Mr. Heidgen's name on the seals, tubes or kit because he did not know it; (e) watched Nurse Busco use the blood kit needle to draw Mr. Heidgen's blood and then discard it; and (f) neglected to complete the blood kit's forms which are included with the kit to ensure the integrity and proper handling of

the evidence. That testimony was materially different than that of forensic scientist Lisa Lindenthaler who testified that she received blood tubes with red seals over the tops, not white seals as Tr. O'Hare claimed he used, and no initials printed on the tubes themselves, which O'Hare testified he had done (A655, A673-A676). It was also refuted by the testimony of Inv. Harris who said that when he sent Inv. Baez to the hospital to get the blood, they had already found Mr. Heidgen's wallet in his truck so they knew his name (A566). These discrepancies became blatantly obvious when the blood kit was opened in court and the kit's unopened, unused needle was inside. Finally, as a further attack on the trustworthiness of the blood evidence, counsel added that according to the troopers' testimony, the unsealed kit containing the blood tubes was passed from Tr. O'Hare to Tr. Stafford to Inv. Baez thus leaving no assurances that it had not been tampered with (A677).

Prior to ruling on the motion, the court ordered the People to re-call Tr. O'Hare for a hearing out of the presence of the jury "to determine whether or not those are the seals he used and whether or not those are his initials. If they are not, the objection is sustained; if they are, the objection is overruled." (A681).

Later that day, Tr. O'Hare testified out of the presence of the jury and over defense objection, that he recognized his initials on the white and red seals. He further testified that he put white seals on the tubes but acknowledged that the blood

tubes the People were seeking to put in evidence had red seals on them (A686-A687, A692). He also testified that he wrote his initials on the seals before putting them on the tubes and on other seals he did not use which he believed others would use later to seal the box. He claimed he did not seal the box before handing it off because the defendant's name, which he did not know, needed to be put on the tubes. (A688-A689, A694)

On cross-examination, Tr. O'Hare further testified that, despite writing his initials on the very blood tubes themselves, upon looking at the tubes presented by the People in court, his initials were not there (A698). Finally, O'Hare testified that he observed Nurse Busco use the needle from the blood kit to draw Mr. Heidgen's blood and discard it when she was done and that all that remained in the box when he gave it to Tr. Stafford was the blood tubes. However, when asked to look in the blood kit the People were attempting to offer into evidence at trial, he found the kit's unopened, unused needle and the blood tube holder. (A698-A701)

Immediately following his testimony, the court ruled that the defense "objection to further testimony by Lisa Lindenthaler is sustained" which effectively precluded admission of the blood into evidence (A713).

At the end of that trial day, the People asked the court for an order pursuant to C.P.L. §240.40(2)(b)(v) to require Mr. Heidgen to provide a DNA sample. The

People argued the DNA test was necessary because of "testimony that we were not aware of, that has caused the Court to rule to exclude extremely crucial evidence in this case; that being the blood evidence and the result of the blood alcohol content from the defendant." (A728-A729) The defense strenuously objected arguing that: (1) the evidence offered by the People at trial was absolutely not in the same condition as it was at the time it was drawn from Mr. Heidgen – at the time the blood was drawn, Tr. O'Hare placed white seals on the blood tubes and the blood evidence the People tried to introduce at trial had red seals; at the time the blood was collected, O'Hare put his initials on the filled blood tubes and the blood tubes the People tried to introduce at trial had no initials; when O'Hare gave the blood kit to Tr. Stafford at the hospital all that was left in it were the filled blood tubes, but the kit the People tried to introduce at trial contained an unopened, unused needle; (2) there were two different chains of custody for the evidence which had the blood, in an unsealed box, going to different places and being handled by different people; (3) the People's claim that the testimony just developed was false since the testimony at issue was from their own witnesses and thus was not newly discovered evidence not available before trial; (4) this request could and should have been made during the statutorily proscribed discovery period; (5) the People had every opportunity during the fourteen-month period between the accident and trial to test the blood in their

78

custody; (6) during discovery the defense requested the results of all scientific tests and was told there were none and formed the theory of their defense, planned their case, and questioned the People's witnesses based on that declaration; and, (7) the People cannot just shift gears and try a different way to get a piece of evidence admitted which had been precluded based on its obvious unreliability. (A730-A736)

Despite defense counsel's cogent arguments, the court found that the DNA test was "a means with relative certainty to determine that it is not Mr. Heidgen's blood or that it is Mr. Heidgen's blood" [A736] and then immediately, without an adjournment to permit the defense to conduct any legal research (even though it was the end of the day), granted the People's request noting "The last thing in the world I'm going to worry about is reversal." (A745)

The next morning, defense counsel attempted to re-open discussion of the issue and articulate his position. The court refused and also denied the defense's request to stay the execution of the order to give the defense time to seek a writ of prohibition from the Appellate Division. (A749-A750).

## II.  **APPLICABLE LEGAL PRINCIPLES**

### A.  *The Admissibility of Real Evidence*

In People v. Julian, this Court established the admissibility test for real evidence:

> To be admissible, any piece of real evidence must be shown to accurately portray a relevant and material element of the case. When real evidence is purported to be the actual object associated with a crime, the proof of accuracy has two elements. The offering party must establish, first, that the evidence is identical to that involved in the crime; and, second, that it has not been tampered with... Proof of a complete chain of custody is one accepted technique for showing the authenticity of a fungible item of real evidence.

People v. Julian, 41 N.Y.2d at 342-43.

    B.   *Applicable Statutory Provisions*

C.P.L.§240.40(2)(b)(v) states in pertinent part that "Upon motion of the prosecutor, and subject to constitutional limitation, the court... (b) may order the defendant to provide non-testimonial evidence. Such order may, among other things, require the defendant to... (v) Permit the taking of samples of blood, hair or other materials from his body..." C.P.L.§240.90(1) requires: "A motion by a prosecutor for discovery shall be made within forty-five days after arraignment, but for good cause shown may be made at any time before commencement of trial."

## III.  __ANALYSIS__

Simply stated, the trial court got it right the first time and, had he stuck with that decision, this would not be an issue. The initial ruling that the blood evidence was inadmissible as a result of the dramatic defects in the chain of custody and

marked differences in the condition of the evidence presented by the prosecution at trial as revealed by the testimony of the People's witnesses was correct.

Indeed, on direct appeal, Respondent acknowledged that the blood evidence was different than what Tr. O'Hare recalled at trial. However, they attempted to explain away those colossal differences between what he testified he observed and did on July 2nd and the evidence they brought into court by claiming that the differences were caused by some "confusion" and "lapses of memory" cleared up by the trooper's "simple testimony". Resp. Br. at 51, 56. That characterization is a complete fantasy. The reality is that there was no confusion or "lapses of memory". O'Hare's recollection was very clear when he testified in front of the jury and again without the jury. And, even when given that second chance to change his testimony at the hearing, he maintained that he recalled: (1) putting his initials on the tubes themselves but the tubes the People proffered had no initials; (2) putting white seals over the tops of the blood tubes but the tubes the People proffered had red seals; and (3) watching the nurse remove the sealed needle from the blood kit and use it to draw Mr. Heidgen's blood, but when the kit was opened in court, it contained the unopened needle. These glaring differences between O'Hare's testimony versus the reality of what the People presented in court make it obvious that Tr. O'Hare was talking about an altogether different piece of evidence.

Although the inquiry regarding the blood should have ended with the correct ruling to preclude it, the trial court gave in to the People's request for a DNA test for the purpose of confirming that it was Mr. Heidgen's blood in the improperly handled tubes which they claimed would render it sufficiently reliable to be admitted as evidence. As argued by the defense at the time, that decision was incorrect on several grounds. The first argument was based on statutory procedure which is that the request was simply too late.

The defense's second argument against the mid-trial DNA testing was that during discovery they made a timely request for results of all scientific tests and were told there were none so they formed the theory of their defense, planned their case, and questioned the People's witnesses based on that information. By sandbagging the defense and allowing the People to perform this DNA test mid-trial, the entire case was fundamentally changed, leaving the defense to scramble to alter their case resulting in a violation of Mr. Heidgen's constitutional fair trial rights.

