# 15 Cv. 819

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

---

### MARTIN HEIDGEN,

*Petitioner,*

### - against -

### HAROLD GRAHAM, SUPERINTENDENT AUBURN CORRECTIONAL FACILITY and NYS DOCCS,

*Respondent.*

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MARTIN HEIDGEN'S PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254

---

JILLIAN S. HARRINGTON, ESQ.
Attorney at Law
P.O. Box 6006
Monroe Twp., New Jersey 08831
(718) 490-3235
JBHESQ@AOL.COM

## TABLE OF CONTENTS

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

REPLY ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**POINT I.**

THE TRIAL COURT VIOLATED MR. HEIDGEN'S CONSTITU-
TIONAL RIGHTS TO A FAIR TRIAL AND TO PRESENT A
DEFENSE BY  PRECLUDING HIM FROM PRESENTING THE
EXPERT TESTIMONY OF A QUALIFIED POLICE ACCIDENT
RECONSTRUCTIONIST... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE TRIAL COURT DID NOT ERR IN INITIALLY
        PRECLUDING THE BLOOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     THE TRIAL COURT ERRED WHEN HE REVERSED
        HIMSELF AFTER THE DNA TEST REVEALED THAT
        MR. HEIDGEN'S BLOOD WAS IN THE TUBES . . . . . . . . . . . . . . . . . . . . . . 8

III.    MR. HEIDGEN'S CONSTITUTIONAL RIGHTS TO DUE
        PROCESS AND A FAIR TRIAL WERE BLATANTLY
        VIOLATED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.     MR. HEIDGEN WAS PREJUDICED BY THE ADMISSION
        OF THE BLOOD EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**POINT II.**

THE PEOPLE FAILED AS A MATTER OF LAW TO PROVE MR.
HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED
INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE
DOUBT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**POINT III.**

MR. HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND
IMPROPERLY ADMITTED INTO EVIDENCE AT TRIAL IN VIOL-
ATION OF HIS FOURTH AMENDMENT RIGHT TO BE FREE OF
UNREASONABLE, WARRANTLESS SEARCHES AND SEIZURES. . . . . . . . . . . . 36

## TABLE OF CONTENTS (cont'd)

*POINT IV.*

THE TRIAL COURT VIOLATED MR. HEIDGEN'S CONSTITU-
TIONAL RIGHTS TO A FAIR TRIAL AND TO PRESENT A
DEFENSE BY  PRECLUDING HIM FROM PRESENTING THE
EXPERT TESTIMONY OF A QUALIFIED POLICE ACCIDENT
RECONSTRUCTIONIST... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41


CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES:</u>

<u>Baker v. Reid</u>, 482 F.Supp. 470 (SDNY1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Birchfield v. North Dakota</u>, ___ S.Ct. ___ (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<u>Cavazas v. Smith</u>, 132 S.Ct. 2, 6 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Collins v. Scully</u>, 755 F.2d 16 (2d Cir.1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Missouri v. McNeely</u>, 133 S.Ct. 1552 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

<u>People v. Daniels</u>, 265 A.D.2d 909 (4th Dept. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>People v. Feingold</u>, 7 N.Y.3d 288 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 30

<u>People v. Gomez</u>, 65 N.Y.2d 9 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>People v. Harley</u>, 74 A.D.3d 1090 (2d Dept. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>People v. Heidgen</u>, 87 A.D.3d 1016 (2d Dept. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25, 26

<u>People v. Heidgen</u>, 22 N.Y.3d 259 (2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>People v. Hoffman</u>, 282 A.D.2d 928 (4th Dept. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>People v. Julian</u>, 41 N.Y.2d 340 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>People v. Keating</u>, 283 A.D.2d 589 (2d Dept. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

<u>People v. Lazartes</u>, 23 A.D.3d 400 (2d Dept. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>People v. McPherson</u>, 89 A.D.3d 752 (2d Dept. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>People v. Mooney</u>, 62 A.D.3d 725 (2d Dept. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>People v. Padula</u>, 197 A.D.2d 747 (3d Dept. 1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>People v. Payne</u>, 3 N.Y.3d 266 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>People v. Prindle</u>, 16 N.Y.3d 768 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>People v. Suarez</u>, 6 N.Y.3d 202 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

<u>People v. Valencia</u>, 14 N.Y.3d 927 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

<u>People v. Williams</u>, 184 A.D.2d 437 (1st Dept. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Taylor v. Curry</u>, 708 F.2d 886 (2d Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Taylor v. Illinois</u>, 484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## <u>STATUTES:</u>

28 U.S.C. §2254.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

C.P.L. §240.90. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 38, 40

U.S. Const. Amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 41, 46

U.S. Const. Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 41, 46

## REPLY ARGUMENT

## POINT I.

### MR. HEIDGEN WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS AS A RESULT OF THE TRIAL COURT'S DECISION TO PERMIT DNA TESTING IN THE MIDDLE OF TRIAL AND REVERSE HIS OWN DECISION AND ADMIT THE PREVIOUSLY EXCLUDED BLOOD PURPORTED TO BE MR. HEIDGEN'S.

Mr. Heidgen contends that his fundamental constitutional rights to a fair trial and due process of law were violated by the trial court's decision to permit the People to conduct a DNA test in the middle of trial and then reverse his decision to preclude the admission of what he had already determined to be unreliable blood evidence. U.S. Const. Amends. VI and XIV. This decision to permit DNA testing and then admit the unreliable blood was erroneous because: (1) it violated New York's discovery statutes; (2) it violated Mr. Heidgen's constituional rights to a fair trial and due process of law as he had already formed and presented his defense based on the information that no DNA testing had been performed; and (3) no DNA test could render reliable this evidence which the trial court had already deemed unreliable and excluded based on the testimony of the People's witnesses which demonstrated that there were no reasonable assurances that the blood was in the same condition as when it was drawn and because the chain of custody reports were flawed. As a result, Mr. Heidgen's request for a writ of habeas corpus should be granted.

In response, the People argue that (1) the trial court's error was in precluding the blood evidence in the first place [Resp. Memo of Law at p. 25][1]; (2) the trial court properly reversed

---

[1] Numbers in brackets preceded by "Resp. Memo of Law" refer to the pages of the Memorandum of Law submitted by the People; "Pet. Memo of Law" refer to the pages of the Memorandum of Law submitted by Mr. Heidgen.

himself after the DNA test revealed that Mr. Heidgen's blood was in the tubes [Resp. Memo of Law at p. 33]; (3) even if the blood was erroneously admitted, the right to a fair trial was not violated [Resp. Memo of Law at p. 37]; and (4) Mr. Heidgen was not prejudiced by the admission of the blood evidence [Resp. Memo of Law at p. 38].

## I.      THE TRIAL COURT DID NOT ERR IN INITIALLY PRECLUDING THE BLOOD

The People's first line of defense against Mr. Heidgen's allegations is that the trial court's error was not in admitting the blood evidence but, rather, was in precluding it in the first place [Resp. Memo of Law at p. 25]. In support of this argument, the People claim that they presented an adequate chain of custody for the blood samples which assured its reliability. The People are wrong and clearly are experiencing the same "lapses of memory" that they claim their witness experienced.

According to the People, the trial court suppressed the blood evidence "Because of Trooper O'Hare's confusion and lapses of memory concerning the color of the seals he placed on the test tubes, as well as whether the needle used to draw the blood was that contained in the kit or one from the hospital..." [Resp. Memo of Law at p. 26]. In making this claim, the People are grossly underestimating the trial court's reason for precluding this evidence which was that he found Tr. O'Hare's testimony incredible and unworthy of belief. This was obviously his conclusion as he took the rare step of precluding the People from presenting a key piece of evidence.

Clearly recognizing that the "lapses of memory" were not the only problems for this key piece of evidence, the People also acknowledge that the court precluded the blood based on its "initial determination that the People failed to establish an adequate chain of custody for the samples that were ultimately delivered to the Mid-Hudson lab." [Resp. Memo of Law at p. 28]. The People

were also forced to admit that "no one would suggest that this was the best way the evidence could have been handled." [Resp. Memo of Law at p. 31]. That is a huge understatement. They argue, however, that despite this less than ideal handling of this key piece of evidence, "the testimony established that every single person who had contact with petitioner's blood sample received and safeguarded that sample and passed it on, unchanged, until it was analyzed by the forensic scientist." [Resp. Memo of Law at p. 31]. That outrageous statement is absolutely untrue and is belied by the record. And, the trial court obviously agreed with the defense's assessment as demonstrated by his initial decision to preclude the blood evidence even after holding a hearing outside of the presence of the jury at which Tr. O'Hare was given a second chance to redeem the evidence (and himself) but was unable to do so.

It is incredible that the People have chosen to completely ignore the fact that the written chain of custody reports created by the law enforcement officers who handled this blood evidence kit not only did not establish an adequate chain of custody, they clearly demonstrated the inept and unprofessional manner in which this critical evidence was handled. The People appear to have conveniently forgotten (or perhaps have a lapse in memory) that the trial testimony demonstrated that the chain of custody reports showed the blood going to different people and different places – a claim that the People have never denied and have consistently ignored because they cannot refute or explain it away.

