UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MARTIN HEIDGEN,

                Petitioner,

        -against-

HAROLD GRAHAM, Superintendent Auburn
Correctional Facility and NYS DOCCS,

                Respondent.
-------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**

15-CV-0819 (LDH)

L<small>A</small>SHANN D<small>E</small>ARCY HALL, United States District Judge:

Petitioner Martin Heidgen moves pursuant to 28 U.S.C. § 2254 to vacate his conviction. (Petition for Writ of Habeas Corpus ("Pet."), ECF No. 1.) Petitioner's claims arise from a judgment of conviction following a jury trial in the Supreme Court of New York State, Nassau County, on two counts of murder in the second degree, three counts of assault in the first degree, and two counts of operating a vehicle while under the influence of alcohol. (Respondent's Affidavit in Opposition ("Resp. Aff.") at 21, ECF No. 10.)

## BACKGROUND

### I. Facts Elicited at Trial

In the late afternoon of July 1, 2005, Petitioner spent several hours in a Manhattan bar with friends where Petitioner consumed at least six 12-ounce bottles of beer. (Trial Transcript ("Tr.") at 1419:7–14, 1420:11–20, 1421:13–19, ECF No. 10.) Later that night, Petitioner attended a friend's party in Merrick, Long Island. (*Id*. at 1460:5–10, 1461:17–18.) He arrived at the party shortly before midnight. (*Id*. at 1461:19–20.) While at the party, Petitioner was observed drinking several alcoholic beverages, dancing, and playing a drinking game. (*Id*. at 1462:19–23, 1463:16–24.) Petitioner was intoxicated although he was not observed stumbling or

1

staggering. (*Id*. at 1463:25–1464:4, 1465:14–20, 1787:14–23.) Petitioner was articulate and did not slur his words when he spoke. (*Id*. at 1477:10–15.) Petitioner remained at the party for between one and a half and two hours and did not say goodbye to anyone before he left. (*Id*. at 1462:8–15, 1789:6–9, 1789:16–18.)

In the early morning of July 2, 2005, Petitioner was driving his pickup truck north in the southbound lanes of the Meadowbrook State Parkway when he collided head-on with a limousine driven by Stanley Rabinowitz who was driving south in the southbound lanes. (Resp. Aff. at ii.) Fifty-nine-year-old Rabinowitz was killed on impact as was one of his passengers, seven-year-old Katherine Flynn, who was decapitated in the collision. (*Id*. at 2.) Rabinowitz's other passengers also suffered grievous injuries. (*Id*. at ii.) In the minutes leading up to and at the time of the crash, a number of witnesses observed Petitioner's pickup truck. (*Id*. at 5.)

**A. Other Drivers**

Elizabeth Serwin was on her way home from work at approximately 2:00 a.m. on July 2, 2005. (Tr. at 1488:22–1489:5.) She was driving a 1994 Toyota Corolla southbound in the center lane of the Meadowbrook Parkway just south of Merrick Road when she noticed a set of headlights from a vehicle headed towards her. (*Id*. at 1489:25–1490:6.) When Serwin realized that the vehicle was driving in the same lane as she, Serwin veered to the right lane and then pulled over onto the shoulder. (*Id.* at 1490:23–1491:1.) As Serwin came to a complete stop on the shoulder, she observed a large pickup truck driving northbound, then beeped her horn three times as the vehicle passed her. (*Id*. at 1491:3–5.) She noticed that two other cars were also pulled over on the shoulder behind her. (*Id*. at 1491:17–18.) As Serwin continued to watch the passing pickup truck, she observed that it remained in the center lane, stayed within its markings, and never weaved or swerved. (*Id.* at 1492:8–1493:2.) Serwin estimated that the pickup truck

was driving seventy to seventy-five miles per hour. (*Id*. at 1494:1.) After less than a minute on the shoulder, Serwin pulled back onto the highway and called 911 to report what she had witnessed. (*Id*. at 1494:2–1495:3.)