Finally, defense counsel argued that this was just an attempt by the People to shift gears and try a different way to get a piece of evidence admitted which had properly been deemed inadmissible. The court had already ruled the blood was unreliable based on the broken chain of custody and glaring differences in the descriptions of the blood evidence by the People's own witnesses. Thus, any alleged

confirmation obtained by the People through DNA testing that Mr. Heidgen's blood was in the tubes should not render reliable this piece of evidence that was already deemed unreliable by the court.

A.   *The Court's Decision to Permit Scientific Testing Mid-Trial Was Procedurally Erroneous*

While a trial court is permitted to order a defendant to provide "non-testimonial evidence" including DNA at the People's request [C.P.L.§240.40(2)(b)(v)], that authority is not limitless. In an obvious effort to avoid situations such as this one where the discovery period ended and a defendant relied upon the People's assertion as to what evidence they would present, the legislature enacted C.P.L.§240.90(1) which requires a motion by a prosecutor for discovery of this type be made within forty-five days after arraignment or, where "good cause" can be shown, up to the commencement of trial. Id. That limitation – before the commencement of trial – was a clear declaration by the legislature that it did not want this type of discovery motion made during trial and for very good reason.

In the case at bar, we are faced with a situation where the discovery motion was made and granted smack in the middle of trial. This was a blatant violation of C.P.L.§240.90(1) which requires such a motion to be made before the trial starts.

The People argued below that this is not an issue of violation of the statute but,

rather, an issue of enforcement of the statute: "the decision not to strictly enforce the discovery statute was a permissible exercise of the court's discretion in light of the compelling circumstances." Resp. Br. at 60. The People are wrong. Not only was this motion made many months after arraignment, it  was made smack in the middle of trial. This is not an issue of "strict" enforcement or discretion. This was a blatant violation of C.P.L.§240.90 which mandates that such a motion "be made within forty-five days after arraignment, but for good cause shown may be made at any time before commencement of trial." This statute was not a suggestion by the legislature. It is a rule of procedure which must be followed all the time – not just when it is convenient for the District Attorney. The statute could have been drafted to permit this type of motion at any time but it was not and must be strictly followed.

Furthermore, this is not, as the People claimed below, a situation where "compelling circumstances" justified ignoring the statute. These "compelling circumstances", according to the People, were the result of "unexpected testimony from their own witnesses and they argued that "if [they] had had any reason to expect that the testimony would establish anything other than a complete chain of custody, [they] would have requested a blood sample for DNA testing within the statutorily established time-frame... Trooper O'Hare's testimony was wholly unanticipated and took the People by surprise." Resp. Br. at 61. That argument is absurd given that this

84

so-called "unexpected testimony" came from their own police witness, Tr. O'Hare, who testified that he reviewed his paperwork and met with members of the prosecution team who reviewed his testimony with him (A690-A691).It is also ridiculous given that the evidence, including the blood and the chain of custody reports, was in the People's possession for more than fourteen months. Thus, this is not an issue of foreseeability but rather one caused by the People's failure to properly investigate and prepare their case. Had they examined the blood kit and the chain of custody reports that went along with it, they would have discovered, as defense counsel did, that there were discrepancies that seriously called into question the reliability of this critical piece of evidence. A successful cross-examination of a prosecution witness during which a flaw in the People's case is exposed should not open the door to the re-investigation of their case in the middle of trial and the trial court certainly should not help them do it by violating the discovery statutes.

Finally, in their effort to excuse the trial court's error, the People, relying on a Third Department case, People v. Finkle, 192 A.D.2d 783 (3d Dept. 1993) argued that violation of the discovery statute does not require *per se* reversal unless a constitutionally protected right is implicated. As discussed in much greater detail *infra*, that burden can be met here as Mr. Heidgen's rights – both statutory and constitutional – were clearly violated. The trial court's decision to ignore the statute

resulted in the violation of his State and Federal constitutional rights to a fair trial and due process. U.S. Const. Amends. VI and XIV; N.Y. Const. Art. I, §6.

Indeed, it is more than noteworthy that the trial court himself admitted that he was not interested in the soundness of his decision on this issue, but only with the appearance of the proceedings: "The last thing in the world I'm going to worry about is reversal." (A745). However, the trial court's duty was to ensure that Mr. Heidgen received a fair trial which necessarily means following the rules enacted by the legislature and the failure to do so should result in the reversal about which the judge claimed to have a lack of concern.

B.     *Permitting DNA Testing in the Middle of Trial Precluded Mr. Heidgen from Receiving a Fair Trial*

In addition to being procedurally erroneous, permitting DNA testing mid-trial violated Mr. Heidgen's State and Federal constitutional rights to a fair trial and due process. Criminal defendants have the statutory right to be provided with written reports of scientific tests conducted by law enforcement. C.P.L.§240.20. As defense counsel vigorously argued, they already formed the defense theory, planned their case and questioned the People's witnesses based on the People's response to their pre-trial discovery demands that no DNA testing had been done. That defense included a vigorous attack on the blood evidence which was clearly a successful strategy given

that the trial court precluded the blood before changing that ruling after allowing DNA testing mid-trial. It is clear from the record that this defense was directly related to the People's discovery responses. Had the defense known pre-trial, when it would have been appropriate, that such testing would be performed, they may have had a different strategy which would not have included such a forceful attack on the blood.

Moreover, the court's decision to preclude the evidence only to later admit it actually placed Mr. Heidgen in a worse position than he would have been had the court not precluded it in the first place because the defense was left scrambling to recover from the tremendous prejudice suffered by what the People claimed to be a verification that the tubes contained his blood. Without the DNA testing, the defense was in a better position to attack the reliability of the blood which was clearly in a completely different condition than when it was drawn. The court's decision to change his mind was significantly more than an evidentiary ruling. It had a devastating effect on the defense and likely severely damaged the credibility of defense counsel who prepared his case and presented it up to that point with the understanding that no such testing had been done. As a result, Mr. Heidgen was denied his constitutional rights to a fair trial and due process.

C.    *No DNA Test Could Render Reliable a Piece of Evidence the Court Already Deemed Unreliable and Excluded*

The final reason given by the defense against the DNA testing was that it was nothing more than an attempt by the People to try a different way to get a piece of evidence admitted which had been deemed unreliable and precluded. Any alleged confirmation the People obtained through a DNA test could not render it reliable. Although the DNA test may arguably have established that Mr. Heidgen's blood was in the tubes, what the test could not prove was that the blood had not been tampered with. No test could prove that. Thus, all of the reasons the court had for precluding the blood – the material differences between Tr. O'Hare's description of the blood tubes he passed to Tr. Stafford in an unsealed box and those described by Lisa Lindenthaler and presented at trial and the differences in the chain of custody – were still there after the DNA test was performed. In other words, the blood evidence was as unreliable after the DNA test as it was before and should have remained excluded.

While it is true that proof of an incomplete chain of custody may be excused where there are reasonable assurances of the identity and unchanged condition of the evidence [People v. Julian, 41 N.Y.2d at 343], "where the circumstances fail to provide such assurances... a gap in the chain of custody affects the admissibility of the evidence, not just its weight". People v. Rivera, 184 A.D.2d 153, 156 (1st Dept 1993); People v. Alomar, 55 A.D.3d 617 (2d Dept. 2008).