Inv. Baez testified at trial that the General II and Lab I forms that accompany the blood kit showed two different chains of custody: The Lab I showed the blood went from Stafford to Baez to Harris to the Medical Examiner's toxicology department. In contrast, the General II indicated that the blood went from Harris to Hemmerich (not from Harris to the Medical Examiner as the Lab I

3

indicated) and then from Hemmerich to Drake to the Newburgh BCI evidence to the Mid-Hudson Crime Lab (not the Medical Examiner). In other words, the two reports showed the blood kit going to two different places – one to the Mid-Hudson Lab and the other to the Medical Examiner. (Baez: T. 1088-92, 1099)[2]. And Tr. O'Hare admitted that the Lab I, which he acknowledged travels along with the blood kit to ensure its integrity, was wrong as it should have said Mr. Heidgen to Busco to O'Hare but he left himself out. He further testified that the form (which was filled in by another officer) indicated that the blood was passed from Stafford to Baez which was also incorrect. (O'Hare: T. 664-65, 673-74) The People have the temerity to call this an "unbroken chain of custody" [Resp. Memo of Law at p. 32] when these reports, which are supposed to be filled in simultaneously with the passage of the blood from one person to another, clearly demonstrate that the chain of custody is suspect to say the least. Indeed, these errors should, in and of themselves, have moved the trial court to preclude the blood.

In addition to the flawed chain of custody reports, it must also be remembered that there was testimony that the box containing the blood vials was unsealed as it was passed along from one officer to another [O'Hare: T.1373]. Thus, any claim that the testimony of those who handled the blood, given more than fourteen months later as the People point out in defending O'Hare's error-filled testimony, is more credible than those reports, must be disregarded. While it is true, as the People claim, that all of their witnesses testified that they "received and safeguarded that [blood] sample and passed it on, unchanged, until it was analyzed by the forensic scientist" [Resp. Memo of Law at 31], the People's convenient "memory loss" regarding something as important as the error-

---

[2] Numbers in parentheses preceded by the letter "T" refer to the pages of the trial transcript. Witnesses' names are noted accordingly.

filled chain of custody reports and the fact that when the box containing the blood was passed between several of those people it was not even sealed and the paperwork had only been partially filled out, is outrageous. And it is the errors in the chain of custody report, along with the error-filled testimony of Tr. O'Hare that led the trial court to preclude the blood in the first place which was the correct decision and can definitely be described as rare. That is, it is not often that a trial court precludes critical evidence such as this on the basis that it was improperly handled by police and found to be unreliable as a matter of law.

The People also claim that the evidence was "unchanged" as it was passed along. That claim is false and is clearly belied by the record. Tr. Stafford testified that Tr. O'Hare gave him the unsealed blood kit at Nassau County Medical Center which Stafford gave to NYS Police Inv. Baez when he arrived at the hospital two hours later. Baez testified that he looked at the contents of the box and then signed the Lab I form but did not write on the kit or other forms. He observed two blood tubes with grey stoppers sealed with integrity seals with the date of July 2nd and O'Hare's initials. When it was pointed out to him on cross-examination that his name was on the box, he said it was not his handwriting. (Stafford: T.779-84, 787-89, 794-95). Baez further testified that, because he knew he had to sign the Lab I report, he examined the contents of the kit which included two tubes of blood with gray stoppers sealed with red integrity seals which had the initials "DPO" and the date, "7/2/05", but no name for the subject. (Baez: T.1032-35, 1069, 1086-87). Baez further testified that he used two of the seals that O'Hare had filled out (with O'Hare's initials, the date, and time) to seal the plastic container that held the blood tubes. (Baez: T.1034, 1038, 1078-82, 1128) NYS Police Inv. Michael Harris testified that Baez gave him a blood kit which Harris, still at the accident scene, placed under the driver's seat of his car. Later that morning, Harris drove to the

Medical Examiner's Office to submit the kit for toxicology analysis but the office was closed. While they made some calls to find out where to bring the kit, Harris opened the outer box and examined its contents. He removed the paperwork and looked at the plastic container which had two white seals on it which did not contain Mr. Heidgen's name or a supervisor's initials as they were supposed to. He also observed two tubes of blood sealed with red seals with the date and initials "DPO". He then wrote Mr. Heidgen's name on the seals on the plastic container and put his initials in the spot requiring a supervisor's initials. He also filled in information on the Lab I and put it in the outer box and sealed the box with two seals. (Harris: T.1157-63, 1172-73, 1223, 1226-27)

Given this testimony by these law enforcement officers that they were given an unsealed blood kit which they sealed themselves using seals filled out by other officers and that they observed initials on blood tubes which did not exist when the tubes were examined in court and wrote the defendant's name on the seals, it is impossible and disingenuous to say that the blood kit was passed along "unchanged" to shore up its reliability.

In addition to leaving out critical testimony, the People go to great lengths to minimize Tr. O'Hare's trial and hearing testimony that led to the blood's preclusion. They claim that the mammoth differences between what he testified that he observed and did on July 2nd and the evidence they offered for admission at trial was caused by some "confusion" and "lapses of memory" cleared up by his testimony that "To the best of my recollection, Your Honor, at the time I believe[d] I used the white seals. Looking now I see I used the red integrity seals" (O'Hare: T.1371). [Resp. Memo of Law at p. 31]. The People claim this was an "acknowledgment that, after fourteen months, his recollection was mistaken and he actually sealed the test tube with a red seal and initialed the samples" [Resp. Memo of Law at p. 32]. That is a mischaracterization of Tr. O'Hare's testimony.

6

Indeed, he did not acknowledge that his recollection was incorrect. To the contrary, he maintained that he recalled putting white seals on the tubes and it was only after he examined the tubes in court that he testified that he must have used red seals, not because his recollection had been refreshed, but because he was confronted with evidence that did not match up with his memory of the events. Indeed, in response to approximately ten questions, O'Hare testified that he was only saying that he must have used red seals after looking at the evidence in court (O'Hare: T.1375-77, 1382, 1391). Thus, there was no clearing up of any confusion or lapses of memory because there was no confusion or lapses of memory to clear up. This glaring difference between O'Hare's testimony and the reality of what the People offered for admission at trial make it obvious that he was talking about an entirely different piece of evidence. And, despite the People's efforts to minimize these differences by saying he "explained" them [Resp. Memo of Law at p. 31], the differences could not be "explained".

Moreover, the seal color is not the only discrepancy that needed to be "explained". During Tr. O'Hare's testimony, he said approximately seven times that he recalled writing his initials on the blood tubes but when defense counsel asked him to examine the tubes in court, he admitted "I don't see my initial(s) on the tubes". (O'Hare: T.1382, 1385, 1387, 1394). No matter how hard the People tried to get him to change his answer, O'Hare repeatedly answered "to the best of my recollection I believe I put my initials on the tubes." (O'Hare: T.1386-87) Other officers also testified that they saw the initials on the tubes when they examined the contents of the blood kit as it was passed from officer to officer (Baez: T. 1034). Those admissions were conspicuously ignored here by the People.

Another major discrepancy which O'Hare's testimony could not cure was the fact that he told the jury that he observed the hospital nurse remove the needle from the blood kit and use it to draw Mr. Heidgen's blood (O'Hare: T.1316-17, 1322). At the hearing without the jury, he repeated

7

approximately six times that he saw her use the needle from the kit and that there was no needle in the unsealed box when he passed it on to Tr. Stafford (O'Hare: T.1384-85, 1394-96). However, despite O'Hare's certainty in his recollection of what he observed the nurse do, when defense counsel asked him to open the blood kit in court, it shockingly contained the unopened, unused needle (O'Hare: T.1385, 1395). One again, since the People could not explain such a major flaw in his memory, they have chosen to ignore it here.

All of this makes it obvious that the trial court's error was not in precluding the blood in the first place. The error came next when the court permitted the People to resurrect this piece of evidence which the court himself had recognized was unreliable. Simply stated, the trial court got it right the first time and should have stuck with that decision given that he was convinced that the extraordinary difficult threshold of proof required to preclude the evidence had been met.

## II.     THE TRIAL COURT ERRED WHEN HE REVERSED HIMSELF AFTER THE DNA TEST REVEALED THAT MR. HEIDGEN'S BLOOD WAS IN THE TUBES

In order to get the unreliable blood evidence admitted, the People asked the trial court to violate New York's discovery rules which the court did willingly to help the People obtain a conviction in this case at all costs. Indeed, the court himself acknowledged that he was not concerned with the propriety of his decision, noting that "The last thing in the world I'm going to worry about is reversal." (T.1448)

After making the correct decision to preclude the blood, the trial court, at the People's request, ordered a DNA test smack in the middle of trial. The People have conceded that this decision violated the discovery statutes but excuse the violation arguing that the decision not to strictly enforce the discovery statute was a permissible exercise of the court's discretion in light of

8

"unexpected testimony" from their own police witnesses [Resp. Memo of Law at p. 33]. They further argue that, despite the blatant violation, reversal is not required because no constitutional rights were implicated. [Resp. Memo of Law at p. 35]. The People are wrong.

The discovery statutes are very clear that a prosecutor's motion for scientific testing of this type must be made within forty-five days after arraignment or, where "good cause" can be shown, up to the commencement of trial. C.P.L. §240.90(1). The statute does not say that this timing is preferable or that the motion "should" be made during this time-frame "where possible". The statute emphatically states that the motion "shall be made" within the proscribed period. Id. It is not a suggestion that should be complied with when it is convenient for the People to do so.

The People's first line of argument in support of this blatant violation of the discovery statutes is that the DNA test was appropriate "given Trooper O'Hare's unexpected testimony concerning the seals on the test tubes" [Resp. Memo of Law at p. 33]. This is yet another outrageous argument by the People who claim that they could not have anticipated the testimony of their own police witness and that if they had "had any reason to expect that the testimony would establish anything other than a complete and reliable chain of custody, it would have requested a blood sample for DNA testing within the statutorily established time-frame". Resp. Memo of Law at p. 36. The People even go so far as to argue that the DNA test was only needed because "Tr.  O'Hare's testimony was wholly unanticipated and took the People by surprise." [Resp. Memo of Law at p. 36].