Joseph Caruso was heading to his girlfriend's house and was driving south in the southbound center lane on the Meadowbrook Parkway at approximately 2:00 a.m. on July 2, 2005. (*Id.* at 1538:1–7, 1540:15–16.) Caruso was at the Merrick Road overpass when he saw headlights coming towards him from a vehicle in the center lane. (*Id*. at 1539:20–1540:11.) Caruso "drifted" over to the left and the vehicle also moved to the left. (*Id*. at 1540:23–25, 1543:23-24.) Caruso moved back into the center lane and then eventually got into the right lane. (*Id*. at 1540:25–1541:1–5.) Caruso observed the vehicle to be a pickup truck. (*Id*. at 1541:17.) Caruso also observed that the pickup truck never reduced speed and never made any erratic speed changes. (*Id*. at 1544:5–13.) He estimated that the pickup truck was driving between seventy and eighty miles per hour. (*Id*. at 1542:12–17.)

Matthew Sussingham was on his way home driving south in the right lane of the Meadowbrook Parkway on the morning of July 2, 2005, when he observed a pickup truck driving northbound in the center lane of the southbound lanes. (*Id*. at 1690:2–13, 1692:14–22.) The pickup truck maintained a steady speed, did not move into Sussingham's lane, and never veered from its lane as it passed him. (*Id*. at 1694:25–1695:2, 1697:21–1698:7.)

Stephen Weber was on his way home riding his motorcycle in the left northbound lane of the Meadowbrook Parkway around 2:00 a.m. on July 2, 2005. (*Id*. at 1572:6–9.) As he drove on the entrance ramp, he noticed a pickup truck ahead of him on the opposite side of the highway divider, driving northbound in the southbound lanes in the same direction as Weber's motorcycle. (*Id*. at 1577:24–1578:1.) Weber pulled up next to the pickup truck and kept pace

3

with it. (*Id*. at 1581:10–24.) Both Weber and the pickup truck were driving at approximately seventy miles per hour. (*Id*. at 1582:23–1583:9.) Weber lost sight of the pickup truck where bushes began to separate the northbound and the southbound lanes. (*Id*. at 1589:18–20.)

Steed Davidson was on his way home driving south in the center southbound lane of the Meadowbrook Parkway at approximately 2 a.m. on July 2, 2005. (*Id*. at 1717:21–25, 1719:1–1720:20.) He was passed by a limousine which was driving in the left lane. (*Id*. at 1720:22–1721:8.) Davidson estimated that the limousine was driving at about fifty-five to sixty miles per hour, only five miles faster than the speed Davidson was going. (*Id*. at 1721:9–23.) As the limousine passed Davidson, he saw a vehicle in the left lane coming towards the limousine. (*Id*. at 1722:1–1723:9.) Before Davidson could react, the vehicle collided head on with the limousine. (*Id*. at 1723:12–15.) Following the crash, the limousine collided with Davidson's car. (*Id*. at 1726:4–6.)

### B. Limousine Crash Victims

Christopher Tangney, Denise Tangney, their daughter Jennifer Flynn, son-in-law Neil Flynn, and granddaughters Katie Flynn and Grace Flynn were all passengers in the limousine, driven by Rabinowitz. (*Id*. at 390:7–16.) The Tangneys each testified that as the limousine drove on the Meadowbrook Parkway at approximately 2 a.m. on July 2, 2005, they were disturbed to see a light coming from an oncoming vehicle in the distance. (*Id*. at 392:6–15, 419:24–420:2, 420:11–23.) Christopher Tangney testified that he observed a vehicle approaching the limousine in the center lane while the limousine was in the left southbound lane. (*Id*. at 421:14–15.) He stated that shortly before the crash, the pickup truck changed lanes and moved from the center lane to the left lane where the limousine was driving. (*Id*. at 421:15–17.)

As Rabinowitz attempted to move over, Petitioner's pickup truck appeared to move in the same direction and within two seconds the pickup truck crashed into the limousine. (*Id*. at 421:18–23.)

### C. Law Enforcement Officers at the Scene

Freeport Police Officer Christopher Pandolfo was at the scene of the crash and he found Petitioner behind the wheel of his pickup truck with the dashboard "pushed up." (*Id*. at 535:16–19.) Petitioner was initially unresponsive to Officer Pandolfo's questions until Officer Pandolfo grabbed Petitioner by the shoulder to get his attention. (*Id*. at 536:20–537:3.) When Officer Pandolfo asked Petitioner his name and what happened, Petitioner moaned, mumbled, slurred his words, and gave the response: "I don't know where I am. What happened?" (*Id*. at 537:5–6.) Petitioner was conscious, but as Officer Pandolfo testified, Petitioner "was completely out of it" and given his condition, it was "pointless" to respond to Petitioner's question of what happened. (*Id*. at 565:9–18.) Officer Pandolfo also smelled liquor on Petitioner and observed that his eyes were glassy. (*Id*. at 537:7–14.)