Here, we have significantly more than an incomplete chain of custody. What

we have here are two chain of custody reports that show the blood evidence going to different people and different places. That should have given rise to serious doubts about the integrity and reliability of the evidence. The People's own witnesses admitted that the chain of custody report showed Mr. Heidgen's blood being given to different people and being taken to two completely different places for analysis. Inv. Baez testified that the General II and Lab I showed two different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the Medical Examiner's toxicology department. In contrast, the General II indicated that the blood went from Harris to Hemmerich (not from Harris to the Medical Examiner as the Lab I indicated) and then from Hemmerich to Drake to the Newburgh BCI evidence to Mid-Hudson Crime lab (not the Medical Examiner). In other words, the two chain of custody reports showed the blood going to two different places – one to Mid-Hudson Lab and the other to the Medical Examiner's toxicology department. (Baez: A436-A440, A447). And Tr. O'Hare, arguably the People's most important witness, admitted that the Lab I, which he acknowledged travels with the blood kit to ensure its integrity, was wrong as it should have said Mr. Heidgen to Busco to O'Hare but he left himself out. He further testified that the form (filled in by another officer) indicated the blood was passed from Stafford to Baez which was also wrong. (O'Hare: T.A153-A154, A162-A163) This testimony by the People's witnesses

clearly demonstrates that the chain of custody reports could not be relied upon to establish the authenticity and reliability of the blood as it could not provide assurances that it was identical to that drawn from Mr. Heidgen on the night of the accident. What we have here is more than an incomplete chain of custody. It is a completely defective one which destroyed the reliability of the evidence.

Moreover, there were no "reasonable assurances" of the identity and unchanged condition of the evidence as described by the <u>Julian</u> Court to cure the defective chain of custody. The unsealed blood kit was passed from person to person without Mr. Heidgen's name being written on the box or the tubes inside leaving it vulnerable to tampering. And the testimony of the People's witnesses demonstrated that the blood evidence Tr. O'Hare described was not even remotely the same, let alone identical to, what the People presented for admission at trial. The critical differences are worth repeating: First, O'Hare testified that while in the hospital he put his initials on the blood tubes themselves but the tubes Lindenthaler testified she received at the lab and the tubes the People offered for admission at trial had no initials. Second, Tr. O'Hare testified he put white seals over the tops of the blood tubes in the hospital but the tubes Lindenthaler testified she received and the tubes offered by the People for admission at trial had red seals. And, third, O'Hare claimed he watched Nurse Busco remove the needle from the kit, use it to draw Mr. Heidgen's blood and then discard

it, but when the kit was opened in court, it contained an unopened, unused needle. Those descriptions of the blood evidence by the People's witnesses versus the reality of what was presented in court demolished its reliability.

Given that the blood proffered by the People at trial was materially different than that described by the People's witnesses which led the court to exclude it in the first place, any proof that Mr. Heidgen's DNA was in the tubes did not bar the possibility that the blood had been tampered with. The evidence cannot be described as identical, in fact, it does not even resemble the blood described by O'Hare. The court was obviously deeply concerned about the evidence as demonstrated by his initial decision to preclude it and that should have been the end of the road for the blood. Its resurrection based on a DNA test resulted in an unfair trial.

D.  *This Error Cannot Be Deemed Harmless*

This egregious error cannot be deemed harmless given that the evidence was already excluded by the trial court because it was unreliable. The unsealed blood kit was passed from person to person and the kit proffered by the People at trial was materially different from the one the People's witnesses described as having been used on the night of the accident. And, although the court recognized that these differences rendered the blood unreliable and went so far as to exclude it, he then reversed himself and admitted it after the People conducted a DNA test which only

proved, if anything, that Mr. Heidgen's blood was in the tubes. That DNA test could not provide the "reasonable assurances" that the blood had not been contaminated or tampered with as required by this Court in <u>People v. Julian</u>, 41 N.Y.2d at 343.

What is more, the integral part of a DWI-related homicide case is the defendant's blood alcohol content. Thus, once the court reversed himself and admitted the blood, it became the centerpiece of the People's case. The court's decision resulted in grave prejudice to the defense which planned and presented its case, including a vigorous attack on the blood evidence, based on the People's pre-trial assurance that no such scientific testing had been performed. The decision to permit DNA testing in the middle of trial was a tremendous blow to the defense which violated the discovery statutes and was fundamentally unfair. Therefore, it cannot be said that its admission was harmless.

## IV.   <u>CONCLUSION</u>

In short, what happened here was a desperate attempt by the People to resurrect a piece of evidence which had been correctly precluded by the trial court due to the grossly negligent manner in which it was handled by police and because the People were unprepared for the attack the defense mounted against it. The egregious errors in the handling of the blood, the different chain of custody reports, and the material differences in the blood evidence itself described by the People's own witnesses

exposed by the defense clearly could have been discovered by the People with the proper examination of their own evidence and adequate preparation of their witnesses. In fact, in support of her application for DNA testing, the prosecutor admitted the request was being made because of the defense's "relentless assault on the identity of whose blood is in that vial" [A742] which should be recognized as a job well done by defense counsel given what he revealed by mounting that attack. In reality, this request for DNA testing was made because of poor police work uncovered by the defense. However, the court gave the People another bite at the apple by permitting a DNA test mid-trial in blatant violation of the discovery statutes. And, despite all of this, the Appellate Division, Second Department inexplicably declined to even address this issue. As a result, Mr. Heidgen's conviction should be reversed and the case remanded for a new trial excluding the blood evidence.

# POINT III.

## MARTIN HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND IMPROPERLY ADMITTED INTO EVIDENCE AT TRIAL.

Mr. Heidgen contends that his blood was illegally seized by police and improperly admitted into evidence at trial. Despite the obvious nature of this error which resulted in the admission of unreliable and illegally obtained evidence, this issue was not addressed by the Appellate Division on direct appeal. As a result, Mr. Heidgen's conviction should be reversed and a new trial ordered.

## I.  FACTUAL BACKGROUND

In April 2006, a Huntley/Mapp hearing was conducted to address, *inter alia*, the admissibility of a blood sample taken from Mr. Heidgen after the accident without his consent or court order. There, PO Christopher Pandolfo testified that shortly after arriving at the accident scene on July 2, 2005, he approached Mr. Heidgen who was alone, seated behind the wheel of his pick up truck. When Pandolfo approached Mr. Heidgen, who he described as conscious with his eyes open, Mr. Heidgen inquired: "What happened? Where am I?" (Pandolfo: A1651-A1653, A1656, A1662-A1663).

PO Timothy Nolan also responded to the accident scene and testified that Mr. Heidgen was conscious and that, although his speech was low and slurred, he

accurately answered questions and followed commands. (Nolan: A1672-A1674, A1677-A1678, A1684-A1687)

Tr. Siegler spoke with Mr. Heidgen in the ambulance. Although he did not answer Siegler's questions, his eyes were open, he was moaning and conscious. According to his paperwork, Tr. Siegler arrested Mr. Heidgen at 2:33 a.m., which would have been while in the ambulance en route to the hospital but admitted that he did not tell him that he was under arrest. (Siegler: A1688-A1699, A1704-A1708)

At approximately 2:30 a.m., Tr. O'Hare entered the ambulance with a blood kit and escorted Mr. Heidgen to the hospital. During the ten-minute ride to the hospital, Mr. Heidgen's eyes were open, and he was moaning and moving. EMT Cook, who was tending to Mr. Heidgen, told him to calm down and relax so they could help him. O'Hare and Cook placed gurney straps on Mr. Heidgen to restrain him to allow Cook to perform medical procedures. Tr. O'Hare, a certified first responder, reluctantly admitted Mr. Heidgen was, by the trooper's own definition, conscious with his eyes open and able to answer questions.(O'Hare: A1712-A1714, A1717-A1721, A1733-A1735, A1744-A1750)

Tr. O'Hare further testified that, shortly after arriving at the hospital, Mr. Heidgen became unconscious at which time he asked Nurse Busco to draw his blood. She drew two tubes of blood which she handed him. He stayed with Mr. Heidgen in

the emergency room and accompanied him to the ICU where he stayed until he was relieved. Throughout the time he was with Mr. Heidgen, O'Hare never told him he was under arrest and never sought his consent to draw his blood. He also did not request a search warrant for his blood or consult with the District Attorney before obtaining it. (O'Hare: A1722-A1726, A1735-A1741, A1744-A1750)

Tr. Zawol was sent to the hospital to relieve O'Hare with instructions to "watch" Mr. Heidgen and inform his sergeant when he regained consciousness. When Mr. Heidgen awoke, Zawol spoke with him. Mr. Heidgen thanked him for being there and helping him. Tr. Zawol informed Mr. Heidgen that investigators were coming to speak with him and said "Just wait right here and I'll be here with you." Although he admitted he would not have let Mr. Heidgen leave, at no time did Zawol inform him that he was under arrest or advise him of his Miranda rights.[11] In fact he was not formally arrested and given Miranda until Invs. Harris and Baez arrived at the hospital that afternoon.[12] (Zawol: A1752-A1766; Harris: A1771-A1779, A1815)

After the People rested their case, the defense moved to suppress the blood on the ground that the People failed to show that it was drawn by a registered

---

[11] The hearing court determined Mr. Heidgen was under arrest at this time and suppressed statements Mr. Heidgen made to Tr. Zawol. (A1914).