That argument made by the People here and at the time the request was made is utterly ridiculous given that this so-called "unexpected" and "surprise" testimony came from their own police witness, Tr. O'Hare, who testified that he reviewed his paperwork and met with members of the prosecution team who reviewed his testimony with him (O'Hare: T.1374-75). And the blood and

chain of custody reports were in the People's custody for more than fourteen months before trial so that if they had taken the time to adequately prepare for trial, they would surely have known what their witness' testimony was going to be and that the chain of custody reports were wrong. And, if they had done so, they could have made a motion for DNA testing before trial when it would have been appropriate. Instead, they did not do their homework and then were rewarded by the trial court for their disgracefully poor preparation by allowing them to perform a mid-trial DNA test.

### III.   MR. HEIDGEN'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE BLATANTLY VIOLATED

The People further argue that this decision by the trial court to order the mid-trial DNA test was an excusable "decision not to enforce strictly New York's discovery statute" [Resp. Memo of Law at p. 35]. The People are, once again, wrong. This is not an issue of enforcement, nor is it excusable. It is a blatant violation of a statute that was enacted to ensure the fairness and integrity of the criminal justice process and to ensure that the defendant has sufficient time and information to prepare his case for trial. And, contrary to the People's claim that "no constitutionally protected right was in issue" because "there was good cause for the People's late application and reasonable ground for the court to grant that application" [Resp. Memo of Law at p. 35], the reality is that the trial court's decision to ignore the statute and let the People play by their own rules, resulted in the violation of Mr. Heidgen's fundamental constitutional rights to due process and a fair trial. And, in doing so, the judge, in essence became another prosecutor.

The People claim in response that Mr. Heidgen concedes "by implication, that the time provisions for discovery, as established in CPL section 240.90(1), do not implicate any constitutional right" [Resp. Memo of Law at p. 36]. Mr. Heidgen does not now and has never made that concession

and, indeed, has consistently argued the converse. What was said in Mr. Heidgen's Memorandum of Law in support of this petition was that "even an erroneous evidentiary ruling by a State court could rise to the level of a constitutional claim which would be cognizable in a habeas petition if it were shown that the error so infected the proceedings as to have rendered a petitioner's trial fundamentally unfair". [Pet. Memo of Law at p. 29 *citing* Collins v. Scully, 755 F.2d 16 (2d Cir.1985); Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983); Baker v. Reid, 482 F.Supp. 470, 471 n. 2 (S.D.N.Y.1979)]. Thus, it has always been, and continues to be, Mr. Heidgen's position that the trial court's error to reverse himself, allow the DNA test, and then admit the unreliable blood evidence resulted in the violation of his basic constitutional rights to due process and a fair trial.

The People correctly cite the Second Circuit's standard for a petitioner to prevail on a habeas claim of evidentiary error which is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Collins v. Scully, 755 F.2d at 19. The erroneously admitted blood evidence easily meets that standard. A trial without the blood evidence would have been a completely different trial because, if the People did not have the blood, what did they have? They had a tragic car accident involving a person who was lost, driving on the wrong side of the road, because they would be unable to prove his level of intoxication without the blood.

According to the People, regardless of Tr. O'Hare's "initial confusion concerning the needle the nurse used to draw the blood and the color of the seals that he applied to the blood tubes, there was never any question about the possession of the blood samples that was taken." [Resp. Memo of Law at p. 38]. That could not be further from the truth. As discussed in greater detail *supra*, there

11

are absolutely no reasonable assurances that the blood offered by the People at trial was the same blood that was taken by Nurse Busco or that it was in the same condition as when she handed the vials to Tr. O'Hare in the hospital. Thus, the People's statement that "The chain of custody -- long though that chain may have been -- was unbroken, and the evidence was reliable" [Resp. Memo of Law at p. 38] is patently incorrect. This is a case of a trooper describing an entirely different piece of evidence than that which was proffered for admission at trial and it never should have been admitted. The incorrect chain of custody reports and the testimony from several police witnesses that the kit containing the blood was unsealed when passed from officer to officer and then sealed by another officer with seals that had been partially filled out by yet another officer cannot seriously be considered a "reliable" or "unbroken" chain of custody by any stretch of the imagination. Moreover, if the court believed that the chain of custody was reliable and/or unbroken as the People claim, it would never have taken the drastic step to preclude the blood evidence in the first place. The fact that he precluded it is clear evidence that the court, which listened to and observed the witnesses, determined that, at a minimum, Tr. O'Hare's testimony was unreliable. And if the court had stopped there, there would have been no error but, inexplicably, the court succumbed to the pressure that was mounted by the People and the obvious protests from the families of the deceased in this highly publicized and politicized case, and reversed himself and allowed the People to present what is clearly an unreliable piece of evidence which, as discussed in greater detail *infra*, had a devastating effect on the defense.

## IV.    MR. HEIDGEN WAS PREJUDICED BY THE ADMISSION OF THE BLOOD EVIDENCE

As their final line of defense, the People claim that, even if the decision to admit the blood

evidence was error, that the error was harmless [Resp. Memo of Law at p. 38]. The People argue that Mr. Heidgen was not prejudiced because "regardless of the DNA testing, petitioner still maintained that the blood sample is unreliable" [Resp. Memo of Law at p. 38]. This argument is shortsighted as defense counsel had no choice but to continue to pursue this argument that the blood was unreliable but, after the unreliable blood was re-admitted by the court based on a DNA test that only proved, if anything, that Mr. Heidgen's blood was in the tubes, he was much more limited in his argument. First, the testimony and evidence had already shown that the blood evidence was unreliable as demonstrated by the trial court's initial decision to preclude it. And, second, the defense could not now abandon this argument when they had so vigorously attacked the evidence before the DNA testing had been done. To abandon the argument would have resulted in a loss of credibility in the eyes of the jurors which was unacceptable. In fact, this decision had a devastating effect on the defense case and likely severely damaged the credibility of defense counsel who prepared his case and presented it up to that point with the understanding that no DNA testing had been performed, resulting in Mr. Heidgen's conviciton.

Incredibly, the People argue that the blood evidence and BAC determination "was actually useful evidence for the defense, rendering it significantly more difficult for the People to prove [Mr. Heidgen's] state of mind than had there been no such proof" [Resp. Memo of Law at p. 40]. If this case was not extremely serious, this argument would be laughable. Of course, Mr. Heidgen has attempted to use this evidence to support his defense but only because he was forced to defend against it at trial and on appeal. But, no matter how the People try to spin it, the court's decision to order the DNA test and then admit the evidence that it had already deemed incredible gravely damaged the defense and the credibility of defense counsel and the defendant.

13

This outrageous statement by the People makes it clear that they ave missed the point. The truth is that this would have been a very different trial without this blood evidence. As an initial matter, a BAC of .28 in a DWI homicide case involving the deaths of two people, including one young child, is extremely difficult, if not impossible, to overcome. The unsealed blood kit was passed from person to person and the box and its contents offered at trial was materially different than what the People's witnesses described they observed on the night of the accident. And, although the trial court recognized these differences rendered the blood unreliable and excluded it, he then reversed himself and admitted it after he allowed a mid-trial DNA test in violation of the discovery statutes which only proved, if anything, that Mr. Heidgen's blood was in the tubes. That DNA test could not provide the necessary "reasonable assurances" that the blood had not been tampered with or contaminated. People v. Julian, 41 N.Y.2d 340, 343 (1977). Moreover, this argument begs the question – if this blood evidence was so helpful to the defense, then why did the People fight so hard to get it in front of the jury? Once again, it is clear that the defense was forced to use the evidence. There was no other choice but to do so.

Second, the defense had already formed the theory of their defense, planned their case, and questioned the People's witnesses based on the People's representation made in response to their timely pre-trial discovery demands that DNA testing had not been done. Thus, the People's argument that "the defense could not have been formulated based on an assumption that the People would be precluded from introducing the BAC evidence that resulted from the testing of that blood" [Resp. Memo of Law at p. 38] missed the point. If that was the case, then no one would ever fight to have a piece of evidence precluded. The defense was formulated based on the lack of scientific testing, the discovery statutes (which the trial court chose to completely disregard), and the flawed chain of

custody – not the preclusion of the blood. Thus, the decision to admit the evidence after first precluding it resulted in "actual prejudice" to Mr. Heidgen and his defense.

Third, contrary to the People's claim that the blood evidence helped Mr. Heidgen's defense, the court's decision to preclude the blood only to later admit it, placed him in a worse position than he would have been had it not been precluded. This is so because the defense was left scrambling to recover from the grave prejudice that resulted from the court's decision to then re-admit it including a devastating loss of credibility and the need to contest the reliability of the blood evidence which the trial court had already deemed unreliable based on the way that it was handled and the flawed chain of custody reports. Without the DNA testing that the People claim cured these defects, the defense was better able to attack the reliability and probative value of the blood which was clearly in a completely different condition than it had been at the time that it was taken by the hospital nurse and turned over to Tr. O'Hare. That blood, which was contained in an unsealed box, then went through the hands of multiple officers who altered the box and its contents. These facts make the court's decision to change its mind significantly more than an evidentiary ruling. It was a devastating and unrecoverable blow to the defense case. Thus, the error cannot, in any view of the evidence, be deemed harmless as it caused "actual prejudice" to Mr. Heidgen and his defense.

## POINT II.

### THE PEOPLE FAILED AS A MATTER OF LAW TO PROVE MR. HEIDGEN'S GUILT OF CRIMES INVOLVING A DEPRAVED INDIFFERENCE TO HUMAN LIFE BEYOND A REASONABLE DOUBT.

Mr. Heidgen contends that he is entitled to a writ of habeas corpus because, as a matter of law, the People's evidence was legally insufficient to establish beyond a reasonable doubt that he acted with the *mens rea* of depraved indifference to human life[3] and, therefore, insufficient to establish his guilt of the crimes including a *mens rea* of depraved indifference beyond a reasonable doubt.