Freeport Police Officer Timothy Nolan was also at the scene and assisted with removing Petitioner from the pickup truck after the crash. (*Id*. at 579:4–5.) Officer Nolan and other officers removed Petitioner from the pickup truck, placed him on a backboard, and gave him minor medical attention. (*Id*. at 579:9–12.) While helping to carry Petitioner to an awaiting ambulance, Officer Nolan asked Petitioner if he was okay and whether he was in pain. Petitioner did not respond to any of these questions. (*Id*. at 580:15–18.) Officer Nolan again asked Petitioner if he was okay, and again there was no response. (*Id*. at 580:19–20.) When officers again asked Petitioner his name, Petitioner began to respond by mumbling and severely slurring his words. (*Id*. at 580:20–22.) Petitioner was unintelligible until Officer Nolan knelt down

5

beside Petitioner and could hear Petitioner saying through slurred speech that his name was Marty. (*Id*. at 580:24–581:3.)

New York State Trooper Daniel O'Hare arrived on the crash scene and was informed by another officer that a serious crash had occurred and that there were fatalities involved. (*Id*. at 601:2–4.) Trooper O'Hare was also informed that there was a possible DWI involved so he went to his police cruiser to retrieve a blood kit. (*Id*. at 601:4–12.) Trooper O'Hare left the scene with Petitioner and a medical technician in an ambulance to go to the hospital. (*Id*. at 608:9–13.) In the ambulance, Trooper O'Hare asked Petitioner his name but received no response other than moans and groans. (*Id*. at 609:20–21.) The medical technician also questioned Petitioner but received no response. (*Id*. at 609:24–610:7.)

### D. Police Interrogation

Petitioner was taken to Nassau County Medical Center where he was treated for his injuries and had his blood drawn by a nurse. (*Id*. at 1031:23–25.) New York State Police Investigators Eric Baez and Michael Harris informed Petitioner of his arrest, gave him Miranda warnings, and then interviewed Petitioner. (*Id*. at 1043:6–13, 1109:7–11, 1196:2–6.) Petitioner told the investigators that he had argued with his ex-girlfriend over the phone; his boss owed him a thousand dollars; his grandmother had recently passed away; and he was upset, depressed, and in a "self-destruct mode." (*Id*. at 1199:17–23, 1203:22–24.) Petitioner told the investigators that since he had moved to New York from Arkansas the previous October, things had been going wrong, he had financial problems and "everything he seem[ed] to do was never enough." (*Id*. at 1200:2–4.) Petitioner also stated that he never intended to hurt himself and that he "wouldn't cash out like this. [He] would wait for another hand to be dealt." (*Id*. at 1204:21–1205:2.)

## II.     Jury verdict and sentence

Petitioner was convicted of two counts of murder in the second degree, three counts of assault in the first degree, and two counts of operating a vehicle while under the influence of alcohol on October 17, 2006.  On February 28, 2007, Petitioner was sentenced to eighteen years to life imprisonment for each count of murder, eighteen years' imprisonment and five years' post-release supervision for each count of assault, and one hundred eighty days' incarceration for each count of driving under the influence of alcohol.  The terms run concurrently.  (Resp. Aff. at 21.)

## PROCEDURAL HISTORY

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department.  He presented five issues for review:  (1) whether the prosecution failed, as a matter of law, to prove Petitioner's guilt of crimes involving a depraved indifference to human life beyond a reasonable doubt; (2) whether Petitioner was denied his right to a fair trial as a result of the trial court's decision to permit a DNA test during the course of the trial; (3) whether Petitioner's blood was illegally seized by police and improperly admitted into evidence; (4) whether the trial court erred in precluding the defense from presenting testimony of a police accident reconstructionist; and (5) whether Petitioner's right to a fair trial was violated by the trial court's failure to address certain instances of juror misconduct.  (Petitioner's Memorandum in Support ("Pet. Br.") at 19, ECF No. 2.)  On September 13, 2011, the Appellate Division, Second Department affirmed the decision of the trial court, holding that:  (1) the evidence was legally sufficient to support the Petitioner's convictions of depraved indifference murder in the second degree and assault in the first degree; (2) the trial court properly denied Petitioner's

claims of juror misconduct; and (3) Petitioner's remaining claims were without merit. *See People v. Heidgen*, 87 A.D.3d 1016, 1020–27 (2d Dept. 2011).