[12] Medical personnel bound Mr. Heidgen's wrists to the bedpost with gauze; he was not handcuffed. (Zawol: A1753, A1760, A1766-A1767; Harris: A1775, A1831).

professional as required by statute. The hearing court reserved decision and Mr. Heidgen presented his case. The issue was revisited after both sides rested but the application was ultimately denied. (A1838-A1840, A1895-A1896, A1905, A1915).

The defense called Raffi Zohrabian, M.D., attending emergency room doctor at Nassau County University Medical Center. Dr. Zohrabian testified that he has been a doctor for more than thirty years and an emergency room attending surgeon since 1993. Dr. Zohrabian testified that he treated Mr. Heidgen for fifteen minutes and administered neurological and physical examinations during which he calculated Mr. Heidgen's Glasgow coma score which measured his level of consciousness by measuring eye movement, verbal and motor response. Mr. Heidgen received top scores in the eye movement and motor response portions of the exam and scored slightly lower – three out of five – on the verbal portion. The full score was a thirteen out of fifteen which the doctor described as "a little below normal, but reasonable". Dr. Zohrabian explained that, despite Mr. Heidgen's answers to questions being inappropriate and not always understandable, he was able to answer "yes" or "no" questions and was reasonably conscious. Overall, Dr. Zohrabian's tests revealed Mr. Heidgen was alert, able to comprehend and obey commands, and had eye spontaneity. There was no question in Dr. Zohrabian's mind, based upon a reasonable degree of medical certainty, that Mr. Heidgen was definitely capable of consenting to medical

procedures, including giving a blood sample, and that he was able to appreciate the implications of doing so. (Zohrabian: A1841-A1858, A1862-A1873, A1877-A1882)

During oral argument on the motion, defense counsel argued, *inter alia*, that troopers failed to formally arrest Mr. Heidgen for purposes of drawing blood pursuant to V.T.L.§1194(2)(a)(1) and that they failed to seek his consent before drawing his blood. Mr. Heidgen was not formally arrested until Invs. Harris and Baez arrived at the hospital approximately ten hours after his blood was drawn and well outside the statute's two-hour window. Despite Dr. Zohrabian's testimony that Mr. Heidgen was conscious and capable of giving consent, the police made no effort to obtain it.

The People countered by arguing that Mr. Heidgen was not able to understand he was being arrested so the troopers were under no obligation to tell him he was. They further argued that, despite Dr. Zohrabian's testimony that he was conscious and able to understand, Mr. Heidgen could not consent to the blood draw because he was nonresponsive at the scene and in the ambulance and unconscious at the hospital. The People claimed Mr. Heidgen therefore impliedly consented to his blood being drawn.

The hearing court determined that Mr. Heidgen's blood was properly drawn and admissible on the People's direct case. In so holding, the court reasoned that Mr. Heidgen was arrested at the accident scene and, finding a distinction between the medical definitions of consciousness and responsiveness and those used in law, the

court ruled that Mr. Heidgen was unable to consent to his blood being drawn and, therefore, there was no need to request it. (A1887-A1893; A1902-A1906; A1914-A1915).

## II.    THE APPLICABLE LEGAL PRINCIPLES

V.T.L.§1194(2)(a)(1) states that a police officer may direct the administration of a chemical analysis to determine the alcoholic content of blood upon:

> having reasonable grounds to believe such person to have been operating in violation of any subdivision of section eleven  hundred ninety-two of this article and within two hours after such person has been placed under arrest for any such violation...

The Supreme Court has held that the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State" and the taking of a suspect's blood is considered a search and seizure which must comply with the Fourth Amendment. Schmerber v. California, 384 U.S. 757, 767 (1966).

## III.    ANALYSIS

A.    *Mr. Heidgen's Blood Was Drawn after the Expiration of the Two-Hour Time Limit Mandated by Statute*

V.T.L.§1194(2)(a)(1) mandates that a chemical blood test is permissible when an officer has a reasonable basis to believe a person has been driving while under the

influence of alcohol. However, that power is not limitless. The statute specifically states that the blood must be drawn within two hours arrest. In this case, Mr. Heidgen's blood was drawn approximately ten hours before he was arrested and, thus, improperly obtained.

When police arrived at the accident scene at about 2 a.m., Mr. Heidgen was conscious and seated behind the wheel of his pickup. His eyes were open, he asked questions and gave appropriate responses to questions posed to him. Several officers testified they smelled alcohol on his breath, observed red, watery eyes and described his speech as slurred. (Pandolfo: A1655-A1657, A1661-A1662; Nolan: A1676-A1679; Siegler: A1695-A1697, A1705; O'Hare: A1716). Believing they had probable cause to arrest, Tr. O'Hare – with blood kit in hand – accompanied Mr. Heidgen to the hospital with orders to get his blood. They left in the ambulance at approximately 2:25 a.m. and arrived at the hospital fifteen minutes later but the time of arrest was noted on police paperwork as 2:33 a.m. although no one bothered to tell Mr. Heidgen. (Siegler: A1699-A1700; O'Hare: A1724-A1731)

En route to the hospital, Mr. Heidgen remained conscious, his eyes were open, he was moaning and moving. He received medical treatment in the emergency room, including an evaluation of his consciousness on which he scored very high. At about 2:45 a.m., while Mr. Heidgen was conscious, Tr. O'Hare asked a nurse to draw his

blood. That means police were with a conscious Mr. Heidgen for about forty minutes but did not bother to (1) tell him he was under arrest, (2) read him his rights, and (3) ask for his consent to draw his blood. Approximately ten hours passed from the time Mr. Heidgen's blood was drawn until police formally arrested him – clearly outside the two-hour limit proscribed by statute.[13]

Police had every opportunity to formally arrest Mr. Heidgen but did not. They arrived at the scene as early as 2:00 a.m. and accompanied him to the hospital and stood guard over him. Tr. Zawol, who was directed to go to the hospital to "watch" Mr. Heidgen, spoke with him when he awoke at approximately 9:00 a.m. and, rather than tell him he was under arrest, lulled him into a false sense of security by telling him to stay right there and "I'll be here with you" even though he admitted he would not have let him leave the hospital. (Zawol: A1756) Everyone except Mr. Heidgen knew he was under arrest but noone bothered to tell him before taking his blood.

Nor can it be argued that Mr. Heidgen knew or should have known that he was under arrest. The hearing testimony revealed he was strapped to an ambulance gurney to enable the EMT to perform medical procedures and was later restrained to his hospital bed with gauze, likely for the same reason. Although not indicative of an

---

[13] Tr. Zawol testified investigators arrived at the hospital between 11:15 and 11:30 a.m., although that time is about an hour earlier than the time Inv. Harris testified to, it was still almost nine hours after Mr. Heidgen's blood was drawn.

arrest in and of itself, Mr. Heidgen was not handcuffed. <u>People v. Allen</u>, 73 N.Y.2d 378 (1988). In fact, Mr. Heidgen's response to Tr. Zawol being at his bedside was one of gratitude, not concern regarding his legal status (Zawol: A1754). It is clear that a reasonable person in Mr. Heidgen's position would not have known he was under arrest under those conditions.