The crux of the People's argument in response here is that a writ of habeas corpus cannot issue in this case because it cannot be said that "no rational juror could agree with the state jury." [Resp. Memo of Law at p. 44] *citing* Cavazas v. Smith, 132 S.Ct. 2, 6 (2011) *quoting* Jackson v. Virgnia, 443 U.S. 307, 19 (1979). The People are wrong.

The People further claim that Mr. Heidgen's conduct in this case

> driving the wrong way on the highway for over two miles, 'engag[ing] in what amount[ed] to a high speed game of chicken, with complete disregard for the value of the lives that [were] thereby endangered' ([*People v.*] *Heidgen*, 22 N.Y.3d at 277) -- is surely among 'those rare circumstances... evincing an actor's depraved indifference to human life'... not unlike firing a gun into a crowd, or driving an automobile along a crowded sidewalk at high speeds (see [*People v.*] *Suarez*, 6 N.Y.3d at 214). And so, based on the evidence at trial, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.

[Resp. Memo of Law at pp. 45-46]. The People's argument has several major flaws. First, the People

---

[3] The *mens rea* of depraved indifference to human life was created by the New York State Court of Appeals in People v. Feingold, 7 N.Y.3d 288 (2006). It was not, as a mental state needs to be, created by the State legislature and codified in a statute.

failed to prove that Mr. Heidgen was aware that he was driving on the highway in the wrong direction for over two miles. Second, they failed to prove that he consciously disregarded the risk that his actions posed to others on the road.

Contrary to the People's arguments, the evidence at trial clearly demonstrated that Mr. Heidgen, in his extreme state of intoxication (which he was forced to argue as discussed in greater detail *infra*), was not consciously or deliberately driving in the wrong direction but, rather, got lost trying to drive himself home, when he accidentally got on the Meadowbrook Parkway going in the wrong direction, and continued to drive approximately 2.5 miles at which time the unrefuted expert testimony was that he slowed down because he realized something was amiss. Thus, his conduct was not, under any view of the evidence, as the People claim, equivalent to that of a person who shoots into a crowd, one of the New York State Court of Appeals' quintessential examples of conduct evincing a depraved indifference to human life. People v. Payne, 3 N.Y.3d 266, 271 (2004). An examination of the record of this case clearly demonstrates that Mr. Heidgen's act of unintentionally driving in the wrong direction and then slowing down, did not warrant a finding of depraved indifference. Whereas deliberately picking up a gun, loading it with bullets, aiming it into a crowd and shooting, an act which required the shooter to disregard the obvious risk of serious injury or death to those in the crowd, is precisely the type of deliberate behavior that should be, and has already been, classified as conduct evincing a depraved indifference to human life. That is so because the shooter intended to act and committed the act with total awareness, full consciousness, and a total disregard for the consequences of his actions. The same cannot be said of Mr. Heidgen who got drunk (which he was forced to argue after the DNA test), got behind the wheel of his car, got lost while trying to get himself home from an area with which he was unfamiliar since he had just moved

17

to Long Island from Arkansas just nine months earlier, and ended up on the wrong side of the highway. While such a scenario is admittedly deserved of criminal liability, the conduct did not evince the requisite depraved indifference to human life.

There was nothing deliberate or intentional about what Mr. Heidgen did in accidentally driving on the wrong side of the road that can elevate this accident to the level of the conduct included in the New York State Court of Appeals' quintessential examples of depraved indifference. People v. Suarez, 6 N.Y.3d 202, 214-15 (2005). In those examples, the culpable parties deliberately opened the lions cage at the zoo, deliberately shot a gun into a crowd, deliberately placed a bomb in a public place, deliberately poisoned a well from which people drink, deliberately opened a drawbridge as a train was about to pass over it, and deliberately dropped stones from an overpass onto a busy highway. Id. Those are all purposeful acts which the actor totally understood to come with the real possibility of serious death or injury.

To the contrary, what happened here was a terribly tragic accident. Mr. Heidgen's act of getting lost while trying to drive himself home in an extremely intoxicated state, getting on the wrong side of the parkway because he was unfamiliar with the area, and then slowing down when he realized something was amiss or that he was driving in the wrong direction can hardly be put in the same category as those quintessential examples of depraved conduct. Any claim that he knew he was driving the wrong way and continued on is based on pure speculation and conjecture. Whereas, the truth, that he did not realize he was going the wrong way until it was too late, is supported by the record which includes Mr. Heidgen's unequivocal statements to police which both the State courts and the People conspicuously fail to mention. That is, when asked three times by police during his hospital interrogation if he was trying to hurt himself, all three times Mr. Heidgen

18

unequivocally replied that he was not, once emphatically stating "No. Not under any circumstances" and the other times replying: "No, never before" and "No sir. I wouldn't cash out like this. I would wait for another hand to be dealt." (Harris: T.1199-1200, 1204, 1261). Those are not the answers of a man with a depraved mind. Those are the answers of a man who got lost and ended up on the wrong side of the parkway and should have erased any ambiguity.

One of the major themes of the People's argument here is their theory that Mr. Heidgen was a "practiced drinker" which they define as "one who, upon repeated exposure, has developed a tolerance to alcohol." [Resp. Memo of Law at p. 46]. This definition has no basis in law. However, they argue that he was a "practiced drinker" because his "apartment was strewn with empty liquor bottles and flasks, his wallet contained membership cards to seven different drinking clubs in Arkansas, he had spent the afternoon and early evening of July 1 in a bar, drinking at least six beers, and that night he went to a party where he drank still more." [Resp. Memo of Law at p. 46]. They then argue that "his conduct while under the effect of the alcohol he has consumed, more than warranted the conclusion that he was, indeed, a 'practiced drinker,' exceptionally tolerant of high levels of alcohol and very much aware of and in control of his behavior." [Resp. Memo of Law at p. 46]. However, nothing about his behavior establishes that he was a so-called "practiced drinker".

First, this description of his apartment was a gross exaggeration. There was no evidence that the apartment was "strewn" with liquor bottles. The testimony was that there were some empty bottles that he had collected on top of the refrigerator and two flasks. The People would have the Court believe that the apartment looked like a fraternity house after a big party but that is not what the testimony revealed.

Second, while it is true, as the defense conceded throughout these proceedings, that Mr.

Heidgen had been drinking before the accident, the People's claim that he is a "practiced drinker" is not, in any way, supported by the testimony. The People throw around this term "practiced drinker" while implying that it means a person who drinks regularly and has developed an abnormally high tolerance for alcohol – perhaps even an alcoholic. The flaw in their argument is that there was absolutely no evidence whatsoever to support such an allegation here. No one testified that Mr. Heidgen drank on a regular basis or that he had an abnormal tolerance for alcohol. Indeed, there was no evidence that he was anything but a casual drinker who drank socially with friends as many people in their twenties do. Although there were some liquor bottles in his home – as many adults have – and cards in his wallet from some bars in Arkansas (which are required to enter those bars) where he had not lived in nine months, this certainly does not qualify him to be diagnosed an alcoholic or a practiced drinker. But the People's claim that he was steady on his feet and did not slur his words at the party so he must be a "practiced drinker" which somehow makes him more culpable than another person who makes the tragic mistake of driving while intoxicated, is absurd. That is simply not what the proof established.

In their effort to retrofit this case into depraved indifference murder, the People also attempt to attack every piece of evidence that points to Mr. Heidgen's explanation that he simply got lost while trying to get home. For instance, according to the People, because Mr. Heidgen made a phone call on his way home – which they refuse to acknowledge was to get directions because he was lost in an unfamiliar area – that he must have been aware of where he was and known that he was driving on the wrong side of the road which makes him depraved [Resp. Memo of Law at p. 47]. The People are wrong and their assertion is belied by the record. According to Mr. Heidgen's cell phone records, the call to Amanda Goldman was made at 1:45 a.m. [Harris: T.1228-29] and the accident happened

20

at 2:06 a.m. – approximately twenty minutes later [Harris: T.1231]. Thus, it is clear that the call for directions was placed long before he got on the Meadowbrook Parkway going the wrong way and the fact that he called for directions does not demonstrate that he knew he had gotten on the road going the wrong way in the middle of the night in an unfamiliar area (he had only been living on Long Island for about nine months). After all, as established by the trial testimony, this was the same person who we know he had called two times earlier that evening on his way to the party for directions clearly demonstrating that he was unfamiliar with the area.

The People twist Mr. Heidgen's words and claim that he is arguing that he made the call because "drunken awareness suddenly set in" and that "somehow, when facing the one set of headlights that could not and did not get out of his way, petitioner suddenly again became aware of his circumstances and, he claimed, hit the brakes." Resp. Memo of Law at p. 48. That is not what Mr. Heidgen claims happened – that is what actually did happen.

According to the unrefuted testimony of the accident reconstruction expert Stephen Schneider, just before the accident, Mr. Heidgen's pickup truck slowed down from 70 MPH to between 33 and 38 MPH (or less according to one of the People's experts as discussed in greater detail *infra* at Point IV). This is an unrefuted fact that the People have conveniently ignored and/or attempted to downplay. Indeed, their own police accident reconstructionist, whose testimony they blocked from getting before the jury when it did not jive with their theory [see *infra* at Point IV], reported that he performed an accident reconstruction and speed analysis and determined that Mr. Heidgen was driving approximately 45 MPH at the time of the impact. Thus, for the People to try to minimize the importance of the fact that Mr. Heidgen was slowing down, which the Appellate Divsion, Second Department has held that slowing down "is the antithesis of a depraved, as opposed

21

to a reckless, state of mind" [People v. Lazartes, 23 A.D.3d 400, 405 (2d Dept. 2005)], is outrageous.