Petitioner was granted leave to appeal to the New York Court of Appeals by the Appellate Division, Second Department. *See People v. Heidgen*, 22 N.Y.3d 259, 271 (2013). Petitioner presented the same five issues to the New York Court of Appeals as he had to the Appellate Division, Second Department. On November 21, 2013, the New York Court of Appeals affirmed the decision of the Appellate Division, holding that: (1) there was legally sufficient evidence to support Petitioner's convictions for depraved indifference murder; (2) Petitioner's claim that his blood was drawn without a warrant in violation of the Fourth Amendment to the U.S. Constitution was unpreserved for review; and (3) Petitioner's remaining claims were without merit. (*Id*. at 277, 280.)

On February 17, 2015, Petitioner filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition states the following claims: (1) the prosecution failed to prove Petitioner guilty of crimes of depraved indifference to human life beyond a reasonable doubt; (2) Petitioner was denied his constitutional rights to due process and a fair trial as a result of the trial court's decisions to permit DNA testing in the middle of trial; (3) Petitioner's blood was illegally obtained and improperly admitted into evidence at trial in violation of the Fourth Amendment; and (4) Petitioner's rights to a fair trial and to present a defense was violated when the trial court precluded him from presenting the testimony of a police accident reconstructionist. (Pet. Br. at 1.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody

8

pursuant to a state-court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I. Insufficiency of the Evidence

Petitioner argues that the prosecution's evidence was legally insufficient to establish beyond a reasonable doubt that he acted with the *mens rea* of depraved indifference to human life necessary to prove Petitioner guilty of murder in the second degree and assault in the first degree.

9

Insufficiency claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam). On direct appeal, "a court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." (*Id.*) (internal citation and quotation marks omitted). Where a court is "faced with a record of historical facts that supports conflicting inferences [it] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Collazo v. Duncan*, 126 F. App'x 501, 502 (2d Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Under New York law, murder in the second degree, depraved indifference murder, occurs when "under the circumstances evincing a depraved indifference to human life, the defendant recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused the death of another person." N.Y. Penal Law § 125.25(2). In other words the prosecution must establish the following elements beyond a reasonable doubt: (1) Petitioner caused the death of another; (2) by recklessly engaging in conduct that created a grave risk of death, (3) under circumstances evincing a *mens rea* of depraved indifference. *People v. Feingold*, 7 N.Y.3d 288, 294 (2006).

At trial, in support of its contention that Petitioner acted with depraved indifference, the prosecution argued that Petitioner was suicidal. Petitioner maintains that there was insufficient evidence to support the prosecution's theory. (Pet. Br. at 53–54.) He points to testimony from his friends in which they stated that he was in a good mood, happy, having a good time at a party, laughing, dancing, and socializing with friends throughout the late afternoon and evening before the crash. (Pet. Br. at 54.) There was also testimony that Petitioner was making plans for the upcoming holiday weekend, and had told his friend that he finally obtained the telephone number of a bartender with whom he had been flirting. (*Id*.) He also called a friend from Arkansas to schedule a visit there in the coming weeks. (*Id*. at 54–55.) Petitioner argues that this testimony demonstrates that the prosecution's claim that he was trying to harm himself or others is unsupported by the evidence. (*Id*. at 53–56.)

Petitioner also directs the Court to a letter in evidence that he wrote to a friend while incarcerated, in which he disavowed some of the statements he made to police while he was in the hospital. (*Id*. at 57.) In the letter, he told a friend that he lied to police investigators about being depressed and being in a "self-destruct mode," because he wanted to protect his friends who had hosted the party. (Tr. at 1801:16–18.) He stated that he lied to police about arguing with his ex-girlfriend from Arkansas and made up the story about having financial problems. (*Id*. at 1801:21–25.) The letter also indicated that Petitioner's statement about being in a "self-destruct mode" was not a true expression of how Petitioner felt but rather was a line he borrowed from the movie *Ocean's Eleven*. (*Id*. at 1802:1–6, 1803:16–21.) Testimony from one of the police officers who interrogated him in the hospital indicated that Petitioner told police emphatically that he was not suicidal and did not attempt to harm himself as he drove on the highway in the wrong direction. (*Id*. at 1204:21–1205:2.)