Viewing the totality of the circumstances, Mr. Heidgen was not formally arrested until more than ten hours after the accident. Given the hearing testimony by police and the experienced emergency room doctor, the police paperwork indicating the time of arrest as 2:33 a.m., does not cure this infirmity. Thus, Mr. Heidgen's blood was improperly drawn in violation of the V.T.L. and should have been suppressed.

B.    *Mr. Heidgen's Blood Was Drawn Without His Consent*

Additionally, Mr. Heidgen was conscious and able to consent to having his blood drawn yet police never offered him the opportunity to do so. While the V.T.L. provides for implied consent for a blood sample, that provision applies when a driver is unconscious or so disoriented that he cannot consent. This Court in <u>People v. Kates</u>, 53 N.Y.2d 591 (1981), discussed the distinction between the unconscious and severely disoriented driver and the conscious driver and held that drawing blood from an unconscious driver or one that is so disoriented that police are unable to get consent, is not improper. <u>Id.</u> That was not the case here.

102

It is undisputed that, despite his high level of intoxication, when police arrived at the accident scene, Mr. Heidgen was conscious. His eyes were open, he answered questions and followed commands. (Nolan: A1672-A1674, A1677-A1678, A1684-A1687) While in the ambulance, he remained conscious. (O'Hare: A1717-A1723, A1733-A1734, A1744-A1748). And, if you believe Tr. O'Hare, Mr. Heidgen did not lose consciousness until after arriving at the hospital. Although O'Hare, who was at the hospital solely for the purpose of getting a blood sample as his supervisor had ordered him to do, spent approximately 40 minutes with a conscious Mr. Heidgen, he never bothered to ask him for consent. In fact, there was no testimony that O'Hare even bothered to speak with doctors to see if he was capable of consenting. Instead he just followed his supervisor's order to get the blood without any consideration of Mr. Heidgen's rights. This was improper and warranted suppression.

The most compelling evidence presented at the hearing that police should have sought Mr. Heidgen's consent was the testimony of experienced emergency room surgeon Dr. Zohrabian who performed neurological and physical examinations which proved Mr. Heidgen was conscious and able to consent to having his blood drawn:

> Q:    Now, Dr. Zohrabian, based upon your medical examination of Mr. Heidgen on that night at that time, do you have an opinion based upon a reasonable degree of medical certainty whether Mr. Heidgen was capable of giving his informed consent or request made of him to

perform medical procedures, including that of submitting a sample of blood for the purpose of ascertaining a blood alcohol level?...

A:     That opinion is that he definitely understood what the test is all about and what his responsibility was in terms of responding to the officer's request, and therefore he knew quite well that the blood that was taken from him had some implications.

Q:     Is there any question in your mind?

A:     No, there is no question in my mind.

Q:     And does that opinion encompass the entire period of time from the beginning of your examination?

A:     It did.

Q:     To the end of the examination?

A:     To the end of the examination.

Q:     Including the time that the blood was drawn?

A:     Yes.

(Zohrabian: A1853-A1854). That testimony was unrefuted. The People did not bring in any doctors or medical personnel to testify about Mr. Heidgen's condition.  It was the defense that called Dr. Zohrabian as a witness and he unequivocally declared that Mr. Heidgen was conscious and capable of consenting to medical procedures. That testimony should have been dispositive of this issue.

104

At the pre-trial hearing, the People argued that Mr. Heidgen was unable to understand that he was under arrest and his physical condition rendered him incapable of consenting. According to the People, it was therefore not necessary to tell him he was under arrest. They further argued that the troopers were not obligated to seek his consent before requesting hospital personnel to draw his blood. (A1901-A1906) That theory is belied by the hearing record which demonstrates that, despite his extreme state of intoxication, Mr. Heidgen was conscious and able to consent (or decline) to have his blood drawn. The People's own witness, Tr. O'Hare, a trained first responder, admitted Mr. Heidgen was conscious in the ambulance (O'Hare: A1747). And, an unbiased and very experienced emergency room doctor performed physical and neurological examinations of Mr. Heidgen and determined he was capable of understanding the implications of having his blood drawn. Dr. Zohrabian's unrefuted testimony should not have been ignored by the trial court.

In support of his decision to deny suppression, the trial court concocted a new distinction between the medical definition of consciousness and that used in the law:

> While the doctor testified in his opinion that the defendant was conscious and responsive, those conclusions were made in his estimation, given his task of surgically assessing the needs of the defendant. And the ability of the defendant to tolerate medical procedures or comprehend medical procedures is a different and completely distinct standard from that what we use in the law when making a

> decision whether a defendant is conscious or so disoriented
> as to make the acquisition of consent unnecessary, which
> the Court does find in this case.

(A1915). The trial court was wrong and neither he nor the People can cite to any precedents whatsoever in support of this theory. Dr. Zohrabian could not have been more certain in his conclusion that Mr. Heidgen "definitely understood what the [blood] test is all about and what his responsibility was in terms of responding to the officer's request." (A1853-A1854). What more could the court have wanted the doctor to say? It cannot possibly be the case that we want courts to take the lay opinion of a police officer over a physician's expert evaluation when making a determination regarding consciousness and ability to respond to a simple question such as "do you consent to have your blood drawn?" This is especially true when the doctor who examined the defendant definitively testified that Mr. Heidgen was capable of responding to and understanding the consequences of the question. If we leave this decision to a police officer rather than an experienced emergency room surgeon, as the trial court says we should do, we are giving entirely too much authority to police.

C.   _Police Did Not Obtain a Warrant for Mr. Heidgen's Blood_

Finally, in addition to the means of legally obtaining a suspect's blood sample upon suspicion of DWI discussed _supra_, the police could easily have obtained a

warrant for the blood. All they would have had to do was contact a judge over the telephone and ask for the warrant and they surely would have gotten it. But they chose not to. Instead, they just had a nurse draw Mr. Heidgen's blood, without legal authority to do so.

## IV.   __CONCLUSION__

In sum, Mr. Heidgen's blood was taken in violation of the statute and his Fourth Amendment right protecting against unreasonable searches and seizures and should therefore have been precluded at trial. Accordingly, the conviction should be reversed and a new trial ordered excluding the blood evidence.

## POINT IV.

## THE TRIAL COURT ERRED IN PRECLUDING THE DEFENSE FROM PRESENTING THE TESTIMONY OF A POLICE ACCIDENT RECONSTRUCTIONIST.

Mr. Heidgen was denied his State and Federal constitutional rights to a fair trial and to present a defense as a result of the trial court's decision to preclude him from presenting the expert testimony of NYS Police Sgt. Scott Crawford who performed an accident reconstruction in this case. U.S. Const. Amends. XIV and VI; N.Y. Const. Art. I §6. Once again, although this issue was presented for review to the Appellate Division, the Court failed to address it. As a result, Mr. Heidgen's conviction should be reversed and a new trial ordered.

## I.    FACTUAL BACKGROUND

At trial, the defense called NYS Police Sgt. Scott Crawford who testified that on July 2, 2005, he performed an accident reconstruction on the Meadowbrook Parkway. Upon arriving, Crawford walked the scene to observe any evidence. Then, along with Inv. Sweeney, he documented his findings with a total work station used to measure distances and angles. They used those measurements to create a forensic map of the scene. In addition, at a later date, Sgt. Crawford returned to the scene and used a roll wheel to measure the Parkway's lane lines. (A1346-A1352) After

recording the measurements, Crawford analyzed the collision by performing a reconstruction. As a result of his investigation, he reached conclusions which he memorialized in a report dated January 13, 2006 which was given to the People. (A1353-A1354)

After describing his investigation, defense counsel asked Sgt. Crawford to outline his training and experience. He testified that to be qualified as an accident reconstructionist, he completed three two-week courses amounting to 248 hours of training after which he received certificates from the Institute of Police Technology and Management at the University of Florida. Sgt. Crawford explained those courses covered topics including, *inter alia*, identifying evidence at an accident scene, speed estimates, drawing collision diagrams, momentum formula calculations, and time distance evaluations. He further testified that since completing those courses, he has participated in 40 to 50 accident reconstructions. (A1354-A1355, A1359)