In their desperation to turn this into depraved indifference murder, the People even go so far as to attempt to undermine the testimony of their own expert witness Dr. William Closson who testified that a person with a .28 BAC would likely have issues driving including, *inter alia*, increased "perception reaction time" (the time between a person's perception of stimuli and his response to it which changes from an average of one half to one and one-half seconds for a sober person to three to five seconds for an intoxicated person), difficulty processing stimuli, difficulty thinking clearly, blurred vision, difficulty tracking an object visually, greatly reduced peripheral vision (described as "tunnel vision" making a person stare straight ahead and unable to see to the sides), and reduced ability to perform multiple tasks simultaneously such as steering a car while also paying attention to other vehicles on the road, traffic signals and lights. He added that a person with a BAC of .28 may feel invulnerable and disregard grave risk to himself and others. (Closson: T.2131-38, 2165, 2168)

The People, however, argue that "Intoxication may have slowed petitioner's response time, but it did not slow it by two minutes... or, as petitioner would suggest, eradicate it. Intoxication did not render him deaf or blind" [Resp. Memo of Law at 46]. Mr. Heidgen certainly never claimed to be deaf or blind and any claim that he did is offensive. What Mr. Heidgen actually argued, as supported by the People's own expert, is that he missed the signs that he was driving on the wrong side of the road because he was lost – which you do not even have to realize to be lost – and extremely inebriated and had what Dr. Closson called "tunnel vision" so that he was not aware of the risk he was creating because he simply did not perceive the risk. And he did not perceive the risk because his extreme state of intoxication caused him to focus only on driving straight ahead, making

him oblivious to what was happening around him. That explanation is supported by the People's witnesses who testified that he was looking straight ahead while driving.[4] As Justice Cohen correctly stated in his dissent in the Second Department: "Given the defendant's probable tunnel vision, his change to the limousine's lane was more likely a reaction to his observation of the headlights of Davidson's vehicle. Such an action in my opinion militates against the conclusion that the defendant acted with depraved indifference." People v. Heidgen, 87 A.D.3d 1016, 1033 (2d Dept. 2011). In addition, at trial in People v. McPherson, 89 A.D.3d 752, 767 (2d Dept. 2011), Dr. Closson (the same expert who testified in this case) testified "that an intoxicated person's vision becomes blurred and he or she develops 'tunnel vision' meaning he or she 'cannot see as effectively to either side' [and] may be unaware that he or she is driving the wrong way on a roadway." Id. He added at McPherson's trial that "an intoxicated person's ability to do 'divided attention tasks,' such as driving, is 'most affected' by alcohol. Thus, while driving requires equal attention to steering, acceleration, braking, direction signals, and responding to objects in the environment, an intoxicated person may devote all of his or her attention to only one or two of these tasks." Id. That is precisely what happened here and explains that Mr. Heidgen did not ignore the signs that he was driving the wrong way, he missed them because of his level of intoxication.

The People further claim that, even if Mr. Heidgen had "tunnel vision" as Dr. Closson said he would given the amount of alcohol he consumed, "he would have seen two sets of headlights, a mile apart, driving directly into his lane." [Resp. Memo of Law at p. 49]. Once again, the People failed to mention some critical facts with regard to the vehicles that were coming in his direction.

_____

[4] For instance, Weber was on the other side of the road when he spotted Mr. Heidgen who he testified was looking straight ahead (Weber: T.1593).

Despite the People's claim that he drove past "driver after driver, repeatedly facing and ignoring headlights in his lane, honking horns, and cars swerving out of his path, not understanding the import of what was happening" [Resp. Memo of Law at p. 47], this is simply not true. Indeed, prosecution witnesses Serwin, Weber and Sussingham all testified that the road was empty when they saw Mr. Heidgen's pickup [Serwin: T.1516; Sussingham: T.1697; Weber: T.1665] so he would not have seen headlights coming at him and realized he was driving the wrong way. The only driver who testified Mr. Heidgen passed him on the road was Caruso. Serwin testified she pulled onto the shoulder before the pickup passed her (Serwin: T.1491). Sussingham testified he was all the way to the left approaching the exit ramp when the pickup passed (Sussingham: T.1691). Weber was on the other side of the road when he spotted Mr. Heidgen who he testified was looking straight ahead [Weber: T.1593] and likely did not even see him. And, Inv. Sweeney testified that there was a two-sided sign that said "Norman J. Levy Memorial Parkway" on the center median near the accident scene facing southbound so it could be read by a person driving the wrong way (Sweeney: T.984-86, 1001). Only the limousine came straight at Mr. Heidgen and, contrary to the People's claim that he was playing "chicken" with the other cars on the road [Resp. Memo of Law at p. 45], when he realized he was going the wrong way, he slowed down, a fact the People repeatedly forget to mention because it completely contradicts their speculative theories. Thus, it cannot be said that Mr. Heidgen chose not to react to cars coming at him when, in fact, he slowed down dramatically when the one car coming at him did not veer out of his lane. If he was playing chicken or if his intention was to crash head on into one of the vehicles, he would have followed the other cars that veered out of his lane to accomplish his goal.

Moreover, any lane change was not, as the State courts claimed, to track vehicles or as the

24

People claim to play chicken with the drivers coming at him, but, rather, was Mr. Heidgen's reaction to headlights coming at him, his extreme level of intoxication and the fact that he was lost. As Justice Cohen noted in his Appellate Division dissent, the People's witness Dr. Closson testified that "oncoming headlights would be within the view of an intoxicated driver, and if those headlights suddenly veered to one side, the driver would be expected to react." People v. Heidgen, 87 A.D.3d at 1033. Although it was obviously a slow reaction to move into the lane of oncoming headlights as they changed lanes, it was the reaction of an extremely intoxicated man driving in an unfamiliar area. Just because it was a delayed reaction to stimuli, does not, as the People claim, mean that it was deliberate and it certainly does not prove that he was acting with a depraved mind. Thus, in order to buy the People's theory, the jury would have had to completely dismiss Dr. Closson's expert opinion and there was no legal basis to do so since Mr. Heidgen moved into what would have been the slow lane (the right lane) if he had been traveling in the right direction which would have been the correct reaction to a car coming at him.

    It is also important to note in this regard that the testimony was not that Mr. Heidgen drove directly into or was "tracking" the limousine as the Appellate Division majority claimed. Rather, the evidence, including the testimony and video from the limousine's camera as outlined by Justice Cohen's dissent, revealed that Reverend Davidson, who was driving the lead vehicle :

> was lawfully operating his vehicle in the center southbound lane of the Meadowbrook State Parkway, when the limousine operated by Mr. Rabinowitz passed him on the left. Their testimony also established that the defendant was in the center southbound lane and then moved into the limousine's lane just prior to the collision, but that Mr. Rabinowitz could not veer away from the defendant's vehicle because Reverend Davidson's vehicle was directly to his right. I reject the majority's argument that he was 'tracking' headlights because he was suicidal, and conclude that such an interpretation arises from a misapprehension of the expert's

25

> testimony. Given the defendant's probable tunnel vision, his lane change to the limousine's lane was more likely a reaction to his observation of the headlights of Davidson's vehicle. Such an action, in my opinion, militates against the conclusion that the defendant acted with depraved indifference.

People v. Heidgen, 87 A.D.3d at 1033. That description is not of a driver deliberately crashing head-on into a limousine, and certainly is not a description of a driver acting with a depraved indifference to human life.

Next, because the evidence clearly demonstrated that Mr. Heidgen was a happy, young man in his early twenties who enjoyed his job and new friends in his new city and, therefore, had no motive to hurt himself or anyone else, the People claim that they had no obligation to establish a motive for his conduct. While it is true that motive is not an element of these crimes, in order to establish depraved indifference murder, the People needed to prove that he was not mistakenly driving in the wrong direction. And to prove that, they needed to show why a young man who, by all accounts and according to every witness who testified at this trial, including those presented by the People, was happy and enjoying life, would deliberately do such a thing. To meet that burden, the People concocted a theory that he did not care about the victims in his path because he was unhappy and depressed about his life [Resp. Memo of Law at p. 51]. However, no matter how hard they try to spin it, they failed to prove this because it is simply not true and has absolutely no support in the record.

In support of their explanation as to why Mr. Heidgen would do what they allege he did when all of the testimony points to the conclusion that he would not, the People cite his statement to police in the hospital (before he knew two people had died) that he was in a "self-destructive mode". However, this time, they argue that this statement does not necessarily mean that he was suicidal –

26

although they argue that the jury could have believed that he was [Resp. Memo of Law at p. 51]. Now, they argue that when he said he was in a "self-destructive mode", he meant his conduct was "clearly contrary to one's self-interest" [Resp. Memo of Law at p. 51]. In so arguing, the People cite cases in which the term "self-destructive" has been used to describe behaviors including prostitution, alcoholism and drug abuse. Deliberately driving a car into the path of on-coming vehicles can hardly be put in the same category as engaging in sexual acts for money. If the People are to be believed, then Mr. Heidgen drove into the path of on-coming vehicles without caring what could happen to him or others. How can that be described as anything other than suicidal? The short answer is that it cannot. The People have hatched this theory – which was not their theory at trial – because, no matter how hard they have tried to spin the facts, they could not prove he deliberately drove on the wrong side of the road with total disregard for human life.

Furthermore, for the People's theory to be proven, they needed to discredit Mr. Heidgen's argument that he was not really in a "self-destructive mode" which was clearly supported by his letter to his friend Josh Zigman which the People put into evidence. According to the People, "There was no reason to believe petitioner's belated and self-serving denial that he was in a negative frame of mind" [Resp. Memo of Law at p. 52]. Because it supports Mr. Heidgen's argument, the People claim the letter is not to be believed [Resp. Memo of Law at p. 52]. They had to make that claim or else the theory of their case would crumble. However, the truth is that there is no reason not to believe what was contained in the letter because everything in the record pointed to the truth of what was in it.