11

A review of the entire record, however, indicates that there was sufficient evidence to support Petitioner's conviction for depraved indifference murder and assault. Evidence was adduced at trial that Petitioner told officers that he was in a "self-destruct mode," he was depressed, he argued with an ex-girlfriend the day before the crash, his boss owed him a thousand dollars, he was drinking heavily, and he felt that nothing he ever did in life was ever enough. (*Id*. at 1199:17–23, 1203:22–24.) Petitioner also left the party he attended before the crash without saying goodbye to anyone. (*Id*. at 1462:8–15.) In addition, the jury heard testimony that while Petitioner drove on the Meadowbrook Parkway in the early morning of July 2, 2005, he drove at a high rate of speed, tracked the headlights of oncoming vehicles, ignored wrong-way signs, and disregarded the fact that many of the signs he passed were backwards. He also ignored a motorcycle that drove alongside him in the northbound lanes. (*Id*. at 1540:23–25, 1543:23–24, 1581:10–24.) Petitioner also drove at a steady speed, did not drive erratically, and was able to stay within lane markers. (*Id*. at 1694:25–1695:2, 1697:21–1698:7.) The jury also heard testimony from Dr. William Closson, who testified as an expert in forensic toxicology. Closson testified that despite Petitioner's blood alcohol level, he would not have been so intoxicated that he would have been totally unaware of his surroundings and unable to respond to stimuli. (*Id*. at 2134:22–2135:7, 2144:9–13.) Friends described him as steady on his feet, able to dance without staggering, and articulate. (*Id.* at 1463:25–1464:4, 1465:14–20, 1787:14–23.)

In the face of this evidence, a rational trier of fact could have concluded that Petitioner was indeed suicidal, and therefore had the requisite *mens rea*. Petitioner's claim is therefore denied.

## II.     Error of State Law

At trial, there was conflicting testimony from several prosecution witnesses concerning the description of the blood kit used to draw Petitioner's blood. As a result, the court conducted an evidentiary hearing outside the presence of the jury. During that hearing, the court heard additional testimony from Trooper O'Hare who testified that he remembered the integrity seals on the blood kit used by the nurse to draw Petitioner's blood to be white. Testimony from multiple other witnesses indicated that the seals were red. (Tr. at 1397:10–11.) Due to the inconsistency of the witness testimony, the court initially ruled that the blood sample taken from Petitioner in the hospital after the crash was inadmissible. The prosecution subsequently made a motion to have Petitioner undergo a DNA test mid-trial to determine the origin of the blood evidence. The court granted the prosecution's motion. (*Id*. at 1448:2–8.) The DNA test confirmed that the blood evidence came from Petitioner. Upon this finding, the court reversed its previous decision to exclude the blood evidence and ruled it admissible. (*Id*. at 2058:15–18, 2060:9–10.) Petitioner contends that the trial court violated his constitutional rights to a fair trial and due process by ordering a DNA test mid-trial.

Petitioner argues that the trial court's order of a DNA test mid-trial was a violation of New York discovery statute Criminal Procedure Law § 240.90(1). The statute states that a prosecutor's application for a DNA test must be made before the commencement of trial: "[a] motion by a prosecutor for discovery shall be made within forty-five days after arraignment, but for good cause shown may be made at any time before commencement of trial." NY CPL § 240.90(1). Further, "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984). It is not the province of a federal court to reexamine state-court determinations on state-law questions. In

13

conducting a habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

To the extent that Petitioner's claim can be construed as a violation of an evidentiary rule, that argument too fails. "[E]rroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a *fundamentally fair* trial.'" *Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) (emphasis in original and internal citations omitted). Therefore, the question before the Court is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. It must have been 'crucial, critical, [and] highly significant.'" *Hamilton v. Lee*, 94 F. Supp. 3d 460, 474–75 (E.D.N.Y. 2015) (internal quotations and citations omitted).

Petitioner argues that the DNA testing mid-trial deprived him of a fundamentally fair trial. Petitioner does not challenge the admissibility of blood alcohol evidence with respect to its conviction of driving under the influence, but that the trial court's order of a DNA test mid-trial was a violation of the discovery statute. The blood alcohol evidence would have been crucial, critical, and highly significant as it related to Petitioner's charges of driving under the influence. Indeed, the prosecution's theory of the case was that he was not so intoxicated that he could not form the requisite *mens rea*.[1] Blood evidence would have only helped defendant's case by undermining the *mens rea* requirement. As such, excluding the evidence would have supported a finding Petitioner acted with depraved indifference. While the trial court's decision to order the

---

[1] Petitioner also argues that he was not so intoxicated.