Following his detailed questioning regarding Sgt. Crawford's experience and training in accident reconstruction, defense counsel asked the court to declare Sgt. Crawford an expert in accident reconstruction (A1359). The prosecutor then conducted *voir dire* examination during which Crawford again stated that he had participated in approximately 50 accident reconstructions, and added that he had been the primary reconstructionist on 10 to 12 of them. Crawford noted that "technically"

he is not an expert in angular momentum or comfortable with it because "There is usually too many variables in it". (A1359-A1362)

Following the District Attorney's *voir dire,* after which she objected to the declaration of Sgt. Crawford as an expert, the court asked Crawford if he had ever been qualified as an expert to which he replied that he had not. (A1362)

Oral argument was then heard. Defense counsel argued that Sgt. Crawford

> is a New York State Trooper, a sergeant, who took the requisite courses in accident reconstruction, and who was assigned to do an accident reconstruction in this case. He has done fifty. He has been the primary on twelve. He prepared a report. Defense certainly didn't ask him to do a report; the New York State Police did, and submitted a report to the district attorney's office, that was turned over to us and to the Court by affirmation in January. He made certain conclusions. Whether the district attorney likes those conclusions or not, or whether the district attorney thinks this State Trooper is competent... They are opinions based on his expertise.

(A1363-A1364). Counsel added that Crawford's credibility is ultimately an issue for cross-examination (A1364). When the court argued that he has never been declared an expert, counsel stated that the witness told him he was never declared an expert because this was the first case on which he was the primary accident reconstructionist that went to trial and that his qualifications should be more important than his lack of experience testifying in court. (A1365-1366) Counsel further noted that Sgt.

Crawford was on the People's witness list and it was not until the middle of trial that they decided not to call him (A1366-A1367).

The court sustained the People's objection and the jury returned to the courtroom and never heard from Sgt. Crawford again. (A2264)

## II.   <u>THE APPLICABLE LEGAL PRINCIPLES</u>

It is axiomatic that a defendant is entitled to "a meaningful opportunity to be heard". <u>Boddie v. Connecticut</u>, 401 U.S. 371, 377 (1971). And, when asked by the People to preclude evidence, a court is required to weigh the possibility of prejudice to the prosecution against the right of the defendant to present his case. <u>People v. Berk</u>, 88 N.Y.2d 257, 266 (1995).

## III.   <u>ANALYSIS</u>

As an initial matter, this issue is preserved for appellate review by defense counsel's timely objection to the court's ruling precluding Sgt. Crawford's expert testimony (A1368); C.P.L.§470.05(2); <u>People v. Gray</u>, 86 N.Y.2d 10 (1995).

In the case at bar, the defense called a NYS Police Sergeant who was on the People's witness list. He is a trained, qualified, certified, accident reconstructionist whose supervisors thought enough of his expertise to assign him to be the primary accident reconstructionist in this highway accident involving two fatalities. However, it appears that when the People did not like the results included in Crawford's

accident reconstruction report, which included an estimation that Mr. Heidgen was "driving 45 MPH" at impact [Resp. Br. at 67] which is in line with the determinations reached by the defense expert, they decided not to call him as a witness and then blocked the defense from doing so by objecting to his declaration as an expert thereby precluding him from offering his opinions about speed. This outrageous conduct by the People, sanctioned by the trial court who refused to declare him an expert, resulted in a violation of Mr. Heidgen's State and Federal constitutional rights to due process, a fair trial and to present a defense.

This Court has held that a witness who testifies as an expert, "should be possessed of the requisite skill, training, education, knowledge, or experience from which it can be assumed that the information imparted or the opinion rendered is reliable". Mattot v. Ward, 48 N.Y.2d 455, 459 (1979). That Sgt. Crawford possessed that skill, training, education, knowledge and experience was clearly demonstrated by defense counsel who established that he had attended the courses necessary to qualify him as an accident reconstructionist. And, the NYS Police was obviously satisfied with those qualifications because they assigned him to participate in 40 to 50 reconstructions, on 10 to 12 of which he was the primary reconstructionist (A1360-A1362). To now say that he was not "comfortable" with the calculation necessary to conduct the reconstruction and is not qualified to be an expert seems all

too convenient. If the NYS Police believed Crawford was qualified to perform this reconstruction and the 40 to 50 others, the trial court have been satisfied as well.

In arguing against the declaration of Sgt. Crawford as an expert, the People claimed that

> in preparing the witness, in speaking to him, in reviewing the foundations that he used in his report, it cannot meet the threshold foundation requirement of reliability... In this case, this momentum equation, it is the most difficult, the most sensitive in all of accident reconstruction, and he can't do it.

(A1367). This statement by the prosecution makes it clear they did not want Crawford to testify because his findings did not support their theory. If his speed calculations were what they wanted them to be, that is, if they supported the People's theory that Mr. Heidgen was speeding at a consistent rate and not slowing down at the time of the accident, they would have been all too happy to put him on the stand themselves and certainly would not have blocked the defense from calling him. Instead, they desperately tried to stop his expert opinions regarding speed from getting before the jury. To say that "he can't do it", referring to the speed calculations, when he did do it and was trained to do it and had prepared a report based on it, was an obvious attempt to stop the jury from hearing their own witness' opinions.

As defense counsel effectively argued, despite Crawford's claim that he is not

113

comfortable with angular momentum, "He wrote the report based upon these exact properties, the momentum analysis. If he felt at the time in January that he should not have been doing it, he didn't say anything about it. It is only now, months later, after these reports were turned over to the D.A.'s Office that he is saying, well, I don't- I'm not so comfortable anymore, because the speed here is not what they like." (A1366-A1367). Clearly, based on defense counsel's statement concerning Sgt. Crawford's opinion regarding the speed of Mr. Heidgen's truck, it was not consistent with the People's theory at trial but, rather was consistent with the defense theory that he was slowing down immediately before the accident which, as discussed *supra* at Point I, would negate a finding of depraved indifference.

Moreover, the court's reliance on the fact that Sgt. Crawford had never been declared an expert was misplaced. Defense counsel explained he was never declared an expert because none of the cases on which he had been the primary reconstructionist went to trial (A1365-A1366). This explanation should have satisfied the court and not been the basis for denying the request. This was not a situation where a court had previously refused to declare him an expert. This was just the first time anyone tried to declare him an expert. Every expert has to have a first time.

Furthermore, since Sgt. Crawford's credentials and experience clearly qualified him as an expert, the credibility and reliability of his opinions should have been a

matter for the People to test on cross-examination and the jury would then have been free to accept or reject the testimony. <u>People v. Negron</u>, 91 N.Y.2d 788, 892 (1998).

Finally, this error cannot, by any stretch of the imagination, be deemed harmless. <u>People v. Crimmins</u>, 36 N.Y.2d 230, 242 (1975). In fact, not only was it not harmless, the preclusion of Sgt. Crawford's testimony severely damaged, if not crippled, Mr. Heidgen's defense. Had this expert been permitted to testify, his findings would have had a dramatic effect upon the defense, as his report would have contradicted the People's theory that Mr. Heidgen did not slow down when he realized he was traveling on the wrong side of the road and corroborated the testimony of Mr. Heidgen's expert Stephen Schneider who testified he calculated Mr. Heidgen's speed using two types of analysis and found that the truck was going between 33 and 38 MPH at the time of impact. (A1408-A1409, A1416, A1427-A1428) That determination was in line with Crawford's estimate that Mr. Heidgen was "driving 45 MPH" at impact [Resp. Br. at 67] which the jury never got to hear. That is precisely the reason the People sought to block Crawford's testimony and is hardly the "truth seeking function" the People talked about in support of their claim that the court's violation of the discovery statutes was appropriate. Resp. Br. at 62.