It is not at all surprising that the People would make this argument since the letter to Zigman refutes every reason they have put forward as to why this happy, normal, young man was in the

27

"negative frame of mind" that would drive him to do what they say he did. In making this argument, the People once again conveniently ignore what the evidence at trial actually showed which was, not that Mr. Heidgen was depressed, but that he was a happy, young man who had been out partying and playing drinking games with his new friends who all testified he was in a good mood, looking forward to the holiday weekend. But in order to avoid the picture of a happy, young man drawn by all of the witnesses which is what they would have to do to explain why he would go to a party and have a good time and then suddenly snap and have a desire to consciously drive on the wrong side of the road and deliberately into another car or play a game of chicken, the People argue that even if he was happy earlier, all that matters is that he manifested a depraved indifference at the time he was driving. While it is true that it is his state of mind at the time of the accident that prevails [People v. Valencia, 14 N.Y.3d 927 (2010)], the People's argument that he went from being a cheerful man, partying, drinking with his friends and picking up women, to a depraved man capable of deliberately driving on the wrong side of the road and into the cars of innocent people, is unsupported by the record. From the moment he spoke to people, met people, went to a party, the trajectory of his mental state is clear and nothing about it demonstrated a depraved indifference to human life.

Thus, the People's claim that there is no reason to believe the assertions in the letter is wrong. The converse is actually true as there is no reason to believe the statements in the letter were false since the proof at trial verified that it was the statements in the letter that were true, not the statement to police that he was in a "self-destructive mode". Indeed, everything in the letter was supported by the trial evidence. For instance, Mr. Heidgen told police that he drank an entire fifth of Old Parr Scotch in his apartment which, if true, would have completely incapacitated him. As for his objective

28

being to shield from legal responsibility their friends Amanda and Justin Goldman at whose house

he and his friends had been partying, this is obviously true because, during his hospital interrogation,

he did not mention that he had been to a party at their house before the accident. And we know that

he was partying there because the District Attorney brought in a parade of witnesses who testified

that they were at the Goldman house, drinking, playing games and smoking marijuana (not Mr.

Heidgen), while the parents were out (Zigman: T.1810; Sodikoff: 1481). With regard to the scotch

bottle, Zigman testified that he had been in Mr. Heidgen's apartment several times and recalled

seeing it on top of the microwave and had pointed it out because he liked the old bottle. Another

friend, Foster, also testified that he recalled seeing the empty bottle during a New Years' visit from

Arkansas and even had photos of it. (Zigman: T.1844, 1890) The phone records revealed that he had

not spoken with his ex-girlfriend that day. As for the alleged financial problems, they did not exist.

He had a good job witnesses testified he liked, he was living in his mother's house rent-free, his

father was paying his car and student loans, car insurance and cell phone bill, and he recently

inherited $20,000 from his grandmother. (Zigman: T.1834; Aponte: T.2203, 2226, 2235) Thus, the

money he earned from his job was discretionary income for him to do with as he pleased. Finally,

and perhaps most importantly, in the letter he explained that the statement to police that he was in

a "self-destructive mode" was taken from the movie Ocean's Eleven, the line being: "My wife left

me. I was upset I fell in a self-destructive pattern". And Zigman and Foster testified that Mr. Heidgen

was notorious for quoting movies (Zigman: T.1810-11, 1815, 1844; Foster: T.1891). Thus, any

attempt by the People to discredit this letter must fail as the evidence at trial clearly demonstrated

its factual accuracy.

It is also more than noteworthy that the testimony at trial revealed that following the accident,

Mr. Heidgen believed that he had hit a tree or median and expressed concern about his pickup truck. And, he also thanked police officers for their help. Concern and gratitude are hardly the emotions that you would expect from a man who is alleged to have acted with a depraved mind.

Finally, the People make a strong effort to distinguish this case from two cases in which the New York State Court of Appeals found that depraved indifference had not been proven – <u>People v. Valencia</u>, 14 N.Y.3d at 927 and <u>People v. Feingold</u>, 7 N.Y.3d 288 (2006). It is not surprising that the People would go to great lengths to distinguish those cases because they know that, when applied to Mr. Heidgen's case, those cases require reversal.

In those cases, the New York State Court of Appeals held that the intentional acts (<u>Valencia</u> in driving while extremely intoxicated and <u>Feingold</u> in turning on the gas stove in an effort to kill himself) had nothing at all to do with other people. Indeed, the judges in both of those cases who presided over the bench trials said so in their verdicts when they said that they were oblivious to their surroundings. Valencia was oblivious because he was so intoxicated he could not form the *mens rea* of depraved indifference and Feingold was oblivious because he was so focused on himself that he did not think about the potential danger to others caused by his failed suicide attempt. In other words, their conduct was committed without a thought as to what could potentially happen to those around them so that it could not be said that they consciously disregarded the risk needed to find depraved indifference because they simply did not perceive the risk.

The same can be said for Mr. Heidgen. When he got into his car to drive himself home in his extremely inebriated state, there is no evidence that he was thinking about the potential consequences to others. As he told police when they asked where he was headed, he was trying to go home and said so. And when he got on the Meadowbrook Parkway going the wrong way, he was not thinking about

30

the consequences to others since he did not know he was going the wrong way. But when he figured out that something was amiss, he slowed down in an effort to self-correct. He did not, as the People speculate, continue on, not caring about those in his path. Thus, it cannot be said that Mr. Heidgen had the awareness of the potential consequences of his actions required to make a finding of depraved indifference to human life.

Furthermore, Mr. Heidgen's claim is now and has always been that intoxication alone is not enough to establish depraved indifference. Mr. Heidgen's argument has consistently been, not that depraved indifference can never be found where alcohol is involved, but that New York's courts have consistently held that intoxication is not enough to turn a reckless mental state into depraved indifference without something more than mere intoxication and the diminished reactions associated with a severely intoxicated person. The result, no matter how tragic and newsworthy, is not what transforms these events into a depraved indifference murder. He has argued that that something more simply is not found in this case where there is no proof that Mr. Heidgen knew he was driving in the wrong direction and continued on, disregarding the risk that doing so posed to others.

There is a long line of New York cases decided both before and after Feingold in which the courts have upheld convictions in which depraved indifference was found with intoxicated drivers. Each of those cases is distinguishable from Mr. Heidgen's because in those cases, unlike this one, there was something more than mere intoxication to support a finding of depraved indifference. For example, in People v. Keating, 283 A.D.2d 589 (2d Dept. 2001), a depraved indifference murder conviction was upheld where the defendant sped down residential streets at rates twice the speed limit, ignoring traffic signals, colliding with several vehicles, before hitting the victim and fleeing. Depraved indifference was established in that case, not because the defendant was drunk and

31

speeding, but because he hit other cars, which made him aware of his conduct, before striking and killing his victim and then continued on demonstrating that he was totally aware of what he was doing and the danger it posed, consciously disregarded the risk, and continued on. In People v. Hoffman, 282 A.D.2d 928 (4th Dept. 2001), a depraved indifference murder conviction was upheld where the defendant struck a car and, after being stopped by police who took his keys, he grabbed another set of keys from his girlfriend and drove off, leading police on an 80 MPH chase, passing cars on the right. Defendant ignored passengers' pleas to stop and did not brake when he drove down an off-ramp colliding with a car, killing two people. These events clearly show that Hoffman was totally aware of the risk which, once again, satisfies the standard that something more than intoxication is needed for a finding of depraved indifference. In People v. Daniels, 265 A.D.2d 909 (4th Dept. 1999), a depraved indifference murder conviction was upheld where, after running a red light, defendant engaged in a chase with police at 100 MPH and told a passenger who asked him to stop that he "was not going to jail for a DWI". He continued weaving between lanes and finally lost control going 80 MPH in a 35 MPH zone, killing two passengers. These facts show that the defendant was depraved, not because he was speeding and weaving in and out of lanes which this Court in People v. Prindle, 16 N.Y.3d 768 (2011) held was insufficient to establish depraved indifference, but because he ignored his passengers' pleas to stop and his statement that he "was not going to jail for a DWI" meaning he fully understood what he was doing and continued to drive erratically after his passenger begged him to stop, demonstrating that his desire not to go to jail superceded the safety of those in his path. In People v. Padula, 197 A.D.2d 747 (3d Dept. 1993), the defendant drove a "high-powered sports car at excessive speed" during the evening rush hour, and, despite passengers' pleas to stop, failed to brake and ran a red light, colliding with a car and killing

32

a passenger. These facts, highlighted by the passengers' pleas to stop, and the failure to brake or slow down, demonstrate that Padula was aware of and disregarded the risk he posed to others. In <u>People v. Williams</u>, 184 A.D.2d 437 (1st Dept. 1992), after sideswiping a car, defendant led police on a high speed chase, sideswiping other cars, running red lights and stop signs and then "rac[ed] through a construction site causing 20 workers to dive out of the way" before striking and dragging his victim. He then continued on and kept driving until he hit a bus. Once again, by sideswiping cars, racing through a construction zone and striking and dragging his victim before hitting a bus, it is with absolute certainty that Williams was totally aware of his actions and consciously disregarded the risk demonstrating his mental state of depraved indifference. Finally, in <u>People v. Gomez</u>, 65 N.Y.2d 9 (1985) a depraved indifference charge was upheld where, after careening across traffic and striking two cars, defendant drove on the sidewalk at over 50 MPH and struck a child. When his passenger begged him to stop, he said "no, I cannot brake... I have killed a person already", accelerated, crossed the street and drove on the opposite sidewalk where he struck another child. He then crossed another street, drove onto the sidewalk, nearly striking several others. This case presents the most obvious example as the defendant continued to drive in an extremely dangerous manner after hitting a child and explained he could not stop because he already killed a person demonstrating that he was totally aware of the danger he was creating and completely disregarded it.