14

DNA test mid-trial violated the New York discovery statute, this error of state law does not give rise to a cognizable constitutional claim. Conducting the mid-trial DNA test, which resulted in the admission of the blood evidence, was not crucial, critical, or highly significant, and was not sufficiently material to provide the basis for Petitioner's conviction.

### III. Fourth Amendment Violation

Petitioner maintains that the grant of habeas corpus is appropriate in this case because, police violated his Fourth Amendment right to be free from "unreasonable searches and seizures" by obtaining a blood sample from Petitioner without his consent or a warrant. (Pet. Br. at 67.) In opposition, Respondent argues principally that habeas relief for Petitioner's Fourth Amendment claim is precluded under *Stone v. Powell*, 428 U.S. 465 (1976).

In *Stone*, the Supreme Court held that a Fourth Amendment claim cannot be the basis of habeas relief where the petitioner was provided with a full and fair litigation of the Fourth Amendment claim. *See Stone*, 428 U.S. at 481-82. That is, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." As elaborated by the Second Circuit "all that the [Supreme] Court required was that the state [] provide[] the *opportunity* to the state prisoner for a full and fair litigation of the Fourth Amendment claim" *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (noting) (emphasis in original.) Nothing more.

In this case, Petitioner was provided an opportunity to litigate his Fourth Amendment claim. A fact to which, Petitioner does not dispute—nor could he, as the trial court held a pre-trial suppression hearing regarding the admissibility of a blood sample taken from Petitioner by

15

hospital personnel. (Pet. Br. at 67.)[2] Indeed, Petitioner makes no effort to counter Respondent's argument that his Fourth Amendment claim is precluded by *Stone*.[3] In other words, Petitioner fails to present any evidence that the state provided no corrective procedures to redress his Fourth Amendment violation or that he was prevented from using any such corrective measure because of an unconscionable breakdown in the underlying process. Absent any such evidence, the Petitioner's claim is precluded as a matter of law. *See Gates*, 568 F.2d at 839 (finding that a review of Fourth Amendment claims on habeas petition may be undertaken only where: (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process).

## IV. Exclusion of Expert Testimony

Petitioner claims that he was denied his constitutional rights to a fair trial and to present a defense as a result of the trial court's decision to preclude him from presenting the testimony of New York State Police Sergeant Scott Crawford. (Pet. Br. at 84.)

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001) "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). This right protects, among other things, the truth-finding process. However, "[t]he accused does

---

[2] After oral argument and testimony proffered from both sides, the trial court determined that Petitioner's blood was properly drawn and denied Petitioner's motion to suppress. (*Id*. at 70.)
[3] Petitioner devotes much of his argument to disproving the Court of Appeals determination that his Fourth Amendment claim was unpreserved and therefore not adequately exhausted. Even if the Court were to accept Petitioner's argument that the issue of the warrant was rightly preserved, such a finding is insufficient to overcome the prohibition to habeas review under *Stone*.

16

not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible." *Id.* at 410.

"To establish a Sixth Amendment violation, a defendant must demonstrate that he was deprived of the opportunity to present a witness who would have provided testimony that was 'both material and favorable to his defense.'" *Howard v. Walker*, 406 F.3d 114, 132 (2d Cir. 2005) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). Materiality requires that "the omission . . . be evaluated in the context of the entire record." *Id.* (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982)). When considering whether a trial court's exclusion of expert witness testimony violated a criminal defendant's right to Compulsory Process, a two-step analysis is appropriate. *Id.* *First*, we consider the trial court's reasons for excluding the evidence. *Id.* *Second*, we consider the strength of the prosecution's case as a whole. *Id.* (citing *Washington*, 255 F.3d at 59; *Agard v. Portuondo*, 117 F.3d 696, 705–07 (2d Cir. 1997)).

Further, where a defendant has the opportunity to present the very argument that the excluded testimony supports, there is no constitutional violation. *See id.* at 133. The exclusion of expert testimony does not rise to the level of constitutional error where the admission of the testimony would not have created an otherwise non-existent reasonable doubt about the Petitioner's guilt. *Washington*, 255 F.3d at 60.