This error can also not be rendered harmless just because, as the People argued below, the trial court's decision did not prevent Mr. Heidgen from presenting expert

testimony. While that is obviously true since they called their own reconstructionist Stephen Schneider, the issue is not whether Mr. Heidgen was prevented from calling any expert witness. The issue is whether he was erroneously prevented from calling this particular witness. That he called his own expert should not excuse the court's error in preventing him from calling Sgt. Crawford. In addition, the significance of a police witness' expert testimony should not be underestimated. The testimony of this sergeant who is viewed by jurors as part of the prosecution team would have gone a long way to proving  Mr. Heidgen's defense that he was slowing down at the time of the impact which, as discussed in much greater detail *supra*, was a crucial issue for the defense since slowing down negates depraved indifference. People v. Lazartes, 23 A.D.3d at 405.

## IV.  **CONCLUSION**

In sum, the trial court's decision to deny the defense's request to declare Sgt. Crawford an expert in accident reconstruction which precluded Mr. Heidgen from presenting his expert testimony, resulted in the denial of his State and Federal Constitutional rights. As a result, his conviction should be reversed and the case remanded for a new trial.

## POINT V.

## MR. HEIDGEN'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE TRIAL COURT'S FAILURE TO ADDRESS CERTAIN INSTANCES OF JUROR MISCONDUCT AND HIS ERRONEOUS FINDING THAT OTHERS WERE UNSUBSTANTIATED.

On appeal, Mr. Heidgen contends that he was denied his State and Federal constitutional right to a fair trial before a jury whose verdict was based solely on the evidence presented in court. U.S. Const. Amends. XI and XIV, N.Y. Const. Art I, §6; Turner v. Louisiana, 379 U.S. 466, 471 (1965). Mr. Heidgen, via a C.P.L.§330.30 motion [A1916], brought to the trial court's attention several instances of juror misconduct, each of which warranted a fact-finding hearing and setting aside of the jury's verdict. Although the court conducted a hearing, it was limited to the issue of whether the jurors discussed that Mr. Heidgen had a prior DWI. The failure to permit the defense to present evidence of other instances of misconduct was error and requires reversal and a new trial. In addition, the court's decision after the hearing that the extrinsic evidence brought into the jury's deliberations did not violate Mr. Heidgen's fair trial right was also error requiring reversal.

## I.    PROCEDURAL BACKGROUND

By motion dated November 28, 2006, the defense moved the court pursuant to

C.P.L.§330.30 to set aside the jury's verdict based on misconduct during deliberations (A1916).

In his affirmation in support of the §330.30 motion, defense counsel explained that following the jury's verdict, he read several newspaper articles which quoted the foreperson as saying she did not believe the proper verdict had been reached and described improper conduct during deliberations. As a result, counsel successfully contacted four jurors, two of which (Jurors #1 and 9 - Loy Malcolm and Craig Cavaco) came to his office and provided affidavits detailing their experiences. Those affidavits were attached as exhibits to counsel's §330.30 motion (A1934-A1941).

According to the jurors' affidavits, throughout their deliberations, the jury was split between a conviction for Manslaughter in the Second Degree and Murder in the Second Degree and it was apparent they could not reach a unanimous verdict.

Defense counsel affirmed that his investigation revealed that during the course of deliberations, the jury discussed extra-record information concerning the difference in what sentence would be imposed if Mr. Heidgen was convicted of Manslaughter vs. Murder. According to the jurors' affidavits, those discussions were aimed at convincing the jurors voting for Manslaughter to change their votes to Murder. The jurors further affirmed that these discussions clearly influenced some of the jurors.

In addition, Malcolm stated that Juror #11, an advocate for a Murder

conviction, said that Mr. Heidgen had a prior DWI in college in an effort to convince

Malcolm and others to change their vote to Murder.

In response, the People conceded that there should be a hearing but argued it

should be limited to a determination regarding whether the jurors discussed that Mr.

Heidgen had a previous DWI and, if so, what impact it had on the verdict.

Malcolm further informed counsel that the jury discussed and considered the

fact that Mr. Heidgen did not testify at trial and that the defense failed to call certain

witnesses including his ex-girlfriend Lindsay Long.

In response, the People conceded that there should be a hearing but argued it

should be limited to a determination regarding whether the jurors discussed that Mr.

Heidgen had a previous DWI and, if so, what impact it had on the verdict.

By order dated February 2, 2007, the trial court ruled that

> the only allegation made by the defendant which requires
> further inquiry, and upon which basis a hearing is now
> granted, is that jurors considered as evidence information
> not contained in the record - that the defendant had a prior
> DWI conviction and what effect if any this information
> may or may not have had on the jury's verdict.

(A1945). The court further ordered: "Specifically excluded from the issues litigated

at the hearing is the allegation that jurors discussed possible punishment during their

deliberations, and that the information regarding possible sentences was obtained

from extra-record sources" and found the remaining issues raised either speculative

or insufficiently supported to warrant inquiry. Id.

On February 13, 2007, the court conducted a hearing limited to the issue of

119

whether there was discussion among the jurors that Mr. Heidgen had a prior DWI. There, the defense called Loy Malcolm, the jury foreperson, who testified that during deliberations the jury was divided– five for Manslaughter, five for Murder and two undecided (A1954). Malcolm, who explained that she was advocating for a Manslaughter conviction, testified that while she was discussing the case with a small group of approximately four jurors, Juror Michelle Vargas, in an effort to persuade them to switch their votes to Murder, said Mr. Heidgen had a prior DWI while in college (A1956-A1959, A1964). Malcolm further testified that Vargas' statement influenced her vote which was not solely based on the evidence presented at trial (A1960-A1961).

The People called several other jurors as witnesses including Michele Vargas who testified that she did not tell any of the jurors that Mr. Heidgen had a prior conviction for driving while intoxicated (A2039).

Immediately after oral argument, the court denied Mr. Heidgen's motion: "this court is unconvinced that there was any extrinsic evidence brought into the deliberations that affected a substantial right of the defendant. Having failed to carry their burden of proof, the defendant's motion is denied in all respects" (A2104).

On direct appeal, the People argued that the (1) court's decision to limit the hearing to whether the jurors discussed that Mr. Heidgen had a prior DWI was

appropriate; (2) other allegations of juror misconduct were not appropriately raised at a C.P.L.§330.30 hearing; and (3) court properly denied the motion after the hearing. Resp. Br. at 87-97.

The Appellate Division majority held that the evidence adduced at the §330.30 hearing failed to establish Mr. Heidgen's claim of juror misconduct because one of the jurors testified at the hearing that

> another of the jurors stated during deliberation that the defendant has 'a prior DWI' when he was in college. However, upon hearing that information, that juror did not immediately change her vote from a conviction for manslaughter to a conviction for murder. She stated that the information had an influence on her, but that it was not the only influence, even though in a statement she provided to the prosecution, she denied that the information had any influence on her vote.

People v. Heidgen, 87 A.D.3d at 1027.

The Appellate Division majority further held that the trial court did not err in limiting the scope of the hearing and refusing to address the issue regarding the jury's consideration of the jail time Mr. Heidgen faced if convicted of manslaughter as opposed to murder "because the evidence submitted with the motion did not demonstrate that the jury's determination of guilt or innocence was affected by any such consideration." Id.

## II.    THE APPLICABLE LEGAL PRINCIPLES

It is axiomatic that a criminal defendant enjoys the right to have a fair trial before a jury whose verdict is based solely on the evidence presented at trial. People v. Brown, 48 N.Y.2d 388 (1979); Turner v. Louisiana, 379 U.S. at 471-72 *citing* Irvin v. Dowd, 366 U.S. 717 (1961).

## III.   ANALYSIS

While it is true that generally a criminal defendant may not impeach a verdict by probing into their deliberations, the showing of improper, extra-record influence is a necessary exception to that rule. People v. Brown, 48 N.Y.2d at 393. The policy considerations underlying the general rule against impeachment of a verdict must be balanced against the defendant's constitutional right to a trial by an impartial jury and a finding that such improprieties occurred requires the setting aside of the verdict. People v. DeLucia, 20 N.Y.2d 275 (1967); Parker v. Gladden, 385 U.S. 363 (1966). Simply stated, extra-record information that comes to the attention of a juror is presumptively prejudicial and may be overcome only "by an affirmative showing by the People that the information was harmless". United States v. Weiss, 752 F.2d 777, 782 (2d Cir. 1985).