The legal premise that intoxicated drivers can have the *mens rea* of depraved indifference did not end with <u>Feingold</u>. Although <u>Feingold</u> changed the way we evaluate cases alleging depraved indifference, the post-<u>Feingold</u> cases still require something more than intoxication. For example, in <u>People v. Mooney</u>, 62 A.D.3d 725 (2d Dept. 2009), a depraved indifference conviction was upheld where the intoxicated driver engaged police in a chase (70-75 MPH) through a residential area, made

U-turns into oncoming traffic, ran stop signs and turned off his lights before heading into a curve which resulted in a crash with a police vehicle. It is clear that this defendant knew precisely what he was doing and continuously disregarded the grave risk his driving posed to others. In <u>People v. Harley</u>, 74 A.D.3d 1090 (2d Dept. 2010), a depraved indifference reckless endangerment conviction was upheld where the defendant drove 120 MPH on a highway, weaving in and out of traffic for thirty miles, "making sharp apparently intentional turns toward other vehicles, which caused an estimated 24 to 30 other motorists to take evasive measures... and any time a police vehicle neared the defendant's vehicle, she would turn toward it as though she were trying to force it off the road". And, even after two of the defendant's tires were blown out, she turned her car toward an officer standing on the side of the road demonstrating that she disregarded the risk of her actions and consciously disregarded the risk she posed to others.

Each of these pre- and post-<u>Feingold</u> cases illustrates Mr. Heidgen's point that there must be something more than intoxication to prove depraved indifference. The common factor that distinguishes all of those cases from Mr. Heidgen's is that the events in those cases demonstrate that the defendants were consciously aware of and totally disregarded the risk that they posed to others by driving in an extremely erratic and dangerous manner. The same cannot be said of Mr. Heidgen who did not continue on but, instead, dramatically slowed down when he realized something was amiss or discovered that he was driving the wrong way. Simply stated, the evidence does not rise to the level of establishing that he was aware of the danger he posed to others and consciously disregarded it and without that, the *mens rea* of depraved indifference cannot be established.

Moreover, it must be remembered that PO Pandolfo testified that shortly after arriving at the accident scene on July 2, 2005, he approached Mr. Heidgen who was alone, seated behind the wheel

of his pick up truck awake and looking straight forward. When Pandolfo approached him, Mr. Heidgen inquired: "What happened? Where am I?" (Pandolfo: H.3-5, 8, 14-15). This testimony, when viewed in conjunction with the testimony of the emergency room physician Dr. Zohrabian that Mr. Heidgen did not sustain a traumatic head injury, demonstrates that Mr. Heidgen, although awake and medically conscious, did not know what happened or where he was. Those innocent questions – what happened? and where am I? – are very revealing and prove, beyond a reasonable doubt, that he was not aware of his actions or where he was because he was lost. This is what differentiates this case from the others in which depraved indifference was found because in those cases, the defendants were totally aware of what they were doing and the danger their conduct posed and consciously decided to continue on whereas Mr. Heidgen was not. Stated simply, if his intent was to play "chicken" with the other cars or to drive into one of them, he would have had no reason to ask what happened or where he was. He certainly would have known the answers to those questions.

In sum, viewing the totality of the evidence in the light most favorable to the People, the evidence, as a matter of law, was insufficient to prove Mr. Heidgen's state of mind was that of depraved indifference to human life. And, since "no rational juror could agree with the state jury" a writ of habeas corpus should issue.

### POINT III.

### MR. HEIDGEN'S BLOOD WAS ILLEGALLY OBTAINED AND IMPROPERLY ADMITTED INTO EVIDENCE AT TRIAL IN VIOLATION OF HIS FOURTH AMENDMENT RIGHT TO BE FREE OF UNREASONABLE, WARRANTLESS SEARCHES AND SEIZURES.

Mr. Heidgen contends that his Fourth Amendment right was violated when his blood was illegally seized by police and improperly admitted into evidence at trial. U.S. Const. Amend. IV. As a result, his petition for a writ of habeas corpus should be granted.

In response, the People argue that (1) this issue was not exhausted in the State courts because the precise constitutional issue raised here was not raised in the State courts [Resp. Memo of Law at p. 60]; (2) even if the issue was available for habeas review, he is not entitled to relief because the claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" [Resp. Memo of Law at p. 63 *citing* 28 U.S.C. §2254(d)(1)]; and (3) the trial court did not err in denying the motion to suppress based on the facts presented at the hearing [Resp. Memo of Law at p. 71].

First, this issue was raised in the State courts below. Although it was raised as one of several aspects of the argument against admission of the blood evidence, the Fourth Amendment claim was raised. In his Appellant's Brief presented to the Appellate Division, Second Department, Mr. Heidgen argued that his "blood was taken in violation of the V.T.L. and his Fourth Amendment right protecting against unreasonable searches and seizures and should therefore have been precluded at trial." [App. Div. Brief at p. 94]. And, in the New York State Court of Appeals, Mr. Heidgen argued that his "blood was taken in violation of the statute and his Fourth Amendment right protecting against unreasonable searches and seizures and should therefore have been precluded at trial." [Court

36

of Appeals Brief at p. 107]. And, although it is true, as the People note that he stated [Resp. Memo of Law at pp. 60-62] that the People "could" have obtained a warrant for his blood [Court of Appeals Brief at p. 106] that surely does not mean that Mr. Heidgen was abandoning the constitutional Fourth amendment argument that his blood was illegally seized under both the State statutes and Federal Constitution. To argue to the contrary is to play a game of semantics which we respectfully request that this Court not engage in. Thus, the claim is not procedurally barred from habeas review.

The People next argue that, even if the issue was available for habeas review, Mr. Heidgen is not entitled to relief because the claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" [Resp. Memo of Law at p. 63 *citing* 28 U.S.C. §2254(d)(1)]. Once again, the People are wrong as the trial court's decision in this case flies directly in the face of the Fourth Amendment and the case law that has developed in the field of blood seizures including Schmerber v. California, 384 U.S. 757, 767 (1966) and its progeny, most notably the Supreme Court's recent cases of Missouri v. McNeely, 133 S. Ct. 1552, 1557-58 (2013) and Birchfield v. North Dakota, ___ S.Ct. ___ (2016)[5], a case which was argued before the Court on April 19, 2016 and may have further impact on the case at bar.

Although the People desperately try to convince this Court that the Supreme Court's McNeely decision does not apply here, they cannot succeed. In McNeely, the defendant was arrested for drunk driving and, after he refused to consent to breathalyzer and blood tests, the police, acting

---

[5] In Birchfield v. North Dakota, the issue before the Court was whether or not a state, without a warrant, can make it a crime for a driver suspected of driving under the influence to refuse to take a test to measure the alcohol in his blood and whether a warrant is necessary for such an invasion. Three men from Minnesota and North Dakota contend that the states cannot, because it would violate their rights under the Fourth Amendment to be free from unreasonable searches and seizures.

without a warrant, directed a hospital employee to draw his blood to obtain his BAC level. The Supreme Court, in a 5-4 decision, held that this action violated his Fourth Amendment right to be free from unreasonable searches and seizures. Missouri v. McNeely, 133 S. Ct. at 1557-58. In so holding, the majority wrote that in drunk driving cases, the "natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." Id. at 1568. The majority's opinion makes it clear that the Court was not willing to make an exception to the warrant requirement for the drawing of blood and was applying standard Fourth Amendment jurisprudence to the seizure of blood without a warrant. In so doing, the Court found that its Fourth Amendment precedents simply did not support a blanket rule that blood could be drawn by police without ever having to seek a warrant from a judge.

Although the People would have this Court believe that McNeely does not apply here, they are incorrect. The primary reason they give for distinguishing the cases is that McNeely "was fully conscious and aware, while [Mr. Heidgen] was incoherent and unresponsive." [Resp. Memo of Law at p. 65]. A review of the record reveals that is simply untrue. As outlined in greater detail in Mr. Heidgen's Memorandum of Law in support of the petition, when police arrived at the accident scene, Mr. Heidgen was conscious, his eyes were open, he answered questions and followed commands. (Nolan: H.24-26, 29-30, 36-39) While in the ambulance, he remained conscious. (O'Hare: H.69-75, 85-86, 96-100). And, the most compelling testimony came from experienced emergency room physician Dr. Zohrabian who performed neurological and physical examinations which proved Mr. Heidgen was conscious and capable of giving consent and understanding the legal consequences of having his blood drawn. (Zohrabian: H.205-06). However, like they did in the State courts, the People completely ignore this assessment and once again quote the trial court's finding that "the

38

doctor's evaluation of petitioner was made in his role as a physician determining petitioner's medical condition for the purpose of treatment, applying 'a completely distinct standard' from that used in a legal context for the purpose of assessing a petitioner's ability to reasonably understand and knowingly consent" to having his blood drawn [Resp. Memo of Law at p. 70]. This argument has always been and remains outrageous. To say that we should take the word of a police officer on the job for approximately four years [O'Hare: T.597], over a trained emergency room physician with approximately thirty years of experience [Zohrabian: T.193], is unbelievable. Dr. Zohrabian was asked the specific question "...based upon your medical examination of Mr. Heidgen... do you have an opinion based upon a reasonable degree of medical certainty whether Mr. Heidgen was capable of giving his informed consent or request made of him to perform medical procedures, including that of submitting a sample of blood for the purpose of ascertaining a blood alcohol level?..."  and he gave this very specific and unequivocal answer: "That opinion is that he definitely understood what the test is all about and what his responsibility was in terms of responding to the officer's request, and therefore he knew quite well that the blood that was taken from him had some implications." (Zohrabian: H.205-06). That very precise question and the doctor's very precise response were not about Mr. Heidgen's ability to understand his medical treatment. That question and its response were tailored to determine whether Mr. Heidgen could understand the legal consequences of giving consent to having his blood drawn. It is inconceivable that a court would completely disregard such an obvious declaration by a very experienced emergency room physician and that the People would argue that it was proper to do so because the doctor was "applying 'a completely distinct standard' from that used in a legal context for the purpose of assessing a petitioner's ability to reasonably understand and knowingly consent." [Resp. Memo of Law at p. 70]. This theory was concocted by

39

the trial court and neither he nor the People have ever been able to cite any legal authority to support it.