Sergeant Crawford was directed by his police superiors to reconstruct the collision involving Petitioner. (Tr. at 2242:18–25) (Resp. Aff. at 75.) Sergeant Crawford prepared a report indicating that Petitioner was traveling at forty-five miles per hour at the time of impact. (Pet. Br. at 84.) The trial court, however, refused to certify Sergeant Crawford as an expert witness and permit his testimony on the ground that Sergeant Crawford lacked sufficient

17

expertise to testify as an expert. (*Id*. at 85–86.) The trial court excluded Sergeant Crawford's testimony based on a finding that he was not qualified to opine on post-impact reconstruction and analysis of automobile collisions. Indeed, in response to a question from the prosecutor as to whether he considered himself to be an expert in the "particularized area of head-on collision momentum calculations," Sergeant Crawford responded, "I would say technically I am not an expert. I'm not. I'm not very comfortable with angular momentum overall." (Tr. at 2255:25–2256:5.) Sergeant Crawford also testified that he had not had relevant training in angular head-on collisions since 1996 or 1997. He stated that he had only reconstructed an angular head-on collision once in his career—which was eight years prior to the crash at issue in this case. Sergeant Crawford also stated he had never been qualified to testify as an expert. (*Id*. at 2254:5–7, 2254:17–24, 2256:21–25.) On this record, the trial court's exclusion of Sergeant Crawford as an expert is unassailable.

Further, an examination of the prosecution's case as a whole demonstrates that Sergeant Crawford's testimony, though favorable to Petitioner's defense, was not material. The prosecution called several lay witnesses who testified that Petitioner was driving at a high rate of speed prior to the collision. (Tr. at 1494:1, 1542:12–17.) The Petitioner tracked the headlights of oncoming vehicles who sought to change lanes when confronted by the headlights of Petitioner's pickup truck. (*Id*. at 1540:23–25, 1543:23–24.) With the support of expert testimony from Dr. William Closson and the testimony of Petitioner's friends, the prosecution argued that Petitioner was not so intoxicated that he would not have been able to react to stimuli such as oncoming vehicle headlights, and wrong-way signs. (*Id*. at 1463:25–1464:4, 1465:14–20, 1787:14–23, 2134:22–2135:13.) These facts, established by witness testimony, gave credibility to the prosecution's theory of the case, which is that Petitioner drove with depraved

18

indifference to human life. The prosecution made a compelling case that Petitioner drove at a high speed and with disregard for the harm his actions might cause to others which was strong evidence that Petitioner acted with the *mens rea* of depraved indifference. The presence of Sergeant Crawford's testimony would not have significantly weakened the prosecution's case. This was not a close case. Indeed, the admission of Sergeant Crawford's testimony would not have created an otherwise non-existent reasonable doubt over Petitioner's guilt. Therefore, the exclusion of the testimony did not rise to the level of constitutional error.

Moreover, the trial court qualified an expert who offered testimony which would have been similar to the excluded testimony of Sergeant Crawford. Here, the defense called Steven Schneider, whom the trial court qualified as an expert in accident reconstruction. Schneider testified that Petitioner's pickup truck was moving at thirty-three miles per hour at the time of impact with the limousine. (Tr. at 2311:25–2312:5.) The jury heard testimony from Schneider that Petitioner attempted to slow down at the time of impact. (*Id.*) This testimony supported Petitioner's defense to the crimes involving a *mens rea* of depraved indifference. Schneider's testimony bolstered Petitioner's claim that he did not intend to cause any harm but that he actually intended to avoid serious injury to himself or others. This Court finds that the exclusion of Petitioner's expert, Sergeant Crawford, was not constitutional error because "the defendant was not deprived of the opportunity to make the argument that was supported by the expert's testimony." *See Howard*, 406 F.3d at 133 (citing *Washington*, 255 F.3d at 60).

The petition is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court denies Petitioner's motion for a writ of habeas corpus. Because Petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability will issue. *See* 28 U.S.C. § 2253; *see also Lucidore v. N.Y.*

*State Div. of Parole*, 209 F.3d 107, 112–13 (2d Cir. 2000).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.  *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).  The Clerk of Court is directed to close the case.

Dated: Brooklyn, New York
       January 22, 2019                       SO ORDERED:

                                                                       ____s/ LDH_____

                                                                       LaSHANN DeARCY HALL
                                                                       United States District Judge