Moreover, improper influence upon a jury's deliberations embraces not only attempts to corruptly affect the jury, but also well-intentioned jury conduct which puts

the jury in possession of evidence not introduced at trial. <u>People v. Brown</u>, 48 N.Y.2d at 393 *quoting* <u>United States v. Beach</u>, 296 F.2d 153 (4th Cir. 1961). In determining whether a jury has been subjected to improper influence, the court must examine the facts "to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered". <u>People v. Brown</u>, 48 N.Y.2d at 394. Here, there can be no doubt that the information placed before the jury was prejudicial.

A.   *<u>The Court Erred in Limiting the Scope of the §330.30 Hearing</u>*

With respect to claims of juror misconduct, each case must be examined on its unique facts to determine the nature of the misconduct and likelihood that defendant was prejudiced. <u>Id.</u> "The trial court is invested with discretion and post-trial fact finding powers to ascertain and determine whether the activity during deliberations constituted misconduct and whether the verdict should be set aside and a new trial ordered." <u>People v. Maragh</u>, 94 N.Y.2d 569, 574 (2000). And, a court is correct in summarily denying a motion to set aside a verdict, without a hearing, if the application is supported only by hearsay allegations or speculative claims of prejudice contained in an attorney's affidavit. <u>People v. Friedgood</u>, 58 N.Y.2d 467 (1983).

Here, there was much more than just defense counsel's affirmation. In his §330.30 motion, defense counsel requested that the verdict be set aside based on juror misconduct which included: (1) discussion about a prior DWI; (2) discussion about

the difference in sentence Mr. Heidgen would receive if convicted of manslaughter vs. murder; (3) improper private meetings and discussions between jurors; and (4) discussion about defendant's failure to testify at trial or call certain witnesses. The motion was supported by affidavits of two jurors and defense counsel detailed his conversations with two others.

However, rather than order a fact-finding hearing at which the allegations made by Mr. Heidgen as supported by the affidavits of his attorney and two jurors could be fully explored, the court limited the scope of the hearing to the issue of whether the jurors had discussed that Mr. Heidgen had a prior DWI. That decision severely hindered Mr. Heidgen's ability to determine whether his conviction was obtained based on erroneous and improper discussions among the jurors.

This is not a case where the defendant improperly asked the court to delve into the tenor of the jury's deliberations. Here, we have a situation where the court was asked to evaluate the claim that information not presented at trial was discussed by the jurors which likely effected the outcome of this case. That is a classic example of "improper influence" which this Court has held "includes jury conduct that tends to place the jury in possession of evidence not introduced at trial". People v. Arnold, 96 N.Y.2d 358, 364-5 (2001); People v. Brown, 48 N.Y.2d at 393. And the courts have held that the possession of such information requires a new trial. See e.g. People v.

Romano, 8 A.D.3d 503 (2d Dept. 2004) (Court upheld decision to set aside verdict where jurors read and discussed newspaper articles about the case and discussed defendant's guilt before deliberations.); People v. Dashnau, 187 A.D.2d 966 (4th Dept. 1992) (Reversal required where juror told fellow jurors defense counsel was a private attorney being paid by defendant who, therefore, must be a drug dealer.); People v. Lafferty, 177 A.D.2d 1043 (4th Dept. 1991) (Court ordered new trial where juror said she read newspaper report indicating defendant had been in jail for 8½ years).

Specifically, Mr. Heidgen's claim regarding the jurors' discussion of the potential sentences he faced if convicted should have been explored. Both Malcolm and Cavaco affirmed that during deliberations, Anthony Macchiarulo discussed the sentences Mr. Heidgen faced if convicted of manslaughter vs. murder. Malcolm further affirmed that Macchiarulo told jurors he did not believe a manslaughter conviction provided enough jail time since he would only serve four or five years. According to both jurors, who described this information as persuasive and having influenced the jury, other jurors agreed with Macchiarulo's assessment. That is precisely what the courts have sought to avoid– a juror conducting his own investigation and discovering extra-record information not presented at trial which he brings back to the jury room and utilizes in voting. People v. Maragh, 94 N.Y.2d at 574.

Finally, it would have been appropriate for the court to permit the defense to explore all of these claims of misconduct because, while taken individually they were each sufficient to warrant reversal, taken together they certainly paint a picture of a jury that violated the court's instructions and statutes governing jury conduct.

B.      *The Court Erred in Denying the §330.30 Motion Following the Hearing*

At the §330.30 hearing, the testimony was limited to the issue of whether one juror told others that Mr. Heidgen had a prior DWI. Loy Malcolm testified that during deliberations and while she was discussing the case with a small group of jurors, Michelle Vargas, in an effort to persuade them to switch their votes to murder, said that Mr. Heidgen "had a prior DWI...when he was in school" (A1956-A1959, A1964). Malcolm further testified that Vargas' statement influenced her vote which was not solely based on the evidence presented at trial (A1960-A1961). That statement rendered Vargas an unsworn witness providing critical information without Mr. Heidgen having the ability to confront or cross-examine as guaranteed by the Sixth Amendment.

It is noteworthy that the People admitted in their Respondent's Brief below that Vargas informed the others that Mr. Heidgen had a prior DWI and that this was the proper subject of inquiry at the C.P.L. §330.30 hearing. The People even admitted that some of the alleged misconduct "may have violated the court's instructions", while

simultaneously arguing the violations "did not constitute the type of outside influence require to set aside the verdict". Resp. Br. at 87.

The discussion of the prior conviction in and of itself warranted a reversal. People v. Magnano, 175 A.D.2d 639 (4th Dept. 1991) (Court held new trial required where "during jury deliberations, a juror initiated a discussion of defendant's bad reputation in the community and his prior conviction for selling untaxed cigarettes."); People v. Edgerton, 115 A.D.2d at 258 (Court reversed conviction in arson case where one of the jurors told others that defendant set other fires). But what makes this incident even more egregious is that Mr. Heidgen did not have a prior conviction for DWI or anything else. That kind of prejudice in a case as emotionally and politically charged as this one was insurmountable especially coupled with the other alleged instances of misconduct which the trial court refused to explore.

## IV.  **CONCLUSION**

In sum, the trial court erred by not holding a full fact-finding hearing to address all of Mr. Heidgen's allegations of juror impropriety and then erred in finding, after the limited hearing, that the claim of misconduct was unsubstantiated. As a result, the conviction should be set aside and a new trial ordered.

## CONCLUSION

For the reasons stated above, this court should reverse the judgment of conviction and dismiss the underlying indictment. In the alternative, the case should be remanded to the trial court for a new trial.

Respectfully submitted,

_____

JILLIAN S. HARRINGTON, ESQ.
Attorney at Law
*Attorney for Defendant-Appellant*
*Martin Heidgen*
P.O. Box 6006
Monroe Twp., NJ 08831

148 Madison Avenue
New York, New York 10016
(718) 490-3235

## CERTIFICATE OF COMPLIANCE

The foregoing brief was prepared on a computer. A proportionally spaced type-face was used as follows:

Name of Typeface:   Times New Roman
Point Size: 14
Line Spacing: Double

128

NEW YORK STATE
COURT OF APPEALS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
PEOPLE OF THE STATE OF NEW YORK,

                     *Respondent,*

            - v -

MARTIN HEIDGEN,

            *Defendant-Appellant.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**AFFIRMATION
OF SERVICE**

App. Div. Docket
No. 2007-2662

## AFFIRMATION OF SERVICE

Jillian S. Harrington, Esq., an attorney at law, hereby states under the penalties of perjury:

On September 6, 2012, I served a true copy of the Appellant's brief and Appendix by mailing the same in a sealed envelope with postage paid in an official depository of the U.S. Postal Service to the following:

Hon. Kathleen Rice
District Attorney, Nassau County
262 Old Country Road
Mineola, New York 11501
Attention:   ADA Judith Sternberg

                                    JILLIAN S. HARRINGTON