In sum, Mr. Heidgen's blood was taken in violation of New York's discovery statute as well as his Fourth Amendment right to be free from unreasonable searches and seizures and should, therefore, have been precluded at trial. U.S. Const. Amend. IV.

## POINT IV.

## THE TRIAL COURT VIOLATED MR. HEIDGEN'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND TO PRESENT A DEFENSE BY PRECLUDING HIM FROM PRESENTING THE EXPERT TESTIMONY OF A QUALIFIED POLICE ACCIDENT RECONSTRUCTIONIST.

Mr. Heidgen was denied his constitutional rights to a fair trial and to present a defense as a result of the trial court's decision to preclude him from presenting the expert testimony of NYS Police Sgt. Scott Crawford who performed an accident reconstruction in this case and prepared a report that was given to the People indicating that Mr. Heidgen was traveling at 45 MPH at the tine of impact. U.S. Const. Amends. XIV and VI. As a result, Mr. Heidgen's request for a writ of habeas corpus should be granted and a new trial ordered.

The People begin their response with something both parties agree on – that there is "no dispute that the Constitution guarantees the right to call witnesses in order to present a meaningful defense at a criminal trial." [Resp. Memo of Law at p. 74 *citing* U.S. Const. Amends. VI and XIV; Taylor v. Illinois, 484 U.S. 400, 408-09 (1988)]. However, that is where the agreement ends as the people go on to argue that, although a defendant is entitled to call witnesses, Mr. Heidgen was not entitled to call this particular witness because, according to them, he was not a qualified expert "concerning post-impact reconstruction and analysis of an automobile collision." [Resp. Memo of Law at p. 74]. The People are wrong.

In response, the People argue that (1) by denying the defense request to declare Sgt Crawford an expert, the court did not prevent the defense from presenting expert testimony on accident reconstruction [Resp. Memo of Law at p. 79]; (2) the court's decision to preclude Sgt. Crawford's testimony was proper because he was not qualified to be declared an expert [Resp. Memo of Law

41

at p. 76]; and (3) any error was harmless [Resp. Memo of Law at p. 79].

The People's first contention – that the court properly denied the request to declare Sgt. Crawford an expert because he lacked the requisite qualifications – is untrue. The People claim that Crawford was unqualified because (1) it had been almost ten years since he took three two-week accident reconstruction classes; (2) even though he had been involved in approximately fifty accident reconstructions, he was only the primary reconstructionist on ten to twelve of them; (3) he only reconstructed one other angular head-on collision in his career; and (4) he was not comfortable with the angular momentum formula [Resp. Memo of Law at p. 77]. At its core, the People's claim is essentially that the New York State Police assigned what they claim to be a grossly unqualified sergeant to perform an accident reconstruction in this double homicide case explaining that "the court was presented with a witness whose training in, and experience with, angular momentum was limited, remote and dated. This, alone, would have justified the court's refusal to qualify the witness as an expert" [Resp. Memo of Law at p. 78]. This argument begs the question – if he was so unqualified to perform this reconstruction, then why did his supervisors assign him to perform the task in what they mut have known would be a high-profile, double homicide involving the tragic death of a young child?

Before requesting that he be declared an expert, defense counsel asked Sgt. Crawford to describe his training and experience in the field of accident reconstruction. He explained that he completed three two-week courses amounting to 248 hours of training and had, up to that point, participated in 40-50 accident reconstructions. (Crawford: T.2248-49, 2253) That resume surely supports his qualification as a reconstructionist whose supervisors thought enough of his expertise to assign him to be the primary reconstructionist in this case. And, while it is true that the NYS

42

Police, not the District Attorney, made this assignment, the People would have happily called him as a witness themselves and put his report into evidence if it had supported their theory that Mr. Heidgen was speeding down the Meadowbrook Parkway at 70-80 MPH without slowing down. But, since Crawford's report did not support that theory, and, instead, supported the defense theory that he was dramatically slowing down at the time of the accident, the People did everything they could to discredit him and keep his findings away from the jury and now even shockingly are willing to go so far as to label him "unreliable" [Resp. Memo of Law at p. 76]. That is a very bold statement to make about a law enforcement officer who they have likely called as a witness many times since Mr. Heidgen's trial and whose findings they have likely relied upon to obtain convictions in other cases.

Moreover, the People would have had every opportunity to attack Crawford's reliability on cross-examination and were free to call their own experts whose services they had retained to critique the report. Indeed, the People have admitted that they had other experts who they had paid to evaluate this case but did not call them as witnesses, likely for the same reason they did not want Sgt. Crawford to testify – because their expert opinions were not in line with their theory that Mr. Heidgen was not slowing down.[6] The People claim that they hired, using taxpayer money, these other experts "upon receiving Crawford's report and seeing that his findings were contrary to other

---

[6] And we know that this was true because, for example, one of those witnesses, Wade Bartlett, an expert in the field of accident reconstruction, prepared two reports for the People. The first found that Mr. Heidgen was traveling at 23 MPH at the time of the accident and, of course, they did not call him as a witness. How can it be that all of these experts came to similar conclusions about Mr. Heidgen's speed but they, according to the People who did not like those findings, were all wrong? This is just further evidence of how the People were attempting to hide the truth from the jury in order to make out their case of depraved indifference murder when the evidence did not support it. And that truth is that Mr. Heidgen was slowing down at the time of the accident.

evidence in the case..." [Resp. Memo of Law at p. 76]. Although they do not cite what this "other evidence in the case" is, the only other evidence they have ever cited with regard to speed is the testimony of a lay witness who was driving on the road who claimed that Mr. Heidgen was driving 70-80 MPH. Thus, that must be the inconsistency to which they refer when the truth is that the only other credible and reliable testimony regarding vehicle speed came from an expert witness called by the defense who said that Mr. Heidgen had dramatically slowed down immediately before the accident. That testimony was unrefuted.

The People's second claim – that the court's decision not to declare Sgt. Crawford an expert did not prevent Mr. Heidgen from presenting expert testimony [Resp. Memo of Law at p. 79]– is obviously true. The defense called its own accident reconstructionist, Stephen Schneider, who testified that he calculated Mr. Heidgen's speed using two types of analysis and found that the pickup truck was going between 33 and 38 MPH at the time of impact with the limousine. (Schneider: T.2304-05, 2312, 2323) That determination was right in line with Crawford's estimate that he was "driving 45 MPH" at impact which the jury never got to hear because it did not support the People's theory.

However, the issue should not be whether Mr. Heidgen was prevented from calling any expert witness at trial. The issue is whether he was unfairly prevented from calling this particular police witness. The fact that he called his own expert should not excuse the court's error in preventing him from calling Sgt. Crawford. Moreover, the significance of a police witness' testimony must not be underestimated. The testimony of this New York State Trooper, viewed by jurors as part of the prosecution team, would have gone a long way to proving Mr. Heidgen's defense that he was slowing down at the time of the accident which, as discussed *supra*, negates a finding

44

that he acted with a depraved indifference to human life.

The People further argue in this regard that their "decision not to call Crawford was not an attempt to sweep his findings under the rug [Resp. Memo of Law at p. 76]. They support this claim by noting that they "provided a copy of Crawford's report to the defense" [Resp. Memo of Law at p. 76]. They say this as though they should be rewarded for doing so and that they did it out of the goodness of their hearts when the truth is that he was on their witness list and was only called by the defense when the People decided not to call him which, we now know, is because the conclusion of his accident reconstruction was not what they wanted it to be.

Finally, the People's claim that if there was an error that it was harmless is meritless. First, the People argue that the expert's speed determination was not important because "three disinterested eyewitnesses", other drivers on the dark, desolate parkway who were in shock after seeing a vehicle on the wrong side of the road in the middle of the night, testified that Mr. Heidgen was going 70-80 MPH right before the accident [Resp. Memo of Law at p. 81]. Any argument that the testimony of an expert, police accident reconstructionist whose supervisors thought enough of him to assign him to perform this reconstruction would not refute the testimony of lay drivers on a dark, desolate road in the middle of the night is ridiculous.

Second, evidence that Mr. Heidgen was slowing down at the time of the crash was crucial to the defense's contention that he was not acting with a depraved indifference to human life. Thus, Crawford's determination that Mr. Heidgen was going 45 MPH, which was so close to the findings of defense expert Schneider, would have helped the defense prove its case – which is precisely the reason the People fought so hard to keep him off the stand.

In sum, the court's refusal to declare Sgt. Crawford an expert in accident reconstruction

45

which precluded Mr. Heidgen from presenting his expert testimony was an abuse of the trial court's discretion which resulted in the denial of his constitutional rights to a fair trial and to present a defense. U.S. Const. Amends. XIV and VI. As a result, his request for a writ of habeas corpus should be granted.

## <u>CONCLUSION</u>

For the foregoing reasons Mr. Heidgen's request for a writ of habeas corpus should be granted, his conviction should be reversed and a new trial ordered.

Respectfully Submitted,


_____ /s/ Jillian S. Harrington_____
Jillian S. Harrington, Esq.
*Attorney for Petitioner Martin Heidgen*
P.O. Box 6006
Monroe Twp., New Jersey 08831
(718) 490-3235
jbhesq@aol.com

47